# EXHIBIT F

1      UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
2

3    ------------------------------------------------------------
                                    )
     Fair Isaac Corporation,        )  File No. 16-cv-1054(DTS)
4    a Delaware Corporation,        )
                                    )
5            Plaintiff,             )
                                    )
6    v.                             )
                                    )
7    Federal Insurance Company,     )  Courtroom 14W
     an Indiana corporation,        )  Minneapolis, Minnesota
8    and ACE American Insurance     )  Thursday, March 2, 2023
     Company, a Pennsylvania        )  8:47 a.m.
9    Corporation,                   )
                                    )
10           Defendants.            )
                                    )
11   ------------------------------------------------------------

12

13

14        BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16        **(JURY TRIAL PROCEEDINGS - VOLUME IX)**

17

18

19

20

21

22     Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                         *   *   *
24

25

1   <u>APPEARANCES:</u>

2     For Plaintiff:          MERCHANT & GOULD P.C.
                              BY:  ALLEN W. HINDERAKER
3                                  HEATHER J. KLIEBENSTEIN
                                   PAIGE S. STRADLEY
4                                  MICHAEL A. ERBELE
                                   JOSEPH W. DUBIS
5                                  GABRIELLE L. KIEFER
                              150 South Fifth Street, #2200
6                             Minneapolis, Minnesota 55402

7     For Defendants:         FREDRIKSON & BYRON
                              BY:  TERRENCE J. FLEMING
8                                  LEAH C. JANUS
                                   CHRISTOPHER D. PHAM
9                                  RYAN C. YOUNG
                                   PANHIA VANG
10                            200 South Sixth Street, #4000
                              Minneapolis, Minnesota 55402
11
                              O'MELVENY & MYERS LLP
12                            BY:  LEAH GODESKY
                                   ANTON METLITSKY
13                                 DARYN E. RUSH
                                   ROXANA GUIDERO
14                            Times Square Tower
                              7 Times Square
15                            New York, New York 10036

16    Court Reporters:        RENEE A. ROGGE, RMR-CRR
                              KRISTINE MOUSSEAU, CRR-RPR
17                            MARIA V. WEINBECK, RMR-FCRR
                              PAULA RICHTER, RMR-CRR-CRC
18                            United States District Courthouse
                              300 South Fourth Street, Box 1005
19                            Minneapolis, Minnesota 55415

20                                  *   *   *

21

22

23

24

25

1

# I N D E X

2

PAGE

3

**N. WILLIAM PAUL WAID**
     Direct Examination By Mr. Hinderaker                1712
4    Cross Examination By Ms. Godesky                     1747
     Redirect Examination By Mr. Hinderaker               1828

5

**KEVIN HARKIN**
6    Direct Examination By Ms. Janus                      1849
     Cross-Examination By Ms. Kliebenstein                1871

7

**PAMELA LOPATA**
8    Direct Examination By Ms. Godesky                    1906
     Cross-Examination By Mr. Hinderaker                  1917

9

**MICHAEL SAWYER BY DEPOSITION**

10

11

12   PLAINTIFF'S EXHIBITS                                 REC'D
         404A                                             1892
13       1177                                             1875
         1178                                             1875
14       1179                                             1875

15

16   DEFENDANTS' EXHIBITS                                 REC'D
         12                                               1821
         30                                               1800
17       77                                               1756
         172                                              1829
18       276                                              1818
         283                                              1817
19       284                                              1817
         293                                              1817
20       330                                              1810
         343                                              1819
21       356                                              1857

22

23

24

25

```
1       March 2, 2023                        8:47 A.M.

2

3              (In open court without the Jury present.)

4              THE COURT:  Good morning.  Please be seated.

5              All right.  We're on the record outside the

6       presence of the jury.  I understand that we've got an issue

7       with some late-added exhibits to the plaintiff's exhibit

8       list.  I've reviewed the exhibits.

9              Let me ask, first of all, if there is a -- have

10      the parties had a chance to meet and confer and resolve the

11      issue?

12             MR. HINDERAKER:  No, we haven't, Your Honor.

13      They came to us at like 11:30 last night.

14             THE COURT:  Okay.

15             MS. GODESKY:  Your Honor, Mr. Waid is in the

16      courtroom.  Is it possible for him to step out while we're

17      talking about these documents?

18             THE COURT:  Sure.

19             MS. GODESKY:  Thank you.

20             MR. HINDERAKER:  Could I also clarify what we're

21      talking about a little bit from our point of view?

22             THE COURT:  Sure.

23             MR. HINDERAKER:  Both parties have -- you know,

24      there is a court order about when exhibits are to be filed

25      with the Court.  And both parties have been adding to the
```

1    exhibit list as we go along.  That's not why we're raising

2    it with the Court today.  That's not why we are raising

3    this with the Court today.  That's fine.  That's how it

4    works.

5            But Mr. Waid is sequestered.  He is, you know, in

6    the midst of his testimony.  And at 11:30 last night we get

7    more exhibits that clearly are going to be relevant to his

8    examination, and we think the unfairness is the late

9    notice.

10           Now, your order says if an exhibit is not on the

11   exhibit list, it can't be used, save for good cause.  And

12   so just to be precise, it's not modifying the exhibit list

13   in general, but it's a notice so late, when we're unable to

14   even talk to the witness about what are these, I think

15   that's unfair.

16           MS. GODESKY:  Your Honor, may I respond?

17           THE COURT:  Yeah.  Let me just -- okay.  Go

18   ahead.

19           MS. GODESKY:  So, Your Honor, I think what we

20   have done is we have overdisclosed.  Your Honor's order is

21   clear that you do not need to disclose impeachment

22   material.  That's the only reason this will be used.  Quite

23   frankly, I think I could have used it without disclosing it

24   last night, but out of an abundance of caution we put a

25   defendants' stamp on it.  And I'm only going to use it if

 1    it's necessary for impeachment.

 2              THE COURT:  Understood.  You don't have to

 3    disclose impeachment material.  With that caveat, you can

 4    use it for impeachment.  It won't be introduced into

 5    evidence, but you can use it for impeachment, okay?

 6              MS. GODESKY:  That's fine, Your Honor.

 7              THE COURT:  If appropriate, obviously.

 8              MS. GODESKY:  Sure.

 9              THE COURT:  Anything else we need to take up?

10              MS. GODESKY:  Not from us.

11              MR. HINDERAKER:  No, Your Honor.

12              THE COURT:  Do we know if they're ready?

13              MS. KLIEBENSTEIN:  Hold on.  Yes, Your Honor.

14              We have, we have two issues, one minor one, a

15    little bit more major.

16              So the more major one, we will be filing a short

17    two-page letter brief regarding Mr. Bakewell, their damages

18    expert.  He was disclosed to go on the stand tomorrow.  I

19    had imagined he was going to go on next week and was going

20    to give the Court time to look at this.

21              Mr. Bakewell -- the damages period here is 2016

22    to 2020.  His last supplementation on cost numbers was

23    2018.  So he has never, not to my knowledge -- and if I

24    missed a supplemental report, I stand corrected, but even

25    though he has had notice of the new numbers from

1    Interrogatory Number 17 for three, going on four years,

2    there is no new cost data for 2019 and 2020.  And so we are

3    going to move to exclude any deduction of costs from 2019

4    and 2020.

5              The other issue that we have, we have a

6    demonstrative that's going to come in with Mr. Harkin, and

7    we have an issue with two of the pages.  Mr. Harkin is a

8    CFO.  Several of the pages relate to annual revenues,

9    things like that.  That's fine.  But we also see that

10   circle diagram again, and we're also seeing the pillars

11   again.  And a demonstrative, Your Honor, is supposed to be

12   prepared by the witness for their testimony.

13             And I think given that we have seen these in the

14   opening and we have seen them with one witness at least,

15   they're going to keep coming in just to repetitively

16   ingrain these ideas with the jury from the opening, but

17   that's not what a demonstrative is for.  And it's clear

18   that given he is the CFO, that circle diagram isn't within

19   the scope.  You know what I mean?

20             THE COURT:  I am very aware of which diagram --

21             MS. KLIEBENSTEIN:  Yes.  So that one --

22             COURT REPORTER:  Excuse me.  One at a time.

23             MS. KLIEBENSTEIN:  I apologize.

24             So those are the two issues we have with the

25   Harkin demonstrative, and I think one of them might come up

```
 1    again with Ms. Lopata, but I'll let Mr. Hinderaker deal
 2    with that.
 3              THE COURT:  Okay.  As to -- first of all, on the
 4    Bakewell issues, thank you for raising that now.
 5              As to Harkin, I don't know that the demonstrative
 6    has to be prepared by the witness.  I'm not sure that
 7    it's -- it has been used already.  I'm not sure it's unfair
 8    to continue using it, but let's revisit that maybe briefly
 9    over the lunch hour, and you can give me a little bit more
10    on that question.
11              MS. KLIEBENSTEIN:  Okay.
12              THE COURT:  Okay?
13              MS. KLIEBENSTEIN:  Thank you.
14              THE COURT:  Are you all ready to proceed?
15              MS. GODESKY:  Yes, Your Honor.
16              THE COURT:  For heaven's sake, seven minutes
17    early?
18              MS. GODESKY:  Yes.
19              THE COURT:  Okay.
20                        (Short break)
21              THE COURT:  I think we're waiting on a couple of
22    jurors.
23              You can sit down, Mr. Waid.
24              They cannot go over today past 5:00.  They're
25    willing to do 30-minute lunch again.  Do we want to do 30
```

1    minutes?  But they would like to know in advance.  Are we

2    willing to do that?

3              MS. GODESKY:  I think generally, Your Honor,

4    unless we're going to have like 15 minutes of argument

5    about the demonstratives, that might get a little tight.

6              THE COURT:  Fair point.

7              MS. GODESKY:  Maybe 45 minutes.

8              THE COURT:  Yeah.  Okay.  We'll figure it out.

9    Tell them 30 to 45 minutes for now.  Go ahead.

10             THE CLERK:  Okay.

11             THE COURT:  And we will be back here at, straight

12   up 9:00.  We will be ready to go.

13                        **(Recess taken.)**

14

15             THE CLERK:  All rise for the jury.

16                        **(Jury enters.)**

17

18           **(In open court with the Jury present.)**

19             THE COURT:  Be seated.  Mr. Hinderaker, you may

20   proceed.

21             MR. HINDERAKER:  Thank you.

22                   **(N. WILLIAM PAUL WAID)**

23                    **DIRECT EXAMINATION**

24   BY MR. HINDERAKER:

25   Q.  Good morning.

1    A.  Good morning.

2    Q.  We finished yesterday having walked through the pricing

3    guideline, and now I would like to start with the next

4    component of pricing.  And if you would go to the Exhibit

5    0616, please?

6            And, Mr. Mayleben, would you go to slide 2,

7    please.

8            Do you have it there?

9    A.  It's a blank page.

10   Q.  Well, that's not so helpful.  Here is the rest of it.

11   A.  Thank you.

12   Q.  This exhibit -- it's also same the document as 1090,

13   for the record for what it's worth, but this exhibit

14   slide --

15           Not that slide, please.  Slide 3.

16           This exhibit is now on the screen.  And the

17   document that you have in front of you is, what, three

18   pages, correct?

19   A.  Correct.

20   Q.  Yeah.  So the purpose of having this up on the screen

21   is to go through each of the pages and ask you to explain

22   them.

23           But before we go to the pages, if you would put,

24   give us the context of how this document, sizing matrix and

25   the other two pages, relate to what we were speaking about

```
 1     yesterday in FICO's standard methodology to derive a fee.

 2              MS. GODESKY:  Mr. Hinderaker, I'm sorry to

 3     interrupt, but I don't have a copy of this, either.  I just

 4     have the blank page.

 5              MR. HINDERAKER:  Well, that's not good.

 6              THE COURT:  If it helps, if it helps, we can

 7     switch to the document camera.

 8              MR. HINDERAKER:  1090.

 9              MS. GODESKY:  Okay.

10              THE COURT:  Got it?

11              MR. HINDERAKER:  1090 is a better copy.

12              THE COURT:  Okay.

13     BY MR. HINDERAKER:

14     Q.  Yes.  So maybe we'll get started yet.

15              Explain for us, if you will, how this document

16     relates to the guidelines that we went through yesterday.

17     A.  So we talked about application-based pricing.  In order

18     to come up with a standard way of actually having our sales

19     force and our clients understand how we size applications

20     so that they understand what's a small, what's a medium,

21     and what's a large, soon after 2003 when the sales force

22     started growing for this product, we created this chart.

23     And this chart actually shows a billion logics and

24     progressions in order for anybody to size what an

25     application is, small, medium or large.
```

1   Q.  All right.  And now the page that's on the screen,

2   application sizing matrix, if you would describe how to

3   interpret this and how to use it?

4   A.  Sure.  Let's, let's just start with an overview of how

5   to read this first, and then we can double click into some

6   specifics.

7          You will see across the top where it says, small,

8   medium, large and very large.  That corresponds to the

9   application size.  Again, the intent here is just to figure

10  out whether or not if an application is small, medium,

11  large or very large.

12         If you look along the left side of the document

13  from top to bottom, there is ████████████ that actually go

14  into determining if it's small, medium, large or very

15  large.  You must meet the minimum criteria in each column.

16  Essentially what that's saying there, that first line, is

17  that if, if all the criteria does not fit in a medium, you

18  cannot be a medium.  If some of the criteria spills over

19  into a large, you must be a large.  If it spills over into

20  a very large, you must be a very large.

21         The first criteria across the top is what we're

22  referring to as ██████.  And you will see the very first

23  segment of █████ here under small is ██████████

24  ████████████████████████████████████.  That's the

25  first characteristic.

1    The second characteristic is the ███████████

2    █████████████████████████████████████████████

3    █████████████████████████████████████████████

4    ████████████

5    After that, it says "and."  So they're connected,

6    meaning they both must be true.  You have ███████████

7    ███████████████████ that the rules are actually applied

8    to.  So if you have ██████████████, then you're a small.

9    If you have █, then you need to move to a medium.

10   After that it says, "and/or."  The reason it says

11   "and/or" is because if we have batch, the following

12   conditions must also be true.  If you don't have batch,

13   then you're just fine with the real-time decisions.  If you

14   don't have real time, but you only have batch, then that's

15   just the batch conditions that apply.  That's why it says

16   "and/or."

17   If you go down to the batch, it talks about the

18   batch in several dimensions.  The first dimension is the

19   █████████████████████████████████████████████

20   ██████████████████████

21   Just to reiterate what was discussed earlier, but

22   the difference between real-time and batch is if I'm

23   waiting to do something, like I'm online shopping, that's

24   real-time.  You're doing that at that point in time.  An

25   example of batch would be, you fill out your grocery

1   deliveries and you ship it off.  Somebody picks that up on

2   the other side and takes care of it.  It doesn't happen at

3   the time that you click the button and all of a sudden your

4   groceries are knocking on the door.  That's the difference

5   between real-time and batch.

6            So in the batch case, it's ███████████████

7   ██████████████████████████████████████████████████████

8   ██████████████████     Why is that relevant?  It's

9   relevant because if I have 10 million records that I need

10  to process and I take all day to do that, I need lots

11  compute resource.  If I have to process those 10 million

12  records in 15 minutes and get it done, I need a lot of

13  compute.  And that's sort of a measure of the use of the

14  software during that period of time.

15           The next criteria below that is ███████████████

16  █████████████████████████████████████████

17  ████████████████████████████████████████

18  ██████████████████████████████████████████████

19  ████████████████████████████████████████

20           Underneath that is actually if it's known, right,

21  ██████████████████████████████     Very frequently that's not

22  known, but it's another measure of sizing relative to the

23  application size.  You will see ████████████████████████████

24  ████████████████████████████████     necessary for Blaze to

25  do its work.  Same concept as the batch.  A lot of records

```
1    in a short period of time, there is a lot of work to be
2    done in a short period of time.
3            Am I going too fast?
4    Q.  Well, thank you for --
5    A.  I just realized that.  I'm sorry.
6            The last one here is ███████████████████████
7    You might have heard that our RMA for business users is --
8    it's not limited.  So you have to, you have to pay for the
9    development seat, but you don't have to pay for the RMA or
10   the business user interfaces. ████████████████████████
11   ██████████████████████████████████████████████████████
12   ██████████████████████████████████
13       █████████████████████████████████████████████████
14   ███████████████████████████████  That's eight.  You might
15   ask, Where is the ninth?  It's the bottom row down here
16   where there is ███████████████████████████████████████
17   ██████████████████████████████████████████████████████
18   █████████████████████████████████████████████
19   █████████████████████████████████████████████
20   ████████████████████████████████████████████████████████
21   ██████████████████████████
22       ██████████████████████████████████████████
23   ██████████████████  These particular types of hardware
24   are very high-end, expensive.  They process very quickly
25   and, therefore, to measure the value you're getting out of
```

1    the software.

2    Q.  Okay.  Thank you.

3            Now let's go to the next page of this

4    Exhibit 1090.  Now we have -- well, as we all see, there is

5    some dollars under the small, medium, large and very large

6    categories.

7            Would you explain how this applies to the

8    standard FICO methodology?

9    A.  Yeah.  The 2003 pricing that you saw is reflective of

10   what's here with one exception.  The large size pricing at

11   the time of this publication increased from ████████    We

12   discovered early on that we could get more value out of a

13   large for the use of Blaze Advisor, so we did increase that

14   price at the time of this publication.

15           What happens after this at this period of time,

16   we, we have a quoting process that we follow.  We

17   actually -- in order to explain this pricing, we created a

18   fancy spreadsheet within Excel that takes all these very

19   complicated number of things and puts them in line items so

20   that you can see exactly how the pricing comes out.  And

21   it's transparent.  It shows you all of the pricing, but you

22   just check which one you want and it fills in the total on

23   the left side.

24           This pricing sheet, the sizing grid, and this

25   pricing grid that you see here, this actually gets attached

```
1    to the back of that spreadsheet activity for salespeople.

2    It does not go to the client, but it is part of the

3    workbook that the salespeople use, and this actually

4    reflects the pricing.  So you will see here that there is

5    small, medium, large and very large, and you will see that

6    reflective in the perpetual pricing license of ███████

7    Underneath that you will see the high performance, which is

8    the compiled sequential option.  If you end up buying that,

9    there is an incremental fee for that.

10            And then underneath that, if you remember from

11   yesterday, there is the development seat costs, and they

12   are in those packs of ████████████

13   Q.  Why do you price the development seats in these pack

14   levels?

15   A.  It's -- if you, if you look at the unit price that was

16   in 2003, it was ██████ per seat.  So if you take █ seats

17   times ████, it's ██████.  We're offering here for ██████

18   If you take █ times █, it's ██████  We're offering it

19   for ██.  We're just giving it a little incentive for the

20   client to buy a little bit more when they're buying.

21            So if they're on the edge and they need, you

22   know, ████ seats, maybe they will just say, ah, I want to

23   go to ████  It's not that big of a jump to go from ██ to

24   ██ if they think they're going to need them.  That's the

25   purpose of it.
```

```
 1    Q.  Okay.  And this -- just to make clarification, at least
 2    for me -- the small, medium, large and very large pricing
 3    that's on this document and this page, is that also the
 4    standard pricing as of today -- or as of 2016?
 5    A.  We have not changed it.  It still is the standard
 6    pricing.  There were several proposals to change it.  We
 7    decided not to.  It is still the pricing today.
 8    Q.  Then with respect to -- at the bottom it says,
 9    "Deployment license annual maintenance and support."  It's
10    calculated at ███████████ of net license amount annually.
11         I guess I have two questions.  One is to explain
12    how that's priced against the license fee -- it might be
13    self-explanatory, but if you could detail that out -- and
14    then whether ███████████ is the percentage that was used in
15    2016.
16    A.  Yeah.  So, first of all, the calculation -- let's just
17    say that we priced a small application.  That's what the
18    client was going to buy.  There was no discount.  So
19    they're paying ███████ for it.
20         The maintenance is calculated on top of that fee
21    as ███████ of that fee.  So ██████ times ███████████
22    would be roughly ██████.  ██████████ paid annually would be
23    that maintenance and support.  That maintenance and support
24    is what gives our clients the ability to download new
25    versions and call us or e-mail us for help, and it's paid
```

1    annually.  The ███████████ this document was created

2    shortly after 2003.  ██████████ was changed in February of

3    2015 to be ███████████ across all FICO products, and it

4    became mandatory.

5    Q.  The licensing of maintenance and support became

6    mandatory?

7    A.  Yes.

8    Q.  Okay.

9    A.  The support became mandatory, yes.

10   Q.  And then the fee was standardized across all products

11   at ██████████

12   A. ████████████

13   Q.  Let's go to -- let's go to this page of the

14   Exhibit 1090.  Sizing definitions.  If you would go through

15   this with us, please.

16   A.  Yeah.  This is referring back to the words that were

17   used on that sizing grid.  In order to avoid ambiguity or

18   uncertainty about how to read that sizing grid, we provided

19   definitions of terms.  These terms are actually used in

20   that sizing grid, so you need to understand what they mean

21   in order to use the grid.  So, for example, ███████████, it's

22   the generalized extent of █████████████████████████

23   ███████████████████████████████████████████

24   ████████████████, sort of --

25           If the application is going to be used over here

```
 1    in a ████████████████████████████████, say, ████████
 2    ████    that actually brings the scope of use ████████    If
 3    that particular application is used to cross just ██████
 4    ████████, say, D&O insurance, then it gets a little bit
 5    broader.  Right?  If it's used ██████████████████████████
 6    ████████, like a ████████████████, then it gets broader.
 7    Eventually if you have applications used across ████
 8    ██████████    meaning it's used for purposes of ██████████
 9    ██████████████████████████████    then it would be an
10    █████████████████████    That's the definition there.
11              The rest of these terms really refer back to sort
12    of like rule transaction, we mentioned that, any indication
13    of the Blaze Advisor rules server, independent of the
14    number of rules.  Okay?
15              Number of ██████████████████.  The total
16    number of ██████████████████ that will have access to
17    the application, which is -- which invokes Blaze Advisor
18    rules server.  So it's not about who is using Blaze
19    Advisor; it's about who is using the application in which
20    Blaze is embedded.  These are sort of the definitions of
21    the terms that are used in the sizing grid.
22    Q.  Thank you.  And now with the sizing, I would like to
23    turn to what's in evidence as Exhibit 517.  We can go --
24    oops.  Okay?
25    A.  Don't make this easy.  Okay.
```

1    Q.  All right.  The screen is on, too.

2              So we saw this with Mr. Ghislanzoni's testimony,

3    and it has information regarding the use of Blaze Advisor.

4              Is this, is this kind of information relevant to

5    you as you -- using your standard methodology for pricing

6    of Blaze Advisor?

7    A.  Yes.  It includes several useful pieces of information.

8    Q.  Okay.

9    A.  It specifically highlights here the ████████████ in the

10   first column.  And as you move across, it's ████████████

11   ████████████████████████████████████████████████████████

12   ██████████   These are the parameters that are in the sizing

13   grid.

14   Q.  I would like to -- what I'm going to ask you now to do

15   is -- we will use the slides, but ask you now to do is to

16   take that pricing matrix, apply it to the information

17   regarding Blaze Advisor's use at the defendants, in terms

18   of going through this pricing analysis.  So explain,

19   explain how that, explain, explain the process, the

20   methodology for pricing, and we will just go through the

21   information on the slide.

22   A.  Well, what we would do is, we would actually pull off

23   the information from this spreadsheet for each of the

24   individual applications identified.  I think what is

25   indicated here is the applications that we would target to

```
 1      pull off --
 2      Q.  Okay.
 3      A.  -- listed from CSI Express, DecisionPoint, Automated
 4      Renewal Process, CUW, IRMA, TAPS, Premium Booking,
 5      Evolution, Adapt/ABL and EZER.
 6              We would also look at the individual countries
 7      that are on here.  You will see that most of them are U. S.
 8      There is one that is U. S. and Canada.  There is one that
 9      is Europe and Australia and then Canada and just Europe.
10      That's where we would start.
11      Q.  Let's go to this step.
12      A.  There is two reasons to pull this information off here,
13      ███████████████████████████.  First of all, ████████████████
14      ████████████████████████████ is one of the sizing
15      parameters in the sizing grid, as we saw.
16              The other reason for pulling ████████████████████
17      ██  is -- and that comes back to the development seats.  So
18      they are priced separately from the small, medium, large,
19      so we will need to know how many developing seats will be
20      needed here in order to perform a pricing exercise.
21              You will see that there is ██████████████ for CSI
22      Express.  It's a little unclear here.  There is ███████████
23      for DecisionPoint.  There appears to be four separate sort
24      of uses of DecisionPoint here broken down.  We will just
25      assume that it's ██████ because we don't really have clarity
```

1    around that.  Automated Renewal Process, here again, we'll

2    assume it's ██████  CUW, ████ and so on.

3    Q.  And the next column over, how does that apply to the

4    methodology?

5    A.  This is also in the sizing grid, if you recall.  The

6    ███████████████████ is a parameter that actually determines the

7    size of the application.

8    Q.  Okay.  Let's go to the second page of 517.

9    A.  So you will see at the top here it says real-time.

10   And, remember, there is a real-time and batch and real-time

11   or batch, one of the two.

12           In this particular case, we're, we're getting a

13   ██████████████████████████████████████████████████████████

14   ████████  We're going to have to do a little math here

15   because the rule sizing grid says ███████████.  So we're going

16   to have to take this number and do some math to get to the

17   ██████████

18           Generally speaking, when we get numbers ████████

19   ██████████ because this is -- they operate 7 by 24, but the

20   majority of their -- in sort of these worlds in banking and

21   insurance, they operate on ██████████████████  So we generally

22   ██████████████  as the basis to take this number of ███████████████

23   █████████████████████████████████████████████████████████████████

24   ████████████████████

25           And you will see here that, if you link back,

1    you'll see that DecisionPoint has a █████████████

2    ████████  and so does CUW.

3    Q.  This column, how does that relate?

4    A.  So this is where the batch comes in.  You'll see that

5    this is ███████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████

9    Q.  Okay.  So those are the columns that we've looked at in

10   terms of 517 as relates to your methodology per pricing

11   with the matrix and the sizing.

12             So next go focus in on -- I think you've talked

13   about each of these now.

14   A.  Yes.

15   Q.  So let's apply them, and we'll start off with CSI

16   Express.  I think I'm going to ask you to go through the

17   methodology in detail with CSI Express, and then we'll go

18   through the rest of them without every -- touching base on

19   every step.

20             Here we have CSI Express against your sizing

21   matrix.  And why does -- well, explain, explain that

22   decision.

23   A.  Yes.  CSI Express is actually for the specialty lines

24   of business, so there is multiple lines of business in

25   that, but it is in the division of the specialty line.  So

N. WILLIAM PAUL WAID  -  DIRECT  (Continued)



that's

a large.

A.  So you will see that the

rules.  And if you go to the large, you're capped at

Since it's more, you have to move to the next

category, which becomes            .  That actually puts it

into a very large at this point in time.

Q.

A.  So, as I mentioned, you need to do a little math here.

So a relatively small use in batch

world.

Q.  So overall in the pricing matrix, what's the size that

1   you price CSI Express at?

2   A.  Well, it would be sized at a very large.

3   Q.  And we would go back to the earlier sizing sheet that

4   we saw where it puts the price at each of the levels.

5   A.  Yes.  When you take this very large, you can then go to

6   that pricing sheet and figure out what that standard price

7   would be.

8   Q.  Have you done this analysis, then, on each of the, on

9   each of the applications?

10  A.  Yes, that analysis was done across all the information

11  that we had available.

12  Q.  So this is Automated Renewal Processing.  Just to

13  confirm, the process that you used, the steps that you

14  took, were like what you've just described for CSI Express?

15  A.  For each and every one of them, reading the parameters

16  at the top, finding the locations, circling which one it

17  actually fits to, and then whatever the largest one is,

18  that becomes the size.  In this case, Automated Renewal

19  Process is a large.

20  Q.  Okay.  With respect to DecisionPoint, using the matrix,

21  the decision was --

22  A.  Very large.

23  Q.  The next application we have here, Profitability

24  Indicator.  And what did the pricing matrix say with

25  respect to that?

 1    A.  It's a very large.

 2    Q.  CUW?

 3    A.  Again, very large.

 4    Q.  Premium Booking?

 5    A.  Very large.

 6    Q.  TAPS?

 7    A.  This would be a small.

 8    Q.  Applying the same criteria?

 9    A.  Yes.

10    Q.  IRMA?

11    A.  This would be a large.

12    Q.  CIS Claims linked to CSI Express?

13    A.  This would be a very large.

14    Q.  DecisionPoint -- we did DecisionPoint.  This is

15    Cornerstone.  Similar?

16    A.  It is similar to what is inside of DecisionPoint.  We

17    are a little uncertain from the information we have here,

18    so we took the more conservative route of actually just

19    calling it a medium, because we didn't have enough

20    information to really justify that it's a large or a very

21    large, but what we did know about it, we knew it was at

22    least a medium.

23    Q.  Evolution.

24    A.  This is a very large.

25    Q.  This is the Canadian Evolution.  Broker Site, also in

1    Canada.

2    A.  Yes.  This was linked to Evolution and, therefore, a

3    very large.

4    Q.  Let's go to Adapt-ABL.

5    A.  That came out to a large.

6    Q.  Now Evolution in Australia?

7    A.  And that came out to a small.  The reason we went with

8    a small is because it was a pilot application.  It never

9    went into full production use.

10   Q.  EZER?

11   A.  That's a large.

12   Q.  And then Exari that was linked to EZER?

13   A.  That came out to a large.

14   Q.  So we've sized these applications.  Now standard

15   application pricing for FICO, you would apply those dollar

16   amounts to each of the applications.  Small would be at

17   that level, medium, large and very large, as you've

18   explained.

19           Would you explain the difference, please, between

20   the numbers that you have for perpetual license and the

21   numbers that you have for annual?

22   A.  So our pricing practices and policies around annual, if

23   you recall from yesterday where you actually have a period

24   of time that you're licensing the software, is to take the

25   perpetual license and calculate the annual fee from the

N. WILLIAM PAUL MAID - DIRECT (Continued)

```
 1    perpetual license.  So we always start with the perpetual
 2    license fee.  The conversion of that perpetual license to
 3    an annual license is a multiplier of ▊▊▊
 4         So you take a small at ▊▊▊▊ perpetual.  You
 5    multiply that by ▊▊▊ and you come up with ▊▊▊▊ per
 6    year.  If you take the medium and you multiply that by ▊▊▊
 7    you come up with ▊▊▊▊ per year.  The large, it's ▊▊▊▊
 8    times ▊▊ you end up at ▊▊▊▊  The very large at ▊▊
 9    ▊▊▊▊ times ▊▊, and you end up with ▊▊▊▊ per year.
10    Those are the license fees annually.
11         Maintenance is on top of that, which is ▊▊
12    ▊▊▊▊  So for a small, your maintenance is ▊▊▊▊  For
13    a medium, it's ▊▊▊▊  For a large, it's ▊▊▊▊  For a
14    very large, it's ▊▊▊▊
15         You add that annual license fee and the annual
16    maintenance fee, and you end up with the annual fee that
17    you pay for a small, medium and large.  The small is
18    ▊▊▊▊  The medium is ▊▊▊▊.  The large is ▊▊ -- I'm
19    sorry --▊▊▊▊.  And the very large is ▊▊▊▊ per year.
20    Q.  And now that was with respect to deployment license?
21    A.  That is the deployment fees, yes.
22    Q.  Okay.  Separate from that, do you charge for the
23    development?
24    A.  Correct.  That would be the lower chart.
25    Q.  And if you would go through that, please.
```

1    A.  So rather than take you through the individual math as

2    I did before, if we look across the ██████████████████████

3    ████████████████ the annual fee for the ██████████ calculates to

4    ██████████ per year.  The ██████████ calculates to ██████████ per

5    year.  The ██████████ calculates to ██████████ per year, and the

6    ██████████ calculates to ██████████ per year.

7    Q.  And the conversion between perpetual and annual in this

8    instance is, as well, is the ██████████?

9    A.  Yes.  It's the same process.  Perpetual license times

10   ████   Then on top of that license fee, you add ████████████

11   maintenance.

12   Q.  Well let's, let's see what that looks like.  We're just

13   going to assume a portfolio of applications like what we

14   just described and look at what that, what that would be

15   standard methodology on an annual fee basis.

16         And does this represent the result of that?

17   A.  So, yeah, there is a number of applications listed I

18   see here on the left, which represents the application size

19   to very large all the way down to small.  The annual

20   deployment fee would be coming off of that previous chart

21   we just looked at.  If it's a large, small, medium, that

22   would be where you pull that number from.  The multi

23   platform is not something we've discussed yet.

24   Q.  That's true.

25   A.  So you might remember that in the pricing grid, there

1   is this concept of Java and .NET.  It's possible to have

2   two or three different platforms.  So the way our pricing

3   works is you take the deployment fee that you would look up

4   as our standard pricing, and you take ██████████ of that if

5   you have a second platform.  So if you have Java and .NET,

6   you take the original fee. ████████████ of that, that's the

7   second platform.

8           So as represented here is two multi platforms,

9   where the fee for the second platform is ███████████ of the

10  deployment fee.  And then you see a various number sets of

11  development seats, and those development seats are pulled

12  from the packs that you saw on the previous chart.  And

13  then you just simply do the math and add them up, and you

14  come up with an annual fee for these various configurations

15  of large, very large, medium, small and the associated

16  development seats.

17          In this particular case, you can see those annual

18  fees listed in the far right column.

19  Q.  So the math on this one, $8,690,673 per year?

20  A.  Yes, that would be the total per year.

21  Q.  Does FICO as a standard matter license, on a fixed

22  term, license for less than a year?

23  A.  No, we do not license for less than a year.  We license

24  for ████████████████████████ years.  The most common

25  is ██████ years.

1   Q.  And with the, with the multi-year annual -- with the
2   multi-year term license, does FICO protect itself at all
3   with respect to inflation?
4   A.  We do.  We generally apply CPI in our contracts.  So
5   we -- as you've seen since 2003, we haven't really changed
6   our pricing from that application size, barring that one
7   large from ██████████  That was the only change.  But, you
8   know, things do get more expensive, as we found out very
9   recently in our economy.
10          CPI is an index that's commonly known, consumer
11  price index, and it's used to allow us to go back every
12  year and increase our prices for variable things like, for
13  example, annual fees or maintenance and service.
14  Q.  Was that -- was any consideration given to that in
15  putting together this example of pricing?
16  A.  No, because I'm actually not talking about a contract
17  here.  I'm talking about our standard pricing.  This is
18  just our standard pricing.  So this is for these individual
19  configurations, for these number of development seats, this
20  is what those annual fees would be.
21          I haven't actually put them into a term yet.  I
22  don't know if it's one year, two year, three year or five
23  year.  But eventually if they end up in a contract, they
24  would have a term underneath it that says that it's subject
25  to CPI or consumer price index increases.

1    Q.  Let's look at the next slide that assumes some varying

2    terms, varying years, number of years of fixed term.

3            I take it, as this slide, we start with the

4    annual fees that we just looked at.  You've displayed an

5    array of years on this slide?

6    A.  Yes.  It would be helpful if I could just see the

7    previous slide briefly.

8    Q.  Sure.

9    A.  Okay.  Thank you.

10           Yes, it appears these annual fees are carried

11   forward from the previous calculation.  So these would be

12   the fees that would come out from our standard pricing on a

13   yearly basis, an annual basis.  And this exhibit is

14   demonstrating various years from, anywhere from one year or

15   two, four, five, seven and ten years.

16           Essentially for standard pricing you would just

17   simply, you know, take the annual fee times the years and

18   get to your projected total amount of fee that you would

19   pay over that period of time.  Of course, there is no CPI

20   applied to this.  This is just straight math to the years

21   and the annual price.

22   Q.  So with this, these assumptions, this array of

23   possibilities, the math simply is standard annual fee for

24   the fixed terms that we're assuming here, 49,714,705?

25   A.  For these fixed years, yes, that's correct.

1    Q.  Now, all of this pricing that we have been talking

2    about from your methodology is annual fees on an

3    application basis.

4    A.  Correct.

5    Q.  Now, FICO does also have a methodology that we saw

6    yesterday in terms of pricing on a fixed term basis, but

7    building from enterprise pricing parameters.  Have I said

8    that correctly?

9    A.  I'm not sure I understand the question.

10   Q.  I haven't said it so well.

11         As a standard matter, when presented with a

12   contract with a fixed term, does FICO approach the pricing

13   of that contract on an application annual basis, as we

14   discussed?  Will FICO approach that process assuming an

15   enterprise construct?

16   A.  I have never seen us approach an annual on an

17   enterprise license.

18   Q.  Is there a business reason for that?  Why?

19   A.  It's more around sort of the history of where our

20   licensing has evolved to.  Early on in the life of Blaze

21   Advisor, we sold a lot of perpetual licenses.  That's what

22   the market demanded.  We were interested in getting the

23   revenues that the larger amounts that came with perpetual

24   licenses upfront.  As time went on, we became less

25   interested in that and the market became less interested in

1    buying that way, so it shifted to term-based licensing.

2            We still have perpetual licensing.  We still have

3    annual or term-based licensing, but most of our licensing

4    today is annual.  In 2016 it was a mixed bag, and most of

5    it was still perpetual moving to term, but it was moving

6    and it was moving aggressively, but we have never actually

7    taken an enterprise license and actually made that annual.

8    At least to my recollection, unless I'm missing something,

9    I don't think it's ever been done.

10   Q.  Okay.  Well, with that background, I nevertheless would

11   just like to go through the exercise --

12   A.  Okay.

13   Q.  -- a hypothetical, just assuming you would change --

14   A.  If we did it, you want to talk about the process.

15   Q.  Yeah, I want to talk about the process.

16            So let's go to this slide.

17            Standard Blaze Advisor annual ELA pricing.  And

18   annual because we're dealing with a fixed term.  ELA

19   pricing means Enterprise License Agreement, correct?

20   A.  That's what it stands for, Enterprise Licensing

21   Agreement, yes.

22   Q.  So let's start, and just showing the exercise, this

23   slide is assuming a 35-billion-dollar enterprise.  With

24   that assumption in place, would you explain this process

25   for us?

1    A.   Okay.  So assuming it's a 35-billion-dollar

2    organization and it's for the entire organization, all 35

3    billion, not for a piece of it, but the whole thing, the

4    license fees are broken down into the deployment perpetual

5    fee, the multi platform that we discussed earlier, if you

6    have multiple platforms, perpetual fee and then the

7    development license perpetual fee.

8         So for 35 billion -- I'm not going to pull up my

9    price sheet, I can, but I'm not going to pull it up -- we

10   would go to the price grid that you saw and look for 35

11   billion and extrapolate that off of that.  It comes out to

12   about ██████████ dollars for that perpetual license.  We

13   would take ██████████ of that to get to the multi platform.

14   That would be ██████████.

15        The deployment license fees are actually a little

16   more complicated because we have four separate countries

17   here.  That means that you would need to get unlimited

18   development seats for each of the four countries.  So

19   that's, starting at a minimum of ██████ per country, times

20   the four countries, is ██████████████ for that fee.

21        But you also have two of them that are multi

22   platform.  Typically, we would uplift that if it's

23   unlimited.  If it's not unlimited, we require you to buy

24   both.  If we have three .NET and three Java, you got to buy

25   three and three, six total.  On the unlimited case, we

1    would actually just take ███████████ of that fee and uplift

2    for that use, in this case two.  That would come out to

3    ████████████.  So your perpetual fees would be $10,740,000.

4    That's the standard price.

5    Q.  Can you translate that into an annual?

6    A.  Yes.  So to get that into an annual, cut myself, ████

7    times that 10,740,000.  Your license fee would be

8    ██████████ ██████████ of that license fee annually would

9    be  ██████████  Combine them together, your annual fee for

10   this enterprise license would be $5,896,260.

11   Q.  And the next slide just assumes a different size

12   enterprise at 3.5 billion.  The process is the same?

13   A.  Process is the same.  You have two big differences

14   here.  One is the size of the organization has now been

15   reduced to one tenth or 10 percent of that, 3.5 billion.

16   You have three countries, and you have one multi platform

17   in that calculation, but you would come up with a perpetual

18   license fee of ██████████  Convert that to annual with

19   maintenance at an annual fee of ██████████.

20   Q.  So if we were going to just take these assumptions

21   using our, using the enterprise pricing and reducing it

22   down to the annual fixed fee terms, that's what we're

23   assuming some years here, so at the 35-billion-dollar

24   enterprise, your standard annual fee, if it was five years,

25   it 29,481,300?

```
 1    A.  That's correct.
 2    Q.  And under the other exercise of an enterprise a tenth
 3    the size, 3.5 billion, we're assuming on this side six
 4    years, so the math is 10,013,760?
 5    A.  That looks right, yes.
 6    Q.  Okay.  And so we have two different fixed term examples
 7    based upon that pricing approach.
 8              Now, this is, this is -- you know, we've
 9    concluded FICO pricing methodology.  We haven't started any
10    negotiations with the licensee at this stage?
11    A.  That's correct.  This is just our standard pricing.
12    Q.  Now, would you just share with us the experience that
13    you have had in terms of negotiating with the licensee for
14    fixed term licenses?
15    A.  The extent of that?
16    Q.  Not all of it, but we're going to take two different
17    assumptions, if you will.  The first assumption I would
18    like you to take and explain your experience is, assume a
19    contract with the client has come to an end and the client
20    wants to negotiate a new contract for a fixed term.
21              I would like to, if you would, what are the
22    factors that in your experience have played into the
23    negotiations that affect the price of the license fee?
24    A.  Well, the first thing I would ask is, it's a fixed
25    term, and at the end of that term, the relationship ends?
```

1    Q.  Let's assume that.

2    A.  Okay.  That's very different.  It's material and

3    important in the discussions.

4    Q.  Understood.

5    A.  In a fixed term negotiation where the relationship is

6    not going to go any further, the biggest factor is, that's

7    the extent of my relationship with that client.  I'm not

8    looking beyond.  I don't have a long-term value proposition

9    with this client where I'm getting more services, more

10   maintenance, more product sales.  I am just negotiating for

11   a period of time, and then they're going to stop using it.

12           That's actually reflected in this chart in two

13   different avenues here, right?  So if I'm not going to sell

14   anything more to this client or the client doesn't use

15   other Fair Isaac products or FICO products, then that has

16   an upward pressure on my negotiation.  I'm going to remain

17   firm.  This is my one opportunity to negotiate value out of

18   the use of my software.  I don't have an opportunity after

19   this.

20   Q.  Take -- what are the assumptions under which there

21   would be -- the licensee would be able to put pressure on

22   you to reduce your price?

23   A.  Yeah.  So the licensee, conversely, would not want to

24   be paying larger fees for the software.  They're going to

25   want a lower fee.  And what they have working for them is

1    how easy is it for them to turn off the software, how

2    quickly can they turn off that software.  Right?  So if

3    it's relatively easy and they can turn it off immediately,

4    they're in a very strong negotiating position for price.

5    They can just say, you know what, no, I'm not paying that,

6    we'll turn it off, I'm done.  Conversely, if they're in a

7    position where they can't turn that off, then they're going

8    to want to negotiate to other terms.  And the most logical

9    one that they would go to is a shorter period.  I'm going

10   to get off of you as soon as possible because I'm not going

11   to pay those kind of fees.

12            So this is sort of a push/pull of a negotiation,

13   right, because the longer they stay on the software the

14   more value we're going to extract out of that negotiation.

15   So it really comes down to a measure of, well, what is the

16   term, right, and of that term what are we actually going to

17   negotiate from a deviation or a discount off of that

18   standard pricing.

19            So, generally speaking, the first year or two,

20   there is really little incentive for us to discount.  It's

21   going to take at least a year, if not two, for clients to

22   move from a position of using the software to not using the

23   software.  If they actually want to extend that to ████

24   ████████  years, we would sort of back off of that list

25   price.  We would start discounting.

 1          To sort of put a set of parameters around that,

 2     you know, if you're at a ███████ period of time, a ██

 3     ███████████████ on that would be essentially, I'm going to

 4     sell you a ██████████ and give you the ██████████ for

 5     free.  So I wouldn't go that far.  I would pull back into

 6     something more like the ██████████ kind of range.  That

 7     would be where I would go with that.  If they wanted to

 8     extend to ███████ maybe I would bump that ██████████ maybe a

 9     ██, higher than that, depending on the circumstances, but

10     it really depends on a number of these factors here.

11          But the primary driver is, Do I have future

12     business?  Do I have current business.  That's the biggest

13     thing from the licensor side.  And then the term.  But what

14     is offsetting that from the licensee side is, look, I don't

15     need that, so I'm not going to pay that.  Therefore, I'm

16     going to take extra effort to not pay that.  And those are

17     predominantly driven by the scope of use, how quickly can

18     they get off or turn it off.

19     Q.  Okay.  Then let's take the other assumption, that there

20     is a future with the client.  How does that different

21     assumption affect the negotiating tactics and pressures

22     that you can apply or that the licensee applies against

23     you?

24     A.  In the new business, well, probably the biggest

25     contributor from our perspective to where we bring the

1    price point into, and actually also in this case from the

2    licensee is, what is the long term value to FICO, how much

3    business are we going to do with this client?  We saw that

4    previously on the transition side.  It plays into the new

5    business side equally and actually maybe even more so than

6    in the previous scenario of a fixed period of time.

7         We have a number of clients that buy a lot of

8    products from us, and they carry a lot of weight with us.

9    When they speak, we listen.  And so the number of products

10   in the revenue stream we have from a particular client has

11   a big factor; and if they come in and demand more discount,

12   we pay attention.  We negotiate, but we pay attention.

13        If, equally, you know, there is a large number of

14   opportunities on that table of sales that we can see coming

15   from this client, we're going to pay attention, and we're

16   going to be a little more flexible in our price.  In

17   particular, this has to do with not just what it is today,

18   but what it is five years from now.  It matters.  We have a

19   lot of our clients today who are negotiating much bigger

20   contracts with us on our new stuff, which is, we want to

21   retain those customers.

22        Another factor is the size of the transaction.

23   Very clearly, you know, you've seen that in the pricing

24   guide, sort of the more you buy, the more you're allowed to

25   discount.  And it's, it's true across pretty much anything

1    that you negotiate in life.  The more you buy, the more

2    pricing leverage you have.  You're going to get a bigger

3    discount.

4         If you offer reference in case studies, you know,

5    we're going to be a little more sensitive to the price.  We

6    don't actually include a particular discount for this; but

7    if you're going to do it, we would be a little more

8    sensitive around what we actually price to and negotiate

9    to.  And duration.  Duration does play a factor in the

10   business, it's less so here because we're looking at a

11   long-term relationship.  If you want a contract with us for

12   two years, fine; one year, fine; five years, fine; but the

13   anticipation is that there is business coming from you

14   after that.

15   Q.  Good.  Let me show you the last slide that we have.

16   And I think it's trying to put those two considerations or

17   two scenarios, better said, that you just described.  And

18   what do you intend to convey by this slide?

19   A.  I think it's reflective of scale of where we would go

20   with discount.  So as I mentioned before, if I'm

21   negotiating a fixed term and that's the extent of my

22   relationship, then I'm less inclined to go to higher

23   discounts because I'm extracting the full value of that

24   negotiation from that one transaction and that one period

25   of time.

```
 1            If I'm -- so I would limit it.  You know, we
 2    talked about ████████████ kind of discounts.  That's
 3    typically what I would see in these scenarios.  But if I
 4    went further down discounting for new business, yeah, maybe
 5    I'd go to ██████████.  It's possible.  It depends on
 6    the circumstances.  So this chart just represents a
 7    relative scale there of how far we would go in a
 8    negotiation.
 9            MR. HINDERAKER:  Mr. Waid, thank you for your
10    time.
11            MS. GODESKY:  May I proceed?
12            THE COURT:  You may.
13            MS. GODESKY:  Thank you.
14                        CROSS EXAMINATION
15    BY MS. GODESKY:
16    Q.  Good morning, Mr. Waid.
17    A.  Good morning.
18    Q.  My name is Leah Godesky and, I represent the defendants
19    in this case.  And you know that because you have been
20    sitting here in court with us since the beginning of trial,
21    right?
22    A.  Correct.
23    Q.  You previously sat for two depositions in this case
24    back in 2019, correct?
25    A.  Yes.
```

1    Q.  As I think everyone understands by now, you provided

2    sworn testimony in a conference room with lawyers just like

3    you are under penalty of perjury here today, correct?

4    A.  Correct.

5    Q.  And there is a copy of your transcripts, Mr. Waid, in

6    the binder that's in front of you, along with a copy of the

7    transcript from yesterday.

8    A.  Okay.

9    Q.  Now, Mr. Hinderaker started your direct examination

10   yesterday by having you talk about certain sections of

11   Chubb's Blaze license agreement.  Do you remember that?

12   A.  I do.

13   Q.  It is not your responsibility at FICO to interpret

14   FICO's contracts.  You rely on the legal department to do

15   that, correct?

16   A.  I do.

17   Q.  And Mr. Hinderaker asked you yesterday whether you were

18   part of any discussions in the 2006 time frame about the

19   client in the Blaze license agreement being anything other

20   than Chubb & Son.  Do you remember that?

21   A.  I have to say I don't remember that.

22   Q.  Okay.  Let's, let's refresh your recollection and look

23   at the trial transcript.  It's in the binder in front of

24   you.  Do you see the side tab that says Trial Transcript?

25   A.  Yes.

```
1    Q.  And then if you could go to page 1636.

2    A.  I'm there.

3    Q.  And if you go to line 6, Mr. Hinderaker asked you,

4    "Were you part of any discussions during that time frame of

5    Chubb & Son wanting to sign -- of any discussion about the

6    client being anybody else but Chubb & Son?"

7              And your answer was "no," correct?

8    A.  Yes, because I wasn't part of any discussions.

9    Q.  And that's exactly right.  You don't have any specific

10   memories of communications with Chubb in the 2006 time

11   period, correct?

12   A.  Absolutely not.

13   Q.  All you can say is that you would have signed off on

14   the pricing of the agreement because that's part of your

15   job to sign off on pricing of enterprise-wide license

16   agreements, correct?

17   A.  Yes, it is.

18   Q.  Now, you understand as the corporate representative

19   that one of the breach of contract claims that FICO is

20   bringing in this case relates to Section 10.8 of the

21   license agreement, correct?

22   A.  Yes.

23   Q.  And you looked at that provision yesterday with

24   Mr. Hinderaker, and I'm hoping we can pull it up on the

25   screen.  It's in Joint Exhibit 1, at page 8.
```

1    Thank you, Vanessa.  And if we could highlight

2    the second sentence of Section 10.8.

3    Now, you testified yesterday, Mr. Waid, that in

4    your mind the business meaning of this second sentence is

5    that if one of these events happens, a merger or an

6    acquisition, FICO needs to consent to it, correct?

7    A.  It's deemed an assignment, and we must consent.

8    Q.  In your mind, this provision means that if there is an

9    acquisition, FICO's consent is needed to keep using Blaze,

10   hard stop, correct?

11   A.  It is my opinion that if one of these events occur, it

12   is an assignment and consent from FICO is required, yes.

13   Q.  In all circumstances?

14   A.  In all of these events, yes.

15   Q.  Okay.  I want to take a look at P123, which is already

16   in evidence.

17   And you can see at the top, Mr. Waid, this is an

18   e-mail chain between Russ Schreiber and Mike Sawyer at FICO

19   in fall 2015 after they heard about the ACE acquisition,

20   correct?

21   A.  I need to get to it.

22   Q.  Sure.

23   A.  I'm sorry.  What was -- P what?

24   Q.  123.

25   A.  I'm sorry.  What was your question?

1    Q.  This is an e-mail chain between Russ Schreiber and Mike

2    Sawyer at FICO, right?

3    A.  It appears to be, yes.

4    Q.  And the time period is fall 2015.  So this would be

5    after they heard about the ACE acquisition, correct?

6    A.  I wouldn't know.

7    Q.  They're both part of FICO's sales team, right?

8    A.  They are, yes.

9    Q.  And Mr. Schreiber was pretty senior?

10   A.  Yes, he was.

11   Q.  You described Mr. Schreiber yesterday as the global

12   insurance lead, right?

13   A.  Yes, he was.

14   Q.  He was Mr. Sawyer's boss?

15   A.  Yes, he was.

16   Q.  And you spoke yesterday about how you communicated with

17   Mr. Sawyer and Mr. Schreiber after the ACE acquisition was

18   announced about FICO's rights under the contract, right?

19   A.  That is correct.  In November.

20   Q.  Right around this time period, fall 2015, correct?

21   A.  This is dated October.

22   Q.  Roughly the same time period, right?

23   A.  It's 30 some odd days later.  No, I don't agree.

24   Q.  Okay.  Let's go to the bottom of the e-mail chain on

25   page 3.  And there is an e-mail from Mr. Sawyer to

```
 1    Mr. Schreiber on October 7 titled Chubb Language.  Do you
 2    see that?
 3    A.  Yes, I do.
 4    Q.  And Mr. Sawyer says, "I think we're in a good spot.
 5    See below.  First excerpt is from the MSLA and states they
 6    have no assignment rights."  Do you see that?
 7    A.  I see what he wrote, yes.
 8    Q.  And then he goes on to talk about other provisions of
 9    the Chubb's license agreement, correct?
10    A.  I need a moment to read.
11    Q.  Sure.
12    A.  I've read it, yes.
13    Q.  So then he goes on to quote other provisions, right,
14    generally reference them?
15    A.  Provisions as in -- yes.  Yes, provisions.
16    Q.  Then let's look at the next e-mail chain moving up.
17    A.  Okay.
18    Q.  This is Mr. Sawyer's response -- I'm sorry --
19    Mr. Schreiber.  Do you see that?
20    A.  Yes.
21    Q.  He says, "The unreasonably withheld bit has me a little
22    concerned, so it may come down to how did we size the
23    enterprise discussion."  Correct?
24    A.  That's what it says.
25    Q.  Mr. Schreiber didn't say, "Mike, I agree we're in a
```

1   good spot.  The business purpose of all of our agreements

2   is always to make sure that if there is an acquisition, we

3   have to consent."  He didn't say that, right?

4   A.  It's not in the e-mail.

5   Q.  It's not in the e-mail.  And Mr. Schreiber said he's

6   not so sure.  He says, "The unreasonably withheld bit has

7   him a bit concerned."  Correct?

8   A.  That's what it says in the e-mail, yes.

9   Q.  And that's a reference by Mr. Schreiber to the second

10  sentence of Section 10.8 where FICO agreed not to

11  unreasonably withhold --

12              THE COURT:  Hang on a second.

13              MR. HINDERAKER:  I object to examination that's

14  outside the scope of the witness's knowledge.  He has no

15  knowledge of these conversations between other people.

16              THE COURT:  Overruled.

17  BY MS. GODESKY:

18  Q.  So, Mr. Waid, this is a reference by Mr. Schreiber to

19  the second sentence of Section 10.8 and FICO's agreement to

20  not unreasonably withhold consent to continued use of

21  Blaze, correct?

22  A.  I don't know that.

23  Q.  Let's look at Mr. Sawyer's response.  Mr. Sawyer on the

24  next e-mail up in the chain, he says, "I'm not as concerned

25  about it."  Do you see that?

1    A.  I see it, yes.

2    Q.  And then he sort of makes the argument we heard you

3    make yesterday about revenue increasing.  He says, "Chubb

4    had 12.3 billion in GWP in 2014 compared to ACE's 23

5    billion."  Do you see?

6    A.  I see that, yes.

7    Q.  And you testified yesterday that FICO always has these

8    absolute rights in circumstances of an acquisition because

9    it could materially change the basis on which the license

10   was granted and priced, right?

11   A.  I believe I said it's a material change in

12   circumstances.

13   Q.  You said it could materially change the basis on which

14   the license was granted and the price was set.

15   A.  If you say so, that sounds right.

16   Q.  It sounds right.  But Mr. Schreiber, the insurance

17   global lead at FICO, he still wasn't so sure, right?  Let's

18   look at his response.  This is October 7th at 9:53 a.m.

19   A.  Are we in the same document?

20   Q.  Yep.  Just moving up one e-mail.

21           And Mr. Schreiber says, "Is the license

22   specifically tied to GWP?"  Do you see that?

23   A.  I do, yes.

24   Q.  And GWP, as we have all learned, in the world of

25   insurance is revenue, right, gross written premium?

```
1    A.  Yes.  Correct.

2    Q.  And then let's go to the front page of this exhibit,

3    and the second to top e-mail is Mr. Schreiber again.  He

4    says, "Nothing in the contract?  I can dig up the proposal,

5    but it was a decade ago."  Do you see that?

6    A.  Yes.

7    Q.  In then Mr. Sawyer's response, he starts by attaching

8    all the contracts to Chubb.  And he says, "I don't see

9    anything on GWP in the agreements," correct?

10   A.  That is correct, yes.

11   Q.  And you have been in court watching all of the

12   testimony as it's come in, right?

13   A.  Yes.

14   Q.  And you saw Mr. Schreiber's deposition video played

15   during that first week of trial, correct?

16   A.  Yes.

17   Q.  And Mr. Schreiber testified at deposition that he asked

18   Mr. Sawyer whether the contract specifically referenced

19   revenue because then it would have been clear.  Do you

20   remember Mr. Schreiber testifying to that?

21   A.  I don't.

22   Q.  Mr. Schreiber was asking if the Chubb agreement

23   referenced revenue, because he knows that some Blaze

24   license agreements do specifically reference revenue in the

25   assignment provisions, correct?
```

1   A.  Yes, some of them actually do negotiate to specific

2   revenue.

3   Q.  Let's take a look at Exhibit D77.  And this is not in

4   evidence yet, so we're not going to publish it.  Let me

5   know when you're with me, Mr. Waid.  I know the binder is

6   large.

7   A.  I believe I'm there, yes.

8   Q.  Okay.  And this is a November 29th, 2010, software

9   license agreement between FICO and ████████████████,

10  correct?

11  A.  It appears that way, yes.

12  Q.  And it's a license for Blaze Advisor.  I can help you

13  if you look at page 14.

14  A.  Just give me a minute.  It is a license for Blaze

15  Advisor.

16  Q.  And also if you look at page 14, you can see that this

17  was an ██████████████████████████████████████████

18  Do you see that?

19  A.  And ████████████████████  correct.

20  Q.  And that means you would have approved it?

21  A.  It would have come to me for approval, yes.

22          MS. GODESKY:  Okay.  Defendants offer D77 into

23  evidence.

24          MR. HINDERAKER:  No objection, Your Honor.

25          THE COURT:  D77 is received.

```
 1              MR. HINDERAKER:  Subject to the earlier
 2    practices?
 3              THE COURT:  Correct.
 4    BY MR. GODESKY:
 5    Q.  Okay.  Mr. Waid, let's look at page 10.  And we can put
 6    this on the screen for the jury.
 7              Do you see there is an assignment delegation
 8    clause in this contract?
 9    A.  A very large one, yes.
10    Q.  And it starts by saying, ████████████████████████
11    ████████████████████████████████████████████████
12    ████████████████████████████████████████████
13    ████████████████████████████████████████████████
14    ██████████████████████████████████████████████████
15    ████████████████████████████████████████  Correct?
16    A.  Yes.
17    Q.  And then the next sentence goes on to talk about a
18    deemed assignment.  Do you see that reference?  It says,
19    ████████████████████████████████████████████
20    ████████████████████████████
21    A.  Yes, I'm with you.
22    Q.  And then I want you to go down in this paragraph and
23    find the sentence that starts with, ████████████████
24    ████████
25              Maybe Vanessa can highlight it and help us find
```

```
 1    it.

 2    A.   I'm there, yes.

 3    Q.   Okay.  It says, ████████████████████████

 4    ████████████████████████████████████████████

 5    ████████████████████████████████████████████

 6    ██████████████████████      Do you see that?

 7    A.   Yes.

 8    Q.   And then it says, ███████████████████████

 9    ████████████████████████████████████████

10    ████████████████████████████████████████████

11    ████████████████████████████████████████████

12    ████████████████████████████████████████████████

13    ████████████████████████████████████████████

14    ████████████████████████████████████████

15    ████████████████████████████████████████████

16    ████████████████████████████████████████████

17    ████████████████████████████████████████████

18    ████████████████████████████████████████      Do

19    you see that?

20    A.   Yes, I do.

21    Q.   And this language does not appear in the Blaze license

22    agreement that FICO entered with Chubb, correct?

23    A.   Absolutely not.

24    Q.   In fact, the word "revenue" doesn't appear in

25    Section 10.8 of the Chubb agreement at all, correct?
```

1    A.  Absolutely not.

2    Q.  And this doesn't say that FICO will definitely get more

3    fees if all these things happen, right?  When it references

4    additional fees, it says ███████

5    A.  Yeah, absolutely.

6    Q.  And this is the language that Mr. Schreiber hoped to

7    see in Chubb's agreement, right, when he said, Does it

8    specifically reference revenue?

9    A.  I don't think that's what he meant.

10   Q.  Okay.  Vanessa, if we could go back to Joint Exhibit 1

11   and look at page 8, which is our assignment provision,

12   again, and if we could highlight the second sentence.

13        Mr. Waid, you testified yesterday during direct

14   with Mr. Hinderaker that another purpose of the second

15   sentence of Section 10.8 was to make sure that Blaze is

16   locked down until FICO gives this consent, right?

17   A.  Yes.  That's correct.

18   Q.  And you said from the business point of view, there is

19   a 30-day cure period where this lockdown is in effect,

20   right?

21   A.  Generally speaking, 30 days is what we actually put in

22   our contracts.

23   Q.  There is no reference in the second sentence of

24   Section 10.8 to a 30-day cure period, correct?

25   A.  It usually occurs in another section of the contract.

1    Q.  But there is no reference in Section 10.8 to a 30-day

2    cure period?

3    A.  It doesn't typically end up there, correct.

4    Q.  Okay.  I want to talk about expanded use.  So it is

5    established at this point, Mr. Waid, that Mr. Carretta, the

6    deputy general counsel at FICO, sent general counsel at

7    Chubb Limited a letter accusing Chubb of breach in January

8    of 2016, correct?

9    A.  I don't know the exact date, but, yes, you're generally

10   in the ball park.

11   Q.  January 2016 is the right month, right?

12   A.  Is this a memory test?  I don't know.  It's January

13   somewhere.

14   Q.  I'm happy to refresh your recollection.  We can pull up

15   P90.

16   A.  Okay.

17   Q.  Mr. Waid, this is a letter from FICO to Mr. Joe Wayland

18   at Chubb dated January 27, 2016?

19   A.  That's correct.

20   Q.  So I want to look at Chubb's response to Mr. Carretta's

21   letter, which is in evidence as P91.  And if we could go to

22   the second paragraph on the first page --

23   A.  I'm sorry.  Do I have that?

24   Q.  I think so.  It might be in the binder that you used

25   with Mr. Hinderaker, if you don't mind looking at that one.

1    A.  P19?

2    Q.  Yes.

3    A.  Got it.

4    Q.  Okay.  So we're in the second paragraph, second

5    sentence.  Mr. Hopp wrote -- and this is in response to

6    Mr. Carretta's breach letter, right?

7    A.  Yes.

8    Q.  He says, "While we continue to evaluate our use and

9    needs, our initial findings indicate that the applications

10   that have been utilizing Blaze Advisor software since 2006

11   are currently running in the exact same fashion as prior to

12   the merger transaction."  Correct?

13   A.  It says that, yes.

14   Q.  And you talked about that sentence with Mr. Hinderaker

15   yesterday.  And you said that this was fairly characterized

16   as an assurance from Chubb that Blaze use was locked down,

17   right?

18   A.  That's the way I took it, yes.

19   Q.  It wasn't expanding, correct?

20   A.  I took that as yes.

21   Q.  And you said, It reassured you, right?

22   A.  Yes.

23   Q.  You also said you weren't sure how convinced you were.

24   Do you remember saying that?

25   A.  That is correct, yes.

1   Q.  But you had no evidence as of February 17th, 2016,

2   suggesting that this statement from Mr. Hopp was false?

3   A.  Absolutely not.

4   Q.  So as of February 17th, 2016, you're generally feeling

5   reassured.  It's locked down.  There is no expanded use.

6   Fair?

7   A.  I was happy that he wrote that.  I had concerns.

8   Q.  Okay.  So as of February 17th you're happy, generally

9   reassured, right?

10  A.  I appreciated it, yes.

11  Q.  Now, I want to look at another communication from Chubb

12  a few days later on February 25th.  This is in evidence as

13  P94.  And this is a message that Ms. Tamra Pawloski at

14  Chubb sent Mr. Sawyer and Mr. Schreiber, correct?

15  A.  One second.  Am I looking at the e-mail or the letter?

16  Q.  There is an e-mail from her that's the first page,

17  right, and then she has attached her proposal?

18  A.  Right.  You want me to look at the e-mail?

19  Q.  The e-mail is from Ms. Pawloski, right?

20  A.  Yes, it is.

21  Q.  Okay.  And then if you look at the second page of the

22  document, it says FICO Proposal, February 25th, 2016,

23  correct?

24  A.  Yes.

25  Q.  So we're eight days later from where you're pretty

1    happy and generally reassured about the lockdown.

2    A.  Yeah.

3    Q.  Okay.  Now yesterday you declared this message from

4    Ms. Pawloski a nonstarter.  That basically means it cannot

5    be accepted at face value.  That's what you said, right?

6    A.  Absolutely.

7    Q.  Okay.  So let's look at the first paragraph.  And in

8    the first paragraph Chubb says, "Although Chubb strongly

9    disagrees with FICO's stated position, in a good faith

10   effort to move the relationship forward, Chubb proposes

11   that the parties renegotiate Chubb's current perpetual,

12   unlimited, application-based enterprise license to

13   downgrade and limit use of Blaze Advisor development and

14   deployment to reflect Chubb's actual usage of 15 named

15   applications of Blaze Advisor deployment and 100 seats of

16   Blaze Advisor development at no additional cost to Chubb."

17           Do you see that.

18   A.  Yes, I do.

19   Q.  So this was an offer from Chubb to switch from its

20   perpetual license with no limit on the number of

21   applications to a license that would have limited Chubb to

22   15 applications, correct?  That's what we see here, first

23   paragraph.

24   A.  That's what is in that first paragraph.

25   Q.  I'm only focused on the first paragraph.

1    A.  I figured.

2    Q.  And then it says in the next sentence, "All usage now

3    and going forward does not and will not change from that

4    permitted under the current license agreement and all usage

5    remains with the same named applications."  Correct?

6    A.  That's what it says, yes.

7    Q.  So, Mr. Waid, what we've read so far sounds like it's

8    an agreement not to expand, correct?

9    A.  No.

10   Q.  It's still pretty locked down, right, Mr. Waid?

11   A.  No.

12   Q.  In the next sentence of the paragraph, it says, "Under

13   this proposal, Chubb will continue to pay for maintenance

14   at the current cost of about $237,000 per year in

15   accordance with the terms of the parties' current

16   agreement."  That's what it says, right?

17   A.  That's what it says, yes.

18   Q.  And, by the way, Chubb did pay hundreds of thousands of

19   dollars to FICO for maintenance over the course of their

20   relationship, right?

21   A.  Yes.

22   Q.  And that totaled many millions of dollars?

23   A.  Yes.  Had to do the math.

24   Q.  Now, again, you declared this yesterday a bad faith

25   proposal.  And you pointed to the next part of

1    Ms. Pawloski's message, correct?

2    A.  Correct.

3    Q.  And the first sentence of that next section --

4         If we could go down, Vanessa.  I'm looking under

5    "Utilization of Blaze Advisor."  Thank you.

6         The first sentence says, "The applications listed

7    below are those applications that currently utilize the

8    Blaze Advisor software.  These are the same applications

9    utilizing the software both prior to and after the merger."

10   Right?

11   A.  That's what it says, yes.

12   Q.  So far same message that you got from Mr. Hopp,

13   reassuring, lockdown, not expanding, so far, right?

14   A.  No, I don't think it says that.

15   Q.  But it was really the next sentence that you pointed to

16   yesterday as bad faith by Chubb, right, the nonstarter?

17   A.  Correct.

18   Q.  And that next sentence says, "Under the above proposal,

19   Chubb shall have the right to change the applications

20   utilizing the Blaze Advisor software at any time in its

21   sole discretion without FICO's consent so long as the named

22   applications do not exceed an amount of 15."  Right?

23   A.  That's what it says.

24   Q.  And when you were asked about this second sentence by

25   Mr. Hinderaker yesterday, you said, "Our clients don't

1    grant licenses themselves."  Right?  Do you remember saying

2    that?

3    A.  That is correct, yes.

4    Q.  And you said, "There's no governance in that statement.

5    They could call anything an application and say that's

6    going from here to there.  There is no definition.  There

7    is no common understanding and that threw the proposal out

8    of question."  Do you remember saying that?

9    A.  Yes.

10   Q.  And, Vanessa, if we could bring up P95, which is in

11   evidence.

12            We see the response from Mr. Carretta less than

13   24 hours later, right?  You've seen this before.  He says,

14   "The proposal is not acceptable, and I confirm it's

15   rejected."  Right?

16   A.  That is correct, yes.

17   Q.  And you testified yesterday you authorized him to send

18   that e-mail?

19   A.  Absolutely.

20   Q.  You said Ms. Pawloski's e-mail was in bad faith because

21   there was no common understanding or definition, right?

22   A.  I don't know that I said that, but I did say bad faith,

23   yes.

24   Q.  But you lamented the fact that there was no common

25   understanding or definition in her proposal.  That's what

```
 1    you said yesterday, right?

 2    A.  Yeah, I can't -- I don't remember.

 3    Q.  I want to refresh your recollection about that.

 4    A.  Okay.

 5    Q.  Can we go back to the trial transcript at 1663?

 6    A.  I'm there.

 7    Q.  And at line 16 you said, "Our clients don't grant

 8    licenses themselves.  That's a core tenet of our license

 9    agreement.  Besides that, fundamentally there is no

10    governance on that statement.  They could call anything,

11    you know, an application and say that's going here from

12    there to here."  Right?

13    A.  Correct.

14    Q.  And then you went on, Mr. Waid, to say, "There is no

15    definition of it.  There is no common understanding of it.

16    That alone completely threw the proposal out of question."

17    That was your testimony yesterday?

18    A.  Yes.

19    Q.  Okay.  Before Mr. Carretta sent that e-mail less than

20    24 hours later saying that the proposal is rejected, you

21    didn't make any effort to propose a common understanding,

22    correct?

23    A.  That is incorrect.

24    Q.  You don't have any record of going back to

25    Ms. Pawloski, correct?
```

1    A.  Yes, I do.

2    Q.  Now, you heard Mr. Whitener in the courtroom yesterday,

3    right?

4    A.  Yes.

5    Q.  FICO's Blaze Advisor and insurance expert, correct?

6    A.  Yes.

7    Q.  And he testified that a lot of different applications,

8    like DecisionPoint and Premium Booking, are included in the

9    CSI Express application, right?  They're part of it.

10   A.  The umbrella called CSI Express, the policy management

11   system, yes.

12   Q.  It includes these separate pieces, DecisionPoint and

13   Premium Booking, right?

14   A.  There are separate application business functions

15   inside of CSI Express for specialty lines insurance,

16   correct.

17   Q.  Okay.  And if we go back to Ms. Pawloski's proposal,

18   which is again, Vanessa, at 94, P94.

19          And if we could go down to the list of

20   applications, you see that Ms. Pawloski's proposal

21   separately lists DecisionPoint and Premium Booking and CSI

22   Express, right?

23   A.  It does, yes.

24   Q.  So that suggests she was trying to be overinclusive,

25   not deceitful and underinclusive, right?

1    A.  I don't have any reason to believe she was being

2    deceitful at all, no.

3    Q.  And you heard testimony a few days ago from Chubb

4    architect Claudio Ghislanzoni, right?

5    A.  Yes.

6    Q.  And he testified that around this time period in early

7    2016 he was instructing his colleagues in Australia, Do not

8    add Blaze to a new application, right, because our policy

9    is we cannot expand use, correct?

10   A.  I heard that eventually that message got out to the

11   team, yes.

12   Q.  And as of February 26th, 2016, when Mr. Carretta sent

13   his "Your proposal is rejected e-mail," you didn't have any

14   evidence that Chubb had added Blaze to new applications,

15   right?

16   A.  No, I did not.

17   Q.  And in fact, as you said earlier, just eight days

18   earlier, by February 17th you were pretty reassured things

19   had been locked down, right?

20   A.  That's not what I said.  I said I was happy he said

21   that.

22   Q.  You were reassured?

23   A.  It gave me some comfort, yes.

24   Q.  You said "reassured."

25   A.  I was reassured, yes.  Thank you.

1    Q.  And you didn't receive any new information between

2    February 17th and February 26th calling that reassurance

3    into doubt, correct?

4    A.  No.

5    Q.  And, yet, you still authorized that e-mail from

6    Mr. Carretta, "Your proposal is rejected," correct?

7    A.  Yes, because it was.

8    Q.  Okay.  We can take that down.  Thank you, Vanessa.

9         I want to talk now about this issue with the DWS

10   consultant in Australia.

11   A.  Okay.

12   Q.  And if we could pull up Exhibit P1114, which you looked

13   at with Mr. Hinderaker yesterday.

14   A.  I'm there.

15   Q.  And I want to look at a part of the chain we didn't see

16   yesterday, which is on the bottom of page 3.

17        And this is a message from Mike Sawyer.  We're in

18   March 2016.  Do you see that?  The e-mail is 1:26 a.m.

19   That's the time stamp.

20   A.  Yep.  I'm there.  Yep.

21   Q.  And this is a message to Mr. Paul Swyny, right?

22   A.  Swyny, right.

23   Q.  Swyny.  Thank you.

24        And yesterday you called Mr. Swyny, quote, "The

25   client partner who owned the Chubb Insurance Company of

1    Australia account.  Do you remember saying that?

2    A.  Yes.

3    Q.  So it's your testimony that FICO had assigned a client

4    partner to Chubb Australia, but didn't know Chubb Australia

5    was using Blaze?  That's your testimony?

6    A.  No, that's not my testimony.  My testimony was that

7    there was a client partner assigned to Chubb.  Is there a

8    following question you have for me?

9    Q.  Your testimony was that there was a client partner who

10   owned the Chubb Insurance Company of Australia account,

11   right?

12   A.  Yeah.  Absolutely.

13   Q.  And it's also your testimony that FICO didn't know

14   Chubb Australia was using Blaze, correct?

15   A.  That's correct.  Yes.

16   Q.  Okay.  So let's look at Mr. Sawyer's directive to

17   Mr. Swyny regarding DWS, and I want to look at the last

18   sentence of the first paragraph.

19        He says, "Please continue to be responsive to

20   DWS, but do not make any statements regarding Chubb's

21   rights to use the software."  Do you see that?

22   A.  I do.

23   Q.  And you're on this chain, right?

24   A.  I am.

25   Q.  And you didn't jump in and say, Wait, Mike, under

1    Section 3.1 of the contract we cannot let DWS have any

2    access to Blaze, right?  You didn't say that.

3    A.  I did not, no.

4    Q.  You were fine with the idea that FICO would continue to

5    be responsive, correct?

6    A.  I was fine that we would continue to be responsive,

7    yes.

8    Q.  And DWS wasn't sneaking around and trying to hide that

9    it was accessing Blaze, right?

10   A.  Absolutely not.

11   Q.  We saw that folks were e-mailing FICO from at DWS.com

12   e-mail addresses, right?

13   A.  Absolutely.

14   Q.  And they were joining FICO in chat rooms and

15   identifying themselves openly, correct?

16   A.  Absolutely.

17   Q.  Okay.  We can take that down.  Thank you.

18            Now I want to talk about pricing of Blaze

19   licenses.  Okay?

20   A.  Okay.

21   Q.  And as we discussed earlier, you understand that FICO

22   is suing Federal for breach of contract in this case,

23   right?

24   A.  I'm not a lawyer.

25   Q.  But, you know, you went through all those contract

1    provisions with Mr. Hinderaker yesterday because you

2    understand there is a claim in this case that Federal

3    breached Section 10.8, right?

4    A.  I think the lawsuit is much bigger than just the

5    breach, but I'm not a lawyer.

6    Q.  But you understand there is a breach claim, right?

7    A.  I understand that there is a copyright claim, and I

8    understand that there is a use claim, yes.

9    Q.  And you told me a few minutes ago when we started this

10   examination that you also understood FICO is suing for

11   breach of 10.8, the assignment provision, right?

12   A.  We, we terminated the agreement because of 10.8.  I

13   don't know about this suing for.  I wasn't part of the suit

14   filing, so I can't comment on what we sued for.

15   Q.  Okay.  Fair enough.  So do you generally understand,

16   Mr. Waid, that the idea here is that if FICO proves a

17   breach of contract, it's asking for damages in the form of

18   lost license fees.  Do you generally understand that?

19   A.  Oh, yeah, that I understand.

20   Q.  Okay.  And that's why we're talking about how FICO

21   prices Blaze licenses?

22   A.  That's correct.

23   Q.  It goes to the damages claim, right?

24   A.  Well, the jury gets to decide what that is.  I'm just

25   providing pricing.

```
 1    Q.  Right.

 2    A.  Our standard pricing.

 3    Q.  Relative to damages?

 4    A.  Yes.

 5    Q.  Okay.  I'd like to take a look at P517.  This is one of

 6        the documents you just looked at with Mr. Hinderaker.

 7             And you walked through some of the information in

 8        this chart of Chubb use of Blaze, right?

 9    A.  Correct.

10    Q.  And you were using it in the context of talking about

11        how you do application-based pricing at FICO, right?

12    A.  Sizing.

13    Q.  Sizing.  And this document is something that FICO

14        received in litigation in 2018 or 2019, right?

15    A.  I'm not sure when it was received.

16    Q.  But you understand it was received as part of the

17        litigation?

18    A.  It was post termination, so yes.

19    Q.  Okay.  When potential customers are negotiating a Blaze

20        license and the pricing, you don't typically have all of

21        this detailed information, right?

22    A.  No, we don't.

23    Q.  No.

24    A.  Typically we have less information, yes.

25    Q.  You generally don't know how many ████████████ and
```

1    ██████████████████ is running in your software when you're

2    negotiating pricing?

3    A.  We have a better understanding of ████████████ but

4    ████ is tough.

5    Q.  You don't know like ████████████████████████████

6    ████████████, right?  They don't usually turn that over?

7    A.  That's one of the stronger metrics we usually get,

8    yeah.

9    Q.  But you can agree, Mr. Waid, you don't get this level

10   of detail from every customer you're negotiating with?

11   A.  I already agreed to that, yes.

12   Q.  And in fact, you didn't know how Chubb was using Blaze

13   until 2018, 2019 when you received this as part of the

14   litigation, right?

15   A.  I didn't know the full extent of what Chubb was using

16   until I got the proposal letter in February.

17   Q.  And usually you're mainly pricing off of publicly

18   available information, right?

19   A.  Oh, no.  We actually get the information directly from

20   the client.  We take it at face value that they're acting

21   in good faith, and we use that information.

22   Q.  You actually technically have the information that --

23   A.  Yes, we do.  Yeah, yeah, yeah.  For the enterprise

24   licensing.  Sorry.  Yes.

25   Q.  Okay.  Now, as you established with Mr. Hinderaker --

1    and we can take that down, Vanessa, thank you -- FICO has a

2    price list that it uses in figure out what to charge

3    customers, right?

4    A.   Yes.

5    Q.   And that price list has been in place since 2003?

6    A.   The model has been in place since 2003.

7    Q.   Hasn't changed?

8    A.   The model has not changed.

9    Q.   Now sometimes FICO's customers license Blaze so that it

10   can be used in a particular managed computer application,

11   right?

12   A.   I would say business application, but yes.

13   Q.   And then as you said yesterday, generally speaking, as

14   clients buy more application licenses from us and they

15   spend more money, it becomes easier for them to license an

16   enterprise-wide license?

17   A.   Absolutely.

18   Q.   And when your customers start to use Blaze in more than

19   three or four applications, it's FICO's general practice to

20   offer them an enterprise-wide license?

21   A.   It was, yes.

22   Q.   And it was at least as of 2019, correct?

23   A.   Oh, absolutely.

24   Q.   Okay.  And an enterprise-wide license is one where you

25   lift the restrictions on the number of people and

1    applications that can use Blaze and you price based on the

2    size of the organization?

3    A.   I would say exception to the word "people," but you're

4    generally correct, yes.

5    Q.   Now, I notice that you said yesterday, Today we don't

6    sell enterprise license agreements anymore.  Do you

7    remember that?

8    A.   Yeah, we've moved away from them.

9    Q.   But you do still have a whole section of your pricing

10   guide devoted to enterprise licenses, right?

11   A.   We haven't taken it away, no.  And under the right

12   circumstances would we sell it?  Probably.

13   Q.   And at least as of 2018, 2019, FICO was still selling

14   enterprise-wide licenses, right?

15   A.   Yes.

16   Q.   Let's pull up the pricing guide, which is in evidence

17   as P418.  Mr. Waid, if we could look at page 3.

18   A.   I am there.

19   Q.   It says "License Types" at Section 2.1.1, correct?

20   A.   Correct.

21   Q.   If we could blow that up, Vanessa.  Thank you.

22            If you look at the third sentence it says, █████

23   ████████████████████████████████████████████████████████

24   ███████████████████████████████████████████████████████

25   ████████████████████████████        Do you see?

```
 1     A.  I do.

 2     Q.  And "perpetual" means forever?

 3     A.  As long as the license agreement terms are in place,

 4     yes.

 5     Q.  No end date?

 6     A.  There is no term, no.

 7     Q.  And the Blaze license that Chubb purchased in 2006 was

 8     perpetual, right?

 9     A.  Yes, it was.

10     Q.  Now, I heard you say yesterday that you're also moving

11     away from perpetual licenses, right?

12     A.  We are, yes.

13     Q.  But to be clear, as of 2018, FICO was still offering

14     customers perpetual licenses?

15     A.  Yes.  Correct.

16     Q.  They were an option?

17     A.  Absolutely.

18     Q.  They're still an option today?

19     A.  They are still an option today, yes.

20     Q.  And you testified this morning then in that 2016 period

21     it was sort of a mixed bag between perpetual and limited in

22     time, right?

23     A.  We had started moving away from perpetual in 2015, and

24     it was starting to become more annual in that time period,

25     but still a mixed bag.
```

1    Q.  Okay.  So let's talk about how you price

2    enterprise-wide Blaze licenses.  We have all heard FICO's

3    witnesses say that the company uses value-based pricing,

4    right?

5    A.  Correct.

6    Q.  And that means as a general matter, FICO tries to make

7    sure that its pricing reflects the value that Blaze

8    generates for the customer.  That's what you're trying to

9    do?

10   A.  Trying to, yes.

11   Q.  And when you reference value in this context, you're

12   talking about cost savings for the company or profit,

13   right?

14   A.  No, not always.  Sometimes it's ease of doing business

15   and revenue growth.

16   Q.  Okay.  Value?

17   A.  Value, yeah.

18   Q.  Okay.  Let's look at page 17 of the pricing guide.  And

19   this is where we see the section on Blaze Decision

20   Management, right?

21   A.  Correct.

22   Q.  And then let's flip forward a few pages to page 21.

23   And that's where we see this Enterprise/Business Unit

24   Pricing Guidelines, right?

25   A.  Correct.

1    Q.  So application pricing, you deal with that sizing grid

2    that you walked through with Mr. Hinderaker, right?

3    A.  I'm sorry.  I was reading.  I didn't pay attention.

4    Sorry.

5    Q.  Sure.  So I just want to draw a distinction.  If you're

6    talking about application-based pricing, you're using that

7    sizing guide?

8    A.  That's correct.  Absolutely correct.

9    Q.  When you deal with enterprise-wide pricing, you're

10   focusing on the size of the customer?

11   A.  That's correct, and other factors.

12   Q.  And you said yesterday that FICO views the size of the

13   customer and its revenues as a proxy for that value?

14   A.  Correct.

15   Q.  And there is, of course, a degree of judgment involved,

16   right?

17   A.  Yeah.  The judgment has to come down to, you know, the

18   organization and some of these factors that are actually on

19   the screen right now.

20   Q.  Yeah.  That's what I would like to look at.  So if you

21   look at the pricing guide, it says appropriate Blaze

22   enterprise pricing is a function of ██████████ , right?

23   A.  At the time, yes.

24   Q.  And there is these bullets?

25   A.  Yep.

1   Q.  The first factor is, ███████████████████

2   ████████████████████████████████████████████

3   correct?

4   A.  Yes.

5   Q.  Next is ████████████████████████████████

6   ████████████████

7   A.  Yes.

8   Q.  And then it says, ██████████████████

9   A.  Yes.

10  Q.  We've heard about ██████████████   in this trial,

11  right?

12  A.  Yes.

13  ██████████████████████████████████████████████

14  ███████████████████

15  ████████████████████████████████████

16  Q.  But determines █████████████████ -- it's in the pricing

17  guide because you agree that ██████████████ reflects the

18  value that Blaze is bringing to a customer, right?

19  A.  Yeah, it might actually be --███████████   It's

20  ████████████████████████████████████████████████

21  ████████████████████████████████████

22  Q.  The pricing guide says █████████████, right?

23  A.  That's what it says, yes.

24  Q.  And the idea is that Blaze is bringing more value to

25  the customer because █████████████████████ right?

1   A.  It also says ███████████████████████████, so it's

2   both.  That's my point.  It's both.

3   Q.  Next is ████████████████████████ right?

4   A.  Yes.

5   Q.  You're considering is Blaze helping the █████████

6   ██████

7   A.  Absolutely.

8   Q.  And then ██████████████████████████████

9   █████   right?

10  A.  Absolutely.

11  Q.  Essentially is Blaze contributing to profit at all?

12  A.  I wouldn't go so far as profit.  It just says ████████

13  ██████

14  Q.  And then finally the ███████████████████████████████

15  ████████████████████████████ both currently and in

16  the future, right?

17  A.  Yes, as I said also in my testimony as well.

18  Q.  Now if you look under the bullets we were just reading,

19  there is a box that provides guidance on how to come up

20  with an enterprise price based on the revenue of the

21  customer, right?

22  A.  Yes.

23  Q.  And this is the concept of the proxy we were talking

24  about?

25  A.  Yes.

```
 1    Q.  So if you have a smaller company with up to ████████
 2        ████████  in sales, you're looking at about a ████████
 3        enterprise-wide license fee, right?
 4    A.  That's what it says, yes.
 5    Q.  And then if you are a large company with ████████  in
 6        revenues, you're probably going to pay more, right?
 7    A.  Yeah.
 8    Q.  And the recommendation in this guide is ████████
 9    A.  That is correct, yes.
10    Q.  Again, enterprise-wide, no limitation on applications?
11    A.  No limitations on the number of applications, correct.
12    Q.  And now if a customer falls in between two of these
13        categories, so let's say they have ████████  in
14        revenue a year, so you're in between medium and large,
15        you're going to sort of prorate the fee and try to target a
16        number between the ████████
17    A.  Yeah, we call it extrapolation, but yes.
18    Q.  The high end on this chart is an extremely large
19        company with ████████  in revenue,
20        right?
21    A.  That's where the table stops, correct.
22    Q.  And the recommendation in the pricing guide is to add
23        ████████
24        ████████ , right?
25    A.  I wouldn't call it a recommendation, but, yes, that's
```

N. WILLIAM PAUL WAID - CROSS

```
 1    what it says.
 2    Q.  That's the guide in the pricing guide?
 3    A.  It is the pricing guide, yes.
 4    Q.  So if you have a huge, giant ███████████
 5    company, the guideline here is that ██████████ dollars is
 6    your starting point for a license fee, right, because you
 7    have your ████████████████, and then you're going to add
 8    another ███████████████████████████
 9    A.  Yeah, your math is correct.
10    Q.  Again, the idea here is it's an art, not a science,
11    right?
12    A.  Yes.
13    Q.  And you're trying to price in a way that you believe
14    reflects the value that Blaze brings to your customer's
15    company?
16    A.  Based on our experience, yes.
17    Q.  And in terms of where FICO goes to get these revenue
18    numbers, it's working off publicly available information
19    mostly?
20    A.  Mostly, yeah.  We do ask the clients, though.
21    Q.  Ultimately, it comes from the 10-K, those annual
22    reports that are filed?
23    A.  Yes, the 10-K.
24    Q.  Okay.  So now I want to talk about discounts.
25              If we go, Vanessa, to page 3 of the FICO price
```

1  list.  It's the same document.  Thank you.  Page 3.

2         So at the bottom of page 3 we see discount

3  schedules, right, Mr. Waid?

4  A.  Correct.

5  Q.  This is the standard discount table for perpetual Blaze

6  licenses, right?

7  A.  As of 2003.

8  Q.  You haven't changed the guide, right?

9  A.  Yes, we have.

10  Q.  But you don't have an updated written guide, correct?

11  A.  No.  It's actually part of our sales force automation

12  system.

13  Q.  And you apply these discounts to whatever price the

14  revenue chart we were just looking at tells you to ball

15  park.  That's how it worked, right?

16  A.  That's how it works, yes.

17  Q.  Okay.  So according to this table, if the revenue chart

18  tells you the starting price is ███████████████, the

19  standard discount is ████████████

20  A.  That's what this chart says.

21  Q.  And you suggested yesterday during questioning with

22  Mr. Hinderaker and again just now that things have really

23  changed on the discounting front?

24  A.  Absolutely.

25  Q.  You talked about how Blaze sales picked up after 2006,

1    so you didn't have to really aggressively discount anymore.

2    That's what you said, right?

3    A.  If you are speaking generally across the business that

4    I talked about, yes, that statement is correct.

5    Q.  But at least as of 2019, when you gave your deposition

6    testimony in this case, it was standard to give a

7    ██████████████████  for an up-front enterprise license?

8    A.  It was, yes.  That was the questioning that I was

9    asked.

10   Q.  Through 2019 at least, right?

11   A.  Oh, I wouldn't say that.

12   Q.  But that was your testimony in 2019, right?  It was

13   standard to give a ████████████████?

14   A.  That was my testimony, but I thought that was in the

15   context of the period of time for the negotiation for the

16   Chubb license in 2006.

17   Q.  Okay.  Let's look at your deposition testimony from

18   January 16th, 2019.

19   A.  Where do I go?

20   Q.  We're going to look at page 133.

21   A.  I'm sorry.  What tab?

22   Q.  I think there is a side tab at the front, Mr. Waid,

23   that says January 16th, 2019.

24   A.  I have it.  What page?

25   Q.  133.  So we're setting the stage.  We're in 2019,

```
 1   right?

 2   A.   That's when this deposition occurred, yes.

 3   Q.   Okay.  And at line 24 you were asked, "So can you

 4   explain to me how discounts are determined when FICO

 5   determines the price to charge for its Blaze software

 6   enterprise licenses?

 7        "Answer:  ████████████████████████████████████

 8   ████████████████████████████████████████████████

 9   ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ███████████████████████████████████████

12   ██████████████████

13        "The ██████████, thousands of customer pricings

14   that have gone out, it's just years of experience.  It's

15   even in Don's PowerPoint deck here, right.  He even says

16   that, you know, this is a bit of an art as much as it is a

17   science and it just comes from doing deals and knowing what

18   your competition is and how to incent customers to move.

19   It's quite expansive and extensive.

20        And you were asked, "So is it standard to give a

21   ████████████████████?

22        "Answer:  For an upfront ELA, yes. "

23        That was your testimony in 2019?

24   A.   In the context of an e-mail from 2006, yes.

25   Q.   You didn't say that in your answer.
```

```
 1    A.  It's in the deposition.
 2    Q.  Now, even though the discount table that we're looking
 3    at in the pricing guide stops at          , FICO does
 4    offer even higher discounts from time to time, right?
 5    A.  It has been known to, yeah.
 6    Q.  And your approval is needed for client discounts that
 7    go over         .
 8    A.  Actually, I need to go above me.
 9    Q.  But folks at FICO have authority to discount up to even
10            , right?
11    A.  Will Lansing is our CEO.  He can discount whatever he
12    wants.
13    Q.  And you've seen discounts often up to          ,
14    correct?
15    A.  I have, yes.
16    Q.  The idea behind the discount is you want to incentivize
17    the customer to buy that enterprise-wide license, right?
18    A.  That was the incentive initiative at the time.
19              THE COURT:  Counsel, hang on one moment.  Are we
20    at a point where we could take a break?
21              MS. GODESKY:  Mm-hmm.
22              THE COURT:  All right.  Members of the Jury, we
23    will take our morning recess.  Be back at ten minutes after
24    11:00.
25              THE CLERK:  All rise for the jury.
```

| | |
|---|---|
| 1 | **(Jury exits.)** |
| 2 | |
| 3 | **(In open court without the Jury present.)** |
| 4 | THE COURT:  You can step down if you want.  We |
| 5 | will be back at ten minutes after 11:00. |
| 6 | **(Recess taken.)** |
| 7 | |
| 8 | **(In open court with the Jury present.)** |
| 9 | THE COURT:  Go ahead and be seated.  Be seated. |
| 10 | BY MS. GODESKY: |
| 11 | Q.  Welcome back.  So we talked about general pricing |
| 12 | guidelines at FICO, and now I want to talk specifically |
| 13 | about the Chubb license. |
| 14 | A.  Okay. |
| 15 | Q.  As FICO's corporate representative, you understand that |
| 16 | FICO says the 1.3 million dollar 2006 license that Chubb |
| 17 | purchased limited Blaze use to the Chubb & Son, division of |
| 18 | Federal, right? |
| 19 | A.  Yes. |
| 20 | Q.  And it's FICO's position -- and you said yesterday that |
| 21 | you didn't know until 2016 that Blaze was used globally at |
| 22 | Federal affiliates in Canada, Australia and Europe? |
| 23 | A.  That is correct. |
| 24 | Q.  And you also understand that it's Chubb's position in |
| 25 | this case that the parties agreed and priced back in 2006 |

1    on a 1.3 million dollar license that would include Federal

2    and its global affiliates, right?

3    A.  That is what you are saying, yes.

4    Q.  And you are involved in 2006 discussions about pricing

5    a global license for Chubb, right?

6    A.  I was, yes.

7    Q.  And you didn't talk about any of those communications

8    during your direct examination with Mr. Hinderaker,

9    correct?

10   A.  I did not.

11   Q.  Okay.  So let's, let's take a look.  So there was --

12   the enterprise-wide license that we're all talking about,

13   that was finalized, the second amendment was signed at year

14   end 2006, correct?

15   A.  Yeah, December 2006, correct.

16   Q.  But there was discussion about the possibility of an

17   enterprise-wide license deal for Chubb earlier in 2006,

18   right?

19   A.  Yes.

20   Q.  So I want to take a look at what's already in evidence

21   as P330.

22           And this is an e-mail that John Haines to you,

23   dated April 4, 2006, correct?

24   A.  I'm still getting there.  You said P330, right?

25   Q.  Yes.

1    A.  That is the date of the e-mail, yes.

2    Q.  And Mr. Haines was your colleague at the time, as you

3    can see from his signature block at the bottom, right?  He

4    was the Director For Sales For Enterprise Decision

5    Management Technologies?

6    A.  Absolutely.

7    Q.  And the title of Mr. Haines's message to you was

8    "Pricing approval for Chubb ELA," right?

9    A.  That is correct.

10   Q.  And we all know by now ELA stands for Enterprise

11   License Agreement, right?

12   A.  It does, yes.

13   Q.  Let's look at the first two sentences, if we could.

14           Mr. Haines says, "Bill, I want to pass this

15   pricing by your" -- you -- "for Chubb."  Right?  "It is for

16   an ELA and is primarily for budgetary purposes."

17           Do you see that?

18   A.  I do.

19   Q.  And then he goes on to say, "Chubb Group of Insurance

20   Companies signed 12.3 billion in policies in 2005, and

21   based on that we used a .24 (24 percent of 1 percent -

22   decimal point is hard to see in e-mail) as the basis for

23   the pricing in the attached."  Right?

24   A.  That's what it says.

25   Q.  And he goes on to say, "10 dev seats and a 30 percent

1    volume discount," right?

2    A.  That's what it says.

3    Q.  And "dev" is short for development?

4    A.  Yes.

5    Q.  And you understood this to be a quote for an enterprise

6    license for the full set of Chubb Group of Insurance

7    Companies?

8    A.  There is an attachment.  Just let me look real quick.

9    Yes, that's correct.

10   Q.  And that means the enterprise-wide pricing would be

11   based on the revenue generated by the entirety of the Chubb

12   Group of Insurance Companies?

13   A.  In this e-mail, this quote, yes, that's correct.

14   Q.  That's the proxy being used for the value?

15   A.  That is correct, yes.

16   Q.  Let's look at the attachment, which is page 3 of the

17   exhibit.  And we can see Mr. Haines's document says at the

18   top, "Price quote for enterprise licensing by Chubb Group

19   of Insurance Companies, April 4th, 2006," right?

20   A.  Correct.

21   Q.  And we can see it's directed to the attention of James

22   Black at Chubb, right?

23   A.  Correct.

24   Q.  And then in the middle of the page -- if we go down,

25   Vanessa -- there is a note that sort of lists all those

1    factors we just looked about that FICO uses to price

2    enterprises licenses, right?

3    A.  It sure does.

4    Q.  And then right above the pricing breakdown, it says

5    something.  I want to take a look at what it says.  Right

6    above the grid, it says, "Enterprise deployment" --

7    development -- no.  "Enterprise deployment license is for

8    unlimited use for all Chubb Insurance group application

9    development."  Do you see that?

10   A.  Yes, it does.

11   Q.  And then if you look at line 6, the amount for the

12   license is identified at about 2.9 million.

13   A.  Yes.  That's correct.

14   Q.  And this is consistent with the rules of thumb in the

15   FICO pricing guide, right?

16   A.  Yes.  If you turn to the FICO -- sorry.  If you turn to

17   the FICO pricing guide, you will see that that is indeed

18   our standard pricing for all of Chubb.

19   Q.  Right.  And he's working off that 12.3 billion dollar

20   number for the Chubb Group of Insurance Companies?

21   A.  Yes.  All 12.3, all of Chubb, that is the price.

22   Q.  And then if you look at line 7, Mr. Haines's proposal

23   then applies a 30 percent discount, correct?

24   A.  That is what he is suggesting we propose.

25   Q.  And 30 percent of that 2.9 million starting point, I've

1    done the math, it's a little over 900,000.  Does that sound

2    right?

3    A.  It's essentially right here.  It's 923,100.

4    Q.  Thank you.  And so that means the discounted price that

5    Mr. Haines is proposing for a global license for the Chubb

6    Group of Insurance Companies is about 2 million dollars?

7    A.  Just a little bit above, but, yes, let's call it

8    2 million.

9    Q.  And you signed off on this pricing proposal for an

10   enterprise-wide perpetual license for all of global Chubb,

11   right?

12   A.  I did, yes.

13   Q.  I want to look at Defendants' Exhibit 14.  And this is

14   not in evidence yet, but I believe there is no objection.

15           Is that correct?

16           MR. HINDERAKER:  No objection.

17           MS. GODESKY:  Thank you.

18   BY MS. GODESKY:

19   Q.  So we're going to take a look at D14.  This is your

20   response to Mr. Haines, right?

21   A.  Yep.  As I said, I approved it.

22   Q.  And you had that one-word response, "Okay."

23   A.  Correct.

24   Q.  Okay.  Now you saw FICO damages expert, Mr. Zoltowski,

25   testify earlier, right?

1    A.  I did, yeah.

2    Q.  And he talked about revenue running through computer

3    applications using Blaze, right?

4    A.  He did, yes.

5    Q.  And you didn't respond to this e-mail from Mr. Haines

6    and say, Wait a minute, John, we think the value that Blaze

7    can bring to the Chubb Group of Insurance Companies could

8    be billions of dollars.  You didn't say that, right?  You

9    said "Okay."

10   A.  No.  Why would I?

11   Q.  And you didn't even say, Wait a minute, John, we have

12   to factor in the value that we're going to bring to the

13   Chubb Group of Insurance Companies, and we need to be

14   asking for tens of millions of dollars.  You didn't say

15   that, right?

16   A.  No.  I was following the pricing guides.

17   Q.  Just, "okay," to the 2.5 million proposal, right?

18   A.  2.95, but, yes, correct.

19   Q.  And that felt right for an enterprise perpetual license

20   for the global Chubb Group of Insurance Companies?

21   A.  That is correct.  Yes.

22   Q.  Now I want to move forward in time a couple of months

23   to June 2006, and this is a document already in evidence as

24   P108.  This is a June 16th, 2006, e-mail from Mr. Haines to

25   you, copying Mr. Wachs, right?

1    A.  It is.

2    Q.  So this is all internal at FICO, correct?

3    A.  Yes.

4    Q.  And Mr. Haines writes, "Chubb is inquiring again about

5    an enterprise price, but they want to know if this will

6    include international."  Do you see that?

7    A.  I do.

8    Q.  Then he says, "I have attached the quote for your

9    review, but I think if they wanted to do an ELA, then for

10   this price, we could grant them global rights," correct?

11   A.  That's what it says.

12   Q.  So it's clear from Mr. Haines's e-mail in June 2006

13   that you are talking about how to price a global license?

14   A.  It is talking about how to globe -- yes.

15   Q.  Let's look at page 2 of the exhibit.  And here again at

16   the top, we see price quote for enterprise licensing for

17   Chubb Group of Insurance Companies, correct?

18   A.  Yep.

19   Q.  And if we go to page 3 of the exhibit, Vanessa, we can

20   see that it's the same approximately 2.5 million dollar

21   quote that we looked at from April, right?

22   A.  It is, yes.  It's actually the same quote.

23   Q.  And so that means Mr. Haines was comfortable proposing

24   a 2.5 million dollar fee for a global license to the whole

25   Chubb Group of Insurance Companies?

1    A.  This, this quote says that, yes.  Correct.

2    Q.  And now this time, Mr. Waid, you had a follow-up

3    question for Mr. Haines?

4    A.  I did, yes.

5    Q.  Okay.  Let's take a look at the e-mail that is already

6    in evidence as P226.

7    A.  I'm there.

8    Q.  Great.  I want to look at the bottom of the e-mail

9    chain where you are responding to Mr. Haines.

10              Blow that up, Vanessa.  Thank you?

11              So you wrote, "What are the annual revenues."  Do

12   you see that?

13   A.  Yes, I do.

14   Q.  And then Mr. Haines responded with income numbers from

15   a press release, publicly available information, right?

16   A.  He is indeed giving me the global Chubb, all of Chubb

17   revenues, yes.

18   Q.  And he says, if you look at the third paragraph of

19   Mr. Haines's message, "Net written premiums in 2005

20   increased 2 percent to 12.3 billion.  Premiums for the

21   insurance business grew 4 percent, 3 percent in the United

22   States and 8 percent outside the United States," correct?

23   A.  Correct.

24   Q.  So no doubt about it, that 12.3 billion dollar revenue

25   number includes revenues generated from Chubb's global

1    operations, right?

2    A.  Agreed.

3    Q.  And that's the entirety of the Chubb Group of Insurance

4    Companies, not just the Chubb & Son division, right?

5    A.  Correct.

6    Q.  Now I want to look at your response in the next e-mail

7    up in the chain.  You wrote, "This would be a 1.6 million

8    dollar list price."  And then you recommended that FICO go

9    with 1.6 million with a 20 percent discount, right?

10   A.  That's what I wrote, yes.

11   Q.  20 percent of 1.6 million, I will represent to you, is

12   320,000.  Does that sound right?

13   A.  Yes, it is correct.  Yes.

14   Q.  So that meant you were proposing a 1.28 million dollar

15   global license fee as of mid 2006 for the whole Chubb Group

16   of Insurance Companies?

17   A.  No, I did not.  Which ELA is it talking about?

18   Q.  But you wrote in response to Mr. Haines's proposal that

19   you should go with a 1.6 million dollar fee with a 20

20   percent discount, correct?

21   A.  For which ELA?

22   Q.  Mr. Waid, is it your testimony that when you suggested

23   that FICO propose this 1.28 million dollar fee you were not

24   including the Chubb Group of Insurance Companies?

25   A.  The 1.295, it was included.  This just says, 1.6 list

1    price.  Which ELA?  There is multiple ELA's in discussion

2    right now.

3    Q.  So it's your position -- I just want to make sure I'm

4    clear on your position.  It's your testimony that your

5    response here, your reference to the 1.2 million dollar

6    proposal, 1.6 with a 20 percent discount, that was not for

7    a global license.  That's your testimony?

8    A.  I -- as I said at the deposition, and I'll say now, I

9    don't recall any of these e-mails.  However, there is

10   evidence, circumstantial evidence, in the e-mail themselves

11   why it is not the global price.

12   Q.  So you don't really recall any of this.  You don't have

13   a firsthand recollection?

14   A.  Nope, I do not.

15   Q.  And there is nothing in these e-mails with Mr. Haines,

16   where you are responding to his global proposal, where you

17   say anything like, We need to charge separate enterprise

18   fees for each country that might use Blaze.  You don't make

19   that proposal, right?

20   A.  Not in any of these e-mails, no.

21   Q.  Now, let's look at Mr. Layden's response.  He is

22   reacting to your suggestion that you do a 1.6 million

23   dollar license with a 20 percent discount.  And he says,

24   "You are correct.  Let's not get greedy," right?

25   A.  That's what he says, yes.

1    Q.  Mark Layden was the general manager of the decision

2    management software business unit, right?

3    A.  He was my boss.

4    Q.  He was your boss.  And he thought that Mr. Haines's

5    quote of 3 million with a 30 percent discount might be a

6    little on the greedy side for a global enterprise license

7    for the Chubb Group of Insurance Companies, right?

8    A.  I can't speak to what was in Mr. Layden's head.

9    Q.  That's what this e-mail suggests, right?

10   A.  No, I don't think it does.

11   Q.  There is no suggestion from Mr. Layden here, either,

12   about breaking this up by individual countries and charging

13   country specific license fees, right?

14   A.  No.

15   Q.  He doesn't suggest that?

16   A.  No.

17   Q.  Let's look at Exhibit P -- I'm sorry.  Let's look at

18   Exhibit D30.

19           This is not in evidence yet, but I believe there

20   is no objection, if Mr. Hinderaker could confirm.

21           MR. HINDERAKER:  No objection, Your Honor.

22           THE COURT:  D30 is received.

23   BY MS. GODESKY:

24   Q.  Mr. Waid, this is an e-mail from Mr. Haines on the same

25   chain we were just looking at, right, but this was sent at

1     9:56 a.m.  Do you see that?

2     A.  Correct.

3     Q.  Mr. Haines writes, "More financial data."  Do you see

4     that at the top of his e-mail?

5     A.  Correct.

6     Q.  And then he pastes some information that looks like it

7     would have been come from Chubb's 10-K, right?

8     A.  Correct.

9     Q.  And the information from Mr. Haines shows in the first

10    line of the financial information that 12.3 billion in net

11    written premiums for 2005, correct?

12    A.  Correct.

13    Q.  And so this is undoubtedly a reference to 12.3 billion

14    dollars in revenue for the entire global Chubb Group of

15    Insurance Companies.  That's what this reflects?

16    A.  Correct.

17    Q.  And that's clearly what Mr. Haines is working off of

18    with his proposals, correct?

19    A.  Correct.

20    Q.  No one on any of these chains did anything to subtract

21    from that 12.3 billion dollar number revenues earned by

22    Chubb Australia, right?

23    A.  That is correct.

24    Q.  No one jumped in and said, Well, we've to carve out

25    Chubb Canada and Chubb Europe?  No one made that proposal,

1    right?

2    A.  Proposal or carved those numbers out?  I don't

3    understand the question.

4    Q.  No one suggested, Hey, when we're coming up with these

5    license fee proposals, we need to subtract from that 12.3

6    billion dollar number revenue earned by Chubb Canada.  No

7    one said that, right?

8    A.  Correct.

9    Q.  Now, if we could pull up Defendants' Demonstrative 22.

10              This is a summary you've seen, Mr. Waid, of some

11   terms from Chubb's various Blaze license agreements, right?

12   A.  I have seen this before, yes.

13   Q.  And we can agree that the first iteration of the

14   license agreement from June 2006, use of Blaze was limited

15   to CSI Express, right?

16   A.  Correct.

17   Q.  And that cost about $173,000, right?

18   A.  That was a negotiated price.

19   Q.  And then there was Amendment One that said, okay, now

20   you can use Blaze in the entire Chubb specialty lines

21   division, no limit on the number of applications, but

22   you've got to stay in that division, right?

23   A.  That's correct.

24   Q.  And that was a perpetual license, forever?

25   A.  Correct.

```
 1    Q.  And the cost went up to $350,000?

 2    A.  That's correct.

 3    Q.  And then the third box shows where things landed for

 4    the enterprise-wide amendment in December 2006, correct?

 5    A.  Correct.

 6    Q.  And we can all agree that the defined scope quantity in

 7    that second amendment was enterprise-wide, correct?

 8    A.  That was the scope in the contract.

 9    Q.  And that means, no limitation on the division or number

10    of applications this time.

11    A.  There are limitations in the contract, but

12    enterprise-wide means all of Chubb & Son, a division of

13    Federal, yes.

14    Q.  It was defined as an enterprise-wide license, right?

15    We can agree on that.  It was an ELA?

16    A.  That's what is in the table, yes.

17    Q.  And there was no limit on the number of applications?

18    A.  That is correct, yes.

19    Q.  And the price increased to 1.3 million dollars, right?

20    A.  That is correct.

21    Q.  And we saw earlier in 2006, you had recommended pricing

22    the enterprise license for the Chubb Group of Insurance

23    Companies at 1.6 million plus a 20 percent discount, right?

24    A.  I did not propose that.

25    Q.  We saw the e-mail where you were proposing 1.6 plus a
```

1  20 percent discount.  We saw that e-mail.

2  A.  I did propose that, yes.

3  Q.  And we agreed that 1.6 million with a 20 percent

4  discount is 1.28 million?

5  A.  Below this number, yes.

6  Q.  Very close to this 1.3 million dollar number, right,

7  Mr. Waid?

8  A.  It is below.

9  Q.  And it is your position now, I'm sensing from your

10  testimony, that this 1.3 million dollar payment only

11  covered the Chubb & Son, division of Federal, not the

12  global group of the Chubb -- not the global Chubb Group of

13  Insurance Companies.  That's your position.

14  A.  As I told you, I have no recollection of any of this.

15  I only have the documentation that you have that I have.

16  Q.  Okay.  Let's look at already in evidence P111.  This is

17  an e-mail from Sally Holt at FICO to you on December 1st,

18  2006, correct?

19  A.  Correct.

20  Q.  And according to her signature on the first page, she

21  is the senior director of sales engineering.

22  A.  That is correct.

23  Q.  This is a sales engineering report, right?

24  A.  That is correct.

25  Q.  Basically it's an update from the sales team on where

1    things stand?

2    A.  From the engineers in their engagement with the sales

3    team, correct.

4    Q.  Let's look at page 3 of the PDF, and we see an entry

5    for Chubb Global Enterprise License Agreement, right?

6    A.  That is correct.

7    Q.  And it says, "Expected value, 1.2 million dollars,"

8    right?

9    A.  That's correct.

10   Q.  So the hope was, FICO was expecting as of early

11   December 2006 to be able to sell a global enterprise

12   license to Chubb for 1.2 million dollars?

13   A.  Incorrect.

14   Q.  That's the reference here, right, expected value?

15   A.  In the quarter.

16   Q.  In the quarter.  So it's your testimony, Mr. Waid, that

17   the idea was that FICO would be collecting 1.2 million

18   dollars from Chubb just in this quarter?

19   A.  Correct.

20   Q.  And then --

21   A.  Sorry.  Additionally.

22   Q.  And then more money to come in the future?

23   A.  No.  She is talking about a contract that would be an

24   additional 1.2 million dollars.

25   Q.  Doesn't say that, right?

1    A.  That's the way the report is set up.  It's actually to

2    indicate what we are closing in this quarter.

3    Q.  It's entitled Chubb Global ELA Expected Value 1.2,

4    correct?

5    A.  Yeah.  That's what it is labeled.  Yes, correct.

6    Q.  And that number is pretty consistent with what we saw

7    John Haines pretty clearly proposing in those prior e-mails

8    for a global license for the Chubb Group of Insurance

9    Companies, correct?

10   A.  I'm sorry.  You have to help me with which e-mail

11   you're referring to, because I haven't seen a 1.2 e-mail so

12   far.

13   Q.  We have seen a lot of e-mails in the 1.2 million dollar

14   range, right?

15   A.  No.  I can't say yes to that.

16   Q.  Regardless, Mr. Waid, the number that we see on this

17   sales report, the expected value 1.2 million, we can agree

18   that that's right in the ball park of the 1.3 million that

19   Chubb ended up paying with Amendment Two?

20   A.  No, I can't agree with that.

21   Q.  Okay.  Let's look a little lower on the page where

22   there is an entry on November 30th, 2006.  Do you see that?

23   It says, "Last update."

24   A.  I do.

25   Q.  "Current status.  Pricing sent to Chubb of 1.5 million

N. WILLIAM PAUL WAID - CROSS

1    for global ELA, Blaze Advisor."  Do you see that?

2    A.  I do.

3    Q.  And then if you scroll down a little more, Vanessa,

4    there is another entry for November 30th, 2006.

5              Do you see that?  Are you with me, Mr. Waid?

6    A.  I am.

7    Q.  And it says, "Moving toward a global ELA," right?

8    A.  That's what it says.

9    Q.  And then it references Larry.  That's Mr. Wachs?

10   A.  Yes.

11   Q.  "Larry has been working with Chubb to get an ELA

12   through this year."  Do you see that?

13   A.  I do.

14   Q.  "The total after credit for a global ELA including

15   COBOL and smart forms was priced at 1.5 million.  I need to

16   get an update on Chubb's response to the proposal."

17             Do you see that?

18   A.  I see that.

19   Q.  And these numbers in these sales reports, they're a lot

20   lower than the tens of millions of dollars on the slides

21   you were walking through with Mr. Hinderaker on your direct

22   examination, correct?

23   A.  Yes.

24   Q.  And certainly nowhere near the billions of dollars that

25   we heard Mr. Zoltowski talking about?

1    A.  I think that's obvious to everybody, yes.

2    Q.  And when you received this message from Mr. Holt or

3    Ms. Holt --

4    A.  Ms. Holt.

5    Q.  There is no record of you responding and saying,

6    expected value, 1.2 million, we can bring tens of millions

7    of dollars of value to Chubb, right?  You didn't say that.

8    A.  No, I did not.

9    Q.  And there is nothing in this proposal that talks about

10   dividing the global enterprise-wide lines into country by

11   country license fees, right?  No one suggested that.

12   A.  This is not a proposal.  It's a report, but it's not in

13   the report, that is correct.

14   Q.  And there is nothing in the report about excluding

15   Chubb Canada, Chubb Australia and Chubb Europe.

16   A.  Absolutely nothing.

17   Q.  And of course we know from that demonstrative we just

18   looked at that Chubb had already done the single

19   application thing, right?  It had that first initial

20   license, a few hundred thousand dollars, one application,

21   right?

22   A.  Correct.

23   Q.  And so it was now in the position where it wanted to

24   add it to a few more applications, so you're talking about

25   enterprise license, right?

1    A.  There was the intermediate step of division, but yes,

2    more.

3    Q.  Now one of the reasons -- we can take that down,

4    Vanessa.  Thank you.

5            One of the reasons we're all here for this trial

6    is FICO says under this Blaze license agreement where Chubb

7    paid 1.3 million dollars, Chubb Canada could not use the

8    software, correct?

9    A.  Correct.

10   Q.  And Mr. Hinderaker made a point of asking you

11   yesterday, when did you first become aware that Blaze was

12   used by Chubb outside the United States.  Do you remember

13   that?

14   A.  Yeah.

15   Q.  And you said, January 2016, Mike Sawyer and Russ

16   Schreiber made me aware.  Do you remember that?

17   A.  Correct.  Yes.

18   Q.  I want to take a look at Defendants' Exhibit 330.  This

19   is not in evidence.

20           This is an e-mail from Isabel Vives, a FICO

21   employee in Canada, correct?

22   A.  Correct.

23   Q.  This was sent November 9th, 2015, correct?

24   A.  Correct.

25   Q.  At this point in fall 2015, FICO had not yet taken the

1   position that Chubb was in breach of the contract because

2   of the ACE acquisition, correct?

3   A.  That's correct.

4   Q.  You're copied on this e-mail, correct, Mr. Waid?

5   A.  I am, yes.

6          MS. GODESKY:  Defendants offer Exhibit D330 into

7   evidence.

8          THE COURT:  D, is it 330?

9          MS. GODESKY:  330, Your Honor.

10         THE COURT:  330 is received.

11  BY MS. GODESKY:

12  Q.  I want to take a look at the bottom of page 3 of the

13  PDF, if we could, Vanessa.

14         This is Ms. Vives at FICO reporting on efforts to

15  sell Blaze in Canada.  That's basically what is happening,

16  right?

17  A.  Hang on a second.

18         MS. GODESKY:  Vanessa, let's actually go back to

19  the first page of Ms. Vives's e-mail, and if you can blow

20  up the first paragraph.

21  BY MS. GODESKY:

22  Q.  She says, "Per instructions, I've reached out to

23  practically every responsibly sized insurance company in

24  Canada."

25  A.  Yes.

1    Q.  "See below for current status on each account."

2    A.  I just had to orient myself.

3    Q.  Me, too.  Let's go to page 3 of the PDF, and we see at

4    the bottom Chubb?

5    A.  Yes.

6    Q.  So she has called Chubb Canada as part of her sales

7    reference, right?

8    A.  Technically doesn't say that, but yes, Chubb Canada.

9    Q.  There is an entry 10/26, October 26th.  "Mike Sawyer

10   indicates they have enterprise licenses for Blaze

11   worldwide.  They are also a small player in Canada, special

12   lines."

13        Do you see that?

14   A.  I see that, yes.

15   Q.  You didn't chime in and say, wait a minute, Isabel,

16   when we sold Chubb our enterprise license back in 2006, we

17   carved Chubb Canada out.

18        You didn't say that, right?

19   A.  I'm not even sure I read it.

20   Q.  Now, on this topic of how much FICO charges for Blaze,

21   I want to take a look at some of the contracts that FICO

22   has entered with other companies.

23   A.  Okay.

24   Q.  I want to start with a Blaze license agreement that

25   FICO entered with a company called ███████████, and this

```
1      is already in evidence as Defendants' Exhibit 4.

2              Do you know, Mr. Waid, ███████████ is a bank

3      holding company.  Does that sound right?

4      A.  Yeah.

5      Q.  And they were acquired by ████████?

6      A.  Eventually, yes.

7      Q.  Okay.  We'll just wait for D4 to come up on the screen.

8              No problem.

9              Okay.  We have D4, and if you look at the top,

10     Mr. Waid, this is a copy of the Blaze license agreement

11     that FICO executed with ████████████ in 2005, correct?

12     A.  Correct.

13     Q.  And I want to look at page 8 where we can see the term.

14     Do you see it says, ████████████████████████

15     █████████████████████████████████████████████████

16     █████████████████████████████████████████████████

17     ████████████  right?

18     A.  Correct.

19     Q.  So this is a perpetual license like Chubb's.

20     A.  Correct.

21     Q.  And then if we could go to page 13 of the document and

22     look at Exhibit A, we can see that FICO charged ████████

23     ██████████████████████████  for a perpetual

24     enterprise-wide license, correct?

25     A.  That is correct.
```

1    Q.  And that covered deployment and development, right?

2    A.  Correct.

3    Q.  And since this is an enterprise-wide license, you would

4    have signed off on it.

5    A.  I more than signed off it.  I negotiated this one.  I

6    will never forget this contract.

7    Q.  Does it sound right, Mr. Waid, that ▮▮▮▮▮▮▮▮▮▮ had ▮

8    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ as of the time you were

9    negotiating this license?

10   A.  It's around the there.  It's a long time ago.  I don't

11   remember, but it's around there, I'll concede, ▮▮▮▮▮▮▮.

12   Q.  So you will concede that ▮▮▮▮▮▮▮▮ had about ▮

13   ▮▮▮▮▮▮▮▮▮▮▮▮▮, give or take, and FICO sold an

14   enterprise-wide perpetual deployment and development

15   license for ▮▮▮▮▮▮▮▮▮▮▮?

16   A.  In 2005.

17   Q.  Okay.  Let's move on to 2007.  I want to take a look at

18   a Blaze license agreement that FICO entered with ▮▮▮▮,

19   and ▮▮▮▮ is a large department store chain that we all

20   know and love, right?

21   A.  Correct.

22   Q.  This is Exhibit D284.

23   A.  I'm there.

24   Q.  Okay.  And if we turn to page 6, which is Exhibit B,

25   you can see if we can blow up that chart, this states that

```
1    the license is perpetual for development and deployment,
2    right?
3    A.   That's what it says.
4    Q.   And the scope is defined as use solely within client's
5    ███████████████████, right?
6    A.   That's what it says, yes.
7    Q.   So this is not an enterprise-wide license.
8    A.   It is not, no.
9    Q.   Right.  Let's go to page 5.  And if we go to Section
10   5.4 of Exhibit B on page 9, sorry, do you see there is a
11   section called Enterprise License Option?
12   A.   Correct.
13   Q.   So it says, ████████████████████████████████
14   █████████████████████████████████████████████████
15   ████████████████████
16   A.   Correct.
17   Q.   Do you see that?
18   A.   Yes.
19   Q.   And then if you look at subparagraphs A and B below,
20   the ultimate total price that ██████ would pay for an
21   enterprise-wide license if it wanted to convert would be
22   ████████████████, right?
23   A.   One month after Chubb signed, yes.
24   Q.   And does it sound right to you that ██████ had more
25   than 50 billion dollars in revenue as of this time period?
```

1    A.  Wouldn't surprise me at all.

2    Q.  Let's look at Defendants' Exhibit 283, which is a

3    contract with ███████

4          Are you with me, Mr. Waid?

5    A.  283, yes.

6    Q.  And if we could go to page 13, this is defining the

7    scope and price of the original agreement with ██████

8    right?

9    A.  In 2005, yes.

10   Q.  It was not an enterprise license.  It was limited in

11   scope, correct?

12   A.  Correct.

13   Q.  I want to take a look at the addendum to this contract,

14   which we can find at page 34, and this chart, Mr. Waid,

15   shows that the license as of March 29th, 2007, had been

16   expanded to perpetual enterprise-wide, right?

17   A.  That is correct.

18   Q.  For both development and deployment, correct?

19   A.  Correct.

20   Q.  And the total price listed at the top right of this

21   chart is ███████ , correct?

22   A.  Correct.

23   Q.  And then there was a credit to ██████ for prior license

24   fees that they had already paid.

25   A.  Correct.

```
 1    Q.  And so the final net license fee for this perpetual
 2    enterprise-wide Blaze license was about ███████
 3    A.  Correct.
 4    Q.  Does it sound right to you that ████████ revenue around
 5    this period of time was about 14 billion?
 6    A.  It does not.
 7    Q.  Okay.  Let's look at in your binder next to you, I have
 8    a set of 10-Ks.  Let's take a look at Defendants'
 9    Exhibit 309.
10    A.  Okay.
11    Q.  And if you go to page 9.
12    A.  Page 9.  I'm there.
13    Q.  Does that refresh your recollection, Mr. Waid, about
14    ████████ --
15    A.  This is worldwide?
16    Q.  They had 14 billion dollars in worldwide revenue as of
17    2006, correct?
18    A.  Yes, but this is U. S. grant.
19    Q.  What was the revenue for U. S.?
20    A.  I don't know.
21    Q.  Next I want to look at ████.  This is Defendants'
22    Exhibit 293, and ████ we all know it's a big national
23    ████████████ right?
24    A.  Colossal.
25    Q.  Colossal.  And if we turn to page 17, we can see the
```

N. WILLIAM PAUL WAID - CROSS

1    summary of this license agreement, and the price for this
2    Blaze license was ███████████████, correct?
3    A.  It is ██████████████      yes.
4    Q.  And that included unlimited development seats, correct?
5    A.  Correct.
6    Q.  And it was perpetual and enterprise-wide, correct?
7    A.  Correct.
8    Q.  And does it sound right that ███ had tens of billions
9    of dollars of revenue around this time period?
10   A.  ███ did, yes.
11            MS. GODESKY:  And just for clarity of the record,
12   Your Honor, defendants do offer D293, which is the ████
13   license agreement, and D283, the ██████ agreement in
14   evidence.
15            MR. HINDERAKER:  Subject to your Court's order,
16   Your Honor.
17            THE COURT:  Subject to the Court's order, 283 and
18   294 are received.
19            MS. GODESKY:  I will add 284 for ████████
20            THE COURT:  Same.  284 is received subject to the
21   Court's limitation.
22            MS. GODESKY:  Thank you.
23   BY MS. GODESKY:
24   Q.  And then if we could take a look at Defendants'
25   Exhibit 276, which is a license agreement with ████████ the

1    ████████████████████, correct?

2    A.  One second:  Correct.

3              MS. GODESKY:  And defendants offer D276 into

4    evidence.

5              MR. HINDERAKER:  Haven't gotten there yet, but

6    subject to the same.

7              THE COURT:  Subject to the Court's order, D276 is

8    received.

9    BY MS. GODESKY:

10   Q.  And, Mr. Waid, if we look at page 15, we will see our

11   summary chart of the Blaze license terms, and here we have

12   an enterprise perpetual deployment and development license

13   for ████████  on the deployment side and a little over ████████

14   on development, correct?

15   A.  Correct.

16   Q.  Okay.  Now I want to take a look at Exhibit D343, and

17   this is not yet in evidence.

18              This is a February 27th, 2007, e-mail regarding a

19   ████████████  Blaze ELA pricing proposal.  Do you see that,

20   Mr. Waid?

21   A.  I see that, yes.

22   Q.  And you are copied on this e-mail, correct.

23   A.  I am indeed.

24   Q.  The e-mail comes from a Ms. Karen Beale, and she is at

25   FICO?

```
 1    A.  She was.
 2    Q.  And it's sent to Mr. Vincent Gamba at ███████████,
 3    right?
 4    A.  That's what it says.
 5             MS. GODESKY:  Defendants offer D343.
 6             MR. HINDERAKER:  No objection.
 7             THE COURT:  D343 is received.
 8    BY MS. GODESKY:
 9    Q.  Now, the first paragraph of this e-mail says, "FICO is
10    extending an incentive proposal for a Blaze Advisor ELA at
11    ███████████████████, to be executed March 26th,
12    2007."
13             Do you see that?
14    A.  Are you on the first page or second page?  Where are
15    you at?
16    Q.  I am in the first sentence?
17    A.  Correct.
18    Q.  And then if you turn to the second page, a little more
19    than halfway down, there is this header, Incentive Proposal
20    For Enterprise License, right?
21    A.  Correct.
22    Q.  And this was an enterprise license for the ███████
23    ██████ region?
24    A.  That's what it says.
25    Q.  And the proposed price was ███████████ dollars?
```

```
 1    A.  And that's the proposed price, yes.
 2    Q.  And that reflected a ███████████████████
 3    ███████████, right?
 4    A.  That's what it says.
 5    Q.  And you would have approved it because it's a big
 6    discount, right?
 7    A.  I wouldn't have approved the ███████████.  Somebody else
 8    had to do that.
 9    Q.  Might have been your boss?
10    A.  Probably.
11    Q.  Okay.  And then let's look at another e-mail like this,
12    which is Defendants' Exhibit D12.  You're familiar with the
13    company ███████████, Mr. Waid?
14    A.  Yes, I am.
15    Q.  It's a credit card company, right?
16    A.  They do more than that now, but yes.
17    Q.  And this is a March 1st, 2006, e-mail from David
18    Burgess to ████████ correct?
19    A.  David Burgess.
20    Q.  And David Burgess is a FICO employee?
21    A.  At this time, yes.
22    Q.  And he's e-mailing ████████████████████?
23    A.  He is, yes.
24         MS. GODESKY:  Defendants offer Exhibit D12 into
25    evidence.
```

```
 1              MR. HINDERAKER:  No objection.
 2              THE COURT:  D12 is received.
 3   BY MS. GODESKY:
 4   Q.  I want to take a look at what Mr. Burgess says.  He
 5   says, "Our product management team has determined that the
 6   Blaze Advisor ELA value for ██████████ is a little over 9
 7   million dollars," right?
 8   A.  ████
 9   Q.  ████?
10   A.  It says ████ here.
11   Q.  Thank you.  ████.  And then if you scroll down, there is
12   a proposal for an ELA at ██████████.
13   A.  No, that's not correct.  The proposal is for ████
14   ██████████.
15   Q. ██████████.  That's the proposal.
16   A.  Correct.  And then there is credits for what they have
17   already paid, which brings the net due to ████.
18   Q.  Okay.  So this is a proposal for ██████████ dollars
19   for an enterprise license for ██████████?
20   A.  In 2006, correct.
21   Q.  Okay.
22              Now, we can take that down, Vanessa.  Thank you.
23              Mr. Waid, you are quite familiar with your more
24   than 20 years of work at FICO with these contracts that the
25   company enters into for Blaze, right?
```

```
1    A.  I am, yes.
2    Q.  And we've seen that FICO regularly does business with
3    very large companies?
4    A.  We do business with very large companies, yes.
5    Q.  You have access to all those contracts that FICO enters
6    into for Blaze Advisor software, right?
7    A.  What do you mean "access"?
8    Q.  You have access to a lot of them at work, right?
9    A.  I'm not sure I understand the word "access."  You mean
10   can I get to them?
11   Q.  Sure.
12   A.  Yes, I can get to them.
13   Q.  We walked through a few of them, ████████████████
14   ████ and other big companies, right?
15   A.  Yes.
16   Q.  We've seen the license fees and we've seen the 1.3
17   million that was charged to Chubb in 2006, right?
18   A.  Correct.
19   Q.  And I get the sense that you're trying to suggest that
20   pricing has changed since the mid 2000s when Chubb signed
21   its Enterprise License Agreement, correct?
22   A.  No.  I'm saying that discounting has changed.
23   Q.  Discounting has changed.  So pricing is generally the
24   same.  It's just discounting has changed?
25   A.  Yeah.  The models have shifted from perpetual to term
```

1    annual, and we've moved away from ELAs.  That's another

2    change, but the actual model, no, not changed.

3    Q.  Okay.  Vanessa, if we could pull up the slide deck that

4    Mr. Waid used with Mr. Hinderaker and go to slide 29.

5            So you walked through this calculation with

6    Mr. Hinderaker of a hypothetical customer using Blaze in

7    various computer applications, right?

8    A.  Correct.  Yes.

9    Q.  And the total here is almost 50 million dollars, right?

10   A.  It is, yes.

11   Q.  And you have access to a lot of Blaze license

12   agreements at FICO, but you haven't identified any license

13   agreement with any customer anywhere where they paid 50

14   million dollars to access Blaze, correct?

15   A.  You have to take into the account the years here as

16   well.  Let me do the math real quick.  It's easier to do it

17   on an annual basis, so it would be hard for me to answer

18   that question.

19           Annually I can answer it off the top of my head,

20   but this is hard because it's duration.

21   Q.  When you walked through your direct examination with

22   Mr. Hinderaker, you didn't show us any Blaze license

23   agreements with other customers, right?

24   A.  No.

25   Q.  You just showed us the hypothetical calculation on page

1  29, correct?

2  A.  No.  I showed you my standard pricing.

3  Q.  Right --

4  A.  This is my standard pricing.

5  Q.  Your standard pricing on slide 29, 50 million dollars,

6  correct?

7  A.  For these applications at this size with those number

8  of dev seats for those years, correct, that is standard

9  pricing.

10  Q.  But you were not able to bring a single license

11  agreement to trial showing a single customer ever paying 50

12  million dollars to access Blaze, correct?

13  A.  No.

14  Q.  And you also didn't bring a single contract to trial

15  showing a customer ever paying 40 million dollars to access

16  Blaze, correct?

17  A.  We did not bring -- the easy answer is no, we did not

18  bring anything to trial, yes.  That's correct.

19  Q.  And you don't have a contract you can show the jury

20  where a customer paid 20 million dollars to access Blaze,

21  right?

22  A.  I don't know about that.

23  Q.  But you haven't shown them, correct?

24  A.  We have not, no.

25  Q.  So let's talk about your standard pricing on slide 29.

1    Let's leave it up, Vanessa.

2              Your standard pricing hypothetical here on the

3    screen assumes that Blaze is in use in 17 applications,

4    correct?

5    A.  This scenario?  Correct, 17.

6    Q.  But with your 20 years of experience at FICO, you

7    cannot identify a single company that ever entered into an

8    application based license for Blaze for even 15

9    applications, right?  That's never happened.

10   A.  That's not true.

11   Q.  I want to look at your deposition testimony from April

12   2nd.  And I'm looking at page 77.

13             Are you with me, Mr. Waid?

14   A.  I'm there.

15   Q.  You were asked at line 3, "Question:  Now in section 11

16   of your declaration," and a declaration is a sworn

17   statement under penalty of perjury, right?

18   A.  Yes.  Correct.

19   Q.  Okay.  "In section 11 of your declaration, you,

20   Mr. Waid, say, 'To my knowledge, a FICO licensee has never

21   entered into a license agreement for the use of Blaze

22   Advisor software on an application basis with 15 separate

23   applications; is that accurate?"

24             And your answer, "Yes," correct?

25   A.  At the time, yes.

1   Q.  And that's because as we discussed earlier, generally

2   when a customer uses Blaze in more than three or four

3   applications, FICO's practice is to offer an

4   enterprise-wide license, correct?

5   A.  That is correct.

6   Q.  And this 49 million dollar number is not only based on

7   individual licenses for 17 different computer applications.

8   It also applies annual license fees to each application,

9   right?  That's what you have done with your math.

10  A.  That is correct, yes.

11  Q.  So your calculation starts with a 3.9 million dollar

12  fee to use Blaze in a single, very large computer

13  application for five years, right?

14  A.  For five years, correct.  Yes.

15  Q.  You don't have a contract where a customer ever agreed

16  to pay almost 4 million dollars to use Blaze for just five

17  years, correct?

18  A.  Actually, I have one for four.

19  Q.  You didn't bring that here, right?

20  A.  It's not in the trial, no.

21  Q.  And then your math goes on.  Then it's a separate 2.4

22  million dollars to use Blaze in a large computer

23  application, but only for five years, right?  That's the

24  math.

25  A.  That's correct.

1    Q.  Then another 2.8 million dollar fee for another

2    separate computer application, only for five years, almost

3    3 million dollars, correct?

4    A.  That's correct.

5    Q.  And this math goes on and on, and that's how you get to

6    this 50 million dollar figure, correct?

7    A.  That's our standard pricing, yes.

8    Q.  Mr. Waid, almost all of these individual entries on

9    your chart on slide 29 are higher than the 1.2 million

10   dollars you suggested FICO charge for an enterprise-wide

11   perpetual license to use Blaze at Chubb, right?

12   A.  I did not say that.

13   Q.  We saw your e-mail correspondence with Mr. Haines,

14   right, where you were all talking about proposing a license

15   agreement to the Chubb Group of Insurance Companies,

16   correct?

17   A.  The e-mail did not say that it was 1.6 million for the

18   enterprise group of Chubb.

19   Q.  We all saw the e-mail conversations with you and

20   Mr. Haines and Mr. Layden and you're all talking about

21   enterprise-wide license for Chubb in the ball park of 1 to

22   2 million dollars.  That was the price, right, not 50

23   million?

24   A.  Which enterprise?

25   Q.  These numbers all dwarf the enterprise-wide perpetual

```
 1   licenses that we saw for ███ and ██████ and ████ and what
 2   was offered to ██████████ and what was offered to
 3   ██████████, correct?
 4   A.  It does, yes.
 5   Q.  And all of these numbers dwarf the approximately 1
 6   million dollars that we know from Mr. Ghislanzoni that
 7   Chubb paid to access Red Hat Decision Management software
 8   in 2019 and 2020 for the Chubb enterprise, right?
 9   A.  I can testify to the fact that it's more than a
10   million.  I can't testify to the rest of your statement.
11   Q.  And it's a lot more than a million dollars that Chubb
12   paid for a replacement rules software license, right?
13   A.  If that's what you paid, yes.  It's a lot more money.
14            MS. GODESKY:  Thank you, Mr. Waid.  I have no
15   more questions.
16            THE COURT:  Just letting Members of the Jury
17   know, we'll go until about 12:30.
18            MR. HINDERAKER:  All right.  Where to begin.
19                    REDIRECT EXAMINATION
20   BY MR. HINDERAKER:
21   Q.  Mr. Waid, let's begin by, I gave you a binder, and in
22   that binder is Defendants' Exhibit 172.  Let's start there.
23   A.  Okay.
24   Q.  Thank you.  Just trying to grab the date off of this.
25   This is dated July 1, 19 -- 2019.
```

```
 1    A.  Correct.

 2    Q.  And let's talk about, this is, this is a term license.

 3    I'll give you a moment to orient yourself, myself, too.

 4    A.  It is a term license, yes.

 5    Q.  And for how many years?

 6    A.  Five years.

 7    Q.  And the scope of the use is for what?

 8    A.  It's for named application.

 9    Q.  For a named application?

10    A.  Correct.

11    Q.  One?

12    A.  One.

13    Q.  And what is the total fee that ███████████████

14    ███████████████████████████████████████

15    A.  The license was ███████████.  Total is ███████████

16    Q.██████████████, one application for five years, correct?

17    A.  Correct.  That total doesn't total the full amount of

18    the five years.  There is actually another four years of

19    maintenance on here, which is another ███████████████

20    ███████████████████████████████

21    Q.  4.3 million.

22              Your Honor, I offer the Exhibit D172.

23              MS. GODESKY:  No objection.

24              THE COURT:  D172 is received.

25    BY MR. HINDERAKER:
```

 1    Q.  So I didn't catch the total.  When you add all the

 2    elements, it was what?

 3    A.  I'm doing it in my head.  It's not the best, not the

 4    best way to do it, but it's about █████

 5    Q.  For the five-year term.

 6    A.  That could be off.

 7    Q.  Got it.  You were asked --

 8            Well, let me go to, let me go to the Exhibit 276,

 9    and I think this is one that you were asked about with

10    ██████

11    A.  Correct.

12    Q.  And this, now this, this exhibit is November 11, 2010.

13    A.  Correct.

14    Q.  And you see that it is a, if you would give me the

15    scope of use of this agreement, please.  I was asking about

16    the scope of use.

17    A.  I'm sorry.  Scope of use is enterprise.

18    Q.  Thank you.  Are you familiar with the negotiations and

19    the pricing of this license with █████?

20    A.  I am.  Correction.  It's enterprise deployment.  There

21    is three named seats for the development.

22    Q.  So you were familiar with the pricing of this.  You

23    were part of the pricing of this license agreement?

24    A.  I was, yes.

25    Q.  Okay.  When we are in this time frame of 2010, can you

```
 1    tell us whether there was any discounting involved in this
 2    license agreement?
 3    A.  Just a ███████████████   yes.
 4    Q.  How minor?
 5    A.  ████████████
 6    Q.  Okay.  And why was the ████████████████   given in
 7    this context in 2010?
 8    A.  They probably pushed on the price a little bit, but we
 9    held pretty firm.
10    Q.  Always losing my pen.  I don't know where it is.  There
11    we go.  All right.
12            Let me, let me go to D293.
13    A.  Yes.  I'm here.
14    Q.  And now, this is another one that you were asked
15    questions about in 2008 now.  What was the scope of this
16    license with ████
17    A.  This was actually restricted to corporate, the
18    corporate group of ████
19    Q.  So not all of ████
20    A.  Not all, just the corporate support function.
21    Q.  Can you give any more background as to what that
22    application was?
23    A.  Yeah.  They were, they were providing, like when you
24    call in prescriptions and you want to get them fulfilled,
25    sort of drug interactions and facilitating to make sure
```

1    your prescription is ready when you show up.  It was sort

2    of that automated process that they were using Blaze for.

3    Q.   Okay.  And you were involved in the pricing of ███

4    A.   Yes, I was.  They are tough negotiators.

5    Q.   In your judgment, in your experience, is there anything

6    inconsistent between the pricing for ███ given the scope of

7    use of Blaze Advisor and the pricing models that we have

8    been talking about in general in this lawsuit?

9    A.   None.

10   Q.   All consistent?

11   A.   All consistent.

12   Q.   And I want to go to, for -- if we go to Defendants'

13   Exhibit 12 for a moment, please.  It uses as an example

14   ████████ of 2006.

15   A.   March 2006, yes.

16   Q.   Right.  And so, the ELA value you testified to on

17   cross-examination was ██████████?

18   A.   At standard price, yes.

19   Q.   At standard price.  And the proposal of ██████████

20   ███████, was that a proposal with credit?

21   A.   No, that was not with credit.  That was before credit.

22   Q.   Before credit.

23   A.   Mm-hmm (Yes).

24   Q.   So that's another ██████████?

25   A.   Correct.

1    Q.  And in this context, if I could bring you to our own

2    license agreement and perhaps that defendants' exhibit, do

3    we have, do we have, whatever it is, D22, that same chart

4    that was put up by the defendants.

5              If not, we can do it without if it's not easy to

6    get.  How about putting up --

7              Well, let's go to, let's go to our license

8    agreement, Mr. Waid, the Chubb & Son license agreement.

9              And I asked you, I asked you on my direct

10   examination a rather general question about pricing, and

11   Mr. Waid's testimony about pricing being after credit being

12   incremental additional amount.

13   A.  Correct.

14   Q.  So I want to now in light of the cross, I want to go

15   back and do that in a little more detail with respect to

16   this license agreement that we have.

17             So if we look at the pricing for the original

18   license agreement, and I'll just do deployment pricing, the

19   original license agreement was in deployment 173,750.

20   A.  Correct.

21   Q.  Okay.  And then if we go to the Amendment One, and we

22   see that the price there is $350,000?

23   A.  Correct.

24   Q.  But was that $350,000 additional to FICO?

25   A.  It was not.  There is a little footnote down here at

1    the bottom talking about payments of the first one.  Since

2    these were so close, we might not have received all of the

3    payment.

4    Q.  Isn't it, the credit --

5    A.  The --

6    Q.  The amount of fee paid for the original named

7    application license was credited against the 350,000.

8    A.  It was, yes.

9    Q.  So the incremental amount to FICO is not 350,000.  It's

10   about 173,000.

11   A.  That sounds about right, yes.

12   Q.  And then when we go to the Amendment Number Two, and we

13   see the pricing at 1,300,000, but the incremental, but the

14   additional revenue to FICO wasn't 1,300,000?

15   A.  It was not.

16   Q.  Because why?

17   A.  Because we took 350,000 off of that, and it says right

18   here that the net license fee, the additional amount of

19   money paid at this time was 950,000.

20   Q.  So if we're talking about the incremental revenue to

21   FICO for the Chubb & Son license, the Amendment Two brought

22   in an incremental, an additional amount of revenue of

23   950,000?

24   A.  That's correct.

25   Q.  Let's go to Plaintiff's Exhibit 111 and then to the

1    second or third page.  There we go.

2              And you've explained to us who Sally Holt is in

3    terms of her role, and this is a form document that you're

4    familiar with from FICO or not?

5    A.  Yeah.  We created it.

6    Q.  Okay.  And when she is saying, and this is -- first

7    let's put in the time context.

8              This is before Amendment Two is signed.

9    A.  That is correct.  The original create date was October

10   12th.

11   Q.  And so she is looking at an expected value of 1.2

12   million, correct?

13   A.  That's correct.

14   Q.  As you read that internally at FICO, is that an

15   expected value of an additional 1.2 million of revenue to

16   FICO?

17   A.  That is correct.

18   Q.  In contrast to the $950,000 that was actually paid

19   under the license agreement?

20   A.  That is correct.

21   Q.  You were asked about Defendants' Exhibit 4, if you

22   could find that, please.

23              Let's put this in the time frame of September 30,

24   2015.

25   A.  No.  September 30th, 2005.

1   Q.  That's what I wrote down, and I misspoke.  2005.  You

2   said you negotiated the deal, and you will never forget it.

3   I would like you to explain the pricing that was a -- that

4   was resulting in -- or resulted in this Exhibit 4.

5   A.  Yeah.  The reason I will never forget this deal.  We

6   had been negotiating with them for some time.  We were

7   talking about at one time an ████████████████, and

8   the date of this is actually the last day of our fiscal

9   year.

10          And I got a phone call from my boss saying we

11  need some business, where can we get it.  I said, well, guy

12  this guy has offered me ████████████   I can take the

13  deal if you want it.  So I called him up about 3:00 or 3:30

14  in the afternoon.  And he said, okay, but you have to get

15  it done before the football comes on, because I'm watching

16  my football game.

17          So I will never forget that.

18  Q.  Is this an anomaly?

19  A.  At this time I wish I could say it was an anomaly, but

20  we used to grab business a lot back at this time in

21  history.  We switched to reoccurring revenue streams, and

22  clients don't want to buy right now, they want to buy

23  later, they buy later.  So be it.

24  Q.  And let's look at Exhibit 284.  What was the scope of

25  use for 284 for Blaze Advisor?

N. WILLIAM PAUL WAID - REDIRECT

```
 1   A.  In this contract, this one is for use solely with
 2   ██████████████████████████████████████.
 3   Q.  So not the whole of ███████?
 4   A.  This is, this is a group that figures out ██████████
 5   ████████████████████████████████████████████████
 6   ████████████████████████████████████████████████
 7   ███████████████████
 8   Q.  Okay.  Let's go to Exhibit 77, D77, and you were asked
 9   some questions about what in this license agreement is
10   10.7.
11           And, Mr. Mayleben, could we show page 10 of this
12   license agreement on the screen.  And could you just put
13   yellow on the 10.7 Assignment, Delegation.
14           You mentioned that it was a long provision.
15   Every license agreement is individually negotiated.
16   A.  They are, yes.
17   Q.  What does this Defendants' Exhibit 77 tell you about
18   the extent of negotiations about paragraph 10.7 here?
19   A.  As my reaction showed, it's pretty long.  I don't, I
20   don't recall seeing something quite this long before.
21   Obviously would have been involved in approving it, but,
22   yes, it's pretty long.
23   Q.  Okay.  And let's put up the license agreement between
24   Chubb & Son and FICO and show paragraph 10.8.
25           Is it fair to say the level of negotiation is
```

 1   quite different?

 2   A.  Yes.  Quite different.

 3   Q.  You were shown the e-mails of Russ Schreiber and Mike

 4   Sawyer.  Russ is commenting about what the license said or

 5   do not say about GWP.

 6          With respect to the license agreement in this

 7   case, in your mind, in your judgment, is there any concern

 8   about the reasonableness -- about FICO's reasonableness?

 9   A.  None.

10   Q.  Is there any, is there any, is there any -- what's the

11   right word -- any ambiguity in the change of circumstances

12   in your mind from the status of the client at the time of

13   2006 to the time --

14   A.  Not in my mind, no.

15   Q.  You were asked about the resolution of that consent or

16   not consent within a 30-day period.  You mentioned that it

17   was not written into 10.8.

18   A.  That's correct.  Yes.

19   Q.  Let's go back to J001, and can we go to paragraph 9

20   point -- I'm sorry.  Section paragraph 9.2, please, and

21   then if we can focus in on 9.2A, Uncured Breach.

22          Is that what you had in mind in terms of another

23   provision of the contract detailing out a 30-day period?

24   A.  That's correct.  Yes.

25   Q.  Now, you were asked about Exhibit 94, which is the

1    proposal from Ms. Pawloski of February 25.

2    A.  Correct.

3    Q.  2016.  And you were asked whether you had communication

4    with her afterwards?

5    A.  Correct.

6    Q.  And did you?

7    A.  I did.

8    Q.  And what were they?

9    A.  Both written and verbal.

10   Q.  Let's just do the verbal.  We want to stay within the

11   time frame of -- around or in response to the February 25

12   proposal.

13   A.  Yes.  I responded rather quickly, actually setting up a

14   call, and set her through very specifically why this

15   proposal was not acceptable to us and actually counter

16   proposed with an equivalent approach, which was not, was

17   not taken any further.

18   Q.  But you explained to her why, your thinking about her

19   proposal?

20   A.  Correct.

21   Q.  Did they propose anything different at that moment?

22   A.  She did not.

23   Q.  At that time in February of 25 of 2016, did you have

24   any additional information from Chubb & Son, other than

25   what was contained in Mr. Hopp's letter earlier and what

1    was contained in that proposal?

2    A.  It's hard to hear you.

3    Q.  My bad.  Do you recall Mr. Hopp's letter to

4    Mr. Carretta which you just recently looked at, do you

5    recall -- you recall Tamra Pawloski's e-mail with a

6    potential proposal.

7            In terms of your involvement, did you have any

8    information about the intentions of the future use of Blaze

9    Advisor, other than what was in those communications and

10   the call you had with her?

11   A.  Nothing.

12   Q.  Okay.  In the call you had with her, did she in any way

13   modify or change the approach that she presented in that

14   commercial proposal?

15   A.  No.

16   Q.  If we can go to Exhibit 91, please.

17           THE COURT:  Mr. Hinderaker, we're at 12:30.  How

18   much more do you have?

19           MR. HINDERAKER:  I don't know.  You know the Mark

20   Twain saying, if I had more time, I would have wrote a

21   shorter letter.

22           THE COURT:  Right.  All right.  I think we should

23   take our lunch break.

24           Okay.  Members of the Jury, we'll break for lunch

25   and be back in at, make it about 1:10.  Give yourselves a

```
 1    little bit of time.

 2                THE CLERK:  All rise for the jury.

 3                       (Jury exits.)

 4

 5         (In open court without the Jury present.)

 6                THE COURT:  Go ahead and be seated if you want.

 7    Just your best estimate at this point, Mr. Hinderaker.

 8                MR. HINDERAKER:  Half hour, 40 minutes.

 9                THE COURT:  Okay.  And, Ms. Godesky, depends on

10    the redirect, but from what you can tell --

11                MS. GODESKY:  Brief.

12                THE COURT:  Brief, okay.  And who at that point

13    will we begin with, do you know?

14                MS. GODESKY:  Our first witness will be Kevin

15    Harkin.

16                THE COURT:  Okay.  Then I will address the

17    question regarding Mr. Harkin's use of the demonstratives.

18    I've had a chance to consider it over the time.  I'm going

19    to allow him to use those.

20                MS. GODESKY:  Thank you.

21                THE COURT:  All right.  We will see you at 1:10.

22                MS. GODESKY:  And, Your Honor, sorry.

23                THE COURT:  Yes.

24                MS. GODESKY:  If we have a motion, how would you

25    like us to handle that?
```

```
 1                THE COURT:  Well, as we discussed, we can argue

 2      it after, after the close of business today.  You need not

 3      make a show in front of the jury of moving for the directed

 4      verdict or the judgment.  We understand that motion is

 5      coming.

 6                MS. GODESKY:  So no need even to come up to

 7      side-bar, right?

 8                THE COURT:  Correct.

 9                MS. GODESKY:  Okay.  Okay.  Thank you.

10                THE COURT:  Thank you.

11                      (Lunch recess taken.)

12

13      1:11 p.m.

14                           IN OPEN COURT

15                          (JURY PRESENT)

16                THE COURT:  Be seated.

17                Mr. Hinderaker, you may proceed.

18                MR. HINDERAKER:  Thank you.

19      BY MR. HINDERAKER:

20      Q.  A few more questions.  You were asked questions about

21      the discounting chart in the guidelines, and you mentioned

22      that it wasn't, the 2003 document was not updated because

23      the information is now in your sales force automation

24      system.

25                We don't know what that is.  Could you tell us?
```

1    A.  Yes.  So the first thing that we did was we actually

2    created Excel spreadsheets to do the quoting.  I mentioned

3    that earlier.  Originally, they went into a software

4    solution that we, we actually licensed from another third

5    party, which is, it's a Contact Management System,

6    essentially put in accounts, people that work at those

7    accounts or companies, and then you put in opportunities or

8    we call them sales opportunities.

9           So you create these entries in this system.  And

10   it helps you manage, you know, when you called so and so

11   and what proposal you sent where, and you attach these

12   proposals to that registry in the sales force automation

13   tool.  It's something to help the salespeople keep track of

14   where they're at in their discussions, what's coming next.

15          And it helps management understand what their

16   pipeline of opportunity looks like.

17   Q.  And how is the discounting and pricing guidelines put

18   into that system?

19   A.  Well, originally it was in actually just in the, in the

20   spreadsheets themselves.  And then there's a routing

21   mechanism for the quote where there's a management chain.

22   And so the management chain has to check a box and say yes,

23   I've looked at that, and it's approved.

24          The same thing with contracts.  They flow through

25   that same automation system.  So when contracts are

N. PAUL WILLIAM WAID - REDIRECT

1    written, it flows through, and there's guidelines in there

2    about what you can and cannot do.

3           So right inside the sales force tool, you cannot

4    actually enter a discount unless you have check mark

5    management approval to do so at the discount level.

6    Q.  Thank you.  And with staying on the theme of discounts,

7    you were asked, you were asked about discounting at a

8    40 percent level from your deposition.  And your memory was

9    that the question was in the 2006 time frame.

10          I would like you to go back to -- I'd like you to

11   go to the transcript of the January 16, 2019, deposition.

12          And if we could put up Exhibit 226, please.

13          Do you have it?

14   A.  I have it, yes.

15   Q.  Okay.  And you have your transcript at page 133,

16   January 16, 2019, transcript.

17   A.  So you don't want P226?  You want the transcript?

18   Q.  Well, we're going to use both.

19   A.  Okay.  Sorry.  I'm sorry.  Which one is it?  1 or 4.

20   Q.  January 16, 2019.

21   A.  And what page again?

22   Q.  133.

23   A.  And I'm there.

24   Q.  Okay.  If you see at the middle of the page at lines

25   14, the question is, "If we can then go to Exhibit 226, if

1    we can then go to 226."  Do you see where I'm reading?

2    A.  Yes.

3    Q.  And on the screen, if we can blow up at the bottom, the

4    Plaintiff's Exhibit 226 is also as you see the Deposition

5    Exhibit 226.

6    A.  Yes.

7    Q.  And the date of that, and the date of that email is

8    what, June 16, 2006?

9    A.  Correct.

10   Q.  And the question and answer that you were then

11   presented with, continuing on page 133 and going to around

12   line 19 or 18 or 19 on 134, was that all in the context of

13   this email and 2006 pricing?

14   A.  It was.

15   Q.  And now I'd like to go back to Exhibit 77, please,

16   Defendants' 77.

17          Thank you.

18          And I'd like to go to the provision at

19   paragraph 10.7 that we looked at before.  And if we can

20   just bring that up.  Thank you.

21          Now I've already asked you this, so it's just to

22   put in context.  This is an example of client negotiating

23   provisions of paragraph -- the no assignment provisions of

24   a FICO license agreement.

25   A.  It is.

1    Q.  Okay.  And over the course of your years, have other

2    clients negotiated limitations into FICO's protections of

3    no assignment?

4    A.  They have.

5    Q.  And the level of negotiations to limit FICO's

6    protection of the no assignment provision, I assume various

7    varies from client to client?

8    A.  It varies quite significantly, yes.

9    Q.  Do you have some clients that don't change FICO

10   language at all?

11   A.  We have a lot of them who do not change FICO language.

12   Q.  So the protections that FICO enjoys from its own

13   version of paragraph 10.8 survives into the written, into

14   the written license agreement?

15   A.  That's correct.

16   Q.  Okay.  And you've looked at paragraph 10.8 for the

17   Chubb & Son license with FICO?

18   A.  I have.

19   Q.  Was there any degree to which they sought to limit

20   FICO's rights under paragraph 10.8?

21   A.  The only edit that they added was the "may not be

22   unreasonably withheld."

23   Q.  And to that extent in your understanding,

24   paragraph 10.8 of the license agreement in this case has

25   all of FICO's standard protections?

1    A.  Correct.

2              MR. HINDERAKER:  No further questions.  Thank

3    you.

4              MS. GODESKY:  Nothing further from me, Your

5    Honor.

6              THE COURT:  All right.  Thank you, Ms. Godesky.

7              Mr. Waid, you may step down thank you.

8              THE WITNESS:  Judge?

9              MR. HINDERAKER:  Your Honor, the plaintiff rests.

10             THE COURT:  Very well.

11             MR. HINDERAKER:  It's case in chief.

12             THE COURT:  Thank you, Mr. Hinderaker.

13             So the plaintiff just rested their case in chief.

14   We will commence with the defendants' case in chief in just

15   a second.

16             I'm going to give you one evidentiary

17   instruction, just so that you have some context for what

18   you've heard and what you are going to hear.  I will or may

19   have other evidentiary instructions at the close of the

20   trial.

21             You have heard testimony from Ms. Jandeen Boone,

22   the FICO lawyer who participated in drafting the 2006

23   software licensing agreement, and from Mr. Thomas Carretta,

24   the FICO lawyer who issued the notice of breach of the

25   license agreement.  You will or may hear testimony from

1     Ms. Pamela Lopata, a lawyer from Federal.

2          I'm going to instruct you about what that

3     testimony does and does not cover.

4          A lawyer, like any witness, may testify regarding

5     the circumstances and progression of contract negotiations,

6     the drafts and language proposals that were exchanged

7     during contract negotiations, and the final language of the

8     agreement.

9          In addition, a witness, including a lawyer, may

10    testify regarding the commercial purpose behind provisions

11    of the agreement.  However, no witness, including lawyers,

12    are permitted to testify about the legal meaning or the

13    proper interpretation of the license agreement or any of

14    its provisions.

15         It is you, and you alone, who will decide in this

16    trial what the language of the license agreement means

17    based on the evidence that has been admitted during the

18    trial.

19         Ms. Godesky.

20         MS. GODESKY:  Thank you.  Defendants call their

21    first witness, Mr. Kevin Harkin.

22         THE COURT:  Come on up, Mr. Harkin.  If you will

23    stop right here and raise your right hand please.

24

25

1                    KEVIN HARKIN,

2    called on behalf of the defendants, was duly sworn, was

3    examined and testified as follows:

4              THE WITNESS:  I do.

5              THE COURT:  Come on up here.  Sit down.  Speak

6    into the mic phone and state your full name for the record.

7              THE WITNESS:  Kevin Matthew Harkin.

8                    DIRECT EXAMINATION

9    BY MS. JANUS:

10   Q.  Good afternoon Mr. Harkin.

11   A.  Good afternoon.

12   Q.  I have given you a binder with some exhibits that we

13   might reference and the demonstrative slides that we might

14   look at?

15             What is your current job and who is your

16   employer?

17   A.  I am the chief financial officer for Chubb's

18   North America operations.  My direct employer is the ACE

19   American Insurance Company.

20   Q.  And for how many years have you held that position?

21   A.  One.

22   Q.  Please give the jury a sense of your roles and

23   responsibilities as the chief financial officer of Chubb

24   North America.

25   A.  Sure.  I do accounting and reporting.  I do the

1    financial planning, the budgets, that kind of thing.  We

2    oversee billing and collections, certain aspects of

3    treasury operations, things like that.

4    Q.  What company were you working for as of year end 2015?

5    A.  ACE American Insurance Company.

6    Q.  And what was your job at ACE at the time ACE acquired

7    the Chubb Corporation in January 2016?

8    A.  I was a senior vice president in our corporate finance

9    department.

10   Q.  What were your responsibilities in that position?

11   A.  I was in the Legacy ACE entity.  I oversaw our

12   expenses, our expense allocation process, as well as

13   certain aspects of budgeting and planning for the ACE

14   organization.

15   Q.  Let's focus on the first two years then after the

16   acquisition, so 2016 through 2017.  Please give us a sense

17   of your role and responsibilities during that period.

18   A.  I oversaw the integration of the Legacy ACE Company and

19   the Legacy Chubb Company for North America finance in terms

20   of budgeting and planning and general reporting of our

21   profit and loss information.

22   Q.  And how about the next three-year period.  How, if at

23   all, did your role and responsibilities change from 2018

24   through 2020.

25   A.  The integration focussed more so changed to a business

1    as usual focussed, but I handled the financial planning,

2    budgeting and forecasting for a subset of the North America

3    segment.

4    Q.  And then let's move to the two years before your

5    promotion to become the chief financial officer of Chubb

6    North America.

7              What did your responsibilities look like in 2020,

8    to 2022?

9    A.  I maintained strong elements of the financial budgeting

10   and planning, but also had financial operations, how we

11   used data and analytics and just operational efficiencies,

12   things like that.

13   Q.  Where did you go to college and when did you graduate?

14   A.  University of Richmond.  I graduated in the year 2000.

15   Q.  And do you hold any other advanced degrees or

16   certifications?

17   A.  Not currently.  I was a Certified Public Accountant

18   back in my earlier days, but when I left public accounting,

19   it was voluntarily inactive.

20   Q.  Before your involvement in this litigation, had you

21   ever heard of Blaze?

22   A.  No.

23   Q.  Let's put up DD005, which is a list of the computer

24   applications that used Blaze between 2006 and 2016.

25              Have you ever used any of these computer

1   applications in the course of your regular day-to-day work

2   at Chubb?

3   A.  No.  No.

4   Q.  Let's talk a little bit about the corporate structure

5   of Chubb.

6           In the course of your work, in the course of the

7   work you did from 2016 through 2018 on the ACE/Chubb

8   integration, did you come to have a general familiarity

9   with the structure and financial operations of the Chubb

10  Corporation before it was acquired by ACE?

11  A.  I did.

12  Q.  How was the structure and financial operations of Chubb

13  Corporation relevant to the work that you did in the

14  initial two years after the acquisition?

15  A.  My role was to integrate the operations of the two

16  Legacy companies.  In order to do so, I had to develop a

17  pretty strong understanding of how the Legacy Chubb

18  organization operated so that I could move them forward

19  into the future integrated state.

20  Q.  Let's take a look at DD001, and that is in the packet

21  that you've got in the front folder of your binder.

22          Do you recognize this chart?

23  A.  I do.

24  Q.  What is it?

25  A.  It is a chart depicting the Federal Insurance Company

1    and some of its direct subsidiaries that Chubb & Son and

2    Chubb Insurance Company of Europe, Australia, Canada, as

3    well as a depiction of the Chubb & Son, a division of

4    Federal, component.

5    Q.  What role did the Chubb & Son, division of Federal,

6    have in Federal's financial operations?

7    A.  It was, I would characterize it as a mechanical

8    efficiency.  It was part of the legal entity Federal

9    Insurance Company, and it served to administer central

10   functions like payroll and certain vendor expense

11   relationships, things like that.

12   Q.  You mentioned employee payroll.  Did the Chubb & Son

13   division have employees?

14   A.  The employees were legally employees of the Federal

15   Insurance Company, but the Chubb & Son, a division of

16   Federal, administered the paycheck process to them.

17   Q.  So no actual employees of the Chubb & Son, division of

18   Federal?

19   A.  No.

20   Q.  Did most of the payments that were made on behalf of

21   Federal come from the Chubb & Son division?

22   A.  For the most part, yes.

23   Q.  If the Chubb & Son, division of Federal, was making

24   payments on behalf of Federal, does that mean that the

25   Chubb & Son division generated money for the company?

1    A.  No, it didn't.  It usually had payments that we want

2    out the door and then allocated out to some of the other

3    insurance companies it supported.  So in a perfect world,

4    it would have had nothing in it, just an in and out.

5    Q.  Did the Chubb & Son, division of Federal, report its

6    financial results separately or together with Federal?

7    A.  Together with Federal.

8    Q.  Why is that?

9    A.  Because it was legally part of the Federal Insurance

10   Company.

11   Q.  So there would have been nothing else to, nothing

12   separate to report?

13   A.  Nothing separate to report.  And again it would have

14   had nothing in it in an ideal world.

15   Q.  Let's shift topics to the Chubb & Son Corporation's

16   revenue.  First I want to get a couple of terms out there,

17   and some of them we've heard before, but just to be clear

18   about what we're talking about.

19          How do you define gross written premium or GWP?

20   A.  Gross written premium is the amount we charge our

21   policyholder for issuing an insurance policy.

22   Q.  How do you define net written premium or NWP?

23   A.  So net written premium would be the gross written

24   premium less any reinsurance that we purchase.  Reinsurance

25   would be insurance like for an insurance company.

1    Q.  Why does Chubb purchase insurance for itself?

2    A.  There are a number of reasons why, but one example

3    would be, if we have a lot of policies in one area, we have

4    a high risk of a hurricane or something coming through that

5    area, we want to be able to pay our claims.

6              So we purchase reinsurance to share the risk with

7    another insurance carrier.

8    Q.  And in your role working on the integration of ACE and

9    Chubb in the 2016 to 2018 time period, did you come to have

10   a general familiarity with the products that Chubb

11   Corporation offered and how it generated revenue before it

12   was acquired by ACE?

13   A.  I did.

14   Q.  Why was that information relevant to the work you did

15   on the integration?

16   A.  The integration I oversaw had elements of the

17   financial, budgeting and planning process.  In order to

18   integrate the two companies, I needed to understand the

19   products and the offerings of the Legacy Chubb

20   organization.

21   Q.  Let's look at Exhibit D355.  So that's one of the tabs

22   in your binder.  This is not in evidence, but I do not

23   believe there is an objection.

24              MS. KLIEBENSTEIN:  Correct.

25              THE COURT:  Exhibit D355 is received.

KEVIN HARKIN - DIRECT

1    BY MS. JANUS:

2    Q.  What is this chart?

3    A.  This is a chart depicting the Chubb Corporation's net

4    written premium for the years 2002 to 2014.

5    Q.  Where does this information come from?

6    A.  This came from the publicly disclosed 10-K filings with

7    the Securities and Exchange Commission.

8    Q.  And did you personally check the information in this

9    chart to confirm that it's accurate and that it matches the

10   amounts publicly reported by the Chubb Corporation?

11   A.  I did.

12   Q.  Let's switch to the demonstrative, DD024.

13            What does this show?

14   A.  This is a bar chart depicting the net written premium

15   figures that we just spoke about.

16   Q.  So this graphically depicts the information that's in

17   D0355?

18   A.  Yes.

19   Q.  What is the significance of the green bar before --

20   behind the entry for 2006?

21   A.  That is the year the Legacy Chubb Corporation began

22   using Blaze.

23   Q.  What happened to the Chubb Corporation's revenue

24   between 2002 and 2004?

25   A.  Between 2002, 2004, the revenue increased pretty

1   meaningfully.

2   Q.  And how would you describe Chubb Corporation's revenue

3   between 2005 and 2006?

4   A.  It started to dip.

5   Q.  Would you say that there was a growth momentum that

6   leveled off at that point?

7   A.  I would say so.

8   Q.  What happened to Chubb Corporation's revenue between

9   2007 and 2014?

10  A.  After 2007, it remained pretty stable.  In 2008

11  bottomed out, really, in 2009 and started to climb back up

12  again through 2014.

13  Q.  In terms of the Chubb Corporation's former operating

14  structure, what was Chubb Commercial Insurance?

15  A.  Chubb Commercial Insurance, also called CCI, was one of

16  the Legacy Chubb Corporation's operating segments.

17  Q.  And let's take a look at Exhibit D356.

18          This is not yet in evidence, but I do not believe

19  there is an objection.

20          MS. KLIEBENSTEIN:  That's correct.  For

21  everything that's in this binder, it's just fine.

22          THE COURT:  Okay.  Thank you, counsel.

23          All those exhibits will be received.

24  BY MS. JANUS:

25  Q.  What is this chart showing us?

1    A.  This is a chart showing the net written premium for the

2    Legacy Chubb CCI or Chubb commercial segment for the years

3    2002 to 2014.

4    Q.  And is this information from public filings as well?

5    A.  It is.

6    Q.  And did you check the accuracy of this information

7    yourself?

8    A.  I did.

9    Q.  Let's switch then to DD025.

10           Sorry, Vanessa, DD25.

11   A.  I'm sorry.

12   Q.  Thank you.

13           What is this showing us?

14   A.  This is a bar chart showing the same net written

15   premium figures for the Chubb commercial insurance segment

16   that we just talked about.

17   Q.  Can you explain what you're seeing then with net

18   written premium in the CCI, the commercial line of

19   business, between 2002 and 2005?

20   A.  Yeah.  The net written premium grows meaningfully each

21   year up through 2005.

22   Q.  And how about 2006 to 2008?

23   A.  2006, it starts to decline.  Bottoms out around 2009,

24   2010, and then starts to climb back up again through 2014.

25   Q.  And we have the green bar again depicting the year that

1   the Blaze license was acquired, correct?

2   A.  Correct.

3   Q.  What was, in terms of again talking about Chubb

4   Corporation's former operating structure, what was Chubb

5   specialty insurance?

6   A.  Chubb specialty insurance was another one of the Legacy

7   Chubb Corporation's operating segments.

8   Q.  And it was referred to as CSI at times?

9   A.  It was referred to as CSI, yes.  It was specialty

10  products, insurance for people who worked for companies,

11  directors, officers, professional services like lawyers and

12  accountants, things like that.

13  Q.  Let's look at D357.

14          What does this chart show us?

15  A.  This is, this depicts the net written premium for the

16  Legacy Chubb specialty insurance, CSI, segment for the

17  years 2002 to 2014.

18  Q.  And is the information in this chart from public

19  filings?

20  A.  It is.

21  Q.  And did you check the accuracy of the information

22  yourself?

23  A.  I did.

24  Q.  Let's look at DD026.  What is this showing us?

25  A.  This is a bar chart depicting the net written premium

1    figures we just talked about for the Legacy Chubb CSI

2    segment.

3    Q.  And what do you see happening then in the 2002 to 2004

4    time period?

5    A.  The net written premium grew pretty meaningfully during

6    that period from 2002 up to 2004.

7    Q.  And what about then 2005 onward?

8    A.  2005 onward, the net written premium declined each

9    year, eventually bottomed out in 2012, then slightly

10   increased over the next two years.

11   Q.  In your role as the chief financial officer of Chubb

12   North America, do you ever have occasion to factor into

13   your revenue projections and forecasts changes in the

14   company's technology or internal systems?

15   A.  On occasion, yes.

16   Q.  Can you give us an example of a time where that came

17   up?

18   A.  Early on in the Legacy Chubb, Legacy ACE integrated

19   company, we had a personal lines system conversion.  It had

20   an impact to our net written premiums, so we had to factor

21   that into our plan and budget assumptions for the upcoming

22   year.

23   Q.  And during what years was Blaze, was the Blaze software

24   removed from Chubb's internal systems?

25   A.  The 2019 and 2020 years.

1    Q.  Did you have to incorporate the removal of Blaze from

2    Chubb's systems into the company's revenue projections

3    during those years or deal with it in any other way?

4    A.  No.

5    Q.  In your role as chief financial officer of Chubb

6    North America, have you come to have a general familiarity

7    with revenue generated by the combined ACE/Chubb entity,

8    known as Chubb Limited?

9    A.  Yes.

10   Q.  Let's take a look at D358.  What does this chart show?

11   A.  This is a chart depicting the net written premium of

12   the Chubb Limited Company from 2015 to 2021.

13   Q.  Same questions as before.  Did this come from public

14   files and did you check the information for accuracy?

15   A.  It came from public filings, yes, and I checked the

16   information for accuracy.

17   Q.  Let's take a look at DD027.

18            Thank you, Vanessa.

19            What is this showing us?

20   A.  This is a bar chart showing the net written premium

21   figures for Chubb Limited that we just talked about.

22   Q.  What happened to Chubb Limited's -- well, first I will

23   ask you.  Why is the 2015 bar a different color?

24   A.  The 2015 net written premium is a pro forma number.

25   The integration of the two companies closed in January of

1    2016.  So this shows an as if the two companies were

2    together during the '15 year.

3    Q.  And what happened to Chubb Limited's revenue between

4    2015 and 2018?

5    A.  Revenue decreased starting in 2016.  It started to

6    climb back up through 2018.

7    Q.  How would you best describe Chubb Limited's revenue in

8    and after 2019 when Blaze was removed from Chubb systems?

9    A.  The revenue, net written premium, increased from 2019

10   to 2020, and then increased very meaningfully in 2021.

11   Q.  And what was driving that meaningful increase?

12   A.  A number of factors, but largely speaking, market

13   condition changes.

14   Q.  Did anyone ever raise with you concerns about how

15   removing Blaze from the company's technology infrastructure

16   would impact Chubb's revenues?

17   A.  No.

18   Q.  So we've talked through a lot of revenue numbers.  At

19   an insurance company, is revenue the same as profit?

20   A.  No.

21   Q.  Why not?

22   A.  Well, we want to -- we pay clients, to our

23   policyholders, as losses occur.  And then we have expenses

24   in commissions to our agents and brokers, overhead expenses

25   like salaries for our employees, and our technology costs

1    for our systems.

2              Those get deducted from the premium to arrive at

3    what we call an underwriting profit.

4    Q.  In your role as Chubb North America's chief financial

5    officer, are you familiar with what's driving the company's

6    ability to make a profit and to generate revenue?

7    A.  Yes.

8    Q.  How do you have -- how did you come to that knowledge?

9    A.  I oversee the financial budgets for the upcoming year

10   and the ongoing accounting and reporting.  In order to

11   execute and plan for the upcoming year, I need to know what

12   our drivers are and how the company makes revenue and

13   profit.

14   Q.  Let's take a look at DD015.  Have you seen this slide

15   before?

16   A.  I have.

17   Q.  And, generally speaking, what does it depict?

18   A.  It depicts six different pillars of aspects that drive

19   revenue and profit for an insurance company.

20   Q.  What role does Chubb's reputation, paying claims,

21   financial management, have in the sales work that Chubb

22   does?

23   A.  It's a pretty critical role in the sales work.  When

24   companies buy insurance, they want to know that their

25   counterparty will pay the claims when the losses come.

1    They want to know that that company has the financial

2    stability to be around to pay the claims.

3           And they want to know that they have a strong

4    working relationship with the agent and brokers who serve

5    as intermediaries between the two.

6    Q.  When ACE and Chubb merged, ACE acquired Chubb, what

7    name did the resulting company take on?

8    A.  The resulting company took on the name Chubb.  The

9    Chubb brand in the marketplace had a very, very strong

10   reputation, particularly around how well they paid claims.

11   Q.  Looking at the sales pillar, you mentioned the agents

12   and brokers.  Can you also comment on the underwriting

13   aspect as a part of the sales process?

14   A.  Mm-hmm.  When a company wants to buy insurance, they

15   will contact, call up an agent and a broker, and then the

16   agent will contact insurance carriers that they deal with.

17   Those insurance carriers will then assess the risk that

18   they're looking to insure.

19           If it's a building, they'll take a look at the

20   building.  If it's a workers' compensation, they will look

21   at how many employees the company has.  And that

22   underwriter will generate a quote for that company to say

23   if you want insurance, this is how much it's going to cost.

24   Q.  Fair to say, it has a significant role in driving

25   revenue and profits?

1    A.  Yes.

2    Q.  As the sales pillar does generally?

3    A.  As the sales pillar does generally.

4    Q.  What about operations?  How does that play into revenue

5    and profits?

6    A.  Operations is critical as well in the sense that it

7    involves our actuarial functions, and our actuaries are the

8    ones who try to predict the future.  When you issue an

9    insurance policy, you don't always know what claims are

10   going to come.  They're in the future.

11            So the actuaries pull together a lot of

12   information and data and help the underwriter when they go

13   generate their price for their quote.  And then also once

14   we issue the policy, they're the ones that kind of assess

15   our losses and how they think it's going to play out over

16   the long term.

17   Q.  What, finally, what about compliance?  How does that

18   factor into Chubb's revenue and profits?

19   A.  The insurance industry is a very heavily regulated

20   industry, and we want to be able to operate in

21   jurisdictions around the world.  In order to do so, we have

22   to understand all the local regulations and compliance and

23   ensure that we are compliant.

24   Q.  So you explained earlier in your testimony that for an

25   insurance company, revenue is not the same as profit.  And

1    I'd like to follow up in a little bit more detail on that.

2              Are you familiar with the term "underwriting

3    profit"?

4    A.  I am.

5    Q.  What is underwriting profit?

6    A.  So underwriting profit would be the amount, we'll call

7    it, left over once we take our premium and we backed out

8    all the claims that we've paid and then all the expenses,

9    whether commissions to an agent or the salary and

10   technology costs that I was talking about before.

11   Q.  And you mentioned specifically commissions.  Are those

12   a significant expense as expenses go?

13   A.  They can be, yeah.  They, you know, if you issue an

14   insurance policy for a dollar, typically you pay $0.15 in

15   commission.

16   Q.  How does Chubb track underwriting profit?

17   A.  We track it in a number of different ways.  Externally,

18   we track it at our reportable operating segments, as well

19   as some of our insurance companies around the world at that

20   level.

21             Internally, we're a bit more granular we track it

22   at a line of business level.

23   Q.  Does Chubb track underwriting profit for each policy?

24   A.  No.

25   Q.  Prior to the merger with ACE, did Chubb track

1    underwriting profit for each policy?

2    A.  No.

3    Q.  We've heard a little bit about combined, the term

4    "combined ratio."  What is a combined ratio?

5    A.  So the losses and the expenses that I just spoke about,

6    they -- the combined ratio is simply a percentage of the

7    total premium.  So if we have a combined ratio of, let's

8    say, 85 percent, that means for every dollar of premium,

9    $0.85 goes out the door for claims or expenses, leaving us

10   with a profit of $0.15.

11   Q.  And so the combined ratio encompasses both the losses

12   and the expenses that you were talking about earlier?

13   A.  Correct.

14   Q.  So how does one get from a combined ratio to an

15   underwriting profit?

16   A.  Sure.  Sticking with the same example, if we have a

17   combined ratio of 85 percent, that means the 15 percent is

18   our profit.  So for an insurance policy of a dollar, we get

19   $0.15.

20   Q.  What denotes better performance for an insurance

21   company, a high combined ratio or a low combined ratio?

22   A.  Typically the lower combined ratio would indicate a

23   higher underwriting profit for a company.

24   Q.  And when you say "lower," I mean, how would you

25   characterize a combined ratio in the mid 80s?

1    A.  A mid 80 combined ratio is a strong one throughout the

2    industry.  I would consider it to be a low combined ratio.

3    Q.  In your role working on the integration of ACE and

4    Chubb between 2016 and 2018, did you come to have a general

5    familiarity with the pre-merger combined ratio of the Chubb

6    Group of Insurance Companies?

7    A.  Yes.

8    Q.  Why was that information relevant to the work you did

9    on the integration?

10   A.  As I was integrating the operations of the two Legacy

11   companies, particularly their financial budgeting, I needed

12   to understand the profitability of the Legacy Chubb

13   operations.

14   Q.  And how did pre-merger Chubb track combined ratio?

15   A.  In a similar manner to the post merger Chubb.  We had

16   combined ratios externally at our operating segment, as

17   well as internally at a line of business level.

18   Q.  Let's take a look at D359.  And I'll take this in a

19   chunk.  We'll do D359, D360 and D361.

20                   What are these charts?

21   A.  These are charts depicting the combined ratio of the

22   Legacy Chubb Corporation, the -- in total, the CCI Chubb

23   commercial segment of the Legacy Chubb Corporation, and the

24   Chubb specialty insurance segment of the legacy Chubb

25   Corporation, for the years 2006 to 2014.

1   Q.  And same questions as before.  Is this information from

2   public filings?

3   A.  It is.

4   Q.  And did you check the accuracy of the information?

5   A.  I did.

6   Q.  Let's look at DD028.  What is this chart showing us?

7   A.  This is a bar chart showing the combined ratio figures

8   that we just spoke about.  The CCI Chubb commercial

9   insurance segment, the Chubb specialty insurance segment

10  and the total Chubb combined ratios.

11  Q.  So if we look -- well, first I'll ask, I see there

12  isn't an entry for 2015.  Why is that?

13  A.  The Legacy Chubb Corporation ceased to exist in January

14  of 2016 when it merged with the ACE entity, so they did not

15  file a 10-K for the 2015-year.

16  Q.  And if we look first at the CCI combined ratios, they

17  range from, it looks like, 83 percent to 99 percent.  Does

18  that look right to you?

19  A.  Yes.

20  Q.  And is there, does that strike you as relatively

21  typical?

22  A.  Yeah.  The combined ratio may move a little bit in any

23  given year if there's a big hurricane or something that

24  causes a lot of loss, but for the most part over that

25  period it stayed within that range of the low 80s to the

1   high 90s.

2   Q.  And same question for CSI.  It looks like a range of

3   about 77 percent to 91 percent, with seven of the nine

4   years in the chart in the 80s.  Is that, same question,

5   relatively typical to you?

6   A.  It does.  Same general principle.  You might get some

7   fluctuation in any given year if there are a number of

8   shareholder lawsuits or something like that, but the range

9   kind of is reasonable and what I would expect to see.

10  Q.  Are you familiar with the combined ratio for the Chubb

11  Group of Companies since the merger?

12  A.  Yes.

13  Q.  How does post merger Chubb track combined ratio?

14  A.  Externally, we track it by our defined operating

15  segments, as well as our local statutory entities around

16  the world.  Internally, we track it at a line of business

17  level.

18  Q.  Let's look at D362.  What is this?

19  A.  This is a chart depicting the Chubb Limited combined

20  ratio for the years 2015 through 2020.

21  Q.  And is the information in this chart from public

22  filings?

23  A.  It is.

24  Q.  And you checked the accuracy of the numbers?

25  A.  I did.

1    Q.  Let's look at DD029.  What is this chart?

2    A.  This is a bar chart depicting the combined ratios that

3    we just talked about.

4    Q.  And the chart reflects a combined ratio for the Chubb

5    Group of Companies that is between 88.7 and 96 percent; is

6    that right?

7    A.  Correct.

8    Q.  Again, relatively typical?

9    A.  Typical.  The range is a little bit higher.  It's in

10   the high 80s up until the high and mid 90s for the total

11   Chubb Corporation.

12   Q.  And this chart doesn't have the break out for CCI and

13   CSI.  Why is that?

14   A.  Post integration, Chubb stopped tracking the results

15   for those segments at that level.  We redefined.  We

16   focussed more on geography, as opposed to a worldwide view.

17   Q.  Great.

18         Well, thank you very much, Mr. Harkin.  Those are

19   all my questions.

20         THE COURT:  Ms. Kliebenstein.

21                    CROSS-EXAMINATION

22   BY MS. KLIEBENSTEIN:

23   Q.  Hi, Mr. Harkin.

24   A.  Hello.

25   Q.  It's been four years.  Good to see you.  Just let me

```
1    get set up for a second here.
2            It looks worse than it is.  Maybe just put it
3    right down on the floor next to you.
4            Yeah.  And I believe you have a copy of your
5    deposition transcript up there?  Perfect.  So that
6    transcript is dated March 21st, 2019, where you and I met
7    for a long day over financials years and years ago.
8            All right.  Let's get to it.  So where to start?
9            Mr. Harkin, you just, you just mentioned several
10   pillars of profits, if you recall that.
11   A.   Mm-hmm.
12   Q.   And then one of them was about reputation.  Do you
13   know, and is it your position that the reputation of Chubb
14   Limited, of Chubb, drives revenue for the company?
15   A.   I would say it's a factor.
16   Q.   It's a factor.  Do you know what percentage it plays in
17   the driving of revenue or profits at Chubb?
18   A.   I don't know of an exact percentage.  I would say the
19   pillars all contribute in a meaningful way.  I don't know
20   the exact percentage of reputation, but it's a critical
21   factor.
22   Q.   And so would you say the same thing about all of the
23   other pillars you mentioned, the paying of the claims, the
24   operations, the compliance?  That's all I can remember.
25   A.   The underwriting and --
```

1    Q.  And the underwriting.

2    A.  I would say they are all important.

3    Q.  Okay.  They are all important.  Can't pinpoint a

4    specific amount or a percentage that they contribute to the

5    revenue?

6    A.  Not a percentage necessarily, no.

7    Q.  Okay.  And who, if you had to name your top five

8    competitors, who would you name?

9    A.  It would be my own editorial.  I think you get a

10   different answer depending on who you ask, but some

11   competitors that we see in the U.S., right market, would be

12   different.  Travelers Insurance Company, AIG Insurance

13   Company, those are two.

14           When you go more globally, an Allianz or a

15   Zurich, you know, and probably a whole handful of others as

16   you go down the line.

17   Q.  And you also mentioned compliance.  I know the

18   insurance industry is highly regulated.  I know there's a

19   significant amount of financial reporting that's required

20   at the state level, at the national level.  Would you agree

21   with that?

22   A.  That, yes, I would agree.  It's heavily regulated a the

23   state level and the national level.

24   Q.  And if you didn't comply with those regulations in that

25   financial reporting, you wouldn't be in business at all?

```
1    A.  That's a severity of noncompliance, yeah.  They could

2    in fact pull your license.

3    Q.  And that's the same for Travelers, AIG, Allianz,

4    correct?

5    A.  It's the same for everyone who operates an insurance

6    company in those jurisdictions.

7    Q.  And those three, those three competitors, Travelers,

8    AIG, Allianz, I'm pretty sure everyone in this room has

9    probably heard of them.  Would you agree that they're

10   reputation is probably an important part of their company

11   too?

12   A.  I would agree everyone's insurance carrier is an

13   important part.

14   Q.  It's just that type of industry, right?

15   A.  It's that type of industry.

16   Q.  And your -- when we last spoke in 2019, obviously you

17   were in the finance department.  Is that the department

18   that you would call it?

19   A.  Yeah.

20   Q.  And in the finance department, you are not doing

21   underwriting?

22   A.  That's correct.

23   Q.  And you are not talking with agents about insurance

24   projects; is that correct?

25   A.  That's correct.
```

1    Q.  And you are not directly selling insurance, correct?

2    A.  That's correct.

3    Q.  Okay.  Now in your direct exam, you went through

4    several tables with the combined ratio and the revenues.

5    And I just wanted to go through those and see if we could

6    link up what was happening in the market at the same time

7    those ratios and those revenues were changing, if we could.

8              Mr. Mayleben, can we pull up, let's pull up,

9    well, let me, let's pull up P1177, please.

10             And is that showing to the jury, Your Honor?

11             THE COURT:  It is.

12             MS. KLIEBENSTEIN:  Okay.

13   BY MS. KLIEBENSTEIN:

14   Q.  We've got a couple of exhibits we're going to go

15   through here 1177, 1178 and 1179.

16             Ms. Janus, can you confirm there is no objection?

17             THE COURT:  Any objection?

18             MS. JANUS:  No objection.

19             THE COURT:  All right.  Those will be received,

20   if you used.

21   BY MS. KLIEBENSTEIN:

22   Q.  So I took the charts from the defendants, and I just

23   kind of combined things so that we could all be looking at

24   all of the information in one chart.

25             And so in this chart I've put the CSI, the

 1    specialty insurance, on the left-hand side.  And then I

 2    have CCI commercial next to it.  And then I filled in the

 3    blank with the personal lines that total up to the Chubb

 4    Corp.

 5           Do you agree with my 10,000-foot description of

 6    this document?

 7    A.  I would say there's probably some nuances, but it's

 8    materially correct.

 9    Q.  Okay.  So the first three columns should add up to the

10    fourth, right?

11    A.  They should, largely speaking.

12    Q.  Largely speaking.

13           And so the personal lines, and we really haven't

14    talked about that a lot in this lawsuit, but I think it's

15    material to looking at what's going on with the whole

16    company.

17           Mr. Mayleben, can you pull up D196, which is the

18    2004 annual report.  And can you scroll over to page 12.

19    Thank you.  I don't have reading glasses.  Apparently I

20    need them.

21           So in this annual report Chubb Corp. is talking

22    about the personal lines.  And in this annual report they

23    characterize the personal lines as, "Our premier personal

24    lines product Masterpiece covers homes, cars, boats,

25    valuable possessions and collections and personal

1    liability.  Chubb is also a leading worldwide specialist

2    insurer of jewelry, fine arts and other collectables and

3    can provide policies designed specifically for vacation

4    homes, city homes, antique and collector vehicles, yachts,

5    family office and family protection, including kidnap and

6    ransom."

7              Is that an accurate description of the personal

8    lines as they existed at Chubb Corp.?

9    A.  It is.

10   Q.  Mr. Mayleben, can you go back to P1177, please.

11             And I see back in 2004 the personal lines were

12   about 2.8 million out of the 12 million total.  Would you

13   agree with that?

14   A.  Per this chart, yes.

15   Q.  The other thing I also wanted to drill down on is, I

16   see between 2004 and 2005 in the specialty lines, do you

17   see that where it goes from 4.6?

18             Mr. Mayleben, if you could highlight that.

19             To 3.0?

20   A.  Mm-hmm.

21   Q.  I did the back-of-the-napkin math, and that's about a

22   34 percent drop between those two years.  Would you agree

23   with that math?

24   A.  I would say it sounds right.  I don't have a calculator

25   unfortunately, but --

KEVIN HARKIN - CROSS

1    Q.  And there it is.  So a 30 percent -- 34, 34.7 percent

2    drop in the CSI Chubb specialty line in one year.

3              Mr. Harkin, do you recall when, when the license

4    agreement with FICO was executed by, with Chubb & Son?

5    A.  2006.

6    Q.  Correct, in early 2006.  So let's scroll back out.

7              One other question.  Do you know when the, all of

8    the applications at issue were installed in the various --

9    when Blaze Advisor was installed in the various

10   applications that you looked at in your first

11   demonstrative?

12   A.  No.

13   Q.  No?  So you don't know if they were all in 2006 or

14   spread out?

15   A.  I don't know the answer to that.

16   Q.  Okay.  Let's scroll back out, Mr. Mayleben, if we

17   could.

18             So let's focus in on 2007 in particular.  I think

19   that's the start of when you said things started to

20   plateau.  So I just wanted to drill down into that.

21             I see in 2007 compared to the year before, you

22   know, everything looks, everything looks kind of flat.

23             So if we can go into D199, which is the 2007

24   annual report and move to page 4, please.  And you can see

25   a copy of this, Mr. Harkin, in your box, if you care to

KEVIN HARKIN - CROSS

1    look or you can look on the screen.  It's in the -- they're

2    in folders in your box.

3    A.  Okay.

4    Q.  Right next to you.

5    A.  Oh, in my box here.  Yeah.  There's a lot of folders in

6    the box here.  I might just look on the screen.

7    Q.  I don't want to deprive you of the opportunity to flip

8    through paper, but that's fine too.  If you ever have a

9    question just pop in the box.

10   A.  Sure.

11   Q.  Here we are on page 4, and it says for 2007 the

12   combined loss and expense ratio -- I'll wait for you.

13   A.  Thanks.

14   Q.  On page 4 it says, "The combined loss and expense ratio

15   for 2007 improved to 82.9 percent from 84.2 percent in

16   2006."

17   A.  Mm-hmm.

18   Q.  And, Mr. Mayleben, if you could scroll out, please.

19   Thank you.

20           And then I see, then I see above that in the

21   paragraph that starts "Net premium"?

22   A.  Mm-hmm.

23   Q.  It says, "The net premiums declined one percent

24   reflecting the impact of the transfer of our outgoing

25   reinsurance business to Harbor Point."

1    A.  Mm-hmm.

2    Q.  And so that would be a large event that affected

3    revenues, correct?

4    A.  It would.

5    Q.  Okay.  And then down a couple more paragraphs,

6    Mr. Mayleben, if you could scroll out, there it was.  Yep.

7            Catastrophe.  "Catastrophe losses in 2007

8    accounted for three percentage points of the combined

9    ratio."

10           You mentioned earlier hurricanes, storms and the

11   like, how does that impact the revenues of a company like

12   Chubb Limited?

13   A.  The storms wouldn't have a direct impact on the revenue

14   per se.

15   Q.  That's a fair point.  They have an impact on the

16   profit, don't they?

17   A.  Correct.

18   Q.  Correct.  Because when a storm happens, people make

19   claims, and you have to pay them out.  So the combined

20   ratio may fluctuate as a result of that.

21   A.  Yeah.

22   Q.  Okay.  All right.  Fair point.

23           And if we move back to D199-065, there's a bunch

24   of numbers on these papers, but it should be tabbed in your

25   document.  Oh, no, no.  No.  Same exhibit.

1    A.  D199-65.

2    Q.  On the very bottom.

3    A.  Got a bunch of ones that start with P.

4           THE COURT:  It's on the screen.

5           THE WITNESS:  It's on the screen.  Got it.  It

6    just came up.

7    BY MS. KLIEBENSTEIN:

8    Q.  It's on the screen.  And I see kind of in the middle of

9    the third paragraph down, the last sentence in that

10   paragraph I see in this annual report Chubb Corp. wrote,

11   "In line with our strategy in recent years of directing our

12   focus to small and middle market publicly traded and

13   private held companies, the percentage of our book of

14   business represented by large public companies has

15   continued to decrease."

16          Do you see that?

17   A.  I do.

18   Q.  Do you have any reason to disagree with that statement?

19   A.  I do not.

20   Q.  Mr. Mayleben, if we could move to P1178.

21          And these are the combined ratios put together

22   for the various years from 2006 to 2014, correct?

23   A.  Yes.

24   Q.  And just so I make triple sure I have it right, the

25   profit of the company is basically 100 minus whatever this

1    number is, so 100 minus 87.5 which would be 12 and a half?

2    A.  Yes, that would be the profit margin.

3    Q.  Okay.  So it is of an inverse way to look at the

4    profits.  So the lower the number, the better the profit?

5    A.  The lower the combined ratio, the better the profit.

6    Q.  Correct.  Correct.

7            So looking at the CSI combined ratio, in 2006 I

8    see it's 87.5.  And then in 2007, I see that it's 77.4.  So

9    it's almost a 10 percent improvement in profitability in

10   that business unit over one year, correct?

11   A.  Correct.

12   Q.  And then we were just talking about the catastrophe

13   losses in 2007.  You know what.  I think we'll get to a

14   better example when Superstorm Sandy comes up.  So we will,

15   we will move on from that point.

16           Okay.  Marching forward, 2008.  This looks like a

17   rougher year than the years before when it comes to

18   profitability, would you agree?

19   A.  The combined ratio is higher than the years preceding

20   it yes.

21   Q.  So less profitable in 2008.

22           And, Mr. Mayleben, if we could switch over to

23   1177.

24           If we look at the revenues for 2008, juxtaposed;

25   to 2007, the revenues are just a tiny bit lower, the total

1    revenues on the right-hand side.  I see 11.8 million in

2    2007 and 11.7 million in 2008.  Do you see that?

3    A.  Billion, but yes.

4    Q.  Apologies.  Billion.

5              So the revenues were consistent that year, but

6    the profit margin was a lot lower, correct?

7    A.  Correct.

8    Q.  And I think I can guess what was happening in 2008, but

9    let's go to -- let's go to Exhibit D200, which is the 2008

10   annual report.  And let's go to page 3.

11             And I see that Chubb Corp. wrote, "I'm happy to

12   report that Chubb effectively navigated the most turbulent

13   global financial markets experienced since the Depression,

14   achieving 2008 results that were the third best in the

15   corporation's history."

16             Do you agree with that statement?

17   A.  I would have to -- I don't have an opinion without much

18   more context than that line.

19   Q.  And can we move to page 4?

20             And so the combined loss in ratio was 88.7, but

21   then I see just below that, catastrophe losses, including

22   those attributable to Hurricane Ike, accounted for 5.1

23   percentage points of the combined ratio in 2008.

24             Do you agree with that statement?

25   A.  Yes.

1    Q.  And catastrophe losses, do those affect the commercial

2    lines or the specialty lines more?

3    A.  Those would more affect the commercial lines where

4    there's property damage.

5    Q.  And so I see in 2008 the CCI combined ratio is 93.9, up

6    from the year before.  Do you agree with that statement?

7    A.  Yes.

8    Q.  And then let's skip forward to 2010, during the period

9    when you said the revenues were still bottoming out.

10           If we could go to D202, the 2010 annual report,

11   please.  And let's scroll over to page 3.

12           And I see that net premiums, net premiums were up

13   one percent.  And then moving forward to page 4, I see that

14   CCI, the net written premiums were basically unchanged,

15   including a 5.4 percent of impact of catastrophes.  And I

16   think we can see what those catastrophes were if we go to

17   page 5.

18           And so in that year we had a benign hurricane

19   season, but we had heavy catastrophe losses from winter

20   storms in the mid-Atlantic and northeast regions of the

21   United States and a Chilean earthquake if the first quarter

22   and from hailstorms in Oklahoma in the second quarter."

23           And these catastrophes that happened, weather,

24   earthquakes, what else is included in a catastrophe bucket?

25   A.  The definition is, we have an agency called ISO that

1    defines a catastrophe, but it could be a severe winter

2    storm, a hurricane, floods, tornadoes, typically weather

3    events like that.

4    Q.  And those catastrophes materially impact the combined

5    ratio; is that right?

6    A.  They can.

7    Q.  They can.

8            Then let's go, let's go to 2013.  Well, actually,

9    no.  Let's stick with 2012.

10           Can we look at P1178, please, Mr. Mayleben.

11           So in 2012 we see the combined ratios are all in

12   the 90s, correct?

13   A.  Correct.

14   Q.  And we can look at the annual report, but would you

15   take my representation that Storm Sandy hit that year in

16   2012?

17   A.  I would.

18   Q.  And that probably had a material impact on these

19   numbers, correct?

20   A.  I would think it had an impact.  I don't know the

21   materiality of it.

22   Q.  Let's move forward to D207, which is the 2015 annual

23   report.

24           Mr. Harkin, have you seen this document before?

25   A.  I have.

1    Q.  And it's the Chubb Limited annual report from 2015?

2    A.  Correct.

3    Q.  Mr. Mayleben, can we look at page 14, please.

4            And on the lower, on the left-hand column in the

5    lower third, there's a sentence that starts with, "The

6    Chubb acquisition."  And it says, "The Chubb acquisition

7    brings us so much more capability, including underwriting

8    knowledge, data and analytical insights, product and

9    distribution capability, exceptional claims and engineering

10   services and so many talented seasoned professionals, to

11   serve in particular the mid size commercial and high net

12   worth personal lines market in North America through an

13   expanded agency system that can be leveraged globally."

14           Do you agree with what Chubb Limited wrote about

15   the acquisition in the 2015 annual report.

16   A.  Yeah.

17   Q.  Okay.  Let's move into 2016 and beyond, if we may.

18           Mr. Mayleben, could we put up P1179.

19           And this is a table that I put together that

20   combines the net written premium and the combined ratio.

21   And I see generally on the left-hand side, after 2016,

22   there's climbing upward, and on the right-hand side, the

23   combined ratios are ranging from 96 percent in 2020 and 88

24   in 2016.

25           Do you agree with that?

```
1    A.  Yes.

2    Q.  And let's look at, let's start with 2016, the annual

3    report D208 to see if we can determine what's impacting the

4    combined ratio and the revenues.

5            If we could go to page 6 and 7.  And on page 6 or

6    7 the annual report writes, "Our underwriting result was

7    achieved, despite industry experiencing approximately 54

8    billion in natural catastrophe losses, its sixth costliest

9    year on record, which was double the prior year's reported

10   27 billion."

11           Do you agree with that statement?

12   A.  I am sure it was true at the time.

13   Q.  And if we go to page, I think we're on page 6.  There's

14   a chart that's hiding down there.  If we can scroll back

15   out, Mr. Mayleben.

16           Have you seen this chart before?

17   A.  I don't recall it.

18   Q.  I believe this is a chart of combined ratio of Chubb

19   versus its global peers and North American peers.  Would

20   you agree with that?

21   A.  Yeah.  I can see it, yep.

22   Q.  And so for 2016, Chubb's 88 percent combined ratio was

23   below, was better than, its global peers and certainly its

24   North American peers.  Do you agree with that?

25   A.  Yes.
```

1    Q.  So even with the, even with the catastrophe losses,

2    Chubb Limited was still doing better than its peers?

3    A.  Sure.

4    Q.  From --

5    A.  The losses are industry, so they would affect the peers

6    as well, but yes.

7    Q.  Correct.  Correct.

8              And let's go forward to 2017.  And on -- I'll

9    wait and I'll give Mr. Mayleben the exhibit number.  D209.

10   And if we can move to page 7, please.

11             And I see that gross written premiums improved

12   about four percent.  Would you agree with that?

13   A.  Yes.  Yes.

14   Q.  And then on page 9, we had another record or near

15   record year for worldwide insured natural catastrophe

16   losses; is that right?

17   A.  That's what it says, yep.

18   Q.  And if we go to page 10, the table on page 10, it looks

19   like all of Chubb's peers had a pretty rough year.  In fact

20   they were not profitable at all, correct?

21   A.  I can't say all of their peers weren't profitable, but

22   the -- it looks like this is the average ratio of the

23   peers.

24   Q.  That's a fair point.  For the peers that are reflected

25   in this table, they were above a hundred percent correct?

1    A.  The average of them, yes.

2    Q.  Okay.

3    A.  Some may have been above; some may have been below.

4    Q.  Sure.  And Chubb was at 94.7 percent for a combined

5    ratio?

6    A.  Yes.

7    Q.  And so Chubb did better than its peers in even a year

8    where there were record or near record worldwide insured

9    natural catastrophe losses; is that right?

10   A.  That's these peers on here, yes.

11   Q.  And let's move to 2018.  Could we move to page 10 in

12   this annual report.

13           And, again, we have another chart where Chubb is

14   at 90.6, and its peers are at 90.2 for a combined ratio,

15   correct?

16   A.  Correct.

17   Q.  And so that was another year where Chubb did better,

18   materially better than its peers as, with regards to its

19   profits, right?

20   A.  Correct.

21   Q.  And it's -- would you agree that, you know, revenue is

22   one thing, but it's profit that matters more than the

23   revenue, correct?

24   A.  I would say it depends on how a company is managed, but

25   for the most part, profit is more important than revenue.

1    Q.  And let's go to D211, which is the 2019 annual report.

2    And could we go to page 8.

3              And again we have that table, and again Chubb is

4    doing, if I can do my math, almost 7 percent, but not quite

5    7 percent, 6.8 percent better on its combined ratio than

6    its peers, correct?

7    A.  Correct.

8    Q.  And, Mr. Mayleben, can we go to page 27.

9              And again this is 2019.  And the annual report

10   says, "The net premiums written for North America

11   commercial P&C insurance increased 7.1 percent from 2018."

12             Do you agree with that statement?

13   A.  Yes.

14   Q.  And on page 29 it says, "In 2019 net premiums written

15   in Chubb's middle market and small business division grew

16   6.1 percent."  Do you see that?

17   A.  Yes.

18   Q.  And then let's move to 2020 in D212, the 2020 annual

19   report, And let's go to page 8.

20             I'm going to guess what the catastrophe was in

21   this year, but we'll walk through it.  I see at that Chubb

22   is about 2.8 percent better than its -- better than its

23   peers on it's combined ratio.  Do you see that?

24   A.  Yes.

25   Q.  But between 2019 and 2020, both the blue line and the

KEVIN HARKIN - CROSS

1    orange line we want up; is that right?

2    A.  It looks kind of purplish to me, but sure.

3    Q.  Thank you.  Can we go to page 5, Mr. Mayleben.

4            And what happened in 2020.  "Over the last

5    12 months, Chubb withstood a global pandemic, a recession,

6    and a record run of natural catastrophes."

7            Is that what led to the, would you call it a

8    decrease or an increase in combined ratio when the number

9    goes up in the 90s?

10   A.  When the number goes up, the combined ratio increases.

11   Q.  Okay.  So you would agree with me that between 2019 and

12   2020 the combined ratio for Chubb increased, right?

13   A.  Yes.

14   Q.  And would you attribute most of that increase to what's

15   written here on this page, "The global pandemic, a

16   recession and a record run of natural catastrophes"?

17   A.  They were factors, yes.

18   Q.  And I won't ask you how many record runs of natural

19   catastrophes we can have.

20           All right.  Let's move on from that.

21           Mr. Harkin, if you can grab your deposition

22   transcript, we're just going to run through a couple things

23   we covered in your depo.  And then you also have a binder,

24   a small binder that has some exhibits we may look at, from

25   your depo.  Correct?  From your deposition.  You have that?

```
1    A.  Mm-hmm.

2    Q.  Okay.  So in your deposition we reviewed, we reviewed

3    some interrogatory responses, and we reviewed some

4    financials.  Do you recall that?

5    A.  Yes.

6    Q.  And I'd like you to look at Exhibit P404A, which is a

7    redacted copy.  And you'll see on this --

8            Your Honor, this is not in evidence yet, so I

9    just want to slow down and check that box before we get too

10   far.

11           So this is Deposition Exhibit Number 407, which

12   was Plaintiff's Trial Exhibit 404A, which we've redacted

13   consistent with the ninth supplemental interrogatory

14   responses.

15           Mr. Harkin, do you recall seeing this at your

16   deposition?

17   A.  Generally, yes.

18   Q.  Okay.

19           Your Honor, I move to admit Exhibit P404A.

20           MS. JANUS:  No objection.

21           THE COURT:  P404A is received.

22   BY MS. KLIEBENSTEIN:

23   Q.  And the title of this document is Federal Insurance

24   Company's Fifth Supplemental Answer to Plaintiff's

25   Interrogatory Number 16 and Sixth Supplemental Answer to
```

1    Plaintiff's Interrogatory Number 17.

2             Do you see that?

3    A.  I do.

4    Q.  And so this was an interrogatory, a question, from FICO

5    to the defendants.  Do you agree with that?

6    A.  Yes.

7    Q.  And the defendants provided answers to FICO, correct?

8    A.  Correct.

9    Q.  And in our deposition we went through these

10   interrogatories to determine where the gross written

11   premium revenue dollars, where they came from, how they

12   were collected.  Do you recall that?

13   A.  Yes.

14   Q.  Let's just take the time to look at interrogatory

15   number 16 and number 17.

16             And I have interrogatory number 16 up on the

17   screen.  And it is, it says, "For all insurance policies in

18   connection with which the Blaze Advisor software was used,

19   the gross written premium of defendants and the gross

20   written premium of each related company, including the

21   specific identification of each related company, for each

22   year from 2007 to 2012."

23             Do you agree with that?

24   A.  Yes.

25   Q.  And then let's go just to level set, let's go to

1    page 10 where it defines interrogatory number 17.

2            And let's blow that up.

3            And interrogatory number 17 is, "For all

4    insurance policies in connection with which the Blaze

5    Advisor software was used, the gross written premium of

6    defendants and the gross written premium of each related

7    company, including the specific identification of each

8    related company, for each quarter from March 30th, 2016, to

9    date."

10           Do you agree with my reading of interrogatory

11   number 17?

12   A.  Yes.

13   Q.  So I wanted to spend some time confirming how the

14   numbers, if we can scroll back out and back to

15   interrogatory number 16.  I just want to take the time to

16   confirm for the record how the numbers were pulled.

17           Let's go to 16.  Perfect.  Now move forward one

18   page, Mr. Mayleben.  All right.

19           So on that page, do you see a table titled

20   DecisionPoint?

21   A.  Yes.

22   Q.  And in your deposition, I asked you what's your

23   understanding of the information that's --

24           MS. JANUS:  Objection.

25           THE COURT:  Sustained.  You can ask him the

1    question directly and then impeach him with the deposition,

2    if need be.

3              MS. KLIEBENSTEIN:  We can go that route too.

4              At a 10,000-foot level what is your understanding

5    of the information that's contained in this first table

6    titled DecisionPoint, for DecisionPoint?

7              THE WITNESS:  It is the gross written premium and

8    policy count that ran through the DecisionPoint application

9    and used the Blaze software.

10   BY MS. KLIEBENSTEIN:

11   Q.  And scrolling back out and down.

12             For CSI Express, can you tell me, same question,

13   right, at a 10,000-foot level, what data is reflected in

14   that table?

15   A.  It is the gross written premium and the policy count

16   for policies that ran through CSI Express and used the

17   Blaze software.

18   Q.  And I'm not, I'm not sure if this is a distinction with

19   any difference or not, but in your deposition you told me

20   it is policy count, written premium associated with those

21   policies and writing companies for the policies that ran

22   through the automated renewal process and/or -- sorry.

23   Wrong one.

24             Yeah.  Okay.  CSI Express.  I asked you the

25   second table titled CSI Express Automated Renewal and

1    Profitability Indicator, can you tell me at a 10,000 foot

2    level what data is reflected in that label.

3           And I think this is what you just said, but I

4    just want to make sure we're on the same page.  It's the

5    policy count, written premium associated with those

6    policies and writing companies for the policies that ran

7    through the Automated Renewal Process and/or Profitability

8    Indicator for the, that used the Blaze software.

9           Are we saying the same thing?

10   A.   Yes.

11   Q.   Okay.  Perfect.

12          And let's scroll back out and go to the next page

13   and the next page and the next page.

14          And here we, at the very top, we have Premium

15   Booking.  And I'll ask you -- I'd like the table

16   highlighted.

17          I'll ask you the same question.  At a 10,000-foot

18   level, can you tell me what data is reflected in this

19   table?

20   A.   It's the policy count and gross written premium that

21   ran through the premium booking system and used the Blaze

22   software.

23   Q.   And then let's scroll out and go down to CUW-IM.

24          And I'll ask you the same question again.  At a

25   10,000-foot level, what is the data that's shown in this

KEVIN HARKIN - CROSS

1897

1    table?

2    A.  This is the policy count, written premium and writing

3    companies for policies that went through CUW-IM and used

4    the Blaze software.

5    Q.  And let's scroll out.

6         And the -- you have this document in front of

7    you.  We also have IRMA and the TAPS applications.  Well

8    actually wait.  Just the IRMA, just the IRMA application in

9    here.

10        If I asked you the same answer or the same

11   question, at a 10,000-foot level what data is reflected in

12   this, would you give me the same answer?

13   A.  Yes.

14   Q.  Okay.  Then let's move forward to interrogatory number

15   17.  And in interrogatory number 17 we have, again,

16   DecisionPoint, CSI Express, CUW-IM, TAPS, IRMA, and Premium

17   Booking.

18        Do you recall the location of the data center at

19   which Blaze Advisor was -- Blaze Advisor software was

20   installed that's used in these applications?

21   A.  I don't recall it, no.

22   Q.  Is it the Raleigh, North Carolina, data center?

23   A.  If that's what I said in the deposition, yeah.  I was

24   prepped for the deposition at that time.

25   Q.  And if you want to refresh your recollection, I'm on

1    page 102 and 103 of your deposition.  I don't want to put

2    words in your mouth.

3    A.  Raleigh data center, correct.

4    Q.  Okay.  And we just covered the gathering process for

5    interrogatory number 16.  If I asked you, just so we can

6    move through this quickly, the same questions for

7    interrogatory number 17 for the applications DecisionPoint,

8    CSI Express, Premium Booking, CUW-IM, TAPS and IRMA, could

9    you tell me at a 10,000-foot level how, what that data

10   reflects?

11   A.  The data reflects the policy count and associated gross

12   written premium and writing company that ran through the

13   applications you listed and used the Blaze software.

14   Q.  For the policies that ran through the applications and

15   utilized Blaze Advisor software, correct?

16   A.  Correct.

17   Q.  Okay.  We also talked about Legacy ACE writing

18   companies in the context of interrogatory number 17.  And

19   if you could move to page 15 of your interrogatory.

20          Do you agree that the writing companies listed in

21   the middle of the left-hand column, the following are

22   Legacy ACE Writing Companies:  ACE American Insurance Co.,

23   ACE Fire Underwriters Insurance, ACE Property and Casualty,

24   Illinois Union Insurance, Indemnity Insurance Co., Pacific

25   Employers Insurance, Westchester Surplus Sidelines and WFIC

```
 1    for business effective 1/1/11?

 2    A.  Yes.

 3    Q.  I want to spend a little bit of time on the expense

 4    information that we looked at in your deposition, if we

 5    could.

 6              So in your deposition we look at, we looked at

 7    some spreadsheets that had expenses on them, like claims

 8    losses, commissions and other general expenses in running a

 9    business.  Do you agree with that?

10    A.  We did look at some schedules that had that information

11    on it, yes.

12    Q.  And I asked you, I asked you about the policies that we

13    saw in interrogatories number 16 and 17, and particularly

14    as it related to Premium Booking.  For the policies that we

15    saw in Exhibit 16 and 17, would you agree that it's

16    extremely difficult, it's very difficult to identify

17    expenses directly related to the policies we looked at in

18    interrogatory number 17?

19    A.  I would say we don't track or identify expenses at a

20    policy level.

21    Q.  So you would agree it's, it would be impossible,

22    actually, to identify those expenses under your

23    recordkeeping?

24    A.  Under our recordkeeping, yes.

25    Q.  And then we also went through one -- we went through a
```

1    couple of spreadsheets, but one in particular was

2    Exhibit 409.  And I have a copy if you need your

3    recollection refreshed.

4              And it was the, it was the expenses for the CSI

5    and CCI business units from 2016 to 2018.  Do you recall

6    that?

7    A.  That was our best estimate of the CSI and CCI business

8    units.  We stopped tracking it at that level beginning in

9    2016.

10   Q.  I've printed out a large copy for our eyes.

11   A.  Thank you.

12   Q.  Is this the document that we were just referring to?

13   A.  Yes.

14   Q.  Okay.  And it's got a big number on the bottom,

15   FED017882, and it was Deposition Exhibit Number 409.

16             And can you tell me, what are the dates?  What

17   are the dates on this document?

18   A.  The dates are the years in question.  So I guess more

19   specifically what date are you referring to?

20   Q.  It spans from 2016 to 2018, correct?

21   A.  Correct.

22   Q.  Okay.  That's what I meant.

23             And can you tell me at a 10,000-foot level, this

24   data also included data from Canada in it as well; is that

25   right?

1    A.  Yes.

2    Q.  And the data in this expense spreadsheet is not

3    specific to the policies that touch Blaze Advisor that we

4    looked at in interrogatory 17; is that right?

5    A.  Not directly, no.

6    Q.  And would you agree with me that this report as its

7    run, it's not part of your typical reporting processes?

8    A.  This is not part of our typical reporting process.

9    Q.  And the data that's in here comes from the CCI and the

10   CSI segments.  Is that the right word for you?

11   A.  It was our best estimate of what they would look like

12   given that we changed the way we tracked data after the

13   acquisition.

14   Q.  For CCI and CSI?

15   A.  For CCI and CSI.

16   Q.  And we saw those acronyms on those combined ratios and

17   those revenue charts that we just looked at?

18   A.  For the 2002 to 2014 years.

19   Q.  Yep.  Because CSI is the acronym that Chubb Corp. used

20   to use for its specialty lines?

21   A.  Correct.

22   Q.  And CCI was the acronym for Chubb Commercial that Chubb

23   Corp. used to use before the acquisition, right?

24   A.  Correct.

25   Q.  Okay.  And so the policies that we looked at in

1   interrogatory number 17 fell under that, those CSI and CCI

2   buckets?

3   A.  From the years prior to 2016.

4   Q.  Right.  And the data that's in FED017882, that's from

5   2016 to the end of 2018.  It doesn't include any Legacy ACE

6   revenue or expenses in it, right?

7   A.  No.

8   Q.  And there's no way for us to definitively link up the

9   costs and expenses in that document to the gross written

10  premiums in interrogatory 17; is that right?

11  A.  That's correct.

12  Q.  And in that cost and expense spreadsheet that you are

13  refreshing your recollection with, there's premium revenue

14  that doesn't touch Blaze Advisor, correct?

15  A.  There would be premium in here that potentially does

16  not touch Blaze Advisor.  It's hard to definitively say.

17  Q.  And then touching on that Legacy ACE issue, going back

18  to interrogatory number 17 when I had you identify those

19  writing companies from Legacy ACE, do you recall where you

20  gathered the policy and the policy information, the policy

21  count and the revenues, what database you looked at for the

22  Legacy ACE companies?

23  A.  For what application?  For the CUW-IM?

24  Q.  That's correct.

25  A.  I believe there was a query run up against a -- the

KEVIN HARKIN - CROSS

1    CUW-IM application that included an identifier, and that

2    identifier was then pulled up against a registration

3    system.

4    Q.  I'll ask it a different way.  The Legacy ACE data, it

5    came from a database called Genius Legacy ACE, correct?

6    A.  A registration system Genius, yes.

7    Q.  And that's not a Legacy Chubb database, correct?

8    A.  Correct.

9    Q.  And in the context of the spreadsheet, the big

10   spreadsheet that you are refreshing your recollection with,

11   we talked about bulk expenses and direct expenses.  And

12   bulk expenses are things like general administrative

13   expenses, taxes, licenses and fees.  Would you agree with

14   that?

15   A.  Yes.

16   Q.  And those are tracked at the North American level from

17   2016 to 2018, correct?

18   A.  They're tracked at department levels within

19   North America.

20   Q.  In your deposition you told me the bulk expenses are

21   tracked in a larger bucket and apportioned to a line of

22   business.  Do you agree with that?

23   A.  Yes.

24   Q.  And would you agree that these bulk expenses cannot

25   specifically be linked to an individual policy or premium?

1    A.  By and large, yes.

2    Q.  With regard to -- you mentioned, you mentioned earlier

3    that Chubb pays its claims.  Did I hear you say that right?

4    A.  Chubb pays its claims, yes, when they're valid claims.

5    Q.  Pays its what?

6    A.  When they're valid claims, yes.

7    Q.  When they're valid claims.

8    A.  Yes.

9    Q.  And when we, when we looked at the expense data, I

10   recall that there was a line, what was it called, LAE?

11   A.  Mm-hmm.

12   Q.  Loss adjusted expenses?

13   A.  Yes.

14   Q.  And that included legal expenses relating to disputed

15   claims; is that right?

16   A.  Among other things, but yes.

17   Q.  And do you know what percentage of its claims Chubb

18   Limited disputes?

19   A.  I don't have any -- I wouldn't have an appreciation for

20   how much they dispute.  And you can have legal claims for

21   or legal costs for non-disputed claims as well.

22   Q.  So you don't know what percentage of its claims, of the

23   claims from the customers that Chubb Limited views as valid

24   or not valid; is that right?

25   A.  I don't have an understanding of the percent of

1    disputes of nonvalid versus valid, no.

2            MS. KLIEBENSTEIN:  All right.  I don't think I

3    have any further questions.

4            THE COURT:  Ms. Janus, do you ever any further

5    questions?

6            MS. JANUS:  No.

7            THE COURT:  All right.  Thank you, Mr. Harkin.

8    You may step down.

9                    (Witness excused.)

10           THE COURT:  Members of the jury, we'll take our

11   afternoon break.  Be back in the courtroom at quarter after

12   3:00.

13           THE CLERK:  All rise for the jury.

14                    (Recess taken)

15   3:15 p.m.

16                    **IN OPEN COURT**

17                    **(JURY PRESENT)**

18           THE COURT:  Be seated.

19           Ms. Godesky, will you call your next witness.

20           MS. GODESKY:  Defendants call Pamela Lopata.

21           THE COURT:  Ms. Lopata, come on up here and I'll

22   swear you in.

23                    <u>PAMELA LOPATA</u>,

24   called on behalf of the defendants, was duly sworn, was

25   examined and testified as follows:

1          THE COURT:  I do.  Please be seated.

2          Speak into the microphone and state your full

3    name for the record.

4          THE WITNESS:  My full is Pamela Lopata.

5                    DIRECT EXAMINATION

6    BY MS. GODESKY:

7    Q.  Good afternoon, Ms. Lopata.

8    A.  Good afternoon.

9    Q.  What is your current job and who is your employer?

10   A.  I am currently managing counsel within the legal

11   department at Chubb.  And my employer is ACE American

12   Insurance Company.

13   Q.  How can you be in the Chubb legal department and be

14   employed by ACE?

15   A.  So the ACE American Insurance Company affiliate within

16   the Chubb group is the entity that employs me and others

17   within the organization, runs payroll.

18   Q.  Now you said that you are managing counsel.  Does that

19   mean you are a lawyer?

20   A.  Yes.

21   Q.  Were you employed by Chubb at the time that it was

22   acquired by ACE?

23   A.  Yes.

24   Q.  When did you first join Chubb?

25   A.  I first joined Chubb in December of 2012.

```
1    Q.  Could it be 2011?

2    A.  I'm sorry.  December of 2011, yes.  December of 2011.

3    I got married in December of 2012.

4    Q.  Can you tell the jury about your education?

5    A.  Sure.  I went to Penn State University for my

6    undergraduate degree, and then I went to the Catholic

7    University of America for my JD.

8    Q.  And when did you get your JD?

9    A.  In 2001.

10   Q.  What did you do immediately after law school?

11   A.  Immediately after law school, I clerked for the

12   appellate court in New Jersey.

13   Q.  What does it mean to clerk for the appellate court?

14   A.  I would review trial transcripts that were on appeal

15   for cases that were coming up on appeal, and then I would

16   write briefs for the appellate panel of judges that would

17   then sit and hear the cases on appeal.

18   Q.  What did you do after your clerkship?

19   A.  After my clerkship, I joined a law firm by the name of

20   Budd Larner in New Jersey as a corporate associate.

21   Q.  How long did you work there?

22   A.  Approximately three or four years.

23   Q.  And what did you do next?

24   A.  After that I joined another law firm in New Jersey,

25   Gibbons, as a corporate associate.
```

1    Q.  And then did you join Chubb after that?

2    A.  And then I joined Chubb after that.

3    Q.  What did your role at Chubb look like between when you

4    first joined the company in 2011 through the time of the

5    ACE acquisition in early 2016?

6    A.  So I was assistant counsel within the general counsel

7    department, and one of the areas that I supported was the

8    global strategic sourcing/procurement area, and they were

9    responsible for ensuring that we were contracting with

10   vendors for different services and products that the

11   company needed.

12            And I would get involved from a legal perspective

13   to negotiate deals that were over $500,000 of spend.

14   Q.  And when you talk about vendor contracts, do you mean

15   things like software license agreements?

16   A.  Correct.  Yeah.

17            THE COURT:  Excuse me one second, counsel.

18            Slow down just a little bit.

19            THE WITNESS:  Oh, sure.  Okay.

20   BY MS. GODESKY:

21   Q.  Are you familiar with someone at Chubb named Andrew

22   Hopp?

23   A.  I am, yes.

24   Q.  Does he work in the legal department?

25   A.  He does.

1    Q.  Did he come to the combined ACE Chubb entity from ACE

2    or from Chubb?

3    A.  Andrew was from ACE.

4    Q.  In the years before the ACE acquisition, by what

5    company were you formally employed?

6    A.  Federal Insurance Company.

7    Q.  If one of the vendors that you work with asked you what

8    company do you work for in that time period, what would you

9    say?

10   A.  Chubb.

11   Q.  Why wouldn't you say Federal?

12   A.  Federal didn't have the brand recognition like Chubb

13   and would not really have indicated that I worked for Chubb

14   Insurance.

15   Q.  I want to put Defendants' Demonstrative 1 on the

16   screen.

17            Thank you, Vanessa.

18            Ms. Lopata, have you seen this before?

19   A.  I have.

20   Q.  And what are we looking at here?

21   A.  We are looking at an organizational chart of the Legacy

22   Chubb organization.

23   Q.  And we see the Chubb & Son, division of Federal, inside

24   the box for Federal Insurance Company, correct?

25   A.  Correct.

1    Q.  What was Chubb & Son's role in the day-to-day

2    operations of Federal before the ACE acquisition?

3    A.  So Chubb & Son was a division of Federal, and it was

4    the contracting arm of the organization.

5    Q.  Was Chubb & Son, a division of Federal, ever an

6    independent legal entity?

7    A.  Never.

8    Q.  Did it ever issue any insurance policies?

9    A.  Never.

10   Q.  Did Chubb & Son, a division of Federal, ever have

11   employees?

12   A.  No.

13   Q.  Now, the jury has seen some lists of names of people

14   who are identified as officers of Chubb & Son.  How can

15   that be true if there are no employees of the Chubb & Son

16   division?

17   A.  So employees of Federal were granted officer titles,

18   and they were tied to Chubb & Son.  I had one, and it was

19   tied to Chubb & Son.  It indicated that you were an officer

20   within the Chubb organization.

21   Q.  Would it surprise you if people outside the legal

22   department weren't sensitive to the nuances of what it

23   meant to have an officer title through Chubb & Son?

24   A.  No.

25               MR. HINDERAKER:  Objection.  Leading.

```
 1              THE COURT:  I did not hear the objection.  I'm
 2    sorry.
 3              MR. HINDERAKER:  I think that's leading, Your
 4    Honor.
 5              THE COURT:  Sustained.
 6    BY MS. GODESKY:
 7    Q.  Ms. Lopata, in the time period before the ACE
 8    acquisition, how widely understood was this nuance about
 9    why certain people have officer titles through the Chubb &
10    Son division?
11    A.  Within the legal department it was well known.  Outside
12    of the legal department, I wouldn't -- not as well known.
13    Q.  Would the Chubb & Son division of Federal itself have
14    had a use for a software license?
15    A.  No.
16    Q.  Why not?
17    A.  Because Chubb & Son didn't have any employees.  It
18    wasn't a legal entity, and Chubb & Son, a division, would
19    not have been, would not have had a need for a software, a
20    software tool.
21    Q.  Did Chubb & Son, a division of Federal, ever have any
22    affiliate companies?
23    A.  No.
24    Q.  Why not?
25    A.  Because Chubb & Son, a division, is not a legal entity.
```

1    It wasn't a legal entity.

2    Q.  After you joined Federal in 2011, did you become

3    familiar with the company's general practices and

4    procedures for entering vendor contracts?

5    A.  Yes.

6    Q.  In the course of your work in the legal department, did

7    you from time to time work with vendor contracts and legal

8    agreements that were executed before you joined the

9    company?

10   A.  Yes.

11   Q.  And in what context would that happen?

12   A.  That would have been in the context of amending an

13   agreement, adding a new statement of work to an agreement,

14   reviewing an agreement to understand what a party's legal

15   obligations may be under an agreement, or if a vendor had a

16   particular service level that it needed to meet in

17   connection with the services they were providing or the

18   software tool, I would go back and look at these older

19   contracts for any of those purposes.

20   Q.  Did you also interact with older contracts in the

21   context of renewals and terminations?

22   A.  Yes.

23   Q.  Why would that happen?

24   A.  In order to take -- I'm sorry.  Can you repeat the

25   question?

1    Q.  So you testified that you would sometimes work with

2    these older contracts in the context of a renewal or

3    termination.  Just explain what you mean by that.

4    A.  Oh, sure.  If a contract was expiring, but Chubb wanted

5    to continue with the services, we may have to enter into a

6    renewal amendment or a renewal addendum or some kind of

7    documentation to restart the agreement.

8            If Chubb wished to terminate an agreement, we

9    then would have to review the agreement to draft a

10   termination letter and understand what our obligations were

11   in connection with the termination.  So that would require

12   me to have to go back and look at all of the previous

13   pieces of the contract to make those decisions.

14   Q.  How far?

15           MR. HINDERAKER:  Excuse me, Your Honor.  Could we

16   have a sidebar?

17           THE COURT:  You may.

18                   (Sidebar discussion)

19           THE COURT:  Go ahead.

20           MR. HINDERAKER:  Unfortunately I don't have a

21   copy of the defendants' witness list with me.

22           THE COURT:  Okay.

23           MR. HINDERAKER:  But the disclosure from

24   Ms. Lopata was about corporate structure.

25           THE COURT:  Okay.

```
 1              MR. HINDERAKER:  And this testimony is now going
 2      beyond that into contracts, termination of contracts,
 3      renewals of contracts.
 4              MS. GODESKY:  I don't want to alarm anyone.  I'm
 5      just trying to lay a foundation for the fact that she knows
 6      the general practices and procedures from before 2011 when
 7      she joined the company.  That's all I'm trying to
 8      establish.
 9              MR. HINDERAKER:  It sounds more than that.
10              MS. GODESKY:  I'm literally just laying a
11      foundation.
12              THE COURT:  I understand.  So for now, at least,
13      we can revisit it.  I'll deny the motion to, or the
14      request, but go ahead.  So go ahead and lay the foundation,
15      and we'll see where it goes.
16              MS. GODESKY:  Okay.
17              THE COURT:  And well, that's fine.  Okay.
18                      (In open court)
19              THE COURT:  You need to turn the mic back on
20      after that.
21              THE WITNESS:  Okay.
22              THE COURT:  Okay.  Go ahead.
23      BY MS. GODESKY:
24      Q.  Ms. Lopata, how far back in time do you have a general
25      understanding of Chubb's practices for executing contracts
```

1    with vendors?

2    A.  At least, at least through the early 2000s.

3    Q.  Did you ever work with contracts executed in the 1990s

4    and 80s as well?

5    A.  Yes.

6    Q.  How many vendor contracts and license agreements did

7    you work on during your time at Chubb before the ACE

8    acquisition?

9    A.  Hundreds.

10   Q.  When you joined Federal in 2011, what was the general

11   practice in terms of what contracting entity would

12   typically sign vendor contracts and license agreements for

13   Federal?

14   A.  Chubb & Son, a division of Federal.

15   Q.  And approximately when did that policy begin?

16   A.  At least, at least the early 2000s, if not prior, to my

17   understanding.

18   Q.  And did that general default practice continue having

19   the Chubb & Son, division of Federal, sign contracts on

20   behalf of Federal up until the ACE acquisition?

21   A.  Yes.

22             MR. HINDERAKER:  Objection.  Leading.

23             MS. GODESKY:  Why was it the general practice for

24   the Chubb & Son division to sign contracts on behalf of

25   Federal?

1           MR. HINDERAKER:  Also objection.  Leading.

2           THE COURT:  Overruled.

3           THE WITNESS:  Can you repeat the question?

4    BY MS. GODESKY:

5    Q.  Sure.  Why was it the general practice for the Chubb &

6    Son division to sign contracts on behalf of Federal?

7    A.  Because Chubb & Son was the contracting arm of Federal

8    Insurance Company, and the Chubb & Son division allowed for

9    the outside world, the vendors and the providers, to, to

10   recognize that they were dealing with the Chubb

11   organization.  Federal would not have necessarily allowed

12   for that.

13   Q.  When contracts were signed by the Chubb & Son division,

14   did Federal take the position internally and externally

15   that the contract granted Federal rights under the

16   contract?

17   A.  Yes.

18   Q.  In the five years that you worked at Federal before the

19   ACE acquisition, did any company take the position that

20   Federal did not have rights under a contract because it was

21   signed by Chubb & Son?

22   A.  No.

23           MS. GODESKY:  Thank you, Ms. Lopata.  No further

24   questions.

25           THE COURT:  Mr. Hinderaker.

```
1          MR. HINDERAKER:  Yes.  Thank you.

2                   CROSS-EXAMINATION

3    BY MR. HINDERAKER:

4    Q.  Good afternoon.

5    A.  Good afternoon.

6    Q.  We haven't met.  My name is Al Hinderaker.

7    A.  Nice to meet you.

8    Q.  I represent -- I am one of the lawyers representing

9    FICO.

10          Let's pull up.  Oh, yeah.  Sorry.

11          This is some of the documents I will be asking

12   you about.

13   A.  Okay.

14   Q.  In your, in the binder of materials that I have just

15   given to you is what's called an exhibit called J001.

16   A.  Okay.

17   Q.  And if you would go to that first, please.  And I just

18   want to see if we can agree to a few things.

19          This happens to be the license agreement between

20   FICO.

21          And if we could blow that up.

22          The client in this license agreement is defined

23   as Chubb & Son, a division of Federal Insurance Company.

24   Do we agree?

25   A.  Yes.  It says, "Client."
```

1   Q.  Yes.  And then if we go to the last, not the last page,

2   but it's -- if you look at the top right-hand corner, it's

3   10 of 17.

4   A.  I'm sorry.  Which page?

5   Q.  10 of 17.  And that's 10 of 17.

6          One earlier, Mr. Mayleben.

7   A.  I see 10 of 16.

8   Q.  Look at the screen.  That's the document.  That's the

9   page I want.

10          MS. GODESKY:  I think we have a different -- I

11   think we have a different document, Mr. Hinderaker, because

12   I don't have those numbers on my document either.

13          MR. HINDERAKER:  I have a document that's marked

14   J001.  We can work off of the -- if you go -- how about

15   going to in the box then call it 9 of 16.  Instead of 10 of

16   17, call it 9 of 16.

17          THE WITNESS:  9 of 16 I have.

18   BY MR. HINDERAKER:

19   Q.  All right.  And the signature block on this license

20   agreement is Chubb -- is client-Chubb & Son.  Do we agree

21   with that?

22   A.  That's what it says here, yes.

23   Q.  And then we go forward a few pages.  And if you look at

24   the bottom of the page, it has a J-001 and then -017.  And

25   it's called Amendment Number One?

1    A.  I see that.

2    Q.  And do you see that on Amendment Number One, it's an

3    agreement between Fair Isaac Corporation and Chubb & Son, a

4    division of Federal Insurance, defined as client?

5    A.  I see that.

6    Q.  We agree?  That's what it says?  That's what it says?

7    Yes?

8    A.  Yes.

9    Q.  And then if we go to the next page where there's

10   signature blocks, do we agree that the client is Chubb &

11   Son?

12   A.  That's what it says.

13   Q.  That's what it says?  And if we go to the next page

14   over it's Amendment Two.  And if we look at the opening

15   paragraph, "Amendment Two is an agreement by and between

16   Fair Isaac Corporation and Chubb & Son, a division of

17   Federal Insurance Company, defined as client."  Do we

18   agree?

19   A.  That's what it says.

20   Q.  And then on the signature block for Amendment Two, it

21   says, "Client Chubb & Son, a division of Federal Insurance

22   Company."  Do we agree?

23   A.  That's what it says.

24   Q.  If you go to the exhibit that's numbered 91 in that

25   binder, you see, I'll give you some orientation.  It's a

1    letter dated February 17, 2016.  It's to a Thomas Carretta

2    at Fair Isaac.

3              If you go to the second page where the signature

4    block, it's Andrew D. Hopp, Esquire, Deputy General

5    Counsel.  This is after the merger.

6              As of February 17, 2016, is Andrew Hopp your

7    superior?

8    A.  No.

9    Q.  What was your relationship with Andrew Hopp in the

10   organizational structure?

11   A.  At the time of the merger -- I'm sorry.  I thought you

12   meant manager.

13   Q.  I think you understand the question.  What's your

14   relationship with him in the hierarchy?

15   A.  At the time of the merger after it happened, Andrew

16   became my manager.

17   Q.  Okay.  And I think we have the fact that the merger

18   happened in January of 2016.

19   A.  Correct.

20   Q.  So as of this date, you reported to Mr. Hopp?

21   A.  That's correct.

22   Q.  And Mr. Hopp in the first paragraph of this letter

23   tells FICO, "Chubb & Son, the contracting party to the

24   agreement, remains a viable legal entity within the Chubb

25   Group of Insurance Companies corporate structure and the

1   contracting party to the agreement.  In short, Chubb & Son

2   is still FICO's client as such term is defined in the

3   agreement."

4           Did I read that correctly, Mr. Hopp's words?

5   A.  Can you reread the sentence?

6   Q.  Of course.  About midway the sentence begins,

7   "Notwithstanding the acquisition, Chubb & Son, the

8   contracting party to the agreement, remains a viable legal

9   entity within the Chubb Group of Insurance Companies

10  corporate structure and the contracting party to the

11  agreement.  In short, Chubb & Son is still FICO's client as

12  such term is defined in the agreement."  Then it goes on

13  another subject.

14          That's what Mr. Hopp told FICO on that date.

15  A.  That's what it says here.

16  Q.  That's what it says.

17          Let's go forward to Exhibit 94.

18          We have seen -- the rest of us in this room have

19  seen this before.  February 25, 2016.  It is from Tamra

20  Pawloski.  Did you know her at the time?

21  A.  I did.

22  Q.  And she was vice president of software compliance and

23  optimization, global vendor services organization, as it

24  says on the email?

25  A.  That's what it says.

1    Q.  Okay.  And if you go to the second page, first full

2    paragraph, on the bottom part, do you see where this

3    proposal says, "The contracting party to the license

4    agreement is and remains Chubb & Son, a division of Federal

5    Insurance Company."

6              That's what it says?

7    A.  That is what it says.

8    Q.  Now, if I might bring you to -- let me ask you -- I'm

9    going to ask you to go to Exhibit 0336.

10             And this is a master services agreement between

11   Chubb & Son, a division of Federal Insurance Company, and

12   FICO, as you see in the opening paragraph.

13   A.  I see that.

14   Q.  Agreed?  If you would go to the end of the document,

15   please.

16             Well, first, before we get to the end, would you

17   stop at the, the Bates number is 21684.  It's Section 17.

18   Do you see that?

19   A.  I see the section.

20   Q.  Okay.  Thank you.

21             Were you familiar with James Black?

22   A.  No.

23   Q.  No?  All right.  You see that James Black on this

24   master services agreement identifies himself as vendor

25   management group, Chubb & Son, a division of Federal

1    Insurance Company?

2    A.  I see that here.

3    Q.  Do you have any doubt that the members who were part of

4    the division Chubb & Son, as well as the officers who were

5    officers of Chubb & Son, were aware that they were, that

6    they were part of the Chubb & Son division of Federal?

7    A.  Can you repeat the question?

8    Q.  Sure.  That was kind of a long mess, that question.

9            Mr. Black is acknowledging that he's part of the

10   Chubb & Son division vendor management group, correct?

11   A.  That's what's written here on the page.

12   Q.  That's what's written.  And as you mentioned, many

13   people were designated as officers of Chubb & Son.

14   A.  That's correct.

15   Q.  And do you have any doubt that the people who were

16   officers of Chubb & Son, as well as people like Mr. Black

17   who worked in the operating unit of Chubb & Son, knew that

18   they were members of the division?

19   A.  I really wouldn't know that.

20   Q.  All right.  Did you know that you were an officer of

21   the division?

22   A.  I knew that I was an officer of the division.

23   Q.  And then let's go, continuing on, to this.  And we

24   see --

25            I want to go to the signature page, which as an

PAMELA LOPANA - CROSS

1    exhibit number is 0336-009.

2    A.  I see.

3    Q.  All right.  Got that?  And here we have in bold, you

4    know, the signature block for Chubb & Son, a division of

5    Federal Insurance.  Do you see that?

6    A.  I see that.

7    Q.  Okay.  Now let's read the rest of the words, but let's

8    read them a bit carefully.

9            It goes on to say, "For itself and as servicer

10   for the Chubb Corp. and its noninsurance company

11   subsidiaries, or as manager of its insurance company

12   subsidiaries 'Chubb.'"

13           That's exactly what it says?

14   A.  Correct.

15   Q.  In this description, you did not see the word "on

16   behalf of," did you?

17   A.  No.

18   Q.  I'd like to go to Exhibit 948.  And if you would go to

19   page 28.  Hang on.  I had the wrong page.  Let's do page 3.

20   A.  I'm sorry.  Which page?

21   Q.  Three.  And there's a category, there's a heading,

22   Property and Casualty Insurance.  Do you see that?

23   A.  I see that.

24   Q.  The P&C group -- oh, and you are generally familiar

25   with what a 10-K, Form 10-K is?

1    A.   Generally, although I don't handle 10-Ks.

2    Q.   No, neither do I, but we both know it's a form that the

3         corporation, in this instance the Chubb Corporation, files

4         with the Securities and Exchange Commission.

5    A.   Yes.

6    Q.   Yes.  And so under the heading Property and Casualty

7         Insurance, it says, "The P&C group consists of subsidiaries

8         domiciled both in and outside the United States.  Federal

9         Insurance Company is the largest subsidiary in the P&C

10        group and is the parent company of most of Chubb's other

11        insurance subsidiaries."

12                  Have I read that right so far?

13   A.   That's what it says.

14   Q.   Okay.  And it goes on to say, "Chubb & Son, a division

15        of Federal, is the manager of several U.S. subsidiaries in

16        the P&C group."  So far I read it right?

17   A.   That's correct.  That was read correctly.

18   Q.   And then it goes on, "Chubb & Son also provides certain

19        services to other insurance companies included in the P&C

20        group."  Right?

21   A.   Correct.

22   Q.   So this is describing, do you agree with me that this

23        is describing what Chubb & Son does?

24   A.   It's hard for me to provide opinion on this, because I

25        really didn't have anything to do with it.

1    Q.  All right.  I'm not, I'm not trying to even ask you

2    about -- do you know this?  Do you know this?

3              Do you know if Chubb & Son was a servicer for

4    insurance companies, insurance company subsidiaries, of

5    Federal or of the Chubb Corporation?

6    A.  I also didn't handle the intercompany relationship

7    agreements.

8    Q.  So you don't know if Chubb & Son was a servicer of

9    other subsidiaries of Federal or of the Chubb Corporation?

10   A.  Chubb & Son, a division of Federal Insurance Company,

11   acted as servicer to other affiliates within the Chubb &

12   Son organization.

13   Q.  Okay.  Thank you.  And did you know that Chubb & Son

14   also acted as a manager for other affiliates within the

15   Chubb Corporation organization?

16   A.  Chubb & Son, a division of Federal Insurance Company.

17   Q.  Was a manager?

18   A.  I'm honestly not sure.

19   Q.  You just don't know?  Okay.  So while the 10-K filing

20   says Chubb & Son, a division of Federal, is the manager of

21   several U.S. subsidiaries in the P&C group, you're just not

22   in a position to say that that's right or wrong?

23   A.  I'm really not.

24   Q.  Okay.  That's fair.  I'm not trying to take you where

25   you can't go.

```
 1              If you would go to Exhibit 26, please.  This is,
 2   I'll represent to you we've had testimony about this.  It
 3   happens to be a management agreement between Great Northern
 4   Insurance Company and Chubb & Son, a division of Federal
 5   Insurance Company, as you see in the preamble or in the
 6   opening paragraph.
 7   A.  Okay.
 8   Q.  Okay.
 9   A.  I see that.
10   Q.  Do you have any knowledge of these agreements that
11   Chubb & Son, a division of Federal, entered into with other
12   subsidiary companies of Federal?
13   A.  Not really.
14   Q.  Not really?  Well, if we go to the second page of this
15   agreement you see the signature block is Chubb & Son, a
16   division of Federal Insurance Company?
17   A.  I see that.
18   Q.  It doesn't say, for example -- and that's what it says,
19   right?
20   A.  That's what it says.
21   Q.  It does not say Chubb & Son, a division on behalf of
22   Federal Insurance Company, does it?
23   A.  It says Chubb & Son, a division of Federal Insurance
24   Company.
25   Q.  Thank you.  Now in this instance we have Chubb & Son, a
```

1    division, contracting with another insurance subsidiary

2    within the Federal group.  I presume they each know who

3    they are.

4    A.  Can you repeat the question?

5    Q.  It's not necessary.

6              You said you went to ACE American, became

7    employed by ACE American Insurance.  Was that on January 1,

8    2017?

9    A.  I don't know when the change happened.

10   Q.  Was there a change where all of the people who were

11   employees of Federal became employees of ACE American

12   Insurance?

13   A.  That I don't know either.

14   Q.  Were you formerly an employee of Federal?

15   A.  I was formerly an employee of Federal Insurance Company

16   and then at some point became an employee of ACE American

17   Insurance Company.

18   Q.  Okay.  But the date of that transition for you, you

19   don't know?

20   A.  I don't know.

21   Q.  And you weren't -- and it just happened to you,

22   correct?

23   A.  It just happened.

24   Q.  Right.  Now you saw, you saw the descriptions in the

25   10-K of what Chubb & Son did as a manager or as a servicer.

1    But if I can be clear, are you saying to us that you don't

2    really know what it meant for Chubb & Son to be a servicer

3    or a manager for other insurance companies?

4    A.  No.

5    Q.  Did you know what it meant?

6    A.  Yes, I knew what it meant.

7    Q.  Okay.  And, and was one of the -- did you know

8    therefore that Chubb & Son, the division, with respect to

9    the various management contracts that it entered into with

10   various subsidiaries of Federal was the operating arm that

11   managed those other insurance company subsidiaries so that

12   policies of insurance in their names could be issued,

13   booked, bound, written?

14   A.  Could you repeat the question?

15   Q.  Sure.

16   A.  Because it is long.

17   Q.  All right.  I'll break it down.

18          Did you know that many of the insurance company

19   subsidiaries had no Federal employees?

20   A.  I wouldn't have known that.

21   Q.  Okay.  You did not know.

22          Did you know what services that Chubb & Son as

23   manager provided to other insurance company subsidiaries

24   within the Federal group?

25   A.  Chubb & Son, a division of Federal, would have provided

1    services like the -- they were the contracting arm, right,

2    of Federal.  So they were, they would have been IT

3    services, marketing services, different types of services.

4    Q.  And with respect let's just focus on the IT services.

5    Do you know one way or the other whether Chubb & Son

6    provided IT services to these various other insurance

7    companies, other subsidiary insurance companies?  Do you

8    know one way or the other?

9    A.  No.

10   Q.  All right.

11   A.  I don't know that I -- no.

12   Q.  So if you don't know whether Chubb & Son as a manager

13   of other insurance company subsidiaries did or did not

14   provide IT services, I take it you don't know whether Chubb

15   & Son as a division would be, would be needing technology?

16   A.  Chubb & Son was the contracting arm of Federal

17   Insurance Company, so --

18   Q.  I'm not trying to interrupt you.  I'm trying to ask you

19   factual questions.  I think whether there's a legal issue

20   in all of that will be for the court, not for us.  Okay?

21   A.  Okay.

22   Q.  My question was, as a -- as we saw in the 10-K, the

23   Chubb Corporation says to the public that Chubb & Son is a

24   manager, provides management services, to other subsidiary

25   insurance companies of the Federal group.

1    Do you know what those services were that it
2    provided as manager?
3    A.  Not, not really.  I --
4    Q.  It might be outside your role.  You don't have to know.
5    A.  Yeah.  I don't really know.  I wouldn't have been
6    involved in --
7    Q.  So you don't know what services Chubb & Son in any
8    detail provided to the insurance company subsidiaries?
9    A.  Not with any detail.
10   Q.  Okay.  And so why Chubb & Son, the division, reached
11   out to FICO and then entered into a license agreement for
12   technology called Blaze Advisor, that's not something that
13   you know about.
14   A.  I would not have known anything about the engagement.
15   Q.  You may not know, but do you know one way or the other
16   about all of the persons who were employed by Federal
17   Insurance Company were in the United States?
18   A.  I would not know that.
19   Q.  Don't know one way or the other?
20   A.  I wouldn't know one way or the other.
21        MR. HINDERAKER:  Okay.
22        No further questions, Your Honor.
23        THE COURT:  Thank you, Mr. Hinderaker.
24        Ms. Godesky, any redirect?
25        MS. GODESKY:  No.  Thank you.

```
 1                 THE COURT:  All right.  Thank you.  Call your
 2      next witness.
 3                 You may be excused, Ms. Lopata.  Thank you.
 4                      (Witness excused.)
 5                 MS. GODESKY:  Your Honor, defendants next witness
 6      is Michael Sawyer by video.
 7                 THE COURT:  Okay.
 8                 MS. GODESKY:  And the parties have agreed to the
 9      following introduction to the video.
10                 Michael Sawyer is a former FICO employee.
11      Mr. Sawyer was employed by FICO as a manager of client
12      services from September 2007 to February 2010 and client
13      partner for insurance and health care from March 2010 to
14      February 2014.
15                 Mr. Sawyer was deposed on October 2nd, 2018.
16                 THE COURT:  Just for planning purposes, do you
17      know how long this video will run, approximately?
18                 MS. GODESKY:  1 hour, 40 minutes.
19                 THE COURT:  Okay.  Well, we won't get through it
20      all tonight.
21
22                      MICHAEL SAWYER BY DEPOSITION
23      BY MR. FLEMMING:
24      Q.  Good morning, Mr. Sawyer.
25      A.  Good morning.
```

```
 1    Q.  I'm Terry Fleming.  I represent the defendants in this

 2    case.  Can you please state your full name and work

 3    address?

 4    A.  Sure.  It's Michael Lemuel Sawyer.  Currently I work at

 5    201 Jones Road in Waltham, Massachusetts.

 6    Q.  All right.  And are you represented by counsel today?

 7    A.  Yes.

 8    Q.  And when did you retain counsel?

 9    A.  Officially earlier this week.

10    Q.  And could you identify your counsel?

11    A.  Yes.  It's Mr. Hinderaker.

12    Q.  All right.  And what did you do to prepare for the

13    deposition today?

14    A.  I met with my counsel yesterday for a number of hours.

15    Other than that, nothing.

16    Q.  Could you tell me in general terms your educational

17    background and work history?

18    A.  Sure.  I have a bachelor's degree from The university

19    of Michigan, a master's degree from the University of

20    Southern California.  I've held numerous positions since I

21    graduated from college in either insurance, consulting or

22    software technology terms.

23    Q.  Could you walk through your employment history.

24    A.  From the date that I graduated college?

25    Q.  Please.
```

1    A.  Sure.  So roughly 2001 to 2002, at a third-party

2    administrator for 401K plans in Detroit called Freedom One

3    Financial.  From 2002 to roughly 2005, I worked at Sun Life

4    Financial.  From 2005 to 2007, I worked at Bearing Point

5    Consulting.  It was formerly known as KPMG Consulting.

6           From 2007 to 2015, I worked at FICO.  For 2015, I

7    worked at a company at that time which was known as

8    Connolly Health Care.  It then changed names during my time

9    there to Connolly Eye Health Technologies.

10          I then returned to FICO from I guess -- maybe I

11   may have misstated the year.  I think it was -- 2014 is

12   when I was at Connolly and Connolly Eye Health.  I then

13   returned to FICO in 2015 until October 2017, and since

14   October -- November of 2017, I've work at a company called

15   Versant Technologies, which just last Friday changed names

16   to Cotiviti.

17   Q.  What does Versant Technologies/Cotiviti --

18   A.  Cotiviti.  It's C-O-T-I-V-I-T-I.  We are a health care

19   focused organization that sells software and analytics, the

20   majority to health plans, to help them with risk, quality

21   performance and payment accuracy.

22   Q.  Showing you what's been marked as Exhibit 72, can you

23   identify that document?

24   A.  Yes, I mean.  It is my LinkedIn profile.

25   Q.  So let's walk through your employment at FICO, if we

1    could.  So if we turn to the second page there, it looks

2    like your first stint at FICO was between September 2007

3    and February 2014; is that right?

4    A.  That is correct.

5    Q.  And could you tell me, are those titles that are listed

6    on the LinkedIn page correct that you were manager of

7    client services from September 2007 to February 2010, and

8    then the client partner, insurance and health care,

9    March 2010 to February 2014?

10   A.  Yes, they are correct.  My formal title for the first

11   position was likely customer support manager in the

12   official docket at FICO.

13   Q.  Customer support manager?

14   A.  Correct.

15   Q.  And what were your duties as customer support manager

16   during that time period?

17   A.  They were a blend of sales, as well as account service

18   for existing clients within the insurance and health care

19   business segment.  I supported client partners who owned

20   the responsibility for sales, as well as service delivery

21   to our existing clients.

22   Q.  And what were your duties as client partner insurance

23   and health care from March 2010 to February 2014?

24   A.  In that capacity, I would have owned a portfolio of

25   client accounts where I was responsible for the baseline

1    revenue associated with those accounts, as well as I was a

2    quota carrying sales rep for new revenue generation.

3    Again, all within the insurance and health care segment.

4    Q.  So who -- what clients were included in your portfolio

5    of client accounts during that time period?

6    A.  There's too many to list.  I probably had somewhere

7    between 30 and 40 existing revenue generating accounts that

8    were part of my portfolio.  And then I managed probably all

9    new business development for roughly eight or nine states,

10   primarily the Northeast and mid Atlantic.

11            So in any given year, I interacted with probably

12   50 or 60 different organizations.

13   Q.  And was Chubb one of those organizations?

14   A.  Yes.  Chubb was one of those organizations during that

15   entire period of 2010 to 2014.

16   Q.  Was Chubb one of your more significant accounts during

17   that time period?

18   A.  How would you define "significant"?

19   Q.  In terms of revenue and time that you spent on the

20   account?

21   A.  During that period of my time there from 2010 to 2014,

22   I would say yes to both of those criteria.  They were a

23   significant revenue-generating account, as well as time

24   spent.

25   Q.  So could you estimate how much revenue was being

MICHAEL SAWYER BY DEPOSITION

1    generated from Chubb during that time period in general

2    terms?

3    A.  I would -- so there's multiple revenue streams that

4    would occur.  One would be software maintenance payments,

5    and then the second would be professional services that we

6    offered, consulting services.  The maintenance is easier to

7    estimate as that was a recurring fee.  You know, roughly

8    $250,000 I would estimate on an annual basis.

9           Professional services was a lot more

10   intermittent.  There was a large project that we did for

11   Chubb that probably crosses over those two positions,

12   somewhere between 2009 into the time when I was client

13   partner.  I would estimate that, you know, you're looking

14   at roughly a million dollars of professional services

15   associated with that project.

16          There was probably a few other smaller-sized

17   deals, you know, hundred thousand dollar type deals in

18   there but nothing else significant.

19   Q.  What project was that?

20   A.  I believe Chubb referred to it as the Premium Booking

21   modernization project.

22   Q.  What did that entail?

23   A.  Chubb had a large COBOL based application that had

24   grown up over many years that was designed to validate data

25   from their policy administration systems downstream into

1    their financial ledgers.  That project was to replace that

2    COBOL decision application with the Fair Isaac Blaze

3    Advisor product.

4    Q.  All right.  So other than this one large project that

5    you just referenced, do you recall any other significant

6    projects during that time period prior to the time you left

7    FICO the first time?

8    A.  No.  We would periodically sign what we referred to as

9    a retainer contract where Chubb would buy a small bucket of

10   hours from us on a pre-purchase basis, which we would then

11   deploy small, you know, teams of resources for smaller

12   finite periods of time to help Chubb when they encountered

13   an issue, whether it was, you know, requirements or design

14   for something, but it was all on a much, much, much smaller

15   scale than the Premium Booking project.

16   Q.  All right.  So why did you leave FICO the first time in

17   February 2014?

18   A.  To pursue a new career opportunity that presented

19   itself to me.  I was recruited by the -- what was then

20   Connolly Health Care, which became Connolly Eye Health and

21   actually then became Cotiviti.  So you can see my careers

22   are merged a bit here in that the company that I was

23   working for last week bought Cotiviti, and we rebranded as

24   Cotiviti.  So even though Cotiviti is listed here twice,

25   they were separate entities the two times that I've worked

1    for them.

2              So I was recruited by Cotiviti, Connolly,

3    Connolly Eye Health to come work for them in 2014.

4    Q.  And when did you return then to FICO?

5    A.  I believe my start date was February 16th of 2015 then.

6    Q.  And why did you leave Cotiviti?

7    A.  The opportunity didn't pan out.  It did not meet my

8    expectations on why I left FICO.

9    Q.  So when you returned to FICO, did you have -- that was

10   in March 2015, correct?

11   A.  Correct.  February of 2000 -- end of February 2015.

12   Q.  Okay.  And when you returned, you had the same position

13   and title that you had when you left back in February 2014?

14   A.  That is correct.

15   Q.  Okay.  And what was your -- what were your

16   responsibilities as the client partner at that time?  Was

17   it the same as before you left?

18   A.  It was predominantly the same in terms of the

19   responsibilities with the role.  My territory that I had

20   responsibility for had changed.  When I left the first

21   time, they had reorganized the territories for the

22   remaining client partners; and so when I came back, I did

23   not assume all prior client accounts that I had previously.

24   Q.  So in terms of the number of accounts that you had when

25   you returned to FICO, was it similar to what you had before

1    you left?

2    A.  Yes, it was.

3    Q.  So the most significant change from your perspective

4    was just the geographical location of the clients or the

5    territories that you were responsible for?

6    A.  That was part of it.  Geographic responsibility.  I did

7    not assume -- reassume responsibility for the mid-Atlantic

8    region.  And then given my experience at Cotiviti,

9    Connolly, Connolly Eye Health at that time focused on

10   health care.  I took on some more national-based health

11   care focused opportunities for FICO?

12   Q.  Then your final position at FICO was as -- I'm sorry.

13   There are two of them there.  You were insurance and health

14   care segment leader from September 16th, June 2017; is that

15   right?

16   A.  That is correct, but it was limited to our fraud

17   security and compliance solutions.  So FICO had undergone a

18   reorganization and as part of that focussed the sales staff

19   on, more specifically on products versus accounts, and I

20   focussed for that period of September 2016 to June of 2017

21   only on our fraud security and compliance solutions for the

22   most part.

23   Q.  So was that a job that was different than the job you

24   had before?

25   A.  Yes, it was.  It was reporting to a different

1   individual.  It reported into our fraud, security and

2   compliance business unit, as opposed to previously I

3   reported to the leader of the insurance group at FICO.  But

4   largely the responsibilities were the same in terms of

5   selling new products into client accounts in insurance and

6   health care, but focussed on fraud, security, and

7   compliance solutions.

8   Q.  Who were you reporting to before as the leader of the

9   insurance group?

10  A.  I reported to Russ Schreiber.

11  Q.  And who were you reporting to when you were working in

12  the insurance and health care segment group involving

13  fraud, security.  And compliance solutions.

14  A.  Bob Shiflet.

15  Q.  Now during this time period when you were working with

16  regard to fraud, security and compliance solutions, did

17  Chubb continue to be a client?

18  A.  They did.

19  Q.  Okay.  And were you responsible for the other services

20  that were provided to Chubb during that time?

21  A.  Yes.

22  Q.  And then your final position at FICO was as a segment

23  leader of insurance and health care from July 2017 to

24  November 2017?

25  A.  That is correct.

```
 1    Q.  And what were your duties in that position?
 2    A.  I was a sales leader for a team of sales and pre-sales
 3    resources responsible for selling FICO's solution, all
 4    solutions into the insurance and health care segment.
 5    Q.  And how did that differ from when you were acting as a
 6    contract partner or client partner?
 7    A.  In the client partner role, I was a direct quota
 8    carrying sales rep responsible for the actual development
 9    of new business.  As the segment leader, I was a sales
10    manager.  So I had a team of folks that were responsible
11    for the direct client engagement and sales.
12    Q.  And why did you leave FICO in -- first of all, did you
13    leave FICO in November 2017?
14    A.  I did.
15    Q.  And why did you leave FICO?
16    A.  Again, to pursue another career opportunity that I
17    thought offered me a position that better fit my career
18    direction.
19    Q.  Let me ask you some general questions.  How does FICO
20    generate revenues, or during the time that you were
21    employed at FICO, how did it generate revenue?
22    A.  FICO operates largely in two separate business units.
23    One is a scores unit, which develops and offers syndicated
24    analytic scores to the marketplace, such as your FICO
25    credit score.  There are others in that portfolio.  And
```

1    then they operate a software segment.

2              That software segment develops software

3    applications and software tools, which they sell to a

4    variety of industries, which generates revenue through

5    software licenses, software maintenance and support

6    contracts, professional services, and probably some other

7    additional commercial vehicles, but largely those are the

8    main sources.

9    Q.  And are you familiar with the Blaze Advisor?

10   A.  Yes.

11   Q.  What does Blaze Advisor do; what is its function?

12   A.  Blaze Advisor is a business rules management system.

13   It is a domain agnostic piece of software that is designed

14   to allow companies to build out decision logic, business

15   rules, deployment of analytic models, decision trees, to

16   help automate decisioning.

17   Q.  And Blaze is one of the products that FICO sells; is

18   that correct?

19   A.  Yes.  That is correct.

20   Q.  What was your involvement in the licensing process at

21   FICO during your employment there?

22   A.  It varied by role in the organization.  When I was in

23   the manager of client services position, when I began at

24   FICO, I was purely in a support function where the client

25   partners that I reported to were responsible for the

1    contracts that we would enter into with clients.

2         When I became a client partner, I took on

3    responsibility for the negotiation of contracts with

4    clients for new services, as well as to up-sell for

5    additional products.  And so I was possible for

6    orchestrating the contracting process in combination with,

7    you know, FICO business leadership, as well as our legal

8    teams.

9         And then as a segment leader, I was in more of an

10   oversight role of the quota carrying reps that were

11   managing that process as I had when I was a client partner.

12   Q.  Who were the client partners responsible for the Chubb

13   relationship during the time that you were employed at

14   FICO?

15   A.  When I started at FICO, Russ Schreiber, I believe, was

16   the assigned client partner.  Following Russ, I believe it

17   was a gentleman named Ian Brodie, B-R-O-D-I-E.  Then I was

18   responsible for the Chubb account.  I do not know with

19   certainty who was responsible for the Chubb account during

20   the year that I spent away from FICO.

21        When I returned to FICO in, I think it was, 2016

22   or -- let's see -- 2015, I reassumed responsibility for the

23   Chubb account and largely held that almost until the end of

24   my time there with the firm.

25   Q.  So through like March 2017?

1    A.  I held it through -- at least through June of 2017.

2    Q.  And when did you first assume that role?

3    A.  It would have been when I first became a client partner

4    in March of 2010.

5    Q.  And what were your -- was anybody else responsible for

6    the Chubb relationship at the time that you were

7    responsible?

8    A.  I should clarify that I was responsible for our North

9    American business.  FICO was not organized in our insurance

10   segment to have a global account owner.  We were

11   responsible for -- I was responsible for Chubb domestically

12   in the U.S., and, no, there was nobody else that would have

13   had the same responsibility that I did for the account in

14   the U.S. during that time.

15   Q.  So during that time period that you were employed at

16   FICO, to your knowledge, who was responsible for Chubb

17   outside of the United States?

18   A.  So I can't speak to every geography around the world.

19   I think, but I'm not 100 percent certain, that Richard Hill

20   in the UK had responsibility for EMEA.  For what time

21   frames, I cannot be certain.

22           Outside of EMEA, I don't know who would have had

23   responsibility for the accounts.

24   Q.  And when you said "domestically" in your last response,

25   is that the same as the United States?

MICHAEL SAWYER BY DEPOSITION

1   A.  Yes, the United States.

2   Q.  During the time that you were the client partner

3   responsible for the Chubb relationship, how many other

4   accounts were you also the client partner responsible for?

5   A.  As I said earlier, roughly 30 to 40 accounts that had

6   recurring baseline revenue and then all new sales

7   opportunities within my geographic region, regardless of

8   whether FICO had had a relationship with those clients

9   previously.

10  Q.  So during the time that you worked at FICO, was your

11  compensation dependent on the revenues generated by

12  particular clients?

13  A.  Yes.

14  Q.  How so?

15  A.  As a client partner, the compensation models changed

16  from year to year, but in general they had two major

17  components.  The first was a revenue target, and the second

18  would be what they refer to as a bookings target.

19  Q.  I'm sorry.  I didn't hear you.

20  A.  A bookings, B-O-O-K-I-N-G-S.  So on a bookings target,

21  that would be the total contract value of a new sale that

22  FICO expected to recognize as part of that contract.  So

23  that is a, you know, new business-focussed metric.

24          The revenue component was a combination of

25  existing baseline revenue from contracts that had been

```
 1    booked in prior quarters.  So ensuring that revenue was

 2    recognized by FICO, plus any new revenue that was generated

 3    based on contracts that were booked during the fiscal year.

 4          So that combination made up my quota targets.  In

 5    addition to that, I did have a base salary.

 6    Q.  Mark this as Exhibit 73 and hand to the client.

 7          Can you identify this document?

 8    A.  It appears to be an email from me in November 2014 --

 9    November 14, 2008, to Ian Brodie, Rich Hill and Russell

10    Schreiber for a meeting to discuss the Chubb license.

11    Q.  So, Mr. Sawyer, could you read the text of your email

12    to these gentlemen?

13    A.  Yes.  It says, "All, please join this call to discuss

14    the Chubb license agreement and plan for Chubb Europe.

15    Attached are the three SLSA contracts for the latest Chubb,

16    and the latest Chubb annual report."

17    Q.  Do you recall what was the reason for setting up this

18    appointment and sending these documents?

19    A.  Most likely, it was a request from Ian Brodie, who I

20    reported to at this time and who was the client partner for

21    Chubb.  As a client support manager, it would be my role to

22    help organize and coordinate meetings for FICO in support

23    of Ian.

24          At this point in time, I believe that Russell

25    Schreiber was the leader of the insurance group at FICO,
```

1    and so we would have included Russ as well.

2    Q.  Right.  And I'm not asking you to speculate, but would

3    you periodically send out, at the request of the contract

4    partner, the various software licenses for a particular

5    account and the most recent client information in order to

6    discuss a new project or an existing project?

7    A.  That -- yes.  So, you know, if there was a question, a

8    new project, dialogue that the client partner would have

9    with the account, yes, it would be in my scope of

10   responsibility to coordinate a discussion on behalf of that

11   client partner and to, you know, gather relevant materials

12   internally to support those discussions.

13   Q.  Okay.  And would there have been any other reason to

14   have sent out all of the software licenses for a particular

15   client and the most recent information about that client,

16   other than to discuss either a new project or a pending

17   project?

18   A.  It's possible, but I think most likely it was to

19   discuss a project or an inquiry from the client.

20   Q.  Okay.  Fair enough.  And you don't recall a particular

21   project that was discussed in connection with this email;

22   is that fair?

23   A.  I do not.

24   Q.  Do you see the reference to a plan for Chubb Europe?

25   A.  Yes, I see that.

1    Q.  What was the plan for Chubb Europe?

2    A.  I do not know.

3    Q.  Now, were you at that time familiar with the actual

4    license and the amendments that Chubb had with FICO?

5    A.  I cannot be certain if I had reviewed them prior to

6    this meeting or not.  So I can't say yes or no to that

7    question.

8    Q.  Did you have any understanding as to the -- at that

9    time as to the geographical scope of the FICO license with

10   Chubb?

11   A.  Not that I can recall.  At that point in time, it would

12   have been the client partner's responsibility for managing

13   that.  So Ian Brodie would have been the client partner at

14   that time, and that would be in his responsibility.

15   Q.  Now, were you familiar at that time or did you

16   familiarize yourself with the Chubb software license and

17   the amendments to that license?

18   A.  I most likely did.  FICO stores their contracts

19   separately in the contracts library based upon, you know,

20   each executable agreement, and so the three contracts that

21   you provided here in Exhibit 73 would have been stored

22   separately within our contract system.

23          And based on that, you know, I can't be certain

24   that I did trace everything back through all the separate

25   contracts.  You know, it's most likely I would have gone

1    and read the Amendment Two as the most recent to reflect

2    the status of the relationship.  So I cannot be certain

3    that I went back and read the full 17 pages of the original

4    agreement.

5    Q.  So are you familiar with this software license and

6    maintenance agreement?

7    A.  Generally, yes.

8    Q.  Okay.

9    A.  Not the specifics as it pertains to the unique one for

10   Chubb.

11   Q.  Do you recall, at that time, when there was a

12   discussion about a plan for Chubb Europe, any internal

13   discussions about the scope of this software license and

14   maintenance agreement?

15   A.  I do not.  You know, looking at the attendees on that

16   list, Ian Brodie was the client partner who was responsible

17   for that.  Russ Schreiber was the client partner when the

18   license agreements were sold to Chubb.  So I was -- I

19   believe I was mostly a coordinator in this effort.

20        Those two individuals were the authoritative

21   figures on the relationship with Chubb.

22   Q.  Was it your understanding that the basic FICO software

23   license excluded client affiliates from using the license?

24        MR. HINDERAKER:  Could I ask a clarifying

25   question?  When you say basic, are you talking about the

 1    license with Chubb or just --

 2              MR. FLEMING:  In general.

 3              MR. HINDERAKER:  -- just a general.

 4              THE WITNESS:  I'm not aware of what our standard

 5    language was related to affiliates, although it was a

 6    common item for negotiation with clients in general.

 7    BY MR. FLEMING:

 8    Q.  What was a common part of negotiation?

 9    A.  Determining the definition of affiliates within the

10    contracts.

11    Q.  Okay.  Do you recall any discussions in 2008 as to

12    whether the FICO license agreement permitted use by a Chubb

13    affiliate in Europe?

14              MR. HINDERAKER:  Same clarifying question:  Are

15    we talking about the Chubb license or just general licenses

16    now?

17              MR. FLEMING:  Just general licenses.

18              MR. HINDERAKER:  Thank you.

19              THE WITNESS:  No, I don't recall any discussions

20    that took place in 2008.

21    BY MR. FLEMING:

22    Q.  Do you recall any discussions about that topic while

23    you were at FICO?

24    A.  I do.

25    Q.  What do you recall?

1    A.  I recall at some point after I assumed responsibility

2    as client partner for Chubb reviewing the agreements.  And

3    at that point in time, I realized the territory clause

4    within the original software license service agreement.

5    And, you know, it clarified for me, you know, the scope of

6    Amendment Two based on territory clause.

7              And it highlighted for me, you know, a potential

8    discrepancy in the way that my predecessors had, you know,

9    interpreted that clause.

10   Q.  And when you're talking about your predecessors, are

11   you referencing Ian Brodie or anybody else?

12   A.  Ian Brodie and Russ Schreiber.

13   Q.  How had they interpreted that clause?  What was the

14   discrepancy that you just referenced?

15   A.  Can you clarify your question, please?

16   Q.  What discrepancy are you referencing?

17   A.  The extent to which the enterprise license in Amendment

18   Two applies from a territory perspective.

19   Q.  And what do you mean by that?

20   A.  I can't speak to, you know, Ian or Russ's

21   interpretation of the agreement.  However, based on

22   knowledge that I had, you know, in working with Henry

23   Mirolyuz and the team at Chubb that there may have been

24   some use of the products for Chubb businesses outside the

25   United States.

```
 1              And so when I read the agreements, went back

 2       through the territory, I, you know, highlighted that to

 3       Russ Schreiber.  I can't be certain on the date.

 4       Q.  So when you say you highlighted that to Russ Schreiber,

 5       are you referencing an email that you sent to him at that

 6       time?

 7       A.  No.  It would have been in discussion.

 8       Q.  Was it ever memorialized in an email?

 9       A.  I couldn't recall for the nine years that I worked at

10       FICO if I wrote an email or not, but most likely it was in

11       discussion with Russ.

12       Q.  And when was that discussion?

13       A.  So it would be during the period of time that I was a

14       client partner responsible for the Chubb account.  So it

15       was somewhere between March 2010 and February 2014.  My

16       guess is it's in that period of time when I was responsible

17       for the account.

18       Q.  So in responding to that question, you were referencing

19       the LinkedIn document, right?

20       A.  Yes.

21       Q.  So you don't have a separate recollection of it without

22       referencing a document; is that fair?

23       A.  That is correct.  I was referencing Exhibit 72 just to

24       refresh my mind of the period of time in which I served in

25       that role at FICO.
```

1    Q.  Okay.  So let's talk about what you had learned from

2    Henry Mirolyuz about the use of the Blaze product for Chubb

3    business outside of United States.  What did you learn from

4    him?

5    A.  So I -- in multiple conversations with Henry, largely

6    centered around presentations that Henry would do

7    internally to Chubb folks around the use of Blaze Advisor,

8    there was reference to an application of Blaze Advisor for

9    renewal processing, I believe, supporting their UK

10   business.

11        And I also engaged in conversations with Henry

12   about some interest that the European unit had around a

13   decision simulation product that FICO also offered.  But I

14   do not recall having any direct conversations with members

15   of, you know, a European team for Chubb.

16   Q.  Now, at this time that you came to this determination,

17   which was sometime between March 2010 and February 2014,

18   was it your understanding based on communications that you

19   had with Henry Mirolyuz and others at Chubb that Chubb had

20   the same interpretation of these provisions as your

21   predecessors did?

22   A.  You know, I have a hard time speaking to what Henry's

23   perception was of the agreement.  You know, and through my

24   time at FICO and generally in my career, you know, I have

25   been very careful not to make contract interpretations on

1    behalf of my clients.

2            So when there is, you know, a question about the

3    scope of the license agreement, you know, my approach has,

4    you know, typically been to provide the contract or the

5    language to my client to allow them to interpret the

6    language for themselves.

7            So I do not remember or recall making the

8    definitive statement to Henry or Chubb as to what the scope

9    of their license agreement was.

10   Q.  Right.  And I'm not asking about what you told them,

11   but, rather, based on their actions and statements, did it

12   appear to you that Chubb interpreted this contract the same

13   way that your predecessors did?

14   A.  Based on their behavior, I would say that's a fair

15   statement.

16   Q.  Okay.  I mean, from your perspective, Henry Mirolyuz

17   and others at Chubb were not in any way concealing the fact

18   that Chubb was using apps, using Blaze in Chubb Europe and

19   in Chubb Canada, correct?

20   A.  So with respect to Chubb Europe, Henry was very open

21   about the use of the software to support Europe.  You used

22   a phrase "an application in Europe."  I'm not aware of

23   where the actual technology sat for that application, but

24   he was open about, you know, the use of the software for

25   the benefit of Europe.

MICHAEL SAWYER BY DEPOSITION

1    With respect to Canada, I was unaware that Chubb

2    was using the software for the benefit of Canada.  I did

3    have a number of conversations with Henry about a potential

4    use of the software in Canada.  And as a sales

5    professional, right, advancing the use of our software

6    product, I do recall offering to Henry to meet with his

7    team in Canada, help them understand the capabilities of

8    our software product to evaluate it for their use case, but

9    to my best recollection, the Chubb Canadian team did not

10   take up that offer.

11       And, you know, following that, you know, my

12   communication with Henry on the subject, you know, would,

13   you know, die out.  And so I was not certain at any point

14   in time until, you know, late in the dispute that something

15   had actually happened in Canada in terms of the use of the

16   software.

17       But, again, I didn't, even with that I don't know

18   where the software physically resided.

19   Q.  When did you have these discussions with Henry Mirolyuz

20   about the potential of using the app in Canada?

21   A.  I can't recall when that occurred.

22   Q.  Did it occur prior to or after the time that you

23   determined that your interpretation of the software license

24   agreement was different than your predecessor's?

25   A.  I can't be certain; however, I think the -- my response

1    to the inquiry from Henry would -- in terms of what I was

2    being asked to do in terms of sales, probably wouldn't have

3    varied much regardless of the timing of that, right?

4            If a client were to come to me and suggest that

5    we have a knew potential use for your software, whether

6    that would be, you know, something that is licensed under

7    their current license agreement or would be a new sales,

8    new license sale opportunity, I would still offer to

9    support the client in a similar way to help them evaluate

10   the use case of the software, you know, whether it be to

11   try and sell professional services or sell a license.

12           So because I would have reacted in a very similar

13   way to that request from Henry, I couldn't be certain if it

14   was before or after.

15   Q.  So you did not relate to Henry Mirolyuz at that time

16   that you believed that the current software license

17   agreement between Chubb and FICO would not extend to use by

18   Chubb Canada?

19   A.  No.  I can definitively say no, I did not.

20   Q.  Mr. Sawyer, prior to the time you became the client

21   partner, would you agree that it was not your

22   responsibility to understand the software license

23   agreement -- the software license agreements with your

24   customers?

25   A.  I would say it was my responsibility in combination

1   with the client partner who owned the client relationship

2   to understand the scope of our services for the client, but

3   it was not -- as I was not the sole responsible party for

4   administration of the account, I was, you know, serving the

5   client partner whose ultimate say in how things progressed

6   with the client.

7   Q.  So certainly when you became a contract partner, you

8   understood it was your responsibility to understand the

9   FICO's software license agreements with the customers that

10  you serviced?

11  A.  I want to clarify that my title was client partner, not

12  contract partner.

13  Q.  Client.  Excuse me.

14  A.  And yes, when you are the client partner for an account

15  at FICO, it is your responsibility to understand the

16  contracts associated with your assigned accounts.

17  Q.  So in the ordinary course, when would you have had a

18  discussion with Henry Mirolyuz about the scope of the

19  software license, if at that time you believed that the

20  license would not allow use of Blaze in Europe?

21  A.  At this point in time, it would not be my

22  responsibility to have that conversation.  As you see on

23  this email, Ian Brodie is copied.  Ian is the client

24  partner at that time.  I would have been supporting Ian in

25  this effort with Henry.

1       And it's likely that, you know, based on a

2   conversation that Ian had with Henry that Ian requested

3   that I pull this relevant case study and send it over to

4   Henry.  So as it relates to this specific email, it would

5   not have been in my scope of responsibility.

6   Q.  Showing you what's previously been marked as

7   Exhibit 47, do you recall seeing this email chain before?

8   A.  I don't remember this specific email, but I remember

9   the event described at the very top.

10  Q.  What are those events?

11  A.  As you see, they reference a POC of Blaze versus

12  Drools.  Drools is an open source business rules management

13  system.  And, you know, it appears that FICO assisted Chubb

14  with positions on the capabilities of Blaze Advisor so that

15  individuals doing a comparison of Drools versus Blaze would

16  understand the competitive differentiations between the

17  Blaze Advisor product.

18  Q.  And where was this product going to be used?

19  A.  So I don't specifically recall from the conversations

20  there, right, but in terms of looking at the email, Richard

21  Hill was involved and Larry Jacobson was involved, which

22  are both members of the FICO team in EMEA.  So it looks as

23  if it was related to use in EMEA or Europe.

24  Q.  Okay.  So was Richard Hill the client partner for Chubb

25  responsible for European operations?

1    A.  I don't know his specific title, but he was a sales

2    resource in Europe responsible for insurance.

3    Q.  Okay.  Well, why don't we go to the very first email in

4    the second page.  That first email is an email from Richard

5    Hill to Russ Schreiber, dated August 14th, 2012.  And do

6    you see where it says, "Hey, Russ, Chubb UK have started

7    being interested in Blaze again, and I'll try and speak

8    with the new contact who apparently wants to do a POC for

9    underwriting."

10   A.  I see that.

11   Q.  Okay.  And then in the email about above that, you're

12   copied on an email from Russ Schreiber to Richard Hill

13   responding to the email.  And it says, "They do have a

14   Blaze ELA.  We're working a model central POC."  "The" -- I

15   think you meant they, "need model central simulator and

16   always buy services in various quantities."

17          I'm sorry.  That's Russ Schreiber talking.  And

18   he says, "Check with Mike Sawyer as to the lay of the

19   land."  So you were copied on that email.  What did you

20   understand he was talking about?

21   A.  So what part of his -- what part of his sentence are

22   you asking me to weigh in on?

23   Q.  Well, what was the issue that Russ Schreiber was

24   discussing with Hill in this email that you were copied on?

25   A.  Sure.  Give me a second to read --

1    Q.  Sure.

2    A.  -- the first email in the chain.  Sure.

3             So the first email in the chain relates to

4    Richard Hill and his sales duties, exploring opportunities

5    to sell software and services to Chubb in the UK.  Russ's

6    email provides, you know, his viewpoint on the Blaze

7    license agreement to Richard.  Model central simulator and

8    services are additional opportunities for software sales

9    that Chubb has -- that Russ has suggested to Richard.

10            And his last statement, "Check with me on the lay

11   of the land," in this context most likely relates to the

12   client satisfaction of Chubb at the current time, given

13   Richard's note here around Owen Williams of Chubb

14   previously being supportive of FICO.

15   Q.  So when you say that Russ Schreiber is giving his

16   viewpoint on the Blaze license, what do you mean by that?

17   A.  I can only interpret what he's wrote here, right?

18   Q.  Right.

19   A.  And, you know, what he states is that they have a Blaze

20   enterprise license agreement.

21   Q.  Okay.  And did you understand that to mean that from

22   Russ Schreiber's perspective, he understood that the FICO

23   license agreement with Chubb allowed use in Europe?

24   A.  Yes.

25   Q.  So if you turn then to the first page, which is an

 1    email from you to Richard Hill, dated August 14th, 2012,

 2    could you read the first two lines out loud?

 3    A.  "It's probably two to three years old at this point.

 4    They did a POC of Blaze versus Drools and selected Blaze."

 5    Q.  Okay.  And I'm talking about the email at the bottom of

 6    the page.

 7    A.  Oh, I'm sorry.  "Richard, I am the CP for Chubb.  They

 8    do have a global ELA for Blaze and have an automated

 9    underwriting application running in the UK already."

10    Q.  So at least at this time, it was also your view that

11    the FICO license with Chubb allowed Chubb to use Blaze in

12    the United Kingdom; is that fair?

13    A.  That is correct.

14    Q.  So you were aware of Chubb's use of Blaze in the

15    United Kingdom going back to sometime around August 2010 to

16    August 2011 -- no.  I'm sorry -- August 2009 to

17    August 2010?

18    A.  Based on the dates in this email, that appears to be

19    correct.

20            I should point out, though, that the email, the

21    first email relates to a POC, which is the evaluation of

22    the potential use of the software, not necessarily

23    referencing an actual deployment or use of the software for

24    production purposes.

25    Q.  So on the very first email that you've now referenced a

1    couple of times, that's the email from you to Richard Hill,

2    dated August 14th, 2012.  You say in your response to his

3    question, "Did you know about the underwriting app in the

4    UK?"

5            You responded, "It's probably two or three years

6    old at this point."

7            Is that right?

8    A.  That is correct.  I responded that the potential use of

9    the software for an underwriting app as referenced in

10   Richard's email was probably two to three years old at that

11   point, and my knowledge of that was based on supporting

12   Henry in that POC to determine the -- you know, the

13   competitive advantages of Blaze versus Drools, and based

14   on, you know, the time frame of that POC happening two to

15   three years earlier.

16   Q.  And you state in that first email that you helped some

17   folks at Chubb U.S. put together a position paper to

18   influence that decision.  Do you recall what it is that

19   you're referencing?

20   A.  Yes.  To influence the decision that for the particular

21   use case that Blaze was a better fit than Drools was.

22   Q.  So that would have been back in 2009 to 2010 when you

23   put together this position paper?

24   A.  I would not have put the position paper together.  It

25   would have been done by our pre-sales organization that has

```
 1   technical expertise.  You know, in 2009, most likely Ian
 2   Brodie at this point in time was the client partner and
 3   would have requested me to coordinate with our pre-sales to
 4   respond to, you know, the items of question from the Chubb
 5   team.
 6   Q.  And do you recall what specifically was done by
 7   Chubb -- I'm sorry -- what was done by FICO in putting
 8   together a position paper to influence Chubb's decision?
 9   A.  To my recollection, there was a physical document put
10   together that described the functionality that Blaze
11   offered on, you know, specific technical features and
12   capabilities that Henry Mirolyuz and the Chubb team had
13   asked about.
14   Q.  So is it the circumstances that are referenced in email
15   and this email chain itself, are those some of the reasons
16   why you believe that your predecessors had a different
17   interpretation of the software license agreement that you
18   came to at some point between 2012 and 2014?
19   A.  Yes.
20   Q.  Okay.  I show you an exhibit previously marked --
21            THE COURT:  With that, Counsel, as we're moving
22   to another exhibit, why don't we end for the day?
23            Members of the jury, we're adjourning for the
24   evening.  We'll see you tomorrow morning at 9:00.  As
25   always don't talk to anybody about the case.  Thank you.
```

1    THE CLERK:  All rise for the jury.

2    4:58 p.m.

3                      **IN OPEN COURT**

4                    **(JURY NOT PRESENT)**

5    THE COURT:  All right.  We're going to take a

6    brief break to give the court reporter a break.

7    MR. HINDERAKER:  May I make a comment, Your

8    Honor?

9    THE COURT:  Yeah.

10   MR. HINDERAKER:  During the last break we got

11   placed on our table about 40 pages of two memoranda, and

12   so --

13   THE COURT:  And you are not ready to read and

14   respond to that and file something?

15   MR. HINDERAKER:  Not in the next 15 minutes.

16   THE COURT:  Okay.

17   MR. HINDERAKER:  We have some -- I've had a

18   chance to read it during in and out of the Sawyer testimony

19   to some extent.  I know we have some very different views

20   of what the real law is.  And --

21   THE COURT:  You can sit down, if you want, guys.

22   You can stay or you can sit.

23   MR. HINDERAKER:  I'm happy -- what I am

24   requesting is that we have an opportunity to respond in

25   writing and that we have the weekend to do that, and we'll

1    file it Monday morning, Sunday night.

2            THE COURT:  Yeah.  Well, we'll take this back up

3    in ten minutes, but, yes, I mean, that's going to happen is

4    the short answer.

5            I have a funny feeling I know what's in some of

6    that 40 pages, and we can talk about that for a little bit,

7    but let's take a break for 15 so that my court reporter

8    can, you can, stick her hands in a barrel of ice or

9    whatever.

10           (Recess taken)

11   5:14 p.m.

12                      **IN OPEN COURT**

13                    **(JURY NOT PRESENT)**

14           THE COURT:  So, Ms. Godesky, here's what I'd

15   suggest we do.

16           I would like to hear from you.  Just summarize

17   the bases and the scope of your motion, and then I'll hear

18   from FICO.  I think in the circumstances, I'm going to give

19   them an opportunity to respond, and I'm not going to rule

20   until before, perhaps at the end of the presentation of the

21   evidence.

22           But come on up and tell me what's going on.

23           MS. GODESKY:  Mr. Metlitsky is going to handle

24   this.

25           THE COURT:  Okay.  Let me guess.  You want to

```
 1    talk about client.
 2              MR. METLITSKY:  That would be number one, yeah.
 3              THE COURT:  Okay.
 4              MR. METLITSKY:  So there are three issues.
 5              THE COURT:  Okay.
 6              MR. METLITSKY:  That we're moving on two of them
 7    under Rule 50(a) for judgment as a matter of law and one of
 8    them under Rule 52(c), which applies to issues that you
 9    decide or an advisee jury decides.
10              THE COURT:  Okay.
11              MR. METLITSKY:  So the first one is client and
12    its affiliates.  You know the dispute, Your Honor, and
13    we're seeking a judgment that "client" means Federal and
14    the consequence of which that it's not a breach of contract
15    for Federal's foreign affiliates to use Blaze Advisor.
16              THE COURT:  And on that one, I'll just be really
17    up front with you all.  I am strongly considering that
18    issue.  If I do, if I were to agree with Federal on that,
19    that would dispose of only the question of whether there
20    was a breach by virtue of the use Chubb Canada, Chubb UK.
21              MR. METLITSKY:  Right.
22              THE COURT:  Chubb Australia.  Beyond that, it
23    doesn't, correct?
24              MR. METLITSKY:  Correct.
25              THE COURT:  Okay.
```

1    MR. METLITSKY:  The second issue would dispose of

2    all of 3.1.  The second issue, our argument is that we're

3    entitled to a judgment that FICO's termination on the

4    ground that the third-party consultants used the software,

5    was improper because it was immaterial as a matter of law.

6    And Judge Wright held that that breach had to be

7    material for the termination to be valid.

8    THE COURT:  Not only that, it's in the contract.

9    MR. METLITSKY:  Indeed.

10   So, you know, I can elaborate.  We filed a brief.

11   So, and just tell me if you want me to keep going, but

12   that's the second argument, and that would dispose, I

13   think, of 3.1.

14   THE COURT:  Okay.

15   MR. METLITSKY:  In total.

16   THE COURT:  That would take care of 3.1 in total.

17   Okay.

18   And then the issue about the advisory jury on

19   disgorgement.

20   MR. METLITSKY:  Right.  Our argument is that FICO

21   has failed to satisfy its burden of showing revenue that's

22   attributable to the infringing use or that -- that the

23   infringing use contributed to revenue based on a total

24   failure of proof to connect the revenue with the infringing

25   use, as you heard from Mr. Whitener yesterday.

1    THE COURT:  Okay.  And I'm assuming that you have

2    in your mind -- I'm not being flippant.  To your side you

3    have connected these arguments to the specific testimony

4    that you are relying on.

5    MR. METLITSKY:  Oh, yes.  Yes.  And we also

6    pointed out the differences between the summary judgment

7    record and the trial record on all these issues.

8    THE COURT:  I was going to ask you -- none of

9    this is argument.  I'm not deciding anything today.  But I

10   don't mind getting some guidance based on what's already

11   been done.  I was going to ask you that very question about

12   client and its affiliates.

13   MR. METLITSKY:  Yeah.

14   THE COURT:  When we argued this in the guise of a

15   motion in limine, you had suggested that, well,

16   Judge Wright didn't go there simply because Federal didn't

17   move, but, of course, Rule 56 allows her to go there

18   anyway.

19   So the question would be really what's the state

20   of the record and the difference, and do you address that

21   in your memoranda?

22   MR. METLITSKY:  Yes, and I could just quickly

23   tell you.  First of all, the rule allows the court to grant

24   summary judgment to the nonmoving party, but I don't think

25   it requires the court to do so.  And the court expressly

1    said that it wasn't granting summary judgment because it

2    believed we didn't move.

3            But there is a difference between the summary

4    judgment and the trial record.  You will remember that

5    paragraph, which is a little bit hard to decipher because

6    the beginning talks about the meaninglessness of the term

7    "and its affiliates," right?

8            But then it goes on to say that there might be a

9    fact dispute about whether Chubb & Son had employees and

10   whether it had affiliates.  That second fact dispute is

11   gone.  It's stipulated away.  And I think their witnesses

12   admitted that Chubb & Son has no affiliates.

13           And so now you know that the second amendment and

14   in particular adding "and its affiliates" to "client" would

15   be a complete null set.  It would be meaningless.  It would

16   be a million dollars for nothing essentially, you know, if

17   client --

18           THE COURT:  A million dollar license you can't

19   use.

20           MR. METLITSKY:  Yeah.  Right.  And in particular

21   you can't use through your affiliates even though you added

22   the words "and its affiliates" is what you were paying for.

23   So that is the difference between the record now and the

24   summary judgment record, and it seems like a big

25   difference.

1    Of course, we think the issue is already decided

2    based on the first ground that Judge Wright discussed,

3    which is that Chubb & Son isn't a legal entity and it can't

4    contract anyway, but even if you set that aside, the

5    reading of the contract isn't plausible once it's admitted

6    which is it is, that Chubb & Son has no affiliates and

7    couldn't have affiliates.

8        THE COURT:  Okay.  Thank you.  I don't need or

9    want anything further.

10       MR. METLITSKY:  Okay.

11       THE COURT:  But thank you.

12       MR. METLITSKY:  Can I just add one thing?

13       THE COURT:  You just said that.  Go ahead.

14       MR. METLITSKY:  This isn't on the merits.  This

15   is on the timing.  So we think we will probably be done

16   Tuesday or Wednesday, which means we have to have a charge

17   conference before then, which means you have to have a

18   charge before then.

19       So we would just request that whenever this

20   argument is going to be, you know, it's, I think it should

21   be in advance of that.

22       THE COURT:  Right.  So, yes, we spent several

23   hours here last night working on verdict form and

24   instructions because we can see the train coming down the

25   track.  Certainly, we would have to, we would have to have

 1   a ruling on these issues obviously before the charge

 2   conference.

 3           Is your best estimate that you will be done on

 4   Tuesday or Wednesday and who do you have left?  Just give

 5   me the list.

 6           MS. GODESKY:  So tomorrow we're calling three

 7   witnesses.  Well, we'll have to continue Mr. Sawyer's

 8   video, and then we have three live witnesses, Ellen Garnes

 9   and two experts.  So our directs are fairly targeted, but,

10   you know, if they're crossing two experts, that could bleed

11   into Monday.

12           And then we have at least five more witnesses and

13   one video, I believe, and that comes with the caveat that

14   we're tinkering.

15           THE COURT:  Sure.

16           MS. GODESKY:  But I think end of day Tuesday is a

17   fair estimate, but it could bleed into Wednesday.

18           THE COURT:  It would be aggressive, or not

19   aggressive, but certainly optimistic.  And will one of your

20   expert witnesses be Kursh.

21           MS. GODESKY:  No.  The parties have reached an

22   agreement that we are not calling Kursh, and they are not

23   calling their own rebuttal expert.

24           THE COURT:  Okay.

25           MS. GODESKY:  Yes.

```
 1              THE COURT:  Okay.  So just so everybody's on the
 2     same page.  Assuming that we get this done, testimony, at
 3     least speaking, by Tuesday, sometime 3:00 or later -- well,
 4     realistically noon or later, then closing arguments will be
 5     Wednesday morning.
 6              And -- but if we bleed over into testimony a
 7     little bit on Wednesday, we will have had the charge
 8     conference on Tuesday anyway, I think, and we'll go with,
 9     we'll get to final arguments likely Wednesday afternoon.
10              MS. GODESKY:  Okay.  Understood.  Thank you for
11     that.
12              THE COURT:  Okay.  Thank you.
13              Mr. Hinderaker, come on up.  Like I say, you
14     don't need to argue anything at this point.  Nothing is
15     decided.  And you get the time that you -- I'll give you as
16     much time as I can.
17              MR. HINDERAKER:  Sure.
18              THE COURT:  Let me just on my side of it, I think
19     the serious issue, the most serious issue is this question
20     about "client."  And, you know, looking at it from the
21     perspective of, if I, if FICO's interpretation of Chubb &
22     Son, a division of Federal, is valid, how would that not
23     render the contract just basically illusory?  So, I mean
24     that's my concern.
25              MR. HINDERAKER:  Of course.
```

1    Well, we'll bring forth the law and actually some

2  nice New York law.

3        THE COURT:  Okay.

4        MR. HINDERAKER:  That an unincorporated division

5  is indeed capable of contracting and bound by contracts,

6  and --

7        THE COURT:  Again the bigger -- my problem is

8  less that one than it is this issue of if they have no, if

9  they have employees, fundamental to the license is, they

10  can't let anybody but their employees use it, so they've

11  now purchased a license through three amendments or

12  through three iterations that nobody can use.

13        MR. HINDERAKER:  Yeah.  I think that's not quite

14  the way to think about it.  Okay?

15        So what, what New York law, now I know New York

16  law, is that the division, unincorporated, is capable of

17  contracting and being bound by, and being bound by the

18  agreement.

19        The fact that the division inside of the entity

20  Federal has a consequence of a paycheck coming to the

21  division members from Federal doesn't change the scope of

22  the license agreement to Chubb & Son.

23        Federal, of course, is the defendant because as

24  the legal entity you need a legal entity to sue, but in

25  terms of the performance of the contract, Chubb & Son --

1    I'm sorry -- Federal has chosen to organize itself into a

2    division.  Very large, which division contracts with other

3    insurance companies and contracts with vendors.

4         These are not illusory contracts, they are not

5    fraud, and is bound to them.  The fact that the -- Federal

6    is the employer doesn't change what the contract itself is.

7    So as the manager and servicer, as we've seen, these many,

8    many, hundred thousand -- I mean not a hundred thousand, I

9    mean hundreds or a thousand employees that are organized

10   around Chubb & Son, they provide these services to the

11   other insurance companies without employees.

12        That's the scope of this license agreement.  Now,

13   there's a, you know, one of the cases in New York is, says

14   this:  The unincorporated division or unincorporated

15   entity, the nonlegal entity, is the contracting party.  If

16   that party breaches, the entity will be a defendant.

17        But the plaintiff's remedy, the scope of the

18   plaintiff's remedy is limited to the assets of the

19   unincorporated thing that it contracted with.  The two

20   parties are indeed bound by the agreement that they made.

21        So I think there's a bit of smoke in the sense

22   that, there's a bit of smoke regarding Federal being

23   responsible for Chubb & Son and the fact that they chose to

24   enter into a contract with FICO in this way, and they are

25   bound to it.

1   THE COURT:  So let me put my concern a different

2   way.  FICO has never contended, at least as I understand it

3   in this trial, that the use of Blaze Advisor by Federal

4   employees breached the contract.

5   MR. HINDERAKER:  No, we haven't, because --

6   THE COURT:  How can they maintain that and yet

7   say that the scope of the license is defined by Chubb &

8   Son, a division of Federal, and the license can't be used

9   by people other than the client's employees, then?

10   MR. HINDERAKER:  In our law firm, we have a

11   litigation department.  The paycheck comes from Merchant &

12   Gould.  Everybody in the litigation department knows that

13   we -- that that's the organization in which we are a part.

14   When we sign license agreements for certain products that

15   we decide in the litigation department, we are signing it

16   as in the litigation department, not as Merchant & Gould.

17   It's a way that they chose to organize

18   themselves, and we recognize that they are within, they are

19   within Federal, and we recognize that they are within

20   Federal.  And we haven't said that a Federal employee can't

21   use a software if that person is in the Chubb & Son

22   division of, in the Chubb & Son division, that group.

23   Now, in the testimony of Mr. Taylor, you know, I

24   said, are there any Federal employees outside of the

25   United States?  And he said no.  And the reason I did that

1    is because obviously that means there's no, there's no

2    Chubb & Son division people outside the United States

3    either.

4              So that's why the use by the foreign affiliates

5    is outside of the scope of the license, because those are

6    not Chubb & Son employees.

7              I might say that the notion that was, that we

8    just heard, that FICO has at some point said, has at any

9    point said the foreign insurance companies are not

10   affiliates is not right.  We've always said that they were

11   affiliates.  They're just not -- just that the client

12   doesn't have affiliates.

13             Does that make that the client and its affiliates

14   inoperable?  Yes, it does.  Does it make Amendment Two

15   meaningless?  No, it doesn't because Chubb & Son that was

16   providing all of the services for the dozen other insurance

17   companies to use Blaze Advisor for selling insurance now

18   could use it not just for the specialty insurance, but they

19   could use it for commercial insurance, or if any of the

20   companies that they managed wanted to sell personal

21   insurance, the scope of the applications of the product

22   types, the insurance types, was no longer limited.

23             So that's the expansion of scope to the

24   enterprise of what Chubb & Son does.  That's why we spent

25   so much time just identifying, well, what is Chubb & Son?

1    Well, it's the management.  That's why we put in the

2    contracts of their management.

3         We'll think about it more along with you, but the

4    notion that Chubb & Son enters into contracts and says it

5    will do stuff, but then it's illusory because paychecks are

6    coming from Federal doesn't make sense to me either.

7         THE COURT:  Okay.  Understood.

8         MR. HINDERAKER:  And my only other comment as you

9    want to think about this and you are looking at it, that

10   first sentence of 9.2c does not require materiality.  The

11   first sentence speaks to breach of the license restriction.

12        We'll put the law in the memorandum that parties

13   are quite free to contract around the common law rule of

14   materiality.  And in that first sentence we did.  Yeah, the

15   stuff we can address in the briefs.

16        THE COURT:  Okay.  So let's talk about timing of

17   that.

18        When can you -- can you be fully briefed by

19   Sunday at 6:00 p.m. or -- or tell me.  And the difference

20   being from my perspective, are we going to argue this

21   Monday night?  Are we going to argue it Tuesday before

22   whatever charging conference is done?

23        MR. HINDERAKER:  Well, I'd like to have until,

24   I'd like to have as much time as we can, given the timing

25   to us in terms of doing it.

1    THE COURT:  Okay.

2    MR. HINDERAKER:  So deeper into Sunday would be

3    nice.

4    THE COURT:  Okay.  Well, that's fine.

5    Then why don't you file by midnight -- I can

6    never remember.  If midnight is Monday morning, then, then.

7    If midnight is Sunday night, then, then.  But midnight, the

8    hour between very late Sunday night and Monday morning.

9    And we'll plan on arguing then at the end of the

10   day on Monday.

11   And, certainly, if I don't rule on Monday, I will

12   rule Tuesday morning before we start taking testimony.

13   Okay?

14   MR. HINDERAKER:  Would it be -- not if it's

15   improper, but we've been fairly openly with the sequence of

16   our witnesses.  I hear there's five more.  I hear there's

17   five more witnesses.  Could you disclose who they are?

18   MS. GODESKY:  We will be presenting, after the

19   next three tomorrow, Ms. Theberge, Mr. Schraer, Mr. Folz.

20   We have the Clark video.  And that's what we're certain

21   about right now.  So we can, we can get back to you with

22   more detail this weekend.

23   MR. HINDERAKER:  Thank you.

24   MS. GODESKY:  Mm-hmm.

25   THE COURT:  Okay.  Anything else we should be

1     addressing this evening?

2          MS. GODESKY:  Not from me.  And I'll just add the

3     caveat, that was not necessarily in order.

4          MR. HINDERAKER:  No.  But it at least narrow us

5     down to candidates.

6          THE COURT:  Anything further for FICO?

7          MR. HINDERAKER:  No, Your Honor.

8          THE COURT:  Okay.  We're in recess.  Thank you.

9          (Court adjourned at 5:36 p.m., 03-02-2023.)

10                         *   *   *

11          We, Kristine Mousseau and Renee A. Rogge, certify

12     that the foregoing is a correct transcript from the record

13     of proceedings in the above-entitled matter.

14

15               Certified by:  /s/Kristine Mousseau
                                Kristine Mousseau, CRR-RPR
16                               /s/Renee A. Rogge
                                Renee A. Rogge, RMR-CRR
17

18

19

20

21

22

23

24

25