# EXHIBIT G

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF MINNESOTA
2
     ------------------------------------------------------------
3                                    )
     Fair Isaac Corporation,         )  File No. 16-cv-1054(DTS)
4    a Delaware Corporation,         )
                                     )
5            Plaintiff,              )
                                     )
6    v.                              )
                                     )
7    Federal Insurance Company,      )  Courtroom 14W
     an Indiana corporation,         )  Minneapolis, Minnesota
8    and ACE American Insurance      )  Monday, March 6, 2023
     Company, a Pennsylvania         )  9:00 a.m.
9    Corporation,                    )
                                     )
10           Defendants.             )
                                     )
11   ------------------------------------------------------------

12

13

14           BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

15

16          **(JURY TRIAL PROCEEDINGS - VOLUME XI**

17

18

19

20

21

22      Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                         *   *   *
24

25

1   APPEARANCES:

2      For Plaintiff:          MERCHANT & GOULD P.C.
                               BY:  ALLEN W. HINDERAKER
3                                   HEATHER J. KLIEBENSTEIN
                                    PAIGE S. STRADLEY
4                                   MICHAEL A. ERBELE
                                    JOSEPH W. DUBIS
5                                   GABRIELLE L. KIEFER
                               150 South Fifth Street, #2200
6                              Minneapolis, Minnesota 55402

7      For Defendants:         FREDRIKSON & BYRON
                               BY:  TERRENCE J. FLEMING
8                                   LEAH C. JANUS
                                    CHRISTOPHER D. PHAM
9                                   RYAN C. YOUNG
                                    PANHIA VANG
10                             200 South Sixth Street, #4000
                               Minneapolis, Minnesota 55402
11
                               O'MELVENY & MYERS LLP
12                             BY:  LEAH GODESKY
                                    ANTON METLITSKY
13                                  DARYN E. RUSH
                                    ROXANA GUIDERO
14                             Times Square Tower
                               7 Times Square
15                             New York, New York 10036

16     Court Reporters:        RENEE A. ROGGE, RMR-CRR
                               KRISTINE MOUSSEAU, CRR-RPR
17                             MARIA V. WEINBECK, RMR-FCRR
                               PAULA RICHTER, RMR-CRR-CRC
18                             United States District Courthouse
                               300 South Fourth Street, Box 1005
19                             Minneapolis, Minnesota 55415

20
                                    *   *   *
21

22

23

24

25

1

I N D E X

2                                                                    PAGE

3     **MICHAEL SCHRAER**
          Direct Examination By Ms. Janus                2253
4         Cross Examination By Mr. Dubis                  2285

5     **ALISSA THEBERGE**
          Direct Examination By Ms. Janus                2303
6         Cross Examination By Mr. Dubis                  2317

7     **OLIVER CLARK**
          Direct Examination By Ms. Janus                2325

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        March 6th, 2023

 2

 3          (In open court without the Jury present.)

 4              THE COURT:  Good morning.  Please be seated.

 5              Yeah, just give me one second.  I'm just going to

 6     let you know what's coming.

 7              Some time, probably before the break, you're

 8     going to get a set of jury instructions and a special

 9     verdict form, a verdict form.  Two things:  The

10     instructions are meant to cover all contingencies about the

11     motions, so -- one of which will be very clear because

12     there is two alternatives.  The verdict form keeps all of

13     the questions on it.

14              At the end of the day, I'm going to adopt the

15     process that other judges use, which is a representative of

16     each party will meet with Mimi downstairs in Courtroom 9E

17     to go over what you've been given and see if we can narrow

18     issues.

19              The two caveats or -- well, the two things that I

20     would tell you about that is, we're going to work off that

21     set of instructions and verdict form.  I will explain

22     during the charge conference why I have not included some

23     instructions that the parties have requested.  When we do

24     the charge conference, the things I'm interested in are, if

25     you think I've misstated the law or if it's somehow unfair
```

```
 1    to one side or the other.  And that's really what the focus

 2    will be.

 3            But, hopefully, that will shorten the length of

 4    the charge conference, is the point.  And then, of course,

 5    tomorrow we'll also have the argument on the motions

 6    because I'll have to read FICO's briefs after court today.

 7            Okay?  Any questions?

 8            MR. HINDERAKER:  One question and one --

 9            THE COURT:  Yes, sir.

10            MR. HINDERAKER:  For some reason, I have in my

11    mind at one of our pretrial conferences you told us that

12    the jury would have the instructions at the time of closing

13    argument.  Do I have that right or wrong?

14            THE COURT:  Yes.  Well, yes, and what I had

15    said -- I think you might be talking about what I had

16    suggested doing is, I instruct them, then you do the close.

17            MR. HINDERAKER:  Okay.

18            THE COURT:  And then they can take a hard copy

19    back with them.  They won't have the hard copy during your

20    close.

21            MR. HINDERAKER:  But they will have the

22    instructions and receive them before the closing.  Okay.

23    That was it.

24            And then as a heads up, FICO will be filing its

25    own -- well, we had cross motions now in response, but FICO
```

1    will be filing another JMOL on its behalf today.

2                THE COURT:  Okay.

3                MR. HINDERAKER:  Whenever, as soon as it's done,

4    but yet today, just to let you know.

5                THE COURT:  Okay.  So we will deal with all of

6    that at the end of the day tomorrow in terms of hearing the

7    arguments.

8                Okay.  Anything else?

9                MS. GODESKY:  I just wanted to give the Court a

10   sense of where we are in our case.  So today we have two

11   live witnesses, Mike Schraer and Alissa Theberge, and then

12   we have a videotape of Oliver Clark.  It's about two hours.

13               THE COURT:  Okay.

14               MS. GODESKY:  And then we will run out of

15   witnesses, because our last witness is Mr. Phil Folz, who

16   was out of the country and cannot testify before tomorrow

17   morning.

18               THE COURT:  Okay.

19               MS. GODESKY:  FICO told us yesterday that they

20   plan to have Mr. Zoltowski on rebuttal.

21               THE COURT:  Okay.

22               MS. GODESKY:  So I think we're on track to have

23   two witnesses today --

24               THE COURT:  Okay.

25               MS. GODESKY:  -- Mr. Folz and Mr. Zoltowski

1   tomorrow, and then deal with the charge conference and the

2   motions, it sounds like.

3            THE COURT:  How approximately long will the

4   witnesses each go tomorrow, do you think, your direct of

5   Folz?

6            MS. GODESKY:  Probably 45 minutes --

7            THE COURT:  Okay.

8            MS. GODESKY:  -- to an hour.

9            THE COURT:  And how long do you think Zoltowski

10  will go?

11           MS. KLIEBENSTEIN:  I would expect under a half

12  hour.

13           THE COURT:  Okay.  That's great.  That way, I

14  still think -- my instinct is to, even if it's at noon,

15  send them home or send them wherever they're going Tuesday

16  at noon, and we deal with the charge conference and the

17  motions and then do everything Wednesday morning, because

18  even if we start it, we're only going to get halfway

19  through closings at best.

20           MS. GODESKY:  I agree.  Especially we would all

21  appreciate an opportunity, I think, to just digest the

22  charge and the verdict form.

23           THE COURT:  Sure.  Yes.  Okay.

24           All right.  Let's bring in the jury.  Thank you.

25           Who is the first witness again?

1          MS. JANUS:  Mike Schraer.

2          THE COURT:  Okay.

3          THE CLERK:  All rise for the jury.

4                    **(Jury enters.)**

5

6          **(In open court with the Jury present.)**

7          THE COURT:  Be seated, everyone.

8          All right.  Ms. Janus, call your witness.

9          MS. JANUS:  Thank you, Your Honor.  We call

10   Michael Schraer.

11         THE COURT:  Come on up here, Mr. Schraer.

12         THE WITNESS:  Good morning.

13         THE COURT:  Good morning.  You will raise your

14   right hand.

15                    **(Witness sworn.)**

16         THE WITNESS:  Yes, sir.

17         THE COURT:  Go ahead and be seated.

18         Your microphone doesn't appear to be on, so press

19   that little button in the front.  Speak into the microphone

20   and state your full name for the record.

21         THE WITNESS:  Good morning.  My name is Michael

22   Allen Schraer.

23

24

25

1                          **(MICHAEL SCHRAER)**

2                         **DIRECT EXAMINATION**

3     BY MS. JANUS:

4     Q.   Good morning, Mr. Schraer.

5     A.   Good morning.

6     Q.   Who are you employed by and what is your position?

7     A.   I work for Chubb, and I'm the chief underwriting

8     officer for our North American Financial Lines division.

9     Q.   What is your educational background?

10    A.   I went to school all the through college.  I'm a

11    graduate from the University of Virginia in 1989 with an

12    undergraduate degree in business.

13    Q.   Prior to the merger between ACE and Chubb in 2016, who

14    was your employer?

15    A.   Chubb.

16    Q.   How long have you been employed by Chubb?

17    A.   Just a little bit over 33 and a half years.

18    Q.   So I would like you to talk to us about what kinds of

19    roles you've had at the company for the more than 33 and a

20    half years that you have been there.

21    A.   Sure.  Happy to.

22              So I started in June of 1989 in our Philadelphia

23    office.  I was an underwriter trainee.  And what that meant

24    was, I was hired by Chubb to learn the business of

25    underwriting.  And I worked there for about a year and a

1      half.  I was in our department of financial institutions at

2      the time, and what that means is that our clients, the

3      group of clients we were pursuing to write insurance for,

4      were banks, insurance companies, stockbrokers, companies

5      like that.

6              So I was there about a year and a half, went

7      through all of our very formal training programs for weeks

8      on end.  And then after about a year and a half, I was

9      offered a promotion to work in our Milwaukee office, so I

10     moved out there for about three years, again financial

11     institutions.  That was a very small office.  I was the

12     department.  We were there for about three years.

13             I then moved back to New York to work in our

14     New York City office, again still in the same financial

15     institutions division, stayed there for about ten years.  I

16     had a number of different jobs in the group at the time,

17     but were there for ten years.

18             In 2004, so 15 years at the company, I

19     transitioned out of the financial institutions group, went

20     to our home office in New Jersey, and since that time I've

21     held a number of different jobs.  I ran a division that

22     underwrote our not-for-profit clients for a period of time

23     that -- I kept doing that and switched to focusing on

24     special coverage called employment practices liability,

25     where we insure companies for how they treat their

1     employees.

2           And then in the last five years, I was the chief

3     products officer overseeing a number of people and now the

4     chief underwriting officer, so both of those are more

5     general jobs.  They're not specific to any division or

6     product within Chubb.

7     Q.  And I would like to just place you sort of within the

8     way that Chubb was organized prior to the merger.

9           So prior to the merger, were there three

10    different lines of business at Chubb?

11    A.  Yes.  Chubb, I guess, if you were trying to simply

12    explain it, we had a division called Chubb Personal Lines,

13    which focused on selling insurance to people like us.  So

14    if you bought homeowner's insurance or automobile

15    insurance, so all the clients of that customer group are

16    people just like us.

17          We had another group called Chubb Commercial

18    Insurance that sold property and casualty coverages.  I

19    guess the way I explain that to my friends would be it's

20    similar what you as a person would buy.  If you bought

21    homeowner's insurance and your house burned down, and we're

22    protecting the property, it's the same thing, but it was a

23    manufacturer.  It would be a commercial customer buying

24    property.  Or if somebody slipped and fell in your driveway

25    and they sued you, that's liability.  We sold that to

1  companies.

2           And then we had Chubb Specialty.  So we had Chubb

3  personal, right, for consumers; we had commercial for

4  certain types of coverages; and we had Chubb Specialty,

5  which is the group that I was in.

6           Again, we were selling to commercial companies,

7  so corporations, organizations, not for profits, but we

8  sold special insurance that really covered -- I think the

9  way I would explain it would be the management of those

10  companies.  So not the things, not the property, not the

11  automobiles, but the way that those companies manage their

12  people or the way that they manage their shareholders.  It

13  was more about the quality of how they ran their businesses

14  that our insurance in Chubb Specialty dealt with.

15  Q.  And after the merger, was that line of business, Chubb

16  Specialty Lines referred to as Chubb Financial Lines?

17  A.  Yes.  So I introduced myself before as North American

18  Financial Lines.  That's what we now call today what used

19  to be Chubb Specialty Insurance.

20           THE COURT:  Counsel, hang on one second.

21           Mr. Schraer, will you make sure to move closer or

22  speak into the mic a little more.  Thank you.

23           THE WITNESS:  Is that better.  Okay?

24  BY MS. JANUE:

25  Q.  And then, Mr. Schraer, I left a book of slides for you

 1    there on the witness stand.  And I want to talk then about

 2    how specialty lines was broken down into different business

 3    units.

 4          So were there different business units within

 5    specialty lines?  And I would direct your attention to

 6    slide 2.

 7  A.  Sure.  So within our specialty --

 8          Is that better?

 9          THE COURT:  Yes.

10          THE WITNESS:  Sure.  Thank you.

11          Within our specialty lines division, we had sort

12    of subgroups or subdivisions.  I'd said earlier about

13    financial institutions is where I'd started, so that was

14    still a division all the way through, again

15    targeting financial institutions as clients, banks,

16    insurance companies, stockbrokers.

17          COURT REPORTER:  You are talking way too fast and

18    need to slow down.

19          THE WITNESS:  Sure.  A little extra coffee this

20    morning.  I'll try and slow down.  Thank you.

21          So we had the financial institutions group.

22          We had transactional risk, which is a group that

23    worked in providing insurance coverages to clients who were

24    going through mergers and acquisitions, so companies were

25    buying and selling parts of themselves.  That was another

1    division.

2         We had management liability, which was a group

3    that focused on selling insurance to publicly-traded

4    companies, so that would be companies like where you can

5    buy stock in those companies.  That was a group.

6         We had a cyber and professional liability group

7    that focused on selling unique coverages around cyber

8    liability, like technology-based things or professional, so

9    like if a doctor needed to buy insurance to protect himself

10   from suits, that would be covered.

11        And then we had a private not-for-profit group

12   that targeted clients who were privately owned, so like if

13   I owned a manufacturer, that manufacturer is owned by me,

14   that would be a potential client or not-for-profit

15   organizations, like charitable groups, libraries and

16   healthcare organizations.

17        So it was basically private not-for-profit, cyber

18   professional liability, management liability, transactional

19   risk and financial institutions.  Five.

20        Am I going at a better pace?  I'm sorry.

21        COURT REPORTER:  Not particularly.

22        THE WITNESS:  I will continue trying to do

23   better.  Thank you.

24   BY MS. JANUS:

25   Q.  Do you know how many products were offered by specialty

1    lines altogether?

2    A.  I would say amongst the five groups within Chubb

3    specialty, probably well over 100.  I don't have an exact

4    number.

5    Q.  So you testified that you have been working in

6    underwriting at Chubb for more than 33 years.  I would like

7    for you to talk about what an underwriter does.  And I'll

8    direct your attention to the next slide.  Have you seen

9    this before?

10   A.  Yes.

11   Q.  And can you talk us through from your perspective what

12   an underwriter does, based on your 33 and a half years at

13   Chubb?

14   A.  Sure.  So as an underwriter, the first thing that I

15   would try to explain to people is that we interact with

16   independent agents and brokers.  So while you might say

17   that my job is to sell insurance, we don't deal directly

18   with our ultimate clients.  So whether it's a personal,

19   like one of the individuals here in the jury buying

20   personal insurance, or a bank or a charitable organization,

21   we don't deal directly with them.  We work through

22   independent agents and brokers.  They represent Chubb and

23   dozens of hundreds of other competing companies.

24            So the first thing I always think about is that I

25   have to form as an underwriter relationships with the

1    individuals at these companies so that they like to work

2    with me, that we have a good working relationship

3    communication-wise, that I can explain to them the benefits

4    of my company and that they're comfortable taking me out to

5    visit with them with our mutual potential clients.

6              So I call that, I guess, the

7    relationship-building part of dealing with these

8    independent agents and brokers, because that's a really

9    important part of the business.  If I can't work through

10   them, I can't do anything because I can't contact a client

11   directly, I can't solicit business directly, so the only

12   way I can succeed in doing what I need to ultimately do is

13   work through them.  That's the first thing.

14             The next thing we do is we, through the

15   independent agents and brokers, bring in submissions.

16   Right?  So they will come to us and say, Mike at Chubb, we

17   would like you to consider looking at this perspective

18   client for certain types of coverages."  And they're going

19   to present information to me.  Just to be clear, they're

20   doing this with a number of my competitors at the same

21   time, frequently either a number or dozens of them, but

22   they're going to share information with me.  Some of it may

23   come in the form of an application where the client filled

24   out information.  They may provide me with something like

25   an annual report.  They might give me the website for that

1     client where I can learn more about them.  Their job is to

2     sort of share information with us.  And I take that in as

3     an underwriter, and I analyze that, I digest it.

4            I guess the best way to say is I'm going to try

5     to learn as much as I can about that company so I

6     understand how they do their business.  So that I guess

7     would be the decision of, Do I, as the underwriter, want to

8     insure that company or not.  We don't have to insure every

9     single company.  So that's the first decision is, Do we

10    want to pursue them as a client or not?  And then once we

11    make the decision yes, we do want to insure them, we then

12    take the time to decide which products or coverages we're

13    going to offer them; and then based upon the information

14    we've learned about that company how we will structure

15    those products and how we will price them.  So it's a very

16    subjective process, I guess is what I want you guys to

17    understand.

18           And then, lastly, we would propose that back to

19    the agent or broker.  And then he or she would take that

20    information, along with other competing proposals, and talk

21    with the client and to decide whether or not they want to

22    purchase the insurance from my company versus another one

23    or not at all.  Sometimes they don't buy the product at

24    all.

25           And then if they come back and say yes, we would

1    like to select Chubb as the insurance company, then we have

2    to turn around and take what we proposed and turn it into

3    an insurance policy.  And there is a bunch of mechanics

4    around being able to book or recognize the premium that

5    we're going to be collecting, issuing the policies and then

6    getting them out the door.  So that would be the

7    underwriting process.

8    Q.  And can I -- I want to follow up on one thing that you

9    said.  You said there is subjectivity in the process.

10             Can you talk a little bit more about that aspect

11   of what an underwriter does, how it's subjective or

12   involves sort of human judgment?

13   A.  Sure.  So all of the insurance coverages that my

14   division provides are optional purchases.  None of the

15   companies that we deal with are required to buy these

16   coverages.  So I guess I would compare that to, if I was an

17   individual and I wanted to have an automobile and drive it,

18   I'm required to buy insurance to get a license.  These

19   coverages are very optional, number one.

20             Number two, the nature of what we're insuring is

21   not a thing.  I'm not looking and saying, oh, that's a very

22   old automobile versus a new automobile, and you can compare

23   that, or this is a property that's made out of wood which

24   could burn down.  This is a property made of concrete which

25   won't.  One is better or worse to insure.

1          What we're insuring is the nature of how

2     companies do their business.  Are they well run?  Are they

3     financially stable?  How do they treat their employees?

4     How do they secure their websites?  So they're very

5     subjective things that we're insuring.  So the process of

6     underwriting is very subjective because there is no right

7     or wrong answer.  It's varying shades of gray, I guess is

8     the best way to describe it.

9     Q.  So we've made it through the first three items.

10          What about the last one, interacts with other

11     parts of Chubb's business?

12     A.  Right.  So I talked about how we interact with the

13     external independent agents and brokers in getting to the

14     point of selling a product, an insurance product.  Once

15     it's sold, though, the product isn't really the paper.  We

16     issue a policy, like we've all seen insurance policies.

17     Those -- that's not the product.  What we're really selling

18     is that if our client has a claim in the future, we're

19     going to protect them.  And so that would be called a

20     claim.

21          And I interact extensively with our claims

22     department to make sure that what we agreed to cover or the

23     claims we agreed to pay, would respond to or protect our

24     clients from, did we do that, how did we do that.  So there

25     is a lot of interactions with the claims department.

1          Because the insurance policy that we issue are

2     legal contracts, I work extensively with our lawyers in

3     order to make sure that we're issuing the policies

4     properly, that these contracts make sense.  I'm not a

5     lawyer.  I'm just an underwriter.

6          We work with people in the actuarial department.

7     Most people don't know what an actuary is.  You can think

8     of them as mathematicians.  They spend all their time

9     trying to analyze how we as an insurance company are

10    performing to share advice.  They sort of look backwards at

11    our history and see how my underwriting decisions in the

12    past, did we make good ones, did we make poor ones, and we

13    try to learn from that.  And so we interact with them a lot

14    to understand how we are doing and should we continue to do

15    more of the same or change.

16          And then there is a whole host of other

17    individuals.  We work with our marketing team.  We put out

18    brochures.  That's part of underwriting.  We have the sales

19    group that spends a lot of time with our agents and

20    brokers, so I might go out to lunch with somebody and just

21    talk.  So, yeah, I think that gives you the idea.

22    Q.  Based on your experience, is the underwriting process

23    all about speed?

24    A.  No, I wouldn't say that at all.  I think the subjective

25    nature of it means that at times it can be quite drawn out,

1    and because, again, it's -- there is no kind of right

2    answer, there is a lot of sometimes back and forth.  It's

3    not just like here's what we're going to do and that's it.

4    There is negotiation.  There is discussion.

5              A lot of the times, even within our organization,

6    we have a lot of interaction between underwriters talking

7    about what should we do, because as I was trying to explain

8    before, it is not always obvious what is the right or the

9    best thing to do at that moment, so we do spend a lot of

10   time talking.

11   Q.  Let's talk a little bit about training, now that we've

12   heard about what underwriters do.  Is training required at

13   Chubb to be an underwriter?

14   A.  Yes.  Absolutely.

15   Q.  How extensive is that training?

16   A.  In the early years when we hire somebody, they're going

17   to have weeks, not all right in a row, but they'll have

18   many weeks of in-person training.  So we'll have them into

19   the home office, and they will be there for an entire week,

20   eight to five, all day long, and we bring lots of people

21   like myself in to teach them the various topics.

22             We now have a lot of online training, modules

23   that we also do.  We used to have, like when I started, I

24   was up there for like months.  Now we do a mix of Webexes,

25   online tutorial training, but we're trying to teach them

1      the products that we sell.  We're trying to teach them how

2      to underwrite the business.  We're trying to teach them how

3      to use all the systems.  We have dozens and dozens of

4      different systems to use.

5              So it's a whole mix of all of that, but it takes

6      a long time because, again, we're trying to teach them how

7      to work through a very subjective process.  So it's, it's a

8      challenge to -- and most people don't come out of college

9      or, even if we hire them from another industry, knowing how

10     to do this.

11     Q.  Do you actually run some of the trainings that

12     underwriters take at Chubb?

13     A.  I do.  I have been teaching for the last 15 years, like

14     even the last week in March this year, I guess it's a few

15     weeks away, I'm going to be teaching -- I'll speak both in

16     my current role as the chief underwriting officer kind of

17     at a high level, but I'm also going to be teaching a

18     four-hour session about other practices and liability,

19     because one of my employees who has that coverage is on

20     vacation, so I will be teaching that, so yea.

21              I love teaching.  To me that's one of the

22     hallmarks of Chubb; and I believe if you ask anyone in the

23     industry, it's very well-known that we train as well or

24     better than every other company.

25     Q.  I want to shift topics a little bit to talk about

1    drivers of revenue and profit at Chubb, and I want to start

2    by you giving a little bit more detail about what your

3    current role at Chubb involves.

4    A.   Sure.  As the chief underwriting officer for financial

5    lines, I'm involved in a lot of different parts of our

6    business.  So before what I described to you, the different

7    subgroups of, of our group, the private not-for-profit

8    group, the management liability, the transactional risk, I

9    now get to interact with them in varying capacities.

10         I'm very actively involved in creating the

11   products, the insurance policies that we sell.  It's a very

12   dynamic industry, so -- for instance, the personal auto

13   insurance that I buy to protect my two cars that we own,

14   that policy looks the same as it did 20 years ago.  Nothing

15   really changes.

16         In our space, again, because of the subjective

17   nature of the coverage, the policies are constantly

18   evolving.  We're constantly reinventing them.  So we're

19   working with our legal people, our claims people, the

20   actuaries, to understand -- our brokers and agents and

21   clients, they ask us for things.  So we spend a lot of time

22   evolving or developing or adapting the products.  That's a

23   big part of my business.

24         I'm also part of the senior leadership in our

25   division.  From a financial standpoint, we look at the

 1    results, are we doing well, are we not doing well, what can
 2    we do more of something that's really good, how do we
 3    convince our underwriters to maybe slow down and not do so
 4    much of the things that are troubling -- yes.
 5    Q.   Just remember to slow down.
 6    A.   Thank you.
 7    Q.   I didn't mean to cut you off if you --
 8    A.   No.  I think it's a wide variety of things; but as I
 9    said before, I'll be involved in transactions.  I'll have
10    underwriters who have to come to me for my authority
11    because it's a very complicated or a complex deal.  So not
12    every underwriter at Chubb can do every transaction, so
13    sometimes they need to come a senior person like myself and
14    review the account and get my permission, I guess is the
15    best way to explain, or get my authority to do that deal.
16            We work with 50 states from a regulatory
17    standpoint, so our chief compliance officer reports to me.
18    So he is in charge of compliance, self-audit, things like
19    that, not exciting stuff, but I work on that as well.  So
20    it's a really broad variety of things I guess is the best
21    way to say it.
22    Q.   And in your role as chief underwriting officer, is it
23    part of your job to know what makes Chubb successful?
24    A.   I believe so, yes.
25    Q.   And is it for the reasons that you sort of outlined in

1   terms of your role, or is there more you would say about

2   that?

3   A.  Yeah.  I mean, my, my role as a senior leader within

4   our division is that along with a few others need to be

5   able to direct a team of over 500 individuals as to where

6   to go, how to do things, what to do.  So it is important

7   that we know where we want to be and where we want to go.

8   And so, yes, if I didn't know that, we would be wandering

9   around, I guess is the best way to say it.

10  Q.  Take a look at the next slide in your book.

11  A.  Can I stop for a second and just get some water?

12  Q.  Of course.  Yes.

13  A.  Thanks.  This is the one with the pillars?

14  Q.  Yep.  Yep.

15  A.  Okay.

16  Q.  Have you seen this before?

17  A.  Yes, I have.

18  Q.  And did you provide guidance and feedback in the

19  formation of this slide?

20  A.  Yes, I did.

21  Q.  What does it depict?

22  A.  It would be a visual of the different components of

23  what we as a company and the group of employees that make

24  up the company are doing or things that matter to how we

25  would either generate revenue, being writing business, and

1    equally as important, earning a profit, because writing

2    premium means you grow or shrink, but either way there is a

3    secondary issue, which is profit.  They work together.  So

4    that's what we were trying to display here.

5    Q.  And can you talk about what, based on your experience

6    of 33 and a half plus years at Chubb, what drives Chubb's

7    revenue and profit?

8    A.  Yeah.  Sure.  So just starting at the -- and I truly

9    believe this is the first and most important thing, is the

10   reputation of our company.  So in my mind, if I'm selling a

11   product to someone, could be a consumer, could be a

12   corporation, whoever, they have to make the decision that

13   they want to do business with my company.  And I think the

14   reputation of our company is something that they think

15   about.

16           If we had a very bad reputation, for instance, we

17   were in the news constantly and there were very bad things

18   said about us or people didn't even know about us as a

19   company, then the likelihood that no matter what I want to

20   do, no matter how good my price is or how wonderful my

21   products are, if they don't believe in the company, then

22   they're not likely to want to purchase the product.

23           So reputation would be the very first thing, and

24   that's for any company, but I think for our company in

25   particular because we're selling a promise to pay.  I'm

 1    going to give you an insurance policy today, and I'm

 2    promising at some day in the future to pay a claim if you

 3    have it.  So a client has to say, Will Chubb be there in

 4    the future, could be 1 year, 2 years, 10 years, 20 years

 5    later, to pay the claim and will they do it fairly.  So I

 6    think that's about reputation.  So without that, I like to

 7    think highly of myself, but I think that would be a

 8    problem.

 9          So you can see the next two about paying claims,

10    that's the product we sell.  We don't manufacture things

11    here.  We issue insurance policies or contracts.  The way

12    I've always explained it for 33 years is, it's a promise to

13    pay.  It's a promise that if you, our client, have a claim,

14    we will support you through the process and then we will

15    pay the claim, if appropriate.  And so paying it timely,

16    fairly, quite frankly, being around, as I said, many years

17    later to be able to pay the claim and doing it in a

18    positive manner.  Right?  Like we've all had things where

19    we got what we wanted, but it wasn't like we didn't like

20    how we got it.

21          So I think that paying claims, again, that's what

22    we sell.  So if we don't do that well, it doesn't matter

23    how cheap our client is, how broad our policies are or if

24    they like the color or the font, it doesn't matter, because

25    at the end of the day if what we promise to do doesn't come

MICHAEL SCHRAER - DIRECT

 1     through, we're dead.

 2              Financial management.  Again, many of our

 3     products have a very, very long time between when we sell

 4     the policy and when we have to perform the service of

 5     handling the claim.  So if our clients don't believe that

 6     we're going to be around and financially strong to be able

 7     to make those claim payments, then, again, they might lose

 8     confidence and not choose us.  So I think all of those

 9     things are important before we even get to what I do.

10              And then after that, I certainly do think when

11     you get to sales, this matters.  I have to communicate

12     effectively with our clients and our brokers and agents

13     about what our products do, what makes Chubb unique, why

14     all these things matter.  It's an interesting dynamic where

15     we're asking questions of our clients, but I get asked just

16     as many questions back, and I have to be able to represent

17     fairly what we're about as a company.

18              And then the last two, operations just means we

19     need to do what we're supposed to do.  If we can't get our

20     policies out for two or three years, nobody is going to be

21     happy with it.  It would be like if I bought a car today

22     and they said, Well, we'll get it to you in two or three

23     years, they would be very upset.  So that's the team to

24     help us with that.

25              And compliance.  We're regulated by 50 states, so

1    we have to maintain compliance and good regulatory

2    relationships.  But I think all of these things together

3    come to help us generate revenue and then make smart

4    decisions that allow us to make a profit.

5    Q.  I would like to switch years a little bit and talk

6    about some of the applications that we have been talking

7    about at trial.  Okay?

8    A.  Okay.

9    Q.  And I want to start with DecisionPoint.

10   A.  Okay.

11   Q.  Are you familiar with the DecisionPoint application?

12   A.  Yes, I am.

13   Q.  How so?

14   A.  I was the business sponsor when we created that

15   capability or application or whatever you want to call it.

16   Q.  What is -- what do you mean by "business sponsor"?

17   A.  So when we went about building DecisionPoint, which is

18   effectively an online tool where agents or brokers could

19   come to Chubb and enter information into a portal and

20   potentially get a quote, and I can talk about that a little

21   bit more, but it was a proprietary thing we were creating

22   from scratch.  It didn't exist.  We didn't buy something

23   off the shelf.

24        So we came together as a group of people; and as

25   I talked about a little bit earlier, we had underwriters on

1     the team to help build this.  We had IT or technology, you

2     know, Chubb employees who work on the IT side involved in

3     the team.  We had actuaries.  We talked to some of the

4     claims people.  So, again, similar to what I do on the

5     underwriting side, we had a similar group of people coming

6     together, the different groups and departments as a project

7     team.

8                And then within each of those groups, you kind of

9     had a lead individual representing that group.  So I'm an

10    underwriter, so I was the lead or senior-most underwriter

11    in that project from start to finish; and I was the

12    business sponsor, so I would be kind of held accountable

13    for the continuity.  Maybe we had other underwriters who

14    come in for a week, help us and then leave, but they didn't

15    understand how the whole project worked, so my job was to

16    be sort of that continuity throughout, point person, things

17    like that.

18    Q.  And in that role, were you and the underwriting team

19    involved working with business analysts?

20    A.  Yes.  So, generally, in a project like this I'm an

21    underwriter.  I don't understand how technology works,

22    systems, coding.  I mean, I know what these words are, but

23    we have people to do that at our company; but just in the

24    same way that they don't understand what I do as an

25    underwriter, I don't necessarily know how they do what they

MICHAEL SCHRAER - DIRECT

```
 1    do as a technologist.  I don't know what the right term is.
 2    So we have business analysts who are individuals who are
 3    kind of in the middle, and they are -- to let me talk in
 4    terms of that I'm used to.  I would like this type of thing
 5    to happen; I would like this behavior to happen; I would
 6    like this outcome to occur.
 7           And they are able to talk to the IT people and
 8    translate that in a way that they can execute what I'm
 9    asking for, because otherwise I guess IT and underwriting
10    people would be like this (indicating).  We just don't --
11    it's not bad.  We just don't communicate well because we
12    don't speak the same language.
13    Q.  I think you mentioned briefly what DecisionPoint does.
14    Is this a system that the insureds access, or is it just
15    agents and brokers?
16    A.  No.  It would just be agents and brokers.  Our clients
17    don't know about it, don't have any access to.  Just the
18    agents and brokers.
19    Q.  And are agents and brokers required to use
20    DecisionPoint?
21    A.  No, they're not.  We created this as an additional way
22    for our agents and brokers to access Chubb.  Normally, and
23    still to this day, they either e-mail us or mail us or they
24    will come drop in our office submissions.  This was just an
25    alternative way, really an experiment, to see if they would
```

1    be receptive to being able to go online and enter the

2    information themselves.

3    Q.  And so if an agent or broker chooses not to use

4    DecisionPoint, they would go through the normal process

5    they've always used?

6    A.  Yes.  I mean, like I said, they would either e-mail us

7    information, send it through the regular mail.  That still

8    does occur, surprisingly, and even at times where they will

9    come into our office and say, here and give it to us

10   physically.  And, of course, it's not just a one-and-done.

11   As I said before, a lot of dialogue back and forth.  So

12   even after they have initially given us information, I may

13   ask for more.  I may ask for clarification.  We may have

14   meetings with them or the clients, but, yeah, it's pretty

15   extensive.

16   Q.  If an agent or broker does use DecisionPoint, what is

17   the outcome?

18   A.  There could be --

19   Q.  I guess I should ask a better question.  What are the

20   possible outcomes?

21   A.  I was going to say there is multiple outcomes.  They

22   can certainly identify whether or not we can work with them

23   on that account or not.  So, for instance, if we're

24   currently insuring a particular manufacturer today, we

25   wouldn't allow a new agent to come forward and submit to

1     Chubb a request to provide coverage for the same thing

2     we're already doing.  That wouldn't make sense.

3            So the system is able to say, yes, you can work

4     with Chubb or, no, there is a reason why you can't.  It's

5     not a good or bad thing.  We just can't insure them twice.

6     So it can do that.

7            It can certainly, as I talked before in the

8     underwriting process, give them an indication about whether

9     we would like to insure that or not.  So it might say, This

10    is not in our appetite.  So if we chose not to insure zoos

11    and they submitted a zoo, it would say, Thank you for

12    submitting this, but Chubb is not interested in insuring

13    zoos.  If it is something that we are interested and we

14    like to do, as they're answering the questions, they can

15    get to a quote.  And what that means is, they would have a

16    formal presentation on the screen of both a price and terms

17    and conditions for a policy.

18    Q.  And if instead -- if the outcome was a referral, would

19    the normal underwriting process occur at Chubb?

20    A.  Yes.  That would be -- there are times where it will

21    determine that we are interested, but, for instance, maybe

22    the client is too big for us to be able to provide a quote

23    through this online portal, and there is a reason why, that

24    it refers that submission to one of the human being

25    underwriters at Chubb, who would then pick it up and take

1    it on as if it had come to them directly from the

2    beginning.  So they don't always get a quote.  I just want

3    to be clear on that.

4    Q.  And you talked about this being something for agents

5    and brokers to use.  How would you characterize the

6    adoption of DecisionPoint by agents and brokers?

7    A.  I would say they limited.  It's been a challenge to get

8    them to use it, as I had mentioned before.  We never

9    mandated it.  All right?  So it was always an option for

10   them to pursue.  We -- and I've gotten feedback that, from

11   agents and brokers, that if --

12              MR. DUBIS:  Objection.  Hearsay.

13              THE COURT:  Overruled.

14              THE WITNESS:  We've gotten feedback that agents

15   and brokers realized that if they come into DecisionPoint,

16   they're entering the data in.  They're literally on a

17   screen entering answers, as opposed to the traditional way

18   where they would send a submission to Chubb where they

19   would take an application that was completed by the client

20   and just e-mail it to us.  So I think from a work effort,

21   they're doing more work.

22              They also then realized that by entering the

23   information into Chubb's proprietary DecisionPoint, again

24   they're only accessing Chubb through this proprietary

25   system, the best that they can do is get a quote from

1    Chubb; whereas, if they do their traditional practice which

2    is to take an application and a submission and e-mail it to

3    5, 10, 50 carriers, without any effort they can get back 5,

4    10, 50 quotes.

5          So that idea that they can -- they put more

6    effort in and get less back has been an impediment to broad

7    acceptance, but we still thought it was important to do

8    this because it was an experiment.  We were interested to

9    see where it goes.  We experiment with lots of things at

10   the company.  So it's -- it's been a struggle, quite

11   frankly; and to this day, as I said, we still get the vast

12   majority of submissions through other avenues.

13   BY MS. JANUS:

14   Q.  You talked about the development process.  Were you or

15   the other underwriters that were working on the project or

16   the actuaries aware that Blaze was going to be used in

17   DecisionPoint when you were working on that development?

18   A.  No, we were not.

19   Q.  Prior to this litigation, did you know what Blaze was?

20   A.  I did not know.

21   Q.  As you sit here today, do you know how much of a role

22   Blaze plays in the DecisionPoint application?

23   A.  No, I don't.  As I said, I'm not aware of it by name,

24   but I don't know what role it plays or --

25   Q.  Was FICO involved in the development of DecisionPoint

1    from your perspective?

2    A.  No.  As far as I'm concerned, the entire development

3    process was an internal process.  I'm fully an employee of

4    Chubb.  All the IT people I ever remember meeting were

5    Chubb employees, the actuaries, the business analysts,

6    everybody I believed was a Chubb employee.

7    Q.  And have you ever met with or interacted with anyone at

8    FICO, to your knowledge?

9    A.  Not to my knowledge, no.

10   Q.  I want to just talk about sort of the scope of

11   DecisionPoint, and you alluded to this a little bit, but

12   was DecisionPoint used in the entire Chubb organization?

13   A.  No.  I guess going back to a high level to the three

14   big parts of Chubb, personal lines where we sell

15   homeowner's insurance, never, not all.  To the commercial

16   lines group, not at all.  And within the financial lines or

17   Chubb specialty, yes; but then within that Chubb specialty

18   or financial lines group, we had five subdivisions I talked

19   about before.  It was not in transactional risk.  It was

20   not in financial institutions.  It was not in management

21   liability.  It was not in cyber.  It was really just the

22   private not-for-profit group, so a small subset of the

23   overall company.

24   Q.  And I skipped ahead a few slides, but if you take a

25   look at the screen, is that a visual representation of

1    where DecisionPoint was actually used?

2    A.  Yes.  That's correct.

3    Q.  And within then private not-for-profit, was the use

4    even limited beyond that?

5    A.  Yes.  So in private not-for-profit, we write ten or so

6    different coverage lines or types of insurance coverage.

7    There was only four or so that were available in

8    DecisionPoint.  And then from a type of customer, we can

9    write everything from a tiny, tiny organization with like

10   five employees in one location up to global corporations

11   and everything in between.

12            DecisionPoint I guess a simple way to say it was

13   sort of defined or the eligible size customer was very,

14   very small in the number of employees and revenue.  It

15   would be a very small subset that would even be eligible to

16   come through; and then even after that, depending on the

17   way questions were answered, would they get all the way

18   through the system.

19   Q.  Did DecisionPoint impact the number of products that

20   specialty lines generally could bring to the market?

21   A.  No.  It didn't add products.  It was just an additional

22   way that our agents or brokers could access us for the set

23   of existing products.

24   Q.  Have you come to learn that Blaze was ultimately taken

25   out of DecisionPoint and replaced with a different

1    software?

2    A.  I was made aware there was a change.  I don't know the

3    details to it, but I was aware that there was a change.

4    Q.  And did you notice or have you heard about any issues

5    with the functioning of DecisionPoint with that change?

6    A.  No.  I think it's continued to work as it did before.

7    I guess I was made aware of it in passing, but I have never

8    heard anything from a user one way or the other that it's

9    different.

10   Q.  Let's shift gears and talk about Profitability

11   Indicator.  Are you aware of that application?

12   A.  Yes, I am.

13   Q.  How are you aware of that?

14   A.  I was the business sponsor for that initiative as well.

15   Q.  And so we talked about that role in connection with

16   DecisionPoint.  Was it a similar role with respect to

17   Profitability Indicator?

18   A.  For me personally, yes.  I would say -- yes, and a

19   similar group of whatever you want to call them, the

20   teammates or project team, teammates in areas, but I

21   fulfilled the same function leading the underwriting

22   contribution towards the end outcome.  Yes.

23   Q.  And how would you characterize what Profitability

24   Indicator does?

25   A.  This one is a little bit more interesting to describe.

1    This was an initiative that we embarked on to -- the

2    underwriter's role was looking for more information.  We're

3    always looking for more insight to better understand a

4    potential client, we're looking at -- because I talked

5    about the subjective nature of our underwriting, so we're

6    always looking for more information.  We always had lots of

7    information, but we're always looking for more.

8            And so this was an initiative where we worked to

9    design what we call predictive analytics.  And I think the

10   simplest way that I try and explain that would be that

11   we're trying to look backwards at information and data that

12   we have to try and predict what will happen in the future.

13   It's complicated, and it's very subjective, but it's --

14   that's what we were trying to do.  And I guess in essence

15   say, for a particular client, What's the likelihood that

16   we're going to have claims in the future?  That's really

17   what we were trying to predict.

18   Q.  Would you say that Profitability Indicator is a tool

19   used by underwriters?  Is that --

20   A.  Yes.  This, this is an internal tool, so our agents and

21   brokers don't use this.  This is very different from

22   DecisionPoint.  It's an internal tool.  It's an additional

23   piece of information that we make available to the

24   underwriters, along with lots of other pieces of

25   information that they gather either from the agents and

1    brokers, from interviewing the clients, from going to the

2    Internet.  It's just another piece of information, but it

3    is a tool, if you will.

4    Q.  One of many tools and pieces of information that an

5    underwriter uses in connection with underwriting a policy?

6    A.  Correct.

7    Q.  Is Profitability Indicator used widely within Chubb?

8    A.  Again, similar to DecisionPoint, it has nothing to do

9    with our personal lines group.  It has nothing to do with

10   the commercial lines group.  And within our Chubb specialty

11   or financial lines group that we have been talking about,

12   only certain portions of the divisions within that group

13   are able to use it, because it was only designed for those

14   certain groups.

15   Q.  So only some of the products offered?

16   A.  Correct.  So some of the groups within the financial

17   lines division and only some of the products that they

18   handle.

19   Q.  Prior to the litigation, this lawsuit, did you know

20   that Blaze was a part of Profitability Indicator?

21   A.  No, I did not.

22   Q.  Did FICO participate, to your knowledge, in any way in

23   the development of Profitability Indicator?

24   A.  No.  I know it to be a proprietary project.  So

25   individuals from Chubb working on it.

1    Q.  And have you become aware, similar to DecisionPoint,

2    that Blaze has since been removed from Profitability

3    Indicator?

4    A.  Yeah, I believe I heard something about that.

5    Q.  To your knowledge, has Profitability Indicator been

6    impacted in any way with the removal of Blaze?

7    A.  No.  It continues to perform as it always did.

8            MS. JANUS:  Thank you, Mr. Schraer.  Those are

9    all the questions I have.

10           THE WITNESS:  Thank you.

11           THE COURT:  Thank you, Ms. Janus.

12           Mr. Dubis.

13           THE WITNESS:  Thank you.

14                    **CROSS EXAMINATION**

15   BY MR. DUBIS:

16   Q.  Good morning, Mr. Schraer.

17   A.  Good morning.

18   Q.  As you recall, my name is Joe Dubis.  I'm an attorney

19   representing FICO, and we met at your deposition on

20   February 26th, 2020.

21           I have given you a binder that has a transcript

22   from your deposition, in case we need to look at that, and

23   then some exhibits that we may talk through our discussion

24   here.

25   A.  Okay.

1    Q.  Now I wanted to just start, when you introduced
2    yourself, you testified that before the merger, you worked
3    for Chubb, correct?
4    A.  Yes, that's what I said.
5    Q.  But prior to the Chubb Corporation and ACE Limited
6    merger, you were actually an officer for Chubb & Son,
7    correct?
8    A.  Yes, I believe I was an officer for Chubb & Son.
9    Q.  So in 2014 before that merger, you were an officer for
10   Chubb & Son?
11   A.  An officer, yes.
12   Q.  Okay.  And as an officer, you were a senior vice
13   president of Chubb & Son?
14   A.  Yes, I believe that was the ultimate title I had.
15   Q.  And what were your duties as an officer of Chubb & Son?
16   A.  I didn't have any duties as an officer of Chubb & Son.
17   Q.  So you were a senior vice president at Chubb & Son, but
18   no duties?
19   A.  Nothing specific to that.
20   Q.  And as a senior vice president at Chubb & Son, how many
21   people did you have report to you?
22   A.  None.
23   Q.  So let's turn and talk a little bit about broker and
24   agent relationships.
25              Now, you have been an underwriter since about

1    1989, correct?

2    A.  Yes.  I was hired in June of 1989, that's correct.

3    Q.  And hired at Chubb in 1989?

4    A.  Yes, sir.

5    Q.  Now, you've testified in your direct about the

6    importance of relationships with the independent agents and

7    brokers, correct?

8    A.  Yes, I did testify to that earlier.

9    Q.  And so you would agree that insurance is a

10   relationship-driven business, correct?

11   A.  I believe that's a very key part of the process, yes.

12   Q.  Okay.  And it would be the goal of meeting with agents

13   and brokers to improve those relationships, correct?

14   A.  Yes, amongst many other things.  Yes.

15   Q.  And so one of the reasons to improve those

16   relationships is so that those agents and brokers would

17   push clients to buy more Chubb products, correct?

18   A.  Yes, to better understand our products, to represent us

19   fairly and ultimately to look favorably upon us as an

20   option, yes.

21   Q.  Okay.  Mr. Mayleben, could we look at the pillars

22   demonstrative?  It is page number 6.

23   A.  That's the big book you just handed to me?

24   Q.  If you open it up, I believe it might be -- you went

25   past it.  It's literally the first page.

1   A.   Okay.

2   Q.   You testified that you have seen this before, correct?

3   A.   Yes, I did.

4   Q.   And that you contributed comments to the creation of

5   it, correct?

6   A.   Yes, I did.

7   Q.   Okay.  I just want to make sure that we are fully

8   understanding your role.  You talked extensively about the

9   importance of paying claims, but you have no expertise in

10  the paying claims pillar, correct?

11  A.   I don't agree with that statement.  I don't work in

12  that department.  That's not my direct responsibility, but

13  for 33 and a half years, I worked extensively with the

14  individuals in that group in helping to understand the

15  policies that we issued and how they interpret them, to

16  understand the process.  I talked to clients and brokers

17  and agents about how the process works, when it's working

18  well, when it's not working well.

19         We talked to those groups about when we're

20  creating policies, the wording in them and how they

21  function so that we're on the same page, because ultimately

22  I'm issuing a policy that will be administered by them at

23  the end of the day.  So I believe I'm relatively familiar

24  with what they do and have an extensive amount of

25  interaction with them.

1    Q.  Mr. Schraer, my question was whether you had expertise

2    in paying claims.

3          And so you were deposed on February 26th, 2020,

4    correct?  If you turn to the first page of your deposition,

5    I believe it has the date at the bottom.

6    A.  Yes, February 26th, 2020.

7    Q.  During that deposition, you were under oath to tell the

8    truth, correct?

9    A.  Correct.

10   Q.  Okay.  Could I have you turn to page 36 in the

11   deposition.  The pages are in the upper right-hand corner

12   of the quadrants.  Let me know when you're there.

13   A.  If I could just get my glasses, please.  36, top

14   right-hand corner, okay.

15   Q.  And so if we begin at the last page of 36 at line 25,

16   I'm going to go to page 37, 9.

17          "Question:  Were you ever asked your opinion

18   about what features should be in CIS Claims?

19          "Answer:  Absolutely not.

20          "Question:  You said absolutely not.  Why

21   absolutely not?

22          "Answer:  Because I have nothing to do with the

23   claims department.  I'm an underwriter, meaning I would

24   have used the system, right, as an underwriter to look up

25   claims, but I would never have been involved in either the

1   building, development, right?  It's not my area of

2   expertise."

3            Did I read that correctly?

4   A.  Yes, you did.

5   Q.  Okay.  And turning back to our pillars of Chubb revenue

6   and profit slide, I see reputation and paying claims,

7   financial management, sales, operation, compliance,

8   correct?

9   A.  Yes.

10  Q.  I don't see technology listed anywhere on this slide,

11  correct?

12  A.  No.

13  Q.  Not as a pillar?

14  A.  No.

15  Q.  And not as a sub-pillar, correct?

16  A.  Let me just look through each one.  No.

17  Q.  And so the 4500-plus IT professionals that Mr. Pandey

18  identified in the combined ACE/Chubb entity must not

19  contribute to Chubb's revenue and profits, either, correct?

20  A.  I don't agree with that.

21  Q.  But they're not listed anywhere on these pillars?

22  A.  The words, no.

23  Q.  Okay.  But you would agree that technology has changed

24  the underwriting process at Chubb, correct?

25  A.  Yes.  I think that's a fair statement.

1    Q.  So let's switch topics and talk about Blaze Advisor.

2    So you understand that this lawsuit is broadly about FICO's

3    Blaze Advisor software, correct?

4    A.  I have been made aware of that through this litigation,

5    yes.

6    Q.  Now you testified that you didn't know what Blaze was

7    before this lawsuit, correct, on your direct?

8    A.  Correct.  Yes.

9    Q.  But you had heard of Blaze Advisor before this lawsuit

10   began, correct?

11   A.  I may have heard the name.

12   Q.  So you --

13   A.  But I don't recall either way.  I mean, this was years

14   ago.

15   Q.  So in your deposition, if you could turn to page 47 --

16   and let me know when you're there.

17   A.  Okay.

18   Q.  So starting with the last line of page 47 and going to

19   line 4 of page 48.

20        "Question:  Do you recall when you first heard of

21   Blaze Advisor?

22        "Answer:  I don't remember.

23        "Question:  Was it before or after this lawsuit

24   began in 2016?

25        "Answer:  I would say yes.  I heard it some time

MICHAEL SCHRAER - CROSS

1    before then."

2          Did I read it correctly?

3    A.  Yes.

4    Q.  And just so that we're clear, I believe I heard you

5    testify on your direct that you don't understand how Blaze

6    Advisor works, correct?

7    A.  No.  I'm sorry.  Yes, that's what I said.  Correct.

8    Q.  Just so we're clear, you don't understand how Blaze

9    Advisor works, correct?

10   A.  No.  No.

11   Q.  Let's turn and talk about some of the applications.

12   One of them is Automated Renewal Process.  You're familiar

13   with the Automated Renewal Process application, correct?

14   A.  Yes, I'm familiar with it at some level, yes.

15   Q.  Okay.  And so the Automated Renewal Process application

16   identifies a policy that's available to be automatically

17   renewed, and then some portion of the process of booking,

18   binding and issuing that policy is automated, correct?

19   A.  To the best of my knowledge, I think that's part of it.

20   I don't know if that's all of it or some of it, but those

21   sound fair, yes.

22   Q.  And so the Automated Renewal Process application gave

23   Chubb & Son an added capability of processing renewals,

24   correct?

25   A.  Yes.  It was an additional capability, and it was

1      specific to renewals, not new lines, yes, correct.

2      Q.   And the business benefit of the Automated Renewal

3      Process application was to renew policies with fewer human

4      resources, correct?

5      A.   I think that's a fair characterization, yes.

6      Q.   And renewing with human -- sorry.  And renewing with

7      fewer human resources is a benefit because there are fewer

8      renewal transactions for the individuals to touch, correct?

9      A.   Yes, I think that's a fair statement.

10     Q.   And the business benefit of renewing with less manpower

11     allowed Chubb & Son to perform more transactions with the

12     same number of people, correct?

13     A.   More renewal transactions, yes.  Yes.

14     Q.   And then turning to the new application, the

15     Profitability Indicator, which you talked about on your

16     direct, correct?

17     A.   Correct.

18     Q.   And you said that you were the business sponsor for

19     Profitability Indicator, correct?

20     A.   Yes, I did say that.

21     Q.   Okay.  And you testified regarding the predictive

22     analytics as an underwriting tool to increase the quantity

23     and amount of information to the underwriter, correct?

24     A.   I believe I testified that it was an additional piece

25     of information above and beyond what we previously had, but

1    yes.

2    Q.  Okay.  And making more informed underwriting decisions

3    is a business benefit, correct?

4    A.  Yes, I believe the more we know, we can make better

5    decisions, yes, or more informed decisions.  Yes.

6    Q.  And the underwriting group wanted that function to get

7    more information to improve underwriting evaluation and

8    decision-making?

9    A.  Yes.  I think that's a fair characterization.

10   Q.  And so then another Chubb & Son application that used

11   Blaze Advisor was DecisionPoint.  And, again, you testified

12   you were the business sponsor for DecisionPoint?

13   A.  Yes, I did.

14   Q.  And a purpose of DecisionPoint was to automate the

15   process of reviewing some insurance applications, correct?

16   A.  Yes.  They were entering information and that was being

17   reviewed as opposed to an application, but I think we're

18   saying the same thing.  Yes.

19   Q.  And you testified that FICO was not involved in the

20   development of the DecisionPoint application?

21   A.  To the best of my knowledge, no, they were not.

22   Q.  And you -- so you have no knowledge one way or the

23   other whether Chubb & Son purchased professional services

24   from FICO to assist with the DecisionPoint application?

25   A.  No.  I'm on the underwriting side.  So that sounds like

1    something that, if it happened, would have been with

2    another part of Chubb.

3    Q.  So you have no knowledge one way or the other whether

4    Chubb & Son purchased professional services related to the

5    rule harvesting that went into the DecisionPoint

6    application?

7    A.  I don't even know what those terms are, but I don't

8    have any knowledge of any of that.

9    Q.  In 1989, when you began at Chubb, Chubb did not have

10   the capability to renew applications and give them a rating

11   with no touch, correct?

12   A.  That is correct.

13   Q.  Okay.  Let's turn to Exhibit P504, which is not in

14   evidence.  And so if you turn in your book, Mr. Schraer, to

15   P504.

16   A.  That's P as in Peter zero five zero four?

17   Q.  Correct.

18           Is there an objection to this exhibit?

19           MS. JANUS:  I'm reviewing it.

20           THE WITNESS:  Okay.  I have it here in front of

21   me.

22           MS. JANUS:  No objection.

23   BY MR. DUBIS:

24   Q.  Okay.  Mr. Mayleben, if we could put up P0504.

25           So, Mr. Schraer, let's start just briefly at the

MICHAEL SCHRAER - CROSS

 1    top of the first page and look at -- this is an e-mail from

 2    a Laura Suske?

 3    A.  Yes, that's correct.

 4    Q.  Do you know who Ms. Suske is?

 5    A.  Yes, I know who she was.

 6    Q.  Who is she?

 7    A.  She was a fellow employee at Chubb.

 8    Q.  Okay.  And so the subject of this e-mail is,

 9    "DecisionPoint release-EPL JAG changes."

10          Did I read that correct?

11    A.  Yes.

12    Q.  Okay.  And EPL stands for employment practices

13    liability, correct?

14    A.  Yes.  That's correct.

15    Q.  And that JAG stands for joint accountability group,

16    correct?

17    A.  Yes.  That's correct.

18    Q.  Okay.  Mr. Mayleben, if we could go to page 2 of this

19    e-mail.

20          And so on page 2 here, we have an e-mail from

21    Ms. Suske.  And you see that you're the second recipient on

22    the "to" line, correct?

23    A.  Yes, I see that.

24    Q.  And this e-mail has the same subject as the top e-mail,

25    correct?

1   A.  It would appear to be one continuous e-mail, yes.

2   Q.  Okay.  And so in this e-mail, Ms. Suske says, "Hi, good

3   news.  We have completed the rule changes for EPL that were

4   needed as a result of JAG ahead of schedule.  Myra and the

5   QA team signed off today on testing, so we will deploy

6   tonight, which is two days ahead of our plan.  These

7   changes were defined, analyzed, built and tested in just

8   eight days.  This demonstrates the true value of using

9   Blaze for business rules.  Thanks to all who worked on this

10  release.  Great job, team.  Lori."

11          Did I read that correct?

12  A.  Yes, you did.

13  Q.  And then, Mr. Mayleben, if we could look at the bottom

14  of page 1, and then we're going to go on to page 2, if we

15  could do a side-by-side.

16          And so, again, we have an e-mail from Ms. Suske,

17  correct?  At the bottom of page 1.  And you are the second

18  recipient to that e-mail, correct?

19  A.  Yes.  I see that.

20  Q.  Okay.  And Ms. Suske writes, "Hi, I am sorry that I did

21  not get a chance to send this e-mail yesterday.  I just

22  wanted to confirm that the changes noted below were

23  deployed successfully on Tuesday night.  Thanks, Lori."

24          Did I read that correct?

25  A.  Yes, you did.

MICHAEL SCHRAER - CROSS

```
 1   Q.  Okay.  And can we turn to Exhibit P1181, which is not

 2   yet in evidence.

 3            Mr. Schraer, if you could turn to P1181.  I

 4   believe it's the last document in your binder.

 5   A.  You said P, as in Peter, 1181?

 6   Q.  Correct.

 7            MS. JANUS:  No objection.

 8            THE WITNESS:  Okay.  I have it in front me.

 9   BY MR. DUBIS:

10   Q.  Okay.  And so this is an e-mail from yourself dated

11   December 1st, 2011, correct?

12   A.  Yes.

13   Q.  And this has the same subject line as Exhibit P504 that

14   we just looked at, subject DecisionPoint release-EPL JAG

15   changes, correct?

16   A.  I'm just looking back at the other one.

17   Q.  Yep.

18   A.  It would appear to have the same subject, yes.

19   Q.  Okay.  And this e-mail appears to be forwarding the two

20   e-mails that we talked about in Exhibit P504, correct?

21   A.  Can you give me a minute to read this, because now

22   you're asking me to compare and contrast two documents?

23   Q.  Yep.  Let me know.

24   A.  It would -- sorry -- it would appear to have portions

25   of the first document you showed to me, but the first one
```

1    that had other pieces on it that are not in this one.  So

2    parts in, parts not.

3    Q.  I understand.  And the two e-mails that we talked about

4    that you were included on from Exhibit P504 are included in

5    your e-mail, which is Exhibit P1181, correct?

6    A.  Yes.  That is correct.

7    Q.  Okay.  And in your e-mail you write, "Great job to all.

8    Thanks, Mike."

9         Did I read that correctly?

10   A.  Yep, you read that correctly.

11   Q.  And so you have forwarded Ms. Suske's two e-mails,

12   correct?

13   A.  I don't know whether I forwarded them or replied.  I'm

14   not sure.  It's hard to tell here what happened.

15   Q.  At the top of P1181, this e-mail says, "From

16   CN=MichaelASchraer/zero equals Chubb e-mail."  Did I read

17   that correctly?

18   A.  Yes.

19   Q.  Do you have any reason to believe this was not an

20   e-mail from you?

21   A.  Oh, no.  It's an e-mail from me.  You asked me if I had

22   forwarded it, and I'm saying I don't know if I forwarded it

23   or replied to it, but it is an e-mail from me.  I do agree

24   with you.

25   Q.  And in this e-mail from you that included Ms. Suske's

1    two e-mails in which she said, "This demonstrates the true

2    value of using Blaze for business rules," your comment was,

3    "Great job to all," correct?

4    A.  Yes.  That's what I wrote here.

5    Q.  Okay.  We can take that down.

6             Now you testified that agents and brokers did not

7    like DecisionPoint, correct?

8    A.  I think what I testified was that it was a challenging

9    adoption to get them to use it or continue to use it.

10   Q.  And do you have any documents to support that position?

11   A.  I don't have any documents with me now, no.

12   Q.  So we didn't see any documents from any of these

13   independent agents or brokers talking about the struggle

14   that you testified to, correct?

15   A.  No.  That would be conversation and discussion and

16   things like that that we have.

17   Q.  Yes, but no documents here today?

18   A.  I don't have any physical documents with me, no.

19   Q.  And so I just want to make sure that we're scoping your

20   testimony directly.  So you talked about the specialty

21   lines of insurance, correct?

22   A.  On a number of occasion earlier, yes, I talked about

23   it.

24   Q.  But we're not talking about Chubb commercial or Chubb

25   personal lines, correct?

1    A.  Could you be more specific?  Your question before was,

2    Did I talk about specialty lines.  And I did on numerous

3    occasion earlier.  And now you're asking me a general

4    question about the other groups.  I'm not understanding

5    your particular question.

6    Q.  You're the chief underwriter for the financial lines,

7    correct?

8    A.  Yes.

9    Q.  And before the merger, financial lines was specialty

10   lines, correct?

11   A.  Yes.

12   Q.  And you were in the specialty lines before the merger,

13   correct?

14   A.  That is correct.

15   Q.  You were not in the commercial lines?

16   A.  That is correct.

17   Q.  And you were not in the personal lines?

18   A.  That is correct.

19   Q.  Okay.  And you testified that Chubb specialty has about

20   100 products, give or take, correct?

21   A.  Yes.  The number changes, but I think yes is what I

22   said before.

23   Q.  Sure.  And so when you're talking about DecisionPoint,

24   you're only talking about two products, right?

25   A.  Yes, two.

1   Q.  So all of those other products go through the normal

2   specialty insurance process, correct?

3   A.  That is correct.

4   Q.  And so if that product is built into CSI Express, those

5   underwriters would use CSI Express for those products,

6   correct?

7   A.  I don't believe that's correct.  Not all of the various

8   products that we used in, whether it's Chubb specialty or

9   financial lines, not all of them are processed in CSI

10  Express.

11  Q.  I understand that.  That wasn't my question.  But for

12  the products that were in the CSI Express application, the

13  standard process would be to use the CSI Express, correct?

14  A.  Yeah, I think if you're saying if a product was built

15  in CSI Express, would we then use that system to process

16  the business?  Yes.

17  Q.  Okay.  Thank you.

18          No further questions.

19          THE COURT:  Ms. Janus?

20          MS. JANUS:  Nothing further.  Thank you.

21          THE COURT:  All right.  Thank you.

22          Mr. Schraer, you may step down.  Thank you.

23          THE WITNESS:  Thank you, sir.  Have a nice day.

24          THE COURT:  Go ahead and call your next witness.

25          MS. JANUS:  We will call Alissa Theberge.

1          **(Witness excused.)**

2              THE COURT:  Come on up here, Ms. Theberge.  If

3      you will raise your right hand.

4          **(Witness sworn.)**

5              THE WITNESS:  I do.

6              THE COURT:  Go ahead and sit down.  State your

7      full name for the record, and make sure to speak into the

8      microphone.

9              THE WITNESS:  Alissa Theberge.

10                  **(ALISSA THEBERGE)**

11                 **DIRECT EXAMINATION**

12     BY MS. JANUS:

13     Q.  Good morning, Ms. Theberge.  Who is your employer, and

14     what is your position?

15     A.  I work for Chubb & Son, and currently I am the

16     underwriting services branch manager in Simsbury,

17     Connecticut.

18     Q.  And get a little bit closer to the mic.

19     A.  Okay.

20     Q.  Thank you.  And actually you can move it, too, if it's

21     easier for you.

22              What is your educational background?

23     A.  I graduated from Providence College in 1998 with a

24     degree in economics.

25     Q.  Prior to the merger between ACE and Chubb, who was your

1    employer?

2    A.  I worked for Chubb.

3    Q.  How long have you been employed by Chubb?

4    A.  I have been at Chubb since 1998.  I started at a

5    company in Connecticut called Executive Risk.  That was,

6    right after I started, acquired by Chubb.  So I have worked

7    for the entire time of my insurance career for Chubb.

8    Q.  And if I'm doing the math right, that's about 24 years?

9    A.  Correct.

10   Q.  During your 24 years at Chubb, can you talk with us

11   generally about what your positions have involved?

12   A.  Yes.  I've always been an underwriter for the specialty

13   lines of coverage.  Throughout my career or throughout the

14   years, I've had roles with increased responsibilities,

15   including larger books of business, larger agent

16   relationships, and then also managing larger teams that

17   reported to me that culminate in 2017 with my current role

18   of managing the underwriting services branch in

19   Connecticut.

20   Q.  Can you tell us a bit more about what your current role

21   involves?

22   A.  Yes.  The underwriting services branch, I manage over

23   100 underwriters in our specialty lines of coverage,

24   focused primarily on the not-for-profit, as well as cyber

25   and E&O or professional liability.

1    Q.  And what -- describe for us what sort of the business

2    of the branch is.

3    A.  Sure.  On the renewal side, my renewal teams, the

4    private not-for-profit group is my largest group of

5    underwriters.  And the way that business comes in to our

6    branch is, it's written by any of our field offices in the

7    United States; and if it's under 35,000 in premium, it is

8    eligible for transfer into my group in Connecticut to be

9    serviced on the next renewal.

10   Q.  Does your branch also process new business?

11   A.  Yes, we do.  I have two different teams that work on

12   new business submissions that agents send us directly or

13   some of our branches can send to us directly to work on as

14   well.

15   Q.  Are you familiar with the Automated Renewal Process

16   application?

17   A.  Yes, I am.  My team is responsible for the renewals

18   that go through the Automated Renewal Process process.

19   Q.  So the branch you manage, that branch is the branch

20   that uses Automated Renewal Processing?

21   A.  Correct.

22   Q.  Okay.  And can we refer to it as ARP?

23   A.  Yes.

24   Q.  Okay.  What does ARP do?

25   A.  ARP at a high level buckets and really qualifies

```
 1    whether a renewal needs a renewal -- a submission for the

 2    next renewal cycle or it doesn't, and it can be renewed

 3    without any additional information.

 4    Q.  Do business people at Chubb or underwriters ever change

 5    the rules in ARP?

 6    A.  No.

 7    Q.  And based on your experience with ARP, are the rules in

 8    ARP changed frequently?

 9    A.  No, not frequently at all.  I can't recall since I took

10    over this position in 2017 of a rule change.

11    Q.  Does the auto renewal process drive more policies to

12    Chubb?

13    A.  No.  The policies are already at Chubb, and then they

14    don't.

15    Q.  So it's just -- the policy has already been sold, and

16    this is just the renewal process?

17    A.  Correct.

18    Q.  Does auto renewal impact the number of policies that

19    are actually renewed?

20    A.  No.

21    Q.  Why do you say that?

22    A.  It just depends if we were going to get a submission or

23    not on that renewal.

24    Q.  Does auto renewal or ARP drive more business to Chubb,

25    in your view?
```

1    A.  No, not in my view.

2    Q.  Why do you say that?

3    A.  It's actually transparent to the agent.  It's after we

4    already have sold the policy, and it's just during the

5    renewal cycle.

6    Q.  So the agent or broker -- it's not something the agent

7    or broker has visibility to when they're selling the

8    policy?

9    A.  Correct.

10   Q.  Are policies that are marked for auto renewal ever

11   taken out of that process?

12   A.  Yes.  My management team does review on a monthly basis

13   those -- the total account list that is qualified for

14   automatic renewal, and we can choose to pull accounts out

15   if we require full -- more underwriting review.

16   Q.  Are policies auto renewed indefinitely, or is there

17   only a certain amount of time for which they would be

18   automatically renewed?

19   A.  No.  There is a, there is a rule in place that it can

20   only automatically renew for three years, and then it will

21   pop out to become a -- require a renewal underwriting

22   submission, and the underwriter would review the whole

23   account again.

24   Q.  You mentioned this a little bit when you were

25   describing your branch, but to be clear, are all Chubb

1    policies eligible to go through the auto renewal process?

2    A.  No.  Only certain products that have the capability or

3    in the private not-for-profit customer group.

4    Q.  Before this lawsuit, were you aware of Blaze software?

5    A.  No.

6    Q.  To your knowledge, had you ever heard of Blaze

7    software?

8    A.  No.

9    Q.  Have you now through your involvement in the lawsuit

10   come to understand that Blaze was used in ARP?

11   A.  Yes, through this lawsuit.

12   Q.  Again, have you learned that Blaze has since been

13   removed from ARP?

14   A.  Yes.

15   Q.  And did you notice any change whatsoever in the

16   functioning of ARP when Blaze was removed?

17   A.  No.

18   Q.  That's the main business -- or that's a good portion of

19   the business that your branch does, right, is working with

20   ARP in some way?

21   A.  Correct.

22   Q.  So if there had been a change in that system with the

23   removal of Blaze, you would know about it, right?

24   A.  Yes.

25   Q.  Let's talk about DecisionPoint.  Are you familiar with

1    that application?

2    A.  I am.

3    Q.  And how are you familiar with it?

4    A.  My team, my new business team, is responsible for the

5    referrals that are generated from the DecisionPoint system.

6    Q.  So is it fair to say that anything that's submitted to

7    Chubb through DecisionPoint and goes to a referral goes to

8    your team?

9    A.  That is correct.

10   Q.  Okay.  In your view, does DecisionPoint reduce the

11   amount of work that underwriters at Chubb need to do?

12   A.  No.  The referrals that come from the DecisionPoint

13   system in many cases creates more work for my team because

14   they don't have -- they need to go back to the agent for a

15   lot of the information to proceed with quoting the business

16   or not.

17   Q.  And why?  Why is that, based on your experience?

18   A.  Based on my experience, we don't always have a full

19   view of the underwriter to see what has been inputted into

20   the system, so we have to ask for basically the renewal

21   submission or financial information, and many times the

22   agent doesn't fully complete all of the inputs anyways, so

23   we would have to ask those questions to make an informed

24   decision whether we would like to put forth a quote or not.

25   Q.  Do you have a view of how DecisionPoint has been

1    accepted or adopted by agents and brokers, generally?

2    A.  Yes.  It's had a pretty low adoption rate.  Some of the

3    challenges for agents is it takes quite a bit of their

4    time.  There are a lot of inputs and key strokes and data

5    points that the agent has to put in the system in order to

6    try to get a quote, and many times they can get frustrated

7    if they input all that information and then it just gets

8    referred.

9         But then the other additional challenge that

10   agents -- that we found, is that agents just don't go to

11   one carrier or insurance carrier for a proposal; they would

12   send an e-mail anyways to multiple carriers to try to get

13   options for the insured.  So they would have to go to the

14   DecisionPoint system, potentially get a quote, and then

15   still have to do the same work to send it out to other

16   carriers.  It's much easier for them just to include Chubb

17   on that e-mail address and not have to input any key

18   strokes in DecisionPoint.

19   Q.  Similar questions about Blaze.  I take it you did not

20   know before the lawsuit that Blaze was used in

21   DecisionPoint?

22   A.  Correct.  No.

23   Q.  Did you as the manager of the branch that handles all

24   of the referrals from DecisionPoint, did you notice any

25   change in functioning of DecisionPoint when Blaze was

1    removed from that application?

2    A.  No.

3    Q.  Are you aware of the CSI Express application?

4    A.  Yes, I am.  I began using CSI Express when I started at

5    Executive Risk in 1998.

6    Q.  So CSI Express was actually at Executive Risk?

7    A.  Yes.

8    Q.  And then how did it come to be at Chubb?

9    A.  Once Chubb acquired Executive Risk, that was, that was

10   part of the acquisition, the technology that was acquired.

11   Q.  And then have you used CSI Express then pretty

12   consistently throughout your time at Chubb?

13   A.  Yes, I have.

14   Q.  What does CSI Express do, just in general terms?

15   A.  It's a, it's a -- CSI Express is a policy

16   administration system.  It takes the account from

17   submission entry all the way through the binding and the

18   issuing process.  An underwriter can go in there for -- to

19   price and document and read their accounts.  They use it on

20   their accounts.

21   Q.  Does CSI Express automate the underwriting process?

22   A.  No.

23   Q.  Why do you say that?

24   A.  The underwriter is responsible for all the

25   discretionary and the investigation and reviewing the

1    documents and coming up with pricing.  There is a lot of

2    discretionary decisions that go into the process.  And then

3    we just use CSI Express to put the quote out.

4    Q.  Prior to this lawsuit, did you know that Blaze had been

5    incorporated in some ways into CSI Express?

6    A.  No.

7    Q.  In particular through ARP or --

8    A.  No.

9    Q.  Have you now come to learn that Blaze was removed from

10   CSI Express as it was from the other applications we've

11   discussed?

12   A.  Yes, through this trial.

13   Q.  And have you noticed any difference in the

14   functionality of CSI Express since Blaze was removed?

15   A.  No, I have not.

16   Q.  Any decrease in performance at all?

17   A.  No.

18   Q.  Are you familiar with the Profitability Indicator

19   application?

20   A.  Yes, I am.

21   Q.  And have you come to learn that Blaze was removed from

22   that application?

23   A.  Through this trial, yes.

24   Q.  Did you notice any changes in the performance of that

25   application when Blaze was removed?

```
 1    A.  No.

 2    Q.  Same question for the CUW-IM application.  Are you

 3    familiar with that?

 4    A.  I'm familiar CUW.

 5    Q.  And did you come to understand that Blaze was removed

 6    from that application?

 7    A.  Through this process, yes.

 8    Q.  Have you noticed any changes in the performance of the

 9    application?

10    A.  No.

11    Q.  Is it fair to say that the removal of Blaze from these

12    systems has not impacted your business in any way?

13             MR. DUBIS:  Objection.  Foundation.

14             THE COURT:  Overruled.

15             THE WITNESS:  I have not noticed it, no.

16    BY MS. JANUS:

17    Q.  From your 24 years in underwriting at Chubb, have you

18    come to have an understanding of what drives Chubb's

19    revenues and profits?

20    A.  Yes.  Through the various roles I've had with

21    progressed responsibility, I feel very comfortable with how

22    Chubb derives revenue and profit.

23    Q.  I just put a slide up on the screen.  Have you seen

24    this before?

25    A.  Yes, I have.
```

1    Q.  What is this?

2    A.  This is a graphical representation of all of the really

3    pillars or keys to how Chubb generates revenue and profit.

4    Q.  And based on your experience at Chubb, what of these

5    factors here would resonate with you?

6    A.  As an underwriter, definitely the boxes that resonate

7    and stick out to me is reputation is number one.  That's a

8    key to our success, and it's really our longevity in the

9    industry.  We have an excellent reputation.  We've been

10   around since 1882.  We have a stellar financial strength

11   that allows us to pay our claims and our claims paying

12   ability and wanting to pay our claims is a specific

13   strength and reason for revenue and profit.

14   Q.  Do you think that faster underwriting is a driver of

15   revenue and profit?

16   A.  No.  If you go too fast when you're underwriting, you

17   can miss things and put together, you know, a poor proposal

18   that could lead to losses on accounts or not a profitable

19   account.  It's also important to have a very quality

20   proposal that is tailored towards the different needs of

21   each of the businesses that we look at and specifically

22   endorsed in a way to cover those exposures.

23   Q.  In your experience, are faster quotes a revenue or

24   profit driver?

25   A.  No.  Agents wait for many proposals for what they've

1     sent out to insurance carriers to provide options to our,

2     to potential insureds.  So just quoting an account fast

3     does not mean that's going to turn into a binder.  And many

4     of our -- it has to be a bit -- the proposal has to be

5     comprehensive and a quality proposal, as well as our

6     specialty lines of coverage are discretionary purchases.

7     So the insureds don't have to buy our coverages at all.  So

8     a fast quote doesn't mean that they will ever even buy the

9     account ever.

10    Q.  You mentioned the judgment that goes into underwriting

11    in specialty lines.  Is that subjectivity and human

12    judgment important in your view in the underwriting process

13    for specialty lines?

14    A.  Absolutely.  Underwriting is complex for specialty

15    lines of coverage.  And it is important to, you know, make

16    good and quality decisions on the information that you

17    have, and there is discretion of the underwriter through

18    their tenure in the business and their, their exposures to

19    a lot of different accounts that they draw upon in order to

20    put forth a quality proposal for that piece of business

21    that they're looking at.

22              MS. JANUS:  Thank you, Ms. Theberge.  Those are

23    all the questions I have for you.

24              THE WITNESS:  Thank you.

25              THE COURT:  Thank you, Ms. Janus.

```
 1            Members of the Jury, we will take our morning
 2    recess.  Plan to be back in the courtroom at 11 o'clock.
 3            THE CLERK:  All rise for the jury.
 4                     (Jury exits.)
 5
 6           (In open court without the Jury present.)
 7            THE COURT:  Ms. Theberge, you can step down, if
 8    you want.
 9            THE WITNESS:  Thank you.
10            THE COURT:  Anything to chat about?
11            MS. JANUS:  I don't think so.
12            THE COURT:  Okay.  See you at eleven.
13                     (Recess taken.)
14
15           (In open court without the Jury present.)
16            THE COURT:  Be seated.
17            THE CLERK:  All rise for the jury.
18                     (Jury enters.)
19
20           (In open court with the Jury present.)
21            THE COURT:  Be seated.  The floor is yours,
22    Mr. Dubis.
23            MR. DUBIS:  Thank you, Your Honor.
24
25
```

1                        **CROSS EXAMINATION**

2    BY MR. DUBIS:

3    Q.  Good morning, Ms. Theberge.  It's nice to meet you in

4    person.

5              As you recall, my name is Joe Dubis, and I'm an

6    attorney representing FICO.  And we met at your remote

7    deposition on April 29, 2020, during the heart of lockdown;

8    is that right?

9    A.  Yes.  Correct.  Nice to see you.

10   Q.  Nice to meet you.

11             And I have given you a binder in front of you

12   there, and it has a transcript of that deposition and some

13   exhibits we may walk through.

14             So I just wanted to start out, you testified that

15   you have been in the specialty lines of business for your

16   career, correct?

17   A.  Correct.

18   Q.  And so you have no positions in the commercial lines?

19   A.  Correct.

20   Q.  And no positions in the personal lines, correct?

21   A.  Correct.

22   Q.  And you testified that you don't know about the

23   technologies of the applications that were discussed,

24   correct?

25   A.  That is correct.

1    Q.  Okay.  So then I want to turn to your discussion about

2    renewals.  So you testified that renewals are already at

3    Chubb, correct?

4    A.  Correct.

5    Q.  But you would agree that if Chubb did not renew any of

6    those policies, that would be bad for business, correct?

7    A.  Yes, we look to retain as many renewals as we can.

8    Q.  And if Chubb could not auto renew those policies, then

9    humans would have to touch every single renewal, correct?

10   A.  Correct.

11   Q.  And you would agree that Chubb has more renewals than

12   new applications on a given year, correct?

13   A.  I actually don't know.

14   Q.  You don't?  Okay.  That's fine.

15           And so you testified that auto renewals does not

16   drive Chubb's business, correct?

17   A.  Correct.

18   Q.  And did you provide any documents that say that?

19   A.  Not to my knowledge.

20   Q.  Okay.  And any analysis that says that auto renewals

21   does not drive Chubb's business?

22   A.  Not to my knowledge, no.

23   Q.  And you testified regarding your use of CSI Express

24   dating back to about 1998, correct?

25   A.  Yes.

1    Q.  And do you have any knowledge that Chubb & Son licensed

2    Blaze Advisor in 2006 to automate renewals within CSI

3    Express?

4    A.  I do not know that.

5    Q.  So I want to turn a little bit to talk about brokers

6    and agent relationships.  Would you agree that insurance is

7    a relationship-driven business?

8    A.  Yes, it is.

9    Q.  And so forming relationships with agents and brokers is

10   important to ensure that those agents and brokers are

11   selling Chubb Insurance, correct?

12   A.  Yes, and understand the need for our products, yes.

13   Q.  Mr. Mayleben, could we put up the pillars

14   demonstrative?

15         Ms. Theberge, if you open to the first page in

16   your binder, I believe that should be your graphic.  Okay.

17   And you have it there in front of you, correct?

18   A.  Yes.

19   Q.  Okay.  Now, you spoke about the importance of

20   reputation, correct?

21   A.  Yes, I did.

22   Q.  And -- but did you provide any documents today that say

23   what percent of Chubb's revenue and profits are driven by

24   reputation?

25   A.  No, I don't have anything for that.

1    Q.  Okay.  And you work in the underwriting department,

2    correct?

3    A.  Yes.

4    Q.  And so I see underwriting as the bottom aspect of

5    sales, correct?

6    A.  Yes.

7    Q.  And you contributed to the creation of this document,

8    correct?

9    A.  I reviewed it, yes.

10   Q.  You reviewed it.  Okay.  I don't see technology on this

11   pillars document anywhere.  Do you?

12   A.  No, I don't.

13   Q.  Okay.  Now, in your manager -- sorry.  In your

14   underwriting services branch manager position, you are

15   responsible for work flow, correct?

16   A.  Yes.

17   Q.  Okay.  And as part of that work flow, certain renewal

18   policies were sent to the underwriting services branch for

19   processing, correct?

20   A.  Yes.  If they meet certain criteria, they transfer.

21   Q.  And when you say, "Certain criteria," primarily it's

22   the premium threshold, correct?

23   A.  Correct.

24   Q.  And so you're transferring these lower premium

25   policies.  And that is done to free up the field

1   underwriter's time to get more business, correct?

2   A.  Correct.

3   Q.  And if those lower premium policies were not

4   transferred, the field underwriters would have to work on

5   those policies themselves, correct?

6   A.  Yes.

7   Q.  And so, again, we've already talked about CSI Express,

8   and I just want to clarify it.  So when you were an

9   underwriter, different than being the manager of --

10  A.  Mm-hmm (Yes).

11  Q.  -- when you were an underwriter, you used CSI Express

12  if the specific product was housed within CSI Express,

13  correct?

14  A.  That is correct.

15  Q.  And so then let's turn to the automated renewal process

16  application.  Would you agree with me that when we're

17  talking about renewals, there are high-touch renewals and

18  low-touch renewals, correct?

19  A.  Yes.

20  Q.  And would you agree with me that there are no touch

21  renewals?

22  A.  Yes.

23  Q.  Okay.  And so when we're talking about the Automated

24  Renewal Process, we're really focusing on those no-touch

25  renewals, correct?

1    A.  Correct.

2    Q.  So we're not talking about high-touch renewals,

3    correct?

4    A.  Correct.

5    Q.  Okay.  And so if the policies are of that type, a

6    no-touch, they're renewed without having to be manually

7    reviewed, correct?

8    A.  We do manually review them after -- once they're --

9    after they're scored on a monthly basis.

10   Q.  But there are policies renewed without ever being

11   manually reviewed in any context, correct?

12   A.  Yes.  Correct.

13   Q.  Okay.  And when that happens, the Automated Renewal

14   Process books, binds and issues the policy, correct?

15   A.  Yes.

16   Q.  And you testified about your knowledge of Profitability

17   Indicator, correct?

18   A.  Correct.

19   Q.  And so would you agree Profitability Indicator is a

20   tool that underwriters use for pricing guidance?

21   A.  Yes, one of the various tools we use.

22   Q.  And then let's turn to DecisionPoint.  Now, you

23   testified that DecisionPoint created more work for the

24   agents and brokers, but did you have any documents to show

25   that?

1    A.  I do not.

2    Q.  Okay.  So we didn't talk about any documents that show

3    that agents and brokers were unsatisfied with

4    DecisionPoint, correct?

5    A.  No documents, no.

6    Q.  And my question is, If DecisionPoint was so troublesome

7    for Chubb and disliked by agents and brokers, why was it

8    not phased out in the ten years that it was available?

9    A.  There was still some use in it.  Some agents did use

10   it, for sure.  That's why it was not discontinued.

11   Q.  Okay.  So some agents used it, but -- okay.

12           And you said your team was responsible for much

13   of the DecisionPoint business, if there was a referral,

14   correct?

15   A.  Correct.

16   Q.  But if the quote was automatically generated, that

17   wouldn't come to your, your team, correct?

18   A.  Unless the agent had questions or wanted additional

19   options on that quote, then they would -- those requests

20   would come to my team to handle.

21   Q.  Okay.  And you would agree that the goal of an

22   underwriter is to make smart decisions, correct?

23   A.  Correct.

24   Q.  And that an underwriter's performance is important to

25   the profitability of the insurance company?

1    A.  Yes.

2    Q.  And you would agree with me that there is competition

3    to sell insurance, correct?

4    A.  Yes.

5    Q.  Okay.  And you testified that speed was not important,

6    correct?

7    A.  Correct.

8    Q.  Okay.  Now, if an underwriter moves too slowly, it's

9    possible to lose a business opportunity, correct?

10   A.  Yes, we could.

11   Q.  And you personally have lost a business opportunity

12   because your underwriting was not done fast enough,

13   correct?

14   A.  Correct, because I asked for additional information.

15            MR. DUBIS:  Okay.  I have no further questions.

16   Thank you.

17            THE COURT:  Thank you, Mr. Dubis.

18            Ms. Janus?

19            MS. JANUS:  Nothing further, Your Honor.

20            THE COURT:  All right.  Very well.  Thank you,

21   Ms. Theberge.  You may step down.

22                    **(Witness excused.)**

23            THE COURT:  Ms. Godesky?

24            MS. GODESKY:  Your Honor, defendants' next

25   witness is by video, and it's Oliver Clark, who is a former

1    FICO employee.

2              Mr. Clark was employed by FICO from 2011 to 2022.

3    Mr. Clark was deposed on September 11th, 2018, when he held

4    the position of director in the pre-sales consulting

5    division at FICO, working on the decision management suite

6    line of business at FICO.  And when Mr. Clark worked for

7    FICO, he lived in London, England.

8                          **(OLIVER CLARK)**

9                       **DIRECT EXAMINATION**

10   BY MS. JANUS:

11   Q.  What is your position at FICO?

12   A.  I am a director in the pre-sales consulting division,

13   working within a line of business responsible for one of

14   the three lines of business that FICO provides.

15   Q.  Director in the pre-sales consulting division?  Is that

16   correct?

17   A.  Yes --

18   Q.  Okay.

19   A.  -- of one of the lines of business.

20   Q.  One of the lines of business, and which line of

21   business?

22   A.  This is the decision management suite line of business.

23   Q.  What -- how long have you been a director in the

24   pre-sales consulting division?

25   A.  I cannot recall when I was promoted to that role, to

1    that title.  Sorry.  The role I've had for longer, so I

2    cannot recall the exact date of the promotion.

3    Q.  How long have you been in this role?

4    A.  Since 2014 I've been managing a team of consultants.

5    Q.  2014 to the present?

6    A.  Yes.

7    Q.  Okay.  And how long have you been at FICO?

8    A.  Since 2011.

9    Q.  What positions did you hold prior to your current

10   position?

11   A.  I joined as a senior consultant and became manager in

12   2014 and then promoted to director in -- I believe it was

13   2015.

14   Q.  So the next time that you encountered Chubb during your

15   time at FICO was in 2013, correct?

16   A.  That is, I believe, the next time, yes.

17   Q.  Okay.  And you said that you recall, there was an

18   inbound inquiry from Chubb in Europe; is that correct?

19   A.  So I said that there was an inquiry that came into --

20   somehow, I don't recall, came into the client partner.

21   Q.  Okay.  And who is that?

22   A.  That was Richard Hill.

23   Q.  Did you find out as you were working with Chubb what,

24   whether Chubb had a license for Blaze Advisor?

25   A.  The customer said -- our contact at Chubb said early on

1    in an e-mail that they had a global license for Blaze

2    Advisor and that they were in contact with with the team in

3    the U. S. to manage that.

4    Q.  So your contact at Chubb said that?

5    A.  Yes.

6    Q.  And this was in 2013?

7    A.  I believe so, yes.

8    Q.  Did you discuss the status of Chubb's license for Blaze

9    Advisor with your colleagues at FICO?

10   A.  I had a communication from a colleague internally that

11   echoed what the customer had said.

12   Q.  Go ahead.

13   A.  So the question -- could you repeat the question,

14   please?

15   Q.  Would it be your practice to verify the status and the

16   scope of a client's license for FICO software internally

17   through FICO?

18   A.  It would not be my responsibility to validate that.

19   Q.  But would it be your practice to make sure, as you're

20   working with a client, that either the use you're assisting

21   with is already licensed or that a new license would be

22   contemplated?

23   A.  So my practice would be to -- I had the same

24   information from the client and from an internal source.  I

25   had no reason to doubt that information.

1    Q.  Okay.  And here that information was that there was a

2    global license for Blaze?

3    A.  Yes.

4    Q.  Who at Chubb were you working with?

5    A.  This is Ewen Setti.

6    Q.  Okay.

7    A.  Initially.

8    Q.  What did that -- what did your work with Chubb entail

9    in the 2013 time period?

10   A.  My work with Chubb in that time period was to handle

11   the inquiry.  As I said earlier, it was -- the intention

12   was to understand what the customer is trying to achieve.

13   So I gave a presentation to Ewen on the current

14   capabilities of the software, because customers often don't

15   themselves keep up with what's available in the latest

16   version.  So I saw that as a -- something I was willing to

17   do just to make sure the client was aware of the current

18   capabilities of the system.

19   Q.  Was it your understanding at that time that Chubb in

20   Europe was already using Blaze in certain ways?

21   A.  That was my perception.

22   Q.  And was that based on conversations with Mr. Setti?

23   A.  Yes.

24   Q.  Did you also, did you also learn that Chubb was using

25   Blaze in Europe from your colleagues at FICO?

1    A.  I do not receive that information.

2    Q.  It was your understanding, I take it, that the use

3    Mr. Setti was asking you about for Chubb in Europe's

4    application was within the scope of Chubb's license for

5    Blaze Advisor; is that correct?

6    A.  I was not acting to interpret the license, but I was,

7    based on the information Ewen was giving me, working on the

8    assumption that this usage was legitimate.

9    Q.  What information was that?

10   A.  So the -- Ewen mentioned that they were planning to use

11   the software for a new project or were in the course of

12   doing so, and there was an implication that they were

13   already using it for other areas.

14   Q.  And so based on the information that he was going to

15   use the software on a new project, you assumed that it was

16   allowed under the license?

17   A.  The contact said quite clearly it was a global license

18   and that he was in contact with his colleagues in the U. S.

19   who maintained that.

20   Q.  You said, "The contact said"?  You mean Ewen said?

21   A.  Ewen wrote --

22   Q.  "Ewen wrote," okay.

23   A.  -- that.

24   Q.  Okay.  But based on the information you received from

25   your colleagues at FICO, did you understand that Chubb's

1    contemplated use of Blaze Advisor was within the scope of

2    the license?

3    A.  That is correct.  Yes.

4    Q.  Okay.  So it wasn't an assumption that you had simply

5    based upon comments made by Ewen Setti, correct?

6    A.  Correct.

7    Q.  What happened next in terms of your dealings with

8    Chubb?

9    A.  I believe from memory that there was a series of

10   e-mails where -- again, ad hoc -- Ewen would ask a

11   question, I would write back with a response.

12   Q.  Okay.  And was there another period after that when you

13   were dealing with Chubb in Europe more regularly?

14   A.  Yes.  I invited Ewen to a launch event of a new product

15   that we had in London -- I believe that was 2014 -- and

16   Ewen invited a colleague of his, Hamish Duncan.

17   Q.  What product was that?

18   A.  This was the FICO decision management platform.

19   Q.  Who else at FICO in Europe had contact, direct contact,

20   with Chubb in Europe?

21   A.  The account executives, Andy Moffat and Ross Smith.

22   Q.  R-O-S-S?

23   A.  Yes.

24   Q.  Anyone else?

25   A.  Also I'm aware of a colleague, Larry Jacobson, who

1    attended one of the meetings I had with Chubb.

2    Q.  Okay.  Did you understand that, while you were working

3    with Chubb on an ad hoc basis, Chubb was, in fact, working

4    with Blaze in Europe?

5    A.  Yes.  As previously mentioned, that was my

6    understanding.

7    Q.  And you had dealt with Mr. Sawyer on previously

8    occasions, correct?

9    A.  I had e-mailed him and spoken once, but I did not know

10   him.

11   Q.  But you were involved in, you were involved in

12   discussions about Chubb's use of Blaze Advisor in Europe

13   with FICO employees in the United States?

14   A.  Yes.  Yes.

15   Q.  Who were you involved in those conversations with?

16   A.  So at the time a gentleman called Russ Schreiber was

17   the global practice lead for insurance at FICO.

18   Q.  What were your dealings with Mr. Schreiber?

19   A.  Again, similar to Mr. Sawyer.  Ad hoc inquiries and

20   communications over e-mail.  Nothing verbal.

21   Q.  Okay.  And those communications would have related to

22   Chubb's use of the Blaze Advisor software in Europe?

23   A.  The e-mail communications related to discussions that

24   were being had with Chubb in Europe.

25   Q.  And Chubb's use of Blaze Advisor in Europe?

1    A.  They were related to Chubb's use of Blaze Advisor in

2    Europe.

3    Q.  Okay.  Showing you what has been marked as Exhibit 47,

4    this is a series of e-mails that begin on the second page

5    of the document.  The first one is dated August 14th, 2012,

6    which is one day after the e-mail that we just reviewed in

7    Exhibit 46, correct?

8              We're waiting for you to review the document.

9    Have you done so?

10   A.  I've read the document, yes.

11   Q.  And that e-mail is from Richard Hill to Russ Schreiber,

12   dated August 14th, 2012, correct?

13   A.  Correct.

14   Q.  That is one day after the e-mail that we reviewed dated

15   August 13th, 2012, in which Chubb reached out to FICO about

16   using Blaze in Europe, correct?

17   A.  Yes, it's the day after.

18   Q.  Okay.  Looking at Exhibit 47, the first e-mail in the

19   chain is from Mr. Hill to Mr. Schreiber.  Mr. Hill writes,

20   "Chubb UK have started being interested in Blaze (again),

21   and I'll try and speak with the new contact who apparent

22   wants to do a POC for underwriting," correct?

23              Please answer my question.

24   A.  That is what the document says.

25   Q.  Okay.  And POC is proof of concept?

1    A.  I would assume so in this case, yes.  Yes.

2    Q.  Okay.  Mr. Hill goes on to say, "Let me know if

3    anything has changes" -- I assume he means changed -- "good

4    or bad, and more importantly whether we can actually sell

5    anything new here as I seem to remember their U. S. Blaze

6    license allowed them to use the software for free."

7            Do you see that?

8    A.  That is what the document says.

9    Q.  So Mr. Hill here is asking Mr. Schreiber whether there

10   is anything FICO in Europe can actually sell to FICO -- to

11   Chubb in Europe, correct?

12   A.  He appears to be asking what can be sold in terms of

13   new licenses.

14   Q.  Okay.  And it looks like his recollection was that the

15   U. S. Blaze license allowed Chubb Europe the software for

16   free, correct?

17   A.  I cannot comment beyond anything that's written here by

18   Richard Hill.

19   Q.  Showing you what has been marked as Exhibit 48, I'm

20   going to ask you some questions about this chain of

21   e-mails.  Take a moment to review, and please let me know

22   you've finished reviewing it.

23   A.  Okay.  Okay.  I've reviewed the document.

24   Q.  At the bottom of the first page of Exhibit 48, there is

25   an e-mail from Ewen Setti to Richard Hill, dated August 28,

1    2013, correct?

2    A.  Correct.

3    Q.  And he states that he got Mr. Hill's e-mail address

4    from Matthew Male and Mark Wilson "in our personal lines IT

5    team."  Do you see that?

6    A.  That is what the document says.

7    Q.  And to refresh your recollection, when we were looking

8    at Exhibit 46, which is the first e-mail you looked at, it

9    was Mark Wilson at Chubb who was corresponding with FICO

10   about the personal lines, correct?  I direct you to --

11   A.  Yes, it was Mark Wilson --

12   Q.  Okay.

13   A.  -- who was communicating Exhibit 46.

14   Q.  Okay.  So we carry that through, then.  It looks like

15   Mark Wilson gave Mr. Setti Mr. Hill's contact information,

16   according to this e-mail, correct?

17   A.  That appears to be the case.

18   Q.  Mr. Setti identifies that he works for the commercial

19   license IT team at Chubb in London and that they're

20   embarking on their first rules project, "which involves

21   migrating some low-touch/no-touch renewal rules from their

22   current Oracle-stored procedure implementation over to

23   Blaze Advisor.  Do you see that?

24   A.  That's what it says, yes.

25   Q.  So Mr. Setti is writing an e-mail to FICO explaining

1   that Chubb in Europe is expanding its use of the Blaze

2   software, correct?

3   A.  So it says here that his team, or he, we, are embarking

4   on their first rules project.

5   Q.  Okay.  So they're contemplating using Blaze in a way

6   that they hadn't used Blaze before, correct?

7   A.  I would say it's open to interpretation as to what

8   "embarking on their first project" means.  It doesn't

9   necessarily exclude any other existing usage.

10  Q.  He's writing an e-mail -- Chubb Europe is writing an

11  e-mail to FICO, talking about wanting to use Blaze in Chubb

12  Europe in a way that they're not currently using it or

13  expanding it to another use.  Is that fair?

14  A.  Yes.  Ewen Setti appears to be communicating that he's

15  embarking on a new project.

16  Q.  Then Mr. Hill forwards the e-mail to you on October 28,

17  2013, correct?

18  A.  On August, 28th of August.

19  Q.  Thank you.

20  A.  2013.

21  Q.  Thank you.  And he says, "Hi, Olly.  Do you fancy

22  playing with these guys, too?"

23          I take it he's sort of saying, Do you want to

24  work with Chubb Europe?  "To set expectations, they already

25  have a Blaze global ELA (thanks Russ Schreiber) so the best

1    we will get is some PS, although they do have their own IT

2    team, I doubt they know what they are doing."

3            Do you see that?

4    A.   That is what's written in the document.

5    Q.   So what do you take that to mean, "To set

6    expectations"?  How did you interpret that?

7    A.   I think his sentence explains itself in that he

8    explains that the upside is likely to be limited to

9    professional services.

10   Q.   The upside in terms of revenue generation?

11   A.   Near term revenue.  Revenue.

12   Q.   Do you think that the -- did you interpret the point of

13   his statement to be, Unfortunately, they already have a

14   Blaze global ELA and that's due to Russ Schreiber?

15   A.   Yes.  Russ's role was as global insurance practice

16   lead, so Richard was setting expectations, as he says here,

17   around what this could possibly lead to.

18   Q.   And then he says, "PS -- oh, I'm sorry.  Some PS.  Is

19   that professional services?

20   A.   Yes, that's professional services.

21   Q.   And just describe in general terms what "professional

22   services" means in that context?

23   A.   Professional services can be, used to deploy our

24   software, but also to do things like conduct current state

25   assessments and perform business analysis as a precursor to

1    any project.

2    Q.  Does this refresh your recollection that your -- the

3    first time you received information about the scope of the

4    Blaze license that Chubb had was actually from Mr. Hill at

5    FICO?

6    A.  Yes.  That would -- sorry.  You asked the scope of the

7    license.  Yes.  So it appears to be the case.  He's

8    indicating a global ELA is in place.

9    Q.  And you had not had any contact directly with Chubb in

10   Europe prior to Mr. Hill's August 28th, 2013, e-mail; is

11   that correct?

12   A.  Not that I recall.

13   Q.  Did you in fact begin engaging with Chubb in Europe

14   after receiving this e-mail from Mr. Hill, to the best of

15   your recollection?

16   A.  That is my recollection, yes.  That's when I started to

17   meet with the clients face-to-face in the office.

18   Q.  Showing you what's been marked as Exhibit 49.

19   A.  Mm-hmm (Yes).

20   Q.  This is a calendar entry for a meeting.

21   A.  Yes.

22   Q.  And the subject of the meeting is, "Discussion on the

23   use of Blaze Advisor," correct?

24   A.  That is correct.

25   Q.  It appears to be a meeting on September 10th, 2013,

1     between you and Mr. Setti, correct?

2     A.  Yes.

3     Q.  I'm showing you what's been marked as Exhibit 50.

4     Please let me know when you've had a chance to review this

5     document.

6              Have you reviewed it?  Oh.

7     A.  Yes, I've read the document.

8     Q.  All right.  The first e-mail in the chain, which is on

9     the second to the last page of Exhibit 50, is an e-mail

10    from you to Mr. Setti, dated October 9th, 2013 -- or I'm

11    sorry -- September 10th, 2013, correct?

12    A.  That is correct.  Yes.

13    Q.  Okay.

14    A.  10th of September.

15    Q.  And that was the date of the meeting you had with

16    Mr. Setti, correct?

17    A.  Yes.  Yes.  The dates are in different formats, but

18    yes.

19    Q.  Okay.  And you write an e-mail to Mr. Setti, and you

20    refer to a deck on decision requirements analysis.

21    A.  Yes.

22    Q.  And I guess another slide deck as well, correct?

23    A.  Yes.

24    Q.  Did he discuss with you during the September 10th,

25    2013, meeting how Chubb Europe was using Blaze Advisor at

1    that time?

2    A.  He may have.  I don't recall any details around the

3    extent.

4    Q.  Do you, as you sit here today, do you recall having

5    knowledge generally about how Chubb Europe was using Blaze

6    Advisor?

7    A.  Not in any level of detail, no.

8    Q.  Do you recall what applications Chubb Europe used Blaze

9    Advisor in?

10   A.  I believe in a -- I believe Ewen did advise me that

11   they had an instance in accident and casualty, but that is

12   just my recollection.

13   Q.  Do you recall the name of the application it was used

14   in?  No?

15   A.  (Moves head in negative manner.)

16          No, just a generic, the generic term that I just

17   used.

18   Q.  Okay.  Then on the next page of the exhibit, which is

19   FICO 2024, in the middle of the page you forward the e-mail

20   from Mr. Setti to Mr. Hill, correct?

21   A.  Yes.

22   Q.  And you copy Dermot McCarthy.  Who's that?

23   A.  He was Richard's manager.  The sales director.

24   Q.  Is he at FICO still?

25   A.  He is.

1    Q.  What's his position?

2    A.  He is a client partner managing our processors --

3    relationships with processors.

4    Q.  Okay.  Then in your e-mail to Mr. Hill you say, "It

5    seems like they have plenty of candidate projects for Blaze

6    Advisor in the UK/Europe and they have been coached well by

7    their colleagues in North America."

8            What are you referring to there?

9    A.  So this was a comment on what must have been Ewen

10   mentioning that he perhaps sees potential for using the

11   technology elsewhere.  And when I say, "Have been coached

12   well by their colleagues in North America," I believe that

13   was from a perception that he was well-connected to the

14   U. S. team and seemed comfortable running the projects

15   themselves, as I note in the second paragraph.

16   Q.  And then you say, "As a result, they seem fairly

17   self-sufficient, and Ewen doesn't think that training is

18   needed currently, but" -- bolded and underlined -- "he sees

19   the value of Decision Simulator, which is not currently a

20   part of that ELA."

21           Do you see that?

22   A.  I do see that, yes.

23   Q.  So you're pointing out that there is an opportunity for

24   FICO Europe to license another software to Chubb Europe,

25   correct?

1    A.  Yes, I'm noting to Richard that there is a potential

2    opportunity for Decision Simulator, which is an add-on to

3    Blaze Advisor.

4    Q.  So because there was not an opportunity for licensing

5    Blaze Advisor, it's significant to you that you see an

6    opportunity to license an add-on to Blaze Advisor.  Is that

7    fair?

8    A.  Yes, it's part of Blaze Advisor, and I wanted to make

9    Richard aware that there was a potential opportunity.

10   Q.  Okay.  And you note that the Decision Simulator was not

11   a part of their current enterprise license, correct?

12   A.  That's what's written here, yes.

13   Q.  That's what you wrote?

14   A.  Yes.

15   Q.  You say, "It seems they have had a quote for $500,000

16   for a global DS" -- is that Decision Simulator?

17   A.  Yes.

18   Q.  -- "license, which is perceived to be a little steep."

19            So Mr. Setti had or Chubb had received a quote

20   for a global Decision Simulator license?

21   A.  It appears that that was the case.  I don't

22   specifically recall the discussion, but, yes, that would be

23   the implication of this.

24   Q.  And then you say, "If there were enough projects in

25   Europe, could we propose a license for the use of Decision

1    Simulator within the UK and Europe only," correct?

2    A.  That's what I wrote, yes.

3    Q.  And what was the purpose of that suggestion?

4    A.  The purpose was to give Richard some idea of what he

5    could potentially work towards as a client partner.

6    Q.  Okay.  And the next e-mail up Mr. Hill responds to you

7    relating to your question about a European-only ELA for

8    Decision Simulator.  And he says, "The cost for a

9    European-only ELA for DS would depend on two factors:  How

10   big are the two regions relative to one another, and when

11   do they think they could contract for it."

12            Let's take the first one.  "How big are the two

13   regions relative to one another."  What's your

14   understanding of what that means?

15   A.  ███████████████████████████████████████████████████

16   ██████████  so therefore any discussions around further

17   licensing must take the relative sizes of whatever it is

18   that's being defined into consideration.

19   Q.  So when you say, ████████████████████████████  you mean

20   that the entity that the license is being granted to, the

21   ███████████████████████████████████████████████████████████

22   ███████████████████████████████████████████

23   ███████████████████████████████████████████████████████████

24   ███████████████████████████████████████████

25   ███████████████████████████████████████████████████████████

1  ██████████████████████████████

2  A.  I do not have a specific definition for that.

3  Q.  Is it your understanding that it ████████████████

4  ████████████████████████████████████████████████████?

5  A.  Again, I do not have specific definition of what is

6  meant by ███████████████

7  Q.  And then he mentions, "When do they think they could

8  contract for it?"

9        In the next sentence he also says, "If they can

10 contract this month, we can make that 225K or less."

11       Do you see that?

12 A.  That's what's written in the document, yes.

13 Q.  What did you understand him to be referring to there?

14 A.  So the sales team, as in the sales CBs and account

15 executives have some discretion over discount, and it's,

16 you know, to achieve an order within a certain time period

17 that discount could be applied to make it more attractive

18 to do so.

19       That's my understanding of his statements.

20 Q.  I'm handing you what's been marked as Deposition

21 Exhibit Number 51.  Please let me know when you've had a

22 clans to review the document.

23 A.  Okay.  I've read it.

24 Q.  Okay.  If you take a look at the third page of the

25 document, so that's 4809-3.  Do you see that?

1    A.   Yes.

2    Q.   And towards the top of the page, there is an e-mail

3    from you to Ewen Setti, dated October 24th, 2013.  Do you

4    see that e-mail?

5    A.   Yes, I do.

6    Q.   And you say, "Hello, Ewen.  It's been a while since we

7    last spoke.  How is the work on the auto renewals project

8    going?"

9              Do you see that?

10   A.   I do.

11   Q.   What was the purpose for you writing that e-mail to

12   Mr. Setti?

13   A.   Yeah.  So I mentioned earlier that it's in our

14   interests to have happy customers who are potentially

15   referenceable.  One of the things I wanted to do with Chubb

16   was to have them perhaps reach that state of

17   referenceability.  So this was part of my objective of just

18   making sure I was available to them for any --

19              Yeah.  Just in terms of building up a

20   relationship with the customer.

21   Q.   Okay.  And the auto renewals project that you referred

22   to, was that a project that involved Chubb Europe using

23   Blaze Advisor?

24   A.   I believe this is the same project that Ewen had

25   originally reached out about.

1  Q.  But you understood that it involved Chubb Europe's use

2  of Blaze Advisor?

3  A.  Yes.  I understood that it related to Ewen's team's use

4  of Blaze Advisor, but I wasn't -- I hadn't crystallized in

5  my mind which legal entity of the customer this would be,

6  this was.

7  Q.  Were you familiar with the legal entities, with Chubb's

8  legal entities?

9  A.  No.

10  Q.  Well, presumably you do not want to assist with an

11  entity's use of FICO's software if that use is unlicensed,

12  correct?

13  A.  I would not.

14  Q.  Okay.  And so did you view it as your responsibility to

15  only assist with the licensed use of FICO's software?

16  A.  Yes, it was -- it is not in my interests to -- for that

17  not to be the case.

18  Q.  And in then ensuring that the use you are assisting

19  with is in fact licensed, I take it it would be information

20  from your colleagues at FICO about the scope of the license

21  that you would view to be authoritative on that issue?

22  A.  So I had received this information from multiple

23  places.  I did not weight the pieces of information to say

24  that one is more important than another.

25  Q.  Is it your practice to take direction from your clients

1    about what they believe the scope of a given FICO software

2    license is?

3    A.  I would like to see the situation confirmed from

4    multiple sources.

5    Q.  Confirmed from FICO, from your FICO colleagues?

6    A.  No.  No.  Confirmed from -- by the client in this case

7    and also from internally within FICO as well.

8    Q.  Okay.  In fact, with respect to the Chubb relationship

9    you looked to, and FICO Europe, looked to FICO in the

10   United States for guidance about the scope of the Chubb

11   license.  Is that fair?

12   A.  So that was what we observed, I think, in the previous

13   exhibit where Richard Hill reached out to colleagues in the

14   U. S., and my assumption is that he took that action

15   because that's where the contracts were put together.

16   Q.  Take a look at the exchange then in Exhibit 51 after

17   the e-mail that we looked at on October 24th, 2013, in

18   which you asked how the auto renewals project was going.

19          Mr. Setti on October 24th then writes you an

20   e-mail that is lengthy and appears to be asking technical

21   questions about his project.  Is that a fair

22   characterization?

23   A.  I would categorize this as a how-to, so how to use the

24   software to do a certain thing.

25   Q.  Okay.

1    A.  The answers to many of which similar inquiries are

2    available in the documentation for the software.

3    Q.  So he's asking you how to do something with the Blaze

4    software?

5    A.  Yes.  He's -- the question relates to, yes, how to

6    input decision logic in a certain way into the software.

7    Q.  And then on the same day, October 24th, you responded

8    to Mr. Setti relating to his question, right?

9    A.  Yes.

10   Q.  And you tried to answer it as best you could?

11   A.  Yes.

12   Q.  Okay.  And then above, he states that he managed to

13   resolve it, correct?

14   A.  That's correct.

15   Q.  And it was your understanding that the use of Blaze

16   Advisor that Mr. Setti was working on was, in fact, a

17   licensed use; is that correct?

18   A.  Yes.

19   Q.  I'm handing you what's been marked as Exhibit 52.

20   Please let me know when you've had a chance to review this

21   document.

22   A.  Okay.  I've read the document.

23   Q.  Okay.  Just tell me in general terms, what does this

24   e-mail discussion relate to?

25   A.  I was preparing for a workshop with my team and several

1    colleagues from the U. S., and I wanted to have a visual

2    way of representing where our customers are.  So my inquiry

3    was to the product manager, Jeremy Chen, to ask if we had

4    more granular detail so that I could more quickly put

5    together something to use in our internal sales enablement

6    session.

7    Q.  And when you say, "Our customers," was that FICO's

8    customers of a particular software?

9    A.  I mean, I was interested in everything, obviously, to

10   help my colleagues in other divisions, but specifically

11   this was around Blaze Advisor.

12   Q.  Okay.  And the first e-mail -- or, I'm sorry -- the

13   last e-mail, the top e-mail on the first page of the

14   document, so I'm looking at the October -- or February

15   27th, 2015, e-mail on the top of the first page.

16          In the third paragraph you've said, "I'm not sure

17   that the multi-national/ELA situation is easy to visualize,

18   as there will be many examples where an ELA signed in the

19   U. S. results in extensive usage in other regions, (Chubb

20   springs to mind)."

21          Do you see that?

22   A.  I do, yes.

23   Q.  So here you're referring to, again, the fact that Chubb

24   is using Blaze Advisor in other regions pursuant to its

25   multi-national ELA; is that correct?

1   A.  I am referencing the fact that there may be customers

2   who have deployments in multiple countries where the

3   license agreement -- sorry -- legitimately having

4   deployments in other countries -- where the license

5   agreement is -- has been agreed in a specific geography.

6   Q.  And you put Chubb in that category, correct?

7   A.  I named Chubb as an example of that kind -- where that

8   situation might arise.

9   Q.  So you're using Chubb as an example of a situation

10  where the license was signed in the United States, and it

11  resulted in extensive usage in regions outside the United

12  States, correct?

13  A.  More specifically where a license agreement is signed,

14  and then legitimately the software is used in other

15  territories in this case.

16  Q.  Okay.  And but -- and so my question is, Chubb fell

17  into that category, correct?

18  A.  Based on all the information I had received, that would

19  be the case for Chubb at the time I wrote this message.

20  Q.  So your understanding was that Chubb's license for

21  Blaze Advisor, as you put it, legitimately allowed Chubb to

22  use Blaze Advisor extensively outside of the United States?

23  A.  That was my understanding, but of course "extensively"

24  is a highly subjective term.

25  Q.  But it's your term, correct?

1    A.  It's the term I used in this instance.

2    Q.  Okay.  Was there any limit that you knew of to Chubb's

3    ability to use Blaze Advisor outside of the United States?

4    A.  I had not reached any conclusion on the -- what those

5    limitations might be.

6    Q.  You did not know of any; is that correct?

7    A.  The license -- my understanding was, it was restricted

8    to certain modules of Blaze Advisor, certain -- Blaze

9    Advisor comes in two editions, and I believe it was my

10   understanding that this was restricted to one of those

11   editions.

12   Q.  Other than that, in terms of Chubb's use of Blaze

13   Advisor outside of the United States, you knew of no

14   limitations.  Is that fair?

15   A.  The information I had been given is that it was a

16   global license, and I was unaware of any limitations

17   relating to this.

18   Q.  I'm showing you what's been marked as Exhibit 53.  This

19   is a chain of e-mails, and I am not going to ask you about

20   the e-mails on the first page of the document.

21            You can feel free to read the whole document, but

22   just so that you know, I'm going to ask you about the

23   e-mails on the pages that follow.

24            Okay.  And Mr. Setti's e-mail says, "We've

25   embarked upon a project to build a new web-based front-end

1    to our legacy policy admin system.  A high level

2    requirement for the new system is for it to incorporate a

3    number of complex insurance rating tools that currently

4    exist as stand-alone Excel spread sheets.  We're

5    considering using Blaze Advisor for this task, but before

6    we make a start on anything, we wanted to check its

7    suitability for the task."

8              Do you see that?

9    A.  Yes.  I do see that.

10   Q.  Okay.  So he's coming to you to ask about a potential

11   new use by Chubb Europe of the Blaze Advisor software,

12   correct?

13   A.  Yes.  I saw this as Ewen -- two years later or a year

14   and a half later, after the original discussion -- using me

15   as a contact to validate that his requirements were a good

16   fit to the technology.

17   Q.  For a new use of the software?

18   A.  That is right.  Yes.

19   Q.  Okay.  And then you write back, "Hi, Ewen.  Good to

20   hear from you.  I'm pretty sure we can help.  I'll give you

21   a call tomorrow just to run through a few questions,"

22   correct?

23   A.  That's what is written here, yes.

24   Q.  Okay.  And that was March 9th, 2015.

25   A.  Yes.  That's right.  March, 9th of March 2015.

1    Q.  Okay.  On the next page, "SLong@Chubb.com," writes an

2    e-mail to you and says, "Hi, Oliver.  As agreed by Ewen,

3    please find attached."

4              And then describes some -- a document that is

5    attached to the e-mail, correct?

6    A.  That's correct.  Yes.

7    Q.  And did this follow the conversation, then, that you

8    had with Ewen about the proposed use of Blaze Advisor in

9    this new application?

10   A.  I believe this is a direct follow-on from that

11   conversation.

12   Q.  Okay.  And to the best of your recollection, what is

13   the purpose, then, of the document that was attached to

14   this e-mail?

15   A.  To the best of my memory, the intention was to give

16   reassurance to Ewen that this was indeed a good fit to what

17   the software is capable of doing, because in many cases

18   there are some -- the client might say, we're thinking of

19   doing this, and actually it's not a good fit.

20             But he wanted reassurance, and it was indeed a

21   good fit, so I agreed to look at the requirements.

22   Q.  Great.  Keep that document in front of you.

23             I'm showing you what's been marked as Exhibit 54,

24   and tell me when you've had a chance to review it.

25   A.  I've reviewed the document.

1    Q.  Okay.  So as we saw in Exhibit 53, Chubb Europe sent

2    you an e-mail and a document on March 10th, 2015, outlining

3    some proposed uses for Blaze Advisor, correct?

4    A.  That's right.  Yes.

5    Q.  And in response to that e-mail or as a result of that

6    e-mail, it looks like on March 11th, so the next morning,

7    you e-mailed Jamie Chaban.

8         Who is Jamie Chaban?

9    A.  At the time he was leading the pre-sales consultant

10   team in the U. S., I believe.

11   Q.  Okay.  And you say, "Hi, Jamie.  I believe you know

12   Chubb well.  Are they using Blaze Advisor as a ratings

13   engine, do you know?"

14        Do you see that?

15   A.  Yes.

16   Q.  And what does "ratings engine" mean for someone who's

17   not familiar with the industry?

18   A.  The ratings engine is something which looks at all the

19   risks and then assigns a rating to those risks, and then

20   that's used to calculate a premium, perhaps, on a policy,

21   an insurance policy.

22   Q.  Okay.  And Jamie gets back to you and says, "My

23   recollection is that they use another solution for rating,

24   but I have been out of Chubb for a long time."

25        And then he refers you to Mike Sawyer, correct?

1    A.  He does.  Yes.

2    Q.  And then Mike Sawyer writes to you and says,

3    "Unfortunately, no.  Chubb does not use Blaze as a ratings

4    engine.  They use it for underwriting rules and models in

5    their specialty book," correct?

6    A.  That's correct.  Yes.

7    Q.  And then you write back to Mike and James on March 11th

8    and state, "Hi, Mike.  It looks like Chubb Europe are

9    looking into this (use as a ratings engine).  I know of no

10   restrictions in the license that prevent them from doing

11   so?"

12          Do you see that?

13   A.  Yes.

14   Q.  Okay.  So you're asking for confirmation from Mike

15   Sawyer that this proposed use of Blaze by Chubb Europe

16   would be in fact a licensed use; is that correct?

17   A.  I'm giving him the option to comment on anything that

18   may have changed since I last received information on the

19   matter.

20   Q.  Okay.  So your understanding at the time you wrote the

21   e-mail was that this would be a licensed use by Chubb

22   Europe, correct?

23   A.  Correct.

24   Q.  And you're giving him an opportunity to say, no, no,

25   no, the license has changed.  This is no longer licensed

1   for some reason.  Correct?

2   A.  Correct.

3   Q.  Okay.  And did you hear back from him in connection

4   with this e-mail, do you recall?

5   A.  I don't recall.

6   Q.  Would you have to expected to hear back from him if the

7   answer was, no, this isn't a licensed use.  Stop assisting

8   immediately?

9   A.  Yes, I would have expected.

10  Q.  And I take it you did not hear that?

11  A.  I don't believe I had a response to that e-mail, but I

12  can't recall.

13  Q.  Okay.  But you would have recalled if you had received

14  a response like that, correct?

15  A.  Yes.

16  Q.  Yeah.  Earlier you said you made an offhand comment as

17  soon as you got back from lunch in responding to a question

18  that you weren't focused on which particular entity was

19  using Blaze in connection with one of the e-mails we looked

20  at.

21              Do you recall saying that?

22  A.  I recall saying that in retrospect that at the time I

23  wasn't aware of what the underlying legal entities were.

24  Q.  Okay.  So when you were working with Chubb Europe, you

25  were not aware of what the underlying legal entities, as

1    you put it, were of Chubb.  Is that fair?

2    A.  That is fair, yes.

3    Q.  Did you have an understanding of how Chubb was

4    organized as a corporation or as a group of corporations?

5    A.  No.  Sorry.

6    Q.  I'm showing you what's been marked as Exhibit 55.  This

7    appears to be a calendar entry for a meeting.  The subject

8    of the meeting is, "Blaze Advisor for insurance rating."

9            Do you see that?

10   A.  Yes, I can see that.

11   Q.  The date of the meeting is March 23rd, 2015, correct?

12   A.  That is correct.

13   Q.  So this meeting was a follow-up to the e-mails that you

14   and Ewen and Mr. Long exchanged relating to Chubb Europe's

15   use of Blaze Advisor for insurance rating?

16   A.  That is correct.  It was a follow-on meeting.

17   Q.  Okay.  Did you in fact have this meeting?

18   A.  I believe so.  If it's the one I remember, it was held

19   in their offices for the first time, the first time I

20   visited them in their own offices.

21   Q.  Okay.  Tell me what you remember about what you

22   discussed with Ewen.  Well, first tell me who was at the

23   meeting, other than you.

24   A.  So I believe Ewen and Sam were certainly there.  I

25   cannot remember if David or Denise were the other two, the

1    optionals, I cannot remember if they were there.  I believe

2    I also invited my colleague Larry Jacobson to attend with

3    me because he's the insurance subject matter expert.

4    Q.  Okay.  And what was discussed at the meeting?

5    A.  I cannot precisely remember what was discussed, but I

6    believe our objective was to convince the customer or give

7    them evidence, perhaps, from case studies from other

8    customers that the use of the software for rating was,

9    again, a good fit for the technology.

10   Q.  So was there, as best you can recall, discussion,

11   additional discussion, about how Chubb Europe planned to

12   use Blaze Advisor for insurance rating?

13   A.  I cannot remember the specific details of what was

14   discussed.  As I say, I did bring my -- I believe I brought

15   my colleague, Larry Jacobson, along.  He's our subject

16   matter expert in the insurance sector, so -- yeah.

17   Q.  Two-hour long meeting; is that right?

18   A.  That's what it seems to have been scheduled for on the

19   invitation.

20   Q.  Do you recall whether it was in fact a two-hour long

21   meeting?

22   A.  I cannot recall whether it overran or --

23   Q.  Showing you what's been marked as --

24            THE COURT:  Mr. Godesky, we're going to break

25   there.  Okay?

```
 1                    MS. GODESKY:  Sure.

 2                    THE COURT:  Members of the Jury, we're going to

 3       take our lunch break, and we will go 45 minutes today, so

 4       be back or expect to be back in the courtroom at 1:00.

 5                    At that time I will be able to give you, I think,

 6       a pretty concrete example or idea of what the schedule

 7       looks like for the rest of the case.  Okay?

 8                    THE CLERK:  All rise for the jury.

 9                            (Jury exits.)

10

11            (In open court without the Jury present.)

12                    THE COURT:  Anything we need to take up?

13                    MR. HINDERAKER:  Not for the plaintiff, Your

14       Honor.

15                    MS. GODESKY:  No.  Thank you.

16                    THE COURT:  Okay.  We'll see you back at 1:00.

17                        (Lunch recess taken.)

18

19                    Afternoon Session on 3/6/2023

20       1:00 p.m.

21                          IN OPEN COURT

22                          (JURY PRESENT)

23                    THE COURT:  Be seated.

24                    Go ahead, Ms. Godesky.  We'll continue.

25                    MS. GODESKY:  Thank you.
```

1   BY MS. JANUS:

2   Q.  Showing you what's been marked Exhibit 56.  Okay.

3        So here Hamish Tonkin states:  Hi, Olly.  Good to

4   meet up again," correct?

5   A.  Yes.

6   Q.  And this is the day after your March 23rd, 2015,

7   meeting, correct?

8   A.  Yes, I believe so.  Yes.  That's right.  Yeah.

9   Q.  And then Mr. Tonkin states, "Would you please be able

10  to chase down whether we have Decision Simulator as part of

11  our license agreement."

12        Do you see that?

13  A.  That's what he's asking.

14  Q.  Then you forward the email to Mr. Tonkin to Andy Moffat

15  with a copy to Mark Collingwood, correct?

16  A.  That is correct, yes.

17  Q.  And Andy Moffat is someone you mentioned earlier.  He

18  was an account executive at FICO; is that correct?

19  A.  Yes.  Sorry.  So at the time there was a

20  reorganization, and a number of people made specialist

21  sellers for insurance, for example, and Andy Moffat was one

22  of them.  I'm not sure whether his actual title at the time

23  was account executive or client partner, but his role was

24  effectively a specialist seller for the insurance sector.

25  Q.  And what about Mark Collingwood?

1    A.  Mark Collingwood was his manager at the time.

2    Q.  Okay.  And you say, "Good afternoon, Andy.  Please see

3    below for an email from one of the global enterprise

4    architects."

5            And then you say, "(Think Sully from the

6    training)"?

7    A.  Yes.

8    Q.  What does that refer to?

9    A.  We had received some sales training, and part of it was

10   about the topic was selling to IT.  So Sully was named as

11   an archetype sort of person that you would want to build a

12   relationship with in order to get -- you know, to follow

13   the selling to IT sales play.

14           So I was referencing the fact that Hamish met

15   that profile, and he was also at the training, of course.

16   Q.  And he was what?

17   A.  And he was at the training that I was referring to.

18   Q.  Oh, I see.  So you're referring to a training about how

19   to sell to someone in IT?

20   A.  Yes.

21   Q.  And Sully at the training was a particular type of

22   person or an example of someone, and you were trained about

23   how to sell to that type of person?

24   A.  We were given the example of an enterprise architect,

25   somebody who has visibility of multiple projects and could

1    look at things holistically.

2    Q.  And then you say, "Chubb having an ELA for Blaze

3    Advisor signed in the USA, but I don't believe that it

4    covers Decision Simulator."

5            In the second to last paragraph you say, "Could

6    you please firstly check that they are not covered for the

7    use of Decision Simulator (in the U.S. contract), and if

8    this is the case, prepare a price for Hamish's

9    consideration."

10           Do you see that?"

11   A.  I do see that, yes.

12   Q.  And my question was, again, you are looking for

13   confirmation from your FICO colleagues about the scope of

14   the Chubb license; is that correct?

15   A.  My understanding was that they were not covered for

16   Decision Simulator.  So I was, again, putting this clearly

17   in writing so that my sales colleague could then laissez

18   with the colleagues in the US.

19   Q.  To confirm that fact?

20   A.  Yes.

21   Q.  I'm showing you what's been marked as Exhibit 57.

22           Please take a look at this document and let me

23   know when you've reviewed it.

24   A.  Okay.

25   Q.  Before I ask you about that, I'm going to ask you about

```
 1    Exhibit 58.
 2              It has some of the same emails in it, but take a
 3    look, and then let me know when you've reviewed Exhibit 58.
 4              Ready?
 5    A.  Yes.
 6    Q.  Okay.  Okay.  So looking at Exhibit 58 on the page
 7    marked 1978, you'll see the bottom of the page is the email
 8    we've looked at previously from Mr. Tonkin to you.
 9    A.  Yes.
10    Q.  Do you see that?  Okay.  And then you respond on the
11    same day to Mr. Hamish, and you say, "Good to meet you
12    again also."
13              You say, "I don't believe your current license
14    covers the usage of the Decision Simulator module, but let
15    me check the contracts library.  Blaze Advisor licenses are
16    typically scoped by application area.  Could you please
17    supply me with a description of the applications you would
18    like to use this within."
19              What did that mean?
20    A.  Can you be more specific about which part?
21    Q.  The second sentence.
22    A.  Specifically?
23    Q.  "Blaze Advisor licenses are typically scoped by
24    application area."
25    A.  Yes.
```

1    Q.  What do you mean by that?

2    A.  That is the default starting position for any

3    discussion around licensing.

4    Q.  What does that mean, "Typically scoped by application

5    area"?

6    A.  It means the use for a specific application only.

7    Q.  Okay.  Was it your understanding that Chubb's Blaze

8    Advisor license was not scoped by application area?

9    A.  My understanding from -- as noted previously -- was

10   that it was a global license, which is the alternative to

11   an application license.

12   Q.  Oh, before we move on, in your response to Mr. Tonkin

13   in the middle of the page marked 1978, you confirm that

14   you're going to check regarding the scope of the Chubb

15   license, correct?

16   A.  Umm.

17   Q.  You say, "I don't believe your current license covers

18   the usage of Decision Simulator module, but let me check

19   the contracts library."

20          Do you see that?

21   A.  Yes.

22   Q.  So you're confirming for Mr. Tonkin at Chubb Europe

23   that you're going to check on the scope of the license.

24   A.  That is what I offered, yes.

25   Q.  Did you in fact check the contracts library?

1   A.  No.  I -- that is, as I've described earlier, that's

2   the client partner's responsibility.  So as you'll see in

3   the remainder, that's something I asked them to look into.

4   Q.  You sent it on to Mr. Moffat?

5   A.  Yes.

6   Q.  Okay.  Then you write back to Mr. Tonkin that you've

7   forwarded his request to the FICO account executive for

8   Chubb, and you confirm that this is to cover commercial

9   property insurance on a PAN-European basis, correct?

10  A.  That's what was written, what I wrote, yes.

11  Q.  And what did you mean by "PAN-European"?

12  A.  So my understanding was that this application would be

13  used for rating in multiple countries.

14  Q.  Okay.  So what did you mean by the term,

15  "PAN-European"?

16  A.  I think in this case it was meant as, you know, not

17  exclusively in the UK.

18  Q.  So other countries in Europe as well?

19  A.  That was my understanding of what this application was

20  designed to serve.

21  Q.  And was Decision Simulator something that Chubb was --

22  Chubb Europe was considering using on top of a Blaze

23  program or in conjunction with a Blaze program?

24  A.  Yes, it would.  It's an add-on module to Blaze Advisor.

25  Q.  Okay.  Okay.  Then Mr. Tonkin states, you know, "Please

1    get back to us ASAP with a pricing model."

2              And he says, "Hint:  Don't make it too steep day

3    one as it will make the business case in the future for

4    global adoption less appealing."

5              Correct?

6    A.  That's what he wrote, yes.

7    Q.  Then you forward on this information to Mr. Moffat and

8    say, "More information for you, Andy"?

9    A.  That's correct.

10   Q.  Then Mr. Moffat writes back on March 26th and says,

11   "Quick question:  Is Chubb not managed from the U.S.?

12   Should the U.S. sales guys be doing this as they control

13   the commercial relationship"?

14             Did you have an understanding of what he meant

15   by, "Should the U. S. Sales guys be doing this?"

16   A.  So my understanding is that he, he seems to be

17   clarifying who has responsibility for quoting for new

18   usages.

19   Q.  And then Larry Jacobson writes back to Mr. Moffat with

20   a copy to you and Mr. Collingwood and directs Mr. Moffat to

21   reach out to Russ.  That would be Russ Schreiber, correct?

22   A.  That's correct.

23   Q.  He -- and he says, "He did the original deal with

24   Chubb, global Blaze ELA," correct?

25   A.  That's what is written, yes.

1    Q.  Turn back to Exhibit 57.  You already reviewed this

2    document, but I haven't asked you questions about it yet.

3    A.  That's correct.

4    Q.  Okay.  And Mr. Moffat writes to Russ Schreiber:  "Larry

5    and Olly recently met with Chubb in London, and we are

6    looking to do some work with them.  One, additional Blaze

7    license for commercial property European-wide).  Two, check

8    if they have Decision Simulator as part of the contract.

9    Can you help here?  Happy to crack on, but need site of the

10   existing commercials and contract terms."

11          Have I read the email correctly?

12   A.  That is what is written, yes.

13   Q.  Okay.  So Mr. Moffat is asking Mr. Schreiber to confirm

14   and inform on the scope of FICO's license to Chubb,

15   correct?

16   A.  He is asking a couple of questions related to the --

17   their license entitlement, yes.

18   Q.  You mentioned he was newer to FICO at this time,

19   correct?

20   A.  Yes.

21   Q.  And Mr. Schreiber gets back to him and says, "Chubb has

22   global ELA for Blaze, but no simulator," correct?

23   A.  That's right.  That's what he was -- wrote here.

24   Q.  And then Mr. Moffat responds, "Thanks, Russ.  So to

25   summarize, there's no additional licensing cost for this

1    except to included Decision Simulator."

2              Do you see that?

3    A.  I do see that, yes.

4    Q.  Mr. Moffat starts out by inquiring of Mr. Schreiber

5    whether there can be an additional Blaze license for

6    commercial property in Europe, correct?

7    A.  He's asking based on unknown prior knowledge.

8    Q.  And Mr. Schreiber, in effect, says, "No.  They have a

9    global ELS for Blaze," correct?

10   A.  That is what's written here, yes.

11   Q.  And just to be sure, Mr. Moffat summarizes that there

12   will be no additional licensing costs with the exception of

13   the Decision Simulator, correct?

14   A.  He does summarize as you said, yes.

15   Q.  And there's no discussion in this email about the

16   corporate structure of the Chubb entities, correct?

17   A.  I don't believe there is.

18   Q.  No discussion of who the parent company, if there is a

19   parent company of Chubb Europe, correct?

20   A.  There doesn't appear to be any discussion of that type.

21   Q.  No indication that that's a relevant consideration at

22   all in the determination of whether Chubb Europe is covered

23   by the Blaze Advisor global ELA, correct?

24   A.  There doesn't appear to be a reference to that.

25   Q.  Turn back to Exhibit 58.  The reason I'm going between

1     these is it appears there are parallel conversations

2     involving the same topic among you and others at FICO.

3               On the first page of Exhibit 58, after

4     Mr. Schreiber has responded to Mr. Moffat with a copy to

5     you about the scope of the Blaze license to Chubb,

6     Mr. Moffat writes to you and Mr. Jacobson with a copy to

7     Collingwood, and at the bottom of the first page of

8     Exhibit 8 states, "The Blaze license is an ELA and not

9     country specific, so nothing to pay there."

10              Do you see that?

11    A.   That's written at the bottom of the first page, yes.

12    Q.   And then you write to Natalie Gundy.  Who is she?

13    A.   She works in the sales support team.  I believe she

14    looks after renewals and other things relating to

15    clients -- existing customers.

16    Q.   And you say, "Could you possibly pull the Chubb

17    Insurance contracts relating to their licenses for Blaze

18    Advisor?"

19    A.   Yes.

20    Q.   "We're trying to license an add-on Decision Simulator

21    and need to know the terms of the original ELA for Blaze

22    Advisor signed in the U. S.," correct?

23    A.   That's what it says here, yes.  That's what I wrote.

24    Q.   And did Ms. Gundy send you the insurance contracts

25    relating -- I'm sorry.

```
 1              Did Ms. Gundy send you the licenses for Blaze
 2     Advisor?
 3     A.  I actually don't recall whether she did or not.
 4     Q.  Why, specifically, did you want to review the licenses?
 5     A.  So the -- I mentioned that the default model for new
 6     quotes is to follow an application license model.  Decision
 7     Simulator is priced as a percentage of the underlying Blaze
 8     Advisor contract.  So I believe it's a 20 percent add-on.
 9              Therefore, to know how to -- or to have some
10     guidance on how to appropriately price the add-on, I was
11     interested in seeing what the overall contract value was.
12     Q.  Getting back to Exhibit 59, you say to Mr. Moffat, "The
13     application scope for the Decision Simulator add-on should
14     be tied to a specific application.  In this case, Chubb
15     want to use it within their rating engine application for
16     use when underwriting commercial property insurance on a
17     PAN-European basis."
18              Do you see that?
19     A.  Yes, I do see it.
20     Q.  So you're providing details about Chubb's potential use
21     of the Decision Simulator to Mr. Moffat for purposes of
22     pricing?
23     A.  I'm relaying what the customer had told me so that
24     Mr. Moffat can develop a proposal himself.
25     Q.  And you say, "Could you and Mark work on an alternative
```

1    model?"

2              And what did you mean by that?

3    A.  My meaning was that it should be scoped by application

4    area, rather than by any other measure.

5    Q.  And then you say, "It should be attractive enough for

6    them to procure for this project, with a model that allows

7    them to expand their usage over time."

8    A.  That's what I wrote, yes.

9    Q.  So your goal was to have Chubb purchase the license for

10   Decision Simulator and hopefully expand that usage?

11   A.  That was actually the guidance that Hamish had given us

12   at the few -- as I said earlier.  "Don't make it too steep

13   day one as it will make the business case in the future for

14   global adoption less appealing."

15   Q.  Okay.  And your goal was to provide a price that would

16   ultimately lead to global adoption?

17   A.  Not necessarily, but one where the client could see

18   that if they did want to expand their usage, then it would

19   have -- there would be a known quantity.  They wouldn't

20   have to necessarily negotiate with the salesperson on the

21   details on each occasion.

22   Q.  Showing you what's been marked as Exhibit 60, let me

23   know when you've reviewed this document.

24   A.  Okay.

25   Q.  Okay.  So Exhibit 60 is the proposal that FICO provided

1    to Chubb Europe relating to Decision Simulator, correct?

2    A.  This is the, yeah, the proposal that Andy sent to the

3    client contact relating to that proposal, yes.

4    Q.  That FICO provided to Chubb Europe?

5    A.  Umm.  So this was prepared by Andy Moffat on behalf of

6    FICO.

7    Q.  Okay.  And the proposal he provided notes that, under

8    (B), "Decision Simulator to be included in existing Blaze

9    ELA contract," correct?

10   A.  That is one of the terms, one of the items in this

11   document, yes.

12   Q.  And he states it would be regional UK license for use

13   of Decision Simulator, correct?

14   A.  That is what it describes here, yes.

15   Q.  Okay.  And you write to Richard, "Tactical error, too

16   high, and scoped to UK only.  Better to start lower and

17   with a per-application scope," correct?

18   A.  I wrote that, yes.

19   Q.  Okay.  So you did not think this was a good proposal

20   that FICO made to Chubb Europe.  Fair enough?

21   A.  I believed that it was not in line with what the

22   customer was asking for.

23   Q.  You were aware that the customer planned to use it in

24   several different countries, not only in the UK, correct?

25   A.  According to the wording that Hamish confirmed, yes.

1    Q.  I'm showing you what's been marked as Exhibit 62.

2            Let me know when you've had a chance to review

3    the document.

4    A.  Okay.

5    Q.  Look at the second page of Exhibit 62.  There's an

6    email from Darcy Sullivan.  Who is she?

7    A.  He is our -- one of our public relations staff.  I'm

8    not sure of his exact title.

9    Q.  At EMEA?

10   A.  I believe he has somewhat of a global remit, but he is

11   located -- his office is London.

12   Q.  And he writes to Russ Schreiber with a copy to you and

13   Lauren Dettloff.  Who is Lauren?

14   A.  She was one of the marketing leads attached to the

15   global decision management suite line of business.

16   Q.  Okay.  Darcy Sullivan says, "Russ, Oliver mentioned

17   these to me as possibilities for client news releases or

18   case studies."

19           And in the subject line it reads, "Chubb and ▮

20   case studies," correct?

21   A.  That's correct.  Yes.

22   Q.  Okay.  So you mentioned Chubb as a possibility for a

23   client news release or case study?

24   A.  That's right, yes.

25   Q.  And what caused you to do that?

1    A.  So there was a push at the time to develop more

2    reference -- reference materials; and knowing that Chubb,

3    or knowing what I knew of Chubb, it met -- it seemed like a

4    good idea to suggest to Darcy, look, this is a potential

5    candidate for something, whether it's, as I said, reference

6    call or speaking at an event or case study or whatever it

7    might be.

8    Q.  What do you -- you said, Knowing what I knew of Chubb,

9    it seemed like a good possibility for several things.

10           And what do you mean by that?  What are you

11   referring to when you say, "Knowing what I know of Chubb"?

12   A.  Going back to what I said earlier today, around them

13   being a good internal sales story, one that was used to

14   show internal people what a client using Blaze Advisor in

15   multiple instances might look like and knowing that we were

16   building some relationships with other parts of the

17   organization.

18           That's why it seemed like a good time to mention

19   it.

20   Q.  What do you mean, "Building relationships with other

21   parts of the organization"?

22   A.  So, you know, for example, the Chubb -- a number of

23   Chubb contacts felt happy asking me for my advice as a --

24   what I saw as a trusted adviser, which is one of the things

25   we aim for.

```
 1              So, for example, when Ewen reached out about this

 2       ratings thing, that's the kind of a relationship we want to

 3       build with the customer where they feel they can have a

 4       discussion with us, and we'll give them a trusted adviser

 5       answer.  That's what I meant.

 6       Q.  So the breadth of Chubb's use of Blaze Advisor was one

 7       of the things that caused you to think of Chubb as a

 8       possible candidate for a client news release or an internal

 9       sales story?

10       A.  Not just the breadth, but also the fact that we had

11       local -- as in UK -- contacts, because again if we're

12       organizing a regional, a user group, for example, we want

13       to have people -- people are more likely to come if they

14       are geographically located in the same area.  So it was a

15       combination of factors.

16       Q.  And so you're saying, you're clarifying to Darcy, Chubb

17       is managed from the U.S., but ███ isn't?

18       A.  That was my clarification.

19       Q.  Okay.  And then you say, "Russ, as some background,

20       Chubb Europe have continued to extend their usage of Blaze

21       Advisor and are looking now to use it for a new rating

22       engine," correct?

23       A.  That's what I wrote, yes.

24       Q.  Okay.  And I think it goes without saying, since you're

25       writing it in an email, but you were aware of Chubb
```

1    Europe's continued extension of its usage of Blaze Advisor,

2    correct?

3    A.  I was aware, yes.

4    Q.  I'm showing you what's been marked as Exhibit 63.

5    A.  Okay.

6    Q.  So the first -- the earliest email in the chain is on

7    page 931.  And that's an email dated February 8, 2016, from

8    you to James Chaban and --

9    A.  Yes.

10   Q.  -- you say, "I've had some interesting news from one of

11   the global architects at Chubb.  Could you please let me

12   know who the CP is in the U.S.," correct?

13   A.  Yes.

14   Q.  Okay?  What was the interesting news?

15   A.  I believe it was this technology valuation topic.

16   Q.  Is the global architect Hamish?

17   A.  Yes.

18   Q.  Okay.  Then Mike writes and says, "Hi, Oliver.  Things

19   are interesting at Chubb right now.  Do you have time to

20   talk tomorrow morning?"

21            Right?

22   A.  Yes.  That's what he wrote, yes.

23   Q.  Okay.  And then you write back, still on February 8th,

24   you say, "I've had word from one of the Chubb global

25   architects that they are just about to go into a technology

1    contest of IBM-ODM, versus FICO Blaze.

2              "As I've done some work with this London team,

3    I'm planning to visit him for lunch on Wednesday to find

4    out a little more."

5              Correct?

6    A.  Correct.  That's what it says.

7    Q.  IBM-ODM, what is that?

8    A.  ODM is a -- on paper -- an equivalent product to Blaze

9    Advisor from IBM.

10   Q.  So Hamish had informed you that they were in the

11   process of assessing IBM-ODM and whether to switch to that

12   product from FICO Blaze?

13   A.  I didn't want -- I wanted to find out more, I guess,

14   when I met him, but, as I said, as it quotes here, they're

15   just about to go into a technology contest of one versus

16   the other.

17   Q.  That's what I'm trying to understand.  Was it your

18   understanding at the time that a technology contest would

19   be, "Let's try out IBM-ODM and see if that works better for

20   us than Blaze or doesn't work as well"?

21   A.  I'm not sure what I thought "contest" meant; but as an

22   employee of FICO, I wanted to make sure that we were able

23   to represent ourselves in that.

24   Q.  Then Mike writes back to you, still on February 8th,

25   and says, "I have not heard that from my contacts.  In

 1    fact, we are in discussions with them here in the states on

 2    two opportunities that would bolt on to/leverage Blaze.

 3    However, you should be aware that FICO has recently served

 4    Chubb with a notice of breach of their Blaze Advisor

 5    license based on their recent merger with ACE.

 6         "We are currently in discussions with Chubb's

 7    vendor management office on this subject.  Please do not

 8    discuss this topic with your contact or provide them any

 9    guidance as to what the scope of their license allows them

10    to do."

11         Correct?

12    A.  That's what was written by Mike, yes.

13    Q.  Is this the first you learned of the dispute between

14    FICO and Chubb?

15    A.  I believe so.  I remember being disappointed, but, yes,

16    I believe this is the first I heard about it.

17    Q.  And why were you disappointed?

18    A.  Since my -- or one of my objectives was to encourage

19    referencebility, this is not something which would help

20    that to happen.

21    Q.  By "encourage referencebility," you mean create a

22    situation in which Chubb would be willing to provide

23    references to potential FICO customers?

24    A.  Yes, references being one thing, but attendance at --

25    and presenting at customer forums being another, also case

1    studies, et cetera.

2    Q.  Okay.  Then you say, on the first page of Exhibit 63,

3    "Hello, Mike.  Can you be more specific on the nature of

4    the dispute?  I understand that ACE were licensed for Blaze

5    Advisor some time ago, but have no idea whether it has been

6    renewed or not or whether maintenance is being paid.

7              "Are there any topics you'd like me to bring up

8    on Wednesday regarding current or future projects?"

9              Did you know at this time prior to receiving the

10   email from Mike Sawyer that Chubb had merged with ACE?

11   A.  I believe I had seen it in the news.

12   Q.  Had you talked with anyone at Chubb about the merger?

13   A.  No.

14   Q.  Did it occur to you that the merger would create an

15   issue with Chubb's license for Blaze Advisor?

16   A.  I did not even consider that this would have an impact.

17   Acquisitions and divestitures happen frequently, so I had

18   not considered that aspect.

19   Q.  Related -- so are you aware of any other instance in

20   which FICO has taken the position that a license has been

21   breached due to a merger or acquisition?

22   A.  Yes.  Again, as part of my role, that's not something

23   that I would even be notified of.

24   Q.  I understand, but I'm asking about your knowledge, just

25   the extent of your knowledge on the topic.

1    A.  And, furthermore, I'm not aware of anything that fits

2    that description.

3    Q.  In response -- oh, I guess you mentioned that you

4    understood ACE was licensed for Blaze Advisor.  Is that

5    something you had involvement with?

6    A.  I had no personal involvement in that, in the client or

7    in anything around the licensing to that client.

8    Q.  It's just something that you were generally aware of?

9    A.  As a historic, as a historic record, yes.

10   Q.  You then -- let's see.  Mike asks for a phone call with

11   you in response to your question about the nature of the

12   dispute, and then you say, "Yes," you're available.

13            Did you end up having a phone call with

14   Mr. Sawyer?

15   A.  I remember speaking to Mike, yes.

16   Q.  Okay.  And tell me everything you recall about that

17   conversation.

18   A.  I don't recall an awful lot, I have to say.  I think we

19   talked about the client and just confirmed, I think, his

20   guidance around not mentioning anything around the topic or

21   any guidance around the scope of the license.  So I cannot

22   recall anything further.

23   Q.  Did Mr. Sawyer say anything about Chubb's ability to

24   use Blaze in Europe?

25   A.  No.  He did not advise of any -- he did not give any

1    guidance on that.

2    Q.  Did he give you any information about Chubb's use of

3    the Blaze software anywhere other than the United States?

4    A.  I don't believe he did, no.

5    Q.  So to the best of your recollection, the conversation

6    similarly consisted of him confirming for you what he said

7    in his email that you shouldn't discuss the scope of the

8    Chubb license during your meeting on Wednesday?

9    A.  Yes.  So it was just confirming exactly what I should

10   and should not do.  And I believe I even -- I believe the

11   meeting with Hamish had already been scheduled.  And so I

12   did question Mike, "Shall we still go ahead with the

13   meeting?"

14          And I believe he -- again, my recollection is he

15   said, "Yes, but just bear in mind these restrictions."

16   Q.  The restrictions were, don't talk about the scope of

17   the license?

18   A.  These two he listed here, yes.  Don't mention the

19   matter and do not discuss what the scope of their license

20   allows them to do, in his words.

21   Q.  I'm showing you what's been marked as Exhibit 64.

22          MR. HINDERAKER:  Thank you.

23   BY MS. JANUS:

24   Q.  Let me know when you've had a chance to look at it.

25   A.  Yes, I've reviewed it.

1    Q.  So on February 11, 2016, you wrote to Mike Sawyer and

2    said, "Hi, Mike.  As promised, an update from yesterday's

3    meeting.  It looks as if Chubb are indeed proceeding with a

4    technology rationalization project, triggered by the merger

5    with ACE, that includes their usage of Blaze Advisor.  ACE

6    have (apparently) standardized on IBM's ODM."

7            Is that correct?

8    A.  That is what is written here, yes.

9    Q.  Okay.  And then Mike says, "Thanks, Oliver."

10           Correct?

11   A.  That's right.

12   Q.  During the meeting that you had with Hamish and -- and

13   this is the meeting with Ross Smith, right?

14   A.  Yes.

15   Q.  Do you -- did you at some point learn that Mr. Sawyer

16   took the position with Chubb that the Chubb license for

17   Blaze was limited to the United States?

18   A.  Did I hear from Mike on that topic?

19   Q.  Yeah.

20   A.  Is that the question?  I don't believe so.

21   Q.  Would it surprise you if Mr. Sawyer took the position

22   that the Chubb license for Blaze was limited to the

23   United States?

24   A.  I was not privy to the account planning for this

25   account or any of Mike's strategies or plans.

1    Q.  But if Mr. Sawyer took the position with Chubb that the

2    Blaze license was limited to the United States, that would

3    be inconsistent with Chubb Europe's continued work with

4    FICO on Blaze, correct?

5    A.  Sorry.  Could you repeat the question one more time?

6    Q.  Can you read it back?

7             (Record read as follows:  "But if Mr. Sawyer took

8    the position with Chubb that the Blaze license was limited

9    to the United States, that would be inconsistent with Chubb

10   Europe's continued work with FICO on Blaze, correct?")

11            THE WITNESS:  Yes.  I don't know exactly what is

12   meant by "inconsistent."

13   BY MS. JANUS:

14   Q.  We've gone through several documents here today in

15   which you are part of conversations relating to the scope

16   of Chubb's Blaze license, correct?

17   A.  Several of these contain information that I was told

18   about the meaning -- the scope, according to an

19   interpretation.  Sorry.

20            So, yeah, several of these documents contain

21   information in which the scope is discussed.

22   Q.  And that scope, according to Mr. Sawyer and

23   Mr. Schreiber and Mr. Hill, was global, a global enterprise

24   Blaze license, correct?

25   A.  And also that was mentioned by the client as well.

1   Q.  That's not my question, though.  Please answer my

2   question.

3   A.  There were a number of mentions of global license.

4           MS. JANUS:  Could you read back my question,

5   please?

6           (Record read as follows:  "Question:  And that

7   scope, according to Mr. Sawyer and Mr. Schreiber and

8   Mr. Hill, was global, a global enterprise Blaze license,

9   correct?")

10          THE WITNESS:  It was described as global, yes.

11  BY MS. JANUS:

12  Q.  Do you see that?

13  A.  Yes.

14  Q.  Okay.

15  A.  Yes.

16  Q.  And we could go through others in which the license is

17  described by FICO employees as "global," correct?

18  A.  Yes.  Sorry.  I just didn't recall that specific

19  mention.

20  Q.  Mr. Hill described the license as global to you,

21  correct?

22          Take a look at Exhibit 48 if you need to refresh

23  your recollection.

24  A.  Yes.

25  Q.  Mr. Schreiber described the license as global, correct?

1    A.  He did, yes.

2    Q.  At the time when you were assisting Chubb Europe with

3    its use of Blaze, you and others at FICO Europe checked to

4    see whether that use was within the scope of the license,

5    correct?

6    A.  Yes.  The information was received saying that this was

7    a global license from both the client and from FICO.

8    Q.  First from FICO, correct?

9    A.  Yes.  Yes.

10   Q.  I'm going to be asking you about FICO's response to

11   interrogatory number 4.  Let me know when you've had a

12   chance to review that.

13   A.  I've reviewed the interrogatory.

14   Q.  Okay.  And this is signed by FICO on page 11, correct?

15   A.  Yes.  There is a signature there.

16   Q.  Okay.  And in response to interrogatory number 4, FICO

17   takes the position in this lawsuit that Federal has

18   disclosed the works, which FICO has defined as the Blaze

19   software, to entities located in the UK, Canada and

20   Australia.

21          Do you see that?

22   A.  Yes, I can see that sentence.

23   Q.  And then it states, "Which is in violation of the

24   license granted by the agreement."

25          Do you see that?

1   A.  Yes, I can see that sentence.

2   Q.  Okay.  So do you understand, based on Exhibit 67, that

3   FICO has taken the position in this lawsuit that Chubb's

4   use of the Blaze software in Europe was in violation of the

5   license?

6   A.  Yes, I am unable to draw a conclusion on that.

7   Q.  You just don't know, based on reading this?

8   A.  I lack the legal expertise to draw a meaning from it,

9   from this within the context of the overall document.

10  Q.  Okay.  And if it was in fact the case that FICO was

11  taking the position in this lawsuit that the use of Blaze

12  software by Chubb in the UK was in violation of the

13  license, that would be inconsistent with the statements

14  we've reviewed by FICO employees and your work with Chubb

15  Europe in connection with Chubb Europe's use of Blaze

16  software.

17          Is that fair?

18  A.  Sorry.  Could you repeat the question, please?

19  Q.  Is there something about the question you didn't

20  understand?

21  A.  Yes.  That's why I'm asking for it to be repeated.

22          (Record read as follows: "Question:  Okay.  And

23  if it was in fact the case that FICO was taking the

24  position in this lawsuit that the use of Blaze software by

25  Chubb in the UK was in violation of the lawsuit, that would

1  be inconsistent with the statements we've reviewed by FICO

2  employees and your work with Chubb Europe in connection

3  with Chubb Europe's use of Blaze software.  Is that fair?")

4           THE WITNESS:  Again, based on my limited ability

5  to interpret these documents, it would seem as if they're

6  not aligned.

7  BY MS. JANUS:

8  Q.  I'm showing you what's been mark as Exhibit 69.  Let me

9  know when you've had a chance to review this document.

10          Have you reviewed it?

11  A.  Yes.

12  Q.  All right.  Have you seen this document before?

13  A.  I do not believe so.

14  Q.  This is the FICO notice of termination of the Chubb

15  license, correct?

16          In the middle paragraph, Mr. Carretta writes to

17  Mr. Hopp at Chubb, "I notified you via email on March 11,

18  2016, that FICO had become aware of a further material

19  breach due to the use of the software outside the

20  United States in two applications utilized in the

21  United Kingdom."

22          Do you see that?

23  A.  Yes.

24  Q.  So does it appear to you that the use of Blaze by Chubb

25  Europe was one of the reasons Mr. Carretta was citing for

1   the termination of the Chubb license?

2   A.  Again, not having been familiar with the terms of the

3   license, I had no way of knowing whether these applications

4   were made available for the United Kingdom or were deployed

5   in the United Kingdom, so that would be a -- I would be

6   unable to say for sure whether the two were the same thing.

7   Q.  Okay.  So you're not sure whether Mr. Carretta is

8   referring to the applications that you worked with Chubb

9   Europe on over the years?

10  A.  I'm not aware of any firm link.  I mean, one might make

11  an assumption that they are, but I don't happen -- I

12  wouldn't want to assume that they were the same.

13  Q.  You're just not sure.

14  A.  I'm not sure whether they are the same.

15  Q.  Okay.  If they were the same, then this position would

16  be inconsistent with your work on behalf of FICO in Europe

17  with Chubb in Europe relating to Blaze, correct?

18  A.  Again, looking at this in isolation and at face value,

19  it would seem to be different to the guidance I had

20  received from a number of individuals.

21  Q.  Okay.  So do you know of any FICO licenses that

22  restrict where data resides or processes reside?

23  A.  Yes.  I can't answer -- I can't name any from memory.

24  Q.  Mr. Clark, you understand you're still under oath.

25  A.  I do.

1    Q.  Okay.  We've talked about many documents here today,

2    and at one point I asked you in connection with one of the

3    conversations relating to the scope of Chubb's license

4    whether you had been asked to look into Chubb's corporate

5    formation or the details of the legal entities that were

6    using Blaze.

7              Do you recall that?

8    A.  I recall the discussion.

9    Q.  Okay.  And my question to you, just to make sure the

10   record is clear, is, Throughout your time at FICO, while

11   you were working with Chubb, were you ever a party to a

12   conversation involving individuals at FICO relating to

13   Chubb's legal organization or the details of the entities?

14   A.  My only information is from privileged communications.

15   Q.  Okay.  So at no point did you believe that the

16   permissibility of Chubb Europe's use of Blaze was dependent

17   upon or related to the structure of Chubb's corporate

18   entities?

19   A.  So, no, I had no interest in or insight into the

20   structure of the legal entities on the client side.

21              THE COURT:  All right.  Thank you.

22              Members of the jury, we're going to take our

23   break for the day now.  The reason for that is this:

24   Federal has one more witness to call in its case in chief;

25   and due to circumstances beyond anyone's control connected

1    with the trial, that witness cannot get here until

2    tomorrow.  So Federal will call that witness tomorrow, and

3    then I believe they will rest their case in chief.

4         At that point FICO has the option to put on a

5    witness or more than one witness in rebuttal to FICO's case

6    in chief.  And I'm informed that they are considering

7    putting on a single witness to do that.

8         So tomorrow the testimony will be completed.  At

9    that point, the lawyers and I have several hours of legal

10   work that has to occur.  It can't occur before the

11   testimony is done, but it has to occur before you are given

12   the case to deliberate.

13        So tomorrow, again, we will be ending early.  And

14   Wednesday morning, you will get instructions on the law and

15   hear closing arguments and then start your deliberations.

16        So that's where things are.  That's the process

17   from here on out, and you may plan accordingly.

18        Okay?

19        All right.  With that we are in recess.

20        THE CLERK:  All rise for the jury.

21   1:58 p.m.

22                    **IN OPEN COURT**

23                  **(JURY NOT PRESENT)**

24        THE COURT:  Go ahead and be seated.

25        Mr. Hinderaker, has your motion made its way onto

```
 1    ECF yet?

 2              MR. HINDERAKER:  According to my watch, it

 3    hasn't.

 4              THE COURT:  Okay.

 5              MR. HINDERAKER:  I had a conversation over the

 6    lunch hour, and it should be soon.

 7              THE COURT:  Okay.

 8              MR. HINDERAKER:  In fact, I said when the witness

 9    was over with and we get a break, I would call the office

10    and -- so that's what I know.

11              THE COURT:  Okay.  And, Ms. Godesky, will your

12    side be filing a written response and, if so, how long

13    would you need?

14              MS. GODESKY:  We don't know what they're filing,

15    but we can quickly file something, if we feel like we need

16    a written response.

17              THE COURT:  Okay.

18              MS. GODESKY:  I understand time is of the

19    essence.

20              THE COURT:  Right.  If you file anything, if you

21    can file a response by 10:00 tonight, it will keep us on

22    track, if you are able to make that.

23              MS. GODESKY:  Okay.  Understood.

24              THE COURT:  Okay.  Anything else we should be

25    taking up here?
```

1          I know a representative from each of you will

2     have to communicate with Miriam, and she'll meet with you

3     down in 9E, when you're able to do that this afternoon.

4          Anything further?

5          MS. GODESKY:  Not from defendants.

6          MR. HINDERAKER:  Nothing from plaintiff.  Well,

7     we'll chat on the scheduling.  I would like to read what

8     was filed.

9          THE COURT:  Right.  That would probably be

10    helpful.

11         MR. HINDERAKER:  I think so.

12         THE COURT:  Okay.  With that then, we're in

13    recess.  We will see you tomorrow morning.

14         (Court adjourned at 2:01 p.m., 03-06-2023.)

15

16                          *   *   *

17         We, Kristine Mousseau and Renee A. Rogge, certify

18    that the foregoing is a correct transcript from the record

19    of proceedings in the above-entitled matter.

20

21                 Certified by:  /s/Kristine Mousseau
                              Kristine Mousseau, CRR-RPR
22                                /s/Renee A. Rogge
                              Renee A. Rogge, RMR-CRR
23

24

25