# EXHIBIT H

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                    )
Fair Isaac Corporation,             )  File No. 16-cv-1054(DTS)
a Delaware Corporation,             )
                                    )
          Plaintiff,                )
                                    )
v.                                  )
                                    )
Federal Insurance Company,          )  Courtroom 14W
an Indiana corporation,             )  Minneapolis, Minnesota
and ACE American Insurance          )  Wednesday, March 8, 2023
Company, a Pennsylvania             )  9:07 a.m.
Corporation,                        )
                                    )
          Defendants.               )
                                    )
------------------------------------------------------------

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

**(JURY TRIAL PROCEEDINGS – VOLUME XIII)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

*   *   *

```
 1    APPEARANCES:

 2      For Plaintiff:          MERCHANT & GOULD P.C.
                                BY:  ALLEN W. HINDERAKER
 3                                   HEATHER J. KLIEBENSTEIN
                                     PAIGE S. STRADLEY
 4                                   MICHAEL A. ERBELE
                                     JOSEPH W. DUBIS
 5                                   GABRIELLE L. KIEFER
                                150 South Fifth Street, #2200
 6                              Minneapolis, Minnesota 55402

 7      For Defendants:         FREDRIKSON & BYRON
                                BY:  TERRENCE J. FLEMING
 8                                   LEAH C. JANUS
                                     CHRISTOPHER D. PHAM
 9                                   RYAN C. YOUNG
                                     PANHIA VANG
10                              200 South Sixth Street, #4000
                                Minneapolis, Minnesota 55402
11
                                O'MELVENY & MYERS LLP
12                              BY:  LEAH GODESKY
                                     ANTON METLITSKY
13                                   DARYN E. RUSH
                                     ROXANA GUIDERO
14                              Times Square Tower
                                7 Times Square
15                              New York, New York 10036

16      Court Reporters:        RENEE A. ROGGE, RMR-CRR
                                KRISTINE MOUSSEAU, CRR-RPR
17                              MARIA V. WEINBECK, RMR-FCRR
                                PAULA RICHTER, RMR-CRR-CRC
18                              United States District Courthouse
                                300 South Fourth Street, Box 1005
19                              Minneapolis, Minnesota 55415

20
                                        *   *   *
21

22

23

24

25
```

1

## **I N D E X**

                                                          PAGE

2

Court's Instructions to the Jury                 2604

3   Defendants' Closing Arguments                    2619
Plaintiff's Closing Arguments                    2671

4   Court's Instructions to the Jury                 2730
Questions from the Jury                          2737

5

6

7

JOINT EXHIBITS                                   REC'D

8      3                                             2737

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**IN OPEN COURT**

**(JURY PRESENT)**

1

2

3      THE COURT:  Be seated, everyone.

4          (Off the record discussion)

5      THE COURT:  All right.  Let's go on the record.

6      You all have copies of the instructions in front

7  of you.  You are welcome to read along or put them aside and

8  just listen.  Either is fine.

9      Members of the jury, the instructions I gave at

10  the beginning of the trial and during the trial are still in

11  effect.  Now I'm going to give you additional instructions.

12  You have to follow all of my instructions, the ones I gave

13  you earlier, as well as those I give you now.

14      Do not single out some instructions and ignore

15  others, because they are all important.  This is true even

16  though I'm not going to repeat some of the instructions I

17  gave you at the beginning of or during the trial.

18      You will have copies of the instructions I'm about

19  to give you now in the jury room.  Remember, you have to

20  follow all of the instructions, no matter when I gave them,

21  whether or not you have written copies.

22      Burden of proof.

23      You must decide whether certain facts have been

24  proved by the greater weight of the evidence, also called

25  the preponderance of the evidence.  A fact has been proved

1     by the greater weight of the evidence if you find that it is

2     more likely true than not true.  You decide that by

3     considering all of the evidence and deciding what evidence

4     is more believable.

5          You have probably heard the phrase "proof beyond a

6     reasonable doubt."  That is a stricter standard than "more

7     likely true than not true."  It applies in criminal cases,

8     but not in this civil case.  So put it out of your mind.

9          Credibility of witnesses.

10         In deciding what the facts are, you may have to

11    decide what testimony you believe and what testimony you do

12    not believe.  You may believe all of what a witness said or

13    only part of it or none of it.  You may consider a witness's

14    intelligence, the opportunity the witness had to see or hear

15    things testified about, a witness's memory, knowledge,

16    education and experience, any reasons a witness might have

17    for testifying a certain way, how a witness acted while

18    testifying, whether a witness said something different at

19    another time, whether a witness's testimony sounded

20    reasonable and whether or to what extent a witness's

21    testimony is consistent with other evidence you believe.

22         In deciding whether to believe a witness, remember

23    that people sometimes hear or see things differently and

24    sometimes forget things.  You will have to decide whether a

25    contradiction is an innocent misrecollection or a lapse of

1    memory or an intentional falsehood.  That may depend on

2    whether it has to do with an important fact or only a small

3    detail.

4           A witness may be discredited or impeached by

5    contradictory evidence or by evidence that at some other

6    time the witness has said or done something or has failed to

7    say or do something that is inconsistent with the witness's

8    present testimony.

9           If you believe any witness has been impeached, and

10   thus discredited, you may give the testimony of that witness

11   such credibility, if any, you think it deserves.

12          If a witness has shown knowingly to have testified

13   falsely about any material matter, you have a right to

14   distrust such witness's other testimony, and you may reject

15   all the testimony of that witness or give it such

16   credibility as you may think it deserves.

17          You have heard testimony from several expert

18   witnesses in this case:  Neil Zoltowski, R. Bickley (Bick)

19   Whitener, William McCarter and W. Christopher (Chris)

20   Bakewell, all of whom testified to their opinions and the

21   reasons for those opinions.

22          You should judge this testimony just as you would

23   any other testimony.  You may accept it or reject it and

24   give it the weight you think it deserves, considering the

25   witness's education and experience, the reasons given for

1    the opinion and all other evidence in the case.

2            Testimony has been presented to you in the form of

3    a deposition.  A deposition is the recorded answers a

4    witness made under oath to questions asked by lawyers before

5    trial.  The deposition testimony you have seen has been

6    electronically videotaped and that recording played for you.

7    You should consider the deposition testimony and judge its

8    credibility as you would that of any witness who testifies

9    here in person.

10           During the trial you have heard testimony from

11   witnesses who appeared in their capacity as the parties'

12   corporate designee.  Those witnesses were authorized to

13   speak on behalf of the organization about information known

14   to the organization.  Those witnesses were standing in the

15   shoes of the organization and were not testifying as

16   individual persons.

17           The following witnesses were designated to testify

18   as their corporate representatives:  Claudio Ghislanzoni,

19   Henry Mirolyuz, John Taylor, William Waid.

20           Exhibit P1116 was introduced for a limited

21   purpose.  It is to be used only as evidence of when and how

22   Mr. Waid learned of DWS's access to Blaze Advisor.  You may

23   only consider Exhibit P1116 for that purpose.

24           Some of the exhibits introduced during trial are

25   software licensing agreements between FICO and companies

1     other than Federal.  These agreements have been introduced

2     for a limited purpose.

3          You may consider the agreements for whatever value

4     they may have in your decisions about the hypothetical

5     license negotiation, which you will hear about shortly.  The

6     agreements may also be used to illustrate other language

7     that the parties might have used in their agreement.

8          The agreements, however, are not evidence of the

9     parties' mutual intent as to the meaning of the software

10    license agreement in this case.

11         Certain charts and summaries have been shown to

12    you in order to help explain the facts disclosed by books,

13    records or other underlying evidence in the case.  Those

14    charts or summaries are used for convenience.  They are not

15    themselves evidence or proof of any facts.

16         If they do not correctly reflect the facts shown

17    by the evidence in the case, you should disregard these

18    charts and summaries and decide the facts from the books,

19    records or other underlying evidence.

20         As you have heard, FICO seeks to recover damages

21    for breach of contract.  FICO had a contract with Federal,

22    the license agreement, that set the terms under which

23    Federal could use FICO's Blaze Advisor software.

24         FICO claims that Federal breached the contract by

25    allowing unauthorized persons or entities to use the

1    software, by failing to obtain consent for the continued use

2    of Blaze Advisor after the merger or by continuing to use

3    Blaze Advisor after FICO terminated the agreement.

4         Federal claims that it did not breach the

5    agreement.  It claims the merger did not violate

6    Section 10.8 of the agreement, that any use by unauthorized

7    persons or entities was not a breach, and that FICO's

8    termination of the agreement was ineffective and was itself

9    a breach of the license agreement by FICO.

10        The party who claims breach of contract has the

11   burden of proving by a preponderance of the evidence that it

12   had a contract with the other party, that it did what it was

13   required to do under the contract, that the other party

14   breached the contract by not doing what it was required to

15   do under the contract, and that the breaching party

16   sustained damages because of the other's breach.

17        If you decide that Federal breached the license

18   agreement in any of the ways FICO has alleged, you will find

19   for FICO on its breach of contract claim, and you will go on

20   to consider FICO's damages against Federal.

21        If you decide that Federal did not breach the

22   license agreement, you will find for Federal on FICO's

23   breach of contract claim.

24        If you decide that FICO breached the license

25   agreement, as Federal as alleged, you will find for Federal

1  on its breach of contract claim, and you will go on to

2  consider Federal's damages.

3          If you decide that FICO did not breach the license

4  agreement, you will find for FICO on Federal's breach of

5  contract counterclaim.

6          In this case the parties agree that the license

7  agreement was a contract.  It is for you to decide what the

8  contract required of both parties, whether either party or

9  both of them failed to do what they promised in their

10  contract and the extent of damages suffered due to any

11  breach that you find.

12          In determining the meaning of the license

13  agreement, you should consider the plain meaning of the

14  words in the license agreement, how a reasonable business

15  person in this situation would have understood their meaning

16  and what the parties here actually intended them to mean.

17          In determining the parties' intent, you may

18  consider evidence of the parties' prior negotiations, the

19  circumstances surrounding the formation of the license

20  agreement and any other evidence you find that bears on that

21  intent.

22          A breach is material if it substantially defeats

23  the purpose of the agreement or where a party fails to

24  perform a substantial part of the agreement, the performance

25  of which was the initial inducement for entering the

1    agreement.

2           A material breach is one that goes to the root of

3    the agreement between the parties.  Performance by the

4    non-breaching party is excused only if the breach is

5    material or if the contract provides otherwise.

6           Where a breach is material, the non-breaching

7    party is justified in terminating the contract.  Where a

8    breach is not material, the non-breaching party may be

9    entitled to damages, but is not entitled to terminate the

10   contract unless the contract specifically allows for

11   termination without a material breach.

12          Both parties may be guilty of breaches, each

13   having a right to damages.

14          If you find that Federal breached the license

15   agreement, FICO was allowed to terminate the license

16   agreement if that breach was material or if termination was

17   expressly permitted by the contract.

18          For Federal's counterclaim, if you find that FICO

19   breached the license agreement, Federal was only excused

20   from performing under the contract if that breach was

21   material.

22          Federal contends FICO breached the license

23   agreement when it terminated the agreement without

24   justification.  If a party terminates an agreement without

25   justification, that termination constitutes a material

1     breach.  FICO contends it properly terminated the agreement.

2              As I previously instructed you, interpreting the

3     license agreement is for you to decide.  This is true except

4     when the court has found that the agreement must be

5     interpreted as a matter of law.  The court has made two such

6     findings in this case.

7              First, you will see references in the documents to

8     a claim by FICO that the license agreement at issue in this

9     case was limited to the territory of the United States.  The

10    court has previously determined that the Blaze Advisor

11    license agreement unambiguously lacks a geographic

12    restriction on the installation or physical location of

13    Blaze Advisor.

14             Accordingly, this territory claim is not a valid

15    legal basis on which FICO could terminate the license

16    agreement.

17             Second, you have heard testimony regarding the

18    definition of "client" in the license agreement.  The court

19    has determined that as a matter of law the client, "Chubb &

20    Son, a division of Federal Insurance Company," means that

21    the client is Federal Insurance Company.

22             Therefore, use of Blaze Advisor by Chubb Canada,

23    Chubb Europe, and Chubb Australia before the license

24    agreement was terminated was not a breach of the license

25    agreement.

1        Every contract includes an implied covenant of

2    good faith and fair dealing.  This means that even though it

3    is not specifically written in the contract, it is

4    understood that each party must act in good faith and deal

5    fairly with the other party in performing under the

6    contract.

7        Under this covenant, the parties promise not to do

8    anything that will injure the other party, including not

9    doing anything that will prevent the other party's

10   performance.

11       Federal has the burden of proof on this claim.

12       On FICO's claim for copyright infringement, FICO

13   has the burden of proving by a preponderance of the evidence

14   that.

15       1.  FICO is the owner of a valid copyright.  This

16   element is established; and 2.  Defendants used the

17   copyrighted work without permission.

18       The party seeking damages must prove those damages

19   were caused by the other party's wrongdoing.  For example,

20   in FICO's breach of contract claim, FICO must prove its

21   damages were caused by Federal's breach.

22       In Federal's breach of contract claim, Federal

23   must prove its damages were caused by FICO's breach.

24       A party asking for damages must prove the nature,

25   extent, duration and consequences of the alleged harm.

1          Damages must be proved with reasonable certainty.

2     You may not award damages that are speculative, that is,

3     damages that might be possible, but are based solely on

4     guess work.

5          The party seeking damages is not required to prove

6     the exact amount of its damages, but must show sufficient

7     facts and circumstances to permit you to make a reasonable

8     estimate of the damages.

9          If you find any party is entitled to a verdict on

10    more than one of its counts, you should take care to avoid

11    awarding duplicative damages.

12         Hold on one second.

13         If you find that either FICO or Federal are owed

14    damages for breach of contract or breach of the implied

15    covenant of good faith and fair dealing, you should award

16    that party damages in the amount that is required to make

17    them whole.

18         Damages on a breach claim are intended to replace

19    the loss caused by the breach and place the party in as good

20    a position as it would have been in had the other party not

21    breached the contract or the implied covenant.

22         If you find that plaintiff has proved that

23    defendant has infringed plaintiff's copyright, then you must

24    determine the amount of damages, if any, plaintiff is

25    entitled to recover.  If you find that plaintiff has failed

1   to prove the claim, then you will not consider the question

2   of damages.

3        Plaintiff must prove damages by a preponderance of

4   the evidence.  Plaintiff may recover for any actual losses

5   it suffered because of the infringement, plus any profits

6   that defendant made from the infringement.

7        I will define these terms in the following

8   instructions.

9        The measure of actual damages for FICO's breach of

10  contract claim and its copyright infringement claim is the

11  fair market value of a license to use Blaze Advisor.  The

12  fair market value is the license fee that a willing buyer

13  and a willing seller would have negotiated for the allegedly

14  improper or infringing use that was made.

15       The license fee is the amount that the licensor

16  and the licensee would have agreed to in a hypothetical

17  negotiation for a license covering the allegedly infringing

18  use that was made.

19       In considering this hypothetical negotiation, you

20  should focus on what the expectations of the licensor and

21  the alleged infringer would have been had they entered into

22  an agreement at that time and had they acted reasonably in

23  their negotiations.

24       In determining this, you must assume that both

25  parties were willing to enter into an agreement.  The

1    license fee you determine must be a fee that would have

2    resulted from the hypothetical negotiation, not simply a fee

3    either party would have preferred.

4           Breach of contract and breach of the implied

5    covenant of good faith and fair dealing claims allow for

6    nominal damages.

7           If you find for FICO on their breach of contract

8    claim against Federal or you find for Federal on their

9    breach of contract or breach of the implied covenant of good

10   faith and fair dealing claim against FICO, but you find that

11   the prevailing party has failed to prove damages as defined

12   in these instructions, you must award nominal damages.

13   Nominal damages may not exceed $1.00.

14          That instruction just pertained to the breach of

15   contract claims and the breach of implied covenant claims.

16   Now I'm returning to the copyright infringement measure of

17   damages.

18          In addition to recovering its actual damages, if

19   you find defendants infringed FICO's copyright, FICO may

20   recover the profits that defendant received because of the

21   infringement.  Defendants' profits are recoverable, however,

22   only to the extent that you have not taken them into account

23   in determining actual damages.

24          The following three instructions all relate to

25   your calculations of profits of the infringer, of the

1    alleged infringer.

2         To meet its burden under the copyright act's

3    disgorgement of profits provision, FICO's burden is to prove

4    a causal nexus between the revenues defendants received and

5    the unauthorized use of Blaze Advisor.  This is referred to

6    as attribution.

7         FICO must identify defendants' revenues that are

8    attributable to the alleged infringement.  A party cannot

9    meet its burden to establish the causal nexus by identifying

10   revenue that is only remotely and speculatively attributable

11   to the infringement, that is, FICO must show that the use of

12   Blaze Advisor contributed to the generation of the revenue.

13        In determining attribution, you should only

14   consider revenue FICO has proven is directly connected to

15   the alleged infringement.  In other words, if defendants

16   earned revenue through programs or products that did not

17   involve use of Blaze Advisor, those revenues are not

18   attributable to the infringement, and you should discount

19   them in your calculation of profits of the alleged

20   infringer.

21        If you find profits were earned by companies under

22   the control of the defendants through their use of Blaze

23   Advisor, you may award those damages if you find they are

24   attributable to the infringement.

25        If FICO establishes attribution, as I have just

1      instructed you, the burden to allocate profits shifts to the

2      defendants, that is, it is defendants' burden to prove those

3      profits as distinct from revenues.

4           Defendants must prove those costs associated with

5      infringing revenue that may be deducted to arrive at profits

6      and must prove the portion, if any, of profits that arise

7      from the infringement by identifying the contribution to the

8      profits of elements other than the infringement.

9           Mathematical exactness is not required, but the

10     apportionment must be reasonable and cannot be speculative.

11          The fact I have instructed you as to the proper

12     measure of damages should not be considered as indicating my

13     view as to which party is entitled to verdict in this case.

14          That concludes the instructions on the law.  After

15     the closing statements or arguments, rather, I will give you

16     a final instruction on the process of deliberation.

17          With that, let's take a brief break.  Stand up,

18     stretch, whatever you need.

19          And, Ms. Godesky, you may prepare.

20          MR. HINDERAKER:  Can we step out for a little bit?

21          THE COURT:  Yes.  We will start again at

22     20 minutes to 10:00 on that clock.

23                    (Recess taken)

24          THE COURT:  Counsel for Federal and ACE, you may

25     proceed.

1          MS. GODESKY:  Thank you.

2          Good morning, everyone.  On March 30th, 2016, a

3     couple of months after the ACE acquisition closed, and after

4     a decade-long positive business relationship, FICO said that

5     it was terminating Chubb's Blaze license agreement with the

6     termination effective the very next day.

7          Here's Mr. Carretta's March 30th termination

8     letter.  "This letter serves as notice that the agreement is

9     terminated effective on March 31st, 2016."

10          This forced Chubb into a completely awful

11     position, because it's physically impossible to extract

12     Blaze from your internal systems immediately.

13          You heard Mr. Ghislanzoni testify that it took

14     Chubb months to do so after it started that process in 2019.

15          So with this termination notice from Mr. Carretta,

16     Chubb was forced to either risk facing a lawsuit alleging

17     that it violated the copyright laws, exactly what happened

18     in this case, or pay FICO much more for a license than Blaze

19     is actually worth.  Basically pay or face allegations that

20     you violated the copyright laws.

21          But Chubb had already paid $1.3 million for the

22     Blaze license, and Chubb would not be bullied into paying

23     money that it didn't owe to a business partner that had no

24     right to terminate a perpetual, supposed to be never-ending

25     license to use Blaze.

1              So why did FICO do this?  We may never know for

2     sure, but I want to talk a little bit about what we do know.

3              We know that ACE was the bigger company.  ACE was

4     buying Chubb, not the other way around.  So maybe FICO

5     assumed that ACE would be in charge and FICO knew that ACE

6     was not a huge fan of Blaze.  Maybe FICO was worried about

7     that, and we saw some emails from Mike Sawyer and Russ

8     Schreiber suggesting as much.

9              Here they are.  Mr. Sawyer and Mr. Schreiber

10    talking about the acquisition.  "Holy cow," from

11    Mr. Schreiber.  "Wow.  Not good," from Mr. Sawyer.

12             You heard both Mr. Sawyer and Mr. Schreiber

13    testify about FICO's relationship with ACE.  We would try to

14    sell them, and they wouldn't take the phone call.  Chubb was

15    a significantly more significant client than ACE.  Maybe

16    FICO figured it had nothing to lose because in 2016 interest

17    in Blaze was plummeting.

18             You heard from Mr. Sean Baseman, FICO's very first

19    witness, about how his work on Blaze dropped from 80 percent

20    of his time in 2016 to just 10 percent by 2021.  You also

21    heard Mr. Baseman admit that these days Blaze is better

22    suited for small companies and companies in Turkey and

23    South America.

24             Or maybe FICO just saw dollar signs.  You heard

25    FICO open this trial by describing the ACE acquisition as

1    the largest insurance company acquisition merger in history,

2    something that created a company with $30 billion in

3    revenue.

4              When you're talking about numbers that big, trying

5    to shake down a business partner for an extra payment that

6    you're not actually entitled to may seem like something that

7    you can just get away with.

8              Ladies and gentlemen, putting Chubb between this

9    rock and a hard place, this position where it either had to

10   pay an additional license fee that it didn't owe or defend a

11   lawsuit, is not only improper under the license agreement

12   itself, but also a breach of the duty of good faith and fair

13   dealing that you just heard about.

14             Now, before we go any further, I do want to thank

15   you for your time and attention over the past few weeks.  I

16   told you in opening that we were going to try to be as

17   efficient as possible with your time.  And defendants really

18   tried to keep that promise and today is no different.

19             I also told you that this case would require some

20   hard work, and you were picked for this jury because we know

21   that you're willing to do that work, and you committed to

22   giving defendants an equal shake.

23             So let's dive in and do the hard work together,

24   and I'm going to talk through each of these issues as

25   efficiently as I can.

1          Now FICO says that Federal breached the license

2     agreement's assignment provision and a provision in the

3     contract that says only Federal's employees could use Blaze.

4     FICO also says that it had valid reasons to terminate the

5     Blaze license in March 2016 and that Federal and ACE

6     committed copyright infringement by continuing to use Blaze

7     after that date.

8          Defendants' claims and defenses are the exact

9     opposite of that.  We're asking you to find that FICO had

10    absolutely no basis to terminate the license agreement in

11    March 2016 because Federal did not breach the contract.

12         FICO made up termination reasons in bad faith, and

13    it had no basis for its copyright infringement claims

14    either.

15         So I'm going to walk you through what that means

16    in terms of the verdict form you're going to be given at the

17    end of the case.  But for now I want to review FICO's

18    made-up termination reasons, working off Mr. Carretta's

19    letter.

20         Here's Mr. Carretta's March 2016 termination

21    letter.  And the first reason FICO gave for terminating the

22    license agreement was this purported violation of

23    Section 10.8, the idea that the deemed assignment from

24    Federal to Chubb Limited after the acquisition was void and

25    of no force and effect.  That's what he said.

1          Now before I launch into all the evidence on this

2     issue, I do want to remind you that as you just heard from

3     Judge Schultz, FICO has the burden of proving breaches by

4     Federal.  That's why you're hearing from me first this

5     morning, even though FICO is the plaintiff.

6          It has the burden of proof on each of these breach

7     claims and as Judge Schultz said, FICO has to prove by a

8     preponderance of the evidence that Federal breached.  That's

9     a burden that they did not meet.

10         Remember that Section 10.8 has two different

11    sentences.  And this case, everyone agrees, is about the

12    second sentence of 10.8.  Mr. Hinderaker told you the same

13    thing in opening.  These are his words on the screen.  "This

14    lawsuit has nothing to do with a formal assignment document

15    where two partners sit down and put in writing that they're

16    going to assign their rights."

17         Remember I gave you that example in opening of

18    maybe me writing an assignment agreement with my sister for

19    my apartment.  That's not what happened here, and everyone

20    agrees, so you can put the first sentence of Section 10.8

21    out of your minds.

22         That leaves us with the second sentence of 10.8,

23    which you are all very familiar with by now.  And the second

24    sentence talks about what happens in the event of a deemed

25    assignment.  It says, If there is a deemed assignment from

1    Federal to Chubb Limited, then Chubb Limited and its

2    affiliates could keep using Blaze after an acquisition so

3    long as they didn't expand use of the software, the expanded

4    use rule that everyone agreed on.

5           And that makes sense, right, because if Chubb paid

6    for a license to use Blaze forever, why should a merger or

7    acquisition or a reorganization, things that happen all the

8    time in the business world, change anything if Chubb is not

9    expanding its use of Blaze?  It shouldn't, and that's

10   exactly why there's an expanded use rule.

11          And the evidence showed, ladies and gentlemen,

12   that FICO does not always agree to an expanded use rule.  We

13   looked at this example, an agreement that FICO entered with

14   ███████████████████████

15          This is a license agreement that says no

16   assignments are ever allowed without FICO's written consent.

17   But this is not what the Chubb agreement said.  The Chubb

18   agreement has an expanded use rule, the second sentence.

19          Now the gist of FICO's breach argument, you heard

20   it from Mr. Waid, is that the second sentence of

21   Section 10.8 is this hard and fast rule.  If there's a

22   merger, if there's an acquisition, if there's a

23   reorganization, consent from FICO was required before Chubb

24   could continue using Blaze regardless of the use.

25          You can see Mr. Waid's testimony about this, about

1  the whole consent required theory up here on the slide.  But

2  this "consent is always required" argument does not line up

3  with the evidence.

4        FICO is telling you now that the business purpose,

5  the commercial purpose of this assignment provision was to

6  make sure that FICO would always have an opportunity to

7  renegotiate fees.

8        But all of FICO's witnesses, every single one of

9  them, admitted that they never discussed this so-called

10  business purpose with Chubb.  Here's their testimony up on

11  the screen.  Ms. Boone, Mr. Carretta and Mr. Waid all said

12  the exact same thing.

13        None of them ever communicated to Chubb this idea

14  that license fees would always need to be renegotiated after

15  an acquisition.

16        And this is important because you heard and -- you

17  heard from Mr. Folz yesterday when he came to testify, and

18  he explained that back in 2006 when vendors proposed license

19  agreements tied to Chubb's revenue, Chubb's practice was to

20  decline those types of deals.

21        FICO could have tried to negotiate language into

22  the Blaze license agreement that expressly said FICO has

23  certain rights if Federal's revenue is growing because of an

24  acquisition, but there's no record that it did, and that

25  kind of language does not appear in the agreement.

1          Now you saw that Mr. Schreiber and Mr. Sawyer

2     talked about exactly that in the months after the

3     acquisition.

4          And ladies and gentlemen, let me stop here and say

5     that it is quite significant that you did not hear live

6     testimony in this trial from Mr. Sawyer, Mr. Schreiber or

7     Mr. Wachs.  The evidence showed that those three gentlemen

8     were responsible for FICO's relationship with Chubb, with

9     Mr. Wachs even participating in negotiating the license

10    deal.

11         You heard live testimony from a lot of FICO

12    witnesses who were not involved in any specific

13    communications with Chubb, people like Mr. Carretta,

14    Mr. Baer, Mr. Waid, Mr. Baseman, but those weren't the

15    witnesses whose names were all over the documents.  That was

16    Mr. Sawyer, Mr. Schreiber and Mr. Wachs.

17         Mr. Ghislanzoni traveled here from England to be

18    at trial and make sure that you heard his side of the story.

19    Former Chubb employee Mr. Folz traveled to Minnesota

20    yesterday to look you in the eye and tell you what he

21    intended when he negotiated that license agreement.

22         But Mr. Sawyer, Mr. Schreiber and Mr. Wachs, the

23    three FICO employees at the center of this story, nowhere to

24    be found for trial.

25         But you do have their emails.  So even though you

1    couldn't meet them in person, you know what they were saying
2    years ago.  You knew that Mr. Schreiber was a little
3    concerned about the unreasonably withheld bit in the Chubb
4    license agreement.  He was worried about the expanded use
5    rule.
6           Mr. Sawyer wasn't as concerned.  He said, I would
7    think that tripling the size of gross written premium should
8    be significant enough to get around that unreasonably
9    withheld language.
10          But Mr. Schreiber, his boss, he knew to ask, well,
11   is the license specifically tied to gross written premium,
12   to revenue?  I don't see anything on GWP in the agreements.
13          And we asked Mr. Schreiber about this exchange at
14   his deposition.  He explained that he asked Mr. Sawyer
15   whether the Chubb agreement specifically referenced revenue,
16   because, quote, "That would have been clearer."  Exactly.
17          As Mr. Waid admitted when he testified, the word
18   "revenue" does not appear in the Chubb license agreement.
19   And that's significant, ladies and gentlemen, because FICO
20   does enter agreements that specifically reference revenue
21   levels after a merger or acquisition.
22          And you can see an agreement up on the screen
23   right now.  This is a Blaze agreement with █████████
24   █████████  which specifically talks about renegotiating
25   license fees based on the post acquisition event revenue

1    footprint of a combined company.

2        I asked Mr. Waid if this was in the Chubb

3    agreement.  He said, "Absolutely not."

4        Here's the agreement that FICO had with a company

5    called █████████.  It talks about how if annual gross

6    revenues increase after a merger or an acquisition by at

7    ████████████, certain rules are going to kick in.

8        Ms. Boone agreed that she never tried to add this

9    kind of language to the Chubb agreement.

10        Ladies and gentlemen, the other thing is, if

11    Mr. Waid was correct about his hard stop, consent is always

12    required theory, Mr. Schreiber and Mr. Sawyer would not have

13    been trading emails back in 2015 about whether the Chubb

14    agreement referenced revenue.

15        Mr. Schreiber would have sent an email that said

16    something like, well, ACE announced it's acquiring Chubb, so

17    as of the closing date, it's official, Mike, no more use of

18    Blaze unless we consent.  He didn't say that because there's

19    no "consent is always required" rule in the Chubb contract.

20        Mr. Sawyer has acknowledged that.

21        Let's go to the next slide.

22        At the top of this slide, you see Mr. Carretta's

23    letter to Chubb right after the merger.  He wrote "FICO's

24    consent is required under the applicable provision of the

25    license agreement."

1          What did Mr. Sawyer say at his deposition about

2     assertions by FICO that consent is always required?  He

3     said, "I would have communicated to Chubb that it is

4     possible that consent will be required based on what we know

5     about the planned merger."

6          Possible, not a hard and fast rule, ladies and

7     gentlemen.  And that what Mr. Sawyer said right here, that

8     is defendants' position on how the expanded use rule works.

9     Chubb might need consent from FICO if it's deciding to

10    expand use.

11         So what's the significance of all of these

12    problems with FICO's consent is always required theory?

13    Well, they show that there was no breach by Federal.

14         In opening, I walked through the work of examining

15    Section 10.8 and applying it to the facts of this case.  And

16    I want to do it again, and I'm going to use a deemed

17    assignment, the idea that there was an assignment of

18    Federal's rights to ACE as my example.

19         The first thing you need to do is substitute

20    "Federal" for the first two times that client appears in

21    this contract, because as Judge Schultz just instructed you,

22    Federal was the client that bought the Blaze license.

23         Then you need to remove all the references to

24    mergers and reorganizations and focus on acquisitions,

25    because that's what happened here.  And I did that on this

1    slide with the green dots, that simplification.

2            Next, you need to remember two undisputed facts

3    that Judge Schultz read to you right when this case started.

4    Fact 13.  After the acquisition of the Chubb Corporation by

5    ACE Limited, the Chubb Corporation ceased to exist; and fact

6    14, ACE Limited changed its name to Chubb Limited.

7            Based on those undisputed facts, you can fill in

8    exactly what happened after the acquisition.  Federal was

9    acquired by ACE Limited, which then became Chubb Limited.

10   And once you do that, once you fill in the words with what

11   the evidence showed happened, what does the contract say?

12           It says that if Federal is acquired by ACE

13   Limited, the acquisition shall be deemed an assignment

14   subject to this section.

15           Now, Mr. Carretta, FICO's lawyer, he agrees with

16   that.  If we go to the next slide, you will see the top box

17   is a quote from Mr. Carretta's first letter to Chubb after

18   the ACE acquisition.  He wrote, "A change of control or

19   merger and acquisition of Chubb was also stated as being a

20   deemed assignment requiring consent."

21           Now, of course, we disagree with Mr. Carretta that

22   consent was required, but we're all on that same page that a

23   deemed assignment is what happened here.

24           Now if we go back to Section 10.8 and we look at

25   the second clause, the second sentence, the expanded use

1  rule, it says, "And ACE Limited, now Chubb Limited, shall

2  make no expanded use of the FICO products as a result of any

3  such acquisition unless and until FICO provides such written

4  consent, which will not be unreasonably withheld."

5          So ladies and gentlemen, what did the evidence

6  show about whether the use of Blaze expanded after the ACE

7  acquisition?

8          What we know, what expanded use of a software

9  program is, because Mr. Ghislanzoni told us.  Expanding use

10 means you're adding the software, in this case Blaze, to new

11 computer applications.

12         Ladies and gentlemen, this is one place where you

13 do not have to do the hard work.  Mr. Ghislanzoni's

14 explanation is undisputed.  FICO has not given you an

15 alternative definition for expanded use.

16         Mr. Waid was here every day at trial, so he

17 certainly heard Mr. Ghislanzoni's testimony, but he didn't

18 offer a different way to measure expanded use.  And that's

19 because the evidence shows that FICO has agreed in other

20 circumstances to measure expanded use based on the number of

21 computer applications using Blaze.

22         Here's that contract with ████████.  Look what

23 it says about a merger and acquisition.  It says ████████

24 would need ████████████████████████████████████

25 ████████████████████████████████████████████

1 ▮▮▮▮▮▮▮▮

2          FICO cannot prove that Chubb put Blaze in more

3 applications after the acquisition.  It has not even tried.

4          Now Mr. Ghislanzoni told you it was his job to

5 integrate the Chubb and the ACE technology, and the

6 direction that he received was do not expand use of Blaze.

7 And Chubb was very careful and clear about this.

8          How do you know that?  Well, you heard about this

9 Evolution project in Australia.  Of course, it would have

10 been easier in 2016 to just copy the Evolution application

11 from Canada over to Evolution Australia, but that's not what

12 Chubb did.

13          You heard Mr. Ghislanzoni tell you that he

14 personally, he got involved and instructed the team in

15 Australia, do not add Blaze.

16          Now FICO has tried to call this into question with

17 those ChEAR spreadsheets.  And I have a feeling you may be

18 hearing more about them soon, but the person who created the

19 ChEAR spreadsheets, Mr. Pandey, explained that a ChEAR

20 spreadsheet simply tracks all of the technology that's ever

21 been under consideration at Chubb.  It does not show what

22 technology is actually in use.

23          The evidence is that Chubb Australia used the IBM

24 ODM software instead of Blaze in Evolution.

25          Now I really want to drill down on this question

1    of whether Chubb expanded use, because one of defendants'

2    claims in this case is that FICO acted in bad faith when it

3    rushed to terminate this contract in March 2016, even though

4    it had no evidence that use of Blaze at Chubb was expanding.

5            Remember.  The parties agreed in Section 10.8 that

6    FICO would not unreasonably withhold concept to even

7    expanded use of Blaze.  And this language was very

8    important.  It was specifically requested and negotiated by

9    Chubb.  You saw that in the red lines of the agreements and

10   the markup from Mr. Black at Chubb.

11           He added this language.  And FICO's conduct after

12   the ACE acquisition flew in the face of this agreement.  You

13   saw the first letter that Chubb sent FICO on February 17th,

14   after the acquisition, telling FICO nothing was changing

15   about its use of Blaze.

16           Mr. Waid told you when he testified that he found

17   this letter reassuring.  So no problems as of February 17th.

18           And then Chubb reiterated its commitment not to

19   expand use of Blaze in a second message that it sent a few

20   days later on February 25th.

21           You heard FICO claim that they had no information

22   as to what Chubb was planning after the acquisition.  But

23   here's the information.  Chubb told FICO that there would be

24   no change in how Blaze was used and how many applications

25   included Blaze.  Chubb even proposed downgrading use.  It

1   said, we'll go from our unlimited license to agree to only

2   use Blaze in 15 computer applications.

3           Chubb also offered to lock down the number of

4   Blaze users at 100, going from unlimited seats that they

5   paid for to 100.

6           But FICO did not like this proposal, as reasonable

7   as it was, because it wouldn't get FICO more license fees.

8           So Mr. Waid pointed to this sentence of

9   Ms. Pawloski's proposal and declared it a deal breaker.  He

10  said it was a non-starter.  This meant Chubb was operating

11  in bad faith.

12          So what was so offensive about this sentence?

13  Well, Ms. Pawloski's proposal suggested that Chubb could

14  later change the applications using Blaze as long as it

15  limited it to 15.

16          You heard Mr. Schreiber on video trying to

17  characterize this as a FICO, the sucker, proposal.  An

18  agreement to downgrade from an unlimited license that gave

19  you unlimited applications and unlimited seats to 15

20  applications and just 100 seats is not a proposal that

21  justifies terminating a license that was supposed to last

22  forever.

23          You heard FICO try to justify its rush to

24  termination by saying, well, we were concerned that FICO

25  might try to trick FICO -- that Chubb might try to trick

 1    FICO about how many applications really had Blaze.  But I

 2    think you know better than that by now, because you know if

 3    anything Chubb has been overcounting the number of

 4    applications.

 5            Remember you heard about all those components of

 6    the CIS CSI Express application, DecisionPoint,

 7    Profitability Indicator.  Chubb counted those separately,

 8    both in this report and at trial.

 9            Ladies and gentlemen, Mr. Carretta admitted that

10    he never even saw this proposal from Ms. Pawloski before he

11    sent his letter terminating the agreement.  That is truly

12    incredible.  That is bad faith.

13            And it gets even worse, because when Mr. Carretta

14    and Mr. Waid testified, neither of them identified any

15    evidence of expanded use of Blaze at Chubb in the period

16    before that termination letter went out.  Zero.  Zilch.

17    Nothing.

18            They both admitted that they couldn't identify

19    anything.  You can see it in their testimony on the screen.

20    And Mr. Sawyer admitted the same thing at deposition.

21            "And my question was, are you aware of any

22    evidence that there actually was expanded use following the

23    merger?

24            "No."

25            FICO's witnesses had to admit that there was no

1    evidence of expanded use because there was just no way to

2    get around that fact.  If there had been, each and every one

3    of their witnesses would have been here telling you about

4    it.

5         Now, I expect that FICO will spend a lot of time

6    talking to you about an argument crafted by its lawyers

7    after the lawsuit started and years after FICO terminated

8    this license agreement.  They reviewed all of Chubb's books

9    and records and searched for something that they could call

10   expanded use.

11        FICO is going to talk to you about how the number

12   of insurance writing companies in the applications that use

13   Blaze expanded.

14        The first thing I want you to remember about these

15   writing companies is they do not matter to FICO's claim that

16   it properly terminated the license agreement or to its

17   copyright claim.  To prove that FICO properly terminated the

18   license agreement and that it's entitled to copyright

19   damages, FICO has to show that it properly terminated the

20   contract on March 30th, 2016.

21        And even FICO hasn't argued that there was some

22   kind of expansion in writing companies before that day.

23        They couldn't because the information that FICO

24   relies on for its writing company theory, defendants'

25   response to interrogatory number 17, shows that FICO only

1    asked for information about Chubb's computer applications

2    starting after March 30th, 2016.

3           But even more important, this whole writing

4    company theory is made up.  It's not what expanded use means

5    under the license agreement.  Think about it.  No one at

6    FICO who actually negotiated the agreement or was involved

7    in the business negotiations with Chubb talked about writing

8    companies when they testified.

9           You only heard about writing companies from FICO's

10   trial lawyer and Mr. Neil Zoltowski, the expert that FICO

11   hired for this case.  They showed you over and over Chubb's

12   response to interrogatory number 17.

13          But this interrogatory response tells you nothing

14   more than the simple fact that after FICO terminated the

15   agreement, some policies by ACE writing companies, running

16   through one single application, CUW-Inventory Management,

17   were from Legacy ACE writing companies.  That's it.

18          And I want to be clear about what this does not

19   tell you.  It does not tell you that Chubb infringed FICO's

20   copyright.  It does not tell you that ACE employees came in

21   and all started using these applications.  And you heard

22   quite the opposite.

23          Mr. Ghislanzoni told you that ACE had no interest

24   in expanding its use of Blaze.  That means it wasn't trying

25   to put Blaze in ACE applications.  Even Mr. Carretta had to

1    admit there was no evidence that Blaze expanded into ACE

2    applications.

3            And both Mr. Ghislanzoni and Mr. Pandey, the

4    architects responsible for running these applications, told

5    you they have no reason to believe that ACE underwriters

6    were ever granted access to the CUW-Inventory Management

7    application.

8            And after years and years of litigation, FICO

9    hasn't found anything suggesting otherwise.

10           Now, they've talked a lot about this document that

11   shows that at one point in time, shortly after the

12   acquisition, some folks at Chubb considered whether they

13   should give ACE underwriting assistants access to CUW.

14   That's it.

15           So this whole argument about writing companies

16   expanding, transactions expanding that comes from the

17   interrogatory answer, is just an attempt to confuse the

18   evidence.  It's something that lawyers came up with years

19   after FICO terminated the license agreement because they had

20   to justify that March 2016 termination.

21           But it has no bearing on whether use of Blaze

22   actually expanded, and the evidence made clear that when

23   you're actually looking at Section 10.8, the expanded use

24   rule applies and Chubb did not expand its use of Blaze.

25           Now I want to turn to FICO's copyright

1   infringement claim.  This claim is connected to these issues

2   we're discussing, so I want to cover it now before we go

3   back to Mr. Carretta's letter.

4          Now you know that there's no copyright

5   infringement by Federal because FICO's termination was

6   completely improper.  And as long as FICO -- Federal had a

7   license to use Blaze, it couldn't be liable for

8   infringement.  So I want to focus here on this idea of an

9   infringement by ACE American.

10         Ladies and gentlemen, the whole point of

11  Section 10.8 was to ensure that ACE American would have a

12  valid license to use Blaze in circumstances like the ACE

13  acquisition.  Remember the work that we did applying

14  Section 10.8 to this case.

15         This says that if there was a deemed assignment

16  from Federal to the new entity, ACE Limited, which then

17  changed its name to Chubb Limited, you have the expanded use

18  rule.

19         And then remember Amendment Two to the Blaze

20  license agreement extended rights under the contract to

21  client and its affiliates.  It gave the client, now Chubb

22  Limited, and it's affiliates, like ACE American, the right

23  to use Blaze.

24         And here's what that means in practice.  As soon

25  as the acquisition closed, the new parent organization was

1    ACE Limited.  And ACE American became part of the Chubb

2    group.

3              FICO may talk about another ACE entity, ACE INA

4    Holdings, but as far as this corporate transaction and what

5    it means under Section 10.8 are concerned, they are all the

6    same.

7              Now you heard that ACE Limited quickly changed its

8    name to Chubb Limited, because of brand recognition.  And

9    this is what the new organization looked like.

10             Chubb Limited acquired the right to use Blaze

11   after that deemed assignment.  And because ACE American was

12   an affiliate of Chubb Limited, ACE American could use Blaze

13   too.

14             Now, you heard FICO's lawyers ask every Chubb

15   witness who went up there on the stand detailed questions

16   about who their employer was, what name was on their

17   paycheck.  FICO's theory is that because Federal employees

18   became employees of ACE American in January 2017, there was

19   Blaze copyright infringement as of that date.

20             But, ladies and gentlemen, the whole point of this

21   deemed assignment was to make sure that FICO could not

22   accuse Chubb of copyright infringement just because of

23   technical corporate name changes.  And that makes sense.

24             What wouldn't make sense is if a company could be

25   on the hook for copyright infringement just because one day

1    Pamela Lopata is working for Federal and then the next day

2    her employer is ACE American.

3              FICO has not met its burden to show copyright

4    infringement.

5              Now I want to return to Mr. Carretta's letter.

6    The next thing that he said in his letter was that he's

7    going to terminate the contract because FICO had become

8    aware of a further material breach due to use of the

9    software outside the United States in two applications in

10   the United Kingdom and Europe.  And then he references

11   becoming aware of another application in Canada.

12             And by the way, look at how Mr. Carretta is

13   talking about use of Blaze in this letter.  He's talking

14   about the applications that use Blaze.  He's not counting

15   names of writing companies.

16             Now when Mr. Carretta testified, he confirmed that

17   he was not involved in the original negotiations for the

18   license agreement and he had no idea what was discussed

19   about use of Blaze in Europe.  He also admitted that he

20   didn't do anything to investigate what his colleagues at

21   FICO had been telling Chubb about whether Blaze could be

22   used in Europe before sending that termination letter.

23             You can see from the testimony that he fought me a

24   bit on those questions because he didn't like my reference

25   to representations by FICO, but he did finally admit he

1    didn't look into any conversations between Chubb and FICO

2    about use in Europe.

3              The evidence is overwhelming that back in 2006

4    FICO and Chubb negotiated a global license.  You know that

5    now.

6              Mr. Carretta's failure to investigate that in good

7    faith before he sent this letter is another reason why

8    defendants have a counterclaim against FICO.

9              I want to take a look at what Mr. Carretta would

10   have learned if he had investigated, even just a little,

11   whether Chubb's Blaze license was global, or maybe the issue

12   was that Mr. Carretta didn't want to investigate because he

13   knew what he would find.

14             Now, I told you in opening to look out for

15   instances where FICO is telling you one thing now that's

16   different from what it said back then.  You saw this over

17   and over in the course of trial.

18             FICO tried to take the position, you just saw it

19   in the letter, that the Blaze license only covered the

20   United States.  But before the ACE acquisition, when FICO

21   thought no one was watching, Mr. Wachs, the FICO executive

22   who negotiated this agreement, admitted he negotiated a

23   global deal.

24             You also heard live testimony from Mr. Folz, who

25   negotiated with Mr. Wachs.  He told you it was completely

1    ridiculous for FICO to claim that the scope of the license

2    didn't include Federal's global affiliates.

3          And the evidence showed that's exactly what

4    Mr. Carretta would have realized if he had undertaken any

5    sort of investigation into FICO's communications about the

6    scope of the agreement.  Time after time after time after

7    time in this trial, you saw that FICO's executives

8    acknowledged that the Chubb license was global.

9          Remember this email.  This was Mr. Haines at FICO

10   proposing a $2.9 million license fee for Blaze saying that's

11   the price to grant Chubb global rights.  And Mr. Waid chimed

12   in with a recommendation of 1.6 with a $20 million discount.

13         When I confronted Mr. Waid with these emails,

14   first he kept asking me, well, what ELA are you talking

15   about, and then when he realized that there's no way to

16   align his emails from 2006 with FICO's position in that

17   termination letter from Mr. Carretta, the termination letter

18   that Mr. Waid told you he authorized, he retreated to saying

19   he just doesn't remember anything.  I don't recall any of

20   those emails.

21         Look at FICO's own internal tracker.  Chubb global

22   ELA.  Moving towards a global ELA.  That's weeks before the

23   agreement was signed.

24         Next is Mr. Wachs's message to Mr. Schreiber in

25   November 2008, two years after the agreement was signed.

1    Mr. Folz referenced this email yesterday when he was

2    testifying when Mr. Hinderaker asked him, "Well, do you have

3    any evidence that FICO knew it was a global license?

4         "We were negotiating for a global ELA?  Correct.

5         "You state that in reviewing your notes and some

6    archived emails it's apparent to me that the corporate ELA

7    that was negotiated with Phil Folz and June Drewry intended

8    to include the global license, correct?

9         "That is what I stated.

10        "You believe that it was intended to include --

11        "That's what I said.

12        "The ELA was intended to clue the global license?

13        "That is what I said."

14        On the next slide is a document that FICO prepared

15   for Chubb in 2011, reporting that FICO faced challenges at

16   Chubb in the UK.  FICO was helping Chubb Europe use Blaze

17   before Mr. Carretta decided to try to terminate the license

18   agreement because Chubb was using Blaze in Europe.

19        Let's go forward in time.

20        This time we have a confirmation of a global

21   license from Mr. Sawyer.  They do have a global ELA for

22   Blaze, and they have an application running in the UK.

23        Now remember, Mr. Carretta admitted that before he

24   sent his termination letter, he didn't check with Mr. Sawyer

25   to see what Mr. Sawyer knew about Chubb's global rights.

1          Mr. Hill, another FICO employee, sends an email.

2    To set expectations, they already have a Blaze global ELA.

3          Another email, someone at Chubb Europe, a Mr. Ewen

4    Setti, reaching out to FICO to Mr. Oliver Clark.  We're

5    using a global Blaze Advisor license.

6          No one at FICO responded to this message in 2013

7    and said, hold on, Chubb Europe, you don't have a license to

8    use Blaze, this is a material breach of the contract, and

9    we're terminating your rights.

10          That's because, as you saw Mr. Clark admit on

11    video on Monday, all the information he had at the time

12    confirmed Chubb Europe had a right to use Blaze.

13          "At the time that you were assisting Chubb Europe

14    with its use of Blaze, you and others at FICO Europe checked

15    to see whether that use was within the scope of the license,

16    correct?

17          "Yes, information was received saying that this

18    was a global license that the client had from FICO.

19          "First from FICO, correct?

20          "Yes."

21          That's the information that Mr. Clark received

22    when he asked about Chubb's rights under the agreement.  But

23    Mr. Carretta didn't ask, or maybe he didn't want to ask.

24          Here's Mr. Schreiber again.  He acknowledged about

25    a year before the ACE acquisition, before he saw the dollar

1    signs, that Chubb's license was global.

2            Now we have Mr. Moffat from FICO emailing Chubb

3    London with a price quote.  No additional Blaze license is

4    needed as it is covered within the overall global ELA.

5            Mr. Carretta's letter also mentioned some late

6    breaking news of Chubb use in Canada, but you know from the

7    evidence you've seen at trial that again this was not

8    improper.  Mr. Folz negotiated a global license, and FICO

9    reported on that over and over.

10           This is an email that went to Mr. Waid in 2015

11   when folks at FICO were canvassing Canadian insurance

12   companies trying to drum up business.

13           Mike Sawyer indicates that they, Chubb Canada, has

14   enterprise licenses for Blaze worldwide.

15           Ladies and gentlemen, the evidence is

16   overwhelming.  Executives in every corner of FICO, including

17   the people responsible for FICO's relationship with Chubb,

18   Mr. Sawyer and Mr. Schreiber and Mr. Wachs, acknowledged

19   over and over that Chubb had a global license.  But in

20   FICO's bad faith rush to terminate and try to extract those

21   extra license fees, Mr. Carretta and Mr. Waid were not

22   concerned with these facts.

23           Let's look now at Mr. Carretta's third and final

24   reason for terminating the license agreement.  That's this

25   idea that there was disclosure of confidential information

1    to a third-party consultant.

2            Now FICO told you, and I'm sure you'll hear again

3    in closing, that Federal has admitted in the course of this

4    litigation that consulting firms called DWS and AppCentrica

5    used Blaze in connection with supporting work at Chubb

6    Canada and Chubb Australia.

7            And the argument from FICO is that help from

8    consultants breached the contract.

9            But very importantly, Judge Schultz just

10   instructed you that damages are an element of a breach of

11   contract claim.  That means that AppCentrica and DWS's

12   access to Blaze only counts as a breach under the law if

13   FICO can show that their use actually caused FICO damages.

14           Now you've heard that there's no categorical ban

15   at FICO about using consultants to help develop computer

16   applications.  And there's no evidence that these two

17   consultants actually caused damage to FICO.  There has been

18   a complete failure of proof.

19           What did you hear about DWS?  Well, you heard that

20   two people at DWS in Australia reached out to FICO to ask

21   questions about Blaze.  That's it.  DWS wasn't lurking in

22   the shadows.  They emailed and called FICO, with one

23   gentleman identifying himself as someone who worked at DWS

24   and downloading a trial license from FICO's website.

25           Now I didn't even need to call Mr. Russ Hodey from

1    Chubb Australia to testify and tell you how FICO could not

2    have been damaged by this.  It was clear from FICO's

3    evidence that no damages were caused and we didn't want to

4    waist your time.  We wanted to return you to your lives.

5         So remember what Mr. Carretta said.  Mr. Carretta

6    didn't have any information about these consultants, other

7    than the fact that when he asked people to comb through

8    maintenance logs and see if they could find anything else to

9    raise with Chubb, he saw a reference to DWS.

10        Mr. Carretta also did nothing to investigate how

11   many people at AppCentrica or DWS used Blaze.

12        Any question about whether FICO could have

13   possibly been harmed by this was answered by this email that

14   Mr. Sawyer sent around the time FICO found out about DWS.

15   And this was before the lawsuit.  Here's what he said.

16   "Please continue to be responsive to DWS."

17        And you saw Mr. Waid was on this email chain, and

18   when I asked him about it last week he said, "I was fine

19   that they would continue to be responsive."

20        Now I have a feeling that FICO's going to get up

21   and talk about how critical, how important it is that FICO

22   have complete control over who is using Blaze and how it was

23   damaged in some way by this access.

24        But if that were true, if FICO really believed it

25   was being damaged, Mr. Sawyer and Mr. Waid wouldn't have

1    told their teams, continue responding to DWS.  They would

2    have done everything they could to stop it.

3              So here, too, FICO's actions before the lawsuit

4    tell you a lot more about their claims than what you are

5    hearing at trial.  FICO knew about these consultants.

6    Mr. Waid told you so, and you saw the emails.  FICO

7    consented to the use by the consultants.

8              Mr. Sawyer told his team to keep working with

9    them.  And FICO was not concerned about the consultants.

10   Mr. Carretta told you he did nothing to investigate when he

11   learned about it.

12             That evidence shows that use by the consultants

13   did not cause FICO harm, and it certainly wasn't material.

14   That means FICO has not met its burden of proving breach.

15             Now we're at the point where I have to start

16   talking about all of the money that FICO is asking for in

17   this case.  Remember, if there's no breach of contract and

18   no copyright infringement, FICO is not entitled to any

19   damages.

20             You don't even have to talk about damages.  You

21   can skip over those questions in your verdict form, and I

22   believe that you will based on all the evidence we just

23   talked about.

24             But FICO is going to spend some time talking about

25   all of the money it's hoping you will award, so I need to

1   address it.  And I'm going to start with this concept of

2   actual damages or lost license fees.

3          The idea here is that if FICO proves that Federal

4   breached the contract or wins this copyright infringement

5   claim, FICO would be entitled to a license fee that would

6   cover any improper use of Blaze.

7          As Judge Schultz instructed you this morning, that

8   means we're talking about a license that would cover the use

9   of Blaze at Chubb beginning in 2016 through 2020 when Blaze

10  was removed.

11         So how are you supposed to figure that out?  Well,

12  Judge Schultz told you that you would determine this license

13  fee based on what a willing buyer and seller would have

14  negotiated.

15         He told you that you have to assume they were

16  acting reasonably.

17         Let's go to the next slide.

18         Once more, FICO's position now does not match its

19  position before the litigation.

20         Now, I'm not sure exactly what Mr. Hinderaker is

21  going to say when he gets up here, but I think FICO's

22  litigation price will involve tens of millions of dollars.

23  But before this lawsuit, FICO willingly negotiated an

24  enterprise-wide perpetual license with Chubb, willing buyer,

25  willing seller, for $1.3 million.  But now that FICO is in

1    the middle of the lawsuit, they've doubled down.

2            When Mr. Waid talked about standard FICO pricing,

3    he did some really creative math that involved charging on a

4    per application basis, charging based on the number of years

5    Blaze was in use and even charging per country fees.

6            No one at FICO is pricing licenses, by the way,

7    based on the number of writing companies using Blaze.  You

8    saw that they use application-based pricing.

9            Now you know by now, ladies and gentlemen, that

10   there is nothing standard about paying tens of millions of

11   dollars for Blaze.  Mr. Waid focused his math on

12   application-based pricing, but you also heard about

13   enterprise-wide pricing.

14           When a customer buys a license that covers the

15   whole enterprise, they can put in as many applications as

16   they want.  That's the type of license that Chubb bought in

17   2006, and it's the type of license a lot of customers buy.

18           If an enterprise-wide license is available, what

19   buyer would ever be willing to buy Blaze individually for 10

20   to 20 different applications?  Not one.  And FICO couldn't

21   show you a single example in this trial.

22           That's because Mr. Baseman and Mr. Waid told you

23   FICO has a rule of thumb.  If a customer uses Blaze in more

24   than two to three applications, they'll typically offer them

25   an enterprise-wide license.  And that makes perfect sense.

1   If you have a family of five, you buy a family

2   plan for Verizon.  You don't each get your individual plans

3   because it costs more.

4   Mr. Waid also focused his math on

5   application-based pricing that charged by each individual

6   year of use, but you also heard about perpetual license.

7   That's the type of license that Chubb bought, the type of

8   license that many of FICO's customers bought, because,

9   again, no willing Blaze buyer is ever going to agree to pay

10  more for a license to use Blaze year by year than it could

11  pay for a license that lasts forever.

12  Here are FICO's standard pricing guidelines for

13  enterprise-wide perpetual Blaze license.  Mr. Waid admitted

14  when he testified that ███████████ would be the starting

15  point, the pre-discount starting point, for a ████

16  ███████████████.

17  Ladies and gentlemen, a ███████████████████ is

18  huge.  That is ████████████ than Chubb before the ACE

19  acquisition, and it's ████████████ than the combined

20  ACE/Chubb entity.

21  So remember if you're considering awarding FICO a

22  lost license fee in this case, and we do not think there's

23  any basis to do so, the idea is that you would figure out a

24  perpetual enterprise license that would cover the combined

25  ACE/Chubb entity as of 2016.  That's because the Chubb side

1    of the house had already paid for a perpetual

2    enterprise-wide license.

3            So what does that math look like under FICO's

4    standard pricing guidelines?  I did the math on the slide.

5    It comes out to about ████████.  This math is based on the

6    fact that ACE had ████████ in revenue as of 2016, and it

7    assumes the ████████ discount that's listed in the

8    standard pricing guide for licenses over ████████.

9            But you don't need to take me at my word with my

10   math.  You can do the math yourself working off the FICO

11   pricing guide, or you can see what Mike Sawyer did when he

12   was asked to apply FICO's standard pricing model to ACE in

13   2016.

14           "As I recall, I was asked to apply the standard

15   pricing model that they put out to the field representatives

16   by plugging in the scope of use, which would then -- the

17   enterprise-wide license agreement, and based on the new

18   assumed gross written premium, and that would spit out the

19   price.

20           So what number did Mr. Sawyer come up with?  Well,

21   we know he said this to Mr. Schreiber in February of 2016.

22   "They, meaning Chubb, probably don't have a sense that we're

23   going to be asking for three plus million."

24           Ladies and gentlemen, FICO seems to have forgotten

25   all about what standard pricing actually means when it

1  walked through the courtroom doors.  Back in 2006 they

2  understood.  This was a discussion about the right price for

3  an enterprise-wide perpetual license for the Chubb Group of

4  Insurance Companies which reported $12 billion in revenue

5  that year.

6          Mr. Waid recommended FICO suggest 1.6 million with

7  a 20 percent discount.  And Mr. Laden, Mr. Waid's boss,

8  responded you are correct, let's not get greedy.

9          And this is all consistent with what you heard

10  from Mr. Folz yesterday.  Mr. Folz spent 30 years

11  negotiating license agreements for Chubb.  He told you that

12  when he set out to negotiate a never-ending license for

13  Blaze, $2 million was his high-end number.

14          He told you that numbers like 30, 40, $50 million,

15  the kind of numbers Mr. Waid walked us through, were

16  completely ridiculous.  No willing buyer has ever paid close

17  to even $5 million to access Blaze.

18          Mr. Waid has access to every agreement FICO has

19  ever entered, but when I asked him if he brought to trial a

20  single license for Blaze that showed a customer paying 50

21  million, 40 million, 30 million, 20 million, he couldn't

22  show me one.

23          If FICO had an agreement that showed anything

24  close to the numbers they've been throwing out in this

25  trial, they would have brought it to show you.  Of course,

1     they would have.  They didn't bring one because it doesn't

2     exist.

3              There are 14 Blaze licenses in evidence in this

4     case, and they are all listed on this chart.  We could have

5     put more into evidence, but we didn't want to waist your

6     time.  The point is made.

7              Here is what customers actually pay for Blaze,

8     even the biggest companies in the world, ██████ , ██████ ,

9     ██ .  None of them has paid anywhere near the tens of

10    millions of dollars you have heard from Mr. Waid.  The

11    highest license fee amount in evidence is an approximately

12    ██████████████████████

13             You heard Mr. Waid characterize it as a

14    ████████████ , but that was including maintenance.

15             All these prices, ladies and gentlemen, make a lot

16    of sense when you consider what Mr. Ghislanzoni told you.

17    Whether Mr. -- when Chubb removed Blaze and switched to

18    Drools, Chubb spent about $1.5 million.  That's in the range

19    of the 1 to $2 million you saw in the graph a minute ago and

20    nowhere near FICO's litigation pricing.

21             Why would any willing buyer of pay tens of

22    millions of dollars for Blaze when they could get a

23    comparable product on the market for about two percent of

24    that?  No willing buyer would, and that's what matters,

25    because as Judge Schultz told you, any lost license fee

1    cannot be based solely on what FICO would have preferred.

2    It has to also reflect what a willing buyer would actually

3    pay.

4           Okay.  Let's talk about disgorgement damages.

5    These are the damages that can only be awarded if there's

6    copyright infringement.  And for all the reasons we talked

7    about, there is no copyright infringement and no

8    disgorgement damages.

9           But again I think FICO will talk to you about that

10   $21 billion in revenue earned by Chubb and the idea of all

11   this value associated with Blaze, so I need to address this

12   argument too.

13          During this trial, FICO showed you over and over

14   again interrogatory responses 16 and 17, because that's

15   where Chubb identified $21 billion in revenue associated

16   with insurance policies running through the computer

17   applications that included Blaze.

18          The reason FICO did that, the reason FICO kept

19   showing you those numbers, is because it's hoping that you

20   will award FICO billions of dollars in copyright damages or

21   some other really huge number.

22          And before I talk to you about why there's

23   absolutely no basis to do that, I want to level set.

24          FICO sold Federal a global, never-ending license

25   to use Blaze for just over a million dollars.  And I just

1    showed you that's pretty much what everyone else pays to use

2    Blaze as well.

3            Every FICO witness, and Mr. Hinderaker during his

4    opening has told you, that FICO uses value-based pricing.

5    That means they try to make it so the license fee a customer

6    pays roughly matches FICO's estimate of its value.  So FICO

7    took into account the value or the revenue that FICO

8    expected Blaze to bring to Chubb when it came up with that

9    $1.3 million fee.

10            And as we just talked about, the highest license

11   fee in evidence is just over 2 million.

12            When I asked why Mr. Waid was okay with those

13   numbers, why he wasn't jumping in on those emails from 2006

14   to say wait, hold on, Blaze can bring tens of millions of

15   dollars or billions of dollars in value to a company, he

16   said, "Why would I?"

17            And that's exactly right.  This whole idea that

18   Blaze could somehow be connected to billions of dollars in

19   revenues is just something that FICO came up with for this

20   lawsuit.

21            So against that backdrop I want to talk to ou

22   about the first thing you would have to do if you're

23   considering awarding disgorgement damages.

24            Judge Schultz instructed you that FICO has the

25   burden of proving a causal nexus between defendants'

1    revenues and the use of Blaze.

2         Now, you heard a lot from FICO about the value of

3    technology generally.  FICO has shown you over and over this

4    quote from a Chubb annual report that refers to technology

5    as a competitive weapon.  They highlighted it in opening.

6    They showed it to several witnesses.

7         FICO's lawyers wanted everyone to admit that

8    technology can be useful.  That's their big aha.  But

9    members of the jury, that's obviously true.  No one disputes

10   that technology is used by every company or that it can be

11   valuable.  Mr. McCarter, defendants' software expert, he

12   admitted that right away.

13        Mr. McCarter told you technology runs through all

14   of these pillars.  But this trial isn't about technology.

15   This trial is about Blaze, and Blaze is not everywhere.  It

16   was in 13 computer applications at Chubb.  And there's a big

17   difference between agreeing with the general statement that

18   technology has value and the notion that Blaze had a

19   connection to Chubb's revenues.

20        You heard Mr. Pandey, he explained this reference

21   in Chubb's annual report didn't have anything to do with

22   Blaze.  The business referenced on this slide was that Duck

23   Creek administration system.

24        After weeks of testimony, no one connected Blaze

25   to Chubb's revenue.  FICO did not meet its burden.  These

1    are FICO's witnesses.  They picked them.  You should assume

2    that they picked witnesses who had knowledge about the

3    things they were asked about.

4            Mr. Baer told you he has no idea of what rules

5    Chubb used.

6            Mr. Ivey didn't know how Blaze was implemented at

7    Chubb.

8            Mr. Baseman was only vaguely familiar with Chubb's

9    use.

10           And Mr. Marce was not familiar with specifics

11   either.

12           No one, not a single person at FICO, took the

13   stand to tell you that Blaze generated revenue for Chubb.

14   In fact, Mr. Baseman, the employee who FICO picked to come

15   here and talk first about all of the virtues of Blaze, said

16   he could not try to quantify the value.

17           Instead what you saw over and over was the

18   response to interrogatory number 17.  And then FICO had its

19   damages expert, Mr. Neil Zoltowski, add up all the numbers

20   in the interrogatory.  That's what he did.  He added up the

21   numbers, and that's how you get to 21 billion.  That's it.

22           But when Mr. Zoltowski was here last week, he very

23   clearly testified that he totaled up the numbers in the

24   interrogatories, but he didn't do the analysis that you've

25   heard is required under the law to connect the use of Blaze

1    to revenue.

2           He did not do the analysis that would be required

3    to offer opinions on whether there's that causal nexus

4    between that $21 billion and Blaze.  You saw when he came

5    back in rebuttal, he didn't want to admit that was true, but

6    it was.

7           When Mr. Zoltowski issued his opinions in this

8    case, he thought Mr. Whitener was going to cover the causal

9    nexus.  You heard him talk yesterday about how that's

10   usually covered by the industry experts.  And in this case

11   that would be an expert like Mr. Whitener who has worked in

12   the insurance industry.

13          But then FICO had a lot of problems when

14   Mr. Whitener testified.  After talking for about four hours

15   about all the value Blaze supposedly brought to Chubb,

16   Mr. Whitener admitted in the first ten minutes of his

17   cross-examination that he knew nothing about Blaze or any

18   decision management software when he sat down to write his

19   opinions.

20          FICO taught Mr. Whitener everything he knew about

21   Blaze in a 90-minute demonstration that used a college

22   admission scenario.  And it's very hard to believe, but FICO

23   waited to give that demonstration until after Mr. Whitener

24   had already written all of his opinions.

25          Remember, Mr. Whitener got on the stand, and he

1    put up this slide, and he said, oh, yes, there's all these

2    reasons why you'd use Blaze, increasing speed and agility

3    and precision, hours and hours of testimony.

4           But then what happened on cross-examination?

5    Mr. Whitener admitted that he didn't measure whether Blaze

6    actually did any of those things.  I do not know if Blaze

7    increased speed of response.  When I asked him you did not

8    try to quantify in this case whether Blaze actually improved

9    Chubb's ease of doing business, he agreed.

10          And then he even went on, allow me to point out I

11   measured none of those things.

12          He didn't measure the ease of use for brokers and

13   agents.  He didn't measure whether Blaze actually improved

14   ability to define accurate pricing.  And he can't speak at

15   all to whether Chubb actually increased the precision of its

16   quotes to customers.

17          Here is the most important thing about

18   Mr. Whitener's testimony.  When I asked Mr. Whitener whether

19   he could satisfy that causal nexus, whether he could say

20   that Blaze actually contributed to any increase in revenue

21   or profit at Chubb, he said he could not.

22          "Question:  You do not know whether Blaze actually

23   contributed to any increase in revenue or profit at Chubb,

24   correct?

25          "Answer:  I did -- correct.  I did not measure

1    anything."

2              That is it right there.  If any part of you was

3    thinking about awarding copyright infringement damages, and

4    I really hope you are not, this should be the end of the

5    consideration.

6              Remember, the judge told you it's FICO's burden to

7    prove that the use of Blaze contributed to the generation of

8    revenue.  No one at FICO could do it.  Mr. Zoltowski told

9    you he was counting on Mr. Whitener.  And Mr. Whitener

10   admitted he can't say that at all.

11             Now, I could stop there, but FICO is talking about

12   billions and billions of dollars.  So I need to make sure

13   there is not a doubt in your mind that FICO has not met its

14   burden.

15             We also showed you what happened when Chubb

16   removed Blaze from those 13 computer applications.  Chubb's

17   CFO walked through all these graphs.  If there was a

18   connection between Blaze and revenue, you'd see a drop in

19   revenue when Blaze is removed.  But FICO completely failed

20   to show any connection.

21             You heard exactly that last Friday from our

22   damages expert, Mr. Chris Bakewell.  He started his career

23   in computer programming, and he has extensive financial

24   analysis experience.

25             When FICO cross-examined Mr. Bakewell, they wanted

1    to spend all their time talking about that $21 billion

2    number in response to interrogatory number 17.  Mr. Bakewell

3    explained why that number is inflated, and I'm going to get

4    to that in a minute, but I want to focus on Mr. Bakewell's

5    larger point.

6          Remember what he told you.  All that math working

7    off this $21 billion is wrong.  It's wrong because there is

8    no nexus between Blaze and Chubb's revenues in the first

9    place.

10         Mr. Bakewell told you in no uncertain terms that

11   when he examined the record, he found that FICO established

12   no economic nexus between the use of Blaze and Chubb's

13   revenues.

14         We agree.  And you should stop there, because FICO

15   hasn't met its burden.  But if you somehow found that FICO

16   met its burden, the next question is how much of Chubb's

17   actual profits is attributable to Chubb.  And as the judge

18   explained, that burden is on us, if you get there.

19         We have to prove what costs should be deducted

20   from any revenues attributable to Blaze and whether profits

21   were earned by things other than Blaze.  And that's where we

22   got into all these things that make Chubb Chubb.

23         Mr. Bakewell explained how to do this calculation.

24   He explained that you need to convert gross written premium

25   to net written premium, and you apply the combined ratio,

1    and you get to a much smaller number.  But all of this math,

2    of course, Mr. Bakewell walked you through and explained to

3    you don't get to this math because they haven't shown a

4    causal nexus.

5              But we did show you all other factors that

6    generated profit at Chubb other than Blaze.

7              Let's go to Chubb's software expert, Mr. William

8    McCarter.  He's worked in the insurance software and

9    business solutions for the last 26 years.  He told you about

10   all the different decision management software he worked

11   with.

12             At one point in trial, Mr. Hinderaker made a

13   comment about how he thinks it's up to the jury to decide

14   who is an expert.  Well, I do not think there can be a

15   serious dispute as to Mr. McCarter's qualifications as

16   compared to Mr. Whitener.

17             And as Mr. Whitener explained, he knows decision

18   management software inside out, and he concluded that Blaze

19   did not contribute to the revenue or profits at Chubb.

20             He testified that many different factors, brands,

21   strategy, reputation, paying claim, those are what

22   contribute to revenue, not Blaze.

23             That brings us back to the pillars.  You heard how

24   important reputation is in the business of selling

25   insurance.  Mr. Harkin explained that's why ACE took Chubb's

1     name after the acquisition.  You heard about agents and

2     brokers and how important it is to have good relationships

3     to generate business.

4           Human relationships do not have anything to do

5     with Blaze.  Mr. Schraer explained that to you.  How else do

6     you know Blaze was not driving profits?  Well, we showed

7     that Blaze had a really low rate of adoption.

8           Remember, Chubb had the right to put Blaze in as

9     many computer applications as it wanted.  If Blaze was a

10    profit-generating tool, you would have expected to see it in

11    every computer application, but that's not what happened at

12    all.

13          You know that all 1500 of Chubb's computer

14    applications use rules.  Mr. Pandey explained that to you.

15    But only 13 of those applications ever used Blaze.  That's

16    less than a one percent rate of adoption.  At ACE it was

17    even lower.  Only four applications ever used rules decision

18    management software at all.

19          Why am I talking about ACE?  Well, ACE is another

20    very large, successful insurance company.  But as

21    Mr. Ghislanzoni explained, they didn't see any benefit to

22    using decision management software.  They relied on software

23    engineers to use programming language to write their rules.

24          Even where Blaze was used, we showed that it's

25    only one of many components.  Mr. Zoltowski didn't consider

1    that at all in throwing out his $21 billion number.

2            Mr. Pandey walked through the blueprint of this

3    application.  He explained that there are 20 plus different

4    components.  And he told you that Blaze is nowhere near the

5    brain nor the central nervous system of any computer

6    application at Chubb.

7            There is still more evidence that Blaze didn't

8    driver Chubb profits.  Remember, FICO's witnesses kept

9    talking over and over about how Blaze can be used by

10   business people.  You don't need IT.  But Mr. Pandey and

11   Mr. Ghislanzoni told you that they tried that at Chubb and

12   ACE, but it didn't work.  And IT professionals had to jump

13   it in to help.

14           Testimony by Mr. Theberge was consistent with

15   that.  She's a business user at Chubb, and she confirmed she

16   never wrote rules into Blaze.

17           We showed that Blaze came with costs and

18   challenges.  You heard from Mr. Ghislanzoni about how

19   sometimes it can create latencies in the IT systems, delays.

20   Blaze required having software engineers who were trained in

21   Blaze.  But finding people who can use Blaze can be

22   difficult.

23           You heard Mr. Schraer and Ms. Theberge explain on

24   Monday that even when Blaze was up and running it wasn't

25   always a success.  They told you DecisionPoint, it had a low

1     adoption rate.  It was a challenge.

2          We also showed that where Blaze was being used to

3     run rules, in that, as a single component, Blaze wasn't

4     deciding the rules.  This was not controversial.

5          FICO's own witnesses admitted, using Blaze is like

6     starting with a blank piece of paper.  It's the Chubb

7     employees who decide all the rules and exercise the

8     judgment, people like Ellen Garnes, who you met last week.

9          So not only was Blaze a single component of these

10    complicated computer applications running rules that Chubb

11    employees came up with, we showed that Blaze is one of many

12    different software products that can do the same thing.

13    ODM, Red Hat, Drools, Pega.  You heard about all of them.

14         Or software engineers can write rules into the

15    applications themselves.  That's the professional coding

16    that Mr. Ghislanzoni described.  And Mr. Pandey explained,

17    99 percent of the time that's what Chubb chose to do.

18         Ladies and gentlemen, if there's a doubt in your

19    mind, even after we showed you, that Blaze is a single

20    component of complicated computer applications, running

21    rules that Chubb employees came up with and that Blaze could

22    be replaced by another software product or programming

23    language, consider the evidence of what happened when Blaze

24    was removed.

25         No one complained to Mr. Pandey.  No one

1    complained to Mr. Ghislanzoni.  Ms. Garnes told you she

2    noticed no changes in terms of her experience at Chubb.  And

3    the business users, people like Mr. Schraer and

4    Ms. Theberge, also saw absolutely no impact.

5          Think about what Mr. Harkin, the CFO, told you.

6    He told you that sometimes he has to factor changes in

7    software into his financial projections, but that never

8    happened with Blaze.

9          FICO walked through so many public financial

10   statements and talked about all the natural disasters in

11   those documents that affected Chubb's bottom line.  But you

12   know what was not mentioned in any of those reports?  The

13   impact of removing Blaze.

14         Blaze is nowhere in those documents.  Trust me.

15   If there was a connection between Blaze and billions of

16   dollars, even tens of millions of dollars, it would be

17   there.

18         So let's end this discussion where we started it,

19   which is this concept of value pricing for Blaze.

20         Mr. Waid testified that the value-based pricing he

21   used was meant to approximate revenues generated or cost

22   decrease, basically how much profit could Blaze possibly

23   bring a company.  So they're pricing their licenses in that

24   1 to $1.5 million range to correspond to the profit that

25   they think they could possibly generate.

1          So if they're doing that, then the amount of

2     profit Blaze is generating, according to FICO, is the same

3     as the price of the license.  And look at the judge's

4     instruction.  Disgorgement damages are recoverable only to

5     the extent you have not already taken them into account in

6     determining the lost license fee.

7          So whether you consider disgorgement in your

8     deliberations or not, the only proper outcome is an award of

9     zero dollars.

10          Now when you go to the deliberation room, you're

11     going to receive a document called a verdict form.  Here it

12     is.  For all the reasons we discussed, you should answer

13     "no" and find for Federal on questions 1, 2 and 3, because

14     there was no breach of Section 3.1 or 10.8.

15          But even if you say "yes" to question 2 because

16     you think Federal somehow expanded use of Blaze after 2016,

17     you should still say "no" to answer number 3.  And that's

18     because at the time FICO terminated that license in

19     March 2016, there was no expanded use of Blaze.

20          If you find in favor of Federal on question number

21     3, you will see that you can skip ahead to Section II.  You

22     don't even need to discuss the questions on page 2.

23          But if you do discuss them, we ask that you find

24     for Federal on question 5 and fill in zero damages on

25     questions 4 and 6.

1    If there was no breach of contract, there can't be

2    damages or any copyright infringement by Federal either.

3    As we talked through earlier, if you consider

4    awarding a lost license fee to FICO, the evidence shows that

5    no willing buyer has with paid more than $3 million for a

6    Blaze license, and most buyers pay a lot less.

7    That brings us to the last two pages of the

8    verdict form.  Because there was a deemed assignment, there

9    could not be copyright infringement by ACE, and all of

10   FICO's claims here fail.

11   That means you have to answer "no" to question 7

12   and put zero dollars in response to question 8.

13   Now we had to break up the copyright and actual

14   damages questions between Federal and ACE because they're

15   two different entities, but any sort of market value damages

16   for this license should be combined.

17   The last section of the verdict forms concerns

18   defendants' counterclaims against FICO.  And for all the

19   reasons we discussed, it was FICO's bad faith termination of

20   the license agreement that brought us all here.  So we ask

21   that you answer "yes" to questions 12 and 13 and award

22   whatever amount of damages you think is appropriate to

23   compensate defendants.

24   FICO took a license that was supposed to last

25   forever and forced defendants to incur costs to transition

1    away from Blaze after only a decade of use.

2           Now I want to close by thanking you all for your

3    continued time and attention.  Jury duty is hard.  And you

4    stuck with us for several weeks, through the snowstorm and

5    now these tropical heat conditions that we're all in.  And

6    so we want to thank you for all of the hard work and the

7    time that you've put in.  We are very grateful.

8           Thank you.

9           THE COURT:  Thank you, Ms. Godesky.

10          Members of the jury, we will take a break until

11   15 minutes after 11:00, and at that time we will hear FICO's

12   closing argument.

13          Thank you.

14          THE CLERK:  All rise for the jury.

15                    (Recess taken)

16

17          **(In open court with the Jury present.)**

18          THE COURT:  Be seated, everyone.

19          Members of the Jury, we're working on it.  All

20   right?

21          Mr. Hinderaker, are you ready to proceed?

22          MR. HINDERAKER:  I am, Your Honor.

23          THE COURT:  All right.

24          MR. HINDERAKER:  So I'm in the unenviable position

25   of being what stands between you and lunch.  Good afternoon,

1   anyway.

2           I would like to begin by telling a story.  It's a

3   story about -- I mentioned -- it's a story about my

4   neighbor, a neighbor.  And, you know, I mentioned when we

5   were selecting the jury, when you all were selected, that I

6   live in South Minneapolis, and I'm in one of those areas of

7   South Minneapolis that has an alley.  So the block is

8   divided by the alley, and there is that side and this side.

9   And the alley is where neighbors meet, one of the places.

10          And Emmett Duffy has passed now, but for years

11  Emmett Duffy was retired from the Department of

12  Transportation, Minnesota state, and was the block captain,

13  if you will.  Everybody knew Emmett, and Emmett knew

14  everybody else.  And so I would be chatting with Emmett; and

15  Emmett would say to me often, Did you get it in writing?

16  And that was his wisdom.  If you're talking about something,

17  did you get it in writing.  And that wisdom of Emmett is one

18  of the things that this lawsuit is about, because FICO and

19  Federal got it in writing and the writing is the lawsuit.

20          The consequences -- this lawsuit was brought

21  because the license agreement and the writing in that

22  license agreement have consequences when they're not

23  honored.  And the lawsuit was also brought because under the

24  copyright law, there are consequences from infringing

25  somebody else's intellectual property.  These two core

1    elements are what we seek to hold the defendants responsible

2    for.

3              And in doing that, there is another piece of

4    wisdom, and this one comes from a 14th century philosopher

5    and theologian by the name of William of Ockham.  And his

6    piece of wisdom is now -- that is attributable to him is now

7    called Occam's razor.  And Occam's razor is simply this:

8    The simplest explanation is usually the best one.

9              Now, there are parts of this lawsuit that are

10   complex.  Blaze Advisor software is complex.  The corporate

11   structure of the Chubb Corporation is complex.  The

12   corporate structure of ACE Limited, now Chubb Limited, is

13   complex.

14             But I submit to you in your deliberations the

15   answers to the fundamental questions that you will be

16   deciding are found in the simplest explanations, and they're

17   found in the words that were put in writing in the license

18   agreement.

19             I submit to you from what you have heard in this

20   lawsuit, if the shoe were on the other foot, would Federal

21   Insurance or ACE Insurance Company be arguing that you

22   should ignore the plain words of the license agreement?

23             And before we go, let me say a word about

24   disgorgement.  The evidence shows that Federal infringed

25   FICO's copyrights when it continued to use Blaze Advisor

1    without FICO's permission after the license agreement was

2    terminated.  During that period of time, Federal acted like

3    it was the owner of Blaze Advisor.  And then a different

4    company called ACE American, as you know, a different

5    company in January 1, 2017, decided that it would be the

6    user of Blaze Advisor, and it then acted as if it owned it.

7         ACE American has never had permission to use Blaze

8    Advisor in connection with selling insurance like it did in

9    this case.  And so they did so from January 2017 until some

10   time in April 2020.  And because of that length of time, the

11   revenue amounts, the gross revenue amounts, that are

12   connected to the infringing use of Blaze Advisor, they are

13   huge.  21 billion is a huge amount of money.  But when you

14   look at 21 billion in the context of all of the revenue that

15   Chubb Limited had over that same period of time, that 21

16   billion is 14 percent.  14 percent is not a big number.

17        If Federal had stopped use when the license

18   agreement terminated, we wouldn't be here talking about

19   disgorgement.  There would be none.  If ACE American never

20   thought it owned Blaze Advisor and used it without FICO's

21   permission, we wouldn't be here talking about disgorgement,

22   because there would be none.

23        The disgorgement arises from their infringement.

24   The size of the disgorgement is because they are so huge.

25   But the disgorgement is -- and I might say, the disgorgement

1    is not compensation to FICO.  The disgorgement is the

2    consequence that the copyright laws say follow when you

3    infringe intellectual property.

4           So let me go -- let me provide an overview of

5    FICO's claims to try to focus on what we actually are

6    contending.

7           We have both the defendants, of course; and while

8    the claims overlap, they also are different.  So against

9    Federal, we have the breach of paragraph 10.8.  And 10.8

10   occurs when there is an event that significantly changes the

11   circumstances of the client, significantly changed the

12   circumstances of the client's use of Blaze Advisor.

13          So at the time of the original license agreement,

14   Blaze Advisor was going to be used in a 12-billion-dollar

15   company.  Because of one of the events of paragraph 10.8,

16   Blaze Advisor is now going to be used in a 35-billion-dollar

17   insurance company.  That's a big difference.

18          Now, Federal did not request FICO's consent, and

19   Federal and FICO could not agree.  And so after 60 days, not

20   immediately, 60 days after Mr. Carretta's notice of breach

21   letter, FICO terminated the license agreement.  And Federal,

22   rather than honor a license agreement or use software only

23   with permission, treated it as its own and did not stop use.

24          So that's paragraph 10.8.  I submit that on all

25   the evidence, there is really no serious dispute that may

1    even be admitted, though it is admitted in their

2    interrogatory answers, that Federal disclosed and permitted

3    unauthorized third-party consultants to access and use Blaze

4    Advisor.  That is a violation of paragraph 3.14.

5            Federal did what it represented and warranted that

6    it would not do.  It did give third parties access and use

7    to Blaze Advisor.  And then, again, for a second independent

8    reason for terminating the contract, Federal continues to

9    use Blaze Advisor as if it was its own.

10           There are copyright infringement claims against

11   ACE American.  ACE American is a different company, as I've

12   said.  ACE American has never had rights under the license

13   agreement.  So regardless of what you may conclude, and I'll

14   suggest why you should conclude in favor of FICO, regardless

15   of what you may conclude relative to Federal, ACE American

16   has no rights to use Blaze Advisor.  ACE American's use is

17   copyright infringement, and it lasted for years.  ACE

18   American used Blaze Advisor in connection with selling

19   insurance, just as Federal had before it.

20           Now, as a consequence, we have actual damages, and

21   we have actual damages which are compensation from both

22   Federal and ACE American.  The actual damages under the

23   copyright law is the same amount of damages as you would

24   award under the breach of the license agreement, the fair

25   market value for the infringing use, for the unauthorized

1    use of Blaze Advisor for the period of that unauthorized

2    use.

3            I'll comment in a while about this argument about

4    a perpetual license.  Having a perpetual license when the

5    period of use is during the infringing period for a number

6    of years, the professor would say is counter-factual.  We

7    would say it makes no sense.

8            And then under The Copyright Act is the profits.

9    We are entitled to the profits from Federal for its period

10   of infringement, and we are entitled to the profits from ACE

11   American for its period of infringement.

12           Consequences from infringement -- you know, the

13   laws of the country say that creative authors, writers, what

14   they create is worth protecting.  Mr. Marce has spent most

15   of his life creating and writing Blaze Advisor.  It is also

16   a work of authorship protected by the copyright laws.

17           So let me, with that construct, go to the

18   beginning of the story for a little bit.

19           The specialty lines of Federal wanted to expand

20   and grow, as we know, into the underrepresented marketplace

21   of the mid and small market accounts.  It had this, as we

22   have seen, key strategic initiative.  Duck Creek was already

23   in its architecture.  All of its pillars are already in, are

24   already there.  It is a viable and ongoing business, but it

25   wants to do what it hasn't been able to do before.

1          It wants to go into a different marketplace, a

2     small and mid, and it needs -- and it knows and wants Blaze

3     Advisor to do it, and it tells us why; because movement into

4     this has been difficult, it requires teams and systems to

5     handle an increased volume of work, more transactions,

6     policies, claims, in an environment where Chubb's current

7     expense management strategy does not allow for the increase

8     of staffing.

9          To succeed in that marketplace, you need to be

10     able to handle a higher volume, a lot more transactions, a

11     lot more applications.  You have to have the technology.

12     The technology that they were looking for was Blaze Advisor.

13     The technology that they licensed was Blaze Advisor.

14          There is in the jury instructions the reference to

15     the fact that when all of these companies are under the same

16     control and doing the same thing in joint, that is, to sell

17     insurance, the revenue from all of these companies is

18     recoverable from the two defendants.

19          One element of that is, Well, what is this Chubb &

20     Son, division of Federal, and what is the RFI all about?

21     Well, the RFI is about the fact that Federal's division of

22     Chubb & Son is the manager of many other insurance

23     companies.  Well, what does that mean?  It means that there

24     are many other insurance companies with no employees who

25     have policies of insurance issued in their names.

1          And how is that at all possible?  Because

2     Federal's division Chubb & Son provides the operating

3     personnel and all of the management services to be able to

4     do that.  When we had Mr. Taylor testify on the video, where

5     there were a number of these management and service

6     agreements that were entered into evidence, and all of them

7     have very much this language.

8          The manager, Federal, division Chubb & Son, is

9     empowered in the name and on behalf of said company, the

10    writing company, to effect, sign, countersign and issue all

11    policies or contracts of insurance and reinsurance.  And it

12    goes on and on.  All the authority that goes to the manager,

13    concluding and manage the business of insurance by and on

14    behalf of the company and take all necessary measures for

15    the company's production -- protection.

16         That is why, one of the reasons why Blaze Advisor

17    was of interest to Federal, because not only did it sell

18    insurance in its name, it was the arms and legs that made it

19    possible for insurance to be sold in the name of dozens of

20    other what we now know are writing companies.

21         And when this topic is addressed in the government

22    filings to the SEC, they say the same thing.  Chubb & Son

23    provides day-to-day management and operating personnel to

24    all of these other subsidiary insurance companies.

25         So there was an interest in Blaze Advisor because

1    the key strategic initiative was to move those companies

2    into this other market.

3              I would like to take a breath, but also to

4    slightly change topics just for a moment, and I would like

5    to discuss the issue of credibility.

6              As Judge Schultz has instructed you, you are the

7    judges of credibility.  If you believe a witness was telling

8    the truth, you can believe it.  If you believe a witness was

9    not telling the truth, you can believe some of what the

10   witness says or you can believe none of what the witness

11   says.  That's up to you.

12             And in this lawsuit, I raise this now in the

13   context of Chubb & Son and the -- being a manager, as I

14   recall the testimony of Ramesh Pandey.

15             "Have you ever heard of Chubb & Son, division of

16   Federal?

17             "Say again.

18             "Had you ever heard of the Chubb & Son, division

19   of Federal, before this litigation?

20             "Never."

21             And he's an officer.  Was that truthful?

22             You know, and as nice and as smart a woman as

23   Ellen Garnes was, Is there anybody here who doesn't know

24   where their paycheck comes from?

25             And as nice -- I found him nice -- a person as

1    Claudio Ghislanzoni, why did his whole demeanor and tone

2    change when I was asking him questions as opposed to when he

3    was on direct?

4             These are factors that you can consider as you

5    weigh, as you weigh the evidence.

6             Let's go back to the license agreement.  We know

7    that FICO was not the only rules management system that was

8    sent an RFI.  There were many.  As Mr. Wachs said, the first

9    step was to get to the short list.  After being on the short

10   list, the license agreement was made.  We're talking 2006.

11            And then through the progression of the rest of

12   that year, there is -- they go from the original license

13   agreement to the divisional.  So that now it's not just one

14   application, but it's the entire specialty lines division.

15            Why do that if Blaze Advisor isn't adding to your

16   business?  As Mr. Folz said yesterday, we test it out; and

17   if it's valuable, then we're willing to buy more.  So they

18   did buy more, broader scope of license.

19            Then -- oops.  Same slide.  And then they go to

20   Amendment Two.  Tested it out in divisional.  They liked it.

21   Why would you add more unless it was giving you business

22   benefit?  And so then they went to enterprise-wide,

23   enterprise-wide of Federal.

24            And by going enterprise-wide, as Mr. Folz said,

25   now, rather than being limited to the specialty lines, they

1    brought it into the commercial lines.  And they tell us in

2    their interrogatory answers.  The interrogatory answers have

3    been a bit denigrated lately in the arguments, but let's

4    just recall.  It's not FICO's answers.  It's the defendants'

5    answers.  And let's recall.  It's under defendants' sworn

6    testimony that they're truthful.

7         And so let's look at what the defendants say under

8    oath.  With the enterprise license -- now the corporate

9    business systems is using Blaze Advisor, as before on

10   Premium Booking.  Now, with the enterprise license, Chubb

11   Commercial Insurance is using Blaze Advisor for CUW-IM, TAPS

12   and IRMA.  Those were never permitted before Amendment

13   Number Two.

14        I submit just this early history of the continuous

15   increase of license scope is one piece of evidence that

16   proves the value of the connection of Blaze Advisor to

17   selling insurance.

18        Let me turn for a bit to the negotiations.

19        Mr. Folz, as you heard yesterday, had nothing to

20   do with the negotiations of the original license agreement.

21   Jandeen Boone did.  Jim Black did, but he's not here.

22        Every license agreement, as we know, is

23   individually negotiated.  And as you heard it described by

24   Mr. Waid, there is the circumstance where, Is the licensee

25   negotiating into FICO paper, as he described it, or is FICO

1    negotiating into the licensee's paper, which is to say,

2    which party's base contract, standard contract, is the base

3    upon which the negotiations are happening?

4         In this case, Federal, Jim Black, is negotiating

5    into FICO's standard language.  And as Ms. Boone says, I am

6    attaching the standard Blaze Advisor license agreement.

7         Now we know that the 10.8 provision was lightly

8    negotiated.  This shall not be unreasonably withheld, is the

9    addition requested by Mr. Black that FICO had no problem,

10   agreed to.

11        Every other element of that provision is standard

12   FICO language.  Every other element of that provision is

13   there to protect FICO's interests in Blaze Advisor.

14        Now we have seen other license agreements where a

15   licensee has been more aggressive on this, where a licensee

16   has in fact negotiated with FICO, and the agreements of

17   FICO's protection with respect to the 10.8 no assignment

18   provision have been modified.  Every agreement is a new

19   agreement.  And that happens, but it did not happen in this

20   case except for unreasonably withheld.

21        Now, we also know that paragraph 3.6, which is the

22   right of third parties to use, was heavily negotiated.  This

23   is what the standard FICO language license agreement looks

24   like.  There is a 3.5, and then there is a 4.  There is no

25   3.6.  The 3.6 was the product of efforts by Mr. Black to

1       include within the license agreement the rights of a

2       consultant, ACS Solutions, to use Blaze Advisor.

3              Ultimately, FICO did consent, but it wasn't a

4       simple thing.  In the background are the various iterations

5       back and forth that you saw in the redlining between

6       Ms. Boone and Mr. Black to get paragraph 3.6 to a place

7       where FICO was able to agree to it.

8              And FICO was able to agree to it because, as

9       finally drafted, paragraph 3.6 had these protections for

10      FICO:  The use by the consultant will be for the sole and

11      exclusive purpose of fulfilling its obligations to Federal,

12      in this case Chubb & Son; The use was also subject to the

13      terms and conditions of the license agreement; The use does

14      not exceed the limitations on use or other restrictions of

15      the license agreement.  Chubb & Son was made responsible for

16      ensuring that ACS complied, Chubb & Son/Federal.  Chubb &

17      Son/Federal, not only did they ensure that ACS complied, if

18      ACS did not comply, they were made liable to FICO for any

19      such breach.  And it was clear under 3.6 that no other

20      rights were granted to any other party without FICO's

21      written consent.

22             It was not a small thing in FICO's mind to permit

23      anybody to use Blaze Advisor without guardrails.  In the

24      license agreement, those guardrails are the terms and

25      conditions of the license agreement itself.  With respect to

1     this consultant, the guardrails were 3.6.

2          But now let me return to paragraph 10.8, the

3     lightly-negotiated provision.  As I said at the outset, what

4     the two parties here did was they put it in writing, and

5     this is what they agreed to.

6          I heard just a few moments ago that Federal didn't

7     understand what paragraph 10.8 meant.  Do you blame the

8     victim when something is wrong?  If Federal didn't

9     understand what paragraph 10.8 meant, it should have been

10    addressed before they signed the agreement.  To suggest that

11    FICO is responsible to have Federal understand the

12    agreements that it signs and the words that are given,

13    enough said.

14          So we know that FICO has invested decades of time

15    and money to make Blaze Advisor an industry leader in the

16    business rules management software space.  We know that

17    Marce, Mr. Marce, Jean-Luc, for example, has put his

18    professional career there.  His more than three million

19    lines of code, his patent of functionality in Blaze Advisor,

20    that is simply not available from the competitors.  And

21    that's not to denigrate any competitor.

22          And that's not to say that another competitor

23    can't be used.  In fact, I will comment in a while that the

24    defendants chose to use Drools when they finally took Blaze

25    Advisor out.  I'm happy that they're -- they find Drools

1    acceptable.  The point is, they didn't abandon having a

2    business rules management system to assist with them in

3    selling insurance.

4           After four years of infringement, they finally

5    went someplace else, but not to abandon the technology, not

6    to abandon the benefit that the technology gave them to sell

7    insurance.  So because of that investment in the code, in

8    the product, the business, actually, of Blaze Advisor, FICO

9    keeps exclusive control over those rights.

10          And when it puts protections around it, it puts

11   them in writing, and this is some of the writing.  So why?

12   Why have it?  Well, the first sentence we all agree doesn't

13   have any application, and the why of that is pretty

14   straightforward.  If my client wants to assign it to a

15   stranger and they have an agreement, I hereby assign it to

16   you, you don't get to do that without having FICO having

17   consent.  FICO's license agreements don't travel in the

18   world without FICO control.

19          But the second sentence is the heart of the matter

20   here.  And I might say that, you know, when a client is

21   successful organically, FICO applauds.  Make more money.  Do

22   better.  But when circumstances occur where the client is in

23   a very different position than it was at the time of the

24   original license agreement, when those circumstances occur,

25   and so what we have at the time of the event is

1   fundamentally different from what we had when the license

2   agreement was signed, then paragraph 10.8 says FICO gets --

3   10.8 says FICO has the right to revisit things.

4           Now, I would like to go to the language.  Words

5   matter.  And what the words actually are is, "Each such

6   event shall be deemed to be an assignment."

7           The argument of the defendants seems to suggest

8   that there is an animal that is called "deemed assignment,"

9   like there is a real assignment in paragraph -- sentence one

10  and there is something else called deemed assignment.  There

11  is no something else called deemed assignment.  What there

12  is, is an event that fundamentally changes the nature of the

13  circumstances around the client and that shall be deemed to

14  be an assignment, considered to be an assignment.  And why?

15  Because then it is subject to this section.  And why does

16  that matter?  That's what gives FICO the right to consent

17  before you use Blaze Advisor after the event.

18          So what are these events?  A change of control of

19  the client.  The client never changes, just that the client

20  now is owned by somebody else, but they're still the client.

21  Or if client is merged with, acquired by or acquires

22  another.  It's still the client.  It has just simply

23  undergone the fundamental change of circumstances.  Or

24  undergoes a reorganization or otherwise acquires the right

25  to process the business of another entity.  It's still the

1    client, but now it's gone through a different kind of

2    fundamental change.  It's processing somebody else's

3    business.  So the volume has gone up.

4            And it isn't that FICO has any say in whether

5    control changes or whether there is a reorganization or

6    whether somebody is quiet.  FICO's only say is, We get to

7    revisit and consent to whether you want to use Blaze Advisor

8    in your use circumstances.

9            We've had the conversation many times about

10   value-based pricing.  And when -- and that's how FICO

11   prices.  And so it looks at the value that the software can

12   bring to the organization.  So in 2006, when it was pricing

13   that license agreement, it was looking to the value that

14   Blaze Advisor could bring to the use of Blaze Advisor inside

15   of a 12-billion-dollar organization.

16           Now we have a fundamental change of circumstance,

17   and Blaze Advisor is going to be used inside of a 30,

18   35-billion-dollar organization, something twice as big.

19   Well, that significant change presents a significantly

20   different value proposition for Blaze Advisor.  Blaze

21   Advisor can bring much more value inside of a

22   35-billion-dollar company than it can under a 12.

23           And as I said in opening statement, and as

24   Mr. Waid said, were FICO to license to a 5-billion-dollar

25   company, same software, but the value to the

1    5-million-dollar company is much less because the company is

2    much smaller.

3              So value-based pricing aligns with the size of the

4    overall organizations in which the software is going to be

5    used.  You double the size of the organization, you change

6    the value proposition.  FICO in writing has said, We get the

7    right to revisit.

8              Now, why, why are these events included within

9    10.8?  One of the reasons that companies merge, two

10   companies come together to be yet a bigger company, is to

11   grow the business overall.  There is the adage, one plus one

12   equals three.  And sometimes it's just called synergies.  So

13   if you're a part of a 12-billion-dollar organization and now

14   you're part of a 30-billion-dollar organization, you would

15   expect more referrals, more business to your unit just by

16   the fact that you are in that much bigger organization.

17             And so this is what Chubb said right after the,

18   right after the merger.  "We completed the largest merger in

19   insurance history and integrated two complimentary insurance

20   organizations."  That was to make one and one three.

21             "In doing so, we furthered our long-term strategic

22   objectives to grow and diversify our business by adding to

23   our product, talent and distribution capabilities, which,

24   managed right, will generate substantial shareholder value

25   well into the future."  "Shareholder value" means greater

1      revenue, greater stock price.  One and one equals three.

2      And that's one of the reasons why these companies merged.

3            And so FICO put it in writing that when such an

4      event happens, it has the right to have its consent

5      requested, it has the right to have information upon which

6      to make an informed consent, and it has the right to

7      negotiate with the client, who hasn't changed, but the

8      circumstances have, for how that consent will be granted.

9            This is Mr. Schreiber's testimony.  "It sounds

10     like you're saying it's a bad thing, fair revenue.  Good,

11     honest, clean, fair revenue.  Yeah.  Yeah.  If I sold it to

12     a 12-billion-dollar company, now a 30-billion-dollar company

13     is using it, it's a different price point.  That's all."

14           Common sense.  FICO had the right to do it only

15     because it was in the license agreement and Federal agreed

16     to it.  As I said, consent was never requested.  The efforts

17     to find and keep the long-term relationship failed.  I guess

18     you can blame both sides.  And the bad news for FICO was

19     that it lost a client of ten years that it really had a lot

20     of value from.

21           And, again, as I said at the early outset, if

22     Federal had honored the termination of the license, and if

23     Federal had honored paragraph 9.2 that says, What do you do

24     on termination and stopped use, we wouldn't be here.

25           I might also point out now that when we get to

1     that commercial proposal where Federal said, Well, here's

2     what we're going to do, there never was a conversation --

3     there never was a request from Federal to say, You're right,

4     license agreement is terminated, let's end the relationship,

5     but I would like to discuss with you a migration plan, so I

6     can leave Blaze Advisor and go on to something else.  Never

7     had that conversation.  Just ignored us.  Kept on using.

8     And then ACE American took over.

9          So the defendants want to focus on this:  "And

10    client shall make no expanded use of the Fair Isaac products

11    as a result of any such event unless and until Fair Isaac

12    provides such written consent, which will not be

13    unreasonably withheld."

14         And I submit to you, ladies and gentlemen, that in

15    the English language "and" means and.  It is as Mr. Carretta

16    said a second independent restriction on Chubb & Son.  And

17    Chubb & Son shall do nothing different, lock it down, until

18    that written consent is given.  Mr. Schreiber's words, "This

19    expanded use bit on the side is really kind of a safety net

20    while working through the change of control issue is how I

21    read it.

22         "Just make sure you're not running additional

23    business through it."

24         There was the contention that the meaning of

25    "expanded use" is somehow a mystery.  Let's just use our

1    common sense.  Expanded use can be running additional

2    business through an existing application.  Expanded use can

3    be adding applications.  Expanded use is not one thing.

4    Expanded use is whatever common sense says is an expanded

5    use.

6         And Mr. Schreiber says, "Just make sure you're not

7    running additional business or you're not creating new

8    applications, not running additional business through it or

9    creating new additional applications, even if it was the

10   legacy enterprise.  An assignment never was agreed to and

11   all we're saying is, you know, lock it down.

12         "What's that period of time to lock it down?

13         "About 30 days.

14         "Why 30 days?

15         "That's the normal period of time in which you

16   make an agreement, consent, new license, or you don't,

17   terminate."

18         "Lock it down" is not forever, and "and" means

19   and.  There are no rights granted to Federal because it is

20   obligated to lock it down while it's negotiating for

21   consent; and if it doesn't want to use Blaze Advisor, bad

22   for FICO, but fine.  Stop.

23         Mr. Carretta, on the same point, "Don't do

24   anything different today from what you were doing before

25   while you're in this period that we provided to them."  You

1    recall in his letter his initial period that he provided was

2    the 30 days that ultimately was extended.

3          Mr. Waid, "It's an additional constraint that

4    until consent is mutually made, lock it down and don't do

5    anything with that software, lock it down."

6          That's what FICO put in writing.  That's what

7    Federal agreed to in writing.  "And" does not mean, accept

8    that, I have additional rights.  "And" does not mean, but I

9    have other rights.  Nothing in that "and" provision gave

10   Federal any rights to do anything but lock it down until

11   they got consent; or if they didn't get consent, then stop

12   use.

13         In the fairness of it all, from FICO's point of

14   view, that's its business model to price this product on a

15   value-based; and if Federal doesn't like that business

16   model, don't agree to a 10.8, but they did.

17         Now let's turn to this commercial proposal,

18   so-called, on February 25.  This is what FICO was told:

19   "Chubb shall have the right to change the applications

20   utilizing Blaze Advisor at any time in its sole discretion

21   without FICO's consent so long as the named applications do

22   not exceed an amount of 15."  Well, that's the FICO, the

23   sucker, comment from Mr. Schreiber.

24         But before we get to that, how is it that the

25   licensee is telling the licensor what the terms and

1   conditions of the license are that I will change the

2   applications utilizing Blaze Advisor at any time in my sole

3   discretion?

4         I submit there was no -- there was no rush to lose

5   a long-term client, but we did learn in this communication

6   everything that was necessary to know in terms of the

7   operation of paragraph 10.8.  There is no doubt that Blaze

8   Advisor is going to be now used in the 30-billion-dollar

9   organization.  There was no doubt that they would use it in

10  any way they wished, changing applications and running

11  additional volume through it.

12        On this point, I do agree with the defense

13  counsel.  This is everything FICO needed to know that its

14  commercial reasons for having 10.8 were triggered.  Its

15  software was now going to be used in a 30-billion-dollar

16  organization, rather than the earlier one of 12 when the

17  agreement was originally made some ten years earlier.  Clear

18  notice.  They acted like they owned Blaze Advisor.

19        And as Mr. Schreiber said -- Sawyer -- I'm sorry

20  to say, sorry -- when he was talking to Henry Mirolyuz,

21  "It's more likely than not that the decision would be in the

22  future to migrate operations from the Legacy ACE business

23  onto the Legacy Chubb systems and specifically the

24  underwriting and renewal underwriting applications for which

25  Blaze Advisor was a part of."

1          The argument we just heard was criticizing

2    Mr. Carretta, the lawyer, for not knowing about the business

3    side of the discussions with Mr. Waid.  The business people

4    reviewed this proposal.  And as Mr. Carretta said, "I was

5    told to write the e-mail the next day rejecting the offer,

6    the proposal, because the business people had reviewed it.

7          "What did Mr. Schreiber say when he saw it?

8          "Terrible proposal.  Bad-faith proposal.

9    Disgraceful."

10         He was looking at that language of sole

11   discretion, and this is where he made the FICO, the sucker,

12   comment.

13         And what did we learn yesterday from Mr. Folz?

14   Within a couple -- a week, ten days of the announcement of

15   the merger, he was involved in discussions on it with the

16   ACE people and how to integrate the technologies of the old

17   Chubb Corporation into the new Chubb Limited corporation

18   because of the ACE acquisition.

19         February 25 FICO was told, "We are going to use

20   Blaze Advisor in the new organization.  We're going to

21   change it any way we wish."

22         Sawyer's comments with Mirolyuz, "More likely than

23   not.  Blaze in the new organization."

24         Phil Folz.  "Yeah, we were integrate -- we were

25   discussing integration of the technologies right away."

1          Schreiber.  "Loved the client.  Wanted to maintain

2     a reference.  Really wasn't looking to do anything other

3     than figure out, How do we stay whole and continue the

4     relationship, but more important to us was the long-term

5     business relationship."

6          He was the person who originally brought in Chubb

7     & Son in 2006.  The last thing he wanted was to lose that

8     long-term relationship.  This notion of rush to termination

9     for some reason just doesn't fit the facts.  If they wanted

10    to honor the license agreement and stop use, as I said

11    before, we wouldn't be here.  FICO would have no damages.

12    It would just have a lost client.

13          This is Mr. Waid's response.  He was the one who

14    directed Mr. Carretta to write the e-mail.  "We grant

15    licenses.  Our clients don't grant themselves licenses.

16          "Did you draw a judgment whether it was a good

17    faith or bad faith proposal?

18          "My impression was that it was bad faith."

19          We were told exactly what was going to happen.  We

20    were told the value proposition of Blaze Advisor was

21    changing.  We were told that the events that made 10.8

22    commercially reasonable had happened.  And we then learned

23    through the lawsuit, because it takes litigation to get

24    information from the other side, that they did exactly what

25    they said they were going to do.

1          In 2016, about 360 million dollars of additional

2     revenue, additional insurance policies representing that

3     amount of money ran through systems for Legacy ACE insurance

4     companies that had never before sold insurance in connection

5     with Blaze Advisor.  In 2017 the number was 995 million.

6     2018, 807 million.  In 2019, 1,411,000,000.  All told before

7     they stopped use, 3.57 billion dollars of additional volume.

8     Never before used in Blaze Advisor application, ran through

9     CUW-IM utilizing Blaze Advisor because there was a merger.

10    These are all Legacy ACE writing companies that never before

11    had access to Blaze Advisor except because of the merger.

12          So let me turn to -- I want to turn to this:

13    Before I do that, let me just say this:  There is this

14    notion that we're just talking about applications that

15    contain Blaze Advisor and the insurance policies ran through

16    the applications.  Not true.

17          Mr. Harkin was here.  And he testified, "The

18    information that I pulled from our systems to put forth in

19    the interrogatory answers was the insurance policies and the

20    dollar value of the policies that did two things.  They ran

21    through the application, and they used Blaze Advisor.  Tied

22    directly."

23          And that 3.57 billion is the additional volume

24    that ran through, that utilized Blaze Advisor only because

25    there was a merger, and now ACE and Chubb was, as they say,

1     now one.  The interrogatory answers belie the notion of no

2     expanded use unless you adopt the proposition that there is

3     only one common sense definition of expanded use, and that's

4     if you have more applications.  But as Mr. Schreiber said,

5     more volume is expanded use, too, and common sense says more

6     volume is expanded use.

7              So let me sort of wrap up the 10.8 discussion.

8              FICO put it in writing, and Federal/Chubb & Son

9     agreed, that certain specific events would be considered the

10    same as an assignment, not that it was an assignment.  It

11    would be considered the same as an assignment, subject to

12    this section.  So FICO's consent was required to continue to

13    use Blaze Advisor.

14             The three specific events of each one were the

15    circumstances where the client has significant changes as

16    compared to the circumstances of the original agreement; and

17    because FICO's licenses are value-based, the value-based

18    pricing aligns with the benefit that FICO can bring to the

19    organization.  And so when the organization is twice as big,

20    FICO gets the opportunity to consider whether the fees are

21    still fair.

22             We have that significant change of circumstances.

23    FICO had the right to revisit the fairness of the fees, but

24    Federal did not honor that.  They acted like they owned

25    Blaze Advisor, and they just went ahead and did what they

1       wanted to do.

2               FICO lost a client, terminated the license

3       agreement to protect its own software; and the use continued

4       on for another four years until this litigation was well

5       into its time.

6               I have just described what FICO put in writing and

7       what Federal agreed to.  I would like to change topics now.

8               Why -- we saw this.  I pulled these slides from

9       the opening of the defendants, and we heard it again today.

10      And so what I'm asking you in my rhetorical way in this

11      argument is, Why do defendants work so hard, do such

12      violence, to the language of 10.8?  And I'll go through what

13      they are doing with it.  And I submit to you that this

14      distortion, this contortion, of the language of 10.8, they

15      do that because they want to try to hide the fact that ACE

16      American is a straight out, no apologetic, copyright

17      infringer, never having rights to Blaze Advisor.

18              So let's look at the violence that happens to

19      these words.  So here we start out the original, the

20      original language of 10.8.  Well, okay, where it says

21      "client" let's change it to "Federal."  No quarrel.  But why

22      don't we do it for every instance where "client" appears.

23      If client is Federal in that first line where it appears

24      twice, client is Federal later on in the same paragraph

25      where it speaks to the client.  But they don't.  I submit to

1    you that being consistent is not possible with the reading

2    that they put on to paragraph 10.8.

3          What's the next change?  Well, let's remove the

4    change of control language as one of the events.  Well, why

5    do that, I suggest, I wonder?  Well, you want to eliminate

6    the change of control language because Federal did in fact

7    become owned by someone else.  Federal underwent a change of

8    control.  Federal, as a consequence of the merger, became

9    owned by another one of these entities called ACE INA

10   Holdings, Inc.

11         Now, the defendants, they really want to be owned

12   by Chubb Limited, the big thing, but it's simply not true.

13   And one of the uncontested facts that the judge read to you

14   at the beginning of the case is that after November -- after

15   January 15, 2016, Federal was a wholly-owned subsidiary of

16   ACE INA Holdings, Inc., a fact that would be ignored under

17   defendants' reading.

18         So the truth is different from the violence to

19   this language because Federal did have a change of control,

20   and it became under the ownership of ACE INA Holdings, Inc.

21         So what's the next step?  Ahh.  Federal was the

22   client before, but now where "client" appears again, the

23   client becomes Chubb Limited.

24         Now "client" in the same paragraph means two

25   different things, two different companies, and, again, it

1    ignores the uncontested fact that Federal wasn't -- was

2    directly acquired by ACE INA Holdings, Inc.  All of this

3    effort is for the end goal of having you think that all is

4    one; and if you have Chubb Limited, everything underneath it

5    is the -- just all in the same family and we can do whatever

6    we want if we're all underneath that.

7            They would like you to ignore the fact that there

8    are about 100 some different, separate corporations that

9    have different existences, and that determines what this,

10   how this language works and whether ACE American has any

11   rights at all under the license agreement.  And certainly

12   "client" cannot be two different companies in the same

13   sentence.  And it certainly does not make ACE American a

14   client.

15           So we have the slide from defendants that has ACE

16   American on the outside.  This is what the corporate

17   structure really looks like.  Each of those dots is one of

18   the subsidiary corporations.  And you will see where Federal

19   sits in that organizational structure, and you see where ACE

20   American sits in that organizational structure.  They are

21   not owned by the same company directly.  ACE American is

22   certainly not owned 50 percent by Federal to be an affiliate

23   under the license agreement.  Separate companies.

24           Really, when you look at the facts, you cannot

25   escape -- ACE American cannot escape the reality that it had

1    no rights to use Blaze Advisor, and it's a straight out,

2    unapologetic infringer.

3         At the opening statements, we heard from the

4    defense that understanding paragraph 10.8 requires, "Hard

5    work."  I submit to you that understanding the plain words

6    of 10.8 does not.  The hard work is getting through the

7    violence that is done to the words in the defense

8    interpretation.

9         So going to the point that ACE American is a

10    straight out infringer with no rights to Blaze Advisor,

11    again, let's assume for a moment that the license agreement

12    was not terminated.  How does ACE American come into the

13    play?  It doesn't.  Different company.  Just as Pamela

14    Lopata said, It just happened to me, right.  It just

15    happened.  All of a sudden I'm ACE American.  Well, it may

16    just happen, but that doesn't give you rights to use Blaze

17    Advisor without FICO's consent.

18         So we get through the defendants' arguments on

19    this 10.8, and you would have to first believe that somehow

20    Federal's rights under the license agreement become the

21    rights of ACE Limited; and then you have to argue that

22    because ACE Limited/Chubb Limited is the parent of all

23    subsidiary companies, that somehow Federal's rights are

24    transferred to ACE American.

25         That simply does not work, not if you have any

1    fidelity or honor to the fact that each of those 100 some

2    corporations have a separate legal existence.  Chubb & Son

3    organized itself in this way.  Fine.  You can't escape its

4    responsibilities because it's a complicated structure.

5              And I think the fact that ACE American took over

6    the use of Blaze Advisor on January 1, 2017, is simply

7    unchallenged.

8              I commented about the credibility of witnesses.

9    And I would like to take a breath and comment for a moment

10   on the credibility of the proof, and I think you can judge

11   the parties' positions as well by the quality of their

12   proof.

13             So I mentioned this a couple times already.

14   That's the quality of the defendants' proof of the

15   organizational structure of ACE Limited.  The real facts are

16   like that (indicating).  The real facts show that ACE

17   American is not an affiliate of Federal as defined by the

18   license agreement.

19             Defendants want us to avoid the consequences of

20   the real facts, but they cannot be avoided.  When you

21   infringe copyrights, you do.  We heard from Mr. Bakewell,

22   their damages expert, what was the quality of his proof?

23   That was some of it.

24             What was the quality of the proof of the chief

25   financial officer, Mr. Harkin?  Did he come here with

1    financial records?  Did he come here with cost reports?  Did

2    he offer any information to you upon which you could make

3    your judgment?  I submit he just came with slides.

4            So let me move on to paragraph 3.1.  Federal

5    represented and warranted that it would not permit an

6    authorized third party consultant to use or access Blaze

7    Advisor.  What did it do?  It admits to us that AppCentrica

8    used Blaze Advisor when consulting with Chubb Insurance

9    Company of Canada.  It admits to us that DWS Group used

10   Blaze Advisor in consulting with Australia Chubb.

11           What did Mr. Ghislanzoni say?  "I met with Zorica.

12   I remember her mentioning AppCentrica being one of the

13   consultants they were using in Canada.

14           "And in terms of the work being done by Chubb

15   Australia, you were aware that Chubb Australia was using a

16   consultant in connection with this project called DWS Group?

17           "Yes, I was aware of that.

18           "And by 'this project,' I'm talking about the

19   project of creating the Australian Evolution application

20   from the Canadian Evolution application.  We're on the same

21   page?

22           "Yes.

23           "It required the paragraph 3.6 with the consent

24   given to ACE Solutions?

25           "It required all of that legal work and all of

1    those words to put guardrails and protections around the use

2    of ACS solutions, and ACS solutions was the same thing as

3    AppCentrica and the same thing as DWS Group, a consultant

4    working with the insurance company."

5            This is in evidence, and Martin Sill you may

6    recall is one of the DWS people.  He is going to pull

7    together notes on how rules are implemented in Blaze

8    currently.  Very straightforward.  Any doubt that he is

9    accessing and using Blaze Advisor?  I think not.  Any doubt

10   that he had permission?  There is none because he did not.

11           The importance of this to FICO has been

12   undermined, denigrated, but FICO thinks it's awfully

13   important because it puts into 3.1 a variety of controls

14   that will not happen.  Its license, its software will be

15   used for the internal business use only.  No one can alter,

16   change, modify, adopt, translate or make derivative works.

17   No one can reverse engineer.  No one can disclose or permit

18   use by third parties.  No one can assign, sublease --

19   license, lease, transfer or distribute the Fair Isaac

20   products.  They cannot be disclosed or published in the

21   benchmarks.  No use provided by any third party software.

22   It's important.  Decades of creativity.  Decades of

23   investment.  Millions of lines of code.  All important.

24           Mr. Carretta said this.  Let me back up.  I guess

25   it's not on the slide.  Mr. Carretta simply said when asked

1    about this, These restrictions are absolute.  And that's

2    what they are.  You are pregnant or you are not pregnant.

3    You have permission or you do not have permission.  It

4    doesn't matter if you're consulting with Chubb Insurance of

5    Australia or Canada.  Do you have permission to do that?

6    Yes or no.  In this case, no.

7            Mr. Carretta sent his notice of termination letter

8    on March 30th of 2016.  He specifically pointed out at

9    Section 9.3 of the agreement, on effect of termination says,

10   stop.  They did not.

11           If we went into the body of the letter -- and as

12   you know, it's exhibit -- I want to say 90; but when you get

13   in your deliberations, the exhibit will be available to you.

14   When you go into the body of the agreement, you will know

15   that he said there was breach of paragraph 10.8.

16           And he said there was breach of paragraph 3.1

17   because unauthorized consultants that had access and use of

18   Blaze Advisor.  And he said, mentioned, referenced, the fact

19   of the two applications and then Canadian applications

20   outside of the United States.

21           As Judge Schultz has instructed us, you have in

22   your instructions, the issue of a territorial limitation is

23   not in the case.  I ask, Why do we spend so much time on

24   that?

25           You know, a magician really doesn't do magic.

1    What a magician does it keeps your attention over here while

2    it's really changing the rabbit over there (indicating).

3    We're spending a lot of time on an issue that's not in the

4    case of territory to keep our attention away from what was

5    really happening in the case.

6            And as Mr. Carretta had said, when he wrote that

7    letter, he looked at the license agreement, and the license

8    agreement has a definition called Territory.  Physical

9    location of the Fair Isaac products means the United States

10   of America.  Whether he was right or wrong isn't the point.

11   The point is, he had a good faith reason for doing what he

12   said.

13           Also, the testimony that we've heard over and over

14   again about this territory issue is the testimony from the

15   salesmen.  Sawyer, Schreiber, great people, but they're the

16   salesmen.  And I'm not undermining salesmen, but do you

17   think a contract term changes because a salesman says

18   something or knows something?

19           Mr. Carretta said, I have no knowledge of that.

20   Mr. Waid said, I had no knowledge of that until January of

21   2016.

22           The license agreement has a provision called

23   paragraph 10.5.  Unless you have something in writing, the

24   license agreement doesn't change.  It has a thing called

25   paragraph 10.4.  Unless you put it into writing, there is no

 1     waiver.  My point is not to put all of that into issue in

 2     the case.  My point is to say, Mr. Carretta had a good faith

 3     basis, may be wrong, for doing what he said.

 4             We heard yesterday from Mr. Folz.  He had his --

 5     yeah, Folz.  He had his own understanding of what

 6     "enterprise" meant to Chubb.  It means worldwide.  Well,

 7     maybe not to everybody.  When I asked him, if you have a

 8     misunderstanding, how do you figure it out?  Who do you go

 9     to?  You go to the writer; you go to the license agreement.

10             If we have anything here, it's a misunderstanding

11     because as we know from the testimony, sometimes Schreiber

12     said global, sometimes he said international -- I'm sorry --

13     sometimes he said United States.  And he said, I woke up

14     every morning knowing it was a United States contract.

15     Misunderstandings are not bad faith.

16             So now let me, let me focus on what this lawsuit

17     is about.  As the instructions say, the violation of 10.8

18     and the violation of 3.1 because unauthorized consultants

19     were permitted to use Blaze Advisor.

20             And so I turn our attention to this provision of

21     the license agreement, 9.2(c).  Straight out what it says,

22     first sentence, "Fair Isaac may immediately terminate this

23     agreement without a requirement for prior notice or a cure

24     if client violates any terms of the licenses granted in this

25     agreement."

1          Straightforward words.  Violation of 3.1 is a

2   violation of one of the license restrictions.  It is a

3   violation of the license granted in the agreement.  What

4   does 9.2(c) say?  FICO has the right to immediately

5   terminate.  You don't have to get to the issue of

6   materiality with respect to 3.1 because the license

7   agreement says you don't have to.

8          Judge Schultz's instructions say, you don't have

9   to when the contract says you don't have to.  Now, I've

10  given you all of the evidence that says indeed it was

11  material, very important to FICO, to keep those guardrails

12  around unauthorized use, but you don't have to get that far

13  if you just look at paragraph 9.2(c).  The license agreement

14  itself gave FICO the right.

15         So let me turn to the damages discussion.  There

16  is actual damages -- actual damages.  Those are the fees

17  that you will determine through this hypothetical

18  negotiation, the fees between a willing licensor and a

19  willing licensee for that period of unauthorized or

20  infringing use.  We're talking about a four- or five-year

21  period with the language of the industry says, as you have

22  heard, a term license, one for a limited period of time.

23         You just heard argument about people wanting to

24  buy a perpetual license.  A perpetual license forever makes

25  no sense when you're negotiating a license for a limited

1     period of time, a period of time of the infringement.  But I

2     will say more about that in a moment.

3              And then the second category is the disgorgement,

4     which follows simply from The Infringement and Copyright

5     Act.

6              So let's look at the evidence.  Let's just look at

7     the evidence.  What do we know?  What do you know about a

8     willing licensor and a willing licensee in the circumstances

9     of this case?

10             We have a license agreement that's come to an end.

11    And now the licensor, willing, and the licensee, willing,

12    have to come to terms with what a fair price would be for

13    the use of Blaze Advisor for that infringing period of time.

14             Well, Mr. Waid described that in some detail.  He

15    described the standard FICO pricing guidelines.  He has

16    described how they apply.  Excuse me.  He described the

17    dynamics of licensing, fee licensing negotiations in 2006

18    when Blaze Advisor was -- had been on the market, what, six,

19    seven areas by then.  Hadn't gotten the traction in the

20    market that it has now.  He discussed all of that.  He

21    discussed how the pricing model stays the same, has been the

22    same, but that the discounting practices are different now

23    because he doesn't have to chase clients like he did in

24    2006.

25             We saw yesterday from Mr. Folz -- he was quite

1    proud.  They got a great deal, he said.  First in.  He paid

2    FICO half of what his budget was to license Blaze Advisor.

3    Completely aligns with Bill Waid's testimony of the dynamics

4    in 2006.  Chasing revenue.  Not true in 2016.

5           So the way FICO would in the normal case, in this

6    circumstance, they would price based upon what's called a

7    named application pricing.  And as all value pricing at

8    FICO, it depends on the size of the application.  The bigger

9    the application, the more the fees; the smaller the

10   application, less the fee.

11          And so he started with the defendants' own

12   information.  It's Plaintiff's Exhibit 517 in the record,

13   Plaintiff's Exhibit 517.  That's where, the starting point.

14   And then he takes and applies -- and you saw he applied --

15   he took the relevant information out of that document that

16   he would use in sizing an application.  And then I'm just

17   going to go through this one, not all of them.  And then he

18   showed you how he took that information with CSI Express,

19   and he sized it across all of the factors of the pricing

20   matrix, and he got to the conclusion that that wasn't very

21   large.

22          So then the next step on a named application

23   license was to look at, Well, given the different sizes,

24   what is our -- looking at our guidelines, what's our

25   deployment fee?  Is there a multi platform uplift?  What are

1    the development seats?  What's the annual development fee.

2    And then you drive an annual fee.  8 million, 250.  One can

3    say that that's a lot of -- that's a big number, and, of

4    course, it is.  One can also say, that's a lot of

5    applications that you're using without permission, and that

6    is true, too.

7           Now, the shortest period of time that FICO

8    licenses for is one year.  So Federal used it unauthorized,

9    infringed, Blaze Advisor for nine months; but because the

10   shortest period of time that we license for is one year,

11   Federal pays a one-year fee.  The same is true on ACE

12   American.

13          Some of ACE American's use went into 2020.  If you

14   want to have a license for 2020, you buy a year.  You don't

15   buy it by the month.  So that will go into the -- that will

16   go into the next slide where you say, all right, you've got

17   all those applications.  You have an annual fee.  How many

18   years?

19          And on the standard FICO pricing, the beginning of

20   negotiations, $36,542,831 standard FICO fee with that many

21   applications for those many years.  And that, of course, is

22   the beginning, the start of the negotiations.

23          Are there other factors that come into play?  Of

24   course.  Does the licensee have a say, have an oar in the

25   water?  Of course.  But neither party gets to have a fee

1          just because it's the fee that they want.  You have to

2          consider what they can get in the dynamics of the

3          negotiation at the time.  How much will they move their

4          position in the dynamics of the negotiation at the time?

5                    And Mr. Waid, from his experience, identified

6          these factors that would be ones that would -- he's seen and

7          ones that would move him one way or the other.

8                    So let's say this client had existing revenue

9          streams, in addition to what was being negotiated.  Well,

10         that would influence Mr. Waid in the negotiations, and it

11         would influence the licensee to say, Hey, let's reduce the

12         price on this one because I'm already buying licenses on

13         these other products; but if the licensee has no other

14         products from Blaze Advisor, there is no other license

15         stream or the licensee has no leverage, and FICO has no

16         incentive to change.  And the same kind of dynamic goes down

17         through -- I'm sorry -- goes down through the rest.

18                   Well, okay, we have this license agreement, but

19         does FICO have the opportunity to sell more product?  If so,

20         it will reduce its price to get in -- to have the

21         opportunity to sell more product; if not, doesn't change the

22         deal.  Those are the dynamics.  You have to consider all and

23         each one as you and I -- as you run through a hypothetical

24         negotiation.

25                   You look at the business impact from the use of

1    Blaze Advisor.  The level of effort to impact or stop use,

2    that means in the period of time that the client has the

3    license, that the infringing user has the licenses, going to

4    get off Blaze Advisor eventually, does that mean that FICO

5    has to provide more support services to make that transition

6    or not?  Some clients, not.  Some clients, yes.  So if FICO

7    has more obligations because of the nature of the client,

8    well, then, yes, it changes the dynamic.  What's the product

9    support effort, change it up or down, and the up-front

10   committed term.

11          As he is saying here, if the term is three to five

12   years, okay, that's pretty normal.  If the term is three

13   years or one or two, then I really have no incentive to

14   reduce my price because it's such a short-term deal.

15          So that is evidence that we presented with respect

16   to how a negotiation might happen and the factors that would

17   influence it.

18          FICO also will license on a new business basis.  I

19   don't think it's this hypothetical, but let's look at the

20   factors so you can consider them.

21          If the negotiations were with a brand-new client,

22   well, then the possibility of more revenue stream and more

23   products, that would be a factor.  The opportunity to sell

24   more products would be a factor.

25          Well, the size of the transaction would be a

1    factor, but in this lawsuit we know the size of the

2    transaction.  We know it's for the infringing period of use,

3    and we know the number of applications.  So that becomes

4    neutral.

5         The duration of the contract, four to five years.

6    Neutral.  Maybe a little discount.  Professional services

7    revenue, not applicable.  Doesn't change the needle in this

8    arrangement.

9         Other factors you might consider is what, how was

10   Blaze Advisor used in the business?  How important was it to

11   the business?  Was Blaze Advisor, if you recall

12   Mr. Baseman's testimony when he was valuing, was Blaze

13   Advisor connected to revenue-generating events?  That was

14   his phrase.

15        Well, connected to the sales of insurance policies

16   is a revenue-generating event.  What, what is the evidence

17   that we have from the defendants?

18        Well, we have other license agreements from the

19   2006/2007 time frame.  We have other license agreements from

20   a period of time when, it's undisputed testimony, that

21   discounting was much more aggressive than it is now, and as

22   I mentioned, Mr. Folz enjoyed that heavy discounting in 2006

23   because he said he got a good deal.

24        A license agreement that might be more comparable

25   to the 2016 time frame is this one in 2019.  The

1    agreement, and by the by, when you look at the other license

2    agreements, it's going to be important to look at what the

3    scope is.  To say it's a two million dollar license

4    agreement, what does that mean if it's for one application?

5            You have to know what the scope is to match the

6    dollars.  Well, what's ███ license agreement?  Well, the

7    scope is one application.  How much was it when you put in

8    maintenance?  ████████.  How much was it before

9    maintenance?  █████████, for one application.

10           What was the term of ███?  Five years.  If you

11   want a comparable license agreement to the named application

12   license fees that I just went through in terms of FICO's

13   standard pricing, it's the ███ one.

14           Now, FICO, as you've heard, will in its

15   methodology, standard practices, price on what is called an

16   enterprise basis.  There is, there is a similar pricing to

17   value.

18           You get an enterprise price, but we're talking

19   about a term deal, a limited number of years, four or five.

20   Well, how do you convert the enterprise price to a year?

21   It's that ████████ figure, and so if you use that math,

22   you have an annual fee, plus an annual maintenance of

23   5,896,260 per year, and if you apply that out over the five

24   years, it's a 29,481,300.

25           Like I said, what the fair price is in the market

1      from a hypothetical negotiation is your consideration.  What

2      we have given you is information that we have about the

3      dynamics that go into those negotiations, about what the

4      standard FICO pricing is if you go on a named application

5      basis, about what the standard FICO pricing is if you do an

6      enterprise basis and convert it to annual.

7              We have given you the information that we have.

8      What has the defendant given you?  Old license agreements,

9      without an explanation of scope, that don't apply to 2016.

10             So let me turn to this issue of disgorgement.  As

11     I've said, this matter of profits is not compensation to

12     FICO.  It's what the copyright law does to protect the

13     creative work of authors, people like Marce, screen writers,

14     novel writers, people who make original works of authorship.

15     Our laws protect that.

16             The instructions are going to be important to you,

17     I submit, in this regard:  Because it distinguishes between

18     what FICO must prove and what the defendants must prove.  In

19     my version of the instructions, it's page 25 that sets out

20     FICO's burden, and FICO's burden is to identify defendants

21     'revenue that are attributable to the infringement.

22             FICO has done that.  How did we do that?  We did

23     it through the mechanisms of the litigation.  We asked the

24     defendants to swear under oath to us the number of policies

25     and the dollar value of those policies that not only went

1    through an application that contained Blaze Advisor, but

2    that used Blaze Advisor.

3        And Mr. Harkin, the CFO, said, "The data reflects

4    the policy count and associated gross written premium and

5    writing company that ran through the applications you listed

6    and used the Blaze Advisor software."

7        That fact, "And used the Blaze Advisor software,"

8    wasn't noted earlier.  I asked, why talk about Marce?  Why

9    talk about Baseman?  Why talk about people who have nothing

10    to do with this question of tying the revenues and the

11    policies of defendants to their use of Blaze Advisor?

12        Of course they don't know.  How in the world could

13    they, but we had to ask the defendants to go into their

14    systems and give us that information, and they did.

15        Now, not only that, but we know now from the

16    litigation what the Blaze Advisor rule capability was for

17    each of those applications.  It wasn't sitting there for no

18    reason, and we can read down that, and I won't now, but CSI

19    Express, one of the big ones, predictive modeling, policy

20    scoring.

21        What did the underwriters in the last couple days

22    tell us?  More information is better information.  Better

23    underwriting for better information.  We used Profitability

24    Indicator to get better information.

25        We go through the rules, Blaze rules capabilities

1    on the whole screen, and we see that Blaze Advisor is

2    bringing those -- is being used in that way in bringing

3    value to the process of selling insurance.  We have it on

4    policy administration systems.  That's most of them.

5              Utility systems are in support of policy

6    administration systems.  Get the right underwriter to the

7    right applicant at the right time, for example.

8              Compliance systems are a necessity, if you're

9    going to sell insurance and stay out of jail.  So what were

10   the reasons that they wanted to adopt Blaze Advisor?

11             Well, we know this from the documents.  Here's

12   time and cost, revenues -- business applications, get to the

13   market faster.  I won't read all of these.  Consistency and

14   compliance, elevate all decision-making.  That's why they

15   did -- why did they keep it for ten years?  Because they

16   were realizing all these values.

17             We looked at some case studies, and I will just do

18   a couple.  What were the business objectives here?  Move

19   right business into automated renewal.  We heard if you

20   don't renew your policies, your business suffers.

21             Critical to renew insurance policies and keep

22   those customers.  Move the right business into automated

23   renewals.  Increase retention of the best accounts.

24             Revenue generating.  Get rid of the unprofitable

25   accounts.  Revenue saving.  Create efficiencies for

1     underwriters so they can go out and sell and so on.

2          Mr. Mirolyuz said to us in his testimony, those

3     benefits were realized.  Another case study is this one.

4     Again, it sets out the benefits and under the plus/delta

5     what the defendants say themselves, "The defined business

6     benefit was realized."

7          Mr. Whitener wasn't pretending to be a Blaze

8     Advisor expert.  He was in fact, an insurance company expert

9     that says, I want to sell insurance.  How does this Blaze

10    Advisor technology make it better, make it better,

11    contribute, make some contribution to the revenue of selling

12    insurance?

13         And he went through these qualities in some

14    detail, but it does make speed to market faster.  Speed of

15    response to customer, faster.  And as Mr. McCarter said to

16    me, if I can respond to renewal offers faster, I will have

17    an increased percentage of renewals.

18         Consistency of decision-making is important.  We

19    don't get a different answer from a different underwriters.

20    Ease of doing business was important.  For many of the

21    underwriters saying what a relationship business it is with

22    the agents or brokers.

23         Scale, you can't handle the value in the mid

24    market and small market without the technology of Blaze

25    Advisor, which brought all of those benefits.  So in summary

1    what Mr. Whitener said, "Blaze Advisor added significant

2    value to the defendants' process of executing the bind,

3    book, issue, is how I described the process of selling

4    insurance where deployed."

5              I have tried to make the point throughout the

6    trial.  When I have come up to examine a witness, what I

7    wanted to do was talk about what the lawsuit is about and

8    not what the lawsuit is not about, and I want to make that

9    point again here.

10             In terms of the disgorgement, I'm only talking,

11   not only because it's a lot of money, but I am talking only

12   about that 21 billion dollars of revenue that in fact used

13   Blaze Advisor.  When Mr. Schraer was talking about how

14   important it is to do a high touch, sophisticated,

15   subjective underwriting process, I'm sure it is in that

16   case.

17             I'm only talking about the underwriting processes

18   that are automated through Blaze Advisor, not Mr. Schraer's

19   other case.  So we have the 21 billion dollar number, and

20   these are the applications that used it over the years

21   without permission from FICO.

22             This is all of the years of the infringing

23   revenue.  We have the Canadian application because that

24   infringement was also in the United States.  As Mr. Pandey

25   said, that's software was sitting in a server in Raleigh,

1    North Carolina.  So that copyright infringement was in the

2    United States as well.

3              It's a lot of money, as I've said.  This is the

4    revenue that the defendants have over that same period of

5    time.

6              So now it becomes important to look at what the

7    defendants' burden of proof is, and you'll find that in the

8    instruction.  On my copy it's on page 26.

9              The defendants, not FICO, this is what the

10   copyright act says, not FICO.  The defendants move prove the

11   costs that are associated with the infringing revenue.

12   Okay?  Gross revenue, you want to know what the profits are.

13   You've got to deal with costs.

14             You've got to deal with costs, and it's for the

15   defendants to deal with costs.  So what information did they

16   bring to you?

17             Well, this is Mr. Bakewell's analysis.  He gives

18   you information of costs for 2016, 2017, 2018.  Why is there

19   nothing for 2019 and 2020?  Because they did not bring the

20   information to you.  We know from the testimony of at least

21   Mr. Zoltowski, if not Mr. Bakewell as well, that 2019

22   information was available.  Why didn't they analyze it?  Why

23   didn't they present it to you?

24             The fact of the matter is, I don't know.  The fact

25   of the matter is, they didn't.  They did not bring forth

1    under their burden of proof any cost information for 2019 or

2    2020.

3              Now, in the jury instructions to you, there is

4    this issue of the burden of proof, the preponderance of the

5    evidence.  I'm only saying that a fact has to be proven by

6    the greater weight of the evidence.

7              Having no facts, having no evidence, proves

8    nothing?  What else does the instruction say is the

9    defendants' burden of proof?  It is the defendants that must

10   prove the portion, if any, of profits that arise from the

11   infringement by identifying the contribution to the profits

12   and elements, other than the infringement.

13             Going back to FICO's burden of proof, FICO has to

14   prove that there is a contribution, some amount of

15   contribution to the revenue.  Defendants' burden, it's the

16   defendants who have the burden of doing this measuring.

17   What's the amount of those profits that come from other

18   factors?

19             Our witnesses were asked repeatedly about, did you

20   measure, did you measure, what was the impact.  Under the

21   instructions and the law, that's not FICO's problem.  That's

22   the defendants' problem.

23             They have to measure.  They have to judge that

24   impact.  That's their burden of proof to come forth with the

25   portion of profits that arise from other factors.

1        Well, what do they offer us on that?  They offer

2   us the pillars, and -- but that's it.  Now, let me be clear

3   about FICO's position.  Of course there are factors, other

4   than the infringing use of Blaze Advisor, that contributed

5   to the revenue.  Of course.

6        Of course reputation matters.  I wouldn't argue

7   otherwise.  Of course the business logic of the company

8   matters.  Mr. Baseman said that from the first day.  Blaze

9   Advisor is a tool that automates all that logic, brings it

10  together in a repository, adds all kinds of business value,

11  not the beginning point as a company.

12       None of that is, am I arguing about or am I

13  quarreling about.  I am only asking, where is the evidence?

14  The jury instructions, the jury instructions also say to us

15  and say to you, a decision cannot be based upon guessing,

16  and a decision cannot be based upon speculation.

17  Speculation is not a decision in a court of law.  Decisions

18  are supposed to be made on evidence.

19       The defendants simply didn't do the hard work to

20  bring to you evidence of what that portion should be that

21  relates to factors other than the infringement.  Now, it may

22  be, and let's say, let's say the defendants had brought

23  forth evidence.

24       Well, maybe the evidence would show that 80

25  percent of those profits are due from things that were on

1     the pillars.  Maybe.  Maybe not.  We don't know.

2            We know there is something, but without evidence,

3     we're put in a position to guess and speculate, and we're

4     not permitted to do that.  You know, in golf, you say play

5     it where it lies.  Another saying might be, sleep in the bed

6     you made.  The Court says, can't speculate.

7            So let me turn to the verdict form just to walk

8     that through from my point of view, from FICO's point of

9     view.  I've got it here.  So you're going to be asked that

10    first question:  Was there a breach of paragraph 3.1?  I

11    think as I've described, I think it's beyond doubt, frankly.

12           Next, was there breach of paragraph 10.8?  Again,

13    I think the right answer is, yes, for FICO.

14           They said they were going to use it every which

15    way they wanted to inside of the big organization, and they

16    did.

17           And number 3.  Did FICO properly terminate the

18    license agreement?  That proper termination question brings

19    to bear in terms of the paragraph 3.1 violation, 9.2(c).

20    FICO can properly terminate based upon 3.1 immediately just

21    because there is a violation of the license granted by the

22    agreement, 3.1.

23           With respect to the breach of 10.8, FICO can

24    terminate the license agreement because the breach was

25    material.  Not getting FICO's consent to the continued use

1    of Blaze Advisor in a 30 billion dollar organization went to

2    the very core of the purpose of paragraph 10.8.

3          Now I want to point out to you question 5, and

4    what I particularly want to point out to you is the note.

5    If you answered yes to question 3, the license agreement was

6    properly terminated, then there was copyright infringement.

7    It follows like night and day.

8          Similarly with number 6.  That is to say, when you

9    answer the actual, the loss license fee amount for 4, the

10   same amount will be for 6 under The Copyright Act.  FICO

11   doesn't say otherwise.  Same amount.

12         Now I think the rest are, talked about the proof

13   of, the proof of ACE American's liability for infringement.

14   The dollar amounts.  I've talked about the profits and what

15   FICO's burden is is the revenue, number 9.

16         And then you put in an amount, 10.  And then 11,

17   that's where the defendants' burden comes in.

18         What are the costs?  Have they proven any?  For

19   what years?  Have they proven any apportionment?

20         Now, if you find in favor of FICO for any of those

21   reasons, 1, 2 or 3, you don't have to bother with part 4,

22   but I want to make only this comment about part 4:  As it

23   says here, it's defendant -- it's Federal's claim against

24   FICO.  In the argument it was called defendants' claim.

25   Actually it's Federal's claim.

1          You recall that Federal stopped -- you recall that

2     Federal used Blaze Advisor unchanged from the moment the

3     license agreement terminated until December 31, 2016.  On

4     January 1, 2017, no employees at Federal.

5          Federal incurred zero damages, zero costs.

6     Federal incurred nothing with respect to migrating away from

7     Blaze Advisor because it didn't.

8          The testimony of Mr. Ghislanzoni when in 2019 and

9     then into 2020, ACE American got around to taking Blaze

10    Advisor out of the systems, that's a different kettle of

11    fish.  It's not damages because FICO didn't do -- wasn't

12    responsible for it, but it certainly isn't Federal's damages

13    because it was incurred by ACE American.

14         So I've had my, I've had my say on behalf of FICO,

15    but I want to conclude simply by saying this:  I mentioned

16    during the, again, during the jury selection process that I

17    think it's, I think it's a great honor to directly, to

18    directly participate in our country's rule of law.

19         And I thank you for your service.

20         MS. GODESKY:  Your Honor, may I approach?

21         THE COURT:  You may.

22              **(Side-bar discussion.)**

23         MS. GODESKY:  Your Honor, we have an objection to

24    one of the arguments made by Mr. Hinderaker when he put up

25    the numbers on the screen relevant to the actual damages

1      claims idea of hypothetical license fee.  He said something

2      like, you may say that's a big number, but I say that's a

3      lot of applications that you're using without permission.

4              And so that is a direct infusion into the

5      hypothetical negotiation this concept that you're using the

6      software without permission.  You are an infringer, and

7      you're negotiating to continue your use of Blaze without a

8      license.

9              And that was made even worse by the fact that he

10     referred to the period of time that the infringing user

11     needs a license, how much will people improve their position

12     with the dynamics in place at the time.

13             So all of this is what we were trying to avoid by

14     moving to exclude this type of testimony from Mr. Waid in

15     the first place, but certainly in the boundaries of what you

16     told us we could argue.

17             You can't say, you had a lot of applications you

18     were using without permission.  That's not the context of

19     this negotiation.  So we would request a curative

20     instruction.

21             MR. HINDERAKER:  May I go get your instructions,

22     Your Honor?

23             THE COURT:  You may.

24             MR. HINDERAKER:  Because I was just using your

25     words.  Actual damages.  The willing buyer and willing

1    seller would have negotiated for the allegedly improper or

2    infringing use that was made.  I'm just using your language.

3            THE COURT:  Well, here's where we are.  I do --

4    it's pretty clear that the fact of infringement cannot be

5    considered in arriving at the actual damage -- it's clear

6    that the fact of infringement is not a factor that can be

7    used in the hypothetical negotiation.

8            And so the instruction is intended to say, or does

9    say, for the use that was made.

10           What I will do is, I will repeat the instruction,

11   at least in part, to say that it is what a willing seller

12   and a willing buyer agreed to.

13           MR. HINDERAKER:  I obviously have no quarrel with

14   that.  I was trying to follow the instruction.

15           THE COURT:  Understood.

16           MR. HINDERAKER:  Yeah.  Thank you.

17           MS. GODESKY:  Thank you.

18           **(In open court with the Jury present.)**

19           THE COURT:  Members of the Jury, in a second I'm

20   going to give you the final instruction, but while I'm

21   looking for one thing, go ahead and stand up and stretch.

22           We're five minutes or so from being done.  Okay?

23                        **(Pause.)**

24           THE COURT:  Counsel, if you will both approach.

25                  **(Side-bar discussion.)**

1          THE COURT:  I am going to add a sentence that

2     says, "The fact that one party is alleging infringement may

3     not be considered."  That is the law.

4          MR. HINDERAKER:  The fact that one party is

5     considering infringement is a fact that must be decided by

6     the jury, yeah.  No problem.

7          MS. GODESKY:  Thank you.

8          **(In open court with the Jury present.)**

9          THE COURT:  All right.  Members of the Jury, I am

10    going to repeat an instruction and elaborate on one aspect

11    of it that I gave you earlier before the closing arguments.

12          And that is to this determination of actual

13    damages in the hypothetical negotiation.  The measure of

14    actual damages for FICO's breach of contract claim and its

15    copyright-infringement claim is the fair market value of a

16    license to use Blaze Advisor.

17          The fair market value is the license fee that a

18    willing buyer and a willing seller would have negotiated for

19    the use that was made.  The fact that one party is alleging

20    that the use was infringing or improper is not to be

21    considered in determining the outcome of that hypothetical

22    negotiation.

23          All right.  Here is your final instruction:

24          There are the rules you must follow when you go to

25    the jury room to deliberate and return with your verdict.

1     First, you will select a foreperson.  That person will

2     preside over your discussions and speak for you here in

3     court.

4          Second, your verdict must be the unanimous

5     decision of all jurors; therefore, it is your duty as jurors

6     to discuss the case with one another in the jury room.

7          You should try to reach agreement if you can do

8     this without going against what you believe to be true.

9          Each of you must come to your own decision, but

10    only after you have considered all the evidence, discussed

11    the evidence fully with your fellow jurors, and listened to

12    the views of your fellow jurors.

13         Do not be afraid to change your mind if the

14    discussion persuades you that you should.

15         But do not come to a decision just because other

16    jurors might think it's right or just to reach a unanimous

17    verdict.  Remember, you are not for or against any party.

18    You are judges, judges of the facts.  Your only job is to

19    study the evidence and decide what is true.

20         Third, during your deliberations, including during

21    any recess taken during deliberations, you must not,

22    directly or indirectly, communicate with or provide any

23    information to anyone by any means or by any medium about

24    anything related to this case until I accept your verdict

25    and discharge you from further service in this case.

1      Fourth, as stated in my instructions at the

2  beginning of the trial, you may not in any manner seek out

3  or receive information about the case from any source, other

4  than the evidence received by the Court and the law of the

5  case I have provided to you.  You are only permitted to

6  discuss the case with your fellow jurors during

7  deliberations because they have seen and heard the same

8  evidence you have.

9      In our judicial system, it is important that you

10  are not influenced by anything or anyone outside of this

11  courtroom, otherwise your decision may be based on

12  information known only by you and not your fellow jurors or

13  the parties in this case.  This would unfairly and adversely

14  impact the judicial process.

15      Fifth, if you need to communicate with me during

16  your deliberations, send me a note signed by the foreperson.

17  Give the note to the court security officer, and I will

18  answer you as soon as I can, either in writing or in here in

19  court.  While you are deliberating, do not tell anyone,

20  including me, how many jurors are voting for any side.

21      Sixth, nothing I have said or done is meant to

22  suggest what I think your verdict should be.  The verdict is

23  entirely up to you.

24      Finally, the verdict form is your written decision

25  in this case.  I will now read the form to you.

1    Question 1.  Did FICO prove that Federal breached

2    Section 3.1 of the license agreement by allowing third-party

3    consultants DWS and/or AppCentrica to use Blaze Advisor?

4    Answer "yes" or answer "no."

5    Question 2.  Did FICO prove that Federal breached

6    Section 10.8 of the license agreement?  Answer "yes" or

7    answer "no."

8    Question 3.  Did FICO properly terminate the

9    license agreement on March 30th, 2016?  Answer "yes" or

10    answer "no."

11    Instruction:  If you find in favor of Federal on

12    Question 3, skip the remainder of Part I and go to Part II,

13    FICO's claims against ACE American.  Otherwise, answer the

14    remainder of Part I as instructed below.

15    I will now read the remaining questions of Part I.

16    Question 4.  If you find that FICO properly

17    terminated the license agreement, please enter the amount of

18    damages FICO incurred as a result of Federal's use of Blaze

19    Advisor after March 31, 2016.

20    Question 5.  Did FICO prove that Federal infringed

21    FICO's copyright by use of Blaze Advisor after March 31,

22    2016?  (Note:  If you answered "yes" to Question 3 above,

23    you must answer "yes" to this question.)

24    Question 6.  If you have found that Federal

25    infringed FICO's copyright, please enter the amount of

1    actual damages FICO suffered as a result of Federal's

2    infringement.  (Note:  Your answer to Question 4 and

3    Question 6 must be the same.)

4              Part II:  FICO's claims against ACE American.

5              Question 7.  Did FICO prove that ACE American

6    infringed FICO's copyright by use of Blaze Advisor?  Answer:

7    Yes or no.

8              Question 8.  If you have found that ACE American

9    infringed FICO's copyright, please enter the amount of

10   actual damages FICO suffered as a result of ACE American's

11   infringement of its copyright.

12             Part III:  Profits.

13             Question 9.  If you have found that either

14   defendant infringed FICO's copyright, did FICO prove that

15   this infringing use contributed to the revenues of the

16   infringer?  Answer:  Yes or no.

17             Question 10.  If you answered "yes" to Question 9,

18   enter the amount of revenue to which the use of Blaze

19   Advisor contributed.

20             Question 11.  Enter the amount of profits that are

21   not taken into account by computing FICO's actual damages in

22   your answers to Questions 6 and 8.

23             Instruction at the end of Part III:  If you found

24   in FICO's favor on Question 3 above, do not answer any

25   questions in Part IV, but sign and date the verdict form

1     below.

2             Now, I will read the three questions of Part IV.

3             Part IV:  Federal's claims against FICO.

4             Question 12.  Did Federal prove that FICO breached

5     Section 9.2 of the licensing agreement by terminating the

6     agreement?  Answer:  Yes or no.

7             Question 13.  Did Federal prove that FICO breached

8     the implied covenant of good faith and fair dealing?

9     Answer:  Yes or no.

10            Question 14.  If you have found that FICO breached

11    the contract or the implied covenant in answer to either

12    Questions 11 or 12 above, please enter the amount of damages

13    that Federal incurred as a result of FICO's breach.

14            That is the verdict form that you will receive.

15            You will take this form to the jury room; and when

16    you have all agreed on the verdict, your foreperson will

17    fill in the form, sign and date it, and tell the court

18    security officer that you are ready to return to the

19    courtroom.

20            All right, Terianne.

21            THE CLERK:  Would the jury please rise and raise

22    your right hand.

23                        **(Jury sworn.)**

24            THE JURY:  I do.

25            THE CLERK:  Raise your right hand.

1              **(Bailiff sworn.)**

2          THE BAILIFF:  I do.

3          THE COURT:  I can tell you that looking at what

4    I'm looking at, the problem has been remedied.  It will take

5    some time for the temperature to decrease.

6          THE CLERK:  All rise for the jury.

7                    **(Jury exits.)**

8

9        **(In open court without the Jury present.)**

10         THE COURT:  Be seated.

11         So just a cautionary word to all of you.  The jury

12   is being taken down to the Federal Cafe in this building.

13   That is how we feed them.

14         So, please, all of you, don't go down to the

15   Federal Cafe.  And why don't you wait here for ten minutes

16   to make sure they've had time to get down there.  Okay?

17         We can go off the record.

18               **(Off-the-record discussion.)**

19

20       **(In open court without the Jury present.)**

21         THE COURT:  With that, we're in recess.  Okay.  We

22   will be in touch.

23         **(Recess taken at 1:23 p.m. till 3:37 p.m.)**

24

25

1          **IN OPEN COURT**

2         **(JURY NOT PRESENT)**

3          THE COURT:  Please be seated.

4          Let me tell you what the process is that I'm going

5     to follow.

6          We have received two questions from the jury.  I

7     am going to tell you what the questions are and tell you

8     what my answer is going to be to the jury regarding those

9     questions.  You can put objections on the record, if you

10    have an objection to my response.

11         So the first question was:  Can we get judge's

12    original uncontested facts?

13         I have marked and I plan to give them joint, what

14    I have marked as Joint Exhibit 3, which is the parties'

15    amended joint statement of uncontested facts.

16         Question two:  Bill Waid's testimony, can we get a

17    copy?

18         My answer will be:  I cannot provide you a

19    transcript of any testimony.  You must make your decision

20    based on what you recall of the evidence.  You may, of

21    course, use your notes to refresh your recollection.

22         So, Mr. Hinderaker, does FICO have any objection

23    to those answers?

24         MR. HINDERAKER:  No, Your Honor.  They seem to be

25    appropriate answers to me.

```
1              THE COURT:  Thank you.

2              Ms. Godesky, any objection on behalf of Federal

3    and ACE to those answers?

4              MS. GODESKY:  No objection.

5              THE COURT:  Okay.  I will put them on the note I

6    received, put it in the envelope, have it delivered to the

7    jurors.

8              So did you come a long way, all of you?

9              MS. GODESKY:  No.

10             MR. HINDERAKER:  No.

11             THE COURT:  We will keep you informed.

12             MS. GODESKY:  Thank you.

13             THE COURT:  Thank you.

14                       (Recess taken at 3:39 p.m.)

15

16                           *   *   *

17             We, Kristine Mousseau and Renee A. Rogge, certify

18    that the foregoing is a correct transcript from the record

19    of proceedings in the above-entitled matter.

20

21                  Certified by:  /s/Kristine Mousseau_____
                                   Kristine Mousseau, CRR-RPR
22
                                   /s/Renee A. Rogge_____
23                                 Renee A. Rogge, RMR-CRR

24

25
```