# EXHIBIT 1

11

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
 2
 3    ------------------------------------------------
 4    Fair Isaac Corporation,    )
      a Delaware Corporation,    )  File No. 16-cv-1054(DTS)
 5                               )
          Plaintiff,             )
 6                               )
      v.                         )
 7                               )
      Federal Insurance Company, )  Courtroom 14W
 8    an Indiana corporation,    )  Minneapolis, Minnesota
      and ACE American Insurance )  Thursday February 16, 2023
 9    Company, a Pennsylvania    )  9:12 a.m.
      Corporation,               )
10                               )
          Defendants.            )
11    ------------------------------------------------
12
13
14          BEFORE THE HONORABLE DAVID T. SCHULTZ
15       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
16
17          (JURY TRIAL PROCEEDINGS - VOLUME II)
18
19
20
21
22        Proceedings recorded by mechanical stenography;
23   transcript produced by computer.
24                        *   *   *
25
```

12

```
 1   APPEARANCES:
 2   For Plaintiff:       MERCHANT & GOULD P.C.
                          BY:  ALLEN W. HINDERAKER
 3                             HEATHER J. KLIEBENSTEIN
                               PAIGE S. STRADLEY
 4                             MICHAEL A. ERBELE
                               JOSEPH W. DUBIS
 5                             GABRIELLE L. KIEFER
                          150 South Fifth Street, #2200
 6                        Minneapolis, Minnesota 55402
 7   For Defendants:      FREDRIKSON & BYRON
                          BY:  TERRENCE J. FLEMING
 8                             LEAH C. JANUS
                               CHRISTOPHER D. PHAM
 9                             RYAN C. YOUNG
                               PANHIA VANG
10                        200 South Sixth Street, #4000
                          Minneapolis, Minnesota 55402
11
                          O'MELVENY & MYERS LLP
12                        BY:  LEAH GODESKY
                               ANTON METLITSKY
13                             DARYN E. RUSH
                               ROXANA GUIDERO
14                        Times Square Tower
                          7 Times Square
15                        New York, New York 10036
16   Court Reporters:     RENEE A. ROGGE, RMR-CRR
                          KRISTINE MOUSSEAU, CRR-RPR
17                        MARIA V. WEINBECK, RMR-FCRR
                          PAULA RICHTER, RMR-CRR-CRC
18                        United States District Courthouse
                          300 South Fourth Street, Box 1005
19                        Minneapolis, Minnesota 55415
20
                                *   *   *
21
22
23
24
25
```

13

```
 1          INDEX - 2/16/23 - VOL. 2
 2                                    PAGE:
```

```
 3   Plaintiff Opening Statement............................ 13
 4   Defendant Opening Statement............................ 38
 5
 6   PLAINTIFF WITNESSES:
 7   SEAN BASEMAN:
 8     Direct Examination by Mr. Hinderaker.............. 90
 9     Cross Examination by Ms. Godesky.................. 175
10     Redirect Exam by Mr. Hinderaker.................. 190
11
12   JEAN-LUC MARCE:
13     Direct Examination by Ms. Kliebenstein........... 193
14
15
16   JOINT EXHIBITS:
17   J1, J2.............................................. 100
18
19   PLAINTIFF EXHIBITS:
20   839-850............................................. 236
21   1139-1149........................................... 236
22   1151-1165........................................... 236
```
```
23
24
25
```

14

```
 1                 (IN OPEN COURT)
 2                 (Jury seated)
 3                   (9:12)
 4          THE COURT:  Good morning, everyone.  Please be
 5   seated.
 6          Mr. Hinderaker, are you ready?
 7          MR. HINDERAKER:  I am, Your Honor.
 8          THE COURT:  All right.  You may proceed.  Thank
 9   you.
10          A JUROR:  Your Honor, our screen doesn't work.
11          THE COURT:  It's on now?
12          A JUROR:  Yes.
13          THE COURT:  Everyone else, your screens are all
14   up?  Okay.  Good.
15          MR. HINDERAKER:  Good morning, everyone.
16          Yesterday Judge Schultz mentioned about the rule
17   of law, and for me, that's the very best reason that there
18   is for me to be a lawyer.  I know that all of us have
19   something else to do than be here, but I do hope that
20   regardless of the outcome, regardless of -- for my client or
21   against my client, regardless of the outcome, that after our
22   weeks of work together, you think that this effort and this
23   experience has been worthwhile as well because we all are at
24   the moment participating together in the rule of law of this
25   country.
```

71

1    Here's another example of this then/now phenomena.
2  The evidence will show that FICO came up with that
3  $1.3 million license fee that Federal paid by looking at all
4  of Chubb Corporation's revenue, not just Chubb & Son's.  The
5  evidence will show that when the folks at FICO sat down in
6  2006 to figure out how much are we going to charge for
7  Blaze, they looked at the total revenue earned by the entire
8  Chubb Group of Insurance Companies worldwide, $12.3 billion
9  as the starting point for that license fee, all the global
10 entities in this navy blue frame on your screen.  And yet,
11 even though back then, FICO charged and Chubb paid
12 $1.3 million based on the revenue of all of its global
13 affiliates, FICO says, well, now those same global
14 affiliates' use of Blaze was a breach, and now we're
15 entitled to a second license fee.
16    Ladies and gentlemen, we are confident you will
17 reject this first breach claim as meritless.
18    Now, all the problems with FICO's claim that Chubb
19 Canada, Chubb Europe and Chubb Australia were not authorized
20 to use Blaze is why you also heard this other argument from
21 FICO about problems with consultants that use Blaze.  They
22 needed a backup argument.
23    FICO now says that Chubb shouldn't have shared
24 Blaze with two consultants who worked at Chubb Canada and
25 Chubb Australia.  On the screen is the IT director at Chubb

72

1  Australia, Russell Hodey, and he is coming to trial all the
2  way from Australia to address this.  He will explain how
3  Chubb Australia hired a consultant called DWS to help
4  develop an application called "Evolution" that was going to
5  be used in Australia.
6    Chubb Canada was also using the Evolution
7  application, so Chubb Australia and DWS asked Chubb Canada
8  for some help.  And in the course of that project, you'll
9  that an employee of AppCentrica, another consultant, gave
10 DWS a demonstration on how Blaze worked.  The evidence will
11 show that Chubb Australia did not use Blaze in its Evolution
12 application because all of this was unfolding in 2016 right
13 as this litigation was starting, and Chubb was committed to
14 not expanding its use of Blaze.
15    That's it.  That's all that happened.  It would be
16 the kind of thing that no one would ever think twice about,
17 but because it happened at the same time that Mr. Sawyer,
18 Mr. Schreiber and Mr. Carretta were claiming Chubb was in
19 breach, it got folded into this lawsuit, and now we all have
20 to address it.
21    So now we're on the second breach argument you've
22 heard from FICO.  They talked about this breach of Section
23 10.8, the assignment provision.  Now, in the world of
24 contracts, a person or a company who holds rights under the
25 contract can transfer them.  You can assign them to another

73

1  person.
2    So let's say that I go out and I rent an apartment
3  in Minneapolis for $1,000 a month, and that lease gives me
4  the right to live in the apartment as long as I pay the
5  landlord $1,000 a month.  But then my job transfers me to
6  Chicago in the middle of the lease.  So let's pretend that
7  my sister also lives in Minneapolis, and she happens to be
8  looking for an apartment with a $1,000-a-month budget.  I
9  might be able to assign, or transfer, the lease to my
10 sister, and it's like she's stepping into my shoes in the
11 contract, right?  Now she has to pay the $1,000 a month and
12 she gets to live in the apartment for whatever time is left
13 on the lease.
14    Because this concept of assignments is so common
15 in the world of business contracts, when FICO and Federal
16 sat down to negotiate their contract in 2006, they
17 negotiated assignment terms.  And the evidence will show
18 that the parties agreed that there would be two very
19 different approaches to assignments.
20    First, Federal and FICO agreed in the first
21 sentence of Section 10.8 that run-of-the-mill assignments, a
22 situation where Federal just decided I'm going to paper
23 transfer my rights to someone else, just like I might want a
24 paper transfer my rights to my sister for my apartment, not
25 allowed.  One of the executives at Chubb couldn't wake up

74

1  one morning and say, I'm done with Blaze; I'm going to
2  transfer the rights to my friend at MetLife.  Couldn't do
3  that.  Everyone agreed.  That's the first sentence of
4  Section 10.8.  And as FICO says, everyone agrees that type
5  of assignment didn't happen.
6    Now, FICO is hoping that you're going to see the
7  reference in the title of this section that says "No
8  assignment," and you're going to throw up your hands and
9  you're going to say, well, any and all assignments must have
10 been prohibited under this contract.  But Federal and ACE
11 know that you're here and you were picked for this jury
12 because you said that you could be impartial and you would
13 give the parties their fair day in court.  And that requires
14 hard work.  It requires thinking very critically about what
15 the parties intended when they entered this contract.  If
16 the no-assignment title on the contract was enough to
17 resolve this dispute, then we wouldn't need a trial where
18 you're asked to look at all available evidence to figure out
19 what the parties intended to agree to.
20    And the evidence will show that the second
21 sentence of Section 10.8 is very important.  I'm going to
22 read it in its entirety because it's so important.  It says,
23 "In the event of a change of control of client or if client
24 is merged with, acquired by, or inquires another entity or
25 undergoes a reorganization or otherwise acquires the right

191

1 that yours?

2          MS. GODESKY:  It's Heather's.

3 BY MR. HINDERAKER:

4     Q.  I'm sorry, on slide 4, do you have to be able to

5 monetize -- in your judgment, do you have to be able to

6 monetize the value of Blaze Advisor to know whether it's

7 valuable or not?

8     A.  No.

9     Q.  And in some answers to questions that you were asked,

10 you used -- used the phrase, heuristically or heuristic

11 conversations or only heuristically.

12    A.  Yes.

13    Q.  What did that mean?

14    A.  Casual, inference-based, based off of the context of

15 what we were talking about.  So you're able to deduce what

16 it was that they're talking about in the context of what

17 we're there to talk about.

18    Q.  And what did you assume, understand, deduce, regarding

19 the value that Chubb was realizing from Blaze Advisor from

20 these conversations?

21    A.  So how you're able to deduce that the Blaze Advisor

22 component is integral to the decision process is the

23 conversations that we were there to discuss around taking

24 pivotal analytic models and putting them into Blaze Advisor

25 was to get a wider use of those models across all of the

192

1 different systems they were using.  They wouldn't have had

2 that conversation if it wasn't being used.

3     Q.  A related question.  Do you have to know that one thing

4 is -- do you have to know the extent that one thing is

5 faster than another to know that it's faster?

6     A.  No.

7     Q.  Does the fact that you were not measuring, quantifying,

8 the significance of Blaze Advisor, change your testimony

9 about slide 4 with respect to Blaze Advisor's value to the

10 business?

11    A.  Not at all.

12    Q.  And at the close, you were asked about information that

13 you gave in 2021 regarding Blaze Advisor sales.  Do you have

14 any knowledge about the amount of success or lack of -- any

15 knowledge about Blaze Advisor sales today, the quantity, the

16 amount, the success?

17    A.  Not from numbers but trajectory, yes.

18    Q.  What's the trajectory?

19    A.  The trajectory is it continues to sell and is, in fact,

20 picking up in Latin America and especially regions that we

21 do not have the cloud.  So it is still a very viable product

22 of which customers still use.

23          MR. HINDERAKER:  Thank you.

24          No further questions, Your Honor.

25          THE COURT:  Thank you, Mr. Hinderaker.

193

1          Ms. Godesky, any re-cross?

2          MS. GODESKY:  Nothing further, thank you.

3          THE COURT:  All right.  Thank you.  Go ahead,

4 Mr. Baseman, you may step down.

5          THE WITNESS:  Thank you, Your Honor.

6          THE COURT:  Mr. Hinderaker, or whomever, go ahead

7 and call your next witness.

8          MS. KLIEBENSTEIN:  Thank you, Your Honor.  We call

9 Mr. Jean-Luc Marce.

10          Your Honor, may I approach?

11          THE COURT:  You may.

12          Come on up here, Mr. Marce.  Good afternoon.  If

13 you would raise your right hand, please.

14              JEAN-LUC MARCE,

15     duly sworn, was examined and testified as follows:

16

17          THE COURT:  Go ahead and be seated.  Make sure to

18 speak into the microphone and state your full name for the

19 record, please.

20          THE WITNESS:  My name is Jean-Luc Marce,

21 M-A-R-C-E.

22              DIRECT EXAMINATION

23 BY MS. KLIEBENSTEIN:

24    Q.  Mr. Marce, is the microphone at a comfortable spot for

25 you?

194

1     A.  It is now.

2     Q.  Thank you very much.  And I have not met everyone yet.

3 My name is Heather Kliebenstein.  I'm at Merchant & Gould as

4 well.

5          Mr. Marce, can you identify your current employer

6 and job title for us?

7     A.  I'm a VP of software engineering at FICO.

8     Q.  And how long have you worked at FICO?

9     A.  Since 2002, so about 20 years.

10    Q.  And today what are your primary job duties?

11    A.  Today I lead a software development team responsible for

12 developing and mentoring and supporting decision technology

13 software at FICO.  And I'm also leading architect for the

14 software products.

15    Q.  And do you work with any particular software product

16 today at FICO?

17    A.  I'm particularly focusing on Blaze Advisor.

18    Q.  And can you tell the jury, in your words, what is Blaze

19 Advisor?

20    A.  So Blaze Advisor is what we call a business rule

21 management system, which companies use to automate

22 decisions, automate processes and procedures they may have.

23 It helps them do that in a more efficient way and in a more

24 consistent way.

25    Q.  For someone who doesn't work in IT and software

195

1  engineering regularly, what example can you give us to
2  explain what is a business rules management system and where
3  might a normal civilian see such a thing?
4  A.  So typically normal civilian do not see the software
5  directly, but you will see it through procedures that you do
6  in your life, like applying for a job, applying for a loan,
7  buying some large products, like a car and so on.  So
8  whenever we fill forms, whether it's for a bank or for the
9  insurance company, typically those companies have systems
10  behind to validate what you have entered, to make sure that
11  it's consistent, that it's -- it has the right qualification
12  for you to get that loan or to get that product.
13        And the system that they're running by those
14  banks, insurance, telecommunication companies and so on,
15  typically run software such as our software.
16  Q.  And, Mr. Marce, how long have you personally been
17  working on Blaze Advisor software?
18  A.  So Blaze Advisor started in 1996, and I was one of the
19  original developer and lead for Blaze Advisor, so since
20  1996, so it's 27 years.
21  Q.  And 27 years, that's a long time.  Why have you stuck
22  with the same software for 27 years?
23  A.  So since my childhood, I always like things like things
24  like logic and puzzles.  I was doing a lot of chess.  So I
25  was subscribing to some magazines that where they have lots

196

1  of games to meet my interest.  So chess and Rubik's Cube,
2  and many other logic games that I was doing.  So I always
3  liked logic.
4        And for me, I also studied that in school as well.
5  I took some classes related to how to do inferencing, how to
6  do logic in different systems.  And I really like it a lot
7  and when I had this opportunity to join this company to work
8  on software, which is all about automating and processing
9  logic in its pure way, that was too much of an attraction
10  for me, so I decided to join the company.  It was at that
11  time Neuron Data.
12  Q.  And backing up before we get into Neuron Data, did you
13  attend college, Mr. Marce?
14  A.  Yes, I did.
15  Q.  Where?  Can you tell us?
16  A.  In France, Ecole Polytechnique, which is one of their
17  premier engineering schools in France.  So where I
18  studied -- it's basically a major where mathematics and
19  physics and computer science.  Then I did a two-year
20  associate's degree in another school, at Telecom Paris,
21  where I study computer science, computer engineering and
22  telecommunications.
23  Q.  And so I'm going to guess by that, that you grew up in
24  France; is that correct?
25  A.  That's correct.

197

1  Q.  And after you finished school, where was your first job?
2  A.  So my very first job was actually back in the U.S.  I
3  had to do some internship during my school.  I did some
4  internship in a start-up called Neuron Data, and because I
5  was so in love with what they were doing and opportunities
6  to work on their product, in software, so I jumped on the
7  opportunity that was given to me to come back and start
8  there.  So I started in 1991 at Neuron Data.
9  Q.  At Neuron Data.  And what were your job duties at Neuron
10  Data back in 1991 when you started there?
11  A.  So I started working on doing software development on
12  various products that they had.  So I joined as a senior
13  software engineer as part of their team.
14  Q.  Did you focus on any particular products at Neuron Data?
15  A.  Pretty soon I started -- a few years after I joined, we
16  started Blaze Advisor, and most of my professional
17  experience at Neuron Data and in later companies I've been
18  with Blaze Advisor.
19  Q.  What year did you start working on Blaze Advisor?
20  A.  So Blaze Advisor we started in 1996.
21  Q.  And Neuron Data, Blaze Advisor, is that the same Blaze
22  Advisor software that we're talking about today in court?
23  A.  Yes, it is.
24  Q.  And how is it that you ended up working at FICO on Blaze
25  Advisor software too?

198

1  A.  So Neuron Data started Blaze Advisor, so in the early
2  '90s, and then it changed its name at some point, late '90s
3  into Blaze Software.  And Blaze Software, we then went to
4  some acquisitions.  Blaze Software was acquired by Brokat
5  Technologies and then later was acquired by HNC Software,
6  and then HNC Software itself was acquired by Fair Isaac, now
7  called FICO.
8  Q.  Were you an employed by each of those companies along
9  the way?
10  A.  Yes.
11  Q.  And did your job duties change in any way?
12  A.  No.
13  Q.  So you kept working on Blaze Advisor through each of
14  those acquisitions, correct?
15  A.  That's correct.
16  Q.  Now let's shift back a little bit to talk about the
17  creation of Blaze Advisor back in 1996.  Could you specify
18  for us, what were your -- I know you worked on Blaze
19  Advisor, but what were your particular job duties with
20  respect to Blaze Advisor in '96?
21  A.  So in '96, I had two main roles.  One is I worked
22  closely with their chief architect of the company to come up
23  with a new representation of logic, a new language.  We
24  started -- because one of the things we observed in the
25  prior generation of products and all the products that were

199

1  available at that time, most of them used a very technical
2  language.  You had to use some at sign between words and you
3  have to use question marks and all kinds of punctuation
4  marks, and it was okay for technical users, but we really
5  were left leaving out the majority of target users.  We are
6  more on the business side.  So we really wanted to develop a
7  new language that was enabling a business user to be able
8  to -- to make best use of this tool.
9          So we started with looking at different ideas.
10  And, first of all, we started with the English language, and
11  it could have been another language, but English was our
12  primary base.  And we found actually English has a lot of
13  keywords that we use on a day to day bases that can be used
14  to represent relationships between objects that can
15  represent logic itself.  When you say, if something happens,
16  if such-and-such conditions are true, then other things will
17  happen.  We use that commonly in language and that's kind of
18  realization decide to create this language that started from
19  English.
20          So that's one of the things that Hector, the
21  architect, to develop the ideas and come up with this
22  language.  And then also I personally started doing some
23  software development on one main piece of what would become
24  Blaze Advisor later.
25  Q.  And, Mr. Marce, let's just make sure we're on the same

200

1  page.  What is logic?
2  A.  So what I mean by -- what I mean by business logic, the
3  set of policies and procedures and regulations and all kinds
4  of internal reference documents that companies have to
5  direct their business.  So they basically represented in
6  their own form, in their preferred form, so it could be any
7  kind of document.  It could be some Word document, some --
8  maybe some spreadsheets, maybe some PDF files.  So they're
9  going to create different documents that are capturing what
10  the business does and how it performs.
11  Q.  And so this new language that you were creating, it was
12  a new language to represent this logic; is that right?
13  A.  That's right.  So when you write things in documents,
14  the document itself cannot be run and put in a machine and
15  executed.  So what we did was come up with a language which
16  is close to English, so it's more familiar for business
17  users, but it's more structured in the way that it could be
18  formalized and when it's formalized, it can then be
19  processed by a machine, by software and then compiled and
20  then run.  So that was a major thing, be able to capture
21  business logic in a way that enables this execution of this
22  business logic.
23  Q.  And this new language that you created, did it have a
24  special name?
25  A.  Yes.  So we created structured rule language.  Not very

201

1  creative, but that's what we had.
2  Q.  And did this language, did this language get put into
3  Blaze Advisor?
4  A.  Yes.  So that's the core of Blaze Advisor is this
5  language, which is used to express any rule expressions and
6  rule logic.  So it's preferable to other products.  We use
7  it in authoring and design and when we process, process the
8  rules, execute the rules, they are part of their core of the
9  system.
10  Q.  And just to make sure I'm understanding your word, it's
11  the core of the system?
12  A.  Yes.  It's really the main part of their product.
13  Q.  And why did you feel the need to develop this new
14  language rather than just using a language that already
15  existed for Blaze Advisor?
16  A.  So the main part is that there were really no precedent.
17  There were no existing products with or languages that were
18  business friendly and that businesses could use to write
19  such logic.  So we figured out that we had to come up with
20  our own syntax and our own language.
21  Q.  Was this language easy to create?
22  A.  Mostly, not really, because there was no precedent, so
23  we had to figure out how to -- what other element of the
24  language that was the most beneficial.  We started from the
25  pure academic, we started creating a modern language first

202

1  based on English and then from the modern language, modern
2  language is how you mother the word around you.  What other
3  objects, what other relationships between objects.  So we
4  started from that kind of language approach and then we
5  added our logic -- business logic to this language and
6  eventually it become their structured language.  And there
7  was nothing on the market, no precedent at all at the time.
8  Q.  Mr. Marce, besides the structure of rule language, does
9  Blaze Advisor have any additional parts in addition to the
10  structured rule language?
11  A.  Yes, in addition to the language, there are four main
12  components in Blaze Advisor.
13  Q.  And have you prepared a graphic that will help you
14  explain your testimony today?
15  A.  Yes.  So there's an architecture document that shows
16  those four components.
17          MS. KLIEBENSTEIN:  Mr. Mayleben, can you bring up
18  page 1.
19  BY MS. KLIEBENSTEIN:
20  Q.  Is this that graphic?
21  A.  Yes.
22  Q.  And to somebody who's not a software engineer, it's
23  difficult for me to read this type of graphic.  Could you,
24  you know, at a 10,000-foot level, just explain what we're
25  looking at right now?

**239**

```
1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
2

3   ------------------------------------------------------------

4   Fair Isaac Corporation,        )  File No. 16-cv-1054(DTS)
    a Delaware Corporation,        )
5                                  )
         Plaintiff,                )
6                                  )
    v.                             )
7                                  )
    Federal Insurance Company,     )  Courtroom 14W
    an Indiana corporation,        )  Minneapolis, Minnesota
8   and ACE American Insurance     )  Friday, February 17, 2023
    Company, a Pennsylvania        )  8:40 a.m.
9   Corporation,                   )
                                   )
10       Defendants.               )
                                   )
11  ------------------------------------------------------------

12

13

14          BEFORE THE HONORABLE DAVID T. SCHULTZ
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16          (JURY TRIAL PROCEEDINGS - VOLUME III)

17

18

19

20

21

22   Proceedings recorded by mechanical stenography; transcript
     produced by computer.
23                        * * *

24

25
```

**240**

```
1   APPEARANCES:

2   For Plaintiff:        MERCHANT & GOULD P.C.
                          BY: ALLEN W. HINDERAKER
3                             HEATHER J. KLIEBENSTEIN
                              PAIGE S. STRADLEY
4                             MICHAEL A.
                              JOSEPH W. DUBIS
5                             GABRIELLE L. KIEFER
                          150 South Fifth Street, #2200
6                         Minneapolis, Minnesota 55402

7   For Defendants:       FREDRIKSON & BYRON
                          BY: TERRENCE J. FLEMING
8                             LEAH C. JANUS
                              CHRISTOPHER D. PHAM
9                             RYAN C. YOUNG
                              PANHIA VANG
10                        200 South Sixth Street, #4000
                          Minneapolis, Minnesota 55402
11
                          O'MELVENY & MYERS LLP
12                        BY: LEAH GODESKY
                              ANTON METLITSKY
13                            DARYN E. RUSH
                              ROXANA GUIDERO
14                        Times Square Tower
                          7 Times Square
15                        New York, New York 10036

16  Court Reporters:      RENEE A. ROGGE, RMR-CRR
                          KRISTINE MOUSSEAU, CRR-RPR
17                        MARIA V. WEINBECK, RMR-FCRR
                          PAULA RICHTER, RMR-CRR-CRC
18                        United States District Courthouse
                          300 South Fourth Street, Box 1005
19                        Minneapolis, Minnesota 55415

20
                                 * * *
21
22
23
24
25
```

**241**

```
1                        I N D E X
                                                      PAGE
2

3   JEAN-LUC MARCE
       Cross-Examination by Mr. Fleming               254
       Redirect Examination by Ms. Kliebenstein       266
4

5   BENJAMIN BAER
       Direct Examination by Mr. Erbele               269
6      Cross-Examination by Mr. Fleming               293
       Redirect Examination by Mr. Erbele             300

7   RUSSELL SCHREIBER - DEPOSITION
       Examination by Ms. Janus                       310
8

9   BENJAMIN BAER - OFFER OF PROOF
       Direct Examination by Mr. Erbele               367
10     Cross-Examination Mr. Fleming                  390

11  RUSSELL SCHREIBER - DEPOSITION
       Examination by Ms. Janus                       401
12     Examination by Mr. Hinderaker                  438

13  JANDEEN BOONE
       Direct Examination by Mr. Hinderaker           441
14     Cross-Examination by Ms. Godesky               489

15  Offer of Proof                                    367

16  PLAINTIFF EXHIBITS                               REC'D
       133                                            308
17     145                                            460
       P1171                                          242
18     P1172                                          242
       P1174                                          242
19

20
21
22
23
24
25
```

**242**

```
1                  (IN OPEN COURT)

2                  (8:40 a.m.)

3        THE COURT:  All right.  Good morning, everyone.

4        We're on the record in the matter of Fair Isaac

5   Corporation versus Federal, et al., Civil Number 16-1054.

6        We're here, all lawyers, assembled outside the

7   presence of the jury so I can tell you what we're going to

8   do regarding the various case studies, white papers and

9   consultant reports.  I'm going to tell you first what the

10  ruling is, and then I'm going to give you detailed rationale

11  about why I'm doing what I'm doing.

12       So I'm going to exclude the following exhibits:

13  P1024, P1025, P1028, P295, P932, and P1170.

14       I will allow in P1171, P1172, and P1174 with some

15  redactions to two of those documents.

16       So, first, as regards P1024, P1025, and P1028,

17  these were produced to the defendants six weeks ago as

18  supplementation of prior discovery, but on the face of the

19  documents they were written in 2021.  And so I'm going to

20  exclude them on that basis, not because they should have

21  been produced in discovery, discovery was closed by then,

22  but the supplementation is too late.

23       I will have further comments about the consultant

24  report that is, I believe, P10 -- I believe it's 1024.  All

25  right.
```

**399**

1  Management Suite and not specifically about Blaze?

2  A.  That's correct.

3      MR. FLEMING:  All right.  I have no further

4  questions.

5      THE COURT:  Mr. Erbele, do you have any redirect?

6      MR. ERBELE:  No redirect, Your Honor.

7      THE COURT:  All right.

8      Mr. Baer, I have just a couple of quick questions.

9      THE WITNESS:  Yes, sir.

10     THE COURT:  The client success stories or

11  whatever, that's the phrase you used, right.

12     THE WITNESS:  Yes.

13     THE COURT:  At the heart of those as a main

14  component of each of those client success stories were

15  interviews with the underlying clients, right?

16     THE WITNESS:  That's correct.

17     THE COURT:  Do you know personally what, if any,

18  of the clients' documents were reviewed in the preparation

19  of these client support or client success stories?

20     THE WITNESS:  You mean on the client side?

21     THE COURT:  Yes.

22     THE WITNESS:  I don't, but the clients were very

23  specific with us about the metrics that they were using and

24  identifying the ORY of the investments that they were using.

25     THE COURT:  In their conversations?

**400**

1      THE WITNESS:  That's correct, in their

2  conversations with us.

3      THE COURT:  Okay.  Very well.  Thank you.

4      In light of the court's very brief questioning,

5  either of you wish to ask other questions?

6      MR. HINDERAKER:  On behalf of, on behalf of FICO,

7  we'd like to reoffer the exhibits in light of the additional

8  information we have on foundation, as well as

9  trustworthiness and reliability.

10     THE COURT:  All right.  Very well.

11     Any objection?

12     MR. FLEMING:  We object.

13     THE COURT:  My ruling will stand as I announced

14  earlier this morning.

15     Thank you, Mr. Baer.

16     All right.  Let's get the jury and start playing

17  depos.

18     Thanks again, Mr. Baer.

19  1:59 p.m.

20             IN OPEN COURT

21             (JURY PRESENT)

22     THE COURT:  Thank you.  Members of the jury, rest

23  assured when you were in the jury room, we were busy

24  working.

25     Can I ask one of you to close that door for me?

**401**

1      THE JURY:  I think we're waiting.

2      THE COURT:  Oh, never mind.  Then don't close it.

3      THE JURY:  I guess we lost somebody.

4      THE COURT:  All right.  I think we're ready to

5  proceed with playing the deposition, the continuation of

6  that of Mr. Schreiber.

7          RUSSELL SCHREIBER,

8  called on behalf of the plaintiff, was duly sworn, was

9  examined and testified as follows:

10             EXAMINATION

11  BY MS. JANUS:

12  Q.  Did you assume that there would be a change in the

13  license due to the acquisition, or was it uncertain to you?

14  A.  I assume there would be a change in the license, almost

15  certain to me.

16  Q.  It was certain?  Okay?

17  A.  Yes.  It was certain to me.

18  Q.  And why was that?

19  A.  Because the -- our contracts as a rule have a change in

20  ownership as a, by definition, license change.  I forget.

21  You guys know better than me what the legal language is, but

22  there's a term that -- change in ownership is a license

23  event.

24  Q.  So you heard about the ACE merger --

25  A.  Right.

**402**

1  Q.  -- in July of 2015.  Immediately upon hearing about it,

2  you determined that there would need to be a change in the

3  license?

4  A.  That's right.

5  Q.  And so tell me then what the process was generally after

6  you heard about it?

7  A.  Right.  So generally the process was, okay, let's take a

8  look at what ACE looks like because they were a client but a

9  small client.  They were one of those people that we didn't

10  know what was going on.  Remember we talked about earlier in

11  the day.

12     So they had a small, very specific license, but we

13  weren't close to them.  We would try to sell them.  They

14  wouldn't take the phone call, so, so it was the first step

15  was to kind of get smarter about who ACE was, and then be

16  prepared for when Chubb called us to say, hey, we're going

17  to this thing and we need to, we need to get assignment, we

18  need to sign, yeah, we need to sign the license that we

19  would be in a position to have an intelligent conversation.

20  Q.  Did you see this as an opportunity for FICO to increase

21  its licensing revenue for the Chubb license?

22  A.  Did I see this as a-- could have been, yes.  Certainly

23  could have been.

24  Q.  And that was a positive for FICO, right?

25  A.  Yeah.  Revenue growth is good, yeah.  Yeah.

**403**

1  Q.  In your view you wanted, I mean, you wanted to position
2  FICO so that it could recognize as much additional revenue
3  as possible in connection with this license change.
4  A.  It sounds like you are saying that it's a bad thing.
5  Fair revenue.  Good, honest, clean, fair revenue, yeah.
6  Yeah.  If I sold it to a $12 billion company, now a
7  $30 billion company is using it, it's a different price
8  point.  That's all.
9  Q.  Is that true even if the use of the software that Chubb
10  purchased, a perpetual enterprise-wide license for, didn't
11  change or expand in any way?
12  A.  Is that true?  It's maybe not intuitive, but yeah.
13  Yeah, because they couldn't be assured that -- we went into,
14  went into CPUs.  You know, we didn't license by CPU or by
15  physically measured kind of things.  We measured by the size
16  of the business.  That was our license model.
17         That's just what it is, so if you have a bigger
18  business by definition it's a different price point.  If we
19  license it by CPU or some other measurable kind of thing
20  then, then as we bought CPUs, that would have been
21  additional license revenue.
22         But we didn't license it that way.  I don't think
23  they still do unless they changed.  So that, yeah, by
24  definition, bigger company means a bigger license.
25  Q.  Sure.  And so my question for you is, if there's a

**404**

1  merger that ends up creating, you know that whatever, choose
2  your number, $30 billion company, is there any way in your
3  mind for the original licensee to show that its use was not
4  expanded?
5  A.  Yeah.  Yeah.
6  Q.  Okay.  So would that have been a possibility in this
7  situation with Chubb and ACE?
8  A.  Yes.
9  Q.  Okay.  So you said when you learned about the merger in
10  July of 2015, you concluded immediately that there would be
11  a new license with increased license fees?
12  A.  I think I said it separately.  I said new license.  I
13  don't know that I said increased fees.
14  Q.  Okay.  Was it -- had you decided -- when did you decide
15  that there would be increased license fees, due to the
16  merger?
17  A.  At some point we learned that it was not going to be a
18  holding company set on the side, was going to be integrated
19  into ACE or ACE was going to integrate them, but they would
20  blend the enterprises.
21         At that point it became clear that there was no
22  real way for us to track the systems that they used.  We
23  didn't even know what systems they had.  I mean, we had
24  some, some inventory of systems, but even as we kind of, as
25  this thing got you ugly, we kept learning about new

**405**

1  implementations that we didn't even know about.
2         So it became harder and harder for us to ever know
3  what current use was to be able to determine what expanded
4  use would be.
5  Q.  All right.  Showing you what's been marked as
6  Exhibit 121.
7         So this is is, is this the first time you learned
8  about the transaction?
9  A.  I forgot Greenberg did this.  Oh, let's see.  Lamont.
10  Yeah, Lamont Boyd.  Right.  Lamont.  Yes, it is.
11  Q.  And your response is, "Driving costs out will be
12  interesting, and there may be a major license transfer"; is
13  that right?
14  A.  That's what I said.
15  Q.  What does "driving costs out will be interesting," what
16  does that mean?
17  A.  You got two accounting system departments, two IT
18  departments.  There ought to have been a major organization
19  transformation agenda laid out there.  It is probably a
20  three-year plan to pull out, I would think, multi billion
21  dollars' worth of costs.  That's why you do these
22  acquisitions partly, right?
23  Q.  And then you say, "Maybe a major license transfer," and
24  I take it you are meaning that in a positive way, because it
25  may result in increased revenues for FICO?

**406**

1  A.  Yep.  I may have meant it that way.
2  Q.  When did you decide how much FICO was going to increase
3  its license fees to Chubb due to the merger?
4  A.  Oh, I don't know.  I really don't know.  I don't know
5  that I decided per se.  I think it might have been more of a
6  pricing discussion internally.  I do know that we tried to
7  get ahold of them.  They never notified us.  Right?  I mean,
8  they had an obligation as I recall to notify us, and we had
9  to reach out to them and say what are you doing.
10         And so at that point it kind of felt bad.  So I
11  don't know.  We didn't really -- I think we were kind of
12  waiting for them to call because it was their merger, right?
13  So we were waiting for them to call us.  I think it wasn't
14  until late in the calendar year that Sawyer actually got
15  through to somebody.
16  Q.  Is that when you first tried, though?
17  A.  Could be.  It's not when I was first asked to do it,
18  though.
19  Q.  It's what?
20  A.  Sorry.  A little lettuce.
21         It's not the first time he was asked to do it.  I
22  think at some point around Thanksgiving we said this is
23  getting too close, it going to be very uncomfortable.
24  Q.  And so you would have asked him to reach out to Chubb?
25  A.  Yes.

**407**

1  Q. Showing you what's been marked as 122. This is an email
2  from Mike Sawyer to you with the subject line: Chubb
3  language.
4        Did you ask him to put this together?
5  A. I may have. It's likely I would have.
6  Q. So he says, "I think we are in a good spot. See below.
7  First excerpt is from the original MSLA and states they have
8  no assignment rights."
9        And then he cites to a couple other provisions as
10  well.
11        Did you, do you recall whether you agreed with
12  him?
13  A. Do I recall whether I agreed with him? I don't recall.
14  Q. If you take a look at the no assignment clause and read
15  that.
16  A. Right. I'm sorry.
17  Q. Have you read it?
18  A. Almost. I have read it.
19  Q. So the first sentence of the paragraph simply states
20  that, "Neither party shall without prior written consent of
21  the other party assign or transfer this agreement or any
22  part thereof," correct?
23  A. That's what it says, yes.
24  Q. Okay. And then the second sentence more specifically
25  applies to a change of control of client or if client is

**408**

1  merged with, acquired by or acquires another entity or
2  undergoes a reorganization, et cetera, correct?
3        Do you see that?
4  A. Do I see the second sentence? I see the second
5  sentence, yes.
6  Q. Okay. And do you agree with me that the second sentence
7  as opposed to the first sentence, applies specifically to
8  the situation in which there is an event of change of
9  control or a merger or an acquisition of another entity,
10  et cetera?
11  A. That's what it says.
12  Q. Okay. And the provision goes on to state that, "Each
13  such event shall be deemed an assignment subject to the
14  section and client shall make no expanded use of the Fair
15  Isaac products as a result of any such event unless and
16  until Fair Isaac provides such written consent which will
17  not be unreasonably withheld"?
18  A. That's what it says.
19  Q. Okay. So do you agree with me that in the case of a
20  merger or change of control one of these events that the
21  second sentence lists, in that event the analysis is, is
22  there an expanded use, and if so, there needs to be consent,
23  but FICO may not unreasonably with hold it?
24  A. You say your position is -- no, I don't agree with you.
25  Q. Okay.

**409**

1  A. Okay.
2  Q. What do you disagree with?
3  A. I -- this "expanded use" bit on the side is really kind
4  of a safety net while working through the change of control
5  issue is how I read it.
6  Q. Okay.
7  A. As opposed to how you just described it to me.
8  Q. What do you mean by, "A safety net while working through
9  the expanded" -- or I'm sorry. What do you mean by "a
10  safety net"?
11  A. Just make sure that you're not running additional
12  business through it, that you're not using -- creating new
13  applications -- not running additional business through it
14  or creating new applications, even if it was the legacy
15  enterprise.
16        At that point this thing should be frozen, like
17  there should not be one more transaction run through it.
18  We're out in limbo there. You're off the -- you're like
19  Wile E. Coyote off the cliff.
20        You are using it in a way that you are not
21  licensed to use it is how I read that.
22  Q. So your interpretation is that the provision and client
23  shall make no expanded use of the Fair Isaac products as a
24  result of any such event is a safety net?
25  A. Yeah. Yes. My words.

**410**

1  Q. And I mean do you agree with me that it makes sense,
2  that mergers and acquisitions in your world of business, I
3  mean, they happen all the time, right?
4  A. Mergers and acquisitions happen all the time, yes.
5  Q. Well, I'm saying that isn't a fair reading of this
6  sentence essentially so long as you make no extended
7  use of the software, you're okay?
8  A. No. No. No. No. I don't see --
9  Q. What's the point of having the extended use language in
10  there, then?
11  A. So you stop. So we got to get this license transferred.
12  This is about, that expanded use is in the meanwhile while
13  you've got a license that hasn't been transferred yet.
14  That's why we did it. So you got an unassigned -- you have
15  got an event here that took place.
16        An assignment never was agreed to, and all we're
17  saying is, you know, lock it down. That's how I read it.
18  Q. So you continued to use the software, just not in an
19  expanded way?
20  A. Until we -- we're not saying you have to turn it off. We
21  are saying you can lock it down and use it as is until we
22  get a transfer done or an assignment done.
23  Q. Okay. But that's --
24  A. That's how I read it.
25  Q. And would you agree with me that that consent shall not

**411**

1  be unreasonably withheld even if it is expanded use?

2  A.  Huh?

3  Q.  It says, the sentence reads that, "There shall not be

4  expanded use unless and until"?

5  A.  Right.

6  Q.  So no expanded use unless and until you get your written

7  consent, which shall not be unreasonably withheld, and then

8  presumably you can make your expanded use?

9  A.  So I think we just, we read it very differently.  I do.

10  So to me right now you have got a change in ownership, which

11  is a problem.  If we would have sat together well in advance

12  of the change in ownership and said here's how I am using

13  it, I've got this much revenue going through it, told me

14  what you were doing beforehand, we could have managed our

15  way through it.

16       You could have said, oh, if you want to pay no

17  fee, we can create an entity to do that, but by not doing

18  any of those things, at that point because we had no insight

19  into what the plans were, at that point -- and this could

20  happen in any company, right?

21       If you don't tell me what you're doing or whoever

22  is at FICO on that day what's going on, then you have just

23  got to lock it down until we either terminate it or we

24  renegotiate something.  That's what expanded use means to

25  me.

**412**

1  Q.  You agree there was an obligation on the part of FICO to

2  not unreasonably with hold its consent to transfer.

3  A.  That's right.  That's what it says right here.

4  Q.  But do you see anything in the -- I understand you are

5  not looking at the whole agreement right now, but do you see

6  anything in this provision that we're looking at that

7  requires Chubb to reach out to FICO to obtain consent versus

8  FICO initiating the conversation?

9  A.  Yes.  So I view this as an attempt to transfer the

10  agreement without, without first obtaining such written

11  concept.  That's what I view what happened, the last bit.

12       Right here it says, Any attempt to assign or

13  transfer without first obtaining will be void and no force

14  effect, which means you lost your license that day.  You had

15  no license at that point in my mind.

16  Q.  Take a look at this email exchange and let me know.

17  A.  There you go.  23.  There you go.

18  Q.  So this is an email exchange between you and Mike

19  Sawyer?

20  A.  Yep.

21  Q.  In October of 2015, right?

22  A.  Yep.

23  Q.  The first portion of the email is, contains the email we

24  were looking at in 122.

25  A.  Mm-hmm.

**413**

1  Q.  Your response to Mr. Sawyer's email on October 7th is,

2  "The unreasonably withheld bit has me a little concerned.

3  So it may come down to how did we size the enterprise

4  discussion."

5  A.  Yep.

6  Q.  So you had some concern about that language we looked at

7  that "such written consent will not be unreasonably

8  withheld"?

9  A.  Mm-hmm.

10  Q.  Yes?

11  A.  Yes.  I say it right here.

12  Q.  What --

13  A.  I say, yeah, right here.  "Unreasonably withheld has me

14  a little bit concerned."

15  Q.  Right.  And that's because you understood that FICO had

16  an obligation to not unreasonably with hold its consent,

17  correct?

18  A.  Yeah, there were two things that had me worried about

19  this.  This is like in modern day, so I kind of remember

20  this one.  It is kind of nice.  There were two things.  One,

21  that "unreasonably withheld" is not a defined term.

22       So in a contract if I have a term like that and

23  it's not defined, I get antsy, so that would have been the

24  first thing.

25       The next bit was literally, you know, how do we

**414**

1  size it, so we knew we sized it on a $12 billion deal, and

2  now you got acquired by a $23 billion entity, so it's now up

3  to a $35 billion company.

4       So the lack of a defined what is "unreasonably

5  withheld" would have caused me to pause.

6  Q.  Okay.  Yep.

7  A.  But that would have been it.

8  Q.  And by the way, so the deal, the enterprise deal was

9  sized on $12.3 billion of premium revenue?

10  A.  Sounds about right.

11  Q.  Premium revenue and he said, "Sounds about right."

12       Do you recall whether that 12.3 billion in terms

13  of sizing the original deal included Chubb's global

14  revenues?

15  A.  I don't.  I don't.

16  Q.  If it did, do you agree with me that that counsel's in

17  favor of an interpretation of the ELA as being a global ELA?

18  A.  All right.  So I agree that there's some things here

19  that would one to think there was a global, but at the end

20  of the day, the agreements rule, and the agreements are not

21  a global.

22  Q.  All right.  Then Mike Sawyer responds to you and says,

23  "I am not as concerned about it."

24       He talks about this --

25  A.  Yep.

Fair Isaac Corporation v Federal Insurance Company, et al., File No. 16-cv-1054(DTS)                February 17, 2023

---

**475**

1  voting interests, representing the right to vote for the

2  election of directors or other managing authority, in an

3  entity.

4       "Such other entity is an affiliate only during the

5  period that such control exists.  Client shall at all times

6  be responsible for its affiliates' use of the Fair Isaac

7  products."

8  Q.  And in -- I just want to spend a minute on, first it

9  gives a specific definition of affiliates.  And when it

10  looks to -- to be an affiliate, you must be, the client must

11  own more than 50 percent of your stock?

12  A.  Correct.

13  Q.  Is another way of expressing that that the affiliate

14  runs downhill?  How do you say that in your contract

15  language?

16  A.  Downstream.

17  Q.  Downstream?

18  A.  Yes.

19  Q.  So the affiliate must be downstream from the client?

20  A.  Correct.

21  Q.  And then the client must own more than 50 percent of the

22  stock of the downstream entity?

23  A.  Correct.

24  Q.  Did you appreciate at the time that you were drafting a

25  license agreement where FICO was contracting with a

---

**476**

1  division?

2  A.  Yes.

3  Q.  Have you had experience with FICO or with agreements

4  with divisions in other situations?

5  A.  Yes.

6  Q.  Did you have any special -- did you think about the fact

7  that this definition of client and its affiliates with

8  Chubb & Son, the division being a client, meant anything

9  special?

10  A.  I didn't have any specific concerns about it.  To me it

11  was a very specific definition of who the client was in this

12  instance.

13  Q.  I know we didn't see any red lining on it.  Do you

14  recall any conversations with Mr. Black where he wished to

15  have a different definition?

16  A.  I do not.

17  Q.  Let me turn to paragraph 10.8.  This is where I wish I

18  had better eyes.

19       As we saw, this is entitled No Assignment.  And

20  you've told us with the exception of "shall not be

21  unreasonably withheld" that it's standard FICO language.

22       Do you have an understanding of the commercial

23  purpose, the business reason for this language in the

24  license agreement and for you including it in the license

25  agreement?

---

**477**

1  A.  Yes.

2  Q.  What is the business reason behind you drafting this?

3  A.  So from FICO's perspective, when the license is

4  sculpted, so whether it's going to be seat or CPU

5  restrictions or ultimately enterprise-wide, there is a cost

6  that's assigned to that license based on how large the

7  client is, the scope of the business the client is going to

8  be using the software for.

9       So from Fair Isaac's perspective as the licensor

10  of the software, you need to have specificity and certainty

11  as to who your client is and that the use is as intended.

12  So the client, in this case Chubb & Son, cannot simply

13  assign their license to a much larger entity, a much smaller

14  entity.

15       The license is specifically granted to Chubb &

16  Son, and they cannot assign it without Fair Isaac's consent

17  to do so.

18  Q.  Okay.  And you used the word "cost."  Is that the same

19  thing as a license fee?

20  A.  Yes.

21  Q.  Okay.  So you were referencing the first sentence?

22  A.  Correct.

23  Q.  Let's go to the -- well, let's go to the third sentence,

24  and if you would read that, please.

25  A.  I'm looking for the start of the third.

---

**478**

1  Q.  I think it starts, "Any attempt."

2  A.  "Any attempt to assign or transfer all or any part of

3  this agreement without first obtaining such written consent

4  will be void and of no force or effect."

5  Q.  And the business purpose of that is what?

6       MS. GODESKY:  Objection.

7       MR. HINDERAKER:  Why?

8       THE COURT:  Overruled.

9  BY MR. HINDERAKER:

10  Q.  Why do you include that in the language of the license

11  agreement?

12       MS. GODESKY:  Objection.

13       THE COURT:  Let's have an answer to the first

14  question.

15       MR. HINDERAKER:  Okay.

16       THE WITNESS:  Can you repeat the first question?

17       MR. HINDERAKER:  I'd like to.  Could you repeat

18  the first question?

19       (Record read as requested)

20       THE WITNESS:  So the business purpose of this,

21  again, goes to the license fees that would be associated

22  with the grant of the license, also potentially the scope.

23  A multitude of things could or might need to be changed if

24  an assignment is going to be consented to.

25       And so therefore it -- the license cannot be

---

**479**

1  assigned without that consent.
2  BY MR. HINDERAKER:
3  Q.  And when you use the word "scope," that means what in
4  other language?
5  A.  Any kind of restriction, seats, CPUs.
6  Q.  Okay.
7  A.  Applications.
8  Q.  Okay.  And let's turn to the second sentence.
9      So overall what's the business purpose of the
10  second sentence?
11  A.  So the business purpose of the second sentence is,
12  again, to outline various events that can happen to an
13  organization and that if those things happen, those would be
14  deemed an assignment, which would require consent.
15      And the client, Chubb & Son, shall make no
16  expanded use of the Fair Isaac product as a result of any
17  such event unless and until Fair Isaac provides its written
18  consent, which would not be unreasonably withheld, which is
19  the language added from Mr. Black.
20  Q.  Right.  Well, are there business impacts to FICO that
21  are addressed in that second sentence?
22  A.  Yes.  I mean, again, going to the issue of the license
23  fee.  So I don't know what the size of Chubb & Son, a
24  division of Federal Insurance, was at the time in 2006 when
25  this was signed, but the size of that division, as well as

**480**

1  how they were using the Fair Isaac product, would impact the
2  license fee they were charged.
3      So if that changed, either their size --
4  Q.  Could I interrupt you again?
5  A.  Sure.
6  Q.  When you say "their" or "they," is that --
7  A.  Chubb & Son.
8  Q.  Okay.
9  A.  So if Chubb & Son's size changed from a revenue
10  perspective or if they started using the application to
11  support, they, Chubb & Son, used the application to support
12  a larger business, that would have consequences to the
13  license fee.
14  Q.  And can you tell us why?  I mean, the consequences come
15  from what?
16  A.  The price, the license fee is largely based on how the
17  client, in this case Chubb & Son, is going to use the
18  product.  So if that usage is suddenly expanded, the license
19  fee needs to or may need to be adjusted accordingly.
20      So going from -- again, I don't know the size of
21  Chubb & Son in 2006, but going from the size they were to if
22  they were bought by another company or merged with someone,
23  going to a significantly larger size would result in a
24  bigger license fee, generally speaking.
25  Q.  Is that what you mean by "expand"?

**481**

1  A.  Yes.
2  Q.  So they are in a bigger organization?
3  A.  Correct.
4  Q.  The second sentence of 10.8 identifies those different
5  specific events in connection with the client; is that
6  correct?
7  A.  Yes.
8  Q.  The second sentence with the client and those different
9  events, we have these changes of circumstances that affect
10  the client.  Is anything in the second sentence speaking
11  about an actual transfer of -- an actual transfer?
12      MS. GODESKY:  Objection.
13      THE COURT:  Sustained.
14  BY MR. HINDERAKER:
15  Q.  Okay.  You in your explanation of purposes and impacts
16  of this, you go back to the pricing and fee of the original
17  license agreement here in 2006.
18  A.  Yes.
19  Q.  And you seem to contrast that with the events that are
20  in the second sentence of paragraph 10.8.  Can you tell us
21  why you do make that contrast?
22      MS. GODESKY:  Objection.
23      THE COURT:  Sustained.
24  BY MR. HINDERAKER:
25  Q.  As you're drafting paragraph 10.8 and its

**482**

1  interrelationship with the rest of the agreement, is 10.8
2  speaking -- is there any particular point in time that 10.8
3  is speaking to?
4      MS. GODESKY:  Objection.
5      THE COURT:  Counsel, approach.
6      (Sidebar discussion)
7      THE COURT:  I think we may be talking at cross
8  purposes.  I understand your objection.  I'm not sure you're
9  intending to ask her to interpret 10.8 or that's what her
10  objection was.
11      MR. HINDERAKER:  I don't want her to.
12      THE COURT:  Right.  You were trying to -- well, if
13  you can rephrase the question.
14      MR. HINDERAKER:  I think I can go back inside some
15  of her answers and pull out what she's trying to say that
16  way.  It's not an interpretation of what it is.  It's a
17  context in which it operates, just the straight language.
18  That's all.
19      MS. GODESKY:  I mean, the questions as they're
20  phrased to me are how --
21      THE COURT:  As it's been phrased, yeah, I agree,
22  but let's go back.
23      MR. HINDERAKER:  I'll try better.
24      (In open court)
25      THE COURT:  I'm going to try my questions about

**483**

1  this.

2          Going back to one of your earlier answers where --

3  if you recall you used the word "scope." And I said do you

4  mean part of a larger organization, correct?

5          THE WITNESS: Yes.

6  BY MR. HINDERAKER:

7  Q. All right. So I wasn't misinterpreting you?

8  A. No.

9  Q. Okay. So as you were describing the events that are in

10  the second sentence of 10.8, you were describing them as

11  events that -- correct me if I'm not getting you right. You

12  were describing them as events that could change the scope

13  from the original license, from the -- change the scope of

14  the client from the original license time.

15  A. Correct.

16  Q. And when there is such -- well, you know the business

17  reason why FICO wants to have the opportunity to consent

18  should there be a change of scope of the client as compared

19  to when the license agreement was first entered into.

20  A. So the main business reason, again, would be financial

21  related, because the license fee that's charged is

22  calculated based on the original client that enters into the

23  license agreement, so in this case Chubb & Son.

24          If that client changes for some reason, the

25  license fee may also need to be adjusted in order to account

**484**

1  for that.

2  Q. Understood. We've mentioned a few times that, that

3  Chubb & Son wanted the additional language "consent should

4  not be unreasonably withheld." The addition to that of the

5  agreement, was that a business decision or a legal one?

6  A. A legal decision.

7  Q. Why did you accept that change?

8  A. Because it has been accepted case law that in software

9  license situations it is not considered unreasonable for a

10  licensor, in this case FICO, to --

11          MS. GODESKY: Objection.

12          THE COURT: Sustained.

13  BY MR. HINDERAKER:

14  Q. Did you have any concerns in accepting that change?

15  A. No, I did not.

16  Q. The paragraph 10.8 second sentence and then the second

17  part goes on to say, "And client shall make no expanded use

18  of the Fair Isaac products as a result of any such event

19  unless and until Fair Isaac provides such consent."

20          Do you know what the business purpose of that is?

21  A. Yes. So again in the event the client undergoes one of

22  these entity or structure related events, the client, in

23  this case Chubb & Son, cannot expand its use of the products

24  outside of the license grant unless Fair Isaac provides

25  written consent for it to do so.

**485**

1  Q. What does that -- well I, don't want to have you

2  interpret the contract.

3          Do you have a business understanding of what

4  "expanded use" means?

5  A. Yes.

6          MS. GODESKY: Objection. Foundation.

7          THE COURT: Just answer that question yes or no.

8  Do you have an understanding of the business?

9          THE WITNESS: Yes.

10  BY MR. HINDERAKER:

11  Q. Okay. And let me ask you this question, then. In your

12  understanding, if the client goes through a change of scope,

13  as you've described it, is that in the business

14  understanding of FICO an expanded use?

15          MS. GODESKY: Objection. Foundation.

16          THE COURT: Do you have the foundation to answer

17  that question? Do you understand it, and do you have

18  personal knowledge of that business purpose?

19          THE WITNESS: Yes.

20          THE COURT: Overruled.

21  BY MR. HINDERAKER:

22  Q. And what the business purpose is --

23          Can you read it back so we get that right, please?

24          (Record read as requested)

25          THE COURT: And let me just say, your answer is to

**486**

1  the business understanding. We're not testifying about the

2  meaning of Section 10.8 in a legal sense.

3          THE WITNESS: Yes, I believe the business would

4  consider that to be an expanded use.

5  BY MR. HINDERAKER:

6  Q. I would like to touch on some of the other provisions in

7  the license agreement. And we've spoken about 3.1, but I

8  don't think I've asked you if you have knowledge of the

9  business reasons behind having that license restriction

10  paragraph in the license agreement.

11          First question I guess is, Do you have the

12  knowledge of the business reasons?

13  A. Yes.

14  Q. And they are what?

15  A. So from a business perspective, again, the license fee

16  is tied to how the client, in this case Chubb & Son, is

17  going to be using the Fair Isaac product. So the

18  restrictions are really outlining what they can't do with

19  the Fair Isaac product.

20  Q. Let me turn to, let me turn to paragraph -- where is

21  it -- 10.10.

22          This is called Press Release, not the hottest

23  issue in the case, but do you have an understanding of the

24  business reason behind paragraph 10.10?

25  A. Yes.

**487**

1  Q.  And what is that?

2  A.  So as the licensor, Fair Isaac, of this software, the

3  company is wanting to be able to use Chubb & Son's name in

4  things like press releases, marketing materials.  And then

5  Chubb & Son is agreeing to specifically participate in two

6  different types of marketing activities as well, which would

7  go to really helping Fair Isaac to build its brand and

8  reputation within the industry.

9  Q.  That was agreed upon.  And then 10.4, No Waiver.

10        Do you know what the business purpose is behind

11  that?  That's a yes or no.

12  A.  Yes.

13  Q.  And what is it?

14  A.  So it's essentially saying that the parties agree that

15  as the parties kind of live out the rights and obligations

16  of the agreement, neither of them is waiving their right to

17  bring an action against the other party, if, even if it has

18  gone on for some time.

19  Q.  Even if what has gone on for some time?

20  A.  Where the other party is acting out of compliance or in

21  breach of the agreement.

22  Q.  And then paragraph 10.5 entitled Entire Agreement, do

23  you have an understanding of the business purpose behind

24  that?

25  A.  Yes.

**488**

1  Q.  And what is that?

2  A.  That's to say that the parties to this agreement, so

3  Fair Isaac and Chubb & Son, a division of Federal Insurance,

4  do not have any other agreements outside of the, what we

5  call, the four corners of this document.

6  Q.  And then if we go to paragraph 10.12, do you understand

7  the commercial purpose behind that no third-party

8  beneficiaries?

9  A.  Yes.

10  Q.  What is that commercial purpose?

11  A.  So there are no parties outside of Fair Isaac

12  Corporation and Chubb & Son, a division of Federal

13  Insurance, there are no third-party beneficiaries.  So no

14  other party outside of those two parties has any rights or

15  obligations under this agreement.

16  Q.  You are saying the only people, the only companies, the

17  only ones who have rights under the agreement are FICO and

18  Chubb & Son?

19  A.  Correct.

20  Q.  And then if we go to paragraph 9.4, please.  That is

21  called Survival.

22  A.  Yes.

23  Q.  Do you know the commercial purpose behind that?

24  A.  Yes.

25  Q.  And what is it?

**489**

1  A.  So after an agreement terminates, you will often have a

2  survival provision similar to this where the parties are

3  agreeing to the sections of the agreement that will survive,

4  that will live on, even after the agreement has terminated.

5  Q.  And is one of those surviving provisions Section 3.1?

6  A.  Yes, it is.

7  Q.  And is another one of the surviving provisions

8  Section 9.3?

9  A.  Yes.

10  Q.  Effective Termination.

11        Ms. Boone, that's my questions for you.  Thank you

12  for your attention and your time.

13        THE COURT:  Ms. Godesky, how long do you think you

14  will go?

15        MS. GODESKY:  I think it will go past five.

16        THE COURT:  Okay.  Would you like to start?  Shall

17  we start?

18        MR. HINDERAKER:  Let's start.

19        MS. GODESKY:  Sure.  We can start.

20        THE COURT:  Okay.

21            CROSS-EXAMINATION

22  BY MS. GODESKY:

23  Q.  Good afternoon, Ms. Boone.

24  A.  Hello.

25  Q.  My name is Leah Godesky, and I represent the defendants

**490**

1  in this case.

2        You said a few times during your direct

3  examination as you were looking at various iterations of the

4  contract that it represented standard FICO language.  Do you

5  remember saying that?

6  A.  Yes.

7  Q.  What's the basis for saying that?  Have you, do you

8  remember all of the words and phrases in the contracts from

9  back when you work at FICO in 2006 and 2007?

10  A.  I wouldn't say that I remembered them prior to reviewing

11  a standard template from FICO in preparation for my

12  deposition.

13  Q.  So they gave you something before you testified here

14  today to refresh your recollection?

15  A.  Correct.

16  Q.  Do you have that document with you, the template

17  document you just referenced?

18  A.  No, unless it's in the exhibits.

19  Q.  Okay.

20        Does counsel have a copy of that document?

21        MR. HINDERAKER:  I believe you're miss --

22  Ms. Boone said in her deposition and I believe you are

23  mischaracterizing it.

24        THE COURT:  She did say her deposition.

25        MS. GODESKY:  I'm sorry.  I misunderstood.

735

```
 1            UNITED STATES DISTRICT COURT
              DISTRICT OF MINNESOTA
 2
 3   ------------------------------------------------------
 4   Fair Isaac Corporation,    ) File No. 16-cv-1054(DTS)
     a Delaware Corporation,    )
 5                              )
         Plaintiff,             )
 6                              )
     v.                         )
 7                              )
     Federal Insurance Company, ) Courtroom 14W
 8   an Indiana corporation,    ) Minneapolis, Minnesota
     and ACE American Insurance ) Friday, February 24, 2023
 9   Company, a Pennsylvania    ) 9:00 a.m.
     Corporation,               )
10                              )
         Defendants.            )
11   ------------------------------------------------------
12
13
14          BEFORE THE HONORABLE DAVID T. SCHULTZ
         UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16           (JURY TRIAL PROCEEDINGS - VOLUME V)
17
18
19
20
21
22      Proceedings recorded by mechanical stenography;
     transcript produced by computer.
23
                         * * *
24
25
```

736

```
 1   APPEARANCES:
 2   For Plaintiff:        MERCHANT & GOULD P.C.
                           BY: ALLEN W. HINDERAKER
 3                             HEATHER J. KLIEBENSTEIN
                              PAIGE S. STRADLEY
 4                             MICHAEL A. ERBELE
                              JOSEPH W. DUBIS
 5                             GABRIELLE L. KIEFER
                           150 South Fifth Street, #2200
 6                         Minneapolis, Minnesota 55402
 7   For Defendants:       FREDRIKSON & BYRON
                           BY: TERRENCE J. FLEMING
 8                             LEAH C. JANUS
                              CHRISTOPHER D. PHAM
 9                             RYAN C. YOUNG
                              PANHIA VANG
10                         200 South Sixth Street, #4000
                           Minneapolis, Minnesota 55402
11
                           O'MELVENY & MYERS LLP
12                         BY: LEAH GODESKY
                              ANTON METLITSKY
13                             DARYN E. RUSH
                              ROXANA GUIDERO
14                         Times Square Tower
                           7 Times Square
15                         New York, New York 10036
16   Court Reporters:      RENEE A. ROGGE, RMR-CRR
                           KRISTINE MOUSSEAU, CRR-RPR
17                         MARIA V. WEINBECK, RMR-FCRR
                           PAULA RICHTER, RMR-CRR-CRC
18                         United States District Courthouse
                           300 South Fourth Street, Box 1005
19                         Minneapolis, Minnesota 55415
20
                               * * *
21
22
23
24
25
```

737

```
 1                    I N D E X
                                              PAGE
 2
     LAWRENCE WACHS VIA DEPOSITION
 3     Examination By Ms. Janus                739
       Examination By Mr. Hinderaker          806
 4
     THOMAS CARRETTA
 5     Direct Examination By Mr. Hinderaker    843
       Cross-Examination By Ms. Godesky        892
 6     Redirect Examination By Mr. Hinderaker  934
 7
 8
 9
       DEFENDANTS' EXHIBITS                    REC'D
10       4                                     921
         17                                    947
11       282                                   945
         304                                   918
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

738

```
 1                    9:00 A.M.
 2
 3        (In open court with the Jury present.)
 4        THE COURT:  Good morning.  Please be seated go
 5   ahead and be seated.
 6        All right.  Good morning, Members of the Jury.
 7   Thanks, everyone, for making it in here.  I don't know how
 8   bad your commutes were, but thanks for making it.
 9        Mr. Hinderaker, are you ready to proceed?
10        MR. HINDERAKER:  We are, Your Honor.
11        THE COURT:  All right.  Why don't you, you need to
12   explain what's going on now?
13        MR. HINDERAKER:  I do.  I do.
14        THE COURT:  Go right ahead.
15        MR. HINDERAKER:  Our first witness this morning is
16   a gentleman by the name of Larry Wachs, Lawrence Wachs, and
17   he will be showing -- his testimony will be presented by
18   video, so I will read this introduction about him.
19        Lawrence Wachs is a former FICO employee, now
20   living in New York, whose deposition was taken February 26,
21   2019.  His role was in sales; and when he left FICO, his
22   title was sales executive.  He was with FICO from 2006 to
23   2008.
24        Mr. Wachs' deposition was taken by Leah Janus, one
25   of the counsel for defendants.  There may be another voice
```

**851**

1  the third paragraph.

2          And you say to him, "I am writing now to again

3  confirm the agreement may not be transferred or assigned

4  without FICO's consent." I'll continue on but let me stop

5  at that point.

6          Why do you say, "I am writing now to again

7  confirm"?

8  A.   Because prior to this point in speaking with Mike Sawyer

9  and Russ Schreiber, after I did some review, I asked them to

10  go back to the business, their contacts at Chubb, Chubb &

11  Sons, and tell them you should be aware this agreement is

12  out there, obviously, because they'd purchased and been

13  using the software, but that there's a particular clause

14  that is involved when there is a merger or acquisition such

15  as what was described.

16  Q.   So that explains the "again."

17          "Confirm that the agreement may not be transferred

18  and assigned without FICO's consent and that FICO has not

19  and does not consent to such transfer and agreement."

20          Is that a reference to paragraph -- well, what

21  were you referring with that sentence?

22  A.   I was referencing Section 10.8 of the agreement that is

23  J001.

24  Q.   Okay.

25  A.   That's the license agreement. And pointing out that,

**852**

1  you know, we had not consented, just to be very clear, and

2  that we were not consenting to the transfer and an

3  assignment.

4  Q.   Are you referencing the first sentence in 10.8 in that

5  regard?

6  A.   I very much am.

7  Q.   And at this point did you have any information from

8  Chubb & Son with respect to the facts underlying the

9  acquisition or any facts relating to the acquisition?

10  A.   Well, when I saw the announcement, I read it, and I'm

11  experienced in mergers and acquisitions through the course

12  of my career, and so I understood the process. So I read

13  the announcement. I knew the announcement was simply that,

14  it was an announcement that they had signed the agreement,

15  but that these take time to close. And actually the merger

16  be completed.

17          So I read that, and because it was such a large

18  merger and Chubb Corporation was an American public company,

19  so it files with the Securities Exchange Commission reports

20  and things, I was able to read some of the filings.

21          And between those activities and reading the

22  agreement, it became clear to me to tell Russ Schreiber and

23  Mike Sawyer they should go back to their business contacts

24  before the merger was completed.

25          You can never tell when these mergers are going to

**853**

1  complete and close.

2  Q.   Okay. And then this letter January 27th is after the

3  merger was completed, correct?

4  A.   Yes, it is.

5  Q.   All right. And so you're saying in that first sentence:

6  "FICO has not and does not consent."

7          And then let me go to the second sentence of your

8  third paragraph. "The agreement plainly states in

9  Section 10.8 that the agreement may not be assigned without

10  consent," and it goes on.

11          "A change of control or merger and acquisition of

12  Chubb was also stated as being a deemed assignment requiring

13  consent."

14          And what are you saying there when you say "was

15  also"?

16  A.   Well, there's -- the way Section 10.8 was structured --

17          MS. GODESKY: Objection.

18          THE COURT: Sustained. Why don't you rephrase it

19  or --

20          Mr. Carretta, you can answer the question that was

21  asked. You cannot provide testimony about your

22  interpretation of the contract. Okay?

23          THE WITNESS: Okay.

24  BY MR. HINDERAKER:

25  Q.   So my question is why did you say, why did you say what

**854**

1  you said, "A change of control or merger and acquisition of

2  Chubb was also stated"?

3  A.   Well, 10.8 is a commercial clause. It sounds legal, but

4  it's a commercial clause. And I simply looked at it, and in

5  a commercial perspective, it says, "No assignment unless you

6  obtain consent."

7  Q.   And so let's be careful and we'll just stay with your

8  understanding of the provision and why you wrote what you

9  wrote.

10          So let me focus you then on the second sentence of

11  10.8.

12  A.   That's a direct reference to the agreement.

13  Q.   That, that being, that being that the language in your

14  letter, "A change of control or merger and acquisition of

15  Chubb was also stated as being a deemed assignment requiring

16  consent"?

17  A.   That is correct.

18  Q.   Okay. So that language in your letter is a reference to

19  the second sentence of paragraph 10.8?

20  A.   That's right. I was simply mimicking what's in the

21  clause.

22  Q.   As you wrote this letter saying Notice of Breach, in

23  your understanding, when was the request for FICO's prior

24  written consent to have happened?

25          MS. GODESKY: Objection.

**855**

1    THE COURT:  Sustained.
2    BY MR. HINDERAKER:
3    Q.  Why did you think that -- why did you think that Chubb &
4    Son was in breach?
5        MS. GODESKY:  Objection.
6        THE COURT:  Rephrase the question.
7    BY MR. HINDERAKER:
8    Q.  Why did you write a letter that says Notice of Breach to
9    Chubb & Son?
10       MS. GODESKY:  Objection.
11       THE COURT:  Overruled.
12       THE WITNESS:  I wrote the letter because the
13   merger had closed, and therefore it became important to
14   provide information and notice to their counsel that they
15   had either overlooked this issue or they should be very
16   aware of it because it's important.
17   BY MR. HINDERAKER:
18   Q.  I think I understand that.  My question was a little bit
19   different.  Why did you write a letter that says Notice of
20   Breach?
21   A.  Well, because --
22       MS. GODESKY:  Objection.
23       THE COURT:  Let's approach again.
24           (Sidebar discussion)
25       THE COURT:  He wrote what he wrote.

**856**

1        MS. GODESKY:  Sure.  And he can read what he wrote
2    but why --
3        THE COURT:  No, he can say -- he can go beyond
4    that.  He can say because I thought they were in breach or I
5    was putting them on notice that our position was they were
6    in breach.  That doesn't --
7        MR. HINDERAKER:  We're defending against a claim
8    that he acted in bad faith, and he, in my judgment, should
9    be able to explain why he thought he wasn't, what he
10   understood that -- it doesn't.  He's not tell the jury what
11   the contract means, but what he understood and why he was
12   doing what he was doing, so we can defend the bad faith
13   claim.
14       MS. GODESKY:  He should be defending a bad faith
15   claim with evidence other than lawyer's interpretation of
16   the contract.
17       MR. HINDERAKER:  It's not that.
18       MS. GODESKY:  If we could have had lawyers as a
19   mouthpiece interpreting this contract, this case would be
20   very different.  We'd have lawyers from ACE and Chubb all
21   marching up and taking the stand and talking about their
22   interpretation of the clause at the time it was negotiated,
23   their interpretation of Mr. Carretta's breach letters, why
24   they disagreed with the breach.
25       That's not how you try cases.  This is work

**857**

1    product.  This is attorney-client communications, and
2    they're selectively waiving it as they so choose, but he was
3    instructed over and over at his deposition not to answer
4    questions about what does "expanded use" mean in
5    Section 10.8.
6        They don't want him to answer that question, but
7    he's allowed to say I believe that they were in breach when
8    he's been instructed not to answer questions about how he
9    interprets "expanded use"?
10       THE COURT:  Yeah.  How -- so if he is not entitled
11   to -- I mean, he's the person that gave the notice of the
12   breach.  How is FICO to defend the bad faith claim if not, I
13   wrote it, I meant it, this is, you know --
14       It's a very difficult line.  I will give you that,
15   but I'm not so sure that, you know, he's not asking him, you
16   know, what does this provision mean, et cetera, et cetera.
17       MS. GODESKY:  Well, they could defend the bad
18   faith claim by having -- everyone keeps telling us it's a
19   commercial clause, right?  They could have their business
20   people testify about how this was all done in good faith on
21   their end because their interpretation of Section 10.8 and
22   its business purpose is XYZ.
23       But if their defense to our bad faith claim is
24   going to be, our lawyer read the agreement and found a
25   breach, that's an advice-of-counsel defense, and we would

**858**

1    have been entitled to all of Mr. Carretta's memos and emails
2    with Mr. Sawyer and Schreiber.
3        THE COURT:  Well, they're not going to get to
4    argue that FICO relied on the advice of their counsel.
5        MS. GODESKY:  Right.  But that's what's happening
6    when you call the counsel here, and he's, you know, with the
7    gravitas of a lawyer saying, well, I reviewed the contract
8    and I thought it was in breach.
9        MR. HINDERAKER:  Any time for me?
10       THE COURT:  Yeah, please.
11       MR. HINDERAKER:  Yeah.  Thank you.
12       One, we've been through this argument before in a
13   motion in limine.  You gave us instructions about what a
14   lawyer can say and not say.
15       THE COURT:  Right.
16       MR. HINDERAKER:  And Mr. Carretta is a fact
17   witness in the sense that he's the one that wrote the
18   letters.  He's the one that received the letters from the
19   counter counsel at Chubb, and we're going to go from this
20   letter to a couple other communications between he and
21   Mr. Hopp, who is the other lawyer.
22       We're going to jump past all of the 408 time, and
23   we're going to go to the notice of termination letter, which
24   he wrote as well.  So the notion that we should get a bunch
25   of lawyers in here and just argue what the contract means

**859**

1  that are unconnected to the dispute and are not witnesses is
2  wrong.
3         And so having, having been through this once
4  already with the motion in limine, personally I'd appreciate
5  just I'll walk a very fine line.  I'll ask him what's in his
6  mind, why he did it and try to get through this.
7         THE COURT:  And let me give what I think is a line
8  that is appropriate.  Why did you say this?  Because I
9  thought they were in breach.
10         MR. HINDERAKER:  And I say why did you think they
11  were in breach?
12         THE COURT:  That I think crosses the line or
13  what -- I think you can say -- I don't, I think he can say I
14  thought they were in breach.  I believe they breached this
15  section and that section.  But I don't think he can answer
16  the "why" question, why do you think they were in breach.
17         MR. HINDERAKER:  Okay.  I'll ask him, did you
18  believe they were in breach.  Not why did you believe that.
19  What made you think that.
20         THE COURT:  Right, or what do you think they
21  breached.
22         MR. HINDERAKER:  What do you think they breached.
23  I'll ask that.
24         MS. GODESKY:  What section do you think they
25  breached.

**860**

1         THE COURT:  What section, yeah, right, what
2  section.
3         MS. GODESKY:  Then he can identify the section,
4  and that's it.
5         THE COURT:  Right.  Not because they made expanded
6  use or because they did this.  Just I felt they were in
7  breach of Section 3.1, 10.8.
8         MR. HINDERAKER:  And I can say you felt that on
9  January 27th.
10         THE COURT:  Say that again?
11         MR. HINDERAKER:  And I can say and you felt that
12  on January 27th, 2016, the date of the letter.
13         THE COURT:  Yeah, of course.
14         MR. HINDERAKER:  Yeah, so let me -- I'm not sure I
15  think this is quite the fair line, but I'm going to try to,
16  what did you say, what caused you to say that.
17         THE COURT:  Right.
18         MS. GODESKY:  What caused you to say that, you
19  know that's so open ended.  I think the question is meant to
20  be almost more leading.  Did you say, was this because you
21  thought they were in breach, and he can answer yes.  But
22  why, you know, what caused you to say that, well you know
23  there had been an acquisition and --
24         THE COURT:  Right.  I do think the more you lead,
25  the better this will come in.

**861**

1         MR. HINDERAKER:  I'm happy to lead him through it.
2         THE COURT:  Okay.
3         MR. HINDERAKER:  I don't want to be up here every
4  moment with a leading objection.
5         THE COURT:  You won't be.
6         (In open court)
7  BY MR. HINDERAKER:
8  Q.  Okay.  We can hear you, right?
9  A.  Yes.
10  Q.  All right.  Your letter is dated January 27, 2016.  Fair
11  to say you wrote the letter on that date because, to your
12  knowledge, FICO had not received a request for consent?
13  A.  That's correct.  And they hadn't responded to Russ
14  Schreiber and Mike Sawyer either.
15  Q.  And in this letter you were giving Mr. Joseph Wayland
16  notice of breach of paragraph 10.8, correct?
17  A.  That is correct.
18  Q.  Now, so we talked about the sentence where you say, "A
19  change of control or merger and acquisition of Chubb was
20  also stated as being a deemed assignment requiring consent."
21         That was a reference to the second sentence of
22  paragraph 10.8, correct?
23  A.  Yes.
24  Q.  And then in your letter to, in this letter, you also
25  reference other sections of 10.8, one of them being

**862**

1  paragraph 2.1.  Agreed?
2  A.  Yes.
3  Q.  And if you look at paragraph 2.1, that provision of the
4  license agreement says, "Subject to the terms, conditions
5  and limitations of this agreement, Fair Isaac hereby grants
6  to client a perpetual subject to the provisions of Article
7  9, nonexclusive, non-transferrable license."
8         Was that -- was that your reference to
9  Section 2.1?
10  A.  Yes.
11  Q.  And then if we go to Section 2.2, it also says, this one
12  is entitled License to Documentation.  "Subject to the
13  terms, conditions and limitations of this agreement,
14  Fair Isaac grants to client a perpetual nonexclusive,
15  non-transferrable limited license."
16         Was that your reference to paragraph or to
17  Section 2.2 in your letter?
18  A.  Yes.
19  Q.  And then you also reference paragraph 3.1.  And 3.1
20  sub-Roman v, small v, says, "Client represents and warrants
21  that and its employees shall not assign, sublicense, lease,
22  transfer or distribute."
23         Was that your reference in your letter to Section
24  3.1?
25  A.  Yes.

**863**

1  Q.  And then you conclude saying, "Further, the license was
2  personal to Chubb having been granted to Chubb & Son as
3  defined client under Sections 2.1 and 2.2."
4        And that was an explanation of the license
5  agreement that you also provided.
6  A.  That's right.  Correct.
7  Q.  On the top of the next page you say, "Chubb Limited is
8  making use after this notice by FICO of the requirement for
9  consent constitutes Chubb and Chubb Limited as intentional
10  infringers under applicable copyright and patent laws, in
11  addition to being a breach of the agreement."
12        Now, with respect to that sentence, you identify
13  both Chubb and Chubb Limited.  Why?
14  A.  Because the merger had already closed, and so because of
15  that event having happened, the prior clause 10.8 became
16  operative.
17        MS. GODESKY:  Objection.
18        THE COURT:  Sustained.
19        THE WITNESS:  Let me restate that, if I can.
20        The merger closed.  A new party owned the
21  business.
22  BY MR. HINDERAKER:
23  Q.  And so when you reference Chubb Limited, is that a
24  reference to the new entity?
25  A.  That's right.  Chubb Limited at that moment was the

**864**

1  combination of the two companies, with Chubb Limited being
2  the Swiss group primarily that owned the company.
3  Q.  Okay.  And when you, when you use the word "Chubb" in
4  the sentence, is that a reference to Chubb & Son, the
5  client?
6  A.  Yes, because at the beginning of the letter I had
7  defined Chubb & Son as Chubb.  It's a bit confusing.
8  Q.  Well, we're trying to sort it out.
9        In the next sentence -- well, let me back up.  The
10  notice that you're giving is the notice of breach, and as a
11  consequence of the notice of breach, you're telling your
12  counter party no further use of Blaze Advisor is
13  appropriate.
14  A.  That's right.
15  Q.  The next sentence says, "FICO lacks sufficient
16  information to understand the full implications of Chubb
17  Limited's plans."  Why did you add that to your letter?
18  A.  From a business perspective, we needed, we didn't
19  understand anything more than what I had already read from
20  the public filings, and we hadn't gotten any feedback from
21  Chubb & Sons before the closing of the merger.
22        And so we were asking for information, because
23  they were our client, they were a good client, we wanted to
24  be able to understand what they intended to do as this big,
25  big organization.  And so I was simply asking them, you

**865**

1  know, to provide that information to us so that we could
2  consider how our futures would work out together.
3  Q.  And if that information came, it would have gone to the
4  business people?
5  A.  Yes.
6  Q.  Anyway, you didn't get it?
7  A.  I didn't get it, no.
8  Q.  Okay.
9  A.  Maybe I misunderstood what you said, Al.
10  Q.  No.  No.  I meant you're asking for -- you're saying we
11  lack sufficient information.  You knew that.  And you're
12  asking for getting some information to be more transparent
13  to make an informed concept.
14  A.  That's right.
15  Q.  And if that -- the transmission of that kind of
16  information would have gone to the FICO business people
17  rather than to yourself in all likelihood?
18  A.  That's right.
19  Q.  And then in the paragraph Lacks Sufficient Information,
20  you go on to say, "FICO is unable to accommodate any request
21  now for consent.  We are aware, of course, of the much
22  larger entity as a result of the merger."
23        And is that a reference to what?  That's a
24  reference to Chubb Limited, the new larger entity?
25  A.  Yes.

**866**

1  Q.  And you go on to say, "And how allowing the license
2  transfer will expose FICO to adverse impact based on the
3  expanded risks of IP indemnity of a larger organization."
4        What was that about?  Why did you say that?
5  A.  IP indemnity literally means intellectual property
6  indemnity.  It means FICO represented earlier that we owned
7  the software and we had the right to license the software.
8  Software is covered by copyright law.  And one of the rights
9  under copyright law is, you control who you sell to and
10  other bundles of rights.
11        And we needed to understand, when an indemnity
12  means is if a third party decides to sue Chubb Limited or
13  Chubb & Sons, we would have to indemnify, provide defense
14  against those intellectual property claims, to prove in fact
15  we owned the software and to shelter or protect the Chubb
16  organization from those claims.
17        That's part of the bargain that we made with
18  Chubb.  It's absolutely typical in the software industry.
19  Q.  And so you are saying, given that the IP is now inside
20  of a larger organization, that meant what to you?
21  A.  Well, we knew that Chubb Corporation owned Federal and
22  it had a division called Chubb & Sons.  As a result of the
23  merger, Chubb Limited owned Federal and Chubb & Sons.  And
24  it was a completely different entity.
25  Q.  Okay.

**867**

1  A.  So we didn't want to be exposed to this very large

2  entity.  Again, we didn't know what they were planning to do

3  with the software.

4  Q.  Understood then.  And you go on in the same paragraph,

5  "Additionally the original enterprise license was based on

6  Chubb & Son only, not the much larger organization which has

7  breath well beyond Chubb & Son."

8  A.  That's correct.

9  Q.  Okay.  Now does that -- did you say that because of the

10  second sentence in paragraph 10.8?

11  A.  Yes.  And additionally, it's important to understand,

12  and you see it in the first part, Section 2.1, that Chubb &

13  Sons bought license number one.  Then they expanded the

14  license to number two, and then they bought it for number

15  three, which each time gave them more and more rights.

16       And that's just the nature of how software is

17  sold.  You can buy small or you can buy big.  So it was

18  important to reference it again from a commercial

19  perspective.

20  Q.  So then on the second full paragraph on page 2, "While

21  FICO will consider licensing its IP to Chubb Limited, please

22  understand that it is not acceptable or agreed that Chubb

23  Limited may use, make use of FICO's IP."

24       So that's -- you gave that notice in your breach

25  of, in your notice of breach letter?

**868**

1  A.  That is correct.

2  Q.  And then you go on, "Further, FICO retains the right to

3  terminate the agreement, and nothing contained herein is to

4  be construed as a waiver of damages or the right to

5  terminate the agreement."

6       Have I read that right?

7  A.  That's right.

8  Q.  So here you are giving notice of not acceptable to use,

9  no waiver of damages.  And then in the next sentence you

10  say, "We understand that this was a large transaction and

11  this may have been an oversight."

12       Why did you say that?

13  A.  Again, from my merger and acquisition experience,

14  there's a lot going on.  There are tons of lawyers.  There's

15  tax accountants.  There's all these people looking at a lot

16  of different things, and this was a very big merger.

17       So therefore, it would have been possible that

18  they simply missed it, made a mistake, or equally possible

19  that they saw it and just decided to do nothing.  Either

20  way, I wanted to point it out that it could have been a

21  mistake, let's talk about it.  If you want us to make a

22  decision as to what to do, just inform us so that we can

23  decide whether to consent or not.

24  Q.  Okay.  And then in the next sentence you say, "While

25  FICO does not waive its right to terminate the agreement

**869**

1  immediately under Section 9.2C or otherwise waive any

2  rights, FICO is mindful of the long business relationship."

3  I'll go that far.

4       So your letter on the one hand is saying, this

5  could have been an oversight, and on the other side is

6  saying the very same sentence, "We do not waive our rights

7  to terminate."

8       Can you explain that?

9  A.  The -- the event of the merger was a defining moment,

10  and at that point the business relationship changed in terms

11  of what we were supposed to do, what they were supposed to

12  do.

13       And we just wanted them to be clear that because

14  that event happened, it triggered other rights or other

15  actions that could flow out of that.  And that's what I was

16  pointing out to them in that last sentence of the third

17  paragraph.

18       MR. HINDERAKER:  I've been handed a note that

19  perhaps the jurors monitors are off?

20       Am I wrong?  Am I right?

21       THE COURT:  Are they on or are they off?

22       THE JURY:  Off.

23       THE COURT:  It's on my -- did it come on now?

24       THE JURY:  No.

25       THE COURT:  All right.  Hang on.  Now have is as

**870**

1  good a time as any to stand up and stretch for a second.

2       (Off the record)

3       THE COURT:  I don't know why they went off.  It

4  said that everything was off, but everything wasn't off.

5  Yours were off.

6       MR. HINDERAKER:  Swell.

7       Could I ask or the court may ask?  I've been

8  asking questions about this Exhibit 90 for a while.  Has

9  Exhibit 90 ever been on the screen?

10       THE JURY:  No.  It's been off since the first

11  sidebar.

12       THE COURT:  Say again?

13       THE JURY:  It's been off since the first sidebar.

14       THE COURT:  Okay.  Well --

15       MR. HINDERAKER:  Can I go through some of this

16  again then?

17       THE COURT:  You may.

18       MR. HINDERAKER:  Thank you.

19       THE COURT:  Let me just test something again.  It

20  shouldn't affect it, but go ahead.

21  BY MR. HINDERAKER:

22  Q.  If I might, I don't know that I can ask the same

23  questions again, and I don't know that you'd want to hear

24  them again, but I would like to have the opportunity to walk

25  through the letter so you see what it is.  And I'll try to

**871**

1  do that appropriately.  So let's try it again.
2      This January 27, 2016, letter is, Mr. Carretta,
3  your letter giving, as you say, notice of breach of Blaze
4  Advisor software license and maintenance agreement," right?
5  A.  That is correct.
6  Q.  Okay.  And when we look at the third paragraph of the
7  first page, I had asked you questions about, "I am writing
8  now to again confirm the agreement may not be transferred or
9  assigned without FICO's consent."
10      I asked you why did you say "again."  And correct
11  me if I am wrong, but you said again because you understood
12  that Mr. Sawyer or Mr. Schreiber had made contact with Chubb
13  about the -- look at the license agreement in light of the
14  fact of the announced merger.
15  A.  That's right.
16      THE COURT:  Mr. Hinderaker, if I might make a
17  brief suggestion.
18      MR. HINDERAKER:  Yes.
19      THE COURT:  I think that's exactly right.  The
20  more you can lead through what you've already done --
21      MR. HINDERAKER:  Thank you.
22      THE COURT:  -- the better.
23      MR. HINDERAKER:  Thank you.
24  BY MR. HINDERAKER:
25  Q.  And then you go on in the rest of that sentence and say,

**872**

1  "May not be transferred."  "The agreement may not be
2  transferred or assigned without FICO's consent."
3      And that FICO has not and does not consent to such
4  transfer or assignment.
5      And in the prior questioning, you said that's a
6  reference to the first sentence of paragraph 10.8.
7  A.  That is correct.
8  Q.  "The attempted assignment is void and a breach of the
9  agreement."  The agreement plainly states in Section 10.8
10  that the agreement may not be assigned without consent.
11      Then I asked you questions about the next
12  sentence, "A change of control or merger and acquisition of
13  Chubb was also stated as being a deemed assignment requiring
14  consent."
15      And I asked you questions about the phrase "was
16  also."  And you said, well, I talked about the first
17  sentence.  Now it was also.  I'm talking now about the
18  second sentence of paragraph 10.8, right?
19  A.  Yes.
20  Q.  And then you mentioned other sections of the license
21  agreement, 2.1, 2.2 and 3.1, stating that the license is
22  non-transferrable, in your letter.
23  A.  That is correct.
24  Q.  And then when we did not have the monitors up, we went
25  to Section 2.1 of the license agreement and saw that it had

**873**

1  language forbidding -- saying it was non-transferrable.  We
2  went to Section 2.2 saying the same thing.  And we went to
3  Section 3.1 saying essentially the same thing as well,
4  correct?
5  A.  That's right.
6  Q.  And then we turned to the second page.  And I asked you
7  about the last sentence on the top paragraph that comes over
8  from the second or from the first page.  And I went, Chubb
9  Limited is making use after this notice by FICO of the
10  requirement for consent, "Constitutes Chubb and Chubb
11  Limited as intentional infringers under applicable copyright
12  or patent laws in addition to being a breach of the
13  agreement."
14      And I asked you what you meant by "Chubb," and you
15  said that's the client Chubb & Son.  And I asked you what
16  you meant by "Chubb Limited," and you said that's the new
17  larger organization after the acquisition, correct?
18  A.  Yes.  Yes.
19  Q.  And then in the next sentence, the next paragraph, FICO
20  lacks sufficient information to understand the full impli --
21  I couldn't say the word then either -- implications of Chubb
22  Limited's plans and without some shared insight is unable to
23  accommodate any request now for a consent.
24  A.  That is correct.
25  Q.  Okay.  And you explained that at this point in time FICO

**874**

1  at least to your knowledge, FICO simply had not received any
2  information from Chubb & Son?
3  A.  No.
4  Q.  Correct?
5  A.  That is correct.
6  Q.  We are aware, of course, that a much larger entity --
7  and I asked you that's a reference to Chubb Limited?
8  A.  That is correct.
9  Q.  "As a result of the merger and how allowing the license
10  transfer will expose FICO to adverse impacts based upon the
11  expanded risk of IP indemnity of a larger organization."
12      And at that point you explained to the jury how
13  software companies typically indemnify their clients against
14  any IP claims directed against your software.
15  A.  That is correct.
16  Q.  And so how being in a larger organization created
17  greater risk to FICO to honor that indemnity.
18  A.  That is correct.
19  Q.  "Additionally the original enterprise license was based
20  on Chubb & Son only, not the much larger client
21  organization."
22      I asked you.  That's a reference to the second
23  sentence of paragraph 10.8?
24  A.  Yes.
25  Q.  Then we went to the -- then we went to the next

875

1  paragraph. "While FICO will consider licensing its IP to
2  Chubb Limited, please understand that it is not acceptable
3  or agreed that Chubb Limited may make use of FICO's IP."
4       So that's repeating what you've said before about,
5  after this breach letter, no use.
6  A.  That is correct.
7  Q.  You retain the right to terminate. Nothing should be
8  construed as a waiver.
9       And you go on to say, "We understand that this was
10 a large transaction and this may have been an oversight."
11      And you explain how in large transactions
12 sometimes things are missed or sometimes you just close over
13 the problem. You didn't know which.
14 A.  That's right. Correct.
15 Q.  But if there was an oversight, it didn't change the fact
16 of your notice of breach letter.
17 A.  No. If it was a mistake or active, it doesn't matter.
18 The event happened, and it therefore is a breach.
19 Q.  And then you go on to say, "FICO does not waive its
20 right to terminate the agreement immediately under
21 Section 9.2c."
22 A.  Correct.
23 Q.  So looking at 9.2c -- I got to get to c. If I look at
24 the first sentence of 9.2c, "Fair Isaac may immediately
25 terminate this agreement without a requirement for prior

876

1  notice or a cure period if client violates any terms of the
2  license granted in this agreement."
3       That's the first sentence.
4  A.  That is correct.
5  Q.  Is that the sentence that you were -- is that what you
6  were referencing to in your letter?
7  A.  That's right, because my letter was the notice of
8  breach, and I didn't want it confused that we didn't have
9  other rights to immediately terminate. It says the word
10 "may."
11 Q.  The other rights being any violation of the license
12 grant for 9.2c.
13 A.  That's correct.
14 Q.  And then you go on and conclude, "FICO is mindful of the
15 long business relationship with Chubb and is willing to
16 entertain a business resolution for the matter within the
17 next 30 days.
18      "I'm happy to entertain a discussion and encourage
19 the authorized business representatives from both parties to
20 both firms to further discussions."
21 A.  That's right.
22 Q.  Okay. Whether you wrote the letter, what did you
23 understand happened in 30 days?
24 A.  If we weren't able to reach a business solution and
25 continue the relationship, then we would be terminating the

877

1  license agreement.
2  Q.  Then let's turn to Exhibit 91. This is a letter dated
3  February 17, 2016. It's from, if we go to the last page,
4  it's from Andrew D. Hopp, Esquire, deputy general counsel of
5  Chubb. Agreed?
6  A.  Yes.
7  Q.  And it is to you.
8  A.  That is correct.
9  Q.  I'd like to -- I'd like to look at the first paragraph,
10 please.
11 A.  Yes.
12 Q.  Okay. If we can get to that? We will in a second. The
13 first paragraph.
14      Mr. Hopp says to you, "Notwithstanding the
15 acquisition, Chubb & Son, the contracting party to the
16 agreement, remains a viable legal entity within the Chubb
17 Group of Insurance Companies corporate structure and the
18 contracting party to the agreement."
19      Did you agree with Mr. Hopp that Chubb & Son was
20 the contracting party to the agreement?
21 A.  Yes.
22 Q.  And did you agree that it remained the contracting party
23 to the agreement? Let me just read the next sentence.
24      "In short Chubb & Son is still FICO's client and
25 as such term is defined in the agreement, and it is our

878

1  position that no transfer or assignment of the agreement has
2  occurred.
3       Did you have any disagreement with that?
4  A.  Yes. That's just wrong.
5  Q.  How so?
6  A.  Well, the very first part of that sentence he says,
7  there was an acquisition, which was one of the items listed
8  in 10.8. It's plain as day. And Chubb & Son is a division
9  of Federal, which is a corporation owned by Chubb
10 Corporation; and as a result of the merger, it was now owned
11 by Chubb Limited.
12      Chubb Corporation disappeared. And so there was a
13 whole new company in effect in charge, Chubb Limited. And
14 while it would still say Chubb & Son, the corporate
15 structure actually changed.
16      That's the whole purpose of Section 10.8. From a
17 commercial perspective, we want to understand who we are
18 going to do business with and why and how to price software.
19 All of these commercial issues are involved.
20 Q.  And so in your answer that you just gave me, are you
21 referencing the second sentence of paragraph 10.8?
22 A.  I am. Correct.
23 Q.  And in the next, in the next paragraph, "However, we are
24 in the process of evaluating Chubb & Son's use of Blaze
25 Advisor software based enterprise license. While we

**879**

1  continue to evaluate our use and needs, our initial findings

2  indicate that the applications that have been utilizing

3  Blaze Advisor software since 2006 are currently running in

4  the exact same fashion as prior to the merger transaction."

5      Let me stop there.

6  A.  It doesn't change anything.

7  Q.  Well, in your mind why doesn't it?

8  A.  Because that's not --

9      MS. GODESKY:  Objection.

10      THE COURT:  Sustained.

11  BY MR. HINDERAKER:

12  Q.  If Chubb & Son was using Blaze Advisor after the merger

13  in the exact same fashion, would that have changed your

14  notice of breach letter?

15  A.  No.

16      MS. GODESKY:  Objection.

17      THE COURT:  Overruled.

18  BY MR. HINDERAKER:

19  Q.  And is that because when you, as you said earlier, the

20  event that triggered the notice of breach letter was the

21  acquisition without FICO's prior consent for continued use?

22  A.  That is correct.

23  Q.  And is it also correct, because of the -- because of

24  your letter, the period of time in which for FICO and

25  Chubb & Son to agree and continue relationship or not agree

**880**

1  and terminate the license was that 30-day period?

2  A.  That is correct.

3  Q.  Then Mr. Hopp in the third paragraph mentions that the

4  FICO and his business people are discussing purchasing new

5  additional products and professional services.  And he

6  concludes, "I suggest that we allow the business

7  representatives to continue their commercial discussions

8  with one another without legal intrusion."

9      Did you have any disagreement with that?

10  A.  No, I didn't.  In fact I was perfectly aligned with

11  that.

12  Q.  And you had said so in your first letter.

13  A.  That is correct.

14  Q.  You conclude, "We are very mindful of the long-standing

15  business relationship between the organizations, and we are

16  committed to working in the spirit of good partnership with

17  FICO moving forward."

18      You had no quarrel with that either.

19  A.  No, I did not.

20  Q.  Let me turn to the next exhibit in your notebook or your

21  binder, Number 92.

22      And now you are writing back to Mr. Hopp, and your

23  letter is dated February 22, 2016.  Do you have that before

24  you?

25  A.  I do.

**881**

1  Q.  All right.  So in the first paragraph you say, "The

2  agreement sets out in plain language that either a change of

3  control or a merger requires FICO's consent prior to any

4  assignment or transfer and that attempted assignment or

5  transfer is void."

6      Is that a reference to the second sentence of

7  paragraph 10.8, as well as the third sentence of

8  paragraph 10.8?

9  A.  Yes.

10  Q.  And then in the third paragraph you say, "If Chubb

11  Corporation through its subsidiary Federal Insurance Company

12  division, Chubb & Son, was no longer in control or merged

13  and the event turned on simply Chubb & Son being an existent

14  division, it defeats the purpose of having Section 10.8

15  overall."

16  A.  That's correct.

17  Q.  And you believed that then and you believe it now?

18  A.  Absolutely.

19  Q.  You go on to say, "The restrictive language and concept

20  requirement would be superfluous as there would be no point

21  of having all the language since the occurrence of any one

22  of the enumerated events could by remaining the client

23  bypass the restriction on assignment."

24      And that also is a reference to the second

25  sentence of paragraph 10.8?

**882**

1  A.  That is correct.

2  Q.  Are you telling Mr. Hopp that under his interpretation

3  the second sentence of 10.8 is meaningless?

4  A.  I'm telling him his position is wrong.  He's just not

5  reading it.

6  Q.  Let me go to the second page then.  The first full

7  paragraph.  And you say, "Chubb & Son is making use after

8  notice by Fair Isaac of the requirement for a consent.

9  Breach and demand for a license makes Chubb & Son an

10  intentional infringer, in addition to having breached of the

11  agreement."

12      So you are repeating that notice to them again?

13  A.  That is correct.

14  Q.  Then on the -- it's really the, I guess it's the second

15  full paragraph.  I think sometimes the third paragraph.  "In

16  reviewing this matter, I reviewed Chubb Limited and Chubb

17  Corporation's public filings."  And you go on to say a

18  number of things about that.

19      Why did you do that?

20  A.  Because he was ignoring the fact that the acquisition

21  happened.  He admitted it in his other letter, but he was

22  ignoring it in all of his arguments or his letters.  So I

23  was pointing out, look, these are public facts.  They're

24  prepared by the Chubb lawyers.  They're filed with the

25  Securities Exchange Commissions.  They're representing these

**883**

1  as all being true.
2      And if you go through A through E, you see, okay,
3  Chubb Limited now owns the company, including Federal and
4  its subsidiary or, excuse me, its division, Chubb & Sons,
5  that all of the people that were managing Chubb Corporation
6  are all gone.
7      In fact, John Finnigan was getting paid his change
8  of control money, which is a pretty good indicator that the
9  event happened. They changed the headquarters to
10 Switzerland. That's a big change.
11     And except for the independent directors in
12 subparagraph e, who are just that, they don't work for
13 Chubb. They are not Chubb employees. They are just
14 independent directors like your supposed to have who are a
15 minority, all the rest are Chubb Limited people.
16     So it was indisputable in my mind that the event
17 occurred. They said it occurred. Andrew said it occurred
18 in his letter, and therefore we need to get by that. They
19 should have asked for consent, and they didn't prior to the
20 merger closing.
21 Q. And you are detailing for him different indicia of the
22 change of characteristics of the new Chubb Limited as
23 compared to what the prior Chubb Corporation had been?
24 A. That's right. They are just two different companies.
25 They are not the same people.

**884**

1  Q. And then attached to your letter and in the exhibit is
2  the United States Securities and Exchange Commission 8-K
3  form, correct?
4  A. That is correct.
5  Q. And that's what you were referencing in your letter?
6  A. Right.
7  Q. And then on the last page of your letter of
8  February 22nd, you say, "As you note the respective business
9  representatives of FICO and Chubb Limited are in business
10 discussions to address this issue, as well as possible other
11 matters. While I also encourage these discussions, please
12 understand that it is not acceptable or agreed that any
13 entity or division within Chubb Limited make use of the
14 software."
15     So on the one hand, you are encouraging business
16 negotiations, and on the other hand, you are clear about
17 stating FICO's rights.
18 A. That is correct.
19 Q. Well, then let's move to Exhibit 93. This is Andrew
20 Hopp to you a few days later, February 25, 2016.
21 A. That's correct.
22 Q. Agreed?
23 A. Yes, I agree.
24 Q. And he says to you, "Mr. Carretta we continue to
25 disagree. In an effort to preserve a working relationship

**885**

1  between our companies, our IT software compliance team is
2  forwarding a commercial proposal to your sales
3  representatives for consideration."
4  A. That's correct.
5  Q. Agree?
6  A. I agree.
7  Q. I presume you passed that information on to the sales
8  representatives.
9  A. I passed that a proposal was forthcoming. I didn't
10 actually receive the proposal.
11 Q. Understood. So there was other, other witnesses I am
12 sure will testify to the commercial proposal, but that went
13 to the business folks, not to you.
14 A. That is correct.
15 Q. And then if we go to the next Exhibit 95. And it is the
16 next day you say to Mr. Hopp, "Thank you for the email. The
17 proposal was not acceptable from our business and compliance
18 teams, and I confirm it is rejected."
19     That's what you told him on that day.
20 A. That's what I told Andrew Hopp, correct.
21 Q. "However, I respect the effort and encourage continued
22 aggressive business dealings. Thank you for facilitating
23 the business discussions."
24     So that's your communication to him on the 26th of
25 February.

**886**

1  A. I actually used the word "business dialogue" but --
2  Q. I misread it. Okay.
3      And then I think it's the same date. Let's go to
4  Exhibit 96. February 26, 2016.
5  A. Yes.
6  Q. And Mr. Hopp says to you, "Thank you for your response,
7  and I agree with the approach."
8  A. That's correct.
9  Q. Sort of ends the communications that I'll be chatting
10 with you about until we get to Exhibit 103.
11 A. Okay.
12 Q. And if you would turn to that, please. This is dated
13 March 30, 2016?
14 A. That's correct.
15 Q. And in the first paragraph you reference Chubb Limited,
16 you reference your letter of January 27th. You reference
17 the merger of Chubb Corporation and ACE Limited, resulting
18 in the Chubb Limited, which in this letter you call new
19 Chubb.
20     And you reference breach of Section 10.8 of the
21 license agreement, correct?
22 A. That is correct.
23 Q. And in the next paragraph, you say, "I notified you by
24 email on March 11th that FICO had become aware of a further
25 material breach due to the use of the software outside of

887

1  the United States and two applications utilized in the
2  United Kingdom.  Moreover, during the period of time in
3  which FICO and new Chubb attempted resolve the breach of
4  Section 10.8, we became aware of the further application in
5  Canada."  I'll stop there.
6         What was the source of your information to make
7  that statement?
8  A.  I can't recall it specifically, but I thought it was me
9  that asked the maintenance and support organization to look
10 at the maintenance logs.
11 Q.  Okay.
12 A.  So this is a process where they, a client is given a
13 key.  If they have bugs to report or need information, they
14 just log something into the system, and then it gets
15 captured.
16 Q.  That would be the same thing as a help desk log?
17 A.  The same thing.
18 Q.  So the information that you were stating in this letter
19 came to you from help desk log information?
20 A.  That's correct.
21 Q.  Then you go on to say, "And the disclosure of
22 confidential information to an unauthorized third-party
23 consultant."
24        And what was the source of your information to say
25 that in the letter?

888

1  A.  The same, same source.
2  Q.  Okay.  Thank you.  Then you finish, "This information
3  was conveyed to the new Chubb business counter part Tamra
4  Pawloski, VP of software compliance and optimization."
5         Now, when you say that disclosure of confidential
6  information to an unauthorized third party is a breach, is
7  that a reference to paragraph 3.1 of the license agreement?
8  A.  One moment.  Yes.
9  Q.  And when you said that Blaze Advisor software outside of
10 the United States and the United Kingdom and in Canada, what
11 was the basis of -- what in the license agreement led you to
12 believe that that was a breach?
13 A.  The reference to territory in paragraph 1 of the license
14 agreement.
15 Q.  Saying?
16 A.  That the software is to be installed and physically
17 located in the United States.
18 Q.  And then you conclude your letter, "Attempts to amicably
19 resolve the dispute have been unsuccessful.  This letter
20 serves as notice that the agreement is terminated effective
21 March 31st.  Please take further notice of the provisions of
22 Section 9.3 of the agreement.
23        "As noted in my January 27, 2016, letter, FICO
24 considers new Chubb's current use and any future use of the
25 software as a breach of the agreement and willful

889

1  infringement of all applicable intellectual property rights,
2  including but not limited FICO's underlying copyrights and
3  patents."
4         I'd like to then, I'd like to turn then, if we
5  could, to paragraph 9.3 of the license agreement J1, J001.
6  A.  Okay.
7  Q.  Let me get there myself.  And paragraph 9.3 is entitled
8  Effect of Termination.  Agreed?
9  A.  Yes.  That is correct.
10 Q.  And it says, "Upon expiration or termination of this
11 agreement for any reason, all licenses granted hereunder
12 shall terminate immediately.  All support and maintenance
13 obligations shall cease.  Client shall immediately cease
14 using all Fair Isaac products and related documentation
15 (including all intellectual property arising from or related
16 to the foregoing), shall remove all copies of the Fair Isaac
17 products and related documentation from client's computer
18 systems," and so on.
19        And that is the provision that you were
20 specifically referencing regarding the effect of termination
21 in your notice of breach letter?
22 A.  That is correct.
23 Q.  And shortly after that, this lawsuit was commenced.
24        Have you had any -- did you have any involvement,
25 other than being a witness, did you have any involvement in

890

1  the management or handling of this lawsuit?
2  A.  No.
3  Q.  Your participation or your role in this whole matter is,
4  is that of a witness?
5  A.  That is correct.
6         MR. HINDERAKER:  No further questions, Your Honor.
7         THE COURT:  Ms. Godesky.
8         MS. GODESKY:  Your Honor, may I approach?
9         THE COURT:  You may.
10        (Sidebar discussion)
11        MS. GODESKY:  So given Mr. Carretta's reference
12 just now in this last line of questions to his view that the
13 license agreement has a territorial restriction, I would
14 like to either be able to ask Mr. Carretta, as you suggested
15 during the pretrial conference, whether he's aware that the
16 court has held that the license agreement unambiguously does
17 not include a territory restriction or that Your Honor
18 instruct the jury to that fact.
19        MR. HINDERAKER:  And I disagree for all the
20 reasons that we've argued before and all the reasons that
21 the court should not interfere with this issue of whether
22 FICO acted in good faith or not.
23        THE COURT:  I understand the question to
24 Mr. Carretta.  It's an appropriate question.  It asks him
25 for why he said it, what's your good faith basis.

919

1  BY MS. GODESKY:
2  Q.  So the assignment clause, Mr. Carretta, reads, "Neither
3  party shall have the right to assign this agreement without
4  the prior written consent of the other party," and then it
5  goes on to say, "Notwithstanding the foregoing, FICO has the
6  right to delegate certain of its obligations under the
7  agreement."
8       Do you see that?
9  A.  I do.
10 Q.  And there's no specific reference in this agreement to
11 what you've characterized as standard language referencing
12 mergers and acquisitions, correct?
13 A.  Right.  This is unusual language.
14 Q.  Okay.  Now you also talked about --
15      Vanessa, we can take that one down.  Thank you.
16      You also talked during direct examination about
17 what you called the commercial purpose of Section 10.8,
18 right?
19 A.  Right.
20 Q.  And you said, we need to understand who we're doing
21 business with.  That was one reason you gave.
22 A.  That is correct.
23 Q.  And then you brought up indemnity concerns, and you
24 talked about how you need to know if there's a new entity in
25 town because you may have indemnity obligations you need to

920

1  know about, right?
2  A.  Yeah, that was one concern.  That's right.
3  Q.  So you were explaining that was, that's the commercial
4  purpose of these assignment clauses in FICO's contracts,
5  right?
6  A.  Well, the commercial purpose is to balance risk with
7  reward.  And indemnity risk is just that, it's a risk.
8  Q.  Right.  So the commercial purpose has to do with those
9  two things I just described, right?  You want to know who
10 you're doing business with and this indemnity issue.
11 A.  Right, among other possibilities.  That's right.
12 Q.  Now FICO enters Blaze license agreements that don't
13 reflect any particular concerns about new entities using
14 Blaze through mergers and acquisitions unless revenue
15 exceeds a certain threshold, correct?
16 A.  I don't recall that being a rule within FICO.
17 Q.  Okay.  Let's look at -- and we're not going to publish
18 this to the jury just yet.  This is Exhibit D4.
19 A.  Okay.  I'm there, yeah.
20 Q.  And this is a September 30th, 2005, license agreement
21 between FICO and a company called National City Corporation,
22 correct?
23 A.  That's correct.
24 Q.  And if you look at page 11, you can see that this was
25 signed by FICO and National City Corp.

921

1  A.  Yes.
2       MS. GODESKY:  Defendants offer Exhibit D4 into
3  evidence.
4       MR. HINDERAKER:  No objection.
5       THE COURT:  Subject to the same limitation, it's
6  received.
7  BY MS. GODESKY:
8  Q.  Okay.  Mr. Carretta, let's go to page 10 where there's
9  an assignment provision.
10 A.  I see it.  The numbering is a little blurred, but I do
11 see it.
12 Q.  I apologize.  It look like it might be 10.8, but I'm not
13 sure.  It says, "Neither party shall, without the prior
14 written consent of the other party, assign or transfer this
15 agreement or any part thereof, provided, however, and
16 subject to Section 3.2 of Exhibit A, mergers and
17 acquisitions, client may assign this agreement to an
18 affiliate or the purchaser of all or substantially all of
19 its assets."
20      Do you see that?
21 A.  I do.
22 Q.  Okay.  So let's look at Section 3.2 on page 14.
23 A.  I'm on page 14.
24 Q.  Okay.  And do you see the header saying Mergers and
25 Acquisitions Involving Client?

922

1  A.  I do.
2  Q.  It says, "The parties recognize that the fees charged to
3  the client have been determined based primarily on client's
4  asset size.  For that reason the parties agree that if
5  client undergoes a change in control or is merged with,
6  acquired by or acquires another entity, or otherwise
7  acquires the rights to process the accounts of another
8  entity, such that the combined post transaction asset size
9  of the entities involved exceeds client's asset size
10 immediately prior to such transaction by 20 percent or more,
11 client shall not process any data from such other entity
12 through the FICO products, either combined with client or as
13 a separate portfolio, or make any expanded use of the FICO
14 products until FICO and client have agreed on the amount of
15 such license fees and negotiated the scope of an expanded
16 license."
17      Do you see that?
18 A.  I do see that.
19 Q.  So this language, it does not appear in the Chubb
20 license agreement, correct?
21 A.  No.  This was different.  It was negotiated differently.
22 Q.  And this is an example of an agreement where FICO's
23 concerns about potentially negotiating more license fees and
24 changing the scope of the agreement are only triggered if
25 that merger or acquisition means that the new entity is a

**923**

1  particular threshold size, right?

2  A.  That's right.  They anticipated small things and didn't

3  want to bother with them.

4  Q.  We can take that one down.  Thank you, Vanessa.

5          And then the other commercial purpose that you

6  talked about on direct examination, Mr. Carretta, was the

7  need for information so that you can price the software,

8  correct?

9  A.  I'm not sure I understand the context you are talking

10  about.  Are you talking about a new deal or --

11  Q.  So I understood you to be saying during direct

12  examination that one of the reasons this Section 10.8 clause

13  exists, one of the commercial purposes, is so that you,

14  FICO, can get information to price the software after a

15  merger or acquisition.

16  A.  Well, no, that's not entirely correct.  It's a clause

17  that says you can't not assign, right, is the first

18  sentence, and I'm paraphrasing.  And you need to acquire

19  consent before you make one of the assignments or a transfer

20  as defined or undefined.

21  Q.  Mr. Carretta, I'm not asking you to interpret the

22  language.

23  A.  I'm not.  I'm just playing back what it says.

24  Q.  I just -- during direct examination you testified that

25  one of the commercial purposes of Section 10.8 is so that

**924**

1  FICO can get information to properly price the software

2  after a merger or acquisition.

3          Is that true in your mind?

4  A.  I don't think that's what I testified to.

5  Q.  But is that true in your mind?  Is that one of the

6  commercial reasons?

7  A.  The commercial reason is to understand what is going to

8  happen post the event, which may or may not involve price

9  chain or may or may not involve an amendment.  It could be a

10  number of things.

11  Q.  And one of the things that you had to understand after

12  the event that was the ACE acquisition, was this issue of

13  expanded use, right, that's referenced in the second

14  sentence of Section 10.8 of the Chubb license agreement?

15  A.  Right.  There's an additional bit of language there.

16  Q.  And you agree that the words on the page in Section 10.8

17  of the Chubb contract state that FICO will not unreasonably

18  withhold consent to even expanded use of Blaze, correct?

19  A.  Let me look at the agreement, please.

20  Q.  Sure.  We can pull it up on the screen too.

21  A.  That would be --

22  Q.  It's in J1 at page 8.

23  A.  -- helpful.

24  Q.  If we could blow up Section 10.8, Vanessa?  Thank you.

25  A.  So if you wouldn't mind asking your question again.

**925**

1  Q.  My question is whether you agree that the words on the

2  page state, "that FICO cannot unreasonably withhold a

3  consent to expanded use."

4  A.  It's a non sequitur.  The way its written it's comma and

5  client shall make no expanded use, which grammatically means

6  it's a covenant.  It's a separate, independent term of the

7  sentence.  And client shall make no expanded use as a result

8  of, unless and until, they receive such consent.  So I don't

9  agree with you.

10  Q.  Even under your understanding of this agreement, if

11  Chubb were to ask FICO for consent after a merger or

12  acquisition, this agreement says that FICO will not

13  unreasonably withhold that consent, correct?

14  A.  No, that's not correct.

15  Q.  Okay.  Well, let's go look at P90.  This is your first

16  letter to Chubb asserting breach concerns after the ACE

17  acquisition.

18  A.  Okay.

19  Q.  So in P90, I want to go to the second page and look at

20  the first full paragraph.

21          You wrote, and this is January 2016, right,

22  Mr. Carretta?

23  A.  January 27, 2016.

24  Q.  This is your first letter to Chubb, right?

25  A.  The very first one.  That is right.

**926**

1  Q.  And you wrote, "FICO lacks sufficient information to

2  understand the full implications of Chubb Limited's plans

3  and without some shared insight is unable to accommodate any

4  request now for consent."

5          Do you see that?

6  A.  I do.

7  Q.  And you said during direct examination, we didn't know

8  what they were planning to do with the software, right?

9  A.  Right, because they didn't ask before they closed.  They

10  closed, and then we only had the information that we, we

11  could gather, and that's why we're asking them.

12  Q.  Mr. Carretta, I'm going to, to keep moving this along,

13  I'm just going to ask you to answer my question.  Okay?

14  A.  Okay.

15  Q.  I want to show you Mr. Hopp's response to your letter,

16  which is in evidence as P91.

17  A.  Yes.

18  Q.  And this was sent on February 17th, 2016, correct?

19  A.  That's correct.

20  Q.  And if we look at the second paragraph -- and blow that

21  up Vanessa.  Thank you.

22          Mr. Hopp wrote, "While we continue to evaluate our

23  use and means, our initial findings indicate that the

24  applications that have been using Blaze Advisor software

25  since 2006 are currently running in the exact same fashion

927

1   as prior to the merger transaction.

2           "Please be advised that our IT software compliance

3   department has been fully engaged to oversee this evaluation

4   process carefully and is committed to working with FICO to

5   gather the necessary information to understand the full

6   implication of our plans moving forward and to determine

7   Chubb & Son's future licensing needs."

8           Do you see that?

9   A.  I do.

10  Q.  And this was a direct response to the concerns that you

11  had raised in your January letter wondering what Chubb

12  Limited's plans were going to be, correct?

13  A.  Yes, I think that's probably correct.

14  Q.  And this is a direct assurance from Chubb that Blaze use

15  has not expanded by virtue of the ACE acquisition, correct?

16  A.  No, because Andrew ignored the fact that the event

17  occurred, and therefore it was already a breach.

18  Q.  I'm not asking about whether there was already a breach

19  or when in your mind Chubb had to ask for consent.  I'm not

20  asking about that.

21          My question is whether it's true that as far as

22  questions of expanded use are concerned, this was a direct

23  assurance from Chubb in response to your inquiry that Blaze

24  use had not expanded by virtue of the ACE acquisition.

25  A.  I disagree.

928

1   Q.  Now, FICO had agreed when it signed the 2006 agreement

2   to explore any questions of expanded use in good faith,

3   correct?

4   A.  I'm sorry.  Could you repeat that?

5   Q.  When FICO signed the license agreement in 2006, it

6   agreed that it was going to explore any questions of

7   expanded use in good faith, correct?

8   A.  I think it's an implied covenant of good faith and fair

9   dealing for both parties, so yes.

10  Q.  And as to Mr. Hopp's statement in response to your

11  letter where he says, "Applications that have been using the

12  Blaze Advisor software are running in the exact same

13  fashion," you had no evidence as of February 17th, when you

14  received this letter, suggesting that that statement was

15  false, correct?

16  A.  The problem is, it's innocuous.  I don't know what

17  "currently running" means.

18          THE COURT:  Mr. Carretta, you need to answer the

19  question that she asked you.

20          THE WITNESS:  Okay.  Go ahead.  Please ask again.

21  BY MS. GODESKY:

22  Q.  As far as Mr. Hopp's statement in his response to you

23  that the applications that had been using Blaze Advisor

24  software since 2006 are running in the exact same fashion,

25  you had no evidence as of February 17th when you received

929

1   this letter suggesting that was false, correct?

2   A.  We didn't have any information.

3   Q.  You had no evidence suggesting it was false, correct?

4   A.  Yes, that's what I'm saying.

5   Q.  And the information that Mr. Hopp provided you and told

6   you that his compliance department was fully engaged was,

7   applications are currently running in the exact same

8   fashion.  That is information, isn't it?

9   A.  That's what he's telling us.

10  Q.  You had no evidence as of February 17th, when you

11  received this letter, suggesting that the number of

12  applications using Blaze at Chubb had changed, correct?

13  A.  We didn't know.

14  Q.  You had no evidence, right, Mr. Carretta?

15  A.  Right.

16  Q.  And you had no evidence that Blaze had been inserted

17  into Legacy ACE computer applications, right?  You hadn't

18  seen anything suggesting that had happened.

19  A.  No.

20  Q.  Now, I want to look at another communication from Chubb

21  a few days later on February 25th, 2016.

22          This is already in evidence as P94.

23  A.  Okay.

24  Q.  And this is an email that Tamra Pawloski at Chubb sent

25  to Mr. Sawyer and Mr. Schreiber, and this is dated

930

1   February 25th, 2016.  So this would be a few days after

2   Mr. Hopp sent you his letter, right?

3   A.  Yes.

4   Q.  And if you look at Ms. Pawloski's email she says Mike

5   and Russ, I know my GC -- that's general counsel, right?

6   A.  That's correct.

7   Q.  Reached out to you -- sorry?

8   A.  I assume that's what he means.

9   Q.  Okay.  "I know my GC reached out to yours but got an out

10  of office due to illness.  I wanted to share with you that

11  his communication was for us to work through a commercial

12  proposal.  I have attached that for your review and comment.

13  I am pretty open tomorrow if you'd like to discuss."

14          Do you see that?

15  A.  I do.

16  Q.  And then if you turn to the second page of the document

17  it says, "FICO proposal of February 25th, 2016," correct?

18  A.  Yes.  There's a proposal attached that says that date.

19  Q.  Okay.  And so Ms. Pawloski's proposal says, "Although

20  Chubb strongly disagrees with FICO's stated position, in a

21  good faith effort to move the relationship forward, Chubb

22  proposes that the parties renegotiate Chubb's currently

23  perpetual application-based enterprise license to downgrade

24  and limit Blaze Advisor development and deployment to

25  reflect Chubb's actual usage of 15 named applications of

947

1  paragraph 12.8.
2              THE COURT:  Will you be offering D17?
3              MR. HINDERAKER:  I will, yes.  I should.  Thank
4  you.
5              Your Honor, I offer D17.
6              MS. GODESKY:  No objection.
7              THE COURT:  D17 is received.
8  BY MR. HINDERAKER:
9  Q.  And now we can turn to paragraph 12.8.
10 A.  Okay.
11 Q.  And this is also entitled, No Assignment?
12 A.  Correct.
13 Q.  And could you do the same comparison for me, whether
14 there's any difference in the Humana 12.8 to the Chubb & Son
15 10.8?
16 A.  Excuse me.  This doesn't have the language at the --
17 following the last comma which says "will not be
18 unreasonably withheld" that's in the Chubb & Son agreement.
19 Q.  So with the Humana, the "shall not be unreasonably
20 withheld" element that's in the Chubb & Son agreement is not
21 present in the Humana agreement.
22 A.  No, it is not.
23 Q.  From your experience, can you -- are there indicia that
24 tell you whether a license agreement is, say, heavily
25 negotiated or lightly negotiated?  Can you discern the

948

1  difference?
2  A.  Sure.  I mean, the ones that are based on our template,
3  you can do line-by-line comparisons using a tool like Word.
4  Others are on the customer's paper and are therefore
5  radically different.
6  Q.  By definition?
7  A.  By definition.
8  Q.  And the two agreements that I just showed you, those are
9  both on basic paper, as FICO paper?
10 A.  Yes.
11 Q.  And did you notice whether the license agreements that
12 Ms. Godesky showed you, were they basic paper, was the basic
13 paper on those FICO as well?
14 A.  Yeah.  They definitely started with FICO paper or
15 template.
16 Q.  And is it fair to say that in those other agreements
17 they were simply more heavily negotiated?
18 A.  Yes.  Each one is different.
19 Q.  You were, you were asked a question by Ms. Godesky about
20 the second sentence of paragraph 10.8 and the, and then the,
21 "And client shall make no expanded use."
22          And you used the phrase from her examination to
23 you, "Well, that's a non sequitur."
24          Do you recall that?
25 A.  Yes.

949

1  Q.  What did you mean by that?
2  A.  Each of them are different restrictions, and so they all
3  work together, but they're different, independent from each
4  other.
5  Q.  And so what was the non sequitur nature of the question
6  then?
7  A.  Well, if I remember correctly, there's an event, comma,
8  "Client shall make no expanded use as a result," that's
9  driving towards maintaining the status quo.  Don't do
10 anything different today from what you were doing before
11 while we're in this period that we provided to them.
12 Q.  That period being the 30-day period?
13 A.  Yes.
14 Q.  So nothing different during the 30-day period than what
15 you did before?
16 A.  That is right.
17 Q.  Okay.
18          MS. GODESKY:  Objection, Your Honor.
19          THE COURT:  Sustained.
20 BY MR. HINDERAKER:
21 Q.  That's why you said it was a non sequitur.
22 A.  Right.
23          MS. GODESKY:  Objection.
24          THE COURT:  Sustained.
25

950

1  BY MR. HINDERAKER:
2  Q.  You were asked whether FICO had an obligation to explore
3  whether Chubb & Son had expanded its use in that 30-day
4  period.  Do you recall that?
5  A.  Yes.
6  Q.  Did FICO have such an obligation?
7  A.  No.
8  Q.  You've told us, of course, that you were not included in
9  the communications of the commercial proposal of Exhibit 94.
10 Nevertheless, you were asked about it.  You were asked about
11 what you saw just from the reading of it.
12          As you read Exhibit 94, is there any limitation on
13 the -- is there any limitation on the future use of Blaze
14 Advisor with respect to running more volume through the
15 applications?
16 A.  There's no reference to that.
17 Q.  Does it also say that -- I'm sorry.  I think it's in the
18 next paragraph down.
19          And it also says, "Chubb shall have the right to
20 change the applications utilizing the Blaze Advisor software
21 at any time and in its sole discretion without FICO's
22 consent so long as the named applications do not exceed an
23 amount of 15."
24          Also says that?
25 A.  I see that.  I see that.

957

```
 1              UNITED STATES DISTRICT COURT
                  DISTRICT OF MINNESOTA
 2
    -----------------------------------------------------------
 3
    Fair Isaac Corporation,     )
 4  a Delaware Corporation,     )  File No. 16-cv-1054(DTS)
                                )
 5           Plaintiff,         )
                                )
 6  v.                          )
                                )
 7  Federal Insurance Company,  )  Courtroom 14W
    an Indiana corporation,     )  Minneapolis, Minnesota
 8  and ACE American Insurance  )  Monday, February 27, 2023
    Company, a Pennsylvania     )  9:00 a.m.
 9  Corporation,                )
                                )
10          Defendants.         )
                                )
11  -----------------------------------------------------------
12
13
14         BEFORE THE HONORABLE DAVID T. SCHULTZ
       UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
16        (JURY TRIAL PROCEEDINGS - VOLUME VI)
17
18
19
20
21
22    Proceedings recorded by mechanical stenography;
   transcript produced by computer.
23
                       * * *
24
25
```

958

```
 1  APPEARANCES:
 2    For Plaintiff:     MERCHANT & GOULD P.C.
                         BY: ALLEN W. HINDERAKER
 3                            HEATHER J. KLIEBENSTEIN
                              PAIGE S. STRADLEY
 4                            MICHAEL A. ERBELE
                              JOSEPH W. DUBIS
 5                            GABRIELLE L. KIEFER
                         150 South Fifth Street, #2200
 6                       Minneapolis, Minnesota 55402
 7    For Defendants:    FREDRIKSON & BYRON
                         BY: TERRENCE J. FLEMING
 8                            LEAH C. JANUS
                              CHRISTOPHER D. PHAM
 9                            RYAN C. YOUNG
                              PANHIA VANG
10                       200 South Sixth Street, #4000
                         Minneapolis, Minnesota 55402
11
                         O'MELVENY & MYERS LLP
12                       BY: LEAH GODESKY
                              ANTON METLITSKY
13                            DARYN E. RUSH
                              ROXANA GUIDERO
14                       Times Square Tower
                         7 Times Square
15                       New York, New York 10036
16    Court Reporters:   RENEE A. ROGGE, RMR-CRR
                         KRISTINE MOUSSEAU, CRR-RPR
17                       MARIA V. WEINBECK, RMR-FCRR
                         PAULA RICHTER, RMR-CRR-CRC
18                       United States District Courthouse
                         300 South Fourth Street, Box 1005
19                       Minneapolis, Minnesota 55415
20
                              * * *
21
22
23
24
25
```

959

```
 1                        I N D E X
                                              PAGE
 2
 3  HENRY MIROLYUZ
       Examination By Mr. Hinderaker         971
 4
    CLAUDIO GHISLANZONI
 5     Cross-Examination By Mr. Hinderaker    1046
       Direct Examination By Ms. Godesky      1131
       Recross-Examination By Mr. Hinderaker  1161
 6     Redirect Examination By Ms. Godesky    1170
       Recross-Examination By Mr. Hinderaker  1171
 7
    JOHN TAYLOR
 8     Examination By Mr. Hinderaker          1174
 9
10
    DEFENDANTS' EXHIBITS                      REC'D
11     517                                    1080
       518                                    1082
12     526                                    1096
       1002                                   1088
13     1005                                   1088
       1007                                   1088
14     1008                                   1088
15
    PLAINTIFF'S EXHIBITS                      REC'D
16     39                                     1140
17
18
19
20
21
22
23
24
25
```

960

```
 1                       9:00 A.M.
 2
 3        (In open court without the Jury present.)
 4        THE COURT:  Please be seated.  Good morning,
 5  everyone.
 6        The record should reflect that we are in the
 7  courtroom outside the presence of the jury.  As I understand
 8  it, there is a couple of issues, at least one, that we need
 9  to take up now before we begin with testimony and that I
10  think is the interrogatory answer.
11        Is that correct, Mr. Hinderaker?
12        MR. HINDERAKER:  Yes, Your Honor.
13        THE COURT:  Okay.  And tell me what it is you plan
14  to put in and, if it's not obvious, why it's relevant.
15        MR. HINDERAKER:  This is a copy of it.
16        THE COURT:  Yeah, I've looked at it.  Go ahead and
17  bring it up.  Well, what are you proposing to do with this
18  exactly?
19        MR. HINDERAKER:  Well, mister -- well, I guess it
20  comes up in Mirolyuz's deposition because Mr. Mirolyuz is
21  the one who verified it.
22        THE COURT:  Right.
23        MR. HINDERAKER:  During the course of the
24  deposition we had an unsigned copy, and during the
25  deposition I asked Mr. Mirolyuz, and he did verify it in the
```

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    February 27, 2023, Volume VI

**1049**

1  Advisor?
2  A.  So at the beginning of 2016, in February, around
3  February time, we commenced the activity of analysis of all
4  the software products, and we formed the working group
5  called a cross divisional TDA, and I believe one of the
6  evidence that you have seen today carried that name.
7  Q.  Yes.  And I think we will look at that in a little
8  while.
9  A.  Yes.
10  Q.  And so now to go from this time in 2016, and is it
11  accurate also to say that it was in the beginning of 2018
12  that a new IT strategy for the whole enterprise was being
13  formulated?
14  A.  Yes.  It was at the beginning of that year, 2018, we
15  formulated a new IT strategy for the enterprise.
16  Q.  And between the date of March 16th -- date of March 2016
17  and this time frame in 2018, you started to look at a new IT
18  strategy for the whole enterprise, Blaze Advisor continued
19  to be used for applications in connection with selling
20  insurance?
21  A.  Blaze Advisor continued to be used in those applications
22  that had Blaze Advisor as a component that came from legacy
23  Chubb and one application legacy ACE.
24  Q.  We'll talk about that one application in a bit, but that
25  one application from legacy ACE, you're speaking of a legacy

**1050**

1  ACE license agreement with Blaze Advisor?
2  A.  That is correct.
3  Q.  And we can -- and with respect to that license
4  agreement, Blaze Advisor was not used by legacy ACE in
5  connection with selling insurance?
6  A.  It was a set of rules called common rules.
7  Q.  Right.  A set of rules for a different purpose than
8  selling insurance?
9  A.  Yes.
10  Q.  And then as you progressed into 2018 with your IT
11  strategy for the whole enterprise, at a certain point, you
12  reached a decision to adapt an open source technology
13  strategy.  Agreed?
14  A.  As part of the or embedded in the IT strategy that we
15  formulated in 2018, one important decision we made at the
16  time is to expand, increase adaption of open source
17  software.
18  Q.  So now this brings us from March 2016 through 2017
19  through 2018, and it becomes later in the beginning of 2019
20  that you made a decision to replace Blaze Advisor with
21  Drools, the open source solution?
22  A.  That is correct statement.
23  Q.  And then in approximately -- it's approximate, but once
24  you made the decision in the beginning of 2019 to replace
25  Blaze Advisor with Drools, it took about nine months after

**1051**

1  that for some -- for some, many of the applications to
2  actually accomplish the replacement of Blaze Advisor with
3  Drools, correct?
4  A.  Yeah.  We completed an entire migration from Blaze
5  Advisor to Drools in April 2020.
6  Q.  That was going to be my next question, just to follow
7  up.  The whole project of replacing Blaze Advisor was not
8  completed until April 2020.  Agreed?
9  A.  That's when the last application was replaced, the rules
10  were replaced.
11  Q.  Understood.  So from March 2016, '17, '18, '19 to
12  probably March/April of 2020, that was a time frame that was
13  consumed to fully replace Blaze Advisor and all the
14  applications that Chubb & Son had them in?
15  A.  I would correct that statement in terms of, we commenced
16  the activities of migration away from Blaze Advisor at the
17  beginning of 2019, and we completed them in April 2020.
18  Q.  I think we just said the same thing.  All right.  Fine.
19         When you were in the process of considering what
20  technology to use enterprise-wide instead of Blaze Advisor,
21  my understanding is that you looked at only two other
22  technologies, one of them was ODM.  You agree?  Yes?
23  A.  Yes.
24  Q.  And the other one was Drools, correct?
25  A.  Yes.

**1052**

1  Q.  And ODM is a product from IBM?
2  A.  Yes.
3  Q.  And Drools is an open source technology, correct?
4  A.  Yes.
5  Q.  Meaning anybody can use it, but if you want maintenance
6  service, you get that, you pay a fee for maintenance service
7  from a provider?
8  A.  That is correct.
9  Q.  All right.  And if we haven't already said so, Drools
10  is, Drools is open source.
11  A.  Correct.  Drools is open source.
12  Q.  All right.  All right.  Maybe we said that.  So now I
13  would like to turn to that time frame before Blaze Advisor
14  was replaced, and in your binder is a document that you have
15  a tab for 517.  Could you put that in front of you, please?
16  A.  517, did you say?
17  Q.  Yes.
18  A.  Found it.
19         MS. GODESKY:  Your Honor, is this published to the
20  jury?
21         THE COURT:  Not now.
22         MS. GODESKY:  Thank you.
23         MR. HINDERAKER:  Your Honor, this exhibit and the
24  other one are in the same category.  We will do them one at
25  a time.

**1129**

1  A.  Professional programming, yeah.  Programming in our
2  language can be used to achieve the same goal as a rules
3  engine, if this is what you are inferring.
4  Q.  I am.  And then let's look at the number of rules on the
5  second page.
6        If we are doing the hard coding, not to exceed
7  100.  Is that what it says?
8  A.  That's what it says.
9  Q.  And if we are doing open source, not to exceed 400.  Is
10  that what it says?
11  A.  So second column is also -- yeah.  Open source, yes.
12  Q.  That's what I said.
13  A.  That's the one, 400, yes.
14  Q.  And then on the vendor, Blaze or Duck Creek, number of
15  business rules is estimated as large.  And it goes on to
16  talk more about each product, a hundred plus calculations
17  and so on.
18        That's what the document says for that, correct?
19  A.  Yes, that's what the document says.
20  Q.  That was the analysis at the time.
21  A.  Was a set of guidelines.
22  Q.  Understood.  I know.  I know.  I just wanted to know
23  what was being thought at the time and said.
24        I don't know if you know this, but let me ask.  Do
25  you know how long -- okay.  I won't -- I won't ask it.  I

**1130**

1  will find the information in the RFI, and that's well before
2  your time.  Good.
3        So I want to, I want to thank you for your time,
4  and I just want to, I guess, I just want to, I guess, sum up
5  with, with this.
6        You said -- where did I have that note?
7        There was a time in September of 2016 where you
8  knew that the relationship with FICO had, I think your words
9  were, severely deteriorated.  Do you recall that?
10  A.  In 2016.
11  Q.  September of 2016.
12  A.  Yeah.  2016 I was, I was informed, I can't remember the
13  exact month, but I was informed by my superior that a
14  dispute had started between FICO and Chubb.
15  Q.  And that being a fact, Blaze Advisor was not removed
16  from all of the applications until April 2020, right?
17  A.  The last application, the last component, that is
18  correct.
19  Q.  That's right.  And then when you were doing an
20  evaluation to integrate technologies, there was a mention in
21  your, you mentioned that ACE American had one application,
22  and that one application was running ODM, right?
23  A.  We had more than one application running ODM.
24  Q.  Maybe I misspoke.  In terms of looking at rules engine
25  technologies for the selling of insurance, ACE American had

**1131**

1  one application running ODM.
2  A.  I don't remember the specifics of that.
3  Q.  All right.  And then ACE American did have one small
4  license with FICO that had nothing to do with -- nothing to
5  do with rules engine technology in connection with selling
6  insurance?
7  A.  That is correct.
8  Q.  Thank you.
9  A.  Thank you.
10        THE COURT:  Hang on a second.
11        MR. HINDERAKER:  No further questions.
12        THE COURT:  Thank you, Mr. Hinderaker.
13        Ms. Godesky, do you have some direct?
14        MS. GODESKY:  I do.
15        THE COURT:  All right.  Just to let you know the
16  plan, we'll go about ten minutes and then take our afternoon
17  break.
18        MS. GODESKY:  Terrific.
19        Your Honor, I'm told we need to switch the system.
20        THE COURT:  Yep.
21        MS. GODESKY:  Thank you.
22              DIRECT EXAMINATION
23  BY MS. GODESKY:
24  Q.  Good afternoon, Mr. Ghislanzoni.
25  A.  Good afternoon.

**1132**

1  Q.  If you meet someone new in a professional setting, what
2  company do you say you work for?
3  A.  Chubb.
4  Q.  You testified during examination with Mr. Hinderaker
5  that you are the chief enterprise architect at Chubb,
6  correct?
7  A.  I am.
8  Q.  Very briefly, what does it mean to be an architect at
9  Chubb?
10  A.  One way to describe being an architect, an IT architect,
11  could be drawing an analogy with a construction architect.
12  So a construction architect defines a blueprint of a
13  building and what materials are going to be used to create
14  the building.
15        In IT, an IT architect, enterprise architect,
16  defines the blueprint of the IT system of an enterprise and
17  which technologies, which software products to be used.
18  Q.  In what country are you currently working?
19  A.  In England.
20  Q.  And you, you mentioned during questioning from
21  Mr. Hinderaker that your responsibilities are global.  How
22  many people report to you?
23  A.  Over 100 worldwide.
24  Q.  And the jury has heard testimony from a Mr. Ramesh
25  Pandey, another Chubb architect.  How do his

1165

1 enterprise-wide the decision is to standardize on open
2 source.
3 A.  No, not necessarily.  So I can explain.
4 Q.  No, isn't that -- let me -- simple point.
5        Enterprise-wide, you made a decision to go to open
6 source?
7 A.  To embrace open source as a whole more widely than we've
8 ever done in the past.
9 Q.  Agreed.  And then Drools is the open source solution for
10 embracing open source more widely.
11 A.  Drools is the leading open source rules management
12 system, as you know.
13 Q.  And the third-party vendors like ODM, Blaze Advisor from
14 FICO, Pega, whatever, on your sheet, those are not open
15 source?
16 A.  No, they are not.
17 Q.  That's what we just want to be clear about.
18 A.  Okay.
19 Q.  So in 2006, of all of the vendors that were available to
20 Chubb & Son at the time, Blaze Advisor was chosen.  In 2016
21 you're starting to look at Blaze Advisor and ODM, and the
22 relationship with FICO is deteriorated.
23        That takes Blaze Advisor off the table for
24 consideration, and you go to ODM, correct?
25 A.  That's what we did.

1166

1 Q.  And then you start to want to embrace an open source
2 solution more widely, and that forces or takes you to the
3 Drools decision.  Agreed?
4 A.  That's what we did.
5 Q.  All right.  So let me change topics a little bit.  You
6 know, I'd like to see if we could focus on the things that
7 we're here, you know, what this lawsuit is about and what
8 this lawsuit is not about.
9        First, we can agree that this lawsuit is not about
10 the one application license that ACE American had with FICO.
11 Agreed?
12 A.  I understand.
13 Q.  And you agree?
14 A.  I agree.
15 Q.  This lawsuit is about a different license that Chubb &
16 Son had with FICO.  We agree on that?
17 A.  Yes.
18 Q.  And do we also agree that with respect to the use of
19 Blaze Advisor in the applications by Chubb & Son, they used
20 it primarily in the applications for the specialty insurance
21 group of Chubb Corporation?
22 A.  Yeah, that was one of the category.
23 Q.  And the other category was a few applications were used
24 in the commercial line of insurance.  Agreed?
25 A.  Yeah, a few applications.  Yes.

1167

1 Q.  And so we can talk about those applications in
2 connection with selling the insurance of those specialty
3 lines, of those lines of business separate from talking
4 about everything else that goes on in Chubb or legacy ACE or
5 Chubb Limited now.  Agreed?
6 A.  If we want to, yes.
7 Q.  I do want to.
8 A.  We can talk about --
9 Q.  Let me focus on what we are doing in the lawsuit and
10 what we are not doing.
11        You said you don't know -- you said that -- I
12 think you were asked the question:  Post merger, were any of
13 the legacy Chubb applications changed so that legacy ACE
14 underwriters and legacy ACE insurance products could be sold
15 in connection with the use of those legacy Chubb
16 applications.  Do you recall that?
17 A.  The question I recall was did -- to the best of my
18 knowledge, did legacy ACE underwriters access legacy Chubb
19 applications, and I don't have that data point, so I said to
20 the best of my knowledge, no.
21 Q.  So is it also accurate to say that to the best of your
22 knowledge you don't know one way or the other?
23 A.  I don't know.
24 Q.  That's the point.  You do not know one way or the other.
25        You testified that it takes months, it took you

1168

1 months, to migrate off of Blaze Advisor on to Drools, and
2 you explained why?
3 A.  Yes.
4 Q.  I don't need it again, but my question is to only
5 underscore that the process of going from Blaze Advisor to
6 Drools, doing it well so that you don't have any problems as
7 a consequence, nice job, nice transition, that transition
8 was a matter of months.  Agreed?
9 A.  Yes.  Zero disruption to our business and our customers.
10 Q.  As opposed to a matter of years.  So your relationship
11 with FICO was terminated in 2016.  In the fall of 2016 you
12 know that the relationship has deteriorated?
13 A.  Yes.
14 Q.  And it's not until 2020, first quarter of 2020, that all
15 of your applications are off Blaze Advisor, right?
16 A.  Yeah, and we started in 2019.
17 Q.  And you started in 2019.  And once you started, it only
18 takes nine months to make that migration.
19 A.  It took a number of months, yes.
20 Q.  As a professional in the, in the technology space, do
21 you think that there's some importance in -- well, as a
22 professional in technology space, you are familiar with the
23 fact that technologies are licensed from one company who
24 owns the technology to another company who wants to use the
25 technology.

**1169**

1  Do we agree on that?

2  A.  That's one modality or open source.

3  Q.  Or open source.  Let's stay with the vendors --

4  A.  Okay.

5  Q.  -- where you have a license.

6  A.  Yes.

7  Q.  You understand that a license is a permission to use?

8  A.  A license gives you the right to use the technology,

9  yes.

10  Q.  Yes.  And you understand that a license has terms and

11  conditions that put constraints on both parties with respect

12  to the arrangement for that permission to use.

13  A.  Yes, license can be structured with different

14  parameters.

15  Q.  Exactly so.  And typically it's the product of

16  negotiations between the licensor and licensee.  Agreed?

17  A.  Yes.

18  Q.  Do you think license agreements should be honored and

19  kept by the licensee?

20  A.  I think license agreements are an important construct of

21  a relationship between two companies, in this case we're

22  talking about technology, the supplier and the consumer.

23  Q.  Agreed.  And do you think there's consequences or should

24  be consequences when the licensee violates the license

25  agreement?

**1170**

1  A.  As a legal contract, I agree that if there's a

2  violation, then an action needs to be taken.

3  MR. HINDERAKER:  No further questions.

4  THE COURT:  Thank you, Mr. Hinderaker.

5  Ms. Godesky, any redirect?

6  REDIRECT EXAMINATION

7  BY MS. GODESKY:

8  Q.  Mr. Ghislanzoni, you were asked some questions about the

9  Blaze license that Chubb purchased, correct?

10  A.  Yes.

11  Q.  Did Chubb purchase a license to use Blaze on an

12  enterprise-wide basis or specific to certain applications?

13  A.  Specific to one application.

14  Q.  I'm talking about Chubb?

15  A.  Oh, legacy Chubb?

16  Q.  Yes.

17  A.  Enterprise-wide.

18  Q.  And was that license perpetual or was it limited in

19  time?

20  MR. HINDERAKER:  Objection.  Lacks of foundation,

21  not involved with that.

22  THE WITNESS:  The document I see?

23  THE COURT:  Lay some foundation.

24  BY MS. GODESKY:

25  Q.  Mr. Ghislanzoni, do you have a general familiarity with

**1171**

1  the license that Chubb purchased to use Blaze Advisor back

2  in 2006?

3  A.  Legacy Chubb?

4  Q.  Yes.

5  A.  Back in 2006?

6  Q.  Do you have a general understanding of the terms?

7  A.  Now that I have seen the license, I do.

8  Q.  And was it a perpetual license?

9  MR. HINDERAKER:  Same objection, Your Honor.

10  THE COURT:  Overruled.

11  THE WITNESS:  So the license contract that I've

12  seen between -- shows enterprise-wide perpetual license.

13  MS. GODESKY:  Thank you.  No further questions.

14  MR. HINDERAKER:  I don't have a copy of the

15  license agreement in hand.

16  Could I have -- could you put up Joint Exhibit 1,

17  please?  And could we go to the top paragraph where it

18  defines client?

19  RECROSS-EXAMINATION

20  BY MR. HINDERAKER:

21  Q.  Could we read this together and could we agree that the

22  client on this license agreement is Chubb & Son, a division

23  of Federal Insurance Company?

24  A.  That's how it's described in this paragraph.

25  Q.  That's right.  And can we agree that when we're talking

**1172**

1  about an enterprise, it's the enterprise of the client that

2  is being addressed, not somebody else's enterprise?

3  A.  Yeah, enterprise of the client.

4  Q.  The client.  Yeah.  So an enterprise-wide license in

5  this instance is a license that is as wide as the enterprise

6  of Chubb & Son, a division of Federal.

7  Do we agree?

8  A.  I wouldn't be able to agree on this.  I know this is the

9  point of this agreement between FICO and Chubb.

10  Q.  Well, I was just curious because you were just asked

11  questions about the license agreement and what it meant in

12  your view and -- but when you get my questions, you defer.

13  MS. GODESKY:  Objection.

14  THE COURT:  Sustained.

15  MR. HINDERAKER:  Yes.

16  BY MR. HINDERAKER:

17  Q.  We don't have to quarrel about it.  It says what it

18  says.

19  And do you have the license agreement, Defendants'

20  Exhibit 39, in front of you?  It should be in the binder

21  from your counsel.

22  A.  39?

23  Q.  I believe it's D0039.

24  A.  Oh, yeah.  This is the ACE, ACE agreement.

25  Q.  Yes.  Yes.  Yes.  Yes.  Can you go to, it's called

**1198**

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

Fair Isaac Corporation,          )   File No. 16-cv-1054(DTS)
a Delaware Corporation,          )
                                 )
          Plaintiff,             )
                                 )
v.                               )
                                 )
Federal Insurance Company,)   Courtroom 14W
an Indiana corporation,          )   Minneapolis, Minnesota
and ACE American Insurance)   Tuesday, February 28, 2023
Company, a Pennsylvania    )   8:50 a.m.
Corporation,                     )
                                 )
          Defendants.            )
                                 )

------------------------------------------------------------

BEFORE THE HONORABLE DAVID T. SCHULTZ
UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

(JURY TRIAL PROCEEDINGS - VOLUME VII)

Proceedings recorded by mechanical stenography; transcript
produced by computer.

* * *

**1199**

APPEARANCES:

For Plaintiff:        MERCHANT & GOULD P.C.
                      BY:  ALLEN W. HINDERAKER
                           HEATHER J. KLIEBENSTEIN
                           PAIGE S. STRADLEY
                           MICHAEL A. ERBELE
                           JOSEPH W. DUBIS
                           GABRIELLE L. KIEFER
                      150 South Fifth Street, #2200
                      Minneapolis, Minnesota 55402

For Defendants:       FREDRIKSON & BYRON
                      BY:  TERRENCE J. FLEMING
                           LEAH C. JANUS
                           CHRISTOPHER D. PHAM
                           RYAN C. YOUNG
                           PANHIA VANG
                      200 South Sixth Street, #4000
                      Minneapolis, Minnesota 55402

                      O'MELVENY & MYERS LLP
                      BY:  LEAH GODESKY
                           ANTON METLITSKY
                           DARYN E. RUSH
                           ROXANA GUIDERO
                      Times Square Tower
                      7 Times Square
                      New York, New York 10036

Court Reporters:      RENEE A. ROGGE, RMR-CRR
                      KRISTINE MOUSSEAU, CRR-RPR
                      MARIA V. WEINBECK, RMR-FCRR
                      PAULA RICHTER, RMR-CRR-CRC
                      United States District Courthouse
                      300 South Fourth Street, Box 1005
                      Minneapolis, Minnesota 55415

* * *

**1200**

I N D E X
                                                      PAGE

JOHN TAYLOR
  Via Deposition By Mr. Hinderaker                    1219

NEIL J. ZOLTOWSKI
  DIRECT EXAMINATION BY MS. KLIEBENSTEIN              1246
  CROSS-EXAMINATION BY MS. GODESKY                    1334
  REDIRECT EXAMINATION  BY MS. KLIEBENSTEIN           1350
  RECROSS-EXAMINATION BY MS. GODESKY                  1351

RANDOLPH BICKLEY WHITENER
  DIRECT EXAMINATION BY MR. HINDERAKER                1353

PLAINTIFF'S                                           REC'D
  857                                                 1361

**1201**

February 28, 2023

8:50 A.M.

(In open court without the Jury present.)

THE COURT:  Good morning.  Please be seated.

All right.  Good morning, everyone.  We're on the
record outside the presence of the jury.  I understand the
parties have an issue with respect to some of the
interrogatory answers that are intended to come in -- into
evidence today.

So, Ms. Kliebenstein, or whomever on that side,
come on up.

MS. KLIEBENSTEIN:  Thank you.  Good morning, Your
Honor.

We have, we have three -- two and a half issues,
if you will.  So one of them is the interrogatories, but I
think I'll start with something else first.  The defendants
have objected to our inclusion in Mr. Zoltowski's
demonstrative of revenues associated with the Chubb
Insurance Company Canada.  And as we -- they say that
it's -- it was decided on summary judgment, that it's not in
the case anymore.  But as we heard from Mr. Pandey and
Mr. Mirolyuz, that application -- the application running in
that entity in Canada is running out of Raleigh, North
Carolina, and we have outlined the case for infringement in

1230

1  Q.  Okay.  All right.  Let's see if your understanding is
2  similar to mine.  We've got some whereas clauses, and then
3  "So now, therefore, the parties agree as follows:  The
4  following entities shall be added to the agreement as
5  service recipients of ACE American," and then it lists a
6  number of entities.
7        Do you see that?  And all of the entities that it
8  lists are wholly-owned subsidiaries of Federal Insurance,
9  correct?
10  A.  At what time period?
11  Q.  Well, before the merger and after the merger.
12  A.  That is, I believe, incorrect.
13  Q.  And the amendment, this amendment number one, as we
14  said, is effective January 1st, 2008.  So do you have an
15  understanding of how this amendment number one affects the
16  service agreements that we've looked at between Chubb & Son,
17  a Division of Federal, or between Federal and these various
18  entities -- and all of these entities?
19  A.  I'm not sure it would have any impact.
20  Q.  Okay.  And why do you say that?
21  A.  The agreements are still -- the other agreements are
22  still in place.
23  Q.  We just looked at a number of service management
24  agreements between Federal or Chubb & Son, a Division of
25  Federal.

1231

1  A.  Mm-hmm (Yes).
2  Q.  You just said that all of those managements service
3  agreements, to your knowledge, still exist?
4  A.  Mm-hmm (Yes).
5  Q.  And my question is whether you understand that, and I'm
6  not saying -- whether you understand one way or another that
7  pursuant to amendment number one to this service agreement
8  32, all of the services that Chubb & Son, a Division of
9  Federal provided to those various entities is now being --
10  is now being met by ACE American Insurance Company.
11        Do you understand that question?
12  A.  I understand that -- I understand that question.  I'm
13  not -- at the exact date, now Federal no longer has
14  employees.  Employees were moved to ACE American at, I
15  believe -- I believe it was 1/1/17.
16  Q.  ACE American Insurance provided listed services to
17  Federal, and by way of doing that, meets Federal's
18  obligations to the various entities under Federal or Chubb &
19  Son, a Division of Federal's, management services agreement?
20  A.  ACE American -- to the best of my knowledge, yes, I
21  would agree with that.  ACE American provides services to
22  Federal.
23  Q.  And as of January 1, 2017, did all of the employees of
24  Federal or Chubb & Son, a Division of Federal, become
25  employees of ACE American Insurance Company?

1232

1  A.  To the best of my knowledge.
2  Q.  Exhibit 33 is a blowup of another document that was
3  produced to us in the litigation, Federal 004420_001.  You
4  can look at the original if you want, but I think the bigger
5  blowup is easier.
6        So we agree we're looking at a document where, in
7  the key at the right-hand bottom, it says, "As of December
8  31, 2008."  With me so far?
9  A.  Yes.
10  Q.  Agreed?  Okay.  And then I would like you to confirm
11  that to the best of your knowledge as of December 31, 2008,
12  this exhibit is giving us the organizational structure of
13  Federal Insurance Company?
14  A.  To the best of my knowledge, that's what the document
15  says.
16  Q.  Okay.  And so for context later on, can we agree that as
17  of the end of December 2008, Chubb Insurance Company of
18  Europe, Chubb Insurance Company of Canada and Chubb
19  Insurance Company of Australia Limited are all wholly-owned
20  subsidiaries of Federal?
21  A.  That's what the chart indicates, yes.
22  Q.  Mr. Taylor, Exhibit Number 34 is a document produced to
23  FICO in the context of litigation as Federal 000060_001 and
24  2.  And take the time that you would like.  I will represent
25  that it is an exhibit from -- a year-end statement of the

1233

1  Chubb Corporation December 31, 2013.  And I would like you
2  to confirm that it accurately identifies those subsidiaries,
3  the wholly-owned subsidiaries of Federal as of its date?
4  A.  Yes, it appears to.
5  Q.  Mr. Taylor, Exhibit 35 is a very similar agreement, only
6  for the time period December 31, 2014.  And to the best of
7  your knowledge, does this accurately show the wholly-owned
8  subsidiaries of Federal Insurance Company as of this time
9  frame?
10  A.  Yes, it appears to.
11  Q.  Do we agree that Exhibit 36 is a 10-K submission to the
12  United States Securities and Exchange Commission for the
13  period ending December 31, 2016, on behalf Chubb Limited?
14  A.  Correct.  It appears that.
15  Q.  Exhibit 37, you will see from the first page, it says it
16  is a sub document, Exhibit 21.1, and I'll represent that it
17  is from the December 31, 2016 10-K that we just identified
18  as Exhibit 36.  If you would like to confirm, feel free.  If
19  you are willing to accept my representation, we will move
20  on.
21  A.  I will accept your representation.
22  Q.  And so then if we go to the Bates numbered page 6, do we
23  agree that this states the wholly-owned subsidiaries of
24  Federal Insurance Company as of year end 2016?
25  A.  It appears to, yes.

**1326**

1   total, starting from left to right.  The headings for each
2   of the columns read as follows:  U.S. Applications is the
3   first.  Defendants is the second.  Subsidiaries is the
4   third.  Pools is the forth, and Total is the fifth, which
5   will be furthest to the right.
6   Q.  So now we have to read the monetary amounts into the
7   record.
8   A.  I'm going to go row by row, and this is by application.
9   So for Commercial Underwriting Workstation, the amount of
10  gross written premiums for defendants is 7,656,976,388 -- I
11  apologize -- '368.  I should have brought my reading
12  glasses.
13          The next amount is for the subsidiaries, for CUW,
14  and that's 3,663,148,142.
15          Pools for CUW is 1,427,268,700.  And the total for
16  CUW is 12,747,393,210.  The next line item is CSI Express
17  Profitability Indicator and Automated Renewal Process.  This
18  is all on the same line item.  For defendants, the amount is
19  4,783,945,129.
20          For subsidiaries, it's 132,704,843.
21          For pools, it's 94,672,823.
22          And the total for these three applications, which
23  are CSI Express, Profitability Indicator, and Automated
24  Renewal Process is 5,011,322,794.
25          The next line item is Premium Booking.  The total

**1327**

1   for the defendants is 1,750,877,402.  And the total for
2   Premium Booking would be that same amount, 1,750,877,402.
3           The next line item is TAPS or Texas Accident
4   Prevention System.  For defendants, it's 462,805,017.  The
5   total for subsidiaries is 270,951,408.  The total for pools
6   is 110,550,113.  And the total for TAPS is 844,306,538.
7           The next line item is IRMA or Individual Rate
8   Modification Application.  The total for defendants is
9   223,406,656.  The total for subsidiaries is 69,554,858.  The
10  total for pools is 7,355,485.  And the total for IRMA is
11  300,316,999.
12          The next line item is DecisionPoint.  The total
13  for defendants is 18,101,109.  The total for subsidiaries is
14  1,117,772.  The total for pools is 34,636.  And the total
15  for DecisionPoint is 19,253,516.
16          And the last application line item is Cornerstone.
17  For defendants, the total is 518,138,795.  The subsidiaries
18  total is -- it's actually a negative number just because of
19  the way the data was received, so it's a negative 3,510,098.
20          And that's just because it's trying to split them
21  up in a certain way based upon the data we have and didn't
22  have insight into doing so.  So the pools total is
23  14,281,786.  And the total for Cornerstone is 528,910,484.
24          And the total for all of these, I know everyone
25  has been waiting for, defendants is 15,414,250,476.

**1328**

1   Subsidiaries total is 4,133,966,925.  The pools total is
2   1,654,163,542.  And the overall total is 21,202,380,943.
3   Q.  And we'll have one more that we'll -- two more that
4   we'll talk about in a minute.  But I wanted to take a break
5   from the reading and address one final topic with you.
6           So we talked about revenues with your testimony;
7   is that right?
8   A.  That's correct, gross revenues or in this instance,
9   gross written premiums.
10  Q.  And generally speaking, what is profit?
11  A.  A profit basically is revenue less expenses.
12  Q.  And your opinions just identified revenue and not
13  expenses or profit.  Why is that?
14  A.  Based on The Copyright Act, based on the law, I as the
15  plaintiff's expert only needs to identify the gross
16  revenues, and then it's the burden of the infringer as it's
17  written in the statute.
18          MS. GODESKY:  Objection, Your Honor.
19          THE COURT:  Sustained.
20  BY MR. KLIEBENSTEIN:
21  Q.  Let's just talk about -- let's leave the law aside.  And
22  in this situation, why are you only addressing revenues,
23  leaving the law aside?
24  A.  Typically I would address costs if I had the appropriate
25  data that would allow me to do so, even as an expert working

**1329**

1   on behalf of a plaintiff.
2   Q.  And why didn't you do that here?
3   A.  Based on the information that was available, it was -- I
4   couldn't accurately or precisely quantify the costs that
5   were directly related to these particular -- the gross
6   written premiums.
7   Q.  And can you give me -- can you give me an example, just
8   a general example, of where you would be able to identify
9   not just the revenues but the direct costs associated
10  with -- like the cost of goods sold or something like that?
11  A.  Sure.  So I mean, typically we're operating in widgets
12  or something like that, so maybe around here snowmobiles or
13  something of that nature.  As a company that's reporting
14  their financials, there's materials and labor that go into
15  their production of that snowmobile.
16          It typically would have information that would
17  allow us to say here's the costs that relate to these
18  snowmobiles that are at issue that were sold and the
19  revenues associated with those sales and deduct those costs,
20  which would be the cost of goods sold as the terminology
21  is -- and get us to at least a gross profit number.
22          Now, there may be additional costs that might be
23  related, but we can at least get us to that first -- that
24  first step, and here we just did not have data that would
25  allow us to even make that first step.

1330

1  Q. And explain that further. Why not? What were you

2  missing in that initial first step?

3  A. My understanding is that we have data from business

4  units, and it was overinclusive of costs and -- cost data

5  and cost information, as well as even the revenue data that

6  was included with that.

7  Q. All right. Let's move back to the data again.

8       Mr. Zoltowski, where do the numbers in this slide

9  come from?

10  A. This is the summary of U.S. gross written premiums by

11  application by year. Correct?

12  Q. And that came from interrogatory 17, right?

13  A. Yes. I just wanted to make sure I was on the right

14  slide.

15       MR. KLIEBENSTEIN: Your Honor, I would ask to move

16  this single slide into evidence as Exhibit 1177.

17       MS. GODESKY: Objection, Your Honor.

18       THE COURT: Sustained.

19  BY MR. KLIEBENSTEIN:

20  Q. Mr. Zoltowski, can you, just like we did for the last

21  table, can you read the data in this table into the record,

22  and then we'll finish with Canada, and we'll be done.

23  A. I'd be happy to.

24       So, again, this table has application in the

25  furthest left column, and there are five other columns which

1331

1  are covering the time periods, from 2016 through 2020. And

2  then the final column on the right is total. And also want

3  to note that in 2016, it only covers the period March 31

4  through December 31.

5       And then I think this last column is actually just

6  a misprint, because it should be January, I believe, through

7  May based upon other tables. So 2020 is January through

8  May.

9       And then below those header, that header row are

10  all of the applications and the associated gross written

11  premiums, which I'll read by line item by year.

12       For Commercial Underwriting Workstation or CUW,

13  for the March 31st through December 31st, 2016 period, the

14  number is 2,802,600,382. In 2017, for CUW it's

15  3,409,127,185. In 2018, for CUW it is 2,882,872,838. In

16  2019, it is 3,652,792,805. And it's zero for 2020. And the

17  total for CUW over the March 31st, 2016, through May 2020

18  time period is 12,747,393,210.

19       The next line item is the three applications

20  bucketed together, once again, which are CSI Express,

21  Profitability Indicator, and Automated Renewal Process or

22  ARP. For the March 31st through December 31st, 2016,

23  period, the total is 1,008,080,734. 2017, the total is

24  1,358,180,203.

25       For 2018, the total is 1,241,993,390. For 2019,

1332

1  the total is 1,277,242,740. And for the January through May

2  2020 period, it is 125,825,726. And the total for CSI

3  Express, Profitability Indicator, Automated Renewal Process

4  or ARP is 5,011,322,794.

5       The next line item is Premium Booking. For the

6  March 31st through December 31st, 2016, period, the number

7  is 380,416,844. For 2017, the total is 442,839,932. For

8  2018, the total is 500,850,829. For 2019 the total is

9  426,769,797. The number is zero for 2020.

10       And the overall total for Premium Booking for the

11  March 31st, 2016, through May 2020 period is 1,750,877,402.

12       The next line item is TAPS or Texas Accident

13  Prevention System. The total for March 31st through

14  December 31st, 2016, is 215,420,480. For 2017, the number

15  is 252,219,200. For 2018, the total is 216,490,943. For

16  2019, the total is 160,175,914.

17       The total for 2020 is zero. Therefore, the

18  overall total for TAPS for the period March 31st, 2016,

19  through May 2020 is 844,306,538.

20       The next line item is Cornerstone. For the March

21  31st through December 31st, 2016, period, the total is

22  158,202,931. For 2017, the total is 248,313,042. For 2018,

23  the total is 122,400,980.

24       And again, this is one of these quirky ones just

25  based on the data we had, and it's a negative number for

1333

1  2019. It's negative 6,469. And the total -- I'm sorry --

2  for 2020, it is zero for Cornerstone. The total for

3  Cornerstone for the March 31st, 2016, through May 2020

4  period is 528,910,484.

5       The next line item is IRMA or Individual Rate

6  Modification Application. From the period March 31st

7  through December 31st, 2016, the total is 68,975,636. For

8  2017, the total is 89,449,543. For 2018, the total is

9  80,968,955. For 2019, the total for IRMA is 60,922,865.

10  The total in 2020 is zero. And so the total for the whole

11  period of March 31st, 2016, through May 2020 for IRMA is

12  300,316,999.

13       And then the last line item is DecisionPoint for

14  the March 31st through December 31st, 2016, period. The

15  total is 2,680,739. For 2017, the total is 4,319,856. For

16  2018, the total is 4,779,439.

17       For 2019 for DecisionPoint, the total is

18  5,846,994. For the January through May 2020 period, the

19  total is 1,626,488. And that brings us to a total for

20  DecisionPoint over the March 31st, 2016, through May 2020

21  period of 19,253,516.

22       And the totals for each year, this is for all

23  applications, the total amount for March 31 through December

24  31st, 2016, is 4,636,377,746. For 2017, the overall total

25  for all applications is 5,804,448,961. In 2018, the total

1334

1  is 5,050,357,375.  For 2019, the overall total for all
2  applications is 5,583,744,647.
3          And for the January through May 2020 period, the
4  overall total is 127,452,214.  And that gives an overall
5  total for the March 31st, 2016, through June -- I'm sorry --
6  through May 2020 period of 21,202,380,943.
7  Q.  All right.  One final read-in.
8  A.  I'm surprised people are still awake.
9  Q.  Yes.  For Evolution Canada, can you read the total
10 amount?
11 A.  For the Evolution application for Canada, the total
12 gross written premium is 154,380,023.
13 Q.  And that was for the year 2016, correct?
14 A.  Correct.
15 Q.  Okay.  Thank you, Mr. Zoltowski.
16         THE COURT:  Thank you, Ms. Kliebenstein.
17         Ms. Godesky.
18         MS. GODESKY:  Thank you.
19              CROSS-EXAMINATION
20 BY MS. GODESKY:
21 Q.  Hi.
22 A.  Hi.
23 Q.  Good afternoon, Mr. Zoltowski.
24 A.  Good afternoon.
25 Q.  My name is Leah Godesky, and I represent the defendants

1335

1  in this case.
2          During the second half of your testimony with
3  Ms. Kliebenstein, you talked about certain pooling
4  agreements.  Do you remember that?
5  A.  Yes.
6  Q.  And you talked about a pooling agreement between Federal
7  and Vigilant?
8  A.  Yes.
9  Q.  And you talked about how that agreement meant that
10 Federal is empowered on behalf of Vigilant to do certain
11 things.  Does that sound like your testimony?
12 A.  Yes, and that's based on what was in the agreement
13 itself.
14 Q.  Okay.  Let's, Vanessa, if we could, pull up Exhibit P21
15 in evidence.
16         MS. GODESKY:  She doesn't have a signal to the
17 monitor.
18         THE COURT:  Well, I don't control that signal.
19 The monitor is switched so that your side is presenting.
20         Ladies and gentlemen, you can stand up if you'd
21 like while we're waiting for this technological glitch.
22         Would you like me to turn off all the monitors and
23 turn them back on?
24         MS. WHEELER:  That would not be a bad idea.  Thank
25 you, Your Honor.

1336

1          MS. GODESKY:  Thank you, Your Honor.
2          THE COURT:  Ninety percent of problems are solved
3  by rebooting.
4          MS. GODESKY:  Your Honor, can you switch over to
5  plaintiff so we can see if he's able to connect?
6          THE COURT:  He's up.
7          MS. GODESKY:  You have a connection?
8          MR. MAYLEBEN:  Yes.
9          THE COURT:  Let me try rebooting one more time
10 with a little bit more time delay.  I'll have to sit here
11 for 60 second, but . . .
12         We have IT on our way up.  Do you want to start?
13         MS. GODESKY:  Are you seeing signs of action?
14         THE COURT:  There we go.  Something just flashed.
15         MS. WHEELER:  My apologies to the Court, Your
16 Honor.
17         THE COURT:  That's quite all right.  Did we get
18 it?
19         MS. WHEELER:  We did, yes, sir.
20         THE COURT:  There we go.
21         MS. GODESKY:  Yes.
22 BY MS. GODESKY:
23 Q.  So, Mr. Zoltowski, we were talking about what you would
24 describe as this pooling agreement between Federal and
25 Vigilant, correct?

1337

1  A.  That's correct.
2  Q.  And I just want to take a look at, this first paragraph
3  of this agreement talks about how, "The addendum to be
4  attached and form a part of the management agreement (the
5  agreement) effective the 1st day of January, 1998, between
6  Vigilant Insurance Company and Chubb & Son, a division of
7  Federal Insurance Company," and then that's defined as
8  manager, correct?
9  A.  Yes.  That's correct.
10 Q.  And then during your direct examination, you made a
11 point of highlighting the fourth page of the agreement.
12         If we could turn there, Vanessa.
13         And you pointed out how the fourth page of the
14 agreement at the top identifies Vigilant Insurance Company
15 as the company, right?
16 A.  Correct.
17 Q.  And then you said, it also identifies Federal Insurance
18 Company as the manager, right?
19 A.  Yes.
20 Q.  And you kept referring to Federal under this contract
21 because you understand that Chubb & Son Division was signing
22 the agreement on behalf of Federal, correct?
23 A.  Chubb & Son is a division of Federal.
24 Q.  And you described this as an agreement between Vigilant
25 and Federal because you understood the Chubb & Son Division

**1438**

```
 1              UNITED STATES DISTRICT COURT
                   DISTRICT OF MINNESOTA
 2

 3     -----------------------------------------------------

 4     Fair Isaac Corporation,    )   File No. 16-cv-1054(DTS)
       a Delaware Corporation,    )
 5                                )
            Plaintiff,            )
 6                                )
       v.                         )
 7                                )
       Federal Insurance Company, )   Courtroom 14W
 8     an Indiana corporation,    )   Minneapolis, Minnesota
       and ACE American Insurance )   Wednesday, March 1, 2023
 9     Company, a Pennsylvania    )   9:00 a.m.
       Corporation,               )
10                                )
            Defendants.           )
11                                )
       -----------------------------------------------------

12

13

14           BEFORE THE HONORABLE DAVID T. SCHULTZ
        UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15
             (JURY TRIAL PROCEEDINGS - VOLUME VIII)
16

17

18

19

20

21
        Proceedings recorded by mechanical stenography;
22     transcript produced by computer.

23                        * * *
24
25
```

**1439**

```
 1     APPEARANCES:

 2     For Plaintiff:      MERCHANT & GOULD P.C.
                           BY: ALLEN W. HINDERAKER
 3                             HEATHER J. KLIEBENSTEIN
                               PAIGE S. STRADLEY
 4                             MICHAEL A. ERBELE
                               JOSEPH W. DUBIS
 5                             GABRIELLE L. KIEFER
                           150 South Fifth Street, #2200
 6                         Minneapolis, Minnesota 55402

 7     For Defendants:     FREDRIKSON & BYRON
                           BY: TERRENCE J. FLEMING
 8                             LEAH C. JANUS
                               CHRISTOPHER D. PHAM
 9                             RYAN C. YOUNG
                               PANHIA VANG
10                         200 South Sixth Street, #4000
                           Minneapolis, Minnesota 55402
11
                           O'MELVENY & MYERS LLP
12                         BY: LEAH GODESKY
                               ANTON METLITSKY
13                             DARYN E. RUSH
                               ROXANA GUIDERO
14                         Times Square Tower
                           7 Times Square
15                         New York, New York 10036

16     Court Reporters:    RENEE A. ROGGE, RMR-CRR
                           KRISTINE MOUSSEAU, CRR-RPR
17                         MARIA V. WEINBECK, RMR-FCRR
                           PAULA RICHTER, RMR-CRR-CRC
18                         United States District Courthouse
                           300 South Fourth Street, Box 1005
19                         Minneapolis, Minnesota 55415

20
                             * * *
21

22
23
24
25
```

**1440**

```
 1                     I N D E X

 2                                            PAGE

 3     RANDOLPH BICKLEY WHITENER
         Direct Examination (Resumed) By Mr. Hinderaker   1442
 4       Cross Examination By Ms. Godesky                 1532
         Redirect Examination By Mr. Hinderaker           1599
 5

 6     N. WILLIAM PAUL WAID
         Direct Examination By Mr. Hinderaker             1606

 7

 8
```

```
 9     PLAINTIFF'S                                REC'D
       1113                                       1675
10     1116                                       1702
```

```
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**1441**

```
 1     March 1, 2023                  9:00 A.M.

 2

 3          (In open court without the Jury present.)

 4          THE COURT:  Good morning.  Be seated.

 5          We'll take up the issue with respect to

 6     Mr. Waid's testimony over the lunch hour.  It is clear to

 7     me he is not getting on the stand before then.  All right?

 8          MS. GODESKY:  Yes.

 9          THE COURT:  Okay.

10          THE CLERK:  All rise for the jury.

11               (Jury enters.)

12

13

14          (In open court with the Jury present.)

15          THE COURT:  Go ahead and be seated.

16          Okay.  Good morning.  Thanks, everyone, for

17     braving our slippery roads.

18          Mr. Hinderaker, are you ready to proceed?

19          MR. HINDERAKER:  I am, Your Honor.

20          THE COURT:  Go ahead and recall Mr. Whitener

21     back.

22          MR. HINDERAKER:  I would call Mr. Whitener.

23          THE COURT:  Whitener.  Come on up, Mr. Whitener.

24          THE WITNESS:  Thank you.

25          THE COURT:  Just remind you as you're walking up,
```

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 1, 2023, Volume VIII

**1650**

1   against the value that it offers. There are several

2   metrics that we use for doing that. When we get to the

3   scenario here, which is an enterprise-wide, there's other

4   factors that come into play, but the primary metric we use

5   is revenues.

6   Q.  Revenues of -- what's your first data point for

7   revenues then?

8   A.  It's the revenues of the entire entity that we're

9   actually contracting with.

10  Q.  Of which the client is a part?

11  A.  Of which the client is a part, yes.

12  Q.  Okay. Because we've heard testimony of the revenue,

13  and Mr. Wachs testified in his video of the Chubb

14  Corporation having $12.3 billion in annual revenue.

15         So if you would describe for us how that data

16  point of the whole organization then factors into the

17  pricing analysis that you apply, like in the first

18  instance, to a named application license, then to a

19  divisional and then to the enterprise of Chubb & Son.

20  A.  Well, the application license is actually based on a

21  variety of factors. There's nine of them. When we get to

22  the divisional license here at the 350, the way that it

23  would have been priced was to take the entire entity, all

24  12.3 billion of it.

25         And if my memory is correct, I think in the RFI

**1651**

1   they said that their revenues was 3.5 billion for

2   specialty.

3   Q.  Specialty lines.

4   A.  Specialty lines. So essentially you don't take a

5   proportion of that and say, let's say the pricing for the

6   $12.3 billion organization came out to X, and the specialty

7   lines is 30 percent of X. We don't charge 30 percent of

8   the X. What we do is, we try to incent the client to move

9   to a larger purchase, just like we do with the credits. So

10  we'll take the difference between that, which in this case

11  is the three and a half billion to the 12.3.

12         And it's more of an art than it is a science. We

13  pick anywhere between a third and two-thirds of the way

14  between, and we say that's the right price point for this

15  division.

16  Q.  And, of course, it's a matter of then negotiation

17  because the licensee as to decide as well.

18  A.  Of course it is, yes.

19  Q.  And let's say it a different client that's much

20  smaller. Let's say it's a client with 5 million in

21  revenue, and that license licenses Blaze Advisor. Is it

22  the same software that goes to the $5 million client as

23  goes to a huge client?

24  A.  We have one software.

25  Q.  And the fee for the $5 million client will be same or

**1652**

1   less or more?

2   A.  It will be less.

3   Q.  Because of value?

4   A.  Yes.

5   Q.  Once the license agreement is signed, does -- does FICO

6   ever revisit the original, you know, ever go to the client

7   and revisit that price?

8   A.  That depends on the circumstances.

9   Q.  Okay. All right. Let's just say, let's say the

10  client is wildly successful, the client is growing

11  organically, the client makes, over time is just a much

12  bigger client, but it's all organic.

13         Does FICO try to revisit that pricing?

14  A.  We do not.

15  Q.  Well, then let's turn to paragraph 10.8.

16         Of the license agreement with Chubb & Son, as we

17  see, it's entitled No Assignment. From your decades of

18  experience, do all of the Blaze Advisor license agreements

19  have some form of a no assignment clause?

20  A.  Yes, they all have some form of it.

21  Q.  And what is the, why in some cases is it different from

22  others?

23  A.  It can be negotiated. At times with clients, they

24  would come back and want to change the language. If we in

25  the odd case actually used client's paper. We sometimes

**1653**

1   negotiate it in. So it is a negotiable term, but it is

2   still there.

3   Q.  Is it fair to say that every negotiation with every

4   client is unique to that client?

5   A.  Yeah, they are all unique. Sometimes it gets

6   interesting.

7   Q.  What in overview, can you give us -- well, let's take

8   it in pieces.

9          The first sentence, "Neither party shall without

10  the prior written consent of the other party assign or

11  transfer this agreement or any part thereof." So that's of

12  course it's mutual, "neither party."

13         What's the business purpose of that first

14  sentence?

15  A.  It's very simple as that bidirectionally, either party

16  has the opportunity to consent to the assignment.

17  Q.  If the licensor/licensee relationship was going to

18  change by assignment, either party gets to consent? Is

19  that what you said?

20  A.  Yes. That's correct.

21  Q.  Now let's -- and now let's go to the second sentence.

22         What's the reason that that's in FICO license

23  agreements?

24  A.  These contracts are all negotiated, in particular for

25  enterprise agreements, in a unique set of circumstances.

**1654**

1  There are events, such as mergers and acquisitions or
2  reorganizations or the bringing on of portfolios, that have
3  an impact to the circumstances under which it was
4  originally conceived.
5       So this section is basically saying that these
6  events are considered an assignment and it requires
7  consent.
8  Q.  Okay.  And why does FICO preserve that right to itself
9  to consent when one of those events happens?
10  A.  Well, these particular type of events in specific
11  actually materially change the basis, could materially
12  change the basis on which the license was granted and the
13  price that was set for that license.
14  Q.  And you use the word "could."  So depending on the
15  case?
16  A.  Yeah.  I mean, it could be a very small acquisition and
17  it's not material or impacting.
18  Q.  In your view, regardless of size, if there is one of
19  these events, FICO's consent is required?
20  A.  Absolutely.  We want to know about it.  We need to
21  assess that, the opportunity to assess that, and we need to
22  consent to it.  That's what this is saying.
23  Q.  So now let's be clear.  Consent to what?
24  A.  Well, these events are deemed an assignment.  That
25  means that if any one of these things happens, it is an

**1655**

1  assignment, and therefore we need to consent to it.
2  Q.  And what's the outcome -- let's say you do consent,
3  what's the outcome of that?
4  A.  If we do consent, typically there's a modification to
5  the agreement so that we know who the parties are.
6  Q.  Or what the use is?
7  A.  And we memorialize that, yes.
8  Q.  Now, in this second sentence, "In the event of a change
9  of control of client or if client is merged with, acquired
10  by or acquires another entity or undergoes a reorganization
11  or otherwise acquires the right to process the business of
12  another, each such event shall be deemed to be an
13  assignment subject to this section, and the client shall
14  make no expanded use as a result of any such event."
15       So is there any -- in your understanding, the
16  license agreement is still with the client?
17  A.  Yes.
18  Q.  Now, it goes on to say, "And client shall make no
19  expanded use of the Fair Isaac product as a result of any
20  such event unless and until Fair Isaac provides such
21  written consent."
22       What's the commercial reason for that element of
23  the second sentence?
24  A.  It's an additional constraint that until consent is
25  actually made, lock it down, don't do anything with that

**1656**

1  software, lock it down.
2  Q.  And what's, you know, so trying to understand now the
3  time period in which, assuming the event triggering the
4  second sentence, as you understand it from the business
5  point of view, what's the time period in which this
6  lockdown of the use would be in effect?
7  A.  Well, the time period -- well, first of all, should
8  have been notified before the event occurred.
9  Q.  Yeah.
10  A.  But the time period is actually probably specified in
11  the contract relative to the cure period.
12  Q.  Okay.
13  A.  Typically it's 30 days.
14  Q.  Let's assume that's true.  So is that saying, within
15  30 days under the license agreement, there will be consent
16  given and going forward maybe with amended terms or consent
17  not given and the license terminated?
18  A.  Yeah.  Consent could be given, and there's some
19  paperwork to follow up on what that actually means.
20  Consent could be not given, in which case, you know, we
21  need to talk about the termination of the agreement.  New
22  sets of terms and a new agreement could actually be
23  negotiated.
24       There's a whole series of things that could
25  happen.  The point of the, the language is to make sure

**1657**

1  that, you know, in mergers and acquisition there's an
2  opportunity for synergies.  This is referring to the fact
3  that you have an opportunity to grow the business just by
4  your nature of that merger and acquisition.
5       That's why you merged or acquired in the first
6  place, to grow the business.
7  Q.  So being bigger gives you opportunities to grow
8  business?
9  A.  It does.  And the point here is, you shouldn't be
10  processing any incremental business as a result of that.
11  It's lockdown until the consent is actually given and the
12  terms under which that is given.
13  Q.  And that, of course, and I guess we just said, and if
14  consent is not given, well then the license terminates.
15  A.  Yes, which is an option.
16  Q.  Is it the preferred option to FICO?
17  A.  It is not, no.  Our intention is to have long-term
18  relationships with our clients.  There is a, an incremental
19  value we get from our clients and having them happy with
20  our products.  That is actually feeding into the, strongly
21  feeding into our business strategy.
22       So, no, we seek to actually find amenable
23  outcomes in these situations.
24  Q.  Okay.  Let me just see where I'm at.  Would you go
25  to -- I think it's Exhibit 125.

1658

1    And as you see -- I'll wait till it's on the
2  screen. This is from Russ Schreiber to Natasha Fowlin, and
3  you are one of the CC recipients?
4  A.  Yes.
5  Q.  And Russ says, "Can you put 30 minutes on the calendar
6  for this group to discuss ACE's acquisition of Chubb and
7  potential licensing expansion fees?"
8       And obviously you were part of that
9  communication.
10 A.  Yes.
11 Q.  Okay. At this point in time, did you have any
12 information about the acquisition, other than what was
13 publicly announced?
14 A.  No.
15 Q.  Nothing came, no information from Chubb & Son to you?
16 A.  No.
17 Q.  What did you understand -- well, what was your reaction
18 to -- you don't have to say what Mr. Schreiber thought, but
19 what was your reaction to him saying, "Let's discuss ACE's
20 acquisition of Chubb and potential licensing fees
21 expansion"?
22 A.  Well, I have regular calls with Russ, because he's our
23 insurance global lead, and I'm at this point in time
24 running our platform line of business. So we speak on a
25 regular basis, and so I had become aware of the merger

1659

1  announcement in October.
2       And in my last conversation with him, I asked him
3  where do we sit in actually having a conversation with
4  Chubb about the impending merger. And his answer was, we
5  don't have one. We don't have any contact. So I asked
6  him, I'm like let's get Mike Sawyer on the phone. Let's
7  figure out who do we call. We got to know somebody at
8  Chubb who can actually address this, right?
9       This is Russ's conclusion about the licensing
10 event. It's not an unfair conclusion. It typically
11 happens this way that there's a license event. But the
12 purpose of this call was actually entirely about how do we
13 reach Chubb, who do we reach at Chubb, because we need some
14 information about what's coming.
15 Q.  And then did you get any information before the
16 acquisition closed?
17 A.  I did not. I knew that Mike went back and tried a
18 bunch of his resources, but we did not have any information
19 all the way through into January.
20 Q.  All right. So we've seen from Mr. -- let me turn your
21 attention to Exhibit 90. And this is Mr. Carretta's
22 January 27, 2016, letter to Joseph Wayland at Chubb
23 Limited.
24      Were you aware that -- are you aware of this
25 notice of breach letter on or about its time?

1660

1  A.  I was.
2  Q.  Other than, other than -- I take it you -- Mr. Carretta
3  had authority to send the letter.
4  A.  He did.
5  Q.  But were you involved at all in the crafting of the
6  language of the letter?
7  A.  Not the language, no.
8  Q.  So we'll leave that to Mr. Carretta's testimony about
9  that.
10      And then if you would turn to Exhibit Number 91.
11 And now it's Andrew Hopp, Deputy General Counsel,
12 responding to Mr. Carretta, February 17, 2016. You were
13 aware of this response, were you?
14 A.  Yes.
15 Q.  And did you read this response from Mr. Hopp?
16 A.  Yes.
17 Q.  What was your reaction to what he's saying?
18 A.  There were a couple. The first one was, he sort of
19 missed the point that there was an event that needed our
20 consent.
21 Q.  Okay. Agreed. And the second one was what?
22 A.  He, he made a reference to, that the client remained
23 the same and that that was sufficient, which confused me.
24 Q.  Okay. And you say in the second paragraph, he says,
25 "Our initial findings indicate that the applications that

1661

1  have been utilizing the Blaze Advisor software since 2006
2  are currently running in the exact same fashion as prior to
3  the merger transaction."
4       Did that have any significance to you?
5  A.  It reassured me that he was following the contract in
6  that he was, during this period, before consent was given,
7  he was locking it down. I'm not sure how convinced I was,
8  but it was reassuring.
9  Q.  And he also references that his IT people are in the
10 process of gathering information. Let's stay in or around
11 this time frame of February. Were you the -- did you
12 receive any additional, any information -- let me back up.
13      Before the letter from Mr. Carretta went out, you
14 said you had no information from Chubb & Son regarding the
15 acquisition.
16 A.  That's correct.
17 Q.  And in a reasonable time frame after February 17th, did
18 you on the business side, receive any information regarding
19 any more information that wasn't in this letter from
20 Mr. Hopp?
21 A.  No.
22 Q.  And then Mr. Carretta responded on February 22nd, and
23 we've heard his testimony.
24      And were you on the business side with respect to
25 the working with -- the authority for Mr. Carretta to send

**1662**

1  Exhibit 92 out?  Did you have any?
2  A.  I'm sorry.
3  Q.  I'm sorry.  I was waiting for an answer, but you were
4  waiting for a question.
5       You okayed Mr. Carretta to send this letter out?
6  A.  Yes, I agreed.
7  Q.  All right.  I was going to ask you something about
8  this.
9       And the Carretta, the two Carretta letters are,
10 at the conclusion, encouraging business discussions with
11 Chubb & Son.  Did you share that desire?
12 A.  Absolutely.  Ten years of wonderful relationship with
13 Chubb, and they're our first foray into commercial and
14 specialty lines insurance.  They were a great reference.
15 They spoke at FICO World.  They took reference calls for
16 clients on new sales all the time, and they were great
17 people too.  They were, they were good to work with.
18 Q.  So then let's move forward to Exhibit 94.  You were
19 aware of -- the communication of course is from Tamra
20 Pawloski to Mike Sawyer, carbon copy to Russ Schreiber; and
21 then the second page of the document has a proposal
22 February 25, 2016, sent to FICO.
23      Were you aware of this response from Chubb & Son
24 at the time?
25 A.  Yes, it was sent to me.

**1663**

1  Q.  Okay.  And -- well, what was your reaction and reading
2  of it?
3  A.  It's what I would call a non-starter.  That basically
4  means it cannot be accepted on its face value.
5  Q.  Why do you say that?  And give us the details for that.
6  A.  There's a number of reasons why, but let me start with
7  the most egregious one of them, which is this statement
8  here that the applications listed below, "That currently
9  utilize Blaze Advisor software, these are the same
10 applications using the software both prior to and after the
11 merger.  Under the above proposal, Chubb shall have the
12 right to change the applications utilizing Blaze software
13 at any time at its sole discretion without FICO's concept
14 so long as the named applications do not exceed 15," the
15 amount of 15.
16      We grant licenses.  Our clients don't grant
17 themselves licenses.  That's a core tenet of our license
18 agreement.  Besides that, fundamentally there's no
19 governance on that statement.  They could call anything,
20 you know, an application and say that's going here from
21 there to here, right.
22      There's no definition of it.  There's no common
23 understanding of it.  That alone completely threw the
24 proposal out of question.
25 Q.  Okay.  Did you draw a judgment whether it was a good

**1664**

1  faith or bad faith proposal?
2  A.  My impression was, this was a bad faith proposal.
3  Q.  For the reasons you said or for any additional ones?
4  A.  For the reasons I just said.
5  Q.  As a consequence of receiving this proposal, did you
6  have any -- was there any reason to doubt that Blaze
7  Advisor would be used in the new larger organization now
8  called Chubb Limited now, the 30 plus billion dollar
9  organization?
10 A.  No.  The letter itself is very clear.  They want the
11 right to use the 15 applications and change them however
12 they want, whenever they want.  So it's clear that they're
13 talking about the 15 to begin with, but they're talking
14 about open door policy for anything in the future.
15 Q.  In any single Blaze Advisor application, is it possible
16 to change the functionality within that application to
17 service more business?
18 A.  The intention of the license definition and grant is
19 no.
20 Q.  Under the proposal of February 25, 2016, what's your
21 interpretation?
22 A.  That's exactly what she's asking to do.
23 Q.  If you would go to Exhibit 227.  And we see this is a
24 Chubb Corporation annual report of 2005.
25 A.  Yes.

**1665**

1  Q.  And on page 22, if we go to that, we saw a similar list
2  earlier.  Here we have the list of the officers of the
3  division Chubb & Son, right?
4  A.  I'm sorry.  22 or 24?
5  Q.  Yeah, I'm on page 20 -- well, the Bates number, the
6  Exhibit Number is 0227-024.
7  A.  I'm there now.
8  Q.  Okay.  So there we have the, well the whole page is
9  bigger than on the screen, and there we have the officers
10 of Chubb & Son at that point in time.
11      And then I want to go to, I want to go to page 4
12 and just use this as a reference where we see net written
13 premiums grew 2 percent to 12.3 billion, on page 4.  It
14 would be the second full paragraph.
15 A.  Can I ask you to clarify page 4 of what?  It's the
16 Bates page 4?
17 Q.  Yeah.  So page 2 of the actual document, and at the
18 bottom it says P-0227-004.
19 A.  Thank you.  Yes, I see it now.
20 Q.  Okay.  So, so that's a reference point for the 2006
21 license agreement?
22 A.  Yes.
23 Q.  And then I think we've mentioned that that was the data
24 point used in pricing of the original license agreement in
25 2006, correct?

**1666**

1  A.  It was a data point used in several pricing exercises
2  in 2006, yes.
3  Q.  Right.  Right.  But as a data point.  And then let's go
4  to 958.
5        And the front page is the Chubb Limited annual
6  report for 2016.
7  A.  Yes.
8  Q.  And let's go to page 3 of the annual report, not -- or
9  5 on the exhibit number or 3 on the report.
10 A.  Page 3.
11 Q.  Yes.
12 A.  There.
13 Q.  All right.  And here it reports that, if we can go to
14 the left-hand column, "We completed to my fellow
15 shareholders," there we go.  Right at the top, "We
16 completed the largest merger in insurance company history
17 and integrated two complementary insurance organizations,
18 ACE Limited and the Chubb Corporation, transforming
19 ourselves into the highest quality and largest
20 publicly-traded property and casualty insurance company in
21 the world."
22       And if we go to -- trying to find the reference
23 to, the reference to the size of the new organization, and
24 honestly I'm not finding it fast enough.
25       So let me simply just ask, In terms of the

**1667**

1  value-based pricing of FICO and in terms of the business
2  purposes around that second sentence in paragraph 10.8,
3  what from your business point of view is the consequence of
4  Chubb & Son going from $12 billion -- going from being a
5  part of a $12 billion organization to being a part of a 30
6  plus billion dollar organization?
7  A.  That is a very significant change in circumstances.
8  Q.  And then if we go to Exhibit 95.  And this is building
9  off of or in the same time, the next day after that
10 commercial proposal of February 25th.
11       Mr. Carretta says, "The proposal was not
12 acceptable from our business and compliance teams, and I
13 confirm it is rejected."
14 A.  Yes, that's what it says.
15 Q.  And you authorized that?
16 A.  Yes.
17 Q.  And then if we go to Exhibit 103, this is
18 Mr. Carretta's notice of termination letter, which we've
19 gone through with him, the termination being effective the
20 next day.  And you --
21       Did you authorize the sending of the termination
22 letter as well?
23 A.  Yes, I agreed.
24 Q.  I would like to now change topics, and I want to talk
25 about the, I want to talk about the, what you know about

**1668**

1  the third-party consultant called DWS Group, and then after
2  that I want to ask you questions about what you know about
3  the third-party consultant called AppCentrica.  We will
4  take them one at a time.
5        So if you would go to Exhibit 147A, please.
6  A.  I am there.
7  Q.  All right.  And if we can put that on the screen.  I
8  see the cursor, but -- he's having a little glitch.  Hang
9  on a second.  There we go.
10       From the first page, you see this is Federal
11 Insurance Company's Second Supplemental Answer to
12 Interrogatories 2, 3 and 4.
13       And let's look at interrogatory 2 on the next
14 page.
15       MS. GODESKY:  Mr. Hinderaker.
16       MR. HINDERAKER:  Yes.
17       MS. GODESKY:  I just want to confirm you are
18 showing 147A because it says 147.
19       MR. HINDERAKER:  It's on the screen.
20       MS. GODESKY:  Okay.
21       MR. HINDERAKER:  No.  147A.  All the blackout.
22       MS. GODESKY:  Sorry.
23       MR. HINDERAKER:  We seem to be having a
24 transmission issue.
25       All right.

**1669**

1        So interrogatory number 2, if we can get that a
2  little bigger, please.
3  BY MR. HINDERAKER:
4  Q.  "Identify every person, division or entity, other than
5  employees of the division Chubb & Son, to whom Federal has
6  disclosed the FICO Blaze Advisor software after June 30,
7  2006."  And then there are those subparts.
8        Now let's go down the page to the second
9  supplemental answer.  It would be page 2 of the document.
10 I think you are on page 3.
11       Well, let me read it.  You have it in your
12 binder.
13 A.  I do.  I do.
14 Q.  The second supplemental answer, "Disclosure of the
15 Blaze Advisor software was made to at least the following:
16 One, Chubb Insurance Company of Europe SE.  Two, Chubb
17 Insurance Company of Canada, including through its
18 relationship with AppCentrica and Chubb Insurance Company
19 of Australia Limited including through its relationship
20 with DWS Group."  Do you see that?
21 A.  I do.
22 Q.  And I'm going to first go, before more questions, we'll
23 go to the interrogatory number 3, if we could get there.
24       Great.  Interrogatory number 3, and you see it
25 says, "Identify every person, division or entity, other