## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

   Plaintiff,

 v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

   Defendants.

No. 16-cv-1054 (DTS)

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF THEIR MOTION
FOR A NEW TRIAL ON ACTUAL
DAMAGES**

Pursuant to Federal Rule of Civil Procedure 59, Defendants Federal Insurance Company and ACE American Insurance Company submit this memorandum of law in support of their motion for a new trial on actual damages.

## INTRODUCTION

The jury's damages award in this case exceeds the legally permissible measure of damages by at least six or seven times and is against the overwhelming weight of the evidence. There is no legally sufficient basis for the award, and it must be set aside. The $40 million award is based on the jury's mistaken reliance on a supposed damages "model" that this Court previously rejected because it reflected FICO's wish list rather than the outcome of a legitimate hypothetical negotiation between a willing buyer and seller (as the law says it must). The jury was also influenced by FICO's improper appeal to punish the Defendants for copyright infringement, which is not legally permissible.

But whatever led the jury astray, the damages award cannot stand as a matter of law and the Court should order a new trial to determine FICO's actual damages.

There is no question about what the appropriate measure of FICO's damages is: the fair market value of a license that would cover Defendants' March 2016–April 2020 use of Blaze Advisor after FICO terminated the parties' License Agreement. The measure of fair market value is based on a hypothetical, arm's-length negotiation between a willing buyer and seller. All the evidence introduced at trial showed that willing parties in an arm's-length negotiation would value such a license at no more than a few million dollars: FICO previously sold Federal a *perpetual*, enterprise-wide Blaze license for ███████ and it sold or offered other, comparably large companies *perpetual*, enterprise-wide Blaze licenses for between █████████████ . FICO's own pricing guidelines value a *perpetual*, enterprise-wide Blaze license for a company Chubb's size at about ████████████████ offered to FICO customers are applied. Chubb's former client partner at FICO, Mike Sawyer, estimated that FICO would have charged the post-merger Chubb entity approximately ██████ in 2016 for a post-acquisition Blaze license. And the undisputed evidence shows that Defendants purchased a comparable piece of software, from a FICO competitor, covering the exact same type of use, and for the same period of time as the hypothetical Blaze license—*i.e.*, not a perpetual license but an approximately four-year license—for ███ ████ .

In fact, the ***highest*** Blaze license fee FICO introduced at trial was ███████ — and even that amount was calculated by larding up what was actually a ███████

license fee with additional maintenance fees paid by that customer up front. FICO nevertheless argued to the jury that the fair market value of a four-year license covering Defendants' post-termination Blaze use would cost $36.5 million. It arrived at this astonishing figure by purportedly applying its so-called "standard" pricing methodology to Chubb's post-termination use of Blaze. But FICO admitted at trial that it has never applied this "standard" pricing methodology in the manner it did here in an actual license fee negotiation. Indeed, FICO's damages figure was based on nothing more than speculation about the price it hoped to extract from Defendants via litigation. FICO did not introduce a single Blaze license agreement sold for a fee within an order of magnitude of its so-called "standard" price.

Ignoring the Court's instruction on the proper measure of damages, the jury awarded FICO $40 million, which is many times higher than any actual license fee that FICO ever received for Blaze. This award must be set aside because it is against the overwhelming weight of objective evidence establishing that the fair market value of a Blaze license covering Defendants' use is in the ███████████████ of dollars. The only evidence that the jury could possibly have relied on in reaching its verdict was FICO's artificially inflated damages "model," which has no connection to and does not reflect the fair market value of a Blaze license. As a matter of law, therefore, this model cannot serve as the basis for an actual damages award. And, in addition, the only testimony and demonstrative evidence offered to support this model should have been excluded: (i) Mr. Waid's prejudicial testimony about the price he wanted to "extract" for Blaze improperly introduced the substance of expert testimony explicitly excluded by the

3

Court and (ii) two charts quantifying Defendants' Blaze usage that FICO presented to the jury but were prepared specifically for settlement purposes and should have been excluded. Nothing in the record provides a legally sufficient basis for the jury's award and it should be set aside.

## BACKGROUND

Assuming for purposes of this motion that the jury correctly concluded that FICO properly terminated its license on March 31, 2016,[1] there is no dispute that FICO's actual damages are limited as a matter of law to the fair market value of a Blaze license for the infringing use—that is, the fair market value of a license to use Blaze in fifteen computer applications for the four-year period running from March 31, 2016, when FICO terminated the License Agreement, until April 2020, when Defendants fully removed Blaze from their systems, Trial Tr. 1051, Dkt. 1182.

Defendants offered substantial, unrebutted evidence demonstrating the fair market value of such a license. In 2006, FICO sold Federal and its affiliates ("Chubb") a perpetual, enterprise-wide license—that is, a license authorizing the use of Blaze in an unlimited number of applications for an indefinite period of time—for ███████. J-001.[2] FICO prices perpetual, enterprise-wide licenses based on its customer's revenue, see P-0418. FICO regularly sold perpetual, enterprise-wide licenses to large companies

---

[1] Defendants reserve their right to raise on appeal additional issues not raised in this motion. *See Est. of Blume v. Marian Health Ctr.*, 516 F.3d 705, 707 (8th Cir. 2008); *Duban v. Waverly Sales Co.*, 760 F.3d 832, 835 (8th Cir. 2014).

[2] Copies of all cited trial exhibits are attached to the annexed declaration of Leah Godesky ("Godesky Decl.") under their trial exhibit number.

with substantial revenue for amounts between ███████████████████████ ██████████ at most, for even its largest clients.  D-0004 ██████ license fee for company with about $9 billion in revenue); D-0283 (██████ license fee for company with about $14 billion in revenue); D-0284 ██████ contemplated license fee for company with more than $50 billion in revenue); D-0293 ██████ license fee for company with tens of billions of dollars in revenue); D-0276 ██████ license fee for national travel booking company); D-0343 (offering ██████ license fee to national financial services company); D-0012 (offering ██████ license fee to national bank). In 2016, Mike Sawyer, the FICO client partner responsible for the Chubb relationship, stated that FICO sought to charge the newly combined Chubb/ACE entity just north of █ ██████ to expand Chubb's already-existing Blaze license to also cover the ACE entity. P-0133; Trial Tr. 425, Dkt. 1179 (testimony of Russell Schreiber regarding this statement).  When Defendants decided to transition away from Blaze in 2016, Defendants paid $1.5 million for four years of use of an alternative software product interchangeable with Blaze sold by a FICO competitor.  Trial Tr. 1159, Dkt. 1182.  And, in recent years, market demand for Blaze—a key input into its fair market value—has been "decreasing[.]"  Trial Tr. 187, Dkt. 1178 (testimony of Sean Baseman).

FICO did not dispute the facts above, which demonstrate the range of license fees that it has actually negotiated in the real word.  Instead, FICO argued that it would have *liked* to charge Defendants many times more than it has ever sought or received for any Blaze license, including the ██████ that it wanted to charge the merged Chubb/ACE entity in 2016, which was ███ as much as what Chubb actually paid for a substitute

product during the relevant period ($1.5 million).  FICO's only support for its demand at trial comes from Mr. Waid, who testified that his asking price for a license to cover Defendants' four years of Blaze usage would have been $36.5 million.[3]  Mr. Waid arrived at this figure by assigning a fee to each of the Chubb computer applications that incorporated Blaze in some way, multiplying that fee by the number of years in which each application incorporated Blaze after FICO terminated the License Agreement, and then adding each application-level subtotal together.  See Trial Tr. 2711-12, Dkt. 1189; Trial Tr. 1736-38, Dkt. 1185.

FICO asserted that the value of this type of per-application license was the appropriate measure of its actual damages rather than the value of a perpetual, enterprise-wide license prevalent in the marketplace—even though this Court previously held that a pricing analysis "focus[ing] primarily on what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant [four]-year period" was a "subjective and unreliable" measure of FICO's actual damages.  Dkt. 731 at 31-32.  At any rate, Mr. Waid admitted that FICO (i) had never sold a per-application Blaze license spanning 15 computer applications, Trial Tr. 1825, Dkt. 1185, (ii) ordinarily sold *enterprise-wide* licenses to customers using Blaze on more than two or

---

[3] Initially, FICO presented this list price as $49.7 million based, in part, on putative damages arising from the use of Blaze by Federal's foreign affiliates.  Trial Tr. 1736, Dkt. 1185.  When the Court granted Defendants judgment as a matter of law on the foreign-affiliates claim, however, FICO subtracted $13.2 million from its damages request, resulting in the $36.5 million figure it presented in summation.

three applications, *id.* at 1826, and (iii) had no evidence of *any* Blaze license fee within an order of magnitude of $36.5 million, *id.* at 1824-26.

The jury nevertheless awarded FICO $40 million in actual damages. The jury awarded $4.3 million against Federal for breach of contract and copyright infringement, apparently concluding that the fair market value of a license to use Blaze for nine months (the length of time between FICO's termination and the date on which ACE American took over Federal's operations, Trial Tr. 633, Dkt. 1180) was ███████████████ ██████, perpetual or otherwise, introduced at trial. The jury also awarded $35.7 million against ACE American for copyright infringement. In other words, while ACE American used the software for about five times as long as Federal did after FICO's termination, the jury found that the fair market value of a license for ACE American's infringing use was more than eight times that of Federal's use.[4]

This windfall award, which exceeded even FICO's fanciful request, is against the overwhelming weight of the evidence admitted at trial regarding the fair market value of a license covering Defendants' post-termination use of Blaze.

---

[4] The jury concluded that Federal did not breach Section 3.1 of the License Agreement, but that it did breach Section 10.8. The jury also concluded that Federal breached Section 9.3 because the breach of Section 10.8 justified FICO's termination of the License Agreement. It thus found both Federal and ACE American liable for copyright infringement. However, the jury advised the Court that FICO had not proved a nexus between that infringement and Defendants' revenue, taking a profits disgorgement award off the table.

## LEGAL STANDARD

Under Rule 59, a "court may, on motion, grant a new trial on all or some of the issues . . . for any reason for which a new trial has heretofore been granted in an action at law in federal court[.]" Fed. R. Civ. P. 59(a)(1)(A). "A new trial is warranted when the outcome is against the great weight of the evidence so as to constitute a miscarriage of justice." *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 784 (8th Cir. 2021) (quoting *Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851 (8th Cir. 2014)). In determining whether a verdict is against the weight of the evidence, a trial court "can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even when there is substantial evidence to sustain the verdict.'" *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016) (quoting *White v. Pence*, 961 F.2d 776, 780 (8th Cir. 1992)).

Applying Rule 59, a court may set aside an excessive damages award that is "unreasonable on the facts[,]" *Ross v. Kan. City Power & Light Co.*, 293 F.3d 1041, 1049 (8th Cir. 2002) (emphasis omitted), or that resulted from the jury "misappl[ying]" the law, *Nassar v. Jackson*, 779 F.3d 547, 552 (8th Cir. 2015); *see also Miller v. Huron Reg'l Med. Ctr.*, 936 F.3d 841, 846 (8th Cir. 2019) ("If a trial court determines that a jury award is excessive, it may order a new trial or condition a denial of a motion for a new trial on the plaintiff's acceptance of a remittitur."); 11 Wright & Miller, Federal Practice & Procedure § 2807 (3d ed. Apr. 2022 update) ("[A court] may grant a new trial if the size of the verdict is against the weight of the evidence.").

A district court may also order a new trial to correct an erroneous evidentiary ruling sufficiently prejudicial to "affect a substantial right of [a] party[.]" *Pointer v. DART*, 417 F.3d 819, 822 (8th Cir. 2005) (quoting Fed. R. Evid. 103(a)).

## ARGUMENT

## I.   FICO'S ACTUAL DAMAGES ARE THE FAIR MARKET VALUE OF A BLAZE LICENSE COVERING THE INFRINGING USE.

As this Court has repeatedly recognized, *e.g.*, Dkt. 731 at 9, 16, 30-32, 54, and as it instructed the jury, Dkt. 1167 at 22; Trial Tr. 2730, Dkt. 1189, the measure of FICO's actual damages—for both its breach-of-contract and copyright-infringement claims, Dkt. 1167 at 22—is "the fair market value of a license covering the defendant's use" of the copyrighted work, *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001). "To calculate the fair market value, a court deciding a copyright case . . . may hypothesize a negotiation between the parties before the infringement occurred and determine the reasonable license fee on which a willing buyer and a willing seller would have agreed for the use taken by the infringer." *Gaylord v. United States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015); *accord On Davis*, 246 F.3d at 167.

Because the hypothetical negotiation is just a tool to determine a work's "fair market value[,]" only "objective considerations" are relevant to the analysis. *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007). "'The question,' therefore, 'is not what the owner would have charged, but rather what is the fair market value.'" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (quoting *Jarvis*, 486 F.3d at 534). Thus, the trier of fact does not "accept particular practices of the parties on either side[,]"

9

*Gaylord*, 777 F.3d at 1368, or "ask what the owner would like to have charged if unconstrained by reality," *Oracle Corp.*, 265 F.3d at 1088.  Instead, a court looks to the price a "reasonable business person . . . would pay to license" the work, rejecting "unrealistic[]" valuations submitted by the parties.  *Jarvis*, 486 F.3d at 534-35; *accord On Davis*, 246 F.3d at 166 (awarding only the fair market value of the infringing use ensures "the defendant is . . . protected against an unrealistically exaggerated claim"); *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) ("Bell's subjective belief as to the fair market value of his photo is not enough to prove damages.").

"The hypothetical-negotiation determination must be tied to the particular work at issue and its marketplace value[.]"  *Gaylord*, 777 F.3d at 1368.  Consequently, "past arms-length licensing practices by the copyright owner or the infringer for similar uses and 'benchmark' licenses by others in the industry may be useful" because of "what [they] say[] about the work-specific value."  *Id.*; *see also Oracle Corp.*, 765 F.3d at 1093; *Jarvis*, 486 F.3d at 534 (approving district court's examination of "financial perspectives of both the willing buyer (in the form of evidence about what K2 typically pays for images and what it specifically paid Jarvis in its prior dealings with him) and the willing seller (in the form of Jarvis' earlier deals with K2 and his revenue from image databanks) at the hypothetical time of sale"); *On Davis*, 246 F.3d at 167 (when there are "established rates that are regularly paid by licensees[,]" "establishing the fair market value of the license fee of which the owner was deprived is no more speculative than determining the damages in the case of a stolen cargo of lumber or potatoes"); *Dash v. Mayweather*, 731 F.3d 303, 318 (4th Cir. 2013) (fair market value informed by "[e]vidence of the owner's

10

prior sale or licensing of a copyrighted work"); *Rogers v. Koons*, 960 F.2d 301, 310 (2d Cir. 1992) (infringing "exploitation must at least entail 'paying the customary price'" (quoting *Harper & Row Pubs., Inc. v. Nation Enters.*, 471 U.S. 539, 562 (1985))).

The fact that a defendant has been accused of—or found liable for—copyright infringement is irrelevant to a plaintiff's actual damages given the hypothetical negotiation's focus "on fair market value at the time of the infringement." *Jarvis*, 486 F.3d at 535. "Making [a] plaintiff whole"—the purpose of an actual damages award—"is plainly different from punishing the infringer by charging the highest possible rate for the infringement." *Id.* Factoring infringement into the hypothetical negotiation "can risk abuse" because "[o]nce the defendant has infringed, the owner may claim unreasonable amounts as the license fee[.]" *On Davis*, 246 F.3d at 166.

## II. THE JURY'S $40 MILLION ACTUAL DAMAGES AWARD IS AGAINST THE GREAT WEIGHT OF THE EVIDENCE OF BLAZE'S FAIR MARKET VALUE.

### A. The actual damages award is excessive in light of the evidence introduced at trial.

The jury heard ample evidence of the "objective considerations" informing the fair market value of a Blaze license covering Defendants' post-March 31, 2016, use. *Jarvis*, 486 F.3d at 534. That evidence *uniformly* established that the "range of the license's reasonable market value" is ███████ dollars, at most—*far* short of $40 million. *Oracle Corp.*, 765 F.3d at 1088 (alteration omitted) (quoting *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004)). This evidence falls into four categories that are highly probative of the fair market value of a license to use a copyrighted work:

(i) the parties' past dealings, (ii) the price willing buyers in the open market have paid for Blaze licenses, (iii) the sale price of a license for a comparable product, and (iv) the current market for Blaze.

**1. The parties' past dealings.** "[P]ast arms-length licensing practices by the copyright owner or the infringer for similar uses" are probative of the value of "the particular work at issue and its marketplace value." *Gaylord*, 777 F.3d at 1368; *accord Jarvis*, 486 F.3d at 534 (approving district court's examination of prior license agreements between plaintiff and defendant). Here, FICO and Chubb previously negotiated a license that would, if purchased in 2016, have covered Defendants' post-termination use of Blaze: an enterprise-wide, perpetual license with no limitation on the number of computer applications into which Blaze could be integrated or the number of people who could use it. *See* J-001. That license cost ███████. *Id.*; Trial Tr. 1789, Dkt. 1185. Even assuming that a comparable license covering the larger, post-merger Chubb entity would cost more than ███████, the 2006 License Agreement—at the very least—sets the order of magnitude for the price of a Blaze license covering Defendants' post-termination use. At most, the post-merger entity was approximately three times as large as the pre-acquisition entity, *see* Trial Tr. 86, Dkt. 1178—nothing that justifies an award that is *over 30 times* the cost of the original license.

To that end, Mr. Sawyer stated that in 2016, FICO intended to charge the post-ACE acquisition Chubb entity approximately ███████ for a Blaze License. P-0133. If FICO intended to offer a price of just above ███████ for Blaze license in 2016, then the actual fair market value of that license that same year could be *lower* than that amount

(after all, ▇▇▇▇▇ was merely FICO's starting point), but it is difficult to understand how it could be higher. And, of course, the fair market value of Blaze in 2016 could not possibly be an order of magnitude greater than what FICO would have sought to charge.

**2. The prices comparable Blaze licenses have fetched on the open market.**

The leading cases are unanimous that the copyright owner's past sales are highly probative of the fair market value of its work. *Gaylord*, 777 F.3d at 1368; *Jarvis*, 486 F.3d at 534; *On Davis*, 246 F.3d at 167 ("established rates that are regularly paid by licensees" simplify task of "establishing the fair market value of the license fee of which the owner was deprived"); *Mayweather*, 731 F.3d at 318 (looking to "[e]vidence of the owner's prior sale or licensing of [a] copyrighted work"). That makes good sense: because the hypothetical negotiation seeks to recreate the outcome of an arm's-length negotiation on the open market, *Gaylord*, 777 F.3d at 1367-68, the price on which *actual* willing buyers and sellers have agreed is an excellent proxy for "the reasonable license fee on which a willing buyer and a willing seller would have agreed." *On Davis*, 246 F.3d at 167. It reflects "the customary price." *Koons*, 960 F.2d at 310 (quoting *Harper & Row*, 471 U.S. at 562).

The evidence at trial was overwhelming—and undisputed—that FICO regularly sells Blaze licenses that would cover Defendants' post-termination use for fees ranging between ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇, a bank whose revenue at the time it purchased a Blaze license was "around" $9 billion, purchased a perpetual, enterprise-wide license for ▇▇▇▇. Trial Tr. 1812-13, Dkt. 1185; D-0004. ▇▇▇▇, whose revenue was more than $50 billion at the time of

13

its license agreement, purchased a perpetual license for its pharmacy line of business with an option to buy an enterprise-wide license for ███████. Trial Tr. 1813-15; D-0284. ████ bought a perpetual, enterprise-wide license for █████████████ dollars on a revenue of about $14 billion. Trial Tr. 1815-16; D-0283. ████, with tens of billions of dollars in revenue, purchased a perpetual, enterprise-wide license for █████████ dollars. Trial Tr. 1816-17; D-0293. █████ purchased a perpetual, enterprise-wide deployment and development license for approximately █████. Trial Tr. 1818; D-0276. FICO offered ████████ an enterprise-wide license for its North America region for ███ ███. Trial Tr. 1818-19; D-0343. Likewise, FICO proposed to sell ████████ an enterprise-wide Blaze license for ████████. Trial Tr. 1820-21; D-0012.

FICO, of course, has access to every single license agreement it has ever sold for Blaze. If *any* willing buyer had ever paid any more than ████████ dollars to use Blaze, FICO surely would have shown the jury the agreement reflecting that price. Yet the best FICO could do was an agreement under which ████ paid ███████████ ████ with maintenance fees included—to use Blaze in one application over a five-year period. Trial Tr. 1829, Dkt. 1185; D-0172. Indeed, Mr. Waid, despite his access to *every* Blaze license agreement, Trial Tr. 1822, Dkt. 1185, could not testify that any customer had paid anywhere approaching $40 million dollars to use Blaze—or even half that amount, $20 million. *Id.* at 1824.

These agreements reflect that FICO, after engaging willing buyers in arm's-length negotiations, has regularly sold perpetual, enterprise-wide Blaze licenses to companies with billions of dollars in revenue—*i.e.*, licenses that would cover Defendants' post-

14

merger use of Blaze—for between ███████████████ dollars and, at most,

████. Likewise, FICO's pitches to giant companies like ███████ demonstrate

that the value of a perpetual Blaze license to a massive corporation is in the ███████

██████ of dollars. These trends are probative of the range of Blaze's reasonable market

value that a hypothetical negotiation would produce. Certainly, it makes clear that $40

million is a wildly inaccurate assessment of the fair market value of a license for

Defendants' four-year-long use of Blaze.

**3. The market price of a comparable product.** "[A]lternatives available to a

potential licensee provide an important constraint in a hypothetical negotiation[,]"

because "'[t]he buyer will not ordinarily pay more for a license than its anticipated

benefit,' a benefit measured relative to available alternatives." *Gaylord*, 777 F.3d at 1370

(quoting *Oracle*, 765 F.3d at 1089); *see also Jarvis*, 486 F.3d at 534 (looking to what a

licensee "typically pays for images"); Dkt. 731 at 9-10 ("The existence of market

alternatives to Blaze Advisor could impact such a hypothetical negotiation.").

The undisputed testimony of Chubb's Chief Enterprise Architect Claudio

Ghislanzoni established that Defendants paid $1.5 million for four years of use of Drools,

Trial Tr. 1159, Dkt. 1182, a business-rules-management software that, as FICO's own

witness acknowledged, Trial Tr. 606, Dkt. 1180 (Christopher Ivey), is interchangeable

with Blaze, *see also id.* at 706-07 (Ramesh Pandey); Trial Tr. 1156-57, 1158-59, Dkt.

1182 (Claudio Ghislanzoni). This "past arms-length licensing practice[]" for a "similar

use[]" provides yet another point of reference for the fair market value of Defendants'

post-termination use of Blaze—and yet another figure in the low millions of dollars.

*Gaylord*, 777 F.3d at 1368-69.  It defies all common sense that a willing buyer could purchase Drools for $1.5 million on the open market to cover the exact same use for the same period of time, but would choose to purchase Blaze for $40 million instead.

   **4.  The current market for Blaze.**  Undisputed testimony showed that market demand for Blaze—a key input into the fair market value of a license to use the software, *see United States v. Roy*, 748 F. App'x 712, 715 (8th Cir. 2018) ("Fair market value is . . . the point at which supply and demand intersect." (quoting *Value*, Black's Law Dictionary (10th ed. 2014))—has dried up in recent years.  FICO employee Sean Baseman testified that demand for Blaze, "an on-premises program," has been overtaken by demand for "cloud-based technologies."  Trial Tr. 187, Dkt. 1178.  Indeed, because "most" FICO customers now embrace more modern software, Blaze is "better suited for small companies and companies in places like Turkey and Latin America that are not yet incorporating the cloud[.]"  *Id.*  Blaze's increasing obsolescence—and the consequent "decreas[e]" in market demand for the software—would put downward pressure on the fair market value of a Blaze license in a hypothetical negotiation.  *Id.*  If FICO customers would not pay $40 million for Blaze at the height of its power in the market, it makes no sense that they would do so after the market has moved on.

*     *     *

   In sum, the "objective considerations" that provide the legal basis for setting the fair market value establish the following ranges for a Blaze license:

- The parties past dealings:  ████████████
- Comparable Blaze licenses:  ████████████

16

- A comparable product sold by a FICO competitor: $1.5 million.

- The current market for Blaze:  Less than prior license fees.

The jury's windfall award of $40 million in actual damages is, consequently, against the

overwhelming weight of the evidence and must be set aside.

**B.      The jury relied on a damages model "unconstrained by reality."**

**1.      As this Court has held, FICO's litigation price is not what willing parties would agree to in a hypothetical negotiation.**

As described above, the only reference in the trial record to an amount that is close

to the jury's award is the testimony of Mr. Waid that he would have liked to charge

Chubb $36.5 million for a Blaze license.  That testimony, however, is not legally

sufficient to justify the jury's damages award.

According to Mr. Waid, FICO valued Defendants' post-termination use of Blaze

by applying an annualized, application-based pricing analysis—instead of the pricing

guidelines for enterprise-wide, perpetual licenses.  *Id.* at 2710-12; Trial Tr. 1736, Dkt.

1185.  That is, FICO calculated an annual fee for each of Defendants' applications into

which Blaze had been integrated, then multiplied that fee by the number of years it

claimed Defendants used Blaze in each application, and finally added the application-

level subtotals together to arrive at the price it advanced at trial as a measure of its

damages.   Trial Tr. 2712, Dkt. 1189.  Using this contrived-for-litigation model, Mr.

Waid claimed that the value of Defendants' four years of post-termination Blaze usage

was $36.5 million when the evidence showed that the market value of perpetual Blaze

Licenses sold to comparably large companies was between approximately ███████

███████. In short, the $36.5 million claim has no connection to the fair market value of a comparable Blaze license.

As this Court has repeatedly held, and as the case law makes clear, the license fee FICO would charge if "unconstrained by reality" is not the measure of its actual damages. *Oracle Corp.*, 265 F.3d at 1088. That is, triers of fact must reject damages calculations arising from the parties' "particular practices[,]" *Gaylord*, 777 F.3d at 1368, reflecting what the copyright owner "would like to have charged[,]" *Oracle Corp.*, 265 F.3d at 1088, or that are otherwise "unrealistically exaggerated[,]" *On Davis*, 246 F.3d at 166. Instead, they must identify the price a "reasonable business person . . . would pay to license" the work. *Jarvis*, 486 F.3d at 535. That is exactly what we have here: the $36.5 million figure is nothing more than what FICO would have liked to charge.

This Court has already held that FICO's application-based pricing methodology contravenes these principles and so "does not accurately reflect the legal standard for calculating actual damages in this case[.]" Dkt. 731 at 31. Instead, the application-based pricing methodology "focus[es] primarily on what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant [four]-year period, with no prospect of any future business dealing between the parties." *Id.* It thus represents, at best, "what FICO subjectively would have charged[,]" not what "a willing buyer and a willing seller would have contemplated." *Id.* As is clear from its stark divergence from the fair market value indicated by "objective considerations[,]" *Jarvis*, 486 F.3d at 534, the application-based pricing methodology "leads to a subjective and unreliable result that is inconsistent with the applicable legal standard[,]" Dkt. 731 at 32.

18

Because FICO's application-based pricing methodology does not measure its actual damages, *id.*, a damages award based on that methodology—as the jury's apparently was—is "unreasonable on the facts[,]" *Ross*, 293 F.3d 1041, 1049 (8th Cir. 2002), and a "misappl[ication]" of the law, *Nassar*, 779 F.3d at 552.

That remains the case even assuming that FICO's inflated price was meant to be its opening position in a hypothetical negotiation rather than a definitive statement of its actual damages. An initial position at the *start* of a negotiation is, by definition, not the *end result* of a negotiation, which is what the hypothetical negotiation framework seeks to determine. *See Gaylord*, 777 F.3d at 1367. This is especially so when both negotiators are hypothesized to be "reasonable[,]" *Jarvis*, 486 F.3d at 535, and "unrealistically exaggerated claim[s]" are required to be rejected, *On Davis*, 246 F.3d at 166. And indeed, even the suggestion that $36.5 million would have been FICO's opening bid is belied by the actual record—again, Mr. Sawyer observed in an internal email sent as the parties exchanged business proposals for the continued use of Blaze in early 2016, that Defendants "probably don't have a sense that we are going to be asking for ███" P-0133. In *real* negotiations, a $36.5 million fee for a per-application license was not only off the table, but far beyond the realm of the possible.

A hypothetical buyer would instead insist on purchasing a perpetual, enterprise-wide license, knowing that such a license was common on the market, *see supra* at 11-14, would cover Defendants' post-termination usage of Blaze, and, as "objective considerations" show, *Jarvis*, 486 F.3d at 534, would come at a tiny fraction of the price. The Ninth Circuit outlined a very similar dynamic in *Jarvis*. There, the question was the

19

value of a license to use certain photographs. The court of appeals approved the district court's rejection of expert testimony presented by the copyright owner that "unrealistically used a monthly licensing fee as the basis for his valuations." *Id.* (internal quotation marks omitted). The court observed that "the annual price is only about twice as high" as the monthly price, meaning "any reasonable business person . . . would pay to license the image[s] on a yearly basis rather than a monthly basis." *Id.* at 535 (internal quotation marks omitted). Indeed, the court went on to observe that the copyright owner's only contrary argument to this clear business logic was that "charging . . . the higher price" would "deter[] infringers[.]" *Id.* But as the Ninth Circuit appropriately recognized, "[m]aking the plaintiff whole is plainly different from punishing the infringer by charging the highest possible rate for the infringement." *Id.*; *accord On Davis*, 246 F.3d at 166.[5]

Here, there is ample record evidence to support that FICO—in hypothetical form, at least—would sell Defendants the requested enterprise-wide, perpetual license. As Mr. Waid testified, FICO's longstanding practice is to offer enterprise-wide licenses to customers like Defendants planning to use Blaze in more than two or three applications.

---

[5] FICO argues that the ▮▮ license, under which ▮▮ paid FICO ▮▮▮▮—including extra fees—to license Blaze on one application for five years suggests that its per-application pricing analysis has been accepted in the market. *See* Trial Tr. 2715-16, Dkt. 1189. But the fact that one company purchased a single-application license for a ▮▮▮▮ dollars does nothing to undermine the conclusion that a customer seeking to license Blaze for more than a dozen applications would purchase a far cheaper perpetual, enterprise-wide license. Especially so since, as Mr. Waid testified, FICO generally sold such licenses to customers who, unlike ▮▮, planned to use Blaze in more than two or three applications. Trial Tr. 1776, 1826, Dkt. 1185.

Trial Tr. 1776, 1826, Dkt. 1185.  Indeed, Mr. Waid made clear that FICO has *never* sold a per-application Blaze license to a customer using Blaze on 15 or more applications, as Defendants had been doing.  *Id.* at 1825.

FICO now claims that in recent years it has moved away from selling enterprise-wide licenses.  *Id.* at 1777.  Its only evidence for this is the self-serving say-so of Mr. Waid.  In any event, this is irrelevant.  That change in a "particular practice" of FICO's, *Gaylord*, 777 F.3d at 1368, does nothing to increase the fair market value of a license to use Blaze; it merely shows a change in what FICO would "like to" charge for such a license, *Oracle Corp.*, 765 F.3d at 1088.  Such "subjective" idiosyncrasies are not part of the hypothetical negotiation, Dkt. 731 at 32, especially when they are transparently used to justify an "unrealistically exaggerated claim" for actual damages, *On Davis*, 246 F.3d at 166.  At any rate, Mr. Waid admitted on cross-examination that at the time of the hypothetical negotiation—2016—FICO was still selling perpetual, enterprise-wide licenses for Blaze.  Trial Tr. 1777-78, Dkt. 1185.  And we know from Mr. Sawyer's undisputed statement that the price FICO would have liked to charge the combined Chubb entity in 2016 was just north of ████ .

Likewise, Mr. Waid testified that FICO takes into account the prospect of future business with a customer and the length of that prospective business relationship in determining the price for a Blaze license.  *See id.* at 1745.  And FICO's counsel argued that these considerations would put upward pressure on a hypothetical negotiation between FICO and Defendants.  Trial Tr. 2712-14; Dkt. 1189.  But even assuming that these considerations are relevant to the hypothetical negotiation, and not merely

irrelevant "particular practices" of one party, *Gaylord*, 777 F.3d at 1368, FICO offered no evidence as to how those considerations suffice to increase the fair market value of a Blaze license to $36.5 million—or anywhere in that ballpark, *see supra* at 11-14.[6]

More importantly, Mr. Waid's subjective view that he would like to charge more for a four-year license than a perpetual license could only be relevant to the product's value *in the market* if there were not market alternatives available to a buyer like Chubb. But, of course, it is undisputed that such alternatives exist. So if FICO hypothetically took the position that it would not sell Defendants an enterprise-wide license at the "customary price[,]" *Koons*, 960 F.2d at 310 (internal quotation marks omitted), then Defendants, being unwilling to "pay more for a license than its anticipated benefit, a benefit measured relative to available alternatives[,]" *Gaylord*, 777 F.3d at 1370 (internal quotation marks and citation omitted), would simply purchase a license to use one of the many business-rules-management software products interchangeable with Blaze, *see* Trial Tr. 706-07, Dkt. 1180; *id.* at 606; Trial Tr. 1156-57, 1158-59, Dkt. 1182. And the undisputed evidence shows that such licenses can cover four years of enterprise-wide use at a cost in the ███████ of dollars. *Id.* at 1159. The availability of such alternatives is "an important constraint" on the hypothetical negotiation, *Gaylord*, 777 F.3d at 1370, because it shows that no reasonable would pay anywhere close to $36.5 million to purchase Blaze for four years when it could purchase an equivalent product for $1.5

---

[6] As explained below, these considerations improperly suggested to the jury that Defendants, as accused copyright infringers, should pay more than fair market value for a license to use Blaze. *See infra* at 23-26.

million.

Even FICO's own pricing guidelines—on which FICO relied to generate its inflated litigation price—cannot support the $36.5 million fee. *See* P-0418. According to FICO's Global Price List, which has remained unchanged since 2003, Trial Tr. 1776, Dkt. 1185, the price of an enterprise-wide license for a company with the revenue of post-ACE acquisition Chubb—about $30 billion, Trial Tr. 86, Dkt. 1178—is approximately ███████. P-0418-021; *see also* Trial Tr. 1783-86, Dkt. 1185 (Mr. Waid walking through application of enterprise-wide license pricing guidelines). Applying the Price List's *standard* ████████████ for a license of that size produces a license fee of approximately ███████. P-0418-004.[7] Such a fee is directionally consistent with—albeit generous in FICO's favor—the license fees for which FICO has sold perpetual, enterprise-wide licenses to comparably large companies, D-0004; D-0284; D-0283; D-0293; D-0276; D-0343; D-0012, and with the fee Defendants paid to use an interchangeable market alternative product for four years, Trial Tr. 1156-57, 1158-59, Dkt. 1182. *See generally supra* at 11-15.

### 2.     The verdict is tainted by FICO's improper appeal to punish Defendants for copyright infringement.

The order-of-magnitude divergence between the objective indicia of Blaze's fair

---

[7] Mr. Waid testified that FICO no longer offers the ████████████ provided for in the Price List, *see* Trial Tr. 1785-86, Dkt. 1185, but at his 2019 deposition—three years after the time at which the hypothetical negotiation would have taken place—he testified that it was ████████████ on an enterprise-wide Blaze license agreement of the size Defendants would have purchased, *id.* at 1787. Even putting aside the ██████, however, the fee for a ██████ license still pales in comparison to the $40 million that the jury awarded.

market value and the jury's ultimate $40 million award suggests that the jury was influenced by FICO's improper suggestion that the award should reflect punishment for wrongful behavior, rather than the fair market value of a Blaze license.  But allegations that a licensee has infringed a licensor's copyright does not factor into the hypothetical negotiation.  The hypothetical seller may not attempt to "deter[] infringers by charging them [a] higher price" for a license because "[m]aking a plaintiff whole is plainly different from punishing the infringer by charging the highest possible rate for the infringement."  *Jarvis*, 486 F.3d at 535.  A claim of infringement is likewise excluded from the hypothetical negotiation because "[o]nce the defendant has infringed, the copyright owner may claim unreasonable amounts as the license fee[.]"  *On Davis*, 246 F.3d at 166.  Nevertheless, in contravention of these principles, FICO was quite open at trial both that (i) its inflated fee demand was, in fact, meant as retribution for Defendants' infringement and (ii) the jury should consider Defendants' infringement in the hypothetical negotiation.

In closing, FICO's counsel argued that FICO's "big number" on actual damages was justified because "that's a lot of applications that [Defendants are] using without permission[.]"  Trial Tr. 2712, Dkt. 1189.  This comment was plainly calculated to inflame the jury, priming it to award FICO a windfall to punish Defendants' alleged misbehavior.  The Court immediately saw counsel's inappropriate suggestion for what it was, issuing a curative instruction that "[t]he fact that one party is alleging that the use was infringing or improper is not to be considered in determining the outcome of that hypothetical negotiation."  *Id.* at 2730.  The jury's award indicates that the Court's

instruction did not un-ring the bell.  A damages figure calculated as punishment for infringement cannot sustain a damages award.

Additionally, throughout the trial, FICO attempted to introduce the spurious concept of a "transitional" or "bridge" license, through which it sought inappropriately to smuggle Defendant's copyright-infringement exposure into the hypothetical negotiation analysis.  FICO emphasized that the jury should focus on "the fair value to be compensated when the license agreement has been terminated but the former client *needs* a transition license to move away from using Blaze."  Trial Tr. 44-45, Dkt. 1178 (emphasis added).  Through this framing, FICO attempted to inject two improper concepts into the hypothetical negotiation.  First, that the prior agreement between the parties had been "terminated"—a reference to FICO's prior actual-damages theory, proposed by Neil Zoltowski and roundly rejected by the Court, Dkt. 731 at 30-32, that FICO's damages are what it would charge an "adversarial" party with which it had no "long-term relationship," Godesky Decl. Ex 1, at 182-83 (Zoltowski Dep.), for its "unauthorized exploitation of Blaze Advisor," Godesky Decl. Ex. 2 ¶ 65 (Zoltowski Reply Rep.).  Teeing up a hypothetical negotiation in which one party has "terminated" the other party's license does not present the question of the license's fair market value; it invites the jury to factor the buyer's alleged misconduct into the analysis. *See On Davis*, 246 F.3d at 166.  Second, asking the jury to hypothesize a buyer who "***needs*** a transition license to move away from using Blaze Advisor[,]" Trial Tr. 45, Dkt. 1178 (emphasis added), begs the question, and likewise invites jurors to imagine a buyer who must accede to the seller's demands on pain of a copyright infringement lawsuit.  Indeed, in

holding that FICO's application-based pricing methodology was not the measure of its actual damages, the Court concluded that "focus[ing] primarily on what FICO would have charged Defendants had FICO known that Defendants were bound to the license for the relevant [four]-year period, with no prospect of any future business dealings between the parties afterwards"—as the transition license concept does—"leads to a subjective and unreliable result that is inconsistent with the applicable legal standard." Dkt. 731 at 31-32.

None of this reflects how the hypothetical negotiation analysis works. The framework posits "willing," *On Davis*, 246 F.3d at 167, and "reasonable" parties, *Jarvis*, 486 F.3d at 535, not adversaries. That is because the hypothetical negotiation attempts to determine a work's fair market value by recreating generalized market conditions. *See Gaylord*, 777 F.3d at 1368. It is not a tool with which one party, by using the threat of litigation to put upward pressure on the negotiated price, may "extract" an extortionate license fee from an adversary. Trial Tr. 1743, Dkt. 1185; *see On Davis*, 246 F.3d at 166 (determining "that the thing taken had a fair market value" ensures that the defendant is "protected against an unrealistically exaggerated claim"). What it does reflect is the fact that the cumulative effect of FICO's evidence and its arguments at trial was to lead the jury down the impermissible path of using actual damages as a means of punishing Defendants.

### C. The actual damages award against ACE American is excessive in light of the actual damages award against Federal.

The jury's award against ACE American is also excessive relative to its award

against Federal.  The jury found that Federal's actual damages were $4.3 million—these damages represent the period between March 31, 2016, when FICO terminated the License Agreement, and January 2017, when ACE American took over following the merger.  However, the jury also found that ACE American's usage of Blaze, which took place between January 2017 and April 2020 and was—as shown by the evidence—declining during that period, *see* Trial Tr. 1050-51, Dkt. 1182, caused FICO actual damages of $35.7 million.  There is no principled basis upon which the jury could conclude that the fair market value of "the use taken by" ACE American, *Gaylord*, 777 F.3d at 1367, was nearly nine times higher than the infringing use made by Federal when ACE American only used Blaze for approximately five times as long as Federal did after March 31, 2016, and its usage during that period was consistently declining.

## III.   THE JURY'S VERDICT WAS INFLUENCED BY ITS CONSIDERATION OF INADMISSIBLE EVIDENCE.

The jury's reliance on the admission of tainted evidence that should have been excluded justifies a new trial if the "evidentiary error affected [a party's] substantial rights . . . such that a new trial 'would be likely to produce a different result.'"  *Pointer*, 417 F.3d at 822 (quoting *O'Dell v. Hercules, Inc.*, 904 F.2d 1194, 1200 (8th Cir. 1990).

### A.   The admission of Waid's testimony justifies a new trial.

As discussed, Mr. Waid testified that the list price of a license for Defendants' post-termination use of Blaze, as determined by his application-based pricing methodology, was $36.5 million.  This testimony was irrelevant, unduly prejudicial, and its admission was inconsistent with the Court's *Daubert* order excluding the same

27

testimony when FICO proposed to present it through its damages expert, Mr. Zoltowski.

As Defendants argued before and during trial, Mr. Waid's testimony, which, at best, embodies "what the owner would like to have charged if unconstrained by reality," *Oracle Corp.*, 765 F.3d at 1088, is irrelevant to the measure of FICO's actual damages, which "is not what the owner would have charged, but rather what is the fair market value[,]" *On Davis*, 246 F.3d at 166; *see* Dkt. 969 at 7-8 (motion *in limine* to exclude Waid's testimony); Dkt. 1094 at 3 (letter brief objecting to Waid's testimony).  As explained above, *see supra* at 16-23—and as this Court has already concluded, Dkt. 731 at 30-32—Mr. Waid's testimony reflects only a "subjective[,]" *id.* at 32, and "unrealistically exaggerated claim" of the value of a Blaze license, *On Davis*, 246 F.3d at 166.  Consequently, it has no place in an analysis that turns *only* on "objective considerations of market value." *Jarvis*, 486 F.3d at 534.  The price FICO wishes it could charge has no bearing on—and so has no tendency to prove—Blaze's fair market value.  *See* Fed. R. Evid. 401, 402.

The Court allowed Mr. Waid's testimony by admonishing FICO that Mr. Waid could not tell the jury that his application-based price constituted FICO's actual damages, but instead, could only explain to the jury how he came up with this number and that it was the number on which he would base any negotiation.  Dkt. 1065 at 5-6.  This limitation did not keep Mr. Waid's testimony within the bounds of the law.  The construct of a negotiation between willing buyer and willing seller is simply a generic way of describing fair market value of the allegedly infringed work.  *See supra* at 8-11.  What Mr. Waid's supposed opening negotiation position would be in such a negotiation

28

is just another way of articulating the subjective price FICO would like to charge and is simply irrelevant.

Additionally, Mr. Waid's testimony was, at the very least, substantially more unfairly prejudicial than probative, "confusing the issues" and "misleading the jury[.]" Fed. R. Evid. 403.  Whatever limited probative value Mr. Waid's analysis may have had in describing FICO's outrageous and unsupported opening offer in a hypothetical negotiation was outweighed by the unfairly prejudicial anchoring effect a $36.5 million figure had on the jury.  As the sheer size of the verdict makes clear, Mr. Waid's testimony steered the jury away from the proper question—the objective fair market value of a particular Blaze license on which willing buyer and seller would agree, *On Davis*, 246 F.3d at 167—and toward consideration of what FICO "would like to have charged[,]" *Oracle Corp.*, 265 F.3d at 1088.  The testimony, by distracting the jury from the hypothetical negotiation's exclusive reliance on "objective considerations[,]" *Jarvis*, 486 F.3d at 534, "confus[ed] the issues[,]" Fed. R. Evid. 403.

For precisely these reasons, the Court previously excluded testimony about the application-based pricing methodology when FICO proposed to offer it through its damages expert, Mr. Zoltowski.  Dkt. 731 at 32 ("[Zoltowski's] calculation leads to a subjective and unreliable result that is inconsistent with the applicable legal standard.").  The Court's subsequent decision to admit Mr. Waid's substantively identical testimony effectively nullified that earlier order.[8]  Although the Court attempted to limit the scope

_____

[8] As Defendants pointed out in their motion to exclude Mr. Zoltowski's actual damages analysis, Mr. Zoltowski's application-based pricing methodology came directly from and

of Mr. Waid's testimony by barring him from using terms like "hypothetical negotiation" and "actual damages," Dkt. 1065 at 5-6, Mr. Waid nonetheless gave testimony that "does not accurately reflect the legal standard for calculating actual damages in this case, which is an objective standard as opposed to what FICO subjectively would have charged[,]" Dkt. 731 at 31. Given the jury's verdict, it is obvious that the jury took Mr. Waid's testimony to be an assessment of FICO's damages—which, as a matter of law, it cannot be. Dkt. 731 at 32. There simply was no other evidence offered that comes close to the jury's award. And, even assuming the jury understood Mr. Waid to be merely offering FICO's opening position in negotiations, his testimony still created the sort of unfair prejudice the Court had correctly sought to avoid in barring Mr. Zoltowski from presenting the same methodology. *See id.* at 31-32.

In effect, FICO used Mr. Waid's testimony to impermissibly smuggle into evidence Mr. Zoltowski's already-excluded expert testimony. Dkt. 731 at 30-32. Such a maneuver is improper. "What is essentially expert testimony . . . may not be admitted under the guise of lay opinions." *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001). "Such a substitution subverts the disclosure and discovery requirements of Federal Rule[] of [Civil] Procedure 26 . . . and the reliability requirements for expert testimony as set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)." *Id.* at 641. The peril of that subversion is on display here: FICO did not merely *evade Daubert*'s reliability

---

relied exclusively on Mr. Waid. *See* Dkt. 406 at 1 ("Zoltowski merely parrots numbers and theories provided to him by a FICO executive named William Waid[.]").

requirement, it put on testimony that the Court had already concluded was "*unreliable*" under *Daubert*.  Dkt. 731 at 32 (emphasis added).[9]

Mr. Waid's testimony about the application-based pricing methodology was likewise improper because it drew on "technical[] or other specialized" knowledge rather than his own "perception[.]"  Fed. R. Evid. 701.  As Mr. Waid admitted, although he has negotiated many Blaze license agreements, he has neither used the application-based pricing methodology to price a license for the use of Blaze in fifteen or more applications, Trial Tr. 1825, Dkt. 1185, nor did the evidence reflect any Blaze license with a fee within an order of magnitude of the result manufactured by the application-based pricing methodology, *id.* at 1826.  The complete disconnect between Mr. Waid's own "perception[,]" Fed. R. Evid. 701, and his testimony about FICO's damages makes clear that the application-based pricing methodology is, at least under the circumstances of this case, a hypothetical, specialized analysis to which a fact witness could not properly testify.  *See LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929-30 (10th Cir. 2004) (holding that a business executive may, consistent with Rule 701, offer "valuations based on straightforward, common-sense calculations[,]" but the executive may not offer lay testimony regarding a damages model "he 'can't recall any prior instances'" of using).  Moreover, Mr. Waid's total lack of experience applying the application-based pricing methodology under circumstances such as these makes plain

---

[9] It was likewise error for the Court to permit Mr. Waid to regurgitate Zoltowski's expert testimony on actual damages while simultaneously barring Defendant's expert, Christopher Bakewell, from rebutting that testimony.  *See* Dkt. 1065 at 5-7.

the extent to which FICO's actual damages claim is "unrealistically exaggerated[.]" *On Davis*, 246 F.3d at 166.

The improper admission of Mr. Waid's testimony was not harmless error and justifies a new trial. For an evidentiary error to warrant a new trial, it must have affected a party's "substantial rights[,]" meaning that a new trial without the error "would be likely to produce a different result." *Pointer*, 417 F.3d at 822 (quoting *O'Dell*, 904 F.2d at 1200); *see also United States v. Ray*, 768 F.3d 991, 993 (8th Cir. 1985) (improper "receipt by the jury" of evidence when "not harmless error" "necessitates a new trial"), *abrogated on other grounds*, *Henderson v. United States*, 476 U.S. 321 (1986). The improper admission of Mr. Waid's testimony undoubtedly affected Defendants' "substantial right[s.]" *Pointer*, 417 F.3d at 822. As discussed above, the jury's excessive actual-damages award appears to have been anchored by Mr. Waid's wildly unrealistic and self-serving valuation of a license for Defendants' post-termination use of Blaze. No other evidence tended to suggest that FICO's actual damages were anything close to the jury's award. With Mr. Waid's testimony properly excluded, "a new trial 'would be likely to produce a different result.'" *Id.* (quoting *O'Dell*, 904 F.2d at 1200).

**B. Defendants' mediation charts should have been excluded and FICO misused the charts to prejudice Defendants.**

The Court admitted two charts quantifying Defendants' usage of Blaze as of 2018. Trial Tr. 1080, Dkt. 1182 (admitting P-0517); *id.* at 1082 (admitting P-0518).[10] These

---

[10] Defendants objected to the admission of these documents orally, but the Court did not have the benefit at that time of briefing on this issue.

charts were inadmissible as hearsay and as statements made during settlement negotiations.  The Court admitted the charts pursuant to Rule 1006, but that rule "is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible." *Peat, Inc. v. Vanguard Research, Inc.*, 378 F.3d 1154, 1160 (11th Cir. 2004).

The charts, which had been prepared specifically to inform a 2018 mediation session between the parties, were inadmissible "to prove or disprove the validity or amount" of the claim.  Fed. R. Evid. 408(a), (a)(2).  Nevertheless, FICO used them for that exact purpose.  Mr. Waid cited these charts as the basis for his assessment of each application's size, a key input into his post-negotiation calculation of FICO's $36.5 million asking price for a Blaze license.  *See* Trial Tr. 1723-27, 1774-75, Dkt. 1185. Using confidential mediation documents as the basis for the valuation of a claim is a clear-cut violation of Rule 408.  *See Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 965 (8th Cir. 2011) ("[A]dmission of compromise evidence 'going to the . . . amount of a claim . . . eviscerate[s] Rule 408's protections and undermines[s] its clear purpose[.]'" (quoting *Stockman v. Oakcrest Dental Ctr.*, 480 F.3d 791, 798-99 (6th Cir. 2007))).

The mediation charts are also inadmissible hearsay.  FICO's counsel put them forward as business records admissible under Rule 803(6), Trial Tr. 1056, Dkt. 1182 ("It's ordinary business information."), but they are not.  To be admissible under the business records exception to the rule against hearsay, a statement must be part of a record "kept in the ordinary course of a regularly conducted activity of a business[.]" Fed. R. Evid. 803(6).  It is well-established that statements prepared for litigation, like the mediation charts, are not "made for the systematic conduct of the business as a business"

and so are not admissible business records.  *Palmer v. Hoffman*, 318 U.S. 108, 113 (1943).

The Court ultimately admitted the charts under Rule 1006, which permits a party to "use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court[.]"  Fed R. Evid 1006; Trial Tr. 1067, Dkt. 1182.  That was improper for two reasons.  First, Rule 1006 does not render inadmissible evidence admissible merely because it is in summary form.  The contents of the charts are inadmissible under the rule against hearsay and Rule 408; that the charts themselves are summaries does not change things.  *See Peat, Inc.*, 378 F.3d at 1160 ("Rule 1006 is not a back-door vehicle for the introduction of evidence which is otherwise inadmissible."); *United States v. Lemire*, 720 F.2d 1327, 1349 (D.C. Cir. 1983); 31 Wright & Miller, Federal Practice & Procedure § 8043 (2d ed. Apr. 2022 update) ("Rule 1006 evidence also may be excluded where the summarized source materials are inadmissible hearsay or even where just some parts of those materials are inadmissible hearsay."); *cf. Peter Kiewit Sons' Co. v. Summit Constr. Co.*, 422 F.2d 242, 267 (8th Cir. 1969) ("[U]nder certain circumstances . . . the business records exception to the hearsay rule . . . [is not] violated by the presentation of summaries of properly kept business records *which if offered into evidence would themselves be admissible*." (emphasis added)).  Second, FICO failed to comply with Rule 1006's second sentence, which requires the proponent of a summary to "make the originals or duplicates [of the voluminous records] available for examination or copying, or both, by other parties at a reasonable time and place."  FICO did not and could not do so, meaning it was error to

admit the mediation charts under Rule 1006.  FICO may respond that it does not possess the underlying records, which belong to Defendants.  But that only makes clear why the mediation charts are inadmissible under Rule 1006—their proponent could not fulfill the rule's mandatory terms and the data that was provided in the context of a confidential mediation was never requested or produced in the litigation.

Here, admission of the mediation charts affected Defendants' substantial rights, and so was not harmless error.  *See Pointer*, 417 F.3d at 822 (citing *O'Dell*, 904 F.2d at 1200); *Ray*, 768 F.3d at 993.  FICO meticulously walked through these charts line-by-line with several witnesses.  *See, e.g.*, Trial Tr. 1723-27, Dkt. 1185 (Waid); Trial Tr. 1058-67, Dkt. 1182 (Ghislanzoni).  Most importantly, they were the backbone of Mr. Waid's damages calculation and FICO's summation.  Trial Tr. 1774-75, Dkt. 1185; Trial Tr. 2711, Dkt. 1189 (counsel in summation stating "Plaintiff's Exhibit 517 . . . [Mr. Waid] took the relevant information out of that document that he would use in sizing an application"); *see also* Godesky Decl. Ex. 3, at 6-26 (Bill Waid testimony).  During Mr. Waid's testimony, the charts appeared on slide after slide.  *See id.*  FICO, in short, rested its entire per-application damages calculation on these charts—which contain information that, as Mr. Waid admitted, never would have been available to the seller in a hypothetical negotiation.  Trial Tr. 1774-75, Dkt. 1185.  Because "a new trial" without these charts in evidence "'would be likely to produce a different result[,]'" their admission was not harmless.  *Pointer*, 417 F.3d at 822 (quoting *O'Dell*, 904 F.2d at 1200).

## CONCLUSION

The Court should order a new trial to determine FICO's actual damages.

Dated:  April 21, 2023

*/s/ Leah Godesky*
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
lgodesky@omm.com
Anton Metlitsky (Admitted Pro Hac Vice)
ametlitsky@omm.com
Daryn Rush (Admitted Pro Hac Vice)
drush@omm.com
Roxana Guidero (Admitted Pro Hac Vice)
rguidero@omm.com

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

***Attorneys for Federal Insurance Company
and ACE American Insurance Company***