**EXHIBIT 1**

71

1    Here's another example of this then/now phenomena.
2  The evidence will show that FICO came up with that
3  $1.3 million license fee that Federal paid by looking at all
4  of Chubb Corporation's revenue, not just Chubb & Son's.  The
5  evidence will show that when the folks at FICO sat down in
6  2006 to figure out how much are we going to charge for
7  Blaze, they looked at the total revenue earned by the entire
8  Chubb Group of Insurance Companies worldwide, $12.3 billion
9  as the starting point for that license fee, all the global
10 entities in this navy blue frame on your screen.  And yet,
11 even though back then, FICO charged and Chubb paid
12 $1.3 million based on the revenue of all of its global
13 affiliates, FICO says, well, now those same global
14 affiliates' use of Blaze was a breach, and now we're
15 entitled to a second license fee.
16    Ladies and gentlemen, we are confident you will
17 reject this first breach claim as meritless.
18    Now, all the problems with FICO's claim that Chubb
19 Canada, Chubb Europe and Chubb Australia were not authorized
20 to use Blaze is why you also heard this other argument from
21 FICO about problems with consultants that use Blaze.  They
22 needed a backup argument.
23    FICO now says that Chubb shouldn't have shared
24 Blaze with two consultants who worked at Chubb Canada and
25 Chubb Australia.  On the screen is the IT director at Chubb

72

1  Australia, Russell Hodey, and he is coming to trial all the
2  way from Australia to address this.  He will explain how
3  Chubb Australia hired a consultant called DWS to help
4  develop an application called "Evolution" that was going to
5  be used in Australia.
6    Chubb Canada was also using the Evolution
7  application, so Chubb Australia and DWS asked Chubb Canada
8  for some help.  And in the course of that project, you'll
9  that an employee of AppCentrica, another consultant, gave
10 DWS a demonstration on how Blaze worked.  The evidence will
11 show that Chubb Australia did not use Blaze in its Evolution
12 application because all of this was unfolding in 2016 right
13 as this litigation was starting, and Chubb was committed to
14 not expanding its use of Blaze.
15    That's it.  That's all that happened.  It would be
16 the kind of thing that no one would ever think twice about,
17 but because it happened at the same time that Mr. Sawyer,
18 Mr. Schreiber and Mr. Carretta were claiming Chubb was in
19 breach, it got folded into this lawsuit, and now we all have
20 to address it.
21    So now we're on the second breach argument you've
22 heard from FICO.  They talked about this breach of Section
23 10.8, the assignment provision.  Now, in the world of
24 contracts, a person or a company who holds rights under the
25 contract can transfer them.  You can assign them to another

73

1  person.
2    So let's say that I go out and I rent an apartment
3  in Minneapolis for $1,000 a month, and that lease gives me
4  the right to live in the apartment as long as I pay the
5  landlord $1,000 a month.  But then my job transfers me to
6  Chicago in the middle of the lease.  So let's pretend that
7  my sister also lives in Minneapolis, and she happens to be
8  looking for an apartment with a $1,000-a-month budget.  I
9  might be able to assign, or transfer, the lease to my
10 sister, and it's like she's stepping into my shoes in the
11 contract, right?  Now she has to pay the $1,000 a month and
12 she gets to live in the apartment for whatever time is left
13 on the lease.
14    Because this concept of assignments is so common
15 in the world of business contracts, when FICO and Federal
16 sat down to negotiate their contract in 2006, they
17 negotiated assignment terms.  And the evidence will show
18 that the parties agreed that there would be two very
19 different approaches to assignments.
20    First, Federal and FICO agreed in the first
21 sentence of Section 10.8 that run-of-the-mill assignments, a
22 situation where Federal just decided I'm going to paper
23 transfer my rights to someone else, just like I might want a
24 paper transfer my rights to my sister for my apartment, not
25 allowed.  One of the executives at Chubb couldn't wake up

74

1  one morning and say, I'm done with Blaze; I'm going to
2  transfer the rights to my friend at MetLife.  Couldn't do
3  that.  Everyone agreed.  That's the first sentence of
4  Section 10.8.  And as FICO says, everyone agrees that type
5  of assignment didn't happen.
6    Now, FICO is hoping that you're going to see the
7  reference in the title of this section that says "No
8  assignment," and you're going to throw up your hands and
9  you're going to say, well, any and all assignments must have
10 been prohibited under this contract.  But Federal and ACE
11 know that you're here and you were picked for this jury
12 because you said that you could be impartial and you would
13 give the parties their fair day in court.  And that requires
14 hard work.  It requires thinking very critically about what
15 the parties intended when they entered this contract.  If
16 the no-assignment title on the contract was enough to
17 resolve this dispute, then we wouldn't need a trial where
18 you're asked to look at all available evidence to figure out
19 what the parties intended to agree to.
20    And the evidence will show that the second
21 sentence of Section 10.8 is very important.  I'm going to
22 read it in its entirety because it's so important.  It says,
23 "In the event of a change of control of client or if client
24 is merged with, acquired by, or inquires another entity or
25 undergoes a reorganization or otherwise acquires the right

**303**

1   change to the capabilities of a product, but oftentimes
2   they'll add either new features or enhance the speed by
3   which the process works.  That only enhanced the five or six
4   value propositions we've identified.
5   Q.  So you've been at FICO since 2013; is that correct?
6   A.  Correct.
7   Q.  And Blaze Advisor has gone through several version
8   changes since you began at FICO; is that correct?
9   A.  Correct.
10  Q.  But are the benefits of control, speed, accuracy,
11  consistency, transparency and agility realized in all the
12  versions of Blaze Advisor?
13  A.  They are, yes.
14  Q.  Thank you, Mr. Baer.  I have no further questions.
15      THE COURT:  Mr. Fleming, any recross?
16      MR. FLEMING:  Nothing further, Your Honor.
17      THE COURT:  Thank you, Mr. Baer.  You may step
18  down.
19      We are at 20 minutes after 10 and done with the
20  witness, so this would be a convenient time to take your
21  morning break.
22      Remember, members of the jury, no independent
23  research, no talking about the case.  Okay?
24      We'll be back in here at 25 minutes to 11.  Thank
25  you.

**304**

1       (Recess at 10:21 a.m.)
2
3           (IN OPEN COURT)
4       THE COURT:  Go ahead and be seated.
5       It would be my preference, if you're inclined to
6   do an offer of proof, with respect to the other documents,
7   to do it over the lunch hour, assuming Mr. Baer is still
8   going to be here and available.  Will that be acceptable?
9       MR. ERBELE:  Yes, Your Honor.
10      THE COURT:  Okay.  Next witness is Schreiber?
11      MR. HINDERAKER:  Yes, Your Honor.
12      THE COURT:  Should we take up the other issue now?
13      MR. HINDERAKER:  The issue of the --
14      THE COURT:  The testimony.
15      MR. HINDERAKER:  -- of Mr. Schreiber.  I think we
16  should.
17      THE COURT:  Do you have copies of the deposition?
18      MR. HINDERAKER:  I do.  If you would give me a
19  moment, what I have is my copy and I'm going to just make a
20  note and then give it to you.
21      The first bit of testimony that is being
22  challenged is on page 310.  I have a flag by it.
23      THE COURT:  Okay.  If it's easier for you, you
24  could always use the document camera.  That way you can see
25  it and I can, if that makes it easier.

**305**

1       MR. HINDERAKER:  Let's see if we can do without.
2       THE COURT:  Okay.
3       MR. HINDERAKER:  I don't like technology.
4       So you see that it begins on -- and I said, "Okay.
5   All right.  So Chubb could have said no, we're terminating
6   the license, you know, we're moving on to ASIS systems in
7   the next six months, we don't need your license anymore.  It
8   could have happened just like that, and that would have been
9   okay.  But they had told us nothing, so we had to price it
10  out, like it was a new site, a new sale -- or not a new
11  sale, but a transaction was taking place."  And this is in
12  context of an e-mail that is dated February 5th, 2016,
13  Exhibit 133.
14      And this, Your Honor, is that exhibit, and you see
15  the date of it, and you see that the date is before
16  February 25.  The date is before that period of time with
17  settlement negotiations.  It's in the period of time of the
18  business discussions.
19      In addition, during the opening statement, counsel
20  for the defendant tells the jury, "And so the evidence will
21  show that Mr. Sawyer and Mr. Schreiber started a process to
22  try to figure out how can we get more money before that
23  transaction happens?"  And the opening continued.
24      This is an e-mail exchange between Mr. Sawyer and
25  Mr. Schreiber in -- and the testimony is about an earlier

**306**

1   e-mail exchange, before the acquisition, and they're
2   brainstorming about this whole idea of using the acquisition
3   as a basis to get more money.
4       And Mr. Sawyer, he says, "I would think that
5   tripling the size of the GWP, that's a reference to
6   insurance revenue, of business by application should be
7   significant enough to get around that unreasonably withheld
8   language."
9       So it's clear from the opening that the issue of
10  Schreiber and Sawyer, thinking that we have a licensing
11  event, and here's an opportunity to get much more money from
12  a new license, during the period of time of negotiations, is
13  put at issue by the defendant, and this is some of the
14  testimony that relates to that February 5 e-mail.
15      And, relatedly, on page 343 at lines 22 through
16  344 at line 15, and now we're speaking most particularly
17  about the commercial proposal time frame that was within the
18  negotiations, and at line 22, this is what it boils down to.
19  I mean if someone engaged us when we tried to engage or
20  before we tried to engage, talking about 10.8 and when the
21  notice came, we would have found a way to let them
22  transition in a way that would have had maintain a really
23  good working relationship.  Love the client, want to
24  maintain a reference.  Really, wasn't looking to do anything
25  other than figure out how do we stay whole and continue the

**307**

1  relationship and was there a license opportunity?  Yes,
2  there was, but more important to us was that the long-term
3  relationship, the 3 million would have come and went, but I
4  had Chubb as a customer a decade and now a lawsuit?  Come
5  on.
6       He's responding to his reaction and his time frame
7  of Exhibit 94, which is before the tenor turned to
8  settlement.
9       In Defense Counsel's letter to the Court of the
10  15th, at the end of the initial notice period, combined with
11  temporary forbearance of action made clear that the dispute
12  had crystallized, the litigation was on the table.  That is
13  after these events.  Counsel has taken the position that
14  it's after these events.  Counsel has taken the position
15  that FICO has with Schreiber and Sawyer sought to have a
16  licensing opportunity to grab money, but this testimony is
17  necessary to fill in the rest of the story so that the jury
18  hears the rest of the story and enable Schreiber to say it
19  wasn't the money as much as the relationship that I was
20  trying to have as my top concern.  So this is -- none of
21  this is within Rule 408, Your Honor.
22       THE COURT:  All right.  Very well.  Counsel for
23  Federal?
24       MS. GODESKY:  Your Honor, our objection to these
25  two excerpts at 310 and 343 are that they are nonresponsive,

**308**

1  argumentative narratives from a witness.  He wouldn't be
2  allowed to give that kind of nonresponsive speech in court,
3  and the fact that these are deposition videos with no
4  opportunity for even a recross makes it even more
5  prejudicial than it would be if he did that here live.
6       MR. HINDERAKER:  If I can?
7       THE COURT:  Go ahead, Mr. Hinderaker.
8       MR. HINDERAKER:  Just commenting that now the
9  basis for the objection has changed from what it was this
10  morning, and this is the examination of defense counsel at
11  the time, and I don't have a transcript to get the full
12  context, but those were the answers that he was given to the
13  questions and there wasn't any effort made at the time of
14  the deposition to reserve any objection.
15       THE COURT:  Agreed, Mr. Hinderaker.  I do find
16  that these bits of testimony are admissible, that any
17  objection to the nonresponsive nature of the answer, if it
18  is nonresponsive have been waived, and the e-mail, which is
19  Exhibit 13, is also admissible.
20       All right.  We have exactly six minutes everyone.
21  See you back here.
22       (Recess at 10:31 a.m. till 10:39 a.m.)
23            (IN OPEN COURT)
24       THE COURT:  This is up like the old days, we don't
25  have to roll up a television screen or anything, right?

**309**

1  Just do it on your -- all right.
2       MR. HINDERAKER:  Your Honor, for housekeeping?
3       THE COURT:  Yes.
4       MR. HINDERAKER:  The video will run about 2 hours
5  and 11 minutes.
6       THE COURT:  Okay.  So you want to tell us when you
7  want us to stop or if you have an idea when we should stop,
8  Mr. Mayleben will just be here and available.  Right around
9  noon, if there's a natural break.
10       MR. HINDERAKER:  Yes.  And then we spoke at one of
11  the pretrials about being able to give a brief introduction
12  of who this witness is to the jury before it starts.  We've
13  exchanged what I expect -- what I will say and it's
14  agreeable so if you give me a moment to do that.
15       THE COURT:  Absolutely.  Thank you.
16       (Jury in.)
17
18            (IN OPEN COURT)
19       THE COURT:  Mr. Hinderaker.
20       MR. HINDERAKER:  The next witness that will be
21  called in our case, FICO's case, is a gentleman by the name
22  of Russell Schreiber.  I think you should appreciate that we
23  will be playing all of the video of Mr. Schreiber's
24  testimony that which is offered by FICO and that which is
25  offered by the defendants.  It will just be his whole

**310**

1  presentation.  And I'm just going to introduce Mr. Schreiber
2  to you.
3       Mr. Schreiber is a former FICO employee.  He now
4  lives in New York where his deposition was taken on
5  October 24, 2018.
6       He was in sales, and when he left FICO his title
7  was Vice President of Health Care and Insurance, and he was
8  with FICO from 2006 to 2016.  Thank you.
9       THE COURT:  Very well.  Thank you, Mr. Hinderaker.
10            RUSSELL SCHREIBER,
11  Whereupon, having been duly sworn upon his oath, testified
12  as follows:
13
14       (Whereupon, Deposition of RUSSELL SCHREIBER is
15  played, as follows:)
16            EXAMINATION
17  BY MS. JANUS:
18  A.  Russell Schreiber.
19  Q.  What is your work address?
20  A.  I work from home.  I'm self-employed, semi-retired.
21  Q.  What is your home address?
22  A.  It's 180 East End Avenue, New York, New York 10128.
23  Q.  What is your current employment?
24  A.  Self-employed.  Investor and self-employed.  Business
25  owner.  Multiple irons in the fire.

451

1  the services team was going to be doing, and then if there
2  were specific deadlines, timelines or deliverables related
3  to that work, as well as fees and how those were going to be
4  charged and paid.
5  Q.  So the master services agreement is as it says, the
6  master agreement under which statements of work would be
7  performed.  Is that fair?
8  A.  Yes.
9  Q.  Given that you were sending him back edits and changes
10 to the master services agreement and sending him the
11 original -- or the standard form Blaze Advisor license
12 agreement, it appears that you were negotiating or dealing
13 with the master services agreement first.
14          Is that your recollection?
15 A.  I don't recall that specifically, but based on the
16 email, it would seem that was the case, yes.
17 Q.  And then with respect to the client relationship, what's
18 the purpose of the master services agreement and the
19 provision of professional services?
20 A.  So generally, the professional services team would meet
21 with the client, their -- perhaps their business, also maybe
22 their technology team, to talk about how they want to
23 implement or access the software and then how they want the
24 rules drafted, which is what Blaze Advisor very
25 simplistically runs.  And so talking with the client around

452

1  how they were going to use the rules, what kind of rules
2  they need.  And then that may also help to inform how the
3  licenses needs to be scoped, ultimately, depending on what
4  may come out of those conversations.
5  Q.  Then if you would turn to P307.  And as we see, this is
6  from J.W. Black to yourself?
7  A.  Yes.
8  Q.  Perhaps just read what he says to you.
9  A.  So he said, "Jandeen, I have attached the SLA with some
10 Chubb revisions.  Let me know when you would like to
11 schedule a call to review.  Thanks, Jim."
12 Q.  And SLA stands for software license agreement?
13 A.  Yes.
14 Q.  All right.  So if we look at -- and then attached to his
15 email is indeed a version of the -- if we can go to the next
16 page please -- a version of the software license and
17 maintenance agreement showing the redlines that you received
18 from Mr. Black?
19 A.  Yes.
20 Q.  Is there any change from Mr. Black to the definition of
21 client as Chubb & Son?
22 A.  No, there is not.
23 Q.  Let's look at -- or next, paragraph 3.1 on the third
24 page, called "License Restrictions."  What does Mr. Black
25 suggest there by his redlines?

453

1  A.  He has quite a few edits.  He has essentially deleted
2  all of our original license restrictions and inserted his
3  own preferred language.
4  Q.  Okay.  We'll be going through the whole history, so we
5  will take it one step at a time.
6  A.  Okay.
7  Q.  And then if we go to paragraph 3.6 from Mr. Black, what
8  do we see there?
9  A.  Again, it looks like he has deleted all of our original
10 language, and he has inserted a new paragraph that he's
11 proposing that we accept instead.
12 Q.  And his paragraph relates to the use of Blaze Advisor by
13 a consultant called ACS Commercial Solutions?
14 A.  Yes.
15 Q.  Okay.  We're on the same paragraph?
16          And in this -- what is Mr. Black seeking by his
17 redlining at 3.6?
18 A.  He's wanting Fair Isaac's acknowledgement and agreement
19 that Chubb & Son, they have some infrastructure operations
20 that are outsourced to a company called ACS Commercial
21 Solutions.  So he's asking for Fair Isaac to grant ACS
22 Commercial Solutions and their affiliates, employees,
23 agents, consultants and subcontractors the right to use the
24 licensed software on behalf of client Chubb & Son for the
25 sole and exclusive purpose of fulfilling ACS Commercial

454

1  Solutions' obligations to provide information, technology,
2  services to client.
3  Q.  Okay.  So in summary, he's asking Fair Isaac to get
4  permission to a consultant, ACS, to use Blaze Advisor?
5  A.  Yes.
6  Q.  And then let's go to paragraph 9.3, Effective
7  Termination.
8          Mr. Black suggests some changes there as well?
9  A.  Yes.  He struck the -- I believe the last sentence --
10 the last two senses of Fair Isaac's original language.
11 Q.  Is what he struck related to a certification
12 requirement?
13 A.  Yes.
14 Q.  And then if we go to paragraph 10.8.  If we look at
15 that, Mr. Black made some changes to that as well?
16 A.  Yes, he did.
17 Q.  One of the changes that he makes is to -- well, let me
18 back up.
19          The first sentence without change is, "Neither
20 party shall, without the written consent of the other,
21 assign or transfer the agreement."
22          Have I read that right?
23 A.  Yes.
24 Q.  So that first sentence is mutual, is it not?
25 A.  It is mutual, yes.

455

1 Q. Okay. And then looking at the edit in the second

2 sentence, "In the event of a change of control of either

3 party." So that's an edit of Mr. Black to make that second

4 sentence mutual as well?

5 A. Correct.

6 Q. And we'll see if it was accepted or not by FICO shortly.

7    And then Mr. Black also adds, regarding FICO's

8 consent, "which will not be unreasonably withheld"?

9 A. Yes.

10 Q. Those are his edits to 10.8?

11 A. Correct.

12 Q. And then let's go forward in time to Exhibit P309:

13    And this is your email to Mr. Black of June 27th?

14 A. Yes.

15 Q. So his to you, the one we just looked at, was on

16 June 26th. So the next day you are back to him? Fair?

17 A. Yes.

18 Q. Okay. And what you say -- would you just tell us what

19 you said to him, please?

20 A. Sure. "Jim, attached is a redlined revised license

21 agreement incorporating the changes you requested to the

22 extent Fair Isaac is able to agree to them."

23 Q. So each of his redline changes was given review, was it?

24 A. Yes.

25 Q. And to the extent Fair Isaac would accept them, it did?

456

1 A. Correct.

2 Q. And to the extent it could not, it did not?

3 A. Correct.

4 Q. So let's look at what happened then.

5    Attached to your email, P309, is the next version

6 of the software license and maintenance agreement that you

7 sent back to Mr. Black?

8 A. Yes.

9 Q. So paragraph 3.1, what is FICO's response to all of the

10 red lining that Mr. Black had done?

11 A. It was rejected, and we, I, reinserted our original 3.1

12 with the license restrictions.

13 Q. So Mr. Black's suggestions, were they rejected in total?

14 A. It appears so, yes. Yep.

15 Q. And then if we go to 3.6, please. What was, what was

16 FICO's response to his efforts, his seeking of permission

17 for ACS the consultant?

18 A. It's still in the agreement with red line in tract

19 changes, what we call it in the law department, but the

20 original Fair Isaac language that he struck has been

21 deleted. So I'm not sure if I still had questions for him

22 in regard to what he's proposing in 3.6, since I did not

23 completely accept it, but it appears that we're working

24 toward accepting some version of 3.6.

25 Q. Or putting it, in the words of the consultant,

457

1 identifying it more specifically. FICO and you and

2 Mr. Black are working on the conditions under which FICO

3 will consent to ACS Consulting being permitted access to

4 Blaze Advisor?

5 A. Yes.

6 Q. It wasn't rejected out of hand like the changes to 3.1?

7 A. Correct.

8 Q. The last sentence of your red lining, would you read

9 that to us, please?

10 A. Of 3.6?

11 Q. I'm sorry. Yes, of 3.6.

12 A. "The rights granted to ACS herein shall not be extended

13 to any other third party without the prior express written

14 consent of Fair Isaac."

15 Q. And when we get to the, when we go back to the J1, the

16 final agreement, we will check on the conformance of that to

17 the final language.

18    And then let's look at 9.3. What happened to

19 Mr. Black's suggested changes?

20 A. It appears they were accepted. There are no further red

21 lines in 9.3.

22 Q. Would you look at the language of 9.3 in Exhibit 309 to

23 the language in 9.3 in Exhibit J1?

24 A. Yes, they are the same.

25 Q. That is to say, you returned to the standard FICO

458

1 language for Section 9.3?

2 A. Yes.

3 Q. And then let's look at your response to his changes to

4 10.8.

5    Is it fair to say that the only change that FICO

6 accepted was that consent would not be unreasonably

7 withheld?

8 A. Yes.

9 Q. All other changes that Mr. Black had suggested were

10 rejected?

11 A. Correct.

12    MR. HINDERAKER: Your Honor, if you would like to

13 break, this would be a time.

14    THE COURT: That sounds like a great idea. Thank

15 you.

16    Ladies and gentlemen, we'll take our afternoon

17 recess. As always, no research. Talk about anything you

18 want except the case.

19    THE CLERK: All rise for the jury.

20       IN OPEN COURT

21       (JURY NOT PRESENT)

22    THE COURT: Just for planning purposes, what do

23 you think the time, excuse me, timeline is?

24    MR. HINDERAKER: I almost -- I really hate to say

25 this, because of the impact it has on Ms. Boone, but I could

---

**459**

1    see that I would be going for a while yet, you know, maybe
2    as much as an hour, and I'm disappointed in that because
3    cross-examination my not be finished today.
4           THE COURT: Will you be doing the
5    cross-examination, Ms. Godesky?
6           MS. GODESKY: Yes.
7           THE COURT: And your best estimate? I know it's
8    hard to say.
9           MS. GODESKY: 45 minutes, 30 minutes.
10          THE COURT: Yeah. I don't want to keep the jury
11   here to 5:30 or quarter to 6 on Friday. We'll kind of play
12   it by ear, but it sounds like where we're going to break is
13   at the end of the direct.
14          Does that sound about right to you,
15   Mr. Hinderaker?
16          MR. HINDERAKER: It does. I could imagine that
17   the, I could imagine that it might be an early release
18   today.
19          THE COURT: Okay.
20          MR. HINDERAKER: I can maybe talk faster and see
21   what I can do, but that is a judgment.
22          THE COURT: Okay. Well, we'll see where we are.
23   We'll try and get through the witness, if at all possible.
24          We'll take 15 minutes, be back in at quarter to
25   four.

---

**460**

1           Oh, and, Mr. Hinderaker, to the extent that you
2    were asking about Exhibit 145, which was talked about but
3    not actually displayed during the depo, that's in. It was
4    talked about, and it was obviously going to be displayed.
5           MR. HINDERAKER: Yeah, that would be fine.
6           THE COURT: Okay.
7           MS. GODESKY: Sorry.
8           THE COURT: 145. With the video depo, it was
9    referenced and talked about; it just wasn't displayed.
10          MS. GODESKY: I see. That's on our list. Okay.
11   All right. Thank you.
12          (Recess taken 3:32 p.m.)
13   3:47 p.m.
14              IN OPEN COURT
15             (JURY PRESENT)
16          THE COURT: You may proceed.
17          MR. HINDERAKER: Thank you, Your Honor.
18   BY MR. HINDERAKER:
19   Q.   Ms. Boone, would you turn to Exhibit P310, please?
20   A.   Yes.
21   Q.   This is an email from yourself to Mr. Black on
22   June 29th, correct?
23   A.   Yes.
24   Q.   And what are you communicating to Mr. Black in this
25   email?

---

**461**

1    A.   There's an updated version of the agreement. I've made
2    some additional changes, most were grammatical, and also
3    clean up kinds of changes. So I did not highlight those.
4    Substantive changes that were made after input from other
5    groups and based on the business terms that are now included
6    in Exhibit A. There are a few of those.
7    Q.   Okay.
8    A.   And I included notes explaining the changes that I made.
9    Q.   And as you communicated -- transmitting the document
10   back to Mr. Black?
11   A.   Yes.
12   Q.   And the email does reference the fact that, that you had
13   a discussion with him the day before. Do you have any
14   memory of that?
15   A.   I do not. It does say we're having a discussion that
16   same day as the day of the email.
17   Q.   Okay. And any recall of that?
18   A.   No.
19   Q.   No. All right. Well, let's just go through these
20   provisions again.
21          Looking at 3.1.
22   A.   Yes.
23   Q.   Is it fair to say that that now is FICO standard
24   language per your draft to him of a couple days earlier?
25   A.   Yes.

---

**462**

1    Q.   And then if we go to paragraph 3.6, the third party
2    there's still -- work is still being done on that provision?
3    A.   Yes. And I've added some highlighted language for his
4    review.
5    Q.   Yes. And would you tell us, read for us what the
6    highlighted language is that you added?
7    A.   "Provided that such use is otherwise subject to the
8    terms and conditions of this agreement and does not exceed
9    the limitations on use and other restrictions set forth
10   herein."
11   Q.   So that's an additional limitation that FICO proposed to
12   Chubb & Son?
13   A.   Correct.
14   Q.   And is the last sentence still the same as before, the
15   rights granted shall not be extended to any other third
16   party?
17   A.   Yes, that's consistent with the prior draft.
18   Q.   All right. And then if we go to paragraph 9.3, effect
19   of termination, has that returned or is that now the
20   standard FICO language?
21   A.   Yes, that's consistent with the FICO standard language.
22   Q.   And then if we go to paragraph 10.8, is it fair to say
23   that it's standard FICO language, say for the addition of
24   Mr. Black's suggestion of consent not unreasonably withheld?
25   A.   Correct.

---

**463**

1  Q.  So that's the progress that we're making in the

2  negotiations of the language?

3  A.  Yes.

4  Q.  Then let's go to Exhibit 311.  This is also on

5  June 29th?

6  A.  Yes.

7  Q.  And this must be the telephone call that you were

8  referencing earlier?

9  A.  Correct.

10 Q.  And is it fair to conclude from the email that some

11 changes were made in your discussion with him?

12 A.  Yes.

13 Q.  And then those were memorialized in the document that

14 you transmitted by Exhibit 311?

15 A.  Correct.

16 Q.  Okay.  As we know from J1, the license agreement is

17 in fact signed, the main body of the license agreement as

18 it's signed the next day on June 30th.

19         So let's go to paragraph 3.1 on this draft.  And

20 is there a change there?

21 A.  Yes, there is.  In subsection two.

22 Q.  And what is that, what is that change?

23 A.  So we're carving out an exception around the restriction

24 where otherwise Chubb & Son cannot alter, change, modify

25 adapt, translate or make derivative works of the Fair Isaac

**464**

1  products.  And we're calling out an exception there to say

2  that "other than in connection with rules" they cannot

3  alter, change, modify, adapt, translate or make derivative

4  works.

5  Q.  Okay.  Was that a suggestion from Mr. Black?

6  A.  I don't recall.

7  Q.  Okay.  It's not standard FICO language, though?

8  A.  Correct.

9  Q.  Is everything else in paragraph 3.1 standard FICO

10 language?

11 A.  I believe so, yes.

12 Q.  Looking specifically at 3.1 sub, you know, small Roman

13 IV, can you tell, is that standard FICO language?

14 A.  Yes.

15 Q.  And then if we go to paragraph 3.6, what's the state of

16 negotiations regarding permission for ACS to have access and

17 use of Blaze Advisor?

18 A.  It appears that we have agreed to the language at this

19 point.  And the highlighted language that I added and sent

20 to him in my prior email is now unhighlighted, which would

21 lead me to believe it's been accepted by the parties.

22 Q.  It's still there?

23 A.  It's still there, yes.

24 Q.  Yes.  Yes.  And then if we go to 9.3, what's the state

25 of the negotiations over the language of the term -- the

**465**

1  effective termination provision?

2  A.  That section has been agreed to.  There are no further

3  red lines or open items.

4  Q.  And as we saw before, that's now back to standard FICO

5  language?

6  A.  Yes.

7  Q.  And then if we go to paragraph 10.8, it looks like, what

8  is that telling you there?

9  A.  There are no open items remaining in 10.8, and that

10 appears to be FICO's standard language.

11 Q.  With the exception of "shall not be unreasonably

12 withheld"?

13 A.  With that exception, yes.  We agreed to include that.

14 Q.  Would you go to -- before we go forward to June 30th,

15 would you go to Exhibit P336 please?

16 A.  Yes.

17 Q.  All right.  And this master services agreement, look at

18 the, I guess look at the last page.  The master services

19 agreement is the final signed document?

20 A.  Yes.

21 Q.  Okay.  And at the signature page the client is whom?

22 A.  Chubb & Son, a division of Federal Insurance Company.

23 Q.  And the same is true as being the client on the first

24 page of the master services agreement?

25 A.  Yes.

**466**

1  Q.  And if you go to article 17 in the master services

2  agreement that's titled Notices.  It's on page 21684 of the

3  Bates?

4  A.  Yes.

5  Q.  And under Notices for Chubb, James Black is called out?

6  A.  Correct.

7  Q.  And how does Mr. Black identify himself?

8  A.  He is in the vendor management group with Chubb & Son, a

9  division of Federal Insurance Company, in Warren,

10 New Jersey.

11 Q.  Thank you.  Now I'd like to go, that being the history

12 of the negotiations, I'd like to go to J1.  During the, as

13 we saw, as we said at the outset, the client in the final

14 master -- the client in the final software license and

15 maintenance agreement is Chubb & Son, the division.

16         In all of your conversations with Mr. Black, was

17 there any request to make that anything, make the client

18 somebody else?

19 A.  Not that I recall, but it was never in a red line

20 document from him.

21 Q.  And we also saw that, yes.

22         From your, you know, in your role in drafting

23 these agreements, working with the business folks, but in

24 your understanding of the commercial purpose of the license

25 agreement, does the license agreement grant rights to

**911**

1  A.  We began to become curious about who was using the
2  software.
3  Q.  And in the regular course of business, Mr. Carretta, you
4  don't usually scan maintenance logs for potential problems
5  with your customers, right?
6  A.  I don't.
7  Q.  And you don't direct people to do that either, right?
8  A.  I don't direct people to do that.
9  Q.  And it would have been helpful for you in this time
10  period, after the ACE acquisition was announced, if you
11  could find more potential problems with Chubb's use of
12  Blaze, correct?
13  A.  Not necessarily, no.
14  Q.  But it might give you more potential leverage in any
15  breach letters that you might want to send or conversations
16  that you want to have with Chubb, correct?
17  A.  Not necessarily.
18  Q.  But you did end up citing the use of Blaze by these
19  consultants, just like you cited use of Blaze in Europe, in
20  your termination letter, correct?
21  A.  I reference it in my termination letter.  That's
22  correct.
23  Q.  You referred to them as material breaches.
24  A.  Yes.
25  Q.  And based on those material breaches, you said that the

**912**

1  next day the contract was over and Chubb couldn't use Blaze
2  anymore.
3  A.  Among the other breach, the obvious one we spent all day
4  talking about.
5  Q.  Did you do anything to investigate the full extent of
6  the use, like how many people at AppCentrica or DWS had laid
7  eyes on the Blaze software?
8  A.  I did not personally, no.
9  Q.  Any use of Blaze in connection with this potential
10  project in Australia would have been quite small in the
11  context of an enterprise-wide license like Chubb had,
12  correct?
13  A.  I don't know that.
14  Q.  Well, an enterprise-wide license means that you can use
15  the software in an unlimited number of applications, right?
16  A.  I thought it was limited to the number of applications.
17  I'd have to look at the agreement to see how they defined it
18  again.
19  Q.  So you can't -- you can't speak at all to the relative
20  impact of this issue with DWS and AppCentrica relative to
21  the size of Chubb's use of Blaze and the scope of its
22  license?
23  A.  Well, it's more of an absolute.  We don't guess that,
24  oh, this one is important.  It was just two guys that looked
25  at it, versus Accenture.

**913**

1  Q.  But my question is whether you did anything to
2  investigate the magnitude of this issue.
3  A.  No, because of what I just said.  It's an absolute, you
4  are not allowed to do this.
5  Q.  And did you ever identify any evidence that AppCentrica
6  or DWS accessed Blaze for any purpose other than assisting
7  Chubb in its work on one of its internal computer
8  applications?
9  A.  I don't know what they did.  I don't remember.
10  Q.  So you have not identified any evidence that AppCentrica
11  or DWS accessed Blaze for any purpose other than assisting
12  Chubb, correct?
13  A.  The only thing I know is that they showed up in the
14  maintenance logs.  I was told that.  But I don't remember
15  any of the details that you are asking about.
16  Q.  Okay.  So I'm going to ask my question one more time.
17  You have no evidence that AppCentrica or DWS accessed Blaze
18  for any purpose other than to assist Chubb in it's computer
19  application work, correct?
20  A.  I just told you I don't remember.  I don't believe I was
21  told that.
22  Q.  So that's a no.  You don't have any evidence?
23  A.  I don't personally have any evidence, no.
24  Q.  And are you aware of any evidence that anyone at
25  AppCentrica or DWS shared Blaze with any third party outside

**914**

1  Chubb?
2  A.  I don't know.  I just know that third parties accessed
3  the software.
4  Q.  So that's a no.
5  A.  They are there in the log.
6  Q.  So that's a no.
7  A.  No.  That's just what I said.
8  Q.  Mr. Carretta, I'm entitled to an answer to the question
9  I'm asking.  Are you aware of any evidence that anyone at
10  AppCentrica or DWS shared Blaze with any third party outside
11  Chubb?
12  A.  Not that I'm aware of, other than that they appear in
13  the logs.
14  Q.  Okay.  Let's talk about Section 10.8 and this whole
15  concept of assignment.
16  A.  Okay.
17  Q.  During your direct examination, when you were talking
18  about that letter you sent to Chubb on January 27th, 2016,
19  you made a point of saying in your questioning with
20  Mr. Hinderaker that Chubb had not responded to Sawyer and
21  Schreiber at that point in time.
22      Do you remember that?
23  A.  Yes.
24  Q.  I want to take a look at P131, which is already in
25  evidence.  And I want to go to page 3 of the PDF.

**915**

1  A.  I'm looking at the screen now, yes.

2  Q.  Okay.  Perfect.  So this starts with an email from Mike

3  Sawyer to someone at Chubb on January 8th, 2016.  Do you see

4  that?

5  A.  Yes.

6  Q.  And he says, "Hi, Elie.  Happy new year!  I am following

7  up on the voicemail I left you before the holiday."

8         Do you see that?

9  A.  I do.

10  Q.  And then he says, "Can you get back to me about the ACE

11  acquisition?"

12  A.  Yes.

13  Q.  And then if you go to the second page of the PDF,

14  there's another email from Mr. Sawyer to Mr. Merheb at Chubb

15  the same day, about three hours later.  Do you see that?

16  A.  Where in this cycle of all these emails are you?

17  Q.  Sure.  I'm on the email from Mike Sawyer --

18  A.  Yes.

19  Q.  -- to Chubb at January 8th at 3:25 p.m.

20  A.  I see that.

21  Q.  And Mr. Sawyer says, "Elie.  Thanks for the call this

22  afternoon.  As discussed attached are Chubb's Blaze Advisor

23  license agreements for your review."  Do you see that?

24  A.  I do.

25  Q.  So this looks like Mr. Merheb at Chubb called Mr. Sawyer

**916**

1  at FICO the afternoon that Mr. Sawyer emailed him, correct?

2  A.  Yes.

3  Q.  And this was January 8th, 2016, a couple weeks before

4  you sent that letter alleging breach, correct?

5  A.  That is correct.

6  Q.  Now if we could go to Joint Exhibit 1, which is the

7  license agreement, I'd like to take a look at the text of

8  Section 10.8, which is on page 8.

9         So, Mr. Carretta, there's a few sentences in

10  Section 10.8, correct?

11  A.  Yes.

12  Q.  And during your direct examination with Mr. Hinderaker,

13  you distinguished between the first and the second sentence

14  of Section 10.8 several times, correct?

15  A.  They're independent, yes.  That's correct.

16  Q.  And you walked us through how certain things in your

17  breach letter related to the first sentence and how certain

18  things in your breach letter related to the second sentence.

19  Do you remember that?

20  A.  Yes.

21  Q.  Now it's true that FICO will sometimes enter license

22  agreements that don't have the second sentence that we see

23  in the Chubb agreement, right?  Sometimes FICO enters

24  license agreements that have assignment clauses without

25  specific references to mergers and acquisitions, correct?

**917**

1  A.  Like I said, they're all negotiated, so I'm sure there

2  are some that don't have that, but I am sure there are some

3  that do.

4  Q.  So you are sure that there are some that do not have

5  this second sentence that specifically references mergers

6  and acquisitions?

7  A.  Well, this particular sentence has a, an edit added on

8  to the end that was unique to Chubb.  The other, the rest of

9  the sentence starting with "in the event" and ending with

10  "provide such consent" is standard template language.

11  Q.  Okay.  I want to, if we could show Mr. Carretta, and not

12  yet publish to the jury, Exhibit D304.

13         This is in your binder, but we will put it on the

14  screen too, Vanessa.  I think the judge has turned it off

15  for the jury.

16  A.  Okay.

17  Q.  This is a software license agreement between FICO and

18  Grange Insurance Group, correct?

19  A.  That's what's in the header, yes.  That is correct.

20  Q.  And if you turn to page 15 you can see signatures from

21  FICO and Grange Insurance going off those --

22         THE JURY:  Your Honor, we don't have the --

23         THE COURT:  Did you just say that your monitors

24  are off?

25         THE JURY:  Yes.

**918**

1         THE COURT:  That's actually on purpose at this

2  time because the exhibit is not yet into evidence.

3         THE JURY:  Oh, I'm sorry.

4         THE COURT:  Quite all right.  I'm glad you asked.

5         THE WITNESS:  It's back on my screen.

6  BY MS. GODESKY:

7  Q.  Okay.  Terrific.  So on page 15 you can see that this

8  was signed by FICO and Grange Insurance, correct?

9  A.  That is correct.

10         MS. GODESKY:  Okay.  Defendants offer Exhibit 304

11  into evidence D304.

12         MR. HINDERAKER:  We just maintain our earlier

13  position, Your Honor.

14         THE COURT:  Overruled.  The exhibit is admitted.

15  BY MS. GODESKY:

16  Q.  And so then if we could publish the document to the jury

17  and go to page 13, there's an assignment clause.

18         If you could make that bigger Vanessa.  Thank you.

19         So, Mr. Carretta, this section reads, "Neither

20  party shall have the right to assign this agreement without

21  the prior written consent of the other party."

22         Your Honor, I think there's a --

23         THE COURT:  Oh, thank you.

24         MS. GODESKY:  Thank you.

25

**939**

1  entered into?
2  A.  That's correct.
3  Q.  Let me not hit this mic again.
4       Let's go to -- you were asked some questions about
5  your termination letter, 103.  Plaintiff's Exhibit 0103.
6  And keep the license agreement nearby as well.  In fact --
7  A.  Okay.
8  Q.  -- on a reference, your termination letter, because in
9  the termination letter you speak of the two applications
10  outside the United States and then in Canada.  I guess
11  three?
12  A.  Yes.
13  Q.  Would you go to the license agreement J001?
14  A.  Okay.
15  Q.  And if we could go to the seventh page, please.
16  A.  Okay.
17  Q.  The license agreement does include a provision 10.5 that
18  says Entire Agreement?
19  A.  That is correct.
20  Q.  It says it supercedes all prior or contemporaneous
21  proposals, and all other oral or written understandings,
22  representations, conditions and other communications between
23  the parties.
24       Agreed?
25  A.  Agreed.

**940**

1  Q.  It goes on to say that, "Each party represents and
2  warrants to the other party that entering into this
3  agreement it does not rely on any representation, promises
4  or assurances from any other party or employee," and so
5  forth.
6       And then it ends with the sentence, "Any other
7  terms or conditions or amendments shall not be incorporated
8  herein or be binding upon any party, unless expressly agreed
9  to in a writing signed by authorized representatives of
10  client and Fair Isaac."
11       Agreed?
12  A.  Yes.
13  Q.  And then the license agreement also has a provision
14  called 10.4, No Waiver.
15  A.  Yes.
16  Q.  And that provision ends, "No waiver of any rights of a
17  party under this agreement will be effective unless set
18  forth in a writing signed by the parties."
19       Agreed?
20  A.  Agreed.
21  Q.  Now at Fair Isaac, as a matter of fact, does Fair Isaac
22  have a policy that identifies those persons who have the
23  ability to enter into an agreement on behalf of FICO?
24  A.  Yes.
25  Q.  Do salesmen like Mr. Sawyer or Mr. Schreiber have the

**941**

1  authority under that written policy to enter into agreements
2  on behalf of FICO?
3       MS. GODESKY:  Objection.
4       THE COURT:  Overruled.
5       THE WITNESS:  No, they do not.
6  BY MR. HINDERAKER:
7  Q.  You were asked some questions about consultants, third
8  party.  And you made the statement that the, the prohibition
9  is absolute.  The magnitude does not matter.
10       What did you mean by that?
11  A.  Essentially the slightest infraction is a breach.  That
12  it effectively defines materiality.  Lawyers sometimes call
13  it strict liability.
14  Q.  Okay.  Let's go to the license agreement again and
15  paragraph 3.6.
16  A.  Okay.
17  Q.  Why don't you review it briefly so that you can get some
18  context.
19  A.  Okay.
20  Q.  All right.  And here in paragraph 3.6, FICO and Chubb &
21  Son have agreed that one consultant, ACS Commercial
22  Solutions, has the right to use Blaze Advisor software.
23       Do you see that?
24  A.  That's correct.
25  Q.  And in fact paragraph 3.6 expressly says, does it not,

**942**

1  that ACS Commercial Solutions is the information technology
2  infrastructure operations outsourced to ACS Commercial
3  Solutions?
4  A.  That's correct.
5  Q.  That's to say, ACS Commercial Solutions is going to be
6  using Blaze Advisor for the benefit of Chubb & Son, the
7  division?
8  A.  That's correct.
9  Q.  But to get that permission, it was negotiations of
10  paragraph 3.6?
11  A.  Yes.
12  Q.  And 3.6 further says, "Provided that such use is
13  otherwise subject to the terms and conditions of this
14  agreement and does not exceed the limitations and use for
15  other restrictions set forth herein."  Correct?
16  A.  Yes.  That's correct.
17  Q.  And it further says, "Client shall responsible," client
18  Chubb & Son, "shall be responsible for assuring ACS's
19  compliance with the terms and conditions of this agreement."
20       Agreed?  That's what it says?"
21  A.  Yes.
22  Q.  "And client shall be liable to Fair Isaac for any breach
23  of the agreement by ACS."  It says that?
24  A.  Yes.
25  Q.  "The rights granted to ACS herein shall not be extended

**943**

1  to any other third party without the prior written consent

2  of Fair Isaac."

3  A.  That's correct.

4  Q.  And if we went to paragraph 3.1, this contains a variety

5  of client representations and warrants that its employees

6  shall not under the heading License Restrictions?

7  A.  Yes, I see that.

8  Q.  An unauthorized third party using Blaze Advisor is not

9  subject to any of these restrictions, is it?

10  A.  I'm not sure I understand your question.

11  Q.  If a third-party consultant is using Blaze Advisor

12  without FICO's permission, that third-party consultant isn't

13  subject to any other restrictions of the license agreement,

14  correct?

15  A.  That's correct.

16  Q.  You were shown, you were shown some emails from Sawyer

17  and Moffat, maybe, and they were dated January 8, 2016.

18      So let's be clear.  Those are before your notice

19  of breach letter of January 27th.

20  A.  That's correct.

21  Q.  And in the third paragraph you say, "I am writing now to

22  again confirm."  And that "again" reference, the fact that

23  Sawyer had finally had gotten in contact with the client by

24  January about 10.8, as you say, "I am writing now to again

25  confirm"?

**944**

1  A.  That's right.

2  Q.  When you were asked questions about 10.8, you said the

3  first sentence and the second sentence are your words were,

4  "Independent restrictions."

5  A.  That's correct.

6  Q.  Why did you say that?

7  A.  Because that's the way it was designed.

8  Q.  Okay.  But what -- can you --

9  A.  Why did I say that?

10  Q.  Can you help us with that?

11  A.  Sure.  Because the first sentence which we have seen in

12  a number of these agreements, notwithstanding they're

13  negotiated in a little different -- is neither party without

14  the prior written consent of the other party, neither party

15  shall without the written consent of the other party, assign

16  or transfer this agreement or any part thereof.

17      So that's the absolute rule, the first rule.

18      MS. GODESKY:  Objection, Your Honor.

19      THE COURT:  Overruled.

20      THE WITNESS:  Okay.

21  BY MR. HINDERAKER:

22  Q.  Okay.  That's one restriction.  What's the other

23  independent restriction?

24  A.  The second restriction was designed to address mergers

25  and acquisitions and what happens in those circumstances

**945**

1  where there's a laundry list of these various kinds of ways

2  to get mergers done and acquisitions done, where each such

3  event shall be deemed it to be an assignment subject to this

4  section, which is 10.8.  And then it goes on.

5  Q.  Understood.  You were shown a couple license agreements.

6  A.  Correct.

7  Q.  And I'm going to show you a couple more.  And if you

8  would go to -- let's find the exhibit that's D282.

9      This is a license agreement between FICO and Alpha

10  Bank A.E., dated June 30, 2006; is that correct?

11  A.  Sorry.  I was in the wrong book.

12  Q.  Yeah.  Yeah.  It's the one called your name on it

13  redirect.

14  A.  Yes, I have it.  Alpha Bank.

15      MR. HINDERAKER:  Your Honor, I move Exhibit D0282.

16      MS. GODESKY:  No objection.

17      THE COURT:  D0282 is accepted.

18  BY MR. HINDERAKER:

19  Q.  Would you turn to paragraph 8.3, which is called No

20  Assignment?

21  A.  Correct.

22  Q.  Can you tell us looking at paragraph 8.3 of this exhibit

23  how it compares to 10.8 of the license agreement with Chubb

24  & Son?

25  A.  I think it's identical, the first sentence certainly is,

**946**

1  if I check it.  Sorry.

2      They're not quite identical, because it has the

3  words "or delayed" added at the end of the sentence.

4  Q.  All right.  So this one says such -- the Exhibit D0282,

5  Alpha Bank says, everything is the same except it says,

6  "Such consent shall not be unreasonably withheld or

7  delayed"?

8  A.  That is correct.

9  Q.  That's the difference?

10  A.  That's the difference.

11  Q.  With the exceptions of that difference, everything in,

12  everything else in 8.3 of the Alpha Bank agreement is the

13  same as 10.8 of the Chubb & Son's agreement.  Do you agree?

14  A.  Yes.

15  Q.  Okay.  Why don't you pull out the D0017 from that same

16  binder.

17  A.  Okay.

18  Q.  This one is with Humana, Inc.?

19  A.  That is correct.

20  Q.  This is dated May 23, 2006?

21  A.  That is correct.

22  Q.  I think the other was dated May -- no.  It was dated

23  June 30, 2006.

24  A.  Yes.

25  Q.  So on the Humana agreement, why don't we look at

**969**

1  use of the realtime transcript don't allow you to quote that
2  to the Court.  So -- but it's also been pointed out that the
3  transcript that was quoted was accurate, so no harm, no
4  foul.
5      All right.  Anything else from the parties?
6      MS. GODESKY:  Your Honor, I just wanted to point
7  out something we have noticed as we have been going back
8  through the transcripts, that I'm just concerned documents
9  that are admitted during videos --
10     THE COURT:  Mm-hmm.
11     MS. GODESKY:  -- were not -- there is nothing in
12 the transcript memorializing the P or the D number that's
13 been entered into evidence.  So I'm just concerned that
14 could be an issue for the appellate record.  So I think at
15 some point we need to orally read them in.
16     THE COURT:  That's fine with me.  We have been
17 tracking them, and I have been very attentive to
18 distinguishing the trial exhibit number from the deposition
19 exhibit number.  We have an accurate list, and we have been
20 cross-checking it with the parties, but we can certainly put
21 that, and I think it's a good idea, to put it on the record.
22     MS. GODESKY:  Okay.
23     THE COURT:  All right?  Anything else on your
24 side?
25     MS. GODESKY:  No.

**970**

1      THE COURT:  Mr. Hinderaker?  All right.  Let's
2  bring the jury in.
3      THE CLERK:  All rise for the jury.
4          (Jury enters.)
5
6          (In open court with the Jury present.)
7      THE COURT:  Go ahead and be seated.
8      Members of the Jury, first and foremost, our
9  apologies.  We were taking up some matters that we had to
10 deal with before we started testimony this morning.  As I
11 had indicated at the beginning of the trial, that happens on
12 occasion.  Today was one of those occasions.
13     Second of all, I hope you all had a nice weekend.
14 I appreciate your getting here today.  I am hoping that this
15 will be the last "iffy" travel day for all of you, but I
16 make no promises.
17     By way of planning, first of all, as we've
18 discussed -- okay.  We will shorten the lunch break
19 considerably, and that will speed things up.
20     For planning purposes, we think that you will get
21 the case for deliberation by approximately, well, early next
22 week, let's just put it that way for now.  Okay?
23     All right.  Mr. Hinderaker?
24     MR. HINDERAKER:  Your Honor, our first witness by
25 video is Mr. Henry Mirolyuz, and I will give you his

**971**

1  introduction.
2      Henry Mirolyuz is a former Chubb employee, who was
3  with Chubb from 2006 to 2018.  In July 2018, Mr. Mirolyuz
4  was a corporate representative and testified to the
5  knowledge of Federal.  At the time of his deposition his
6  title was senior architect, Chubb claims IT.  At that time
7  he was living in Simsbury, Connecticut.
8      The second deposition was taken January 2019.  And
9  this time Mr. Mirolyuz was testifying in his personal
10 capacity, as well as a corporate representative, to the
11 knowledge of Federal.  At that point he had left employment
12 with Chubb and he had left employment with Chubb effective
13 January 1, 2019.  Both of these depositions were taken by me
14 on behalf of FICO.
15         (HENRY MIROLYUZ)
16          EXAMINATION
17 BY MR. HINDERAKER:
18 Q.  Sir, good morning.
19 A.  Good morning.
20 Q.  Thank you for coming.
21 A.  My pleasure.
22 Q.  If you would give us, with spelling, your full name as
23 well as your current employer.
24 A.  My name is Henry Mirolyuz, M-I-R-O-L-Y-U-Z.  I'm an
25 employee of Chubb claims IT architecture team.

**972**

1  Q.  And where -- what's the location of your employment?
2  A.  I'm located in Simsbury, Connecticut.
3      COURT REPORTER:  I'm sorry?
4      THE WITNESS:  Sims bur.
5  BY MR. HINDERAKER:
6  Q.  And your residence is in the same area?
7  A.  Same area.
8  Q.  Sir, can you identify Exhibit 2 for us, please?
9  A.  Exhibit 2 is my resume.
10 Q.  And under professional experience, on the top line it
11 says, "July 2011 to present."  And in that context, my
12 question is, How current is this resume?
13 A.  This resume is as current as of 2015.  Pre Chubb/ACE
14 merger.
15 Q.  Pre-merger.  If you would -- I would like you to carry
16 your resume forward for us from this document to date.  So
17 pre-merger to date.  What changes would there be or what
18 additions would there be on here?
19 A.  Addition is I become the architect in claims IT
20 organization.  So my title changed from senior technical
21 analyst to senior architect, and my responsibility is I'm no
22 longer involved with Blaze software, and I'm in charge of
23 architecture of claims applications and systems.
24 Q.  When did you stop being involved with Blaze Advisor?
25 A.  Right after the post-merger activities due to the

**973**

1  litigations.
2  Q.  Well, before then, under accomplishments, you note you
3  have been a guest speaker on multiple FICO World and
4  Business Rules Forum conferences.  On how many occasions
5  were you a guest speaker?
6  A.  I believe three or four FICO World conferences and one
7  Business Rules Forum, which was not FICO specific.
8  Q.  And then under professional experience under the heading
9  senior technical analyst, in the second bullet, "Working
10  with EA."  What is EA?
11  A.  Enterprise architecture team.
12  Q.  And caring on with that bullet point, "DM life cycle."
13  What is DM?
14  A.  Decision -- DM, decision management.  It's a FICO
15  methodology which was provided to us by FICO.
16  Q.  By FICO?
17  A.  By FICO.
18  Q.  In the next bullet point is, "Worked with multiple teams
19  across DSO."  What is DSO?
20  A.  Development source organization.  It's a group of people
21  who is involved in the implementation of the application.
22  As an architect, I design the application and developers
23  implement the application.  That's such acronym DSO,
24  development services organization.
25  Q.  Let me try that in my words.  As architect, do you

**974**

1  design the application?
2  A.  Correct.
3  Q.  And then do the development service organization people
4  do the coding?
5  A.  Absolutely correct.
6  Q.  And with respect to your experience, then, what does --
7  in general, what did you do to facilitate presentations to
8  business analysts?
9  A.  I conducted the sessions overview of the benefits which
10  Blaze Advisor software or using Blaze Advisor software can
11  provide to the projects, future projects at Chubb, as well
12  as making sure people are familiar with the technology.
13  Q.  What do you mean by the benefits of Blaze Advisor for
14  future projects at Chubb?
15  A.  Any design can be implemented in multiple ways using the
16  different technology, Blaze Advisor being one of them.  My
17  role was to provide -- explain to people potential benefit
18  of using the software.
19  Q.  And the Blaze Advisor software resides on what's called
20  servers, correct?
21  A.  Correct.
22  Q.  And I would appreciate your definition of a server.
23  What is a server?
24  A.  It's a machine located -- not assigned to a specific
25  individual, and accessible by one or many developers or

**975**

1  parties.  It depends on the rights and authorization
2  provided by Chubb.
3  Q.  Okay.  And when you say a server is a machine, is it a
4  computer?
5  A.  A computer.
6  Q.  All right.  So you -- okay.  So you just used the phrase
7  to get the applications in one data center.  What is an
8  application?
9  A.  It's a software which allows user to perform specific
10  functions.  Depends on the components of the application.
11  Q.  And is an application something that you as the -- in
12  your role on the technical side, you were involved in
13  designing the architecture for these applications?
14  A.  Part of the architecture.
15  Q.  Part of it.  At least the Blaze Advisor part of it?
16  A.  Correct.
17  Q.  So you're making a distinction between the Blaze Advisor
18  software and an application that uses Blaze Advisor?
19  A.  That is correct.
20  Q.  And then if we go to Exhibit 5, you see the fifth
21  paragraph down, it is saying, "So we'll be using Blaze 7.1
22  with the Java business object model."
23  A.  Correct.
24  Q.  Do you understand that Blaze Advisor 7.1 is installed on
25  the servers in the UK?

**976**

1  A.  No.  I would interpret it that it will be or could be.
2  It doesn't say that they are using it at the point of right
3  in the e-mail.
4  Q.  So the point of writing the e-mail, your interpretation
5  is that they planned to use Blaze Advisor 7.1?
6  A.  Correct.
7  Q.  For an application?
8  A.  Where again, the question is I cannot say one way or
9  another if they plan to use it or they plan to use the
10  software Blaze 7.1.
11  Q.  What was the application of Blaze Advisor that he is
12  advising you about?
13  A.  They had a policy administration system for the CSI for
14  the specialty lines in Europe, and at the time of the
15  writing the e-mail they were planning to supplement it with
16  business rules written for Blaze Advisor software.
17  Q.  What is a policy administration system?
18  A.  It's a system which would allow them to provide the
19  insurance to the customers, such as software to allow them
20  to provide the insurance for the customers.
21  Q.  What is a no touch renewal?
22  A.  It's allow the renewal which can be issued -- it's a
23  policy renewal which can be issued without any human
24  interaction.  Essentially automated insurance of the
25  renewal.

**1089**

1  was replaced by Drools in the first half of 2020?

2  A.  I can't recollect exactly, but by end of April, 2020,

3  DecisionPoint for sure had been removed from Blaze usage.

4  Q.  Good.  And I should have just pointed you to page 3 of

5  the same exhibit.  Just put -- yep.

6        The Blaze Advisor component was removed from the

7  version of DecisionPoint used by the financial lines unit on

8  or about April 10, 2020.

9  A.  Right.

10  Q.  And then let's go to back to page 5 and talk about ARP.

11  So we touched on that already.  It was taken out at the same

12  time as CSI Express, on January 17, 2020.  Agreed?

13  A.  That's what the document says.

14  Q.  I know.  And then on page 9.

15        When we're talking about CUW at the top of the

16  page, the Blaze Advisor component was removed from the

17  version of CUW in early November, 2019.  That's what that

18  says there, correct?

19  A.  I can see that, yes.

20  Q.  All right.  And then if we stay on this same page for

21  TAPS, we're going to know that it is -- the document says

22  Blaze Advisor was removed from the version of TAPS used by

23  the Chubb Commercial Insurance business unit in late

24  April -- sorry -- in late third quarter or early fourth

25  quarter 2019.

**1090**

1        That's what that says?

2  A.  Yes.

3  Q.  Okay.  And then if we go to page 10, the bullet point at

4  the bottom for IRMA?

5  A.  I can see.

6  Q.  The Blaze Advisor component was removed from the version

7  of IRMA used by Chubb Commercial Insurance business unit in

8  either the summer or early fall of 2019.  That's what it

9  says?

10  A.  Yes.

11  Q.  And then let's go back to page 6.  For premium booking,

12  kind of in the middle of the page, page 6?

13  A.  Yes.

14  Q.  You're there, but the screen isn't, so we will wait a

15  second.

16        Page 6.

17        Okay.  Well, we can read it.  Premium booking used

18  by corporate business systems was removed on or about

19  April 17, 2020, correct?

20  A.  That's what is stated, yes.

21  Q.  Okay.  Good.  If you would go to Exhibit 1008, please.

22  A.  Okay.

23  Q.  This is the Seventh Supplemental Answer to Interrogatory

24  19.  And if we go to page 3, we're told the Blaze Advisor

25  component --

**1091**

1        THE COURT:  Hang on a second.  Can we do the

2  redaction on that page as well, please?

3        Sorry, Mr. Hinderaker.

4        MR. HINDERAKER:  Yeah, we should.

5        Just the bullet point.  There we go.

6  BY MR. HINDERAKER:

7  Q.  The Blaze Advisor software component was removed from

8  the Evolution application described above on or about

9  September 27, 2019.  I read that right, I hope?

10  A.  Yes.

11  Q.  Okay.  And then let's go to Exhibit 1002.

12  A.  1002.

13  Q.  Got it.  Defendants' Seventh Supplemental Answer to

14  Interrogatory Number 18.  I'm interested in EZER.  So if we

15  can go to page 4.

16        And Blaze Advisor component was removed from the

17  version of EZER used by UK Federal on or about March 29,

18  2019.  That's what it reads?

19  A.  Yes.

20  Q.  And then let's go to Exhibit 105.

21  A.  105?

22  Q.  105.  And this is Defendants' Seventh Supplemental

23  Answer to Plaintiff's Interrogatory Number 20.  And if you

24  would go to page 6.

25  A.  I'm on page 6.

**1092**

1  Q.  Page 6, please.  First bullet point.

2        Blaze Advisor component was removed from the

3  version of Adapt used by CEG SE.  That's Europe, correct?

4  A.  Yes.

5  Q.  And Chubb Insurance Company of Australia on or about

6  January 27, 2019.  That's what it reads?

7  A.  Yes.

8  Q.  Okay.  Thank you for that.

9        Let's go to Australia.

10        You know that, that in -- we're going to go to

11  Australia, but we're got going to start off in Canada.  You

12  know that in Canada there was an application called

13  Evolution that used Blaze Advisor.

14  A.  Yes.

15  Q.  And you know that the decision was made to take a copy

16  of the Canadian application and use it as a base to create

17  an Australian application, which ended up also having the

18  name Evolution, correct?

19  A.  Yes.  That was correct.

20  Q.  And the copy of the Canadian application with Blaze

21  Advisor was the starting point for the Australian specific

22  application.  Agreed?

23  A.  That was the intention.

24  Q.  Yes.  And at the end of the day, the Blaze Advisor --

25  I'm sorry.  At the end of the day, the application that was

**1093**

1  used in Australia called Evolution had a rules engine of

2  ODM?

3  A.  Yes.

4  Q.  So for that, for the Australian application called

5  Evolution, the Blaze Advisor component that was in it was

6  removed, and then ODM was put into its place?

7  A.  What I can tell you is, I believe in first person, I

8  engaged with the Australian team in 2016 and facilitated the

9  adoption of ODM as the rules engine for the application.

10 Q.  Okay.  And so to put the -- I'm just making the simple

11 point, I think, that if you start off with Canadian

12 Evolution with that with Blaze Advisor is what you start

13 from, to get to the end point you first have to remove Blaze

14 Advisor and then put in ODM.

15 A.  I cannot tell you if that is what happened.

16 Q.  Okay.  Well, then let's, let's go back to 105 -- 1005.

17 And this is the Seventh Supplemental Answer to Plaintiff's

18 Interrogatory Number 20.

19             And if you would go to page 4.

20 A.  I'm on page 4.

21 Q.  Page 4?  Got it?

22             And there's a bullet point in the middle.  It

23 starts off the A&H business?

24 A.  The A&H business unit, yes.

25 Q.  And then a couple sentences in it reads, "Indeed Blaze

**1094**

1  Advisor was replaced with IBM operational decision

2  management before Blaze Advisor ever went live in

3  Australia."

4             Did I read that right?

5  A.  That's what this document says.  First time I see it.

6  Q.  Fair enough.  I'm not trying to quarrel with you.  This

7  is information I have from the lawsuit, and that's what it

8  says.

9  A.  That's what is reading here.

10 Q.  All right.  Are you familiar with Zorica Todorovic?

11 A.  I met Zorica at the time we started integration.

12 Q.  Okay.  And she's, she's out of Chubb Canada?

13 A.  Yeah.  She was IT lead CIO for Canada at the time.

14 Q.  And she was part of the process of taking the Evolution

15 application with Blaze Advisor as it was in Canada and

16 transferring that to Australia for ultimately the

17 development of the Australian application called Evolution?

18 A.  Yeah.  I cannot tell you if that is an accurate

19 statement.  I was not directly involved in that activity.

20 Q.  Did you know that she was involved in that activity?

21 A.  I know she owned the Evolution application in Canada.

22 Q.  Okay.  And you know that she was a senior vice president

23 operations of IT and chief information officer for Chubb

24 Insurance of Canada.

25 A.  Yes.

**1095**

1  Q.  Okay.  And did you know that she was working with a

2  consultant in Canada called AppCentrica in connection with

3  this project?

4  A.  When I met with Zorica, I remember her mentioning

5  AppCentrica being one of the consultants they were using in

6  Canada.

7  Q.  And in terms of the work being done by Chubb Australia,

8  you were aware that Chubb Australia was using a consultant

9  in connection with this project called DWS Group?

10 A.  Yes, I was aware of that.

11 Q.  And by "this project," I'm talking about the project of

12 creating the Australia Evolution application from the

13 Canadian Evolution application.  We're on the same page?

14 A.  Yes.

15 Q.  Okay.  Would you go to the exhibit in your notebook

16 called 526.

17 A.  526, yes.

18 Q.  I'm not as quick as you are.  All right.  There we go.

19             And Exhibit 526 is one where you happen to be on

20 the email chain.  It's from Hamish Tonkin to Russell Hodey

21 and yourself, among others.  Agreed?

22 A.  Yes.

23 Q.  As it bears the date of May 12, 2016.

24 A.  Yes.

25 Q.  And Russell Hodey is a Chubb representative out of Chubb

**1096**

1  Australia?

2  A.  Yes.

3  Q.  And Hamish Tonkin is out of the European zone of Chubb.

4  A.  Yes.  Hamish Tonkin was a legacy Chubb architect working

5  in the UK, in England.

6  Q.  And the subject matter of this email is Re:  Changing

7  Rules Engine Software.  Agreed?

8  A.  Yes.

9             MR. HINDERAKER:  I don't think there's an

10 objection to this exhibit, but I do offer it, Your Honor.

11             MS. GODESKY:  No objection.

12             THE COURT:  Exhibit 526 is received.

13 BY MR. HINDERAKER:

14 Q.  And the attachment, Rules Engine Matrix, if you would go

15 to Exhibit 527, the next one.

16 A.  527, yes.

17 Q.  And that's -- we're on the same page that Exhibit 527,

18 the Rules Engine Matrix, is the attachment to, excuse me,

19 Exhibit 526, the email.

20 A.  This doesn't say that, but --

21 Q.  If you look at -- go ahead.  If you look at the Bates

22 number that's produced in the litigation, the number for the

23 email is FED013893.  The number for the attachment

24 FED013894, just the next number.

25 A.  Understood.  Thank you.

**1105**

1  for his authenticity for making, giving the foundation,
2  we're getting off track --
3       For showing the authenticity of those documents,
4  then the documents are admissions. I'm not suggesting, and
5  I haven't suggested, that Mr. Ghislanzoni has first-hand
6  knowledge of foundation to speak to these, but I can read
7  their admissions from authenticated documents.
8       THE COURT: I understand.
9       MR. HINDERAKER: Okay.
10      THE COURT: I think in fairness to Federal, I
11  think they need the opportunity to look at the case law that
12  you're citing. I think as I'm hearing it, I don't think you
13  need to use the exhibits themselves with the witness. They
14  can -- if they're admissible, then they will come in either
15  on their own because of the affidavit or through another
16  witness, the emails.
17      MR. HINDERAKER: The reason I -- I wasn't going to
18  do this right away, and the reason I went to it was when
19  Mr. Ghislanzoni identified all the people on the email --
20      THE COURT: Right.
21      MR. HINDERAKER: -- and I know he's not, he's not
22  one of them. He identifies all the people on the email.
23  There's no reason to think it's not exactly what it says it
24  is. And I offered it, and it was refused.
25      I said, well, I am going to find more foundation

**1106**

1  to show the subject matter of this email, the knowledge
2  transfer, is what he already knows about some, and this
3  brings us into AppCentrica and DWS a little bit deeper. If
4  he authenticated the email and the attachment that came from
5  Chubb Canada, I'm not going to ask him his first-hand
6  knowledge about it. He doesn't have it.
7       I'm just going to read the admissions that are in
8  Chubb's own documents.
9       MS. GODESKY: Your Honor, this is exactly what
10  FICO took the position we could not do, get documents into
11  evidence through witnesses who have no foundation to talk
12  about. And that has been the rule since the first day of
13  trial.
14      And what's happening here is, FICO did not take
15  depositions during discovery of Russ Hodey, even though he
16  was identified; Zorica, even though she was identified.
17  They chose not to take those depositions. They don't have
18  the evidentiary record that they need, and now they are
19  trying to shoehorn it in through someone who didn't even
20  start working at the company until after these emails were
21  authored.
22      He's admitted and he will testify that he has some
23  knowledge about what happened with Evolution Australia,
24  starting in spring 2016. But to try to use him as a vehicle
25  to get in the documents from 2015 that he was never on, he

**1107**

1  didn't participate in the conversations, again, when you can
2  look back at the correspondence that FICO sent the court,
3  they said this shouldn't happen, and the court said we
4  couldn't use documents with witnesses who couldn't lay a
5  foundation.
6       MR. HINDERAKER: And this man is going to lay the
7  authenticity through the document. I'm not asking his
8  personal knowledge. And, you know, Zorica is one of those
9  witnesses that we had yet another motion about, and the
10  defendants had her on the witness list. The defendants were
11  going to bring her to trial. Then they were going to take a
12  deposition.
13      I mean, it would have been easier for me if she
14  would have showed up, but that isn't in my control.
15      MS. GODESKY: It would have been easier for us,
16  too, but there's no power to compel her at that point, but
17  they could have taken a deposition earlier and so --
18      MR. HINDERAKER: My point is there's no reason to
19  blame around, either way.
20      MS. GODESKY: I'm not blaming anyone.
21      MR. HINDERAKER: We're dealing with the question
22  of -- I mean, the law is clear, in my judgment. If he can
23  authenticate that the document, email, is what it purports
24  to be and, he's already told me that the attachment connects
25  to the email, then that's all I need.

**1108**

1       It is an authentic record of the defendants, and
2  it's an admission.
3       THE COURT: I don't know that he can. I don't
4  think he has.
5       MR. HINDERAKER: Well, I know that he has already
6  agreed with me that the attachment is with the email. I
7  haven't gotten through your judgment that the email is an
8  authentic document produced in this litigation from Chubb.
9       THE COURT: Right. Well --
10      MR. HINDERAKER: And actually I don't know what
11  more I can because all of the, you know, he identifies the
12  people on it except for Perle and --
13      THE COURT: I haven't had an opportunity to read
14  the declaration of Zorica. What does it say, basically?
15      MR. HINDERAKER: Basically, we work with
16  AppCentrica, AppCentrica access to Blaze Advisor off of our
17  virtual desktops, and then AppCentrica was part of the work
18  with DWS. It's fairly high level. It's fairly high level.
19      THE COURT: Okay.
20      MS. GODESKY: He doesn't know anything about that,
21  Your Honor.
22      MR. HINDERAKER: I agree with you. He doesn't.
23      MS. GODESKY: So this is not the right witness.
24      THE COURT: Well, I agree with Federal. I don't
25  think -- well, I don't think currently we've gotten the

**1109**

1  foundation for the admission of the email with the
2  attachment.
3      Go ahead and lay more foundation if you can.
4      MR. HINDERAKER: If I can.
5      THE COURT: And on the affidavit we can deal with
6  that later. And you're welcome to show him the affidavit,
7  but I don't know that that's -- I mean, he hasn't seen it
8  presumably. He can't testify to its accuracy.
9      MR. HINDERAKER: And I wouldn't ask him to.
10      THE COURT: Right.
11      MR. HINDERAKER: Its accuracy is the admission the
12  defendants have presented to the court as accurate.
13      THE COURT: It doesn't strike me, to be honest
14  with both of you, that the question of whether AppCentrica
15  had Blaze or had access to Blaze and used it as a consulting
16  tool Chubb Canada is terribly in dispute.
17      MS. GODESKY: We did not object when
18  Mr. Hinderaker showed the interrogatory response agreeing
19  with that in his opening.
20      MR. HINDERAKER: It's not terribly undisputed.
21  These documents will -- they say, for example, this will get
22  the source code to DWS, that much. It's a bit more than,
23  it's a bit more than DWS was in the same room as Blaze
24  Advisor as DWS, we're going to get the source code to DWS.
25      MS. GODESKY: My objection is, Your Honor, this

**1110**

1  witness was not involved in DWS and AppCentrica vis-à-vis
2  Blaze, and so to have our corporate representative
3  questioned about correspondence he can't conceptualize, it's
4  just not fair.
5      MR. HINDERAKER: Well, again, I don't -- he's
6  already testified to his general, his knowledge about that
7  transfer. He's already testified he met with Zorica. He's
8  not a 30(b)(6) deposition. He's a human being witness in
9  the trial.
10      MS. GODESKY: Sure.
11      THE COURT: Right. And you're welcome to explore
12  it further with him.
13      MR. HINDERAKER: All right.
14      THE COURT: Again, he, I think he's testified
15  about his knowledge, once he came on board, about DWS and
16  AppCentrica, has he not?
17      MR. HINDERAKER: Yeah, he has. And there's emails
18  that are going to be after his onboarding. I mean, the one
19  I'm working with now is earlier in time, but he comes on
20  board, and he's part of the transition out, and then there's
21  other emails that are after, later in time.
22      THE COURT: Okay. Well, I think the "are you
23  aware" question is fair game.
24      MR. HINDERAKER: I'm sorry. What?
25      THE COURT: The "are you aware" question is fair

**1111**

1  game. But if he's not aware of it, he's not aware of it.
2  And you have a basis for asking it.
3      MR. HINDERAKER: I do. And my, what I lose -- I
4  will do that, but what I lose in the process is, to use one
5  of the defendants' own documents as an admission.
6      THE COURT: I understand. I understand.
7      (In open court)
8      THE COURT: Mr. Ghislanzoni, you will have to turn
9  your microphone back on. There you go. Thanks.
10  BY MR. HINDERAKER:
11  Q. Well, let's just cover a little ground that we've
12  already covered, but I need to do it to get back into a
13  context. Okay?
14  A. Okay.
15  Q. So if we go to Exhibit 526, this is the email that you
16  are on. It's in evidence, and the subject matter is
17  Changing Rules Engine Software. And then the email, excuse
18  me, the email below -- well, the email above has Martin Sill
19  at DWS.comAU and then the email below Russell Hodey at
20  Chubb.com to yourself.
21      And then there's a discussion with Martin and DWS,
22  and as you said already, there was some exploration by DWS
23  into whether Drools would be a substitute for the Evolution
24  application in Australia, but ultimately the decision was to
25  go to ODM.

**1112**

1  So that's -- you agree with that? All right?
2  A. Yeah, I agree with the fact that we selected ODM, and we
3  utilized ODM.
4  Q. Right. Okay. So then let me -- and you are also, you
5  also know, you said, that Chubb Canada was working with a
6  consultancy called AppCentrica.
7  A. What I know that, Zorica, when I met her first time as
8  part of the integration, mentioned that AppCentrica was one
9  of the consultancy that they were utilizing in Canada.
10  Q. Okay. So I think we're on the same page.
11      And if you would go to, go to Exhibit 16A, please.
12  A. Sorry. Could you repeat the number?
13  Q. Sure. 0016A.
14  A. Okay. I'm there.
15  Q. And on this email it is from Robert Lokinger, and his
16  address is at AppCentrica.com, correct?
17  A. I can see that in the email.
18  Q. You don't disagree with that, do you?
19  A. It's written on this paper.
20  Q. All right. And the email is to Zorica Todorovic at her
21  email address at Chubb.com?
22  A. That's what the email shows.
23  Q. Yep. And then the email shows it also goes to another
24  person who is from from AppCentrica Ken Kitamura, I think.
25  Agreed?

1113

1  A.  Yeah, it shows that.

2  Q.  And the subject is SOW for Discussion Tomorrow.  Do you

3  see that?

4  A.  I can see it.

5  Q.  And do you understand SOW means statement of work?

6  A.  Yes, I do.

7  Q.  All right.  And the attachment is Arch, A-R-C-H, that

8  stands for architect?

9  A.  First time I see this email.

10  Q.  No.  I know it is.  I know it is.  I'm not --

11  A.  Okay.

12  Q.  I'm not pretending otherwise.  I'm just asking you what

13  it looks like, what it is.

14  A.  I can read arch.

15  Q.  Okay.  Arch PLD project, right?

16  A.  I don't know.

17  Q.  Okay.

18  A.  I would be guessing.

19  Q.  Well, can you read arch PLD, SOW?

20  A.  Yes.

21  Q.  All right.  Then go to Exhibit 16.

22  A.  16.

23  Q.  Yeah, please.

24  A.  Yes.

25  Q.  And you see that this, the front page of this document,

1114

1  it is from AppCentrica?

2  A.  Yes.

3  Q.  Agreed?  And the title of the document is Chubb Arch PLD

4  Project, right?

5  A.  Yes.

6  Q.  And the title on the email was Chubb -- was Arch PLD,

7  SOW, right?

8  A.  Yes.

9  Q.  And the front page of Exhibit 16 says Statement of Work,

10  right?

11  A.  Yes.

12  Q.  And I know you're not there at the time, but this

13  document says Statement of Work from AppCentrica, correct?

14  A.  It does.

15  Q.  And then if you go to page 3 where it says Introduction?

16  A.  Yes.

17  Q.  Does it say, "The following document provides a

18  statement of work for the Evolution engagement in 2015 and

19  2016 between AppCentrica and Chubb Insurance Company of

20  Canada.  The focus of the work to be completed by

21  AppCentrica over the next two years will be the design and

22  development of the Evolution system for Australia."

23          Agreed?

24  A.  That's what it says.

25  Q.  And it goes on to say, "This is funded by the ARC

1115

1  program, the project name is Arch PLD," same as on the front

2  page of the document, right?

3  A.  That's what it says, yes.

4  Q.  You do know that after your, after the merger, you do

5  know from your involvement in that, Zorica and AppCentrica

6  were working in Canada together, and you know that

7  AppCentrica -- I'm sorry -- and you know that Evolution

8  Canada was being transferred to Australia.

9          And you know that AppCentrica was working with

10  Chubb Canada for that project, right?

11  A.  The last part I didn't know.  I don't know.  I don't

12  have evidence.  You are showing me a document that describes

13  an SOW, but I did not know.

14  Q.  Is there anything in this SOW, Exhibit 16, that looks to

15  you to be not an authentic document of AppCentrica?

16  A.  What I can tell you is what I see in the document, has

17  an AppCentrica name and a logo.

18  Q.  Do you believe it to be an AppCentrica statement of

19  work?

20  A.  That's what it says.

21  Q.  Okay.  And when you look at the earlier email, 16A, you

22  agree that Rob Lokinger was transmitting to Zorica Todorovic

23  this statement of work.  And if you look at the Bates

24  numbers, the email is 6836, and the estimate of work is

25  6837.

1116

1  A.  Yes, I can see.

2  Q.  And I will represent to you that this came to us in the

3  course of the litigation.

4  A.  I understand.

5  Q.  All right?  And do you have any reason to believe this

6  is a record that was kept by Chubb Canada regarding this

7  project?

8          MS. GODESKY:  Objection.  No foundation.

9          MR. HINDERAKER:  I didn't ask for his personal

10  knowledge.  I just asked him if he had reason not to believe

11  it from all the indicia on the documentation.

12          THE COURT:  I will sustain the objection as asked.

13  BY MR. HINDERAKER:

14  Q.  Looking at everything on this, looking at everything on

15  the documentation in terms of whether it appears to be

16  authentic or not, do you have any reason to think that it is

17  not?

18  A.  I was not involved in this activity.

19  Q.  I understand that, sir.  That wasn't my question.

20          My question is:  If you look at these documents on

21  their face, from, to, subject matter, logos, statement of

22  works, introduction, about a project that you know happened,

23  do you have any reason to believe that this is not authentic

24  records from Chubb Canada?

25          MS. GODESKY:  Objection.  No foundation, mis

1117

1 characterizes testimony.
2          THE COURT:  Overruled.
3          THE WITNESS:  So what I can tell you is, you're
4 showing me an email, and you are showing me a document that
5 is clearly an attachment of that email.
6 BY MR. HINDERAKER:
7 Q.  Okay.
8 A.  That says SOW.  I can agree that that is what you are
9 showing to me.
10 Q.  And can you agree that it, from everything on the
11 document, it appears to be the true thing that Zorica got
12 from AppCentrica?
13 A.  I cannot comment beyond -- I cannot say anything more
14 than what I have already said is, you are showing me an
15 email and an attachment that was -- and I have in front of
16 me.
17          Now since I was not working with Zorica at the
18 time, I wouldn't have any additional information to --
19 Q.  And, sir, I'm not going to ask you for additional
20 information.  But we agree that the attachment, that the
21 attachment went with the email, right?
22 A.  Yes, we agree.
23 Q.  And we agree that Zorica was involved in a project.  We
24 agree that Zorica worked with AppCentrica.
25 A.  Yes.

1118

1 Q.  And we agree that AppCentrica -- we agree that Chubb
2 Canada transferred Evolution Chubb Canada to Chubb
3 Australia.  Agreed?
4 A.  We agree that a copy of Evolution was taken from Canada
5 for Australia.
6 Q.  And that in Canada the consultancy that was being
7 worked, that was involved in that project was DWS?
8 A.  DWS was in Australia.
9 Q.  That's what I just said.  We agree that DWS was in
10 Australia.
11 A.  Yes.
12 Q.  And we agree that AppCentrica was in Canada.
13 A.  We agree AppCentrica was a consultancy in Canada, yes.
14          MR. HINDERAKER:  Your Honor, I offer these
15 exhibits as authenticated and as admissions.
16          MS. GODESKY:  There's no foundation, Your Honor,
17 and they're hearsay, unsigned documents.
18          THE COURT:  Sustained.
19 BY MR. HINDERAKER:
20 Q.  And now would you turn to Exhibit 900.
21 A.  900.
22 Q.  Please.
23 A.  Okay.
24 Q.  Who is A. Pavlenko at Chubb.com?
25 A.  If I remember correctly, Alex Pavlenko was a member of

1119

1 Zorica's team in Canada.
2 Q.  And this email is dated January 14, 2016, right?
3 A.  January 14, 2016, yes.
4 Q.  And this is beginning of your time in terms of the
5 integration of technologies, correct?
6 A.  Yes.
7 Q.  And the "to" is to Zorica Todorovic at Chubb.com.  Do we
8 agree?
9 A.  Yes.  Yes.
10 Q.  And do you know the cc's at Chubb.com?
11 A.  No.
12 Q.  Okay.  And the forward and the subject matter is re:
13 Work Manager code, Handover January 14th?
14 A.  Yeah, it says that.
15 Q.  And the work manager code was the element of Canadian
16 application called Evolution that was being handed over to
17 Australia, correct?
18 A.  I remember work manager code being a component of the
19 application.
20 Q.  Of the Evolution application.  I'm sorry.  I spoke over
21 you.  My bad.
22          You remember work manager being a component of the
23 Evolution application?
24 A.  Yes.
25 Q.  And you know that that component of the Evolution

1120

1 application then was transferred to Australia?
2 A.  Not at that level of detail.  I would be able to tell
3 you that, as I mentioned earlier, that Evolution was the
4 starting point for the development, Evolution Canada as an
5 application was the starting point for the development of
6 Evolution Australia.
7 Q.  And do you assume, as I do, that the full Evolution
8 application then from Canada was transferred to Australia?
9 A.  I don't have the details behind it.
10 Q.  And these emails also include on them references to, "I
11 will speak to Martin."  And do you understand Martin is
12 Martin Sill at DWS Group?
13 A.  Where do you see --
14 Q.  On the first page, Zorica to Abad Dokht and another
15 person re:  Work Manager Handover.  "Thanks so much for the
16 constant updates, Alex.  I will speak to Martin and see
17 where we go from there"?
18 A.  Oh, I can see now.  Yes.
19 Q.  And you knew Martin as a DWS person because he was part
20 of the Drools analysis in Australia.
21 A.  Yeah, I know there was an architect called Martin at DWS
22 Australia.
23 Q.  All right.  Good.
24          And then the second page of the email at the top
25 references the APZ team.  Do you see that?

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                                  March 1, 2023, Volume VIII

**1634**

1  A.  Our pricing model -- well, pricing model always been
2  our pricing model, but our pricing practices around
3  discount around the 2010-11, time frame, we started
4  becoming more stringent in how and where we actually
5  offered discounts.  That's reflected in the business.
6          We also changed other practices too.  Like we
7  began moving away from perpetual licenses.  The market was
8  moving away.  We were moving away.  We were moving towards
9  term licenses, which establish a reoccurring revenue base
10  for the product.
11  Q.  You mentioned standard pricing guidelines did not
12  change from that time frame.
13  A.  The pricing and how we priced did not change, no.  It's
14  the same pricing model that we had all the way back in
15  2003.
16  Q.  But discounting has changed?
17  A.  Yes.
18  Q.  And in terms of market acceptance to FICO's pricing
19  without the aggressive discounting, can you describe that?
20  A.  Yeah.  We began in the 2000 -- I said 2010, 2011 time
21  frame of sort of pulling back on the level of discounts and
22  by 2015 into '16, you know, relatively strong flat sales.
23  Going into '17 we had even more sales, 20 percent by my
24  last look of that.
25          So it was, it was a strong business at that point

**1635**

1  in time.
2  Q.  Without aggressive discount?
3  A.  Without aggressive discounting, yes.
4  Q.  If we could go back to the license agreement, please.
5          You see at the top of the, at the top of the
6  license agreement in the first paragraph, if we could open
7  that up.
8  A.  Yes.
9  Q.  The software license and maintenance agreement is
10  entered into as of June 30, 2006, between Fair Isaac
11  Corporation and Chubb & Son, a division of Federal, client.
12          From your role on the business of FICO, but
13  specifically in the licensing of Blaze Advisor, what's the
14  significance, what's the business significance of defining
15  who the client is?
16  A.  It defines who you are doing business with.  It defines
17  who you are licensing the software to.
18  Q.  Okay.  And does it also -- well, a license agreement
19  is, of course, a two-way agreement, licensor/licensee.
20  A.  Yes.
21  Q.  And FICO as the licensor is bound by the terms of the
22  agreement.
23  A.  Yes.
24  Q.  And then on the licensee side, it's the client that's
25  bound by the terms of the agreement.

**1636**

1  A.  Yes, the client is bound to all of the terms of the
2  agreement.
3  Q.  And the -- we've seen already that in the definition
4  of -- in Amendment One and Amendment Two, the definition of
5  "client" did not change.
6          Were you part of any discussions during that time
7  frame of Chubb & Son wanting to sign -- of any discussion
8  about the client being anybody else but Chubb & Son?
9  A.  No.
10  Q.  Going back to the basic, to the base agreement, we look
11  at the license grant in paragraph 2.1.  And there we see,
12  just as you said, the licenses is a, "hereby grants to
13  client."
14          But I'm also interested in asking your, the
15  business reasons for the fact that the license agreement
16  says it's non-transferrable, nonexclusive and a limited
17  license.
18  A.  Yeah, so first of all, software licenses are a
19  construct whereby ownership stays with FICO.  It's our IPR
20  software.  The license just gives them a right to use, and
21  there's specific conditions under that right to use.
22          This begins to outline the fact that this
23  agreement is with the client, and they cannot transfer this
24  agreement to anybody else, and it is nonexclusive, meaning
25  it is not just for them, and that there are limits framed

**1637**

1  within this agreement that they must adhere to.
2  Q.  And what's the business thinking behind the phrase "for
3  internal business purposes only"?
4  A.  Yeah.  So this is an additional protection that we want
5  to make sure that the use of the license, the right to use
6  the license, is for the individual that we're licensing to,
7  in this case the client, and that it is for their internal
8  business purposes, and they can't extend or reach that use
9  of the license outside of the use just for that client.
10  Q.  Let's turn to 3.1.  This is called License
11  Restrictions.  There's a number of them, but overall,
12  what's the commercial business reason for FICO to put
13  restrictions into the license?
14  A.  They're all there to make sure that the software is
15  used in accordance with very specific constraints or
16  limitations that we place on that license grant.  There's
17  various reasons for them from a business perspective, but
18  all of it is to protect a very valuable piece of IP.
19  Q.  Being Blaze Advisor?
20  A.  In this case Blaze Advisor.
21  Q.  If we go into 3.1, we see the small Roman iv.  So it.
22  Begins, "Client represents and warrants that it and its
23  employees shall not," and then Roman, small Roman iv,
24  "disclose the Fair Isaac products to or permit use or
25  access of the Fair Isaac products by any third party or any

**1638**

1  individuals other than the employees of client."

2        So let me stop at that point with "any third

3  party."

4        Why does FICO care that the Blaze Advisor

5  software cannot be disclosed used or accessed by any third

6  party?

7  A.   There's a number of reasons, two primary business

8  reasons.  We like to know who is using our software at all

9  times.  That third party could be a competitor or that

10  third party could be leaking confidential information about

11  the use of our software to a competitor.  It has happened

12  in the past, so we want very tight controls on who actually

13  gets access to that software.

14        Another business reason is also, there is a bit

15  of an integrity issue in the business here.  Third parties

16  purport themselves to be Blaze experts all the time, and we

17  do not want third parties getting access to Blaze software

18  unless we've at least had a conversation with the client

19  about that third party and any representations that they've

20  made.

21  Q.   Well then let's go to, we'll come back to 3.1, but then

22  let's go to 3.6.  And here we have a provision, Use By

23  Third party.

24        Is this an instance of what you just described

25  where the client wishes to have a third party, here ACS

**1639**

1  Commercial Solutions, have access and use of Blaze Advisor

2  on behalf of the client?

3  A.   Yes.  It looks like a negotiated term whereby

4  third-party use was granted in a very specific case of ACS.

5  That conversation must have occurred.  And furthermore,

6  I'll point out here that this section holds ACS to the

7  obligations of the license grant and also the client to

8  ACS's responsibility to the license grant, which is what I

9  didn't mention yet another thing we're concerned about.

10        If the third party is going to use it, we want to

11  make sure that they're aware and they're beholding to the

12  contract terms of the license grant.

13  Q.   And you also bound the client to be responsible should

14  ACS not abide by it.

15  A.   Absolutely, because it's arm's reach for us, so yes.

16  Q.   And then the last sentence is clear saying what?

17  A.   This is basically saying you have a, you have a right

18  to use it with ACS but nobody else unless you actually come

19  back and ask for our consent.

20  Q.   You mentioned just by looking at it that this was a

21  negotiated term.  How did you, how were you able to tell

22  that?

23  A.   Well, it's easy because we don't allow ACS to use our

24  software in every one of our contracts.

25  Q.   All right.  Okay.  Dumb question.

**1640**

1        Let's go back to 3.1(iv,) small Roman four,

2  "Client represents and warrants that it and its employees

3  shall not," and we read about the disclosed.  And then it

4  goes on, "permit use or access by any third party or by any

5  individual other than the employees of client."

6        From the business point of view, why is that

7  further restriction limiting, further restriction saying

8  only employees of the client?

9  A.   Well, it's very similar to the third party.  Our

10  agreement is with the client, and they are responsible for

11  making sure that the terms are agreed to and that flows

12  down through the employees of the client.  If they end up

13  giving it to somebody who is not an employee, where is the

14  terms and conditions being enforced?

15  Q.   Your further understanding of the license agreement,

16  I'd like to go to what's called Exhibit A.

17  A.   Exhibit A.

18  Q.   Exhibit A of the base document.  It's J001-011 on the,

19  our copy.

20  A.   Exhibit A of the contract.

21  Q.   Yes.  Yes.

22  A.   I am there.

23  Q.   And this Exhibit A is called Pricing and Payment.

24        And I want to ask you to explain for us some of

25  the things that are on here, including and starting with

**1641**

1  Blaze Advisor Development.  And what is that as a product?

2  A.   Yeah.  So Blaze Advisor is actually broken down into

3  multiple licensing components.  The two primary components

4  of the licensing are around what we call our development

5  and our deployment licenses.

6        A development license is in the Blaze world are

7  licenses that are granted and limited to the purposes of

8  writing rules, connecting your Blaze Advisor application to

9  your systems and data and actually generating the

10  deployment that gets eventually put into the servers of the

11  client.

12        It's predominantly a technical tool, but the

13  technical tool also generates what we call rule maintenance

14  application, which is where business users can use that.

15  So it's the, it's the primary licensing component for that,

16  that development, authoring, connectivity and integration

17  work.

18  Q.   And at the outset at the original agreement in June for

19  use up to five seats, and then it goes on, "to be used

20  solely in connection with the named application."  We'll

21  get to that named application component in a bit, but what

22  does it mean for up to five seats?

23  A.   Yeah.  The, the development license is actually

24  associated with a portion of the software that actually

25  installs on a personal computer or a workstation.

**1658**

1  And as you see -- I'll wait till it's on the
2  screen. This is from Russ Schreiber to Natasha Fowlin, and
3  you are one of the CC recipients?
4  A. Yes.
5  Q. And Russ says, "Can you put 30 minutes on the calendar
6  for this group to discuss ACE's acquisition of Chubb and
7  potential licensing expansion fees?"
8  And obviously you were part of that
9  communication.
10 A. Yes.
11 Q. Okay. At this point in time, did you have any
12 information about the acquisition, other than what was
13 publicly announced?
14 A. No.
15 Q. Nothing came, no information from Chubb & Son to you?
16 A. No.
17 Q. What did you understand -- well, what was your reaction
18 to -- you don't have to say what Mr. Schreiber thought, but
19 what was your reaction to him saying, "Let's discuss ACE's
20 acquisition of Chubb and potential licensing fees
21 expansion"?
22 A. Well, I have regular calls with Russ, because he's our
23 insurance global lead, and I'm at this point in time
24 running our platform line of business. So we speak on a
25 regular basis, and so I had become aware of the merger

**1659**

1  announcement in October.
2  And in my last conversation with him, I asked him
3  where do we sit in actually having a conversation with
4  Chubb about the impending merger. And his answer was, we
5  don't have one. We don't have any contact. So I asked
6  him, I'm like let's get Mike Sawyer on the phone. Let's
7  figure out who do we call. We got to know somebody at
8  Chubb who can actually address this, right?
9  This is Russ's conclusion about the licensing
10 event. It's not an unfair conclusion. It typically
11 happens this way that there's a license event. But the
12 purpose of this call was actually entirely about how do we
13 reach Chubb, who do we reach at Chubb, because we need some
14 information about what's coming.
15 Q. And then did you get any information before the
16 acquisition closed?
17 A. I did not. I knew that Mike went back and tried a
18 bunch of his resources, but we did not have any information
19 all the way through into January.
20 Q. All right. So we've seen from Mr. -- let me turn your
21 attention to Exhibit 90. And this is Mr. Carretta's
22 January 27, 2016, letter to Joseph Wayland at Chubb
23 Limited.
24 Were you aware that -- are you aware of this
25 notice of breach letter on or about its time?

**1660**

1  A. I was.
2  Q. Other than, other than -- I take it you -- Mr. Carretta
3  had authority to send the letter.
4  A. He did.
5  Q. But were you involved at all in the crafting of the
6  language of the letter?
7  A. Not the language, no.
8  Q. So we'll leave that to Mr. Carretta's testimony about
9  that.
10 And then if you would turn to Exhibit Number 91.
11 And now it's Andrew Hopp, Deputy General Counsel,
12 responding to Mr. Carretta, February 17, 2016. You were
13 aware of this response, were you?
14 A. Yes.
15 Q. And did you read this response from Mr. Hopp?
16 A. Yes.
17 Q. What was your reaction to what he's saying?
18 A. There were a couple. The first one was, he sort of
19 missed the point that there was an event that needed our
20 consent.
21 Q. Okay. Agreed. And the second one was what?
22 A. He, he made a reference to, that the client remained
23 the same and that that was sufficient, which confused me.
24 Q. Okay. And you say in the second paragraph, he says,
25 "Our initial findings indicate that the applications that

**1661**

1  have been utilizing the Blaze Advisor software since 2006
2  are currently running in the exact same fashion as prior to
3  the merger transaction."
4  Did that have any significance to you?
5  A. It reassured me that he was following the contract in
6  that he was, during this period, before consent was given,
7  he was locking it down. I'm not sure how convinced I was,
8  but it was reassuring.
9  Q. And he also references that his IT people are in the
10 process of gathering information. Let's stay in or around
11 this time frame of February. Were you the -- did you
12 receive any additional, any information -- let me back up.
13 Before the letter from Mr. Carretta went out, you
14 said you had no information from Chubb & Son regarding the
15 acquisition.
16 A. That's correct.
17 Q. And in a reasonable time frame after February 17th, did
18 you on the business side, receive any information regarding
19 any more information that wasn't in this letter from
20 Mr. Hopp?
21 A. No.
22 Q. And then Mr. Carretta responded on February 22nd, and
23 we've heard his testimony.
24 And were you on the business side with respect to
25 the working with -- the authority for Mr. Carretta to send

**1662**

1  Exhibit 92 out?  Did you have any?
2  A.  I'm sorry.
3  Q.  I'm sorry.  I was waiting for an answer, but you were
4  waiting for a question.
5       You okayed Mr. Carretta to send this letter out?
6  A.  Yes, I agreed.
7  Q.  All right.  I was going to ask you something about
8  this.
9       And the Carretta, the two Carretta letters are,
10  at the conclusion, encouraging business discussions with
11  Chubb & Son.  Did you share that desire?
12  A.  Absolutely.  Ten years of wonderful relationship with
13  Chubb, and they're our first foray into commercial and
14  specialty lines insurance.  They were a great reference.
15  They spoke at FICO World.  They took reference calls for
16  clients on new sales all the time, and they were great
17  people too.  They were, they were good to work with.
18  Q.  So then let's move forward to Exhibit 94.  Were you
19  aware of -- the communication of course is from Tamra
20  Pawloski to Mike Sawyer, carbon copy to Russ Schreiber; and
21  then the second page of the document has a proposal
22  February 25, 2016, sent to FICO.
23       Were you aware of this response from Chubb & Son
24  at the time?
25  A.  Yes, it was sent to me.

**1663**

1  Q.  Okay.  And -- well, what was your reaction and reading
2  of it?
3  A.  It's what I would call a non-starter.  That basically
4  means it cannot be accepted on its face value.
5  Q.  Why do you say that?  And give us the details for that.
6  A.  There's a number of reasons why, but let me start with
7  the most egregious one of them, which is this statement
8  here that the applications listed below, "That currently
9  utilize Blaze Advisor software, these are the same
10  applications using the software both prior to and after the
11  merger.  Under the above proposal, Chubb shall have the
12  right to change the applications utilizing Blaze software
13  at any time at its sole discretion without FICO's concept
14  so long as the named applications do not exceed 15," the
15  amount of 15.
16       We grant licenses.  Our clients don't grant
17  themselves licenses.  That's a core tenet of our license
18  agreement.  Besides that, fundamentally there's no
19  governance on that statement.  They could call anything,
20  you know, an application and say that's going here from
21  there to here, right.
22       There's no definition of it.  There's no common
23  understanding of it.  That alone completely threw the
24  proposal out of question.
25  Q.  Okay.  Did you draw a judgment whether it was a good

**1664**

1  faith or bad faith proposal?
2  A.  My impression was, this was a bad faith proposal.
3  Q.  For the reasons you said or for any additional ones?
4  A.  For the reasons I just said.
5  Q.  As a consequence of receiving this proposal, did you
6  have any -- was there any reason to doubt that Blaze
7  Advisor would be used in the new larger organization now
8  called Chubb Limited now, the 30 plus billion dollar
9  organization?
10  A.  No.  The letter itself is very clear.  They want the
11  right to use the 15 applications and change them however
12  they want, whenever they want.  So it's clear that they're
13  talking about the 15 to begin with, but they're talking
14  about open door policy for anything in the future.
15  Q.  In any single Blaze Advisor application, is it possible
16  to change the functionality within that application to
17  service more business?
18  A.  The intention of the license definition and grant is
19  no.
20  Q.  Under the proposal of February 25, 2016, what's your
21  interpretation?
22  A.  That's exactly what she's asking to do.
23  Q.  If you would go to Exhibit 227.  And we see this is a
24  Chubb Corporation annual report of 2005.
25  A.  Yes.

**1665**

1  Q.  And on page 22, if we go to that, we saw a similar list
2  earlier.  Here we have the list of the officers of the
3  division Chubb & Son, right?
4  A.  I'm sorry.  22 or 24?
5  Q.  Yeah, I'm on page 20 -- well, the Bates number, the
6  Exhibit Number is 0227-024.
7  A.  I'm there now.
8  Q.  Okay.  So there we have the, well the whole page is
9  bigger than on the screen, and there we have the officers
10  of Chubb & Son at that point in time.
11       And then I want to go to, I want to go to page 4
12  and just use this as a reference where we see net written
13  premiums grew 2 percent to 12.3 billion, on page 4.  It
14  would be the second full paragraph.
15  A.  Can I ask you to clarify page 4 of what?  It's the
16  Bates page 4?
17  Q.  Yeah.  So page 2 of the actual document, and at the
18  bottom it says P-0227-004.
19  A.  Thank you.  Yes, I see it now.
20  Q.  Okay.  So, so that's a reference point for the 2006
21  license agreement?
22  A.  Yes.
23  Q.  And then I think we've mentioned that that was the data
24  point used in pricing of the original license agreement in
25  2006, correct?

**1836**

1  Q.  That's what I wrote down, and I misspoke.  2005.  You
2  said you negotiated the deal, and you will never forget it.
3  I would like you to explain the pricing that was a -- that
4  was resulting in -- or resulted in this Exhibit 4.
5  A.  Yeah.  The reason I will never forget this deal.  We
6  had been negotiating with them for some time.  We were
7  talking about at one time an 8 million dollar number, and
8  the date of this is actually the last day of our fiscal
9  year.
10       And I got a phone call from my boss saying we
11  need some business, where can we get it.  I said, well, guy
12  this guy has offered me a million dollars.  I can take the
13  deal if you want it.  So I called him up about 3:00 or 3:30
14  in the afternoon.  And he said, okay, but you have to get
15  it done before the football comes on, because I'm watching
16  my football game.
17       So I will never forget that.
18  Q.  Is this an anomaly?
19  A.  At this time I wish I could say it was an anomaly, but
20  we used to grab business a lot back at this time in
21  history.  We switched to reoccurring revenue streams, and
22  clients don't want to buy right now, they want to buy
23  later, they buy later.  So be it.
24  Q.  And let's look at Exhibit 284.  What was the scope of
25  use for 284 for Blaze Advisor?

**1837**

1  A.  In this contract, this one is for use solely with
2  client's space planning line of business.
3  Q.  So not the whole of Target?
4  A.  This is, this is a group that figures out where to put
5  things on the shelf.  There is actually a science to it.
6  People buy more if they put it in the right spot, so this
7  team is doing that work.
8  Q.  Okay.  Let's go to Exhibit 77, D77, and you were asked
9  some questions about what in this license agreement is
10  10.7.
11       And, Mr. Mayleben, could we show page 10 of this
12  license agreement on the screen.  And could you just put
13  yellow on the 10.7 Assignment, Delegation.
14       You mentioned that it was a long provision.
15  Every license agreement is individually negotiated.
16  A.  They are, yes.
17  Q.  What does this Defendants' Exhibit 77 tell you about
18  the extent of negotiations about paragraph 10.7 here?
19  A.  As my reaction showed, it's pretty long.  I don't, I
20  don't recall seeing something quite this long before.
21  Obviously would have been involved in approving it, but,
22  yes, it's pretty long.
23  Q.  Okay.  And let's put up the license agreement between
24  Chubb & Son and FICO and show paragraph 10.8.
25       Is it fair to say the level of negotiation is

**1838**

1  quite different?
2  A.  Yes.  Quite different.
3  Q.  You were shown the e-mails of Russ Schreiber and Mike
4  Sawyer.  Russ is commenting about what the license said or
5  do not say about GWP.
6       With respect to the license agreement in this
7  case, in your mind, in your judgment, is there any concern
8  about the reasonableness -- about FICO's reasonableness?
9  A.  None.
10  Q.  Is there any, is there any, is there any -- what's the
11  right word -- any ambiguity in the change of circumstances
12  in your mind from the status of the client at the time of
13  2006 to the time --
14  A.  Not in my mind, no.
15  Q.  You were asked about the resolution of that consent or
16  not consent within a 30-day period.  You mentioned that it
17  was not written into 10.8.
18  A.  That's correct.  Yes.
19  Q.  Let's go back to J001, and can we go to paragraph 9
20  point -- I'm sorry.  Section paragraph 9.2, please, and
21  then if we can focus in on 9.2A, Uncured Breach.
22       Is that what you had in mind in terms of another
23  provision of the contract detailing out a 30-day period?
24  A.  That's correct.  Yes.
25  Q.  Now, you were asked about Exhibit 94, which is the

**1839**

1  proposal from Ms. Pawloski of February 25.
2  A.  Correct.
3  Q.  2016.  And you were asked whether you had communication
4  with her afterwards?
5  A.  Correct.
6  Q.  And did you?
7  A.  I did.
8  Q.  And what were they?
9  A.  Both written and verbal.
10  Q.  Let's just do the verbal.  We want to stay within the
11  time frame of -- around or in response to the February 25
12  proposal.
13  A.  Yes.  I responded rather quickly, actually setting up a
14  call, and set her through very specifically why this
15  proposal was not acceptable to us and actually counter
16  proposed with an equivalent approach, which was not, was
17  not taken any further.
18  Q.  But you explained to her why, your thinking about her
19  proposal?
20  A.  Correct.
21  Q.  Did they propose anything different at that moment?
22  A.  She did not.
23  Q.  At that time in February of 25 of 2016, did you have
24  any additional information from Chubb & Son, other than
25  what was contained in Mr. Hopp's letter earlier and what

**2516**

1  ACE INA Holdings, Inc., was the entity that was
2  created to be the merger entity. ACE Limited creates INA
3  Holdings, Inc., and the Chubb Corporation goes into ACE INA
4  Holdings, Inc. The facts are different than said.
5  I'm happy to look at the Carretta letter, and I'm
6  sure the court will. It's Plaintiff's Exhibit 90. On the
7  notice of breach letter, he addresses it to Chubb Limited.
8  He says I'd be happy to have a new license agreement with
9  you, Chubb Limited, going to the highest level of the
10  control.
11  I've read it a few thousand times. He talks
12  about the deemed assignment of the second sentence. That's
13  to suggest that -- to suggest that Mr. Carretta says, let's
14  make an assignment to you, Chubb Limited. That's not in
15  the letter.
16  Also, did you notice in the argument that the
17  definition of affiliates changes? Rather than the
18  definition in Amendment two, somebody downstream, that you
19  own more than 50 percent of. Now the argument depends upon
20  everybody being an affiliate, because they're all under the
21  same big tree of Chubb Limited. That's not the license
22  agreement.
23  And by the way. Federal still exists, it's still
24  a judicial or jural entity. And that have fact and that
25  proposition is purely one of law. It is for you to decide,

**2517**

1  Your Honor. It doesn't matter that corporations that exist
2  and still exist are different from other corporations that
3  exist and still exist.
4  And doesn't matter that Federal Insurance Company
5  and ACE American are not affiliates, as that is defined by
6  the license agreement. It's a matter of looking at the
7  corporate tree that's in evidence, and the judgment is
8  right there.
9  So I find the argument that they have to be one
10  that requires shifting definitions and a passing reference
11  to who actually acquired who and who actually is owned by
12  whom.
13  Thank you.
14  THE COURT: All right. Thank you.
15  MR. METLITSKY: Can I just say one last thing?
16  THE COURT: Yes.
17  MR. METLITSKY: On the definition of "affiliate,"
18  it says, "Shall mean any other entity directly or
19  indirectly controlled," by the client so it doesn't have to
20  be a direct subsidiary.
21  THE COURT: Understood.
22  MR. HINDERAKER: And I do not disagree.
23  Indirectly or otherwise, Federal and ACE American are not
24  in that relationship.
25  MR. METLITSKY: That is true. Our argument is

**2518**

1  not that ACE American is -- yes.
2  THE COURT: Your argument is that the client
3  changed.
4  MR. METLITSKY: Yes.
5  THE COURT: All right. We're going to take a
6  recess. I'll be back hopefully in here at quarter after
7  3:00, and I'll tell you what we are doing on these various
8  motions.
9  I would strongly suggest -- we're off the record.
10  (Recess taken)
11
12  P R O C E E D I N G S
13  IN OPEN COURT                    3:21 p.m.
14  THE COURT: All right. First turning to Docket
15  Number 1128 and the associated, that's Federal's motion,
16  but FICO's response also requested relief, but was not
17  docketed as a separate motion. So I'm referring to both by
18  the reference to 1128.
19  On the question of the breach or infringement by
20  use by foreign affiliates, this turns on the definition of
21  Chubb & Son, a division of Federal. The question is what
22  does that phrase mean. Does it mean Federal Insurance
23  Company, or does it literally mean Chubb & Son, a division
24  of Federal.
25  I find that as a matter of law, Chubb & Son, a

**2519**

1  division of Federal, means Federal Insurance Company. An
2  unincorporated division is not a legal entity, and even
3  though it can sign contracts, it cannot be sued for the
4  contracts.
5  And when it does enter into contracts, it doesn't
6  do that independently of its corporation of which it's a
7  division.
8  I have read every one of the cases that have been
9  cited. I believe that this finding is required by New York
10  law. I think all of the cases say that. And so as a
11  matter of law, I'm finding that Chubb & Son, a division of
12  Federal Insurance, has to mean Federal Insurance Company.
13  And I will also note that were it to mean
14  otherwise, I think it would be, it would lead to an
15  impossible result. It would literally mean that the
16  license grant to Chubb & Son employees, or the restriction
17  that doesn't allow it to be used beyond employees, would
18  mean that no one could use it, given the testimony that's
19  been in the case. It would also render the definition of
20  affiliates in the original license agreement meaningless.
21  So as a result of that then, there can't be a
22  breach of the contract or an infringement through use of
23  the Blaze Advisor software by Chubb Canada, Chubb Europe or
24  Chubb Australia.
25  Turning to the question of use by third-party

**2520**

1  consultants, Federal urges that that use is di minimis.  It
2  was allowed; and therefore, FICO could not terminate the
3  contract because it was not a material breach.
4       The first question is whether a nonmaterial
5  breach is nonetheless actionable or can be the basis for a
6  verdict in FICO's favor, and the answer under New York law
7  clearly is that it can.
8       FICO urges that because the use is proven, it is
9  entitled to judgment as a matter of law that the contract
10 was breached.  But there's been evidence from which a jury
11 could reasonably decide that the use was known, consented
12 to, harmless and not a breach.
13      So I am not finding as a matter of law that the
14 use by third-party consultants was a breach, and I am not
15 finding that it was not a breach.  That is for the jury to
16 decide.
17      Federal nonetheless urges the court to hold that
18 the breach, if it was one, was not material as a matter of
19 law and therefore FICO could not have properly terminated
20 the license agreement on this basis.  I find two flaws with
21 that argument.
22      Number one, though New York law says a breach
23 must be material in order to terminate a contract,
24 Section 9.2 (C) of the license agreement can reasonably be
25 read to mean that FICO could terminate the agreement even

**2521**

1  if this particular kind of breach, which is to say a breach
2  of the license grant, which could then be interpreted to
3  include a breach of the restrictions on the license grant,
4  that that provision could be reasonably read to mean that
5  you can terminate the contract without a material breach.
6       Even if that weren't reasonable, based on the
7  evidence at trial, including the structure and content of
8  the license agreement and the testimony of several
9  witnesses, this jury could reasonably find that the breach,
10 despite the magnitude of the use, could still be material.
11      So Federal's motion is granted in part to the
12 extent with respect to the Chubb Canada, Chubb Europe,
13 Chubb Australia and then denied as to the rest of it.
14      FICO's counter motion is denied.
15      On disgorgement, I am going to deny the motion at
16 this stage based on the state of the evidence.  And because
17 the verdict is advisory, I think the court will benefit
18 from the jury's advice on that finding, whatever it is.
19      However, at the end of this case, it is an
20 advisory finding, and I will exercise my own best
21 independent judgment on this question, even if it means
22 departing from the advisory verdict, whichever way it goes.
23      Docket 1135 then is denied.
24      Docket 1148, FICO's judgment for a matter --
25 judgment as a matter of law on infringement by ACE

**2522**

1  American.  I will also deny this motion.  Federal's
2  position with respect to ACE American is not unfairly
3  prejudicial, nor do I find that it is a surprise.
4       It is not inconsistent, in my judgment, with
5  Federal's position as to the meaning of the phrase "client"
6  in the license agreement, and the testimony at trial would
7  permit a reasonable jury to find either way on the issue of
8  ACE American's alleged infringement.
9       And I do also rely on Judge Wright's analysis of
10 this issue, even though it was stated in terms of the
11 breach, rather than the infringement, at approximately
12 pages 45 to 50.
13      FICO's judgment, FICO's motion for a judgment as
14 a matter of law on Federal's counterclaim.  I am going to
15 deny the motion for JMOL.  Federal has put in evidence
16 during the trial that it sustained damage in the form of
17 costs and time to remove Blaze Advisor, as well as in the
18 form of loss of use of a license that it claims it had in
19 perpetuity, despite the merger.
20      However, Federal has not offered a calculation of
21 the value of the lost time of its employees or the cost of
22 removing Blaze Advisor from its software.  And so it will
23 not offer a calculation in final argument.
24      There is considerable evidence in the record as
25 to the parties' allegations regarding the value of the use

**2523**

1  of Blaze Advisor, and that evidence is also in the record
2  and could be used, if desired, regarding the counterclaim.
3       So that's the ruling on the motions as described.
4       On the request to take the counterclaim at the
5  end of the case, I'm going to deny that request.  You will
6  have to address it in your summation initially.
7       MS. GODESKY:  Thank you, Your Honor.
8       THE COURT:  All right.  Any questions regarding
9  these motions?
10      Mr. Hinderaker?
11      MR. HINDERAKER:  No, Your Honor.
12      THE COURT:  All right.  Thank you.
13      Ms. Godesky, any questions?
14      MS. GODESKY:  No, Your Honor.
15      THE COURT:  Okay.  Let's turn then to the jury
16 instructions and special verdict form.  Will you all be
17 staying, or will some be departing?  You're all welcome to
18 stay.  I'm just --
19      You have a temperature update.  What is it, that
20 it's hot?
21      THE CLERK:  I do.  That's not so much an update.
22      THE COURT:  It's not an update.
23      THE CLERK:  According to the U.S. GSA, the
24 outside air unit is down and is impacting the temperature
25 throughout the building.  We are working on this and will