UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| FAIR ISAAC CORPORATION,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>FEDERAL INSURANCE COMPANY,<br>an Indiana corporation, and ACE<br>AMERICAN INSURANCE COMPANY,<br>a Pennsylvania corporation,<br><br>　　　　Defendants. | No. 16-cv-1054 (DTS)<br><br><br><br>DEFENDANTS' MEMORANDUM<br>IN OPPOSITION TO FICO'S<br>RENEWED MOTION FOR<br>JUDGMENT AS A MATTER OF<br>LAW |

Defendants Federal Insurance Company and ACE American Insurance Company submit this memorandum of law in opposition to FICO's renewed motion for judgment as a matter of law.

## INTRODUCTION

FICO asks this Court to find that, as a matter of law, third-party consultants' known, consented-to, and harmless use of Blaze Advisor—much of which, the evidence showed, involved a publicly available Blaze trial license—was a breach of the License Agreement that justified FICO's termination.  FICO already made that request in a Rule 50(a) motion, which the Court denied, concluding that the "jury could reasonably decide that the use" of Blaze by third-party consultants "was known, consented to, harmless, and not a breach." Trial Tr. 2520, Dkt. 1188.  That is what the jury ultimately concluded, and as the Court has already held, the record supported that conclusion.

Because the jury found that there was no breach of Section 3.1(iv), it did not consider whether a breach of that provision would have permitted FICO to terminate the License Agreement. But if the jury had considered that question, the evidence would have permitted findings that (i) FICO could terminate the License Agreement only in the event of a material breach, and (ii) any breach by Defendants arising from the third-party consultants was not material, but rather technical and *de minimis*. The Court should deny FICO's motion.

## LEGAL STANDARD

Under Rule 50(b), a post-verdict motion for judgment as a matter of law may only be granted "when no reasonable jury could have found for the nonmoving party." *Monohon v. BNSF Ry. Co.*, 17 F.4th 773, 780 (8th Cir. 2021) (quoting *S. Wine & Spirits of Nev. v. Mountain Valley Spring Co.*, 646 F.3d 526, 533 (8th Cir. 2011)). A court deciding a Rule 50(b) motion must "view[] the evidence in the light most favorable to the verdict"—that is, a court "may not weigh the credibility of evidence, and conflicts in the evidence must be resolved in favor of the verdict." *Id.*; *accord W. Plains, LLC v. Retzlaff Grain Co. Inc.*, 870 F.3d 774, 782 (8th Cir. 2017).

## ARGUMENT

I.   **THERE WAS SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT INCIDENTAL AND HARMLESS USE OF BLAZE BY THIRD-PARTY CONSULTANTS WAS NOT A BREACH OF SECTION 3.1.**

The jury reasonably concluded that FICO did not prove that the *de minimis* usage of Blaze by third-party consultants was a breach of the License Agreement. The Court properly charged the jury—through an instruction to which FICO did not object—that to

prevail on its contract claim, FICO had the burden of proving "that it had a contract with the other party, that it did what it was required to do under the contract, that the other party breached the contract by not doing what it was required to do under the contract, *and that the non-breaching party sustained damages because of the other's breach*." Dkt. 1167 at 11-12 (citing *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011)) (emphasis added). As the Court concluded in denying FICO's first motion for judgment as a matter of law on this issue, Defendants introduced at trial "evidence from which a jury could reasonably decide that the use" of Blaze by third-party consultants "was known, consented to, harmless, and not a breach." Trial Tr. 2520, Dkt. 1188. That is because the evidence supported a finding that FICO did not suffer harm as a result of any breach and therefore did not establish an element of its breach-of-contract claim. *See Fischer & Mandell*, 632 F.3d at 799.

At trial, FICO offered very limited evidence in support of its theory that Defendants violated Section 3.1(iv):

- An interrogatory response in which Defendants stated that Blaze was disclosed to and used by "Chubb Insurance Company of Canada, including through its relationship with AppCentrica" with "FICO's knowledge and participation[,]" "and Chubb Insurance Company of Australia Limited, including through its relationship with the DWS Group[,]" P-0147A-002-005. This response made clear that any use or disclosure occurred on "internal Chubb organization shared space[,]" *i.e.*, a virtual desktop within Chubb's control. *Id.*

3

- A series of communications regarding a DWS employee who encountered technical problems using a **publicly available** "trial license" that "can be had from the FICO web site[,]" P-1114-008; *see also* P-1113 (exchange between this employee and FICO support); P-1116 (public post on a FICO message board by this employee).

- An internal FICO maintenance-support log containing an entry describing "an issue faced" by that very same consultant, Trial Tr. 596, Dkt. 1180 (quoting P-1112).

The record supported a finding that any breach of Defendants' Section 3.1(iv) obligations was "harmless[.]" Trial Tr. 2520, Dkt. 1188. To begin with, FICO did not put forward any evidence of any pecuniary harm caused by the *de minimis* usage of Blaze by consultants. FICO now asserts that its interest in control over its intellectual property was harmed. Dkt. 1242 at 9-10. But FICO identifies no evidence of damage to that interest apart from the fact of the claimed breach itself. Based on the record at trial, the jury was perfectly free to conclude that FICO suffered no harm at all.

That is certainly what the evidence of FICO's contemporaneous reaction to the consultants suggests. Former FICO Deputy General Counsel Thomas Carretta, who learned about the consultants from "the maintenance logs[,]" Trial Tr. 887, Dkt. 1181, admitted that he (i) did nothing "to investigate the magnitude" of the consultants issue, (ii) had "no evidence that AppCentrica or DWS accessed Blaze for any purpose other than to assist Chubb in its computer application work[,]" and (iii) was not "aware of any evidence that anyone at AppCentrica or DWS shared Blaze with any third party outside Chubb." *Id.*

4

at 912-14.  And FICO Chief Product and Technology Officer William Waid testified that he was "fine" with FICO "continu[ing] to be responsive" to the DWS consultant.  Trial Tr. 1771-72, Dkt. 1185.  In short, as the Court observed, the evidence supported a finding that the consultants' use "was known, consented to, [and] harmless[.]"  Trial Tr. 2520, Dkt. 1188.  The jury could have found that FICO failed to prove harm resulting from any violation of Section 3.1(iv), which would negate a necessary element of FICO's contract-breach claim.

## II. IF THE JURY HAD FOUND A BREACH OF SECTION 3.1, THERE WOULD HAVE NEVERTHELESS BEEN SUFFICIENT EVIDENCE FOR THE JURY TO CONCLUDE THAT SUCH A BREACH WOULD NOT HAVE JUSTIFIED TERMINATION.

FICO next argues that the License Agreement's termination provision, Section 9.2, authorized FICO to terminate the agreement upon any technical, non-material breach.  But the jury could have concluded that the License Agreement could only be terminated in response to a material breach.  And the jury's verdict—which reflects a conclusion that any breach was harmless—also makes clear that even if the jury had found a technical breach of Section 3.1(iv), it would have found that any breach was immaterial and thus could not support termination.  Certainly, there was sufficient evidence for the jury to have so found.

### A. The evidence permitted the jury to find that the License Agreement could only be terminated for a material breach.

The Court expressly left for the jury to decide whether a material breach of Section 3.1(iv) was required to authorize FICO to terminate the agreement, thus implicitly concluding that there was sufficient evidence for the jury to find either way.  *See* Trial Tr. 2480, Dkt. 1188 ("I am not going to instruct them that the contract does provide a certain

5

thing" on materiality). That implicit conclusion was correct.

It is a basic principle of New York contract law that a non-breaching party has the right to terminate an agreement only for a material breach. *See, e.g.*, *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). As this Court has explained, "[a] breach of contract 'is material if it [goes] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract.'" Dkt. 731 at 44-45 (quoting *VFS Fin., Inc. v. Falcon Fifty LLC*, 17 F. Supp. 3d 372, 379-80 (S.D.N.Y. 2014) (internal quotation marks omitted)); *see also* Dkt. 1167 at 14 (instructing the jury on this principle). And the License Agreement embraces this principle—Section 9.2(a) provides that "[e]ither party may terminate this Agreement for a breach by the other party of any of the material terms of this Agreement[.]" J-001 § 9.2(a).

FICO maintains, though, that it could terminate the Agreement for a non-material breach of Section 3.1 because Section 9.2(c)—not Section 9.2(a)—governs termination based on a breach of Section 3.1. A reasonable jury could conclude otherwise for several reasons.

*First*, the jury could have concluded that Section 9.2(a)—with its express materiality requirement—governs the consultants claim, not Section 9.2(c).[1] Section 9.2(c) applies only to a breach of the "terms of the *licenses granted* in this Agreement." FICO posits that the restrictions in Section 3.1 are included within the terms of the Agreement's "licenses

---

[1] Indeed, a reasonable jury would have been obligated to so conclude, as Defendants have explained. Dkt. 1129 at 14-18; Dkt. 1141.

6

granted." Dkt. 1242 at 16. But the same could be said about any of the Agreement's restrictions. *See* J-001 § 2.1 (license grant "[s]ubject to the terms, conditions and limitations of this Agreement"). Obviously, not every restriction on the terms of the license falls under Section 9(c); if they all did, then Section 9.2(a), which is the Agreement's general termination provision, and requires a 30-day cure period, would be rendered meaningless surplusage.[2] As this Court has previously noted, "an interpretation that gives a reasonable and effective meaning to all the terms of a contract is generally preferred to one that leaves a part unreasonable or of no effect." Dkt. 731 at 43-44 (citing *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir. 1985). The jury would have been entitled to reject an interpretation of the License Agreement that would render Section 9.2(a) ineffectual. Especially because a much better alternative reading exists: namely, that Section 9.2(c)'s reference to "licenses granted" limits its application to Section 2 of the License Agreement, which is entitled "License Grant." *See id.* § 2; *see also id.* § 2.1 ("License Grant to Fair Isaac Products"). Under that reading, Section 9.2(c) would govern termination for a breach of Section 2, which is part of the License Grant, but would not govern a claim arising under Section 3.1(iv), which is not part of the License Grant.

---

[2] To avoid this absurd conclusion—that Section 9.2(c) encompasses the entire License Agreement—FICO now posits that Section 10.8 "is not part of the licenses granted[.]" Dkt. 1242 at 13. It offers no support for this assertion, however. Nor could it: Section 10.8—like Section 3.1(iv)—was a "negative restriction[]" on Defendants' Blaze license. *See id.* at 12. And Section 10.8 is certainly one of the "terms, conditions and limitations of this Agreement" to which the license grant is subject, *see* J-001 § 2.1, no different than Section 3.1(iv). Therefore, FICO's capacious reading of the term "licenses granted" would plainly encompass it. Indeed, Section 3.1(v), like Section 10.8, precludes assignment of rights under the Agreement. *See id.* § 3.1(v) ("Client . . . shall not . . . assign, sublicense, lease, transfer or distribute the Fair Isaac Products."). How could Section 10.8's anti-assignment provision fall outside the license grant at the same time that Section 3.1's nearly identical provision falls within it? FICO does not say.

*Second*, the jury could have concluded that Section 9.2(c), even if it applied, does not abrogate the common law's materiality requirement. FICO's argument that Section 9.2(c) has no materiality rule depends upon a weak negative inference—that because Section 9.2(c) is silent on materiality, it rejects the materiality rule. The jury would have been entitled to reject that inference and instead find that Section 9.2(c) evinces no departure from the default rule that rescission is only appropriate in response to a material breach. Instead, the jury could have concluded that the point of Section 9.2(c) is not to permit termination for non-material breaches, but instead to permit *immediate* terminations—in other words, while Section 9.2(a) requires a 30-day cure period before termination based on material breach, Section 9.2(c) allows termination upon a material breach without any cure period at all. *See* J-001 § 9.2(c).

*Third*, the jury could have understood that FICO's reading leads to absurd consequences. As explained above, breaches that fall under Section 9.2(c) authorize immediate termination without a cure period. Thus, under FICO's reading, any minor, technical breach of Section 3.1(iv)—or of any provision of the Agreement—would allow FICO immediately to terminate the license and put its counterparty in violation of the federal copyright laws. So, under FICO's reading, if Defendants inadvertently showed Blaze to an unauthorized consultant but retrieved the software without the consultant seeing or learning anything, that would allow FICO to terminate Defendants' license without a cure period, thus putting Defendants in immediate violation of federal copyright law. No reasonable counterparty would agree to such an absurdly punitive provision. Certainly, the jury was not required to conclude that Defendants agreed to it. Likewise,

8

under FICO's reading, whether a nonmaterial breach of Section 3.1(iv) would justify termination depends on FICO's own decision whether to characterize such a breach as a violation of the "licenses granted" or a "provision[] . . . relating to the protection of Confidential Information[,]" the violation of which must be material to justify rescission. J-001 § 9.2(c).[3]

FICO spends a lot of time in its motion explaining how *it* interprets the License Agreement, but that is not the relevant question for deciding the issue. The jury was entitled to read Section 9.2(c) in a manner both true to the License Agreement's text and commercial purpose: as permitting termination only in the event of a material breach.

### B. The evidence permitted the jury to find that any breach arising from the consultants' use of Blaze was nonmaterial.

The jury plainly would have been justified in finding that any breach of Section 3.1 was, at most, "slight, casual, or technical," *Process Am.*, 839 F.3d at 136 (alteration omitted) (quoting *Callanan v. Powers*, 199 N.Y. 268, 284 (1910)), and not a material breach justifying termination under Section 9.2. Indeed, given that the jury credited Defendants' argument that FICO's breach-of-contract claim failed for lack of any harm, it necessarily *would* have found a breach to be non-material had it reached the question.

---

[3] FICO argues that Section 3.1(iv) is not a "provision relating to the protection of Confidential Information" because, while other provisions in the License Agreement use the term "confidential information," Section 3.1(iv) does not. Dkt. 1242 at 13. But, despite what FICO implies, "confidential information" is not a defined term in the License Agreement. *See* J-001 § 1. And FICO itself admits, as Mr. Waid testified, that "one purpose of Paragraph 3.1(iv) is to protect FICO's confidential information[.]" Dkt. 1242 at 13. The jury, having heard Mr. Waid's testimony, would be free to conclude that Section 3.1(iv) could be classified as a "provision . . . relating to the protection of Confidential Information[.]" J-001 § 9.2(c).

In any event, the evidence was more than sufficient to allow the jury to find any breach of Section 3.1 to be non-material. As explained above, the evidence supported a finding of—at most—minimal usage of Blaze by third-party consultants who had access to a *publicly available* trial license. *See* P-1114-008; P-1113; P-1116; Trial Tr. 596, Dkt. 1180 (quoting P-1112). The testimony of Mr. Carretta and Mr. Waid likewise supported a finding that senior FICO executives knew of the consultants' use, did nothing to investigate its magnitude or effects, and instructed FICO staff to continue facilitating that use. Trial Tr. 1771-72, Dkt. 1185; Trial Tr. 912-14, Dkt. 1181. This record, especially when viewed in Defendants' favor, amply supports a finding that any breach of Section 3.1 was not "so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract[,]" *Process Am.*, 839 F.3d at 136, but instead "was known, consented to [and], harmless," Trial Tr. 2520, Dkt. 1188.

## CONCLUSION

The Court should deny FICO's renewed motion for judgment as a matter of law.

Dated: May 19, 2023

*/s/ Leah Godesky*
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425

(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
lgodesky@omm.com
Anton Metlitsky (Admitted Pro Hac Vice)
ametlitsky@omm.com
Daryn Rush (Admitted Pro Hac Vice)
drush@omm.com
Roxana Guidero (Admitted Pro Hac Vice)
rguidero@omm.com

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Federal Insurance Company and ACE American Insurance Company*