# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (DTS) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR A NEW TRIAL ON ACTUAL DAMAGES

## Table of Contents

**Page**

I.   Introduction ..................................................................................... 1

II.   Granting a new trial is only proper to prevent a miscarriage of justice. ............... 3

III.   The jury's actual damages award is not a miscarriage of justice. ......................... 5

A.   The Court provided the framework for the hypothetical negotiation. ....... 5

B.   The jury's actual damages award is not against the great weight of the evidence. ................................................................................. 8

(1)   Blaze Advisor was core to Defendants' systems and provided Defendants with significant value. ................................................. 9

(2)   FICO's standard pricing methodology had been in place and accepted by the marketplace for over a decade at the time of the hypothetical negotiation. ............................................................. 12

(3)   The circumstances of the hypothetical negotiation and the evidence before the jury support the jury's award of $40 million ............... 17

C.   Defendants mischaracterize the evidence before the jury and ignore evidence that rebutted the relevance and import of that evidence. .......... 20

(1)   The parties' past dealings involved different circumstances than those of the hypothetical negotiation. ........................................... 20

a.   The 2006 License Agreement was part of FICO's early effort to establish Blaze Advisor in the marketplace. ........ 20

b.   The 2016 FICO-Federal negotiations were an effort by FICO to maintain a long-term relationship with Federal... 23

(2)   The other Blaze Advisor licenses are not comparable. ................. 25

(3)   The evidence showed that Drools was inferior to Blaze Advisor ......................................................................... 28

(4)    The market demand for Blaze Advisor was increasing around the time of the hypothetical negotiation.............................................. 29

(5)    The evidence supports the actual damages award against both Federal and ACE American. ......................................................... 30

D.    The jury's award of actual damages reflects it determination of an appropriate award based on the evidence. It was not tainted by any allegedly improper attorney argument or inadmissible evidence. .......... 32

(1)    FICO's statements in its opening and closing were consistent with the Court's hypothetical construct and jury instructions. ..... 32

a.    FICO's closing statement was consistent with the Court's jury instruction. ...................................................... 32

b.    FICO's opening statement was consistent with the Court's guidance. ............................................................... 35

(2)    Mr. Waid's testimony was properly admitted. It was consistent with the Court's Orders and guidance and provided the jury with evidence relevant to the hypothetical negotiation. ........ 36

(3)    P-0517 and P-0518 were properly admitted................................. 40

a.    The Charts are admissible as business records under Federal Rule of Evidence 803............................................ 40

b.    Federal Rule of Evidence 408 does not preclude admission of the Charts....................................................... 42

i.    P-0518 was not created for or used during settlement negotiations............................................ 42

ii.    The Charts do not fall within the limited scope of Federal Rule of Evidence 408. ........................... 43

c.    Defendants cannot show prejudice from admission of the Charts. ......................................................... 44

IV.    Conclusion ..................................................................................................... 45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ADC Telecomms., Inc. v. Switchcraft, Inc.*,
  No. 04-CV-1590, 2007 WL 973547 (D. Minn. May 17, 2007)....................................4

*Allied Sys., Ltd. v. Teamsters Auto. Transp. Chauffeurs, Local 604*,
  304 F.3d 785 (8th Cir. 2002) ...................................................................38

*Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*,
  610 F. Supp. 2d 998 (D. Minn. 2009)........................................................34

*Beckman v. Mayo Found.*,
  804 F.2d 435 (8th Cir. 1986) ................................................................4, 5

*Bevan v. Honeywell, Inc.*,
  118 F.3d 603 (8th Cir. 1997) ...................................................................40

*Billingsley v. City of Omaha*,
  277 F.3d 990 (8th Cir. 2002) ...................................................................35

*Davis v. Gap*,
  246 F.3d 152, 167 (2d Cir. 2001)..............................................................33

*EEOC v. Old Dominion Freight Line, Inc.*,
  No. 2:11-CV-02153, 2015 WL 3895095 (W.D. Ark. June 24, 2015) .......................31

*Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*,
  466 F.2d 179 (8th Cir. 1972) ....................................................................5

*First Sec. Bank v. Union Pac. R.R.*,
  152 F.3d 877 (8th Cir. 1998) ...................................................................40

*Gaylord v. United States*,
  777 F.3d 1363 (Fed. Cir. 2015).......................................................20, 23, 33

*Goddard v. Allegiance Adm'rs, LLC*,
  No. 2:19-cv-1506, 2021 WL 184644 (S.D. Ohio Jan. 19, 2021)................................43

*Grussing v. Orthopedic & Sports Med., Inc.*,
  892 F.3d 953 (8th Cir. 2018) ...................................................................34

iii

*Hoffmannn Bros. Heating v. Hoffman Air Conditioning and Heating, LLC*,
    No. 4:19-cv-00200-SEP, 2023 WL 2681994 (E.D. Mo. Mar. 29, 2023) ..................... 4

*Howard v. Mo. Bone & Joint Ctr., Inc.*,
    615 F.3d 991 (8th Cir. 2010) ................................................................................... 3

*Jarvis v. K2 Inc.*,
    486 F.3d 526 (9th Cir. 2007) ................................................................................ 38

*Lundstrom v. Homolka*,
    No. 1:19-CV-01006-CBK, 2022 WL 458432 (D.S.D. Feb. 12, 2022)........................ 31

*Malden v. Union Elec. Co.*,
    887 F.2d 157 (8th Cir. 1989) ................................................................................ 34

*Medtronic, Inc. v. Bos. Sci. Corp.*,
    99-cv-1035, 2002 WL 34447587 (D. Minn. Aug. 8, 2002)........................................ 38

*Melford Olsen Honey, Inc. v. Adee*,
    452 F.3d 956 (8th Cir. 2006) .......................................................................... 4, 31

*Monohon v. BNSF Ry. Co.*,
    17 F. 4th 773 (8th Cir. 2021) .................................................................................. 4

*Palmer v. Hoffman*,
    318 U.S. 109 (1943)............................................................................................. 41

*Peter Kiewit Sons' Co. v. Summit Constr. Co.*,
    422 F.2d 242 (8th Cir. 1969) ................................................................................ 42

*Raimondi v. Olenicoff*,
    No. SACV 12-2094, 2015 WL 9703485 (C.D. Cal. July 7, 2015)............................ 20

*Smiley v. Gary Crossley Ford, Inc.*,
    859 F.3d 545 (8th Cir. 2017) ................................................................................ 34

*Sony Music Entm't v. Cox Communs., Inc.*,
    No. 1:18-cv-950-LO-JFA, 2019 WL 13298945
    (E.D. Va. Nov. 19, 2019) ..................................................................................... 41

*Sorin Grp. USA, Inc. v. St. Jude Med., S.C., Inc.*,
    No. 14-4023 (JRT/HB), 2017 WL 3503360 (D. Minn. Aug. 15, 2017)............... 34, 35

*St. Jude Med., Inc. v. Access Closure, Inc.*,
    No. 08-CV-4101, 2012 WL 12919321 (W.D. Ark. June 4, 2012) ............................ 30

*Standard Havens Prods. v. Gencor Indus., Inc.*,
No. 88-1209-CV-W-3, 1989 U.S. Dist. LEXIS 10333
(W.D. Mo. Aug. 30, 1989) ........................................................... 31

*Tsewang Gyamtso v. New Metro Trucking Corp.*,
No. 11-3457, 2014 WL 3012907 (D. Minn. July 3, 2014) ........................................... 45

*United States v. $29,008 in U.S. Currency*,
No. 1:14-cv-56-jgm, 2014 WL 5460481 (D. Vt. Oct. 27, 2014) ................................. 43

*United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*,
No. 13-cv-3003, 2023 WL 36174 (D. Minn. Jan. 4, 2023) ........................................ 43

*United States v. Fujii*,
301 F.3d 535 (7th Cir. 2002) ................................................. 41

*United States v. Hunter*,
No. 15-19, 2016 WL 3815175 (D. Minn. July 13, 2016) ........................................... 41

*United States v. Mast*,
999 F.3d 1107 (8th Cir. 2021) ................................................. 38

*United States v. Nixon*,
694 F.3d 623 (6th Cir. 2012) ................................................. 41

*United States v. Williams*,
No. 11-60285-CR, 2013 WL 6328488 (S.D. Fla. Dec. 5, 2013) ................................. 31

*Van Steenburgh v. Rival Co.*,
171 F.3d 1155 (8th Cir. 1999) ................................................. 5

*Wolfe v. Gilmour Mfg. Co.*,
143 F.3d 1122 (8th Cir. 1998) ................................................. 45

**Other Authorities**

Federal Rule of Civil Procedure 59 ................................................. 1, 4

Federal Rule of Evidence 408 ................................................. 3, 42, 43, 44

Federal Rule of Evidence 803 ................................................. 40, 41, 42

Federal Rule of Evidence 1006 ................................................. 40, 41, 42

## I.    Introduction

A new trial cannot be granted under Federal Rule of Civil Procedure 59 unless the jury verdict is against the great weight of the evidence resulting in a miscarriage of justice. This exacting standard cannot be met here. Indeed, the jury's award of actual damages is fully supported by the evidence.

Defendants Federal Insurance Company's and ACE American Insurance Company's (collectively, "Defendants") request for a new trial on actual damages is premised on their highly selective view of facts cherry-picked to support an award of actual damages Defendants would have liked to have paid. Defendants ask the Court to usurp the role of the jury by adopting this unduly narrow view of the facts—one that ignores the whole of the evidence. The Court should reject this improper invitation and deny their motion.

Defendants insist that the parties' prior dealings and other Blaze Advisor license agreements compelled the jury to conclude that the fair market value of Blaze Advisor in this case was "a few million dollars." This is wrong. Defendants mischaracterize the evidence they present. They also ignore the Court's instruction to the jury: "You may consider the agreements for whatever value they may have in your decisions about the hypothetical license negotiation . . . ."

The evidence showed that the parties' past dealings and other Blaze Advisor licenses were not comparable to the circumstances of the hypothetical negotiation here. The FICO-Federal 2006 License Agreement and other Blaze Advisor licenses relied upon by Defendants were perpetual licenses made with new clients many years before the time

1

of the hypothetical negotiation. In those early years of Blaze Advisor, FICO gave aggressive discounts to establish Blaze Advisor in the marketplace and grow the business. Each of those early perpetual licenses also gave FICO other benefits not present in the circumstances of the hypothetical negotiation.

As the Court repeatedly held, the hypothetical negotiation in this case was one in which a client's license had terminated and a license going forward was necessary for a limited term of four to five years. The total lifetime value of the license in this case was limited to the fees for that term license. In contrast, the total lifetime value of other Blaze Advisor licenses included benefits stemming from a long-term relationship in addition to the fees.

Moreover, Defendants ignore or attempt to explain away other pertinent evidence. Unlike the parties' 2006 License Agreement and other Blaze Advisor licenses made with new clients, here Defendants used Blaze Advisor in sixteen applications that, the jury could conclude from the evidence, gave Defendants significant value. The jury was also free to credit and give significant weight to the unrebutted, knowledgeable testimony of Bill Waid regarding FICO's historical pricing and discounting practices, its licensing practices, how those practices were being implemented in 2016, and various factors highly relevant to licensing negotiations.

The jury was entitled to evaluate all the evidence and give each piece of evidence the weight it deemed appropriate. It is not for the parties or the Court to substitute their judgment for that of the jury. When the whole of the evidence is considered, the jury's

actual damages award must be upheld. The fact that the award is contrary to Defendants' selective view of the evidence is not a miscarriage of justice.

Defendants' other arguments largely rehash the arguments they previously made, which this Court rejected. Before trial, Defendants attempted to exclude FICO's standard pricing methodology and Mr. Waid's testimony regarding the same. The Court rejected those attempts, recognizing that FICO's standard pricing methodology, among other things, is relevant to the hypothetical negotiation. To that end, on multiple occasions the parties and Court addressed the standard for actual damages and the circumstances of the hypothetical negotiation specific to this case. The evidence and FICO's arguments to the jury were consistent with the Court's Orders, guidance, and jury instructions. Nothing suggested the jury should punish Defendants as they now contend.

Separately, P-0517 and P-0518 were properly admitted. They detail pre-existing facts, admittedly gathered by Defendants from Defendants' own business records. They fall within the business records exception to hearsay, and such pre-existing facts are not shielded from admissibility under the guise of Federal Rule of Evidence 408.

The Court must consider the whole of the evidence, as did the jury. The evidence shows there is no miscarriage of justice, and the Court should deny Defendants' motion for a new trial.

## II.     Granting a new trial is only proper to prevent a miscarriage of justice.

The grant of a new trial is "generally disfavored," and the standard for granting a motion for a new trial is high, higher even than the standard for judgment as a matter of law. *Howard v. Mo. Bone & Joint Ctr., Inc.*, 615 F.3d 991, 995 (8th Cir. 2010);

*Hoffmannn Bros. Heating v. Hoffman Air Conditioning and Heating, LLC*, No. 4:19-cv-00200-SEP, 2023 WL 2681994, *3 (E.D. Mo. Mar. 29, 2023). As Defendants admit, a new trial under Federal Rule of Civil Procedure 59 is only warranted when the jury's verdict "is against the great weight of the evidence so as to constitute a miscarriage of justice." (Dkt. 1228 at 8 (citing *Monohon v. BNSF Ry. Co.*, 17 F. 4th 773, 783 (8th Cir. 2021)).)

This exacting standard aligns with the Constitutional significance of the Seventh Amendment's right to trial by jury. *See Beckman v. Mayo Found.*, 804 F.2d 435, 439 (8th Cir. 1986) (affirming denial of motion for new trial where jury was presented with conflicting evidence such that its finding was not against the weight of the evidence); *Melford Olsen Honey, Inc. v. Adee*, 452 F.3d 956, 967 (8th Cir. 2006) (affirming denial of post-trial motions and explaining that the damages award rendered "need not match any certain projected number provided the award falls within the mathematical limitations set forth by the witnesses and the trial evidence as a whole"); *ADC Telecomms., Inc. v. Switchcraft, Inc.*, No. 04-CV-1590 (PJS/RLE), 2007 WL 973547, at *3 (D. Minn. May 17, 2007) ("The jury's damages award was well within the range of possibility based on the evidence presented at trial, does not represent a miscarriage of justice, and will not be disturbed by this Court.").

Although the Court may, in considering a motion for a new trial, interpret the evidence and judge the credibility of witnesses, "it may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable." *Monohon*, 17 F.4th at 783 (quoting *Van Steenburgh v. Rival Co.*, 171 F.3d

4

1155, 1160 (8th Cir. 1999)); *see also*, *e.g.*, *Fireman's Fund Ins. Co. v. Aalco Wrecking Co.*, 466 F.2d 179, 187-88 (8th Cir. 1972) (reversing grant of new trial and explaining that "a trial judge should not grant a new trial merely because he believes another result would be more reasonable"); *Beckman*, 804 F.2d at 439.

## III.  The jury's actual damages award is not a miscarriage of justice.

Defendants criticize FICO for allegedly putting forth its subjective view of what it would have liked to charge. That criticism is baseless. From FICO's opening statement to the Court's jury instructions, the award of actual damages was for the jury alone. The jury was presented with extensive evidence relevant to determining actual damages and was free to accept or reject the parties' competing views of that evidence. Looking objectively at the whole of the evidence, the jury weighed the evidence, found in favor of FICO, and awarded FICO $40 million. When all the evidence is considered, the jury's $40 million award is not against the great weight of the evidence. Defendants have not met their burden of establishing a miscarriage of justice.

### A.  <u>The Court provided the framework for the hypothetical negotiation.</u>

Throughout this case, the Court has provided guidance to the parties as to the standard for determining actual damage and the hypothetical negotiation construct. FICO's evidence conformed to this guidance.

The Court first stated the standard for actual damages in its summary judgment Order. There, the Court explained that actual damages are determined based on the fair market value of Blaze Advisor, which is calculated as the license fee to which a willing buyer and willing seller would have agreed. (Dkt. 731 at 54.) Although the Court

excluded FICO's damages expert Neil Zoltowski's ultimate opinion on actual damages, the Court denied Defendants' motion for summary judgment on FICO's actual damages claim and expressly held that "there remains relevant evidence underlying those [Mr. Zoltowksi's] opinions that has *not* been excluded." (*Id.* at 55 (emphasis in the original).) Such evidence includes "FICO's standard pricing methodology" and "evidence of Defendants' use of Blaze Advisor." (*Id.*; *see also id.* at 18 (holding the "intrinsic value" of Blaze Advisor is relevant to determining actual damages).)

The Court's Order denying Defendants' motion to bifurcate reiterated the same guidance—FICO's standard pricing methodology and evidence of Defendants' use of Blaze Advisor is relevant to the jury's determination of actual damages. (Dkt. 935 at 5.)

The Court again addressed the issue when Defendants moved in limine to exclude FICO's evidence relevant to actual damages. Defendants made the same arguments they now make, namely, (1) FICO's standard pricing methodology reflects FICO's subjective belief of what it would have charged, and (2) allowing Mr. Waid's testimony is improper because it is not based on his own personal knowledge. (*See generally*, Dkt. 969.) The Court disagreed. Mr. Waid was permitted to testify:

> Mr. Waid may provide the jury information about the application-based pricing methodology, including: FICO's pricing structure for application-based pricing; which applications are subject to application-based pricing; how many applications Federal has that could be priced using this methodology. He can also add up the total price for those applications. Mr. Waid may not make any statement about what FICO's actual damages are, nor can he use the phrase "hypothetical negotiation" or opine about what FICO would have charged in such a hypothetical negotiation.

6

(Dkt. 1065 at 5-6; *see also*, Ex. 1 at 55:19-56:22, 63:15-64:19.)[1]

At the pretrial conference Defendants argued the hypothetical negotiation should not take into "account the economic circumstances of this case and defendants' use in this case." (Ex. 1 at 69:22-70:3.) This too was rejected. The Court explained that the circumstances of the negotiation consider how long the licensee is going to use the software and the extent of such use. (*Id.* at 73:2-11 (explaining that relevant factors include "how much are they [the licensee] going to use, for how long, what have they historically used" and "it does I think include, We know that they intend to use it only for the next three years or whatever").) In particular, the Court described the circumstances of the hypothetical negotiation:

> Given that the parties find themselves at this moment in time and they are negotiating a license with these characteristics, what would that negotiation result in. That's how I understand it.
> * * * *
> [A willing licensor and a willing licensee] [w]ho, for lack of a better way of putting it, in essence, have come to the end of the contract period and now they're negotiating a license going forward.

(*Id.* at 71:16-19, 73:19-21.)

During trial the Court provided further clarification, stating that Mr. Waid could discuss:

- "the fact that the license is terminated" and the parties are now negotiating a license for a certain term;

---

[1] All exhibits are attached to the Declaration of Paige Stradley filed concurrently herewith.

- the factors that FICO would consider in negotiations and factors Mr. Waid has seen the other side of the table consider; and

- the level of efforts to/impact of stopping use and how it impacts negotiations.

(Ex. 2 at 1570:13-1571:11, 1575:12-20, 1576:25-1579:8; *see also id.* at 824:1-16, 826:6-827:1, 1573:25-1574:18 ("There is no way around the notion that the jury is going to understand that that license period occurs after the putative end of the first license. And so that fact just is not capable of being kept from the jury.").)

Finally, the Court's jury instructions laid out the standard for the jury's determination of actual damages. Among other things, the Court instructed the jury that "[t]he fair market value is the license fee that a willing buyer and willing seller would have negotiated for the allegedly improper or infringing use that was made" and that the hypothetical negotiation "focus[es] on what the expectations of the licensor and the alleged infringer would have been had they entered into an agreement at that time . . . ." (*Id.* at 2615:19-23.)

**B.** **The jury's actual damages award is not against the great weight of the evidence.**

Consistent with the Court's Orders and guidance, FICO introduced evidence upon which the jury could determine actual damages including, among other things, evidence of the extent of Defendants' use of Blaze Advisor, the value Blaze Advisor provided to Defendants, FICO's standard pricing methodology, and witness testimony highly relevant

to the hypothetical negotiation. That evidence strongly supports the jury's award, making clear the award is not against the great weight of the evidence.

### (1) Blaze Advisor was core to Defendants' systems and provided Defendants with significant value.

When Federal first licensed Blaze Advisor in 2006, the license was limited to one named application. (Ex. 3 at J-001-011.)[2] Within approximately one month, the license scope had expanded to permit use of Blaze Advisor across the Specialty line of business, and ultimately to permit use enterprise-wide. (Ex. 3 at J-001-017, J-001-019.) FICO worked extensively with Federal to develop and deploy Blaze Advisor across numerous applications, with Federal spending nearly three times the amount of the license fees—over $3.7 million—across fifty-two statements of work over nine years. (Ex. 2 at 541:1-8, 554:19-22; *see also id.* at 553:17-554:7 (the statements of work involved requests for consulting, implementation, and training).) By the time of the hypothetical negotiation in 2016, Defendants were using Blaze Advisor across sixteen applications connected to the sale of insurance. (Exs. 4-7.)

Defendants' documents P-0517 and P-0518 detailed Defendants' use of Blaze Advisor, identifying each application using Blaze Advisor and the extent of such use, including, e.g., the number of business and technical users, complexity of rules, number of transactions, and rule capabilities. (Exs. 4-5; *see also*, *e.g.*, Ex. 8 at P-0094-002.)

---

[2] The 2006 License Agreement identifies the Client as "Chubb & Son, a division of Federal." (*Id.* at J-001-001.) Over FICO's objections, the Court granted Defendants' motion for judgment as a matter of law that the Client was Federal. (Dkt. 1128; Dkt. 1196.)

The evidence showed that at the time of the hypothetical negotiation, Blaze Advisor was core to Defendants' operations and that Defendants received significant value from its use. (*E.g.*, Ex. 9; Ex. 10 at P-0192-005; Ex. 11 at P-0195-013, P-0195-014; Ex. 2 at 162:24-163:7, 191:18-192:2, 986:25-988:3, 995:5-999:13, 1389:3-9, 1399:14-18, 1463:13-22, 1505:3-8, 1524:4-22, 2137:22-2140:18, 2142:19-24, 2143:14-2144:8, 2145:4-10.) Among other things, Federal licensed Blaze Advisor to enable it to scale and "expand[] and grow[] the business into mid-market and smaller accounts." (Ex. 12 at J-002-005.) The evidence showed that this goal was achieved. (Ex. 13 at P-0958-005, P-0958-011, P-0958-016.)

The early value provided by Blaze Advisor was described by FICO employee Larry Wachs:

> Q.    And then did any of the business – did any of the business people of Chubb & Son comment on how the use of the products, that is Blaze Advisor, would be able to assist them in growing their revenue, moving into the mid-market?
>
> A.    Only that within the first full year they did succeed in accepting considerably more business than they had in the previous year for no increase of staff.

(Ex. 2 at 816:8-14.)

Similarly, FICO employee Sean Baseman was involved in "countless" conversations with Chubb personnel. (*Id.* at 160:20-161:19.) He testified that "it was apparent that Blaze Advisor was central to all of their [Federal's] decision-making process within the group that we were talking about," and it was "pivotal to what they

were doing. (*Id.* at 162:24-163:7; *see also id.* at 191:18-192:2 (testifying he understood they were realizing value from Blaze Advisor).)

Defendants' own witnesses also recognized the central role played by, and the value provided by, Blaze Advisor. Defendants' expert William McCarter admitted that Defendants deployed Blaze Advisor in applications that were core to Defendants' business as an insurance company. (*Id.* at 2137:22-2140:18, 2142:19-24.) For example, Blaze Advisor was deployed in various policy administration systems, which Mr. McCarter, as well as FICO's expert Mr. Whitener, agreed were core to the sale of insurance. (*Id.* at 986:25-988:3, 995:5-999:13, 1505:3-8, 2137:22-2140:18; Ex. 4; *see also*, Ex. 2 at 2143:14-2144:8, 2145:4-10 (describing DecisionPoint as providing information important to insurance companies and admitting there is a business benefit to automatic renewals).) As Mr. Whitener testified, insurance cannot be sold at a competitive price without policy administration systems. (Ex. 2 at 1389:3-9.) Mr. McCarter further testified that Blaze Advisor provided the benefits of precision, consistency, agility, speed, time, and cost efficiencies. (*Id.* at 2146:14-2147:24.)

Henry Mirolyuz, a Senior Systems Architect at Chubb & Son, testified similarly. With Blaze Advisor Defendants brought products to market faster, increased the percentage of renewals, and better responded to changing market conditions. (*Id.* at 1021:11-22, 1023:19-1024:2, 1028:15-19, 1032:5-7.) Mr. Mirolyuz documented the benefits and value provided by Blaze Advisor and testified that such benefits had been realized. (*See id.* at 1028:15-25, 1031:6-1033:17; Ex. 10 at P-192-005; Ex. 11 at P-0195-

11

013; Ex. 14 at P-0194-007.) Indeed, the applications utilizing Blaze Advisor generated

$21 billion in revenue during the period of infringement. (Ex. 15.)

The sale of insurance is the heart of Defendants' business. The jury could rightly

conclude from all the evidence that Defendants extracted significant business value

connected to selling insurance by using Blaze Advisor. This evidence of intrinsic value is

relevant to and supports the jury's damages award. (Dkt. 731 at 18.) The jury was well

within its right to give substantial weight to those critical factors when determining actual

damages.

> ### (2)    FICO's standard pricing methodology had been in place and accepted by the marketplace for over a decade at the time of the hypothetical negotiation.

Mr. Waid has been engaged in pricing and negotiations for Blaze Advisor licenses

throughout his career at FICO. (Ex. 2 at 1683:24-1684:13.) He has negotiated hundreds

of Blaze Advisor licenses, including in circumstances in which a license has come to an

end and the negotiations are for a new license. (*Id.* at 1684:18-1684:22.) He has also

negotiated licenses with entities who are new clients. (*Id.* at 1683:23-1685:1.) He was the

person with final authority on Blaze Advisor pricing in 2006 and 2016. (*Id.* at

1684:14-17.) Based on his own personal experience, Mr. Waid offered detailed testimony

regarding FICO's standard pricing methodology, including its application-based pricing,

enterprise-wide based pricing, pricing matrix, the changes in FICO's discounting

practices over the years, and various other factors that influence price negotiations.

FICO's standard pricing methodology is largely codified in FICO's Global Price

List dated October 10, 2003 (hereinafter "Pricing Guide"). (Ex. 16.) It was adopted in

2003 and was in place at the time of the hypothetical negotiation. (Ex. 2 at 1685:2-25, 1721:1-7; Ex. 16.) Consistent with the Court's Orders and guidance, Mr. Waid walked through that standard pricing methodology with the jury. First, Mr. Waid explained the different scope of licenses available—a named-application or enterprise-wide license. (Ex. 2 at 1685:21-1686:6, 1686:12-1687:11.) For named application pricing, Mr. Waid testified that, under FICO's standard pricing, FICO would size an application as small, medium, large, or very large using FICO's sizing matrix, with each size corresponding to a different price point. (Ex. 2 at 1695:14-21; Ex. 31; *see also* Ex. 2 at 1713:2-1723:21.)

Mr. Waid also explained there are two types of license grants—annual (also referred to as a term license) and perpetual. (Ex. 2 at 1685:21-1686:6, 1686:12-1687:11.) Mr. Waid described the difference between perpetual and term license pricing and how to translate a perpetual license into a term license. (*Id.* at 1731:19-1732:21.)

Mr. Waid also discussed discounting, testifying that the Pricing Guide identifies a ceiling of allowable discounts but does not require discounting. (*Id.* at 1689:20-1690:19.) He explained that FICO's discounting practices have evolved since the early 2000s. Mr. Waid testified that, while FICO's discounting practices in the early years were aggressive, around 2010-2011 FICO began to pull back on the level of discounting. (*Id.* at 1634:1-1635:3 (noting the pricing model did not change, the discounting practices changed).) By 2016, FICO's discounting practices were "very different," and FICO no longer used the Pricing Guide discount schedule and no longer gave discounts for marketing attribution. (*Id.* at 1632:8-1633:24, 1689:20-1690:19, 1691:18-24.) By that time Blaze Advisor was an established product, indeed the market leader in business rules

management system software, and FICO no longer needed to discount aggressively as it did in its early years to gain market share. (*Id.* at 1634:18-1635:3; *see also id.* at 1691:3-24.)[3]

Not only did FICO's discounting practices change over the years, so did its licensing practices. Around 2010-2011 FICO began to move away from perpetual licenses in favor of the recurring revenue stream offered by term licenses. (Ex. 2 at 1634:1-1635:3, 1738:2-9, 1822:19-1823:2.) FICO also moved away from offering enterprise-wide licenses in favor of named-application licenses:

> Ultimately the named application licensing that we do in this guide became the most popular form of it. Enterprise license agreements were very popular up front. Today we don't sell enterprise license agreements anymore. Most clients aren't interested in it.

(*Id.* at 1685:21-1686:4; *see also*, *id.* at 1822:19-1823:2.) The RGA license is an example of the evolution of FICO Blaze Advisor licensing practices. The RGA license was entered into in 2019 and was for a fixed term of five years for a single-named application. (Ex. 17.) The license fee for this one application was ███████ (Ex. 2 at 1828:21-1829:15.)

With this background in mind, Mr. Waid testified that for a term contract, FICO would approach the negotiations expecting to use named-application pricing (rather than enterprise-wide pricing). (*Id.* at 1737:11-1738:9.) Mr. Waid applied FICO's standard

---

[3] Defendants incorrectly suggest that Mr. Waid's testimony regarding FICO's evolving discounting practices is inconsistent with his 2019 deposition testimony. (Dkt. 1228 at 23 n.7.) As Mr. Waid stated on redirect, the discounting discussed in his 2019 deposition was in connection with pricing in 2006. (Ex. 2 at 1844:10-1845:14.)

pricing methodology and standard pricing matrix to Defendants' information regarding their use of Blaze Advisor and sized each application. (*Id.* at 1724:14-1731:13.) Thereafter, Mr. Waid assumed a portfolio of anonymized applications of the various sizes used by Defendants and calculated a standard annual fee based on FICO's standard pricing methodology. (*Id.* at 1733:12-1734:20.) That standard annual fee was $8,690,673. (*Id.* at 1734:19-20.) Applying that annual fee to an assumed number of years, Mr. Waid calculated the standard fee for a term license for the assumed number of years to be $49,714,705. (*Id.* at 1736:22-25.)[4] As Mr. Waid testified, this was a starting point from which FICO would enter negotiations with a willing licensee, and additional factors, discussed below, could place upward or downward price pressure on the negotiation. (*Id.* at 1741:16-1747:8.) Because the Court later granted Defendants' motion for judgment as a matter of law that Federal was the "Client," FICO's closing argument identified the standard pricing (i.e., the start of the negotiation) to be $36,542,831, using the same methodology as described by Mr. Waid but excluding affiliated foreign insurance company applications. (*Id.* at 2712:13-2712:22.)

Although FICO had moved away from enterprise-wide pricing by the time of the hypothetical negotiation, Mr. Waid also explained FICO's standard pricing methodology based on enterprise-wide pricing, assuming a $35 billion-dollar entity, and how a term license fee would be derived from that construct. (*Id.* at 1696:5-1697:16, 1738:2-1741:5.) That standard fee for an enterprise-wide, term license (translated from a perpetual license

---

[4] FICO does not offer licenses for partial years. (*Id.* at 1734:21-25.)

to a term license for the assumed years) for a $35 billion entity was $29,481,300 using FICO's standard methodology. (*Id.* at 1740:20-1741:1.) Again, this was only a starting point from which FICO would enter negotiations with a willing licensee and that price could go up or down based on additional factors. (*Id.* at 1741:16-1747:8.)

Mr. Waid also addressed various factors that, in his experience, influence license negotiations over price and explained their potential impact:

- Other existing revenue streams;

- Opportunity to sell more (products);

- Business impact;

- Level of effort to/impact of stopping use;

- Product support effort;

- Upfront committed term;

- Size of the transaction;

- Reference, case study, publicity;

- Duration of the contract; and

- Professional services revenue.

(*Id.* at 1741:12-1747:9.) Defendants offered no witnesses to address factors influencing licensing negotiations.

As described more below, the evidence of FICO's standard pricing methodology and factors relevant to the hypothetical negotiation support the jury's actual damages award.

16

    **(3)**    **The circumstances of the hypothetical negotiation and the evidence before the jury support the jury's award of $40 million.**

The Court's guidance recognized that the circumstances of the hypothetical negotiation are that the parties' contract had "come to the end" and the parties are negotiating a license going forward. The jury was instructed that the license going forward was for "the allegedly infringing use that was made" (*Id.* at 2615:15-18), which the evidence showed was for four to five years across sixteen applications. (Exs. 4-7; Dkt. 1072 at Nos. 31-40.) Because the infringing use was for a limited period of four to five years, it was not a miscarriage of justice for the jury to conclude that, under the circumstances of the hypothetical negotiation, the license would be for a limited term with no prospect of future business from the licensee. The total lifetime value of the relationship with Defendants in the hypothetical negotiation was limited to only the license fee.

It was also not a miscarriage of justice for the jury to accept FICO's standard pricing methodology as a starting place for the hypothetical negotiation. The evidence showed that FICO had implemented its standard pricing methodology for over a decade before the hypothetical negotiation, and that, over the years, FICO had stopped giving steep discounts and moved toward term, named-application licenses which were accepted by the marketplace. (Ex. 2 at 1632:8-1633:24, 1634:1-1635:3, 1685:21-1686:4, 1689:20-1690:19, 1691:3-24, 1738:2-9.) Much of the testimony relating to FICO's standard pricing methodology came in through Mr. Waid. He testified knowledgeably, based on his own experience, regarding FICO's historical pricing, discounting, and licensing

practices and how those practices were being implemented in 2016. (*See*, *supra*, Section III(B)(2).) He further testified knowledgeably regarding factors relevant to licensing negotiations. (*Id.*) The jury was free to credit his testimony and give it significant weight.

Using FICO's standard pricing methodology, as explained by Mr. Waid, FICO's evidence showed that approximately $36.5 million was a starting place for negotiations. (*See*, *supra*, Sections III(B)(1)-(2); Ex. 2 at 2712:19-22.) Importantly, in his testimony, Mr. Waid identified various factors that in his experience put either ***upward or downward*** pressure on the price being negotiated (Ex. 2 at 1741:16-1747:8.) Here, the evidence showed there would be ***substantial upward pressure*** on the price negotiations from the following factors:

- no prospect of future business with Defendants and the value that comes from a long-term relationship, including a lack of opportunity to sell additional products and a lack of professional services revenue; and

- the significant value provided by Blaze Advisor to Defendants, particularly given the extent of Defendants' use and the central role played by Blaze Advisor in core applications of Defendants.

As Mr. Waid explained:

> In a fixed term negotiation where the relationship is not going to go any further, the biggest factor is, that's the extent of my relationship with that client. I'm not looking beyond. I don't have a long-term value proposition with this client where I'm getting more services, more maintenance, more product sales. I am just negotiating for a period of time, and then they're going to stop using it.

(*Id.* at 1742:5-11.) The evidence showed the importance of the total lifetime value of the relationship (*e.g.*, *id.* at 1657:16-23, 1742:5-11, 1741:21-1742:19, 1744:11-18), and the jury was well within its right to find that, for the hypothetical negotiation, the lack of a continuing, long-term relationship alone placed significant upward pressure on the negotiation. Moreover, there was no evidence presented by Defendants of any factors that would place downward pressure on the negotiation. This evidence supports the jury's determination that a hypothetical negotiation yields a fair market value for Defendants' use of Blaze Advisor of $40 million.

The RGA license was introduced into evidence by FICO. That license was for a term of five years—just like the circumstances of the hypothetical negotiation—for a single-named application. (Ex. 17.) Entered into in 2019, the date of this license aligned more with the evidence of FICO's standard pricing in 2016 than the other licenses relied upon by Defendants. The license fee for RGA's one application was ███████. (Ex. 2 at 1828:21-1829:15.) Were that fee applied to sixteen applications (the number of applications used by Defendants), that fee would be ███████, more than the jury's $40 million award.

As discussed below, it is not for the parties or the Court to divine how the jury arrived at the award of $40 million. The point is that when all the evidence is considered, the $40 million award is not against the great weight of the evidence.

**C.** **Defendants mischaracterize the evidence before the jury and ignore evidence that rebutted the relevance and import of that evidence.**

**(1)** **The parties' past dealings involved different circumstances than those of the hypothetical negotiation.**

Defendants rely heavily on FICO's and Federal's past dealings to argue that a proper damages award would be no more than "a few million dollars" for a perpetual, enterprise-wide license. Defendants' arguments stem from (1) Federal's purchase in 2006 of a perpetual, enterprise-wide license for Blaze Advisor for $1.3 million and (2) the parties' negotiations in early 2016 following the acquisition of the Chubb Corporation by ACE Limited. Defendants' arguments ignore unfavorable evidence, the uniqueness of the negotiating circumstances of each license agreement, and the economic circumstances of the specific hypothetical negotiation between FICO and Defendants. The jury was free to consider the circumstances surrounding the parties' prior dealings in comparison to the circumstances of the hypothetical negotiation and find the parties' past dealings deserved little or no weight. *See Gaylord v. United States*, 777 F.3d 1363, 1368 (Fed. Cir. 2015) ("[T]he use of past licenses as evidence must always take account of economically relevant differences between the circumstances of those licenses and the circumstances of the matter in litigation."); *Raimondi v. Olenicoff*, No. SACV 12-2094 AG (RNBx), 2015 WL 9703485, at *2-3 (C.D. Cal. July 7, 2015).

> **a.** **The 2006 License Agreement was part of FICO's early effort to establish Blaze Advisor in the marketplace.**

The evidence shows that the 2006 license amount was not relevant to the hypothetical negotiation. Blaze Advisor was launched commercially in approximately

2000, and it made no profit for several years after launch. (Ex. 2 at 1611:10-1612:23, 1629:9-17.) Mr. Waid testified: "it's not uncommon for it to take many years before a software product actually begins to make money" because it takes time to build the software and get it to a state where it adds value; "then you actually have to take it to market and sell it, and you have to establish customers with some kind of reoccurring or regular revenue stream so that you can offset those expenses." (*Id.* at 1628:4-1629:8.) It took FICO around nine years before Blaze Advisor turned a profit. (*Id.* at 1629:9-17.)

During these early years, FICO was leanly staffed with a sales team consisting of only four people (Mr. Waid and three others) and at that time was "aggressive[ly]" discounting Blaze Advisor, with the goal of "secur[ing] enough business to get references in the industry" and of obtaining future business. (*Id.* at 1632:8-1633:5, 1834:18-1835:3.)

It was during this early period of establishing Blaze Advisor in the market that FICO licensed Federal. FICO and Federal entered into the perpetual, enterprise-wide License Agreement for $1.3 million in 2006. (Ex. 3 at J-001-019, J-001-020.) Mr. Waid explained that the 2006 License Agreement reflects a time in which FICO had a general practice of incenting customers to move to larger deals as quickly as possible. (Ex. 2 at 1633:6-22.) He further elaborated that "[e]arly on in the life of Blaze Advisor, we sold a lot of perpetual licenses. That's what the market demanded. We were interested in getting the revenues that the larger amounts that came with perpetual licenses upfront." (*Id.* at 1737:11-1738:1.)

Mr. Folz, retired Chief Information Officer for the Commercial Lines Division of Chubb, negotiated the 2006 License Agreement on behalf of Federal. (*Id.* at 2397:19-

2398:14, 2403:15-2405:25; *see also id.* at 2399:24-2400:4.) He confirmed the substance

of Mr. Waid's testimony. Mr. Folz acknowledged, referencing an email from that time,

that Federal got a "good deal as a first in." (*Id.* at 2435:23-2436:13.) Indeed, the $1.3

million license fee was significantly less than his $2 million budget. (*Id.* at 2404:25-7.)

He further testified that, as part of the deal, FICO had requested Federal agree to issue a

press release and speak at a client forum. (*Id.* at 2411:6-2412:10.) As Mr. Folz explained,

"landing an enterprise deal with a company like Chubb is a big deal for them [FICO]."

(*Id.* at 2411:22-2412:2.)

By the time of the hypothetical negotiation, the circumstances had fundamentally

changed. FICO had a significant market presence and was no longer giving steep

discounts. (*Id.* at 1632:8-1633:24, 1634:1-1635:3, 1689:20-1690:19, 1691:18-24.)

Additionally, at the time of the 2006 negotiations, Federal was part of a $13 billion

organization and a new licensee with the prospect of substantial future business. In

contrast, at the time of the hypothetical negotiation, Federal was part of a $35 billion

organization, was using Blaze Advisor across sixteen applications extracting significant

value, and FICO had no prospect of future business from Federal. Also, FICO's licensing

practices had shifted. The jury heard testimony from Mr. Waid that at the time of the

hypothetical negotiation FICO was (1) moving away from perpetual licenses in favor of

term licenses and (2) moving away from enterprise-wide licenses in favor of

named-application licenses. (*Id.* at 1634:1-1635:3, 1685:21-1686:4, 1738:2-9.) He also

testified FICO would have approached the hypothetical negotiation seeking a named-

application license. (*Id.* at 1737:11-1738:9.) Defendants offered no evidence to contradict

22

Mr. Waid's testimony; indeed, Defendants did not present a single witness who testified that a licensee would seek a perpetual license.

Defendants' argument that a licensee would "insist on purchasing a perpetual, enterprise wide license" is counter factual. (*E.g.*, Dkt. 1228 at 19.) The jury was instructed that "[t]he fair market value is the license fee that a willing buyer and willing seller would have negotiated ***for the allegedly improper or infringing use that was made***." (Ex. 2 at 2615:9-14 (emphasis added).)[5] Defendants' infringing use was for a particular period, a term of approximately four to five years. And in the hypothetical negotiation, unlike in the 2006 time-period, there was no prospect for future business/sales. Contrary to Defendants' argument, the circumstances of the hypothetical negotiation were for a term, not for perpetuity. The hypothetical negotiation was also with a licensee deploying Blaze Advisor in sixteen applications that provided significant business value. Those circumstances are fundamentally different than the circumstances present in 2006 during negotiations for the License Agreement. As instructed, it was for the jury to give the 2006 License Agreement whatever value it had, including that it was incomparable and had no value. (Ex. 2 at 2608:3-5.)

> **b.      The 2016 FICO-Federal negotiations were an effort by FICO to maintain a long-term relationship with Federal.**

Defendants also look to the 2016 negotiations between FICO and Federal, arguing that FICO was prepared to offer Federal a license in the $3+ million range. (Dkt. 1228 at

---

[5] The Court's jury instructions on this point are consistent with the law. *Gaylord*, 777 F.3d at 1367 (quoting *Davis v. Gap*, 246 F.3d 152, 167 (2d Cir. 2001)).

12, 19.) But, again, the jury was presented with evidence that showed the circumstances of those 2016 negotiations were not comparable to the circumstances surrounding the hypothetical negotiation.

The evidence showed that central to FICO's standard pricing methodology is the total lifetime value of the relationship. For approximately a decade, FICO and Federal maintained a mutually beneficial relationship that brought value to both parties. It was this long-term, mutually beneficial relationship that FICO sought to maintain when, in 2016 following the acquisition of the Chubb Corporation by ACE Limited and breach by Federal of the License Agreement, it engaged in negotiations with Federal regarding a new or modified license agreement.

Former FICO employee Russ Schreiber testified that he wanted to maintain the parties' "really great working relationship" and maintain Federal as a reference. (Ex. 2 at 310:3-8, 312:1- 18, 437:1-17.) Mr. Waid echoed Mr. Schreiber's sentiments and the import of long-term relationships with clients. Mr. Waid explained that FICO wanted to maintain its relationship with Federal because of the long-term value it would provide FICO. (*Id.* at 1657:7-23.) The FICO-Federal negotiations in 2016 contemplated a long-term, on-going relationship between the parties that would bring FICO additional value throughout the life of that relationship, including through maintenance, support, training, and other professional services; by opportunities for an expanded relationship through licensing of other FICO products; and by having Federal serve as a reference for other prospective clients. (*E.g.*, *id.* at 310:3-8, 312:1- 18, 437:1-17, 541:1-8, 554:19-22, 1657:16-23, 1687:16-1688:25, 1744:19-1746:15.) Mr. Baseman's testimony confirmed

24

the same. He testified that in the 2015 and 2016 timeframe Federal was considering add-ons to Blaze Advisor, including a model governance and model translator solution, and was also interested in FICO's cloud platform for Blaze Advisor resulting in additional work from FICO staff. (*Id.* at 163:16-164:17.)

These circumstances were very different from those of the hypothetical negotiation. The evidence showed that Defendants' unauthorized use was for four to five years—there was no prospect of a continuing relationship. And, FICO introduced evidence that the lack of a long-term relationship and its attendant benefits would significantly impact the hypothetical negotiation, placing upward pressure on that negotiation. (*Id.* at 1657:16-23, 1741:16-1747:8.)

Given all the evidence, the jury was free to conclude that the circumstances of the hypothetical negotiation, in which the parties' agreement had come to an end and the parties were negotiating a term license of approximately four to five years with no prospect of a long-term relationship, constituted significantly different circumstances from the 2016 negotiations and could weigh the relevance of the 2016 negotiations accordingly.

### (2)     The other Blaze Advisor licenses are not comparable.

Defendants introduced Blaze Advisor licenses (or proposed licenses) for several entities other than Federal: D-0004 (National City); D-0284 (Target); D-0283 (Avnet); D-0293 (CVS); D-0276 (Expedia); D-0343 (Merrill Lynch proposal); and D-0012 (Capital One proposal). Defendants insist these other licenses represent the fair market value of Blaze Advisor and that, based on such licenses, the fair market value for a

perpetual license to Blaze Advisor must be in the "single-digit millions of dollars." (Dkt. 1228 at 13-15.) But, while Defendants had Mr. Waid acknowledge the existence of these other Blaze Advisor licenses, Defendants never tried to show through Mr. Waid (or any other witness) that these other licenses were comparable. They are not.

These other licenses were perpetual licenses entered into between 2005 and 2010. (Exs. 18-24.) Much like the parties' past dealings, the jury was free to reject Defendants' counter factual argument that the hypothetical negotiation would conclude with a perpetual license. Consistent with the Court's guidance, jury instructions, and the evidence, the jury could also consider Defendants' use of Blaze Advisor, including the fact that they were not a new licensee, and find that the hypothetical negotiation would conclude with a term license for four to five years with no prospect of a long-term relationship. The evidence was more than sufficient for the jury to find the other Blaze Advisor licenses incomparable and give them no weight.

Furthermore, the jury was free to reject these licenses as incomparable because they were entered into years before the hypothetical negotiation when FICO was aggressively discounting to establish Blaze Advisor in the marketplace. The evidence showed that was not the case at the time of the hypothetical negotiation. The evidence also showed that at the time of the hypothetical negotiation, FICO was moving toward named-application licenses.

The scope and circumstances surrounding these licenses further established they were not comparable:

26

- the National City license (D-004 (Ex. 18 hereto)) was entered into in 2005, and Mr. Waid testified that originally the parties were discussing an ███ ██████. (Ex. 2 at 1836:1-9.) Mr. Waid further described that it was the end of FICO's fiscal year, FICO needed to report more revenue, and that his boss (the CEO) instructed him to get the deal done quickly and take National City's low offer of approximately ██████. (*Id.* at 1836:1-17.) According to Mr. Waid, this was not an anomaly because FICO "used to grab business a lot back at this time in history." (*Id.* at 1836:18-23)

- the Target license (D-0284 (Ex. 19 hereto)), entered into in February of 2008, was limited in scope to Target's space planning line of the business (i.e., the business line that determines where to put things on shelves) within its pharmacy line. (Ex. 2 at 1836:24-1837:7.) This is a use case and value proposition fundamentally different from that of Defendants.

- the CVS license (D-0293 (Ex. 21 hereto)), entered into in December of 2008, was limited in scope to a corporate support function. (Ex. 2 at 1831:12-1832:12.) This is also a fundamentally different use case and value proposition than that of Defendants.

- the Avnet license (D-0283 (Ex. 20 hereto)), entered into in May of 2005, was limited to use on a single platform and to use in the U.S. only. (Ex. 2 at 1815:2-1816:20; Ex. 20 at D-0283-013.) Defendants did not present evidence of Avnet's U.S. revenues, making any comparison to Defendants' circumstances on that basis impossible. (Ex. 2 at 1815:2-1816:20.)

27

For at least these reasons, the jury was well within its right to find the other Blaze Advisor licenses incomparable to the hypothetical license negotiation. Also in evidence for the jury's consideration was the RGA license and Mr. Waid's testimony affirming that FICO has entered into a Blaze Advisor license agreement on a named application basis for fifteen applications. (Ex. 2 at 1825:6-10, 1828:21-1829:20; Ex. 17.)

FICO witnesses testified that each negotiation and license is unique. (Ex. 2 at 538:14-16, 1653:3-6.) The jury was free to give all the other Blaze Advisor licenses "whatever value they may have" to the hypothetical negotiation (*Id.* at 2608:3-5); it was free to credit (or not) Mr. Waid's testimony regarding the circumstances surrounding those licenses and FICO's licensing practices and determine the significance of such licenses to the hypothetical negotiation.

### (3)    The evidence showed that Drools was inferior to Blaze Advisor.

Defendants attempt to use the price of an open-source software program called Drools to suggest the jury's award of actual damages does not reflect the fair market value of Blaze Advisor. That argument fails. The circumstance of the hypothetical negotiation is one in which the parties "have come to the end of the contract period and now they're negotiating a license going forward" for Blaze Advisor. (Ex. 1 at 71:16-19, 73:19-21.) Here, the evidence established that Defendants had been using Blaze Advisor for over a decade, enterprise-wide, across multiple core applications connected to selling insurance that provided Defendants with significant business benefits. (*See*, *supra*, Section III(B)(1).) Under such circumstances, the jury could reasonably have found the pricing of Drools of little or no relevance.

28

The jury also had sufficient evidence before it to find Defendants' witnesses not credible and to view their testimony about Drools with skepticism. Defendants offered no explanation as to how an open-source software program, typically offered for free or by companies only charging for support, could possibly be comparable to a proprietary commercial product like Blaze Advisor. Defendants' own documents compared vendor-based software options, including Blaze Advisor, to open-source options, such as Drools. (Ex. 25.)[6] That comparison showed the advantages provided by vendor-based options over open-source options, including that vendor-based options allow for more frequent rule changes and have superior rule reversal, rule execution, and speed of execution with less IT involvement. (Ex. 25.) Defendants also described Blaze Advisor as the "technology of choice for business rules" and ranked Blaze Advisor above other competing rules engines, including Drools. (Exs. 26-27.) Finally, Defendants' own actions contradicted their testimony. Defendants chose to continue using Blaze Advisor for four to five years after termination of the License Agreement despite now claiming to have had the ability to easily switch to an allegedly comparable alternative like Drools.

> **(4)   The market demand for Blaze Advisor was increasing around the time of the hypothetical negotiation.**

Defendants contend that the "[u]ndisputed testimony showed that market demand for Blaze . . . has dried up in recent years" and that this places downward pressure on the hypothetical negotiation. (Dkt. 1228 at 16.) Defendants' only support is the testimony of FICO employee Mr. Baseman. (*Id.*) But Mr. Baseman's testimony regarding the demand

---

[6] Drools is an open-source option. (Ex. 2 at 1050:10-22.)

29

for Blaze Advisor as an on-premises product (in contrast to the Cloud-based version of Blaze Advisor) is directed to recent years, around 2021, not the time frame of the hypothetical negotiation in 2016. (*See* Ex. 2 at 186:8-188:3.)[7]

Indeed, Mr. Waid testified that in 2015-2016, Blaze Advisor had strong stable sales and that "[g]oing into '17 we had even more sales, 20 percent by my last look of that. So it was, it was a strong business at that point in time." (*Id.* at 1634:18-1635:1.) Mr. Waid's testimony directly contradicts Defendants' contention, and the jury was free to credit his detailed testimony and find that the increased demand in Blaze Advisor placed upward pressure on the negotiation.

> **(5)    The evidence supports the actual damages award against both Federal and ACE American.**

Defendants also argue that the jury's award against ACE American is excessive relative to the award against Federal. (Dkt. 1228 at 26-27.) Defendants essentially ask the Court to divine the jury's rationale in reaching its verdict. (*Id.*) This approach misses the mark.

FICO could speculate that, based on the evidence, the jury's damages award is too low, while Defendants could speculate it is too high. But it is not for the parties or Court to speculate as to how the jury arrived at its damages award. *E.g.*, *St. Jude Med., Inc. v. Access Closure, Inc.*, No. 08-CV-4101, 2012 WL 12919321, at *4 (W.D. Ark. June 4, 2012) (denying motion for new trial, noting that the jury's reasonable royalty award fell

---

[7] Blaze Advisor is still offered to customers. It is now offered on the Cloud as part of a suite of products called the Decision Management Suite. (*Id.* at 289:2-12.)

within the range the evidence presented, and explaining that "[t]he Court will not speculate about how the jury arrived at its damages award"); *United States v. Williams*, No. 11-60285-CR, 2013 WL 6328488, at *7 (S.D. Fla. Dec. 5, 2013) ("[T]he Court should not be in the business of injecting itself into jury deliberations and trying to divine how the jury reached its verdict, and this Court will not do so here."); *Lundstrom v. Homolka*, No. 1:19-CV-01006-CBK, 2022 WL 458432, at *9 (D.S.D. Feb. 12, 2022) (explaining that "[i]t is always a mystery as to how a jury arrives at a verdict" and refusing to grant a new trial).

The relevant questions are: (1) were the damages awarded by the jury against Federal a miscarriage justice and (2) were the damages awarded by the jury against ACE American a miscarriage justice? The answer to each is no. (*See*, *supra*, Sections III(B), III(C)(1)-(4).) The parties and Court cannot know exactly how the jury arrived at its damages awards, but the damages awarded against Federal and, separately, against ACE American are within reason based on the evidence presented at trial. (*See*, *supra*, Sections III(B), III(C)(1)-(4).) *Melford Olsen Honey, Inc.*, 452 F.3d at 967 ("The damages award rendered, however, need not match any certain projected number provided the award falls within the mathematical limitations set forth by the witnesses and the trial evidence as a whole" and finding court did not err in denying posttrial motions); *EEOC v. Old Dominion Freight Line, Inc.*, No. 2:11-CV-02153, 2015 WL 3895095, at *13 (W.D. Ark. June 24, 2015) ("Although the Court cannot know exactly how the jury arrived at this figure, the amount is within reason."); *see also Standard Havens Prods. v. Gencor Indus., Inc.*, No. 88-1209-CV-W-3, 1989 U.S. Dist. LEXIS 10333, at *20 (W.D. Mo. Aug. 30,

1989) (denying defendant's motion notwithstanding the verdict and explaining that, even though it was unclear how the jury's calculations were made, the evidence presented provided a rational basis for the award) (attached hereto as Ex. 30).

**D.    The jury's award of actual damages reflects its determination of an appropriate award based on the evidence. It was not tainted by any allegedly improper attorney argument or inadmissible evidence.**

**(1)    FICO's statements in its opening and closing were consistent with the Court's hypothetical construct and jury instructions.**

Because Defendants do not like the jury's damages award, they contend FICO improperly suggested to the jury that its damages award should punish Defendants for their infringement. (Dkt. 1228 at 23-26.) Defendants point to only two comments made by FICO, one during opening and one during closing. (*Id.* at 24-26.) Neither remotely suggested to the jury that it should punish Defendants. Rather, FICO's statements in opening and closing were consistent with the Court's guidance and jury instructions.

***a.    FICO's closing statement was consistent with the Court's jury instruction.***

Defendants point to FICO's comment during closing that the large actual damages number request is because "that's a lot of applications that [Defendants are] using without permission" and argue it somehow amounts to a request to punish Defendants. (Dkt. 1228 at 24.) Not so. FICO's comment merely reflects that the hypothetical negotiation is meant to compensate FICO for Defendants' infringing use and, accordingly, considers the extent of Defendants' infringing use. There was no innuendo that the unauthorized use or period of infringement had any significance other than the

length of the term of the license and Defendants' extent of use—both of which are relevant to the hypothetical negotiation. (*See*, *supra*, Section III(A).)

The Court's jury instructions state "[t]he fair market value is the license fee that a willing buyer and willing seller would have negotiated ***for the allegedly improper or infringing use that was made***" and "[t]he license fee is the amount that the licensor and the licensee would have agreed to in a hypothetical negotiation for a license ***covering the allegedly infringing use that was made***." (Ex. 2 at 2615:9-18 (emphasis added).) *See, e.g.*, *Gaylord*, 777 F.3d at 1367 (quoting *Davis v. Gap*, 246 F.3d 152, 167 (2d Cir. 2001)). Likewise, the Court's Orders and guidance expressly recognized that the extent of Defendants' use is relevant to the hypothetical negotiation. (Ex. 1 at 73:2-11 (relevant factors include "how much are they [the licensee] going to use"); Dkt. 731 at 55; Dkt. 935 at 5.) FICO's comment during closing was entirely consistent with the Court's jury instructions, Orders, and guidance.

The single statement in the closing was not improper or prejudicial. Before damages could be considered, FICO had to prove Defendants' infringement. (*See* Dkt. 1169.) To establish infringement, the jury was already well-aware of FICO's position: Defendants used Blaze Advisor without permission across numerous applications. (*E.g.*, Ex. 2 at 2673:24-2674:2, 2674:7-9.)

Moreover, as the Court instructed, attorney argument is not evidence. (*Id.* at 167:7-10 (preliminary instructions).) And, following closing arguments, the Court reminded the jury of the instructions for assessing actual damages and further instructed the jury that "[t]he fact that one party is alleging that the use was infringing or improper

is not to be considered in determining the outcome of that hypothetical negotiation." (*Id.* at 2730:9-22.) There was nothing to cure. Yet, these additional instructions remove any doubt of prejudice.[8] *Grussing v. Orthopedic & Sports Med., Inc.*, 892 F.3d 953, 957 (8th Cir. 2018) (finding counsel's statement did not warrant a new trial where district court had correctly instructed and emphasized to the jury the burden of proof and immediately gave a curative instruction during arguments); *Sorin Grp. USA, Inc. v. St. Jude Med., S.C., Inc.*, No. 14-4023 (JRT/HB), 2017 WL 3503360, at *4-5 (D. Minn. Aug. 15, 2017) (instruction to jury that statements made by attorneys are not evidence cures prejudice caused by statements made during closing); *see also Malden v. Union Elec. Co.*, 887 F.2d 157, 164-65 (8th Cir. 1989) (where "Defense counsel's comments were brief and were made in the context of a lengthy closing argument . . . . We decline to order a new trial solely on the basis of defense counsel's remarks."). The jury is presumed to follow the Court's instruction, and there is no reason to believe the jury did not do so here. *Smiley v. Gary Crossley Ford, Inc.*, 859 F.3d 545, 555 (8th Cir. 2017); *Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 610 F. Supp. 2d 998, 1017 (D. Minn. 2009).

---

[8] Counsel for Defendants asked for a curative instruction, did not object to the Court's curative instruction, and cannot now be heard to complain those instructions were insufficient. (*See id.* at 2727:23- 2730:22.)

###### b.      FICO's opening statement was consistent with the Court's guidance.

Defendants also argue that FICO's use of the term "transitional" or "bridge" license during opening prejudiced Defendants.[9] Defendants never objected to the use of this terminology during opening. (*See* Ex. 2 at 44-45, 48-49.) Any objection has been waived. *See Billingsley v. City of Omaha*, 277 F.3d 990, 997 (8th Cir. 2002) (failure to object to statements made during closing waives objection).

Moreover, there is no prejudice to Defendants. First, FICO's comments are consistent with the Court's hypothetical negotiation construct. A "transitional" or "bridge" license is just another phrase for expressing that the parties "have come to the end of the contract period and now they're negotiating a license going forward." (*See*, *supra*, Section III(A) (citing to Ex. 1 at 71:16-19, 73:19-21).)[10] As the Court noted, "[t]here is no way around the notion that the jury is going to understand that that license period occurs after the putative end of the first license." (Ex. 2 at 1574:10-14.) Second, the Court instructed the jury that attorney comments are not evidence (*id.* at 167:7-10 (preliminary instructions)) which cures any alleged prejudice. *Sorin Grp. USA, Inc.*, 2017 WL 3503360, at *4-5.

---

[9] Although Defendants contend FICO introduced the concept of a transitional or bridge license throughout trial, Defendants only point to a single comment during opening using this terminology. (Dkt. 1228 at 25.)

[10] FICO's use of the term "transitional" or "bridge" license occurred in opening before the Court instructed the parties not to use that terminology. However, in making that ruling the Court made clear that the parties could "certainly discuss the fact that the license is terminated." (Ex. 2 at 1570:25-1571:6.)

Defendants' contention that FICO's statements "invite[] the jurors to imagine a buyer who must accede to the seller's demands on pain of a copyright infringement lawsuit" also misses the mark. (Dkt. 1228 at 25.) FICO never made any such comment. And Mr. Waid repeatedly emphasized that he was only testifying as to FICO's standard pricing methodology that was a starting place for negotiations and to the factors to be considered during negotiations. (Ex. 2 at 1695:19-21, 1697:14-16, 1741:8-11.)

Defendants have not shown prejudice, let alone that their substantial rights were affected and that a new trial would likely produce a different result.

> ### (2)   Mr. Waid's testimony was properly admitted. It was consistent with the Court's Orders and guidance and provided the jury with evidence relevant to the hypothetical negotiation.

Defendants refer to Mr. Waid's testimony as "unconstrained by reality" and claim that FICO's named-application pricing reflects FICO's subjective view of what it "would like to have charged." (Dkt. 1228 at 17-23, 27-32.) This argument largely stems from Defendants' insistence that the jury must accept as true Defendants' view of the parties' past dealings, the comparability of the other Blaze Advisor licenses they rely upon, alleged alternatives to Blaze Advisor, and marketplace demand. (*Id.* at 18-19.) But the jury was presented with more than sufficient evidence to reject Defendants' view of that evidence and give it little or no weight. (*Supra*, Section III(C)(1)-(4).) Moreover, Defendants' contention is belied by the fact that FICO's standard pricing methodology had been in place and accepted by the marketplace for over a decade before the hypothetical negotiation. (Ex. 2 at 1634:18-1635:3, 1685:2-6, 1685:21-1686:6; Ex. 16.)

Similarly, Mr. Waid's discussion of changes in licensing practices in the marketplace does not reflect what FICO would have liked to charge nor is it "self-serving say-so." (Dkt. 1228 at 21.) Rather, it is a fact, and one that Defendants did not rebut via witnesses or documents.[11] With Mr. Waid's vast licensing experience, the jury had every right to credit and accept his unrebutted testimony.

Defendants also mischaracterize the Court's summary judgment Order and argue that permitting Mr. Waid's testimony "effectively nullified" the Court's Order excluding Mr. Zoltowski. (Dkt. 1228 at 18, 28-31.)[12] Defendants are wrong.

The Court's summary judgment Order excluded the ultimate opinion offered by Mr. Zoltowski because his opinion only considered FICO's perspective going into the negotiation. (Dkt. No. 731 at 30-32.) The Court expressly held, however, that relevant evidence underlying Mr. Zoltowski's conclusions was not excluded, "includ[ing] evidence of FICO's standard pricing methodology . . . ." (*Id.* at 55; *see also* Dkt. 935 at 5.) Likewise, during motions in limine the Court rejected the same argument Defendants now make, again holding Mr. Waid could testify regarding FICO's standard pricing methodology. (Dkt. 1065 at 5-6.) The Court was correct in so ruling.

---

[11] The other Blaze Advisor licenses do not call into question Mr. Waid's testimony on this issue because they are from 2005-2010, before any such changes in licensing practices.

[12] Defendants complain that the Court barred Defendants' expert Christopher Bakewell from rebutting Mr. Waid's testimony. (*Id.* at 31 n.9.) Mr. Bakewell's report responded to Mr. Zoltowki's opinions. He did not offer any damages opinion separate from his response and criticism of Mr. Zoltowski.

As the Court instructed the jury, the hypothetical negotiation considers "what the expectations of the licensor and the alleged infringer would have been had they entered into an agreement at that time . . . [,]" and had they acted reasonably in their negotiations." (Ex. 2 at 2615:19-23.)[13] *See also Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007) (finding the court properly considered the financial perspectives of both the willing buyer and the willing seller). That is exactly what Mr. Waid testified about—the expectations of both the willing licensor and the willing licensee based on his own personal experience negotiating hundreds of license agreements. *E.g.*, *Allied Sys., Ltd. v. Teamsters Auto. Transp. Chauffeurs, Local 604*, 304 F.3d 785, 792 (8th Cir. 2002) (fact witnesses may testify regarding facts within their personal knowledge, even if those facts are of a technical nature); *United States v. Mast*, 999 F.3d 1107, 1112 (8th Cir. 2021) (fact witnesses may have expertise); *Medtronic, Inc. v. Bos. Sci. Corp.*, 99-cv-1035 (RHK/FLN), 2002 WL 34447587, at *22 (D. Minn. Aug. 8, 2002) (explaining that Rule 701 distinguishes between expert and lay testimony, not expert and lay witnesses).

At its core, Defendants' argument is that Mr. Waid did not testify as to his own perceptions because he has not negotiated a term, application-based license (rather than a perpetual license) for fifteen applications and that other Blaze Advisor licenses are allegedly inconsistent with FICO's damages theory. (Dkt. 1228 at 31.) But Mr. Waid has extensive experience with term licenses, application-based licensing, and FICO's standard pricing methodology (*see*, *supra*, Section III(B)(2)) and testified to the existence

---

[13] Defendants did not object to this portion of the Court's jury instruction. (*See id.* at 2550:1-2559:6.)

of an application-based license agreement that FICO had entered for fifteen applications (*id.* at 1825:6-25). Further, the jury had evidence before it to conclude the other licenses were incomparable. (*See, supra*, Section III(C)(2).) Defendants were free to and did cross-examine Mr. Waid and present the jury with evidence of other Blaze Advisor licenses; but the jury was also free to reject Defendants' view of the case.

Mr. Waid's testimony was neither prejudicial nor confusing. It was consistent with the Court's Orders, guidance, and jury instructions. Throughout his testimony Mr. Waid never used the term "hypothetical negotiation," never used the phrase what "FICO would have charged" (or the like), and never suggested he was calculating FICO's actual damages. Instead, he made clear he was testifying as to FICO's standard pricing methodology and to the factors to be considered during negotiations based on his experience. (Ex. 2 at 1695:19-21, 1697:14-16, 1741:8-11.) He testified no less than three times that the standard pricing methodology was simply a starting place before negotiations begin. (*Id.* at 1695:19-21, 1697:14-16, 1741:8-11).)[14] The jury could use the information he provided as they saw fit to determine damages. (Ex. 2 at 1773:23-25 (Mr. Waid testifying the jury decides the damages; he provided pricing information).)

There was nothing improper, confusing, or prejudicial about Mr. Waid's testimony. The Court was correct to admit it.

---

[14] FICO agrees that the start of the negotiation is not the end result. (Dkt. 1228 at 19.) Mr. Waid testified as to factors relevant to licensing negotiations and their impact on the price negotiation—both upward and downward. The jury received this evidence as well as other evidence to inform its decision as to the end result of the negotiation.

### (3)    P-0517 and P-0518 were properly admitted.

Defendants argue P-0517 and P-0518 (collectively, the "Charts") should have been excluded from evidence as inadmissible hearsay and as statements made during settlement negotiations. (Dkt. 1228 at 32-35.) Both arguments fail.

#### a.    The Charts are admissible as business records under Federal Rule of Evidence 803.

The court has wide discretion in admitting and excluding evidence during trial. *See First Sec. Bank v. Union Pac. R.R.*, 152 F.3d 877, 879 (8th Cir. 1998); *Bevan v. Honeywell, Inc.*, 118 F.3d 603, 612 (8th Cir. 1997). Here, the Charts contain facts, namely the identification of applications using Blaze Advisor, the number of business and technical users, complexity of rules, number of transactions, and rule capabilities. (Exs. 4-5.) As the Court aptly noted and counsel for Defendants admits, the information contained in the Charts was gathered from Defendants' business records. (*See* Ex. 2 at 1067:20-6 (acknowledging the information comes from Defendants' computer system that it uses every day to run their business).) Claudio Ghislanzoni testified that he supervised the team who gathered the relevant information from "sources starting from the servers where the software was running." (*Id.* at 1053:12-19, 1069:10-16.) Yet Defendants contend the Court should not have admitted a summary of their own business records that they prepared because (1) they are not business records and (2) FICO failed to comply with the second sentence of Federal Rule of Evidence 1006. (Dkt. 1228 at 33-35.)

Defendants' first argument fails. Defendants focus solely on the fact that the Charts were generated for this litigation but do not address the question of whether a document generated from underlying business records falls within the business record exception to hearsay. The answer is yes. Because the information contained and summarized in the Charts, admittedly, comes from Defendants' business records, the Charts fall under Federal Rule of Evidence 803(6)'s exception to hearsay. *E.g.*, *United States v. Nixon*, 694 F.3d 623, 633-35 (6th Cir. 2012) (affirming admission of an exhibit which was a printout of a subset of data pulled from a larger database under Rule 803(6)); *United States v. Fujii*, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6), even though the *printouts* themselves are not kept in the ordinary course of business.") (emphasis in original); *Sony Music Entm't v. Cox Communs., Inc.*, No. 1:18-cv-950-LO-JFA, 2019 WL 13298945, at *2 (E.D. Va. Nov. 19, 2019) (finding the subset of data from a larger database admissible under Rule 803(6)). This makes sense because the information contained in the Charts retains the same assurances of accuracy and reliability as the business records from which they came. (*See* Ex. 2 at 1082:19-22.) Defendants' single case is inapposite. (Dkt. 1228 at 33-34 (citing *Palmer v. Hoffman*, 318 U.S. 109, 113 (1943)).) It involved an accident report created by a company based on an interview with an employee, which the Court held was not made in the regular course of business. *Palmer*, 318 U.S. at 113. The case did not relate to information admittedly gathered from business records that are maintained in the regular course of business, which is the fact pattern here.

41

Because the Court properly admitted the Charts as business records, they need not be separately admissible under Federal Rule of Evidence 1006. *United States v. Hunter*, No. 15-19 (DSD/BRT), 2016 WL 3815175, at *2 (D. Minn. July 13, 2016) (rejecting argument that evidence was inadmissible under Rule 1006 because the subset of records kept in the ordinary course of business was properly admitted under Rule 803(6)). Regardless, the very case cited by Defendants, *Peter Kiewit Sons' Co.*, supports that summaries of properly kept business records are admissible if the underlying business records would also be admissible (as is the case here). (Dkt. 1228 at 34 (citing *Peter Kiewit Sons' Co. v. Summit Constr. Co.*, 422 F.2d 242, 267 (8th Cir. 1969).)[15] Separately, Defendants' argument that FICO had to provide the underlying records is nonsensical. Defendants had the underlying records because the summary came from their records. There can be no harm from admitting Defendants' own summary of their records.

### b.    *Federal Rule of Evidence 408 does not preclude admission of the Charts.*

#### i.    *P-0518 was not created for or used during settlement negotiations.*

Defendants are wrong when they say that P-0518 was "prepared specifically to inform a 2018 mediation between the parties" and is inadmissible under Federal Rule of Evidence 408. (Dkt. 1228 at 33.) P-0518 was not prepared for or used as part of mediation discussions. On December 28, 2018, FICO served its Request for Production Nos. 89 and 90 which were directed to the applications utilizing Blaze Advisor, the

---

[15] Within the Eighth Circuit there are cases that could be interpreted to find Rule 1006 inapplicable in the context of this case.

number and type of rules used in each application, and the number of transactions for each application. (Ex. 28 at Nos. 89-90.) In response to these requests, Defendants produced P-0518 on April 16, 2019, months after the alleged mediation in 2018. (Ex. 29.) P-0518 was produced as AEO, bates stamped, and without any designation referring to Rule 408 or otherwise suggesting it was used in connection with any settlement discussions—because it was not.

Defendants offer nothing but their false argument to say that P-0518 was prepared to inform a 2018 mediation between the parties. (Dkt. 1228 at 33 (citing no witness testimony or other evidence to support contention).) P-0518 was properly admitted into evidence.

> ii. *The Charts do not fall within the limited scope of Federal Rule of Evidence 408.*

The scope of Rule 408 is limited. *United States ex rel. Fesenmaier v. Cameron-Ehlen Grp., Inc.*, No. 13-cv-3003 (WMW/DTS), 2023 WL 36174, at *15 (D. Minn. Jan. 4, 2023). It only precludes use of offers of consideration in compromising a claim or "conduct or a statement made during compromise negotiations ***about the claim***." Fed. R. Evid. 408 (emphasis added). It does not shield underlying facts merely because they were exchanged during negotiations. Fed. R. Evid. 408 advisory committee's note to 2006 amendment ("[T]he Rule cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations."); *see also, e.g.*, *Goddard v. Allegiance Adm'rs, LLC*, No. 2:19-cv-1506, 2021 WL 184644, at *9 (S.D. Ohio Jan. 19, 2021) ("[A] document that is otherwise discoverable is not rendered

inadmissible simply because it was presented during settlement negotiations."); *United States v. $29,008 in U.S. Currency*, No. 1:14-cv-56-jgm, 2014 WL 5460481, at *2 (D. Vt. Oct. 27, 2014) ("Hausler cannot make discoverable evidence inadmissible by introducing it in the course of negotiation.").

The Charts simply are not offers of consideration to compromise a claim or statements or conduct made during compromise negotiations about the claim. (Exs. 4-5.) Indeed, on their face, nothing about them relates to Defendants' liability or damages for the asserted claims. Rather, these exhibits consist of pre-existing facts from Defendants' business records regarding Defendants' use of Blaze Advisor. (Exs. 4-5.)[16]

FICO used the Charts to put facts before the jury. Those facts were applied to FICO's pricing matrix to size each application in accordance with FICO criteria. FICO's use of pre-existing, discoverable facts does not fall within the limited scope of Rule 408, and the Court was correct to reject Defendants' attempt to make these pre-existing, discoverable facts inadmissible under the guise of Rule 408.

c.    ***Defendants cannot show prejudice from admission of the Charts.***

The information contained in P-0517 was admitted into evidence separate from the admission of P-0517, and Defendants agreed that doing so was proper. During trial, counsel for Defendants stated that she had no objection to FICO utilizing P-0517 as a demonstrative and questioning Mr. Ghislanzoni regarding the information contained

---

[16] This is confirmed by the fact that P-0518, which was not used during settlement negotiations (*see, supra*, Section III(D)(3)(b)(i)), and P-0517 contain overlapping information. (*Compare* Ex. 4 *with* Ex. 5.)

therein. (Ex. 2 at 1055:2-1057:20.) FICO did just that, having Mr. Ghislanzoni read all the information contained in P-0517 into the record. (*Id.* at 1058:11-1067:4, 1068:23-1080:15.)[17]

There is no prejudice to Defendants, and Defendants cannot show a new trial would likely produce different results, when the information contained in the Charts is already of record. *E.g.*, *Wolfe v. Gilmour Mfg. Co.*, 143 F.3d 1122, 1125-26 (8th Cir. 1998) (any error from admitting exhibits was "harmless because the contents were cumulative of other evidence already properly admitted" ); *Tsewang Gyamtso v. New Metro Trucking Corp.*, No. 11-3457 (DWF/JSM), 2014 WL 3012907, at *4 (D. Minn. July 3, 2014) (denying motion for new trial and explaining that "the evidence Defendant argues was inadmissible was presented by Plaintiffs through multiple avenues—some of which Defendant does not argue was inadmissible").

## IV.    Conclusion

Defendants present only their view of the evidence and mischaracterize or ignore other evidence before the jury that clearly supports the jury's verdict. The jury was not required to accept Defendants' view of the evidence. The jury was presented with ample evidence to support its award of actual damages against both Federal and ACE American. The jury's award is not against the great weight of the evidence, and there is no miscarriage of justice.

---

[17] In addition, other evidence of the extent of Defendants' use of Blaze Advisor was also admitted. (*E.g.*, Exs. 6-7; Ex. 8 at P-0094-002; Ex. 10 at P-0192-005; Ex. 11 at P-0195-013, P-0195-014.)

Dated: May 19, 2023

MERCHANT & GOULD P.C.

/s/ Heather Kliebenstein
Allen Hinderaker, MN Bar # 45787
Heather Kliebenstein, MN Bar # 337419
Paige S. Stradley, MN Bar # 393432
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
Gabrielle L. Kiefer, MN Bar # 0402364
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
ahinderaker@merchantgould.com
hkliebenstein@merchantgould.com
pstradley@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com
gkiefer@merchantgould.com

*Attorneys for Plaintiff Fair Isaac
Corporation*