# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF MINNESOTA

    -----------------------------------------------------------
                                     )
    Fair Isaac Corporation,          ) File No. 16-cv-1054(DTS)
    a Delaware Corporation,          )
                                     )
           Plaintiff,                )
                                     )
    v.                               )
                                     )
    Federal Insurance Company,       ) Courtroom 14W
    an Indiana corporation,          ) Minneapolis, Minnesota
    and ACE American Insurance       ) Friday, February 3, 2023
    Company, a Pennsylvania          ) 3:00 p.m.
    Corporation,                     )
                                     )
           Defendants.               )
                                     )
    -----------------------------------------------------------




              BEFORE THE HONORABLE DAVID T. SCHULTZ
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


                   **(FINAL PRETRIAL CONFERENCE)**








       Proceedings recorded by mechanical stenography;
    transcript produced by computer.

                            *   *   *
```

                          RENEE A. ROGGE, RMR-CRR
                              (612)664-5107

       1    app-based methodology for a $37 million actual damage

       2    figure, but she said it's based on -- she excluded it and it

       3    was on the basis that it was based on the wrong legal

       4    theory.  FICO has argued that it's expectancy, it's what we

       5    would have charged.  And Judge Wright clarified, well, no,

       6    it's a fair market value, is the basis for determining

       7    actual damages.  And this app-based methodology does not do

       8    that.  It's subjective.  It only goes to what they would

       9    have wanted to charge, but it doesn't show what a willing

     10    buyer and a willing seller would reasonably have agreed to.

     11    And she excluded it.

     12           And two months later, three months later, FICO

     13    files its supplementary interrogatories and they double

     14    down.  They give a $47 million figure based on the exact

     15    same methodology that has been excluded.  And there's no

     16    difference between what Mr. Waid would testify than what

     17    Mr. Zoltowski purported to testify, since his was based on

     18    Mr. Waid's analysis.  There's no difference.  And it's a

     19    collateral attack on Judge Wright's order because it does

     20    not comport with the fair market value analysis, which is

     21    the appropriate measure for damages here.

     22           If Mr. Waid could testify as to that, then

     23    Mr. Zoltowski could testify as to that.  I mean, it's a

     24    circular -- it really makes no sense for Mr. Waid being able

     25    to provide that app-based methodology, which the court has

1     already excluded.

2                 And their only response is that the judge
3     referenced in passing what they could provide.  But what
4     Judge Wright said simply at the end, after explaining at
5     length why the app-based methodology is going to be
6     precluded, she says, "Although some of the facts underlying
7     Zoltowski's opinion may be relevant to the calculation of a
8     hypothetical loss license fee, his selective application of
9     the facts leads to a subjective and unreliable result."  I
10    mean, she simply says "some of the facts underlying" his
11    opinion.  I mean -- so there are other things that can be
12    testified about, but not this app-based methodology.  I
13    mean, she could not be more clear about the preclusion of
14    that evidence.

15                So, I mean, we're asking that his -- Mr. Waid's
16    testimony or any other FICO witnesses who comes forward and
17    uses an app-based methodology precisely as Mr. Zoltowski
18    had, that it be subject to the same order.

19                THE COURT:  I think -- here's where I think we
20    maybe part ways.  What she says is, and this is at page 31,
21    "Zoltowski's opinions as to FICO's actual damages do not
22    consider what a willing buyer and a willing seller would
23    have" -- sorry, Renee -- "contemplated.  Instead, his
24    opinions focus primarily on what FICO would have charged
25    defendants had FICO known that defendants were bound to the

     1    license for the relevant three-year period with no prospect
     2    of any future business dealing between the parties
     3    afterwards.  According to FICO, its standard annual
     4    application fee pricing for the period of unauthorized use
     5    is the measure of FICO's loss, not the purported value to
     6    Federal, but this measure does not accurately reflect the
     7    legal standard."  So -- and then goes on to say that some of
     8    the facts underlying the analysis are admissible.
     9             So what I read in that is under no circumstances
    10    can FICO argue that this methodology is the measure of its
    11    actual damages because that's what FICO would have charged.
    12    And I don't think they can argue it's the measure of
    13    damages, period, but the underlying facts, here's how we
    14    price, if we price on an application basis, here's how we
    15    price it.  It's going to be untethered testimony, perhaps,
    16    but the jury can hear it when it considers, I think, what a
    17    willing buyer and a willing seller would negotiate.  And
    18    they're free to argue that this is -- you know, these are
    19    facts that the jury can use.  They're not free to say,
    20    That's the measure of actual damages.  So I do think there
    21    is a, there's a slice here that they get to put in, but it
    22    has to be careful.
    23             MR. FLEMING:  All right.
    24             THE COURT:  And you think none of that methodology
    25    comes in?

1                    MR. FLEMING:  Well, not a methodology in which
2     they take 15 different applications, determine a fee on an
3     annual basis and then multiply it by the number of years
4     that they claim infringement, which is exactly what
5     Zoltowski did, which is exactly what was precluded and what
6     they've done in their most recent supplementary
7     interrogatory responses.  It's the exact same thing.  There
8     is no difference.
9                    Now, if you are saying, Well, they can talk about
10    how they license applications on an annual basis, they can
11    do that; or if they have any license agreements where
12    they've sold somebody a license based on 15 different
13    applications being utilized in this way, but, oh, wait, he
14    said he's never done that, so they don't have any of that
15    evidence.
16                   What we're asking here is an order precluding an
17    actual damage claim based on an app-based methodology, which
18    is the basis for their most recent interrogatory responses.
19                   THE COURT:  Okay.  I understand.  Anything
20    further?
21                   MR. FLEMING:  Not right now, Your Honor.
22                   THE COURT:  Okay.  Thank you.
23                   Mr. Hinderaker.
24                   MR. HINDERAKER:  Thank you, Your Honor.  And if
25    you wish, we could blend this together with the other motion

1    matrix. That was also part of the deposition and is used in
2    conjunction. This guideline (indicating) does discuss and
3    describe in what circumstances do we have a perpetual
4    license agreement, what is the fee for that, in what
5    circumstances is it an application-based license agreement,
6    how do we determine the fee for that. Bill Waid will
7    explain how FICO's damages follow the guidelines as they're
8    written in the exhibits, in the documents.
9              THE COURT: Okay. Thank you.
10             MR. FLEMING: Your Honor, I have a few responses
11   to what Mr. Hinderaker just said, and then Ms. Godesky was
12   going to talk about the admissibility of those Zoltowski
13   testimony. So she'll follow me, if that's all right.
14             THE COURT: Yep.
15             MR. FLEMING: Okay. So I don't know exactly what
16   Mr. Hinderaker is saying here, because it's as if he's
17   saying, well, as long as he uses this phrase "hypothetical
18   negotiation," he can testify about whatever he wants to.
19   And that's -- you can't simply do that, because Judge Wright
20   does give quite a bit of direction.
21             And one thing she says is that the copyright
22   owner's subjective beliefs or objections to an alleged
23   infringer's conduct are irrelevant to this inquiry. But I
24   hear Mr. Hinderaker saying that those circumstances should
25   be taken into account in a hypothetical negotiation, but she

1   has said they should not be.

2   So what I'll end with is that to the extent that
3   there is an attempt by Mr. Waid to provide an actual damage
4   figure based on an app-based pricing, which, by the way, was
5   used in Judge Wright's opinion on page 31, and he bases it
6   on a 15 -- on a 15-app basis using the exact same
7   methodology that Zoltowski used, that that evidence ought to
8   be excluded.  Just a straightforward following of
9   Judge Wright's order with regard to Zoltowski.  It applies
10  equally well to Mr. Waid.

11  THE COURT:  Okay.  Thank you, Mr. Fleming.

12  Hang on a second, Ms. Godesky.  I was going to
13  tell you what I was going to do on this motion --

14  MS. GODESKY:  Okay.

15  THE COURT:  -- and let me first.

16  The motion is granted in part and denied in part.
17  And I will give the parties some further direction about
18  experts at the end of all this, but here's what Mr. Waid can
19  testify to that is consistent with Judge Wright's ruling.

20  And in case it is not blindingly obvious, I am
21  going to follow every one of Judge Wright's rulings.  It's
22  the law of the case.

23  Mr. Waid can testify to the pricing structure for
24  application-based pricing.  In other words, he can testify
25  to how they price on an application-based contract.  He can

```
 1    testify about what apps in Federal's group are subject to
 2    what pricing.  In other words, are they small, medium, large
 3    or very large, and what price would apply to that.  He can
 4    testify to how many apps Federal has.  And the last thing
 5    I'm about to say is the one that I am least certain about,
 6    but I think he can do the math, meaning 15 apps at this
 7    price means this amount.  Okay?  What he can't say is that
 8    this is FICO's actual damages or use the phrase
 9    "hypothetical negotiation" or say this is how much FICO
10    would have charged.
11              So the jury can have those facts about that
12    pricing methodology.  And Mr. Hinderaker and his team are
13    welcome to use those facts appropriately in their final
14    argument or in opening statement as factual matters.  They
15    can use it to say that the jury can consider these facts.
16    And in argument, he can make what argument he chooses about
17    what the actual damages are, but that's not coming out of a
18    witness's mouth, at least that's how I understand
19    Judge Wright's ruling.
20              So, all right, let's go to the last one.  I think
21    this is the last one, correct, Ms. Godesky?
22              MS. GODESKY:  Your Honor, there's actually two
23    more, but the first one is the one I was getting up to
24    argue --
25              THE COURT:  Right, Zoltowski.
```

1     MS. GODESKY: Yeah. And I think it's very brief,
2    because the issue here relates to what you just decided.
3             So as we have been discussing, Judge Wright held
4    unequivocally that Zoltowski's opinions with regard to
5    actual damages cannot be presented to the jury.
6             In their opposition to this motion, FICO says very
7    curiously, quote, "Mr. Zoltowski will offer facts and his
8    analysis of certain facts that the jury will consider in
9    determining actual damages." And that is completely
10   contrary to Judge Wright's holding. He may only testify as
11   to disgorgement.
12            To the extent that they envision calling
13   Mr. Zoltowski to echo the facts that you just explained
14   Mr. Waid may testify to, that would be completely improper,
15   because he has no personal knowledge of these facts, he's
16   never worked at FICO, and he would just be dressing up facts
17   with the imprimatur of your damages expert, right, to sort
18   of sneak in extra opinions regarding these facts that can
19   only come in through fact witnesses. So I think this is
20   very clear-cut.
21            And so what we're asking for is additional
22   guidance to FICO that given Judge Wright's ruling and the
23   law of the case Mr. Zoltowski cannot offer facts and
24   analysis of facts relating to actual damages, because all of
25   his disclosed actual damages opinions have been excluded.

1    hope I didn't say that, because it's not what he will
2    testify to.  His report doesn't -- it doesn't address a
3    hypothetical negotiation at all, so, of course, he didn't
4    testify to that and he won't be.  But the jury is going to
5    be able to consider with the court's guidance of what are
6    the factors that are relevant, these things that
7    Mr. Zoltowski does testify to and may testify to under
8    Judge Wright's order under *Daubert*.
9               THE COURT:  Okay.  Thank you.
10              So the best way to describe my ruling on this one
11   is that it's granted in part and denied in part as well, but
12   this is -- here's what I want to convey on the subject of
13   experts.  Hopefully, this guidance -- it not only answers I
14   think this motion, but it answers perhaps some unasked
15   questions or lurking questions.
16              So I'm going to start with Zoltowski.
17   Mr. Zoltowski cannot offer an opinion as to what FICO's
18   actual damages are.  Point one.
19              Point two.  He cannot testify to facts supporting
20   that opinion, the opinion he originally gave, because he
21   does lack foundation -- that's point two as to those
22   facts -- unless, and this is point 3, those facts have also
23   been disclosed as support for his opinion on disgorgement.
24   So if the facts have been disclosed or relied upon as to his
25   disgorgement opinion, he can testify to them.

1          Now, because Zoltowski can't testify to actual
2  damages, Bakewell can't testify to the flaws in Zoltowski's
3  actual damages analysis or to the facts that support his
4  opinion that Zoltowski's actual damages analysis was flawed.
5          Zoltowski's rebuttal opinions in his rebuttal
6  report are limited to only those opinions to which Bakewell
7  and Kursh actually testify at trial, and both of them have
8  been limited by Judge Wright as well.
9          And to make sure it's also clear, Zoltowski cannot
10 testify to opinions or matters that are not disclosed in his
11 expert reports or covered in his deposition.  I'm assuming
12 he was deposed.  So to the extent that he has now said
13 something and that's been put in here and that exceeds the
14 scope of those matters, he's not going beyond them.  Okay?
15         MS. GODESKY:  Your Honor, may I ask for a
16 clarification relating --
17         THE COURT:  Please do.
18         MS. GODESKY:  So this is not specific to experts.
19 That guidance was helpful.  This relates more to argument
20 and the boundaries for attorney argument, because --
21         THE COURT:  All right.
22         MS. GODESKY:  -- I heard Mr. Hinderaker talk about
23 how this hypothetical negotiation should take into account
24 how FICO, quote, "would approach this situation."  That's
25 how he phrased it.  And then he referenced the fact that the

1    hypothetical negotiation should take into account the
2    economic circumstances of this case and defendants' use in
3    this case.
4            And so I just want to be clear.  Mr. Fleming
5    referenced this line in Judge Wright's opinion where she
6    said, "The copyright owner's subjective beliefs or
7    objections to an alleged infringer's conduct are irrelevant
8    to this hypothetical negotiation."  And so I just want to
9    confirm that that is the law of the case.
10           And to the extent we're characterizing in argument
11   what this hypothetical negotiation looks like, I think it
12   would be outside the bounds for counsel to suggest that you
13   should be taking into account, you know, this situation
14   where you're dealing with someone you think to be infringing
15   on your product, you know, the economic circumstances of
16   this case, where you're accusing someone of breach and
17   infringement, because that is not the arm's length
18   hypothetical negotiation that, you know, the jury will be
19   asked to decide.
20           THE COURT:  The hypothetical negotiation, as I
21   understand it -- first of all, I think the first point you
22   make, I agree with.  How FICO would approach it is not
23   relevant.  How Federal would approach it is not relevant.
24           What is relevant is you have a software provider,
25   for lack of a better, more accurate description, and an

1  insurance company, and the insurance company uses it for
2  these processes and how often it's used and all that stuff,
3  and this is how this software manufacturer engages in
4  pricing.  And if you assume then you have a hypothetical
5  willing seller and a hypothetical willing buyer, the jury
6  has to arrive at a figure.  And the economic circumstances,
7  as I'm using that phrase, would include the extent of use of
8  the buyer and things like that.
9       And so when you, when you talked about point two
10  and point three that Mr. Hinderaker raised, my reaction is
11  those are fair.
12       You then raised another point, which is in the
13  context of someone who is allegedly infringing or who has
14  breached the contract.  I don't think those are reflective
15  of market value.  Those are subjective.
16       The question is, Given that the parties find
17  themselves at this moment in time and they are negotiating a
18  license with these characteristics, what would that
19  negotiation result in.  That's how I understand it.
20       MS. GODESKY:  So do I.
21       THE COURT:  Okay.
22       MS. GODESKY:  Thank you for the clarification.
23       THE COURT:  Mr. Hinderaker.
24       MR. HINDERAKER:  I think -- well, I can't repeat
25  what Ms. Godesky said to characterize what I said.  I do

1     agree -- and I am happy to have the guidance.  I do agree
2     that a hypothetical negotiation looks to what a reasonable
3     licensor and a reasonable licensee would do in the context
4     of that negotiation, in the context of the circumstances of
5     the negotiation.
6              I agree that FICO's claim of actual damages is
7     not, is not -- FICO cannot claim actual damages based upon
8     its subjective belief of what it wanted, because that's not
9     the hypothetical negotiation, but FICO can go into a
10    hypothetical negotiation saying, as licensor, One of the
11    first steps we do is we look at our pricing methodology and
12    our guidelines, we figure out what the sizing is and we come
13    to some sense of what value is and then -- but that's not
14    the end of the negotiations.  And I think that was
15    Judge Wright's points.  That's not a negotiation at that
16    point, and it's certainly not the end of a negotiation.  So
17    what does the -- what does a willing licensee look to and
18    what are those factors?  And how do they -- what weight do
19    they have in the circumstances of the negotiation?
20             So if we're -- I have no quarrel if the court's
21    guidance is that the evidence should be directed to the
22    factors that come into play in negotiating a license
23    agreement between a willing licensor and a willing licensee
24    under the circumstances at the time.  If it's something
25    other than that, then I'm not understanding Judge Wright's

1   order.
2           THE COURT: The only thing that I think in that
3   that's -- where there's an ambiguity is what everyone means
4   by "under the circumstances at the time." And I think that
5   means how much are they going to use, for how long, what
6   have they historically used, what are you guys doing. But I
7   don't think it means, And they just breached our contract or
8   they just infringed our copyright. Now, it does I think
9   include, We know that they intend to use it only for the
10  next three years or whatever. Those circumstances are all
11  part of the negotiation.
12          MR. HINDERAKER: And so that I'm clear and our
13  intention, I do not intend that the hypothetical negotiation
14  is premised on some putative notion that because you're an
15  infringer, we take a pound of flesh.
16          THE COURT: Right.
17          MR. HINDERAKER: I'm supposed to be in the context
18  of a willing licensor and a willing licensee.
19          THE COURT: Who, for lack of a better way of
20  putting it, in essence, have come to the end of the contract
21  period and now they're negotiating a license going forward.
22          MR. HINDERAKER: For the fair market value of
23  whatever that period of use is going to be, yes.
24          THE COURT: Right.
25          MR. HINDERAKER: At that stage where the

1       relationship has been ended.
2                   THE COURT:  Right.  I think that's --
3                   Ms. Godesky, you look concerned.
4                   MS. GODESKY:  Just I was only concerned with the
5       last piece of what Mr. Hinderaker said, you know, that
6       you're taking into account that your relationship has ended?
7                   THE COURT:  Well, I took that to mean kind of what
8       I just said, which is, You're at the end of your contract
9       period, now you got to negotiate a new license.
10                  MS. GODESKY:  If that's the understanding, I
11      agree.
12                  THE COURT:  Okay.  All right.
13                  MS. GODESKY:  Thank you.  That was helpful
14      guidance.
15                  THE COURT:  Was it?  I have no idea anymore.
16                  All right.  Let's take up the last motion in
17      limine.  Carretta, I believe?
18                  MS. GODESKY:  Yes, Your Honor.  So FICO -- this is
19      Mr. Thomas Carretta, in-house lawyer at FICO, and FICO
20      intends to call him to testify selectively about his advice
21      and work product.
22                  He was approached by the business team at FICO
23      after they learned of the ACE acquisition and asked for
24      legal advice about the license agreement.  And, in
25      particular, they want to elicit testimony from Mr. Carretta