1

```
 1              UNITED STATES DISTRICT COURT
 2                DISTRICT OF MINNESOTA
 3   ------------------------------------------------
 4   Fair Isaac Corporation,      )
     a Delaware Corporation,      )   File No. 16-cv-1054(DTS)
 5                                )
           Plaintiff,             )
 6                                )
       v.                         )
 7                                )
     Federal Insurance Company,   )   Courtroom 14W
 8   an Indiana corporation,      )   Minneapolis, Minnesota
     and ACE American Insurance   )   Wednesday February 15 2023
 9   Company, a Pennsylvania      )   9:00 a.m.
     Corporation,                 )
10                                )
           Defendants.            )
11   ------------------------------------------------
12
13
14       BEFORE THE HONORABLE DAVID T. SCHULTZ
15   UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
16
         (JURY VOIR DIRE PROCEEDINGS - SEALED)
17
18
19
20
21
22
23       Proceedings recorded by mechanical stenography;
     transcript produced by computer.
24
25                      * * *
```

2

```
 1   APPEARANCES:
 2   For Plaintiff:       MERCHANT & GOULD P.C.
 3                        BY: ALLEN W. HINDERAKER
                             HEATHER J. KLIEBENSTEIN
                             PAIGE S. STRADLEY
 4                           MICHAEL A. ERBELE
                             JOSEPH W. DUBIS
 5                           GABRIELLE L. KIEFER
                         150 South Fifth Street, #2200
 6                       Minneapolis, Minnesota 55402
 7   For Defendants:     FREDRIKSON & BYRON
 8                        BY: TERRENCE J. FLEMING
                             LEAH C. JANUS
                             CHRISTOPHER D. PHAM
 9                           RYAN C. YOUNG
                             PANHIA VANG
10                       200 South Sixth Street, #4000
                         Minneapolis, Minnesota 55402
11
                         O'MELVENY & MYERS LLP
12                        BY: LEAH GODESKY
                             ANTON METLITSKY
13                           DARYN E. RUSH
                             ROXANA GUIDERO
14                       Times Square Tower
                         7 Times Square
15                       New York, New York 10036
16   Court Reporters:    RENEE A. ROGGE, RMR-CRR
17                       KRISTINE MOUSSEAU, CRR-RPR
                         MARIA V. WEINBECK, RMR-FCRR
                         PAULA RICHTER, RMR-CRR-CRC
18                       United States District Courthouse
                         300 South Fourth Street, Box 1005
19                       Minneapolis, Minnesota 55415
20
                                * * *
21
22
23
24
25
```

3

```
 1                   JURY VOIR DIRE
 2                   (9:22 a.m.)
 3                   (IN OPEN COURT)
 4        THE COURT:  All right.  Everyone, go ahead and be
 5   seated.  Thank you.
 6        So you've all managed to pass the first test of
 7   whether you can be jurors.  You navigated the obstacles
 8   we've thrown in your path to getting a seat, so thank you.
 9        All right.  Good morning, everyone, members of the
10   jury panel.  You've been called to this courtroom for the
11   purpose of selecting a jury in a civil trial.  Not a
12   criminal case, a civil case.
13        My name is David Schultz.  I'm a United States
14   Magistrate Judge, and I will be one of the judges presiding
15   over this trial.  Now, I say "one of the judges," because in
16   our judicial system, there are actually two judges in the
17   courtroom.  One of the judges to decide questions of law,
18   and that will be me.  And one judge to decide questions of
19   fact, and that will be you, the jury.  Actually, those of
20   you who are selected to be the jury in this case.
21        Before we get into the rest of the process, the
22   first question for any of you in the box and in the gallery:
23   Is anyone having difficulty hearing or understanding what I
24   am saying?  If so, please raise your hand.  Okay, good.
25        In a few minutes, we're going to start jury
```

4

```
 1   selection.  You're probably a little nervous, but don't
 2   worry, we will give you guidance and direction at each step
 3   of the process.
 4        To make sure that both parties receive a fair
 5   trial by an impartial jury, we're going to ask you some
 6   questions.  I'll ask you some questions first and then the
 7   lawyers will be given a brief opportunity to follow up and
 8   ask additional questions.  You will be under oath when you
 9   answer our questions, so you must answer truthfully.
10        I ask you now all to please stand, all of you, and
11   face my courtroom deputy, who will administer the oath to
12   you.
13        THE CLERK:  Please raise your right hand.
14        (Oath given to the jury.)
15        THE COURT:  All right.  Thank you.  You may be
16   seated.
17        We currently have 18 prospective jurors in what we
18   call the well.  That's the portion of the courtroom where
19   the actual trial takes place.  The selection and order of
20   these jurors, and all of you, were randomly done by a
21   computer.  At the end of the selection process, we will have
22   a jury of 12, and all 12 of you who are in the box at the
23   end of that process will serve on the jury.  As you can see,
24   we have more than 12 of you here this morning.  So as a
25   matter of arithmetic, some of you will not be called into
```

165

1   trial itself.  Unless I tell you otherwise, all of my
2   instructions, both those that I give you now and those I
3   give you later, are equally binding and must be followed.
4        As I've just described, this is a civil case
5   brought by FICO against Federal for breach of the license
6   agreement and for copyright infringement and against ACE
7   American for copyright infringement.  There is also a claim
8   by Federal against FICO for breach of the license agreement
9   and the Covenant of Good Faith and Fair Dealing.  It will be
10  your duty to decide from the evidence whether either party
11  is liable to the other on any of these claims.
12       From the evidence you will decide what the facts
13  are.  You are entitled to consider the evidence in light of
14  your own observations and experiences in the affairs of
15  life.  You may use reason and common sense to draw
16  deductions or conclusions from the facts that have been
17  established by the evidence.  You will then apply those
18  facts to the law that I give you in these and in my other
19  instructions, and in that way, reach your verdict.
20       You are the sole judges of the facts, but you must
21  follow the law as stated in my instructions whether you
22  agree with it or not.  In deciding what the facts are, you
23  may have to decide what testimony you believe and what
24  testimony you do not believe.  You may believe all of what a
25  witness said or only part of it or none of it.

166

1        In deciding what testimony to believe, consider
2   the witness' intelligence, their opportunity to have seen or
3   heard the things they testify about, their memories, any
4   motives they may have for testifying a certain way, their
5   manner while testifying, whether they said something
6   different at an earlier time, the general reasonableness of
7   their testimony, and the extent to which their testimony is
8   consistent with other evidence that you believe.
9        Do not allow sympathy or prejudice to influence
10  you.  The law demands of you a just verdict, unaffected by
11  anything except the evidence, your common sense and the law
12  as I give it to you.
13       You should not take anything that I may say or do
14  during this trial as indicating what I think of the evidence
15  or what I think your verdict should be.  I may, for example,
16  ask a question of a witness.  If I do, it is only to make
17  certain that I understand the witness' testimony.  It is not
18  to imply that I believe or do not believe the witness or
19  that I think particular testimony is or is not important or
20  that I have any view whatsoever about the case.  If at any
21  time I slip and make a comment about the facts, you should
22  disregard it.  I decide all questions of law that arise
23  during the trial, but you jurors decide all questions of
24  fact.
25       I have mentioned the word "evidence".  Evidence

167

1   includes the testimony of witnesses, documents, and other
2   things received as exhibits, any facts that have been
3   stipulated, that is formally agreed to by the parties, and
4   any facts that have been judicially noticed; that is facts
5   that I say you may but are not required to accept as true,
6   even without evidence.
7        Certain things are not evidence.  I will list
8   those things for you now:
9        Statements, arguments questions and comments by a
10  lawyer are not evidence.
11       Objections are not evidence.  The parties have a
12  right and sometimes an obligation to object when they
13  believe something is improper.  You should not be influenced
14  by the objection.  You should not, for example, be
15  prejudiced in any way against an attorney who makes an
16  objection or the party whom he or she represents.  If I
17  sustain an objection to a question or an exhibit, you must
18  ignore the question or the exhibit and must not try to guess
19  what information that might have been.
20       Testimony and exhibits that I strike from the
21  record or tell you to disregard are not evidence and must
22  not be considered.
23       Anything -- exhibits that are identified by a
24  party but are not received in evidence are not evidence.
25       Anything you see or hear about this case outside

168

1   the courtroom is not evidence.
2        Furthermore, a particular item of evidence is
3   sometimes received for a limited purpose only.  That is, it
4   can be used by you only for one particular purpose and not
5   for any other purpose.  I will tell you when that occurs,
6   and instruct you on the process -- or on the purposes for
7   which the item can and cannot be used.  You should pay
8   particularly close attention to such an instruction, because
9   unlike the final instructions that I will give you at the
10  end of the case, an instruction about a particular piece of
11  evidence may not be able -- may not be available to you in
12  writing later in the jury room.
13       Finally, some of you may have heard the terms
14  direct evidence and circumstantial evidence.  You should not
15  be concerned with those terms.  The law makes no distinction
16  between direct and circumstantial evidence.  You should give
17  all evidence the weight and value you believe it is entitled
18  to receive.
19       Your verdict will depend on whether you find that
20  certain facts have been proved by the greater weight of the
21  evidence.  To prove something by the greater weight of the
22  evidence is to prove that it is more likely true than not
23  true.  To determine whether a fact is more likely true than
24  not true, you must consider all of the evidence and decide
25  which evidence is more believable.  If on any issue in the

43

1   of all these other insurance companies, and ACE American
2   became the one using Blaze Advisor to sell insurance.  No
3   license, no permission.  As a consequence, that use is
4   copyright infringement.  FICO did not learn of ACE
5   American's use of Blaze Advisor until this lawsuit.  So in
6   the chronology, we have the unlicensed use by Chubb & Son,
7   Federal being responsible, and the unlicensed use by ACE
8   American.
9           So now let me turn to the remedy or the damages
10  that FICO seeks in this lawsuit.  The employees of the three
11  different insurance companies were able to use Blaze Advisor
12  because Chubb & Son violated that provision of 3.1 regarding
13  not permitting anybody but a Chubb & Son employee to use it.
14  So there's a period of time before the license agreement is
15  terminated that FICO seeks to be compensated for all the
16  applications that these foreign insurance companies used to
17  sell insurance with Blaze Advisor.  And then the license
18  agreement is terminated, but just like Chubb & Son, the
19  foreign insurance companies don't stop.  And so FICO seeks
20  to be compensated for their use until their use actually
21  does stop.
22          There is the period of time when Chubb & Son is
23  using Blaze Advisor after termination, and FICO seeks to be
24  compensated for that.  And then there is the period of time
25  where ACE American, unlicensed, infringer of copyrights,

44

1   uses Blaze Advisor on applications, and FICO wants to be
2   compensated for that.
3           So FICO looks at the damages in this way:  The
4   unlicensed use of the foreign insurance companies before
5   termination, foreign insurance company use after
6   termination, unlicensed Federal use after termination, and
7   then ACE American's copyright infringement.  So how do we
8   determine the dollar value to compensate FICO?  That, ladies
9   and gentlemen, is your job.
10          Our last witness will be Bill Waid, a person who
11  has negotiated many hundreds of Blaze Advisor license
12  agreements over the years.  And as I mentioned, there is no
13  one standard fee.  And he'll explain first, you know, FICO's
14  value-based pricing.  He'll look to some pricing methodology
15  that FICO has used since 2003.  He'll testify how the
16  marketplace has accepted that pricing methodology for the
17  last 20 years.  He'll relay his experience in negotiating
18  license agreements under the unique facts of each
19  circumstance.  Every license, every licensee, every
20  circumstance has its own uniqueness to it.
21          There is one set of circumstances when you're
22  trying to negotiate a license agreement with a brand new
23  client, and there's another set of circumstances when you're
24  trying to figure the fair value to be compensated when the
25  license agreement has been terminated but the former client

45

1   needs a transition license to move away from using Blaze
2   Advisor.
3           Those circumstances are quite different.  The
4   motivations between those circumstances are quite different.
5   And Mr. Waid will explain that Chubb & Son looks to the
6   total lifetime value of the relationship when it's
7   negotiating the fee.  And so he will discuss total lifetime
8   value in the context of a brand new client, total lifetime
9   value in the context of the circumstance where a former
10  client needs a transition license.
11          The evidence will also consider and present for
12  your consideration well, how is Blaze Advisor used?  How
13  does the licensee use Blaze Advisor?  Well, in this case, it
14  was used -- it was central to the licensee's business
15  because it was used to sell insurance, and their business is
16  selling insurance.
17          Another consideration, and you figure out the fair
18  fee, is how much insurance was sold using Blaze Advisor?  As
19  I mentioned, it's about $5 billion for each unlicensed year.
20          Of course, licensees have their counterpoints to
21  be made in a negotiation.  Mr. Waid will explain his
22  experience with respect to that as well.
23          And then at the end you will be the ones to
24  decide, what's the compensation to FICO for the years of
25  unlicensed use in these many applications to sell insurance?

46

1           And, now, let me now turn to what the law calls
2   disgorgement.  This is the issue that the Court will be
3   seeking your advice on.
4           Disgorgement is a legal word that means taking
5   away from the infringer the benefits that are gained by the
6   infringement.  And FICO seeks an award of disgorgement
7   because the infringement of intellectual property has
8   consequences.  So says the copyright law of the United
9   States.
10          Here, over the years of infringement, Blaze
11  Advisor was used in connection with selling $21 billion
12  worth of insurance.  That's a huge number.  Putting that
13  number in context, during that same period of time, Chubb
14  Limited sold more than $150 billion worth of insurance.  The
15  amount of benefit to be taking away from the defendants is
16  about 14 percent of that total.
17          Again, returning to the Chubb Limited 2018 annual
18  report, technology is a competitive weapon.  In this case,
19  the defendants took the know-how, their own know-how of how
20  to sell insurance, but then they made it operational by
21  automating the process of selling and by automating the
22  decisions necessary to sell insurance.  As stated in the
23  RFI, they needed Blaze Advisor in order to expand into the
24  small and mid-markets.
25          We will have an industry expert by the name of

47

1  Bick Whitener, who has studied hundreds of the documents
2  that the defendants have produced in this litigation, and he
3  will explain how they used Blaze Advisor in order to sell
4  insurance.  In conclusion, his testimony is that the use of
5  Blaze Advisor made a significant contribution to the sale of
6  insurance.
7       Defendants have asserted counterclaims against
8  Blaze Advisor in reaction to the lawsuit.  For all of the
9  reasons and the evidence that I have just overviewed, FICO
10  properly terminated the license agreement.  For all the
11  reasons that I have just overviewed, that termination was in
12  good faith.  For all the reasons I have overviewed, the
13  copyright and counterclaims have no merit.
14       So in summary, FICO brought this lawsuit because
15  its software was used without permission for years.  That
16  unlicensed use was a knowing use.  It was in disregard of
17  the license agreement, and it was in disregard of FICO's
18  copyrights.
19       We request to be compensated for the years of that
20  unlicensed and infringing use, and we request that the
21  benefits that the infringers gained from their infringement
22  of FICO's copyrights be taken away.
23       I thank you for your attention.
24       THE COURT:  Thank you, Mr. Hinderaker.
25       Members of the jury, we're going to take our

48

1  morning recess now, and so we'll ask that you be back in the
2  courtroom at 25 minutes to 11:00 on that clock.
3       Now, remember, no research, no talking to outside
4  people, and you can talk amongst yourself about anything
5  except this case.
6       Thank you.  We're in recess.
7       (Jury leaves the courtroom.)
8              (JURY NOT PRESENT)
9       THE COURT:  Federal, I'm going to switch the input
10  here and make sure that it works for you.
11       MS. GODESKY:  Sure.
12       THE COURT:  Okay.  Why don't you put something up,
13  anything, just to make sure that it's coming up.
14       Okay.  Very well.
15       All right.  We're in recess until 25 minutes to
16  11:00.
17       Counsel, nothing to talk about right now, right?
18       MR. HINDERAKER:  I assume the slides have been
19  changed?
20       MS. GODESKY:  Yes.
21       THE COURT:  All right.  Thank you.
22
23       (Recess taken at 10:21 a.m.)
24            (IN OPEN COURT)
25            (10:37 a.m.)

49

1       (Jury seated.)
2       THE COURT:  Thank you everyone.  You may be
3  seated.
4       All right.  Ms. Godesky.
5       MS. GODESKY:  Thank you.
6       Good morning, everyone.  As you know by now, my
7  name is Leah Godesky, and I represent the defendants in this
8  case, Federal Insurance Company and ACE American Insurance
9  Company.  As you will hear, both defendants are what's
10  commonly referred to as the Chubb Group of Insurance
11  Companies.  And many of the witness from Chubb that you'll
12  see testify here today will call themselves Chubb employees.
13  And it will be a shorthand that I use a lot as well.  I'm
14  very proud to represent Chubb in this case, and it means a
15  lot to these companies.
16       I'll be joined at counsel table throughout by
17  Mr. Claudio Ghislanzoni, who's sitting over there with the
18  glasses, and he's travelled all the way from England to be
19  here for the trial every day.  Maxwell Bryer, who is an
20  attorney at Chubb, is also sitting next to Mr. Ghislanzoni.
21       Claudio being here from England is just a preview
22  of something you'll see about a lot of the Chubb witnesses
23  you'll meet during this trial because this case is about
24  technology infrastructure.  And as you'll learn, you need
25  hands from all around the world to keep the technology

50

1  infrastructure of a big company like Chubb running.
2       I also want to introduce again Leah Janus -- there
3  are two Leahs -- and Terry Fleming, who are with the
4  Fredrikson firm right here in Minneapolis.  And they, like
5  me, are representing -- lawyers representing the defendants
6  in this case, and they'll be presenting witnesses during
7  trial.
8       We also have Vanessa Wheeler, who's sitting in the
9  back there, and she's going to be running our exhibits and
10  videos so you can see documents throughout trial.
11       We're also working with a few other lawyers and
12  paralegals that you'll see from time to time because they're
13  working behind the scenes to keep things running as
14  efficiently as possible because we do not want to waste your
15  time.  This is a very important case to our clients, and
16  it's very important to us that you're all taking time out of
17  your very busy lives to be here, so we are going to be as
18  efficient as possible, and I'm going to get started right
19  now.
20       So FICO just told you -- made references to the
21  fact that the defendants in this case did things like they
22  had indifference to the copyright, they were ignoring a
23  contract, there were unauthorized third parties using Blaze.
24  And all of those references are intended to make you feel
25  like Federal and ACE did something wrong and they should be

159

1  dimensions, right.  So let's back it up a little bit, and we
2  talk about high-volume applications.  We used the
3  illustration before about a couple hundred to 500 to
4  thousands to maybe millions of decisions, right?  So by
5  having the control of those aspects through Blaze Advisor, I
6  can actually introduce new concepts to subset of the
7  population that I'm working with, I can actually throttle
8  certain areas.  I have the full control from a business
9  without actually having to change anything.  And the beauty
10  is is Blaze Advisor doesn't care if it's 1,000 decisions
11  today and tomorrow is a million.  It doesn't care, right?
12  So you have the centralized control of being able to do
13  that.
14  Q.  And then it goes on, control over the results of
15  high-volume operational decisions.  I think we understand
16  what high-volume is from your testimony.  What do you mean
17  by operational decisions?
18  A.  So operational decisions actually impact the tactical
19  decision that I'm actually making at that point in time,
20  right?  So a business decision is I would like to originate
21  100 more applications a month, right?  That's a
22  business-level decision.
23          The operational decision is within that context, I
24  know exactly what decision I've made within what I'm trying
25  to do so I can actually prove it down.

160

1  Q.  And what's the technology that brings the rules of
2  decision to the point that where the decision is made and
3  something happens in the marketplace?
4  A.  That's the flexibility that we talked about upfront.
5          Now, there's one angle here that's also off of the
6  ability to handle high-volume operational decisions and
7  there's a semicolon there that says "scale."  The scale is
8  what's very important in these context, right?  So as I
9  achieve my frontline business goal of originating more
10  customers, now I want to go after a bigger market, right?
11  So my scale changes.  And then by centralized control that
12  I'm making consistently across, regardless of how many
13  providers are reselling my insurance packages, how many
14  customers are applying for that, the Blaze Advisor doesn't
15  care.
16  Q.  It can scale?
17  A.  It scales.  Yes.
18          MR. HINDERAKER:  We can take that down now.
19  BY MR. HINDERAKER:
20  Q.  And let me turn now to your personal experience with
21  Chubb.  Over the years, about how many meetings have you
22  had, whether in-person or Zoom or telephone?
23  A.  So my interaction with Chubb was pre-Zoom, so we had a
24  lot of meetings in person and telephone.  So I can recall
25  three or four meetings in person post the sale of Blaze

161

1  Advisor to Chubb and countless phone conversations along the
2  way.
3  Q.  And in general, the purpose of those discussions --
4  well, first, who at Chubb were you speaking with?
5  A.  So at various levels.  So typically the conversations at
6  Chubb would be with architects, so people that were, you
7  know, in charge of the infrastructure systems.  Some
8  business owner capacity that would represent the business,
9  and I'm a little fuzzy with names, so, you know, it's been a
10  long time.
11          Another set of conversations would be with Chubb
12  leadership around sort of the value of Blaze Advisor and
13  things that we're doing inside of their environment.
14  Q.  So you've had -- you did, in fact, have conversations
15  with those three categories of people?
16  A.  Yeah.  And one more category I forgot, data analyst as
17  well.  So think of the data scientist, if you will, the
18  people that are building algorithms to evaluate the
19  customer.
20  Q.  Can you tell us the subject matter of these meetings in
21  general?
22  A.  So the subject matter of most of the meetings were
23  around, we're using Blaze Advisor.  We have new problem sets
24  that we're trying to solve.  For example, one of the most
25  prevalent conversations that we've had is we have an

162

1  analytic model, so think of it as fancy math, right?  Fancy
2  math to determine some aspect of their customer.
3          Well, in this process, they would develop these
4  analytic models over here with other data systems, but
5  taking that analytic data model and actually putting it in
6  this framework, this application that Blaze Advisor
7  provides, is complicated.  So Blaze Advisor provides an
8  ability for them to ingest those models directly into this
9  overall process.  So most of the conversations I had past
10  that was how Blaze Advisor and some of the remodel
11  translating techniques would support that.
12          There was also conversations around best practices
13  on growing Blaze Advisor within different problem sets and
14  the governance associated with that.  So how do they
15  actually organize themselves around it, et cetera.
16  Q.  Model translator, that's an add-on product to Blaze
17  Advisor?
18  A.  Model translator is an add-on product to Blaze Advisor.
19  Q.  So I guess I heard you say so far sometimes the
20  discussion was about additional possible FICO add-ons to
21  Blaze Advisor and other times how to better use or more
22  fully use Blaze Advisor?
23  A.  That's correct.
24  Q.  Okay.  Did you gain an understanding of the extent to
25  which Blaze Advisor was integrated into their business at

163

1    Chubb?
2    A.  So in those conversations, it was apparent that Blaze
3    Advisor was central to all of their decision-making process
4    within the group that we were talking about.  And the reason
5    why they were looking at leveraging that is because they
6    wanted to extend other groups' works into Blaze Advisor.  So
7    it was pivotal to what they were doing.
8    Q.  Let me focus you on some meetings in 2015, 2016.
9    A.  Okay.
10   Q.  So in all of your occasions of meeting with Chubb at
11   that time frame, were you the initiator to be involved in
12   the conversation or were you being invited?
13   A.  No, I was always invited.
14   Q.  They were interested in talking to you?
15   A.  Yes.
16   Q.  And you mentioned model translation, were they also
17   interested in other FICO products at that time as add-ons to
18   Blaze Advisor?
19   A.  So they were interested in add-ons to Blaze Advisor not
20   just in model translator but the model governance solution
21   that we had, which is a how do I manage all of my different
22   models?  Because think -- you know, these insurance
23   companies have thousands of these analytic models and, you
24   know, hundreds of people that need to manage it.  And the
25   conversations were around how do we use model translator to

164

1    bring it into Blaze Advisor and what the best practices
2    of -- once it's in Blaze Advisor, how do we actually govern
3    that model and monitor the performance of that model over
4    time?  And various times it would be roadmap conversations
5    as well.  So what is FICO doing?  How are you guys sort of
6    progressing products, things like that.
7    Q.  They want to look forward to where FICO is going?
8    A.  Absolutely.
9    Q.  Were there any discussions that you were involved in
10   where the conversation was about FICO's cloud platform for
11   Blaze Advisor?
12   A.  Yes.
13   Q.  And what were they?  And first give us a time frame, if
14   you would, if you can recall?  I'm asking late 2015, early
15   2016?
16   A.  Well, I think it would have been, it was definitely
17   cold, so it would have been, yeah, around 2016 in the cold.
18   Q.  Okay.
19   A.  And it was -- you know, they were beginning the thought
20   process around moving to cloud.  Again, cloud technology was
21   very new at the time, so there was a lot of trepidation
22   around the cloud as a principle in itself.  And then, you
23   know, what value would our cloud offering of Blaze Advisor
24   provide them in those situations.
25   Q.  And we should now back up a little bit for all of us to

165

1    understand what do you mean by "cloud" and, you know, what
2    is this?
3    A.  What's the easiest description of cloud?  The easiest
4    description of cloud is traditionally large organizations
5    would manage all of their IT infrastructure, all the
6    thousands of computers that they run to be able to do
7    things.  The cloud is a central provider through Internet
8    technology does all of that for them.
9    Q.  Is it fair to say, in other words, in theory, all of the
10   IT staff of Chubb & Son becomes redundant because the IT is
11   put in the cloud and some other provider is doing that
12   work -- the work that was formerly done by in-house staff?
13   A.  That is certainly one aspect.  There certainly is a
14   redundancy of staff that occurs in that but really it allows
15   them to focus on more important strategic things and be more
16   transformative across the organization as opposed to just
17   keeping the lights on on old technology.
18   Q.  So the cloud service provider is providing a lot of the
19   technology to keep the software running in the cloud?
20   A.  Yes.
21   Q.  But as -- as you said, those are just beginning
22   exploratory discussions at that point?
23   A.  Yeah.  So at that time it was the beginning of our cloud
24   offering, so these were partnership-based conversations
25   around here's where we're thinking of going, where are you

166

1    guys thinking of going?  How does this sort of gel together?
2    Q.  And today is that called the FICO platform, your cloud
3    offering?
4    A.  That is called FICO platform, yes.
5    Q.  When you were meeting with these folks, were there any
6    conversations that came up about the fact that ACE had or
7    will be acquiring the Chubb Corporation?
8    A.  There were --
9            MS. GODESKY:  Your Honor, may we have a sidebar?
10           THE COURT:  You may.  Approach.
11           MS. GODESKY:  Thank you.
12           THE COURT:  Remind the members of the jury, while
13   we're doing this, feel freely to stand up, stretch your
14   legs.
15           (Sidebar discussion.)
16           MS. GODESKY:  Your Honor, this goes to the Rule
17   408 issue that we've been discussing.  We submitted a
18   supplemental submission on this yesterday, and we have an
19   excerpt that's quoted in our submission from Mr. Baseman's
20   deposition where when he was questioned about these early
21   2016 meetings, Ms. Kliebenstein, Mr. Hinderaker's partner,
22   asserted that Rule 408 privilege should apply to all of
23   these conversations that were happening in early 2016
24   because they were set up for the express purpose of
25   settlement negotiations.  It is in black and white in the

183

1  A.  Yes.
2  Q.  And that's a general statement, right, Mr. Baseman?  You
3  have not done anything in the course of your work at FICO to
4  specifically analyze the extent to which Blaze reduced time
5  at Chubb?
6  A.  Correct.
7  Q.  And then your third bullet says, new applications can be
8  developed and changes to existing applications can be made
9  faster than was possible before Blaze, right?
10  A.  Yes.
11  Q.  But you haven't analyzed and you don't have any
12  information from the course of your work at FICO that allows
13  you to say whether it's true that new applications were
14  developed faster at Chubb because of Blaze, correct?
15  A.  Not so.  So we do have customers that continue
16  **relationships with FICO, which they talk about how much**
17  **value that they've received and we have those kind of**
18  **conversations.**
19  Q.  But specifically at Chubb, you cannot identify a
20  particular application that was developed faster at Chubb
21  because of Blaze?
22  A.  Only through heuristic conversations, yes.
23  Q.  And you also can't measure or talk about how quickly
24  Chubb was able to make changes to its internal computer
25  applications because of Blaze.  You haven't measured that,

184

1  right?
2  A.  Of their existing ones?
3  Q.  Correct.
4  A.  Correct.
5  Q.  Your fourth bullet says, each insurance policy requires
6  a unique set of rule statements for deciding on whether to
7  offer an applicant a policy and at what price, right?
8  A.  Yes.
9  Q.  But just to be clear, you have not studied the specific
10  policies that Chubb offers and figured out exactly which
11  rules were being run against which lines of business?
12  A.  No.
13  Q.  Your fifth bullet is Blaze enhances business agility
14  because rule statement changes can be made quickly, correct?
15  A.  Yes.
16  Q.  But you didn't get any information in the course of your
17  work at FICO in terms of how quickly Chubb was implementing
18  rule changes, right?
19  A.  Not necessarily, no.  So in the -- can I elaborate?
20  Q.  Not necessarily, no, is good for now.  Thank you.
21      And you also don't have any specific information
22  on whether they actually did implement rule changes at
23  various points in time, correct?
24  A.  No.  They certainly did make various rule changes, yes.
25  Q.  Can you specifically identify rule changes that were

185

1  made and whether they were made faster at particular points
2  in time because of Blaze?
3  A.  Only heuristically, yes.
4  Q.  Your sixth bullet talks about rule statements for
5  decision can be changed faster, new insurance products can
6  be brought to market faster, each product being a unique set
7  of rule statements, right?
8  A.  Correct.
9  Q.  Can you specifically identify any insurance product that
10  Chubb was able to bring to market faster because of Blaze?
11  A.  No.
12  Q.  And based on all of this, Mr. Baseman, you are not in a
13  position to say whether Blaze had any specific impact at all
14  on Chubb's revenue or profit, correct?
15  A.  Mathematically, no.
16  Q.  Okay.  So I want to talk about briefly what goes into
17  removing Blaze from a computer application.  If a large
18  company has integrated Blaze into multiple applications, it
19  can be complex to remove the software, correct?
20  A.  Potentially.
21  Q.  And it could take days, months or even years to unravel
22  from internal systems, correct?
23  A.  To unravel -- potentially.
24  Q.  And you're saying potential because there's no typical
25  length of time.  It's going to depend on the nature of the

186

1  company, right?
2  A.  It would be dependent on the nature of how the
3  integration was done, what their software development life
4  cycles were, yes.
5      MS. GODESKY:  I'm almost done, Your Honor, if I --
6      THE COURT:  That's fine.
7  BY MS. GODESKY:
8  Q.  Now, the amount of time you spent working on Blaze has
9  shifted over time, correct?
10  A.  Yes.
11  Q.  And it has declined in recent years, fair?
12  A.  Yes.
13  Q.  In 2016, you were spending about 80 percent of your time
14  on Blaze, right?
15  A.  2016?  Yes.
16  Q.  By 2021, when you'd provided deposition testimony in
17  this case, you were only spending about 10 percent of your
18  time on Blaze?
19  A.  Correct.
20  Q.  And that's because there was the introduction of this
21  new FICO product called Decision Modeler, the cloud-based
22  product, right?
23  A.  Partially, yes.
24  Q.  And for the most part, Decision Modeler, the cloud-based
25  product, and Blaze do the same things?

187

1 **A. There are similarities.**

2 **Q.** And just so everyone understands, this is a little

3 technical, right, but Blaze is an on-premises program,

4 right?  It's not in the cloud.

5 **A. Correct.**

6 **Q.** And today most FICO customers are embracing cloud-based

7 technologies, right?

8 **A. Most, yes.**

9 **Q.** And since customers are focussed on the cloud-based

10 offerings, that's also where FICO has been focusing in

11 recent years?

12 **A. Yes.**

13 **Q.** The percentage of FICO's software revenue that is

14 attributable to Blaze has been decreasing in recent years,

15 correct?

16 **A. I'd say that's fair.**

17 **Q.** And most of the company's decision management revenue

18 now comes from that cloud-based FICO platform?

19 **A. Yes.**

20 **Q.** FICO still sells Blaze to some customers, but you've

21 said that it's better suited for small companies and

22 companies in places like Turkey and Latin America that are

23 not yet incorporating the cloud, correct?

24 **A. At that time, that was -- yes, that's what I said.**

25 **Q.** Okay.  And as of 2021, when you were deposed in this

188

1 case, the number of Blaze customers was not increasing,

2 correct?

3 **A. At that time, correct.**

4 **Q.** Okay.

5         MS. GODESKY:  Thank you.  I have no further

6 questions.

7         THE COURT:  All right.  We'll take our afternoon

8 break.  We'll plan to be back in the courtroom at 25 minutes

9 to 4:00, okay?  Thank you.

10         (Jury leaves courtroom.)

11             (WITHOUT JURY PRESENT)

12         THE COURT:  Mr. Hinderaker, any update on sort of

13 a time relative to Mr. Baer and some of the exhibits?

14         MR. HINDERAKER:  Your Honor, I think that -- I

15 have a short redirect, but my best estimate is that -- I

16 think Mr. Marce will be our last witness today, so we won't

17 be getting to -- if we got to Mr. Baer, there would be ten

18 minutes left in the day, that sort of thing.

19         THE COURT:  That's very helpful.  Thank you.  All

20 right.  We'll be in recess until -- yes, Mr. Godesky,

21 Mr. Fleming?

22         MR. FLEMING:  We've submitted a letter response to

23 FICO's arguments concerning the issues we discussed earlier

24 today.

25         THE COURT:  Okay.  I'll certainly look at that as

189

2 well.

2         MS. GODESKY:  I just had a question.  Does Your

3 Honor have a rule with regard to speaking to witnesses when

4 they're testifying?  May we speak to witnesses when they're

5 on direct but not on cross?  Are there any guardrails that

6 we both should be following?

7         THE COURT:  I think the rule, right, referencing

8 the sequestration rule is once the witness is in the

9 stand --

10         MS. GODESKY:  No discussion.

11         THE COURT:  -- no discussion.

12         MS. GODESKY:  Thank you.

13         THE COURT:  Thank you.  We're in recess until 25

14 minutes to 4:00.

15         (Recess taken at 3:20 p.m.)

16             IN OPEN COURT

17             (Jury seated)

18         THE COURT:  Mr. Hinderaker, any redirect?

19         MR. HINDERAKER:  Yes, Your Honor.

20         THE COURT:  And Mr. Baseman, once again, remember

21 you're under oath.

22         THE WITNESS:  Yes.

23         MR. HINDERAKER:  And remember to be slow in your

24 speech.

25         THE WITNESS:  That I will try.

190

1             **REDIRECT EXAMINATION**

2 BY MR. HINDERAKER:

3 **Q.** A few follow-up questions.

4 **A. Yes, sir.**

5 **Q.** Do you have any responsibility for the pricing of Blaze

6 Advisor licenses?

7 **A. No.**

8 **Q.** Is that the responsibility primarily of Mr. Bill Waid?

9 **A. Among others, yes.**

10 **Q.** When you were asked the question about a customer with

11 two applications considering -- having -- using Blaze

12 Advisor for more applications --

13 **A. Yes.**

14 **Q.** -- and the wisdom of moving to an enterprise-based

15 license --

16 **A. Yes.**

17 **Q.** -- were you assuming that -- did you give your answer in

18 the -- under the assumption of an ongoing business

19 relationship?

20 **A. Yes.**

21 **Q.** Have you ever had experience in setting Blaze Advisor

22 pricing in the context where the relationship had ended and

23 a transition license was being negotiated?

24 **A. No.**

25         MR. HINDERAKER:  Could we put slide 4 back up?  Is

191

1  that yours?
2       MS. GODESKY:  It's Heather's.
3  BY MR. HINDERAKER:
4  Q.  I'm sorry, on slide 4, do you have to be able to
5  monetize -- in your judgment, do you have to be able to
6  monetize the value of Blaze Advisor to know whether it's
7  valuable or not?
8  A.  No.
9  Q.  And in some answers to questions that you were asked,
10  you used -- used the phrase, heuristically or heuristic
11  conversations or only heuristically.
12  A.  Yes.
13  Q.  What did that mean?
14  A.  Casual, inference-based, based off of the context of
15  what we were talking about.  So you're able to deduce what
16  it was that they're talking about in the context of what
17  we're there to talk about.
18  Q.  And what did you assume, understand, deduce, regarding
19  the value that Chubb was realizing from Blaze Advisor from
20  these conversations?
21  A.  So how you're able to deduce that the Blaze Advisor
22  component is integral to the decision process is the
23  conversations that we were there to discuss around taking
24  pivotal analytic models and putting them into Blaze Advisor
25  was to get a wider use of those models across all of the

192

1  different systems they were using.  They wouldn't have had
2  that conversation if it wasn't being used.
3  Q.  A related question.  Do you have to know that one thing
4  is -- do you have to know the extent that one thing is
5  faster than another to know that it's faster?
6  A.  No.
7  Q.  Does the fact that you were not measuring, quantifying,
8  the significance of Blaze Advisor, change your testimony
9  about slide 4 with respect to Blaze Advisor's value to the
10  business?
11  A.  Not at all.
12  Q.  And at the close, you were asked about information that
13  you gave in 2021 regarding Blaze Advisor sales.  Do you have
14  any knowledge about the amount of success or lack of -- any
15  knowledge about Blaze Advisor sales today, the quantity, the
16  amount, the success?
17  A.  Not from numbers but trajectory, yes.
18  Q.  What's the trajectory?
19  A.  The trajectory is it continues to sell and is, in fact,
20  picking up in Latin America and especially regions that we
21  do not have the cloud.  So it is still a very viable product
22  of which customers still use.
23       MR. HINDERAKER:  Thank you.
24       No further questions, Your Honor.
25       THE COURT:  Thank you, Mr. Hinderaker.

193

1       Ms. Godesky, any re-cross?
2       MS. GODESKY:  Nothing further, thank you.
3       THE COURT:  All right.  Thank you.  Go ahead,
4  Mr. Baseman, you may step down.
5       THE WITNESS:  Thank you, Your Honor.
6       THE COURT:  Mr. Hinderaker, or whomever, go ahead
7  and call your next witness.
8       MS. KLIEBENSTEIN:  Thank you, Your Honor.  We call
9  Mr. Jean-Luc Marce.
10       Your Honor, may I approach?
11       THE COURT:  You may.
12       Come on up here, Mr. Marce.  Good afternoon.  If
13  you would raise your right hand, please.
14            JEAN-LUC MARCE,
15       duly sworn, was examined and testified as follows:
16
17       THE COURT:  Go ahead and be seated.  Make sure to
18  speak into the microphone and state your full name for the
19  record, please.
20       THE WITNESS:  My name is Jean-Luc Marce,
21  M-A-R-C-E.
22            DIRECT EXAMINATION
23  BY MS. KLIEBENSTEIN:
24  Q.  Mr. Marce, is the microphone at a comfortable spot for
25  you?

194

1  A.  It is now.
2  Q.  Thank you very much.  And I have not met everyone yet.
3  My name is Heather Kliebenstein.  I'm at Merchant & Gould as
4  well.
5       Mr. Marce, can you identify your current employer
6  and job title for us?
7  A.  I'm a VP of software engineering at FICO.
8  Q.  And how long have you worked at FICO?
9  A.  Since 2002, so about 20 years.
10  Q.  And today what are your primary job duties?
11  A.  Today I lead a software development team responsible for
12  developing and mentoring and supporting decision technology
13  software at FICO.  And I'm also leading architect for the
14  software products.
15  Q.  And do you work with any particular software product
16  today at FICO?
17  A.  I'm particularly focusing on Blaze Advisor.
18  Q.  And can you tell the jury, in your words, what is Blaze
19  Advisor?
20  A.  So Blaze Advisor is what we call a business rule
21  management system, which companies use to automate
22  decisions, automate processes and procedures they may have.
23  It helps them do that in a more efficient way and in a more
24  consistent way.
25  Q.  For someone who doesn't work in IT and software

**287**

1 without software like this, wouldn't often have insights
2 into the day-to-day process that somebody who might be
3 reviewing applications would be using. So the ability to
4 document and codify these business rules or business process
5 gives everybody access to the process, they get to see it,
6 they get to modify it, they get to vet it, determine if
7 that's within their business practice.
8 Q. That's an example of the control benefit we discussed
9 earlier?
10 A. Correct.
11 Q. Looking at the final bullet there, choosing the optimal
12 strategy by running "what if" analyses, what does that mean?
13 A. So one of the benefits distinctly in the software is
14 once I've identified all of this process, I can take that
15 process and change it, and I can change it in a sandbox, so
16 to speak, so it's not impacting direct customers, but I can
17 see what changes and modifications, maybe changes to the
18 analytics, changes to the data, changes to the offering
19 would have on my profitability. So I can run the process,
20 if you will, in silo, make those modifications and then
21 compare and contrast it to the process I'm currently using
22 and see if there's benefit to making those changes.
23 Q. So out of those list of benefits we discussed earlier,
24 what would that be an example of?
25 A. I can't remember the list. I think it was transparency.

**288**

1 Yes.
2 Q. Okay. Would you turn to the next page, Mr. Baer,
3 page 2? On the right-hand column in the lower right-hand
4 corner a list of bullets, what is shown there?
5 A. These are also improvements that underwriters should
6 expect to see by enabling this process.
7 Q. And can you walk through that list of bullets?
8 A. Better identify risk and improve strategies to prevent
9 losses, transition from static to dynamic, variable-based
10 pricing models, more finely and accurately segment
11 customers, and view policyholder relationships as a whole to
12 optimize treatments.
13 Q. And can you turn to page 3, Mr. Baer. Starting on the
14 second column at the bottom and on to the third column,
15 there's a list of bolded headings. What are those?
16 A. These are capabilities within the software.
17 Q. And can you walk through those capabilities?
18 A. Ingest, synthesize, sense and respond to data of any
19 size in real time.
20 Q. And so what does that mean in layman's terms?
21 A. That the software allows you to integrate data sets.
22 They could be, you know, what we call streaming, they happen
23 in real time, or they could be a big database that you
24 already have. And the ability of the software to ingest any
25 of that data, regardless of where it comes from, I think

**289**

1 empowers the decision-making process.
2 Q. And when you say "the software," Mr. Baer, what are you
3 referring to specifically?
4 A. The business rules management system.
5 Q. And is that Blaze Advisor?
6 A. Blaze Advisor.
7 Q. I think this document refers also to Decision Management
8 Suite; is that correct?
9 A. Yes. So Decision Management Suite is an evolution of
10 our software to move it to the cloud, so there's a product
11 within the Decision Management Suite referred to as decision
12 modeler, which is Blaze Advisor in the cloud.
13 Q. Okay. I would like you to turn to Exhibit 1174 in your
14 binder. Do you recognize this document, Mr. Baer?
15 A. I do.
16 Q. And what is it?
17 A. This is an internal sales enablement sheet. This is a
18 document that we produce for sales so that they understand
19 what they're selling and who they're selling it to.
20 Q. And is this document created and kept in the ordinary
21 course of FICO's marketing business?
22 A. Correct, it is.
23 Q. And is it FICO's regular practice to produce sales
24 sheets such as this?
25 A. Yes.

**290**

1        MR. ERBELE: Your Honor, I would move Exhibit 1174
2 into evidence.
3        MR. FLEMING: No objection.
4        THE COURT: 1174 is received.
5 BY MR. ERBELE:
6 Q. And so who receives this document, Mr. Baer?
7 A. Only sales. This is an internal sales document.
8 Q. So this is FICO's salespeople?
9 A. Correct.
10 Q. And at the top it says repeatable solution: Insurance
11 underwriting. So are these FICO's salespeople involved in
12 selling FICO products to the insurance industry?
13 A. That is correct.
14 Q. And which FICO products would be at issue here?
15 A. Any product that addresses some of the concerns that
16 insurers might have in underwriting, including Blaze
17 Advisor. It could include express optimization, as well as
18 analytic modeler or other products within the Decision
19 Management Suite.
20 Q. So looking at the right-hand column there entitled
21 Benefits, what is shown in that column?
22 A. These are benefits that insurers, that clients who use
23 the Decision Management Suite would -- could achieve based
24 on our customer feedback.
25 Q. And why is benefits included in the sales document?

**307**

1  relationship and was there a license opportunity?  Yes,
2  there was, but more important to us was that the long-term
3  relationship, the 3 million would have come and went, but I
4  had Chubb as a customer a decade and now a lawsuit?  Come
5  on.
6          He's responding to his reaction and his time frame
7  of Exhibit 94, which is before the tenor turned to
8  settlement.
9          In Defense Counsel's letter to the Court of the
10 15th, at the end of the initial notice period, combined with
11 temporary forbearance of action made clear that the dispute
12 had crystallized, the litigation was on the table.  That is
13 after these events.  Counsel has taken the position that
14 it's after these events.  Counsel has taken the position
15 that FICO has with Schreiber and Sawyer sought to have a
16 licensing opportunity to grab money, but this testimony is
17 necessary to fill in the rest of the story so that the jury
18 hears the rest of the story and enable Schreiber to say it
19 wasn't the money as much as the relationship that I was
20 trying to have as my top concern.  So this is -- none of
21 this is within Rule 408, Your Honor.
22         THE COURT:  All right.  Very well.  Counsel for
23 Federal?
24         MS. GODESKY:  Your Honor, our objection to these
25 two excerpts at 310 and 343 are that they are nonresponsive,

**308**

1  argumentative narratives from a witness.  He wouldn't be
2  allowed to give that kind of nonresponsive speech in court,
3  and the fact that these are deposition videos with no
4  opportunity for even a recross makes it even more
5  prejudicial than it would be if he did that here live.
6          MR. HINDERAKER:  If I can?
7          THE COURT:  Go ahead, Mr. Hinderaker.
8          MR. HINDERAKER:  Just commenting that now the
9  basis for the objection has changed from what it was this
10 morning, and this is the examination of defense counsel at
11 the time, and I don't have a transcript to get the full
12 context, but those were the answers that he was given to the
13 questions and there wasn't any effort made at the time of
14 the deposition to reserve any objection.
15         THE COURT:  Agreed, Mr. Hinderaker.  I do find
16 that these bits of testimony are admissible, that any
17 objection to the nonresponsive nature of the answer, if it
18 is nonresponsive have been waived, and the e-mail, which is
19 Exhibit 133, is also admissible.
20         All right.  We have exactly six minutes everyone.
21 See you back here.
22         (Recess at 10:31 a.m. till 10:39 a.m.)
23              (IN OPEN COURT)
24         THE COURT:  This is up like the old days, we don't
25 have to roll up a television screen or anything, right?

**309**

1  Just do it on your -- all right.
2          MR. HINDERAKER:  Your Honor, for housekeeping?
3          THE COURT:  Yes.
4          MR. HINDERAKER:  The video will run about 2 hours
5  and 11 minutes.
6          THE COURT:  Okay.  So you want to tell us when you
7  want us to stop or if you have an idea when we should stop,
8  Mr. Mayleben will just be here and available.  Right around
9  noon, if there's a natural break.
10         MR. HINDERAKER:  Yes.  And then we spoke at one of
11 the pretrials about being able to give a brief introduction
12 of who this witness is to the jury before it starts.  We've
13 exchanged what I expect -- what I will say and it's
14 agreeable so if you give me a moment to do that.
15         THE COURT:  Absolutely.  Thank you.
16         (Jury in.)
17
18             (IN OPEN COURT)
19         THE COURT:  Mr. Hinderaker.
20         MR. HINDERAKER:  The next witness that will be
21 called in our case, FICO's case, is a gentleman by the name
22 of Russell Schreiber.  I think you should appreciate that we
23 will be playing all of the video of Mr. Schreiber's
24 testimony that which is offered by FICO and that which is
25 offered by the defendants.  It will just be his whole

**310**

1  presentation.  And I'm just going to introduce Mr. Schreiber
2  to you.
3          Mr. Schreiber is a former FICO employee.  He now
4  lives in New York where his deposition was taken on
5  October 24, 2018.
6          He was in sales, and when he left FICO his title
7  was Vice President of Health Care and Insurance, and he was
8  with FICO from 2006 to 2016.  Thank you.
9          THE COURT:  Very well.  Thank you, Mr. Hinderaker.
10             RUSSELL SCHREIBER,
11 Whereupon, having been duly sworn upon his oath, testified
12 as follows:
13
14         (Whereupon, Deposition of RUSSELL SCHREIBER is
15 played, as follows:)
16             EXAMINATION
17 BY MS. JANUS:
18 A.  Russell Schreiber.
19 Q.  What is your work address?
20 A.  I work from home.  I'm self-employed, semi-retired.
21 Q.  What is your home address?
22 A.  It's 180 East End Avenue, New York, New York 10128.
23 Q.  What is your current employment?
24 A.  Self-employed.  Investor and self-employed.  Business
25 owner.  Multiple irons in the fire.

311

1   Q.  What type of work do you do as a business owner?
2   A.  So I have real estate properties, and I've got a small
3   tool handling business that I've got a 20-million-a-year
4   business, a material handling business that I'm an investor
5   in.
6   Q.  For those who aren't in that line of business, what is
7   material handling?
8   A.  Oh, warehouse.  Forklifts is probably the easiest way.
9   So forklifts, yeah.
10  Q.  And is your work in New York?
11  A.  Yes.
12  Q.  Prior to being self-employed, what was your employment?
13  A.  At that time I was with FICO.
14  Q.  Okay.  And what were the years of your employment with
15  FICO?
16  A.  It was 2006 through 2016.  And I had a four or six
17  month -- I forgot now -- hiatus where I left FICO and I came
18  back.  So that was in the pre-2010 window somewhere.
19  Q.  Somewhere in 2009 or?
20  A.  Maybe '7 or '8, but it was just for a short period of
21  time, say four to six months, as they say.  I left and they
22  sucked me back in.
23  Q.  Other than that four to six month hiatus, you were
24  employed at FICO from 2006 to 2016 continuously?
25  A.  That's correct.

312

1   Q.  And what were your positions at FICO?
2   A.  So I joined FICO with responsibility for the northeast
3   insurance market.  And from -- then over time, I moved
4   to be responsible for the United States insurance market.
5       I have to give some thought if you want to know
6   the years, but -- and then from the north -- from the U.S.
7   insurance market, I moved to the global insurance market
8   lead.  And then after that I took on I added to that the
9   U.S. health care lead.  So I was global insurance, U.S.
10  health care, then ultimately I had global remit for
11  insurance and health care markets.
12  Q.  Global remit?
13  A.  Right, responsibility.
14  Q.  Oh, okay.
15  A.  So my title I think at the end was -- that's great, with
16  the insuring markets -- but I was vice president of health
17  care and insurance, global vice president or something like
18  that.
19  Q.  So let's try to, exact dates aren't crucial but just put
20  rough times on those positions.  You started with, you said
21  you were responsible for the northeast insurance market?
22  A.  Right.  So that's January of '06.  And then I left in
23  around late '07.  Right.  So say I came back mid-'08, and at
24  that point mid-'08 forward, I had the U.S. insurance market.
25  That was about two years.  Then I had the global insurance

313

1   market.  And then the U.S. health care was kind of a very
2   short shift until global health care, so say by 2013, '14, I
3   had all of the insurance in North America markets.
4   Q.  So from 2010 to the end of your employment, there you
5   were responsible for the global insurance market.  It's just
6   --
7   A.  A piece of it.
8   Q.  -- at some point in time there was health care added in?
9   A.  February, roughly.
10  Q.  All right.  And so first I want to just understand what
11  you mean by responsible for a given insurance market, so we
12  can start with when you were responsible for the northeast
13  insurance market, what does that mean at FICO?
14  A.  Right.  So that means revenue.  Revenue, r-e-v, okay,
15  revenue.  So that means that includes new business, customer
16  retention of old business, customer satisfaction.
17  Basically, you let out a revenue plan, put together a
18  revenue plan, and then how do you achieve that.  It's
19  through sales and service.
20  Q.  Well, FICO sells software?
21  A.  Right.
22  Q.  That's a source of revenue generation for FICO, that
23  might be one area of revenue generation that would apply the
24  to the insurance market?
25  A.  Right.

314

1   Q.  Is that fair?
2   A.  So there's software and services, yes.  So software is
3   multiple lines, and software -- the services have multiple
4   lines, yes.
5   Q.  And "services," you mean professional services?
6   A.  Right.
7   Q.  Okay.  So when you started, you were in charge of the
8   northeast insurance market.  And you've described that to
9   mean essentially you were responsible for the revenues that
10  FICO realized from the northeast insurance market.  In terms
11  of your actual job duties, what did that look like,
12  generally?
13  A.  So it was planning how do we achieve revenue goals:
14  work -- work back and forth with the leadership at that time
15  to set a goal and then see how we can fit into it based on
16  the tools that we had.  It would be working with various
17  sales teams.  Like I know we're here to talk about Blaze, so
18  Blaze had a sales team.  There were other products and other
19  sales team.
20      So I'd work with all those teams to see what we're
21  going to bring to a customer or to a territory.  We'd set up
22  road shows.  We'd have marketing events where a hotel room
23  would 80 people invited in and tell our story.
24  Q.  Were you also in a role of client partner at times?
25  A.  Yes.  Yes.

435

1  do a transitional thing, we're going to bury an ELA that we
2  sold to a $12 billion company into a $35 billion company,
3  and we knew that they lost track of use.  This is the use
4  signatory they gave us that day, but we knew there was other
5  stuff out there.  We didn't know what it was, but we knew
6  there had to be.  It's been there a decade.
7           There's a lot more defining of what scope would
8  have been needed to be -- and it would have been a
9  transition.  We would have had to do some sort of transitory
10  thing, I think, but I don't know.  Of course, we never got
11  to that point.
12  Q.  Well, that's confusing to me because you keep saying
13  that despite the timing, which of course FICO knew about the
14  transaction for seven months before bringing it up with
15  Chubb, but --
16  A.  Chubb knew about it too.  Chubb knew about it before
17  seven months.
18  Q.  Take a look at Exhibit Number 95 previously marked.
19  A.  So February 26th.  Okay.
20  Q.  So Tamra sent her proposal, which is marked as
21  Exhibit 94, on February 25th at 2:06 p.m. Eastern, correct?
22  A.  I'm sorry.  Which was -- so Tamra, to 9:50.  Tamra said
23  something, 12:30.  I don't see 2:06 Eastern.
24  Q.  Exhibit 94 --
25  A.  The previous one.

436

1  Q.  -- Tamra sent her email with the proposal on February
2  25th --
3  A.  Right, to Mike and I, yes.
4  Q.  -- at 2:06 Eastern, right?
5  A.  That's right.
6  Q.  Okay.  And then Tom Carretta responded to Chubb's
7  counsel at 9:50 the next morning, correct?
8  A.  Right.
9  Q.  And Tom Carretta's response was, "Thank you for the
10  email.  The proposal was not acceptable from our business
11  and compliance teams, and I confirm it as rejected."
12  A.  Okay.
13  Q.  Do you see that?
14  A.  I see that.
15  Q.  Okay.  And then he says that his business teams will
16  meet and presumably propose a solution from FICO, correct?
17  A.  Right.
18  Q.  So this confirms that at least at this point -- first of
19  all, very quick response on the proposal?
20  A.  Yes.
21  Q.  You did not want to negotiate the proposal that Tamra
22  sent in Exhibit 94, right?
23  A.  Not a proposal so broken that there was nothing to
24  negotiate from.  It's not that I didn't want to.  I needed a
25  proposal that was responsive.

437

1  Q.  So if Tamra had made that proposal that's marked as 94
2  prior to the close of the ACE merger, would you have just
3  negotiated about that proposal and taken out the provision
4  relating to a right to change applications?
5  A.  This is what it boils down to me:  If someone would
6  have engaged us when we tried to engage or before we tried
7  to engage, we would have found a way to let them transition
8  in a way that would have had a -- maintained a really great
9  working relationship.  Loved the client, wanted to maintain
10  a reference.  Really wasn't looking to do anything other
11  than figure how do we stay whole and continue the
12  relationship.
13           And was there a license opportunity?  Yes, there
14  was.  But more important to us was that long-term client
15  relationship.  The $3 million would have come and went.  I
16  had Chubb as a customer for a decade, and now a lawsuit?
17  Come on.
18  Q.  You knew about use of Blaze in at least the UK prior
19  to --
20  A.  I knew of one, yeah.
21  Q.  But you knew about uses in the UK prior to Tom Carretta
22  starting to write letters on this dispute, correct?
23  A.  Whether that's true or not doesn't -- it's still
24  unauthorized, non-compliant.  Noncompliance versus Russ
25  said, oh, yeah, that's global.  That's different than being

438

1  compliant, right?
2  Q.  And do you think that they were unauthorized uses even
3  if FICO said to Chubb, you're up; yes, you can use Blaze in
4  you're -- under the Chubb ELA?
5  A.  Yeah.  Oh, sorry.
6           MS. JANUS:  Those are all the questions I have.
7  Thank you.
8           MR. HINDERAKER:  I just have a few.  Would you
9  mark that as -- let me grab some more copies here -- 143.
10  And then would you mark -- would you mark this as the next
11  one, please.
12                    EXAMINATION
13  BY MR. HINDERAKER:
14  Q.  First, with respect to Exhibit 143, can you identify
15  this for us?
16  A.  This is, "Hello.  Welcome to FICO.  Welcome to Chubb."
17           This is the actual document that kicked off this
18  whole journey that we've been talking about.
19  Q.  Okay.  At the very beginning of the deposition, you were
20  asked about an RFI.  At a certain point in time, there was a
21  question of whether it was an RFI or RFP.  But you were
22  asked about the document from Chubb against which FICO
23  fashioned its original solution.
24           Is that that document?
25  A.  This looks to be that document, yes.

**536**

1  because that's after your time at FICO, right?

2  A.  Correct.

3  Q.  Okay.  So let's look at the third sentence of this

4  provision.  It says, ███████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████████

█████████████████████████████████

███████████████████████████████████

██████████

14            Do you see this?

15  A.  Yes.

16  Q.  So this assignment provision in the ██████ contract

17  does have a specific reference to revenue, right?

18  A.  It has a specific reference to the entity's

19  transactions, yes, which could be translated into revenue

20  ultimately, yes.

21  Q.  And revenue, right, because in sub (1) it says if the

22  annual gross revenues of the surviving entity exceed prior

23  revenue by ███████████, right?

24  A.  Yes.

25  Q.  And it doesn't say that FICO will definitely get more

**537**

1  fees even if revenue has gone up by █████ and the

2  customer is using Blaze to process more transactions, right?

3  A.  It is not a definitive that they would collect

4  additional fees, correct.

5  Q.  It just says that FICO and ████████ agree to negotiate

6  in good faith about additional fees, if any, right?

7  A.  Correct.

8  Q.  And this type of language did not appear in Section 10.8

9  of the Chubb agreement, correct?

10  A.  No, it did not.

11  Q.  And just like the first sentence of this agreement,

12  there is no record of you trying to add this to the Chubb

13  agreement either, correct?

14  A.  No, but to me one of the key differences is this

15  agreement is actually with a company versus a division.  So

16  I think there would be different ways of approaching it.

17  Q.  And you don't know if you had tried to add this

18  agreement whether Mr. Black at Chubb would have agreed to

19  it, correct?

20  A.  No.

21            MS. GODESKY:  Thank you.  I have no further

22  questions.

23            THE COURT:  Thank you, Ms. Godesky.

24       Mr. Hinderaker, redirect?

25            MR. HINDERAKER:  Yes.  Thank you.

**538**

1            REDIRECT EXAMINATION

2  BY MR. HINDERAKER:

3  Q.  Good morning.

4  A.  Good morning.

5  Q.  In your experience at FICO supporting the business side,

6  were license agreements individually negotiated by FICO to

7  the client?

8  A.  Yes.

9  Q.  And then you received the business terms from the

10  negotiations that happened between the business people

11  representing FICO and the business people representing the

12  client.

13  A.  Correct.

14  Q.  So in that context, each license agreement is unique per

15  the negotiations between the parties; is that fair?

16  A.  That's fair, yes.

17  Q.  With respect to the license agreement that is with

18  Chubb & Son, the division of Federal, do we agree that

19  that's J1 in your binder?

20  A.  Yes.

21            MR. HINDERAKER:  Thank you.  I have no further

22  questions, Your Honor.

23            THE COURT:  Any recross, Ms. Godesky?

24            MS. GODESKY:  No thank you, Your Honor.

25            THE COURT:  Very well.  Ms. Boone, you are

**539**

1  excused.  Thank you.

2            THE WITNESS:  Thank you.

3                 (Witness excused.)

4            THE COURT:  Mr. Hinderaker, do you know how you

5  wish to proceed?

6       Ms. Kliebenstein?

7            MR. HINDERAKER:  Maybe if we could go with

8  Mr. Ivey.

9            THE COURT:  Is that what you intend to do?

10            MS. KLIEBENSTEIN:  I think he is here.

11            THE COURT:  Okay.  Come on up, Mr. Ivey.  Come on

12  around here.  And if you will pause here and raise your

13  right hand, please.

14                 (Witness sworn.)

15            THE WITNESS:  I do.

16            THE COURT:  Go ahead and be seated.  State your

17  full name for the record, if you will, and make sure you're

18  speaking into the microphone.

19            THE WITNESS:  Christopher Patrick Ivey.

20            (CHRISTOPHER PATRICK IVEY)

21            DIRECT EXAMINATION

22  BY MS. KLIEBENSTEIN:

23  Q.  Good morning, Mr. Ivey.

24  A.  Good morning.

25  Q.  Apologies for the schedule shift.  Everyone is trying to

**540**

1  avoid the snow.
2  A.  I appreciate it.
3  Q.  Mr. Ivey, can you tell the jury your current employer
4  and role?
5  A.  So I'm the vice president of product support at FICO.
6  Q.  And how long have you worked at FICO?
7  A.  Since 2003, so about 20 years.
8  Q.  And how long have you been in the product support group?
9  A.  Since 2014, nine years.
10 Q.  What does the product support group do at FICO?
11 A.  So the product support group is -- essentially it's a
12 help desk.  So if you were to call in for help on something,
13 we will help out with the software and the errors that are
14 occurring.
15 Q.  Could you move a little closer to microphone?
16 A.  Yes.
17 Q.  And your microphone can move, too, if that's easier.
18 A.  Okay.  There we go.
19 Q.  Perfect.  And before your role in product support, did
20 you have any other positions at FICO?
21 A.  I did.  I was in the professional services group within
22 FICO.
23 Q.  When did you start in the professional services group?
24 A.  So I started there in 2003 until 2014, so that was about
25 eleven years.

**541**

1  Q.  And we just talked about what the product support group
2  does.  What does the professional services group do at FICO?
3  A.  So the professional services group at FICO, I sort of
4  bucket it into three areas.  So we provide consulting to our
5  customers.  We provide kind of implementation or
6  configuration services for Blaze Advisor and for the
7  software, and then we provide mentoring around the software
8  as well.
9  Q.  Implementation.  What does implementation mean with
10 respect to the professional services group?
11 A.  So with respect to the professional services group,
12 implementation would be really getting the software kind of
13 up and running.  So it would be working with the customer to
14 take Blaze, which when it, when it is delivered from FICO,
15 it's not really ready to run.  You can't just take it and
16 plug it in and run it.  So it's the life cycle of taking
17 Blaze Advisor, configuring it and getting it up and running
18 at the customer site.
19 Q.  And so the FICO professional services group people help
20 perform that function, correct?
21 A.  Correct.
22 Q.  And you just mentioned another software industry buzz
23 word.  Configure.  What does "configure" mean?
24 A.  So configuration would be -- it's sort of part of the
25 broader implementation.  So configuration would be taking

**542**

1  the business logic, implementing it or configuring it within
2  Blaze Advisor and then get it running.  So kind of -- I
3  guess maybe an analogy would help.
4       So if you have an iPhone, a brand-new iPhone, and
5  you, you know, get it home and you unplug it -- sorry -- you
6  plug it in and you get it started, there is a lot of things
7  that you would need to configure on the phone.  Right?  So
8  what ring tones you want and, you know, all of the -- what
9  mail you're going to get and all the apps that you want to
10 download and things like that.
11      So that's the same way Blaze Advisor is similar to
12 that.  We would take it and work with you to find your
13 preferences and the logic that you want to put in it, and we
14 configure it within the system, if that helps.
15 Q.  And when you left the group in 2014 to move into product
16 support, how many people were on the professional services
17 team at FICO?
18 A.  We had about 80, 80 resources in the North American
19 group.
20 Q.  And what activities -- can you identify the activities
21 in big buckets that the professional services group does
22 with respect to Blaze Advisor, in particular?
23 A.  So I mentioned before, I would say in the sort of these
24 three big buckets that we did sort of consulting and then
25 the configuration, the implementation and really the

**543**

1  mentoring of a customer.
2  Q.  And who receives these services?  Who are you providing
3  them to?
4  A.  So our licensed customers would typically ask for and
5  receive these services.
6  Q.  Let's break down those three buckets and talk about each
7  of them generally.
8  A.  Okay.
9  Q.  Consulting.  What types of consulting did the group
10 offer to Blaze Advisor customers?
11 A.  So in consulting, we were really bringing our best
12 practices around the software.  So we've obviously
13 implemented it many, many times with many customers.  So our
14 knowledge around the best ways to take the software to use
15 it in a performant way, in a way that was -- you were
16 looking for it to be scaleable and adaptable and agile.  So
17 a lot of those best practices are around those areas.  We
18 provided a lot of that in the consulting aspect of it, how
19 you would implement a business rules management system
20 within your company, if you hadn't used one before.
21 Q.  And next bucket, configuration.  Can you explain what
22 are those services with respect to Blaze Advisor?
23 A.  So configuration is really the, the, again, part of the
24 area where we take the software, we're going to work with
25 the customer to understand their business logic, and then

**552**

1  the requirements that they wanted, what they wanted this to
2  look like, we really worked back and forth with how this was
3  going to implement and work with their system as well.
4        And then we go into the design of it.  So we said,
5  okay, what would this look like with ▮▮▮▮▮▮, do we
6  have the right data that we need, do we have all the logic,
7  is it written down, is it in ▮▮▮▮▮▮▮▮, you know,
8  where is it.  So we gathered a lot of that and put that
9  together.
10       And then we worked with them to actually develop
11  the system, so worked through actually implementing again
12  the full Blaze Advisor, the full repository, all the rules,
13  working hand in hand with them and then training them at the
14  same time and mentoring them.  And we deployed that out into
15  ▮▮▮▮.  And the result was that they actually were then
16  able to go through really all ▮▮▮▮▮▮▮▮▮▮▮
17  within, you know, hours versus 1,000 with, you know, eight
18  people sitting around a desk for two weeks.  So it was a
19  huge success story.  It was really good.
20  Q.  And how, how do customers get a copy of Blaze Advisor?
21  A.  So we have a fulfillment website where customers
22  typically would log in and download the software.
23  Q.  And once it's installed, can FICO turn off Blaze Advisor
24  at its customer site?
25  A.  No, we don't really have an option to do that.  The

**553**

1  license is kind of on their premises.  There is no way for
2  us to go in and turn it off.  So it's not like a Cloud
3  account, like Spotify or Netflix or something, where we can
4  turn it off remotely.
5  Q.  And let's drill down into the fun part, the contracts of
6  the professional services group.  Can you pick up -- you've
7  got two big binders.  Apologies, everyone.  Pick up the
8  first one that starts with P212, in the first exhibit right
9  here.
10  A.  This one here?
11  Q.  Okay.
12  A.  Oh, yeah.  P212.  Yes, sir.
13  Q.  When you worked in the professional services group, were
14  you ever involved in documenting customer engagements?
15  A.  I was.  So I -- when I was in the professional services
16  group, I would document statements of work.
17  Q.  And a statement of work, for someone who is not a lawyer
18  or who is not in the technical software industry, can you
19  tell me just at a top level what is a statement of work?
20  And then we will look at some.
21  A.  Sure.  Yeah.  So a statement of work really just
22  describes what a customer has asked us to do for them.  It
23  will run through what we're going to do, kind of the
24  deliverables that we will provide, and then usually the cost
25  and the -- excuse me -- and the number of hours that it will

**554**

1  likely take.
2  Q.  Is a statement of work a license?
3  A.  No, a statement of work is not a license.  So typically
4  that would have been negotiated before I got involved.  So
5  the license was -- or, rather, I'll say the professional
6  services statement of work would be an appendix to the
7  license.
8  Q.  So it's a totally separate contract, correct?
9  A.  Totally separate contracts, yes.
10  Q.  And did you work on statements of work during your time
11  at FICO in the professional services group?
12  A.  I did.  I did.  So I was for a period of time in charge
13  of, in charge of the Blaze group.  So I would help negotiate
14  and understand what the customer was really looking for and
15  then write up the statements of work.
16  Q.  And did you work on any of those statements of work
17  between FICO and Chubb & Son?
18  A.  I did, yes.
19  Q.  Do you know how many, how many of those statements of
20  work exist between Chubb & Son and FICO?
21  A.  I did a count, and there were I believe 52 statements of
22  work.
23  Q.  And have you personally reviewed all of those statements
24  of work?
25  A.  I have.

**555**

1  Q.  Based on your experience, do you recall generally what
2  type of services Chubb & Son requested from FICO?
3  A.  Yes.  So generally it followed a lot of ways I was
4  talking about earlier, so consulting, so the implementation,
5  that Four D approach that I talked about, training, there
6  was a number of trainings in there, and then that
7  mentorship, mentoring and guidance, yeah.
8  Q.  Please turn to Exhibit 337 in your binder.
9        MS. KLIEBENSTEIN:  AND, Your Honor, to my
10  knowledge, there is no objection to the exhibits we're going
11  to go through here.
12        THE COURT:  Were you offering -- it hasn't been
13  displayed 212.  Were you offering 212?
14        MS. KLIEBENSTEIN:  Not yet.
15        THE COURT:  Okay.
16        MS. KLIEBENSTEIN:  Thank you.
17  BY MS. KLIEBENSTEIN:
18  Q.  So Exhibit 337, do you recognize this exhibit, Mr. Ivey?
19  A.  I do, yes.  Yes.
20  Q.  What is it?
21  A.  So this is a statement of work dated the 12th of June,
22  2006.
23  Q.  And, Mr. Mayleben, could you just show us the first page
24  there?  Thank you.
25        So this is a statement of work contract.  Can you

**815**

1    Once the units -- and I call them units.  I call
2   them building blocks.  Once those building blocks are
3   created, you unit test each of those building blocks, and
4   then you start to glue those building blocks together to
5   perform a more fully functional product, which then can be,
6   again, tested by the users in the form of acceptance testing
7   or full quality control to make sure that if I run this
8   business in the as-is state and then I run it again in the
9   future state, I'm going to get the same results or that I am
10  going to accept the changes because that was designed that
11  way.
12    So what I'm saying is, you have to quality control
13  your product acceptance, and that was conditional, and
14  anybody that is buying a professional services engagement
15  has to be able to finally accept the work product
16  deliverable.  And those are steps -- were key steps in the
17  process.
18  Q.  And were you involved in that process with Chubb & Son?
19  A.  Yes, I attended the status meeting.
20  Q.  Okay.  And were you in meetings where either the
21  business people or the IT people of Chubb commented upon the
22  performance of the software in that context of the
23  acceptance testing?
24  A.  One of those folks -- and this is told to me by, I
25  believe, Sully -- was so impressed, he said that I just did

**816**

1   in one afternoon myself, utilizing the Blaze Advisor
2   software, something that would have taken months and
3   hundreds of thousands of dollars of budget for that same
4   process to be done by IT.  This product implementation has
5   basically paid for itself on the first time we ran it.
6   Q.  And that was from Sully?
7   A.  Yes.
8   Q.  Okay.  And then did any of the business -- did any of
9   the business people of Chubb & Son comment on how the use of
10  the product, that is, Blaze Advisor, would be able to assist
11  them in growing their revenue, moving into the mid-market?
12  A.  Only that within the first full year they did succeed in
13  accepting considerably more business than they had in the
14  previous year for no increase in staff.
15  Q.  This was identified in an earlier deposition as
16  Exhibit 330, dated November 3, 2006.  Placing a time, it's
17  after the June license agreement.  It's after the divisional
18  and it's before the second amendment.
19    Do you know who prepared Exhibit 330?
20  A.  I did.
21  Q.  And what was the purposes of Exhibit 330?
22  A.  Sales training within FICO.
23  Q.  So internal, internal to FICO?
24  A.  Yes.
25  Q.  Okay.  And I think maybe the title tells us what we need

**817**

1   to know, but would you just give us a general description of
2   what this document was intended to say and teach?
3   A.  It was a full, if you will, client journey document here
4   which described the business need, the intended solution,
5   how we built the solution, and the results of the
6   implementation.
7   Q.  Okay.  And is this fair to say that this summarizes your
8   firsthand experience in that process of selling to Chubb?
9   A.  Certainly.
10  Q.  Maybe just a couple more questions about this.  If you
11  go to the page that is 5877 where it says, "Chubb specialty
12  insurance business" and has the bullet points.
13  A.  Yes.
14  Q.  What, what was the source of this information that's on
15  this letter?
16  A.  Interestingly, the bullet that talks about 3.5 billion
17  comes from the RFI from Chubb.
18  Q.  Mm-hmm (Yes).
19  A.  1,000 employees comes from the RFI.  100,000 policies
20  written comes from RFI.  And the enterprise-wide premium
21  revenue comes from the earlier intent -- or I should say a
22  summary intent to talk about what would have come from the
23  annual report.
24  Q.  Okay.  And then on the next page, which is 5878, same
25  question:  What was the source of your understanding of the

**818**

1   Chubb current state?
2   A.  Initially, in that first response, it was the RFI, and
3   it was refined through subsequent weekly conversations with
4   the technology team headed by Sully.
5   Q.  And then on the next page, 5879, you lay out the vision
6   statement and then you lay out success criteria.  Do you
7   know if the success -- do you know if the success criteria
8   were met?
9   A.  I do know that they automated their renewals --
10  Q.  Mm-hmm.
11  A.  -- in short order.  I do know that from the testimony of
12  the business people that they did -- they were able to
13  access and modify the rules; and through the analysis tools
14  of the Blaze Advisor product, they would be able to know
15  which rules are the best rules and which rules are the worst
16  rules and, in effect, modify them accordingly.
17    THE COURT:  All right.  Members of the Jury, we're
18  going to take our break now.  And I have a matter that I and
19  the lawyers need to take up during the break, so why don't
20  you plan to be back in the courtroom at 1:35 on that clock.
21  Okay?
22    THE CLERK:  All rise for the jury.
23    (Jury exits.)
24
25    (In open court without the Jury present.)

**823**

1  context, and in the patent context, which is different, it
2  requires sort of distilling those cases down. They seem to
3  require that the licenses involve similar or same technology
4  and be generally economically comparable.
5        So in this case, I find that the third-party
6  licenses here meet the low threshold for admissibility and
7  concern over their dissimilarities go to the weight of the
8  evidence and are more than fair game for cross-examination.
9        Simply stated, they are licenses for Blaze Advisor
10 between FICO and another entity. The fact that they are
11 perpetual, rather than for a fixed term, is a more than fair
12 field of inquiry by FICO, and FICO is more than free to
13 admit testimony and evidence why the considerations that go
14 into the hypothetical license negotiation are different from
15 those that are involved in initial perpetual licenses like
16 these.
17        I will also note that two of the licenses, as I
18 read them, D172 and D281, do not appear to be perpetual
19 licenses. So some further guidance to the parties. This
20 issue or fight over actual damages has focused the parties a
21 little bit more concretely, I think, on the standard for
22 actual damages. I mentioned at the outset that the license
23 fee is premised on the infringer's use, that is the license
24 that is being negotiated for in the hypothetical
25 negotiation.

**824**

1        And in order to avoid some of the disputes that
2  have arisen, I am going to define now the scope or the
3  license that is the subject of the hypothetical negotiation,
4  and at the end of the case, this will be, or something,
5  very, very close to this, will be the instruction to the
6  jury.
7        The license that is the subject of the
8  hypothetical negotiation is a one-time, enterprise-wide
9  global license to use Blaze Advisor for internal business
10 purposes in 15 applications for a period of three years by
11 an insurance company with annual revenues of approximately
12 30 billion. Let me just pause there so people can follow
13 that, and I want to emphasize something that I just said.
14 It's a one-time, three-year license.
15        So and that is the economic circumstance in which
16 the hypothetical negotiation is occurring. So let me turn
17 to the last issue about whether those license agreements may
18 also be introduced as evidence of the meaning of the FICO
19 Federal license, and I find that they cannot be.
20        I've reviewed the cases by Federal. They fall
21 into two categories, I would say. Most of them involve
22 evidence that or contracts between the two parties involved
23 in the litigation.
24        The other case, which is the Quadrant case, really
25 involves a different circumstance where the Court was

**825**

1  construing the meaning of a provision in a contract that had
2  very discrete language and looked to how two other decisions
3  by a court had interpreted very similar language that just
4  omitted one word, and so this was not a circumstance where
5  the jury was considering how do I interpret an ambiguous
6  contract based on a whole variety of agreements, but rather
7  the Court was applying interpretations of other courts as a
8  matter of law to a very discrete set of or very discrete bit
9  of language in a contract before it.
10        So I find that Federal's cases are inapposite, and
11 FICO's cases generally establish the point that I think is
12 accurate that parol evidence is, if not exclusively, then
13 virtually exclusively, evidence of course of dealings
14 between the two parties at issue in the litigation, which is
15 not the case with the license agreements between FICO and
16 third parties, and I would exclude those licenses or limit
17 their admission to not prove the meaning of this contract.
18        And I would also say that that is based not only
19 on what I have just said, but also on Rule 403 and the
20 danger that this might confuse the jury or waste time or
21 unfairly prejudice FICO. That said, obviously Federal is
22 free to ask a witness, couldn't you have used language like
23 such and such, not referencing the agreement, but you can
24 use, couldn't you have used language like this.
25        And in that circumstance if the witness says, no,

**826**

1  we could not have or we never have, then, you know, it's a
2  fair subject of impeachment, but the agreements may not be
3  put in for that purpose, and I will consider giving a
4  curative instruction or an instruction at the end of the
5  case on that topic.
6        All right. That's the Court's ruling on those
7  issues. Let me ask.
8        Mr. Hinderaker, any need for clarification?
9        MR. HINDERAKER: I think I understand. So from
10 point of view of clarification, no. From the point of view
11 of our factual evidence, some of the, some of the years of
12 use of the application are more than three years, but so
13 there is a -- there is an issue around that, limiting it to
14 a three-year term.
15        THE COURT: Understood.
16        MR. HINDERAKER: Limiting it to a term I have no
17 quarrel with. Limiting it to a certain -- the term limits
18 should be in line with the evidence.
19        THE COURT: It should, and I will look to the
20 parties to tell me what the term is. I think it should be
21 the maximum term of any of the uses, so if it's four years,
22 it's four years, if you're following what I'm saying.
23        And then I would say, I have described it as a 30
24 billion dollar enterprise. Again, I'm looking to the
25 parties to make sure that I have that right number. I think

**827**

1  you know what number I'm referring to.

2          Anything further on your side, Mr. Hinderaker?

3          MR. HINDERAKER:  No, Your Honor.  I understand the

4  construct.  I understand the Court's thinking, I think, and

5  then it will conform with the evidence as it finally comes

6  in in the trial.

7          THE COURT:  Very well.  And let me just before I

8  turn to Federal for a second, let me just say a couple of

9  things.

10         Ms. Kliebenstein's letter not last night but the

11  one immediately previous to that, I just want to say

12  contained a complete, accurate and fair summary and a clear

13  understanding of what I had said, so I appreciate that.  One

14  other thing you guys should know.  There is no way you would

15  know this.  We don't have access to Lexus.  We have Westlaw,

16  so if you cite Lexus cases, I can usually find them on

17  Westlaw, but not always.

18         So if you do cite Lexus, if you wouldn't mind

19  attaching a copy of the case, that would be helpful.  Okay.

20  Any questions or clarification by Federal?

21         MS. GODESKY:  So we noticed the same thing

22  Mr. Hinderaker raised about the term of the license.  So we

23  will think about that and come back to the Court.  Just so

24  it's clear, this hypothetical negotiation is in the context

25  of willing buyer, willing seller, not someone under the

**828**

1  threat of copyright infringement if they're continuing to

2  use the product.

3          THE COURT:  Correct.

4          MS. GODESKY:  Okay.

5          THE COURT:  It is an arm length negotiation

6  between a willing buyer and a willing seller, and so, yes.

7  That context cannot under the law include the fact of threat

8  of litigation or claim of breach, that one of the cases, and

9  I believe it was On Davis, maybe it was one of the other

10  ones, made it very clear that the infringer's use not

11  accounting for the claim of infringement.  Okay?

12         MS. GODESKY:  And then, Your Honor, on the last

13  issue you ruled on, this issue of introducing other license

14  agreements to resolve the ambiguity in Section 10.8, we

15  certainly --

16         THE COURT:  You disagree.  I understand.

17         MS. GODESKY:  We disagree, yes, but I also think

18  your ruling did not address another reason why these

19  contracts are plainly admissible which is, the door has been

20  opened.  Mr. Hinderaker opened this case by declaring this

21  is the standard FICO language, and then Ms. Boone came on

22  the stand and said this is the standard 10.8 language, and

23  this is its business purpose.

24         And so we have to be able to challenge that with

25  evidence that shows, this isn't standard language.  It's

**829**

1  different in, I mean, they produced hundreds of contracts.

2  I have no intention of producing or entering into evidence

3  hundreds of contracts, but we should be able to show there

4  is nothing to prove that this is the standard Section 10.8,

5  and the business purpose that they're describing is

6  reflected in numerous other contracts that they regularly

7  enter into and are completely distinct from the provision in

8  this contract.

9          The door is open, and we have to be able to

10  challenge this notion that this is standard and consistent

11  with our standard business purpose.

12         THE COURT:  I would, I would say this:  I think

13  you can challenge the notion that this is standard language.

14  Okay?  And to that extent, the agreements that come into

15  evidence can demonstrate that it's not or the jury can

16  decide whether it's standard language, but what it can't be

17  used for is to say if, in order to interpret 10.8 in this

18  contract, you need to consider the language of these 10

19  other license agreements.  That I think is beyond what the

20  law allows, and so it's a very thin distinction.

21         But the license agreements, you know, I've said

22  they come in for whatever use the jury decides to make of

23  them in the hypothetical negotiation.  I think you are free

24  to say that the claim that this is standard language is

25  belied by other evidence, but Mr. Hinderaker is more than

**830**

1  free -- I'll give you a second -- is more than free to say,

2  you know, there is no evidence that it's not standard.

3  There is just, we have a lot of agreements.

4          So I understand your point, but I don't think you

5  can get from there to, and therefore, this is how to

6  interpret 10.8 in light of the language of these other

7  agreements.

8          MS. GODESKY:  But they have their witnesses, Your

9  Honor.  We saw it with Ms. Boone, and I expect to see it

10  from other witnesses testifying that we, we have a standard

11  business purpose behind our assignment clauses, and the

12  standard purpose is that if there is a merger or acquisition

13  that results in more revenue, right, we have the ability to

14  get more money through a license fee.

15         And the fact that there are numerous license

16  agreements that actually say that, if there is a merger or

17  acquisition that results in more revenue we have a right to

18  get additional license fee, in contrast to the Chubb license

19  agreement, that is completely probative of resolving the

20  ambiguity in 10.8.  They know how to negotiate that language

21  in to serve the business purpose.

22         They didn't here, and the jury should be free to

23  consider that.

24         THE COURT:  Well, the problem with that I think

25  is, you are assuming that that is -- you said they are free

**985**

1  UK?
2  A.  I cannot identify those.  They dealt with the help desk
3  support, and they would raise the tickets.  So they do
4  not -- that worked generically as FICO.  Mike Sawyer would
5  be the contact person for me in case any additional
6  assistance would be needed.
7  Q.  Do you recall yourself contacting or engaging Mike
8  Sawyer and yourself?
9  A.  I did.
10  Q.  And when was that?
11  A.  That's during the -- between 2010 and 2014, if my memory
12  serves me correctly.
13  Q.  Tell me about your contacts with Mike Sawyer.
14  A.  I got informed by developers that there was an issue and
15  they need to be resolved quickly.  So I would just make him
16  aware.  Because as the client representative of FICO, he has
17  an influence to expedite the request to go to the help desk.
18  Q.  So is it fair to say that you advised Mike Sawyer making
19  him aware that people in the UK were reaching out to the
20  help desk for help?
21  A.  Correct.  In the UK or U.S.  That was normal part of my
22  working relationship with him.
23  Q.  Okay.  Do you recall specifically reaching out to Mike
24  Sawyer specific to install issues with regard to UK?
25  A.  I believe I did.

**986**

1  Q.  You believe you did?
2  A.  Yes.
3  Q.  Do you remember when?
4  A.  I don't recall the exact date.
5  Q.  Same questions with respect to installations in Canada.
6  A.  Again, I did -- yes, I did.  And I do not recall the
7  exact date.
8  Q.  So, again, there is no individual person at FICO that
9  you know of that assisted in the installation?
10  A.  No.
11  Q.  To your knowledge, who do you -- did anybody tell you --
12  as opposed to your assumptions, did anybody tell you that
13  Canadian Chubb representatives placed tickets at the help
14  desk?
15  A.  My conversations in the past with Tony Zahn, who was the
16  architect for the Canadian zone, that they opened the
17  ticket.
18  Q.  Mr. Mirolyuz, I am showing you an exhibit that we are
19  numbering 188.
20       So I would like you to go to the table the last
21  page of 188, if you would, as well as go to that second
22  exhibit the 30(b) 6 notice.  Do you have those two in front
23  of you.  Do you have that?
24  A.  Yes.
25  Q.  What I would like to do is, with these two, these two in

**987**

1  mind, go through these applications.  So let's start with
2  CSI Express?
3  A.  Okay.
4  Q.  So what's the function or purpose of CSI Express?
5  A.  It's a policy administration system for --
6              COURT REPORTER:  For what?
7              THE WITNESS:  Policy administration system for
8  specialty lines.
9  BY MR. HINDERAKER:
10  Q.  And does it encompass all of the lines within the
11  specialty line of business?
12  A.  I believe -- it is a majority of them.
13  Q.  Are you saying you don't know, so you're assuming a
14  majority?
15  A.  I cannot speak for sure this it is all the lines within
16  the policy.  So yes.  I don't know for fact.
17  Q.  And CSI Express uses Blaze Advisor?
18  A.  Correct.
19  Q.  Among other technologies?
20  A.  Among other technologies, yes.
21  Q.  When I say it's using Blaze Advisor, we'll assume it can
22  be among other technologies.
23  A.  Correct.
24  Q.  Okay.  And what is the purpose of a policy
25  administration system?

**988**

1  A.  As I said before, to book, bind and issue the policy
2  for -- in this particular case, specialty line of business
3  in the case of CSI Express.
4  Q.  What is automated renewal process?
5  A.  It is part of the CSI Express suite tools which allows
6  automated processing of the renewals issued through the CSI
7  Express.
8  Q.  It allows the what?
9  A.  Automated processing of renewals for policies issued
10  through the CSI Express.
11  Q.  Okay.  And by, "Automated renewal of policies issued
12  under CSI Express," does that mean renewal of policies
13  without human intervention?
14  A.  Correct.
15  Q.  What is CSI Express renewal rule maintenance center, its
16  purpose and function?
17  A.  It is part -- it's an applications which is part of
18  Blaze Advisor software which allows nontechnical user
19  maintenance of the business rules.
20              COURT REPORTER:  The business what?
21              THE WITNESS:  Business rules.
22              COURT REPORTER:  Rules?
23              THE WITNESS:  Yeah.  R-U-L-E-S.
24  BY MR. HINDERAKER:
25  Q.  And what is the function and purpose of CSI Express

**993**

1  Q.  All right.

2  A.  And that's based on that score, the underwriter can

3  assess the severity of the risk.

4  Q.  And assessing the severity of the risk then informs the

5  premium, the price?

6  A.  That, yes, among other things.

7  Q.  Among other things.  Yes, among other things.

8        It informs what solution is going to be provided

9  by way of the insurance policy?

10  A.  Exactly.

11  Q.  And are there situations in which, for the renewal --

12  well, and then does profitability indicator -- does that

13  operate with respect to each renewal application?

14  A.  For the specific line of businesses.  So not every line

15  of business would go through the profitability --

16  profitability indicator is only for a certain line of

17  businesses.

18  Q.  Okay.  So there is a broader -- there is a broader array

19  of business that goes through CSI Express?

20  A.  Correct.

21  Q.  And within that broader array, there is a subpart of

22  that which, to which profitability indicator functions?

23  A.  Correct.

24  Q.  And then within that subpart, will profitability

25  indicator function and then one possible outcome is that the

**994**

1  renewal is renewed automatically?

2  A.  Correct.

3  Q.  Okay.  So the information that profitability -- the

4  score that profitability indicator generates will inform

5  other parts of the system and perhaps -- and there will be

6  instances where human intervention is not necessary for the

7  policy to be renewed?

8  A.  Correct.

9  Q.  And if human intervention is necessary for the policy to

10  be renewed, the software application highlights for the

11  human underwriter what to address?

12  A.  That is correct.

13  Q.  On Exhibit 188 we have the SBU -- I'm still more or less

14  talking about CSI Express, but we have the SBU CSI.

15  A.  Correct.

16  Q.  And that's stands for Chubb specialty lines?

17  A.  Insurance.

18  Q.  Or insurance.  Chubb Specialty Insurance.

19        And then if we look at te cell CSI Express, it has

20  a corresponding subpart, predictive modeling?

21  A.  Correct.

22  Q.  What is that?

23  A.  It's the old name for profitability indicator.

24  Q.  And then it has another subcell, underwriting guidance.

25  What is that?

**995**

1  A.  It was an extension of the profitability indicator or

2  predictive modeling.  It's additional to provide the

3  guidance in human readable form, instead of score providing

4  the wording.

5  Q.  Okay.  And then under the CSI SBU, there is the

6  automated renewal process and that the subpart ARP 1,

7  renewal categorization.  What is that?

8  A.  Ultimately, the renewal process consists of two parts.

9  It is determining -- ARP 1 specifically focuses on te

10  determining if policy is eligible to be processed

11  automatically.

12  Q.  If it is, then it is processed automatically?

13  A.  Yes.

14  Q.  And if it isn't, it goes to a human underwriter?

15  A.  Exactly.  Correct.

16  Q.  And then the issues to be addressed are highlighted?

17  A.  Correct.

18  Q.  What is ARP 2?

19  A.  If policy is eligible for renewal automation, the ARP 2

20  is taking care for all the issuance -- book, binding and

21  issuance process associated with the renewal process.

22  Q.  So ARP 2 is the instances where the policy is

23  automatically renewed?

24  A.  Correct.

25  Q.  Let's talk about DecisionPoint.  What is that, its

**996**

1  function and purpose?

2  A.  DecisionPoint is how to make it quote, quote --

3        COURT REPORTER:  I'm sorry?

4        THE WITNESS:  Automated quoting system for small

5  book of business.

6  BY MR. HINDERAKER:

7  Q.  Is it, what is the -- is there a functional relationship

8  between DecisionPoint and CSI Express?

9  A.  Correct.  Yes.

10  Q.  And what is that relationship?

11  A.  The quote issued in the DecisionPoint, if they are

12  accepted by the customers, are ultimately entered as the

13  policy in CSI Express.

14  Q.  All right.  So let's start in the instance of -- so

15  DecisionPoint is an application intended for a certain

16  segment of the market?

17  A.  Correct.

18  Q.  And let's take a customer that's in that segment who is

19  interested in a new -- say a noncustomer in that segment who

20  is interested in becoming a customer, so it's a new policy.

21  DecisionPoint functions -- tell me how DecisionPoint

22  functions in the context of a new policy.

23  A.  The customer submits the form to the Chubb employee who

24  is responsible for entering the information into

25  DecisionPoint in the system.

**997**

1 Q. Can I -- so the customer -- does a customer access the

2 portal directly, or does the customer access it through the

3 agent/broker?

4 A. It is directly or through the agent/broker, but they

5 have to submit the application, paper application.

6 Q. So there is a customer-facing portal in DecisionPoint?

7 A. Not necessarily a customer-facing portal. It's not a

8 customer-facing portal. It's a paper application which they

9 fill up and submit it to the mailbox or fax it to the Chubb,

10 the Chubb team responsible for that.

11 Q. Okay. So hard copy application is submitted to either a

12 broker -- submitted to Chubb either directly or through a

13 broker/agent?

14 A. Correct.

15 Q. And now what happens?

16 A. The part of the team who is responsible for entering the

17 information would enter the information into the

18 DecisionPoint application.

19 Q. Is that a manual process?

20 A. Manual process. Internal Chubb manual process.

21 Q. So the information is entered into DecisionPoint?

22 A. Automated process picks up this information. It goes

23 through the -- I'm just going by the list here -- goes

24 through the eligibility process, which validates if the risk

25 is acceptable. I'm looking into the eligibility here.

**998**

1 Q. Mm-hmm (Yes).

2 A. It goes through the pricing process, which determines --

3 if risk is acceptable, determines a price for that

4 particular risk. It goes through some of the data

5 normalization, if necessary.

6 Q. What does "data normalization" mean?

7 A. Sometimes application submitted -- if address is missing

8 or address might not be -- zip code might not be correct.

9 So type of data validation, data correction. And it

10 generates the list of applicable endorsements.

11 Q. So it looks to see if there is an opportunity to sell

12 more insurance?

13 A. Not necessarily. Whether there's limitations on the

14 policy. Different outside limits, type of additional

15 coverage, which restricts the risk, because it depends on

16 the risk.

17 Q. So I imagine, is it accurate to say that each individual

18 application is going to be individually accessed?

19 A. Correct.

20 Q. In that individual assessment a decision is made whether

21 additional endorsements would be appropriate for that

22 circumstance?

23 A. Exactly.

24 Q. It may be in some circumstances yes, and then they'll be

25 presented, and some circumstances no?

**999**

1 A. It is never in bulk. It is individual risk being

2 assessed.

3 Q. So now that's completed.

4 A. It generates the quote letter, which the person in

5 internal Chubb team responsible for DecisionPoint will

6 either mail or e-mail to the customer or agent or broker.

7 Q. The quote letter?

8 A. Yes.

9 Q. And the quote letter is the offer at that price to sell

10 and bind insurance for that customer?

11 A. Correct.

12 Q. And DecisionPoint uses Blaze Advisor?

13 A. Yes.

14 Q. Let's go to -- if we look at Exhibit 188, the next SBU

15 is CCI, Chubb Commercial Insurance?

16 A. Correct.

17 Q. And let's talk about CUW. Does CUW stand for

18 "commercial underwriting workstation"?

19 A. That is correct.

20 Q. If you would tell us the functional purpose of CUW.

21 A. CUW is the system which allows underwriters to maintain

22 the records of the interaction with the customers --

23 documents, notes, et cetera.

24 Q. Okay. How is CUW, how is CUW used in connection with

25 the sale of insurance?

**1000**

1 A. As underwriter interacts with the customer, any

2 conversation, any documents he receives from insured has

3 been recorded and either manually or stored in the CUW.

4 Q. Okay. And CUW uses Blaze Advisor?

5 A. One of -- CUW is the suite of tools.

6         COURT REPORTER: The what?

7         THE WITNESS: Suite.

8         MR. HINDERAKER: S-U-I-T-E.

9         COURT REPORTER: Oh.

10         THE WITNESS: Only one application, inventory

11 management, is using in Blaze Advisor software.

12 BY MR. HINDERAKER:

13 Q. What is the function and purpose of inventory

14 management?

15 A. It assesses number of policies assigned to that

16 particular underwriter and raises the alert if number

17 exceeds certain thresholds.

18 Q. Is there an interrelationship of function between CSI

19 Express and CUW?

20 A. CUW is only us as a ledger of records. It has nothing to

21 do with the CSI Express, just additional convenience for the

22 underwriter to store their records.

23 Q. Okay. And let's go to, let's go to CSI claims. Can you

24 tell me what that application is?

25 A. This was a small application developed for the actuarial

**1017**

1 through a witness, and the witness is going to have to be

2 somebody who has knowledge or foundation for the document."

3          And so through the first eight witnesses in this

4 trial, we planned our case based on FICO's objection and

5 then the Court's directive.

6          And so last night FICO sent us a list of about 20

7 different exhibits that they want to use with

8 Mr. Ghislanzoni. He is our corporate representative, but he

9 is not a 30(b)(6) deponent. He has not been educated on

10 topics outside his personal knowledge.

11          So the group of e-mails that were submitted to the

12 Court, there is an evidentiary issue separate and apart from

13 foundation for one of them, but all of them predate his time

14 at the company. He is not on any of them, and he can't

15 speak to what happened. And it's completely prejudicial to

16 be confronting our corporate representative with e-mails and

17 asking him questions about things that he has no knowledge

18 of.

19          Relatedly, Mr. Hinderaker also alluded to the fact

20 that they want to try to use interrogatories with

21 Mr. Ghislanzoni. They disclosed last night these are

22 interrogatories that show various gross written premium

23 levels run through certain applications. Mr. Ghislanzoni

24 doesn't know anything about that. He wasn't involved in the

25 process of running that data. And FICO took three or four

**1018**

1 days of 30(b)(6) deposition testimony of multiple deponents

2 on how that data was run, where it came from and what it

3 means.

4          So if they wanted party admissions about, you

5 know, those gross written premium numbers, they could have

6 designated that deposition testimony. Apparently, they

7 don't like the deposition testimony, so, instead, they would

8 like to prejudice our case by confronting our corporate

9 representative with rogue responses that he had no

10 involvement of, no knowledge of and would be completely

11 confused by.

12          THE COURT: Okay. Mr. Hinderaker, very briefly.

13 You're going to have to lay foundation.

14          MR. HINDERAKER: Absolutely. So there will be --

15 a foundation will be laid through Mr. Ghislanzoni. It will

16 or it won't.

17          THE COURT: Okay.

18          MR. HINDERAKER: He testified at his deposition,

19 "A decision was made to take a copy of the Canadian

20 application and use it as a base to create an Australian

21 application."

22          In his role as the architect overall, he was

23 knowledgeable and participated in the decisions of how and

24 when to remove Blaze Advisor. He is not testifying as a

25 corporate representative or as a 30(b)(6), but as a person.

**1019**

1          THE COURT: Right.

2          MR. HINDERAKER: And in terms of jumping the gun

3 on the interrogatories, they also tell us when the

4 applications -- when Blaze Advisor was no longer used. And

5 this goes to our earlier conversation. We have to clean

6 them up with all the --

7          THE COURT: Understood. Yes.

8          Okay. Let's bring in the jury.

9          By the way, one of the jurors informed me that

10 they are perfectly happy with a 60-minute lunch break, so we

11 will go to 60 minutes.

12          MR. HINDERAKER: I hope they don't shorten it up

13 anymore.

14          THE COURT: We will be down to 10 minutes by the

15 end of the week.

16          THE CLERK: All rise for the jury.

17          (Jury enters.)

18

19          (In open court with the Jury present.)

20          THE COURT: Be seated.

21          You may proceed, Mr. Hinderaker.

22 BY MR. HINDERAKER:

23 Q. I have given you Exhibit 189. It has the heading CSI IT

24 Summit. I acknowledge that it bears a date of August 2006.

25 Have you seen this before?

**1020**

1 A. No.

2 Q. Okay. So when you picked up your involvement with Blaze

3 Advisor, was this part of the background information --

4 information that you reviewed?

5 A. At that point, no, it was not, because at that point in

6 time the decision to use the Blaze Advisor was already made

7 and the work on the project was already started. So my role

8 at that time was a developer. So I was really boots on the

9 ground to help with the development of Blaze Advisor.

10 Q. I see.

11 A. I was not an architect at that point of time.

12 Q. Mm-hmm. Who, who was the person leading the Blaze

13 Advisor project in November of 2006?

14 A. Owen Williams who was one of the department managers at

15 CSI. He was leading the Blaze Advisor project.

16 Q. We've handed you Exhibit 191.

17 A. Yes, I do.

18 Q. Okay. And from the metadata, I believe you were the

19 author of that.

20          From the metadata, I believe you are the author of

21 this. Would you agree?

22 A. Oh, yes.

23 Q. Okay. And what was the purpose of your creation of

24 Exhibit 191?

25 A. After the success of the business rules project for the

**1021**

1    ARP 2, the purpose of this document is to market the
2    business rules technology -- business rules across the
3    enterprise, across the Chubb.
4    Q.  And that was the purpose.  And what was the goal to be
5    achieved from that purpose?
6    A.  We thought that using the business rules can bring the
7    benefits to the IT teams across the Chubb.  So the goal is
8    as they become familiar, they would start implementing or
9    using the business rules technology that is making their
10   life simpler.
11   Q.  Okay.  So the -- was there a benefit to -- separate from
12   the simpler life of the underwriters, was there a benefit to
13   the business that you were advancing?
14   A.  Benefit would be, from my view, would be quicker
15   turnaround of the projects; thus, we can deploy the business
16   requests significantly quicker, as was demonstrated by the
17   ARP 1 project.
18   Q.  And from your point of view, what was the benefit to the
19   business when you were able to do that?
20   A.  Again, the changes or business changes can be deployed;
21   thus, whatever benefit is intended for that particular
22   implementation can be achieved significantly faster.
23   Q.  Does that mean then that new policies can be put to
24   market faster?
25   A.  Not necessarily, but could be more precise guidance or

**1022**

1    more precise scoring for that particular example.  It
2    doesn't necessarily impact the speed or increase on the
3    business.
4    Q.  Let's back up a second.  So the reason for having Blaze
5    Advisor is that it has an ultimate benefit for the business.
6    A.  Correct.
7    Q.  Correct?
8    A.  Ultimately, yes.
9    Q.  Yes, ultimately.  And one of the benefits of, I think
10   that you just said, is that it makes people lives easier?
11   A.  Correct.
12   Q.  Correct?  And the people that you're referencing are the
13   underwriters?
14   A.  No.  I'm referencing the IT teams because they're
15   ultimately responsible.  Again, I'm talking -- my role was
16   from the IT perspective.
17   Q.  Okay.
18   A.  I would not be able to speak for any business benefits
19   achieved through the use of the Blaze Advisor technology or
20   business rules technology.  I do speak around the
21   benefits -- that's what I speak in this document, is where
22   the business rules technology could benefit from the IT
23   point of view.
24   Q.  Anyway, that's what I said.  4 of 42 and Bates number
25   0004.

**1023**

1    A.  Okay.
2    Q.  And you wrote Introduction and Scope 1.1?
3    A.  Correct.
4    Q.  All right.  So you start that with, "The purpose of this
5    document is to illustrate."  And then tell me what you mean
6    by, "Such as increasing agility to implement the business
7    change and reducing time to market the new products and
8    services."
9            First paragraph.
10   A.  So we believed at the time of --
11           COURT REPORTER:  I lost you.
12           THE WITNESS:  Sorry.  I believed at the time I
13   wrote this document that implementation of the business
14   rules technology --
15           MR. FLEMING:  I'm sorry.  I thought you were
16   saying 40.
17   BY MR. HINDERAKER:
18   Q.  Let's try again.
19   A.  Yeah.  So at the moment of writing this document, I
20   believed that use of the business rules technology would
21   enable IT team to deploy any business request to production
22   or to come to market significantly faster as compared with
23   traditional technologies employed at Chubb at a that point
24   in time.
25   Q.  Say what?

**1024**

1    A.  It increases the agility of the project and increases --
2    and reducing time to market.
3    Q.  It increases the agility of the business?
4    A.  Agility of implementation.  Again, as you can see
5    specifically here, it is agility to implement to business
6    changes.
7            So I'm not speaking to the business benefit for
8    this.  This specifically says if I have a request from the
9    business to implement particular change, I can deploy it, I
10   can implement it significantly faster and deploy it
11   significantly faster for business to use.
12   Q.  As a consequence, as you say, that reduces the time to
13   market for new products and services, correct?
14   A.  If it's implemented in the Blaze Advisor.  Again, big
15   disclaimer.
16   Q.  And you just, you just, you just said the phrase, "if
17   implemented in Blaze Advisor."
18           And I want to turn you to the next page.  And you
19   have a heading, "What are business rules?"  And then you
20   have a description, you know, four paragraphs down,
21   "Traditionally embedded" -- "traditionally embedded inside
22   code."  And then you say -- and then you have the next
23   paragraph, "Externalizing the business rules to be a
24   structured decision management."
25           Is that what you're meaning by if Blaze Advisor is

**1025**

1  used because it externalized the business rules?

2  A.  Correct.  And that is how it was marketed to us by FICO

3  when we bought the tools.

4  Q.  And then -- let's see.  And then on the same page at the

5  bottom, "Enhance business performance by."  And Number 1 is,

6  "Increasing Analytical Ability."

7       Over time, can you tell me how Blaze Advisor

8  applications were used to increase analytical ability?

9  A.  Profitability indicator is an example of such

10  application which provides the ability to determine the

11  severity of the risk as underwritted by Chubb.

12  Q.  Okay.  And then Number 2, Automate Decisions by, and

13  then it says, "Automating High-Volume, Low-Risk Decisions."

14  Is that a component of -- tell me what applications of Blaze

15  Advisor used that.

16  A.  DecisionPoint.

17  Q.  How about Automatic Renewal?

18  A.  Automatic Renewal -- it renews all the policies, so I

19  wouldn't qualify as low risk.  It's entire book of

20  business, whereas DecisionPoint is for specific low-risk,

21  high-volume business.

22  Q.  And then II is "Establishing Uniform Decisions Across

23  Multiple Functions, Channels and Business Touch Points."

24  What applications using Blaze Advisor did that?

25  A.  Essentially, again, profitability indicator, because it

**1026**

1  is used in many different places.  Automatic Renewal, CSI

2  Express, DecisionPoint.  That's an example of uniform

3  decision about the risk.

4  Q.  It would be separate from profitability indicator.  Is

5  this also true for the underwriting guidance for CSI

6  Express?

7  A.  Underwriting guidance is developed -- yes, it is correct

8  in terms of application.  But since it speaks about multiple

9  functions and touch points, decision points, my view at

10  least, it's a better example.

11  Q.  Okay.  CSI Express and underwriting guidance does

12  establish underwriting decisions?

13  A.  Correct.  But in context of one application decision is

14  not shared across anywhere else.

15  Q.  This is Exhibit 192 for the record.  It's a cover e-mail

16  having a subject line of "Creating and Managing Business

17  Rules, CoE, Henry Mirolyuz, Chubb," dated 9/16/2009, and

18  then the attachment bearing Bates numbers FICO0057207

19  through 57222, bears as a title "FICO Forum:  Decision

20  Management Tools User Group, September 16-18, 2009."  It

21  includes on the title page, "Henry Mirolyuz, technical

22  analyst, business rules CoE, Chubb."

23       Do you recall this presentation, Mr. Mirolyuz?

24  A.  Yes, I do.

25  Q.  Okay.  Did you prepare this entire deck?

**1027**

1  A.  I prepared the deck in collaboration with Michael Sawyer

2  from FICO.

3  Q.  Okay.  All right.  Let me just go to the Bates number

4  57208?

5  A.  50208.

6  Q.  The second page.

7  A.  Yep.

8  Q.  And there is this quote from Donald Light.  Why did you

9  include that quote in the presentation?

10  A.  I felt that the term "business rules" was used a little

11  bit loosely.  People do not realize or do not have complete

12  understanding about what the business rules really is versus

13  the term of "decision business" and "decision-making

14  process" is a better illustration or a better terminology

15  for the technology itself.  I think it's gives the people

16  better insight into that.

17  Q.  And is that because as a consequence of the business

18  rules application, it enables a company to make decisions?

19  A.  Yes.  Same as wrote in the EcoSystem document.  Better

20  uniform decisions.

21  Q.  Let me turn to the next page, 209.  And, again, these

22  are your statements in the slides?

23  A.  Correct.

24  Q.  All right.  So we don't need to read them to each other.

25  But under the Potential Future Applications, there is a

**1028**

1  heading, Cross/Upselling?

2  A.  Yes.

3  Q.  Was that application implemented during your time at

4  Chubb?

5  A.  Not to my knowledge.  It was considered, as you can see

6  it here, but I don't believe it was implemented.

7  Q.  Would it have been a functionality of CSI Express?

8  A.  Correct.

9  Q.  And then the next header is Predictive Models.  Was that

10  implemented at CSI Express -- was that implemented at Chubb?

11  A.  Yes, it was.  Profitability indicator.

12  Q.  And if we go to the next page, 57210, you're giving a

13  case study of Automated Renewal I?

14  A.  Correct.

15  Q.  Thank you.  And in this, with respect to Automated

16  Renewal I on this slide, the overall business goal is to

17  increase the percentage of automated renewal submissions.

18  Was that accomplished?

19  A.  Correct.  Yes, it was.

20  Q.  And it goes on to say that the policies that are

21  automatically renewed, the more time the underwriter has to

22  develop and produce additional business or handle

23  additional -- produce additional business or handle

24  additional business.  And that also was achieved?

25  A.  I believe it was.

**1029**

1  Q.  And then there a header, "Objectives/Benefits, and
2  Reach."  Were those achieved as well?
3  A.  I cannot say if it was completely achieved or not.
4  Q.  I'm sorry?
5  A.  I cannot say if it was completely achieved or not.  It
6  was the goal to achieve those benefits.  But was it achieved
7  100 percent?  I'm not sure.  I cannot speak to that.
8  Q.  Okay.  Do you know if it was achieved to some extent?
9  A.  To some extent, yes, it was.
10 Q.  You have been handed Exhibit 196.
11        COURT REPORTER:  193.
12 BY MR. HINDERAKER:
13 Q.  I'm sorry.  193.  Thank you.  And an Introduction to
14 Business Rules, Improving Performance Through Decision
15 Management.  And you, sir, are one of the presenters; is
16 that right?
17 A.  That is correct.
18 Q.  And do you recall --
19 A.  Oh, yes.
20 Q.  -- the context of this?  What was it?
21 A.  It was a presentation on one of the forums which was
22 hosted by FICO to talk about the business rules and Chubb
23 experience in particular.
24 Q.  All right.  So this was an external presentation outside
25 of Chubb?

**1030**

1  A.  Yes.
2  Q.  Then the next -- the next page has the next slide,
3  Business Rules Overview, CoE, October of 2009.  Are you the
4  author of the slides that follow that?
5  A.  If my recollection is correct, it was a collaborative
6  effort, so we all work.  I mean, I would have provided the
7  information, but we all worked on all the presentations all
8  together.
9  Q.  Is it accurate to say that you were one of the
10 collaborators on this entire set of slides?
11 A.  Correct.
12 Q.  So you had an input into all of the slides?
13 A.  Yep.  At least I was able to review it and provide the
14 feedback, if necessary.
15 Q.  If you disagreed, you could say so?
16 A.  Yeah.
17 Q.  If you would go to the Bates number that has 0012 as its
18 ending.
19 A.  Okay.
20 Q.  You'll actually get the original 12 of this slide as
21 well.  You see that slide bears the heading, "What is
22 Decision Management?  FICO's Point of View."
23 A.  Yep.
24 Q.  And then it has five dimensions of Decision Management?
25 A.  (Moves head in affirmative manner.)

**1031**

1  Q.  And my question is:  From the deployment of Blaze
2  Advisor and the particular Blaze Advisor applications at
3  Chubb, can you describe for me how the Chubb Blaze Advisor
4  applications align with these five points?
5  A.  I'm not sure I follow the question the way it's stated.
6  Q.  Let me say it this way:  Blaze Advisor applications that
7  were implemented by Chubb aligned with the -- made
8  decisioning more precise?
9  A.  So again, Profitability Indicator, as I said before, is
10 a great -- is an example of precise decision to identify
11 high-risk policies or customers.
12 Q.  And Chubb's implementation of Blaze Advisor applications
13 made decisioning more consistent?
14 A.  For the lines which were implemented.  So the Blaze
15 Advisor for Profitability Indicator.
16 Q.  That's another example?
17 A.  Yep.
18 Q.  CSI Express is another example?
19 A.  CSI Express, again, is too in general, but Blaze
20 component is used for a specific line of -- as I said
21 before, specific line of business.  So for those implemented
22 for Blaze, yes, it makes decisioning much more precise.
23 Q.  And then another dimension of decisioning is agility.
24 And you mentioned that in your earlier slides --
25 A.  Correct.

**1032**

1  Q.  -- as one of the benefits of Blaze Advisor, deploying
2  Blaze Advisor?
3  A.  Correct.  We were able to implement the changes quicker
4  than what we were able to do it before.
5  Q.  And another dimension of using Blaze Advisor is speed to
6  market.  You were able to accomplish some of that?
7  A.  Correct.
8  Q.  And if you would -- the e-mail itself is 5/27/15, but
9  then the e-mail has 5/21/15, just to be clear.
10        And if you would go to the e-mail Bates numbered
11 5271, looking at that profitability indicator.  And,
12 Mr. Mirolyuz, are you the author of this slide?
13 A.  I could have provided the information for that slide.
14 However, I don't recall if I was the author or Mike created
15 the slide himself.
16 Q.  So whether your fingers touched the keys or not, the
17 information on the slide is your information?
18 A.  Correct.
19 Q.  And then on the top left corner is the heading
20 "Initiative," and it lists various objectives, benefits?
21 A.  Correct.
22 Q.  And are you listed -- and then under the bottom left,
23 there's another cell, "Plus/Delta," and then under Plus it
24 says, "The defined business benefit was realized."
25 A.  Correct.

1033

1  Q.  Let's go to the next slide.  And this one is talking
2  about DecisionPoint, correct?
3  A.  Correct.
4  Q.  Okay.  And, again, you list in the Initiative cell four
5  business benefits to be achieved by the DecisionPoint
6  application?
7  A.  Correct.
8  Q.  And then under Plus/Delta, you state that, "The defined
9  business benefit was realized"; is that correct?
10  A.  That is correct.
11  Q.  Can you just tell us -- maybe we know, but what's the
12  meaning of real-time quotes and bindable quote letter?
13  A.  That we can provide -- as requested, we can provide the
14  quotes in real-time.  They don't have to wait for -- the
15  customers don't have to wait overnight to get a quote.  They
16  can receive it -- real-time is not absolutely correct.  It's
17  near real-time but within a reasonable time frame.
18  Q.  Do you know if Chubb has -- I'm just talking the big
19  company Chubb -- undertaken the analysis to quantify the
20  business value which is realized from Blaze Advisor
21  applications?
22  A.  I cannot speak one way or another.  I'm looking from the
23  technical perspective.  As I said before, the decision
24  regarding using Blaze was already made before I started at
25  Chubb.

1034

1  Q.  You have Exhibit 195.  It says, "Chubb Enterprise
2  Architecture - Business Rules Strategy/Roadmap."
3  A.  Yeah.
4  Q.  I will just represent that the metadata suggests this is
5  a July 21, 2017, document with yourself as the author.  Do
6  you recall it?
7  A.  Yes, I do.
8  Q.  Okay.  What was the purpose of this document,
9  Exhibit 195?
10  A.  The purpose of this document is to summarize the
11  strategy around the business or provide a strategy in a
12  future roadmap regarding the business rules for the Chubb at
13  the Enterprise level.
14  Q.  Is this an internal presentation to Chubb?
15  A.  Correct.  Specifically it is limited to the Chubb
16  Enterprise Architecture.  So it's not even presented to the
17  broader audience.  It's specifically intended for the
18  Enterprise Architecture team.
19  Q.  The Enterprise Architecture team, is that speaking of --
20  speaking to IT personnel who have Enterprise-wide
21  responsibilities?
22  A.  In Chubb -- all Chubb architects.  All the architects
23  were the Enterprise architects.  It was not separated by the
24  business unit, so anybody who had the title "architect"
25  would be considered to be the Enterprise architect.  So this

1035

1  is specifically that team.
2  Q.  That team.  All right.
3          So that's to whom it was presented.  And then why
4  was it being presented?
5  A.  Again, to inform -- to develop the strategy and as
6  well as a future roadmap in regards to the use of the
7  Business Rules technology at Chubb.
8  Q.  Okay.  And are you the author of the entire document
9  then?
10  A.  With the input of information from others, but yes, I am
11  the one who compiled it.
12  Q.  So it's fair to say, this is your document?
13  A.  Yes.
14  Q.  All right.  If we could go to page 11, please, and that
15  slide has a header, "2015 Business Rules Projects at Chubb
16  (Active)."  Are we on the same page?
17  A.  Yes.
18  Q.  All right.  So the first line is "Corp" and then "PARS."
19  Do you recall that?
20  A.  Correct.
21  Q.  What is it?
22  A.  It's a CBS, corporate -- it's a Premium Booking.  So the
23  name acronym was the PARS, and we called it CBS, Corporate
24  Business Division.
25  Q.  Is Premium Booking and Corporate PARS the same thing?

1036

1  A.  Yes, it is the same thing.
2  Q.  And that project was completed per this slide?
3  A.  Correct.
4  Q.  Okay.  And why did you choose DecisionPoint and
5  Profitability Indicator as the applications to highlight in
6  the presentation?
7  A.  Profitability Indicator was our first attempt to
8  implement predictive models, risk assessment in Blaze.  By
9  itself, it was an interesting project, and people had raised
10  an interest on how we did it and the benefit of using it.
11  Q.  Mm-hmm (Yes).
12  A.  DecisionPoint was the project which we were using the
13  latest and greatest in terms of lessons learned and
14  experiences.  So we developed, actually in collaboration
15  with working with FICO as well, some assistance there,
16  application using --
17          (Court reporter asked for clarification.)
18          THE WITNESS:  -- agile methodologies.
19          MR. FLEMING:  Agile.
20  BY MR. HINDERAKER:
21  Q.  Is that what you mean, agile, A-G-I-L-E?
22  A.  Yeah.
23  Q.  Agile methodologies?
24  A.  Yeah.  And we were -- I mean, it was -- again, a number
25  of capabilities implemented in the DecisionPoint was

1049

1    Advisor?
2    A.   So at the beginning of 2016, in February, around
3    February time, we commenced the activity of analysis of all
4    the software products, and we formed the working group
5    called a cross divisional TDA, and I believe one of the
6    evidence that you have seen today carried that name.
7    Q.   Yes.  And I think we will look at that in a little
8    while.
9    A.   Yes.
10   Q.   And so now to go from this time in 2016, and is it
11   accurate also to say that it was in the beginning of 2018
12   that a new IT strategy for the whole enterprise was being
13   formulated?
14   A.   Yes.  It was at the beginning of that year, 2018, we
15   formulated a new IT strategy for the enterprise.
16   Q.   And between the date of March 16th -- date of March 2016
17   and this time frame in 2018, you started to look at a new IT
18   strategy for the whole enterprise, Blaze Advisor continued
19   to be used for applications in connection with selling
20   insurance?
21   A.   Blaze Advisor continued to be used in those applications
22   that had Blaze Advisor as a component that came from legacy
23   Chubb and one application legacy ACE.
24   Q.   We'll talk about that one application in a bit, but that
25   one application from legacy ACE, you're speaking of a legacy

1050

1    ACE license agreement with Blaze Advisor?
2    A.   That is correct.
3    Q.   And we can -- and with respect to that license
4    agreement, Blaze Advisor was not used by legacy ACE in
5    connection with selling insurance?
6    A.   It was a set of rules called common rules.
7    Q.   Right.  A set of rules for a different purpose than
8    selling insurance?
9    A.   Yes.
10   Q.   And then as you progressed into 2018 with your IT
11   strategy for the whole enterprise, at a certain point, you
12   reached a decision to adapt an open source technology
13   strategy.  Agreed?
14   A.   As part of the or embedded in the IT strategy that we
15   formulated in 2018, one important decision we made at the
16   time is to expand, increase adaption of open source
17   software.
18   Q.   So now this brings us from March 2016 through 2017
19   through 2018, and it becomes later in the beginning of 2019
20   that you made a decision to replace Blaze Advisor with
21   Drools, the open source solution?
22   A.   That is correct statement.
23   Q.   And then in approximately -- it's approximate, but once
24   you made the decision in the beginning of 2019 to replace
25   Blaze Advisor with Drools, it took about nine months after

1051

1    that for some -- for some, many of the applications to
2    actually accomplish the replacement of Blaze Advisor with
3    Drools, correct?
4    A.   Yeah.  We completed an entire migration from Blaze
5    Advisor to Drools in April 2020.
6    Q.   That was going to be my next question, just to follow
7    up.  The whole project of replacing Blaze Advisor was not
8    completed until April 2020.  Agreed?
9    A.   That's when the last application was replaced, the rules
10   were replaced.
11   Q.   Understood.  So from March 2016, '17, '18, '19 to
12   probably March/April of 2020, that was a time frame that was
13   consumed to fully replace Blaze Advisor and all the
14   applications that Chubb & Son had them in?
15   A.   I would correct that statement in terms of, we commenced
16   the activities of migration away from Blaze Advisor at the
17   beginning of 2019, and we completed them in April 2020.
18   Q.   I think we just said the same thing.  All right.  Fine.
19            When you were in the process of considering what
20   technology to use enterprise-wide instead of Blaze Advisor,
21   my understanding is that you looked at only two other
22   technologies, one of them was ODM.  You agree?  Yes?
23   A.   Yes.
24   Q.   And the other one was Drools, correct?
25   A.   Yes.

1052

1    Q.   And ODM is a product from IBM?
2    A.   Yes.
3    Q.   And Drools is an open source technology, correct?
4    A.   Yes.
5    Q.   Meaning anybody can use it, but if you want maintenance
6    service, you get that, you pay a fee for maintenance service
7    from a provider?
8    A.   That is correct.
9    Q.   All right.  And if we haven't already said so, Drools
10   is, Drools is open source.
11   A.   Correct.  Drools is open source.
12   Q.   All right.  All right.  Maybe we said that.  So now I
13   would like to turn to that time frame before Blaze Advisor
14   was replaced, and in your binder is a document that you have
15   a tab for 517.  Could you put that in front of you, please?
16   A.   517, did you say?
17   Q.   Yes.
18   A.   Found it.
19            MS. GODESKY:  Your Honor, is this published to the
20   jury?
21            THE COURT:  Not now.
22            MS. GODESKY:  Thank you.
23            MR. HINDERAKER:  Your Honor, this exhibit and the
24   other one are in the same category.  We will do them one at
25   a time.

**1053**

1  BY MR. HINDERAKER:
2  Q.  So, looking at Exhibit 517, I know that you are familiar
3  with the document, correct?
4  A.  I am.
5  Q.  And the document was created to describe the
6  applications that leverage Blaze Advisor.  Agree?
7  A.  Yes.
8  Q.  And we've heard the word "leverage" a couple of times.
9  Leverage in your language means that Blaze Advisor is used
10 in the applications, correct?
11 A.  That is correct.
12 Q.  And while you had a team of people, that the document
13 was created by a team of your people, you contributed to the
14 creation of this document?
15 A.  Yeah, I oversaw the activity.
16 Q.  Yes.  You oversaw it.  And as we just -- as you said
17 already, the document then in its totality describes the
18 applications that leverage or use Blaze Advisor.  Agreed?
19 A.  Yes.  At that point in time.
20 Q.  At that point in time.
21     Your Honor, I offer Exhibit 517.
22     MS. GODESKY:  We object, Your Honor.
23     THE COURT:  Overruled.  517 is received.
24     MS. GODESKY:  Your Honor, may I approach, please?
25     THE COURT:  You may.

**1054**

2          (Side-bar discussion.)
3     THE COURT:  Make sure you both speak clearly into
4  the mic.
5     MS. GODESKY:  These charts, there is another one.
6  These charts were created in connection with mediation.
7  They are not business records.  They are documents that were
8  created in connection with litigation.  They are privileged
9  under Rule 408, and there is no basis to admit them into
10 evidence.
11    THE COURT:  I did not hear him say they were
12 created for the mediation; is that true?
13    MR. HINDERAKER:  I think we received, we received
14 a copy of it during that correct time frame.  He testified
15 they were created for -- they were created by him and his
16 team.  They were created for, knowing the Blaze Advisor
17 applications that leverage -- knowing the applications that
18 leverage Blaze Advisor as part of the transition to and
19 away.  And it's their business facts.  We're not going to
20 get within 100 miles of discussing some settlement or some
21 mediation.
22    THE COURT:  No.  I understand.
23    MR. HINDERAKER:  And this isn't, and the only
24 document that we received, if we did receive it in this
25 context is this one.  There are other documents like the

**1055**

1  same that were just produced to us in litigation.
2     MS. GODESKY:  Your Honor, I could show you the
3  deposition transcript from Mr. Ghislanzoni's deposition
4  where Ms. Kliebenstein marked.  Mr. Fleming said, aren't
5  these the documents I just sent you in connection with the
6  mediation?  Ms. Kliebenstein said yes, and then she said you
7  would be free to object under 408 and other bases at trial.
8     MR. HINDERAKER:  Only with respect to that
9  document.  Only with respect to that document.
10    MS. GODESKY:  I have no objection to
11 Mr. Hinderaker questioning Mr. Ghislanzoni about the
12 information.
13    THE COURT:  About the information in the document.
14    MS. GODESKY:  But this is not a business record,
15 and it's not admissible, and there is also the Rule 408
16 issue.
17    THE COURT:  Understood.
18    MR. HINDERAKER:  I will be taking a long time and
19 I will read every line item in every column.
20    THE COURT:  I understand.
21    MR. HINDERAKER:  Which is a waste.  No reason to
22 know it's even close -- you know, this whole issue about
23 settlement conferences and Rule 408, Rule 408 is not a
24 shield that prevents business information from being
25 discussed in a trial.

**1056**

1     THE COURT:  Right.  I agree with that statement,
2  if this is ordinary business information, but I think --
3     MS. GODESKY:  It was created for purposes of
4  litigation, not normal course of business.
5     MR. HINDERAKER:  It's ordinary business
6  information.  He didn't make up those numbers.
7     MS. GODESKY:  I would have no objection to a
8  demonstrative that has these numbers, but it's not
9  admissible.
10    MR. HINDERAKER:  If you are reading Rule 408 it's
11 not for the purpose of a claim, it's not for the purpose of
12 liability.
13    THE COURT:  Hang on.  Arguably it's a statement
14 made during compromised negotiations.  I'm not sure it's
15 about a claim.
16    MR. HINDERAKER:  But it's not offered for any
17 purpose related to 408.
18    MS. GODESKY:  Your Honor, I want to be clear that
19 my objection is primarily that it's hearsay.  It's offered
20 for its truth and it's not a business record.  This is not a
21 document made in the regular course of business at Chubb.
22 It was a document made at the direction of counsel in
23 connection with settlement negotiations.
24    MR. HINDERAKER:  I don't know that that's true,
25 and it's not in the deposition.  The conversation gets

1057

1    into --

2                  THE COURT:  I -- I --

3                  MS. GODESKY:  If it is -- sorry, Your Honor.

4                  THE COURT:  I agree with you that I think this is

5    a tempest, frankly, in a teapot.  The information is coming

6    in.  If you need to read it line by line, you are welcome to

7    do that.  The document can be published to the jury for

8    demonstrative purposes, but absent something further, I

9    won't allow it, admitting it into evidence, but the

10   information seems to me to be quite clearly admissible.

11   Okay.

12                 MS. GODESKY:  I have no objection to a

13   demonstrative, if we turn this into plaintiff's

14   demonstrative.

15                 MR. HINDERAKER:  I am going to go through the

16   process of having that information before the jury for the

17   truth of the matter of the information.

18                 THE COURT:  Yep.

19                 MR. HINDERAKER:  So he gets to testify to it.

20                 THE COURT:  Understood.

21

22                 (In open court with the Jury present.)

23                 THE COURT:  Mr. Ghislanzoni, you will have to turn

24   your microphone back on.  Exhibit 517 will be received for

25   demonstrative purposes only.

1058

1    BY MR. HINDERAKER:

2    Q.   And now, Mr. Ghislanzoni --

3    A.   Yes.

4    Q.   We're going to spend some time with it now.

5    A.   Okay.

6    Q.   And when -- and let me just confirm this:  When you and

7    your team created this document, to the best of your

8    knowledge, the information on the document is accurate?

9    A.   To the best of my knowledge, this was a good

10   representation of what we found in the end of 2018.

11   Q.   So we have in front of us, let us -- first I want to go

12   across the top line, top row, and we will identify each of

13   those.  The SBU stands for the business unit?

14   A.   Yes.

15   Q.   The application is the name of the application?

16   A.   Yes.

17   Q.   This document, all of the applications on this document

18   are applications using Blaze Advisor?

19   A.   That used it at the time.

20   Q.   Of course.  At the time of its creation?

21   A.   Yes.

22   Q.   And then under application status, you will see, we can

23   read down that column, not retiring, not retiring, not

24   retiring, not retiring, not retiring, not retiring, meaning

25   what?

1059

1    A.   So as part of the integration activity between ACE and

2    Chubb, one important activity for us in IT was to decide

3    which applications were going to remain in the landscape and

4    therefore continue to be used and which ones we were going

5    to retire, eliminate from the IT landscape and stop using

6    them.

7                  What it means is, at the end of 2018, this was the

8    status of the application at the time.

9    Q.   And then if we go to the next row down where it says

10   Corporate Systems SBU, Premium Booking Application, it says

11   "Retiring but no ETA."  So it says what it says.  You don't

12   know when it will be retired, but the notion at this time is

13   to retire, correct?

14   A.   Correct.

15   Q.   And then we go to Canada.  Evolution, not retiring, to

16   Adapt-ABL.  COZ stands for which region?

17   A.   COG?

18   Q.   Yes.

19   A.   COG is a term, is used to describe.  It stands for Chubb

20   overseas general, which is the division of Chubb.

21   Q.   Thank you.  And EUZ is for Europe?

22   A.   Euro zone.

23   Q.   Better said.  And for Adapt-ABL the plan at this time

24   was to retire 12/2018?

25   A.   Yes.

1060

1    Q.   We'll look later to see if that was accomplished on time

2    or not, and then EZER for PAS and Europe, retiring 6/2019,

3    and again we'll look from other documents and see if that

4    was accomplished or not.  So far so good?

5    A.   So far so good.

6    Q.   And so far, to the best of your knowledge, all of this

7    was accurate?

8    A.   That was what the team that worked at the time together

9    with me produced looking at all the data available.

10   Q.   Good.  Thank you.  And then country supported on that

11   top row, we can look down the column and align the

12   application to the country that is identified.  Are we

13   agreed?

14   A.   That's the -- describes where, in which countries the

15   application is in use.

16   Q.   Yep.  And then Adapt-ABL, for example, is used both in

17   Europe and Australia?

18   A.   Yes, at the time.

19   Q.   At the time.  All of this, of course, is at the time?

20   A.   Mm-hmm (Yes).

21   Q.   Yeah.  Okay.  And then the next heading is L ACE, L

22   Chubb.  And I take it that L ACE stands for legacy ACE and L

23   Chubb stands for legacy Chubb?

24   A.   Yes.

25   Q.   And all of the applications on the page that we're

**1061**

1  looking at are legacy Chubb, right?

2  A.  Yes.

3  Q.  Now the next column is number of users.  Agreed?

4  A.  Yes.

5  Q.  And that column is divided into two parts.  On the left

6  side is the business users.  And on the right side is the

7  technical users, agreed?

8  A.  Yes.

9  Q.  And so let's use CSI Express for example.  This is

10  telling us that there are 500 business users and 3 technical

11  users for CSI Express, right?

12  A.  Yes.  So --

13  Q.  That's right?

14  A.  That's what it says.

15  Q.  That's what it says.  And so then if we go down, if we

16  look at that column, number of users in business, and we

17  just go down the column.  We can line up the number of

18  business users with the different applications, right?

19  Agreed?

20  A.  I don't know which line you are on.

21  Q.  I was just speaking in general.

22  A.  Okay.  Thank you, Your Honor.

23  Q.  Let's do DecisionPoint.

24  A.  Okay.

25  Q.  So here we have 1200 business users on DecisionPoint, or

**1062**

1  is it 1200 times 4?

2  A.  No.  It was 1200 --

3  Q.  Agreed.  All right.  And then on the technical side is

4  5?

5  A.  Yes.

6  Q.  Yes.  And then automated renewal process, on the

7  business side it says not applicable because it's a batch,

8  and on the technical side, it says there is 5 technical

9  users?

10  A.  Yes.

11  Q.  And then if we go to CUW, the business users is 1,000 --

12  I'm sorry -- it's 3,197?

13  A.  Yes.

14  Q.  And then the technical users is 60, right?

15  A.  That's what it says.

16  Q.  And then on the application IRMA, business users is 434,

17  434, right?

18  A.  Yes.

19  Q.  Technical users is 2, correct?

20  A.  Yes.

21  Q.  TAPS, Texas Action and Prevention System, this again is

22  a batch process, so no business users, and batch means what?

23  A.  Batch is a term we use to describe a process, an

24  application that runs without the interaction with a human

25  being through a user interface, and to expand from there, it

**1063**

1  is typically an application that runs towards the end of the

2  day or the end of a week or the end of a month.

3  Q.  Right.  And hence the name "batch"?

4  A.  Batch.

5  Q.  Exactly.  So we were looking at TAPS, and here we have

6  technical users of 2, agreed?

7  A.  That's what it says.

8  Q.  And then let's go to premium booking corporate systems,

9  it has 10 technical users?

10  A.  That's what it says.

11  Q.  And if we go to application Canada, 350 business users?

12  A.  Yes.

13  Q.  And 3 technical users, agreed?

14  A.  Yes.

15  Q.  We go to Adapt-ABL for Europe/Australia, 525 business

16  users and 5 technical users, agreed?

17  A.  That's what it says.

18  Q.  Believe me.  It's not my choice to do it this way, but

19  we will just do it.

20      And then EZER, business users 300, and technical

21  users 3?

22  A.  That's what it says.

23  Q.  Okay.  So now let's go over to the next column,

24  complexity, number of rules, and this is a description of

25  whether the rules are complex, high, low or not, and the

**1064**

1  number of rules that are being run in Blaze Advisor,

2  correct?

3  A.  That is correct.

4  Q.  All right.  So if we go to CSI Express, its complexity

5  is high, and the number of rules is 8,300, correct?

6  A.  Yes.

7  Q.  If we go to, also part of CSI Express, the complexity is

8  high and the number of rules is 12,800?

9  A.  Yeah.  That was the ABL service.

10  Q.  For the underwriting guidance at the time?

11  A.  Yes.

12  Q.  Before disablement it was 12,800, and high complexity?

13  A.  Yes.

14  Q.  For DecisionPoint, it's high complexity and the decision

15  services run to 2500?

16  A.  Yes.

17  Q.  The complexity is high and the number of rules is 3,410.

18  Agreed?

19  A.  Yes.

20  Q.  Then we go to CUW, and we have low complexity, right?

21  Agreed?

22  A.  That's true.

23  Q.  The number of rules is 680, right?

24  A.  Yes.

25  Q.  And IRMA, low complexity, and number of rules 460?

1065

1  A. Yes.
2  Q. And then TAPS, low complexity, number of rules 270,
3  right?
4  A. That's what the document says.
5  Q. Yep. And then premium booking, we have a high
6  complexity, and 5,460 rules, right?
7  A. Yes.
8  Q. And then for Evolution Canada, a medium complexity and
9  1,000 to 1500 rules, right?
10 A. Yes.
11 Q. And then for Adapt-ABL in Europe and Australia, medium
12 complexity, 1,720 rules?
13 A. Yes.
14 Q. And for EZER in Europe, medium complexity, 910 rules,
15 right?
16 A. That's what it says.
17 Q. So the next column is number of decision services, and
18 give me the definition of that, please?
19 A. Decision service fundamentally is how the rules were
20 being combined together for the execution.
21 Q. And then as that column is populated by numbers, what
22 does the 1 mean in contrast to a 3?
23 A. One way to describe it would be when you have lots of
24 rules, we are talking about thousands in many cases, and we
25 group them together. So is a group a 1 versus some other

1066

1  lines you have a 2 groups. We created 2 groups of those.
2  Q. And then the next column is the number of entry points
3  per service, and why don't you please define that?
4  A. Yeah, those were -- so service is an object that has,
5  contains all of these rules. So these object interact with
6  other objects. What we described so far is, we term, we
7  refer these to components in application. So the term
8  "entry points" is a point of integration.
9  Q. Okay. Thank you. And then on the last column on the
10 first page here, number of RMAs. Now an RMA is the rules
11 maintenance application that's part of Blaze Advisor?
12 A. Yes.
13 Q. Yes. And so like this is saying to us for
14 DecisionPoint, for example, there is, there is one RMA?
15 A. Yes.
16 Q. So the business people -- there is one RMA that the
17 business people can use to write rules into Blaze Advisor
18 relative to DecisionPoint?
19 A. Which, which in our case was the IT people were doing
20 it.
21 Q. Understood. And you chose to have IT people use the
22 rules maintenance application for that purpose?
23 A. That was the net result of our experience.
24 Q. All right. And so the number of RMAs we will know by
25 going down that column for each of the applications that is,

1067

1  that it is designated for. So if all told, one, two,
2  three -- so all told you have five RMAs for the applications
3  that are listed on the first page?
4  A. Yes.
5       THE COURT: Mr. Hinderaker, we're just after noon.
6  It sounds like you're at a convenient breaking point.
7       MR. HINDERAKER: I am, Your Honor. I finished the
8  first page.
9       THE COURT: All right. Very well. We will take
10 our noon break. Be back and ready at five minutes after one
11 o'clock.
12      THE CLERK: All rise for the jury.
13
14      (In open court without the Jury present.)
15      THE COURT: Everyone be seated, please.
16 Mr. Hinderaker, just going forward with this witness, we're
17 going to proceed in the vein of, I'm not going to publish
18 until you've moved for admission, just to be on the safe
19 side.
20      Ms. Godesky, why isn't this admissible as a
21 Rule 1006 summary of voluminous business records?
22      MS. GODESKY: My understanding is that this is not
23 a summary of voluminous business records. I do not think
24 that Chubb keeps in the regular course of business records
25 with the information reflected on P 517. It's my

1068

1  understanding that this information was hunted and gathered
2  from --
3       THE COURT: From Chubb's business records, right,
4  from its computer systems and the thing that it uses every
5  day of its existence to run its business, right?
6       MS. GODESKY: I think that's correct.
7       THE COURT: Okay.
8       MR. HINDERAKER: And as a point of information,
9  Your Honor, this same document is on their exhibit list as
10 175.
11      THE COURT: All right. Thank you, Mr. Hinderaker.
12 We're in recess.
13      (Lunch recess taken.)
14 Monday 2/27/23, afternoon session
15                * * *
16 1:05 p.m.
17         IN OPEN COURT
18         (JURY PRESENT)
19      THE COURT: Go ahead and be seated.
20 Mr. Hinderaker.
21      MR. HINDERAKER: Thank you.
22 BY MR. HINDERAKER:
23 Q. Sir, we're going to stay on this Exhibit 517.
24 A. Okay.
25 Q. Over the lunch hour I noticed that I had missed

**1069**

1  something on the first page.  I just would like to go back
2  to that for a moment.
3       And if you go to the, if you go to the premium
4  booking line --
5  A.  Yes.
6  Q.  -- and you go across to countries supported, I believe
7  we mentioned the U.S.A., but this document shows it's U.S.A.
8  and Canada, correct?
9  A.  That's what it shows.
10  Q.  Okay.  Now we can turn to the second page.
11       I take it this information was gathered from your
12  organization's records wherever they were kept and then
13  summarized on this document?
14  A.  So this data was, it was at a point in time analysis,
15  and we looked at value sources starting from the servers
16  where the software was running.
17  Q.  Thank you.  So on the second page.
18       Now, to read the second page, you have to have the
19  first page in mind in that, like the call to the top row
20  that's in light blue, corresponds to the preceding page for
21  us to know that it's CSI Express, right?
22  A.  Yes.
23  Q.  Okay.  So let's stay with CSI Express on the second
24  page.
25       The transaction processing column is divided into

**1070**

1  two parts, batch/realtime and then the other is overlap, if
2  both.
3       So on CSI Express under batch/realtime it says
4  both?
5  A.  Yes.
6  Q.  So that means that it processes transactions both in
7  realtime and by batch?
8  A.  Yes.
9  Q.  Okay.  And then the other half of that column where it
10  says overlap, if both, well then of course the answer is
11  yes?
12  A.  Yes.
13  Q.  The next line down or we go down from there, going to
14  the first page the, SBU is commercial financial.  And we
15  look across to see what it's talking about, and now we're
16  talking about DecisionPoint, correct?
17  A.  The second line, yes.
18  Q.  Yes.  And so where it says transaction processing,
19  batch/realtime, for DecisionPoint, it's realtime?
20  A.  Yes.
21  Q.  So then the next column overlap, if both, well it's not
22  both.  So it says and slash A, not applicable.  Am I reading
23  that right?
24  A.  Correct.
25  Q.  And then under the DecisionPoint we have automated

**1071**

1  renewal processing, and that's batch only, right?
2  A.  The third line, yes.
3  Q.  Okay.  Now let's go to the commercial MMI.  The top row
4  is CUW.  It is, CUW is both batch and realtime, correct?
5  A.  So you looking at the first one.
6  Q.  Yes, I am.
7  A.  CUW.
8  Q.  Yes.
9  A.  Batch.  Sorry.  Both.
10  Q.  It's both, right?
11  A.  Both.  Both.
12  Q.  Yep, that's what I thought.
13       And then under that we have IRMA, and that's
14  realtime?
15  A.  Yes.
16  Q.  And under that we have TAPS, and that's batch, right?
17  A.  Yes.
18  Q.  And then if we go to corporate systems, the premium
19  booking, that's batch?
20  A.  Yes.
21  Q.  And we go under that to Evolution Canada, that's batch?
22  A.  Yes.
23  Q.  And then we go to Adapt-ABL in Europe and Australia,
24  that's batch, correct?
25  A.  Yes.

**1072**

1  Q.  And EZER is batch, correct?
2  A.  Yes.
3  Q.  Okay.  So then let's go to the next large column,
4  realtime transactions.  Do you see that?
5  A.  Yes.
6  Q.  And that's divided into, I'd say, we'll call it three
7  subparts for my purposes.  All right?
8       So let's go, the first is average number per
9  month.  So is that telling us the average number of
10  transactions for the application per month?
11  A.  Yes.  Related to that particular --
12  Q.  Application?
13  A.  -- line, application.  Yes.
14  Q.  Exactly.  So let's do it again.  CSI Express is at the
15  top.  Average number per month of realtime transactions,
16  7,500 to 1 million, right?
17  A.  Yes.
18  Q.  And then we go to DecisionPoint and we have, we have
19  average number of transactions per month, and it's showing
20  10,000, 50,000, 30,000 and 50,000.  Am I reading that right?
21  A.  Yes.
22  Q.  So do we add that all up to get the total?
23  A.  In this case, yes.
24  Q.  And then we go down to CUW, realtime transactions,
25  1.22 million per month, correct?

1073

1   A.  Yes.
2   Q.  And then under that is IRMA, realtime transactions
3   184,072?
4   A.  Yes.
5   Q.  And no information is reported on TAPS.  And that's that
6   column, so in terms of information.
7        Let's go to maximum number of concurrent users.
8   A.  Yes.
9   Q.  So a concurrent user is what?
10  A.  Number of users of the application that are using in
11  exact same time the application.
12  Q.  Thank you.  And for CSI Express it's 100?
13  A.  Yes.
14  Q.  And then for DecisionPoint it's 3 to 5, 3 to 5, 3 to 5,
15  3 to 5.  So again I can add those all up.
16  A.  Well, in this case it's 3 to 5 for the whole
17  application.
18  Q.  Okay.  Very good.  And then we go down to -- everything
19  else is -- no more information on maximum number of
20  concurrent users.
21       So let's go to maximum processing time.  Start
22  again with CSI Express.  My eyes aren't so -- I wish they
23  were better, but is that saying 5S?  Five seconds, what is
24  that saying?
25  A.  Yeah, five seconds.

1074

1   Q.  Five seconds?
2   A.  Yeah.
3   Q.  Maximum processing time.  Then we go to DecisionPoint,
4   10 seconds, 2 seconds, 2 seconds, 5 seconds?
5   A.  Yeah, that's for one realtime transaction --
6   Q.  Okay.
7   A.  -- interaction.
8   Q.  I see.  So if I go across, there's a realtime average
9   per month, 10,000; maximum concurrent users, 3-5; maximum
10  processing time 10 seconds?
11  A.  Yes, for one transaction.
12  Q.  One transaction.  And I would do the same on
13  DecisionPoint across the line to understand that, right?
14  A.  Yes.
15  Q.  Okay.  And then, then under CUW, maximum processing
16  time, it says the longest recorded was 37 seconds.  Accurate
17  to the best of your knowledge, right?
18  A.  That's what we were able to capture.
19  Q.  And then on IRMA, maximum processing time, it says
20  1.794.  1.794 what, do you know?
21  A.  Seconds.
22  Q.  Seconds, okay.  Good.
23       Now let's go to batch transactions.  That column
24  is also divided into three parts.  Agreed?
25  A.  Yes.

1075

1   Q.  So the number of transactions -- I'm sorry.  Number of
2   transactions on -- on per job.  So under the heading, Batch
3   Transactions, what does that mean "on per job"?
4   A.  Per job, meaning one execution of a batch is called a
5   job.
6   Q.  Oh, good.  And so the number of transactions in a job
7   for CUW is 150,000?
8   A.  Yes.
9   Q.  Okay.  Nothing for, and we pick up again with automated
10  renewal, right?
11  A.  Yes.
12  Q.  And the number of transactions per job is 10,000?
13  A.  Yeah.  The first line, yes.
14  Q.  And then on the second line is 500 to 1,000?
15  A.  Yes.
16  Q.  And then on CUW, the transactions per job for batch is
17  32,000, correct?
18  A.  Yes.
19  Q.  And we go to TAPS, and the number of jobs, batch per job
20  is 8,456?
21  A.  Yes.
22  Q.  And then we'll go to premium booking, and the number for
23  transactions per job is 482, right?
24  A.  Yes.
25  Q.  And that fills out that column.

1076

1        So now let's go to time window under batch
2   transactions.
3        So for CSI Express -- well, first time window
4   means what?
5   A.  The execution window --
6   Q.  Okay.
7   A.  -- for the entire batch.
8   Q.  Beginning to end.  Beginning to end?
9   A.  Beginning to end for a job.
10  Q.  For a job, yeah.
11       So time window, CIS express varies from 20 minutes
12  to multiple days.  Have I read that right?
13  A.  Yes.
14  Q.  The next time it's applicable is, automated renewal runs
15  at night for 4-6 hours is one entry, and then runs at night
16  30-minute to 1 hour is another entry, right?
17  A.  Yes.
18  Q.  For CUW it runs 2:30 a.m. to 4:30 a.m.?
19  A.  Yes.
20  Q.  And then for TAPS it runs from 14:02 to 14:28, right?
21  A.  Yes.
22  Q.  So in Minnesota time that's two minutes after 2:00 to
23  28 minutes after 2:00, right?
24  A.  It --
25  Q.  You're using military time?

**1077**

1  A.  Yes.  28 minutes after 2:00 p.m.

2  Q.  And then premium booking is overnight.  Evolution is

3  overnight, correct?

4  A.  Overnight, yes.

5  Q.  And then Adapt-ABL is every morning for the European

6  zone and overnight for Australia, correct?

7  A.  Yes.

8  Q.  And then for EZER in Europe it's overnight, right?

9  A.  Yes.

10  Q.  All right.  So the third column in batch transactions,

11  run frequency.  And if you tell us what that means?

12  A.  It means when is the batch run.

13  Q.  Okay.

14  A.  Could be daily, monthly, weekly.

15  Q.  Got it.  So CSI Express, run frequency, multiple type of

16  batches, on average twice per week.  Agreed?

17  A.  Yes.

18  Q.  For automated renewal, it says monthly openly or monthly

19  and daily?

20  A.  Yeah, because there are two type of batches.

21  Q.  Got it.

22          And then for CUW, it's nightly?

23  A.  Yes.

24  Q.  For TAPS, it's monthly?

25  A.  Yes.

**1078**

1  Q.  For premium booking, daily?

2  A.  Yes.

3  Q.  For Evolution, daily once?

4  A.  Yes.

5  Q.  Evolution Canada for Adapt-ABL, daily twice, right?

6  A.  Yes.

7  Q.  And for EZER, daily once?

8  A.  Yes.

9  Q.  Okay.  And the next column is transaction payload, and

10  that's divided into two.  One of them is type.  And all of

11  them have -- the type for all of them is Java?

12  A.  That's correct.

13  Q.  And that's a certain kind of software platform?

14  A.  So the rules that you define in Blaze gets translated

15  into a programming language.  The one we chose or the one

16  that Federal Insurance chose was called Java.

17  Q.  Thank you.  And then transaction payload.  And then you

18  have the approximate number of attributes.  And an attribute

19  means what?

20  A.  A data item.

21  Q.  I'm sorry.  A what?

22  A.  A data item.

23  Q.  Data item?

24  A.  Yes.  Could be, I don't know, premium number, a premium

25  figure or --

**1079**

1  Q.  Got it.  So CSI Express has 140, the number of

2  attributes?

3  A.  Yes.

4  Q.  And DecisionPoint has 120, right?

5  A.  As you can see, we broke it down into four different

6  groups because there were different set of rules, each one

7  requiring different number of attributes.  That's why you

8  have these four lines.

9  Q.  All right.  That's why it says 120, 140, 60 and 250?

10  A.  Yes.

11  Q.  All right.  Thank you.

12          And then for automated renewal, there's a, one

13  line is 140 and the other line is 120?

14  A.  Yes.

15  Q.  For the same reason?

16  A.  Same reason.

17  Q.  And then for CUW, 125, right?

18  A.  Yes.

19  Q.  And for IRMA, 60, right?

20  A.  Yes.

21  Q.  And for TAPS, 60, right?

22  A.  Yes.

23  Q.  And then we go to premium booking, and that's 300,

24  right?

25  A.  Yes, 300.

**1080**

1  Q.  And then Evolution Canada, 120?

2  A.  Yes.

3  Q.  And then we're into Adapt-ABL for Europe/Australia, 140,

4  right?

5  A.  Yes.

6  Q.  And for EZER in Europe 140, right?

7  A.  Yes.

8  Q.  And then the last column is number of sandboxes needed.

9  What is a sandbox?

10  A.  A sandbox is a term we use in IT to describe a test

11  environment.

12  Q.  Okay.  And for every, for every --

13  A.  Application.

14  Q.  -- line that's filled in, it's one?

15  A.  One per -- yeah.  An application required a sandbox.

16          MR. HINDERAKER:  Okay.  Good.

17          Your Honor, I move again for the admission of 517

18  as a business record or as a Rule 1006 summary of their

19  business records.

20          MS. GODESKY:  We object for the reasons discussed

21  and also the second sentence of Rule 1006.

22          THE COURT:  The objection is overruled.  The

23  exhibit is received.

24  BY MR. HINDERAKER:

25  Q.  Now, Mr. Ghislanzoni, let us move on to -- if you would

**1081**

1  look at Exhibit 518.

2  A.  518.

3  Q.  518.

4  A.  Okay.

5  Q.  And you are also familiar with this document --

6  A.  Yes.

7  Q.  -- correct?  And I understand -- and this document to

8  the best of your knowledge was made about April or maybe

9  March, April, 2019, correct?

10  A.  So this document, which is similar to the one we just

11  looked at.

12  Q.  It is.

13  A.  Yeah.  My recollection is, was produced towards the end

14  of 2018.

15  Q.  Let me see if -- would you look at the end of the -- the

16  back of that binder there's your deposition transcript.

17  A.  Okay.

18  Q.  And I'm just seeing if that would refresh your

19  recollection.  If you go to page 101.

20  A.  Sure.

21  Q.  I'm sorry.  Let me know when you are there.

22  A.  Page 101, yes.

23  Q.  Page 101.  And so you were talking about Exhibit 406,

24  and then you said that was before 503 which is the one we

25  are talking about now.

**1082**

1         And the answer is, "So when did you receive 553,"

2  which is the exhibit we are talking about now is as trial

3  Exhibit 518.  And at page -- you say, "I believe it was

4  maybe March or April 2018."

5         And the answer March, April -- I'm sorry.  March

6  or April 2019.  And the answer is, "March, April, 2018, so at

7  that point in time."

8         Does that refresh your recollection it's in the

9  spring of March, April 2018?

10  A.  Yeah, what I remember is we started creating this view

11  at the end of 2018.  We might as well possibly have refined

12  the view at the beginning of 2019.

13  Q.  Fair enough.  And then one of the things that's in

14  Exhibit 51 -- let me.  Hang on.

15         And Exhibit 518 was prepared in the same general

16  process as the earlier exhibit?

17  A.  Yeah, the foundation in terms of data gathering was the

18  same.

19  Q.  And to the best of your knowledge, Exhibit 518 is an

20  accurate reflection of the information in your organization

21  at the time?

22  A.  To the best of my knowledge, yes.

23         MR. HINDERAKER:  Your Honor, I offer Exhibit 518.

24         MS. GODESKY:  We have the same objections.

25         THE COURT:  Overruled.  518 is received.

**1083**

1  BY MR. HINDERAKER:

2  Q.  And if we look at Exhibit 518, sir, a lot of the

3  information -- information being the same, but look at

4  what's different.  If we go to Adapt-ABL, do you agree with

5  me that in the later document, 518, Adapt-ABL shows both for

6  the European zone and Australia, right?

7  A.  Same as before.

8  Q.  Same as before.  Just different terminology.  So on 518

9  for Adapt-ABL, you said writing guidance for EUZ, that's the

10  European zone and Australia, and then 517 is, 517 doesn't

11  say underwriting guidance, does it?

12  A.  No, it doesn't.

13  Q.  Well, 518 is in evidence, and we can compare those two

14  exhibits in terms of their differences, not in the same

15  level of detail we did before, but 518 has as a header:  Has

16  a header application as before, but now it has a header

17  Blaze Rules Capability, right?

18  A.  Yes.  I remember I said in this column to explain the

19  main capability that was provided through the rules.

20  Q.  Right.  And then the complexity and number of rules,

21  realtime transactions, month average per day, batch, that's

22  likely information from the earlier exhibit?

23  A.  Complexity of rules, yes.

24  Q.  Yeah.  Okay.  So 518 is useful in terms of new

25  information because it has the Blaze rules capability as

**1084**

1  part of, as part of its expression.  Agreed?

2  A.  Sorry.  Could you repeat the question?

3  Q.  518 has the heading Blaze Rules Capability, and then

4  that information is filled in?

5  A.  Yes.

6  Q.  Okay.  Thank you.

7         Would you go to Exhibit 156 in the notebook.

8  A.  156.

9  Q.  Thank you.  And I believe this is in evidence but the

10  subject is ChEAR Application and Technology Stack Summary.

11  Do you see that?

12  A.  Legacy Chubb application summary.

13  Q.  Right.  And then the attachment is legacy Chubb

14  application summary.  Agreed?

15  A.  That's what it says.

16  Q.  Okay.  I would rather not walk you through this

17  document.  I would like to only know from your expertise and

18  familiarity to how to read it correctly.  All right?

19         And so, for example, if in the attachment I go to

20  the second page, and I was to find the, near the top

21  third -- there we go -- where it says the technology Blaze

22  Advisor, and then it says preferred primary, 7.1 and

23  leverage.

24         I just want to know from -- and I think from your

25  earlier testimony it is, but I just want to know that when I

**1386**

1  to sell that insurance by the state, the state of Virginia,

2  the state of Massachusetts, the State of Minnesota.

3        So the independent agent, if they decide that they

4  desire to make their career by having an insurance-selling

5  business, they go to the State, and they take tests, and

6  they acquire a license to sell. Then they go out and they

7  establish relationships with insurance companies.

8        When I entered into the industry in the late

9  1970s, it wasn't unusual for an independent agent to have

10 10, 12 companies in its arsenal of people for which it had a

11 license to sell insurance. Nowadays, that number is

12 probably a little closer to five because the agents started

13 to realize it costs money to have the insurance license for

14 that company.

15        But the reality is, the real bottom line here is

16 the independent agents are independent businesses. They run

17 their own business. They're licensed by the state. They

18 acquire that themselves. And then they go out, and they

19 market themselves to the insurance companies.

20        Insurance companies say, yes, we want to do

21 business with you, and they have a contractual agreement

22 that allows the independent agent to sell on behalf of the

23 company.

24 Q.  But the independent agent doesn't have to only sell on

25 behalf of one company. He can sell on behalf of as many

**1387**

1  companies as he has agreements with?

2  A.  Correct. As I mentioned, and nowadays it looks to be

3  about five.

4  Q.  Okay.

5  A.  And that creates an interesting dynamic in the

6  relationship because all of the insurance companies know

7  that the independent agent has a portfolio of companies

8  available, and so there's a -- there is a goal in that front

9  line underwriting function to establish for the agents you

10 select almost a loyalty, if you will, a preference for doing

11 business with each other.

12 Q.  And then let's turn to the third, say, person involved

13 in the process of selling insurance, the underwriter of the

14 insurance company. I think at this point we're talking

15 about front line underwriting?

16 A.  We are.

17 Q.  And so what is the role, if you will, of the -- well,

18 let me ask you this: Is it possible to sell insurance

19 without front line underwriting?

20 A.  No.

21 Q.  Not whether you use technology or not, but you have to

22 underwrite to sell insurance?

23 A.  Yes, because the definition of underwriting is within

24 the -- it's where the risk appetite and the type of policies

25 the company wants to write, and then inside of those types

**1388**

1  of policies, so let's go back to the flower shop. Okay? I

2  want to write flower shops. Okay?

3        Hey, front line underwriting, we want to write

4  flower shops, but we don't want you to write flower shops

5  that have five delivery vehicles. We want the small guys.

6  We want somebody that only has one or two vehicles.

7        All of that has to take place in the underwriting

8  process. Sometimes executed systemically and sometimes

9  executed by humans.

10 Q.  Okay. And "systemically," did you mean by technology?

11 A.  Yes. Yes.

12 Q.  And I think that -- I go slow on the natural, but I

13 think you have to go slow on the unnatural. Slow down a

14 little bit.

15 A.  I'll do my best, sir.

16 Q.  All right.

17 A.  As Mr. Pandey pointed out, he loves technology. I might

18 be guilty of the same thing as it respects property casualty

19 insurance.

20 Q.  All right. Is it fair to say that the underwriter is

21 the key person in this process of selling insurance?

22 A.  It is fair to say that the underwriter is the key -- the

23 front line underwriter is the key person in this.

24 Q.  Okay. So that's the -- that's having the steps of

25 selling in mind. I want to go to a different topic being

**1389**

1  what we've heard defined, I guess, as a policy

2  administration system. Turn to that subject.

3        With or without technology, can insurance

4  companies sell insurance without a policy administration

5  system?

6  A.  In today's current environment, it could be done, but

7  you can't be price-competitive because the expenses it would

8  cost to do that would drive your price way above the point

9  where you could sell in the marketplace.

10 Q.  Okay. Fair to say regardless of what the particular

11 technology is, technology is used in the policy

12 administration system's process?

13 A.  I would say that differently. Policy -- policy

14 administration system is a technology or a collection of

15 technologies used to administer the selling of insurance

16 process in the underwriting process.

17 Q.  Thank you. I'm sorry to talk over you.

18        And that was your experience -- and that was true

19 in your experience in the industry?

20 A.  Yes, across all 44 years.

21 Q.  So let's go to the steps in the process of selling and

22 underwriting, just to walk us through the application. We

23 don't have to spend any more time than necessary, but let's

24 spend, as you might say, all the time that is necessary.

25        Describe for us the application step in the

**1398**

1 issued. There is no paper. There is no dec page. But
2 coverage exists. That's the binding process.
3 Q. So when I trade in my car to the dealer and have a
4 different car but I want to be insured on my ride home, I
5 call my agent, give him the information. The agent says,
6 okay, you're bound, you have insurance?
7 A. That's a good understanding.
8 Q. And then separate from bound is another step, policy is
9 booked and issued. What does that mean?
10 A. These are two processes that take place simultaneously.
11 So the policy is bound. The underwriter has the
12 communication. The applicant has accepted the policy.
13     Well, now -- this is an oversimplification. A
14 button has to be pushed which says issue the policy. Right?
15 The underwriter pushes that button, and now what insurance
16 technology people would call interfaces, interfaces start
17 the process.
18     One of the processes is an interface communication
19 out to whatever I call this fulfillment, but who is going to
20 print the dec page. Right? Who's going to stuff it into an
21 envelope. Today that's a little bit of a misnomer because
22 many people receive their issued policy documents
23 electronically.
24     But it has to be issued, and a copy, electronic or
25 paper, of the policy and everything that comprises the

**1399**

1 policy has to go to the interested parties. So the now
2 named insured is going to receive a copy of the policy. You
3 move from applicant to named insured.
4     The agent, the independent agent, is going to
5 receive a copy. If there is a financial institution
6 involved, so if you think about that flower shop and that
7 flower shop actually owns the physical property, they're not
8 renting, there's probably a mortgage, a financial loan on
9 that. And the mortgage company is going to want to be named
10 on the policy, and they're going to want to get a copy of
11 the policy.
12     That's the issued process. Dec page, policy
13 language, statutory endorsements.
14 Q. And in your experience, technology is used inside of a
15 policy administration system to assist in that part of the
16 process as well?
17 A. Yes. The policy administration system is the technology
18 that is driving all of these processes.
19 Q. Policy monitoring, what is that?
20 A. Once a policy comes into existence, it is a concern of
21 the front line underwriter if significant, meaningful,
22 changes take place to the policy in the -- in the middle of
23 the term.
24     So they have usually systems checks, rules in
25 place that say, hey, if X or Y or Z, an easily understood

**1400**

1 but fairly radical example would be that flower shop that
2 all of a sudden starts selling fireworks, the underwriter
3 would want to know that.
4 Q. How would the insurance company know that the flower
5 shop has changed business to fireworks?
6 A. Well, the independent agent will -- the policyholder,
7 the named insured, would communicate to the independent
8 agent, hey, I've got a new business now. I've got different
9 inventory. I need to change the coverages.
10     The independent agent would communicate to the
11 underwriters, and red flags would flip up.
12 Q. Okay. And again, it's technology -- in this day and
13 age, it's technology that does that.
14 A. For the most part, yes.
15 Q. Yes. And then policy renewal. Maybe it's
16 self-explanatory, but in the whole process, would you
17 describe that, please?
18 A. Certainly. The preponderance, but not all, of policies
19 today carry an annual policy term. So when you have a quote
20 that is converted to a policy, it's considered a new
21 business policy. That's how the insurance industry
22 categorizes it.
23     Once that policy begins to approach the expiration
24 date of the policy, and if my memory is correct,
25 Mr. Pandey's description of this renewal process was a

**1401**

1 90-day ahead of time window, different products, different
2 companies have a different window. It might be 95. It
3 might be 82. But a window exists.
4     That window is going to kick off, and the
5 evaluation of whether the insurance company wants to offer a
6 renewal will take place. And if they decide the answer to
7 that is yes, they will send out a renewal offer.
8     Now, the renewal offer will look a whole lot like
9 a policy, a new policy with a second policy term, but the
10 reality is, it doesn't become a policy unless it is
11 accepted, and the acceptance is generally deemed to be the
12 receipt of premium.
13 Q. Okay. And in the -- and in your experience in the
14 industry, how valuable -- how valuable to the insurance
15 company is its ability to convert existing policies into
16 renewal policies, or maybe I could say another way: How
17 valuable is the overall percentage of renewals to an
18 insurance company?
19 A. Renewals are incredibly important to an insurance
20 company, and you'll see the phrase "renewal retention,"
21 because there's just not enough opportunity in the market of
22 people looking for a new insurance policy to accomplish the
23 written premium objectives that companies have if they don't
24 hold on to or if they're not good at holding on to their
25 renewals.

**1462**

1  A.  Mr. Hinderaker, the court record is important.  Can I
2  ask you to read the last two sentences back?  Okay.  Go
3  ahead, sir.
4  Q.  Don't worry about it.
5          With respect to the applications that defendants
6  had that use Blaze Advisor, one of them is CUW-IM?
7  A.  Yes.
8  Q.  IM being Inventory Management?
9  A.  Yes, Commercial Workstation Inventory Management.
10 Q.  Is that one of the -- is that an application that would
11 fall in the value chain of workflow routing and
12 orchestration?
13 A.  Yes.  Inventory management is, in fact, executing that
14 process I talk about, making sure the request gets to the
15 right party.
16 Q.  Okay.  And by "right party," are you saying the right
17 underwriter?
18 A.  Yes, if it is going to be human underwriting.
19 Q.  Yes.  Let's use human underwritten for a moment.
20 A.  So then the answer to the question is yes, and it's
21 going to get it to the right underwriting person.
22 Depending upon the complexity of the transaction, that
23 might be a special underwriting assistant.  It might be
24 a -- it might be an underwriter.  It's going to be somebody
25 in the underwriting department with the authority and

**1463**

1  authorization to execute that transaction.
2  Q.  Was it also used to direct the workflow and the
3  application to the underwriter with the appropriate
4  expertise to address -- the issue being to address the
5  policy for underwriting?
6  A.  In the specific case of defendant, yes.
7  Q.  Okay.
8  A.  There are -- there are insurance companies out there
9  that don't really leverage that concept, but in this case,
10 that is accurate.
11 Q.  The defendants did?
12 A.  The defendants did.
13 Q.  Were they also able to, with this CUW-IM, I'll call it,
14 extend the day?
15 A.  Yes.  Yes.  Because if you have a submission of a
16 request for policy that arrives at four o'clock in, just
17 arbitrarily speaking, Boston, Eastern time, and the agent
18 has communicated, I really need input on this by the close
19 of business today, well, that's only one hour.  But if you
20 had that expertise on the West Coast, now you take 5:00
21 p.m. and you extend it out to 6:00, 7:00-  you extend it to
22 8:00 p.m.
23 Q.  Let's go now to number ten, predictive analytics of --
24 did -- well, if you would describe for us how the
25 defendants used Blaze Advisor applications with respect to

**1464**

1  this element of value called predictive analytics.
2  A.  Certainly.  This takes place in two points.  One of
3  their predictive -- and I'm going to use the phrase
4  "predictive modeling."  That's probably a little more
5  familiar phrase with people.
6          The first point where predictive modeling use
7  Blaze Advisor was applied is a policy capability called
8  profitability model.
9  Q.  Profitability Indicator?
10 A.  I'm sorry.  Profitability Indicator.  I apologize.
11         Profitability Indicator is a computer model using
12 Blaze Advisor that created a prediction on profitability,
13 as the name says, based on a given price point.  And then
14 the underwriter could look at that and say, oh, well, by
15 golly, the price point needs to go up X, 5 percent.  Or the
16 Profitability Indicator could say, hey, by golly, you don't
17 need all this money, you can go down 5 percent.  Okay?  And
18 5 percent is just for examples.  Okay?
19 Q.  Sure.
20 A.  So Profitability Indicator is a predictive modeling
21 application.  It used Blaze Advisor, and it was deployed
22 into CSI Express.
23 Q.  All right.  And how about CIS Claims?  Is that involved
24 in the predictive analytics category for value?
25 A.  It does.  CIS Express was a predictive model used

**1465**

1  primarily by the actuarial sciences folks --
2  Q.  We're talking about CIS Claims.
3  A.  I'm sorry.  I'm sorry.  CIS Claims is a predictive
4  model used in the actuarial sciences function.  And what
5  it's doing is it's taking a hindsight view of policies, and
6  it's recalculating the proposed premium for it.
7  Q.  All right.
8  A.  Okay?  And then that proposed premium, it could be spot
9  on, it could be exactly right, it can be too little, oh, my
10 goodness and we've got to adjust our pricing process, or it
11 could be too much and, again, we would have to adjust our
12 pricing process.
13 Q.  Okay.  Let's go to another slide that you reviewed,
14 another document.  This is Business Rules Situation
15 Overview, and we're going forward in time to May 2014.
16 This is a document that you reviewed as part of your
17 analysis in forming your opinions?
18 A.  Yes.
19 Q.  And -- oops.  And this document has the Donald Light
20 quote that we saw before.
21 A.  Yes, it does.
22 Q.  So Chubb & Son continues to reference that as it's
23 internally talking about Blaze Advisor.
24 A.  Agreed.
25 Q.  And then we've seen what drives the business value.

**1502**

1    THE COURT:  Counsel, approach, please.

2

3         (In open court with the Jury present.)

4    THE COURT:  Please put that back up.  Thank you.

5

6         (Side-bar discussion.)

7    THE COURT:  Sorry, but the second to the last

8 bullet point on that slide refers to the cost of basically

9 replacing and getting the application new.  I want to make

10 it clear, you're talking about the CSI Express application.

11    MR. HINDERAKER:  I am.

12    THE COURT:  Okay.  I just wanted to make sure, as

13 opposed to --

14    MR. HINDERAKER:  Not the whole schmiel.

15 Application by application.  There will be a couple other

16 instances of that, but it's application by application.

17    THE COURT:  And the applications we're

18 referencing are the applications of Chubb.

19    MR. HINDERAKER:  Only, yes.

20    THE COURT:  Okay.  I just wanted to make sure.

21

22         (In open court with the Jury present.)

23 BY MR. HINDERAKER:

24 Q.  In my view, this is important information, and I'm also

25 trying to think about the most efficient way to convey the

**1503**

1 information.  So I'm suggesting, Mr. Whitener, if -- using

2 this slide, if you could speak to the bullet points that

3 you have put on the slide regarding the CSI Express

4 application, and tell us in your view the significance at

5 the defendants.

6 A.  Certainly.  CSI Express is the policy administration

7 system for the specialty products of defendant.  You will

8 notice in the -- in the second bullet point that we note

9 from defendant documentation that they have 113 of those

10 specialty products.  So CSI Express is doing the policy

11 processing, it's doing the new business, the quotes, the

12 renewals, the terminations.  It's executing -- or managing

13 the execution of the "bind, book, issue" process for these

14 products.

15         CSI Express is the named application, computer

16 system in the 2006 RFI, requesting the information about

17 solutions.  There is a lot of other information on here.

18 Let me highlight just one or two things, and I'm going to

19 look at the slide to do this, because I don't remember the

20 details.

21 Q.  Please look.

22 A.  Probably the most important point here is the fact that

23 it supports Automated Renewal Processing, so that's through

24 two projects, ARP-1 and ARP-2.  It has a simulation tool in

25 it, a what-if, so that the corporate underwriting process

**1504**

1 at Chubb and that product development function I -- product

2 management function I spoke to can take a book of business

3 or a product and it can take all of that -- all of those

4 policies, and it can change rules and parameters and get a

5 result back that says, hey, if you do this, this is what we

6 expect to happen, which is very powerful.

7         And the last point I will make -- the last two

8 points I'll make is, this is one of the places where the

9 predictive modeling capability turned into Profitability

10 Indicator is applied, and it used Blaze 7.1.

11 Q.  Okay.  Then let's do a similar approach with Automated

12 Renewal Processing.  We'll combine both ARP-1 and ARP-2.

13 From the documents and your review, if you would explain

14 for us the significance of the bullet points you put on

15 this slide.

16 A.  Certainly.  So with the goal for straight-through

17 processing and the goal to improve speed and the goal to be

18 easier -- I'm sorry.  I apologize.

19         The first goal being straight-through processing;

20 the second goal being improved speed; the third goal being,

21 it would be easier to do business with, using Blaze Advisor

22 7.1, defendant built two renewal processing projects.  They

23 deployed ARP-1, when ARP-1 was just simply a

24 categorization.  Here is a policy's risk characteristics.

25 It fits into high touch, the underwriter has to do this.

**1505**

1 Low touch, maybe somebody else can do it, an underwriting

2 assistant.  And no touch.

3         But with ARP-1 even though it categorized it no

4 touch, the system still wouldn't issue the renewal.  I

5 mean, a -- a minor, minor amount of human interaction was

6 required.  When they flushed out and implemented and

7 deployed ARP-2 now in that no-touch category, that minor

8 amount of button-pushing was no longer required.

9         The goal that was stated in the documents was to

10 eventually get to 90 percent of the renewals going through

11 straight-through processing within three years.  It's a --

12 it's a learning process.  It's a step-by-step process.  So

13 you would go in, and if you had stuff that categorized at

14 high touch, you would look at it, and say, anything we can

15 do with the rules.

16         If it were low touch, you would now be looking

17 at, okay, what can we do that might turn more of those into

18 low touch.  So it is an iterative process, if you'll allow

19 me that phrase.

20 Q.  And then no touch would be characterized as

21 straight-through processing?

22 A.  Yes.  No touch and straight-through processing mean the

23 same thing.

24 Q.  And in your review of the defendants' documents, did

25 you see where they were able to change the renewal rules

**1522**

1    Q.  Do these utility applications -- although not being
2    policy administration systems, do they connect to the
3    selling of insurance?
4    A.  Absolutely.
5    Q.  So at the defendants' utility applications were
6    commercial -- are these the utility applications at the
7    defendants?
8    A.  Yes.
9    Q.  We have spoken about CUW-IM, Broker Site in Canada.  We
10   will speak more about Exari in Europe.  We haven't really
11   addressed that.  And we've talked about CIS Claims.
12          So the Blaze Advisor function at Commercial
13   Underwriter Workstation.  That is what it was?
14   A.  Yes.
15   Q.  And I think we're spoken about that.
16   A.  I agree.
17   Q.  Okay.  And then Brokersite, we haven't really spoken
18   about that, client information access portal for brokers.
19   How did Brokersite use the Blaze Advisor function?
20   A.  It is a tool made available to the independent agents
21   and brokers to discover information about their
22   policyholders.  So if -- using a very, very simple example,
23   if the business calls the independent agent and broker and
24   says, when is my next premium due?  In this deployment and
25   in this function, the independent agent would go to the

**1523**

1    Brokersite, look up that policy and say, oh, look, you have
2    a thousand books due on August the 1st.
3    Q.  This is an ease of doing business benefit?
4    A.  Correct.
5    Q.  Exari, data capture and document generation.  What was
6    that?
7    A.  Exari never deployed into production but built using
8    Blaze Advisor, is a use of Blaze Advisor to create an
9    interview tool to walk someone through an interview
10   process, an agent and broker, or potentially a customer,
11   asking them questions, and then the application Exari is
12   going to fill out paperwork based on those answers.
13   Q.  For the purpose of selling the insurance policy?
14   A.  Agreed.
15   Q.  And then CIS Claims, claims categorization, I think I
16   could use a little better understanding of what that means.
17   A.  CIS Claims is the predictive modeling use that looks
18   back at information and says, did we get the price right?
19   So when you think about categorization, really, there are a
20   couple, right?  There is, I got it right, or I didn't get
21   it right, and if I didn't get it right, I missed by --
22   Q.  Okay.  Got it.  Understood.
23          Now let's go through each of them in a little
24   more detail.  Commercial Underwriting Workstation Inventory
25   Management, this -- in terms of these bullet points, from

**1524**

1    your review of the documents, was it used by 6,000 users in
2    the United States and Canada?
3    A.  Based on the documents, yes.
4    Q.  You had the bullet point, If CUW Inventory Management
5    is down and work orders cannot be created or reviewed, what
6    did you see from the documents that was the consequence of
7    CUW-IM being down?
8    A.  I believe the direct words of the document, and I
9    believe it here is the -- there was little to no "bind" --
10   "bind, book, issue" taking place.  This is the deployment
11   to -- for inventory management, and so inventory management
12   makes sure that any individual participant in the
13   underwriting process, it makes sure that their in-box does
14   not -- in-box of "bind, book, issue," in-box of any other
15   type of underwriting work, be it underwriting endorsements
16   or underwriting renewals, it's making sure that's what's in
17   their in-box is within their defined capacity.  And if it
18   does not, taking that work and getting it into some other
19   similar skill set person whose in-box can absorb the work.
20   Q.  And if that can't be done, then the work doesn't get
21   done?
22   A.  If that can't be done, the work doesn't get done.
23   Q.  You have here that commercial -- Chubb Commercial
24   Insurance processes over 5 billion dollars worth of
25   business with CUW-IM?

**1525**

1    A.  It does.
2    Q.  Is that on an annual basis or what time frame?
3    A.  No.  That is annually.
4    Q.  You also have on here that there were 1.22 million
5    transactions per month.  That was CUW-IM?
6    A.  Correct.
7    Q.  And some of these other bullet points we've spoken to,
8    it uses Blaze Advisor 7.1?
9    A.  It does.
10   Q.  And then you have the estimated cost to purchase or
11   redevelop CUW at between 5 and 10 million dollars?
12   A.  Yes.  That's from the same data source as before.
13   Q.  Same data source as before, this Duff & Phelps?
14   A.  Correct.
15   Q.  Let's go to Brokersite.  We've spoken about it a bit.
16   So the interface between Brokersite and Evolution was what,
17   as you saw from the documents?
18   A.  The Blaze Advisor is used in Brokersite.
19   Q.  Mm-hmm (Yes).
20   A.  And it participates in that -- in that interface.  And
21   as I mentioned before, Brokersite's job is to get
22   information back to the agent and the broker as it relates
23   a specific policy, suite of policies, customer.
24   Q.  And as you've already said, the Canadian application
25   called Evolution used Blaze Advisor?

**1570**

1  THE CLERK:  All rise for the jury.

2  (Jury exits.)

3

4

5  (In open court without the Jury present.)

6  THE COURT:  See you at ten to 1:00.

7  ( Lunch recess.)

8  Wednesday Afternoon Session of Fair Isaac versus Federal

9

10  12:56 p.m.

11  IN OPEN COURT

12  (JURY NOT PRESENT)

13  THE COURT:  All right.  A housekeeping matter,

14  just so you know, we may -- well, we'll just get going.

15  I'm going to lay down some guidance for the

16  parties with respect to Mr. Waid's testimony and tell you

17  what I see in the demonstrative slides, and then there's a

18  group of slides I have a question about.

19  So just by way of general guidance -- and,

20  Mr. Waid, you need to be heads up on this too.

21  During your testimony you can't use the phrase

22  "hypothetical negotiation."  You can be asked and you can

23  respond to questions about negotiating a license that is

24  four years in duration.

25  I'm going to prohibit counsel from using the

**1571**

1  phrase "transitional or bridge license" because of the way

2  that connects to the question of infringement and breach of

3  contract.  That said, it is a fact and you can certainly

4  discuss the fact that the license is terminated.  And the

5  parties are now -- well, if they were to negotiate a

6  license for four years.

7  MR. HINDERAKER:  Or whatever the right period is.

8  THE COURT:  Whatever the right period is.  I

9  mean, it's from stem to stern, it's approximately four

10  years.  Different applications are different lengths.  So I

11  think the best approach is four years.

12  MS. GODESKY:  Your Honor, may I just clarify

13  something on that?

14  THE COURT:  Sure.

15  MS. GODESKY:  So there's different elements to

16  this claim, and so they have the four-year scenario for,

17  you know, the enterprise ACE entity.

18  THE COURT:  Right.

19  MS. GODESKY:  But then there's also this question

20  of -- and I think the question that's presented to the jury

21  is, what would have been the fair market value of a license

22  that would have covered use by Chubb Canada, Chubb Europe

23  and Chubb Australia from 2006 to 2016, under the scenario

24  where they weren't included in the first place, right, and

25  so they are seeking ten years there.

**1572**

1  THE COURT:  But how is -- given that the court

2  has found no territorial restriction in the license, and

3  they are not a third party, so what's the, why is that

4  ten-year period at issue?

5  MS. GODESKY:  I am under the impression that they

6  are -- you're asserting a breach of contract claim.

7  THE COURT:  Okay.

8  MS. GODESKY:  Based on --

9  THE COURT:  They're a third party based on the

10  client definition?

11  MS. GODESKY:  Yes.  And so Mr. Waid's slides

12  include ten-year periods that the, those international

13  affiliates, right, were using Blaze in their particular

14  applications.  And so, you know, this isn't just about

15  hypothetical negotiation in 2016 post-termination.

16  There's also a huge driver of the numbers here is

17  hypothetical negotiation sitting there in 2006, also

18  including these three Chubb affiliates that they say

19  weren't included in the original license.

20  THE COURT:  Based on the definition of "client."

21  MS. GODESKY:  Correct.

22  MR. HINDERAKER:  I think the plaintiff should

23  also get a chance to restate the plaintiff's claims.

24  The definition of client is one element of it,

25  which depends on whether those foreign insurance companies

**1573**

1  are subsidiaries or not.  Also a different element of it is

2  paragraph 3.1 of the license agreement says, "Only

3  employees of Chubb & Son may use Blaze Advisor."

4  We learned yesterday from Mr. Taylor that no

5  employees of Chubb & Son are outside of the United States

6  of America.

7  So the client, we have -- there's different

8  routes to the same result.  It is part of FICO's claim that

9  the use for those many years outside of the United States

10  was a violation of the license agreement.

11  THE COURT:  Okay.  Yep.

12  And so for that then you're going to have to be

13  clear about negotiating a license for that use for that

14  period.  Okay?  Again, we're not going to call it a

15  hypothetical -- you guys aren't calling it a hypothetical

16  negotiation.

17  And it will, of course, be made clear, it needs

18  to be clear, that the basis for that claim is not a

19  territorial restriction.

20  MR. HINDERAKER:  Exactly so.

21  THE COURT:  Understood?

22  MR. HINDERAKER:  Can I ask one other question,

23  Your Honor?

24  THE COURT:  You may.

25  MR. HINDERAKER:  I have used, you know, as you

**1574**

1  know from our letters on this issue, I have used the word
2  "transition license," because it was a word that
3  Mr. Schreiber used, kind of an industry term.  I'm happy to
4  use -- and in my judgment a transition license is exactly
5  the license that you have described, one license that's
6  come to a conclusion, and it's now necessary to negotiate
7  another license for a period of years.
8          I'm happy to use whatever term the court finds
9  appropriate.
10         THE COURT:  There is no way around the notion
11  that the jury is going to understand that that license
12  period occurs after the putative end of the first license.
13  And so that fact just is not capable of being kept from the
14  jury.
15         MR. HINDERAKER:  All right.
16         THE COURT:  I'm asking you to not use the phrase
17  "transitional" or "bridge," though frankly they may well
18  use that in their own heads.
19         MR. HINDERAKER:  Yeah.  I'm happy to use any
20  word.  Is there just not a shorthand phrase to use,
21  apparently, is what we're saying.
22         THE COURT:  Precisely.
23         MR. HINDERAKER:  I see.  Fine.  That's fine too.
24         I don't know if we should -- what I'm thinking
25  about is, I think some of the slides have -- I'd have to

**1575**

1  look at the slides.
2          THE COURT:  Yeah, a few of them do, and they will
3  have to take the word "transitional" off.
4          MR. HINDERAKER:  Yeah, I'm happy with the --
5          THE COURT:  Right.
6          MR. HINDERAKER:  I'm just trying to be straight
7  up.
8          THE COURT:  Yep.  No.  I appreciate it.
9          MS. GODESKY:  Your Honor, may I?
10         THE COURT:  Hang on.  No.  Let me finish.
11         MS. GODESKY:  Oh, sorry.
12         THE COURT:  When you're talking about the
13  negotiation or the things that would go into this
14  hypothetical license, the fact witnesses, Mr. Waid, is
15  allowed to discuss the factors that FICO would consider in
16  those negotiations.  He may discuss factors that he has
17  observed the other side of the table to consider, but you
18  have to have the foundation to say that.
19         Not what would I consider if I were them, but
20  what have I seen them consider.  That can all come in.
21         That said, let me turn to the pricing
22  methodology, and I'm going to jump to sort of the end of
23  it, and then I will hear what you have to say about whether
24  it was disclosed.
25         In my view, slides 28 through 40 cannot be used

**1576**

1  because you can't connect the pricing methodology through a
2  witness to the Chubb use.  Mr. Waid can testify to that
3  pricing methodology, how it works, how it's supplied, and
4  you can testify to math.  Okay?  This plus this equals
5  that.
6          You just cannot connect it to Chubb, because then
7  you are, in my judgment, presenting the damages analysis
8  that was excluded that was included in Zoltowski's report.
9          Having said that, so in my judgment slide 27 can
10  come in or can be shown.  And you can explain the various
11  components as they -- I'm trying to describe this
12  carefully.  So you can say that 15 or 10 of the Chubb
13  applications were large, two of them were very large.  You
14  can explain the facts about Chubb's usage.  The witness
15  can't connect those two dots.
16         And in final argument, you can only connect those
17  dots by arguing that that is what a willing buyer and
18  seller would have agreed upon.  It's argument.  The jury is
19  free to disagree with you.
20         So, Ms. Godesky, now what was your point or
21  question?
22         MS. GODESKY:  I apologize for interrupting.  I
23  okay.  Thought you were summoning the jury.
24         THE COURT:  No.  No.
25         MS. GODESKY:  My other issue, Your Honor, was

**1577**

1  just with these slides that talk about transition license
2  negotiations, and one of the entries is, "Level of effort
3  to/impact of stopping use."  And then there's a sliding
4  scale as to whether the customer can turn Blaze off
5  immediately or if it's going to be time consuming and
6  significant.  And that is --
7          THE COURT:  Which slide is that?
8          MS. GODESKY:  There's an example of it on slide
9  41.
10         THE COURT:  I don't have that printed in front of
11  me, but go ahead.
12         MS. GODESKY:  My concern is just that that takes
13  us out of willing buyer, willing seller land into world
14  where the buyer is under threat of, if you don't buy this
15  license, you know, we're going to sue you for breach or sue
16  you for copyright infringement.  That is how I understand
17  this entry on that slide.
18         THE COURT:  I don't necessarily understand it
19  that way.
20         But, Mr. Hinderaker, go ahead.
21         MR. HINDERAKER:  Mr. Waid will -- Mr. Waid's
22  understanding of that element is nothing, is 180 degrees
23  from Ms. Godesky's understanding of that element.
24         There are some circumstances and some clients in
25  his experience where he's encountered that it is FICO, more

**1578**

1  FICO support to the client. It is useful to the client to
2  make this, to remove Blaze Advisor from, from their systems
3  by the end of the term.
4       And if there is more, if there is some extended
5  support that's required, some level of effort in that, well
6  then that affects the price. If there's not, then it
7  doesn't affect the price. It has nothing to do with any
8  putative or infringing nature of the circumstances.
9       It's just one of the things that he's
10  experienced. In his experience, he has clients that say I
11  want to move off of Blaze Advisor. Let's figure out a term
12  for that and how to do it. And sometimes FICO's services
13  are useful to the client to do that. That's a fact.
14      THE COURT: And I understand it that same way. I
15  would contextualize it by saying, when you are entering
16  into negotiations for a license that has a known fixed
17  term, which is our hypothetical negotiation, one of the
18  factors that the parties might discuss is knowing that the
19  term is four years and what are you going to do to extract
20  the software.
21      Those are factors that I would think they would
22  negotiate over.
23      MR. HINDERAKER: And in fact have.
24      THE COURT: Yeah. The only other issue with
25  respect to this -- well, I think that's sufficient. Okay.

**1579**

1       MR. HINDERAKER: Yeah, and then I think there's
2  been -- there was a challenge to 43. This is Mr. Waid's
3  experience that these various factors have different
4  influencing weight, you know, on his negotiations, have had
5  different influencing weight on his negotiations.
6       And so this isn't, this is just testifying to his
7  experience and how those factors have played out.
8       THE COURT: Understood.
9       Ms. Godesky, on those slides.
10      MS. GODESKY: It's because the same language I
11  just pointed Your Honor to was on that slide as well, so --
12      THE COURT: Understood.
13      So take off the phrase "transition license
14  negotiations" and maybe insert "fixed term license
15  negotiations," if you can.
16      MR. HINDERAKER: Well, we're certainly going to
17  do business -- are we on, which slide are you on, Your
18  Honor?
19      THE COURT: Well, I was on 41.
20      MR. HINDERAKER: Yeah, so we --
21      THE COURT: I see.
22      MR. HINDERAKER: Experience with fixed term
23  license negotiations.
24      THE COURT: Yes.
25      MR. HINDERAKER: That's good.

**1580**

1       THE COURT: Going back to 38, on the top of that,
2  in this context I'm not sure this is appropriate. The
3  slide is labeled "Standard Blaze Advisor Annual ELA Pricing
4  For Post-Termination Global Use."
5       MR. HINDERAKER: The -- we've talked a lot about
6  named application pricing, and many of the slides are doing
7  the standard FICO pricing for the named application. The
8  defendants have made arguments about, well, let's do
9  enterprise pricing. And ELA stands for enterprise license
10  agreement.
11      And so if we were going to follow the basic
12  guidelines, the standard guidelines of FICO for pricing on
13  an enterprise, from an enterprise point of view, then that
14  gets translated into an annual price as well. And that's
15  what slide 38 does. We start not from an application-based
16  construct, but we start from an enterprise-based construct.
17  That then gets translated into the annual fee for the fixed
18  term.
19      THE COURT: And I think the issue, at least for
20  me, with respect to slide 38 is, again, not directly tieing
21  it to Chubb. So the language here is clearly tying to
22  Chubb specifically as opposed to the pricing methodology.
23  If you are dealing with an entity, you know, we, our
24  standard pricing methodology is X dollars per billion of
25  revenue or whatever.

**1581**

1       So I assume they have some kind of guidelines
2  like that where they're -- in other words, the point is, I
3  don't think we can do a pricing in the evidence tied to
4  Chubb, because that runs afoul of Judge Wright's order that
5  it's not what FICO would charge.
6       And so you could talk about what they normally do
7  or what their standard pricing methodology is for a company
8  of this to that.
9       MR. HINDERAKER: Well, I am confused at this
10  point.
11      THE COURT: Okay.
12      MR. HINDERAKER: Judge Wright clearly said that
13  FICO can introduce its evidence using its standard pricing
14  methodology and the use of Blaze Advisor by defendants.
15  This is a lawsuit against Chubb. And the notion that FICO
16  would be introducing evidence untethered to the defendants
17  or untethered to the facts of the case, I'm just not
18  tracking.
19      THE COURT: And what I'm trying to describe is,
20  you put in the standard pricing methodology. You can put
21  in the facts of the case, okay, through this witness or you
22  can remind the jury through there witness. In final
23  argument, you can connect those two dots in argument and
24  say why that reflects what a willing buyer and a willing
25  seller would agree to.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)          March 1, 2023, Volume VIII

**1610**

1  nets, genetic log rhythms, more decisioning and reference

2  engine technology, a variety of technologies.

3  Q.  So then you left Stone & Webster, and where did you go

4  from there?

5  A.  I went to a company called Neuron Data in 1996.

6  Q.  I think Mr. Marce mentioned, identified Neuron Data.

7  A.  Yeah.  Jean-Luc was one of a handful of people at

8  Neuron Data when I joined.

9  Q.  And what was your work at Neuron Data?

10  A.  I was a systems engineer.  Essentially my job was to

11  work with our clients and map the technology to their very

12  specific problems, get them to -- and buy the software and

13  then help them figure out how to use it to drive business

14  value out of the software.

15  Q.  Was there a connection between this work at Neuron Data

16  and work with the clients that you just described and what

17  now has become known as Blaze Advisor?

18  A.  Yeah.  So one of the challenges with the technology in

19  my experience at Stone & Webster was that it was very

20  powerful, but it was very expensive and very difficult to

21  use.

22          And at the time, Neuron Data was, had two

23  products.  It had something called Expert, which was an

24  expert system tool, that older technology I referred to,

25  and it also had what was known as a cross-platform Gooey

**1611**

1  and database tools.  Essentially you could build something

2  in this and deploy it to Unix, a PC, a Mac, any of 28

3  different environments.  This is before Java came in.

4          Java was coming, so Neuron Data needed to

5  redefine itself.  It needed a new product, or it was going

6  to go out of business.  The proposal was made that we could

7  actually take the baseline of Neuron Data Expert product

8  and create a new, more powerful business tool.  And this

9  was the genesis of Blaze Advisor.

10  Q.  And you, that idea was -- so there's the idea.

11  What was done with that idea?

12  A.  So we had, we had a starting point and as a system

13  engineer it was my job to work with clients.  So we began

14  to do what in the software industry we call it sort of beta

15  testing.  We would take early versions of our Blaze Advisor

16  software to clients.  I would work with them, figure out

17  what their needs were in order to make Blaze more powerful

18  and more meaningful to them.

19          And that sort of went through a period up until

20  2000, and then in 2000, we actually launch the first

21  official go to market version for Blaze Advisor.

22  Q.  Okay.  Let me kind of catch up with you.  In your work

23  with the clients to see what business needs they had that

24  perhaps could be solved with the technology Blaze Advisor,

25  I'd like to know what your interaction then was between

**1612**

1  your role and, say, Jean-Luc Marce or other people who were

2  writing code, and I'll call it creating the product.

3          What was that dynamic?

4  A.  Yeah.  We started sort of the pilot work in 1998.  And

5  so I would collect very specific use cases.  I would

6  actually feed back features of the product directly to

7  Carlos Serranos Morales who was the lead architect and

8  developer.  Jean-Luc worked for Carlos.

9          And those would then be iterated on and released

10  as a product, taken back to the client, got additional

11  feedback on how they used it, what features they thought

12  they would need going forward, and then that sort of

13  iterated and cycled.

14          And you continue to improve the product.  It's

15  what we actually in the software industry call product

16  management.

17  Q.  Okay.  So I think you said the inception was 1996.

18  A.  That's when we started work, yes.

19  Q.  And you said your first launch was 2000.

20  A.  Yeah, we took our beta in '98.

21  Q.  1998.

22  A.  The first commercial launch to widespread sales was in

23  2000.

24  Q.  Let's define for us all, what does beta mean in normal

25  language?

**1613**

1  A.  Yeah.  It's sort of like, think of it like the Wright

2  Brothers building an airplane.  I don't think anybody

3  wanted to get on the first airplane they built.  Maybe they

4  did, but it is something like that.

5          And then when they perfected it, it got strong

6  enough, stable enough to actually become, you know,

7  repeatable in-flight airplane.

8  Q.  Okay.  And when you get to the, when you get to the

9  point of being repeatable, that's when you went to market

10  in 2000.

11  A.  Correct.

12  Q.  How many years -- maybe I'm going to get ahead of you a

13  little bit here, but for how many years have you been

14  involved in working with clients to understand how and

15  direct the enhancements of or the continued improvements of

16  Blaze Advisor?

17  A.  Since 1998.  That really stopped.  I have a broader

18  remit and responsibility, but it is still involved with

19  Blaze Advisor.

20  Q.  So Neuron Data, what happened to that company?

21  A.  So they rebranded themselves to Blaze Software.

22  Q.  Same company, different name.

23  A.  Just changed the name.

24  Q.  Okay.

25  A.  As I mentioned, their other products became less

**1614**

1  useful. And so the focus was entirely on Blaze Advisor,
2  and they named the company Blaze Software.
3  Q.  Then what happened to the company Blaze Software?
4  A.  Interestingly enough, it was owned by a bunch -- it was
5  a startup. So it was owned by a bunch of early investors,
6  and anybody who invests in a company, they want to get
7  their money out. So these investors have been around for a
8  long time, and they wanted their money out.
9        So they did something unusual. The first part is
10  not unusual. They we want into an initial public offering.
11  Like they put it on the NASDAQ listing. Raised a bunch of
12  money. Investors got their investment out. Made a lot of
13  money off the back of it.
14        And then a company in Germany called Brokat
15  actually bought Blaze Software, and another company,
16  Gemstone, off the market in a reverse, a reverse cash deal.
17  They basically took it off the market.
18  Q.  Okay. And your personal role in employment, you stayed
19  with Blaze Advisor through these various companies, did
20  you?
21  A.  I did. I actually changed roles through a couple of
22  those transitions, but I stayed.
23  Q.  And then after Brokat, was there another owner after
24  that?
25  A.  Yeah. So Brokat actually burned through a whole bunch

**1615**

1  of cash from that acquisition and actually became
2  insolvent. They pretty much ran out of money in the June
3  time frame of 2001. And we did find a buyer for the Blaze
4  Advisor asset in a company called HNC Software, but they
5  couldn't close before the beginning of August.
6        So we actually went out to all of our Blaze
7  clients and said we need you to buy the software that you
8  were talking about buying so we can stay afloat long enough
9  to close this deal. And they did. We were very up front
10  and very clear with them of the situation we were in.
11        But to keep their investment in Blaze alive, we
12  needed the money in order to bridge, and they did. So HNC
13  Software purchased the assets Blaze Advisor.
14  Q.  All right. And then how did Blaze Advisor get to FICO?
15  A.  So a year later, literally one year later in August of
16  2002, FICO purchased HNC Software. Their primary interest
17  in, at that time, in HNC Software was a product called
18  Falcon. Falcon is a fraud prediction tool that uses AI
19  techniques. It also uses Blaze Advisor.
20        And it essentially predicts potential fraud or on
21  credit cards or debit cards. So every time you swipe your
22  card, it's back there checking to make sure it was you who
23  actually charged the card.
24  Q.  Okay. So we've come forward to Blaze Advisor and
25  yourself at FICO in 2002.

**1616**

1        Would you give us -- describe for us the size of
2  the Blaze Advisor team. I'm not talking about, I guess I'm
3  not talking about the coders, but the size of the Blaze
4  Advisor team in the context of bringing Blaze Advisor to
5  market from, you know, 2002 forward, 2002 on.
6  A.  Yes. HNC had this concept of connecting decisions, and
7  it was a combination of bringing artificial intelligence,
8  analytic and predictive modeling and decisioning together
9  into sort of a unified way of driving business for our
10  clients. It's essentially what the business FICO and HNC
11  were in, just at the core, at the core technology level.
12        So when that came across, FICO wasn't really
13  interested in that. They were more interested in the
14  larger revenues from the Falcon product. So I actually had
15  expected to get laid off in the acquisition and not have a
16  job, but they decided to keep me, and they asked me to run
17  a go-to-market function, which is essentially taking those
18  products into themselves.
19        So in 2002 I had -- it was three people and me.
20  That was the scope of our go-to-market effort.
21  Q.  And did that go-to-market effort include the product
22  Blaze Advisor?
23  A.  Yeah, Blaze Advisor was the hallmark product at that
24  time. There actually wasn't really very many others in the
25  works in engineering. They were building them, but they

**1617**

1  weren't ready for go-to-market.
2  Q.  In these early years were additional -- in addition to
3  the in-house, I'll call it in-house enhancements and
4  capabilities and improvements, feeding back from the client
5  feedback, in these early FICO years, were other investments
6  made into the capabilities of Blaze Advisor?
7  A.  Yeah, a tremendous amount of them, actually.
8  Q.  Can you tell us what they were?
9  A.  It's a long list.
10        So we introduced what we call RMA, our rule
11  maintenance application. We've actually purchased another
12  company called Rules Power. That was a company by
13  Dr. Charles Forgy, who was the inventor of RETE, and he had
14  a patent for something called RETE 3. He owned that. It
15  was faster than RETE 2 and RETE 1, but it also included
16  conflict detection. Checked for things like circular
17  logic, rules never reached, nested rules that actually
18  conflict with one another.
19        It was a way to sort of check the validity of the
20  rules. And our business is entirely focussed on enabling
21  businesses to make better decisions, and business users
22  today, they're all business users of the product. So we
23  needed these capabilities to make sure that when
24  businesses -- business people are authoring rules that
25  they're not doing something they shouldn't be doing and

**1626**

1  directly in the same unit.

2        And when you when you talked about any kind of

3  coding or programming, it's all in line, unless you're

4  architecture is designed to separate that.

5  Q.  Okay.  Does the concept of latency have anything to do

6  with the use of Blaze Advisor?

7  A.  It has more to do with the architecture.  Your

8  architecture of your design is a bigger issue here.  In

9  today's modern compute world, though, we have a ton of

10  customers processing huge volumes on the Cloud, and we

11  don't have latency problems.

12        If you are in your own data center, you shouldn't

13  have latency problems.  Performance does play into that,

14  though.

15  Q.  Meaning?

16  A.  Well, the time to communicate is also the time to

17  process.  So if you have performance problems with your

18  software and it takes a long time for it to execute, you

19  will have the appearance of a latency.  Where that actual

20  delay is coming from, dependent on your architecture,

21  depends on your coding practices.  In the business world

22  space, business rules space, it gets a little confusing

23  because there's two forms of performance.

24        There's the performance of the rules.  Did I have

25  good business outcome?  And then there's the performance of

**1627**

1  executing them.

2  Q.  Understood.  I'm changing topics again.

3        I'd like you to find in your book the

4  Exhibit 956.

5  A.  I have that.

6  Q.  Okay.  And you see that -- if we could publish the

7  first page.  I think there's no objection to it.

8        956 is the 2014 Chubb Corporation annual report.

9  Great.

10        You may recall Mr. Pandey saying that he had

11  never heard of Chubb & Son, a division of Federal, before

12  this lawsuit?

13  A.  I do.

14  Q.  Would you turn to page 12 of this annual report,

15  please.

16  A.  I am there.

17  Q.  Okay.  And you see that begins a listing of the

18  officers of Chubb & Son, a division of Federal?

19  A.  I do.

20  Q.  Okay.  And would you turn to page 13?

21  A.  I am there.

22  Q.  All right.  And under "officers," what's the first name

23  of officer of Chubb & Son?

24  A.  Ramesh Pandey.

25  Q.  And then if we go down that page a bit, we see a

**1628**

1  listing of the officers of Federal Insurance Company.

2  A.  Yes.

3  Q.  Thank you.

4        Let me change topics again.  I'd like to

5  understand -- I'd like to understand the business model in

6  the software industry.  I'd like to -- in a way I'm going

7  back to 1996, 2002, but I'd like to understand the model,

8  the business model in the software industry.  But let's,

9  let's make it specific to Blaze Advisor and the lawsuit.

10        So when Blaze Advisor was first introduced into

11  the market and sold to the early customers, was there any

12  profit made?

13  A.  No profit.

14  Q.  All right.  Is that a common element, common aspect of

15  the software business model?

16  A.  It is very common.

17  Q.  Can you explain that for us, please?

18  A.  Yeah, and you will see this in start-up companies.

19  They're looking for investment money.  It's capital.

20  There's a number of reasons for it.

21        First of all, it takes time for you to build the

22  core software and get it to a state where it begins to

23  bring business value.

24        Once you get to that state, then you actually

25  have to take it to market and sell it, and you have to

**1629**

1  establish customers with some kind of reoccurring or

2  regular revenue stream so that you can offset those

3  expenses.  And the period of time that it takes, that

4  depends on the software.

5        But it's not uncommon for it to take many years

6  before a software product actually begins to make money.

7  The good part about it is is once it does, it starts making

8  lots of money.

9  Q.  In the early years of Blaze Advisor -- well let me ask

10  you this:  How many years did Blaze Advisor lose money

11  before it turned?

12  A.  Well, we, if you count when we actually went to market

13  full, it's around nine years.

14  Q.  Before it turned?

15  A.  Before it turned a profit, yeah.

16  Q.  So 2000 launch.  Nine years brings us to 2009.

17  A.  Yeah, around there.  Maybe the end of 2008.

18  Q.  Okay.  Changing topics again.

19        We've heard a lot of language, use of words in

20  the trial.  We've heard the words "rules."  We've heard the

21  words "business rules."  Is there a distinction between

22  those?

23  A.  There is.  The concept of a rule is actually a

24  programming construct.  It's where it came out of.  Most

25  people think of it as an if then else rule.  A business

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                                    March 1, 2023, Volume VIII

1630

1   rule by its very nature and by its label refers to rules
2   that the business actually control or own.
3           So they're the ones that come up with it.
4   They're the ones that have to actually get it into some
5   kind of operating function.  They're the ones that have to
6   ensure that it's separating the way they intend it to be.
7   They're the ones who have to make sure it's a compliant
8   rule.
9           And so there's this connectivity between the
10  business having a care and ownership of that versus not.
11  I'll give you an example.
12          You actually want to convert a date of birth to
13  an age.  That actually constitutes a rule, not something a
14  business person is generally interested in.
15  Q.  Then now let's talk about what a business rule is in
16  contrast to that.
17  A.  They can be quite varied.  But by their pure
18  definition, they are rules that the business actually cares
19  to use to operate their business.  Very frequently those
20  rules change.  They change from pressures from a variety of
21  reasons.
22          One is compliance.  Another one would be new
23  product introduction.  Some of it might be competitive
24  pressure that they have to adjust against.  There's a lot
25  of reasons why, but in the core systems of banks and

1631

1   insurance, those core rules actually become the
2   representation of how they do business.
3   Q.  So if we were going to try to understand the
4   significance within a company, I take it that we should be
5   asking about the business rules as opposed to their rules.
6   A.  Yes.
7   Q.  Let me change topics again.  Well, let me -- yeah, let
8   me do this first.
9           If we could get J1, please, the license
10  agreement.  There we go.  Thank you.
11          So we have on the screen, and you have the book
12  there, Mr. Waid, J1, the software license and maintenance
13  agreement between Chubb & Son, a division, and FICO, right?
14          I'd like to know, at this stage what was your
15  personal role with respect to, with respect to this license
16  agreement?
17  A.  So 2006, this would have been when the team was growing
18  to become international.  So I had international remit for
19  Blaze and other related tools products.
20          So I would have actually been involved in any
21  sort of core decisions made around pricing or material
22  changes in our contract terms or things of that nature.
23  They would have had to come to me for approval.
24  Q.  So your involvement at the management level?
25  A.  Yes.

1632

1   Q.  And in fact were you the person who gave final approval
2   for the pricing of this license agreement?
3   A.  I don't recall that, but it would have been me, yes.
4   Q.  Okay.  And would it have been you that approved the
5   pricing for each of the amendments, Amendment one and
6   Amendment two?
7   A.  It would have required my approval, yes.
8   Q.  In 2006, and going back to the discussion we just had
9   about the -- we can take this down now for a little bit.
10          Going back to the discussion that we had about
11  the business model and the software industry and the
12  investment before turning profit, in 2006, that time frame,
13  what were FICO's discounting practices regarding Blaze
14  Advisor?
15  A.  I would use the word "aggressive."
16  Q.  Okay.  Can you build on that for us?
17  A.  Look.  2002 we just get this thing off the ground.
18  2003, there's three of us kicking around into 2004.  We're
19  look to go secure enough business to get references in the
20  industry.
21          Once you get those references and clients see
22  what you are able to accomplish with other clients, that
23  builds on itself, and you start to build a base of more
24  sales, both with the same clients or with new clients.
25          So it's not uncommon early in software to be

1633

1   quite aggressive by discounting very low sometimes in order
2   to secure those reference accounts and secure that initial
3   business.
4   Q.  For the prospect of future business?
5   A.  Always for the prospect of future business, yes.
6   Q.  And when we look at the license agreement, we see that
7   Amendment Two was signed at the end of December of 2006.
8   A.  Yes.
9   Q.  Did that, does that timing bear on FICO motivations
10  with this product for discounting?
11  A.  At this time it did.
12  Q.  Why?
13  A.  It was -- it was our general practice to incent
14  customers to move to larger deals as quickly as possible.
15  It was our common practice at the time, they bought an
16  initial license, to communicate to them in some form,
17  either written or go back and try to convince them, hey, if
18  you upgrade your license or if you buy more, I will credit
19  back what you've already bought 100 percent, just so you
20  buy more.
21          Those practices were quite common at that time
22  frame, yes.
23  Q.  Okay.  Can you contrast that to 2016?
24  A.  Very different.
25  Q.  And how and why?

**1634**

1  A.  Our pricing model -- well, pricing model always been

2  our pricing model, but our pricing practices around

3  discount around the 2010-11, time frame, we started

4  becoming more stringent in how and where we actually

5  offered discounts.  That's reflected in the business.

6           We also changed other practices too.  Like we

7  began moving away from perpetual licenses.  The market was

8  moving away.  We were moving away.  We were moving towards

9  term licenses, which establish a reoccurring revenue base

10 for the product.

11 Q.  You mentioned standard pricing guidelines did not

12 change from that time frame.

13 A.  The pricing and how we priced did not change, no.  It's

14 the same pricing model that we had all the way back in

15 2003.

16 Q.  But discounting has changed?

17 A.  Yes.

18 Q.  And in terms of market acceptance to FICO's pricing

19 without the aggressive discounting, can you describe that?

20 A.  Yeah.  We began in the 2000 -- I said 2010, 2011 time

21 frame of sort of pulling back on the level of discounts and

22 by 2015 into '16, you know, relatively strong flat sales.

23 Going into '17 we had even more sales, 20 percent by my

24 last look of that.

25          So it was, it was a strong business at that point

**1635**

1  in time.

2  Q.  Without aggressive discount?

3  A.  Without aggressive discounting, yes.

4  Q.  If we could go back to the license agreement, please.

5           You see at the top of the, at the top of the

6  license agreement in the first paragraph, if we could open

7  that up.

8  A.  Yes.

9  Q.  The software license and maintenance agreement is

10 entered into as of June 30, 2006, between Fair Isaac

11 Corporation and Chubb & Son, a division of Federal, client.

12          From your role on the business of FICO, but

13 specifically in the licensing of Blaze Advisor, what's the

14 significance, what's the business significance of defining

15 who the client is?

16 A.  It defines who you are doing business with.  It defines

17 who you are licensing the software to.

18 Q.  Okay.  And does it also -- well, a license agreement

19 is, of course, a two-way agreement, licensor/licensee.

20 A.  Yes.

21 Q.  And FICO as the licensor is bound by the terms of the

22 agreement.

23 A.  Yes.

24 Q.  And then on the licensee side, it's the client that's

25 bound by the terms of the agreement.

**1636**

1  A.  Yes, the client is bound to all of the terms of the

2  agreement.

3  Q.  And the -- we've seen already that in the definition

4  of -- in Amendment One and Amendment Two, the definition of

5  "client" did not change.

6           Were you part of any discussions during that time

7  frame of Chubb & Son wanting to sign -- of any discussion

8  about the client being anybody else but Chubb & Son?

9  A.  No.

10 Q.  Going back to the basic, to the base agreement, we look

11 at the license grant in paragraph 2.1.  And there we see,

12 just as you said, the licenses is a, "hereby grants to

13 client."

14          But I'm also interested in asking your, the

15 business reasons for the fact that the license agreement

16 says it's non-transferrable, nonexclusive and a limited

17 license.

18 A.  Yeah, so first of all, software licenses are a

19 construct whereby ownership stays with FICO.  It's our IPR

20 software.  The license just gives them a right to use, and

21 there's specific conditions under that right to use.

22          This begins to outline the fact that this

23 agreement is with the client, and it cannot transfer this

24 agreement to anybody else, and it is nonexclusive, meaning

25 it is not just for them, and that there are limits framed

**1637**

1  within this agreement that they must adhere to.

2  Q.  And what's the business thinking behind the phrase "for

3  internal business purposes only"?

4  A.  Yeah.  So this is an additional protection that we want

5  to make sure that the use of the license, the right to use

6  the license, is for the individual that we're licensing to,

7  in this case the client, and that it is for their internal

8  business purposes, and they can't extend or reach that use

9  of the license outside of the use just for that client.

10 Q.  Let's turn to 3.1.  This is called License

11 Restrictions.  There's a number of them, but overall,

12 what's the commercial business reason for FICO to put

13 restrictions into the license?

14 A.  They're all there to make sure that the software is

15 used in accordance with very specific constraints or

16 limitations that we place on that license grant.  There's

17 various reasons for them from a business perspective, but

18 all of it is to protect a very valuable piece of IP.

19 Q.  Being Blaze Advisor?

20 A.  In this case Blaze Advisor.

21 Q.  If we go into 3.1, we see the small Roman iv.  So it.

22 Begins, "Client represents and warrants that it and its

23 employees shall not," and then Roman, small Roman iv,

24 "disclose the Fair Isaac products to or permit use or

25 access of the Fair Isaac products by any third party or any

1650

1 against the value that it offers. There are several
2 metrics that we use for doing that. When we get to the
3 scenario here, which is an enterprise-wide, there's other
4 factors that come into play, but the primary metric we use
5 is revenues.
6 Q. Revenues of -- what's your first data point for
7 revenues then?
8 A. It's the revenues of the entire entity that we're
9 actually contracting with.
10 Q. Of which the client is a part?
11 A. Of which the client is a part, yes.
12 Q. Okay. Because we've heard testimony of the revenue,
13 and Mr. Wachs testified in his video of the Chubb
14 Corporation having $12.3 billion in annual revenue.
15        So if you would describe for us how that data
16 point of the whole organization then factors into the
17 pricing analysis that you apply, like in the first
18 instance, to a named application license, then to a
19 divisional and then to the enterprise of Chubb & Son.
20 A. Well, the application license is actually based on a
21 variety of factors. There's nine of them. When we get to
22 the divisional license here at the 350, the way that it
23 would have been priced was to take the entire entity, all
24 12.3 billion of it.
25        And if my memory is correct, I think in the RFI

1651

1 they said that their revenues was 3.5 billion for
2 specialty.
3 Q. Specialty lines.
4 A. Specialty lines. So essentially you don't take a
5 proportion of that and say, let's say the pricing for the
6 $12.3 billion organization came out to X, and the specialty
7 lines is 30 percent of X. We don't charge 30 percent of
8 the X. What we do is, we try to incent the client to move
9 to a larger purchase, just like we do with the credits. So
10 we'll take the difference between that, which in this case
11 is the three and a half billion to the 12.3.
12        And it's more of an art than it is a science. We
13 pick anywhere between a third and two-thirds of the way
14 between, and we say that's the right price point for this
15 division.
16 Q. And, of course, it's a matter of then negotiation
17 because the licensee as to decide as well.
18 A. Of course it is, yes.
19 Q. And let's say it a different client that's much
20 smaller. Let's say it's a client with 5 million in
21 revenue, and that license licenses Blaze Advisor. Is it
22 the same software that goes to the $5 million client as
23 goes to a huge client?
24 A. We have one software.
25 Q. And the fee for the $5 million client will be same or

1652

1 less or more?
2 A. It will be less.
3 Q. Because of value?
4 A. Yes.
5 Q. Once the license agreement is signed, does -- does FICO
6 ever revisit the original, you know, ever go to the client
7 and revisit that price?
8 A. That depends on the circumstances.
9 Q. Okay. All right. Let's just say, let's say the
10 client is wildly successful, the client is growing
11 organically, the client makes, over time is just a much
12 bigger client, but it's all organic.
13        Does FICO try to revisit that pricing?
14 A. We do not.
15 Q. Well, then let's turn to paragraph 10.8.
16        Of the license agreement with Chubb & Son, as we
17 see, it's entitled No Assignment. From your decades of
18 experience, do all of the Blaze Advisor license agreements
19 have some form of a no assignment clause?
20 A. Yes, they all have some form of it.
21 Q. And what is the, why in some cases is it different from
22 others?
23 A. It can be negotiated. At times with clients, they
24 would come back and want to change the language. If we in
25 the odd case actually used client's paper. We sometimes

1653

1 negotiate it in. So it is a negotiable term, but it is
2 still there.
3 Q. Is it fair to say that every negotiation with every
4 client is unique to that client?
5 A. Yeah, they are all unique. Sometimes it gets
6 interesting.
7 Q. What in overview, can you give us -- well, let's take
8 it in pieces.
9        The first sentence, "Neither party shall without
10 the prior written consent of the other party assign or
11 transfer this agreement or any part thereof." So that's of
12 course it's mutual, "neither party."
13        What's the business purpose of that first
14 sentence?
15 A. It's very simple as that bidirectionally, either party
16 has the opportunity to consent to the assignment.
17 Q. If the licensor/licensee relationship was going to
18 change by assignment, either party gets to consent? Is
19 that what you said?
20 A. Yes. That's correct.
21 Q. Now let's -- and now let's go to the second sentence.
22        What's the reason that that's in FICO license
23 agreements?
24 A. These contracts are all negotiated, in particular for
25 enterprise agreements, in a unique set of circumstances.

**1654**

1  There are events, such as mergers and acquisitions or
2  reorganizations or the bringing on of portfolios, that have
3  an impact to the circumstances under which it was
4  originally conceived.
5        So this section is basically saying that these
6  events are considered an assignment and it requires
7  consent.
8  Q.  Okay.  And why does FICO preserve that right to itself
9  to consent when one of those events happens?
10  A.  Well, these particular type of events in specific
11  actually materially change the basis, could materially
12  change the basis on which the license was granted and the
13  price that was set for that license.
14  Q.  And you use the word "could."  So depending on the
15  case?
16  A.  Yeah.  I mean, it could be a very small acquisition and
17  it's not material or impacting.
18  Q.  In your view, regardless of size, if there is one of
19  these events, FICO's consent is required?
20  A.  Absolutely.  We want to know about it.  We need to
21  assess that, the opportunity to assess that, and we need to
22  consent to it.  That's what this is saying.
23  Q.  So now let's be clear.  Consent to what?
24  A.  Well, these events are deemed an assignment.  That
25  means that if any one of these things happens, it is an

**1655**

1  assignment, and therefore we need to consent to it.
2  Q.  And what's the outcome -- let's say you do consent,
3  what's the outcome of that?
4  A.  If we do consent, typically there's a modification to
5  the agreement so that we know who the parties are.
6  Q.  Or what the use is?
7  A.  And we memorialize that, yes.
8  Q.  Now, in this second sentence, "In the event of a change
9  of control of client or if client is merged with, acquired
10  by or acquires another entity or undergoes a reorganization
11  or otherwise acquires the right to process the business of
12  another, each such event shall be deemed to be an
13  assignment subject to this section, and the client shall
14  make no expanded use as a result of any such event."
15        So is there any -- in your understanding, the
16  license agreement is still with the client?
17  A.  Yes.
18  Q.  Now, it goes on to say, "And client shall make no
19  expanded use of the Fair Isaac product as a result of any
20  such event unless and until Fair Isaac provides such
21  written consent."
22        What's the commercial reason for that element of
23  the second sentence?
24  A.  It's an additional constraint that until consent is
25  actually made, lock it down, don't do anything with that

**1656**

1  software, lock it down.
2  Q.  And what's, you know, so trying to understand now the
3  time period in which, assuming the event triggering the
4  second sentence, as you understand it from the business
5  point of view, what's the time period in which this
6  lockdown of the use would be in effect?
7  A.  Well, the time period -- well, first of all, should
8  have been notified before the event occurred.
9  Q.  Yeah.
10  A.  But the time period is actually probably specified in
11  the contract relative to the cure period.
12  Q.  Okay.
13  A.  Typically it's 30 days.
14  Q.  Let's assume that's true.  So is that saying, within
15  30 days under the license agreement, there will be consent
16  given and going forward maybe with amended terms or consent
17  not given and the license terminated?
18  A.  Yeah.  Consent could be given, and there's some
19  paperwork to follow up on what that actually means.
20  Consent could be not given, in which case, you know, we
21  need to talk about the termination of the agreement.  New
22  sets of terms and a new agreement could actually be
23  negotiated.
24        There's a whole series of things that could
25  happen.  The point of the, the language is to make sure

**1657**

1  that, you know, in mergers and acquisition there's an
2  opportunity for synergies.  This is referring to the fact
3  that you have an opportunity to grow the business just by
4  your nature of that merger and acquisition.
5        That's why you merged or acquired in the first
6  place, to grow the business.
7  Q.  So being bigger gives you opportunities to grow
8  business?
9  A.  It does.  And the point here is, you shouldn't be
10  processing any incremental business as a result of that.
11  It's lockdown until the consent is actually given and the
12  terms under which that is given.
13  Q.  And that, of course, and I guess we just said, and if
14  consent is not given, well then the license terminates.
15  A.  Yes, which is an option.
16  Q.  Is it the preferred option to FICO?
17  A.  It is not, no.  Our intention is to have long-term
18  relationships with our clients.  There is a, an incremental
19  value we get from our clients and having them happy with
20  our products.  That is actually feeding into the, strongly
21  feeding into our business strategy.
22        So, no, we seek to actually find amenable
23  outcomes in these situations.
24  Q.  Okay.  Let me just see where I'm at.  Would you go
25  to -- I think it's Exhibit 125.

**1682**

1  A.  No.
2  Q.  From your point of view, was the commercial purpose of
3  the license agreement as signed, with the license agreement
4  as signed, if there is, if there are no affiliates of the
5  client, does that change anything in your view regarding
6  the license agreement?
7  A.  No.
8  Q.  Why not?
9  A.  Still with the client.
10  Q.  Now, we saw in Mr. Carretta's notice of termination
11  letter that it was effective, excuse me, effective the next
12  day.  And he referenced in that letter paragraph 9.3 of the
13  license agreement.  So let's just go to that for a moment.
14          Effective termination.  We all can read it.
15  Client shall immediately cease using all Fair Isaac's
16  products and so forth.
17  A.  Yeah.
18  Q.  Okay.  And we saw from Mr. Carretta's letter that he
19  specifically pointed out that provision and the
20  consequences of not stopping use.
21          Today, as of today -- well, at any time, did you
22  receive a communication from Chubb & Son that they had
23  stopped using Blaze Advisor?
24  A.  I have not.
25  Q.  Did you ever receive a return of the documentation or a

**1683**

1  certification that the documentation had been destroyed?
2  A.  I have not.
3  Q.  Let's turn to the subject matter of ACE American.  We
4  saw in earlier testimony that there's a small license
5  agreement between FICO and ACE American.  Are you generally
6  familiar with that?
7  A.  I am.
8  Q.  Does that license agreement have any, any applicability
9  to the use of Blaze Advisor by Chubb & Son, the client in
10  this agreement?
11  A.  It does not.
12  Q.  When did you first learn that ACE American Insurance
13  was using Blaze Advisor in connection with selling
14  insurance, using Blaze Advisor in the applications that
15  previously had been the ones run by Chubb & Son?
16  A.  In this lawsuit.
17  Q.  Never before?
18  A.  No.
19  Q.  So then it's obvious to say that no one from ACE
20  American ever reached out to FICO to your knowledge to try
21  to license Blaze Advisor to use in connection with selling
22  insurance?
23  A.  No.
24  Q.  I want to now turn to, I want to now turn to
25  standard -- well, I want to now turn to the experience,

**1684**

1  your personal experience in the negotiation of license
2  agreements.
3  A.  Okay.
4  Q.  And I guess let's begin with personally, speaking of
5  you personally, not me.  Speaking of you personally.
6          How many negotiations of -- for Blaze Advisor
7  license fees have you been a part of?
8  A.  That would be really hard to say, but it's definitely
9  hundreds and hundreds of them.
10  Q.  And is it fair to say that you've been negotiating
11  Blaze Advisor license agreements in one form or another
12  since maybe 2002 or 2000?
13  A.  Even before that.
14  Q.  And as we noted in 2006 time frame, then you were the
15  person with final authority on pricing.  Is that still, was
16  that true still in 2016?
17  A.  Yes.  In 2016, absolutely.
18  Q.  Have you experience in negotiating agreements with
19  clients where, where the license agreement that they have
20  has come to an end, and you're negotiating with them for a
21  new license agreement?
22  A.  Yes.
23  Q.  And you've had experience where you're negotiating a
24  license agreement with someone who has never been a client
25  as well?

**1685**

1  A.  Yes.
2  Q.  And you mentioned before that, well, discounting
3  practices have changed.  The guidelines for pricing really
4  have not, since 2003?
5  A.  Yeah.  The core -- the core pricing model has not
6  changed, no.
7  Q.  So I would ask you to go to Exhibit 421, please.
8  A.  I'm sorry.  You said 421?
9  Q.  421.  418.  It used to be called 421.  Now it's called
10  418.  Let's go to 418.
11          This is, as you see, Business Science Enterprise
12  Decision Management Design and Deployment, Tools and
13  Infrastructure Software Global Price List, 10/10/03.
14          I would like to first start by just understanding
15  the pricing methodology that FICO applies for the Blaze
16  Advisor licenses.
17  A.  Okay.
18  Q.  And let's begin with, with this document, and if you
19  could educate us about how to read it and how to use it.
20  A.  Okay.
21  Q.  All right?  And by the by, it's been in place since
22  2003.  Over the decades, what's the reaction, what's the
23  reaction from the marketplace to this methodology that FICO
24  applies in pricing?
25  A.  Yeah.  Ultimately the named application licensing that

**1686**

1  we do in this guide became the most popular form of it.

2  Enterprise license agreements were very popular up front.

3  Today we don't sell enterprise license agreements anymore.

4  Most clients aren't interested in it.

5      But those two initially out of the gate were the

6  most popular.

7  Q.  Okay.  And as we go through this then, we will try to

8  keep that in mind that there are two flavors, the named

9  application and the enterprise, and we'll treat them,

10  excuse me, as best we can as separate things so we're not

11  getting ourselves confused, or me confused.

12      So let's go, if you would walk us through -- so

13  at the time of the notice of breach letter in 2016, these

14  are in place.  Would you walk us through how these

15  guidelines work?  Maybe we start at 2.1.1 or 2.1.2.

16  A.  Yeah, they're both related.

17  Q.  Okay.

18  A.  So in software industry there's two types of license

19  grants, generally speaking, annual or subscription and

20  perpetual.

21      Back in this time frame and for a number of years

22  following, most software, or most clients actually

23  preferred to buy perpetual licenses.  The primary

24  distinction between the two of them is, perpetual means

25  that the license continues to go on as long as the license

**1687**

1  agreement terms are being upheld.

2      In the annual licensing, it's for a period of

3  time called a term.  So clients can pick that, anywhere

4  between, you know, one-year and five-year.  We don't sell

5  longer than five-year terms at this point in time.

6      And essentially the client is signing up and

7  saying, for a period of time I'm going to license the

8  software.  And that's what this is speaking to here, is

9  those two types of licenses, perpetual and annual.

10  Sometimes we use the term and annual interchangeably.  So

11  forgive me if I do that.

12  Q.  These, of course, are licenses, not purchases.

13  A.  They are licenses.  Absolutely.

14  Q.  Permissions to use.

15  A.  Permissions to use under the contract.

16  Q.  Okay.  This -- is there anything more, I mean, there's

17  other things said here.  Is there anything more of interest

18  from your point of view in describing the FICO pricing

19  methodology that comes out of 2.1.2 or 2.1.2?

20  A.  It does speak to this concept of annual maintenance and

21  support.  So I'm sure this is going to come up, so you

22  might as well cover it.

23      So there's a license to use the software, and

24  then there's a service that FICO offers called maintenance

25  and support.  And it covers two categories, general

**1688**

1  categories of things.

2      One, the product continues to evolve.  We invest

3  it in.  We add new features to it.  Hopefully we don't get

4  defects, but if there are, we fix them.

5      And then we also offer support lines you heard

6  Chris Ivey talk about.  That's what he does, so you can

7  call him and ask for help, ask questions, troubleshoot

8  problems.

9      So the maintenance and support is a service.  You

10  pay for that every year.  And what this section is

11  referring to is how that maintenance is calculated.

12      In perpetual it's ███████ is what is listed

13  here.  You will see later in the section, you can't go

14  below ███████.  It's a negotiated term.

15      And on the annual maintenance, you will see here

16  that at this time it was included in the fee.  Later on we

17  had to separate them out because of our revenue accounting

18  and the way our accounting systems -- our accounting for

19  revenue actually occurs.

20  Q.  Okay.  If we move forward to 2016, was there a standard

21  maintenance percentage at that point?

22  A.  Yeah, things changed throughout the years, but in

23  February of 2015, all maintenance was standardized across

24  all products at ███████, and it was required.  You

25  couldn't get out of it.  You had to buy maintenance.

**1689**

1  Q.  And by -- so we've seen testimony of Blaze Advisor

2  having different versions.  We have the copyright

3  registrations, you know, that started, 3.0 I think, and go

4  forward by many, many verges.

5      If a client wants to be updated or upgraded to

6  the next version of Blaze Advisor, is that a right the

7  client has because it pays for maintenance?

8  A.  If they are paying for maintenance and support and they

9  are current on their payments then, yes, they get access to

10  the new software.

11  Q.  Let's go to then, if it's helpful, but you're the one.

12  I'm looking at 2.2.2, Standard Order Volume Discount

13  Schedules.  Do I have that right?

14  A.  Yeah.  We don't use that.  We -- it was put into this

15  price guide as sort of a way to get clients to buy over

16  time.  Essentially, it's you buy a little bit more now, and

17  little bit later, you buy some more and buy some more.  And

18  over time, we will give you bigger discounts because you

19  buy a lot from us.

20  Q.  Excuse me for a moment.  I think I misspoke to 2.2.2,

21  but it's really 2.2.1?

22  A.  Yeah, 2.2.1.  This is our standard discount schedule

23  for a particular transaction.  So if a client is going to

24  buy software from us, depending on the amount that they're

25  going to spend, there's an allowable discount.

**1690**

1    There's no requirement to discount, but there is
2  an allowable discount.  This gives our salespeople the
3  latitude to request and think in the scope of how much can
4  they actually discount the software.
5    There is authority levels on these different
6  tiers.  So individual salespeople can discount ███████
7  ███████ without asking.  They have to ask their manager to
8  go to ████████, and so on up the line.  You can see here
9  that it's capped at ████████.
10    That doesn't mean we didn't discount more than
11  ████████.  It was just not publicized, and those deals
12  that were above that have to have senior executive
13  management approval.
14  Q.  And is that discounting, what's the practices today
15  with respect to 2.2.1 or in 2016?
16  A.  Yeah.  We don't use this discount schedule anymore.  We
17  haven't use it in a long period of time.  As I mentioned
18  earlier, our discounting practices had changed
19  dramatically over the years.
20  Q.  Is there any use -- I jumped us ahead to 2.2.2.  Is
21  there useful information there in terms of understanding
22  standard pricing methodology?
23  A.  Not really.  As I was saying, this is a, this is an
24  option for discounts over time, and they are lower amounts.
25  Clients didn't really prefer this.  They actually preferred

**1691**

1  negotiating each deal.  So very infrequently did we use
2  this and only early on.
3  Q.  Okay.  Well then let's go to 2.2.3, Marketing Reference
4  Client Discount.
5  A.  Yeah.  We, particularly early on as we're trying to get
6  this business off the ground, we are interested in
7  marketing attribution.  We need clients to stand up and
8  say, hey, yeah, we like this software.  It works well.
9  Create case studies and tell us about what benefits they
10  got from it, press releases, speaking engagements, anything
11  that's marketing related to sort of drum up new business.
12    The easiest way and the best way for us to get
13  business is for our clients to talk to other clients or
14  prospects about how great the software was.  So we would
15  incent clients to say, hey, look, we'll give you ████
16  ████████ additional discount if you actually become a
17  marketing reference.
18  Q.  Is that influence in pricing true as of 2016 to the
19  same extent?
20  A.  We don't really give marketing discounts anymore.
21  That's kind of frowned upon in the industry.  It's sort of
22  like a sort of bribery thing, so we've taken that off.  We
23  still ask for marketing attribution, but we don't give
24  discounts for it, no.
25  Q.  Okay.  Well, should we move to, move to Section 7,

**1692**

1  Blaze Decision Management.
2    So tell us what we need to know from 7.1, the
3  introduction.
4  A.  So at this time there was two separate products, the
5  Blaze Advisor and the Blaze Decision System.  This is a
6  holdout because FICO when they bought HNC had their own
7  sort of rules engine capability called Decision System.
8    So we had clients who were using this, and we
9  cobranded them Blaze, but they were two separate products.
10  Shortly after this, we merged those products, and anybody
11  who was a Decision System customer became a Blaze customer,
12  and all that functionality that was in Decision System
13  became available in Blaze.
14    And what you see underneath that, though is a
15  listing of options.  You have seen some of these already.
16  Q.  Mr. Waid, before we go there, let's -- no.  Stay in
17  this section, but I just want to point out at the first
18  bullet point, Blaze Advisor, which has two components that
19  are sold separately.  And here we have the guidelines
20  talking about Blaze Advisor development, and then Blaze
21  Advisor deployment.
22  A.  That's correct.
23  Q.  Okay.  I just want to tie that back to the license
24  agreement.  All right.
25    So I interrupted you.  You were going to say?

**1693**

1  A.  Yeah.  I was just going to say that you will see these
2  listing of add-on options.
3    The Java code generation high speed processing,
4  you will see it referenced in here as high performance
5  option, today it's called the compile sequential option.
6  It's the same thing, but we support COBOL, Java and C
7  languages.  These are all languages that our clients might
8  want to work with in this sort of compile mode, very
9  separate from the RETE engine that I talked about.  Those
10  are two totally separate things, somewhat of a unique
11  offering for Blaze.
12    You will see reference to XML manager insurance.
13  This is a way of getting application data into Blaze.
14    Most of these, the rest of these options, the
15  scorecard, the reporting module, the rule analyst
16  automation model, the reporting module became standard in
17  Blaze.  We just added them.
18  Q.  We saw in the license agreement with Chubb & Son the
19  platform .NET as well as the platform Java?
20  A.  Yes, those are options as well.
21  Q.  Okay.  So this portion of the pricing guideline ties
22  back to that element of the license agreement.
23  A.  Yes.
24  Q.  Should we go to Section 7.3, does that make sense at
25  this point, for deployment pricing?

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 1, 2023, Volume VIII

**1694**

1  A.  Yeah.  We can talk about it.  I mean, early on we

2  offered an option to license Blaze by the size of the

3  machine, the server machine it was installed on.  So

4  servers have different sizes, and the primary metric at

5  this time for servers, before Cloud and virtual servers

6  came into being or predominantly into being, was the number

7  of CPUs and how many core processing units are on it.

8         The more there are, the faster the machine runs.

9  Basically you can install Blaze on it and run whatever you

10  want on that machine.  That was this licensing model.

11        The only place that this actually took hold was

12  the U.S. Government.  They like to buy this way.  Most

13  clients prefer the named application license price.

14  Q.  Okay.  So then let's go to that named application

15  license 7.4.

16        Can you, as it says, "Business function pricing

17  scopes the use of the deployment license to a single named

18  project or business process within a specified business

19  unit."

20        You have project size, project license fee, and

21  then other categories as you see in this, on the left-hand

22  side.

23        I'd appreciate it if you would walk us through

24  the guiding information at the top of the table and then

25  the table itself.

**1695**

1  A.  Yeah.  So the, the information at the top is

2  delineating the fact that the licenses for deployment, not

3  development, are all based on the scope or size of the

4  business project in question.

5         The latter part actually refers back to how that

6  sizing actually occurs, which there was a more

7  sophisticated way of introducing sizing after 2003, but the

8  last part of this is actually coming back to some of the

9  option pricing that was included on the previous page.

10        The table and the predominant element here is

11  that the table is repeated, but you can see, as I, I said

12  Blaze Advisor and Decision System were separate products at

13  this time, and they merged later.

14        But ostensibly the way that the sizing worked was

15  this concept of, you size the application into small,

16  medium large or very large.  And if it was a small, you go

17  across, your sale price was ███████.  If it was a medium,

18  your sale price was ███████.

19  Q.  And then to be clear, this is before any negotiation.

20  A.  Correct.  This would be our standard pricing.  This is

21  before anybody sat down and tried to get a better deal.

22  Q.  Okay.  I interrupted you, but did you finish?

23  A.  Yeah.

24  Q.  Okay.  And then 7.4.1, Named Application, Business

25  Function Pricing For Blaze Advisor Options.

**1696**

1  A.  Yeah, this is just referring to some of the options

2  that were add-ons.

3  Q.  That we looked at on the prior page?

4  A.  Correct.

5  Q.  So we have looked at 7.4 Named Application, Pricing For

6  Deployment.  And now I guess we should turn to 7.5,

7  Enterprise Business Unit Pricing Guidelines.

8         Would you describe that for us, please?

9  A.  Yeah.  So you've already heard about the fact that we

10  have these named application licenses as one way of buying.

11  Generally speaking, as clients buy more application

12  licenses from us and they spend for money, it becomes

13  easier for them to license an enterprise-wide license.

14        This like is outlined in the contract that you

15  saw, frees up the scope, so you don't have to count how

16  many applications that you have.  It says and is restricted

17  to a scope definition.  Specialty lines business or all of,

18  you know, Chubb & Son, division of Federal, but it's the

19  broad scope.

20        There is a number of factors that come into it

21  that are listed here up front.  We do take into account how

22  many applications you are going to end up buying.  So, you

23  know, if you're a bank, you're going to end up buying lots

24  of applications from Blaze Advisor because you are going to

25  find value for it in a number of places.

**1697**

1         If you are a manufacturing company, you are

2  probably not going to buy a lot of application use from

3  Blaze Advisor.  So those factors are taken into account, as

4  well as a bunch of others, but the core sort of pricing

5  mechanism is in the table.  It's relatively simple and

6  straightforward.

7         If there was a $2 billion entity that wanted to

8  license Blaze Advisor, it would be ██████.  If it was a

9  $4 billion entity, it would be ███████, and so on down

10  the line.

11        Now, this is just the fee for the deployment, and

12  it is a perpetual fee.  And this is the pricing that was in

13  place in 2003.

14  Q.  And again, this is a starting place before negotiations

15  begin.

16  A.  Correct.

17  Q.  Now let's move to 7.6 to understand development seat

18  pricing.

19  A.  So as we discussed and saw in the contract, the license

20  is split into the development seats and the deployment

21  seats.  The development seats are the users that are sort

22  of integrating Blaze and writing rules or doing some kind

23  of technical deployment of Blaze.

24        Ostensibly, and you've seen it in the contract,

25  these are typically linked to the application, or they're

**1712**

1   minutes?  But they would like to know in advance.  Are we
2   willing to do that?
3              MS. GODESKY:  I think generally, Your Honor,
4   unless we're going to have like 15 minutes of argument
5   about the demonstratives, that might get a little tight.
6              THE COURT:  Fair point.
7              MS. GODESKY:  Maybe 45 minutes.
8              THE COURT:  Yeah.  Okay.  We'll figure it out.
9   Tell them 30 to 45 minutes for now.  Go ahead.
10             THE CLERK:  Okay.
11             THE COURT:  And we will be back here at, straight
12  up 9:00.  We will be ready to go.
13                   (Recess taken.)
14
15             THE CLERK:  All rise for the jury.
16                   (Jury enters.)
17
18             (In open court with the Jury present.)
19             THE COURT:  Be seated.  Mr. Hinderaker, you may
20  proceed.
21             MR. HINDERAKER:  Thank you.
22                   (N. WILLIAM PAUL WAID)
23                   DIRECT EXAMINATION
24  BY MR. HINDERAKER:
25  Q.  Good morning.

**1713**

1   A.  Good morning.
2   Q.  We finished yesterday having walked through the pricing
3   guideline, and now I would like to start with the next
4   component of pricing.  And if you would go to the Exhibit
5   0616, please?
6              And, Mr. Mayleben, would you go to slide 2,
7   please.
8              Do you have it there?
9   A.  It's a blank page.
10  Q.  Well, that's not so helpful.  Here is the rest of it.
11  A.  Thank you.
12  Q.  This exhibit -- it's also same the document as 1090,
13  for the record for what it's worth, but this exhibit
14  slide --
15             Not that slide, please.  Slide 3.
16             This exhibit is now on the screen.  And the
17  document that you have in front of you is, what, three
18  pages, correct?
19  A.  Correct.
20  Q.  Yeah.  So the purpose of having this up on the screen
21  is to go through each of the pages and ask you to explain
22  them.
23             But before we go to the pages, if you would put,
24  give us the context of how this document, sizing matrix and
25  the other two pages, relate to what we were speaking about

**1714**

1   yesterday in FICO's standard methodology to derive a fee.
2              MS. GODESKY:  Mr. Hinderaker, I'm sorry to
3   interrupt, but I don't have a copy of this, either.  I just
4   have the blank page.
5              MR. HINDERAKER:  Well, that's not good.
6              THE COURT:  If it helps, if it helps, we can
7   switch to the document camera.
8              MR. HINDERAKER:  1090.
9              MS. GODESKY:  Okay.
10             THE COURT:  Got it?
11             MR. HINDERAKER:  1090 is a better copy.
12             THE COURT:  Okay.
13  BY MR. HINDERAKER:
14  Q.  Yes.  So maybe we'll get started yet.
15             Explain for us, if you will, how this document
16  relates to the guidelines that we went through yesterday.
17  A.  So we talked about application-based pricing.  In order
18  to come up with a standard way of actually having our sales
19  force and our clients understand how we size applications
20  so that they understand what's a small, what's a medium,
21  and what's a large, soon after 2003 when the sales force
22  started growing for this product, we created this chart.
23  And this chart actually shows a billion logics and
24  progressions in order for anybody to size what an
25  application is, small, medium or large.

**1715**

1   Q.  All right.  And now the page that's on the screen,
2   application sizing matrix, if you would describe how to
3   interpret this and how to use it?
4   A.  Sure.  Let's, let's just start with an overview of how
5   to read this first, and then we can double click into some
6   specifics.
7              You will see across the top where it says, small,
8   medium, large and very large.  That corresponds to the
9   application size.  Again, the intent here is just to figure
10  out whether or not if an application is small, medium,
11  large or very large.
12             If you look along the left side of the document
13  from top to bottom, there is ████████ that actually go
14  into determining if it's small, medium, large or very
15  large.  You must meet the minimum criteria in each column.
16  Essentially what that's saying there, that first line, is
17  that if, if all the criteria does not fit in a medium, you
18  cannot be a medium.  If some of the criteria spills over
19  into a large, you must be a large.  If it spills over into
20  a very large, you must be a very large.
21             The first criteria across the top is what we're
22  referring to as ████  And you will see the very first
23  segment of ████ here under small is ████████████
24  ████████████████████████████████████████.  That's the
25  first characteristic.

**1716**

1    The second characteristic is the ████████

2    ████████████████████████████████████

3    ████████████████████████████████████████

4    ████████

5    After that, it says "and."  So they're connected,

6    meaning they both must be true.  You have ████████████

7    ███████████████████ that the rules are actually applied

8    to.  So if you have ██████████████, then you're a small.

9    If you have ██ then you need to move to a medium.

10    After that it says, "and/or."  The reason it says

11    "and/or" is because if we have batch, the following

12    conditions must also be true.  If you don't have batch,

13    then you're just fine with the real-time decisions.  If you

14    don't have real time, but you only have batch, then that's

15    just the batch conditions that apply.  That's why it says

16    "and/or."

17    If you go down to the batch, it talks about the

18    batch in several dimensions.  The first dimension is the

19    ████████████████████████████████████████████████

20    ███████████████████████

21    Just to reiterate what was discussed earlier, but

22    the difference between real-time and batch is if I'm

23    waiting to do something, like I'm online shopping, that's

24    real-time.  You're doing that at that point in time.  An

25    example of batch would be, you fill out your grocery

**1717**

1    deliveries and you ship it off.  Somebody picks that up on

2    the other side and takes care of it.  It doesn't happen at

3    the time that you click the button and all of a sudden your

4    groceries are knocking on the door.  That's the difference

5    between real-time and batch.

6    So in the batch case, it's ████████████████████

7    ████████████████████ Why is that relevant?  It's

8    relevant because if I have 10 million records that I need

9    to process and I take all day to do that, I need lots

10    compute resource.  If I have to process those 10 million

11    records in 15 minutes and get it done, I need a lot of

12    compute.  And that's sort of a measure of the use of the

13    software during that period of time.

14    The next criteria below that is ████████████████

15    ████████████████████████████████████████

16    ████████████████████████████████████████

17    ████████████████████████████████████████

18    Underneath that is actually if it's known, right,

19    ████████████████████████████ Very frequently that's not

20    known, but it's another measure of sizing relative to the

21    application size.  You will see ████████████████████

22    ████████████████████ necessary for Blaze to

23    do its work.  Same concept as the batch.  A lot of records

**1718**

1    in a short period of time, there is a lot of work to be

2    done in a short period of time.

3    Am I going too fast?

4    Q.  Well, thank you for --

5    A.  I just realized that.  I'm sorry.

6    The last one here is ████████████████████████.

7    You might have heard that our RMA for business users is --

8    it's not limited.  So you have to, you have to pay for the

9    development seat, but you don't have to pay for the RMA or

10    the business user interfaces.  ████████████████████

11    ████████████████████████████████████████

12    ████████████████████████████████

13    ████████████████████████ That's eight.  You might

14    ask, Where is the ninth?  It's the bottom row down here

15    where there is ████████████████████

16    ████████████████████████████████████████████

17    ████████████████████████████████████████████████

18    ████████████████████████████████████████████████

19    ██████████████████████████

20    ████████████████████████████████████████████

21    These particular types of hardware

22    are very high-end, expensive.  They process very quickly

23    and, therefore, to measure the value you're getting out of

**1719**

1    the software.

2    Q.  Okay.  Thank you.

3    Now let's go to the next page of this

4    Exhibit 1090.  Now we have -- well, as we all see, there is

5    some dollars under the small, medium, large and very large

6    categories.

7    Would you explain how this applies to the

8    standard FICO methodology?

9    A.  Yeah.  The 2003 pricing that you saw is reflective of

10    what's here with one exception.  The large size pricing in

11    the time of this publication increased from ████████.  We

12    discovered early on that we could get more value out of a

13    large for the use of Blaze Advisor, so we did increase that

14    price at the time of this publication.

15    What happens after this at this period of time,

16    we, we have a quoting process that we follow.  We

17    actually -- in order to explain this pricing, we created a

18    fancy spreadsheet within Excel that takes all these very

19    complicated number of things and puts them in line items so

20    that you can see exactly how the pricing comes out.  And

21    it's transparent.  It shows you all of the pricing, but you

22    just check which one you want and it fills in the total on

23    the left side.

24    This pricing sheet, the sizing grid, and this

25    pricing grid that you see here, this actually gets attached

**1720**

1  to the back of that spreadsheet activity for salespeople.
2  It does not go to the client, but it is part of the
3  workbook that the salespeople use, and this actually
4  reflects the pricing.  So you will see here that there is
5  small, medium, large and very large, and you will see that
6  reflective in the perpetual pricing license of ███.
7  Underneath that you will see the high performance, which is
8  the compiled sequential option.  If you end up buying that,
9  there is an incremental fee for that.
10      And then underneath that, if you remember from
11  yesterday, there is the development seat costs, and they
12  are in those packs of ███.
13  Q.  Why do you price the development seats in these pack
14  levels?
15  A.  It's -- if you, if you look at the unit price that was
16  in 2003, it was ███ per seat.  So if you take █ seats
17  times ███ it's $███  We're offering here for ███
18  If you take ███ times ███ it's ███  We're offering it
19  for ███  We're just giving it a little incentive for the
20  client to buy a little bit more when they're buying.
21      So if they're on the edge and they need, you
22  know, ███ seats, maybe they will just say, ah, I want to
23  go to ███  It's not that big of a jump to go from ███ to
24  ███ if they think they're going to need them.  That's the
25  purpose of it.

**1721**

1  Q.  Okay.  And this -- just to make clarification, at least
2  for me -- the small, medium, large and very large pricing
3  that's on this document and this page, is that also the
4  standard pricing as of today -- or as of 2016?
5  A.  We have not changed it.  It still is the standard
6  pricing.  There were several proposals to change it.  We
7  decided not to.  It is still the pricing today.
8  Q.  Then with respect to -- at the bottom it says,
9  "Deployment license annual maintenance and support."  It's
10  calculated at ███ of net license amount annually.
11      I guess I have two questions.  One is to explain
12  how that's priced against the license fee -- it might be
13  self-explanatory, but if you could detail that out -- and
14  then whether ███ is the percentage that was used in
15  2016.
16  A.  Yeah.  So, first of all, the calculation -- let's just
17  say that we priced a small application.  That's what the
18  client was going to buy.  There was no discount.  So
19  they're paying $███ for it.
20      The maintenance is calculated on top of that fee
21  as ███ of that fee.  So ███ times ███
22  would be roughly $███  $███ paid annually would be
23  that maintenance and support.  That maintenance and support
24  is what gives our clients the ability to download new
25  versions and call us or e-mail us for help, and it's paid

**1722**

1  annually.  The ███ -- this document was created
2  shortly after 2003.  ███ was changed in February of
3  2015 to be ███ across all FICO products, and it
4  became mandatory.
5  Q.  The licensing of maintenance and support became
6  mandatory?
7  A.  Yes.
8  Q.  Okay.
9  A.  The support became mandatory, yes.
10  Q.  And then the fee was standardized across all products
11  at ███?
12  A.  ███.
13  Q.  Let's go to -- let's go to this page of the
14  Exhibit 1090.  Sizing definitions.  If you would go through
15  this with us, please.
16  A.  Yeah.  This is referring back to the words that were
17  used on that sizing grid.  In order to avoid ambiguity or
18  uncertainty about how to read that sizing grid, we provided
19  definitions of terms.  These terms are actually used in
20  that sizing grid, so you need to understand what they mean
21  in order to use the grid.  So, for example, ███, it's
22  the generalized extent ███
23  ███
24  ███ sort of --
25      If the application is going to be used over here

**1723**

1  in a ███, say,
2  ███ that actually brings the scope of use ███.  If
3  that particular application is used to cross just ███
4  ███, say, D&O insurance, then it gets a little bit
5  broader.  Right?  If it's used ███
6  like a ███ then it gets broader.
7  Eventually if you have applications used across ███
8  ███ meaning it's used for purposes of ███
9  ███, then it would be an
10  ███.  That's the definition there.
11      The rest of these terms really refer back to sort
12  of like rule transaction, we mentioned that, any indication
13  of the Blaze Advisor rules server, independent of the
14  number of rules.  Okay?
15      Number of ███.  The total
16  number of ███ that will have access to
17  the application, which is -- which invokes Blaze Advisor
18  rules server.  So it's not about who is using Blaze
19  Advisor; it's about who is using the application in which
20  Blaze is embedded.  These are sort of the definitions of
21  the terms that are used in the sizing grid.
22  Q.  Thank you.  And now with the sizing, I would like to
23  turn to what's in evidence as Exhibit 517.  We can go --
24  oops.  Okay?
25  A.  Don't make this easy.  Okay.

**1724**

1  Q.  All right.  The screen is on, too.

2        So we saw this with Mr. Ghislanzoni's testimony,

3  and it has information regarding the use of Blaze Advisor.

4        Is this, is this kind of information relevant to

5  you as you -- using your standard methodology for pricing

6  of Blaze Advisor?

7  A.  Yes.  It includes several useful pieces of information.

8  Q.  Okay.

9  A.  It specifically highlights here the ▓▓▓▓▓▓ in the

10  first column.  And as you move across, it's ▓▓▓▓▓▓▓▓

11  ▓▓▓▓  ▓▓▓▓  These are the parameters that are in the sizing

13  grid.

14  Q.  I would like to -- what I'm going to ask you now to do

15  is -- we will use the slides, but ask you now to do is to

16  take that pricing matrix, apply it to the information

17  regarding Blaze Advisor's use at the defendants, in terms

18  of going through this pricing analysis.  So explain,

19  explain how that, explain, explain the process, the

20  methodology for pricing, and we will just go through the

21  information on the slide.

22  A.  Well, what we would do is, we would actually pull off

23  the information from this spreadsheet for each of the

24  individual applications identified.  I think what is

25  indicated here is the applications that we would target to

**1725**

1  pull off --

2  Q.  Okay.

3  A.  -- listed from CSI Express, DecisionPoint, Automated

4  Renewal Process, CUW, IRMA, TAPS, Premium Booking,

5  Evolution, Adapt/ABL and EZER.

6        We would also look at the individual countries

7  that are on here.  You will see that most of them are U. S.

8  There is one that is U. S. and Canada.  There is one that

9  is Europe and Australia and then Canada and just Europe.

10  That's where we would start.

11  Q.  Let's go to this step.

12  A.  There is two reasons to pull this information off here,

13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  First of all, ▓▓▓▓▓▓▓▓▓

14  ▓▓  ▓▓▓▓▓▓▓▓▓▓▓▓  is one of the sizing

15  parameters in the sizing grid, as we saw.

16        The other reason for pulling ▓▓▓▓▓▓▓▓

17  ▓▓  ▓▓  is -- and that comes back to the development seats.  So

18  they are priced separately from the small, medium, large,

19  so we will need to know how many developing seats will be

20  needed here in order to perform a pricing exercise.

21        You will see that there is ▓▓▓▓▓▓ for CSI

22  Express.  It's a little unclear here.  There is ▓▓▓▓▓

23  for DecisionPoint.  There appears to be four separate sort

24  of uses of DecisionPoint here broken down.  We will just

25  assume that it's ▓▓▓ because we don't really have clarity

**1726**

1  around that.  Automated Renewal Process, here again, we'll

2  assume it's ▓▓▓ CUW, ▓▓ and so on.

3  Q.  And the next column over, how does that apply to the

4  methodology?

5  A.  This is also in the sizing grid, if you recall.  The

6  ▓▓▓▓▓▓▓▓▓▓ is a parameter that actually determines the

7  size of the application.

8  Q.  Okay.  Let's go to the second page of 517.

9  A.  So you will see at the top here it says real-time.

10  And, remember, there is a real-time and batch and real-time

11  or batch, one of the two.

12        In this particular case, we're, we're getting a

13  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

14  ▓▓▓  We're going to have to do a little math here

15  because the rule sizing grid says ▓▓▓▓.  So we're going

16  to have to take this number and do some math to get to the

17  ▓▓▓▓.

18        Generally speaking, when we get numbers ▓

19  ▓▓▓ because this is -- they operate 7 by 24, but the

20  majority of their -- in sort of these worlds in banking and

21  insurance, they operate on ▓▓▓▓▓▓▓▓.  So we generally

22  use 20 days as the basis to take this number of ▓▓▓▓▓

23  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

24  ▓▓▓▓▓▓▓▓▓▓▓

25        And you will see here that, if you link back,

**1727**

1  you'll see that DecisionPoint has a ▓▓▓▓▓▓▓▓▓▓

2  ▓▓▓ s and so does CUW.

3  Q.  This column, how does that relate?

4  A.  So this is where the batch comes in.  You'll see that

5  this is ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

6  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

7  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

8  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

9  Q.  Okay.  So those are the columns that we've looked at in

10  terms of 517 as relates to your methodology per pricing

11  with the matrix and the sizing.

12        So next go focus in on -- I think you've talked

13  about each of these now.

14  A.  Yes.

15  Q.  So let's apply them, and we'll start off with CSI

16  Express.  I think I'm going to ask you to go through the

17  methodology in detail with CSI Express, and then we'll go

18  through the rest of them without every -- touching base on

19  every step.

20        Here we have CSI Express against your sizing

21  matrix.  And why does -- well, explain, explain that

22  decision.

23  A.  Yes.  CSI Express is actually for the specialty lines

24  of business, so there is multiple lines of business in

25  that, but it is in the division of the specialty line.  So

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)   March 2, 2023, Volume IX

**1728**

1 ███████████████████████████

2 ███████████████████████

3 █████████

4 ███████████████

5 ████████████████████████████

6 ██████████████████████████████ that's

7 a large.

8 ████████████████████

9 A.  So you will see that the █████████████

10 rules.  And if you go to the large, you're capped at

11 ████  Since it's more, you have to move to the next

12 category, which becomes █████████  That actually puts it

13 into a very large at this point in time.

14 Q.  ████████████████████

15 █████████████████████████████

16 █████████████████████████████

17 ██████████████████████████████████

18 ████████████████████████████

19 ████████████████████████

20 ███████████████████

21 █████████████████████████

22 █████████████████

23 ████████████████.  So a relatively small use in batch

24 world.

25 Q.  So overall in the pricing matrix, what's the size that

**1729**

1 you price CSI Express at?

2 A.  Well, it would be sized at a very large.

3 Q.  And we would go back to the earlier sizing sheet that

4 we saw where it puts the price at each of the levels.

5 A.  Yes.  When you take this very large, you can then go to

6 that pricing sheet and figure out what that standard price

7 would be.

8 Q.  Have you done this analysis, then, on each of the, on

9 each of the applications?

10 A.  Yes, that analysis was done across all the information

11 that we had available.

12 Q.  So this is Automated Renewal Processing.  Just to

13 confirm, the process that you used, the steps that you

14 took, were like what you've just described for CSI Express?

15 A.  For each and every one of them, reading the parameters

16 at the top, finding the locations, circling which one it

17 actually fits to, and then whatever the largest one is,

18 that becomes the size.  In this case, Automated Renewal

19 Process is a large.

20 Q.  Okay.  With respect to DecisionPoint, using the matrix,

21 the decision was --

22 A.  Very large.

23 Q.  The next application we have here, Profitability

24 Indicator.  And what did the pricing matrix say with

25 respect to that?

**1730**

1 A.  It's a very large.

2 Q.  CUW?

3 A.  Again, very large.

4 Q.  Premium Booking?

5 A.  Very large.

6 Q.  TAPS?

7 A.  This would be a small.

8 Q.  Applying the same criteria?

9 A.  Yes.

10 Q.  IRMA?

11 A.  This would be a large.

12 Q.  CIS Claims linked to CSI Express?

13 A.  This would be a very large.

14 Q.  DecisionPoint -- we did DecisionPoint.  This is

15 Cornerstone.  Similar?

16 A.  It is similar to what is inside of DecisionPoint.  We

17 are a little uncertain from the information we have here,

18 so we took the more conservative route of actually just

19 calling it a medium, because we didn't have enough

20 information to really justify that it's a large or very

21 large, but what we did know about it, we knew it was at

22 least a medium.

23 Q.  Evolution.

24 A.  This is a very large.

25 Q.  This is the Canadian Evolution.  Broker Site, also in

**1731**

1 Canada.

2 A.  Yes.  This was linked to Evolution and, therefore, a

3 very large.

4 Q.  Let's go to Adapt-ABL.

5 A.  That came out to a large.

6 Q.  Now Evolution in Australia?

7 A.  And that came out to a small.  The reason we went with

8 a small is because it was a pilot application.  It never

9 went into full production use.

10 Q.  EZER?

11 A.  That's a large.

12 Q.  And then Exari that was linked to EZER?

13 A.  That came out to a large.

14 Q.  So we've sized these applications.  Now standard

15 application pricing for FICO, you would apply those dollar

16 amounts to each of the applications.  Small would be at

17 that level, medium, large and very large, as you've

18 explained.

19 Would you explain the difference, please, between

20 the numbers that you have for perpetual license and the

21 numbers that you have for annual?

22 A.  So our pricing practices and policies around annual, if

23 you recall from yesterday where you actually have a period

24 of time that you're licensing the software, is to take the

25 perpetual license and calculate an annual fee from the

**1732**

1  perpetual license.  So we always start with the perpetual
2  license fee.  The conversion of that perpetual license to
3  an annual license is a multiplier of ▮▮▮
4        So you take a small at ▮▮▮▮▮ perpetual.  You
5  multiply that by ▮▮ and you come up with ▮▮▮▮▮ per
6  year.  If you take the medium and you multiply that by ▮▮
7  you come up with ▮▮▮▮ per year.  The large, it's ▮▮▮▮
8  times ▮▮ you end up at ▮▮▮▮▮  The very large at
9  ▮▮▮▮▮ times ▮▮ and you end up with $▮▮▮▮ per year.
10 Those are the license fees annually.
11        Maintenance is on top of that, which is ▮▮▮
12 ▮▮▮▮  So for a small, your maintenance is ▮▮▮  For
13 a medium, it's ▮▮▮▮  For a large, it's ▮▮▮▮  For a
14 very large, it's ▮▮▮▮
15        You add that annual license fee and the annual
16 maintenance fee, and you end up with the annual fee that
17 you pay for a small, medium and large.  The small is
18 ▮▮▮▮  The medium is ▮▮▮  The large is ▮▮ -- I'm
19 sorry -- ▮▮▮▮  And the very large is ▮▮▮▮ per year.
20 Q.  And now that was with respect to deployment license?
21 A.  That is the deployment fees, yes.
22 Q.  Okay.  Separate from that, do you charge for the
23 development?
24 A.  Correct.  That would be the lower chart.
25 Q.  And if you would go through that, please.

**1733**

1  A.  So rather than take you through the individual math as
2  I did before, if we look across the ▮▮▮▮▮
3  ▮▮▮▮▮▮, the annual fee for the ▮▮▮ calculates to
4  $▮▮ per year.  The ▮▮▮ calculates to ▮▮▮ per
5  year.  The ▮▮▮▮ calculates to ▮▮▮ per year, and the
6  ▮▮▮ calculates to $▮▮ per year.
7  Q.  And the conversion between perpetual and annual in this
8  instance is, as well, is the ▮▮▮▮?
9  A.  Yes.  It's the same process.  Perpetual license times
10 ▮▮▮  Then on top of that license fee, you add ▮▮▮▮
11 maintenance.
12 Q.  Well let's, let's see what that looks like.  We're just
13 going to assume a portfolio of applications like what we
14 just described and look at what that, what that would be
15 standard methodology on an annual fee basis.
16        And does this represent the result of that?
17 A.  So, yeah, there is a number of applications listed I
18 see here on the left, which represents the application size
19 to very large all the way down to small.  The annual
20 deployment fee would be coming off of that previous chart
21 we just looked at.  If it's a large, small, medium, that
22 would be where you pull that number from.  The multi
23 platform is not something we've discussed yet.
24 Q.  That's true.
25 A.  So you might remember that in the pricing grid, there

**1734**

1  is this concept of Java and .NET.  It's possible to have
2  two or three different platforms.  So the way our pricing
3  works is you take the deployment fee that you would look up
4  as our standard pricing, and you take ▮▮▮▮▮ of that if
5  you have a second platform.  So if you have Java and .NET,
6  you take the original fee.  ▮▮▮▮▮ of that, that's the
7  second platform.
8        So as represented here is two multi platforms,
9  where the fee for the second platform is ▮▮▮▮▮ of the
10 deployment fee.  And then you see a various number sets of
11 development seats, and those development seats are pulled
12 from the packs that you saw on the previous chart.  And
13 then you just simply do the math and add them up, and you
14 come up with an annual fee for these various configurations
15 of large, very large, medium, small and the associated
16 development seats.
17        In this particular case, you can see those annual
18 fees listed on the far right column.
19 Q.  So the math on this one, $8,690,673 per year?
20 A.  Yes, that would be the total per year.
21 Q.  Does FICO as a standard matter license, on a fixed
22 term, license for less than a year?
23 A.  No, we do not license for less than a year.  We license
24 for ▮▮▮ years.  The most common
25 is ▮▮ years.

**1735**

1  Q.  And with the, with the multi-year annual -- with the
2  multi-year term license, does FICO protect itself at all
3  with respect to inflation?
4  A.  We do.  We generally apply CPI in our contracts.  So
5  we -- as you've seen since 2003, we haven't really changed
6  our pricing from that application size, barring that one
7  large from ▮▮▮▮  That was the only change.  But, you
8  know, things do get more expensive, as we found out very
9  recently in our economy.
10        CPI is an index that's commonly known, consumer
11 price index, and it's used to allow us to go back every
12 year and increase our prices for variable things like, for
13 example, annual fees or maintenance and service.
14 Q.  Was that -- was any consideration given to that in
15 putting together this example of pricing?
16 A.  No, because I'm actually not talking about a contract
17 here.  I'm talking about our standard pricing.  This is
18 just our standard pricing.  So this is for these individual
19 configurations, for these number of development seats, this
20 is what those annual fees would be.
21        I haven't actually put them into a term yet.  I
22 don't know if it's one year, two year, three year or five
23 year.  But eventually if they end up in a contract, they
24 would have a term underneath it that says that it's subject
25 to CPI or consumer price index increases.

**1736**

1  Q.  Let's look at the next slide that assumes some varying
2  terms, varying years, number of years of fixed term.
3         I take it, as this slide, we start with the
4  annual fees that we just looked at.  You've displayed an
5  array of years on this slide?
6  A.  Yes.  It would be helpful if I could just see the
7  previous slide briefly.
8  Q.  Sure.
9  A.  Okay.  Thank you.
10        Yes, it appears these annual fees are carried
11 forward from the previous calculation.  So these would be
12 the fees that would come out from our standard pricing on a
13 yearly basis, an annual basis.  And this exhibit is
14 demonstrating various years from, anywhere from one year or
15 two, four, five, seven and ten years.
16        Essentially for standard pricing you would just
17 simply, you know, take the annual fee times the years and
18 get to our projected total amount of fee that you would
19 pay over that period of time.  Of course, there is no CPI
20 applied to this.  This is just straight math to the years
21 and the annual price.
22 Q.  So with this, these assumptions, this array of
23 possibilities, the math simply is standard annual fee for
24 the fixed terms that we're assuming here, 49,714,705?
25 A.  For these fixed years, yes, that's correct.

**1737**

1  Q.  Now, all of this pricing that we have been talking
2  about from your methodology is annual fees on an
3  application basis.
4  A.  Correct.
5  Q.  Now, FICO does also have a methodology that we saw
6  yesterday in terms of pricing on a fixed term basis, but
7  building from enterprise pricing parameters.  Have I said
8  that correctly?
9  A.  I'm not sure I understand the question.
10 Q.  I haven't said it so well.
11        As a standard matter, when presented with a
12 contract with a fixed term, does FICO approach the pricing
13 of that contract on an application annual basis, as we
14 discussed?  Will FICO approach that process assuming an
15 enterprise construct?
16 A.  I have never seen us approach an annual on an
17 enterprise license.
18 Q.  Is there a business reason for that?  Why?
19 A.  It's more around sort of the history of where our
20 licensing has evolved to.  Early on in the life of Blaze
21 Advisor, we sold a lot of perpetual licenses.  That's what
22 the market demanded.  We were interested in getting the
23 revenues that the larger amounts that came with perpetual
24 licenses upfront.  As time went on, we became less
25 interested in that and the market became less interested in

**1738**

1  buying that way, so it shifted to term-based licensing.
2         We still have perpetual licensing.  We still have
3  annual or term-based licensing, but most of our licensing
4  today is annual.  In 2016 it was a mixed bag, and most of
5  it was still perpetual moving to term, but it was moving
6  and it was moving aggressively, but we have never actually
7  taken an enterprise license and actually made that annual.
8  At least to my recollection, unless I'm missing something,
9  I don't think it's ever been done.
10 Q.  Okay.  Well, with that background, I nevertheless would
11 just like to go through the exercise --
12 A.  Okay.
13 Q.  -- a hypothetical, just assuming you would change --
14 A.  If we did it, you want to talk about the process.
15 Q.  Yeah, I want to talk about the process.
16        So let's go to this slide.
17        Standard Blaze Advisor annual ELA pricing.  And
18 annual because we're dealing with a fixed term.  ELA
19 pricing means Enterprise License Agreement, correct?
20 A.  That's what it stands for, Enterprise Licensing
21 Agreement, yes.
22 Q.  So let's start, and just showing the exercise, this
23 slide is assuming a 35-billion-dollar enterprise.  With
24 that assumption in place, would you explain this process
25 for us?

**1739**

1  A.  Okay.  So assuming it's a 35-billion-dollar
2  organization and it's for the entire organization, all 35
3  billion, not for a piece of it, but the whole thing, the
4  license fees are broken down into the deployment perpetual
5  fee, the multi platform that we discussed earlier, if you
6  have multiple platforms, perpetual fee and then the
7  development license perpetual fee.
8         So for 35 billion -- I'm not going to pull up my
9  price sheet, I can, but I'm not going to pull it up -- we
10 would go to the price grid that you saw and look for 35
11 billion and extrapolate that off of that.  It comes out to
12 about ███████ dollars for that perpetual license.  We
13 would take ██████ of that to get to the multi platform.
14 That would be ██████.
15        The deployment license fees are actually a little
16 more complicated because we have four separate countries
17 here.  That means that you would need to get unlimited
18 development seats for each of the four countries.  So
19 that's, starting at a minimum of ████ per country, times
20 the four countries, is ██████████ for that fee.
21        But you also have two of them that are multi
22 platform.  Typically, we would uplift that if it's
23 unlimited.  If it's not unlimited, we require you to buy
24 both.  If we have three .NET and three Java, you got to buy
25 three and three, six total.  On the unlimited case, we

**1740**

1  would actually just take ███████ of that fee and uplift
2  for that use, in this case two.  That would come out to
3  ███████.  So your perpetual fees would be $10,740,000.
4  That's the standard price.
5  Q.  Can you translate that into an annual?
6  A.  Yes.  So to get that into an annual, cut myself, ██
7  times that 10,740,000.  Your license fee would be
8  ████████████████ of that license fee annually would
9  be ███████.  Combine them together, your annual fee for
10  this enterprise license would be $5,896,260.
11  Q.  And the next slide just assumes a different size
12  enterprise at 3.5 billion.  The process is the same?
13  A.  Process is the same.  You have two big differences
14  here.  One is the size of the organization has now been
15  reduced to one tenth or 10 percent of that, 3.5 billion.
16  You have three countries, and you have one multi platform
17  in that calculation, but you would come up with a perpetual
18  license fee of ███████.  Convert that to annual with
19  maintenance at an annual fee of ███████.
20  Q.  So if we were going to just take these assumptions
21  using our, using the enterprise pricing and reducing it
22  down to the annual fixed fee terms, that's what we're
23  assuming some years here, so at the 35-billion-dollar
24  enterprise, your standard annual fee, if it was five years,
25  it 29,481,300?

**1741**

1  A.  That's correct.
2  Q.  And under the other exercise of an enterprise a tenth
3  the size, 3.5 billion, we're assuming on this side six
4  years, so the math is 10,013,760?
5  A.  That looks right, yes.
6  Q.  Okay.  And so we have two different fixed term examples
7  based upon that pricing approach.
8       Now, this is, this is -- you know, we've
9  concluded FICO pricing methodology.  We haven't started any
10  negotiations with the licensee at this stage?
11  A.  That's correct.  This is just our standard pricing.
12  Q.  Now, would you just share with us the experience that
13  you have had in terms of negotiating with the licensee for
14  fixed term licenses?
15  A.  The extent of that?
16  Q.  Not all of it, but we're going to take two different
17  assumptions, if you will.  The first assumption I would
18  like you to take and explain your experience is, assume a
19  contract with the client has come to an end and the client
20  wants to negotiate a new contract for a fixed term.
21       I would like to, if you would, what are the
22  factors that in your experience have played into the
23  negotiations that affect the price of the license fee?
24  A.  Well, the first thing I would ask is, it's a fixed
25  term, and at the end of that term, the relationship ends?

**1742**

1  Q.  Let's assume that.
2  A.  Okay.  That's very different.  It's material and
3  important in the discussions.
4  Q.  Understood.
5  A.  In a fixed term negotiation where the relationship is
6  not going to go any further, the biggest factor is, that's
7  the extent of my relationship with that client.  I'm not
8  looking beyond.  I don't have a long-term value proposition
9  with this client where I'm getting more services, more
10  maintenance, more product sales.  I am just negotiating for
11  a period of time, and then they're going to stop using it.
12       That's actually reflected in this chart in two
13  different avenues here, right?  So if I'm not going to sell
14  anything more to this client or the client doesn't use
15  other Fair Isaac products or FICO products, then that has
16  an upward pressure on my negotiation.  I'm going to remain
17  firm.  This is my one opportunity to negotiate value out of
18  the use of my software.  I don't have an opportunity after
19  this.
20  Q.  Take -- what are the assumptions under which there
21  would be -- the licensee would be able to put pressure on
22  you to reduce your price?
23  A.  Yeah.  So the licensee, conversely, would not want to
24  be paying larger fees for the software.  They're going to
25  want a lower fee.  And what they have working for them is

**1743**

1  how easy is it for them to turn off the software, how
2  quickly can they turn off that software.  Right?  So if
3  it's relatively easy and they can turn it off immediately,
4  they're in a very strong negotiating position for price.
5  They can just say, you know what, no, I'm not paying that,
6  we'll turn it off, I'm done.  Conversely, if they're in a
7  position where they can't turn that off, then they're going
8  to want to negotiate to other terms.  And the most logical
9  one that they would go to is a shorter period.  I'm going
10  to get off of you as soon as possible because I'm not going
11  to pay those kind of fees.
12       So this is sort of a push/pull of a negotiation,
13  right, because the longer they stay on the software the
14  more value we're going to extract out of that negotiation.
15  So it really comes down to a measure of, well, what is the
16  term, right, and of that term what are we actually going to
17  negotiate from a deviation or a discount off of that
18  standard pricing.
19       So, generally speaking, the first year or two,
20  there is really little incentive for us to discount.  It's
21  going to take at least a year, if not two, for clients to
22  move from a position of using the software to not using the
23  software.  If they actually want to extend that to ████
24  ████ years, we would sort of back off of that list
25  price.  We would start discounting.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 2, 2023, Volume IX

**1744**

1    To sort of put a set of parameters around that,
2    you know, if you're at a ███████ period of time, a
3    ███████ ████ on that would be essentially, I'm going to
4    sell you a ████████ and give you the ████████ for
5    free. So I wouldn't go that far. I would pull back into
6    something more like the ████████ kind of range. That
7    would be where I would go with that. If they wanted to
8    extend to ████ maybe I would bump that ████████, maybe a
9    ████ higher than that, depending on the circumstances, but
10   it really depends on a number of these factors here.
11   But the primary driver is, Do I have future
12   business? Do I have current business. That's the biggest
13   thing from the licensor side. And then the term. But what
14   is offsetting that from the licensee side is, look, I don't
15   need that, so I'm not going to pay that. Therefore, I'm
16   going to take extra effort to not pay that. And those are
17   predominantly driven by the scope of use, how quickly can
18   they get rid of it or turn it off.
19   Q.  Okay. Then let's take the other assumption, that there
20   is a future with the client. How does that different
21   assumption affect the negotiating tactics and pressures
22   that you can apply or that the licensee applies against
23   you?
24   A.  In the new business, well, probably the biggest
25   contributor from our perspective to where we bring the

**1745**

1    price point into, and actually also in this case the
2    licensee is, what is the long term value to FICO, how much
3    business are we going to do with this client? We saw that
4    previously on the transition side. It plays into the new
5    business side equally and actually maybe even more so than
6    in the previous scenario of a fixed period of time.
7    We have a number of clients that buy a lot of
8    products from us, and they carry a lot of weight with us.
9    When they speak, we listen. And so the number of products
10   in the revenue stream we have from a particular client has
11   a big factor; and if they come in and demand more discount,
12   we pay attention. We negotiate, but we pay attention.
13   If, equally, you know, there is a large number of
14   opportunities on that table of sales that we can see coming
15   from this client, we're going to pay attention, and we're
16   going to be a little more flexible in our price. In
17   particular, this has to do with not just what it is today,
18   but what it is five years from now. It matters. We have a
19   lot of our clients today who are negotiating much bigger
20   contracts with us on our new stuff, which is, we want to
21   retain those customers.
22   Another factor is the size of the transaction.
23   Very clearly, you know, you've seen that in the pricing
24   guide, sort of the more you buy, the more you're allowed to
25   discount. And it's, it's true across pretty much anything

**1746**

1    that you negotiate in life. The more you buy, the more
2    pricing leverage you have. You're going to get a bigger
3    discount.
4    If you offer reference in case studies, you know,
5    we're going to be a little more sensitive to the price. We
6    don't actually include a particular discount for this; but
7    if you're going to do it, we would be a little more
8    sensitive around what we actually price to and negotiate
9    to. And duration. Duration does play a factor in the
10   business, it's less so here because we're looking at a
11   long-term relationship. If you want a contract with us for
12   two years, fine; one year, fine; five years, fine; but the
13   anticipation is that there is business coming from you
14   after that.
15   Q.  Good. Let me show you the last slide that we have.
16   And I think it's trying to put those two considerations or
17   two scenarios, better said, that you just described. And
18   what do you intend to convey by this slide?
19   A.  I think it's reflective of scale of where we would go
20   with discount. So as I mentioned before, if I'm
21   negotiating a fixed term and that's the extent of my
22   relationship, then I'm less inclined to go to higher
23   discounts because I'm extracting the full value of that
24   negotiation from that one transaction and that one period
25   of time.

**1747**

1    If I'm -- so I would limit it. You know, you
2    talked about ████████ kind of discounts. That's
3    typically what I would see in these scenarios. But if I
4    went further down discounting for new business, yeah, maybe
5    I'd go to ████████. It's possible. It depends on
6    the circumstances. So this chart just represents a
7    relative scale there of how far we would go in a
8    negotiation.
9    MR. HINDERAKER:  Mr. Waid, thank you for your
10   time.
11   MS. GODESKY:  May I proceed?
12   THE COURT:  You may.
13   MS. GODESKY:  Thank you.
14   CROSS EXAMINATION
15   BY MS. GODESKY:
16   Q.  Good morning, Mr. Waid.
17   A.  Good morning.
18   Q.  My name is Leah Godesky and, I represent the defendants
19   in this case. And you know that because you have been
20   sitting here in court with us since the beginning of trial,
21   right?
22   A.  Correct.
23   Q.  You previously sat for two depositions in this case
24   back in 2019, correct?
25   A.  Yes.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                                              March 2, 2023, Volume IX

**1772**

1  Section 3.1 of the contract we cannot let DWS have any
2  access to Blaze, right?  You didn't say that.
3  A.  I did not, no.
4  Q.  You were fine with the idea that FICO would continue to
5  be responsive, correct?
6  A.  I was fine that we would continue to be responsive,
7  yes.
8  Q.  And DWS wasn't sneaking around and trying to hide that
9  it was accessing Blaze, right?
10 A.  Absolutely not.
11 Q.  We saw that folks were e-mailing FICO from at DWS.com
12 e-mail addresses, right?
13 A.  Absolutely.
14 Q.  And they were joining FICO in chat rooms and
15 identifying themselves openly, correct?
16 A.  Absolutely.
17 Q.  Okay.  We can take that down.  Thank you.
18        Now I want to talk about pricing of Blaze
19 licenses.  Okay?
20 A.  Okay.
21 Q.  And as we discussed earlier, you understand that FICO
22 is suing Federal for breach of contract in this case,
23 right?
24 A.  I'm not a lawyer.
25 Q.  But, you know, you went through all those contract

**1773**

1  provisions with Mr. Hinderaker yesterday because you
2  understand there is a claim in this case that Federal
3  breached Section 10.8, right?
4  A.  I think the lawsuit is much bigger than just the
5  breach, but I'm not a lawyer.
6  Q.  But you understand there is a breach claim, right?
7  A.  I understand that there is a copyright claim, and I
8  understand that there is a use claim, yes.
9  Q.  And you told me a few minutes ago when we started this
10 examination that you also understood FICO is suing for
11 breach of 10.8, the assignment provision, right?
12 A.  We, we terminated the agreement because of 10.8.  I
13 don't know about this suing for.  I wasn't part of the suit
14 filing, so I can't comment on what we sued for.
15 Q.  Okay.  Fair enough.  So do you generally understand,
16 Mr. Waid, that the idea here is that if FICO proves a
17 breach of contract, it's asking for damages in the form of
18 lost license fees.  Do you generally understand that?
19 A.  Oh, yeah, that I understand.
20 Q.  Okay.  And that's why we're talking about how FICO
21 prices Blaze licenses?
22 A.  That's correct.
23 Q.  It goes to the damages claim, right?
24 A.  Well, the jury gets to decide what that is.  I'm just
25 providing pricing.

**1774**

1  Q.  Right.
2  A.  Our standard pricing.
3  Q.  Relative to damages?
4  A.  Yes.
5  Q.  Okay.  I'd like to take a look at P517.  This is one of
6  the documents you just looked at with Mr. Hinderaker.
7        And you walked through some of the information in
8  this chart of Chubb use of Blaze, right?
9  A.  Correct.
10 Q.  And you were using it in the context of talking about
11 how you do application-based pricing at FICO, right?
12 A.  Sizing.
13 Q.  Sizing.  And this document is something that FICO
14 received in litigation in 2018 or 2019, right?
15 A.  I'm not sure when it was received.
16 Q.  But you understand it was received as part of the
17 litigation?
18 A.  It was post termination, so yes.
19 Q.  Okay.  When potential customers are negotiating a Blaze
20 license and the pricing, you don't typically have all of
21 this detailed information, right?
22 A.  No, we don't.
23 Q.  No.
24 A.  Typically we have less information, yes.
25 Q.  You generally don't know how many ▮▮▮▮▮▮ and

**1775**

1  ▮▮▮▮▮▮ is running in your software when you're
2  negotiating pricing?
3  A.  We have a better understanding of ▮▮▮▮ but
4  ▮▮▮ is tough.
5  Q.  You don't know like ▮▮▮▮
6  ▮▮▮▮▮▮, right?  They don't usually turn that over?
7  A.  That's one of the stronger metrics we usually get,
8  yeah.
9  Q.  But you can agree, Mr. Waid, you don't get this level
10 of detail from every customer you're negotiating with?
11 A.  I already agreed to that, yes.
12 Q.  And in fact, you didn't know how Chubb was using Blaze
13 until 2018, 2019 when you received this as part of the
14 litigation, right?
15 A.  I didn't know the full extent of what Chubb was using
16 until I got the proposal letter in February.
17 Q.  And usually you're mainly pricing off of publicly
18 available information, right?
19 A.  Oh, no.  We actually get the information directly from
20 the client.  We take it at face value that they're acting
21 in good faith, and we use that information.
22 Q.  You actually technically have the information that --
23 A.  Yes, we do.  Yeah, yeah, yeah.  For the enterprise
24 licensing.  Sorry.  Yes.
25 Q.  Okay.  Now, as you established with Mr. Hinderaker --

**1812**

1  is already in evidence as Defendants' Exhibit 4.
2       Do you know, Mr. Waid, ███████ is a bank
3  holding company.  Does that sound right?
4  A.  Yeah.
5  Q.  And they were acquired by ███████?
6  A.  Eventually, yes.
7  Q.  Okay.  We'll just wait for D4 to come up on the screen.
8       No problem.
9       Okay.  We have D4, and if you look at the top,
10  Mr. Waid, this is a copy of the Blaze license agreement
11  that FICO executed with ███████ in 2005, correct?
12  A.  Correct.
13  Q.  And I want to look at page 8 where we can see the term.
14  Do you see it says, "████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████ right?
18  A.  Correct.
19  Q.  So this is a perpetual license like Chubb's.
20  A.  Correct.
21  Q.  And then if we could go to page 13 of the document and
22  look at Exhibit A, we can see that FICO charged ███████
███████ for a perpetual
24  enterprise-wide license, correct?
25  A.  That is correct.

**1813**

1  Q.  And that covered deployment and development, right?
2  A.  Correct.
3  Q.  And since this is an enterprise-wide license, you would
4  have signed off on it.
5  A.  I more than signed off it.  I negotiated this one.  I
6  will never forget this contract.
7  Q.  Does it sound right, Mr. Waid, that ███████ had █
8  ███████████ as of the time you were
9  negotiating this license?
10  A.  It's around the there.  It's a long time ago.  I don't
11  remember, but it's around there, I'll concede, ███████
12  Q.  So you will concede that ███████ had about ███████
███████████████ , give or take, and FICO sold an
14  enterprise-wide perpetual deployment and development
15  license for ███████████?
16  A.  In 2005.
17  Q.  Okay.  Let's move on to 2007.  I want to take a look at
18  a Blaze license agreement that FICO entered with ███████
19  and ███████ is a large department store chain that we all
20  know and love, right?
21  A.  Correct.
22  Q.  This is Exhibit D284.
23  A.  I'm there.
24  Q.  Okay.  And if we turn to page 6, which is Exhibit B,
25  you can see if we can blow up that chart, this states that

**1814**

1  the license is perpetual for development and deployment,
2  right?
3  A.  That's what it says.
4  Q.  And the scope is defined as use solely within client's
5  ███████████ , right?
6  A.  That's what it says, yes.
7  Q.  So this is not an enterprise-wide license.
8  A.  It is not, no.
9  Q.  Right.  Let's go to page 5.  And if we go to Section
10  5.4 of Exhibit B on page 9, sorry, do you see there is a
11  section called Enterprise License Option?
12  A.  Correct.
13  Q.  So it says, "██████████████████████████████
██████████████████████████████████████████
██████████████████
16  A.  Correct.
17  Q.  Do you see that?
18  A.  Yes.
19  Q.  And then if you look at subparagraphs A and B below,
20  the ultimate total price that ███████ would pay for an
21  enterprise-wide license if it wanted to convert would be
22  ███████████████ , right?
23  A.  One month after Chubb signed, yes.
24  Q.  And does it sound right to you that ███████ had more
25  than 50 billion dollars in revenue as of this time period?

**1815**

1  A.  Wouldn't surprise me at all.
2  Q.  Let's look at Defendants' Exhibit 283, which is a
3  contract with ███████
4       Are you with me, Mr. Waid?
5  A.  283, yes.
6  Q.  And if we could go to page 13, this is defining the
7  scope and price of the original agreement with ███████
8  right?
9  A.  In 2005, yes.
10  Q.  It was not an enterprise license.  It was limited in
11  scope, correct?
12  A.  Correct.
13  Q.  I want to take a look at the addendum to this contract,
14  which we can find at page 34, and this chart, Mr. Waid,
15  shows that the license as of March 29th, 2007, had been
16  expanded to perpetual enterprise-wide, right?
17  A.  That is correct.
18  Q.  For both development and deployment, correct?
19  A.  Correct.
20  Q.  And the total price listed at the top right of this
21  chart is $███████ correct?
22  A.  Correct.
23  Q.  And then there was a credit to ███████ for prior license
24  fees that they had already paid.
25  A.  Correct.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                        March 2, 2023, Volume IX

**1816**

1  Q. And so the final net license fee for this perpetual
2  enterprise-wide Blaze license was about ███
3  A. Correct.
4  Q. Does it sound right to you that ███ revenue around
5  this period of time was about 14 billion?
6  A. It does not.
7  Q. Okay. Let's look at in your binder next to you, I have
8  a set of 10-Ks. Let's take a look at Defendants'
9  Exhibit 309.
10 A. Okay.
11 Q. And if you go to page 9.
12 A. Page 9. I'm there.
13 Q. Does that refresh your recollection, Mr. Waid, about
14 --
15 A. This is worldwide?
16 Q. They had 14 billion dollars in worldwide revenue as of
17 2006, correct?
18 A. Yes, but this is U. S. grant.
19 Q. What was the revenue for U. S.?
20 A. I don't know.
21 Q. Next I want to look at ███ This is Defendants'
22 Exhibit 293, and ███ we all know it's a big national
23 chain, right?
24 A. Colossal.
25 Q. Colossal. And if we turn to page 17, we can see the

**1817**

1  summary of this license agreement, and the price for this
2  Blaze license was ██████████, correct?
3  A. It is ██████████, yes.
4  Q. And that included unlimited development seats, correct?
5  A. Correct.
6  Q. And it was perpetual and enterprise-wide, correct?
7  A. Correct.
8  Q. And does it sound right that ███ had tens of billions
9  of dollars of revenue around this time period?
10 A. ███ did, yes.
11     MS. GODESKY: And just for clarity of the record,
12 Your Honor, defendants do offer D293, which is the
13 license agreement, and D283, the ███ agreement in
14 evidence.
15     MR. HINDERAKER: Subject to your Court's order,
16 Your Honor.
17     THE COURT: Subject to the Court's order, 283 and
18 294 are received.
19     MS. GODESKY: I will add 284 for ███
20     THE COURT: Same. 284 is received subject to the
21 Court's limitation.
22     MS. GODESKY: Thank you.
23 BY MS. GODESKY:
24 Q. And then if we could take a look at Defendants'
25 Exhibit 276, which is a license agreement with ███ the

**1818**

1  ██████████, correct?
2  A. One second: Correct.
3     MS. GODESKY: And defendants offer D276 into
4  evidence.
5     MR. HINDERAKER: Haven't gotten there yet, but
6  subject to the same.
7     THE COURT: Subject to the Court's order, D276 is
8  received.
9  BY MS. GODESKY:
10 Q. And, Mr. Waid, if we look at page 15, we will see our
11 summary chart of the Blaze license terms, and here we have
12 an enterprise perpetual deployment and development license
13 for ███ on the deployment side and a little over ███
14 on development, correct?
15 A. Correct.
16 Q. Okay. Now I want to take a look at Exhibit D343, and
17 this is not yet in evidence.
18     This is a February 27th, 2007, e-mail regarding a
19 ██████████ Blaze ELA pricing proposal. Do you see that,
20 Mr. Waid?
21 A. I see that, yes.
22 Q. And you are copied on this e-mail, correct.
23 A. I am indeed.
24 Q. The e-mail comes from a Ms. Karen Beale, and she is at
25 FICO?

**1819**

1  A. She was.
2  Q. And it's sent to Mr. Vincent Gamba at ██████████,
3  right?
4  A. That's what it says.
5     MS. GODESKY: Defendants offer D343.
6     MR. HINDERAKER: No objection.
7     THE COURT: D343 is received.
8  BY MS. GODESKY:
9  Q. Now, the first paragraph of this e-mail says, "FICO is
10 extending an incentive proposal for a Blaze Advisor ELA at
11 ██████████., to be executed March 26th,
12 2007."
13     Do you see that?
14 A. Are you on the first page or second page? Where are
15 you at?
16 Q. I am in the first sentence?
17 A. Correct.
18 Q. And then if you turn to the second page, a little more
19 than halfway down, there is this header, Incentive Proposal
20 For Enterprise License, right?
21 A. Correct.
22 Q. And this was an enterprise license for the ███
23 ███ region?
24 A. That's what it says.
25 Q. And the proposed price was ████ dollars?

**1820**

1  A.  And that's the proposed price, yes.

2  Q.  And that reflected a ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

3  ▇ ▇▇▇▇▇▇▇ right?

4  A.  That's what it says.

5  Q.  And you would have approved it because it's a big

6  discount, right?

7  A.  I wouldn't have approved the ▇▇▇▇▇▇.  Somebody else

8  had to do that.

9  Q.  Might have been your boss?

10  A.  Probably.

11  Q.  Okay.  And then let's look at another e-mail like this,

12  which is Defendants' Exhibit D12.  You're familiar with the

13  company ▇▇▇▇▇, Mr. Waid?

14  A.  Yes, I am.

15  Q.  It's a credit card company, right?

16  A.  They do more than that now, but yes.

17  Q.  And this is a March 1st, 2006, e-mail from David

18  Burgess to ▇▇▇▇▇, correct?

19  A.  David Burgess.

20  Q.  And David Burgess is a FICO employee?

21  A.  At this time, yes.

22  Q.  And he's e-mailing ▇▇▇▇▇▇▇▇▇?

23  A.  He is, yes.

24          MS. GODESKY:  Defendants offer Exhibit D12 into

25  evidence.

**1821**

1         MR. HINDERAKER:  No objection.

2         THE COURT:  D12 is received.

3  BY MS. GODESKY:

4  Q.  I want to take a look at what Mr. Burgess says.  He

5  says, "Our product management team has determined that the

6  Blaze Advisor ELA value for ▇▇▇▇▇▇ is a little over 9

7  million dollars," right?

8  A.  ▇▇

9  Q.  ▇▇

10  A.  It says ▇▇ here.

11  Q.  Thank you. ▇▇  And then if you scroll down, there is

12  a proposal for an ELA at ▇▇▇▇▇.

13  A.  No, that's not correct.  The proposal is for ▇▇▇

14  ▇ ▇▇▇▇▇▇

15  Q.  ▇▇▇▇▇.  That's the proposal.

16  A.  Correct. And then there is credits for what they have

17  already paid, which brings the net due to ▇▇▇

18  Q.  Okay.  So this is a proposal for ▇▇▇▇▇ dollars

19  for an enterprise license for ▇▇▇▇▇?

20  A.  In 2006, correct.

21  Q.  Okay.

22         Now, we can take that down, Vanessa.  Thank you.

23        Mr. Waid, you are quite familiar with your more

24  than 20 years of work at FICO with these contracts that the

25  company enters into for Blaze, right?

**1822**

1  A.  I am, yes.

2  Q.  And we've seen that FICO regularly does business with

3  very large companies?

4  A.  We do business with very large companies, yes.

5  Q.  You have access to all those contracts that FICO enters

6  into for Blaze Advisor software, right?

7  A.  What do you mean "access"?

8  Q.  You have access to a lot of them at work, right?

9  A.  I'm not sure I understand the word "access."  You mean

10  can I get to them?

11  Q.  Sure.

12  A.  Yes, I can get to them.

13  Q.  We walked through a few of them, ▇▇▇▇▇▇▇

14  ▇▇ ▇▇ and other big companies, right?

15  A.  Yes.

16  Q.  We've seen the license fees and we've seen the 1.3

17  million that was charged to Chubb in 2006, right?

18  A.  Correct.

19  Q.  And I get the sense that you're trying to suggest that

20  pricing has changed since the mid 2000s when Chubb signed

21  its Enterprise License Agreement, correct?

22  A.  No.  I'm saying that discounting has changed.

23  Q.  Discounting has changed.  So pricing is generally the

24  same.  It's just discounting has changed?

25  A.  Yeah.  The models have shifted from perpetual to term

**1823**

1  annual, and we've moved away from ELAs.  That's another

2  change, but the actual model, no, not changed.

3  Q.  Okay.  Vanessa, if we could pull up the slide deck that

4  Mr. Waid used with Mr. Hinderaker and go to slide 29.

5        So you walked through this calculation with

6  Mr. Hinderaker of a hypothetical customer using Blaze in

7  various computer applications, right?

8  A.  Correct.  Yes.

9  Q.  And the total here is almost 50 million dollars, right?

10  A.  It is, yes.

11  Q.  And you have access to a lot of Blaze license

12  agreements at FICO, but you haven't identified any license

13  agreement with any customer anywhere where they paid 50

14  million dollars to access Blaze, correct?

15  A.  You have to take into the account the years here as

16  well.  Let me do the math real quick.  It's easier to do it

17  on an annual basis, so it would be hard for me to answer

18  that question.

19        Annually I can answer it off the top of my head,

20  but this is hard because it's duration.

21  Q.  When you walked through your direct examination with

22  Mr. Hinderaker, you didn't show us any Blaze license

23  agreements with other customers, right?

24  A.  No.

25  Q.  You just showed us the hypothetical calculation on page

**1824**

1  29, correct?

2  A.  No.  I showed you my standard pricing.

3  Q.  Right --

4  A.  This is my standard pricing.

5  Q.  Your standard pricing on slide 29, 50 million dollars,

6  correct?

7  A.  For these applications at this size with those number

8  of dev seats for those years, correct, that is standard

9  pricing.

10  Q.  But you were not able to bring a single license

11  agreement to trial showing a single customer ever paying 50

12  million dollars to access Blaze, correct?

13  A.  No.

14  Q.  And you also didn't bring a single contract to trial

15  showing a customer ever paying 40 million dollars to access

16  Blaze, correct?

17  A.  We did not bring -- the easy answer is no, we did not

18  bring anything to trial, yes.  That's correct.

19  Q.  And you don't have a contract you can show the jury

20  where a customer paid 20 million dollars to access Blaze,

21  right?

22  A.  I don't know about that.

23  Q.  But you haven't shown them, correct?

24  A.  We have not, no.

25  Q.  So let's talk about your standard pricing on slide 29.

**1825**

1  Let's leave it up, Vanessa.

2       Your standard pricing hypothetical here on the

3  screen assumes that Blaze is in use in 17 applications,

4  correct?

5  A.  This scenario?  Correct, 17.

6  Q.  But with your 20 years of experience at FICO, you

7  cannot identify a single company that ever entered into an

8  application based license for Blaze for even 15

9  applications, right?  That's never happened.

10  A.  That's not true.

11  Q.  I want to look at your deposition testimony from April

12  2nd.  And I'm looking at page 77.

13       Are you with me, Mr. Waid?

14  A.  I'm there.

15  Q.  You were asked at line 3, "Question:  Now in section 11

16  of your declaration," and a declaration is a sworn

17  statement under penalty of perjury, right?

18  A.  Yes.  Correct.

19  Q.  Okay.  "In section 11 of your declaration, you,

20  Mr. Waid, say, 'To my knowledge, a FICO licensee has never

21  entered into a license agreement for the use of Blaze

22  Advisor software on an application basis with 15 separate

23  applications; is that accurate?"

24       And your answer, "Yes," correct?

25  A.  At the time, yes.

**1826**

1  Q.  And that's because as we discussed earlier, generally

2  when a customer uses Blaze in more than three or four

3  applications, FICO's practice is to offer an

4  enterprise-wide license, correct?

5  A.  That is correct.

6  Q.  And this 49 million dollar number is not only based on

7  individual licenses for 17 different computer applications.

8  It also applies annual license fees to each application,

9  right?  That's what you have done with your math.

10  A.  That is correct, yes.

11  Q.  So your calculation starts with a 3.9 million dollar

12  fee to use Blaze in a single, very large computer

13  application for five years, right?

14  A.  For five years, correct.  Yes.

15  Q.  You don't have a contract where a customer ever agreed

16  to pay almost 4 million dollars to use Blaze for just five

17  years, correct?

18  A.  Actually, I have one for four.

19  Q.  You don't bring that here, right?

20  A.  It's not in the trial, no.

21  Q.  And then your math goes on.  Then it's a separate 2.4

22  million dollars to use Blaze in a large computer

23  application, but only for five years, right?  That's the

24  math.

25  A.  That's correct.

**1827**

1  Q.  Then another 2.8 million dollar fee for another

2  separate computer application, only for five years, almost

3  3 million dollars, correct?

4  A.  That's correct.

5  Q.  And this math goes on and on, and that's how you get to

6  this 50 million dollar figure, correct?

7  A.  That's our standard pricing, yes.

8  Q.  Mr. Waid, almost all of these individual entries on

9  your chart on slide 29 are higher than the 1.2 million

10  dollars you suggested FICO charge for an enterprise-wide

11  perpetual license to use Blaze at Chubb, right?

12  A.  I did not say that.

13  Q.  We saw your e-mail correspondence with Mr. Haines,

14  right, where you were all talking about proposing a license

15  agreement to the Chubb Group of Insurance Companies,

16  correct?

17  A.  The e-mail did not say that it was 1.6 million for the

18  enterprise group of Chubb.

19  Q.  We all saw the e-mail conversations with you and

20  Mr. Haines and Mr. Layden and you're all talking about

21  enterprise-wide license for Chubb in the ball park of 1 to

22  2 million dollars.  That was the price, right, not 50

23  million?

24  A.  Which enterprise?

25  Q.  These numbers all dwarf the enterprise-wide perpetual

**1828**

1  licenses that we saw for ▇ and ▇ and ▇ and what
2  was offered to ▇▇▇ and what was offered to
3  ▇▇▇, correct?
4  A.  **It does, yes.**
5  Q.  And all of these numbers dwarf the approximately 1
6  million dollars that we know from Mr. Ghislanzoni that
7  Chubb paid to access Red Hat Decision Management software
8  in 2019 and 2020 for the Chubb enterprise, right?
9  A.  **I can testify to the fact that it's more than a**
10 **million.  I can't testify to the rest of your statement.**
11 Q.  And it's a lot more than a million dollars that Chubb
12 paid for a replacement rules software license, right?
13 A.  **If that's what you paid, yes.  It's a lot more money.**
14         MS. GODESKY:  Thank you, Mr. Waid.  I have no
15 more questions.
16         THE COURT:  Just letting Members of the Jury
17 know, we'll go until about 12:30.
18         MR. HINDERAKER:  All right.  Where to begin.
19             REDIRECT EXAMINATION
20 BY MR. HINDERAKER:
21 Q.  Mr. Waid, let's begin by, I gave you a binder, and in
22 that binder is Defendants' Exhibit 172.  Let's start there.
23 A.  **Okay.**
24 Q.  Thank you.  Just trying to grab the date off of this.
25 This is dated July 1, 19 -- 2019.

**1829**

1  A.  **Correct.**
2  Q.  And let's talk about, this is, this is a term license.
3  I'll give you a moment to orient yourself, myself, too.
4  A.  **It is a term license, yes.**
5  Q.  And for how many years?
6  A.  **Five years.**
7  Q.  And the scope of the use is for what?
8  A.  **It's for named application.**
9  Q.  For a named application?
10 A.  **Correct.**
11 Q.  One?
12 A.  **One.**
13 Q.  And what is the total fee that ▇▇▇▇▇
▇  ▇▇▇▇▇▇▇▇▇▇▇▇
15 A.  **The license was** ▇▇▇▇**.  Total is** ▇▇▇▇**.**
16 Q.  ▇▇▇, one application for five years, correct?
17 A.  **Correct.  That total doesn't total the full amount of**
18 **the five years.  There is actually another** ▇▇▇
▇  ▇▇▇▇▇▇▇▇▇▇▇▇▇
▇▇▇▇▇▇▇▇▇▇▇▇▇
21 Q.  4.3 million.
22         Your Honor, I offer the Exhibit D172.
23         MS. GODESKY:  No objection.
24         THE COURT:  D172 is received.
25 BY MR. HINDERAKER:

**1830**

1  Q.  So I didn't catch the total.  When you add all the
2  elements, it was what?
3  A.  **I'm doing it in my head.  It's not the best, not the**
4  **best way to do it, but it's about** ▇▇.
5  Q.  For the five-year term.
6  A.  **That could be off.**
7  Q.  Got it.  You were asked --
8         Well, let me go to, let me go to the Exhibit 276,
9  and I think this is one that you were asked about with
10 ▇▇▇
11 A.  **Correct.**
12 Q.  And this, now this, this exhibit is November 11, 2010.
13 A.  **Correct.**
14 Q.  And you see that it is a, if you would give me the
15 scope of use of this agreement, please.  I was asking about
16 the scope of use.
17 A.  **I'm sorry.  Scope of use is enterprise.**
18 Q.  Thank you.  Are you familiar with the negotiations and
19 the pricing of this license with ▇▇▇
20 A.  **I am.  Correction.  It's enterprise deployment.  There**
21 **is three named seats for the development.**
22 Q.  So you were familiar with the pricing of this.  You
23 were part of the pricing of this license agreement?
24 A.  **I was, yes.**
25 Q.  Okay.  When we are in this time frame of 2010, can you

**1831**

1  tell us whether there was any discounting involved in this
2  license agreement?
3  A.  **Just a** ▇▇▇▇**, yes.**
4  Q.  How minor?
5  A.  ▇▇▇**.**
6  Q.  Okay.  And why was the ▇▇▇▇▇ given in
7  this context in 2010?
8  A.  **They probably pushed on the price a little bit, but we**
9  **held pretty firm.**
10 Q.  Always losing my pen.  I don't know where it is.  There
11 we go.  All right.
12         Let me, let me go to D293.
13 A.  **Yes.  I'm here.**
14 Q.  And now, this is another one that you were asked
15 questions about in 2008 now.  What was the scope of this
16 license with ▇▇▇
17 A.  **This was actually restricted to corporate, the**
18 **corporate group of** ▇▇.
19 Q.  So not all of ▇▇
20 A.  **Not all, just the corporate support function.**
21 Q.  Can you give any more background as to what that
22 application was?
23 A.  **Yeah.  They were, they were providing, like when you**
24 **call in prescriptions and you want to get them fulfilled,**
25 **sort of drug interactions and facilitating to make sure**

**1832**

1  your prescription is ready when you show up.  It was sort
2  of that automated process that they were using Blaze for.
3  Q.  Okay.  And you were involved in the pricing of ▮▮▮▮
4  A.  Yes, I was.  They are tough negotiators.
5  Q.  In your judgment, in your experience, is there anything
6  inconsistent between the pricing for ▮▮▮ given the scope of
7  use of Blaze Advisor and the pricing models that we have
8  been talking about in general in this lawsuit?
9  A.  None.
10  Q.  All consistent?
11  A.  All consistent.
12  Q.  And I want to go to, for -- if we go to Defendants'
13  Exhibit 12 for a moment, please.  It uses as an example
14  ▮▮▮▮▮▮▮ of 2006.
15  A.  March 2006, yes.
16  Q.  Right.  And so, the ELA value you testified to on
17  cross-examination was ▮▮▮▮▮▮▮▮▮?
18  A.  At standard price.
19  Q.  At standard price.  And the proposal of ▮▮▮▮▮▮▮
20  ▮▮▮▮ was that a proposal with credit?
21  A.  No, that was not with credit.  That was before credit.
22  Q.  Before credit.
23  A.  Mm-hmm (Yes).
24  Q.  So that's another ▮▮▮▮▮▮▮▮?
25  A.  Correct.

**1833**

1  Q.  And in this context, if I could bring you to our own
2  license agreement and perhaps that defendants' exhibit, do
3  we have, do we have, whatever it is, D22, that same chart
4  that was put up by the defendants.
5        If not, we can do it without if it's not easy to
6  get.  How about putting up --
7        Well, let's go to, let's go to our license
8  agreement, Mr. Waid, the Chubb & Son license agreement.
9        And I asked you, I asked you on my direct
10  examination a rather general question about pricing, and
11  Mr. Waid's testimony about pricing being after credit being
12  incremental additional amount.
13  A.  Correct.
14  Q.  So I want to now in light of the cross, I want to go
15  back and do that in a little more detail with respect to
16  this license agreement that we have.
17        So if we look at the pricing for the original
18  license agreement, and I'll just do deployment pricing, the
19  original license agreement was in deployment 173,750.
20  A.  Correct.
21  Q.  Okay.  And then if we go to the Amendment One, and we
22  see that the price there is $350,000?
23  A.  Correct.
24  Q.  But was that $350,000 additional to FICO?
25  A.  It was not.  There is a little footnote down here at

**1834**

1  the bottom talking about payments of the first one.  Since
2  these were so close, we might not have received all of the
3  payment.
4  Q.  Isn't it, the credit --
5  A.  The --
6  Q.  The amount of fee paid for the original named
7  application license was credited against the 350,000.
8  A.  It was, yes.
9  Q.  So the incremental amount to FICO is not 350,000.  It's
10  about 173,000.
11  A.  That sounds about right, yes.
12  Q.  And then when we go to the Amendment Number Two, and we
13  see the pricing at 1,300,000, but the incremental, but the
14  additional revenue to FICO wasn't 1,300,000?
15  A.  It was not.
16  Q.  Because why?
17  A.  Because we took 350,000 off of that, and it says right
18  here that the net license fee, the additional amount of
19  money paid at this time was 950,000.
20  Q.  So if we're talking about the incremental revenue to
21  FICO for the Chubb & Son license, the Amendment Two brought
22  in an incremental, an additional amount of revenue of
23  950,000?
24  A.  That's correct.
25  Q.  Let's go to Plaintiff's Exhibit 111 and then to the

**1835**

1  second or third page.  There we go.
2        And you've explained to us who Sally Holt is in
3  terms of her role, and this is a form document that you're
4  familiar with from FICO or not?
5  A.  Yeah.  We created it.
6  Q.  Okay.  And when she is saying, and this is -- first
7  let's put in the time context.
8        This is before Amendment Two is signed.
9  A.  That is correct.  The original create date was October
10  12th.
11  Q.  And so she is looking at an expected value of 1.2
12  million, correct?
13  A.  That's correct.
14  Q.  As you read that internally at FICO, is that an
15  expected value of an additional 1.2 million of revenue to
16  FICO?
17  A.  That is correct.
18  Q.  In contrast to the $950,000 that was actually paid
19  under the license agreement?
20  A.  That is correct.
21  Q.  You were asked about Defendants' Exhibit 4, if you
22  could find that, please.
23        Let's put this in the time frame of September 30,
24  2015.
25  A.  No.  September 30th, 2005.

**1836**

1  Q.  That's what I wrote down, and I misspoke.  2005.  You
2  said you negotiated the deal, and you will never forget it.
3  I would like you to explain the pricing that was a -- that
4  was resulting in -- or resulted in this Exhibit 4.
5  A.  Yeah.  The reason I will never forget this deal.  We
6  had been negotiating with them for some time.  We were
7  talking about at one time an ███████████████, and
8  the date of this is actually the last day of our fiscal
9  year.
10       And I got a phone call from my boss saying we
11  need some business, where can we get it.  I said, well, guy
12  this guy has offered me ███████████.  I can take the
13  deal if you want it.  So I called him up about 3:00 or 3:30
14  in the afternoon.  And he said, okay, but you have to get
15  it done before the football comes on, because I'm watching
16  my football game.
17       So I will never forget that.
18  Q.  Is this an anomaly?
19  A.  At this time I wish I could say it was an anomaly, but
20  we used to grab business a lot back at this time in
21  history.  We switched to reoccurring revenue streams, and
22  clients don't want to buy right now, they want to buy
23  later, they buy later.  So be it.
24  Q.  And let's look at Exhibit 284.  What was the scope of
25  use for 284 for Blaze Advisor?

**1837**

1  A.  In this contract, this one is for use solely with
2  ████████████████████████
3  Q.  So not the whole of ██████
4  A.  This is, this is a group that figures out ██████████
5  ██████████████████████████████████
6  ██████████████████████████████████
7  ██████████████████████████
8  Q.  Okay.  Let's go to Exhibit 77, D77, and you were asked
9  some questions about what in this license agreement is
10  10.7.
11       And, Mr. Mayleben, could we show page 10 of this
12  license agreement on the screen.  And could you just put
13  yellow on the 10.7 Assignment, Delegation.
14       You mentioned that it was a long provision.
15  Every license agreement is individually negotiated.
16  A.  They are, yes.
17  Q.  What does this Defendants' Exhibit 77 tell you about
18  the extent of negotiations about paragraph 10.7 here?
19  A.  As my reaction showed, it's pretty long.  I don't, I
20  don't recall seeing something quite this long before.
21  Obviously would have been involved in approving it, but,
22  yes, it's pretty long.
23  Q.  Okay.  And let's put up the license agreement between
24  Chubb & Son and FICO and show paragraph 10.8.
25       Is it fair to say the level of negotiation is

**1838**

1  quite different?
2  A.  Yes.  Quite different.
3  Q.  You were shown the e-mails of Russ Schreiber and Mike
4  Sawyer.  Russ is commenting about what the license said or
5  do not say about GWP.
6       With respect to the license agreement in this
7  case, in your mind, in your judgment, is there any concern
8  about the reasonableness -- about FICO's reasonableness?
9  A.  None.
10  Q.  Is there any, is there any, is there any -- what's the
11  right word -- any ambiguity in the change of circumstances
12  in your mind from the status of the client at the time of
13  2006 to the time --
14  A.  Not in my mind, no.
15  Q.  You were asked about the resolution of that consent or
16  not consent within a 30-day period.  You mentioned that it
17  was not written into 10.8.
18  A.  That's correct.  Yes.
19  Q.  Let's go back to J001, and can we go to paragraph 9
20  point -- I'm sorry.  Section paragraph 9.2, please, and
21  then if we can focus in on 9.2A, Uncured Breach.
22       Is that what you had in mind in terms of another
23  provision of the contract detailing out a 30-day period?
24  A.  That's correct.  Yes.
25  Q.  Now, you were asked about Exhibit 94, which is the

**1839**

1  proposal from Ms. Pawloski of February 25.
2  A.  Correct.
3  Q.  2016.  And you were asked whether you had communication
4  with her afterwards?
5  A.  Correct.
6  Q.  And did you?
7  A.  I did.
8  Q.  And what were they?
9  A.  Both written and verbal.
10  Q.  Let's just do the verbal.  We want to stay within the
11  time frame of -- around or in response to the February 25
12  proposal.
13  A.  Yes.  I r█████ rather quickly, actually setting up a
14  call, and set her through very specifically why this
15  proposal was not acceptable to us and actually counter
16  proposed with an equivalent approach, which was not, was
17  not taken any further.
18  Q.  But you explained to her why, your thinking about her
19  proposal?
20  A.  Correct.
21  Q.  Did they propose anything different at that moment?
22  A.  She did not.
23  Q.  At that time in February of 25 of 2016, did you have
24  any additional information from Chubb & Son, other than
25  what was contained in Mr. Hopp's letter earlier and what

**1840**

1 was contained in that proposal?

2 A. It's hard to hear you.

3 Q. My bad. Do you recall Mr. Hopp's letter to

4 Mr. Carretta which you just recently looked at, do you

5 recall -- you recall Tamra Pawloski's e-mail with a

6 potential proposal.

7        In terms of your involvement, did you have any

8 information about the intentions of the future use of Blaze

9 Advisor, other than what was in those communications and

10 the call you had with her?

11 A. Nothing.

12 Q. Okay. In the call you had with her, did she in any way

13 modify or change the approach that she presented in that

14 commercial proposal?

15 A. No.

16 Q. If we can go to Exhibit 91, please.

17        THE COURT: Mr. Hinderaker, we're at 12:30. How

18 much more do you have?

19        MR. HINDERAKER: I don't know. You know the Mark

20 Twain saying, if I had more time, I would have wrote a

21 shorter letter.

22        THE COURT: Right. All right. I think we should

23 take our lunch break.

24        Okay. Members of the Jury, we'll break for lunch

25 and be back in at, make it about 1:10. Give yourselves a

**1841**

1 little bit of time.

2        THE CLERK: All rise for the jury.

3        (Jury exits.)

4

5        (In open court without the Jury present.)

6        THE COURT: Go ahead and be seated if you want.

7 Just your best estimate at this point, Mr. Hinderaker.

8        MR. HINDERAKER: Half hour, 40 minutes.

9        THE COURT: Okay. And, Ms. Godesky, depends on

10 the redirect, but from what you can tell --

11        MS. GODESKY: Brief.

12        THE COURT: Brief, okay. And who at that point

13 will we begin with, do you know?

14        MS. GODESKY: Our first witness will be Kevin

15 Harkin.

16        THE COURT: Okay. Then I will address the

17 question regarding Mr. Harkin's use of the demonstratives.

18 I've had a chance to consider it over the time. I'm going

19 to allow him to use those.

20        MS. GODESKY: Thank you.

21        THE COURT: All right. We will see you at 1:10.

22        MS. GODESKY: And, Your Honor, sorry.

23        THE COURT: Yes.

24        MS. GODESKY: If we have a motion, how would you

25 like us to handle that?

**1842**

1        THE COURT: Well, as we discussed, we can argue

2 it after, after the close of business today. You need not

3 make a show in front of the jury of moving for the directed

4 verdict or the judgment. We understand that motion is

5 coming.

6        MS. GODESKY: So no need even to come up to

7 side-bar, right?

8        THE COURT: Correct.

9        MS. GODESKY: Okay. Okay. Thank you.

10        THE COURT: Thank you.

11        (Lunch recess taken.)

12

13 1:11 p.m.

14              IN OPEN COURT

15              (JURY PRESENT)

16        THE COURT: Be seated.

17        Mr. Hinderaker, you may proceed.

18        MR. HINDERAKER: Thank you.

19 BY MR. HINDERAKER:

20 Q. A few more questions. You were asked questions about

21 the discounting chart in the guidelines, and you mentioned

22 that it wasn't, the 2003 document was not updated because

23 the information is now in your sales force automation

24 system.

25        We don't know what that is. Could you tell us?

**1843**

1 A. Yes. So the first thing that we did was we actually

2 created Excel spreadsheets to do the quoting. I mentioned

3 that earlier. Originally, they went into a software

4 solution that we, we actually licensed from another third

5 party, which is, it's a Contact Management System,

6 essentially put in accounts, people that work at those

7 accounts or companies, and then you put in opportunities or

8 we call them sales opportunities.

9        So you create these entries in this system. And

10 it helps you manage, you know, when you called so and so

11 and what proposal you sent anyone, and you attach these

12 proposals to that registry in the sales force automation

13 tool. It's something to help the salespeople keep track of

14 where they're at in their discussions, what's coming next.

15        And it helps management understand what their

16 pipeline of opportunity looks like.

17 Q. And how is the discounting and pricing guidelines put

18 into that system?

19 A. Well, originally it was in actually just in the, in the

20 spreadsheets themselves. And then there's a routing

21 mechanism for the quote where there's a management chain.

22 And so the management chain has to check a box and say yes,

23 I've looked at that, and it's approved.

24        The same thing with contracts. They flow through

25 that same automation system. So when contracts are

**1844**

1 written, it flows through, and there's guidelines in there
2 about what you can and cannot do.
3       So right inside the sales force tool, you cannot
4 actually enter a discount unless you have check mark
5 management approval to do so at the discount level.
6 Q.  Thank you.  And with staying on the theme of discounts,
7 you were asked, you were asked about discounting at a
8 40 percent level from your deposition.  And your memory was
9 that the question was in the 2006 time frame.
10      I would like you to go back to -- I'd like you to
11 go to the transcript of the January 16, 2019, deposition.
12      And if we could put up Exhibit 226, please.
13      Do you have it?
14 A.  I have it, yes.
15 Q.  Okay.  And you have your transcript at page 133,
16 January 16, 2019, transcript.
17 A.  So you don't want P226?  You want the transcript?
18 Q.  Well, we're going to use both.
19 A.  Okay.  Sorry.  I'm sorry.  Which one is it?  1 or 4.
20 Q.  January 16, 2019.
21 A.  And what page again?
22 Q.  133.
23 A.  And I'm there.
24 Q.  Okay.  If you see at the middle of the page at lines
25 14, the question is, "If we can then go to Exhibit 226, if

**1845**

1 we can then go to 226."  Do you see where I'm reading?
2 A.  Yes.
3 Q.  And on the screen, if we can blow up at the bottom, the
4 Plaintiff's Exhibit 226 is also as you see the Deposition
5 Exhibit 226.
6 A.  Yes.
7 Q.  And the date of that, and the date of that email is
8 what, June 16, 2006?
9 A.  Correct.
10 Q.  And the question and answer that you were then
11 presented with, continuing on page 133 and going to around
12 line 19 or 18 or 19 on 134, was that all in the context of
13 this email and 2006 pricing?
14 A.  It was.
15 Q.  And now I'd like to go back to Exhibit 77, please,
16 Defendants' 77.
17      Thank you.
18      And I'd like to go to the provision at
19 paragraph 10.7 that we looked at before.  And if we can
20 just bring that up.  Thank you.
21      Now I've already asked you this, so it's just to
22 put in context.  This is an example of client negotiating
23 provisions of paragraph -- the no assignment provisions of
24 a FICO license agreement.
25 A.  It is.

**1846**

1 Q.  Okay.  And over the course of your years, have other
2 clients negotiated limitations into FICO's protections of
3 no assignment?
4 A.  They have.
5 Q.  And the level of negotiations to limit FICO's
6 protection of the no assignment provision, I assume various
7 varies from client to client?
8 A.  It varies quite significantly, yes.
9 Q.  Do you have some clients that don't change FICO
10 language at all?
11 A.  We have a lot of them who do not change FICO language.
12 Q.  So the protections that FICO enjoys from its own
13 version of paragraph 10.8 survives into the written, into
14 the written license agreement?
15 A.  That's correct.
16 Q.  Okay.  And you've looked at paragraph 10.8 for the
17 Chubb & Son license with FICO?
18 A.  I have.
19 Q.  Was there any degree to which they sought to limit
20 FICO's rights under paragraph 10.8?
21 A.  The only edit that they added was the "may not be
22 unreasonably withheld."
23 Q.  And to that extent in your understanding,
24 paragraph 10.8 of the license agreement in this case has
25 all of FICO's standard protections?

**1847**

1 A.  Correct.
2      MR. HINDERAKER:  No further questions.  Thank
3 you.
4      MS. GODESKY:  Nothing further from me, Your
5 Honor.
6      THE COURT:  All right.  Thank you, Ms. Godesky.
7 Mr. Waid, you may step down thank you.
8 THE WITNESS:  Judge?
9 MR. HINDERAKER:  Your Honor, the plaintiff rests.
10 THE COURT:  Very well.
11 MR. HINDERAKER:  It's case in chief.
12 THE COURT:  Thank you, Mr. Hinderaker.
13      So the plaintiff just rested their case in chief.
14 We will commence with the defendants' case in chief in just
15 a second.
16      I'm going to give you one evidentiary
17 instruction, just so that you have some context for what
18 you've heard and what you are going to hear.  I will or may
19 have other evidentiary instructions at the close of the
20 trial.
21      You have heard testimony from Ms. Jandeen Boone,
22 the FICO lawyer who participated in drafting the 2006
23 software licensing agreement, and from Mr. Thomas Carretta,
24 the FICO lawyer who issued the notice of breach of the
25 license agreement.  You will or may hear testimony from

2137

1  can be added fairly quickly, two weeks.  Can be leveraged
2  across projects.
3          That's what's said in this document.
4  A.  Yeah, the model that Chubb built.
5  Q.  Agreed.  The model that Chubb built inside of Blaze
6  Advisor that it licensed from FICO.
7  A.  Agreed.
8  Q.  Agreed.
9          Let's go to Exhibit 518 again, Plaintiff's 518.
10  And if we could just, if we can increase that column which
11  is Business Rules Capability.
12          So according to Chubb & Son, the Blaze rules
13  capability for DecisionPoint was rate tables and pricing
14  calculations, eligibility determinations, endorsement
15  generation, and data normalization.
16          Agreed?
17  A.  That's what it says, yes.
18  Q.  And off the top of my, top of the screen, I am not
19  seeing Profitability Indicator detailed out on this one, so
20  we'll move on.
21          We can take that down and let me change slides.
22          Do we agree that policy administration systems
23  are core systems of an insurance company?
24  A.  They are.
25  Q.  And do we agree that the meaning of a core system is a

2138

1  system that's a primary one that supports the insurance
2  operations?
3  A.  It supports the insurance operation, yes.
4  Q.  Okay.  And you understood in your review that Blaze
5  Advisor in CSI Express, as one of the policy administration
6  systems, supported the underlying process for CSI Express?
7  A.  I don't understand your question.
8  Q.  Blaze Advisor supports the -- Blaze Advisor supports
9  the underlying process of CSI Express.  Yes or no?
10  A.  What underlying process?  I don't --
11  Q.  Oh, I understand the confusion.  The process of being a
12  business administration system.
13  A.  It does not do business administration or policy
14  administration.  Blaze does not.
15  Q.  Understood.  Let me go back to 518.  I can get a better
16  question.
17          If we look at 518 and look at CSI Express, Blaze
18  Advisor supported the underwriting guidance in the CSI
19  Express policy administration system application.
20  A.  It provided Chubb's rules for underwriting guidance,
21  yes.
22  Q.  Agreed.  It provided the rules that came from Chubb
23  that it chose to put into Blaze Advisor.
24  A.  Yeah, just to be clear.  It didn't do the guidance.  It
25  provided the guidance rules that Chubb had loaded into the

2139

1  system.
2  Q.  It executed against those rules.
3  A.  It did.
4  Q.  Yes.  I think we're trying to say the same thing.
5  A.  No, we're not.
6  Q.  Well, we'll see.
7  A.  Okay.
8  Q.  The underwriting rules for acceptance or rejection of a
9  risk come from Chubb.
10  A.  Correct.
11  Q.  It is the company that's deciding what its own business
12  logic is.  And that is written into Blaze Advisor for CSI
13  Express.
14  A.  Yes.
15  Q.  Agree with me so far?
16  A.  Yes.
17  Q.  And when an insurance application is received, CSI
18  Express, using Blaze Advisor, compares the risk to the
19  rules of Chubb and executes a decision accordingly.
20  Agreed?
21  A.  I agree with what you are saying.
22  Q.  Thank you.
23          And indeed when a policy is accepted in CSI
24  Express, there are a lot of business rules that are fired
25  or retrieved in the process to bind and book the policy to

2140

1  decide whether it should be, whether to decide whether to
2  renew, and the various functions of the policy
3  administration system, because you said all those things.
4  A.  All those functionalities were built by Chubb to call
5  out to various rules engines, Duck Creek, Blaze, and
6  homegrown rules.
7  Q.  Yes.  And Blaze was one of the components that was
8  executing rules that were put into its software in
9  accordance with the business logic of Chubb & Son.
10  A.  Yes.
11  Q.  In your -- you did some looking at what CUW was.
12  A.  Yes.
13  Q.  In your view, CUW was also a core system?
14  A.  It was part of the CSI Express is the way it was
15  initially presented to me.
16  Q.  Okay.
17  A.  And so, yes, it was part of that core policy
18  administration system.
19  Q.  And we can be -- we can agree, I think, that while it's
20  called out as a separate application, CUW-IM, there is an
21  interfunctionality, if I can use that word, with CUW and
22  CSI Express.
23  A.  The two are integrated.
24  Q.  Better word.  The two are integrated.  We will use
25  that.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 3, 2023, Volume X

**2141**

1   A.  Yeah.
2   Q.  And CIS Claims is another core system and one of the --
3   agreed?
4   A.  CIS Claims, as I understand it, is really mislabeled.
5   It's not a claims system.
6   Q.  Yes.  You've heard the testimony that it's a, feeds
7   into the actuarial process.
8   A.  It's basically a function of the policy administration
9   system to feed data into a repository for claims for
10  analysis.
11  Q.  I think we both heard the same testimony in that
12  regard.
13  A.  Okay.
14  Q.  I understand the confusion given its title.
15  A.  So I wouldn't call that a core system, no.  It's a
16  business intelligence capability.
17  Q.  Okay.
18  A.  I mean, it provides data to the actuary to --
19  Q.  Well, if we go back to your deposition then.  I guess
20  I'm confused.  If you go to line 11, please, or page 11.
21  A.  Of the deposition?
22  Q.  Yes, please.  And I'm going to start on line 14, when
23  you get a chance to get there.
24  A.  Line?
25  Q.  14?

**2142**

1   A.  14.
2   Q.  The question -- are you there with me now?
3   A.  Yep.
4   Q.  Okay.  The question says, "What does the word 'core'
5   mean?
6           "Answer:  It's the primary system that supports
7   the insurance operations.
8           "Question:  In the case of Federal can you give
9   me an example of that?  What would be a core system?
10          "Answer:  Sure.  CSI suppress would be one.
11          "Question:  Any others come to mind?
12          "Answer:  CUW, TAPS, CIS Claims."
13          Did I read that right?
14  A.  Yes.  At the time of this deposition, I still
15  understood that to be the claims system.
16  Q.  Okay.  Your understanding changed.
17  A.  It changed after that.
18  Q.  All right.  Good.  So whether --
19          Let me put it this way.  Rather than debate the
20  use of the word "core," CSI Express is a core system.
21  Agreed?  Right?  And we agree that CIS Claims, your word,
22  I'm going to use your word "integrated," integrates into
23  CSI Express.
24  A.  Yes.  But to be clear it's not the claims system.
25  Q.  No.  We -- yeah, absolutely.

**2143**

1   A.  Okay.
2   Q.  I'm not contending otherwise.
3   A.  Okay.
4   Q.  Yeah.  If we were to speak to the Blaze Advisor role in
5   DecisionPoint, you would agree that Blaze Advisor can serve
6   up a rule quickly?
7   A.  Some rules, yes.
8   Q.  I'm speaking, yeah, I'm speaking of the rules in
9   DecisionPoint at this point.
10  A.  DecisionPoint, there's multiple parts of DecisionPoint,
11  right?
12  Q.  So do we agree -- well, let's put up the 518 again
13  then.
14          So do we agree that for DecisionPoint the Blaze
15  Advisor capability includes rate tables and pricing
16  calculations, eligibility determination, endorsement
17  generation and data normalization?
18  A.  Yes.
19  Q.  Okay.  We can put that down.
20          Let's turn to automated renewal.
21          Do we agree that for insurance companies
22  retaining their customers is important?
23  A.  Absolutely.
24  Q.  And so we agree that the more customers that renew
25  their policies, the better.

**2144**

1   A.  Yes.
2   Q.  Do we also agree that being able to renew policies
3   without human intervention or human touch results in more
4   renewals?
5   A.  Not necessarily.
6   Q.  Do you think there is a business benefit to automatic
7   renewals?
8   A.  Yes.
9   Q.  What is that business benefit?
10  A.  Less touch by humans.
11  Q.  And do you also agree -- well, do you agree that while
12  in any individual case it may or may not make a difference
13  that over the aggregate if you can automate renewals you
14  are going to increase the percentage of renewals overall?
15  A.  I don't agree with that.
16  Q.  Do you have any data that suggests otherwise?
17  A.  I don't have the rules that were actually being used to
18  determine whether it was one that would, a customer would
19  actually renew.  I mean, at the end of the day, renewals
20  aren't something that just automatically happens.  The
21  customer has to say he wants to renew the policy.
22  Q.  Well, I agree.  Of course that's right.
23  A.  So if they don't renew the policy, whether it made it
24  all the way through the process to the end and he didn't
25  renew or she didn't renew.

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 3, 2023, Volume X

2145

1   Q.  I think your answer is highlighting the, an example of
2   an individual customer.  Agreed?
3   A.  Yeah.
4   Q.  My question was directed to, let's call it a hundred
5   customers or a thousand customers.  If you can
6   automatically issue renewal policies to a thousand existing
7   customers rather than do it individually, are you going to
8   increase your rate of renewals from your experience in the
9   industry?
10  A.  Yes.
11  Q.  Do we agree that -- let me turn to, we did some of the
12  applications.  I want to sort of speak about Blaze Advisor
13  more generally now and some of the business benefits from
14  Blaze Advisor.
15          Do we agree that Blaze Advisor was implemented
16  into applications to enhance precision, agility, quality
17  and all the efficiencies that you get out of externalizing
18  rules and managing rules?
19  A.  That's the stated benefits from FICO's document, yes.
20  Q.  And do you think that Blaze Advisor does not produce or
21  achieve those benefits?
22  A.  I don't, I don't have the evidence for what they used
23  it for.  It wasn't clear to me that it had achieved those
24  benefits.
25  Q.  So on page 91 --

2146

1   A.  Of?
2   Q.  Your deposition, please.
3   A.  Okay.
4   Q.  And I'm starting at line 3.
5   A.  On 91?
6   Q.  No.  No.  91.
7   A.  90.  Mr. Folz?  Is that the line?
8   Q.  No.  The -- at your deposition, page 91.
9   A.  Oh, 91.
10  Q.  Yeah, nine one.
11  A.  You said 90.
12  Q.  91.
13  A.  And after -- does it start with, "And after that"?
14  Q.  Yeah.  And then, so question -- yes, it does.
15          "And after that 2006 initial engagement, Federal?
16  Then expanded their use of Blaze into other applications;
17  isn't that right?
18          "Answer:  That's correct."
19  A.  "That's correct."
20  Q.  "Question:  And did you speak with any other
21  individuals or review any other documents about the
22  business justifications for implementation in Blaze into
23  those other applications?
24          "Answer:  There were a number of documents I
25  recall reviewing that basically repeated the same

2147

1   justification for multiple instances of precision and
2   agility and quality and all of the efficiencies that you
3   get out of externalizing rules and managing rules and so
4   forth.
5          "Question:  Precision, consistency, agility,
6   speed, time and costs?
7          "Answer:  Yes."
8   A.  Mm-hmm, correct.
9   Q.  I read that correctly.
10  A.  You did.
11  Q.  And with respect to your analysis, do you agree that
12  Blaze Advisor can achieve those outcomes?
13  A.  I don't know if it can or it can't, but that's the
14  stated goal of the technology.
15  Q.  Good.  Yes, I agree.  And then let's go to page 92,
16  just up, starting at line 4:
17          "Question" -- are you with me now?
18  A.  Yep.
19  Q.  "Question:  Generally speaking, they are efficiencies,
20  do you, do you dispute that Blaze Advisor can achieve those
21  five as you call them efficiencies?
22          "Answer:  No, I don't dispute that."
23          Agreed?
24  A.  Yes.
25  Q.  Changing topics a little bit.  Do we agree that if you

2148

1   have the organization's top expert develop the rules that
2   are then loaded into, put into Blaze Advisor, used to drive
3   decisions, you will get better risk decisions and -- well,
4   you will get better decisions overall?
5   A.  Not necessarily.
6   Q.  If you have the top expert developing the rules that
7   then drive the decisions, you don't think you will get
8   better decisions?
9   A.  The application, as I understand it, allow the under
10  writer to override what the system will say.  So wouldn't
11  necessarily get the result that Chubb was looking for, but
12  got a different result that may still be okay.
13  Q.  Okay.  But it would be the consequence of another
14  underwriter overriding?
15  A.  Overriding what the system was saying you should think
16  about doing it this way.  It's guidance.  It's
17  underwriting -- that's why they call it underwriting
18  guidance, not underwriting absolutes.
19  Q.  All right.  So the system and the guidance would be
20  able to produce a better decision, but an individual human
21  underwriter could override that and change the results?
22  A.  You don't know if it was that that underwriter knew
23  something better than the one that wrote the rule about
24  that particular rule.  So they could have put a different
25  rule in that said do it this way and found out that they had

**2396**

1    11:30 p.m. on the night before Mr. Waid was to continue his
2    testimony. So we got it while he was sequestered and got
3    them at 11:30 at night. These were given to the defendants
4    a few days ago, in fact, although we could anticipate
5    Mr. Folz testifying, it was before we were officially
6    noticed that he would.
7              THE COURT: Understood. Thank you, Counsel.
8         Everybody else ready to proceed?
9         MS. GODESKY: Yes.
10             THE COURT: Okay. And one last second before you
11   bring them in. Give me your current estimate how long with
12   Mr. Folz.
13        MS. GODESKY: 45 minutes to an hour for direct.
14             THE COURT: Okay. And then are you still about
15   45 minutes with Zoltowski?
16        MS. KLIEBENSTEIN: I hope I am well under 30.
17        THE COURT: Okay. Good.
18        THE CLERK: All rise for the jury.
19             (Jury enters.)
20
21        (In open court with the Jury present.)
22        THE COURT: Be seated.
23        Good morning, Members of the Jury. As I had
24   indicated yesterday, this will be the last day of
25   testimony. I'm hopeful that we will conclude that

**2397**

1    testimony before the lunch break, and then I can send you
2    on your way. And then first thing in the morning tomorrow,
3    we will have instructions, final argument, and you will
4    begin your deliberations then. Okay?
5         All right. Ms. Godesky, call your witness.
6         MS. GODESKY: Your Honor, defendants call Phil
7    Folz.
8              THE COURT: Mr. Folz, come on up here, please.
9    If you will raise your right hand.
10             (Witness sworn.)
11        THE WITNESS: I do.
12             THE COURT: Go ahead and sit down. Turn your
13   microphone on, and speak into it, and state your full name
14   for the record.
15        THE WITNESS: My name is Phillip Folz.
16             (PHILIP FOLZ)
17             DIRECT EXAMINATION
18   BY MS. GODESKY:
19   Q. Good morning, Mr. Folz. Are you currently retired from
20   Chubb?
21   A. Yes, I am.
22   Q. When did you retire?
23   A. March 1st, 2018.
24   Q. For how many years did you work for Chubb?
25   A. 28 years.

**2398**

1    Q. And what years were those?
2    A. 1990 up until March 2018. So January of 1990 through
3    March -- March 1st, '18.
4    Q. Is Chubb paying you by the hour to be here today?
5    A. No.
6    Q. Why are you here?
7    A. I heard about this case, and I was the individual who
8    actually negotiated the deal on behalf of Chubb and thought
9    my perspective would be important to hear on the case,
10   so --
11   Q. What was your title at Chubb at the time of your
12   retirement?
13   A. I was the Chief Information Officer for the commercial
14   lines division.
15   Q. And when we talk about commercial lines insurance, what
16   kind of insurance are we talking about?
17   A. So it's really insurance that is sold to businesses.
18   So it could be workers' comp. It could be commercial auto.
19   We had marine products, more general property casualty,
20   liability products, access umbrella. So a whole host of
21   products.
22   Q. What were your general responsibilities as the chief
23   information officer or CIO?
24   A. So I ran or I managed the technology aspect of the
25   commercial lines division, which meant that any technology

**2399**

1    that commercial lines needed to support their business we
2    provided. Okay? In that more specifically, though, in
3    that role for the two years that I was in it, my primary
4    responsibilities were integrating the two organizations.
5    So Chubb was acquired by ACE, and we were integrating the
6    two organizations to become one.
7    Q. Were you managing a budget as the CIO?
8    A. Yes.
9    Q. How big a budget were you responsible for managing in
10   that role?
11   A. It was approximately 100 million dollars.
12   Q. Now, the jury has heard from architects who work at
13   Chubb. How is the role of an information officer different
14   from the role of an architect?
15   A. Yeah. So a chief information officer actually uses
16   input from architects and others in order to come up with
17   the technology strategies in order to support the business.
18   So the architects give you the technical aspects of what
19   we're trying to do and architect it. You get input from
20   other areas, you apply a cost element to it, and you come
21   up with a strategy as to how you're best going to support
22   the business goals of the underlying business that you
23   support.
24   Q. Now I want to take you further back in time to 2006.
25   What was your position at Chubb as of 2006?

**2400**

1  A.  2006 I was the IT controller for the core IT division

2  within Chubb.  And the core IT division was a set of

3  departments that provided a set of shared services and

4  technologies across all of Chubb.

5  Q.  In the context of your work as a controller, what does

6  the term "cost allocation" mean?

7  A.  So when we spend money on products being in a

8  centralized area, I needed to then allocate those costs out

9  to the areas that were benefiting from the use of those

10  products.  It's cost allocation.

11  Q.  And so cost allocation was part of your

12  responsibilities as the controller?

13  A.  Yes, it was.

14  Q.  Mr. Folz, did you provide deposition testimony in this

15  case where you walked in a conference room and provided

16  testimony under oath?

17  A.  Yes, I did.

18  Q.  You provided live deposition testimony?

19  A.  Oh, no, not deposition.  It was a legal statement.

20  Q.  Okay.  Legal statement.  So did you provide a sworn

21  written statement at one point in this case?

22  A.  Yes, I did.

23  Q.  And did you review that statement before you testified

24  here today?

25  A.  Yes, I did.

**2401**

1  Q.  Is there anything in that statement you wanted to

2  correct?

3  A.  Yeah.  I mean, there were two things at the beginning

4  of that particular statement.

5       One was that I worked for Federal Insurance

6  Company for those 28 years.  That is partially true.  That

7  was up until about 2016.  I was a Federal Insurance Company

8  employee.  When we were acquired by ACE and became Chubb

9  Limited, that Federal Insurance went away.  So I can't tell

10  you who I was an employee of, but it wasn't Federal

11  Insurance.  So for those couple of years it changed.

12       The other one is, there is mention in the, in the

13  legal statement that I was the controller for North

14  America.  And at the time when I was giving that legal

15  statement, silly on my part, I thought North America meant

16  only the United States.  Okay?  So I clarify that with, I

17  was a controller for a centralized group that provided

18  services worldwide, but my budget responsibilities were

19  North America -- excuse me -- were the United States, not

20  Canada or Mexico.

21  Q.  So when you said in your sworn written statement that

22  you were the controller for North America, that was a

23  mistake?

24  A.  That was a mistake.

25  Q.  Okay.  And you meant just to refer to the U. S.?

**2402**

1  A.  Yes.

2  Q.  Okay.  Returning to your work at Chubb in this 2006

3  time period, to whom were you reporting?

4  A.  June Drewry, who was the global chief information

5  officer.

6  Q.  And during your nearly 30 years at Chubb, Mr. Folz,

7  approximately how many software license agreements and

8  renewals were you involved in?

9  A.  Probably a couple hundred.

10  Q.  Did there come a time in 2006 when you became involved

11  in negotiations with FICO for a license for Blaze?

12  A.  Yes.

13  Q.  And can you describe the circumstances that led to your

14  involvement?

15  A.  So at Chubb we already had FICO.  We were already using

16  FICO within one of our divisions at Chubb, our specialty

17  lines division.  We had an interest in taking that rules

18  engine capability and extending it to other areas, both

19  within the United States and globally.

20       So my role was to work with FICO and our vendor

21  management and legal folks to try to come up with the best

22  deal possible to acquire what's called an enterprise

23  license that would extend the rights and usage of that

24  software globally.

25  Q.  You talked about an enterprise license.  In the context

**2403**

1  of your work at Chubb, was the term "enterprise"

2  interchangeable with "global" or did those two things mean

3  something different?

4  A.  That's a good question.  So "enterprise," "global" and

5  "worldwide" all mean the same thing at Chubb.  So if we

6  said, We want a worldwide deal, right, it means we want a

7  worldwide deal, global, enterprise, all the same thing.

8  Q.  What was your understanding of why Ms. Drewry, your

9  boss at the time, wanted to explore turning the Blaze

10  license into an enterprise or global deal?

11  A.  So one of June's strategies was to standardize certain

12  functionality across zones so that we could better leverage

13  capability -- we could better leverage human resources and

14  leverage costs.

15  Q.  At the time Ms. Drewry asked you to get involved in the

16  negotiations with FICO, you understood that Chubb already

17  had a license with FICO, right?

18  A.  Yes.

19  Q.  And what was your understanding of the scope of that

20  already-existing license?

21  A.  So the existing license was for one strategic business

22  unit.  That strategic business unit was our specialty group

23  in the United States.

24  Q.  What do you recall doing when you were first asked by

25  Ms. Drewry to get involved in this?

Fair Isaac Corporation v. Federal Insurance Company, et al., No. 16-cv-1054(DTS)                    March 7, 2023, Volume XII

**2404**

1  A.  So the first thing I would do is contact our vendor
2  management group, let them know that we have an interest in
3  opening up a negotiation or at least a discussion with FICO
4  on the possibility of doing an enterprise deal.
5       Next, I would have called Mark Berthiaume, who
6  was the senior IT manager within the Chubb specialty unit,
7  the area that already had the license, and, you know, kind
8  of discuss the license agreement that we already had with
9  him.
10      And then, finally, we would reach out to FICO,
11 and I believe it was Larry Wachs that we spoke to, and open
12 up negotiations.
13 Q.  Were you personally involved in those communications
14 with FICO?
15 A.  Yes, I was.
16 Q.  You mentioned Larry Wachs at FICO.  Was there anyone
17 else at Chubb that was involved?
18 A.  Yes.  So Jim Black from vendor management was involved
19 with me.
20 Q.  And what's your recollection about the general process
21 of those negotiations?  Was it phone calls, e-mails,
22 letters?  Tell us about that.
23 A.  Mostly phone calls and a couple of e-mails, as I
24 recall.
25 Q.  When you set out to determine whether the Blaze license

**2405**

1  could be expanded to enterprise-wide, did you have a budget
2  or a high-end dollar amount in mind for what Chubb would be
3  willing to pay?
4  A.  Yes, I did.
5  Q.  And what was that?
6  A.  It was approximately two million dollars was my upper,
7  upper end.
8  Q.  And how did you come up with that number?
9  A.  So I took a look at what we had spent so far for what
10 we had bought.  And I also, to be quite honest with you, I
11 had -- that's what I kind of had left over in the budget to
12 spend.  So if it was going to be five million dollars, it
13 was a nonstarter.
14 Q.  And once you had that two million high end target in
15 mind, what, if any, plan did you have for how to allocate
16 those costs across the organization if you were able to
17 close the deal?
18 A.  Mm-hmm.  So prior to the, prior to negotiating the
19 deal, we did reach out to all of the areas within IT to
20 gauge interest in using this particular piece of software,
21 you know, within their applications.  And as we did that,
22 it was with the understanding that if we were to come to a
23 deal, I would then allocate expenses to them in future
24 years for like the maintenance aspects of the license
25 agreement.

**2406**

1  Q.  You talked about these other IT areas.  Did that
2  include Chubb Australia, Canada and Europe?
3  A.  Yes.  Yes, it did.
4  Q.  Now, at this point in time in 2006, you had been at
5  Chubb for more than 15 years, correct?
6  A.  Yes.
7  Q.  As of that time period, what was the highest dollar
8  value of a software license you had been involved in
9  negotiating?
10 A.  Personally?  Four or five million dollars, yeah.
11 Q.  What were the circumstances of that type of license
12 fee?
13 A.  So it was a complete suite of IBM products that did
14 much more than the rules engine.
15 Q.  So from the perspective of an IT controller at Chubb,
16 was a suite of IBM products comparable to the Blaze
17 software in terms of functionality?
18 A.  No, no.  Much broader.
19 Q.  From the perspective of a controller who negotiated
20 hundreds of agreements for Chubb, what would your reaction
21 have been to a proposal that Chubb pay 50 million dollars
22 to access Blaze to use for a period of ten years in 17
23 applications?
24 A.  I think that's ridiculous.
25 Q.  Okay.  I want to take a look at the back and forth

**2407**

1  between Chubb and FICO over the license agreement.  And if
2  we could pull up on the screen P112, which is already in
3  evidence.
4  A.  Is this water?
5  Q.  Yes.  You can use the water.
6       Mr. Folz, do you recognize this e-mail exchange?
7  A.  Yes, I do.  Yes, I do.
8  Q.  And this is from December 12th, 2006, right?
9  A.  Yes, it is.
10 Q.  Okay.  And if you look at this first page, the second
11 e-mail down, there is a message from Mr. Wachs.  Do you see
12 that?
13 A.  Yes.
14 Q.  And it says, "Jim, see our responses to the questions
15 raised by Phil.  They are noted in blue text.  Should you
16 need further clarification or wish to discuss these
17 further, please don't hesitate to call," right?
18 A.  Yes.
19 Q.  And the "Jim" is Mr. Black at Chubb?
20 A.  Yes, it is.
21 Q.  Do you have an understanding why Mr. Wachs is referring
22 in this e-mail to questions raised by Phil?
23 A.  Yes.
24 Q.  What's your understanding?
25 A.  I asked these questions.  So this was later in the

**2408**

1  deal.  So this was in December, early December.  I asked
2  these questions of Jim to relay to Mr. Wachs.
3  Q.  And did Mr. Black then relay FICO's responses to you at
4  some point?
5  A.  Yes, he did.
6  Q.  Okay.  I want to focus on the second question that you
7  asked Mr. Black to pass along to FICO.
8          And that's about a third of the way down the
9  second page, Vanessa, if we could flip to the second page.
10         And if you look at number 2 in that list of
11 questions, we can blow that up.  Thank you.
12         It says, "For options 1 and 2 are there any
13 restriction in using or redistributing the licenses across
14 SBUs or other IT areas.  Said another way, do we get
15 licensing rights to 30 and 45 licenses respectively to
16 distribute as we see fit anywhere at Chubb?"
17         Do you see that?
18 A.  Yes.
19 Q.  When you used the word "Chubb" there, did you intend to
20 refer to Chubb & Son or the Chubb Group?
21 A.  The Chubb Group.
22 Q.  What does SBU mean?
23 A.  Strategic business unit.
24 Q.  And why did you have this question for FICO?
25 A.  So, again, the context of the deal was to use it

**2409**

1  globally.  And what we wanted to do was we wanted to be
2  able to distribute the software globally without
3  restrictions on the number of seats.  So if there was an
4  interest in more of our applications, wanting to use the
5  software, we wanted to be able to do that.
6  Q.  Can you read FICO's response which is embedded
7  underneath the question?
8  A.  Yes.  "There are no usage or redistribution
9  restrictions within Chubb in any of the options within the
10 seat limitations of options 1 and 2."
11 Q.  And what did you understand that to mean in terms of
12 the scope of what FICO was offering at that point in the
13 negotiations?
14 A.  Okay.  So within the 30 and 45 seat limitations for
15 those two options, I can distribute that software anywhere
16 I want.
17 Q.  Okay.  Let's take a look at D58, which should be in the
18 binder in front of you, Mr. Folz.
19         It is not in evidence yet, but I believe there is
20 no objection?
21         Is that correct?
22         MR. HINDERAKER:  Yeah.  That's correct.
23         MS. GODESKY:  Okay.  So defendants offer D58 in
24 evidence.
25         THE COURT:  D58 is received.

**2410**

1          MS. GODESKY:  Thank you.
2  BY MS. GODESKY:
3  Q.  Mr. Folz, do you recognize the e-mail on this document?
4  A.  Yes.
5  Q.  And what's happening here?
6  A.  So that's an e-mail that I drafted to our leadership
7  team.  And I'm just, more or less, informing them what the
8  major components of the deal was and that it would be
9  discussed at our next senior management meeting for, you
10 know, approval.
11 Q.  What's the date on this document?
12 A.  My e-mail is 12/15/2006.
13 Q.  And in the first sentence you wrote, "Today, Julia, Jim
14 Black and I had a conference call with the folks from Fair
15 Isaac and received their best and final pricing offer for
16 an enterprise deal."  Do you see that?
17 A.  Yes.
18 Q.  To what enterprise were you referring when you said
19 "enterprise deal"?
20 A.  The Chubb Group of Insurance Companies.
21 Q.  Did your reference to an enterprise deal in this
22 message include Chubb Canada, Australia and Europe, or were
23 you excluding them?
24 A.  I was including them.
25 Q.  What, if any, conversations have you had with the folks

**2411**

1  at Chubb Canada, Chubb Australia and Europe at this time
2  period regarding the potential for them to use Blaze?
3  A.  Again, you know, as part of our -- during negotiations
4  we reached out to each one of them to gauge interest, and
5  we were receiving favorable responses.
6  Q.  So let's look at number 3 in your e-mail, the second to
7  last paragraph.
8          You wrote, "They've also asked that we allow them
9  to issue a press release once we execute the deal.  I told
10 them that we do not typically do this, but would inquire
11 with Corp Communications if we were going to do the deal.
12 Finally, they've asked that we speak at a future client
13 forum."
14         Do you see that?
15 A.  Yes.
16 Q.  To what were you referring with your reference to "Corp
17 Communications"?
18 A.  So Chubb had an overall -- non-IT-related, but an
19 overall corporate communications department that did all of
20 the messaging, external messaging for Chubb.  That's what I
21 was referring to.
22 Q.  What, if any, understanding did you have at the time as
23 to why FICO wanted a press release and someone to speak at
24 this forum?
25 A.  So within the insurance industry, Chubb is considered a

**2412**

1  marquis client: and FICO landing an enterprise deal with a
2  company like Chubb is a big deal for them.
3  Q.  As someone who worked in the Chubb Group of Insurance
4  Companies for three decades, how would you describe the
5  brand recognition of Federal Insurance Company?
6  A.  No one outside of Chubb knows Federal.
7  Q.  Was the decision to agree to a press release for FICO
8  in this time period typical or was it a special
9  accommodation?
10  A.  It would have been a special accommodation.
11  Q.  Okay.  Let's turn to the license agreement, which is in
12  evidence as J1.  And if we could turn to page 8, Vanessa.
13        Do you see on the screen, Mr. Folz, there is a
14  provision titled No Assignment?
15  A.  Yes.
16  Q.  Were you responsible for negotiating assignment
17  provisions at Chubb?
18  A.  No.
19        MR. HINDERAKER:  Your Honor?  Could we have a
20  side-bar, and I will raise my objection?
21        THE COURT:  Approach.
22
23        (Side-bar discussion.)
24        MR. HINDERAKER:  Mr. Folz's e-mail communications
25  and involvement with the license agreement began in

**2413**

1  December with respect to Amendment Number Two.  He has no
2  foundation to discuss the license agreement as it was
3  negotiated in June of 2006.
4        And as Ms. Godesky's question raised was not
5  whether he had negotiations -- I'm sorry -- about 10.8 of
6  this license agreement, but does he have experience
7  negotiating assignment agreements in general, not specific
8  to this contract.
9        THE COURT:  Where are you going?
10        MS. GODESKY:  I just want to ask him, Did you
11  have responsibilities for negotiating assignment provisions
12  at Chubb?  No.  Who had that responsibility?  Legal.  I
13  just want them to know I'm not addressing this with him
14  because it's outside of his bounds.
15        MR. HINDERAKER:  I agree it's outside of his
16  bonds, so we're on the same page.  Thank you.
17
18        (In open court with the Jury present.)
19        THE COURT:  Mr. Folz, you will have to turn your
20  microphone back on.
21  BY MS. GODESKY:
22  Q.  So, Mr. Folz, we were looking at this assignment
23  provision on the screen, right?
24  A.  Yes.
25  Q.  Did you have responsibilities at Chubb for negotiating

**2414**

1  assignment provisions?
2  A.  No.  Provisions like this are negotiated by our legal
3  department.
4  Q.  Okay.  So I want to look at the second amendment, which
5  starts at J19.  And this is the amendment to the license
6  agreement that you were negotiating, right?
7  A.  Yes, it is.
8  Q.  And if we could look at the table on this first page,
9  what was the scope of this Blaze license as amended in
10  December 2006?
11  A.  So enterprise-wide.
12  Q.  And to what enterprise are you referring?
13  A.  The Chubb Group of Insurance Companies.
14  Q.  We saw some references in the e-mail that we were just
15  looking at to limitations on the number of seats that could
16  use Blaze.  Do you remember that?
17  A.  Yes.
18  Q.  Did the final version of this amendment have any
19  limitations on seats or use?
20  A.  There were no limitations on seats or use.
21  Q.  And how long was this license meant to last?
22  A.  It's a perpetual license, so it's forever.
23  Q.  What was the pricing arrangement for this license?
24  A.  So we paid -- the price was a million, three.  We got a
25  $350,000 discount for moneys we had paid for the previous

**2415**

1  SBU-based license earlier in the year.  And so it netted
2  out that we paid a one-time fee of $950,000, plus the first
3  year's maintenance.
4  Q.  Vanessa, could we pull up defendants' demonstrative 22,
5  please.
6        Mr. Folz, have you seen this before?
7  A.  Yes, I have.
8  Q.  And is it a summary of key terms in the various license
9  agreements?
10  A.  Yes, it is.
11  Q.  Can you walk the jury through how the Blaze license
12  agreements changed over time?
13  A.  Yes.  So it basically evolved over time.  We started
14  out -- and this is typical in the way Chubb and other
15  companies do this.  You start out, you're acquiring this
16  capability, you want to try it out.
17        So our first license agreement June 30th, 2006,
18  is for a single application within the overall portfolio.
19  So one application we could use it.  On, and it was limited
20  to five seats.  Okay?
21        Then we decided that we were going to expand the
22  usage to one SBU, strategic business unit.  Chubb had
23  multiple strategic business units.  So we were going to
24  expand it to one.  It was the SBU in which the application,
25  the original application that we did the initial license

2432

1  Q.  The evidence may be that there is a misunderstanding.
2  But my question to you is, If you want to find out if there
3  is a misunderstanding or if both sides have the same
4  understanding, the place to find that answer is in the
5  written agreement that the parties signed, being the
6  license agreement.  Do you disagree with that?
7  A.  I don't disagree.  That's fair.
8  Q.  And then the Amendment One -- we know that the original
9  license amount was limited to the specialty lines.  And
10  then we also know, do we not, that through the various
11  amendments, Amendment One divisional lines, the full
12  division of the specialty, and we do agree, do we not, that
13  as a consequence of Amendment Two, the rights to use Blaze
14  Advisor extended now to the commercial lines of insurance
15  that were sold.
16  A.  It extended to all lines.  Amendment Two extended to
17  all lines around the world.
18  Q.  And the allocation document that you looked at -- I'm
19  not sure I have it.
20       Do you recall -- the allocation document you
21  looked at, where you had that meeting to think about
22  allocations, I noticed that CPI was one of the lines of
23  business for which an allocation was made.  Do you recall
24  that?
25  A.  Can I just refer to my document?

2433

1  Q.  Absolutely.  I'm trying to find the same thing.  There
2  we go.  It's what -- your Exhibit D0067.
3  A.  Yes.  I see that.
4  Q.  You see that.  So 7 percent of the license fee.  Do I
5  read that correctly?
6  A.  13 percent.  13 percent of the maintenance went to CPI.
7  Q.  And that stands for?
8  A.  Chubb personal insurance.
9  Q.  So not only did the permission to use Blaze Advisor
10  extend to the commercial lines, it extended to the personal
11  lines as well?
12  A.  Yes.  The entire, the entire enterprise.
13  Q.  Well, like I say, we'll look at the license agreement
14  with respect to the meaning of things.
15       Now, did -- in your role in negotiations, did you
16  work at all with the legal department in the drafting of
17  the terms of the license agreement?
18  A.  Not the legal terms.
19  Q.  Okay.  And I would like to, if I might, go to your
20  Exhibit D0328.
21       And this is, this is one of the documents that
22  comes from your vendor management system at Chubb?
23  A.  Yes.
24  Q.  So for the, just to read this together a bit, for the
25  software license and maintenance agreement, the original

2434

1  agreement, the Chubb entity in which this is filed is Chubb
2  & Son, a division of Federal, right?
3  A.  That's what it says.
4  Q.  And then the -- and as I said already, the Chubb vendor
5  management contact is Jim Black?
6  A.  Yes.
7  Q.  And then in terms of the Chubb department contact, it
8  references Dolores Sutton, agreed?
9  A.  Agree.
10  Q.  Then in your vendor management system, we will go two
11  documents forward.  You have Amendment One that gives CSI a
12  divisional license, and that, of course, we know is Chubb
13  specialty.  Again, the Chubb entity in which this is filed
14  is Chubb & Son, a division of Federal.  Agreed?
15  A.  Yes.
16  Q.  And as before, the vendor management contact is Jim
17  Black?
18  A.  Yes.
19  Q.  Agreed?  And now the Chubb contact is Dolores Sutton.
20  Agree?
21  A.  I agree.
22  Q.  And then if we go to the document that is Amendment
23  Two, again, Chubb entity is the division of Federal, Chubb
24  & Son the division of Federal?
25  A.  Yes.

2435

1  Q.  And again Jim Black is the contact person?
2  A.  Yes.
3  Q.  And now you, with respect to Amendment Two, are the
4  Chubb department contact?
5  A.  Yes.
6  Q.  Okay.  So that's the progression through.
7       And I noticed, you know, from your direct
8  examination now, as Chubb stored the information in its
9  system, it describes it as worldwide enterprise license.
10  But as before, you and I agree that if we're going to
11  confirm the accuracy of that, we would go and look at the
12  license agreement itself.  Agree?
13  A.  Agreed.
14  Q.  Then let me go to D0058.  And do you have that?  I
15  believe this is in evidence.
16       Do you have that in front of you now, sir?
17  A.  Yes, I do.
18  Q.  And this is a document that's dated December 21, 2006,
19  and the title of it is Fair Isaac - Enterprise License.
20  And Mr. Berthiaume -- and we saw him as a signatory to the
21  original agreement, right?
22  A.  Yes.
23  Q.  And you are -- Dolores Sutton is one of the people on
24  the e-mail as well.  And Mr. Berthiaume is saying to the
25  management team in December 21, we -- with respect to the

2436

1  FICO Blaze Advisor license, "We got a good deal as a first
2  in."
3         Do I read that right?
4  A.  Yes.
5  Q.  And -- yes.  And all of the pricing in terms of this
6  license agreement was pricing that was negotiated in the
7  time frame of 2006?
8  A.  Can you clarify "this license agreement"?
9  Q.  The license agreement that is this J1 in front of you
10 between Chubb & Son and FICO.  And that license agreement
11 and the terms, but particularly the price, were all
12 negotiated in 2006?
13 A.  Yes.
14 Q.  Okay.  Let me just look at my notes a minute more.  And
15 if we could go back to the J1, please.
16        And let's just go to Amendment Two that you were
17 a part of.  Do you have that?
18 A.  Yes.
19 Q.  All right.  And I just want to see if you agree with me
20 that Amendment Two says that it's effective on a certain
21 date, December 28, and it amends the software license and
22 services agreement entered into on June 30th, and by and
23 between Fair Isaac and Chubb & Son, a division of Federal
24 Insurance Company, define term client.  That's what it
25 says?

2437

1  A.  That's what it says.
2  Q.  And so from, from your frame of reference, if someone
3  was to ask, what's the -- if someone was to ask, Is the
4  width and breadth, the full scope of the enterprise, the
5  scope of the enterprise that is the client under the
6  license agreement being Chubb & Son, a division, is that a
7  question that you would go seek legal advice on?
8  A.  Yes.
9  Q.  If I could direct your attention to P1180.  Do you have
10 that before you?
11 A.  It was here, but it went off, so --
12 Q.  Okay.
13 A.  It's back.
14 Q.  And this is an e-mail from a Michael G. Meyer,
15 November 22, 2011, to you, right?
16 A.  Yes.
17 Q.  Among others, of course.
18        And the e-mail says, "Phil, FICO would like to
19 nominate Chubb for a Celent model carrier award for the
20 work we did with them on the Premium Booking modernization
21 program using their Blaze Advisor product and professional
22 services."
23        Did I read that right?
24 A.  Yes.
25 Q.  And Celent is a -- do you know the organization Celent?

2438

1  A.  Yes.
2  Q.  And Celent is what?
3  A.  It's more or less like a research type organization.
4  Q.  Analyze -- gives analytical reports, market reports,
5  company product reports --
6  A.  Yes.
7  Q.  -- in this technology space and insurance.  Agreed?
8  A.  Yes.
9  Q.  And so FICO would like to nominate Chubb for this
10 Celent model carrier award.  Did you have any role or -- in
11 the Premium Booking modernization program that's being
12 referenced in the e-mail?
13 A.  No.
14 Q.  Then I would like to ask you to go to Exhibit 1073,
15 please.  And let me know when you have it.
16 A.  It's here.
17 Q.  Okay.  Great.  And this is from a Robert Iskols?  Did
18 I --
19 A.  Iskols, yes.
20 Q.  To yourself and a bunch of others.  And the subject is,
21 Vendor Day - Need Input Please.
22 A.  Okay.
23 Q.  And in the second paragraph it says, "In terms of the
24 vendors (and this is where I need your input), we will
25 adjust last year's invitee list accordingly."

2439

1         Then if we go a little farther into that same
2  paragraph, "Last year's invitees were Mckinsey, CAI, and
3  then Computer Associates, BCT Partners (who did not attend)
4  and Fair Isaac," among others.
5         Did I read that right?
6  A.  Yes, that's what it says.
7  Q.  So in 2010 Fair Isaac was considered a strategic
8  partner at Chubb, as well as 2011?
9  A.  Yes.
10 Q.  Thank you.  And then if I -- and I am going to ask you
11 to, go to P0171A, please.  And do you have that?
12 A.  Yes.
13 Q.  Okay.  You are ahead of me.  0171.  All right.
14        So 0171A is this e-mail from yourself to Ramesh
15 Pandey dated July 10, 2015, right?
16 A.  Yes.
17 Q.  And the e-mail references -- well, the subject line,
18 the attachment is, Chubb IT Overview for ACE.  Do you see
19 that?
20 A.  Yes.
21 Q.  And so this time frame, even as early as July 2015, the
22 subject matter of this e-mail -- and we'll look at the
23 attachment briefly -- is the integration addressing the
24 integration plan of the technologies of the Chubb
25 Corporation and the ACE Limited companies?

**2548**

1  whether who can bind FICO is totally irrelevant here.

2      We're not saying that there was a new contract

3  formed or anything like that. We're just saying it was a

4  bad faith claim. And the jury, if they want to say that,

5  you know, these people -- they could say whatever they

6  want, right, and I'm sure -- they would have said all the

7  same things under their 3.1 claim, whatever they're going

8  to say in defense to our bad faith argument.

9      But the scope of authority is about who can bind.

10 And that's not what this claim is about. It's about bad

11 faith.

12     THE COURT: Here's -- well, I'm not going to do

13 the instructions that you suggested, Mr. Hinderaker, but my

14 understanding of this claim, even in light of what I said,

15 was that the bad faith that is alleged occurred in 2016,

16 when Mr. Carretta and others took the position that you say

17 is unfounded.

18     Well, and the court has found that it's not in

19 the contract, but that is the bad faith, that they relied

20 on a territorial restriction that isn't in the contract.

21     And, of course, quite obviously, FICO can respond

22 to that by pointing to the terms of the license and to the

23 testimony in which they have explained why it wasn't in bad

24 faith. Okay? All right.

25     Copyright infringement.

**2549**

1      Proof of damages.

2      MR. METLITSKY: Your Honor, my only comment on

3  this was that we should do a nominal damages charge.

4      THE COURT: And that is in here. It's coming.

5      MR. METLITSKY: Okay.

6      THE COURT: So the next one is breach of

7  contract, implied covenant damages. And then after that,

8  it's nominal damages because nominal damages only apply to

9  those claims.

10     MR. METLITSKY: Okay.

11     THE COURT: And you've received the nominal

12 damages instruction, correct?

13     MR. METLITSKY: Yes.

14     THE COURT: All right. Next one, infringement

15 damages.

16     MR. METLITSKY: Your Honor?

17     THE COURT: Yep.

18     MR. METLITSKY: Two little points, but I think

19 they're important. First of all, licensor in the middle

20 here is capitalized.

21     THE COURT: Yeah.

22     MR. METLITSKY: Yeah. And it also says the

23 licensor and the licensee, and we think it should --

24     THE COURT: Oh, you are on a different --

25     MR. METLITSKY: I'm sorry. Where are we?

**2550**

1      THE COURT: I'm on page 21, infringement damages.

2      MR. METLITSKY: Oh, I was going to the next one.

3  Sorry.

4      THE COURT: Determination of actual damages.

5  And is that where we have the issue?

6      MR. METLITSKY: Yeah. So like right in the

7  middle of the second paragraph, there's a capital L.

8      THE COURT: That's coming out.

9      MR. METLITSKY: Yeah. And at the beginning of

10 that paragraph, we think it should say a licensor and a

11 licensee because it's hypothetical.

12     THE COURT: I've been thinking about that since

13 you raised it yesterday, and I'm going to not make that

14 change for two reasons:

15     Number one, I think this is an accurate statement

16 of the law, and I think it is fair for this jury to

17 consider FICO and Federal; but even with that, the phrase

18 "the licensor and the licensee" can certainly be read by a

19 jury in a generic sense.

20     So I'm not going to make that change, but I am

21 taking out the capital.

22     Mr. Hinderaker, any other?

23     MR. HINDERAKER: No, Your Honor.

24     MS. GODESKY: Your Honor, may I raise an issue

25 with regard to actual damages?

**2551**

1      THE COURT: You may.

2      MS. GODESKY: So in light of the court's ruling

3  on that there can be no breach of 3.1, vis-à-vis the

4  foreign affiliates.

5      THE COURT: Right.

6      MS. GODESKY: We would request an instruction

7  that the jury, an explanation and instruction that the jury

8  was presented with certain license fee calculations by

9  Mr. Waid, including use in Canada, Australia and Europe,

10 right, his $50 million number that was constructed around

11 Chubb's actual use, right, and then Mr. Hinderaker walked

12 him through how you would apply that to the, quote unquote,

13 "standard pricing guide at FICO."

14     But I think we need, you know, some guardrails

15 along with your instruction about how that's no longer in

16 the case. I think we need to be telling them, you know,

17 I'm just sort of thinking about it now, right, but there

18 needs to be some sort of instruction and explanation as to

19 how more than half of the damages that they've been

20 presenting are out of the case, in terms of that

21 hypothetical license fee.

22     THE COURT: I have to confess that I don't

23 remember the numbers specifically with respect to that

24 issue. I thought you were going to the, I think the

25 Zoltowski issue of 154 million, which is --

**2552**

1    MS. GODESKY:  That too.

2    THE COURT:  -- also in the case.

3    MS. GODESKY:  Yes, that too.  But the $50 million

4  hypothetical license fee was built around the assumption

5  that it would be possible, you know, that there's a need to

6  find a license fee that would cover infringing use by

7  Canada, Australia and Europe.

8        So I just, I think we need to level set with the

9  jury in terms of what's changed.

10    MR. HINDERAKER:  A comment:  We were very

11  careful, and the court was quite instructive and direct, in

12  the fact that after applications were sized, if you will,

13  that pricing matrix against the defendants' data, the next

14  slides and all of the next slides on the named application

15  license never identify an application.

16        The testimony was, if you have a certain mix, and

17  here we have some very large, some large, this is how the

18  pricing works out.  It was never identified to be an

19  application in the U.S. or anywhere and never identified to

20  be an application.  So there isn't that issue.

21        Secondly, when the testimony turned to, well, how

22  would you price it with a perpetual, again, there was never

23  a reference to -- we had a hypothetical $35 billion company

24  and we had a hypothetical $3.5 billion company.  It was

25  never identified where does 3.5 come from.

**2553**

1        We just, the jury just heard, well, let's see how

2  it works out if you have a tenth of the size of the

3  company, and that's the information that they got.

4    THE COURT:  And the infringing use at the point

5  of the hypothetical negotiation is not based on whether the

6  affiliates could use it while the license was in play.  So

7  I don't think I should do that instruction.  There just --

8        They're hypothetically negotiating over the use

9  that was made, which includes Canada and the UK, maybe not

10  much of Australia.  But, in other words, it's still

11  appropriate to consider that use because the infringement

12  isn't based on the territory restriction.

13        You are not following me.

14    MS. GODESKY:  No.  I'm following you on the

15  infringement piece.

16    THE COURT:  Okay.

17    MS. GODESKY:  But I still think there's a big

18  problem on the actual damages piece, because, you know,

19  whether the slides were labeled Chubb's use of Blaze or

20  not, Mr. Waid walked through, Chubb had a very large

21  application in Australia.  I'm making up the country,

22  right, but it was very large in Australia, and it was used

23  for four years.  And then the chart he put up right after

24  that was very large, four years, price, and all of it

25  totaled up to $50 million.

**2554**

1        So, you know, if the jury is tracking what was

2  being presented, they're thinking that there's a

3  $50 million license fee covering the use that was discussed

4  during Mr. Waid's direct examination.

5    THE COURT:  Prior to 2016.

6    MS. GODESKY:  Correct.

7    MR. HINDERAKER:  Well, $50 million isn't all

8  prior to 2016, but the -- the jury is going to be

9  instructed -- the jury is going to hear the court's

10  instructions.  The argument is going to conform with the

11  court's instructions and the court's rulings.

12        And from the termination of the license

13  agreement, we will be looking at those applications, and we

14  will be going through the sizing and pricing and the

15  testimony that relates only to those applications.

16        Some of those applications will be the Canadian

17  application and will be the UK application for license fee

18  because those uses carried on after the license agreement

19  was terminated.

20        So today the client is Federal.  Today they're

21  affiliates of Federal, and they were clients and affiliates

22  but not after March 31, 2016.  So those application names

23  are going to be in the case as well.  I think the jury's

24  just going to hear our closing argument in light of your

25  instructions.

**2555**

1        And will the numbers be different overall?  Sure.

2  But they're going to hear what we're asking for.

3    THE COURT:  As I'm hearing all this, it strikes

4  me that Mr. Metlitsky's suggestion back on construction of

5  the license agreement with adding a sentence that says that

6  I found that -- this isn't the exact language I'll use, and

7  you get to see the language.

8        But prior to 2016, the license -- it was not a

9  violation of the license agreement to use the software by

10  Chubb Canada, Chubb Australia, Chubb UK.  And I think that

11  will give you what you need in final argument to discuss

12  what you need about the numbers for the actual damages.

13        I understand your concern.

14    MS. GODESKY:  May I reference that expressly?

15  You know, the judge just instructed you that --

16    THE COURT:  Yes.

17    MS. GODESKY:  -- however it is that you phrase

18  it.

19    THE COURT:  Yes.

20    MS. GODESKY:  And then address it that way?

21    THE COURT:  Yes.

22    MS. GODESKY:  My second -- I would propose, just

23  so we're all on the same page, that at a certain time

24  tonight soon, to the extent there's going to be a

25  demonstrative that would summarize --

**2556**

1    You know, Mr. Waid put up his demonstrative that
2  they got to 50 million.  I would expect they would have
3  probably used that in closing.
4    I think I have to close first.  I'm sort of
5  flying blind, you know.  Mr. Hinderaker is saying it's
6  going to conform to the court's ruling, but I think it
7  would be in everyone's interest for us all to just make
8  sure we don't have any dispute about that before openings
9  start in terms of, if you take the $50 million number and
10  extract the pre-2016 use, right, what's the number and how
11  are they going to say they get there?
12    THE COURT:  I think that's fair, but --
13    MR. HINDERAKER:  I hope that both sides exchange
14  their --
15    THE COURT:  Right.
16    MR. HINDERAKER:  -- their demonstrative slides.
17  I hope both sides exchange their demonstrative slides
18  timely after they're prepared.
19    THE COURT:  They will.
20    MR. HINDERAKER:  But I can't exchange what I
21  don't have.
22    THE COURT:  No, I understand.
23    So if you both need me to set a time, I will, but
24  it seems to me that you guys are better off just agreeing
25  on a time at which you will exchange those tonight at a

**2557**

1  reasonable hour, recognizing lawyers' definition of
2  "reasonable" in this context.
3    MS. GODESKY:  So we did not have an agreement to
4  exchange demonstratives for closing.  I mean, is it the
5  court's order that we need to do that in terms of, you
6  know, I mean, most of this is in evidence.
7    THE COURT:  Right.  Well, you're going to have to
8  exchange it before you give the closing, obviously, yes.
9  You know, let me put it this way:
10    Well, nobody wants a situation where somehow a
11  demonstrative is used during closing that is wildly
12  inappropriate or would constitute some grounds for arguing
13  error or objecting even.
14    I take your point.  I guess the parties probably
15  don't want to exchange them before closing; and if that's
16  the case, then I would say -- I take Mr. Hinderaker at his
17  representation, but let's do this:
18    If you're going to use a slide about that actual
19  damages negotiation, why don't you at least submit it to me
20  for in camera review this evening.  And, Ms. Godesky, if I
21  have no concern with it, we'll have to go.
22    MS. GODESKY:  That's fine with me, Your Honor,
23  but I would ask that we should know what the number is.
24  You know --
25    THE COURT:  What is the number?  I mean, is

**2558**

1  this --
2    MS. GODESKY:  I think it takes out more than
3  half, but, you know --
4    THE COURT:  That should be a matter of testimony.
5  Isn't it already in the record?
6    MR. HINDERAKER:  Sure.  She has the information
7  from the slides from -- and our demonstratives with
8  Mr. Waid.  It's a matter of just doing the math.
9    THE COURT:  Okay.
10    MS. GODESKY:  Okay.
11    THE COURT:  Okay.
12    MR. HINDERAKER:  I mean, we know the
13  applications.  We know the new time period.
14    THE COURT:  Well share the number with each other
15  in case you don't agree.  Okay?
16    MR. HINDERAKER:  Once we figure out -- yeah, but
17  it's math for us too.  Just have to do the math.  So I'm
18  happy -- let me back up for a moment.
19    I'm happy to share the number once we have it.
20  And then if we're not going to exchange closing slides, I
21  get that point as well.  But then maybe there's no reason
22  for us to send you a slide.
23    THE COURT:  There is none.  I agree with you.
24  Share the number.  Make sure you are on the same page.  If
25  you are not on the same page, I expect I will hear

**2559**

1  something.
2    MR. HINDERAKER:  You will hear.
3    MS. GODESKY:  Thank you.
4    THE COURT:  Other than -- okay.  So I think we're
5  done on determination of actual damages, having rejected
6  Mr. Metlitsky's request.
7    Profits -- and by the way, thank you parties
8  for -- I don't know what lodged in my brain that I called
9  this throughout lost profits, but thanks for pointing that
10  out.
11    Profits.
12    Page 24, Profits:  Indirect profits.
13    MR. HINDERAKER:  Is that a necessary instruction?
14  It is, of course, an indirect profits case, but I don't see
15  how it matters to the jury.
16    THE COURT:  Yeah, I've been thinking about that.
17  I don't know that it is a necessary instruction.
18    MR. METLITSKY:  Leave it up to you, Your Honor.
19    THE COURT:  So we'll take it out.
20    Profits:  Plaintiff's burden.
21    MR. HINDERAKER:  We have some comments.
22    THE COURT:  Okay.
23    MR. HINDERAKER:  The first comment is the use of
24  the word "causal."  We have no quarrel with the use of the
25  word "nexus."  You know, we referenced Judge Wright's

2560

1  decision, of course, and on page 7, I think it's 7, it is
2  page 7. "In doing so the copyright owner has the initial
3  burden to demonstrate a nexus between the infringement and
4  the infringer's profits."
5          The word "causal" isn't there.
6          THE COURT: It's not in her order; I would agree
7  with that.
8          MR. HINDERAKER: And it starts to sneak up on
9  these arguments of "but for." And I think nexus serves the
10 same purpose as causal without the mischief of suggesting
11 that it's more than a nexus.
12         THE COURT: My recollection is that Andreas ^
13 used that word. One of the cases cited here did. I
14 thought it was Andreas.
15         Yeah, it was Andreas.
16         MR. HINDERAKER: I know that she's cites Andreas
17 as support for the sentence that I just read. I don't have
18 the case in front of me to know one way or the other.
19         THE COURT: All right.
20         MR. HINDERAKER: The next sentence, of course, is
21 after that nexus is established, then the burden shifts.
22         THE COURT: Okay. Let me do this -- well, let me
23 first hear from Mr. Metlitsky on this particular.
24         MR. METLITSKY: Okay. I have some more comments
25 on this instruction.

2561

1          THE COURT: Yep.
2          MR. METLITSKY: Your Honor, so we would object to
3  taking out "causal." We think that's the standard. It's a
4  causation standard.
5          And, you know, we don't see any reason to take it
6  out. The fact that it wasn't in Judge Wright's opinion,
7  she wasn't writing a jury instruction. So --
8          THE COURT: Well, and let's be clear about
9  something. I -- it's not a "but for" standard. And
10 nobody's going to be arguing that it is. Right? Okay.
11         MR. METLITSKY: Nobody's going to be arguing that
12 it is, but the word "causal" is in Andreas many, many times
13 so we would --
14         THE COURT: All right. Mr. Hinderaker, keep
15 going.
16         MR. HINDERAKER: I'm just looking at Andreas.
17         Andreas argues that he met his burden by
18 establishing a causal connection. We don't have to read
19 the full case here, but I think a quick reference to
20 Andreas conforms with Judge Wright's expression of what
21 Andreas stands for, and nexus is not a component.
22         My second point is, and the court made this
23 change some places, that is to add the phrase "at least in
24 part," which conforms with Andreas, conforms with the
25 Honeywell case and conforms with Judge Wright.

2562

1          So here it would be the third line, this is
2  referred to as attribution. FICO must identify defendants'
3  revenues that are attributable at least in part to the
4  alleged infringement.
5          Now, the court uses that phrasing in the special
6  verdict at question nine. I don't think it's arguable that
7  that is the legal standard. And so we would ask that that
8  phrase be added to plaintiff's burden.
9          THE COURT: As long as you're speaking,
10 Mr. Hinderaker, other comments on this before I turn back
11 to Mr. Metlitsky?
12         MR. HINDERAKER: No, not on this instruction.
13 Oh, I guess there is one more.
14         MS. KLIEBENSTEIN: You got it.
15         MR. HINDERAKER: Oh, yeah. So I was just
16 pointing out where that same phrase should be added. Where
17 you sum up at the end of the paragraph, that is, FICO must
18 show that the use of Blaze Advisor contributed, and it
19 should be again at least in part to the generation of the
20 revenue, just to be --
21         THE COURT: Consistent.
22         MR. HINDERAKER: -- consistent.
23         MR. METLITSKY: Your Honor, we object. We object
24 to that.
25         THE COURT: I know you do.

2563

1          MR. METLITSKY: Yeah.
2          THE COURT: All right. I'll put that one aside
3  for the moment.
4          MR. METLITSKY: Can I explain my objection?
5          THE COURT: Yes, by all means.
6          MR. METLITSKY: So on the first one,
7  "attributable to" that's just language from the statute.
8  You should not be adding language to, you know, statutory
9  language.
10         And I don't think it's correct. I mean,
11 "contributed to at least in part" is wrong. "Contributed
12 to" already means at least in part. That's, it's already
13 implied in the phrase.
14         "Contributed to at least in part" is nowhere in
15 Andreas. And the problem with "at least in part" is, it
16 leads into the issue that we were discussing earlier where
17 you are a small part of a big application, and they're
18 going to think that that means that just because the big
19 application contributes to revenue, this then contributes
20 in part.
21         That language is not in the governing case in the
22 Eighth Circuit. And so I do not think we should add it
23 because it's going to cause mischief.
24         THE COURT: Well, and I understand your point. I
25 am inclined to agree. And, frankly, because of this

1    the opinion and all other evidence in the case.

2          Testimony has been presented to you in the form of

3    a deposition.  A deposition is the recorded answers a

4    witness made under oath to questions asked by lawyers before

5    trial.  The deposition testimony you have seen has been

6    electronically videotaped and that recording played for you.

7    You should consider the deposition testimony and judge its

8    credibility as you would that of any witness who testifies

9    here in person.

10          During the trial you have heard testimony from

11   witnesses who appeared in their capacity as the parties'

12   corporate designee.  Those witnesses were authorized to

13   speak on behalf of the organization about information known

14   to the organization.  Those witnesses were standing in the

15   shoes of the organization and were not testifying as

16   individual persons.

17          The following witnesses were designated to testify

18   as their corporate representatives:  Claudio Ghislanzoni,

19   Henry Mirolyuz, John Taylor, William Waid.

20          Exhibit P1116 was introduced for a limited

21   purpose.  It is to be used only as evidence of when and how

22   Mr. Waid learned of DWS's access to Blaze Advisor.  You may

23   only consider Exhibit P1116 for that purpose.

24          Some of the exhibits introduced during trial are

25   software licensing agreements between FICO and companies

1    other than Federal.  These agreements have been introduced

2    for a limited purpose.

3           You may consider the agreements for whatever value

4    they may have in your decisions about the hypothetical

5    license negotiation, which you will hear about shortly.  The

6    agreements may also be used to illustrate other language

7    that the parties might have used in their agreement.

8           The agreements, however, are not evidence of the

9    parties' mutual intent as to the meaning of the software

10   license agreement in this case.

11          Certain charts and summaries have been shown to

12   you in order to help explain the facts disclosed by books,

13   records or other underlying evidence in the case.  Those

14   charts or summaries are used for convenience.  They are not

15   themselves evidence or proof of any facts.

16          If they do not correctly reflect the facts shown

17   by the evidence in the case, you should disregard these

18   charts and summaries and decide the facts from the books,

19   records or other underlying evidence.

20          As you have heard, FICO seeks to recover damages

21   for breach of contract.  FICO had a contract with Federal,

22   the license agreement, that set the terms under which

23   Federal could use FICO's Blaze Advisor software.

24          FICO claims that Federal breached the contract by

25   allowing unauthorized persons or entities to use the

1  software, by failing to obtain consent for the continued use

2  of Blaze Advisor after the merger or by continuing to use

3  Blaze Advisor after FICO terminated the agreement.

4  Federal claims that it did not breach the

5  agreement.  It claims the merger did not violate

6  Section 10.8 of the agreement, that any use by unauthorized

7  persons or entities was not a breach, and that FICO's

8  termination of the agreement was ineffective and was itself

9  a breach of the license agreement by FICO.

10  The party who claims breach of contract has the

11  burden of proving by a preponderance of the evidence that it

12  had a contract with the other party, that it did what it was

13  required to do under the contract, that the other party

14  breached the contract by not doing what it was required to

15  do under the contract, and that the breaching party

16  sustained damages because of the other's breach.

17  If you decide that Federal breached the license

18  agreement in any of the ways FICO has alleged, you will find

19  for FICO on its breach of contract claim, and you will go on

20  to consider FICO's damages against Federal.

21  If you decide that Federal did not breach the

22  license agreement, you will find for Federal on FICO's

23  breach of contract claim.

24  If you decide that FICO breached the license

25  agreement, as Federal as alleged, you will find for Federal

1          Damages must be proved with reasonable certainty.

2     You may not award damages that are speculative, that is,

3     damages that might be possible, but are based solely on

4     guess work.

5          The party seeking damages is not required to prove

6     the exact amount of its damages, but must show sufficient

7     facts and circumstances to permit you to make a reasonable

8     estimate of the damages.

9          If you find any party is entitled to a verdict on

10     more than one of its counts, you should take care to avoid

11     awarding duplicative damages.

12          Hold on one second.

13          If you find that either FICO or Federal are owed

14     damages for breach of contract or breach of the implied

15     covenant of good faith and fair dealing, you should award

16     that party damages in the amount that is required to make

17     them whole.

18          Damages on a breach claim are intended to replace

19     the loss caused by the breach and place the party in as good

20     a position as it would have been in had the other party not

21     breached the contract or the implied covenant.

22          If you find that plaintiff has proved that

23     defendant has infringed plaintiff's copyright, then you must

24     determine the amount of damages, if any, plaintiff is

25     entitled to recover.  If you find that plaintiff has failed

1    to prove the claim, then you will not consider the question

2    of damages.

3         Plaintiff must prove damages by a preponderance of

4    the evidence.  Plaintiff may recover for any actual losses

5    it suffered because of the infringement, plus any profits

6    that defendant made from the infringement.

7         I will define these terms in the following

8    instructions.

9         The measure of actual damages for FICO's breach of

10   contract claim and its copyright infringement claim is the

11   fair market value of a license to use Blaze Advisor.  The

12   fair market value is the license fee that a willing buyer

13   and a willing seller would have negotiated for the allegedly

14   improper or infringing use that was made.

15        The license fee is the amount that the licensor

16   and the licensee would have agreed to in a hypothetical

17   negotiation for a license covering the allegedly infringing

18   use that was made.

19        In considering this hypothetical negotiation, you

20   should focus on what the expectations of the licensor and

21   the alleged infringer would have been had they entered into

22   an agreement at that time and had they acted reasonably in

23   their negotiations.

24        In determining this, you must assume that both

25   parties were willing to enter into an agreement.  The

1    license fee you determine must be a fee that would have

2    resulted from the hypothetical negotiation, not simply a fee

3    either party would have preferred.

4         Breach of contract and breach of the implied

5    covenant of good faith and fair dealing claims allow for

6    nominal damages.

7         If you find for FICO on their breach of contract

8    claim against Federal or you find for Federal on their

9    breach of contract or breach of the implied covenant of good

10   faith and fair dealing claim against FICO, but you find that

11   the prevailing party has failed to prove damages as defined

12   in these instructions, you must award nominal damages.

13   Nominal damages may not exceed $1.00.

14        That instruction just pertained to the breach of

15   contract claims and the breach of implied covenant claims.

16   Now I'm returning to the copyright infringement measure of

17   damages.

18        In addition to recovering its actual damages, if

19   you find defendants infringed FICO's copyright, FICO may

20   recover the profits that defendant received because of the

21   infringement.  Defendants' profits are recoverable, however,

22   only to the extent that you have not taken them into account

23   in determining actual damages.

24        The following three instructions all relate to

25   your calculations of profits of the infringer, of the

1    anyway.

2            I would like to begin by telling a story.  It's a

3    story about -- I mentioned -- it's a story about my

4    neighbor, a neighbor.  And, you know, I mentioned when we

5    were selecting the jury, when you all were selected, that I

6    live in South Minneapolis, and I'm in one of those areas of

7    South Minneapolis that has an alley.  So the block is

8    divided by the alley, and there is that side and this side.

9    And the alley is where neighbors meet, one of the places.

10           And Emmett Duffy has passed now, but for years

11   Emmett Duffy was retired from the Department of

12   Transportation, Minnesota state, and was the block captain,

13   if you will.  Everybody knew Emmett, and Emmett knew

14   everybody else.  And so I would be chatting with Emmett; and

15   Emmett would say to me often, Did you get it in writing?

16   And that was his wisdom.  If you're talking about something,

17   did you get it in writing.  And that wisdom of Emmett is one

18   of the things that this lawsuit is about, because FICO and

19   Federal got it in writing and the writing is the lawsuit.

20           The consequences -- this lawsuit was brought

21   because the license agreement and the writing in that

22   license agreement have consequences when they're not

23   honored.  And the lawsuit was also brought because under the

24   copyright law, there are consequences from infringing

25   somebody else's intellectual property.  These two core

1    elements are what we seek to hold the defendants responsible

2    for.

3              And in doing that, there is another piece of

4    wisdom, and this one comes from a 14th century philosopher

5    and theologian by the name of William of Ockham.  And his

6    piece of wisdom is now -- that is attributable to him is now

7    called Occam's razor.  And Occam's razor is simply this:

8    The simplest explanation is usually the best one.

9              Now, there are parts of this lawsuit that are

10   complex.  Blaze Advisor software is complex.  The corporate

11   structure of the Chubb Corporation is complex.  The

12   corporate structure of ACE Limited, now Chubb Limited, is

13   complex.

14             But I submit to you in your deliberations the

15   answers to the fundamental questions that you will be

16   deciding are found in the simplest explanations, and they're

17   found in the words that were put in writing in the license

18   agreement.

19             I submit to you from what you have heard in this

20   lawsuit, if the shoe were on the other foot, would Federal

21   Insurance or ACE Insurance Company be arguing that you

22   should ignore the plain words of the license agreement?

23             And before we go, let me say a word about

24   disgorgement.  The evidence shows that Federal infringed

25   FICO's copyrights when it continued to use Blaze Advisor

1   without FICO's permission after the license agreement was

2   terminated.  During that period of time, Federal acted like

3   it was the owner of Blaze Advisor.  And then a different

4   company called ACE American, as you know, a different

5   company in January 1, 2017, decided that it would be the

6   user of Blaze Advisor, and it then acted as if it owned it.

7        ACE American has never had permission to use Blaze

8   Advisor in connection with selling insurance like it did in

9   this case.  And so they did so from January 2017 until some

10   time in April 2020.  And because of that length of time, the

11   revenue amounts, the gross revenue amounts, that are

12   connected to the infringing use of Blaze Advisor, they are

13   huge.  21 billion is a huge amount of money.  But when you

14   look at 21 billion in the context of all of the revenue that

15   Chubb Limited had over that same period of time, that 21

16   billion is 14 percent.  14 percent is not a big number.

17        If Federal had stopped use when the license

18   agreement terminated, we wouldn't be here talking about

19   disgorgement.  There would be none.  If ACE American never

20   thought it owned Blaze Advisor and used it without FICO's

21   permission, we wouldn't be here talking about disgorgement,

22   because there would be none.

23        The disgorgement arises from their infringement.

24   The size of the disgorgement is because they are so huge.

25   But the disgorgement is -- and I might say, the disgorgement

1    is not compensation to FICO.  The disgorgement is the

2    consequence that the copyright laws say follow when you

3    infringe intellectual property.

4         So let me go -- let me provide an overview of

5    FICO's claims to try to focus on what we actually are

6    contending.

7         We have both the defendants, of course; and while

8    the claims overlap, they also are different.  So against

9    Federal, we have the breach of paragraph 10.8.  And 10.8

10   occurs when there is an event that significantly changes the

11   circumstances of the client, significantly changed the

12   circumstances of the client's use of Blaze Advisor.

13        So at the time of the original license agreement,

14   Blaze Advisor was going to be used in a 12-billion-dollar

15   company.  Because of one of the events of paragraph 10.8,

16   Blaze Advisor is now going to be used in a 35-billion-dollar

17   insurance company.  That's a big difference.

18        Now, Federal did not request FICO's consent, and

19   Federal and FICO could not agree.  And so after 60 days, not

20   immediately, 60 days after Mr. Carretta's notice of breach

21   letter, FICO terminated the license agreement.  And Federal,

22   rather than honor a license agreement or use software only

23   with permission, treated it as its own and did not stop use.

24        So that's paragraph 10.8.  I submit that on all

25   the evidence, there is really no serious dispute that may

1    proud.  They got a great deal, he said.  First in.  He paid

2    FICO half of what his budget was to license Blaze Advisor.

3    Completely aligns with Bill Waid's testimony of the dynamics

4    in 2006.  Chasing revenue.  Not true in 2016.

5            So the way FICO would in the normal case, in this

6    circumstance, they would price based upon what's called a

7    named application pricing.  And as all value pricing at

8    FICO, it depends on the size of the application.  The bigger

9    the application, the more the fees; the smaller the

10   application, less the fee.

11           And so he started with the defendants' own

12   information.  It's Plaintiff's Exhibit 517 in the record,

13   Plaintiff's Exhibit 517.  That's where, the starting point.

14   And then he takes and applies -- and you saw he applied --

15   he took the relevant information out of that document that

16   he would use in sizing an application.  And then I'm just

17   going to go through this one, not all of them.  And then he

18   showed you how he took that information with CSI Express,

19   and he sized it across all of the factors of the pricing

20   matrix, and he got to the conclusion that that wasn't very

21   large.

22           So then the next step on a named application

23   license was to look at, Well, given the different sizes,

24   what is our -- looking at our guidelines, what's our

25   deployment fee?  Is there a multi platform uplift?  What are

1    the development seats?  What's the annual development fee.

2    And then you drive an annual fee.  8 million, 250.  One can

3    say that that's a lot of -- that's a big number, and, of

4    course, it is.  One can also say, that's a lot of

5    applications that you're using without permission, and that

6    is true, too.

7            Now, the shortest period of time that FICO

8    licenses for is one year.  So Federal used it unauthorized,

9    infringed, Blaze Advisor for nine months; but because the

10   shortest period of time that we license for is one year,

11   Federal pays a one-year fee.  The same is true on ACE

12   American.

13           Some of ACE American's use went into 2020.  If you

14   want to have a license for 2020, you buy a year.  You don't

15   buy it by the month.  So that will go into the -- that will

16   go into the next slide where you say, all right, you've got

17   all those applications.  You have an annual fee.  How many

18   years?

19           And on the standard FICO pricing, the beginning of

20   negotiations, $36,542,831 standard FICO fee with that many

21   applications for those many years.  And that, of course, is

22   the beginning, the start of the negotiations.

23           Are there other factors that come into play?  Of

24   course.  Does the licensee have a say, have an oar in the

25   water?  Of course.  But neither party gets to have a fee

1      just because it's the fee that they want.  You have to

2      consider what they can get in the dynamics of the

3      negotiation at the time.  How much will they move their

4      position in the dynamics of the negotiation at the time?

5            And Mr. Waid, from his experience, identified

6      these factors that would be ones that would -- he's seen and

7      ones that would move him one way or the other.

8            So let's say this client had existing revenue

9      streams, in addition to what was being negotiated.  Well,

10     that would influence Mr. Waid in the negotiations, and it

11     would influence the licensee to say, Hey, let's reduce the

12     price on this one because I'm already buying licenses on

13     these other products; but if the licensee has no other

14     products from Blaze Advisor, there is no other license

15     stream or the licensee has no leverage, and FICO has no

16     incentive to change.  And the same kind of dynamic goes down

17     through -- I'm sorry -- goes down through the rest.

18           Well, okay, we have this license agreement, but

19     does FICO have the opportunity to sell more product?  If so,

20     it will reduce its price to get in -- to have the

21     opportunity to sell more product; if not, doesn't change the

22     deal.  Those are the dynamics.  You have to consider all and

23     each one as you and I -- as you run through a hypothetical

24     negotiation.

25           You look at the business impact from the use of

1    of Blaze Advisor in a 30 billion dollar organization went to

2    the very core of the purpose of paragraph 10.8.

3              Now I want to point out to you question 5, and

4    what I particularly want to point out to you is the note.

5    If you answered yes to question 3, the license agreement was

6    properly terminated, then there was copyright infringement.

7    It follows like night and day.

8              Similarly with number 6.  That is to say, when you

9    answer the actual, the loss license fee amount for 4, the

10   same amount will be for 6 under The Copyright Act.  FICO

11   doesn't say otherwise.  Same amount.

12             Now I think the rest are, talked about the proof

13   of, the proof of ACE American's liability for infringement.

14   The dollar amounts.  I've talked about the profits and what

15   FICO's burden is is the revenue, number 9.

16             And then you put in an amount, 10.  And then 11,

17   that's where the defendants' burden comes in.

18             What are the costs?  Have they proven any?  For

19   what years?  Have they proven any apportionment?

20             Now, if you find in favor of FICO for any of those

21   reasons, 1, 2 or 3, you don't have to bother with part 4,

22   but I want to make only this comment about part 4:  As it

23   says here, it's defendant -- it's Federal's claim against

24   FICO.  In the argument it was called defendants' claim.

25   Actually it's Federal's claim.

1          You recall that Federal stopped -- you recall that

2     Federal used Blaze Advisor unchanged from the moment the

3     license agreement terminated until December 31, 2016.  On

4     January 1, 2017, no employees at Federal.

5          Federal incurred zero damages, zero costs.

6     Federal incurred nothing with respect to migrating away from

7     Blaze Advisor because it didn't.

8          The testimony of Mr. Ghislanzoni when in 2019 and

9     then into 2020, ACE American got around to taking Blaze

10    Advisor out of the systems, that's a different kettle of

11    fish.  It's not damages because FICO didn't do -- wasn't

12    responsible for it, but it certainly isn't Federal's damages

13    because it was incurred by ACE American.

14         So I've had my, I've had my say on behalf of FICO,

15    but I want to conclude simply by saying this:  I mentioned

16    during the, again, during the jury selection process that I

17    think it's, I think it's a great honor to directly, to

18    directly participate in our country's rule of law.

19         And I thank you for your service.

20         MS. GODESKY:  Your Honor, may I approach?

21         THE COURT:  You may.

22              **(Side-bar discussion.)**

23         MS. GODESKY:  Your Honor, we have an objection to

24    one of the arguments made by Mr. Hinderaker when he put up

25    the numbers on the screen relevant to the actual damages

 1    claims idea of hypothetical license fee.  He said something

 2    like, you may say that's a big number, but I say that's a

 3    lot of applications that you're using without permission.

 4          And so that is a direct infusion into the

 5    hypothetical negotiation this concept that you're using the

 6    software without permission.  You are an infringer, and

 7    you're negotiating to continue your use of Blaze without a

 8    license.

 9          And that was made even worse by the fact that he

10    referred to the period of time that the infringing user

11    needs a license, how much will people improve their position

12    with the dynamics in place at the time.

13          So all of this is what we were trying to avoid by

14    moving to exclude this type of testimony from Mr. Waid in

15    the first place, but certainly in the boundaries of what you

16    told us we could argue.

17          You can't say, you had a lot of applications you

18    were using without permission.  That's not the context of

19    this negotiation.  So we would request a curative

20    instruction.

21          MR. HINDERAKER:  May I go get your instructions,

22    Your Honor?

23          THE COURT:  You may.

24          MR. HINDERAKER:  Because I was just using your

25    words.  Actual damages.  The willing buyer and willing

1    seller would have negotiated for the allegedly improper or

2    infringing use that was made.  I'm just using your language.

3            THE COURT:  Well, here's where we are.  I do --

4    it's pretty clear that the fact of infringement cannot be

5    considered in arriving at the actual damage -- it's clear

6    that the fact of infringement is not a factor that can be

7    used in the hypothetical negotiation.

8            And so the instruction is intended to say, or does

9    say, for the use that was made.

10           What I will do is, I will repeat the instruction,

11   at least in part, to say that it is what a willing seller

12   and a willing buyer agreed to.

13           MR. HINDERAKER:  I obviously have no quarrel with

14   that.  I was trying to follow the instruction.

15           THE COURT:  Understood.

16           MR. HINDERAKER:  Yeah.  Thank you.

17           MS. GODESKY:  Thank you.

18           **(In open court with the Jury present.)**

19           THE COURT:  Members of the Jury, in a second I'm

20   going to give you the final instruction, but while I'm

21   looking for one thing, go ahead and stand up and stretch.

22           We're five minutes or so from being done.  Okay?

23                        **(Pause.)**

24           THE COURT:  Counsel, if you will both approach.

25                  **(Side-bar discussion.)**

1          THE COURT:  I am going to add a sentence that

2     says, "The fact that one party is alleging infringement may

3     not be considered."  That is the law.

4          MR. HINDERAKER:  The fact that one party is

5     considering infringement is a fact that must be decided by

6     the jury, yeah.  No problem.

7          MS. GODESKY:  Thank you.

8          **(In open court with the Jury present.)**

9          THE COURT:  All right.  Members of the Jury, I am

10     going to repeat an instruction and elaborate on one aspect

11     of it that I gave you earlier before the closing arguments.

12          And that is to this determination of actual

13     damages in the hypothetical negotiation.  The measure of

14     actual damages for FICO's breach of contract claim and its

15     copyright-infringement claim is the fair market value of a

16     license to use Blaze Advisor.

17          The fair market value is the license fee that a

18     willing buyer and a willing seller would have negotiated for

19     the use that was made.  The fact that one party is alleging

20     that the use was infringing or improper is not to be

21     considered in determining the outcome of that hypothetical

22     negotiation.

23          All right.  Here is your final instruction:

24          There are the rules you must follow when you go to

25     the jury room to deliberate and return with your verdict.

1    First, you will select a foreperson.  That person will

2    preside over your discussions and speak for you here in

3    court.

4            Second, your verdict must be the unanimous

5    decision of all jurors; therefore, it is your duty as jurors

6    to discuss the case with one another in the jury room.

7            You should try to reach agreement if you can do

8    this without going against what you believe to be true.

9            Each of you must come to your own decision, but

10   only after you have considered all the evidence, discussed

11   the evidence fully with your fellow jurors, and listened to

12   the views of your fellow jurors.

13           Do not be afraid to change your mind if the

14   discussion persuades you that you should.

15           But do not come to a decision just because other

16   jurors might think it's right or just to reach a unanimous

17   verdict.  Remember, you are not for or against any party.

18   You are judges, judges of the facts.  Your only job is to

19   study the evidence and decide what is true.

20           Third, during your deliberations, including during

21   any recess taken during deliberations, you must not,

22   directly or indirectly, communicate with or provide any

23   information to anyone by any means or by any medium about

24   anything related to this case until I accept your verdict

25   and discharge you from further service in this case.