# EXHIBIT 17
# [REDACTED]

## BLAZE ADVISOR® BUSINESS RULES MANAGEMENT SYSTEM AGREEMENT

This Blaze Advisor Business Rules Management System Agreement ("*Order Form*" or "*Product Order Form*"), including all exhibits and <u>Appendix I</u> Master License and Services Agreement attached hereto and incorporated herein by this reference ("*MLSA*" and together with the Order Form, the "*Agreement*"), is effective on July 1, 2019 (the "*Effective Date*") and made by and between Fair Isaac Corporation ("*Fair Isaac*" or "*FICO*") and RGA Technology Partners, Inc., a Missouri corporation ("*Client*" or "*RGA*").

1.     **Definitions.** Capitalized terms used herein that are defined in the MLSA have the meanings given to such terms in the MLSA. Other terms may be defined in context within the Order Form. The following terms, as used in the main body of this Agreement, will have the meanings set forth below:

"*AURA*" means Client's proprietary Automated Underwriting Risk Assessment system that is used to support the underwriting of Product Types for Client's AURA Subscribers within the Territory.

"*ALU*" means each combination of (i) a unique single AURA Subscriber and (ii) a single Product Type for that same AURA Subscriber, and which incorporates Fair Isaac Product - FICO Blaze Advisor(s) which must be deployed within the Designated Sites(s); the foregoing shall count as a single ALU unit; with any different combination of (i) and (ii) above creates another single ALU unit.

"*Product Type*" means the following specific insurance products authorized by applicable insurance rules and regulations that can be serviced within AURA. Examples of a Product Type are: Group and Individual Protection products (including, but are not limited to life insurance and riders to life insurance, for critical illness, income protection/disability income, accidental death and dismemberment, waiver of premium, etc.), Claims, Annuities, Pet Insurance, Travel Insurance, Health Insurance, P&C Auto, P&C Homeowners, P&C Commercial, Work Compensation.

"*Service Provider*" means the entity or person listed in <u>Exhibit A</u> of this Agreement which is under contract with Client to subscribe and operate Client's AURA on behalf of insurance companies. An ALU is required for each Product Type per each insurance company that the Service Provider is operating AURA.

"*AURA Subscriber*" means a user that is either (a) an insurance company or other insurance corporate entity (including any partners, affiliates, subsidiaries, parents or agents) that subscribes to AURA in support of underwriting a "Product Type" for its insurance business or (b) a Service Provider that is authorized by Client to subscribe and operate AURA on behalf of an insurance company for such insurance company's internal business of providing insurance.

"*RGA Single Purpose Solution*" an RGA solution that provides insurance related capabilities for a single RGA provided Product Type, operated in a multi-tenant mode servicing multiple RGA clients, but is not customizable to any single RGA client. Examples would be Rx Scoring.

"*SPSLU*" means each RGA Single Purpose Solution instance that will incorporate FICO Blaze Advisor counts as a single unit.

"*Documentation*" means the technical manuals and/or instructions and/or user information and/or training materials, including without limitation the guides and other documentation which accompany the Fair Isaac Product and which contain its technical specifications, as may be amended from time to time (including without limitation by way of upgrade and/or the installation of a new version on a when and if available basis). Documentation shall be deemed Fair Isaac Intellectual Property.

"*Fair Isaac Product*" means all Software and modules as set forth in <u>Section 1</u> in <u>Exhibit A</u> of this Agreement and Fair Isaac Product excludes all Third Party Products. Fair Isaac Product is included in the definition of Fair Isaac Product as defined in the MLSA

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*



DEFENDANTS'
TRIAL EXHIBIT
**D-0172**
CASE NO  16 CV-1054-D  S

*"Maintenance Services"* means the Fair Isaac standard maintenance and support services described in Exhibit B of this Agreement

*"Platform"* means Client's operating system and environment in existence as of the date of delivery of the Fair Isaac Product as further defined in Exhibit A.

*"Professional Services", "Additional Services" or "Other Services"* means the implementation services, consulting, training or any other professional services defined and performed by Fair Isaac or an affiliate as set forth under the terms of any agreement for the provision of professional services.  Professional Services excludes Maintenance Services.

*"Software"* means all programs, code (which will be delivered in object code form only) specifications, graphical user interface (GUI), including all media of delivery thereof (CD, Tape or other electronic means) provided to the Client in connection with delivery of the Fair Isaac Product, including all updates, modifications, releases and enhancements and all software listed in Section 1 in Exhibit A "Fair Isaac Product." Software excludes all Third Party Product.

*"Term"* is defined in Section 7.1(Term).

*"Territory"* means the permitted countries listed in Exhibit A of this Agreement, provided, however Territory always excludes (a) the countries of Cuba, Iran, North Korea, Sudan, Syria; and (b) any additional countries that the United States government prohibits or otherwise restricts any export, deemed export or other prohibitions of doing business with such foreign government.

*"Third Party"* means any person or entity that is not directly a party to this Agreement.

*"Third Party Product"* means Third Party systems, software, services, databases, content, reports, lists, files, services or any other product provided to Client or to Fair Isaac in connection with Client's use of, or otherwise incorporated or embedded in, the Fair Isaac Product as a private label or sold in connection with the Fair Isaac Product.

*"Work Product"* or *"Deliverable"* collectively means the following: deliverables provided by Fair Isaac in connection with Maintenance Services, Documentation and all other related information that is provided to Client in connection with delivery of the Fair Isaac Product and Maintenance Services, including any updates and modifications thereof and Intellectual Property Rights arising from the foregoing.

## 2.      License Grants

2.1      Grant of License to the Fair Isaac Product.  Subject to the terms and conditions in the Agreement, Fair Isaac hereby grants to Client, effective only during period set forth in Exhibit A, a personal,  non-exclusive, non-transferable, non-assignable, non-sublicenseable, limited license to use the Fair Isaac Product in accordance with its Documentation, only in the Territory; only at the Designated Sites; only by authorized contractors and employees of Client or AURA Subscriber; only for the benefit of Client's internal business of providing its services to Client's AURA Subscribers to use Client's AURA system; and subject to additional license limitations set forth in Exhibit A of this Agreement.

2.2      Grant of License to the Documentation.  Subject to the terms and conditions, and limitations in the Agreement, Fair Isaac grants to Client, effective only during period set forth in Exhibit A, a personal, non-exclusive, non-transferable, non-sublicenseable, limited copyright license to reproduce, perform and display Documentation; and only in accordance with Client's license grant of the Fair Isaac Product and Work Product provided in this Section 2. Client may internally reproduce Documentation only as to the extent permitted by this Agreement.  Client shall not have the right to distribute to Third Parties, to modify Documentation, combine the Documentation with other works, or create derivative works from Documentation; provided, however, Client license grant above includes sharing the RMA Documentation (defined below) with current AURA Subscribers as long as Client complies with the terms, conditions and restrictions herein and all the following conditions are satisfied: (1) Client obligates AURA Subscribers in signed and enforceable writing to use the RMA Documentation solely for their own internal business purposes to

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

**D-0172-002**                                    FICO0067098



facilitate their use of the RMA portion of Fair Isaac Product within Client's AURA system, and for no other purpose or distribution to any third party, (2) Client understands and acknowledges that Fair Isaac retains all ownership of the RMA Documentation, as part of the Documentation, and (3) all required Fair Isaac copyright notices on the Documentation shall remain intact and are not altered or removed from the RMA Documentation. *"RMA Documentation"* is the specific portion of Documentation of the Fair Isaac Product which are the specifications of the "RMA" functionality portion of the Fair Isaac Product.

2.3     Grant of License to Work Product.  Subject to the terms and conditions of the Agreement, Fair Isaac hereby grants to Client, effective only during period set forth in Exhibit A a personal, non-exclusive, non-transferable, non-sublicenseable, limited license to use the Work Product only at Designated Site within Territory; and only for the benefit of Client's internal business and only in connection with Client's license grant to the Fair Isaac Product under Section 2.1 above.

**3.  Rights and Restrictions**

3.1     Permission for Back-Up Copy.  Client may reproduce the object code of the Fair Isaac Product, the Documentation and the Work Product for the purposes of exercising the license rights granted under this Agreement, on a single backup production database for each Designated Site in the event of a malfunction that renders the primary single production database inoperable, for the period of inoperability or the expiration or termination of the license, whichever first occurs. Subject to the license restrictions herein, Client may also maintain the Fair Isaac Product for internal non-production test environments located at the Designated Sites, in addition to the back-up copy.

3.2     Notice Reproduction.  To the extent Client is given rights to reproduce any Fair Isaac materials, Client must reproduce on each copy of the Fair Isaac Product(s), Third Party Product, Work Product, and Documentation any copyright, patent, or trademark notice, and any other proprietary legends that were contained in the originals.

3.3     License Restrictions.  Except as expressly stated in this Agreement, Client warrants and agrees that Client its employees, representatives, contractors, and/or agents: (a) shall not in any way use the Fair Isaac Product (all or any portion), Documentation, Work Product and Third Party Product, other than within the scope of the licenses granted by Fair Isaac under Section 2 above, (b) shall not in any way alter, change, modify, adapt or translate the Fair Isaac Product (all or any portion), Documentation, Work Product and Third Party Product; (c) shall not with respect to the Fair Isaac Product (all or any portion) and Third Party Product, actually or attempt to reverse engineer, decompile, disassemble, or reduce any object code to human perceivable form or permit others to do so; (d) shall not sublicense or operate any Fair Isaac Product, Work Product or Third Party Product for timesharing, rental, outsourcing, or service bureau operations, or to train persons other than permitted users; (e) and shall not disclose (other than within Client's organization for Client's own internal business purposes) or publish performance benchmark results for any Fair Isaac Product (all or any portion), Work Product and Third Party Product without Fair Isaac's prior written consent.

**4.     Warranties and Disclaimer.**

4.1     Conformity to Software Specifications.  Subject to Client's compliance with the terms and conditions of the Agreement, Fair Isaac warrants that Fair Isaac Product, as described in Section 1 in Exhibit A, will conform in all material respects to its Documentation for a period of ninety (90) days from the initial date of delivery. Fair Isaac shall, at its own expense and as its sole obligation, and Client's exclusive remedy, for any breach of this warranty, replace the Fair Isaac Product or correct any reproducible error in the Fair Isaac Product reported to Fair Isaac by Client in writing within such 30-day period (along with all information available to Client that is relevant to verifying, diagnosing, or correcting the error). Fair Isaac agrees that it will not intentionally remove or degrade the material features, capabilities, or performance of the Software (as it exists at time of Delivery) during the term of the Agreement.

4.2     WARRANTY DISCLAIMER. ALL THIRD PARTY PRODUCTS ARE PROVIDED TO CLIENT ON AN "AS IS" BASIS WITHOUT ANY WARRANTY, EITHER EXPRESS OR IMPLIED, AND FAIR ISAAC HEREBY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY  OR  FITNESS  FOR  A  PARTICULAR  PURPOSE,  NON-INFRINGEMENT,

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

PERFORMANCE OF SERVICES, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE.

**5.    Maintenance Services.**

5.1    Maintenance; Maintenance Term.  Provided that Client is not in breach of its obligations under the Agreement, Fair Isaac agrees to perform the Maintenance Services described in Exhibit B of this Agreement. Maintenance services for the Fair Isaac Product commence upon delivery of the Fair Isaac Product and shall continue for the term of this Agreement, unless terminated earlier pursuant to the then current support and maintenance policy.

**6.    Fees.**

6.1    Software and Module License Fees.  Client agrees to pay the fees as set forth in Exhibit A of this Agreement.  Client will pay all invoices pursuant to the MLSA.

6.2    Expenses.  Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac, which will be billed to Client at cost. Fair Isaac shall get Client's approval of estimated travel expenses in an applicable Statement of Work. Client agrees to reimburse Fair Isaac for all approved travel-related expenses Fair Isaac incurs in connection with the Agreement.

6.3.    Annual Adjustments.  All fees specified in this Agreement will be reviewed upon each anniversary of the Agreement Effective Date, including each year beginning with the 6th year Renewal Term. Annual adjustments will be based on CPI, which will not exceed an annual rate increase of CPI.  "***CPI***" means the Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84=100, as published by the US Bureau of Labor Statistics.

**7.    Term**

7.1    Term.   This Agreement commence on the Effective Date and end on the date that is the five(5) year anniversary of the date of delivery of the Fair Isaac Product ("Initial Term"); and thereafter shall automatically renew for a successive one (1) year term unless either party provides 90 days advance written notice of its intent not to renew the then current term (a "Renewal Term"). "Term" means together the Initial Term and all successive Renewal Terms and is subject to termination rights set forth in the MLSA. In addition, notwithstanding the expiration or termination of this Agreement, all applicable provisions of this Agreement will continue to apply to any Services still in effect at the time of the termination or expiration of this Agreement.

7.2    Transition.    In the event of termination of the Agreement (excluding termination for cause) and subject to a mutually agreed upon executed form of agreement for transition services ("**Transition Agreement**"), Fair Isaac agrees to provide transition services, for a period up to twelve months, as requested by Client to support the orderly transition of services in support of the operational use of AURA by Client's customers pursuant to the terms of the Transition Agreement. Client understands and acknowledges that Fair Isaac shall have no obligation whatsoever under this Agreement or this section post termination unless the parties have executed the Transition Agreement.

7.3    Survival. The following rights and obligations under this Agreement will survive any termination or expiration of this Agreement or the Agreement: Section 1 (Definitions), Section 3.3 (License Restrictions), Section 4.2 (Warranty Disclaimer), Section 6 (Fees), Section 7.3 (Survival) and Section 8.

**8.    Miscellaneous**

8.1    Entire Agreement; Order of Precedence.  This Agreement, together with the MLSA, represents the complete agreement of the parties and supersedes all prior or contemporaneous agreements, proposals, understandings, representations, conditions, and communications (oral or written), as well as the terms of all existing or future purchase orders and acknowledgments.  In the case of any conflict between the provisions of this Agreement and the MLSA, the provisions of the MLSA shall control.  Any other terms, conditions, supplements, modifications, or amendments

Attorneys' Eyes Only          **D-0172-004**                    FICO0067100

to this Agreement will not be binding upon either party unless expressly set forth in a writing signed by authorized representatives of Client and Fair Isaac.

8.2    Mergers and Acquisitions Involving Client. Client acknowledges and agrees that all licenses, service and maintenance/support fees are based on assumptions on the permitted use, Client's type of business, number, type and location of Client and permitted users of Client's AURA Solution and AURA solution as of this Agreement Effective Date ("**Client Organization Size**"). Accordingly, if Client is merged with, acquired by, or acquires another entity, acquires the rights to process the accounts or transactions of another entity, increases the Client Organization Size, and/or in any way expands the use in any manner of the Fair Isaac Product or Maintenance Service when compared to the Agreement Effective Date by Client's revenue increasing by 10% or more as a result thereof (each an "**Expanded Use**"); then Client agrees (1) that all license and support/maintenance fees under this Agreement may be subject to increase by Fair Isaac to reflect its then current pricing for such Expanded Use and (2) Client shall not process or use the Fair Isaac Product or Maintenance Service for a Potential Expanded Use unless the parties mutually agree upon an amendment to address the Expanded Use. This Section is in addition to and does not override or limit in any manner the licensing restrictions contained elsewhere in the Agreement.

8.3    Counterparts. This Agreement may be executed on separate counterparts or signature pages, which will be considered the same as if a single document had been executed. This Agreement will become binding when one or more of such counterparts or signature pages has been executed by each of the parties and delivered (including by facsimile transmission) to the other party. Each counterpart of this document containing the valid signatures (including those delivered by facsimile) of each of the parties will be deemed an original, and all such counterparts and signature pages, taken together, will be considered a single document.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the Effective Date.

RGA TECHNOLOGY PARTNERS, INC.                FAIR ISAAC CORPORATION

Authorized Signature: _Patti Treis_                Authorized Signature: _____
                                                                              Nick Oriti
Name: Patti Treis _____             Name: ___ Financial Planning & Analysis – Sr. Director

Title:  Senior Vice President AURA Technologies _____   Title: _____

Dated: December 31, 2019 _____       Dated: ___ DEC 3 1 2019

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

| | Page 6 of 27 |
|---|---|

## EXHIBIT A

### FAIR ISAAC PRODUCT AND MAINTENANCE DESCRIPTION, PAYMENT AND PRICING

1.   Fees

| Description | Term | Scope | Payment Terms And Minimum Quantities | Total Fee |
|---|---|---|---|---|
| **Fair Isaac Product:**<br><br>FICO Blaze Advisors<br><br>Development Licenses<br><br>AND<br><br>Deployment Licenses | "Initial License & Maintenance Term" for the Fair Isaac Product(s) described in this Product Order Form beginning on the Product Order Form Effective Date and ending in 5 year(s)<br><br>**Except as provided herein, the Initial 5 year License & Maintenance Term is non-cancelable.** | Limited to **Named Applications:**<br><br>**AURA**<br><br>----------<br><br>**RGA Single Purpose Solution** | **Initial License & Maintenance Term Fees and payments:**<br><br>▮ fee for each ALU up to and including the 39th ALU that is in production at any given time during that yearly period.<br><br>▮ fee for the 40th ALU and each ALU thereafter that is in production at any given time during that yearly period.<br><br>Due and payable in full upon execution of this Product Order Form.<br>8 ALU = ▮<br>After that:<br>July 1 2020 11 ALU ▮<br>July 1 2021 14 ALU = ▮<br>July 1 2022 16 ALU = ▮<br>July 1 2023 21 ALU = $7 ▮<br><br>▮ fee for each SPSLU<br>Due and payable in full upon execution of this Product Order Form.<br>1 SPSLU = ▮<br>After that;<br>July 1 2020  1 SPSLU = ▮<br>July 1 2021  1 SPSLU = ▮<br>July 1 2022  1 SPSLU = ▮<br>July 1 2023  1 SPSLU = ▮<br><br>If Client ceases the production deployment of the initial SPSLU , then Client has the option, via written amendment, on the next anniversary of the then current annual deployment term, to reduce the SPSLU minimum to zero (0) and concurrently increase by two (2)  the ALU minimum for the remainder of the Agreement term. | ▮ for Initial Term<br><br><br><br><br><br>▮ Initial Term |

| | | | | |
|---|---|---|---|---|
| | =================<br><br>("**Renewal License & maintenance Term**"); commences at the end of the Initial License Term, the Product Order Form and is automatically extended for additional one-year renewal terms, unless terminated with proper notice | | ==============================<br><br>**Renewal Term Fee.** Upon expiry of the Initial Term an Annual Renewal Term will commence, based on the number of ALUs and SPSLUs in production on June 30 2023 times the related fees plus the prior year CPI, subject to a minimum Renewal Term fee of $▇ plus CPI for:<br><br>21 ALU = $▇<br><br>1 SPSLU = ▇<br><br>Annual fees above may be increased in accordance with (*) below. | |
| **Maintenance Services:**<br><br>FICO    Blaze Advisor | | The Support and Maintenance fees set forth herein cover only the licenses to the Fair Isaac Product and do not cover any other licenses to the Fair Isaac products granted to Client under any other agreement or Product Order Form. | **Initial Maintenance Fee:**<br><br>Included in License & Maintenance fees listed above<br><br>Is ▇ of the total annual fees charged *(example ▇ ALU is ▇ of License and $▇ of Maintenance)* | Included |
| | | | **Renewal Maintenance Fee**<br><br>Included in License & Maintenance fees listed above.<br><br>Is 2▇ of the total annual fees charged *(example $▇ ALU fee is $2▇ of License and $▇ Maintenance)* | Included |
| | | | **Total Initial Term Fees** | $2,880,000 |

- Adjustment based on number of AURA solutions.
  - On April 30th each year RGA will provide FICO with notification of the number or ALUs and SPSLUs in production and the date each unit started in production, and a list of all Service Providers and a list of the Designated Sites from Section 3 below that are in production.
  - FICO will charge an arrears Pro-rated fee from the Production Date thru June 30 of the then current year for each ALU and each SPSLU in excess of the minimums paid in that current year per the payment terms above.
  - FICO will then adjust the upcoming July 1 renewal counts and fees to reflect the higher number of ALUs and SPSLUs.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

- o   For clarity, during the Initial Term each additional ALU over the minimum has a fee of 
- o   For clarity, during the Initial Term each additional SPSLU over the minimum has a fee of ▮

**3. Additional License Limitations.** In addition to the terms, conditions and restrictions set forth in the Order Form, Client's licenses to the Fair Isaac Product(s), and any Third Party Product(s) if applicable, are further limited as follows:

| | |
|---|---|
| **Territory:** | World-Wide excluding (a) the countries of Cuba, Iran, North Korea, Sudan, Syria; and (b) any additional countries that the United States government prohibits or otherwise restricts any export, deemed export or other prohibitions of doing business with such foreign government. |
| **Permitted Use:** | Use only with the Named Applications (defined above in chart). |
| | Fair Isaac Product - Development Licenses are licensed only internally for the purpose of Client developing, testing and performing maintenance on the Named Applications. |
| | Fair Isaac Product - Deployment Licenses are licensed to be embedded in Client's Named Applications in AURA system and stand as many as needed to support each single ALU and SPSLU. |
| | Client will not distribute the Fair Isaac Product to any person, including AURA Subscribers. Under no circumstances shall Client use the Fair Isaac Product on a stand-alone basis or in connection with any other application other than through the Named Applications in Client's AURA system. Client shall ensure that AURA Subscribers only receive benefits of Fair Isaac Product through access to Client's AURA system Named Applications only subscribers business purposes in the Territory and no other purpose. |
| **Service Provider:** | Client will report in writing to Fair Isaac the current list of Service Providers each April 30th. |
| **Designated Line of Business:** | Product Types |

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

**D-0172-008**

| Designated Sites: | Client locations that are controlled by Client ("**Data Centers**"): |
|---|---|
| | • St. Louis, Missouri USA |
| | • Toronto, Canada |
| | • United Kingdom |
| | • Tokyo, Japan |
| | Amazon Web Services ("**AWS**") country locations pursuant to effective agreement between Client and AWS: |
| | • AWS US East (N. Virginia) |
| | • AWS US West (Oregon) |
| | • AWS Canada (Central) |
| | • AWS Asia Pacific (Tokyo) |
| | • AWS EU (Ireland) |
| | • AWS Asia Pacific (Sydney) |
| | • AWS Asia Pacific (Mumbai) |
| | • AWS Asia Pacific (Singapore) |
| **Designated Equipment:** | Pursuant to Documentation requirements |

**Changes.** The replacement Designated Equipment must comply with Fair Isaac's published minimum requirements for the Fair Isaac Product, or other requirements communicated in writing by Fair Isaac to Client. Client must obtain Fair Isaac's prior written consent for all changes to the Designated Sites, use of the Fair Isaac Product, Third Party Product, Deliverables, and Documentation beyond those authorized on this document, as well as any new or additional licenses; the foregoing of which is not effective unless and until an amendment to this Order Form is executed by the parties. Client acknowledges and agrees that these changes may result in additional fees which, whether or not Client has obtained Fair Isaac's consent, are effective as of the time of the change and will be invoiced accordingly.

Attorneys' Eyes Only            **D-0172-009**                          FICO0067105

**EXHIBIT B**

Fair Isaac Software Support and Maintenance Policy

*Dated October 20, 2018. This policy is subject to any updated Fair Isaac Support and Maintenance Policy located at https://www.fico.com.*

This Support and Maintenance Policy describes the support and maintenance services Fair Isaac provides for its generally available software products. Clients who have purchased these services from Fair Isaac and are current on support and maintenance fees are eligible for services set forth in this policy.

1.  **DEFINITIONS**

| | |
|---|---|
| **Agreement** | The agreement under which Client has licensed generally available software from Fair Isaac. |
| **Application Software** | Software designated by Fair Isaac as an application product on the Support Site. |
| **Business Day** | A calendar day Monday through Friday, excluding holidays observed by Fair Isaac. |
| **Bypass** | One or more procedures recommended by Fair Isaac to avoid an Error or to mitigate the impact of an Error on the Client's business operations, including backing out to a previous Release or rebooting systems, SQL scripts, configuration changes and/or implementing a specific release of a third party software product. |
| **Client** | The Fair Isaac client identified in the Agreement. |
| **CPI** | The Consumer Price Index for All Urban Consumers (CPI-U) for the U.S. City Average for All Items, 1982-84=100, as published by the US Bureau of Labor Statistics. |
| **End of Life (EOL)** | The date upon which Fair Isaac no longer generally provides Support and Maintenance of the Software. |
| **End of Release (EOR)** | The date upon which Fair Isaac no longer generally provides Support and Maintenance of a specific Release of the Software. |
| **End of Version (EOV)** | The date upon which Fair Isaac no longer generally provides Support and Maintenance of a specific Version of the Software (including all Releases to that Version). |
| **Error** | A persistent malfunction, inherent within the Software, that prevents the Software from operating according to its standard technical documentation. |
| **Extended Support** | Entitles Client, for an increased fee, to Support for a Release that has been designated as EOR or Version that has been designated as EOV. |
| **Fair Isaac** | Fair Isaac Corporation and its subsidiaries. |
| **Maintenance** | Entitles Client to standard Versions, Releases and Service Releases in accordance with this policy when and if made generally available by Fair Isaac to its clients that are current on support and maintenance fees. |

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

| Patch | A programmatic correction to the Software, targeted to address a specific Error that has undergone limited or no regression testing. |
|---|---|
| Release | An update to the Software designated by Fair Isaac as "right of dot" (i.e., X.y.z where y is the Release number). A Release will generally include minor improvements, functionality modifications, or Error corrections developed since the previous Release. |
| Service Release | An update to the Software designated by Fair Isaac as "right of the second decimal" i.e., X.y.z where z is the Service Release number). A Service Release will generally contain one or more fixes for recognized Errors. |
| Severity Level | A number assigned by Fair Isaac in accordance with Section 3.8 to a Client-reported Error with the Software. |
| Software | The generally available Fair Isaac software product licensed by Client under the Agreement. |
| Support | Entitles Client to submit questions about the Software to Fair Isaac Product Support, in order for Fair Isaac to use commercially reasonable efforts to resolve operating Errors that are attributable to the Software, and to resolve verified and reproducible Errors in the Software. |
| Support and Maintenance Fees | Fees for Support and Maintenance applicable to the Software, including any Extended Support fees. |
| Support Hours | Hours Fair Isaac is available to provide Support, as specified in Section 3.7. |
| Support Site | Fair Isaac's public website located at http://www.fico.com, or a successor URL designated by Fair Isaac. |
| Tool Software | Software designated by Fair Isaac as a tool product on the Support Site. |
| Version | An update to the Software designated by Fair Isaac as "left of dot" (i.e., Version X.y.z where X is the Version number). A new Version of the Software will generally include significant additional features, functionality, performance improvements, simplifications or improvements to the operator interfaces, and/or load capacity. |

**2.   MAINTENANCE**

2.1.     Subject to payment of the applicable Support and Maintenance Fees and compliance by Client with the terms of this policy and the Agreement, Fair Isaac will provide Maintenance for the Software as set forth in this policy.

2.2.     Service Releases are made available for the most current Release. If a Client Error is discovered on a previous Release and that Error has been resolved in a subsequent Release (or Service Release to that subsequent Release), the Client will be advised to install the most current Release and, if applicable, Service Release.

**3.   SUPPORT**

3.1.     Subject to payment of the applicable Support and Maintenance Fees and compliance by Client with the terms of this policy and the Agreement, Fair Isaac will provide Support for the Software as set forth in this policy.

3.2.     To receive Support Client must:

(a)   designate primary and secondary liaisons that have been sufficiently trained on the Software, and ensure Client's support requests are centralized through these Client liaisons;

(b)   use reasonable efforts, including consulting Fair Isaac-supplied documentation, to verify that reported Errors are due to a malfunction of the Software, and not due to the operating system, hardware, data, interfaces, or improper use of the Software, prior to contacting Fair Isaac for Support; and

(c)   notify Fair Isaac of any Error with the Software in a timely manner (in no event later than 30 days) after becoming aware of an Error with the Software; and

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

(d)    provide all supporting information as requested by Fair Isaac and available to Client, that is relevant to verifying, diagnosing, or correcting the Error, including but not limited to product log files, configuration files, screen prints and information regarding any changes made to the Software configuration or third-party platforms and components.

3.3.    Fair Isaac will only be obligated to provide Support when the Software is operated on or in connection with supported third-party platforms and components installed on designated equipment, as stated in the technical documentation for the Software. If third-party support is retired or discontinued for such third-party platforms or components, Client may be required by Fair Isaac to upgrade to the third-party platforms or components currently supported in order to continue receiving Support.

3.4.    Unless otherwise agreed in writing, Support is provided in the English language only.

3.5    As part of its product lifecycle, Fair Isaac may designate on the Support Site:

(a)  a Release of Software as EOR, for which Extended Support may be available;

(b)  a Version of Software as EOV, for which Extended Support may be available; and

(c)  the Software as EOL.

3.6    Unless longer support is otherwise designated by Fair Isaac on the Support Site:

(a)   For Application Software, Fair Isaac will provide Support for the current Version (which includes, only for purposes of this section 3.6(a), all Releases to that Version) of the Software and the prior Version, but only for a maximum of 12 months after release of the current Version.  For example, assuming Versions 7.0 and 8.0 exist, as Fair Isaac announces Version 9.0, Fair Isaac would designate Version 7.0 EOV, at which time Extended Support, if available, would apply to Version 7.0; and

(b)   For Tool Software, Fair Isaac will provide Support for the current Release of the Software and the prior Release, but only for a maximum of 12 months after release of the current Release.  For example, assuming Releases 5.0 and 5.1 exist, as Fair Isaac announces its latest Release, 5.2, Fair Isaac would designate Release 5.0 as EOR, at which time Extended Support, if available, would apply to Release 5.0.

3.7    Unless additional support hours are otherwise designated by Fair Isaac on the Support Site:

(a)   for Software to be installed at locations in North America, Asia, and South America, "Support Hours" are 6:00 a.m. to 5:00 p.m. Pacific Time, Monday through Friday, excluding holidays observed by Fair Isaac in the United States; and

(b)      for Software to be installed at locations in Europe, Middle East, and Africa, "Support Hours" are 8:30 a.m. to 5:00 p.m. UK Time, Monday through Friday, excluding holidays observed by Fair Isaac in the United Kingdom.

(c)      For Severity Level 1 issues, "Support Hours" are 24x7x365.

3.8    Upon Client's report of an Error, a Fair Isaac representative will acknowledge the Error report by issuing a confirmation to Client, either by phone or email, and Fair Isaac will assign a Severity Level to the Error based on the type of issue reported, according to the following schedule:

Attorneys' Eyes Only    **D-0172-012**    FICO0067108

| Severity Level | Condition | Support Hours | Initial Response | Communication /Status Updates | Action Plan |
|---|---|---|---|---|---|
| 1 | **Production Down Emergency:** An Error in the production environment that inhibits all or substantially all of the Software from functioning in accordance with its documentation and which has a material detrimental impact on Client's business. A severity "one" Error is both severe and mission-critical. | Support will be provided 24x7x365. Client must report Severity Level 1 Errors by phone. Once the Error is identified and logged, Fair Isaac will provide services to resolve the Error on a diligent-efforts priority basis seven days per week until the Error has been resolved, received a Patch, resulted in a Bypass, or downgraded to a lower priority or Severity Level. | Provide a phone response within 30 minutes during Support Hours or within 1 hour outside of those hours. | Provide subsequent updates every 2 hours thereafter, or as mutually agreed with Client. | Provide action plan within 4 hours for the development of a Patch or Bypass. After development of the Patch or Bypass (if applicable), Fair Isaac will notify Client of inclusion of the Patch or a solution in a Service Release. |
| 2 | **Production Impaired:** An Error that causes major functionality of Software to be inhibited, but the Error does not materially disrupt Client's business. | Error will be worked on during Support Hours. Client must report Severity Level 2 Errors by phone | Provide a written or phone response within 4 hours during Support Hours. | Provide subsequent updates every 4 hours thereafter during Support Hours or as mutually agreed with Client. | Provide an action plan within 2 Business Days for a Bypass. If resolution requires a Patch, Fair Isaac will notify the Client of inclusion of the Patch or a solution in a Service Release. |
| 3 | **Production Inhibited:** An Error that inhibits a feature of the Software, but the Error does not materially disrupt Client's business. | Error will be worked on during Support Hours. | Provide a written or phone response within 1 Business Day. | Provide subsequent updates as mutually agreed with Client. | Consider for correction or inclusion in the next Release. |
| 4 | **General Assistance:** A "how to" question or an Error that is minor or cosmetic in nature or an enhancement to be considered for a future Release. | Error will be worked on during Support Hours. | Provide a written or phone response within 2 Business Days. | Provide subsequent updates as mutually agreed with Client. | Consider for correction or inclusion in the next Release. |

**4.   TERM, TERMINATION, REINSTATEMENT**

4.1.   Fair Isaac's Support and Maintenance obligations under this policy begin on the Effective Date of the Agreement and will continue for an initial term of one year.

4.2.   Support and Maintenance will automatically renew for consecutive one-year terms unless the Client gives Fair Isaac 30 days' written notice, prior to the end of the current term, of its intent not to renew, or Fair Isaac designates the Software as EOL.

4.3.   Support and Maintenance during renewal terms will be subject to Fair Isaac's Support and Maintenance Policy in effect for the Software at the time of such renewal.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

4.4.     Support and Maintenance Fees applicable to renewal terms may be increased by Fair Isaac, but no increase may exceed the most recently available annual change in CPI.

4.5.     Support and Maintenance Fees will be invoiced in advance on an annual basis.

4.6.     Fair Isaac may terminate Support and Maintenance under this policy with at least 30 days' written notice if the Client is in breach under this policy or the Agreement and does not cure the breach before the end of the notice period. Fair Isaac will have no obligation to resume Support and Maintenance following a termination for cause.

4.7.     Fair Isaac may, at its sole discretion, reinstate lapsed or terminated Support and Maintenance, in accordance with its then-current policies, upon payment by the Client of the applicable reinstatement fee.

## 5.  EXCLUSIONS

Services outside the scope of this policy are subject to availability of resources and will be charged for separately at Fair Isaac's then-current rates for those services. The following are outside the scope of this policy:

(a)   Support provided outside the Support Hours;

(b)   customizations; the installation of any software or product, Patch (including for a Bypass), Service Release, Release, or Version; integration; consulting; and training;

(c)   optional, separately-priced, or separately licensed Software features made generally available by Fair Isaac to its clients;

(d)   any problem resulting from the following: operator error; a problem or loss not attributable to the Software; third-party components no longer supported by the third party; negligence of Client or any third party; or a problem resulting from a use or modification of the Software not authorized or approved by Fair Isaac in writing, or that could have been avoided by the Client applying all required Patches or installing the latest Service Release or Release; and

(e)   Support or Maintenance for any software (including any custom software) other than Software.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

## EXHIBIT C

## FAIR ISAAC INFORMATION SECURITY AGREEMENT
*(as of March 15, 2018)*

1.      **Definitions**. As used in this <u>Exhibit C</u> Fair Isaac Information Security Agreement, subject to updates and modifications by Fair Isaac from time to time ("**FICO Security Agreement**"), the following capitalized terms shall have the definitions defined below for purposes of this FICO Security Agreement:

"**Agreement**" means collectively the BLAZE ADVISOR® BUSINESS RULES MANAGEMENT SYSTEM AGREEMENT to which this Exhibit C is attached.

"**Customer Information**" means any "nonpublic personal information" about the "customers" and "consumers" of Client (as those terms are defined by applicable law and the privacy regulations adopted thereunder) received by Fair Isaac pursuant to the Agreement. Customer Information includes non- public personal information as that term is defined in the Gramm-Leach-Bliley Act ("**Personally Identifiable Information**" or "**PII**").

"**De-identified Data**" means data, including Customer Information, that has been stripped of all direct identifiers and/or data that does not personally identify an individual person.

"**Regulatory Authorities**" defined below in <u>Section 2.5(a)</u> of this FICO Security Agreement.

"**Security Breach**" means the unauthorized acquisition, access, use or disclosure of Customer Information which compromises the security or privacy of such information, except where an unauthorized person, to whom such information is disclosed, would not reasonably have been able to retain such information. Security Breach does not include:

    a.  Any unintentional acquisition, access, or use of Customer Information by an employee or individual acting under the authority of Fair Isaac if:

        (i)  such acquisition, access or use was made in good faith and within the course and scope of the employment or other professional relationship of such employee or individual, respectively, with Fair Isaac; and

        (ii)  such information is not further acquired, accessed, used or disclosed by any person; or

    b.  Any inadvertent disclosure from an individual who is otherwise authorized to access Customer Information at a facility operated by Fair Isaac to another similarly situated individual at the same facility; and

    c.  Any such Customer Information received as a result of such disclosure is not further acquired, accessed, used or disclosed without authorization by any person.

    d.  Any Customer Information that is de-identified such information which is De-identified Data.

2.      **Information Security; Audits.**  All obligations set forth below are only with respect to Customer Information, and then only to the extent Customer Information is necessary for the provision of the Fair Isaac Product and services provided under the Agreement.

2.1.    **Fair Isaac Responsibilities for Customer Information.**

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

(a)    Protection of Customer Information. Fair Isaac shall implement and maintain reasonable measures that are designed and executed to (i) ensure the security and confidentiality of Customer Information, (ii) protect against anticipated threats or hazards to the security or integrity of Customer Information and (iii) protect against unauthorized access to or use of Customer Information that could result in substantial harm or inconvenience to the consumer customer of Client to whom such Customer Information relates.

(b)    Fair Isaac shall test, on a reasonable, periodic basis, the implementation of its information security program.

(c)    Fair Isaac shall substantially comply with ISO 27002:2013 (Information Technology – Code of Practice for Information Security Management issued by the International Standards Organization). Client shall substantially comply with the standards of the regulators in Client's jurisdiction or jurisdictions if operating in more than one country.

**2.2.    Breach Response.** Fair Isaac shall monitor its systems and its procedures for security incidents, violations, and suspicious activity. This includes suspicious external activity (including, unauthorized probes, scans, or break-in attempts) and suspicious internal activity (including, unauthorized system administrator access, unauthorized changes to its system or network, system or network misuse. Upon detection by either party of any Security Breach that is, in that party's judgment, reasonably likely to succeed or indicates a material vulnerability that will materially and adversely affect the delivery of the Fair Isaac Products and services or the security of the Customer Information, that party shall investigate to identify the cause and take prompt corrective action to prevent similar future incidents. In addition, to the extent the party is legally able to do so, that party shall promptly, but in any event within 48 hours after confirmation, inform the other party of the nature of the Security Breach or unauthorized access and the steps being taken to address the incident and prevent future incidents.

**2.3.    Disposal of Customer Information.** Fair Isaac shall dispose of Customer Information in compliance with applicable law. In furtherance of the foregoing, Fair Isaac shall take reasonable measures to protect against unauthorized access to or use of Customer Information in connection with its disposal, considering the sensitivity of the information, the costs and benefits of different disposal methods, and relevant technological changes. Fair Isaac shall establish policies and procedures governing disposal of Customer Information, and for employee training with respect to such information. Client acknowledges and agrees it has an affirmative obligation to provide Fair Isaac reasonable notice of Customer Information that is or may be subject to specific process disposal requirements, and Fair Isaac's compliance with this section depends on receiving that notice from Client. Any data stored on off-site backups, including without limitation, automatically generated computer back-up or archival copies generated in the ordinary course of Fair Isaac's information technology systems procedures, will be destroyed as part of Fair Isaac's normal data destruction process. If Client requires Fair Isaac to remove specific files from the off-site backups, Client is responsible for all costs associated with calling the tapes back from archive, reloading the data on to Fair Isaac systems, scratching the backup tapes, deleting the files in question, re-backing up the remaining data, and shipping the tapes back off site.

**2.4.    Client Responsibilities for the Provision of Customer Information.**

(a)    Fair Isaac will specify the formats and contents of all data to be sent to Fair Isaac by Client. Such specification may include providing De-identified Data in lieu of Customer Information. All files containing Customer Information sent by Client or Client's agents, Affiliates or contractors to Fair Isaac must be encrypted. If Fair Isaac determines that any files received from or on behalf of Client containing Customer Information are not encrypted or if Client or Client's agents, Affiliates or contractors send non-compliant data to Fair Isaac or send data to the wrong Fair Isaac location, Fair Isaac will remove and destroy the unencrypted and/or noncompliant data from all Fair Isaac systems, databases, backups, backup, archives, off-site backups, etc., at Client's expense, and Client or its agent, Affiliate or contractor must send Fair Isaac new files, correctly encrypted and/or compliant data.

(b)    In addition to any other indemnification obligations provided elsewhere in the Agreement, Client will indemnify Fair Isaac against any third-party claims resulting from Fair Isaac's possession of or in connection with Customer Information.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

(c)      All media sent to Fair Isaac must be in carrier-approved boxes. Fair Isaac will not accept and will not be responsible for any media that is not shipped in carrier-approved boxes. All media sent to Fair Isaac will be read as soon as reasonably practicable after receipt. Five days after the data is read, the media will be destroyed. No media will be returned to Client, unless Client handles the pickup and delivery of the media, and Fair Isaac assumes no responsibility for the media and any data once it leaves the Fair Isaac data center.

(d)      Client represents and warrants that it has legal authority to provide Fair Isaac with Customer Information, and agrees to indemnify, hold harmless and defend Fair Isaac against any and all claims which may be brought by any Third Party premised, in whole or in part, on Client's providing Fair Isaac with, Fair Isaac using or otherwise in connection with any Customer Information.

**2.5.      Audits and Reports.**

(a)      Cooperation with Regulatory Authorities. Client's business operations may be audited by (i) various government agencies having supervisory and regulatory authority that have legal jurisdiction over Client (the "**Regulatory Authorities**"), (ii) Client's own internal auditors ("**Customer Auditors**"), and (iii) Third Party auditors engaged on behalf of Client ("**Third Party Auditors**"). Fair Isaac shall cooperate with Client's efforts to meet its regulatory obligations with respect to audits requested in writing under legally valid notice, request or order by a Regulatory Authority. Fair Isaac shall keep, maintain and make available policies, procedures and reports for the inspection, examination, and auditing by Client, its authorized employees, agents or representatives and auditors, to the extent legally allowed and required by the Regulatory Authorities.

(b)      Audit Expense. Audits are conducted solely at Client's expense, including the utilization of Fair Isaac resources during such audit(s).

(c)      Available Audit Documents and Artifacts. The following documents and artifacts are available, at no cost to Client, as a baseline security assessment (as applicable):

    (i) *Shared Assessment Questionnaires (SIG) with responses for appropriate control frameworks.*

    (ii) *The cover and Table of Contents for security policy and standards is available remotely for verification that policies are in place and reviewed.*

    (iii) *Independent Third Party Reports for applicable environments.*

- FICO Adeptra  PCI Attestation of Compliance (AOC)
- FICO FAC PCI Attestation of Compliance – (AOC)
- FICO –ISO 27001 Certification
- FICO SSAE18 SOC2

If the requested audit scope is addressed in any report described above or similar audit report performed by a qualified Third Party Auditor within the prior twelve months and Fair Isaac confirms there are no known material changes in the controls audited, Client agrees to accept those findings in lieu of requesting an on-site audit of the controls covered by the report. Any request for Fair Isaac to provide assistance with an audit, including by Regulatory Authority, beyond the scope of the foregoing reports, are at Client's sole expense and subject to a time and materials fee-based statement of work and is considered a separate service for such audit assistance. Fair Isaac will develop an estimate of hours needed to support the audit (preparation, conduct, and follow-up) and Fair Isaac will prepare an Order Form (i.e., Confirmed Sales Order) for audit support. Fair Isaac will seek Client's written approval and agreement to pay any related fees before performing such audit assistance.

(d)      Request for Audit. Client may audit Fair Isaac's compliance with the terms of this FICO Security Agreement no more often than once every 12 months. Client may perform more frequent audits of Fair Isaac hosted services (such as Software as a Service offerings) to the extent required by laws applicable to Client. The audit must be conducted during regular business hours at the applicable facility where the Customer Information is being utilized,

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

subject to Fair Isaac policies, and may not unreasonably interfere with Fair Isaac business activities. If a Third Party Auditor is to conduct the audit, the Third Party Auditor to be utilized must be mutually agreed to by Client and Fair Isaac. To request an audit, Client must submit a detailed audit plan at least 30 days in advance of the proposed audit date to Fair Isaac's Information Security organization describing the proposed scope, (including Fair Isaac product or services), duration, and start date of the audit. Fair Isaac will review the audit plan and provide Client with any concerns or questions (for example, any request for information that could compromise Fair Isaac security, privacy, employment or other relevant policies). Fair Isaac reserves the right to object and propose alternatives if Fair Isaac reasonably believes that the proposed audit goes beyond what is reasonable and necessary or that it could compromise the security of information of other Fair Isaac clients. Fair Isaac will work cooperatively with Client to agree on a final audit plan.

(e)     Audit Reports and Audit Data.  Client will provide Fair Isaac's Information Security Organization any audit reports generated by Client or the Third Party in connection with any audit under this section, unless prohibited by law. Client may use the audit reports only for the purposes of meeting its regulatory audit requirements and/or confirming compliance with the requirements of this FICO Security Agreement. The audit reports are Confidential Information of the parties under the terms of the Agreement. All Fair Isaac information received or obtained by Client or its auditors before, during, or after the audit (collectively, "**Audit Data**") must be treated by Client and its auditors as Fair Isaac Confidential Information and may be used and retained only for purposes of the audit. All Audit Data in electronic form must be kept in an encrypted format. All Audit Data maintained as paper documentation or notes must be kept in a secured (locked) container. Client and its auditors may not disclose any of the information to another party without the specific written approval of Fair Isaac.  Auditors must execute a written confidentiality agreement acceptable to Fair Isaac before conducting the audit.

(f)     No Client Testing.  At no time may Client or any party acting on Client's behalf perform any type of tests (automated or otherwise) against the Fair Isaac's infrastructure or networks. Fair Isaac periodically performs its own tests of its infrastructure and networks. Fair Isaac is willing to discuss the results of the tests with Client, and in its discretion may provide executive summary reports of penetration tests, as applicable, such as PCI-DSS testing, but is not required to turn over any of the actual test results to Client.

(g)     Audit Recommendations.  Based on the results of an audit, Client or Client's auditors may make recommendations to Fair Isaac relating to security issues. If the audit uncovers any security issues that the parties agree are both material and directly affect the Agreement or any Client Consumer Information in the possession of Fair Isaac, Fair Isaac will work with Client to remediate the issue. If Client requests that Fair Isaac take corrective actions, Fair Isaac will evaluate the requests in light of industry norms and its contractual commitments to Client and other clients. If Fair Isaac believes that corrective actions are specific to Client's requirements (i.e., not needed for other clients), and Fair Isaac agrees to take corrective action, Fair Isaac will develop a statement of work,  solicit Client's approval of the project which will be solely at Client's cost unless otherwise agreed. If approved, Fair Isaac will develop and propose an implementation schedule.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*



### Appendix I
### Master License and Services Agreement

This Master License and Services Agreement ("**MLSA**") is hereby incorporated by reference into the agreement to which it is attached and shall govern the Agreement (as defined below).

### Introduction

This MLSA governs the rights and obligations of Client and Fair Isaac with respect to products and services ordered by Client from Fair Isaac under this MLSA. Client may order Fair Isaac products and services under this MLSA pursuant to an Order Form (as defined below). The parties agree as follows:

1.    **Definitions.** In this Agreement the following terms have the meanings indicated:

"**Affiliate**" of a party means any other person or entity that, directly or indirectly, controls, is controlled by or is under common control with such party; "control" means the power, directly or indirectly, to direct or cause the direction of the management and policies of another person or entity, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" means this MLSA and the Order Forms (including all documents incorporated therein), considered as a whole, as they may be amended.

"**Business Confidential Information**" is Confidential Information of Discloser that excludes Customer Information (as that term is defined in Exhibit C – FICO Security Agreement) attached to this Agreement and all other like personal data.

"**Confidential Information**" means financial, business and/or technical information of the Discloser, regardless of the form or manner in which the information is disclosed or learned, including, but not limited to, marketing and product plans, ideas, concepts, business plans, employees and employee information, inventions, algorithms, decision technology and/or models, processes, designs, specifications, drawings, samples, improvements, developments, applications, engineering, manufacturing and marketing data and plans, software code (object and source code), documentation (including without limitation manuals, training materials, and presentations), and functionality, security procedures and approaches, know-how, customer names and information, experimental work, distribution arrangements and trade secrets and other information marked confidential by the Discloser.

"**Cooperation**" means Client's general cooperation and providing access to information that is reasonably required to allow Fair Isaac to perform its obligations under this Agreement, including without limitation: (i) providing data and materials in the format and according to the specifications required by Fair Isaac, (ii) for onsite services, providing Fair Isaac with necessary access to office accommodations, facilities, equipment, security access information, and software interfaces to Client's other business applications; (iii) providing personnel assistance as is reasonably requested by Fair Isaac at any time; (iv) complying with all terms, conditions, and requirements set forth in this Agreement; and (v) cooperating with Fair Isaac to make decisions and communicate information in a timely manner.

"**Discloser**" means a party that discloses or provides Confidential Information pursuant to this Agreement.

"**Fair Isaac Product**" means any product or service which is defined in an Order Form as a Fair Isaac Product.

"**Intellectual Property**" or "**Intellectual Property Rights**" means rights associated with all or any of the following anywhere in the world, whether or not filed or registered: (i) patents, patent applications, and inventors' certificates; (ii) copyrights (including moral rights and author's rights), works of authorship, copyright registrations and applications; (iii) database rights; (iv) know-how, trade secrets, and rights in and to confidential information; (v) industrial designs (including utility models); (vi) trademarks, trade names, service marks, logos, Internet addresses (URLs), and the goodwill associated with them; (vii) semi-conductor topography rights; (viii) rights of publicity; and (ix) divisions, continuations, renewals, reissuances and extensions of any of the foregoing (to the extent applicable); and (x) any other proprietary rights relating to intangible property anywhere in the world.

"**Order Form**" means an agreement between the parties that references and incorporates this MLSA and describes the Fair Isaac Product(s) or service(s) being provided to Client, together with all exhibits, schedules, and other attachments to that agreement. Order Forms may be called order forms, subscriptions, service orders, statements of work, or another name.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*



"**Recipient**" means a party that receives Confidential Information of Discloser pursuant to this Agreement.

"**Taxes**" mean all present and future taxes, duties, import deposits, assessments, and other governmental charges (and any related penalties and interest not attributable to the fault or delay of Fair Isaac), however designated, that are now or hereafter imposed by or under any governmental authority or agency that are: (i) associated with the performance by Fair Isaac of its obligations under this Agreement; (ii) associated with the payment of any amount by Client to Fair Isaac pursuant to this Agreement; (iii) based on the license or use of any Fair Isaac-provided product or service; or (iv) associated with the importation of any Fair Isaac-provided product into or use of any Fair Isaac-provided service within a country other than the United States, excepting only (a) Fair Isaac's corporate franchise taxes and taxes imposed on Fair Isaac's net income by the governmental authorities or agencies in any jurisdictions in which Fair Isaac is required to pay those taxes; (b) withholding, employment, and payroll taxes relating to Fair Isaac's employees; and (c) personal property taxes on Fair Isaac property.

**2.    License Grants and Restrictions**

2.1.    <u>License Grants and Restrictions</u>. Due to the variety of products and services offered by Fair Isaac, specific license grants and restrictions are or will be included in the applicable Order Form(s) rather than in this MLSA.

2.2.    <u>Reservation of Rights</u>. Fair Isaac reserves all rights not expressly granted to Client under this Agreement. Unless otherwise expressly provided, all Intellectual Property Rights in the Fair Isaac Product, any products, services custom code, other deliverables, or know how owned or developed in whole or in part by Fair Isaac or any Affiliate of Fair Isaac are retained exclusively by Fair Isaac or that Affiliate. Subject to Fair Isaac's obligations with respect to Client's Confidential Information, Fair Isaac and its Affiliates are free to use any ideas, concepts, techniques, and know-how developed pursuant to this Agreement for themselves and for other clients. Fair Isaac agrees that any custom code developed for Client pursuant to another agreement for the provision of professional service (a Deliverable) will provide a mutually agreed upon license to such Deliverable to Client for use with the Fair Isaac Product; subject to Fair Isaac's obligation with respect to Client's Confidential Information.

**3.    Protection of Confidential Information**

3.1.    <u>Purpose for Disclosure</u>. Recipient may use Confidential Information of the Discloser only for the purposes of exercising Recipient's rights and fulfilling Recipient's obligations under this Agreement.

3.2.    <u>Exceptions</u>. Recipient's obligation under this Agreement to treat information as Confidential Information does not apply to information that: (i) is already known to Recipient at the time of disclosure and was not obtained, directly or indirectly, from Discloser; (ii) is independently developed by Recipient without reference to or use of the Discloser's Confidential Information; (iii) is obtained by Recipient from another source without a breach of any obligation of confidentiality owed by that source to Discloser; or (iv) is or becomes publicly available through no wrongful act of Recipient or any party that obtained the information from Recipient. If Recipient is served with a subpoena or other legal process, court, or governmental request or order requiring disclosure, or is otherwise required by law or securities exchange requirement to disclose, any of Discloser's Confidential Information, Recipient shall, unless prohibited by law, promptly notify Discloser of that fact and cooperate fully (at Discloser's expense) with Discloser and its legal counsel in opposing, seeking a protective order, seeking to limit, or appealing the subpoena, legal process, request, order, or requirement to the extent deemed appropriate by Discloser. Recipient may comply with the subpoena or other legal process or requirement after complying with the foregoing sentence, but only to the extent necessary for compliance. A non-public disclosure made pursuant to the foregoing sentence will not, by itself, remove any Confidential Information from the protections of this Agreement.

3.3.    <u>Limitations on Disclosure and Use</u>. Recipient shall use the same degree of care, but no less than a reasonable degree of care, to protect against the unauthorized disclosure or use of Discloser's Confidential Information as it uses to protect its own confidential information of a similar type. Recipient shall disclose Confidential Information of Discloser only to its employees or independent contractors who have a need to know for the above stated purpose, and who are bound by obligations of confidentiality no less restrictive than the terms of this Agreement. Recipient shall not remove any confidentiality or proprietary notices from Discloser's Confidential Information. If Recipient provides Discloser with comments, suggestions or other input regarding Discloser's Confidential Information or Intellectual Property, Discloser will have an unrestricted, worldwide, royalty-free right to use those comments, suggestions, or other input for any purpose and in any manner, and to authorize others to do so; provided, however, Recipient is still obligated under this section with regard to protection of Discloser's Confidential Information.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

Attorneys' Eyes Only                    **D-0172-020**                    FICO0067116

3.4.    Injunctive Relief. The parties acknowledge that the remedies at law available for the protection of Confidential Information or Intellectual Property may be inadequate, and, without limiting any rights available at law, each party is entitled to seek injunctive relief for any breach of this Agreement relating to the protection of its Confidential Information or Intellectual Property Rights.

**4.    Representations and Warranties**

4.1.    Representations. Each party represents that: (i) it is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation or organization; (ii) it has the power and authority to enter into and perform all of its obligations under the Agreement, and (iii) this MLSA has been signed by its duly authorized representatives who are able to bind their respective companies. The foregoing representations also apply to each Order Form.

4.2.    Warranties Set Forth in Order Form(s). Due to the variety of products and services offered by Fair Isaac, specific warranties applicable to products, services, and deliverables provided by Fair Isaac will be included in the applicable Order Form (s) rather than in this MLSA.

4.3.    WARRANTY DISCLAIMER. Except to the extent expressly provided in an Order Form, Fair Isaac does not warrant that any product, service, or deliverable provided by Fair Isaac will (i) meet Client's requirements, (ii) operate in combination with hardware, software, systems or data not expressly specified in writing by Fair Isaac, (iii) meet any performance level, resource utilization, response time, or system overhead requirements or (iv) operate uninterrupted, free of errors, or without delay. Fair Isaac is not responsible for problems caused by: (a) use of any product, service, or deliverable provided by Fair Isaac outside the scope of this Agreement or not used in compliance with applicable documentation; (b) any modification to a product, service or deliverable not made by Fair Isaac; (c) any change in or modification to the operating characteristics of Client's system or any component of Client's system that is inconsistent with the Fair Isaac Product or Services documentation or specification; or (d) use of any product or deliverable provided by Fair Isaac with hardware or software that is not indicated in the applicable documentation to be interoperable with that product or deliverable. EXCEPT FOR THE EXPRESS WARRANTIES SET FORTH IN THIS AGREEMENT, FAIR ISAAC MAKES NO WARRANTIES, EITHER EXPRESS OR IMPLIED, AND HEREBY DISCLAIMS ALL IMPLIED WARRANTIES, INCLUDING ANY WARRANTIES REGARDING MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WARRANTIES OF TITLE AND NON-INFRINGEMENT, AND ANY WARRANTY ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. CLIENT IS SOLELY RESPONSIBLE FOR ITS USE OF ANY PRODUCTS, SERVICES, AND DELIVERABLES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT AND FOR ANY LIABILITY ARISING OUT OF DATA OR CONTENT SUPPLIED BY CLIENT.

**5.    Indemnification**

5.1.    Intellectual Property Indemnification. Unless otherwise indicated in an Order Form, and subject to Sections 5.2 and 5.4 below, Fair Isaac shall defend at its own expense any action against Client brought by a third party to the extent the action is based upon a claim that a Fair Isaac Product directly infringes any U.S. issued patent or copyright, or misappropriates any trade secret recognized under the Uniform Trade Secrets Act, and Fair Isaac will pay those costs and damages finally awarded against Client in the action that are specifically attributable to that claim, or those costs and damages agreed to in a monetary settlement of the action that are specifically attributable to the claim. Other than settlements of monetary compensation that Fair Isaac is required to indemnify Client for hereunder and has the financial ability to indemnify Client for, Fair Isaac will not settle any claim in the name of Client without Client's prior written consent.

5.2.    Conditions. To be entitled to indemnification under this MLSA, Client must: (i) notify Fair Isaac promptly in writing of the action; (ii) give Fair Isaac sole control of the defense of the action and any related settlement negotiations; (iii) cooperate, as Fair Isaac may reasonably request, in defense or settlement negotiations; and (iv) be and remain in compliance with the material terms of this Agreement.

5.3.    Options. If any Fair Isaac Product becomes, or in Fair Isaac's opinion is likely to become, the subject of a claim subject to indemnification under this Agreement, Fair Isaac may, at its option and expense, either: (i) procure for Client the right to continue to exercise the Fair Isaac Product license; (ii) replace or modify the Fair Isaac Product so that it becomes non-infringing and without materially diminishing functionality previously provided by the Fair Isaac Product; or (iii) if neither option (i) or (ii) is available on reasonable terms, terminate Client's license or subscription for the Fair Isaac Product concerned. Unless otherwise provided in the applicable Order Form, if Fair Isaac exercises option (iii), Fair Isaac will refund to Client the unearned portion of any prepaid term license fees and support and maintenance fees, and will reimburse Client for a pro-rated portion of any perpetual license fees paid for the Fair Isaac Product on a 60-month, straight-line basis.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

5.4.    Exclusions. Fair Isaac has no obligation with respect to any claim based upon: (i) any violation of the terms of Client's license; (ii) any combination or use of any Fair Isaac Product with other products, equipment, software, or data not necessary for use of the Fair Isaac Product or not supplied or approved in writing by Fair Isaac; (iii) any modification of a Fair Isaac Product made pursuant to Client specifications or any other modification made by any entity other than Fair Isaac or its Affiliates; (iv) any claim that would have been avoided had Client upgraded to a new version or release of the Fair Isaac Product made available by Fair Isaac to Client; or (v) any unauthorized use or the Fair Isaac Product or use other than in accordance with the Documentation.

5.5.    Client Indemnification. Subject to the terms of this Section 5.5, Client shall defend at its own expense any action against Fair Isaac brought by (A) any of Client's customers, AURA Subscribers, AURA users and Client Service Provider and (B) a Third Party to the extent the action is based upon a claim that (1) a Fair Isaac Product subject to the exclusions in Section 5.4 directly infringes any U.S. issued patent or copyright, or misappropriates any trade secret recognized under the Uniform Trade Secrets Act, (2) any data, information, documentation software or technology provided to Fair Isaac by Client, or (3) Fair Isaac's adherence to specifications or requirements provided by Client, Client's AURA system and use of any of the foregoing by any AURA Subscribers, infringes the Intellectual Property Rights of a Third Party; and Client will pay those costs and damages finally awarded against Fair Isaac in the action that are specifically attributable to that claim, or those costs and damages agreed to in a monetary settlement of the action that are specifically attributable to the claim. To be entitled to indemnification under this Section 5.5, Fair Isaac must notify Client promptly in writing of the action. The parties will cooperate in the defense of such claim.

5.6.    ENTIRE LIABILITY. THIS ARTICLE STATES FAIR ISAAC'S ENTIRE LIABILITY AND CLIENT'S SOLE AND EXCLUSIVE REMEDY FOR INFRINGEMENT AND MISAPPROPRIATION CLAIMS AND ACTIONS.

6.    **Limitation of Liability**

6.1.    IN NO EVENT WILL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT UNDER ANY THEORY OF RECOVERY (INCLUDING WITHOUT LIMITATION BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, TORT, AND STRICT LIABILITY) FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, CONSEQUENTIAL (INCLUDING WITHOUT LIMITATION LOSS OF DATA, USE, INCOME, PROFIT, OR SAVINGS) OR PUNITIVE DAMAGES ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY PRODUCT, SERVICE, OR DELIVERABLE PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT, EVEN IF THE RESPONSIBLE PARTY HAD BEEN ADVISED OF THE POSSIBILITY OF THOSE TYPES OF DAMAGES OR EVEN IF THOSE TYPES OF DAMAGES WERE REASONABLY FORESEEABLE; PROVIDED, HOWEVER THE FOREGOING LIMITATION IS INAPPLICABLE TO DAMAGES ARISING FROM OR AS A RESULT OF AN INFRINGEMENT OR VIOLATION OF FAIR ISAAC'S INTELLECTUAL PROPERTY RIGHTS (INCLUDING BREACH OF ANY LICENSE GRANT OR RESTRICTIONS FOR ANY PRODUCT OR SERVICE).

6.2.    THE TOTAL AGGREGATE LIABILITY OF EITHER PARTY FOR ALL CLAIMS ARISING UNDER OR RELATED TO THIS AGREEMENT, UNDER ANY AND ALL THEORIES OF LIABILITY (INCLUDING WITHOUT LIMITATION BREACH OF CONTRACT, BREACH OF WARRANTY, NEGLIGENCE, TORT, AND STRICT LIABILITY), WILL NOT EXCEED THE TOTAL AMOUNT PAID BY CLIENT (EXCLUDING IMPLEMENTATION FEES AND REIMBURSED EXPENSES) FOR THE FAIR ISAAC PRODUCT(S), SERVICE(S), OR DELIVERABLE(S) TO WHICH THE CLAIM(S) RELATE(S) DURING THE (i) 24 MONTHS IMMEDIATELY PRECEDING THE DATE OF THE MOST RECENT CLAIM THAT GAVE RISE TO THE LIABILITY OR (II) IN THE CASE OF BREACH OF CONFIDENTIALITY UNDER SECTION 3 ABOVE OF BUSINESS CONFIDENTIAL INFORMATION ONLY, 12 MONTHS OF FEES IMMEDIATELY PRECEDING THE DATE OF MOST RECENT CLAIM MULTIPLIED BY FACTOR OF THREE (3). NOTWITHSTANDING THE FOREGOING (A) CLIENT'S OBLIGATION TO PAY AMOUNTS OWED TO FAIR ISAAC FOR PRODUCTS AND SERVICES PROVIDED BY FAIR ISAAC UNDER THIS AGREEMENT OR OTHERWISE (INCLUDING COSTS OF COLLECTION OF UNPAID AMOUNTS) IS INDEPENDENT OF AND NOT SUBJECT TO THE FOREGOING LIMITATION; (B) THERE IS NO LIMITATION OF LIABILITY FOR DAMAGES ARISING FROM OR AS A RESULT OF AN INFRINGEMENT OR VIOLATION OF FAIR ISAAC'S INTELLECTUAL PROPERTY RIGHTS (INCLUDING BREACH OF LICENSE GRANT OR RESTRICTIONS); AND (C) CLAIMS RESULTING FROM A PARTY'S WILLFUL AND INTENTIONAL MALICIOUS MISCONDUCT.

7.    **Payment Terms**

7.1.    Invoices and Payments. All fees and charges (other than expenses) will be set forth in the applicable Order Form. Except as otherwise provided, all fees, charges, and expenses must be paid within 30 days of receipt of an invoice. All amounts are payable in US Dollars in accordance with the instructions in the invoice or other instructions provided by Fair Isaac. Without prejudice to its other rights and remedies, If Fair Isaac does not receive any payment of an undisputed invoice by its due date, Fair Isaac may assess a late payment charge on the unpaid amount at the rate of 1.5% per month or the highest rate allowed under applicable law, whichever is less. In addition, and if invoice is undisputed by Client, Fair Isaac may terminate the relevant Order Form, including any licenses granted to Client therein, or terminate the service concerned, but not until Fair

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

Isaac has given Client written notice, and the amount remains unpaid 30 days after Fair Isaac gives the notice.  Client has 30 days from receipt of an invoice to notify Fair Isaac of a dispute regarding the invoice.  Fair Isaac and Client will work promptly and in good faith to resolve any disputed invoices.

       7.2.    <u>Costs and Expenses</u>. Prices do not include reasonable travel and associated out-of-pocket expenses incurred by Fair Isaac in connection with this Agreement, which Client agrees to reimburse at Fair Isaac's actual cost to the limit agreed in a relevant Statement of Work.

       7.3.    <u>Taxes and other Charges</u>. All charges under this Agreement are stated exclusive of any applicable Taxes, and Client is solely responsible for, and shall pay or reimburse Fair Isaac for, all Taxes. Fair Isaac shall promptly remit to the appropriate tax authority all Taxes collected from Client on account of Client's tax obligations, if any.  If Fair Isaac receives a refund of Taxes attributable to amounts paid by Client under this Agreement, Fair Isaac shall pay the refunded amount to Client within 30 days of its receipt.

       7.4.    <u>Verification and Audit Rights</u>. Client shall maintain adequate books, records, and accounting practices and systems that will allow proper calculation, documentation, and reporting of payments due to Fair Isaac under this Agreement and that will facilitate auditing of those books, records, and systems, and of Client's use of the Fair Isaac Product(s). At Fair Isaac's written request, Client shall promptly provide to Fair Isaac a written certification executed by an authorized officer of Client that provides information reasonably requested by Fair Isaac to confirm the foregoing. In addition, upon at least 30 days' prior written notice to Client, Fair Isaac may, at its expense, audit Client's use of the Fair Isaac Product(s) and all records of Client relating to this Agreement. Audits may be conducted at Client's facilities or remotely during regular business hours and must be conducted so as to interfere as little as reasonably possible with Client's business activities. Client shall reasonably cooperate with Fair Isaac's auditors in conducting the audit. Fair Isaac may conduct audits no more than once in any consecutive 12 month period. If Client is discovered to have understated any fees owed to Fair Isaac by more than 5%, or if Fair Isaac learns that Client has materially breached this Agreement, then Client shall promptly pay to Fair Isaac the amount of any underpayment. Except as required by law, Fair Isaac shall treat Client's procedures and processes disclosed during the audit as Client's Confidential Information.

**8.**    **Term and Termination**

       8.1.    <u>Term</u>. Unless otherwise terminated as specified in this article, the initial term of this MLSA ("**MLSA Initial Term**") will commence on the Effective Date and continue for a period of five years. Thereafter, this MLSA will automatically renew for successive one-year terms (each an "**MLSA Renewal Term**" and together with the MLSA Initial Term, the "**MLSA Term**") unless either party notifies the other in writing at least 60 days prior to the end of the MLSA Initial Term or then-current Renewal Term that it elects to have the MLSA expire at the end of that term.  Notwithstanding anything contained in this MLSA or any Order Form to the contrary, the MLSA Term shall continue and the provisions of this MLSA remain in effect for as long as there is an outstanding Order Form not yet expired or terminated.

       8.2.    <u>Termination of Order Form or SaaS Subscription</u>.  A party may terminate an Order Form or SaaS Subscription subject to the terms therein by providing written notice to the other party upon the occurrence of any of the following events:

       (a)    <u>Uncured Breach</u>. The other party has committed a material breach of that Order Form or SaaS Subscription any provision of this MLSA as it relates to that Order Form or SaaS Subscription and has failed to remedy the breach within 30 days (or another duration mutually agreed) after receipt of written notice from the non-breaching party identifying the breach and requiring it to be remedied.

       (b)    <u>Insolvency</u>. The other party ceases to conduct business in the ordinary course or is declared insolvent or bankrupt, or makes an assignment of substantially all of its assets for the benefit of creditors, or has a receiver appointed over all or substantially all of its assets, or any proceeding is demanded by, for, or against the other party under any provision of bankruptcy or insolvency legislation.

       (c)    <u>Violations</u>. The other party has committed a material breach of the provisions of this Agreement relating to the protection of Confidential Information or Intellectual Property with respect to that Order Form or SaaS Subscription.  In addition, Fair Isaac may immediately suspend its performance under or terminate any Order Form if Client (i) violates the terms of any applicable license or license restriction, or (ii) violates any applicable import, export, or re-export laws or regulations.

       8.3.    <u>Termination of Agreement</u>. Notwithstanding anything to the contrary in this Agreement, if Client is in breach of any provision of this Agreement involving a failure of payment or violation of Fair Isaac's Intellectual Property Rights (including

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

breach of any license grant or restriction), and fails to remedy the breach within 90 days (or another mutually agreed duration) after receipt of written notice, then Fair Isaac may at its option terminate (i) the Order Form subject to the breach, (ii) the SaaS Subscription subject to the breach, or (iii) the Agreement.

8.4.    Effect of Termination or Expiration. Upon termination or expiration of any Order Form or SaaS Subscription for any reason: (i) all licenses granted to Client under that Order Form or SaaS Subscription will terminate immediately, as will all Fair Isaac support and maintenance obligations; (ii) Client shall immediately cease using all affected Fair Isaac Product(s) and related documentation; (iii) Client shall remove all copies of the affected Fair Isaac Product(s) and related documentation from Client's computers and systems; (iv) Client shall either (a) irretrievably destroy all copies of the affected Fair Isaac Product(s), related documentation, and other related Fair Isaac Confidential Information and Intellectual Property in Client's possession; or (b) at Fair Isaac's option, return to Fair Isaac all copies of the affected Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and Intellectual Property in Client's possession; (v) Client shall provide to Fair Isaac a written certification signed by an authorized officer of Client certifying that Client has complied in full with the foregoing; and (vi) all fees and other charges provided for in this Agreement or in any Order Form will become immediately due and payable.

8.5.    Survival. The following provisions of this MLSA will survive expiration or termination of this MLSA: Article 1 (Definitions), Section 2.2 (Reservation of Rights), Article 3 (Protection of Confidential Information), Section 4.3 (Warranty Disclaimer), Article 5 (Indemnification), Article 6 (Limitation of Liability), Article 7 (Payment Terms), Section 8.4 (Effect of Termination), Section 8.5 (Survival), and Article 9 (Miscellaneous), except Section 9.4 (Press Releases; Publicity). In addition, notwithstanding the expiration or termination of this MLSA, this MLSA will continue to apply to any Order Form still in effect at the time of the termination or expiration of this MLSA.

9.    **Insurance; Information Security**

9.1    Insurance.    FICO must furnish evidence of insurance showing that FICO has and will maintain adequate insurance coverage during the term of this Agreement. Insurance must be carried to at least the following minimum amounts, it being understood that minimum policy limits may be provided through a combination of primary and excess insurance and that the excess or umbrella insurance shall follow the form of the primary insurance: (a) Commercial General Liability insurance, affording Client protection as additional insured, with coverage of not less than US $1 million each occurrence and US $10 million in the aggregate including premises-operations, broad form property damage, products/completed operations, contractual liability, independent contractors, and personal injury. (b) Worker's Compensation Insurance as required by the states within the USA in which the work is to be performed. This policy must include Statutory Benefits (Coverage A) Statutory and Employer's Liability Insurance (Coverage B) (including Each Accident, Disease/Employee, and Disease/Policy Limit) with a limit of no less than US $2 million each incident. (c) Business Automobile Insurance covering any auto or vehicle (including owned, hired, and non-owned autos or vehicles), with a limit of not less than US $5 million each accident. (d) Errors and Omissions Liability Insurance covering the liability for financial loss due to error, omission of Service Provider, including network security liability and breach of privacy, in an amount of at least $5,000,000 (applicable to Technology suppliers and/or Professional Services suppliers). (e) Commercial Crime Insurance covering the liability for employee dishonesty, with a limit not less than $500 thousand each occurrence. (f) Umbrella or Excess Liability with limits of $10 million each occurrence and aggregate for bodily injury and property damage with such policy "following form" including Commercial General Liability, Automobile and Workers Compensation. The evidence of insurance must set forth the name of the insurer, policy number, expiration date, and limits of liability. FICO's compliance with the insurance requirements does not in any way limit FICO's indemnification of RGA in Section 5.

9.2    Information Security. Exhibit C – FICO Security Agreement attached to the Order Form shall incorporate this section 9.2 for the Client; also includes the following for Client:

(a)    **Customer Information Protection** Fair Isaac shall implement and maintain reasonable measures that are designed and executed to (i) ensure the security and confidentiality of Customer Information, (ii) protect against anticipated threats or hazards to the security or integrity of Customer Information and (iii) protect against unauthorized access to or use of Customer Information that could result in substantial harm or inconvenience to the consumer customer of Client to whom such Customer Information relates. Fair Isaac shall test, on a reasonable, periodic basis, the implementation of its information security program.

(b)    **Vulnerability and Penetration Testing.** Fair Isaac will perform Vulnerability and Penetration testing using third party industry standard software and security testing techniques (Example: OWASP or similar) as part of each Major Product release and will make available to Client, at Client's request, the findings via Fair Isaac documentation at no charge to

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

D-0172-024

the Client. Fair Isaac standard security policy for remediation of Product Vulnerability and Penetration findings is provided in Fair Isaac Security Documents.

    ( c )    **Available Audit Documents and Artifacts. The following documents are available, at no cost to Client:**

        (i)    Security policy and standards regarding Secure Software Development Lifecycle are available remotely for verification that policies are in place and reviewed.

        (ii)    Security testing results of relevant application, including Secure Code Review, Static Code Analysis, Open-Source Software Analysis, Secure Secrets Management, Dynamic Application Security Testing and Penetration test summaries.

10.    **Miscellaneous**

    10.1.    Export. In addition to the requirements contained in the MLSA, Client will not export or re-export, directly or indirectly, any SaaS Service, Documentation, Fair Isaac Product, Fair Isaac Confidential Information or Deliverables to any countries outside the United States except as permitted under the U.S. Commerce Department's Export Administration Regulations (Title 15 of the U.S. Code of Federal Regulations part 730 et seq.), and the U.S. trade embargo regulations (Title 31 of the U.S. Code and Federal Regulations Part 500 et seq.).

    10.2.    Commercial Items. The SaaS Service, Documentation and Deliverables provided to the U.S. Government are "Commercial Items," as that term is defined at 48 C.F.R. 2.101, consisting of "Commercial Computer Software" and "Commercial Computer Software Documentation," within the meaning of 48 C.F.R. 12.212 or 48 C.F.R.227.7202, as applicable. Consistent with 48 C.F.R. 12.212 or 48 C.F.R. 227.7202-1 through 227.7202-4, as applicable, the Commercial Computer Software and Commercial Computer Software Documentation are being licensed to U.S. Government end users (a) only as Commercial Items and (b) with only those rights as are granted to all other end users pursuant to the terms and conditions herein, as provided in FAR 12.212, and DFARS 227.7202-1(a), 227.7202-3(a), 227.7202-4, as applicable.

    10.3.    Relationship of the Parties. The relationship between the parties is that of independent contractors. This Agreement is not to be construed as creating any partnership, joint venture, agency, or any other form of legal association that would impose liability upon one party for the act or failure to act of the other party.

    10.4.    Press Releases; Publicity. The parties may issue press releases as mutually agreed by the parties. All press releases or other publicity sought to be issued by either or both parties pursuant to this section must, prior to release, be reviewed and approved by each party. RGA trade names and trademarks, including AURA, may be included in customer listings, but only with the express consent of RGA. RGA reserves the right to withdraw such consent without prior notice. Any other use of RGA trade names or trademarks, including AURA, must be approved in advance by RGA.

    10.5.    No Waiver. No delay or omission by either party in exercising any right under this Agreement will be construed as a waiver of that right. Even if either party waives a breach or default under this Agreement, that party is not deemed to have waived any later or similar breach or default. No waiver will be effective unless in writing and signed by the party waiving the right.

    10.6.    Compliance with Laws. Client is solely responsible for compliance with all laws relating to Client's use of any product, deliverable, or service provided by Fair Isaac under this Agreement, including but not limited to laws and regulations relating to privacy and export control.

    10.7.    Governing Law. This Agreement, and any issues arising under or in any way relating to this Agreement, will be governed by and construed in accordance with the laws of the State of Minnesota, without regard to principles of conflicts of law or international law, including without limitation the 1980 United Nations Convention on Contracts for the International Sale of Goods, as revised, which the parties expressly agree does not apply to this Agreement.

    10.8.    Arbitration. Except as otherwise provided in this section, any dispute arising under this Agreement shall be submitted to binding arbitration under the then prevailing rules of the American Arbitration Association. Judgment upon the award rendered may be entered and enforced in any court of competent jurisdiction. RGA and FICO, before entering into arbitration, shall each appoint an arbitrator, and these two arbitrators shall mutually select a third arbitrator to be a member of the arbitration panel. Should the two arbitrators not be able to agree on a choice of the third, then the American Arbitration

Attorneys' Eyes Only    **D-0172-025**    FICO0067121

| | Page 26 of 27 |
|---|---|

Association shall make the appointment of a person who is neutral to the parties in controversy. None of the arbitrators shall be officers or employees of the parties to this Agreement. Each arbitrator shall have expertise in the computer software field. The exclusive venue for the arbitration proceeding shall be the City of St. Paul-Minneapolis, Minnesota.

(a)    Notwithstanding the foregoing provisions, neither party shall be precluded from instituting an action in a court of competent jurisdiction for collection of undisputed fees, protection of proprietary and Intellectual Property Rights, a temporary restraining order, a preliminary injunction or other equitable relief to preserve the status quo or prevent irreparable harm pending the selection of the panel of arbitrators.

(b)    The resulting arbitration award may be enforced by all lawful remedies including, without limitation, injunctive or other equitable relief in any court of competent jurisdiction.

(c)    Disputes concerning ownership or enforcement of licensing to the Fair Isaac Product, Documentation, Work Product and any Intellectual Property Rights arising from or related to the foregoing, including any modifications or revisions thereto, shall not be subject to arbitration.

10.9.    Notices. Any notices required to be given in writing under this Agreement must be sent to the recipient's address or facsimile (fax) number for notices set forth below. Written notices must be sent by personal delivery, mail (with return receipt provided), major overnight delivery carrier (with return receipt provided), or fax (only if a fax number is provided below). Notices will be deemed given on the actual date of delivery, as indicated by a delivery receipt or fax confirmation, but any notice delivered by fax must be promptly confirmed in writing using another method for giving notice provided in this section. Either party may change its address or facsimile number for notices at any time by giving written notice to the other party as provided in this section.

**For notices to be sent to Fair Isaac:**

Fair Isaac Corporation
Attention: Contracts Administration

3661 Valley Centre Drive
San Diego, CA 92130
USA
Fax: 858-523-4450

**For notices to be sent to Client:**

Patti Treis

RGA

16600 Swingley Ridge Road

Chesterfield MO, 63017

Fax: 636-736-7746

10.10.    Assignment; Delegation.

(a)    Neither party has the right, without the prior written consent of the other party, to assign or transfer this Agreement, or any part of this Agreement. Except as provided herein, any attempt to assign or transfer all or any part of this Agreement without first obtaining that written consent will be void and of no force or effect.

(b)    In the event of a change of control of Client (where "control" means ownership of a majority (51% or more) of the outstanding voting common stock of the subject entity), or if Client is merged with, is acquired by, or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event will be deemed an assignment by Client subject to this Section, and Client shall not permit that other entity to use the Fair Isaac Product(s) or process any data from that entity through the Fair Isaac Product(s) (either combined with Client's data or as a separate portfolio), or otherwise make any expanded use of any product, service, or deliverable provided by Fair Isaac as a result of that event unless and until Fair Isaac provides its written consent.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*

(c)      Either party has the right to (i) delegate the performance of this Agreement, in whole or in part, to its Affiliates in any jurisdiction worldwide; and (ii) disclose to those Affiliates any data or other information received from, on behalf of, or through the other party that the delegating party deems appropriate for the performance of the delegated activities, including but not limited to data and other information (including personally identifiable information) about the other party; but the delegating party must require its Affiliate to adhere to all obligations imposed by this Agreement upon the delegating party. The foregoing does not excuse or delegate each party's obligations and liabilities under this Agreement.

10.11.   Force Majeure; Cooperation. Notwithstanding anything to the contrary in this Agreement, except for Client's obligations to pay amounts due under this Agreement, unless Client's ability to timely pay the amounts due under this Agreement is directly impeded or prevented by virtue of any events set forth in this section, neither party will be deemed to be in default of any provision of this Agreement for any delay, error, failure, or interruption of performance due to any act of God, terrorism, war, insurrection, riot, boycott, strike, or other labor or civil disturbance, interruption of power service, interruption of communications services, problems with the Internet, epidemic, act of any other person not under the control or direction of either party, or other similar cause, provided that the party affected shall promptly notify the other of the force majeure condition and shall exert reasonable efforts to eliminate, cure, or overcome any such causes and to resume performance of its obligations as soon as practicable. In addition, Client acknowledges that Fair Isaac's performance under this Agreement is dependent on Client's Cooperation.

10.12.   No Third Party Beneficiaries. Nothing in this Agreement is to be deemed to create any right or benefit in any person not a signed party to the Agreement.

10.13.   Article and Section Headings. The article and section headings in this Agreement are for reference only, and do not form part of this Agreement.

10.14.   Construction; Severability. This Agreement is not to be more strongly construed against either party, regardless of who is more responsible for its preparation. If any provision of this Agreement is held to be unenforceable, unlawful, or invalid in any respect, then that provision will be deemed ineffective only to the extent of the illegality or invalidity, without invalidating the remainder of that provision or any of the remaining provisions of this Agreement. If a provision is determined to be unlawful or invalid in any respect, then that provision is to be deemed severable to the extent it is unlawful or invalid, and the enforceability, validity, and lawfulness of the remaining portion of that provision or any other provision of this Agreement will not be impaired.

10.15.   Entire Agreement; Order of Precedence. This Agreement represents the complete agreement of the parties and supersedes all prior or contemporaneous agreements, proposals, understandings, representations, conditions, and communications (oral or written), as well as the terms of all existing or future purchase orders and acknowledgments. Any other terms, conditions, supplements, modifications, or amendments to this Agreement will not be binding upon either party unless expressly set forth in a writing signed by authorized representatives of Client and Fair Isaac. In the case of any conflict between the provisions of this MLSA and an Order Form, with respect to the subject matter of this MLSA shall control.

*Fair Isaac Confidential*
*2547778 v14 123019 (fic)*