# EXHIBIT 25

DOCUMENT PRODUCED AS NATIVE





P-0527-002

| Area | Solution 1 = Application Sub-Component Rules Engine (internally developed) | Solution 2 = Service based Rules Engine (internally developed, or Opensource) | Solution 3 = Vendor based Rules Engine (3rd party- eg: Blaze, Duck Creek) |
|---|---|---|---|
| Atomic applicability | The business rules associated with the Product or Line of Business are executed in a single application | The business rules are associated with the Product or Line of Business are executed in multiple applications | The business rules are associated with multiple Products or Line of Business and are executed in multiple applications |
| Frequency of rules modifications | The frequency of rules changes is less than once per quarter (per rule) | The frequency of rules changes is less than once per month (per rule) | The frequency of rules changes is more than once per month (per rule) |
| Scenario Validation | The business have no requirements to be able to perform "what if analysis" on the existing book of business on potential rule changes | The business have requirements to be able to perform "what if analysis" on the existing book of business on potential rule changes | The business have requirements to be able to perform "what if analysis" on the existing book of business on potential rule changes and be able to visualise the output |
| Rule Changes Governance | Development lifecycle and UAT is the mechanism for the business accepting and approving modifications to any business rules. IT manage the change through the formal IT change management process. | Combination of Business and IT change governance: SBU will analyse and scenario test a rule change. -The SBU /LoB Head is accountable for the final signoff on a rule change. -The SBU/LoB Head will then liaise with IT for the rule change to be applied to production. | Business govern changes to rules: 1. Business user has authority to make changes. 2. Business user has to request rule changes to SBU lead - via automated mechanism |
| Auditability | The business have no requirements to understand what rule changes were made, when, and by whom | The business have requirements to understand what rule changes were made, when, and by whom. IT governance to provide the business with the audit log upon request. | A full audit trail of every rule change is available for the business to see (based on authority level) including: -Who made the change, -Date old rule was expired -Date new rule is applied -Old rule value(s), -New rule value(s), -Old rule/decision -New rule/decision

Additionally this data is needed for reporting/analysis to allow the business to determine the effect of a rule change |
| Rule Reversal | The business have no requirements to be able to revert to previous rules or specific previous decision algorithms at a point in time | The business have requirements to be able to revert to previous rules or specific previous decision algorithms at a point in time: -Simple rule reversion | The business have requirements to be able to revert to previous rules or specific previous decision algorithms at a point in time - - Able to associate a rule/formula change to an effective date and expiry date. - Able to regress to an old rule/formula and incept the old rule from an effective date |
| Rule execution | Be able to have some sort of base rule execution across all products held in the application | Be able to have hierarchy of base rule execution across all products held in the application Be able to execute base rules across multiple business lines | Be able to have hierarchy of base rule execution across all products held in the application Be able to execute base rules across multiple business lines Be able to execute base rules across multiple countries, LOB, products and applications |
| Time to execute rule changes | The timescales that the business would like to see rule changes made to production is approximately 4-6 weeks (from date requirement is signed off by business) | Once rule changes have been modelled, scenario tested and have been signed-off then the business would expect I.T to release to production within 1-2 weeks. | Once rule changes have been modelled, scenario tested and have been signed-off then the business would expect an automated or semi-automated release to production within 1 week. The business will have the ability to facilitate and promote the change without IT (for changes to existing rules) |
| Time to execute new business rules | 4-8 weeks | 2-4 weeks | The business will have the ability to facilitate and promote the change without IT (for changes to existing rules) |

| Number of business rules | Number of business rules does not exceed 100 | Number of business rules does not exceed 400 | The number of business rules is estimated as Large. Each Product has 100+ calculations/rules and have multiple decisions which are either used to: -Present and capture information -Store base rules and rule factors -Store lookups for lists and parameters |
| Rule formula | Non linear | Non Linear + multiple decision tree algorithms Forward and backward chaining | Non Linear + multiple decision tree algorithms (complex) - Ability to implement PARENT / CHILD relationship for rules - Rete or Treat based algorithms |
| Rule Visualisation | No graphical interface available to visualise rules | A graphical interface where the business can visualise the existing Business Rules, using a friendly and intuitive interface | A graphical interface where the business can visualise the existing Business Rules, edit them and create new ones, using a friendly and intuitive interface |
| | | | |

P-0527-003

| Area | Guidelines | |
|------|-----------|---|
| Reference Data | All rules that reference data to determine rules outcome should derive the data from reference data and not internally sourced information residing in the local application database (except for specific policy related information about the customer - eg: name, address) | |
| Rules engine | No hard-code Business Rules into the Application Code | |
| Rules Operations | If you need to have an OR between different fields, make sure you split the rule into different rules. Ideally, within a single row, all conditions on fields should combine with AND | |
| Validation rules | Implement data verification, consistency checks | |
| Calculation rules | Compute values based on input data | |
| Decision rules | Selection of business process path | |
| Atomic Rules | Rules should be as atomic as possible and not conditional (with more than one operand - eg: AND, OR, IF, ELSE) unless vendor based solution implemented which is able to cater for more complex rule algorithms | |
| Execution Flow | Rules should be written in UML to visualise the rules sets and decision outcomes | |
| Data Store of rules | A Central Business Rules Repository will store all the Business Rules defined | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

P-0527-004

# EXHIBIT 26

| | |
|---|---|
| **From:** | Chiang, Miranda <mchiang@chubb.com> |
| **Sent:** | Thursday, April 14, 2016 10:35 AM |
| **To:** | Mirolyuz, Henry <hmirolyuz@chubb.com> |
| **Subject:** | Global: path to unified technologies |
| **Attach:** | Technology Tool Due Diligence and Recommendation_V_0.9.pptx |

See attached..........technology of choice for business rules = BLAZE! ☺

CHUBB



**Miranda Chiang**
Technology and Architecture, NA Claims
*Quality and Agility from Ideation through Delivery*

15 Mountain View Road, Warren, NJ 07059, US
O 908-903-2077   M 732-570-3881
E mchiang@chubb.com

ACE and Chubb are now one.

---

**From:** Chiang, Miranda
**Sent:** Thursday, April 14, 2016 11:34 AM
**To:** Thomas, Benku <bethomas@chubb.com>
**Subject:** FYI: Global: path to unified technologies

See attachment..........very interesting!

CHUBB

**Miranda Chiang**
Technology and Architecture, NA Claims
*Quality and Agility from Ideation through Delivery*

15 Mountain View Road, Warren, NJ 07059, US
O 908-903-2077   M 732-570-3881
E mchiang@chubb.com

ACE and Chubb are now one.

---

**From:** Tonkin, Hamish
**Sent:** Thursday, April 14, 2016 10:12 AM
**To:** Pandey, Ramesh <rapandey@chubb.com>; Tribulski, Peter <ptribulski@chubb.com>; Sarnese, John <jsarnese@chubb.com>; Martin, Lance <lancemartin@chubb.com>; Kebbekus, James R <jkebbekus@chubb.com>; Greenberger, Nathan S <sgreenberger@chubb.com>; Ghislanzoni, Claudio <Claudio.Ghislanzoni@Chubb.com>; Leibowitz, Heidi <Heidi.Leibowitz@chubb.com>; Granto, Carmen R <Carmen.Granto@Chubb.com>; Hoffman, Mike <Mike.Hoffman@Chubb.com>; Pancharatnam, Giri <Giri.Pancharatnam@Chubb.com>; Rowlands, David <David.Rowlands@Chubb.com>; Sivakumar, Kott <Kott.Sivakumar@Chubb.com>; Chiang, Miranda <mchiang@chubb.com>; Stoyko, Tatyana <tstoyko@chubb.com>; Rosenberg, Andy M <Andy.Rosenberg@chubb.com>; Sharma, Shailesh <shaileshsharma@chubb.com>; Pillutla, Madhava <Madhava.Pillutla@Chubb.com>
**Cc:** Mccarthy, Cullen C <ccmccarthy@chubb.com>; Shina, Raminder <Raminder.Shina@Chubb.com>; Meyer, Michael G



<michaelmeyer@chubb.com>; Greig, Gary A <Gary.Greig@chubb.com>; Burson, Gloria <Gloria.Burson@Chubb.com>;
Purkis, Danette <dpurkis@chubb.com>
**Subject:** RE: Cross Divisional TDA


Hi everyone,

Please find attached today's agenda:
1. EA governance process – CDF + SAS
2. Technology tool due diligence update (see attached slides)


Kind regards

Hamish


-----Original Appointment-----
**From:** Hamish Tonkin
**Sent:** 10 January, 2016 02:31
**To:** Hamish Tonkin; Pandey, Ramesh; Tribulski, Peter; Sarnese, John; Martin, Lance; Kebbekus, James R; Greenberger,
Nathan S; Ghislanzoni, Claudio; Proodian, Heidi; Granto, Carmen R; Hoffman, Mike; Pancharatnam, Giri; Rowlands,
David; Sivakumar, Kott; Chiang, Miranda; Stoyko, Tatyana; Rosenberg, Andy M; Sharma, Shailesh; Pillutla, Madhava
**Cc:** Cullen C Mccarthy; Shina, Raminder; Meyer, Michael G; Greig, Gary A; Burson, Gloria; Purkis, Danette
**Subject:** Cross Divisional TDA
**When:** 14 April, 2016 16:00-16:50 (UTC) Dublin, Edinburgh, Lisbon, London.
**Where:** Conference number - 940 110 0528


**Weekly Cross-Divisional TDA for Integration to cover off the following topics:**
- **Application roadmaps**
- **Changes to applications (International relevance) – SAS walkthrough**
- **Impact assess and approval**
- **Approve technology tools**

**Thanks**

**Hamish**


**United Kingdom, All Cities : 08445718973**
**United States, All Cities : +1 2244446664**

**Conference code:**
940 110 0528
**Leader PIN:**
3974

Confidential

# EXHIBIT 27





U.S. DIST COURT – MN
PLAINTIFF EXHIBIT
**P-0511**
Case No. 16-cv-1054-DTS



EXHIBIT 546

VERITEXT GHISLANZONI
Reported by:                 Date:3/12/2020
Marilee Johnson, RDR, CRR, CRC, RSA

1

## Table of Contents

- Introduction
- Tools Scope
- Analysis:

  - Integration and Orchestration (Sentinet vs WSRR vs Process Server and Biztalk versus Process Server)
  - ECM (Filenet vs Opentext) – Awaiting Update
  - Rules Engines (Blaze versus ODM)
  - Campaigning (ExactTarget vs Ardent)
  - CRM (Salesforce vs Sugar vs MS Dynamics vs Oracle OD vs Aprimo)
  - Web portals (LifeRay vs MS Sharepoint vs Mendix)
  - WCM (Percussion Rhythmyx vs OpenText WCM vs Crownpeak)

- Appendix A – Detailed analysis for reference

CHUBB

2



Confidential

P-0511-003

# Application Technology Standards Rationalization

| Technology | | ACE | Chubb | Target |
|---|---|---|---|---|
| **Tools** | ALM Tools | MS Visual Studio<br>IBM RTC<br>IBM RAD<br>GitHub | MS Visual Studio<br>IBM RTC<br>IBM RAD<br>IBM Build Forge<br>JIRA | MS Visual Studio<br>IBM RTC<br>IBM RAD<br>IBM UrbanCode<br>JIRA<br>GitHub |
| | Quality Management Tools | HP Performance Center<br>HP Quality Center<br>HP Quick Test Pro<br>HP Unified Functional Testing<br>CAST<br>SONAR | HP Performance Center<br>HP Quality Center<br>HP Quick Test Pro<br>SONAR | HP Performance Center<br>HP Quality Center<br>HP Quick Test Pro<br>HP Unified Functional Testing<br>SONAR |
| **Platform** | Open Systems | .Net<br>J2EE | .Net<br>J2EE | .Net<br>J2EE |
| | Integration & Orchestration | MS BizTalk<br>Sentinet | IBM Process Server<br>IBM MQ<br>IBM WSRR | TBD (BizTalk, Process Server) - 1<br>TBD (Sentinet, WSRR) - 2<br>IBM MQ |
| | Rating & Rules | DuckCreek<br>Ratabase<br>IBM ODM | DuckCreek<br>Ratabase<br>FICO Blaze Advisor | DuckCreek<br>Ratabase<br>TBD (ODM, FICO BA) - 3 |
| | Document Production | EMC xPression | EMC xPression | EMC xPression |
| | Mobile App Development | Appcelerator | jQuery | Appcelerator |
| | Enterprise Content Management | IBM FileNet<br>IBM ViewOne Pro<br>IBM DataCap<br>Vega Unity<br>Pega PRPC | Xythos WebDav<br>OpenText Metastorm<br>Omnipage | IBM FileNet<br>IBM ViewOne Pro<br>IBM DataCap<br>TBD (OpenText Metastorm) - 4 |
| | Web Portals | LifeRay<br>MS SharePoint<br>Moodle | MS SharePoint | MS SharePoint<br>LifeRay<br>Moodle |
| | Web Content Management | CrownPeak<br>OpenText WCM | Percussion Rhythmyx | TBD (CrownPeak, OpenText WCM, Rhythmyx) - 5 |
| | CRM Customer Engagement | Salesforce<br>MS Dynamics<br>Sugar CRM<br>Oracle On Demand | Salesforce<br>Aprimo | TBD (Salesforce, MS Dynamics, Sugar CRM, Oracle On Demand, Aprimo) - 6 |
| | Marketing | | Ardent<br>ExactTarget | TBD (Ardent, ExactTarget) - 7 |
| | Collaboration | Jive | Jive | Jive |

## Discussion

1. BizTalk and Process Server have similar ESB functionalities and extended usage.
2. Sentinet and IBM WSRR have similar functionality in providing service registry and repository functions.
3. IBM ODM and FICO Blaze have similar functionality in automating business rules and decisions.
4. OpenText Metastorm BPM to be assessed for possible positioning alongside FileNet.
5. Percussion Rhythmyx, OpenText WCM and Crownpeak provide similar capability for Web Content Management
6. Salesforce, Microsoft Dynamics, SugarCRM, Oracle On Demand and Aprimo provide similar capabilities for CRU
7. Exacttarget and Ardent have similar capabilities in Enterprise Marketing Management and campaign management

CHUBB

4

## Technology Tool Summary Evaluation – Integration Tool

**Overall Assessment:**

| Weights | Category | BizTalk | IBM WPS/ESB |
|---|---|---|---|
| 30% | Functional | 10.71 | 8.76 |
| 10% | Non-Functional | 7.00 | 6.70 |
| 10% | Technical | 6.50 | 5.35 |
| 10% | Vendor | 3.90 | 3.65 |
| 10% | Pricing | 3.00 | 2.90 |
| 10% | Market | 1.90 | 1.50 |
| 10% | Technology Documentation | 3.00 | 3.00 |
| 10% | Chubb Landscape Impact | 2.20 | 2.00 |
| 100% | | | |



**Summary Findings:**

- Legacy Ace use Microsoft BizTalk as the integration tool where as IBM Process Server (WPS) is used in legacy Chubb. Both the tools were evaluated in range of areas as above including functionality, product standing in the market, pricing and technology. Both products are identified as mature technologies from leading vendors.

- BizTalk comes with an overall higher rating than WPS in term of competitive pricing, value for money, out of the box capabilities and the usage foot print in Chubb landscape. Although IBM technologies lead in performance, the current product we have in legacy Chubb is part of the older stack of IBM technologies. It also comes with a higher cost than BizTalk.

CHUBB

5

Confidential

FED000894_0005

P-0511-005

## Technology Tool Recommendation – Integration Tool

> Recommendation is to promote Microsoft BizTalk as the strategic platform of integration for the new Chubb. BizTalk to be used as the integration technology for all new projects. All surviving legacy Chubb applications which use IBM Process Server as integration platform need to be transitioned gradually onto BizTalk Server

CHUBB

6

Confidential

FED000894_0006

P-0511-006

## Technology Tool Summary Evaluation – Rules Engine - WIP

**Overall Assessment:**

| Weights | Category | IBM - ODM | Blaze |
|---|---|---|---|
| 30% | Functional | 0.54 | 0.95 |
| 10% | Non-Functional | 2.48 | 2.75 |
| 10% | Technical | 2.35 | 2.29 |
| 10% | Vendor | 3.00 | 2.75 |
| 10% | Pricing | 3.00 | 3.00 |
| 10% | Market | 3.00 | 3.00 |
| 10% | Technology Documentation | 2.60 | 2.80 |
| 10% | Chubb Landscape Impact | 1.20 | 2.00 |
| 100% | | 1.92 | |



**Blaze Summary Findings:**

Blaze is functionality rich and has built in modules for integration. It is used widely in legacy Chubb.

**ODM Summary Findings:**

ODM can perform the basic rules engines tasks but requires custom development in large number of cases. Legacy ACE has only one application on ODM.

CHUBB

7

Confidential

FED000894_0007

P-0511-007

## Technology Tool Recommendation– Rules Engine - WIP

➢ Based on the technology assessment, Blaze is the preferred choice for rules engine.

CHUBB

8

Confidential
FED000894_0008

P-0511-008

## Technology Tool Summary Evaluation – Marketing and Campaign management

**Overall Assessment:**



| Category | ExactTarget | Adent Tool |
|---|---|---|
| Functional | 2.51 | 0.94 |
| Non-Functional | 3.00 | 2.83 |
| Technical | 2.72 | 2.14 |
| Vendor | 3.00 | 2.15 |
| Pricing | 3.00 | 2.20 |
| Market | 3.00 | 1.00 |
| Documentation | 3.00 | 1.00 |
| | 2.66 | 1.41 |

**ExactTarget Summary Findings:**

- Large existing legacy ACE installation in US which supports multiple regions.
- Total three installation between two legacy environments.
- Functionally and support are superior over other existing electronic campaign tool
- Acquired by Salesforce and integrated with their SalesForce CRM tool

**Ardent Summary Findings:**

- Regional market player in UK area
- Existing business area that uses it has already made a decision to not to renew and migrating to ExactTarget

CHUBB

9

9

## Marketing Technology Tool Recommendation

- Based on the technical assessment of the two tools currently in use at CHUBB from the perspective of functional, non-functional, technical, vendor, market, technical documentation and impact to organizational IT landscape aspects, Exact Target is the leading technology choice
- ExactTarget would be positioned as the primary Marketing & Campaign management tool
- Combined ExactTarget (Marketing Cloud) instance to support all business units

CHUBB

10

10

P-0511-010



### Technology Tool Summary Evaluation – CRM (1/2) - WIP

**Overall Assessment:**

| Category | SalesForce.com | MS Dynamics CRM | SugarCRM 7.5 | Oracle On Demand CRM | Aprimo | Infor CRM (SalesLogix) |
|---|---|---|---|---|---|---|
| Functional | 2.08 | 2.07 | 1.59 | 2.07 | 1.03 | 1.44 |
| Non-Functional | 3.00 | 3.00 | 2.20 | 2.93 | 2.23 | 2.40 |
| Technical | 2.74 | 2.69 | 2.39 | 2.80 | 0.00 | 2.04 |
| Vendor | 3.00 | 3.00 | 1.75 | 2.90 | 0.00 | 2.00 |
| Pricing | 0.90 | 3.00 | 2.12 | 1.60 | 0.00 | 2.12 |
| Market | 3.00 | 3.00 | 1.90 | 3.00 | 0.00 | 1.50 |
| Documentation | 3.00 | 3.00 | 1.40 | 3.00 | 0.00 | 1.00 |
| | | | 1.79 | | 0.53 | 1.50 |

**CHUBB**

11

Confidential
FED000894_0011

P-0511-011

## Technology Tool Summary Evaluation – CRM (2/2) - WIP

**Salesforce.com Summary Findings:**
- Largest existing legacy Chubb installation in US which support multiple business units.
- Strong integration with ExactTarget (Marketing Cloud) for electronic Campaign (Marketing Automation)
- Wider availability of SMEs along with technical and business resources

**MS Dynamics CRM Summary Findings:**
- 2000 user license available in CICA BU in NA. Piloted in CRS BU in NA.
- Similar and equivalent technical and functional capabilities to Salesforce
- Strong integration with MS Office products
- Limited SME knowledge within both legacy organizations and external documentations

**Infor CRM (a.k.a SalesLogix) Summary Findings:**
- Similar technical and functional capabilities to Salesforce
- Only being used by legacy Chubb Surety
- Limited SME knowledge within both legacy organizations and external documentations

**Sugar CRM, Oracle and Aprimo CRM Summary Findings:**
- Sugar CRM being used in regional market like ASPAC for commercial lines Agent data capturing and not used extensively and user base is also very low
- Oracle CRM on demand being used in regional market like Mexico and is being used extensively for local market due to a good licensing deal and skill availability within the business unit, etc.
- Existing business area which uses Aprimo already has made a decision to not to renew Aprimo and utilizing SalesForce and ExactTarget

CHUBB

12

Confidential

FED000894_0012

P-0511-012

## Technology Tool Recommendation – CRM - WIP

> Stay with the current implementations of Salesforce, Dynamics, Oracle CRM on Demand, Sugar CRM and InforCRM within the respective business units until there is a business driver to revisit the tool selection

> New CRM needs should be leveraging MS Dynamics tool due to cost effectiveness against value provided and to leverage existing integrations as well as internal SME knowledge

CHUBB

13

Confidential
FED000894_0013

P-0511-013



## Technology Tool Summary Evaluation – Web Portals - WIP

**Overall Assessment:**

| Category | SharePoint | Mendix | LifeRay |
|---|---|---|---|
| Functional | 2.17 | 2.01 | 1.61 |
| Non-Functional | 2.70 | 2.63 | 2.23 |
| Technical | 1.90 | 2.41 | 2.18 |
| Vendor | 2.84 | 1.45 | 2.00 |
| Pricing | 1.20 | 2.00 | 1.60 |
| Market | 3.00 | 1.00 | 2.90 |
| Documentation | 3.00 | 2.10 | 2.55 |
|  |  | 1.94 |  |

**SharePoint Summary Findings:**
- SharePoint is currently used in LATAM region for Agent facing portal

**Mendix Summary Findings:**
- Mendix is currently used in legacy ACE in one region for an Agent based portal to provide an insured view as an extension to existing .Net based portal application.
- Overall features in terms of RAD, rich and responsive UI, CI&CD, integration with existing platforms as needed, etc., are good

**LifeRay Summary Findings:**
- Legacy ACE in the regional market of Japan is using this technology for agent communication (authorized forms, reports, news letters, links to authorized back end systems) and notification purpose with mostly out of the box features and code extensions
- LifeRay portal technology uses relatively old Java Portlet standards and has a huge learning curve

CHUBB

14

Confidential
FED000894_0014

P-0511-014

## Web Portals Technology Tool Recommendation – WIP

**Recommendations**

➤ The Mendix software solution provides an environment that enables development teams to create cross platform applications that integrate with legacy applications.

➤ Mendix, as an emerging private platform as a service(PaaS) tool, provides rapid development and deployment as the key benefit and is seen as strategic tool for agent extranet portal or eCommerce development platform. Though LifeRay is rated well by Gartner in the WebPortals space, it is not seen as strategic technology due to the inherent inertia in the portlet UI based technology platform compared with the nimble and rich HTML5 & Javascript frameworks based UI platforms.

➤ Continue with SharePoint and LifeRay in LATAM and Japan regions until there is a business driver to revisit the tool selection

CHUBB

15

Confidential
FED000894_0015

P-0511-015

## Technology Tool Summary Evaluation – WCM

**Overall Assessment:**

| Category | CrownPeak | OpenText WEM | Percussion Rhythmix |
|---|---|---|---|
| Functional | 2.11 | 1.79 | 1.39 |
| Non-Functional | 2.40 | 2.40 | 1.60 |
| Technical | 2.28 | 2.63 | 1.71 |
| Vendor | 2.20 | 2.20 | 1.35 |
| Pricing | 3.00 | 3.00 | 3.00 |
| Market | 3.00 | 3.00 | 1.00 |
| Documentation | 3.00 | 2.00 | 2.00 |
| | 2.45 | 2.23 | 1.65 |



**CrownPeak Summary Findings:**

- The major SaaS installation leveraging the WCM and other WCO features at legacy ACE and is a matured digital solution
- This solutions is also a front end to allow content management of multiple A&H sales and service applications that integrate with System 6 (sales) and ACC (claims).

**Rhythmyx Summary Findings:**

- Already prior to merger, diligence was done to identify the future WCM platform of choice given the fact that Rhythmyx is not strategic for Percussion and planned to migrate to CM1 which is the new offering from Rhythmx
- It is being reviewed now given that equivalent features are available in CrownPeak where substantial investment is already made in legacy ACE

**OpenText WEM Summary Findings:**

- OpenText WEM is used for many travel sites in ASPAC region

CHUBB

16

Confidential

FED000894_0016

P-0511-016

## WCM Technology Tool Recommendation

➢ Based on the evaluation of relevant WCM features across the products in use at CHUBB, it is recommended to channelize future investments into CrownPeak.

➢ Current applications using OpenText WEM could continue to use it until there is a business driver to revisit the tool selection.

CHUBB

17

Confidential

FED000894_0017

P-0511-017



Confidential

P-0511-018

## Next Steps – Enterprise Application Integration

- Identify strategic applications which use IBM Process Server as integration platform post Integration (2018).
- Agree a detailed approach and road map for transition.
- Absorb the best practices to include in the integration strategies and governance model.
- Upgrade/Improve shared BizTalk platform (software versions and infrastructure) to accommodate the increased load where necessary.
- Agree a longer term plan for transition to BizTalk ESB and decommission of IBM process server.
- Establish global COE for Integration

CHUBB

19

Confidential

FED000894_0019

P-0511-019

## Next Steps – Marketing & Campaign management

- Receive quote on consolidated instance to support all business units expected volume
- Establish internal chargeback process to appropriately distribute the cost based on unit's usage
- Define the new business unit within consolidate ExactTaget for new unit and manually migrate the contents into it

CHUBB

Confidential

FED000894_0020

P-0511-020

## Next Steps — CRM Customer Engagement Technology

➢ Organize the documentation of existing configurations and integrations to retain the organizational knowledge on the tools

CHUBB

Confidential

P-0511-021

FED000894_0021

## Next Steps – Web Content Management Technology

> No new application that needs WCM functionality would plan to use Rhythmyx or OpenText WEM
> As enterprise wide license for CrownPeak is available, based on the support window expiration for Rhythmyx and OpenText WEM, appropriate migration planning should be done

CHUBB

22

Confidential

FED000894_0022

P-0511-022

## Next Steps – Web Portals Technology

➢ Do not plan for any new implementations in SharePoint and LifeRay for Extranet Portal/eCommerce platform based use cases

➢ Check if a licensing deal could be obtained from Mendix that is beneficial over LifeRay(Japan) and SharePoint(Mexico) region implementations' considering current run rate, migration costs and support window periods and perform CBA to decide on continuation period for existing installations of these two technologies

CHUBB

23

Confidential

FED000894_0023

P-0511-023

Next Steps – Business Rules Management Technology

CHUBB

24

Confidential



Confidential

P-0511-025

# EXHIBIT 28

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | |
| Plaintiff, | ) ) ) | Case No. 16-cv-1054(WMW/DTS) |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation, and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) | **Jury Trial Demanded** |
| Defendants. | ) ) | |

## PLAINTIFF FAIR ISAAC CORPORATION'S FOURTH SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS FEDERAL INSURANCE COMPANY AND ACE AMERICAN INSURANCE COMPANY

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, Plaintiff Fair Isaac Corporation ("FICO") hereby requests that Defendants Federal Insurance Company ("Federal") and ACE American Insurance Company ("ACE American") produce the following documents and things requested below, in accordance with the Instructions and Definitions that follow. The requested documents and things must be produced at the offices of Merchant & Gould, 3200 IDS Center, 80 South 8th Street, Minneapolis, MN 55402, within thirty days of the date of service of these Requests, or at such other time and location as the parties may agree. If Federal and/or ACE American withholds from production any of the requested documents or things on any ground (for example, on a claim of attorney-client privilege or work-product immunity), FICO requests that Federal and/or ACE American provide, within thirty days of service of these Requests, a schedule identifying the withheld documents and things and the basis for the withholding.

These Requests are continuing, and responses thereto should be supplemented as required by the Federal Rules of Civil Procedure.

## INSTRUCTIONS AND DEFINITIONS

The Instructions and Definitions from FICO's First Set of Requests for Production of Documents are incorporated by reference as if fully set forth herein.  Additionally:

"Legacy ACE American broker and agent" means all brokers and agents credentialed to sell or renew insurance policies issued by any insurance company that was directly or indirectly owned by ACE Limited.

"Legacy Chubb broker or agent" means all brokers and agents credentialed to sell or renew insurance policies issued by any insurance company that was directly or indirectly owned by The Chubb Corporation.

"Legacy ACE American insurance policy product" means all insurance policies issued by any insurance company that was directly or indirectly owned by ACE Limited.

## REQUESTS FOR PRODUCTION

**REQUEST NO. 79:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in the United States in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 80:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in Canada in connection with which Blaze Advisor® software was used for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 81:**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, in

the United Kingdom and Europe in connection with which Blaze Advisor® software was used
for the periods (a) calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 82:**  Documents sufficient to show the total number of insurance policies sold
or renewed, specifically identifying the insurance company that issued each policy or renewal, in
Australia in connection with which Blaze Advisor® software was used for the periods (a)
calendar year 2015 and (b) January 16, 2016, to date, by quarter.

**REQUEST NO. 83:**  Documents sufficient to identify (a) each legacy ACE American insurance
policy product supported by an application or applications using Blaze Advisor® software, and
(b) each legacy ACE American insurance policy product planned to be supported by an
application or applications using Blaze Advisor® software.

**REQUEST NO. 84:**  Documents sufficient to show the total number of insurance policies sold
or renewed, specifically identifying the insurance company that issued each policy or renewal,
by legacy ACE American brokers and agents in the United States in connection with which
Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 85:**  Documents sufficient to show the total number of insurance policies sold
or renewed, specifically identifying the insurance company that issued each policy or renewal,
by legacy ACE American brokers and agents in Canada in connection with which Blaze
Advisor® software was used for the period January 16, 2016, to date, by quarter.

**REQUEST NO. 86:**  Documents sufficient to show the total number of insurance policies sold
or renewed, specifically identifying the insurance company that issued each policy or renewal,
by legacy ACE American brokers and agents in the United Kingdom and Europe in connection
with which Blaze Advisor® software was used for the period January 16, 2016, to date, by
quarter.

**<u>REQUEST NO. 87:</u>**  Documents sufficient to show the total number of insurance policies sold or renewed, specifically identifying the insurance company that issued each policy or renewal, by legacy ACE American brokers and agents in Australia in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**<u>REQUEST NO. 88:</u>**  Documents sufficient to show the total number of insurance policies sold or renewed by legacy Chubb brokers and agents that issued from an insurance company formerly directly or indirectly owned by ACE Limited in connection with which Blaze Advisor® software was used for the period January 16, 2016, to date, by quarter.

**<u>REQUEST NO. 89:</u>**  Specific to each application that uses or used Blaze Advisor® software, documents sufficient to show (a) the number of business rules in each application; (b) the type of business rules in each application, including, without limitation, underwriting, pricing, claims, renewal processing, and workflow, and (c) the number of daily and monthly batch and real-time business rule transactions for each application.

**<u>REQUEST NO. 90:</u>**  Specific to each application that uses or used Blaze Advisor® software, all documents relating to the business rules of each application.

Dated:  December 28, 2019                    MERCHANT & GOULD P.C.

                                             /s/ Heather Kliebenstein
                                             Allen Hinderaker, MN Bar # 45787
                                             Heather Kliebenstein, MN Bar # 337419
                                             Michael A. Erbele, MN Bar # 393635
                                             MERCHANT & GOULD P.C.
                                             3200 IDS Center
                                             80 South Eighth Street
                                             Minneapolis, MN  55402-2215
                                             Tel:  (612) 332-5300
                                             Fax:  (612) 332-9081
                                             ahinderaker@merchantgould.com
                                             hkliebenstein@merchantgould.com
                                             merbele@merchantgould.com

                                             *Attorneys for Plaintiff Fair Isaac
                                             Corporation*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 28, 2018, a copy of the foregoing was emailed to the following attorneys of record:

Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Lora M. Friedemann (#0259615)
lfriedemann@fredlaw.com
Leah Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
FREDRIKSON & BYRON, P.A.
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
(612) 492-7000 (tel)
 (612) 492-7077 (fax)


December 28, 2018                              s/Abigail Krueger
                                                 Abigail Krueger

# EXHIBIT 29

**From:** Hokans, Christian <CHokans@fredlaw.com>
**Sent:** Tuesday, April 16, 2019 12:26 PM
**To:** Allen Hinderaker <AHinderaker@merchantgould.com>; Heather Kliebenstein <HKliebenstein@merchantgould.com>; Michael Erbele <MErbele@MerchantGould.com>
**Cc:** Fleming, Terrence <TFleming@fredlaw.com>; Janus, Leah <LJanus@fredlaw.com>; Pham, Christopher <CPham@fredlaw.com>; Norvold, Deb <DNorvold@fredlaw.com>
**Subject:** FICO v. Federal - Blaze Chart (Production)

**CAUTION - External.**

Counsel,

Please find below a ShareFile link to the production of the updated Blaze Chart referenced in our earlier email on this topic. Let us know if you have any issues accessing this document.

https://fredriksonandbyron.sharefile.com/d-s3f5069d73a648c3b

Regards,

# EXHIBIT 30

 Caution
As of: May 19, 2023 6:20 PM Z

## *Standard Havens Prods. v. Gencor Indus.*

United States District Court for the Western District of Missouri, Western Division

August 30, 1989, Decided and Filed; As Corrected September 1, 1989

No. 88-1209-CV-W-3

**Reporter**
1989 U.S. Dist. LEXIS 10333 *

STANDARD HAVENS PRODUCTS, INC., Plaintiff, v. GENCOR INDUSTRIES, INC., Defendant

## Core Terms

patent, infringement, clear and convincing evidence, reexamination, instructions, patent office, certificate, correction, damages, drum, anticipation, new trial, asphalt, invalid, defense motion, prior art, nondisclosure, aggregate, isolated, argues, breach of contract, credibility, stream, zone, hot, motion for judgment, jury's verdict, references, special verdict form, expert witness

**Opinion by:** [*1] HUNTER

## Opinion

MEMORANDUM AND ORDER

ELMO B. HUNTER, SENIOR UNITED STATES DISTRICT JUDGE

Before the Court is defendant Gencor Industries, Inc.'s (hereinafter "Gencor") Motion for Judgment Notwithstanding the Verdict or, in the Alternative, for a New Trial. This case is a patent and breach of contract action tried to a jury. The jury returned a special verdict form which found in favor of the plaintiff on both counts.

The patent at issue is the Hawkins patent, No. 4,787,938, issued November 29, 1988, and assigned to plaintiff, Standard Havens, Inc. (hereinafter "Standard Havens"). The patent consists of four claims:

(1) a method for continuously producing an asphaltic composition from asphalt and aggregates, the steps of said method comprising:

introducing aggregate material interiorly of a first end of an inclined, horizontal rotating drum to flow generally from said first end to the second end of said drum;

generating a hot gas stream within said drum to flow through said drum to said first end in countercurrent relation to said aggregate material; isolating a zone of said rotating drum from said hot gas stream;

delivering said heated and dried aggregate material to said zone isolated [*2] from hot gas stream;

mixing said aggregate material with liquid asphalt within said zone isolated from said hot gas stream to produce an asphaltic composition; and

discharging said asphaltic composition from said rotating drum.

(2) the method is set forth in claim 1, including the step of adding recycle asphalt material directly to said zone isolated from said hot gas stream

(3) the method as set forth in claim 1, including the steps of creating a curtain of falling aggregate material within said rotating drum and flowing said hot gas stream through said curtain of falling aggregate material.

(4) the method as set forth in claim 1, including the step of blending a fine binder material with the said liquid asphalt and aggregate material within said zone isolated from hot gas stream.

The plaintiff originally brought this action seeking redress for breach of contract and misappropriation of trade secrets. Over plaintiff's objection defendant counterclaimed seeking a declaratory judgment that the Hawkins patent was invalid. In response to this counterclaim, the plaintiff charged that a competing

1989 U.S. Dist. LEXIS 10333, *2

product produced by Gencor infringes upon the Hawkins patent.

No dispositive motions were   [*3]   filed by either Standard Havens or Gencor. Trial was held between June 5 and 26, 1989. In its answers to the special verdict form the jury found that none of the four claims of the Hawkins patent were anticipated or obvious, that Gencor had contributed to and induced the infringement of the Hawkins patent and that Standard Havens had been damaged by that infringement in the amount of $ 5,931,000. With regard to the breach of contract claim, the jury found that a valid contract existed between Standard Havens and Gencor and that Standard Havens had fulfilled its obligations under the contract but that Gencor had not. The jury found that Standard Havens was damaged in the amount of $ 2,284,000 by the breach of contract.

Understandably, the defendant has filed a lengthy motion and is waging a broad based attack on the jury's verdict. In addition to the motion for judgment notwithstanding the verdict or for a new trial, the defendant has also moved that the proceedings before this Court be stayed entirely pending the disposition of a reexamination proceeding currently being carried out by the patent office at the defendant's instigation.

I. The Motion for Judgment Notwithstanding   [*4]   the Verdict on Patent Issues

The defendant has asked that the Court over turn the jury verdict on all of the issues presented in this case. "In deciding a duly filed motion for judgment N.O.V. upon a jury's determination that a patent is valid (i.e., has not been proven invalid), the district court must determine, without substituting its views for those of the jury when resolving conflicts in the evidence, whether in light of the evidence reasonable persons could have found the facts necessary to support the jury's verdict, or whether the facts properly found can in law support the verdict. Weinar v. Ruleform, Inc., 744 F.2d 797, 805 (Fed. Cir. 1984)." Shatterproof Glass Corp. v. Libby-Owens Ford Co., 758 F.2d 613, 618 (Fed. Cir.) cert. dismissed 474 U.S. 976, 106 S. Ct. 340, 88 L.Ed.2d 326 (1985). See also Railroad, Inc. v. A. Stucki Co., 727 F.2d 1506, 1515 (Fed. Cir.) cert. denied, 469 U.S. 871, 105 S. Ct. 220, 83 L.Ed.2d 150 (1984). With regard to defendant's attack on the jury's findings of nonanticipation, nonobviousness, and inventorship, it should be remembered that the defendant was required to prove these elements by clear and convincing

evidence.   [*5]   Obviously, that standard is not altered by the presentation of these issues in the form of a motion for a judgment notwithstanding the verdict. In ruling on a judgment notwithstanding the verdict motion it is unnecessary and inefficient for the trial court to enter new findings of fact which attempt to explain the jury's verdict. Rather, the court is to apply the aforementioned standard and determine whether the outcome reached is supportable by the evidence produced at trial. Glaros v. H. H. Robertson Co., 797 F.2d 1564, 1567 n.4 (Fed. Cir. 1986) cert. dismissed, 479 U.S. 1072, 107 S. Ct. 1262, 99 L.Ed.2d 124 (1987). In light of these very high standards the Court will consider defendant's arguments. [1]

A. Inventorship

Gencor's motion raises the issue that "Mr. Hawkins did not invent the subject matter patented." Unfortunately, the defendant   [*6]   fails to argue this issue in its brief. At trial, there was conflicting evidence and a great deal of argument with regard to this issue. Mr. Hawkins testified to, and was cross-examined at length, on his claim of inventorship. Unlike the defendant's witnesses on this issue, Mr. Hawkins was not successfully impeached with regard to either his general credibility or his credibility with regard to this particular claim. The inventor s testimony, and the lack of credible rebuttal evidence, provides a substantial evidentiary basis for the jury's rejection of defendant's argument. Therefore, the Court finds that the defendant's unbriefed motion with regard to inventorship is wholly without merit.

B. Anticipation

The jury was instructed at length on the issue of anticipation. In special verdict No. 1 the jury was asked whether the defendant had proved by clear and convincing evidence that any claim of the Hawkins patent is invalid due to anticipation. The jury responded in the negative with regard to each of the claim of the Hawkins patent. Defendant now argues that this verdict was not supported by the evidence and that a reasonable jury could not have found that the Hawkins

---

[1]  Defendant has also moved that the jury's finding of willful infringement be overturned. In its Order filed August 8, 1989, the Court determined that no increase in patent damages was warranted despite the finding of willfulness. Therefore, the motion for judgment notwithstanding the verdict on the issue of willfulness is moot.

*patent* **[*7]** *was not anticipated.*

*A patent is invalid for anticipation only where it is shown by clear and convincing evidence that each element of the invention can be found in a single citation of prior art. The presence or absence of an anticipatory prior art reference is a question of fact for the jury. Shatterproof Glass Corp., supra, 758 F.2d at 619.*

*The jury was instructed both as to anticipation generally and to anticipation with regard to the specific references argued by the defendant. The defendant concedes that the jury was properly instructed. Defendant now attempts to reargue its case with regard to the Hepburn patents, U.S. Patent Nos. 1,774,649 and 1,836,754, issued in 1930 and 1931 respectively. During trial the bulk of defendant's proof on the issues of anticipation and obviousness centered on the Hepburn patents. The Hepburn patents, concerning a process and device for producing asphaltic compounds, teach a method of heating and mixing the raw materials in a rotating drum in which the burner is introduced from the rear of the drum to a point approximately in the middle of the drum. However, unlike the Hawkins process the airstream supplying the burner flows unrestricted* **[*8]** *through the missing zone. The plaintiff's expert witnesses testified to several means by which the Hepburn patents could be distinguished from the Hawkins patent. Thus, the Court cannot now conclude that a reasonable jury must have necessarily found that the defendant proved by clear and convincing evidence that the Hepburn patents anticipate the Hawkins patent. Thus, defendant's motion for judgment notwithstanding the verdict on this ground must be denied.*

### C. Obviousness

*As stated in 35 U.S.C. § 103 the patent is invalid for obviousness if it is shown that "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." The question of obviousness is a mixed question of law and fact and may be submitted to a jury upon proper instruction. Railroad Dynamics, Inc., supra, 727 F.2d at 514-15. Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1546-47 (Fed. Cir. 1983).* Instructions No. 17 and 18 mirror the language used in *Graham v. John Deere Co., 383 U.S. 1, 86* S. Ct. **[*9]** *684, 15 L.Ed.2d 545 (1966).* The defendant does not contest the adequacy of the instructions to the jury on the issue of obviousness. In special verdict answer No. 2 the jury found that defendant had not proved any of the claims in Hawkins to be invalid for obviousness.

*Defendant, in its motion for judgment notwithstanding the verdict urges the Court to find that the verdict is unsupportable by the evidence produced at trial. Defendant claims that the Hawkins patent must be found to be obvious in light of the Hepburn patents discussed above and the Heap patent. Bearing in mind the defendant's burden of proof and the deference due to a finding by the jury, the Court must conclude that reasonable people could not have reached the decision made upon the evidence produced at trial. There was a great deal of expert testimony presented on both sides of this issue. Plaintiff's experts testified that the Hepburn patents did not present a workable machine in that it was subject to a tremendous risk of fire or explosion and would produce unacceptable amounts of airborne emissions. Further, there was testimony that the Hepburn patents produced an entirely different result than the Hawkins patent,* **[*10]** *that result being a cooler, rather than a hotter, finished product.*

*Defendant attempts to strengthen its argument for a finding of obviousness by adding to the Hepburn patents the teaching of the Heap patent. The Heap patent concerns a parallel flow drum mixer which was produced by the plaintiff as a forerunner of the counter flow drum mixer produced from the Hawkins patent. The combination of the Hepburn and Heap patents does indeed create a process bearing some resemblance to that created from the Hawkins patent. However, nothing in either of those patents or in the defendant's other evidence indicates that such a combination is suggested by the prior art. The defendant's argument is based upon a hindsight analysis of the prior art and is therefore neither persuasive nor useful in the determination of obviousness. "When prior art references require selective combination by the court to render obvious a subsequent invention, there must be some reason for the combination other than the hindsight gleaned from the invention itself." Uniroyal, Inc. v. Rudkin-Wiley Corp., 837 F.2d 1044, 1051 (Fed. Cir.) cert. denied,__ U.S. __, 109 S. Ct. 75, __ L.Ed.2d __ (1988).* **[*11]** *quoting from Interconnect Planning Corp. v. Feil, 774 F.2d 1132 at 1143 (Fed. Cir. 1985).* Assuming, as the Court must, that the jury followed the instructions given to it the Court finds that there was evidence by which a reasonable jury could find that defendant failed to prove its claim of obviousness by clear and convincing evidence. Therefore, defendant's motion for judgment

withstanding the verdict on the issue of obviousness must be denied.

## D. Infringement

The jury found that the defendant had both contributed to and induced the infringement of all four claims of the defendant's patent. Infringement is a question of fact for the jury and must be proven by the patent holder by a preponderance of the evidence. Envirotech Corp. v. Al George, Inc., 730 F.2d 753 (Fed. Cir. 1984).

There was substantial testimony at trial concerning the infringement of the Hawkins method patent by the defendant's counterflow drum mixer. The jury was instructed on both literal infringement and the doctrine of equivalence, including reverse equivalence as a defense of the charge of infringement.

The defendant now argues that a reasonable jury could not have found infringement in that the **[*12]** defendant's product achieves its result through a substantially different method than taught by Hawkins. The defendant's argument, a reiteration of that presented to the jury, is that its product employs an additional bulkhead wall, a scavenger fan and a manifold assembly by which the "isolation zone" of the Hawkins patent is further sealed in the defendant's mixer. The plaintiff's expert witness Pravel explained that this more complete isolation produced a diminished return over the degree of isolation achieved by the Hawkins method and did not substantially modify or improve upon the method taught by Hawkin. Indeed, there was no objective evidence at trial that the defendant's mixer produced a superior result to that achieved by the Hawkins method under applicable industry standards. In finding infringement, the jury apparently found Mr. Pravel's testimony to be more credible than that of defendant's expert witnesses who attempted to distinguish the processes. The defendant has not carried its burden of showing that the verdict could not have been reached by reasonable people. Therefore, defendant's motion for judgment notwithstanding the verdict on the issue of infringement is denied.

## [*13] E. Damages

The jury returned a verdict finding that the plaintiff's

damages on the patent issues were $ 5,931,000. The defendant now argues that this amount is unsupported by the evidence at trial and that Gencor is entitled to a judgment notwithstanding the verdict or a new trial. The defendant's argument largely consists of a reiteration of the points it attempted to make during cross-examination and through its own experts regarding the sufficiency of plaintiff's expert's calculations. Most of this argument is based on speculation as to how the jury arrived at their final award, that award being in between the figures presented by plaintiff's and defendant's expert witnesses.

It has been stated that "the determination of a damage award is not an exact science and 'the amount need not be proved with unerring precision.'" Del Mar Avionics, Inc. v. Quinton Instrument Co., 836 F.2d 1320, 1327 (Fed. Cir. 1987) quoting from Bio-Rad Laboratories, Inc. v. Nicolet Instrument Corp., 739 F.2d 604, 616 (Fed. Cir.) cert. denied, 469 U.S. 1038, 105 S. Ct. 516, 83 L.Ed.2d 405 (1984). Both sides' damage calculations took into account variable factors and assumptions vigorously **[*14]** contested by the opponent. Upon review of the record and the testimony presented, the Court finds that there is substantial evidence to allow reasonable people to reach the conclusion reached by the jury in this case. There is no indication in the record that the amount of verdict is the result of passion or prejudice against the defendant. Therefore, defendant's motion for judgment notwithstanding the verdict with regard to the patent damages is denied.

## II. Breach of Contract

Defendant has also moved for judgment notwithstanding the verdict with regard to the jury's finding that a valid contract existed between Standard Havens and Gencor, that Gencor breached that contract and the amount of Standard Havens' damages due to that breach. The contract sued upon is a nondisclosure agreement for consulting and technical services dated May 13, 1986. The evidence at trial was that the plaintiff contacted General Combustion Corporation, a wholly owned subsidiary of Gencor to obtain consulting services in the design and manufacture of a burner for plaintiff's proposed counter flow asphalt plant based upon the method described in the Hawkins patent. The non-disclosure agreement requires **[*15]** that the seller is to maintain as confidential and not to disclose or otherwise make use of information obtained from the buyer.

1989 U.S. Dist. LEXIS 10333, *15

*At trial it was plaintiff's contention, which the jury agreed with, that defendant Gencor had misappropriated information gained pursuant to the consulting agreement in the design and production of its counter flow asphalt plant.*

A. Privity of Contract

*Defendant's first argument is that Gencor cannot be held liable for a breach of the contract in that there is indication on the contract that Gencor was a party to that contract. The evidence of the contract at issue consists of a purchase order from Standard Havens to General Combustion Corporation and a nondisclosure agreement signed by E. J. Elliott.* [2] The nondisclosure agreement does not name the seller as either General Combustion or Gencor and Mr. Elliott's signature appears on the contract without a designation of corporate capacity. The evidence at trial was that Mr. Elliott is the chairman of both General Combustion, Inc., and Gencor. The evidence at trial also showed that pursuant to the contract the plaintiff released information about its design to Mr. David Brashears, an officer of both General **[*16]** *Combustion and Gencor. Defendant now argues that Gencor cannot be held liable for breach of the contract in the absence of privity in that General Combustion was a completely separate, although wholly owned, subsidiary of Gencor Industries and that all corporate formalities had been observed. This argument, supported by the testimony of Mr. Elliott and Mr. Brashears, was placed before the jury and the defendant strenuously argued this point. Plaintiff presented evidence which showed that Mr. Elliott exerted virtually complete control over the actions of both companies and that Gencor presented itself to the public as a unitary operation including all of its wholly owned subsidiaries.*

Under Missouri law a parent corporation is normally not liable for the wrongs of its wholly owned subsidiaries; the corporations are to be treated as distinct legal entities for all purposes. *Blum v. Airport Terminal Services, Inc., 762 S.W.2d 67, 72 (Mo. App. 1988)*. An exception exists where two corporations **[*17]** under the same ownership or control are being manipulated through their interrelationship to cause illegality, fraud,

or injustice. In order to pierce the corporate veil it must be shown first that the corporations are controlled and influenced by the same persons or corporation; and second, that the corporate cloak was used as a subterfuge to defeat public convenience, to justify a wrong or to perpetrate a fraud. *Terre Du Lac Association v. Terre Du Lac, inc., 737 S.W.2d 206 (Mo. App. 1987); Pasta House Co. v. Miller, 691 S.W.2d 460 (Mo. App. 1985); Fairbanks v. Chambers, 665 S.W.2d 33 (Mo. App. 1984).*

*Viewing the evidence in the light most favorable to the plaintiff, the Court believes that the jury's verdict is not contrary to the law. First, the evidence clearly established that Mr. Elliott exercised almost absolute control over both corporations. Second, as apparently found by the jury, through the use of separate corporate entities for General Combustion and Gencor, the defendant was able to misappropriate the plaintiff's technology by virtue of plaintiff's contacts with General Combustion and then to make use of that misappropriation through the production capacity* **[*18]** *of Gencor. Thus, this is precisely the situation the aforementioned rule is directed towards. Faced with this situation, the Court must, as a matter of equity, disregard the corporate manipulations which separate General Combustion, Inc. from Gencor. Pasta House Co. v. Miller, supra. Therefore, the Court finds that Gencor can properly be held liable for the breach of the nondisclosure agreements.*

B. Breach of Contract

*Defendant also argues that plaintiff presented insufficient evidence to support a jury finding that the defendant had breached the non-disclosure agreement. In support of this contention, the defendant cites the testimony of its own witnesses, Mr. Elliott and Mr. Brashears, to the effect that Mr. Brashears at no time disclosed the information he had received from Standard Havens and that Gencor's counter flow asphalt plant was the product of independent development on the part of its engineers. The defendant's argument fails to mention the evidence which shows that Gencor was not working on a counter flow plant of the same configuration as that planned by the plaintiff prior to the time Mr. Brashears met with plaintiff's engineers under the nondisclosure agreement* **[*19]** *or that after disclosure at Mr. Elliott's direction the engineers at Gencor dropped their current line of research and development in favor of plant configuration virtually identical to that of the plaintiff. The defendant's*

---

[2] *Mr. Elliott was originally named as a defendant to the contract and misappropriation counts of the complaint. No verdict was rendered with regard to Mr. Elliott. See infra, note 4.*

1989 U.S. Dist. LEXIS 10333, *19

*argument also fails to take into account that there were serious questions raised with regard to Mr. Elliott's and Mr. Brashear's credibility during cross examination.*

*The questionable credibility and the witnesses' demeanor on the stand were a sufficient basis for the jury to not believe defendant's version of the facts. The plaintiff's circumstantial evidence was sufficient to support a jury finding that the defendant's had in fact employed the technology received from Standard Havens. Because there was sufficient evidence to support submission of this question to the jury, the Court is not now at liberty to overturn the jury's finding that the contract was indeed breached, even were the Court inclined to do so. Therefore, defendant's for a judgment notwithstanding the verdict on the issue of breach of the contract must be denied.*

*C. Contract Damages*

*Defendant also argues that the contract damages awarded by the jury were not supported by substantial evidence.* **[*20]** *As was the case with plaintiff's patent damages, the plaintiff and defendant submitted, through their expert witnesses, vastly divergent computations and rationales for the correct amount of damages.* Both sides did a thorough job of presenting their evidence and attempting to discredit the other side's expert witnesses' calculations. At this point of the proceedings, neither the court nor the parties can identify how the jury's calculations were made. However, upon review of the record the Court finds that the evidence presented by plaintiff did provide a rational basis by which the jury could ascertain the amount profits lost by the plaintiff as a direct result of the breach of the nondisclosure agreement. *Gasser v. John Knox Village, 761 S.W.2d 728 (Mo. App. 1988).* Therefore, the defendant's motion for judgment notwithstanding the verdict on the issue of contract damages must be denied.

*III. Motion for a New Trial*

*A. Instructional Error*

*Defendant has also moved for a new trial on the basis of several perceived errors in the instructions given to the jury.*

*1. Instructions 7 and 9*

*In instruction No. 7 the Court instructed the jury with regard to the defendant's* **[*21]** *burden of showing patent invalidity by clear and convincing evidence. The instruction read, in part, "by stricter burden, I mean that clear and convincing evidence involves a greater persuasion that that which might satisfy a preponderance of the evidence standard. For purposes of evaluating the evidence introduced, clear and convincing evidence must produce in your minds a firm belief or conviction as to the matters sought to be established. You must be firmly convinced that the fact is indeed true in order to meet the clear and convincing burden."*

*In instruction No. 8 the Court instructed the jury as to the presumption of validity that rests with every claim in the patent. In Instruction No. 9 the court stated, "in deciding whether the defendant's have met their burden of clear and convincing evidence in attempting to overcome the presumption of patent validity, you must find that the witness' testimony in support of such evidence is credible. The facts to which they have testified must have been distinctly remembered, and the details of that testimony narrated and in due order. Their testimony must have been clear, direct and weighty so as to enable you to come to a clear conviction* **[*22]** *as to the truth of the precise facts in issue. All evidence admitted during this trial, including documentary evidence, must also be considered. The presumption of validity is not overcome unless you are clearly convinced that clear and convincing evidence dictates a contrary conclusion."*

*The defendant now argues that instructions 7 and 9 are conflicting, that they instruct the jury on different definitions of clear and convincing evidence and that instructions 7 and 9 are redundant with the result that defendant's burden of proving invalidity by clear and convincing evidence was improperly emphasized to the jury. The Court finds defendant's argument on this point to be without merit. Although the two instructions do express the clear and convincing evidence standard in different terms the Court does not believe that either statement is contrary to law nor is the language used contradictory or confusing.*

*Further, the Court does not find that instructions 7, 8 and 9 improperly emphasizes the defendant's burden of proof in this case. The sequence of instructions advises the jury on the clear and convincing evidence standard, the presumption of patent validity, and the relationship between* **[*23]** *the two concepts. These concepts are*

at the core of the statutory scheme of patent litigation. The Court does not believe that the concepts are unduly emphasized where discussed in three out of 51 instructions. See generally *Jamesbury Corp. v. Litton Industrial Products, Inc., 756 F.2d 1556 (Fed. Cir. 1985)*. Defendant's point is without merit.

2. *Instructions 39, 40 and 42*

*Defendant also attacks instructions 39 and 40, which concerned causation and damages, as being cumulative and prejudicial. Instruction No. 39 instructs the jury on the four-part showing of lost profit damages as put forth in Paper Converting Machine Co. v. Magna-Graphics Corp., 745 F.2d 11 (Fed. Cir. 1984).* Instruction No. 40 discusses causation in terms of "but for" the infringement the patentholder would have made the sales. Instruction No. 40 further advises the jury that causation requires only a reasonable probability that the sale would have been made but for the infringement. The Court does not view the giving of these two instructions as error. Contrary to defendant's assertions instruction No. 40 clarifies rather than contradicts this standard put forth in instruction No. 39. The Court does **[*24]** *not find that the inclusion of two instructions on this issue worked any prejudice to the defendant.*

Defendant also attacks instruction No. 42 which follows the language from the case of *Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056 (Fed. Cir. 1983)* that "any adverse consequence must rest on the infringer where the inability to a certain loss profits is due to the infringer's own failure to keep accurate and complete records." This instruction was requested in light of defendant's attacks on the basis of plaintiff's damage calculations. As in its brief on this motion, at trial the defendant attempted to discredit plaintiff's expert on damages by emphasizing the lack of foundation for his assumptions. Instruction No. 42 simply advised the jury, correctly, to view this argument in light of the availability of documentation of the infringer's profits. The testimony of both side's witnesses raised some question with regard to the bookkeeping practices of the defendant. Therefore, the giving of instruction No. 42 was not error.

B. *The Erroneous Special Verdict Form*

*At the request of the Court, plaintiff's counsel prepared copies of the jury instructions and a special verdict form* **[*25]** *to be given to the jury in deliberations. Due to a clerical error the verdict form originally submitted to the jury included as question 7 the following: "Do you find*

*that defendant E. J. Elliott was the alter-ego or the motivating, driving force who directed and controlled the actions of defendant Gencor so that this verdict on the patent issue shall be applicable to both defendants Gencor and E. J. Elliott with equal force?"*

*At the close of all the evidence the Court denied plaintiff's motion to amend its complaint so as to include defendant Elliott as a defendant on the patent issues. Thus, the submission of special verdict question 7 was erroneous. The error was discovered before noon on the first day of jury deliberations. At that time Judge Dean Whipple [3]* denied Gencor's request for a mistrial and read to the jury a curative instruction advising them in no uncertain terms that defendant Elliott was not to be considered a defendant with regard to the patent issues. The jury was also told to disregard question No. 7 and provided a correct special verdict form. The Court believes that the error in the submission of question No. 7 was fully cured by the instruction expressly revoking **[*26]** *that question. Further, the defendant has not shown how it could have been prejudiced by the submission of question No. 7 in that defendant Gencor was the named defendant in the infringement action and no verdict whatsoever was returned with regard to Mr. Elliott on either the patent or contract issues. [4]* The Court finds defendant's motion for a mistrial based upon the erroneous special verdict question No. 7 to be completely without merit.

C. *Exhibit 496*

*Defendant urges that a new trial is required due to the Court's "error" in the receipt of plaintiff's exhibit No. 496. Plaintiff's Exhibit 496 is a certificate of correction approved by the patent office on June 5, 1989. The certificate* **[*27]** *of correction adds to the list of references cited in the Hawkins patent 12 United States patents and three other references. The addition includes the Hepburn patents discussed earlier. The*

_____

[3] *Due to a long-standing commitment, the author was required to be absent for one day following submission of this case to the jury. Judge Dean Whipple of this district kindly made himself available as needed during the first day of deliberations.*

[4] *Although named as a defendant on the contract claim, plaintiff's counsel failed to include Mr. Elliott in the special verdict form questions regarding the contract. Therefore, neither verdict nor judgment was rendered against Elliott personally.*

1989 U.S. Dist. LEXIS 10333, *27

*defendant points out that after a verdict was rendered in this case, the Commissioner of Patents, acting upon a petition by defense counsel, ordered that the approval of the certificate of correction be withdrawn.*

*At the point in trial in which plaintiff's exhibit 496 was offered, defendant's expert witness had expressed his opinion that several of the most important references, including Hepburn, had not been considered by the patent examiner. The plaintiff introduced the certificate of correction in contradiction of defendant's expert testimony. At the time the certificate of correction was offered into evidence, it was a public document under seal and of unquestionable relevance to the instant suit. Therefore the Court does not believe that there was error in the admission of the document.*

*The defendant also contends that the Court committed error requiring the grant of a new trial when it refused to admit a petition to the deputy assistant commissioner of the patent office dated June 8, 1989.* **[*28]** *That petition, signed by defense counsel in this case, requests that the deputy assistant commissioner deny or withdraw the approval of the aforementioned certificate of correction. The defendant's petition, unlike the certificate of correction, is not an official public document of the patent office. Rather, the petition consists of counsel's opinion regarding the certificate of correction and counsel's conjecture as to what may have occurred during the patent examination. Further, the petition filed by defense counsel discusses the proceedings before this Court including the possible effect of the certificate of correction upon the jury. The Court believes that it would have been grossly improper and prejudicial to the plaintiff to allow the unsupported statements of defense counsel to be entered into the record simply because the statements were in the form of a petition to the deputy assistant commissioner of patents. Defendant also argues that a new trial is required because the certificate of correction was vacated by the patent office after the conclusion of trial. As will be discussed in the next and final portion of this opinion, there is currently pending in the patent office* **[*29]** *a reexamination proceeding which will address the controversy regarding the issuance of the certificate of correction. In the absence of a final ruling on this issue by the patent office, the pending proceeding with regard to the certificate of correction does not yet rise to the level of "new evidence" as would justify that the judgment be vacated under* Fed. R. Civ. P. 60. *Therefore, defendant's motion for a new trial on this ground is denied.*

*IV. The Reexamination Proceeding*

*Defendant's final contention regarding his motion for a new trial concerns events in the patent office subsequent to the return of a verdict in this case. On July 12, 1989, the Commissioner of Patents and Trademarks issued a Commissioner initiated order for reexamination pursuant to* 35 U.S.C. § 303(a). [5] The order for reexamination is based upon apparent discrepancies in the patent file with regard to a notation dated "8/88" showing that all 23 prior art references had been checked. The notation was apparently entered into the file during the consideration of the plaintiff's application for a certificate of correction in June of 1989. The Commissioner also specifically notes that an apparent failure **[*30]** *to consider the Hepburn patents presents a substantial new question regarding patentability of Hawkins.*

The defendant now charges that the Hawkins patent, the certificate of correction, and the jury's verdict in this case are the product of fraud upon the patent office and this Court. Ultimately, the defendant seeks to offer the Commissioner's remarks regarding the Hepburn patents as new evidence requiring that the jury's verdict be vacated and this case be held in abeyance pending the Commissioner's decision on the order of reexamination.

The Court believes that the defendant overstates his position. Despite defendant's repeated allegations and the Commissioner's decision to reexamine the Hawkins patent there has yet to be proven a fraud upon either the Court or the patent office. This charge should not be so lightly made. Burlington Industries, Inc. v. Dayco Corp., 849 F.2d 1418, 1422 (Fed. **[*31]** Cir. 1988).

The Court finds that the Commissioner's order for reexamination does not require, at this time, any alteration in the verdict reached by the jury. As explained in Ethicon, Inc. v. Quigg, 849 F.2d 1422 (Fed. Cir. 1988) the relationship between a judicial action on the issue of invalidity and a reexamination by the patent office is defined and distinguished by the differing burdens of proof and the effect of the disposition of the proceeding. See Ethicon, Inc., 849 F.2d at 1428-29. The

_____

[5]  *The reexamination order was issued sua sponte within the meaning of the statute. However, the matter was brought to the commissioner's attention by defendant's Washington D.C. counsel. A partner in that firm also served as defendant's expert witness on patent issues at trial.*

verdict reached in this case is that the Hawkins patent was not proven invalid by clear and convincing evidence by this defendant. This finding precludes neither an attack upon the Hawkins patent by other parties nor reexamination by the Commissioner. That there may be an inconsistent finding in the future does not require a conclusion that there was error in either this proceeding or the reexamination. This is true in spite of the fact that the same issue, the effect of the Hepburn patents as prior art, is central to both proceedings. Because the Commissioner has yet to reach a final decision on the validity of the Hawkins patent, defendant's attempt to use the order of reexamination **[*32]** *to nullify a full and fair jury trial is premature.*

*The possible outcomes in the instant situation do not dictate a need for action by this Court.* <u>Ethicon</u> *specifically states that this Court's finding that the Hawkins patent is not invalid does not preclude* <u>sua sponte</u> *reexamination by the patent office. The reexamination order having been issued there are two possible outcomes in the patent office. If it is found that the Hawkins patent is anticipated or obvious in light of the Hepburn patents, then the judgment of this Court becomes a nullity in that the Hawkins is void* <u>ab initio.</u> *On the other hand, if the patent office determines that the Hawkins patent was validly issued, i.e., not anticipated or obvious in light of the Hepburn patents, that decision can only be taken as a reaffirmance of the jury process in this case.*

*However, due to the pendency of the reexamination proceeding the Court finds it to be in the interest of justice that the judgment entered in this case, with the exception of the injunction issued in paragraph 7 of the Court's Order of August 8, 1989, be stayed for a period of 60 days wherein defendant may request that the Court of Appeals for the Federal* **[*33]** *Circuit set a bond and issue a stay of the execution of judgment and the injunction against further sales of defendant's product. Accordingly, it is hereby ORDERED*

*(1) that defendant's motion for judgment notwithstanding the verdict is hereby DENIED;*

*(2) defendant's motion for a new trial is hereby DENIED;*

*(3) that the stay of execution and of injunction previously entered in this case be continued for a period of 60 days from the date of this Order; and*

*(4) that because proceedings in this Court are now concluded, defense counsels' motion to withdraw as counsel of record is hereby granted.*

*IT IS SO ORDERED.*

*Date 8-30-89*

**End of Document**

Abigail Krueger