# EXHIBIT A

1               UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
2

3   -------------------------------------------------------------

                                  )
   Fair Isaac Corporation,    )   File No. 16-cv-1054(DTS)
4   a Delaware Corporation,     )
                                  )
5          Plaintiff,        )
                                  )
6   v.                            )
                                  )
7   Federal Insurance Company,   )   Courtroom 9E
   an Indiana corporation,     )   Minneapolis, Minnesota
8   and ACE American Insurance   )   Wednesday, May 24, 2023
   Company, a Pennsylvania      )   1:00 p.m.
9   Corporation,              )
                                  )
10         Defendants.       )
                                  )
11   -------------------------------------------------------------

12

13

14         BEFORE THE HONORABLE DAVID T. SCHULTZ
      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
15

16                **(MOTIONS HEARING)**

17

18

19

20

21

22     Proceedings recorded by mechanical stenography;
  transcript produced by computer.
23                   *   *   *
24

25

```
1    APPEARANCES:

2      For Plaintiff:        MERCHANT & GOULD P.C.
                             BY:  ALLEN W. HINDERAKER
3                                 HEATHER J. KLIEBENSTEIN
                                  PAIGE S. STRADLEY
4                                 MICHAEL A. ERBELE
                                  JOSEPH W. DUBIS
5                            150 South Fifth Street, #2200
                             Minneapolis, Minnesota 55402
6
       For Defendants:       FREDRIKSON & BYRON
7                            BY:  TERRENCE J. FLEMING
                                  LEAH C. JANUS
8                            200 South Sixth Street, #4000
                             Minneapolis, Minnesota 55402
9
                             O'MELVENY & MYERS LLP
10                           BY:  LEAH GODESKY
                                  ANTON METLITSKY
11                           Times Square Tower
                             7 Times Square
12                           New York, New York 10036

13     Court Reporter:       RENEE A. ROGGE, RMR-CRR
                             United States District Courthouse
14                           300 South Fourth Street, Box 1005
                             Minneapolis, Minnesota 55415
15
16                                *   *   *
17
18
19
20
21
22
23
24
25
```

**P R O C E E D I N G S**

**IN OPEN COURT**

1
2
3       THE COURT:  All right.  Good afternoon.  We are on

4   the record in the matter of First Isaac Corporation versus

5   Federal Insurance Company, et al., Civil Number 16-1054.

6       Counsel for FICO, if you will note your

7   appearances, please.

8       MR. FLEMING:  Your Honor, Allen Hinderaker,

9   Heather Kliebenstein, Joe Dubis, Michael Erbele and Paige

10   Stradley from Merchant & Gould.  And Mr. Jim Woodward, vice

11   president and associate general counsel for FICO.

12       THE COURT:  All right.  Good afternoon to the six

13   of you.

14       Counsel for Federal, et al., if you will note your

15   appearances, please.

16       MS. GODESKY:  Good afternoon, Your Honor.  Leah

17   Godesky from O'Melveny for the defendants.

18       MR. METLITSKY:  Anton Metlitsky from O'Melveny for

19   the defendants.

20       MS. JANUS:  Leah Janus, Fredrikson & Byron, for

21   the defendants.

22       MR. FLEMING:  Terry Flemming, Fredrikson & Byron,

23   for the defendants.

24       THE COURT:  All right.  Good afternoon to the four

25   of you.

1           So I've read everything.  And just letting you

2      know, I have a hard stop at 2:30, which in my estimation

3      ought to be enough time, in any event.  I am going to take

4      up the motion for a new trial on actual damages first.

5           Ms. Godesky, if you want to come on up or whomever

6      is arguing.  I will tell you you get 15 minutes.

7           MR. METLITSKY:  Okay.

8           THE COURT:  Okay?  And here's some of which I'm

9      going to take up.  Okay?

10          MR. METLITSKY:  I figured --

11          THE COURT:  Yeah.  So here's the issue, I guess,

12     as I see it.  You're making in different language two

13     arguments, it seems to me.  One, that the scope of the

14     evidence that the court allowed on the question of actual

15     damages was wrong and that, regardless of that, the

16     plaintiffs and/or their witness or the court's admission of

17     certain charts exceeded that scope, in any event.

18          Generally correct?

19          MR. METLITSKY:  Basically.  I mean, we are making

20     those arguments.  You know, we made these evidentiary

21     arguments at trial.  We still think they're right.  But our

22     argument doesn't depend on us being right about them.

23          THE COURT:  Okay.  Well, here's -- well, let me

24     ask you this.  In her summary judgment order, Judge Wright

25     said, and we all know what she said, at page 31 and 32,

1    "Although some of the facts underlying Zoltowski's opinion

2    may be relevant in the calculation of a hypothetical lost

3    license fee, his selective application of those facts to his

4    calculation leads to a subjective and unreliable result."

5              MR. METLITSKY:  Right.

6              THE COURT:  Here's my question.  I read that and I

7    read that at the time to say, among other things, that the

8    application-based pricing methodology was some, if not all,

9    of the evidence that she said might be relevant.

10             So first question to you, Do you see that a

11   different way?

12             MR. METLITSKY:  I mean, I think what matters is

13   the evidence that came in at trial.  Right?  That was the

14   summary judgment evidence.  I'm not sure what was in

15   Judge Wright's head.  All I know is what happened at trial.

16   And what happened at trial is Mr. Waid testified about this

17   methodology that had never been reflected in any actual

18   license.  And that just seems to me to be sort of the

19   definition of, This is what I would, you know, want to

20   charge.

21             The court held -- heard the testimony just like

22   the rest of us did, and it was not based on any actual real

23   world benchmark.  It was just testimony about what Mr. Waid

24   in this hypothetical role that had never existed in the real

25   world would have, I don't know, done, I guess.  So that

1       seems inadmissible to me, but --

2               THE COURT:  Well, understood.  You know, what I'm

3       getting at, frankly, just sort of a -- I don't know if it's

4       a threshold issue, but what I'm getting at is it seemed to

5       me that it would be hard to read Judge Wright's statement as

6       not referencing the hypothetical -- or the application-based

7       pricing methodology, number one, point one, and, point two,

8       may only reference that.

9               But if that's the case -- as I'd indicated, I

10      wasn't going to revisit that decision; but if that's the

11      case that she's saying this gets to come in to the extent it

12      bears on the hypothetical negotiation, I don't know how that

13      comes in to the extent you are suggesting otherwise without

14      numbers, because then if it doesn't come in with numbers

15      attached to it, it's utterly meaningless.

16              MR. METLITSKY:  Well, I think, I think it could

17      come in if there were some real world basis for thinking

18      that it's something that could actually happen.  It's tied

19      to a real world market value rather than just what FICO

20      would like to do.  Right?  I mean, this was at summary

21      judgment.  Right?  You have to lay foundation at trial, and

22      you have to actually demonstrate that the evidence that you

23      are proffering at trial is, you know, relevant under the

24      legal standard.

25              THE COURT:  The foundation I heard him to lay for

1     it was that this application-based pricing model has existed

2     since, whenever, I mean, early 2000s.  I don't recall now if

3     it was 2003 or 2006, but that it's existed, that it's -- I

4     think that it was published, that they have always had it.

5     I don't know that he tied it this directly to the one

6     application-based price that was introduced at trial, but,

7     you know -- and then he cabined all that with, This is just

8     the starting point for how we would approach the

9     negotiation.

10          MR. METLITSKY:  Right, it was just the starting

11    point.  And the jury picked a number that was higher than

12    his starting point, but I'll get to that in a second.  But I

13    guess it's true that there was some application-based

14    pricing for licenses that used like one application.

15          But the testimony at trial, Mr. Waid admitted that

16    at least at the time -- this is 1825-26 of the transcript --

17    when you had more than two or three, it was always

18    enterprise-wide; and when you had 15 -- he admitted that

19    he'd never seen an application-based license for 15.

20          So that's what I mean.  There was never, ever a

21    license like this using an application-based methodology,

22    and that I think is an evidentiary problem.  But even if

23    it's not an evidentiary problem, it is certainly a problem

24    of proof.  Right?  Even if it -- that's why I'm saying it

25    doesn't, our argument doesn't -- we automatically win if

1    we're right about the evidentiary argument, right, because

2    then there's just no evidence.  But even if the evidence is

3    relevant in some sense, it's only relevant to the seller's

4    side of, you know, whatever this hypothetical negotiation is

5    and --

6              THE COURT:  Well, right, grant you that.

7              MR. METLITSKY:  Right.

8              THE COURT:  But doesn't each side get to say,

9    Look, here's how we would approach it.  And the defendant

10   can say, Well, we would approach it this way, and that's

11   been our experience.  And the jury is left to figure out

12   what would reasonable parties do in this circumstance --

13             MR. METLITSKY:  Yes.

14             THE COURT:  -- and what would they have reasonably

15   negotiated.

16             MR. METLITSKY:  Well, I don't -- so I don't think

17   so, and I'll tell you why in a second.  But even if that's

18   right, the jury's verdict still has to be rational.  We know

19   the jury's verdict here could not possibly have been

20   rational, because the hypothetical negotiation that you have

21   to posit is, Mr. Waid said 36 and a half million dollars,

22   and my client said, Well, that's just too generous, I really

23   need to offer you 40, because otherwise I wouldn't feel

24   right about it.  I mean, what kind of negotiation would work

25   like that?

1           But in our submission, as you know, in our briefs,

2   we think the actual evidence, the objective evidence

3   couldn't support anything higher than a few million dollars.

4   And the reason I think we're right about it under the legal

5   standard, even if this other evidence was reasonable, is

6   because all the cases say, I'm just quoting from the *Oracle*

7   case, for example, in the Ninth Circuit, that the purported

8   hypothetical license values have -- it can't be, quote,

9   "unconstrained by reality."  Right?

10          So the *Gaylord* case out of the Federal Circuit

11  says the particular practices of the parties can't by

12  themselves support the hypothetical license value.  They

13  can't be unrealistically exaggerated.  That's *On Davis*.  The

14  *Jarvis* case in the Ninth Circuit says that you have to look

15  at what a reasonable business person would pay.

16          And so when you look at the evidence, what

17  reasonable business person would, just as an example, what

18  reasonable business person would pay $40 million when they

19  can get a comparable license for a million and a half from a

20  different company.  I mean, it's just completely out of

21  proportion.

22          And I think the *Oracle* case is directly on point

23  because the evidence -- there was evidence in that case like

24  a price list.  Right?  The court didn't say it was

25  inadmissible, considered the evidence.  But here's what it

1    said.  "Although a copyright plaintiff need not demonstrate

2    that it would have reached the license agreement with the

3    infringer or present evidence of benchmark agreements in

4    order to recover hypothetical license damages, it may be

5    difficult for a plaintiff to establish the amount of such

6    damages without undue speculation in the absence of such

7    evidence."  Benchmark evidence.

8            Here, because Oracle has no history of granting

9    similar licenses, as in this case, and has not presented

10   evidence of benchmark licenses in the industry approximating

11   the hypothetical license in question here, as in this

12   case -- I'll get to the benchmark evidence -- Oracle faced

13   an uphill battle.  Oracle bore the burden of proving the

14   fair market value of the hypothetical license in question.

15   And we agree with the district court that Oracle failed to

16   provide sufficient evidence of the market value of the

17   hypothetical license underpinning the jury's damages award.

18   And there was a grant of a new trial in that case.

19           It's exactly the same thing here.  I mean, if you

20   look at -- remember what you are trying to figure out.  This

21   is actual damages, right?  What would FICO have gotten if

22   everything worked the way it should have?  Well, we know the

23   answer to that.  We know the absolute top value that they

24   could have gotten, because the undisputed evidence shows

25   that they would have offered my client a $3 million license

1    for the combined entity.  You usually don't have that kind

2    of evidence, right?

3              THE COURT:  All right.  So your motion -- I don't

4    have to get into whether or not the evidence was properly

5    admitted.

6              MR. METLITSKY:  You don't have to.  I mean, like

7    we still think it was improperly admitted; but, again, if

8    you want to not get into it, don't get into it.  We'll, you

9    know --

10             THE COURT:  No, I, you know, I'm trying to

11   discern, on that topic, I am trying to discern -- you know,

12   we're all big -- we're all adults.  Okay?  So tell me, Did I

13   misunderstand Judge Wright's summary judgment ruling or did

14   Judge Wright, in your estimation, get it wrong or is it both

15   or either or what?

16             MR. METLITSKY:  Well, I guess it depends on

17   what -- I don't know what was in Judge Wright's head.  If

18   what was in Judge Wright's head was that the evidence that

19   actually came in in this trial the way it came in, that

20   Mr. Waid would just testify to something that is not

21   documented -- is not reflective of any real world license

22   and he would just say, Here are all these applications, I

23   would, you know, put this kind of number on it, and that

24   would be my opening position, if that is what Judge Wright

25   was saying, then she was wrong.

1          I'm not sure that she was saying that, because

2     there's -- you know, I just don't know what she meant.  She

3     didn't specify what part of the report that she was

4     excluding, what, you know, the underlying numbers would come

5     in.  All I know is what actually came in.

6          THE COURT:  I don't want to get too bogged down in

7     this, having set a time limit on you, but she said some of

8     the facts underlying Zoltowski's opinion may be relevant,

9     and it would seem to me that that has to mean their

10    application-based pricing model.  And then, you know, to my

11    mind the harder question is, What I did allow, which is to

12    say, How would that application-based pricing model apply to

13    these applications.

14         MR. METLITSKY:  Right.  I mean, as to that,

15    setting aside the admissibility of the charts and all that,

16    which we think those were inadmissible too, but even if the

17    charts were admissible, I don't understand how that could be

18    anything other than a subjective view of what we would like

19    to charge, when there's no real world evidence that has ever

20    happened in a case like this, just as in the *Oracle* case.

21         If you look at the district court opinion, there

22    was an actual price list in that case, not just testimony.

23    You know, this is, you know, separate from any kind of

24    actual documentary evidence.  There was a price list for --

25    that Oracle, you know, would have charged for licenses like

1    this.  And the court said, No, what you would like to charge

2    doesn't matter if you don't have -- it's your burden of

3    proof to demonstrate what the market value of this license

4    would be; and if you don't have benchmark evidence, it's

5    going to be real hard for you to satisfy your burden.

6          We have bench -- I mean, we have a ton of

7    benchmark evidence in this case, right, and it's all

8    hundreds of thousands of dollars, several millions of

9    dollars, and I could go through their responses to all of

10   that, but the answer to all of their questions -- or all of

11   their responses is, you know, even if the number can go up

12   by a little bit, it's not going from 3 million to 40

13   million.  You know, we know what the market value of, what

14   the top end -- I said this before, but the top end of the

15   market value of a license for the ACE-combined company was

16   because we know they were going to offer $3 million.  If ACE

17   had accepted that, they would have been made whole, and

18   that's the whole question.  That's what actual damages is.

19         So their response is, Well, that was a perpetual

20   license, and so we wouldn't have sold the perpetual license,

21   we would only sell a license for four years, and that would

22   cost ten times as much, you know.

23         THE COURT:  Well, I think their argument was since

24   it's not going to be a perpetual license and we're not going

25   to be able to count on, you know, an income stream over

1    time, we would have priced the license differently.  It

2    wouldn't have been three.  I know that leads to begging the

3    question, Well, if it wouldn't have been three, what would

4    it --

5         MR. METLITSKY:  How would it have been 40?  And

6    not only that, I mean, *Jarvis* is directly on point here.  In

7    that case it was photographs, I think.  And the expert in

8    that case was saying, Well, the license for monthly use was

9    X, and that's how I'm going to calculate the value of the

10   hypothetical license.  And the court said, Well, you can't

11   rely on the monthly license, because an annual license costs

12   twice as much as a license for one month would cost, and no

13   reasonable business person would purchase licenses every

14   month if they could just purchase an annual license for a

15   fraction of the costs.

16        It's the same thing here.  Why would a rational

17   buyer, a willing buyer -- they could offer whatever they

18   want.  They could say, you know, I have this, I predict that

19   you will only use this for four years somehow.  I don't know

20   how that would work.  But why would a willing buyer say,

21   Well, you are charging me 40 million when I can get a $3

22   million perpetual license?  You know what, I'll buy the

23   $3 million perpetual license, and I'll not just have the

24   right to use it for four years, but for all the other years

25   that will ever exist in the future of the world.  Right?  I

1    mean -- and if not, if you still say no to that, you say no,

2    no, it's got to be 40 million, I'm just going to go ahead

3    and buy Drools for a million and a half.  And their answer

4    to that is, Well, there's a PowerPoint presentation that

5    says that Blaze is better than Drools.  Well, Mr. Ivey

6    testified that they're comparable, but let's say Blaze is

7    better than Drools.  Is it 26.67 times better than Drools?

8    Is there any evidence that would suggest that somebody would

9    pay $40 million for Blaze rather than paying a million and a

10   half for Drools?  Let's say it's a hundred percent better.

11   What does that get you?  It gets you to $3 million, which is

12   what they offered.  The actual market value we know, the top

13   end of the market value for a license that would have made

14   them whole.

15            THE COURT:  If the jury wasn't free to decide that

16   this hypothetical negotiation could have resulted in a

17   license fee that was within their application-based pricing

18   model, doesn't that just lead me right back to, So why the

19   heck did you let it into evidence?

20            MR. METLITSKY:  I mean, my first answer is yes,

21   but my second answer is not necessarily, because the

22   evidence can still be relevant, but they would have had to

23   back it up with something else.  Right?  Just as in *Oracle*.

24   Right?  You can't have -- even if evidence is admissible,

25   the result cannot be unconstrained by reality, and

1    reality --

2              You know, like just take the simplest example.

3    What is the market value of IBM stock?  That's pretty easy

4    to figure out, right?  But what if a buyer came in and said,

5    You know what -- or a seller -- I have this stock and it's

6    trading at $20, but, you know, my opening position would be

7    100.  I don't know.  Is that admissible?  It seems like no.

8    But if you admitted it, does that mean a jury could find

9    that the license -- that the market value of IBM stock was

10   100 or as in this case 120?  Of course not, because the

11   actual objective evidence of what people paid for the

12   license is in the low millions.

13             THE COURT:  Well, but, you know, what about their

14   argument -- all right.  I really am going to wrap it up a

15   little bit.  But their argument, in part, is the evidence

16   that you're relying on, we all distinguished.

17             MR. METLITSKY:  Right.

18             THE COURT:  The ███████ license wasn't by any means

19   entity-wide.  The ███ license was --

20             MR. METLITSKY:  Right.

21             THE COURT:  -- limited use, et cetera.

22             MR. METLITSKY:  Right.

23             THE COURT:  So the fact that you are saying these

24   other licenses are benchmarks, So what.

25             MR. METLITSKY:  Yep.

1          THE COURT:  We showed that they weren't.

2          MR. METLITSKY:  So let me give you three answers.

3     The first answer is they had access to every single

4     FICO license -- Blaze license that has ever been offered to

5     anybody ever, and they introduced none of them or certainly

6     none of them that looked like this.

7          The second answer is we have the most comparable

8     metric possible.  We have the number that they would have

9     offered for the literal license that we're talking about,

10    the market value of a license to use Blaze that would have

11    covered the infringing use, and it was -- I think it said

12    3-plus million, something like that.

13          THE COURT:  Right.

14          MR. METLITSKY:  You usually don't have that kind

15    of evidence, right?  That's amazing evidence, because you

16    have the offer, which is going to be the top line number.

17    Presumably, the buyer would have negotiated and would have

18    come up with a lower number, but at least you know what the

19    top is going to be.

20          And the third answer is these numbers are always

21    constrained.  This is not a monopoly.  They're always

22    constrained by the existence of alternatives.  No reasonable

23    business person would ever, ever, ever pay $40 million for

24    something that they could get for one and a half million,

25    even if they're right that the one and a half million was,

1    you know, worse in some sense.  Their own witness said they

2    were comparable.  So it's not like there is an order of

3    magnitude difference between them.  No rational jury could

4    find that.

5              THE COURT:  Two last questions.  Given everything

6    you are saying, Why didn't you move for remittitur?  Is it

7    because any number, that if this court were inclined to do

8    that, would be speculation, number one?  And, number two,

9    the jury kind of in my view clearly found there's two

10   licenses, one, right, and then a second one to ACE?

11             MR. METLITSKY:  Yeah, so on the first one I think

12   it's just within -- it's within the court's discretion to do

13   a remittitur, because then they would have the option of

14   either accepting the remittitur or rejecting it, in which

15   case there would be a new trial.

16             I mean, I think a remittitur would have to be

17   somewhere in -- you know, we said in the low millions of

18   dollars, and it's up to the court what the exact number is,

19   but I would find it surprising that it could be more than

20   they would have offered for the license at issue.

21             As to the two licenses, well, if that's -- that

22   itself made no sense, right, because they found -- I think

23   it was something like four and a half million for a

24   nine-month license and then many, many, multiples of that

25   for a license that went three or four times as long.  To the

1    extent the jury thought that there was somehow some

2    difference between the Federal and the ACE uses, that just

3    would have been -- that's just a legal error.

4          THE COURT:  Well, that comment all seems to me

5    to -- assume that your argument that as long as it's not

6    expanded use, it's one license; whereas, what they're saying

7    is, Federal, beyond the termination of the contract, and

8    then ACE, who is not a party to this, you have an argument

9    that licensing Federal license as ACE, but the jury seems to

10   have said otherwise.

11         MR. METLITSKY:  But all the -- no, no, no.  So we

12   accept the jury's verdict for purposes of this motion that

13   there was copyright infringement as to Federal and as to

14   ACE, but all of the benchmarks are for the combined company.

15   So the 3-plus million that they were going to offer was for

16   the combined company, for every entity within the Chubb/ACE

17   merged company to use.  The one and a half million dollars

18   that they actually paid was for the combined company.  So

19   you have to look at the -- you know, the jury said 40

20   million for the combined company, however you slice it.  The

21   slicing itself made no sense.  But, you know, when you add

22   them up, it's 40 million.  Is that rational?  No way, not

23   even close.

24         THE COURT:  Okay.  Thank you.

25         So 15 becomes 23.  I'll give you 23 minutes.

1    Don't feel like you need to take it all.

2              MR. HINDERAKER:  Your Honor, I feel like I don't

3    need to take it all.

4              THE COURT:  All right.

5              MR. HINDERAKER:  I got to find a place to start,

6    though.

7              How many times did we just hear the proposition

8    that there was no benchmark agreements?  The court's

9    question hit that nail on the head in that it was the

10   defendants' burden, not plaintiff's, the defendants' burden

11   to demonstrate that any of these other license agreements

12   that the defendants now -- that relied upon then and argued

13   from then and rely upon now and argue from now are

14   comparable.  Absence a comparability of those agreements to

15   the hypothetical negotiations of 2016, following termination

16   of the license agreement, under the construct that you have

17   guided -- you gave multiple occasions of guidance to the

18   parties -- under the hypothetical and under the

19   circumstances of that hypothetical negotiation, a license

20   agreement has come to an end in 2016, we're going to

21   negotiate a term license following that ending in 2016.  The

22   jury was permitted to give those agreements whatever

23   evidence or weight that they deemed that they had.

24              So the testimony at trial was to the effect that

25   in 2006 FICO had just been -- Blaze Advisor had just been in

1   the marketplace for a few years, hadn't made a profit yet,

2   highly discounted, heavily aggressively discounted its

3   pricing.  And Mr. Folz testified that he got a really great

4   deal for being the first in, and he got a license agreement

5   that was almost half of what his budget was.

6           Then we go to 2016, before the lawsuit.  Schreiber

7   testifies, This is a great client, We want to keep it, We

8   want a long-term relationship.  And there was internal

9   conversation about a 3-plus million dollar for a long-term

10  continuing relationship with -- oh, and the argument was

11  just made, combined company, nonsense -- a continuing

12  relationship with the client.  We always think it was

13  Chubb & Son, a division.  The court ruled that it's Federal.

14  It doesn't matter.  The continuing relationship was with

15  Federal.  ACE American is not even known to exist in FICO's

16  mind at that point in time.

17          And in those, in that offering -- or not offering,

18  but in that conversation internal of 3-plus million dollars,

19  as Mr. Baseman testified, Chubb was interested in Model

20  Translator.  Chubb was -- a new product.  Chubb was

21  interested in a new product called Model Governance.  Chubb

22  was interested in exploring a cloud-based platform for using

23  Blaze Advisor.  The evidence before the jury is that there

24  were long-term opportunities for FICO.

25          Now, counsel and the court just speculated, Well,

1    how do you get from 3-plus to 40?  We didn't have to put on

2    that testimony because it's not our burden to make

3    comparables.  It wasn't comparable when in -- to the

4    hypothetical negotiation where there is no existing

5    relationship at all after the term of four or five years.

6            To advise the court, the pricing of the cloud

7    offering is completely different pricing than on-premises

8    pricing.  It's a transaction service-based pricing.

9    Clients -- we heard the testimony of Baseman that clients

10   are moving to it, clients are accepting it.  Why do clients

11   accept it?  Because FICO takes on more and more of the IT

12   burden -- FICO prices it higher, gets more fees -- and the

13   client has less and less IT burden.

14           Now, there is evidence of Exhibit 527 where Chubb

15   itself is looking at, Do we want open source or do we want a

16   vendor-based.  And a number of those entries are talking

17   about the fact that with a vendor-based we don't have to use

18   our IT resources to support the vendor-provided product.  We

19   do with the open source, Drools.

20           But, nevertheless, it's not FICO's argument to

21   say, to make, because it wasn't FICO's burden to make the

22   comparable.  It's not FICO's argument to make that the

23   license -- the negotiation should look at what Drools was,

24   because they're not comparable.  We had the

25   cross-examination on that, and the jury could decide that it

1    was credible or not credible.  I think they decided that it

2    was not credible, and that's their decision to make.

3         And I guess I'd say in many ways the defendants'

4    argument for a new trial is an argument saying, We wish the

5    jury had saw the evidence the way we see it; We wish the

6    jury had weighed it differently; We wish the jury had found

7    these old 2006, 2005, 2008 agreements comparable; We wish

8    the jury would have believed the nonsense that when the

9    issue is damages, for the period of the improper use, that

10   you would negotiate a perpetual agreement forever.  So

11   that's not even -- that's just simply counter-factual.

12        And the jury was able to credit Mr. Waid's

13   testimony that beginning in 2011, moving into 2015, as the

14   marketplace was more and more acceptance of Blaze Advisor,

15   as they were discounting less and less, as they were

16   looking -- as FICO was looking for recurring revenue, more

17   and more they were able to negotiate with the licensee a

18   fixed-term license, more and more they were not relying upon

19   a perpetual.  Yes, did Mr. Waid also truthfully testify that

20   if in a unique circumstance what we could get was a

21   perpetual, we wouldn't walk away from the deal, there was

22   some licensing on that, but the marketplace was moving

23   toward application-based pricing.

24        THE COURT:  But even with that, I mean, the heart,

25   setting aside the evidentiary issue, the heart of what

1    defendants are saying is that there is -- what is it that a

2    jury would have used in the evidence that was admitted to

3    say that both parties would have agreed to a license at

4    $40 million?

5            MR. HINDERAKER:  What the jury had was Mr. Waid's

6    testimony that -- and I'll answer your question by also

7    responding to the notion that all of this is subjective.

8    The jury had Mr. Waid's testimony that FICO entered into

9    license agreements based upon that 2003 pricing guidelines

10   and they have done it for more than a decade, because the

11   marketplace accepts that approach to pricing.

12           He testified that the discounting practices

13   changed, as referred the product getting more and more

14   accepted in the marketplace, but not the pricing.  That's

15   objective.

16           The size of the defendants' applications, that's

17   objective.  Small, smaller fee; very large, larger fee.

18   Using the FICO matrix for sizing, that's objective.

19           The number of applications that the defendants

20   used, that's objective.  As this court guided the parties,

21   the extent to the defendants' use is, of course, relevant in

22   hypothetical negotiation.  As judge -- the words that

23   Judge Wright used, "intrinsic value," the heavy intrinsic

24   value that these applications were giving.  Mr. McCarter

25   said the applications using Blaze Advisor are core functions

1    of an insurance company.  You can't sell insurance without a

2    policy administration system.  Many of the applications

3    using Blaze Advisor were policy administration systems.  The

4    jury could credit that the defendants were getting,

5    extracting substantial value.

6         The fact that Blaze Advisor is priced based upon

7    the unique value to each customer, the jury could credit

8    Mr. Waid with that, and it's true, which makes the IBM stock

9    analogy just simply unreal.

10        THE COURT:  But it's still --

11        MR. HINDERAKER:  And then to further answer your

12   question.  So all of these objective factors of what the

13   marketplace was doing.  And then Mr. Waid said many times

14   this is only a starting point for FICO.

15        Now, I can only testify to what my experience is,

16   and he did, and in my experience and in the negotiations the

17   licensee comes up with these other arguments, additional

18   products, more applications.  They were all listed out.

19   They were all listed out in his -- and it's on page

20   something or other in our brief.  They are all listed out on

21   the demonstratives that the jury had, and the jury was able

22   to give those considerations in light of the evidence.  And

23   they were other, other existing streams of revenue,

24   opportunity to sell more product.  What's the business

25   impact of Blaze Advisor on the licensee?  The level of

1   effort, was there any impact in terms of helping them

2   migrate away?  Up-front commitment fees, was there any of

3   that?  What was the size of the transaction?  Perhaps a

4   bigger size, may be more revenue, more discounting.  Will

5   they give us references for case -- references for new

6   clients?  Can we use them as a case study for marketing?

7   What's the duration of the contract?  Are there other

8   professional services fees?

9          Each of those are factors that the jury could look

10  to in saying, Okay, that's the start of the negotiations;

11  Now, it's my job as jury to put together the hypothetical.

12  And they decided that, Well, on balance, when they looked at

13  the graphs that Waid had, there was more upward pressure

14  than downward pressure.  And so they went from 60 -- and

15  Waid was saying, I'm not telling you what the damages are;

16  These are not our actual damages; This is our starting

17  place.  And so the jury saw 36.5.  They applied more upward

18  pressure than downward pressure, and they got to 40.

19          Now, the jury also had the ██ license.  It was

20  2019, closer in time to the 2016 marketing practices of FICO

21  and negotiating practices of FICO than the 2006 examples.

22          There was one application for five years, and the

23  all in fee, license and maintenance for that one application

24  for those five years was $██ million.  You extend that out

25  by 16 applications, and it's $██ million.

1    And let me back up for a moment, in terms of these

2    notions of benchmarks.  Mr. Waid testified credibly,

3    cross-examination was not there on this point or any other,

4    really, but the jury could well believe Mr. Waid that after

5    his decades' long experience, after his more than hundreds

6    and hundreds of negotiations, when I asked him -- I think it

7    was in the context of the ▇ license -- the pricing of this

8    license, is it consistent, was it consistent with the

9    pricing guidelines that you're applying now here in this

10   case?  And he said yes.

11    Mr. Waid was testifying honestly about how FICO

12   would go into the negotiations on a named-application basis,

13   and he testified to the progression that FICO went through

14   to more and more license on a named-application basis.  The

15   jury had the consideration from the defendants' argument,

16   Well, what would it have been on a perpetual basis?  Well,

17   does that make any sense in light of the jury instructions

18   that I'm trying to find damages for a term?  The defendants

19   argued, Well, let's price based upon an enterprise-wide

20   pricing.  Mr. Waid gave the jury those numbers and the

21   approach that FICO -- and the result.  He said, We don't do

22   that; We're going away from that; but if you take an

23   enterprise start and then apply that to a term, and he gave

24   the jury $29 million number, about 29.5.

25    So the jury had the information.  It was for the

1    jury to assess credibility.  A person testifying on the

2    stand that this is how we would price it on a standard basis

3    is credible.  The defendants had discovery from us of all of

4    the license agreements.  The court ordered us to give it to

5    them.  And what we got is what we got.  None of them were

6    comparable.  None of them impugned the credibility of

7    Mr. Waid with respect to standard pricing.

8              THE COURT:  But let me interrupt for a second.

9              MR. HINDERAKER:  Mm-hmm.

10             THE COURT:  What Mr. Metlitsky is jumping up and

11   down to say in response to all this is, That's all well and

12   good, but that's all what FICO wants; and what evidence is

13   there in the record that would say that Federal or ACE would

14   ever willingly agree to pay that amount for the use that was

15   made.

16             MR. HINDERAKER:  If you're asking for evidence of

17   whether the defendants would willingly pay anything, the

18   answer is I don't think the defendants would willingly pay

19   anything.

20             THE COURT:  Right.  No.  What's reasonable.

21             MR. HINDERAKER:  We're talking about the

22   hypothetical negotiation of a reasonable licensee.  And the

23   jury heard the evidence of what goes into the negotiations

24   of a reasonable licensee.  FICO offered its testimony.  It's

25   notable that the defendants have no testimony in terms of

1    factors going into a hypothetical negotiation, but the

2    hypothetical negotiation is looking to an objective

3    assessment.  That's why I went into all of the factors of

4    what Waid is doing.  It's not what he wants, not what FICO

5    wants.  That's the objective process that they go through to

6    get to a number.

7         Now, the jury could consider -- perhaps the jury

8    considered ███ perhaps the jury extended that and said,

9    Well, that's ███ we think -- you know, Waid came in at

10   36.5; We think there's upward pressure, 40 million.  That's

11   not for our -- not for us to try to define what happened in

12   that jury room.

13        The question is, Did they have the evidence?  Did

14   they have evidence that supports the result that they got?

15   Yes, they did.  And they believe Mr. Waid.  And what he said

16   would be true objectively in these negotiations was true

17   objectively in these negotiations.

18        What factors did the defendants offer to put

19   downward pressure on that price?  Were they offering more

20   revenue streams?  Were they offering to buy more product?

21   Were they going to give us references?  Was there any value

22   that they were going to give FICO that would put downward

23   pressure on that?  The jury could conclude that there was

24   none.

25        So I probably lost my notes in all of this, but in

1    summary, Your Honor -- I don't know how much I happen to

2    have left here, but, obviously, we have to and this court

3    has to look at the evidence as a whole.  Based upon the

4    evidence as a whole, not what's cherry-picked by the

5    defendants, the question is, Is the jury's conclusion a

6    miscarriage, a manifest injustice?  That's the standard that

7    we're applying, and I offer to say that it is not.

8           There was one place in the jury's -- in the

9    plaintiff's brief that I think is worth emphasizing, as I

10   close up.

11          They say at page 26 of their brief the same --

12   they say the hypothetical negotiation must create

13   generalized market conditions, generalized market

14   conditions, ignoring the court's guidance and ignoring

15   Judge Wright and ignoring the fact that we're trying to

16   assess damages based upon fair market value from the

17   circumstances, the negotiating circumstances, the economic

18   circumstances of this case between these parties.

19          They want to -- they want an argument that is

20   divorced from the facts of the case, untethered completely.

21   Let's go to a stock market.  Let's consider Blaze Advisor a

22   commodity.  Now, the fact that Blaze Advisor is priced at

23   one thing for a small company and the very same software is

24   priced at more for a bigger company, let's ignore the fact

25   that each negotiation is unique.  And whatever "generalized

31

1   market conditions" mean is beyond me as well.

2          They cite the *Gaylord* case, and this is what the

3   *Gaylord* case says.  "The use of past licenses as evidence

4   must also take account of economically relevant differences

5   between the circumstances of those licenses and the

6   circumstances of the matter in litigation."

7          And that's what I'm suggesting in terms of the

8   absence of any comparability.  The different economic

9   circumstances must be taken into account, and the

10  negotiations are about the particular economic circumstances

11  of the two parties in the negotiations at the time of the

12  negotiations.

13         Our brief addresses the fact that FICO never

14  suggested in the context of these negotiations any notion of

15  punishment.  They simply followed the court's statement to

16  the jury that we're assessing the damages for the period of

17  the improper use.

18         I'll leave to the brief the fact that those two

19  charts are business records, came from the business --

20  normally kept records of the defendants.  Clearly admissible

21  as business records.

22         It's also worth noting that those two charts --

23  one of them was prepared, well, produced to us a year or

24  more after the mediation.  Both of the charts do not make a

25  statement of compromise, both of the charts are not

1    statements that were made during compromised negotiations,

2    and neither of the charts is about the claim of actual

3    damages.  It is business information that FICO must use to

4    size an application for its standard pricing.

5                Thank you.

6                THE COURT:  Thank you, Mr. Hinderaker.

7                MR. HINDERAKER:  I hope I didn't go over much.

8                MR. METLITSKY:  Two minutes.  I have two points to

9    make, Your Honor.

10                THE COURT:  He went over by two minutes.

11                MR. METLITSKY:  Okay.  Perfect.

12                The first point is, the overarching argument there

13    is that it was the defendants' burden to show benchmarks?

14    It's their burden to demonstrate actual damages.  That's

15    exactly what I just read you from the *Oracle* case.  They

16    didn't put in any benchmarks.  We put in benchmarks.  They

17    think those are incomparable, fine.  But what is the

18    evidence that demonstrates actual market value?  We think

19    they are comparable, especially the 3 million that they were

20    going to offer to ACE and the one and a half million that

21    ACE actually, you know, purchased through Drools, but --

22                THE COURT:  I think I heard Mr. Hinderaker say

23    that the ▮ license was --

24                MR. METLITSKY:  Oh, yes.  So I was going to go

25    there next.

1          So, first of all, the legal -- it's just wrong as

2     a matter of law.  The plaintiff has the burden, obviously,

3     of demonstrating market, market value, which is actual

4     damages.  And as the *Oracle* case says, if you don't have

5     your own benchmarks, you're going to have a problem.

6          Now, ▮▮▮ is their benchmark.  Right?  The problem

7     with the ▮▮▮ benchmark is that it was one application, as

8     Mr. Hinderaker just said.

9          Mr. Hinderaker said the cross-examination was no

10    good of Mr. Waid.  Well, one thing that was pretty good I

11    thought was at 1825-26 where he admitted that there was

12    never at FICO, certainly at the time, an enterprise-wide

13    license for 15 -- excuse me -- an application-based license

14    for 15 applications.  It did not exist.  So of all the

15    things that are not comparable, the one thing you know for

16    sure is the ▮▮▮ one isn't comparable because no license ever

17    existed ever in the history of FICO, at least in 2016, that

18    would have done this application-based pricing for 15

19    applications.

20          Again, that's 1825-26.  Mr. Waid also testified at

21    1737-38 that enterprise-wide licenses were generally

22    perpetual.

23          Okay.  So that's the problem with ▮▮▮  And it's

24    also, it's also the problem with Mr. Waid's testimony.  Even

25    if you think it's, you know, not subjective, but objective

1    somehow, it's not actually grounded in the real world.

2    There is no example of a 15-application license that's

3    based -- that's priced by application, which means there is

4    no benchmark that demonstrates the actual market value of

5    that, rather than what Mr. Waid would have started with in a

6    negotiation.

7         And, finally, their argument about downward

8    pressure.  We didn't offer evidence of downward pressure?

9    How about the fact that there are market alternatives?  That

10   is the way that a market economy puts downward pressure on

11   how much a willing buyer would pay, regardless of what a

12   willing seller would ask.  And we offered undisputed

13   testimony that ACE/Chubb entity, the whole entity, bought a

14   license for this use for one and a half million.  They say

15   that there is a PowerPoint presentation that says that Blaze

16   is better.  Even accepting that, there is no evidence that

17   it's 26 or 27 times better.

18        That's it.  Thank you, Your Honor.

19        MR. HINDERAKER:  I want to make just --

20        THE COURT:  Go ahead.

21        MR. HINDERAKER:  I just want to emphasize

22   something, if I might.

23        THE COURT:  Go ahead.

24        MR. HINDERAKER:  I encourage the court to look at

25   the transcript at 1825, 6 through 25, that Mr. Metlitsky

1    just mentioned.

2              The question to Mr. Waid was, on cross, You're not

3    aware of any application-based license for 15 applications,

4    are you?

5              His answer was, "That's not true."

6              He is.  If we had another trial, we'd bring it up,

7    but anyway I just -- the court will look at the transcript.

8              THE COURT:  I will look at the transcript.

9              MR. HINDERAKER:  That's what he said.

10             MR. METLITSKY:  Your Honor, could I just point you

11   to the part of the transcript that you should look at?  It's

12   like the next several lines where Ms. Godesky impeaches him

13   with his own deposition.  And then he says, Well, at the

14   time, that is, at 2016, it was true.  Isn't that the time

15   we're looking at for purposes of the hypothetical

16   negotiation?

17             THE COURT:  Okay.  Thank you.

18             So, Mr. Hinderaker, why don't you take up the

19   issue of entitlement to attorneys fees.  And I really got to

20   hold you to five minutes.

21             MR. HINDERAKER:  And, Your Honor, I'm going to

22   defer to Ms. Stradley.

23             THE COURT:  All right.  Ms. Stradley, come on up.

24             MS. STRADLEY:  Thank you, Your Honor.  And I will

25   try to be very quick.

1          I wanted to start with discussion of the objective

2     reasonableness of the defendants' positions.  And I want to

3     look at the factual and legal components of Federal's

4     positions and then separately the factual and legal

5     components of ACE American's position.  So I want to try to

6     keep them separate while we talk.

7          With respect to Federal, as we stated in our

8     brief, at summary judgment Judge Wright did state and

9     accepted Federal's legal position that Section 10.8 could

10    reasonably be read as Federal had described, but then at

11    trial they didn't offer anything to back up or support their

12    legal interpretation.  They cited to -- there was no

13    evidence presented at trial to support that interpretation.

14    And I want to look at the brief at what they tried to do to

15    rebut our position that they didn't offer any evidence.

16         First, they try to argue that we shouldn't even

17    look at the factual component.  Well, that's wrong.  If you

18    look at the *Pinkham* and *Fogerty* case, it expressly says that

19    objective reasonableness does consider the factual and legal

20    components.

21         And then they also cite to and rely on two cases,

22    the law of *Devonshire* and *Greenfield*, for the idea that,

23    well, you're looking at a written contract, you should just

24    look at the text of the contract.  Well, those cases are

25    inapplicable or maybe inapposite is a better word, because

1    the discussion that they pulled those statements from are

2    discussing unambiguous contracts.  So, of course, when

3    you're looking at an unambiguous contract, you do just look

4    at the language that's written in the contract.  But here we

5    know that the contract is ambiguous from what Judge Wright

6    found, so we do need to look at the intent of the parties

7    and the extrinsic evidence.  And they didn't cite or provide

8    any evidence to the jury to support their interpretation

9    other than just their own attorney argument.

10          The two pieces of evidence that they identified in

11   their brief as supporting their interpretation actually

12   don't.  The first was that they looked to other Blaze

13   Advisor license agreements.  We had this fight before in

14   front of the court.  Those other license agreements that

15   aren't relevant to the intent of the parties, you held that

16   at 825, lines 10 through 17.  You instructed the jury to the

17   same effect at 2608, lines 8 through 10.  So those are not

18   evidence of the parties' intent or their interpretation,

19   defendants' interpretation.

20          The other evidence they point to was that there

21   was evidence of no expanded use.  Well, that doesn't

22   actually speak to supporting their interpretation.  You

23   don't get to whether there is or isn't expanded use until

24   you first prove the interpretation as correct in the first

25   place.  So no evidence to support their actual

1    interpretation, no facts to support that.

2            You go to ACE American.  Also no facts to support

3    their attorney argument.  If you think back to the trial,

4    the only thing that was offered was slide presentations

5    during the opening and closing, where they swapped names and

6    changed who the client was, but there was no support that

7    that was the intent of the parties, the understanding of the

8    parties.  It was a conjured-up litigation argument.

9            And we know that because when you actually look at

10    the evidence that was before the jury, before litigation

11    began, their own general counsel stated that the client

12    remained Chubb & Son, but no assignment had occurred.  And

13    if you look at -- and that was Exhibit P91, also Exhibit 6

14    to FICO's memo.  He stated, notwithstanding the acquisition,

15    Chubb & Son, the contracting party, remains a viable legal

16    entity and the contracting -- remains the contracting party

17    to the agreement.  So that's their own general counsel

18    saying that before the litigation began.

19            Also before the litigation began, what did their

20    business people say?  Well, the commercial proposal from

21    Tamra Pawloski, P94, it said, quote, "The contracting party

22    to the license agreement is and remains Chubb & Son, a

23    division of Federal Insurance Company," end quote.

24            So these are the objective facts before the

25    litigation began.  And only after the litigation started did

1    they come up with this sudden change of names and saying

2    that ACE Limited and Chubb Limited somehow got rights under

3    the license agreement.  ACE Limited was never -- ACE Limited

4    and ACE American were never the clients under the license

5    agreement.  They weren't a party to it.  And they never

6    provided any facts to support their contention that somehow

7    some transfer, some deed assignment occurred.

8         The only thing that the defendants point to to

9    support their objective reasonableness with respect to ACE

10   American is your denial of FICO's JMOL.  And with respect to

11   that, the fact that there's a denial of a JMOL does not mean

12   that there was necessarily an objectively reasonable

13   position.  Now we've had the benefit of time and

14   availability to review the record and see what exactly did

15   they present to support their position; and when you look,

16   they didn't support their position.  They cited to nothing

17   in their brief.  And if you check the record, there is

18   nothing.  The only evidence, again, actually contradicts

19   their current position.

20        And so given the importance of the objective

21   reasonability of a party, that alone should weigh in favor

22   of attorneys fees.

23        I'm happy to touch on additional things, but I

24   know we're tight on time.  So any specific questions?

25             THE COURT:  I don't have any.  Thank you.

1                    MS. STRADLEY:  Okay.

2                    THE COURT:  Thanks, Ms. Stradley.

3                    MS. STRADLEY:  Thank you.

4                    THE COURT:  Ms. Godesky.

5                    MS. GODESKY:  Thank you, Your Honor.  I'll just

6        make a few points.

7                    FICO is seeking $8 million plus in legal fees for

8        litigating the entirety of this litigation, so I'd urge the

9        court to keep in mind what that means.  This was a case that

10       litigated four different breach theories.  First, FICO

11       said -- and those breach theories, of course, are what

12       underlie the copyright claim for which they're seeking fees.

13       Right?

14                   And we have first the breach theory that global

15       use of Blaze wasn't allowed, so there was copyright

16       infringement.  We won summary judgment on that.

17                   Then they had the theory that Chubb & Sons global

18       affiliates couldn't use Blaze.  We won judgment as a matter

19       of law.

20                   Then they had a theory that we committed copyright

21       infringement by letting third-party consultants use Blaze.

22       The jury found for us on that.

23                   And then, finally, there's this question of 10.8

24       and whether there was a breach of the no-assignment clause

25       and whether that constituted copyright infringement.  And so

1    that's the only piece of this copyright infringement claim

2    where there actually is some reasonable dispute as to the

3    parties' positions.  We were objectively correct as to the

4    other parts of the claim, and we even had statements from

5    Judge Wright at the summary judgment stage that their

6    position on some of those breach claims was absurd.

7            So as far as the Section 10.8 claim goes, our

8    litigation position was absolutely objectively reasonable.

9    We have Judge Wright's finding at the summary judgment stage

10   that our interpretation is reasonable and it should go to

11   the jury to resolve the factual issues.

12           And then in the post-trial stage, Your Honor found

13   specifically with regard to the ACE claim that, quote, "The

14   testimony at trial would permit a reasonable jury to find

15   either way."

16           And so this is not the type of circumstance where

17   there should be an award of attorneys fees.  This is always

18   within the court's discretion.  They're never awarded as a

19   right.

20           And the types of case that FICO cited in their

21   papers, like the MPAY case, are in a different universe.

22   Those are cases where the parties' position was, quote, "so

23   clearly untenable as to be utterly without merit.

24   Situations where the party insisted on maintaining its

25   claims despite clear guidance from the court."  That is not

1    Chubb's litigating position vis-a-vis 10.8.

2            And so like Ms. Stradley, I'm happy to tick

3    through the other factors, but we don't think the fees are

4    warranted here.

5            THE COURT:  Okay.

6            MS. GODESKY:  Thank you.

7            THE COURT:  Thank you.

8            All right.  Pre- and post-judgment interest.  Who

9    among you is going to be discussing that?  All right.

10            So, Ms. Kliebenstein, as you come up there, I

11    guess I agree with defendants that calculation is really

12    premature for today.  The questions in my mind are, Other

13    than the contract claim, the entitlement to it or the reason

14    to grant it pre-judgment-wise and your thoughts on

15    appropriate interest rate.  So with that, hopefully that

16    helps you.  Maybe not.

17            MS. KLIEBENSTEIN:  Yes.

18            THE COURT:  Okay.

19            MS. KLIEBENSTEIN:  Yes.  How long would you like

20    to hear from me, Your Honor?

21            THE COURT:  Five minutes, if we could.

22            MS. KLIEBENSTEIN:  Sure.

23            So I boil it down to three questions really.  Can

24    we receive pre-judgment interest?  Should we?  And what

25    should the rate be?

1          THE COURT:  Right.  The "can" is clearly yes,

2    right?

3          MS. KLIEBENSTEIN:  I believe so.

4          Defendants have cited the *Eclipse* case for the

5    suggestion that it's not an available remedy in this court;

6    but if you look at that case, something different was going

7    on.  Statutory damages were awarded, and I believe

8    Judge Wright had set them at five times the fair market

9    value.  Statutory damages and disgorgement are different

10   beasts than actual damages.  Pre-judgment interest is

11   intended to allow a plaintiff to recoup its lost investing

12   opportunity, if you will, on money that was owed.  So actual

13   damages is what to pay attention to.  So I agree with Your

14   Honor.  Can we?  Yes.

15         Second question, Should we?  My answer again is,

16   is yes.  The test for pre-judgment interest, it's to be

17   awarded.  The default is that it's to be awarded when

18   damages are due, unless there are exceptional circumstances

19   to justify withholding it.  The baseline is not like

20   attorneys fees where it's a different test.

21         The defendants suggest that the bar to receive

22   pre-judgment interest in this case is higher or it's similar

23   to willful infringement, but that's not what's borne out in

24   the case law.

25         Courts throughout the Eighth Circuit and

1    throughout the country really look at two factors when

2    they're deciding should a party receive pre-judgment

3    interest.  Will an award serve to compensate the injured

4    party for the lost use of the actual damages?  And then the

5    second part is, Even when it would serve a compensatory

6    function, do equitable considerations preclude the award?

7            I think in this case the very first part of that

8    test, will it compensate FICO, that analysis is easy to

9    meet.  $40 million represents the fair market value of the

10   license fee to FICO that was awarded today, but it should

11   have been paid in 2016.  There were lost business

12   opportunities, lost interest-earning opportunities,

13   et cetera, from that amount from 2016, '17 through today.

14           I think it's also important to note, under the

15   facts of this case, FICO's in the business of licensing

16   software.  This amount, this 40 million, is the license fee,

17   which is the bread and butter for FICO.  It's not a

18   tangential amount to the business.  So it's important to

19   keep that in mind as we're looking at the equities.

20           Moving to the second factor, Are there any

21   equitable considerations that preclude the award?  When

22   you're looking at equitable considerations, it has to be

23   behavior, facts, circumstances that are outside of the

24   ordinary.  One aspect that defendants highlight in their

25   brief is it would be inequitable, against the equities, to

1  award pre-judgment interest to FICO because we've already

2  been adequately compensated.  40 million is already far too

3  high, in their mind, and that's enough.

4            That's not the right way to look at it.  The

5  $40 million the jury decided was the fair market value.  The

6  question to answer with pre-judgment interest is, What is

7  the lost value to FICO of not having had that 40 million in

8  2016 and 2017?

9            The cases that defendants cite for that

10  proposition, that large amounts are adequate compensation in

11  and of themselves, are inopposite.  And it takes a little

12  bit of time to dig into them, and I will give you one

13  example.

14            The *Masters* case.  It was an Eighth Circuit 2010

15  decision.  And defendants cite it as support for the

16  proposition that a $2.4 million award was enough

17  compensation.  Now, if you dig down into -- you have to go

18  one step further and look at the district court's decision

19  to figure out exactly what happened.  That 2.4 million was

20  for disgorgement.  No actual damages were awarded in that

21  case.  The district court found it would be inequitable to

22  award interest, noting that disgorgement and actual damages

23  are different.  Actual damages are meant to compensate a

24  plaintiff; disgorgement is something different.

25            Each of the cases cited under that part of the

1    defendants' brief are the same.  You've got either a

2    disgorgement award at issue or you've got -- I believe it

3    was the *EFCO* case -- a future damages award.  So that makes

4    it fundamentally different.

5              Defendants also argue pre-judgment interest

6    shouldn't be awarded because defendants had defenses that

7    were not baseless.  Again, equitable considerations have to

8    be something above and beyond the ordinary.  We would expect

9    parties to have reasonable non-baseless positions for their

10   claims and their defenses.

11             Next, the defendants cite the amount of time lapse

12   between when the infringement began and judgment.  It's

13   approximately seven years.  That's a long time, and it

14   results in a larger number.  However, there's nothing out of

15   the ordinary within the course of the seven years of this

16   litigation that make it inequitable to award pre-judgment

17   interest.

18             I think this argument actually cuts against the

19   defendants.  FICO's the one who has been without the

20   $40 million in license fees since 2016 and 2017.  Defendants

21   have had the benefit of having that money to invest in their

22   company and earn interest on it.

23             Moving on to the rate.  So I've answered the

24   "should we" question.  Yes, there are no factors in this

25   case that make it inequitable, out of the ordinary, such

1    that pre-judgment interest shouldn't be awarded.

2            The rate.  We say in our brief the statutory rate.

3    They say the treasury yield rate.  I don't think that's

4    probably surprising for Your Honor; but, again, if we dig

5    down into the cases, I think we can find the right result

6    pretty quickly.

7            What is the treasury rate?  It's the rate that's

8    in 28 U.S.C. 1961 for post-judgment interest, but at its

9    core it's a risk-free interest rate that is backed by the

10   U.S. Government and only the U.S. Government can use that to

11   access capital.  This is key.  Nobody else gets to borrow at

12   that rate.  FICO doesn't get to borrow at that rate; Chubb

13   doesn't get to borrow at that rate.

14           Another fact the court should keep in mind is that

15   the treasury bill rate has fluctuated over the years.

16   Recently, particularly during the pendency of this lawsuit,

17   it's been very low, .07 in fact for one of the years at

18   issue.  In other years it's been very high, such as during

19   the savings and loan crisis in the 1980s.

20           When you're reading decisions that adopt the

21   T bill rate, pay attention to the year and pay attention to

22   what's going on with the greater economy, because oftentimes

23   you can figure out why that rate was selected over another.

24   It has been very rare that a T bill rate similar to .07 has

25   been adopted by a court as the number of the lost value of a

1    judgment.

2              One helpful case that I read that was cited in the

3    defendants' brief was the 2013 Sixth Circuit *Schumacher*

4    case.  And that court did a really good job of articulating

5    how to look at the competing interest with an interest rate

6    and come out at the right answer.  The Sixth Circuit

7    directed its district courts to look at what rate best

8    reflects the remedial goal to place the plaintiff in the

9    position it would have been, what rate prevents unjust

10   enrichment to defendants from keeping large sums of money,

11   and finally what rate combats inflation.

12             In that Sixth Circuit *Schumacher* case, the

13   district court was reversed for, quote, "mechanically

14   applying" the treasury bill rate and citing 28 U.S.C. 1961

15   as its support for doing it.  And at the time the district

16   court made that decision that led to the appeal in

17   *Schumacher* in 2012, the treasury bill rate was .12.  And the

18   Sixth Circuit said that's a really low rate.  What else is

19   going on in the economy?  And the court noted that

20   defendant's rate on return, their profit margin, was

21   6.55 percent and borrowing costs at the time were

22   7.75 percent.

23             Here, we have the same thing going on.  We have

24   extremely low treasury bill rates from 2016 to 2023.  And we

25   also know that from all of the financial documents and the

1    10-Ks that we had to sit through during trial, FICO's net

2    profit margin varied from 12 to 29 percent.  Chubb's profit

3    margin varied from 4 to 16 percent.  This is a much higher

4    amount, and it reflects of the money that these parties are

5    investing in their business how much money -- what are they

6    making as a return, which I think is a much better analysis

7    as opposed to the post-judgment interest rate.

8              I think another place that the court could look is

9    the prime lending rate from 2016 and 2017 to 2023.  I have a

10   declaration that has the prime lending rate and how that

11   affects the pre-judgment interest award, but it varies

12   essentially from 3.75 to 8.25.

13             And what is the prime lending rate?  Well, that's

14   the rate that major commercial banks charge their most

15   creditworthy clients.  That's the rate at which both parties

16   can access capital, which I believe is a better indicator of

17   the proper interest rate other than the treasury rate.

18             Now, the third question the *Schumacher* court posed

19   is, Well, how much money did the defendants make off of that

20   40 million?  Well, again, we look at the profit margins and

21   we look at the prime rate for support on that.

22             And, finally, I don't think we can lose track of

23   inflation, particularly during this window in time.  I did

24   some research; and, again, it's in my declaration, if the

25   court wants it today or we can file it.  The cumulative rate

50

1    of inflation since 2017 has been over 26 percent.  If you do

2    the math, 40 million in 2016 is 51 million today.  If you do

3    the reverse math, 40 million today is 31 million back in

4    2016.

5              These are the reasons why the mechanical

6    application of the treasury bill rate is improper.  It makes

7    sense in the post-judgment context when the considerations

8    are different.

9              And the *TMTV* case out of the First Circuit in 2011

10   really went into why the post-judgment rate and the

11   pre-judgment rates just aren't the same beasts.  A

12   successful plaintiff can require a prompt payment.  The

13   federal rate is -- the T bill rate is often depressed by

14   monetary policy and not really reflective of how much a

15   party can make in the general market.

16             Further, when you're in post-judgment, a bond is

17   posted.  There's a security interest.  Federal marshals are

18   going to go get that judgment.  So it's a more secure asset

19   that's being invested in.

20             For these reasons, I think the court should not

21   look at the treasury bill rate, but look at the Minnesota

22   state statutory rate, which is actually less than the profit

23   margin of these companies during the period of time.

24             THE COURT:  Thank you.

25             Ms. Godesky.  So I'll ask you the question that

1    they're going to hate and you're going to want.  If I am

2    persuaded -- I'm not saying I am, but let's just assume I'm

3    persuaded that the actual damage award in this case is such

4    that it's affirmed, but really high.  Is that a factor I can

5    consider in determining whether and how much pre-judgment

6    interest can be awarded?

7              MS. GODESKY:  I also don't like that question,

8    Your Honor.

9              THE COURT:  Okay.  Well, I figured you might not

10   like part of it.

11             MS. GODESKY:  I don't like part of it, just for

12   the record.

13             But absolutely.  I mean, what they're asking for

14   here -- Ms. Kliebenstein didn't say the number, but on top

15   of this completely irrational $40 million/4-year license

16   fee, they want the court to award them an additional

17   $25 million in pre-judgment interest on top of the

18   2.6 million everyone agrees they're entitled to,

19   approximately, for the breach of contract claim.

20             So if the question that's posed to the court is

21   whether they're being compensated for any lost time value of

22   money, the court can look to the fact that they're already

23   receiving $2.6 million in pre-judgment interest under

24   New York's mandatory statutory rate to rest assured that

25   that time value of money is being recouped.

1          But what I would say is I do think Judge Wright is

2     correct when she did a survey of the law in the Eighth

3     Circuit in the *Eclipse Sportswire* case that there is no

4     binding decree from the Eighth Circuit that PJI is

5     recoverable in copyright cases, number one.

6          What we do know from the Eighth Circuit and is

7     recited in the *Stroh* case, S-T-R-O-H, is that the court is

8     supposed to look to whether there are exceptional or unusual

9     circumstances that would render PJI inequitable.  And to the

10    extent we're in a world where a $40 million/4-year software

11    license actual damages award is affirmed, then awarding

12    $25 million plus of PJI on top of that would absolutely be

13    inequitable.

14         I do think the *Masters* case and the *EFCO* case from

15    the Eighth Circuit are instructive on that point.  The type

16    of parsing that Ms. Kliebenstein has read into the opinions

17    does not appear in the language from the Eighth Circuit.

18    What the Eighth Circuit says is you look at whether the

19    party has been adequately compensated.  And in those cases

20    they looked wholistically at the award and felt like the

21    party was adequately compensated and so did not award

22    pre-judgment interest.

23         FICO's only authority for this idea that you don't

24    consider the size of the damages award in deciding whether

25    to award PJI is this *Stemtech* case from the Third Circuit,

1     which is obviously not binding on this court.

2               The Eighth Circuit has also instructed in the *EFCO*

3     case that you do take into consideration the amount of time

4     that has lapsed in a litigation; and in that case they said

5     this has been going on for three years, it would be

6     inequitable to award PJI in those circumstances.  Well,

7     we've been litigating for seven years; and contrary to what

8     Ms. Kliebenstein suggested that there were no unusual

9     circumstances, there was a worldwide pandemic that put

10    litigation on hold, right, so everything was delayed and

11    protracted for that reason.

12              And so I think under the Eighth Circuit's mandate

13    in *EFCO* and *Masters* awarding any pre-judgment interest on

14    top of the $40 million actual damages amount would be highly

15    inequitable.

16              I will also just say that I think FICO has come to

17    court today with a declaration supporting all sorts of new

18    calculations, because they realized based on our opposition

19    brief that the *Dependahl* case from the Eighth Circuit that

20    they cited in their papers as relevant for determining the

21    pre-judgment interest rate, you know, that that reasoning

22    has changed, because the *Dependahl* case said -- and they

23    cited it for the fact that you should apply the state

24    statutory rate, but that's because at the time of the Eighth

25    Circuit's decision in *Dependahl* the federal statute that

1    says how you calculate post-judgment interest cited to state

2    statutes.  Well, that statute has changed, and it now says,

3    you know what, apply the one-year treasury bill.  So under

4    the reasoning of *Dependahl*, it's the one-year treasury rate

5    that should apply, not the state statutory rate and not any

6    new creative LIBOR-based or lender rates that FICO is

7    suggesting now.

8              THE COURT:  All right.  Thank you.

9              MS. GODESKY:  Thank you.

10             THE COURT:  All right.  So let me give you a

11   couple of comments on a couple of the other motions and then

12   some direction.  Hang on.

13             So I don't need argument on FICO's motion, renewed

14   motion for judgment as a matter of law.  And I don't really

15   need argument -- well, I don't need argument on the question

16   of findings of fact and conclusions of law with respect to

17   the disgorgement verdict.  I think I naively hoped that just

18   maybe everybody would just accept the verdict.

19             But having looked at the issue and tried to figure

20   out what's the most efficient and fair way of doing this,

21   I've concluded that I'm going to solicit proposed findings

22   of fact and conclusions of law from the defendants 30 days

23   from today.

24             You can do that, I'm assuming?

25             MS. GODESKY:  We can do that.

1            THE COURT:  All right.  And then FICO may have

2       30 days to file objections to or alternatives.

3            But recognize that I haven't changed my view on

4       where this ends up.  So the function of any proposed

5       findings of fact that you submit that are, you know, trying

6       to establish that disgorgement is necessary and appropriate

7       aren't going to win the day here.  Okay?  But they will

8       preserve your rights on appeal.

9            To the extent that you have objections to certain

10      of the proposed findings that they file that are in a

11      different category, certainly those are welcome and will

12      certainly be -- well, they will all be considered, but those

13      will be considered in a different way, so to speak.

14           What we'll do then is get the order out on all of

15      this, including the findings of fact and conclusions of law

16      with respect to disgorgement.

17           I guess the question back to the parties, Under

18      the rule, you have the right to object to those then that

19      the court adopts.  So the question to you, I guess,

20      Mr. Hinderaker, is, In this procedure I'm proposing,

21      assuming there's no waiver of anything, would you want then

22      to object after I've adopted proposed findings and

23      conclusions or would you want to take that as it is,

24      preserving objections, straight to the Eighth Circuit?  Am I

25      being clear?

```
1              MR. HINDERAKER:  Yes.

2              THE COURT:  Okay.  And can I do that, I guess is

3      the other question.

4              MR. HINDERAKER:  I'm not, I'm not familiar enough

5      with 52(b) to technically answer your question.  And I guess

6      I'm going to give you my response; and if in consultation

7      with the client and the team I'm told I made the wrong

8      response, if I can have the privilege of letting you know by

9      letter.

10             THE COURT:  Sure.

11             MR. HINDERAKER:  But my view is that your findings

12     of fact and conclusions of law serve the purpose of

13     outlining your analysis both factually and legally and,

14     thereby, provide the foundation, if you will, or the basis

15     upon which, should FICO appeal any of those, that analysis

16     or that decision, it would have the basis to do so.

17             I also think that it would be an extraordinary

18     circumstance where I felt like something you wrote in the

19     findings of fact and conclusions of law and 52(b) was so out

20     of the universe that it would be something that we would

21     even want to come back to you on.  You know what I mean.

22             THE COURT:  Understood.

23             MR. HINDERAKER:  That's the extraordinary.

24     Otherwise, we're just, you know, going around the mulberry

25     bush for no reason.
```

1          THE COURT:  Right.

2          MR. HINDERAKER:  So that's my view, Your Honor;

3    and if I'm told I was off base, we will let you know as soon

4    as we can.

5          THE COURT:  All right.  And I just want to be

6    clear.  I haven't done the research under 52(b) to see, you

7    know, am I doing something that's inappropriate.  I don't

8    have the sense that it would be somehow improper if the

9    parties -- if we go this way.  Certainly, the point being

10   your objections, your concerns with whatever is done are

11   preserved for appeal.  That's kind of baseline.  That's true

12   of everything that's gone on here, even though I've withheld

13   entering judgment.  Obviously, all the issues you've raised

14   and issues you've raised during trial that were preserved

15   are preserved for appeal.

16          So, Ms. Godesky or Mr. Metlitsky, do you want to

17   weigh in on this idea?

18          MS. GODESKY:  We'll take a look at 52(b) as well,

19   Your Honor, but I share Mr. Hinderaker's feeling about going

20   around and around in circles on this one, if we can

21   short-cut it and everyone is comfortable with that.

22          THE COURT:  Right.  Okay.  Well, and that's

23   obviously the intent here, is to be efficient.

24          All right.  One last thing.

25          I guess we can go off the record on this.

```
 1                    (Off-the-record discussion)

 2              THE COURT:  Okay.  Anything further,

 3      Mr. Hinderaker?

 4              MR. HINDERAKER:  No, Your Honor.

 5              THE COURT:  All right.  Ms. Godesky, anything

 6      further?

 7              MS. GODESKY:  No thank you.

 8              THE COURT:  All right.  Thank you, everyone.

 9              We're in recess.

10          (Court adjourned at 2:28 p.m., 05-24-2023.)

11                           *   *   *

12          I, Renee A. Rogge, certify that the foregoing is a

13      correct transcript from the record of proceedings in the

14      above-entitled matter.

15                      Certified by:  /s/Renee A. Rogge
                                       Renee A. Rogge, RMR-CRR
16

17

18

19

20

21

22

23

24

25
```