## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

FAIR ISAAC CORPORATION,

     *Plaintiff*,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

     *Defendants*.

No. 16-cv-1054 (DTS)

**[PROPOSED] FINDINGS OF FACT
AND CONCLUSIONS OF LAW**

---

Pursuant to the Court's order of May 25, 2023, Dkt. 1264, Defendants Federal Insurance Company and ACE American Insurance Company submit the following proposed findings of fact and conclusions of law in support of the jury's and the Court's conclusion that Plaintiff Fair Isaac Corp. ("FICO") is not entitled to disgorgement of profits under 17 U.S.C. § 504(b).

## FINDINGS OF FACT

### I.  FICO DID NOT SHOW THAT ANY OF DEFENDANTS' REVENUE WAS ATTRIBUTABLE TO THEIR USE OF BLAZE.

**A.  FICO's fact witnesses lacked any knowledge of whether the use of Blaze was attributable to Defendants' revenue.**

1.  FICO's fact witnesses uniformly admitted that they could not establish any connection between Blaze Advisor and Defendants' revenue.

2.  Sean Baseman, who is responsible for FICO's technical and solution architecture, squarely admitted that he was "not in a position to say whether Blaze had any

specific impact at all on Chubb's revenue or profit[.]" Trial Tr. 185, Dkt. 1178. That is because he was "only vaguely familiar with how the software was used at Chubb." *Id.* at 182. He had "not done anything in the course of [his] work at FICO to specifically analyze the extent to which Blaze reduced time at Chubb[,]" could not "identify a particular application that was developed faster at Chubb because of Blaze[,]" and could not "measure or talk about how quickly Chubb was able to make changes to its internal computer applications because of Blaze." *Id.* at 183-84. Baseman could not "specifically identify *any insurance product* that Chubb was able to bring to market faster because of Blaze." *Id.* at 185 (emphasis added). More generally, he testified that he "would not be capable of quantifying the value that Blaze provides to a customer[.]" *Id.* at 179-80.

3.    Benjamin Baer, FICO's Vice President of Partner and Industry Marketing, had "no idea what value, if any, that Blaze has had with respect to Chubb's use of it." Trial Tr. 295, Dkt. 1179.

4.    FICO's Vice President of Software Engineering, Jean-Luc Marce, and one of the original developers of Blaze long before FICO acquired the software, had no more than "a good educated guess" as to "how insurance companies use Blaze[,]" *id.* at 259, as a general matter, and offered nothing whatsoever on how Defendants used it.

5.    Likewise, Christopher Ivey, FICO's Vice President of Product Support, testified he had "no familiarity at all with how Blaze was implemented at Chubb." Trial Tr. at 608–09, Dkt. 1180.

6.    Henry Mirolyuz, a member of Chubb's IT architecture team, who FICO called as a witness via deposition designation, stated that he "would not be able to speak

2

[to] any of the business benefits achieved through the use of the Blaze Advisor technology or business rules technology."  Trial Tr. 1022, Dkt. 1182.

**B.      FICO presented evidence that a portion of Defendants' revenue "touched" Blaze, but not that any of that revenue was *attributable* to Blaze.**

7.      FICO offered evidence of the portion of Defendants' revenue generated by policies that, at any point in their lifecycle, "touched" Blaze.  Trial Tr. 1342, Dkt. 1183 (testimony of Neil Zoltowski); *see* Trial Tr. 2717-18, Dkt. 1189 (counsel in summation arguing FICO proved attribution "through the mechanisms of the litigation.  We asked the defendants to swear under oath to us the number of polices and the dollar value of those policies that . . . used Blaze Advisor").  The Court finds that this evidence failed to establish a causal connection between Defendants' use of Blaze and their revenue.

8.      Neil Zoltowski, FICO's damages expert, "did not endeavor to" offer any opinion on "how much, if any" of Defendants' revenue "is actually connected to Blaze[.]" Trial Tr. 1349, Dkt. 1183.  His analysis did not focus on causation at all.  He did not analyze the relative roles of Blaze and other factors in driving particular sales or applications.  *See id.* at 1343-44.   Instead, he recited Defendants' interrogatory answers that identified premium revenue from every insurance policy that "touched" Blaze.  *See id.* at 1342-44.

9.      This revenue figure does not establish "how much, if any," of Defendants' revenue "is actually connected to Blaze[,]" as Zoltowski admitted.  *Id.* at 1349.  Zoltowski explained that he could not establish a causal relationship between Defendants' use of Blaze and the revenue Defendants identified because he lacked the "information to do so" and "did not endeavor to do so."  *Id.*

10. The fact that policies that ran through Blaze generated revenues is not surprising—every policy Defendants sold generated revenue, and the vast majority of those policies did not run through Blaze. *See, e.g.*, Trial Tr. 673-74, 689, 697, 705, Dkt. 1180 (testimony of Chubb's Chief Architect for North America, Ramesh Pandey, explaining the role Blaze played in Defendants' technical infrastructure). The question is whether any of that revenue is attributable to the use of Blaze. Defendants' interrogatory response identifying premium revenue from insurance policies that "touched" Blaze does not by itself prove that revenue is attributable to the use of Blaze.

    **C.**     **FICO's causation expert, Bick Whitener, was unable to show that any portion of Defendants' revenue was attributable to Blaze.**

        **1.**     **Whitener lacked experience or qualifications sufficient to testify about any connection between Defendants' use of Blaze and their revenue.**

11. FICO principally sought to prove a causal connection between Defendants' use of Blaze to their revenue through the testimony of its causation expert, Bick Whitener. *See* Trial Tr. 2720-21, Dkt. 1189 (counsel for FICO arguing in closing that "Mr. Whitener said [that] Blaze Advisor added significant value to the defendants' process"); *see id.* at 2718 (counsel conceding in summation that Mr. Whitener, and not FICO's fact witnesses, was FICO's principal witness to prove the requisite causal nexus to revenue).

12. Whitener, however, has no relevant experience or qualifications sufficient to support that opinion. *See, e.g.*, Trial Tr. 1537-41, Dkt. 1184.

13. He has no experience with *any* business rules management software, much less Blaze. *Id.*

14. He has never worked in the technology department of an insurance company. *Id.* at 1534.

15. He has never used business rules management software in his work for insurance companies. *Id.* at 1533-37.

16. At the time he produced his reports, he had not written or reviewed peer-reviewed literature regarding rules software or coding rules. *Id.* at 1542-43.

17. Nor at that time had he spoken about Blaze or, indeed, any business rules management software with other rules software vendors. *Id.* at 1546.

18. He had not spoken about business rules management software with anyone at Chubb. *Id.* at 1545.

19. He had not discussed such software with FICO's other customers. *Id.* at 1546.

20. He had not discussed such software with anyone in the insurance industry. *Id.* at 1537-38.

21. He was first introduced to Blaze the day before his deposition when he was given a 90-minute demonstration by FICO of Blaze's use in the college admissions process—not the selling of insurance. *Id.* at 1540-42.

22. This demonstration took place after Whitener authored his 74-page-long report opining on the causal connection between Blaze and Defendants' revenue. *Id.*

### 2. Whitener admitted that he could not connect Defendants' use of Blaze to Defendants' revenue.

23.     Whitener made clear he could draw no connection between Defendants' use of Blaze their revenue, and indeed, made no effort to do so.

24.     Whitener testified generally to his "conclusion . . . that Blaze Advisor . . . added significant value to the defendants' business of selling insurance." *Id.* at 1530; *see also id.* at 1531 ("I don't need a tape measurer or stopwatch to know that computers executing transactions is faster than humans[.]").  That is how FICO's counsel summarized Whitener's opinion in summation:  "Mr. Whitener said [that] Blaze Advisor added significant value to the defendants' process[.]"  Trial Tr. 2720-21, Dkt. 1189.  But adding value in a general sense is not the same thing as actually contributing to revenue.

25.     When asked point blank if he knew "whether Blaze actually contributed to any increase in revenue or profit at Chubb," Whitener said he did not.  Trial Tr. 1599, Dkt. 1184.

26.     He repeatedly emphasized that he did not "measure" any connection between Defendants' use of Blaze and their revenue.  *Id.* at 1558, 1565, 1599.

27.     Indeed, Whitener evinced a comprehensive lack of knowledge about whether Blaze contributed to Defendants' revenue.

28.     He could not say whether Blaze made any contribution to key aspects of Defendants' business:

> a.   He did not know whether the use of Blaze reduced Defendants' need for information technology resources.  *Id.* at 1555.

   b. He did not know whether Defendants increased the speed of making renewal offers because of their use of Blaze. *Id.* at 1556-57.

   c. He did not know whether Blaze allowed Defendants to increase speed to market by ensuring regulatory compliance. *Id.* at 1558.

   d. He did not know whether Defendants increased the ease of use for agents and brokers by using Blaze. *Id.* at 1558-59.

   e. He did not know whether Blaze improved Defendants' ability to define accurate and adequate pricing. *Id.* at 1560.

   f. He did not know whether Blaze permitted Defendants to increase the precision and accuracy of its quotes to customers. *Id.*

   g. He did not know whether Blaze increased the precision and adequacy of Defendants' renewal offers. *Id.*

   h. He did not know whether Blaze enabled Defendants to grow in the small commercial and mid-market segments. *Id.*

29.    Whitener could not say whether Blaze improved the effectiveness of the applications into which it was incorporated.

   a. He spent "less than one second" reviewing the components of CSI Express other than Blaze and gave "zero thought" to whether he could measure whether Blaze contributed to the speed of CSI Express. *Id.* at 1563-64.

   b. He did not measure how significant a role Blaze played in CSI Express, or its role in that application relative to other software. *Id.*

at 1562.  Indeed, he did not know whether CSI Express increased the speed of responses to requests for quotes at all.  *Id.* at 1563.

   c. He did not know whether Blaze contributed to the effectiveness of Profitability Indicator, DecisionPoint, Evolution, Adapt, Cornerstone, Premium Booking, TAPS, IRMA, CUW-IM, CIS Claims.  *Id.* at 1594-95, 1565-69.

   d. He had no basis to refute testimony that Blaze could easily have been replaced in TAPS by an Excel spreadsheet.  *Id.* at 1568.

30.    Whitener lacked knowledge of whether other components of Defendants' immense software infrastructure contributed to revenue, and how those software programs compared with Blaze.

   a. He conceded that defendants use "many, many different technologies to sell insurance," but before rendering his written report, he "didn't do anything to investigate how many other technologies were deployed" while erroneously asserting that Defendants could not "possibly be using hundreds of other technologies in addition to Blaze[.]  *Id.* at 1550-51.

   b. He did not "ma[k]e any effort" to determine those other technologies' contribution to Defendants' revenue.  *Id.* at 1551-52.

   c. He did nothing to determine "how many non-Blaze rules Chubb was running" or how many business rules were written by software engineers.  *Id.* at 1553.

    d.  He testified that the rate of adoption of Blaze in Defendants' business after the merger was "pretty low."  *Id.* at 1598.

31.  Whitener also conceded that human judgment drives a substantial portion of Defendants' business, and that Blaze has no effect on that judgment.  *Id.* at 1544-50.

32.  Ultimately, Mr. Whitener conceded that he did not know whether the integration of Blaze into Defendants' applications contributed to a *single dollar* of Defendants' revenue.  *Id.* at 1599 (Q:  "But you do not know whether Blaze actually contributed to any increase in revenue or profit at Chubb, correct?"  A:  "[C]orrect.").  Indeed, Whitener made clear that he "*measured none of these things*."  *Id.* at 1558 (emphasis added); *see also id.* at 1565 ("I did not measure anything."); *id.* at 1599 ("I did not measure anything.").

33.  Whitener was the only witness who FICO even suggested could establish a causal connection between Defendants' use of Blaze and their revenue, yet Whitener conceded that he could not establish any such connection—and was not qualified to opine on the issue in the first place.  FICO failed as a factual matter to establish any causal connection between Defendants' use of Blaze and Defendants' revenue.

## II.  DEFENDANTS SHOWED THAT BLAZE DID NOT CONTRIBUTE TO PROFIT.

34.  It was FICO's initial burden to prove that Defendants' revenue was attributable to their use of Blaze.  FICO did not satisfy that initial burden.  But even if it had, Defendants showed that Blaze did not contribute to their profit for many reasons.

A.   **Blaze's usefulness derived from the insurance expertise of Defendants' employees.**

35.   Blaze is not an insurance industry-specific tool and does not itself generate rules.  Its value thus depends entirely on the skill and expertise of Defendants' employees.  Trial Tr. 2077-78, Dkt. 1186.

36.   As Defendants' expert William McCarter testified, "Blaze is an industry agnostic tool that has no specific insurance capability," meaning that Blaze's usefulness derives only from "the insurance company's rules and logic[.]"  *Id.*  This testimony was not rebutted.

37.   Blaze did nothing more than run rules developed by Defendants' own insurance professionals.  *See* Trial Tr. 2033-34, Dkt. 1186 (testimony of Chubb's Assistant Vice President of Operations Ellen Garnes); *see also* Trial Tr. 296, Dkt. 1179 (testimony of Baer that "[t]he efficacy of the software is predominantly controlled by the user").

38.   Even Whitener testified that Blaze had nothing to do with key parts of the underwriting process, including decisions about which rules to write and how to use them.  *Id.* at 1549-50, Dkt. 1184.  He also explained that Blaze had nothing to do with important aspects of Defendants' business, including building relationships between brokers and agents, developing insurance products, claim handling, and error-free billing.  *Id.* at 1546-49.

39.   As Whitener put it, it takes "substantial" human experience to write good business rules.  *Id.* at 1554. And "[w]ithout good rules . . . an insurance company cannot make money."  *Id.*

40.     To that end, Whitener admitted that the value of technological speed—one of Blaze's principal theoretical contributions—depends entirely upon the quality of the human judgment and decision-making being sped up. *Id*.

41.     In sum, as McCarter explained, Blaze merely implements the "human judgment" of Chubb's underwriters, actuaries, compliance managers, and claims managers. Trial Tr. 2079, Dkt. 1186.

## B.     Blaze was integrated into a tiny fraction of Defendants' technical infrastructure.

42.     Defendants have a massive infrastructure of software programs and technology solutions to profitably operate their business—the evidence showed that Defendants run around 1500 applications, *see* Trial Tr. 687-88, Dkt. 1180; Trial Tr. 1597, Dkt. 1184; Trial Tr. 2082–83, Dkt. 1196, and even FICO admits there were at least 800, *see id.* at 2161-63.

43.     Even though all of Chubb's software applications use business rules, Trial Tr. 704, Dkt. 1180 (testimony of Pandey), the rate of adoption of Blaze was extremely low—less than one percent, Trial Tr. 1161, Dkt. 1182 (testimony of Chubb Chief Enterprise Architect Claudio Ghislanzoni).

44.     As McCarter explained, Blaze's adoption into Chubb's vast technology infrastructure was so "low" that the program was "not a significant tool in terms of the number of components being used." Trial Tr. 2084-87, Dkt. 1186.  This testimony was not rebutted.

11

**C.    Blaze was interchangeable with other business rules management programs or with hard-coded rules.**

45.    Blaze could have been—and was—replaced with any number of other, interchangeable business rules management software programs.  Defendants could—and frequently did—run manually programed business rules without dedicated business rules management software at all.

46.    McCarter testified that Blaze was interchangeable with "upward of 15" other business rules management software programs—or simply hard-coded rules.  *Id.* at 2092-94.

47.    To that end, Pandey explained that there is no "functional difference" between Blaze and Drools, a competitor program, and that in "99 percent of the cases" Defendants' software developers "code the rule by themselves"—*i.e.*, do not use any third-party rules management software at all.  Trial Tr. 688-89, Dkt. 1180.  Ellen Garnes similarly confirmed that, in her experience, "99 percent of the rules that Chubb uses are in professionally developed code, not in rules engines."  Trial Tr. 2093, Dkt. 1186.

48.    Ghislanzoni likewise made clear that replacing Blaze with Drools caused no problems and occasioned no complaints.  Trial Tr. 1156-57, Dkt. 1182.

49.    Likewise, Mirolyuz testified that "Blaze Advisor can be replaced[.]"  *Id.* at 1011.

50.    Indeed, FICO's own witnesses made clear that Blaze was interchangeable with other options.  Former FICO sales executive Lawrence Wachs testified that other

business rules management software was "comparable in its functionality[.]"  Trial Tr. 741-42, Dkt. 1181.

51.    Even Whitener testified that a number of alternative business rules management software programs to Blaze exist, although he did not analyze how they compare to Blaze.  Trial Tr. 1595-96, Dkt. 1184.

**D.    Blaze attracted no customers and drove no sales.**

52.    As McCarter explained, customers simply did not know or care that Defendants used Blaze, meaning Blaze did not drive business.  Trial Tr. 2095-96, Dkt. 1186.  There is no reason to believe customers would know or care about which of several interchangeable back-office software components their insurer uses.

**E.    Abandoning Blaze had no impact on Defendants' revenue.**

53.    Moving away from Blaze had no impact on Defendants' revenue.  Kevin Harkin, Chubb's North American CFO testified that he did not "have to incorporate the removal of Blaze from Chubb's systems into the company's revenue projections . . . or deal with it in any other way[.]"  Trial Tr. 1861, Dkt. 1185.

54.    And Chris Bakewell, Defendants' expert, explained that "the revenues didn't change" when Defendants removed Blaze from their systems.  Trial Tr. 2181, Dkt. 1186.

**F.    Abandoning Blaze had no impact on Defendants' technical operations.**

55.    Moving away from Blaze likewise had no effect on the efficiency or effectiveness of Defendants' operations.

56.     Defendants' replacement of Blaze caused, according to Pandey, no "problems with the efficient functioning of [Defendants'] IT systems."  Trial Tr. 706, Dkt. 1180.

57.     Ghislanzoni made clear that since the removal of Blaze from Defendants' systems, he has received no "complaints or concerns about speed or efficiency" or "complaints or concerns about technology problems generally in those computer applications" that had previously used Blaze.  Trial Tr. 1156-57, Dkt. 1182.

58.     Garnes likewise testified that she noticed no change in "the process of developing rules" after the removal of Blaze.  Trial Tr. 2043, Dkt. 1186.

59.     Indeed, as Alissa Theberge, a Chubb underwriter, explained, the removal of Blaze had no impact on the underwriting process.  Trial Tr. 2308, Dkt. 1187.

**G.     Many of Blaze's asserted business benefits did not materialize.**

60.     Defendants were unable to realize several of Blaze's touted business benefits.

61.     For instance, business users were generally not able to input rules without help from developers, Trial Tr. 700-01, Dkt. 1180 (testimony of Pandey); Trial Tr. 1144, Dkt. 1182 (testimony of Ghislanzoni), as FICO had claimed they would be, *see, e.g.*, Trial Tr. 95-96, Dkt. 1178 (testimony of Baseman that "[t]he business rules management system provides a framework of which nontechnical users can write and express their logic in a standard format").

62.     Blaze also suffered from latency problems, which limited its usefulness. Trial Tr. 1143, Dkt. 1182 (testimony of Ghislanzoni).

14

## III.   DEFENDANTS IDENTIFIED THE DRIVERS OF THEIR PROFIT, NONE OF WHICH WERE BLAZE.

63.   Not only did Defendants demonstrate that their profits were not attributable to Blaze, they also explained the many factors that enable a large insurance company to be profitable.

64.   Defendants' profit is attributable to their reputation in the market, their prompt payment of claims, prudent financial management, strong sales, operations, and careful compliance with regulatory obligations.  *See, e.g.*, Trial Tr. 2269-73, Dkt. 1187.

65.   For instance, Harkin explained the strength of the Chubb brand and its reputation for "how well they paid claims."  Trial Tr. 1864, Dkt. 1185.

66.   Likewise, Mike Schraer, Chubb's Chief Underwriting Officer for its North American Financial Lines division, emphasized the strength of Chubb's relationships with insurance agents and brokers, Trial Tr. 2260-63, Dkt. 1187, its creation of policies, *id.* at 2267, and its reputation for payment of claims, *id.* at 2270-71, among other things, as the drivers of the company's business.

* * *

67.   The advisory jury found that FICO did not carry its burden of showing a nexus between Defendants' use of Blaze and their revenue.

## CONCLUSIONS OF LAW

**I.    FICO'S BURDEN WAS TO IDENTIFY REVENUE "ATTRIBUTABLE" TO THE USE OF BLAZE.**

68.    Under the Copyright Act, "[a] copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages."  17 U.S.C. § 504(b).

69.    Under Section 504(b), the copyright owner's initial burden is to prove "the infringer's gross revenue" resulting from the infringement.  *Id.*   In meeting this burden, the copyright owner must "demonstrate a nexus" between the alleged infringement and the alleged infringer's revenue.  *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003).   To do so, it must prove that infringement "contributed to" (*i.e.*, was "attributable to") that revenue.  *Id.* at 797; *Furnituredealer.net, Inc. v. Amazon.com, Inc.*, 2022 WL 891462, at *3 (D. Minn. Mar. 25, 2022).

70.    When a copyright owner attempts to disgorge "direct profits"—"those that are generated by selling an infringing product"—proving that infringement contributed to revenue can be a simple matter.  *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002).  But where, as here, the copyright owner seeks a defendant's "indirect profits," "the profits 'attributable' to the infringement are more difficult to quantify."  *Andreas*, 336 F.3d at 796. Nevertheless, "that difficulty does not change the burden of proof established by the statute"—a copyright owner must attribute revenue to infringement to the same degree in an indirect profits case as it would in a direct profits case.  *Id.*

16

71.     A plaintiff cannot establish the requisite nexus by identifying revenue that is "only remotely and speculatively attributable to the infringement." *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

72.     Consequently, the fact that an infringing product may be important or valuable to the infringer does not mean that the infringing use contributed to its revenue. "[S]imply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role' is insufficient" to satisfy the plaintiff's nexus burden, "particularly where, as part of [the defendant's] information technology infrastructure, it comprises only a portion of what enabled [the defendant] to conduct its business profitably." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *4 (S.D.N.Y. Apr. 25, 2013) (internal quotation marks and citation omitted).

73.     Just as in a direct profits case, a party seeking to disgorge indirect profits can satisfy its burden on nexus only by identifying revenue "causal[ly] connect[ed]" to infringement. *Andreas*, 336 F.3d at 795.

## II.     FICO FAILED TO SATISFY ITS BURDEN OF PROVING THAT ANY OF DEFENDANTS' REVENUE WAS ATTRIBUTABLE TO THE USE OF BLAZE.

### A.     FICO's witnesses did not connect the use of Blaze to Defendants' revenue.

74.     As found above, *supra* ¶¶ 1-6, none of FICO's witnesses were able to testify that Defendants' use of Blaze, in fact, contributed to Defendants' revenue. The Court concludes that FICO failed to carry FICO's burden of proving a causal nexus between Defendants' use of Blaze and their revenue.

B. **Whitener did not connect the use of Blaze to Defendants' revenue.**

1. **Whitener was not qualified to testify on whether the use of Blaze contributed to Defendants' revenue.**

75.     FICO offered Whitener as an expert to testify to a causal connection between Defendants' use of Blaze and their revenue.  *See, e.g.*, Trial Tr. 2720-21, Dkt. 1189.

76.     To testify as an expert, a witness must be "qualified . . . by knowledge, skill, experience, training, or education[.]"  Fed. R. Evid. 702; *see also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) ("[T]he proposed witness must be qualified to assist the finder of fact.").

77.     Defendants objected to Whitener's qualifications to offer an opinion that the use of Blaze contributed to Defendants' revenue.  Trial Tr. 1373-79, Dkt. Dkt. 1183.  The Court sustains that objection.

78.     Whitener lacks "knowledge, skill, experience, training, or education[,]" Fed. R. Evid. 702, regarding Blaze or business rules management software.  As found above, *supra* ¶¶ 11-22, he has no experience with business rules management software; has never worked in the technology department of an insurance company; had not, at the time he rendered his written report, reviewed or produced peer-reviewed literature regarding rules software or coding rules; and had not spoken with anyone in the software industry (apart from FICO) or the insurance industry about Blaze or business rules management software. He was first introduced to Blaze the day before his deposition through a 90-minute demonstration that had nothing to do with the Blaze's uses in the insurance industry.  *Supra* ¶ 21-22.  The Court concludes that Whitener was not qualified under Rule 702 to offer an

opinion regarding the causal connection between Defendants' use of Blaze and their revenue. Consequently, the Court discounts his testimony in its entirety.

79. Even assuming Whitener has expertise regarding the insurance industry at a high level of generality, that does not qualify him to opine about a causal connection between the use of Blaze and Defendants' revenue. Rule 702 requires "that the area of [a] witness's competence matches the subject matter of the witness's testimony." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (internal quotation marks omitted); *see also Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) ("[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion."). Here, Whitener's general knowledge about the insurance industry does not "bear a close relationship to [his] opinion" that a specific software program as to which he has no experience, skill, or knowledge, in fact, contributed to Defendants' revenue. *Id.*; *see also, e.g., Bollom v. Brunswick Corp.*, 453 F. Supp. 3d 1206, 1219 (D. Minn. 2020) ("[A] fire investigator's experience opining on 'fire cause and origin' does not qualify him as an electrical expert able to testify regarding whether a particular electrical system malfunctioned and caused the fire."); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1078-79 (D. Minn. 2015) (marketing professor not qualified to testify about "conjoint analysis[,]" which "is a marketing research method that measures customer preferences for particular product features[,]" because, while "conjoint analysis is based in marketing, the Defendants . . . offered no evidence that [the witness] ha[d] . . . been trained in or performed conjoint analysis").

2.   **Whitener's testimony did not connect the use of Blaze to Defendants' revenue.**

80.   Even if Whitener were qualified to testify as an expert regarding a causal connection between Defendants' use of Blaze and their revenue, the Court would conclude that Whitener's testimony did not connect the use of Blaze to Defendants' revenue.

81.   As found above, *supra* ¶¶ 23-26, 32, Whitener conceded that he did not know "whether Blaze actually contributed to any increase in revenue or profit at Chubb[.]"  Trial Tr. at 1599.  He repeatedly conceded that he did not "measure" or quantify *any* connection between the use of Blaze and Defendants' revenue.  *Id.*; *see also id.* at 1558, 1565.  Beyond that, as found above, *see supra* ¶ 29, Whitener evinced a comprehensive lack of knowledge about Defendants' actual use of technology or the role that Blaze played in Defendants' large technology infrastructure.  He also testified that he could not say whether Defendants actually realized Blaze's touted business benefits.  *See supra* ¶¶ 28.

82.   The Court concludes that Whitener's testimony did not carry FICO's burden of proving a causal nexus between Defendants' use of Blaze and their revenue.

C.   **Identifying revenue that "touched" Blaze was insufficient to show that any of Defendants' revenue was attributable to the use of Blaze.**

83.   FICO falls back on its presentation of "differentiated revenues[,]" *see, e.g.*, Dkt. 1206 at 8—that is, Defendants' interrogatory responses, offered through the testimony of Neil Zoltowski, regarding revenue generated by all policies that, at any point in their lifecycle, "touched" Blaze.  The Court concludes that this evidence does not establish a causal nexus between Defendants' use of Blaze and their revenue.

84.     That is because these numbers alone do not prove *attribution* of infringement to revenue.  *See* 17 U.S.C. § 504(b).  They show at most correlation, not causation.

85.     It would be "mere speculation" *Andreas*, 336 F.3d at 796, to conclude, based only on evidence that Defendants' business involves both Blaze and earning revenue, that the revenue is therefore attributable to the use of Blaze.

86.     Zoltowski, who read Defendants' interrogatory responses to the jury, made this clear, acknowledging that his presentation of Defendants' revenue alone did not establish a causal nexus between Defendants' use of Blaze and that revenue.  Trial Tr. 1349, Dkt. 1183 (Q:  "And so that means you are not here to offer opinions on how much, if any, of this $21 billion in revenue is actually connected to Blaze as opposed to all the other things that make Chubb Chubb right?  That's someone else."  A: "That would have been part of my analysis *if there was information to do so*.  I did not endeavor to do so, though." (emphasis added)).  In Zoltowski's own view, the revenue figure alone was insufficient to reach a conclusion about causation.

87.     To the extent FICO has suggested that the Court found the revenue numbers sufficient to demonstrate nexus in its summary judgment order, *see, e.g.*, Dkt. 1206 at 8, that is incorrect.  The Court found that FICO put forward at summary judgment *both* Defendants' interrogatory answers and "*also*" exactly what it failed to adduce at trial: "evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance."  Dkt. 731 at 57 (emphasis added).  The Court was referring to Whitener's written opinion on causation, which, on summary judgment, it was bound to credit.

88.    At  trial,  by  contrast,  FICO  completely  failed  to  prove—through  the testimony  of  Whitener  or  any  other  witness—that  "Blaze  Advisor  contributed  to Defendants' gross revenue."  *Id.*

89.    Without  such  proof,  FICO's  evidence  of  revenue  touching  Blaze  is  not sufficient to prove nexus.  *See Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065, at *11 (S.D.N.Y. Nov. 8, 2013) (rejecting a claim for disgorgement, even though plaintiff  identified  revenue  that  "flowed  through"  infringing  software).   The  Court's summary-judgment order is not to the contrary.

90.    Allowing  a  copyright  owner  to  prove  nexus  merely  by  showing  an *association* between the use of a copyrighted work and revenue would undermine the Copyright Act's burden-shifting framework.  A plaintiff would no longer bear any initial burden of proving the existence of a causal connection between infringement and revenue. Instead,  a  plaintiff  would  be  able  to—as  FICO  seeks  to  do—merely  show  that  (i)  a defendant used a copyrighted work in a line of business and (ii) that line of business generated revenue.  In other words, the burden would shift to the defendant to *disprove* causation without plaintiff having to show *any* evidence of causation in the first instance. That is not how the Copyright Act works.  *See Andreas*, 336 F.3d at 797 (copyright owner bears the "burden of [showing] a causal connection").

91.    The bluntness of Zoltowski's analysis, paired with the many admissions by FICO's witnesses that there is no way of determining whether the use of Blaze contributed to Defendants' revenue, show that the only way a causal connection can be drawn between Blaze and *all revenue* associated with *all policies* that merely *touched* Blaze as a

component is rank "speculati[on.]"  *Polar Bear Prods., Inc.*, 384 F.3d at 711; *see also*

*Bayoh v. Afropunk LLC*, 2020 WL 6269300, at *6 (S.D.N.Y. Oct. 26, 2020) (finding no

nexus where an expert "acknowledged that he is not providing any opinion on causality[,]"

and "[w]ithout expert testimony explaining the basis for a finding that all of Afropunk's

revenue over a four-year period is reasonably related to the infringement, [the expert's]

calculation of Afropunk's gross revenues is irrelevant and must be excluded as highly

prejudicial" (internal quotation marks and citation omitted)).

**D.**    **FICO's generalizations about Blaze's quality or value were legally insufficient to demonstrate that any of Defendants' revenue was attributable to the use of Blaze.**

92.    At trial, FICO offered, at most, evidence that Blaze is a useful product.  *See,*

*e.g.*, Trial Tr. 2720-21, Dkt. 1189 (counsel for FICO arguing in closing that "Mr. Whitener

said [that] Blaze Advisor added significant value to the defendants' process"); Trial Tr.

1530, Dkt. 1184 (Whitener:  "[M]y conclusion is that Blaze Advisor deployed by agents in

some places, not all, added significant value to the defendants' business of selling

insurance."); *id.* at 1531 ("I don't need a tape measurer or stopwatch to know that

computers executing transactions is faster than humans[.]").  The Court concludes that such

generalities are insufficient to carry FICO's burden of proving a causal nexus between

Defendants' use of Blaze and their revenue.

93.    "[S]imply saying that copyrighted material may have played an 'important,'

'significant,' or 'meaningful' role is insufficient, particularly where, as part of

[defendant's] information technology infrastructure, it comprises only a portion of what

enabled [defendant] to conduct its business properly."  *IBM*, 2013 WL 1775437, at *4

(internal quotation marks and citation omitted); *see also DaimlerChrysler Servs. v. Summit Nat'l, Inc.*, 2006 WL 208787, at *4 (E.D. Mich. Jan. 26, 2006).[1]

94.     That rule makes good sense in the context of the nexus analysis, which focuses on concrete proof of a "causal connection" between infringement and revenue, not "mere speculation[.]" *Andreas*, 336 F.3d at 796.

95.     Here too, FICO's approach would subvert the Copyright Act's burden-shifting framework.   As FICO would have it, a copyright owner would be able to demonstrate *prima facie* entitlement to disgorgement by merely (i) introducing general testimony about its work's quality and (ii) showing that a defendant used the work.  With only that kind of evidence, the required inference of causation could be only the result of speculation.  *Andreas*, 336 F.3d at 796.

96.     FICO's approach would also hold plaintiffs in indirect-profits cases to a far less stringent attribution standard than direct-profits plaintiffs face—a clearly perverse result.   They would need to show only a rough association, not a concrete causal connection.  But the law is clear that the attribution standard is the same in both types of case.  *Id.* ("We agree that in an indirect profits case the profits 'attributable' to the

---

[1] FICO has argued that *IBM* and *DaimlerChrysler* are not relevant because there, the plaintiffs "sought all of defendant[s'] pre-tax income, independent of any relationship to the infringement."  Dkt. 499 at 38.  That distinction does not diminish the applicability of *IBM*'s reasoning.  Just because FICO does not seek portions of Defendants' revenue *plainly* unconnected to the use of Blaze does not establish that the revenue it *does* seek is tied to Blaze—as explained above.  And, as *IBM* instructs, "simply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role is insufficient" to establish that connection.  2013 WL 1775437, at *4 (internal quotation marks omitted).

infringement are more difficult to quantify.  But that difficulty does not change the burden of proof established by the statute.").

97.    This conclusion—that proof that a product is valuable and that a defendant used it, without more, is insufficient to prove nexus—is wholly consistent with *Andreas*, the Eighth Circuit's leading disgorgement case.

98.    There, the defendant used copyrighted words in an advertisement. *Id.* at 791-92.  On its face, the causal connection between a component of a commercial and revenue from the product advertised is far stronger than the supposed connection between one of hundreds of back-office software programs and an insurance company's revenues. *See id.*; *see also Timex Corp.*, 384 F.3d at 712 (finding nexus between the infringing use of footage in an advertisement and sales of the advertised product); *cf. Mackie*, 296 F.3d at 916 (finding *no* nexus even though defendant used infringed artwork in a promotional campaign).

99.    But, as noted above, in *Andreas*

[t]he infringement was the centerpiece of a commercial that essentially showed nothing but the TT Coupe.  The evidence established that Audi enthusiastically presented the commercial to its dealers as an important and integral part of its launch of the TT coupe into the U.S. market; sales of the TT coupe during the period that the commercial aired were above Audi's projections; the three commercials received high ratings on the Allison–Fischer surveys that rated consumer recall of the commercials; and Audi paid [the advertising agency] a substantial bonus based on the success of the commercials.

*Id.* at 796-97.

100.    This evidence, taken in the light most favorable to the copyright owner, showed that "the commercial did more than merely 'contribute somehow' to sales of the

TT coupe"—the "causal connection" between infringement and revenue was based on "more than mere speculation[.]" *Id.* (citation omitted).

101. By contrast, here there is no dispute that Defendants "did not market or sell the [Blaze] software to [their] customers and there is no evidence that its customers cared what software system [they] used." *IBM*, 2013 WL 177437, at *4. Blaze was not consumer facing, and was a small part of Defendants' large technological infrastructure.

102. Instead, all FICO could offer was testimony that "copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role[.]" *Id. Andreas* neither holds nor suggests that such evidence, without more, is sufficient to prove nexus. 336 F.3d at 796-97.

103. It is true that it is inherently more difficult for plaintiffs like FICO—whose products are not consumer-facing—to offer the type of evidence *Andreas* highlighted showing a causal connection between the infringing use and the defendant's revenue. But that is a function of the fact that the Copyright Act places the initial burden on the plaintiff to show a connection between the infringing use and revenue. *Id.* at 796. That burden may be more difficult to satisfy in a case (like this case) where the infringed product is not consumer facing or even known to consumers, than in a case (like *Andreas*) where the infringing use is directed at revenue-generating consumers themselves. But courts have no authority to lessen the burden on a copyright plaintiff to show that the defendant's revenue was attributable to the infringing use. The Court adopts the advisory jury's finding that FICO failed to satisfy that burden here.

### III.   DEFENDANTS IDENTIFIED THE ELEMENTS OF PROFIT ATTRIBUTABLE TO FACTORS OTHER THAN THE USE OF BLAZE.

104.   The Court concludes that FICO has failed to carry its initial burden under Section 504(b) of establishing a causal nexus between Defendants' use of Blaze and their revenue.  But the Court also concludes that Defendants have carried their burden of identifying "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).  Consequently, even if FICO had carried its burden of demonstrating a causal nexus, the Court would conclude that FICO was not entitled to disgorge any of Defendants' profits.

105.   This conclusion is based on the Court's findings that Defendants showed that (i) Blaze did not contribute to their revenue, *supra* ¶¶ 1-62, and (ii) that many other factors drove their revenue, *supra* ¶¶ 63-66.  In particular, the Court emphasizes its findings that (i) Blaze is interchangeable with many other technological solutions for running business rules, including a variety of other business rules management programs, (ii) customers were not aware of and did not care about Defendants' use of Blaze, (iii) Blaze constituted a tiny portion of Defendants' technology infrastructure, and (iv) Defendants' revenue derives from numerous factors, especially their reputation in the market and their employees' insurance expertise.

106.   With this showing, Defendants have negated any causal connection between the use of Blaze and their revenue.  A defendant may "demonstrate the absence of a causal link between the infringement and all or part of the profits claimed by the plaintiff" by showing "that customers would have purchased its product even without the infringing

element." *Data Gen. Corp v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1175 (1st Cir. 1994), *abrogated on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *see also IBM*, 2013 WL 1775437, at *4 (finding no causal nexus where "BGC did not market or sell the Informix software to its customers and there is no evidence that its customers cared what software system it used"); *Mackie*, 296 F.3d at 916 (finding no causal nexus where "we can surmise virtually endless permutations to account for an individual's desire to subscribe to the Pops series, reasons that have nothing to do with the [infringed] artwork in question").

107.    Likewise, showings that "migration to another software system . . . would have little or no effect" on a defendant's business operations, *IBM*, 2013 WL 1775437, at *3, and that "services provided by [a defendant] are the result of a number of other factors" apart from a single software component, like "a number of [other] software applications and other technologies, in addition to skilled . . . personnel[,]" *Complex Sys., Inc.*, 2013 WL 5970065, at *12, defeat causation.

108.    Applying this authority, the Court concludes that Defendants, by identifying "the elements of profit attributable to factors other than the copyrighted work[,]" 17 U.S.C. § 504(b), have negated any causal connection between their use of Blaze and their revenue and that FICO is not entitled to disgorge any of Defendants' profits.

## CONCLUSION

The Court denies FICO's request to recover Defendants' profits.

Dated:  June 23, 2023

/s/ *Leah Godesky*
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com

Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN  55402-4400
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
lgodesky@omm.com
Anton Metlitsky (Admitted Pro Hac Vice)
ametlitsky@omm.com
Daryn Rush (Admitted Pro Hac Vice)
drush@omm.com
Roxana Guidero (Admitted Pro Hac Vice)
rguidero@omm.com

**O'Melveny & Myers LLP**
Times Square Tower
7 Times Square
New York, NY 10036
(212) 326-2000

*Attorneys for Federal Insurance*
*Company and ACE American Insurance*
*Company*