## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| FAIR ISAAC CORPORATION, a Delaware corporation, | ) ) ) | Case No. 16-cv-1054 (DTS) |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| FEDERAL INSURANCE COMPANY, an Indiana corporation and ACE AMERICAN INSURANCE COMPANY, a Pennsylvania corporation, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF'S RESPONSES TO DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND PLAINTIFF'S ALTERNATIVE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiff Fair Isaac Corporation ("FICO") submits the following objections and responses to Defendants Federal Insurance Company's and ACE American Insurance Company's ("Defendants") Proposed Findings of Fact and Conclusions of Law (Dkt. 1275) relating to disgorgement under 17 U.S.C. § 504(b). The limited nature of this submission is pursuant to the Court's request that Defendants submit findings of fact and conclusions of law and that FICO counter with objections and responses, without waiver of appeal. FICO further submits Alternative Proposed Findings of Fact and Conclusions of Law.[1]

---

[1] As noted in the May 24, 2023, hearing, FICO reserves the right to object to the process outlined by the Court as improper under Rule 52(b) and prejudicial to FICO. The proper

# FINDINGS OF FACT[2]

## I.   FICO DID NOT SHOW THAT ANY OF DEFENDANTS' REVENUE WAS ATTRIBUTABLE TO THEIR USE OF BLAZE.

### A.   FICO's fact witnesses lacked any knowledge of whether the use of Blaze was attributable to Defendants' revenue.

1.   FICO's fact witnesses uniformly admitted that they could not establish any connection between Blaze Advisor and Defendants' revenue.

FICO Response: FICO objects to this proposed finding of fact as lacking substantiation and as inaccurate. FICO put forth evidence of the specific number of insurance policies and the amount of gross written premium generated through the infringing applications for those policies that actually used Blaze Advisor software. This evidence was in the form of Defendants' own, verified interrogatory responses, which asked "[f]or all insurance policies in connection with which the Blaze Advisor software was used, the gross written premium of Defendants and the gross written premium of each related company . . . " and Mr. Zoltowski's testimony regarding the same. (P-1004A; P-1007A; Trial Tr. at 1260:21-1261:15, 1325:18-1328:9, 1330:20-1334:15.) Defendants conceded that $21,202,380,943 in gross written premium was connected to the use of Blaze Advisor domestically. (P-1004A; P-1007A (*e.g.*, "For the Financial Lines United (post-merger) for the years identified below, the following applications used

---

method of post-trial briefing on issues for ruling by the Court is for each party to submit its own affirmative findings of fact and conclusions of law. Limiting FICO to objections and alternative proposed findings of fact and conclusions of law is prejudicial to FICO.

[2] The headings included in Defendants' Proposed Findings of Fact and Conclusions of Law (Dkt. 1275) are reproduced solely for the Court's convenience. FICO does not agree with the substance of those headings.

Blaze Advisor® software: CSI Express, Decision Point, Automated Renewal Process, Profitability Indicator, and Defined Book Run. The approximate gross written premiums, policy counts, and identification of the insurance writing companies that issued insurance policies that used these applications, ***in connection with which the Blaze Advisor software was used***, is provided in the charts below for the years requested." (emphasis added); *see also* Trial Tr. at 1334:9-14 (Mr. Zoltowski testifying that $154,380,023 in gross written premium was connected to the use of Blaze Advisor by Chubb Insurance of Canada based on Defendants' verified Seventh Supplemental Answer to Interrogatory No. 19); P-1008-A.) Chubb North America's CFO, Mr. Harkin, confirmed at trial that the gross written premiums listed in Interrogatory No. 17 are from policies associated with the use of Blaze Advisor. (Trial Tr. at 1849:15-19, 1898:4-16.) This unrebutted evidence, based on Defendants' own admission, is a differentiated revenue stream that is limited to Defendants' gross written premiums "***in connection with which the Blaze Advisor software was used.***" (P-1004A; P-1007A (emphasis added).)

FICO also put forth additional evidence establishing a connection or relationship between Blaze Advisor and Defendants' revenue through Defendants' own documents, FICO witnesses, and Defendants' witnesses, including Mr. Mirolyuz and Defendants' expert Mr. William McCarter. This evidence is discussed below and in FICO's Alternative Proposed Findings of Fact and Conclusions of Law.

2.    Sean Baseman, who is responsible for FICO's technical and solution architecture, squarely admitted that he was "not in a position to say whether Blaze had any specific impact at all on Chubb's revenue or profit[.]" (Trial Tr. 185, Dkt. 1178.) That is because he was "only vaguely familiar with how the software was used at Chubb." (*Id.* at 182.) He had "not done anything in the course of [his] work at FICO to

3

specifically analyze the extent to which Blaze reduced time at Chubb[,]" could not "identify a particular application that was developed faster at Chubb because of Blaze[,]" and could not "measure or talk about how quickly Chubb was able to make changes to its internal computer applications because of Blaze." (*Id*. at 183-84.) Baseman could not "specifically identify any insurance product that Chubb was able to bring to market faster because of Blaze." *Id.* at 185 (emphasis added). More generally, he testified that he "would not be capable of quantifying the value that Blaze provides to a customer[.]" (*Id*. at 179-80.)

    <u>FICO Response</u>: FICO objects to this proposed finding of fact as legally irrelevant and as mischaracterizing Mr. Baseman's testimony. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir 2003); *ECIMOS, LLC v. Carrier Corp.*, 971 F.3d 616, 635 (6th Cir. 2020). The proposed finding of fact is irrelevant under the proper legal test.

    Defendants' proposed finding also takes Mr. Baseman's testimony out of context and ignores other portions of his testimony. When Mr. Baseman was asked to confirm that he was only vaguely familiar with how the software was used at Chubb, Mr. Baseman testified that he was "very familiar with how the software was used in the context of everything else that they [Chubb] were doing, correct. But to what actual decisions they were using it, no." (Trial Tr. at 182:2-7.) Second, Mr. Baseman did not testify that he did not know if Blaze Advisor had a specific impact on Chubb's revenue or profits. Rather, he stated he could not ***mathematically*** quantify that impact. (*Id.* at 185:12-15.) Mr. Baseman's testimony establishes ***the fact*** that there was a "connection or relationship" between Defendants' use of Blaze Advisor and Defendants' revenues, even if he did not quantify ***the extent*** to which Blaze Advisor contributed to those revenues.

He testified that Blaze Advisor was central and pivotal to Chubb's systems; that it made faster, more consistent decisions; and that it scales. (*Id.* at 92:21-94:20, 181:19-182:7, 155:16-156:14, 160:1-17, 162:24-163:7, 172:4-13.) He also explained that Blaze Advisor is pivotal in the decision process that results in revenue generating events and that Blaze Advisor was integral to Defendants' decision-making process. (*Id.* at 172:4-173:11, 191:18-192:11.) Mr. Baseman's testimony connected Defendants' use of Blaze Advisor to Defendants' revenues.

3.     Benjamin Baer, FICO's Vice President of Partner and Industry Marketing, had "no idea what value, if any, that Blaze has had with respect to Chubb's use of it." Trial Tr. 295, Dkt. 1179.

FICO Response: FICO objects to this proposed finding of fact as incomplete and as mischaracterizing Mr. Baer's testimony. Mr. Baer testified that use of Blaze Advisor in the underwriting process leads to reduced customer churn, improved business insight, faster processing, increased control, and the ability to choose optimal strategies by running "what if" scenarios. (Trial Tr. at 285:19-287:22.) He also testified to specific benefits that insurers can expect based on feedback that came directly from customers that use Blaze Advisor: "Increase the processing time on new insurance policies, transition from a manual underwriting process, reduced decisioning times, an increase in application volume capacity, reduced processing times, double volume, reduced costs, increased revenue, and lowered or combined ratio, which is increased profitability." (*Id.* at 290:20-291:13.) Mr. Baer testified that the numerous benefits of Blaze Advisor— including control, speed, accuracy, consistency, transparency, and agility—had been

5

realized by FICO's Blaze Advisor customers. (*Id.* at 277:11-289:12; *see also* P-1171A, P-1172A.)

4.     FICO's Vice President of Software Engineering, Jean-Luc Marce, and one of the original developers of Blaze long before FICO acquired the software, had no more than "a good educated guess" as to "how insurance companies use Blaze[,]" *id.* at 259, as a general matter, and offered nothing whatsoever on how Defendants used it.

        FICO Response:  FICO objects to this proposed finding of fact as incomplete and as mischaracterizing Mr. Marce's testimony. Mr. Marce testified regarding the purpose of Blaze Advisor: to allow customers, like Defendants, to automate decisions and processes so that their decisioning process is more efficient and consistent. (Trial Tr. at 194:18-195:15.) Mr. Marce also testified at length about the implementation and set up of Blaze Advisor into customers' systems. (*Id.* at 209:15-210:2, 210:18-212:14.) He further testified about how customers use Blaze Advisor, namely, to design, author, test and deploy business rules. (*Id.* at 198:16-201:20, 202:13-207:25.)

5.     Likewise, Christopher Ivey, FICO's Vice President of Product Support, testified he had "no familiarity at all with how Blaze was implemented at Chubb."  Trial Tr. at 608–09, Dkt. 1180.

        FICO Response: FICO objects to this proposed finding of fact as incomplete and as mischaracterizing Mr. Ivey's testimony. Mr. Ivey testified about his extensive knowledge of implementation and configuration of Blaze Advisor in clients' systems and the steps that go into the same. (*See, e.g.*, Trial Tr. at 541:9-542:14, 543:21-544:4, 546:2-550:5.) Mr. Ivey testified at length about Defendants' own implementation of Blaze

Advisor through the discussion of 52 Statements of Work.[3]  (Trial Tr. at 554:10-22.) Mr.

Ivey testified that FICO was paid over $3.7 million for these services. (*Id.* at 587:6-10.)

Mr. Ivey explained that these Statements of Work outlined how Blaze Advisor was

implemented, deployed and used at Defendants. (*Id.* at 554:10-555:7.) For example, Mr.

Ivey testified that FICO helped Defendants implement Blaze Advisor into the Turbo

Batch Renewal Application and Commercial Underwriting Workstation used by

underwriters in issuing policies. (*Id.* at 560:10-562:17; P-0341.) Mr. Ivey also introduced

P-0212, a Business Rules Management Systems Strategy Assessment and

Recommendation white paper prepared by FICO's professional services group, which

Mr. Ivey led.  (Trial Tr. 57:12-580:16.) This document included an analysis of how Blaze

Advisor impacted revenue, including how decision management impacts revenue

through, among other things, real-time point-of-sale decisions and improved channel

management; speedy cross-channel deployments of products addressing a wider range of

markets; and data driven selection and targeting of new business and renewal prospects.

(P-0212 at P-212-160; Trial Tr. at 580:24-582:5.)

     6.     Henry Mirolyuz, a member of Chubb's IT architecture team, who FICO
called as a witness via deposition designation, stated that he "would not be able to speak
[to] any of the business benefits achieved through the use of the Blaze Advisor
technology or business rules technology."  Trial Tr. 1022, Dkt. 1182.

---

[3] The Statements of Work and related Change Orders and Amendments to the Statements
of Work were admitted as Exhibits P-0299, P-0337, P-0341, P-0342, P-0343, P-0344, P-
0344, P-0345, P-0346, P-0347, P-0348, P-0349, P-0350, P-0351, P-0353, P-0354, P-
0355, P-0356, P-0357, P-0358, P-0359, P-0360, P-0362, P-0363, P-0364, P-0365, P-
0366, P-0367, P-0368, P-0369, P-0370, P-0371, P-0372, P-0373, P-0374, P-0375, P-
0376, P-0377, P-0870, P-0871, P-0873, P-0874, P-0875, P-0876, P-0877, P-0878, P-
0879, P-0880, P-0881, P-0882, P-0883, P-0884, P-0885, P-0886, P-0887, P-0888, P-
0889, P-0890, P-0891, P-0892, P-0893, P-0894, P-0895, P-0896, P-0897.

FICO Response:  FICO objects to this proposed finding of fact as incomplete and as mischaracterizing Mr. Mirolyuz's testimony. Mr. Mirolyuz was a senior architect in Federal's Claims IT department and served as Federal's corporate representative. (Trial Tr. at 970:24-14; 971:22-25, 972:15-23.) Mr. Mirolyuz's complete testimony states that he could not speak to benefits achieved through use of Blaze Advisor from the perspective of an underwriter, but he could speak to the benefits he understood from the IT point of view. (*Id.* at 1022:9-23.)

Mr. Mirolyuz testified at length about the revenue-related benefits of Blaze Advisor that were realized by Defendants. For example, Exhibit P-0192 includes a PowerPoint presentation created by Mr. Mirolyuz that discusses the objectives and benefits of Automated Renewal I (referred to as the ARP application):

- Move more of the right business into automated renewal;

- Increase retention on best accounts and more readily identify potentially less profitable accounts;

- Create greater efficiency for underwriters and continued efficiency for agents, who will have fewer policies to handle and fewer questions to address; and

- Easily update underwriting rules as business needs change.

(P-0192 at P-0192-005.) This trial exhibit explains that "[t]he polices that are automatically renewed the more time the underwriter has to develop and produce additional business or handle additional business." (*Id.*) Mr. Miroluyz, who gave the presentation shown in Exhibit P-0192, testified that the defined benefits for the Automated Renewal Process application were, in fact, achieved. (Trial Tr. at 1028:12-

8

1029:9; P-0192 at P-0192-005.) These are business benefits achieved by Chubb from its use of Blaze Advisor that impacted revenue.

Mr. Miroluyz similarly testified regarding Exhibit P-0191, a whitepaper he authored. (Trial Tr. at 1020:16-22.) He explained that the purpose of Exhibit P-0191 was to market Blaze Advisor across the Chubb enterprise based on the success Chubb experienced with the ARP 2 project. (*Id.* at 1020:23-1021:10 (further explaining that "[w]e thought that using the business rules can bring benefits to the IT teams across the Chubb").) The exhibit illustrated how rules technology impacts business needs, "such as increasing agility to implement the business change, and reducing time to market the new products and services." (P-0191 at P-0191-004.) It also explained that automating decisions establishes uniform decisions across multiple functions, channels, and business touch points. (*Id.* at P-191-005; *see also* Trial Tr. 1025:17-1026:14.) In discussing this document, Mr. Miroluyz testified that Blaze Advisor allowed Chubb's technical group to implement and deploy changes requested by business personnel "significantly quicker." (Trial Tr. at 1021:11-22.) He also agreed that Blaze Advisor "reduces the time to market for new products and services." (*Id.* at 1023:2-1024:15.) He then testified to examples of Blaze Advisor applications that increased analytical ability in the underwriting process, namely Profitability Indicator and Decision Point. (*Id.* at 1025:4-16; P-0191 at P90191-005.) These are also business benefits achieved by Defendants from their use of Blaze Advisor that impacted revenue.

Mr. Miroluyz also introduced Exhibit P-0168, a slide deck which he authored to "provide an overview of implementation of the Business Rules in [the] Decision Point

9

application." (Trial Tr. at 1043:7-1044:19.) The slide deck explained the benefits being achieved at Defendants in automating their referral process at that time:

- Moves business logic out of the code;

- Can be leveraged across projects;

- More easily understood by business; and

- Rule changes are implemented quickly *when needed*

(P-0168 at P-0168-007 (emphasis in the original).) By way of further example, Mr. Miroluyz also testified that Blaze Advisor increased the precision of decision making in applications such as Probability Indicator and CSI Express (Trial Tr. at 1031:6-22) and increased decision-making agility by allowing Defendants to "implement the changes quicker than what [they] were able to do it before" (*id.* at 1031:23-1032:7). Mr. Miroluyz also testified that through use of Decision Point, Defendants were able to "provide the quotes in real-time" so that "customer don't have to wait overnight to get a quote." (*Id.* at 1033:1-17.) Again, these are business benefits achieved by Defendants from their use of Blaze Advisor that impacted revenue.

## B.   FICO presented evidence that a portion of Defendants' revenue "touched" Blaze, but not that any of that revenue was *attributable* to Blaze.

7.     FICO offered evidence of the portion of Defendants' revenue generated by policies that, at any point in their lifecycle, "touched" Blaze. Trial Tr. 1342, Dkt. 1183 (testimony of Neil Zoltowski); *see* Trial Tr. 2717-18, Dkt. 1189 (counsel in summation arguing FICO proved attribution "through the mechanisms of the litigation. We asked the defendants to swear under oath to us the number of polices and the dollar value of those policies that . . . used Blaze Advisor"). The Court finds that this evidence failed to establish a causal connection between Defendants' use of Blaze and their revenue.

10

FICO Response: FICO objects to this proposed finding of fact as improperly

including a conclusion of law, incomplete and mischaracterizing the totality of evidence

presented by FICO. The revenue figure identified by FICO was the revenue from "all

insurance policies in connection with which the Blaze Advisor software was used, the

gross written premium of defendants and the gross written premium of each related

company, including the specific identification of each related company for each quarter

from March 30, 2016, to date." (Trial Tr. at 1275:19-1276:15 (quoting P-1007A, the

Ninth Supplemental response to Interrogatory No. 17).) This met FICO's burden of

establishing "some connection or relationship" between Defendants' use of Blaze

Advisor and their revenue. *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635.

FICO introduced additional testimony and evidence that Defendants' use of Blaze

Advisor had a "connection or relationship" to Defendants' revenue. FICO presented

proof that Blaze Advisor was necessary for Defendants to enter into the mid- and small-

markets, which they previously had been unable to penetrate without Blaze Advisor and

which they did enter after licensing Blaze Advisor. (*See* J-002; P-0958 at P-0958-005, P-

0958-016.) Defendants' witnesses, including Mr. Mirolyuz, testified that Blaze Advisor

led to increased speed, agility, and precision. (Trial Tr. at 1031:6-1032:7; 1033:1-17; *see

also supra* Resp. to Proposed FOF Nos. 1-6.) Mr. Whitener testified about how those

benefits impact underwriting and revenues. (*See infra* Resp. to Proposed FOF No. 24.)

8.     Neil Zoltowski, FICO's damages expert, "did not endeavor to" offer any
opinion on "how much, if any" of Defendants' revenue "is actually connected to
Blaze[.]"  Trial Tr. 1349, Dkt. 1183. His analysis did not focus on causation at all. He did
not analyze the relative roles of Blaze and other factors in driving particular sales or
applications. *See id.* at 1343-44. Instead, he recited Defendants' interrogatory answers

11

that identified premium revenue from every insurance policy that "touched" Blaze. *See id.* at 1342-44.

    FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard, inaccurate and misleading. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. Defendants, not FICO, bear the burden of proving "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The proposed finding of fact is irrelevant under the proper legal test.

    Second, Defendants' alteration of Mr. Zoltowski's testimony is inaccurate, misleading and taken out of context. Mr. Zoltowski's actual testimony is as follows:

> Q: And so that means you are not here to offer opinions on how much, if any, of this $21 billion in revenue is actually connected to Blaze as opposed to all the other things that make Chubb, right? That's someone else.
>
> A: That would have been part of my analysis if there was information to do so. I did not endeavor to do so, though.

(Trial Tr. at 1349:4-9.)[4]

    Third, this proposed finding of fact ignores Mr. Zoltowski's testimony that he "assessed and quantified the gross written premium for policies in connection with [ ] which Blaze Advisor received." (Trial Tr. at 1263:22-1264:5.) Mr. Zoltowski further

---

[4] The reason Mr. Zoltowski did not have the information to do so is because Defendants did not provide it. It is Defendants' burden "to prove . . . the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The information necessary to do so, i.e., information relating to Defendants' own business operations, would be in Defendants' possession, not FICO's. Yet, Defendants never provided financial data sufficient to do any such apportionment.

testified that his disgorgement calculations were based on "all insurance policies in connection with which the Blaze Advisor software was used, the gross written premium of defendants and the gross written premium of each related company, including the specific identification of each related company for each quarter from March 30, 2016, to date." (*Id.* at 1275:19-1276:15 (quoting P-1007A, the Ninth Supplemental response to Interrogatory No. 17).)

9.     This revenue figure does not establish "how much, if any," of Defendants' revenue "is actually connected to Blaze[,]" as Zoltowski admitted. *Id.* at 1349. Zoltowski explained that he could not establish a causal relationship between Defendants' use of Blaze and the revenue Defendants identified because he lacked the "information to do so" and "did not endeavor to do so." *Id.*

FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard, inaccurate and misleading. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. Defendants, not FICO, bear the burden of proving "the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). The proposed finding of fact is irrelevant under the proper legal test.

Second, Defendants' proposed finding is incorrect. Mr. Zoltowski testified that his disgorgement calculations were based on "all insurance policies in connection with which the Blaze Advisor software was used, the gross written premium of defendants and the gross written premium of each related company, including the specific identification of each related company for each quarter from March 30, 2016, to date." (Trial Tr. at

13

1275:19-1276:15 (quoting P-1007A, the Ninth Supplemental response to Interrogatory

No. 17).)

10.    The fact that policies that ran through Blaze generated revenues is not surprising—every policy Defendants sold generated revenue, and the vast majority of those policies did not run through Blaze. *See, e.g.*, Trial Tr. 673-74, 689, 697, 705, Dkt. 1180 (testimony of Chubb's Chief Architect for North America, Ramesh Pandey, explaining the role Blaze played in Defendants' technical infrastructure). The question is whether any of that revenue is attributable to the use of Blaze. Defendants' interrogatory response identifying premium revenue from insurance policies that "touched" Blaze does not by itself prove that revenue is attributable to the use of Blaze.

FICO Response: FICO objects to this proposed finding of fact because

Defendants' proposed finding is primarily a legal conclusion—an incorrect one—and

otherwise mischaracterizes the totality of the evidence presented by FICO. FICO

presented evidence of Defendants' revenue connected and related to their infringement

via Defendants' interrogatory responses. FICO also presented additional evidence that

Defendants' use of Blaze Advisor had a "connection or relationship" to its revenue. (*See*

*infra* Resp. to Proposed FOF Nos. 24, 28; *supra* Resp. to Proposed FOF Nos. 1-7.)

Separately, the statement "[t]he question is whether any of that revenue is attributable to

the use of Blaze" is a legal conclusion, not a finding of fact, and is an incorrect statement

of the law as explained *infra* in FICO's responses to Defendants' proposed conclusions of

law.

C.    **FICO's causation expert, Bick Whitener, was unable to show that any portion of Defendants' revenue was attributable to Blaze.**

1.    **Whitener lacked experience or qualifications sufficient to testify about any connection between Defendants' use of Blaze and their revenue.**

14

11.     FICO principally sought to prove a causal connection between Defendants' use of Blaze to their revenue through the testimony of its causation expert, Bick Whitener. *See* Trial Tr. 2720-21, Dkt. 1189 (counsel for FICO arguing in closing that "Mr. Whitener said [that] Blaze Advisor added significant value to the defendants' process"); *see id.* at 2718 (counsel conceding in summation that Mr. Whitener, and not FICO's fact witnesses, was FICO's principal witness to prove the requisite causal nexus to revenue).

FICO Response: FICO objects to this proposed finding of fact as

mischaracterizing FICO's evidence as a whole. Mr. Whitener was one of many witnesses

who testified about the relationship between Blaze Advisor and Defendants' revenues.

(*See infra* Resp. to Proposed FOF Nos. 24, 28; *supra* Resp. to Proposed FOF Nos. 1-7.)

Mr. Whitener testified about the selling process in property casualty insurance (e.g., the

process of how a policy moves from a request to an issued policy) and the role

technology, and specifically Blaze Advisor, plays in this process. (Trial Tr. at 1355:15-

1356:5.)

12.     Whitener, however, has no relevant experience or qualifications sufficient to support that opinion. *See, e.g.*, Trial Tr. 1537-41, Dkt. 1184.

FICO Response: FICO objects to this proposed finding of fact as an untimely

objection to Mr. Whitener's testimony and factually incorrect. Defendants previously

objected to Mr. Whitener's testimony during trial, and the Court overruled that objection

and permitted Mr. Whitener to testify. (Trial Tr. at 1378:19-24, 1379:12-23.) It is

improper for Defendants to now reassert arguments already rejected by the Court. (*See*

*infra* Resp. to Proposed COL No. 77.)

Mr. Whitener has relevant and sufficient experience and qualifications to serve as

an expert at trial. FICO offered Mr. Whitener as an expert in the insurance industry, the

process of selling insurance, the use of technology in selling insurance, and his application of that expertise to the knowledge gained from his analysis of the case-specific facts from Defendants regarding Blaze Advisor and their applications. (Trial Tr. at 1373:4-12; *see also id.* at 1378:19-24, 1379:12-23.) Mr. Whitener's background uniquely qualified him to testify about how the business benefits of Blaze Advisor (speed, precision, consistency, agility, scale, compliance, and ease of doing business) impact Chubb's revenue.[5]

Mr. Whitener worked in the field of insurance for approximately 45 years, with 44 of those years being dedicated to property and casualty insurance. (*Id.* at 1359:2-9.) Mr. Whitener has experience with underwriting, financial management and reporting, product development, product management, field operations management, business management of technology/technology used in selling insurance, and technology for implementing billing and claims. (*Id.* at 1359:2-9, 1362:21-1372:21; P-0857 (Whitener CV).) With respect to rules management software, Mr. Whitener testified that he had prior experience with Duck Creek and was responsible for the selection and implementation of Duck Creek while at American Reliable, a software product that Defendants themselves

---

[5] By contrast, Mr. McCarter, Defendants' expert, was offered to "provide [ ] opinion[s] about the use of Blaze Advisor within Chubb's day-to-day business environment and whether or not Blaze contributed to revenue and profits." (Trial Tr. 2065:18-21.) Mr. McCarter's opinions focused on the implementation and use of Blaze Advisor at Chubb from a technical perspective. (*Id.* at 2074:11-18 (explaining his experience was in insurance software and solutions).) By contrast, Mr. Whitener's testimony focused on the process of selling insurance and the impact of technology, and specifically Blaze Advisor, on the process of selling insurance from the perspective of an underwriter issuing policies. (*Id.* at 1373:4-12.) That Mr. Whitener approached his opinion from a different perspective does not mean he is not qualified to render his opinions.

characterized as a rules software product. (Trial Tr. at 691:8-13, 695:3-15, 1370:17-1372:1, 1535:12-1536:7, 2088:16-2089:21, 2120:17-2121:6.) With this expertise to draw upon, Mr. Whitener explained how the benefits of Blaze Advisor impacted Defendants' process of selling insurance. (*Id.* at 1415:20-1420:13, 1428:16-1432:25.)

13.    He has no experience with *any* business rules management software, much less Blaze. *Id.*

FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard and factually wrong. Mr. Whitener did have experience with the business rules management software Duck Creek. (Trial Tr. at 1370:17-1372:1, 1535:12-1536:7.) Further, his experience with business rules management software is irrelevant to the probative value of his opinions. Mr. Whitener explained how the benefits of Blaze Advisor impacted Defendants' process of selling insurance. (*Id.* at 1415:20-1420:13; 1428:16-1432:25.) Defendants' documents and witness testimony identified the benefits achieved by use of Blaze Advisor. (*See, e.g.*, *id.* at 1028:12-1029:9, 1023:19-1024:15; P-0192 at P-0192-002; P-0191 at P-0191-004.) Mr. Whitener, with experience in underwriting and the process of selling insurance, was able to testify credibly about how those benefits impacted revenue. (Trial Tr. at 1480:9-1491:3.)

14.    He has never worked in the technology department of an insurance company. *Id.* at 1534.

FICO Response: FICO objects to this proposed finding of fact as mischaracterizing Mr. Whitener's testimony and irrelevant. Mr. Whitener has not been a member of a technology department but did have experience with technology utilized by the insurance business. (*See, e.g.*, Trial Tr. at 1370:17-1372:21.) He managed the

selection of vendors for policy administration systems and billing systems.  Mr. Whitener testified he was "heavily involved in the primary setting for technologists and making sure that technologists receive from the business units for which I worked the requirements and documentation that they needed to increase their probability of success, I have seen the value of automating underwriting and compliance and statutory rules through use of technology." (*Id.* at 1604:25-1605:18.)

Further, whether he worked in a "technology department" is irrelevant to the probative value of his opinions. Mr. Whitener explained how the benefits of Blaze Advisor impacted Defendants' process of selling insurance. (*Id.* at 1415:20-1420:13, 1428:16-1432:25.) The benefits achieved by use of Blaze Advisor (speed, precision, consistency, agility, scale, compliance, and ease of doing business) were outlined in Defendants' document and witness testimony. (*See, e.g.*, *id.* at 1028:12-1029:9, 1023:19-1024:15; P-0192 at P-0192-002; P-0191 at P-0191-004.) Mr. Whitener, with experience in underwriting and the process of selling insurance, was able to testify credibly about how those benefits impacted revenue. (Trial Tr. at 1480:9-1491:3.)

15.    He has never used business rules management software in his work for insurance companies. *Id.* at 1533-37.

FICO Response: FICO objects to this proposed finding of fact as mischaracterizing Mr. Whitener's testimony and irrelevant. Mr. Whitener had experience with technology utilized by the insurance business. (*See, e.g.*, Trial Tr. at 1370:17-1372:1.) He managed the selection of vendors for policy administration systems and billing systems and has "been heavily involved in the primary setting for technologists

18

and making sure that technologists receive from the business units for which I worked the requirements and documentation that they needed to increase their probability of success, I have seen the value of automating underwriting and compliance and statutory rules through use of technology." (*Id.* at 1604:25-1605:18.)

Whether he has *personally used* business rules management software in his work for insurance companies is irrelevant to the probative value of his opinions. As described above, Mr. Whitener's experience enabled him to testify credibly about how the benefits of Blaze Advisor impacted revenue. (*Id.* at 1480:9-1491:3; *see supra* Resp. to Proposed FOF Nos. 12-14.)

16.     At the time he produced his reports, he had not written or reviewed peer-reviewed literature regarding rules software or coding rules. *Id.* at 1542-43.

FICO Response: FICO objects to this proposed finding of fact because it mischaracterizes Mr. Whitener's testimony and is irrelevant. Mr. Whitener has worked in the field of insurance for approximately 45 years, with 44 of those years being dedicated to property and casualty insurance. (Trial Tr. at 1359:2-9.) Mr. Whitener has experience with underwriting, financial management and reporting, product development, product management, field operations management, business management of technology used in selling insurance, and technology for implementing billing and claims processes. (*Id.* at 1359:2-9, 1362:21-1372:21; P-0857 (Whitener CV).)

Whether Mr. Whitener has written or reviewed peer-reviewed literature regarding rules software or coding rules is irrelevant to the probative value of his opinions. As described above, Mr. Whitener's experience enabled him to testify credibly about how

the benefits of Blaze Advisor impacted revenue. (Trial Tr. at 1480:9-1491:3; *see supra* Resp. to Proposed FOF Nos. 12-14.)

17.     Nor at that time had he spoken about Blaze or, indeed, any business rules management software with other rules software vendors. *Id.* at 1546.

FICO Response:  FICO objects to this proposed finding of fact because it mischaracterizes Mr. Whitener's testimony and is irrelevant. Prior to writing his report and providing his testimony, Mr. Whitener talked with Mr. Waid, FICO's Chief Product and Technology Officer; reviewed over 10,000 pages of documents from Defendants; reviewed six deposition transcripts; reviewed Defendants' rules repository; and spoke with an individual knowledgeable about rule repositories to ensure an accurate understanding. (Trial Tr. at 1356:6-1358:20.) Furthermore, Mr. Whitener had experience with technology utilized by the insurance business. (*See, e.g.*, *id.* at 1370:17-1372:21.) He managed the selection of vendors for policy administration systems and billing systems and has "been heavily involved in the primary setting for technologists and making sure that technologists receive from the business units for which I worked the requirements and documentation that they needed to increase their probability of success, I have seen the value of automating underwriting and compliance and statutory rules through use of technology." (*Id.* at 1604:25-1605:18.)

Whether Mr. Whitener spoke about Blaze Advisor or any business rules management software with other rules software vendors is irrelevant to the probative value of his opinions. As described above, Mr. Whitener's experience enabled him to

testify credibly about how the benefits of Blaze Advisor impacted revenue. (*Id.* at 1480:9-1491:3; *see supra* Resp. to Proposed FOF Nos. 12-14.)

18.    He had not spoken about business rules management software with anyone at Chubb. *Id.* at 1545.

FICO Response: FICO objects to this proposed finding of fact because it mischaracterizes Mr. Whitener's testimony and is irrelevant. As described above, Mr. Whitener engaged in an extensive analysis prior to writing his report and providing his testimony, including reviewing over 10,000 pages of documents from Defendants, reviewing six deposition transcripts, and reviewing Defendants' rules repository, and had experience with technology utilized by the insurance business. (*See supra* Resp. to Proposed FOF No. 17.)  Mr. Whitener did a sufficient investigation.

Whether Mr. Whitener directly spoke about business rules management software with anyone at Chubb is irrelevant to the probative value of his opinions. Defendants' own documents and testimony, reviewed by Mr. Whitener, described the benefits they realized from use of Blaze Advisor. Mr. Whitener's experience enabled him to testify credibly about how those benefits of Blaze Advisor impacted Defendants' process of selling insurance and their revenue. (*Id.* at 1480:9-1491:3; *see supra* Resp. to Proposed FOF Nos. 12-14.)

19.    He had not discussed such software with FICO's other customers. *Id.* at 1546.

FICO Response:  FICO objects to this proposed finding of fact because it mischaracterizes Mr. Whitener's testimony and is irrelevant. As described above, Mr. Whitener engaged in an extensive analysis prior to writing his report and providing his

testimony and had experience with technology utilized by the insurance business. (*See supra* Resp. to Proposed FOF No. 17.)

Whether Mr. Whitener spoke with FICO's other customers is irrelevant to the probative value of his opinions. Defendants' own documents and testimony, reviewed by Mr. Whitener, described the benefits they realized from use of Blaze Advisor. Mr. Whitener's experience enabled him to testify credibly about how those benefits of Blaze Advisor impacted Defendants' process of selling insurance and their revenue. (Trial Tr. at 1480:9-1491:3; *see supra* Resp. to Proposed FOF Nos. 12-14.)

20.    He had not discussed such software with anyone in the insurance industry. *Id.* at 1537-38.

FICO Response FICO objects to this proposed finding of fact because it mischaracterizes Mr. Whitener's testimony and is irrelevant. As described above, Mr. Whitener engaged in an extensive analysis prior to writing his report and providing his testimony and had experience with technology utilized by the insurance business. (*See supra* Resp. to Proposed FOF No. 17.)

Whether Mr. Whitener discussed Blaze Advisor with others in the insurance industry is irrelevant to the probative value of his opinions. Defendants' own documents and testimony, reviewed by Mr. Whitener, described the benefits they realized from use of Blaze Advisor.  As described above, Mr. Whitener's experience enabled him to testify credibly about how those benefits of Blaze Advisor impacted Defendants' process of selling insurance and their revenue. (Trial Tr. at 1480:9-1491:3; *see supra* Resp. to Proposed FOF Nos. 12-14.)

22

21.    He was first introduced to Blaze the day before his deposition when he was given a 90-minute demonstration by FICO of Blaze's use in the college admissions process—not the selling of insurance. *Id.* at 1540-42.

FICO Response:  FICO objects to this proposed finding of fact because it is misleading, mischaracterizes Mr. Whitener's testimony and is irrelevant. Prior to Mr. Whitener's deposition, Mr. Whitener talked with Mr. Waid, FICO's Chief Product and Technology Officer; reviewed over 10,000 pages of documents from Defendants; reviewed six deposition transcripts; reviewed Defendants' rules repository; and spoke with an individual knowledgeable about rule repositories to ensure an accurate understanding. (Trial Tr. at 1356:6-1358:20.) Mr. Whitener explained that he "reviewed those documents for two things, . . . to see the progress from [D]efendants as it relates to the licensing of Blaze . . . [and] to understand the [D]efendants' use and deployment of Blaze Advisor inside of their selling of insurance process." (*Id.*) Mr. Whitener gained familiarity with Blaze Advisor at least through discussions with Mr. Waid and review of Defendants' documents long before his deposition.

Furthermore, Mr. Whitener had experience with technology utilized by the insurance business. (*See supra* Resp. to Proposed FOF No. 17.) Mr. Whitener explained how the benefits of Blaze Advisor impacted Defendants' process of selling insurance. (Trial Tr. at 1415:20-1420:13, 1428:16-1432:25.) The benefits achieved by use of Blaze Advisor (speed, precision, consistency, agility, scale, compliance, and ease of doing business) were outlined in Defendants' documents and witness testimony. (*See, e.g.*, *id.* at 1028:12-1029:9, 1023:4-1024:15; P-0192 at P-0192-002; P-0191 at P-0191-004.) Mr. Whitener, with experience in underwriting and the process of selling insurance, was able

to testify credibly about how those benefits impacted revenue. (Trial Tr. at 1480:9-1491:3.) That Mr. Whitener was given a demonstration of Blaze Advisor the day before his deposition is irrelevant to the probative value of his opinions.

22.     This demonstration took place after Whitener authored his 74-page-long report opining on the causal connection between Blaze and Defendants' revenue. *Id.*

FICO Response:  FICO objects to this finding because it is misleading, mischaracterizes Mr. Whitener's testimony and is irrelevant. Prior to Mr. Whitener's preparation of his reports, Mr. Whitener talked with Mr. Waid, FICO's Chief Product and Technology Officer; reviewed over 10,000 pages of documents from Defendants; reviewed six deposition transcripts; reviewed Defendants' rules repository; and spoke with an individual knowledgeable about rule repositories to ensure an accurate understanding. (Trial Tr. at 1356:6-1358:20.) Mr. Whitener explained that he "reviewed those documents for two things, . . . to see the progress from [D]efendants as it relates to the licensing of Blaze . . . [and] to understand the [D]efendants' use and deployment of Blaze Advisor inside of their selling of insurance process." (*Id.*) Additionally, Mr. Whitener's two reports totaled 75-pages; he did not submit a single report of 74-pages as this proposed finding of fact suggests. (*Id.* at 1538:7-1539:6, 1540:5-13.)

Furthermore, Mr. Whitener had experience with technology utilized by the insurance business. (*See supra* Resp. to Proposed FOF No. 17.) Mr. Whitener explained how the benefits of Blaze Advisor impacted Defendants' process of selling insurance. (Trial Tr. at 1415:20-1420:13, 1428:16-1432:25.) The benefits achieved by use of Blaze Advisor (speed, precision, consistency, agility, scale, compliance, and ease of doing

24

business) were outlined in Defendants' document and witness testimony. (*See, e.g.*, *id.* at 1028:12-1029:9, 1023:4-1024:15; P-0192 at P-0192-002; P-0191 at P-0191-004.) Mr. Whitener, with experience in underwriting and the process of selling insurance, was able to testify credibly about how those benefits impacted revenue. (Trial Tr. at 1480:9-1491:3.) That Mr. Whitener was given a demonstration of Blaze Advisor after he authored his report is irrelevant to the probative value of his opinions.

### 2. Whitener admitted that he could not connect Defendants' use of Blaze to Defendants' revenue.

23.     Whitener made clear he could draw no connection between Defendants' use of Blaze their revenue, and indeed, made no effort to do so.

FICO Response:  FICO objects to this proposed finding of fact because it mischaracterizes Mr. Whitener's testimony, as fully described below, and is unintelligible as written.

24.     Whitener testified generally to his "conclusion . . . that Blaze Advisor . . . added significant value to the defendants' business of selling insurance." *Id.* at 1530; *see also id.* at 1531 ("I don't need a tape measurer or stopwatch to know that computers executing transactions is faster than humans[.]"). That is how FICO's counsel summarized Whitener's opinion in summation:  "Mr. Whitener said [that] Blaze Advisor added significant value to the defendants' process[.]"  Trial Tr. 2720-21, Dkt. 1189. But adding value in a general sense is not the same thing as actually contributing to revenue.

FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard, as mischaracterizing Mr. Whitener's testimony, and as including a legal conclusion. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. Mr. Whitener's testimony is relevant and probative under this legal test.

25

Defendants mischaracterize and present an incomplete picture of Mr. Whitener's testimony. Mr. Whitener did not testify only about value, generally. Mr. Whitener testified to the specific benefits provided and realized by use of Blaze Advisor in Defendants' sale of insurance. (Trial Tr. at 1530:15-1532:2.) He further testified about how those specific benefits realized by Defendants from their use of Blaze Advisor contributed to their sale of insurance.

For example, in discussing CSI Express, Mr. Whitener explained how Blaze Advisor contributed to revenue through the following:

- Increased speed of response to a request for a quote and speed of making renewal offers, which increases the conversion rate and decreases the time to consider a competitor's quote (*Id.* at 1393:16-1394:5, 1480:9-1482:6);

- Helped the underwriting process achieve a precise, adequate price, which increased the probability that the quote or renewal is competitive and will be accepted (*Id.* at 1482:7-1484:3);

- If human involvement in underwriting was necessary, the problems were flagged, which made the response time faster (*Id.* at 1504:11-1506:9);

- Made it easier for agents and brokers to work with Chubb through better data capture and use of third-party data sources, which reduced the need to ask the applicant for more data, increased the accuracy of the data for underwriting, and made the price more competitive through better data (*Id.* at 1449:1-1450:12, 1499:16-23); and

- Increased the time of underwriting staff to market to agents and brokers and to market new business (*Id.* at 1487:20-1488:16).

Mr. Whitener explained, based on his experience in underwriting and the insurance industry, that the above factors experienced by Defendants through their use of Blaze Advisor facilitated the generation of a greater volume of business —*i.e.* more

insurance policies sold and as a result more revenue received. (*Id.* at 1487:17-1488:16, 1529:13-1532:20.)

The above is exemplary. Mr. Whitener's testimony separately addressed each of Blaze Advisor's benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business—and how those features affected and improved the sales process and contributed to revenue. (*See, e.g.*, *id.* at 1393:16-1395:5, 1480:9-1491:3, 1498:2-1500:12, 1504:11-1506:22, 1507:10-1509:3, 1511:8-12, 1512:12-22, 1514:11-1515:5, 1516:20-1520:15, 1522:1-7, 1522:17-1523:21, 1524:4-22, 1526:24-1528:5, 1528:6-1529:12.)

Mr. Whitener also provided specific examples of Blaze Advisor's role in increasing revenue when he testified that Blaze Advisor allowed Defendants to:

- Acquire a $25 million book of business from another insurance company. This acquisition required quick modification to their booking process, which was facilitated by Blaze Advisor. (*Id.* at 1484:22-1485:19, 1519:19-1520:10.)

- Process more business with the same number of humans (*id.* at 1487:17-1488:16), which affected revenue because "the faster you respond to quotes, the higher the probability that you convert that quote into a policy." (*Id.* at 1508:14-1509:3.)

- Respond to customers' inquiries for new business by providing real-time quotes which "increase[d] [Defendants' probability of converting the quote into a policy." (*Id.* at 1480:9-1482:6.)

Finally, Defendants' proposed finding includes the statement "[b]ut adding value in a general sense is not the same thing as actually contributing to revenue." This is a legal conclusion, not a finding of fact, and is an inaccurate statement of the law as explained herein.

25.     When asked point blank if he knew "whether Blaze actually contributed to any increase in revenue or profit at Chubb," Whitener said he did not. Trial Tr. 1599, Dkt. 1184.

FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard and as mischaracterizing Mr. Whitener's testimony. Underlying Defendants' proposed finding is a faulty premise—that to establish Defendants' use of Blaze Advisor had "some connection or relationship" with Defendants' revenue, FICO must show an increase in revenue. Not so. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. The proposed finding of fact implicitly assumes a higher burden of proof and is therefore irrelevant.

Further, Mr. Whitener did testify that in his expert opinion, Blaze Advisor did contribute to revenue. Mr. Whitener testified that Blaze Advisor did execute transactions faster, did make more consistent decisions, and did add significant value to Defendants' process of selling insurance, even if he could not quantify exactly the extent to which it contributed (which is not FICO's burden). (Trial Tr. at 1530:15-1532:2.)

26.     He repeatedly emphasized that he did not "measure" any connection between Defendants' use of Blaze and their revenue. *Id.* at 1558, 1565, 1599.

FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard and as mischaracterizing Mr. Whitener's testimony. The law does not require FICO to show "but for" causation. Underlying Defendants' proposed finding is a faulty premise—that to establish Defendants' use of Blaze Advisor had

"some connection or relationship" with Defendants' revenue, FICO must specifically

quantify or measure the extent to which Blaze Advisor was connected or related to

Defendants' differentiated revenues. Under 17 U.S.C. § 504(b), FICO's burden was only

to present evidence establishing "some connection or relationship between the

infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971

F.3d at 635.

This proposed finding of fact also mischaracterizes Mr. Whitener's testimony. Mr.

Whitener testified that he understood Blaze Advisor did execute transactions faster, did

make more consistent decisions, and did add significant value to Defendants' process of

selling insurance, even if he could not quantify the extent to which it contributed (which

is not FICO's burden). (Trial Tr. at 1530:15-1532:2.) As Mr. Whitener stated, he didn't

"need a tape measurer or a stopwatch to know that computers executing transactions is

faster than humans because I was a human underwriter and I've worked with many

companies to [] deploy technology into those processes" and "I don't need to measure

variation in compliance because I know a computer system with a set of facts is going to

make the same decision with those facts every time, and I know . . . that humans cannot

do that." (*Id.*)

27.     Indeed, Whitener evinced a comprehensive lack of knowledge about
whether Blaze contributed to Defendants' revenue.

FICO Response: FICO objects to this proposed finding of fact as argumentative

and unsupported. To the contrary, Mr. Whitener testified in great detail about the

connection or relationship between features of Blaze Advisor and Defendants' revenue.

(*See supra* Resp. to Proposed FOF No. 24.)

28.     He could not say whether Blaze made any contribution to key aspects of Defendants' business:

a.      He did not know whether the use of Blaze reduced Defendants' need for information technology resources. *Id.* at 1555.

b.      He did not know whether Defendants increased the speed of making renewal offers because of their use of Blaze. *Id.* at 1556-57.

c.      He did not know whether Blaze allowed Defendants to increase speed to market by ensuring regulatory compliance. *Id.* at 1558.

d.      He did not know whether Defendants increased the ease of use for agents and brokers by using Blaze. *Id.* at 1558-59.

e.      He did not know whether Blaze improved Defendants' ability to define accurate and adequate pricing. *Id.* at 1560.

f.      He did not know whether Blaze permitted Defendants to increase the precision and accuracy of its quotes to customers. *Id.*

g.      He did not know whether Blaze increased the precision and adequacy of Defendants' renewal offers. *Id.*

h.      He did not know whether Blaze enabled Defendants to grow in the small commercial and mid-market segments. *Id.*

FICO Response: FICO objects to this proposed finding of fact as irrelevant under the correct legal standard and as mischaracterizing Mr. Whitener's testimony. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. To the extent Defendants' above points are directed to whether Defendants' use of Blaze Advisor caused a reduction, increase, improvement, or growth in revenue they are not appropriately tethered to that burden. Accordingly, the points listed in this proposed finding of fact are irrelevant under the proper legal test;

namely, whether there is some connection between the infringement and the revenues identified in Interrogatory No. 17.

Second, this proposed finding of fact mischaracterizes Mr. Whitener's testimony. Mr. Whitener *did* testify that Blaze Advisor contributed to key aspects of Defendants' business, as described below:

a.   Mr. Whitener testified that the use of Blaze Advisor reduced Defendants' need for information technology resources. (Trial Tr. at 1423:10-1424:4 ("[T]he IT people, or whomever was making the rule changes, were now able to make changes in just a couple of days, compared to rules inside other points where it was taking them three or four months to change the rules").).

b.   Mr. Whitener testified that Blaze Advisor increased the speed of making renewal offers. (*Id.* at 1480:9-1481:25 ("Blaze Advisor [was] deployed to make things [ ] faster. . . . That goal was achieved. . . . each of those renewal policies that is coming through is going to be done much faster, and the renewal offer is going to make it to the independent agent and the policyholder faster.").)

c.   Mr. Whitener testified that Blaze Advisor increased speed to market by ensuring regulatory compliance. (*Id.* at 1489:2-9 ("They used Blaze to both be in compliance with State and company requirements. . . they used Blaze Advisor to control ranges where underwriting flexibility on a certain item, it had a ceiling, it had a floor, and you just had to make sure you stayed within that ceiling/floor."); 1519:21-1520:10 (agreeing that using Premium Booking "all that back-end reporting was done using Blaze Advisor and much faster, they were able to capture the market").)

d.   Mr. Whitener testified that Blaze Advisor increased the ease of use for agents and brokers. (*Id.* at 1468:6-1470:14, 1490:20-1491:3 ("The independent agents got more consistent answers. The independent agents and brokers got faster responses. The independent agents and brokers got consistency. This [ ] was a technical deployment aimed at ease of doing business in addition to some other value points we discussed.").)

e.   Mr. Whitener testified that Blaze Advisor improved Defendants' ability to define accurate and adequate pricing. (*Id.* at 1526:24-1527:18 ("CIS Claims is going to take that information, policy claims, and its going to go through

31

a predictive modeling process" which includes "the actuarial element of pursuing the adequate accurate predictable price."); *see also id.* at 1506:13-22 ("Profitability Indicator's job was to enable the underwriting function to have a more accurate and precise price in the quoting or in the renewal process. It accomplished that as well.").)

f.   Mr. Whitener testified that Blaze Advisor permitted Defendants to increase the precision and accuracy of its quotes to customers. (*Id.* at 1498:20-1499:9 ("Decision Point is the market-facing capability . . . It priced it. It went through the process of taking it through the underwriting guidelines for those specific products, and it was capable of giving back a real-time quote based on defendant documents."); 1508:14-1509:3 ("the faster you respond to quotes, the higher the probability that you convert that quote into a policy").)

g.   Mr. Whitener testified that Blaze Advisor increased the precision and adequacy of Defendants' renewal offers. (*Id.* at 1506:13-22 ("Profitability Indicator's job was to enable the underwriting function to have a more accurate and precise price in the quoting or in the renewal process. It accomplished that as well.").)

h.   Mr. Whitener testified that Blaze Advisor enabled Defendants to grow in the small commercial and mid-market segments. (*Id.* at 1466:12-1468:5 ("I think the word "defend" is very important, because three years later, after 2006, after we want to grow [the small and mid-market] book, now not only do they want to grow it, but they want to defend it –defend what they have accomplished.").)

29.   Whitener could not say whether Blaze improved the effectiveness of the applications into which it was incorporated.

a.   He spent "less than one second" reviewing the components of CSI Express other than Blaze and gave "zero thought" to whether he could measure whether Blaze contributed to the speed of CSI Express. *Id.* at 1563-64.

b.   He did not measure how significant a role Blaze played in CSI Express, or its role in that application relative to other software. *Id.* at 1562. Indeed, he did not know whether CSI Express increased the speed of responses to requests for quotes at all. *Id.* at 1563.

c.   He did not know whether Blaze contributed to the effectiveness of Profitability Indicator, Decision Point, Evolution, Adapt, Cornerstone, Premium Booking, TAPS, IRMA, CUW-IM, CIS Claims. *Id.* at 1594-95, 1565-69.

     d.    He had no basis to refute testimony that Blaze could easily have been replaced in TAPS by an Excel spreadsheet. Id. at 1568.

<u>FICO Response:</u> FICO objects to this proposed finding of fact as irrelevant under the correct legal standard, inaccurate, and incomplete. Defendants' statement implies an incorrect legal standard. Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. The proposed finding of fact is irrelevant under the proper legal test because these sorts of measurements were unnecessary to meet FICO's burden of proof.

Further, Mr. Whitener testified at length about (1) the functions of each of the applications that used Blaze Advisor (Trial Tr. at 1497:17-1529:16), (2) the benefits of Blaze Advisor realized by Defendants (*id.* at 1417:10-1432:25), and (3) how those benefits contributed to generation of revenue in the insurance industry (*id.* at 1468:6-1474:25; 1529:13-1530:20). Moreover, the testimony cited by Defendants is inaccurate and incomplete, as described below.

     a.    Mr. Whitener did *not* testify that he "gave zero thought to whether he could measure whether Blaze contributed to the speed of CSI Express." Rather, Mr. Whitener testified that "I took zero action based on those thoughts" and further clarified he didn't "need a tape measure or a stopwatch to know that computers executing transactions is faster than humans because I was a human underwriter and I've worked with many companies to [] deploy technology into those processes" and "I don't need to measure variation in compliance because I know a computer system with a set of facts is going to make the same decision with those facts every time . . . and I know . . . that humans cannot do that." (*Id.* at 1530:15-1532:2.)

     b.    Defendants' second assertion is also inaccurate. Mr. Whitener never testified that he didn't measure Blaze Advisor's "role in that application

relative to other software." Mr. Whitener did agree that he "didn't do anything to measure how significant a part of CSI Express Blaze is[,]" but this was not necessary for Mr. Whitener to testify regarding the benefits of Blaze Advisor. (*See supra* Resp. to Proposed FOF No. 24.)

c.    Defendants' cited testimony about the "effectiveness of Profitability Indicator, Decision Point, Evolution, Adapt, Cornerstone, Premium Booking, TAPS, IRMA, CUW-IM, [and] CSI Claims" is incomplete. Mr. Whitener did *not* testify that he did not know whether Blaze contributed to the effectiveness of these applications. Rather, he stated that he did not *measure* or *quantify* the extent to which those applications contributed to revenue. (Trial Tr. at 1563:14-1565:19, 1595:5-13; *see also id.* at 1599:25-1601:6.) Mr. Whitener *did* provide testimony on the business benefits of Blaze Advisor. (*See supra* Resp. to Proposed FOF No. 24.)

d.    Defendants' cited testimony about TAPS is inaccurate. Mr. Whitener agreed that "witnesses have testified in this case that the function Blaze performed in TAPS could have just as easily been performed by an Excel spreadsheet" but did not agree with the premise of such testimony. Mr. Whitener only agreed that "it's certainly possible that other software could have been used in TAPS to perform exactly the same function as Blaze." (Trial Tr. at 1568:6-18.)

30.    Whitener lacked knowledge of whether other components of Defendants' immense software infrastructure contributed to revenue, and how those software programs compared with Blaze.

a.    He conceded that defendants use "many, many different technologies to sell insurance," but before rendering his written report, he "didn't do anything to investigate how many other technologies were deployed" while erroneously asserting that Defendants could not "possibly be using hundreds of other technologies in addition to Blaze[.] *Id.* at 1550-51.

b.    He did not "ma[k]e any effort" to determine those other technologies' contribution to Defendants' revenue. *Id.* at 1551-52.

c.    He did nothing to determine "how many non-Blaze rules Chubb was running" or how many business rules were written by software engineers. *Id.* at 1553.

d.    He testified that the rate of adoption of Blaze in Defendants' business after the merger was "pretty low." *Id.* at 1598.

FICO Response: FICO objects to this proposed finding of fact because it implies an incorrect legal standard and mischaracterizes Mr. Whitener's testimony. Defendants, not FICO, bear the burden of establishing "the elements of profits attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. The proposed finding of fact is irrelevant under the proper legal test.

Furthermore, Defendants' proposed findings in subparts (a)-(d) are incomplete and mischaracterize Mr. Whitener's testimony:

a.   Defendants' proposed finding No. 30(a) is misleading. Mr. Whitener agreed that he had "seen testimony from Mr. Pandey and Mr. Ghislanzoni confirming that there were hundreds of other technologies in use" and agreed that he "didn't consider that" before he wrote his opinions. (Trial Tr. at 1551:7-14.) But it would have been impossible for Mr. Whitener to consider testimony given at trial prior to writing his report before trial. Moreover, this proposed finding is irrelevant because the use of other technologies by Defendants does not speak to whether use of Blaze Advisor is connected or related to Defendants' revenues nor does it negate the import of Blaze Advisor in Defendants' systems.

b.   Defendants' proposed finding No. 30(b) is incomplete because it ignores Mr. Whitener's testimony that Defendants could not have sold insurance without policy administration systems (which included Blaze Advisor). (*Id.* at 1497:14-16.) The contribution of other technologies is irrelevant to FICO's burden of proof.

c.   Defendants' proposed finding No. 30(c) is misleading and incomplete because it ignores the rules that Mr. Whitener did review. Mr. Whitener testified that he reviewed "a fairly robust rules repository from the defendants, and I reviewed their rules" which included "the rules for all of the [ ] applications that ran Blaze Advisor or where Blaze Advisor was a component" other than EZER. (*Id.* at 1356:15-1358:20.)

35

     d.     Defendants proposed finding No. 30(d) mischaracterizes Mr. Whitener's testimony. Mr. Whitener was asked questions regarding prior testimony from Defendants regarding the number of applications and their alleged rate of adoption. Mr. Whitener responded that a one percent rate of adoption is low. (*Id.* at 1597:14-1598:5.) He did not agree that one percent was the rate of adoption or that Defendants' actual rate of adoption was low. (*Id.*) Further, as described in response to Proposed FOF Nos. 42-43, Defendants' proposed finding does not speak to the relative significance of Blaze Advisor in Defendants' systems. (*See infra* Resp. to Proposed FOF Nos. 42-43.)

     31.     Whitener also conceded that human judgment drives a substantial portion of Defendants' business, and that Blaze has no effect on that judgment. *Id.* at 1544-50.

     <u>FICO Response:</u> FICO objects to this proposed finding of fact because it implies an incorrect legal standard and is inaccurate and incomplete. Defendants, not FICO, bear the burden of establishing "the elements of profits attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Under 17 U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971 F.3d at 635. The proposed finding of fact is irrelevant under the proper legal test.

     Moreover, Blaze Advisor provides a solution for the inherent inconsistencies and subjectivities associated with human judgment and decision-making. (*See, e.g.*, Trial Tr. at 92:21-94:20.) As Mr. Whitener testified, "[c]omputers do something the same way every time, and humans don't; therefore, error processes go down." (*Id.* at 1448:6-20, 1531:3-20 ("I know a computer system with a set of facts is going to make the same decision with those facts every time"); *see also id.* at 1484:4-21.)

36

Defendants' own documents and testimony from Mr. Mirolyuz confirm that Blaze

Advisor "[e]levates all decision making to the level of the organization['s] top expert"

and each decision is consistently made at that high level of expertise (P-0195 at P-0195-

005; Trial Tr. at 1405:3-18.) In ensuring the highest level of decision-making, Blaze

Advisor is improving the accuracy and consistency of Defendants' decision-making,

which contributes to revenue. (*See infra* Resp. to Proposed FOF No. 39 (Defendants

proposing that "[w]ithout good rules . . . an insurance company cannot make money");

*supra* Resp. to Proposed FOF Nos. 2, 6.)

32.     Ultimately, Mr. Whitener conceded that he did not know whether the
integration of Blaze into Defendants' applications contributed to a *single dollar* of
Defendants' revenue. *Id.* at 1599 (Q: "But you do not know whether Blaze actually
contributed to any increase in revenue or profit at Chubb, correct?" A: "[C]orrect."").
Indeed, Whitener made clear that he "*measured none of these things*." *Id.* at 1558
(emphasis added); *see also id.* at 1565 ("I did not measure anything."); *id.* at 1599 ("I did
not measure anything.").

FICO Response: FICO objects to this proposed finding of fact because it implies

an incorrect legal standard and mischaracterizes Mr. Whitener's testimony. Under 17

U.S.C. § 504(b), FICO's burden was to present evidence establishing "some connection

or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at

799; *ECIMOS, LLC*, 971 F.3d at 635. The proposed finding of fact is irrelevant under the

proper legal test.

This proposed finding of fact also mischaracterizes Mr. Whitener's testimony. As

the cited quotations show, Mr. Whitener did not concede that "he did not know whether

the integration of Blaze into Defendants' applications contributed to a *single dollar* of

Defendants' revenue." Rather, as the quoted testimony shows, Mr. Whitener was asked

about whether Blaze ***increased or improved*** revenue. While Mr. Whitener acknowledged

he did not ***quantify or measure*** the extent to which Blaze Advisor contributed to revenue

or increased revenue, he also testified that "Blaze Advisor added significant value" to

Defendants' process of selling insurance which facilitated the generation of a greater

volume of business. (Trial Tr. at 1487:17-1488:16, 1529:13-1532:20.)

33.    Whitener was the only witness who FICO even suggested could establish a
causal connection between Defendants' use of Blaze and their revenue, yet Whitener
conceded that he could not establish any such connection—and was not qualified to opine
on the issue in the first place. FICO failed as a factual matter to establish any causal
connection between Defendants' use of Blaze and Defendants' revenue.

FICO Response: Defendants' proposed finding is factually incorrect and is

premised on the application of an incorrect legal standard in that it implicitly adopts a

"but for" causation standard. Mr. Whitener was one of numerous witnesses who helped

establish a connection or relationship between Defendants' use of Blaze Advisor and

Defendants' revenue, and he was qualified to do so. (*See supra* Resp. to Proposed FOF

Nos. 1-7, 24.) For example, among other witnesses, Mr. Mirolyuz testified that numerous

benefits had, in fact, been realized by Defendants' implementation of Blaze Advisor. (*See*

*supra* Resp. to Proposed FOF No. 6.) Defendants' expert Mr. McCarter testified that

Defendants have achieved IT savings and improved IT efficiency through use of Blaze

Advisor. (Trial Tr. at 2130:22-2134:21.) He also testified that technology "contribute[s] –

it supports the business and the business's goal is to make money" and further agreed that

"all of the resources of an insurance company are focused on trying to sell more policies

and reduce the amount of losses[]" and that technology helps achieve that objective. (*Id.*

at 2124:22-2126:7.) Moreover, Mr. McCarter agreed that automatically renewing policies for a large number of customers will increase the rate of renewals. (*Id.* at 2145:4-10.)

Defendants' proposed finding also ignores their own documents, which established a connection or relationship between Defendants' use of Blaze Advisor and Defendants' revenue. Defendants' documents proved that Defendants needed Blaze Advisor to enter a new market (i.e., the mid- and small-markets) that Defendants had not been able to penetrate. (J-002.) And it is unrebutted that Defendants did, in fact, enter the mid- and small-markets while using Blaze Advisor. (P-0958 at P-0958-005, P-0958-016.) Defendants identified no evidence of factors that allowed them to penetrate this previously unavailable marketplace besides Blaze Advisor. For example, Duck Creek was already in use prior to issuance of the RFI (J-002 at J-002-006-J-002-007) and, of course, Defendants also had, prior to issuance of the RFI, their underwriters and other personnel, reputation, relationships with agents and brokers, business rules, and each of the pillars Defendants identified as allegedly contributing to revenue.

Finally, Defendants' proposed finding of fact includes the statement "FICO failed as a factual matter to establish any causal connection between Defendants' use of Blaze and Defendants' revenue." This statement is a conclusion of law premised on the application of an incorrect legal standard.

## II. DEFENDANTS SHOWED THAT BLAZE DID NOT CONTRIBUTE TO PROFIT.

34.     It was FICO's initial burden to prove that Defendants' revenue was attributable to their use of Blaze. FICO did not satisfy that initial burden. But even if it had, Defendants showed that Blaze did not contribute to their profit for many reasons.

FICO Response: Defendants' proposed finding is a legal conclusion and is an incorrect recitation of the burdens of proof established by 17 U.S.C. § 504(b). It is FICO's initial burden to establish "some connection or relationship" between Defendants' use of Blaze Advisor and Defendants' revenues. (*See infra* Resp. to Proposed COL Nos. 69-73.) FICO met this burden. Once FICO meets its initial burden, as it did here, the burden shifts to Defendants "to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Defendants failed to do so as further explained below.

**A.    Blaze's usefulness derived from the insurance expertise of Defendants' employees.**

35.    Blaze is not an insurance industry-specific tool and does not itself generate rules. Its value thus depends entirely on the skill and expertise of Defendants' employees. Trial Tr. 2077-78, Dkt. 1186.

FICO Response: FICO objects to this statement of fact as mischaracterizing the record, incorrect, and irrelevant. The value of Blaze Advisor does not "entirely" depend on the skill and expertise of Defendants. The evidence and testimony demonstrated the value of Blaze Advisor comes from many factors, including automating decision-making, use of predictive analytics, organizing and implementing business logic to create efficient, effective, and consistent expert-level decision-making. (*See, e.g.*, Trial Tr. at 276:22-277:7, 285:19-287:22, 290:3-291:13, 1036:4-1037:6 (Mr. Mirolyuz testifying that Profitability Indicator utilized, inter alia, Blaze Advisor's predictive modeling), 1405:3-18, 1428:16-1430:24, 1468:6-1469:3, 1480:9-1482:6, 2293:2-2294:9; P-0195 at P-0195-005.) As Mr. Baseman explained, Blaze Advisor makes faster, more consistent decisions

because it automates decisions that used to be done through a manual review by humans and because it removes subjectivity in interpretation of data. (Trial Tr. at 155:16-156:14; *see also id.* at 129:23-132:8 (explaining that Blaze Advisor allows thousands and millions of records to be processed in less than a second: "Where humans would take a week to do one, now you can do thousands of them in a second").) Mr. Baer echoed similar benefits of Blaze Advisor based on direct customer feedback, including reducing decisioning times, increasing application volume capacity, and reducing processing times. (*Id.* at 290:20-291:13; *see also id.* at 284:4-7.)

The above benefits come directly from the efforts of Blaze Advisor software developers, such as Jean-Luc Marce, who developed a new language and method of representing business logic. (Trial Tr. at 198:16-201:20.)

Moreover, the fact that Blaze Advisor is customizable and can be used across industries is irrelevant to whether its use by Defendants in their business has some connection or relationship to Defendants' revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

36.    As Defendants' expert William McCarter testified, "Blaze is an industry agnostic tool that has no specific insurance capability," meaning that Blaze's usefulness derives only from "the insurance company's rules and logic[.]"  *Id.* This testimony was not rebutted.

FICO Response: FICO objects to this statement of fact as false, incomplete, and irrelevant. (*See supra* Resp. to Proposed FOF No. 35; *infra* Resp. to Proposed FOF No. 37.) Moreover, the fact that Blaze Advisor is customizable and can be used across industries is irrelevant to whether its use by Defendants in their business has some

41

connection or relationship to Defendants' revenues, and whether Defendants met their

burden to prove the elements of profit attributable to other factors.

37.     Blaze did nothing more than run rules developed by Defendants' own
insurance professionals. *See* Trial Tr. 2033-34, Dkt. 1186 (testimony of Chubb's
Assistant Vice President of Operations Ellen Garnes); *see also* Trial Tr. 296, Dkt. 1179
(testimony of Baer that "[t]he efficacy of the software is predominantly controlled by the
user").

FICO Response:  FICO objects to this statement of fact as false, incomplete, and

irrelevant. As explained above in response to FOF No. 35, the value provided by Blaze

Advisor was that it automated Defendants' rules, the result of which was faster and

consistent expert-level decision-making across the organization as well as the ability to

use predictive analytics. (*See supra* Resp. to Proposed FOF No. 35.) Importantly,

Defendants have always had their business rules, but Defendants themselves recognized

that continued manual, decision-making would not allow them to achieve their goal,

namely entering into the mid- and small-markets. (J-002.) Instead, Blaze Advisor was

needed so that Defendants could "handle an increased volume of work (more

transactions, policies, claims, etc.) . . . ." (*Id.* at J-002-005.)

 Further, the testimony of Ms. Garnes was limited to a single application, the

Texas Accident Prevention System project (TAPS). (Trial Tr. at 2036:19-2042:24.) Ms.

Garnes admitted that she did not have any experience with the any of Defendants' other

applications that used Blaze Advisor or the rules run in those applications. (Trial Tr. at

2048:16-2054:7.)

Moreover, the fact that Blaze Advisor is capable of running rules written by

Defendants is irrelevant to whether its use by Defendants in their business has some

connection or relationship to Defendants' revenues, and whether Defendants met their

burden to prove the elements of profit attributable to other factors.

      38.    Even Whitener testified that Blaze had nothing to do with key parts of the
underwriting process, including decisions about which rules to write and how to use
them. *Id.* at 1549-50, Dkt. 1184. He also explained that Blaze had nothing to do with
important aspects of Defendants' business, including building relationships between
brokers and agents, developing insurance products, claim handling, and error-free billing.
*Id.* at 1546-49.

      <u>FICO Response:</u> FICO objects to this statement of fact as unsupported,

incomplete, and irrelevant. In the cited testimony, Mr. Whitener does not testify that

Blaze Advisor had nothing to do with decisions about which rules to write or how to use

them. (Trial Tr. at 1549:3-1550:6.) Instead, the cited testimony supports Mr. Whitener's

agreement that things such as interpersonal relationships, products offered, error-free

billing, handling of claims, and personal human judgment are important aspects of an

insurance company's ability to sell insurance. (*Id.*) This is consistent with Mr. Whitener's

testimony that Blaze Advisor supports and facilitates these factors. For example, Mr.

Whitener testified that Blaze Advisor freed up underwriters' time, allowing them to focus

on relationships. (Trial Tr. at 1487:20-1488:16.) Similarly, Mr. Whitener testified that the

agility that Blaze Advisor afforded Defendants allowed them to successfully acquire a

$25 million book of business. (*Id.* at 1484:22-1485:19, 1519:19-1520:10; 1508:14-

1509:3; 1480:9-1482:6.) Likewise, Blaze Advisor enhanced personal human judgment by

creating consistency amongst underwriters. (Trial Tr. at 1426:24-1428:7, 1484:4-21; *see*

*also supra* Resp. to Proposed FOF No. 24.)

CASE 0:16-cv-01054-DTS   Doc. 1277   Filed 07/24/23   Page 44 of 125

Defendants' proposed finding is also irrelevant because Blaze Advisor need not be involved in every part of the underwriting process to have some connection or relationship to Defendants' revenues. Moreover, Defendants' proposed finding is irrelevant because Defendants have failed to provide any quantification of the extent to which other factors allegedly contribute to revenue as they were required to do.

39.    As Whitener put it, it takes "substantial" human experience to write good business rules. *Id.* at 1554. And "[w]ithout good rules . . . an insurance company cannot make money." *Id.*

FICO Response: FICO objects to this statement of fact as misleading and incomplete. As described above, Blaze Advisor took Defendants' rules and automated and organized Defendants' decision-making process, which resulted in significant business benefits to Defendants, including faster and more consistent decision-making, that enabled Defendants to scale and enter a previously impenetrable market and to generate revenues in other ways. (*See supra* Resp. to Proposed FOF Nos. 24, 35, 37.) Defendants' proposed finding also admits that Defendants' rules make Defendants money. And, by Defendants' own admission, Blaze Advisor (at least) runs those rules. (*See supra* Resp. to Proposed FOF No. 37; *see also, e.g.*, Trial Tr. at 172:4-13 (Mr. Baseman testifying that Blaze Advisor is making the decisions).) This necessarily means that Defendants' use of Blaze Advisor is connected or related to Defendants' revenues— it runs the rules that Defendants admit make them money. The testimony also showed that Blaze Advisor enabled Defendants to ensure the rules being run are expert-level rules. (Trial Tr. at 1482:24-1483:15.)

44

Moreover, Defendants' proposed finding is irrelevant because Defendants have failed to provide any quantification of the extent to which other factors allegedly contribute to revenue as they were required to do.

40.   To that end, Whitener admitted that the value of technological speed—one of Blaze's principal theoretical contributions—depends entirely upon the quality of the human judgment and decision-making being sped up. *Id.*

FICO Response: Defendants' proposed finding is misleading and incomplete. Mr. Whitener did not say the value of speed depends entirely upon human judgment. Human judgment is just one part of the value of speed imparted by Blaze Advisor. Blaze Advisor improves the consistency of decisions by reducing inherent inconsistencies and subjectivities associated with human decision-making. (*See, e.g.*, Trial Tr. at 1404:13-1406:6; *see also* 92:21-94:20.) Defendants' own documents and testimony from Mr. Mirolyuz confirm that Blaze Advisor "[e]levates all decision making to the level of the organization['s] top expert" and each decision is consistently made at that high level of expertise. (P-0195 at P-0195-005; Trial Tr. at 1405:3-18.) In ensuring the highest level of decision-making, Blaze Advisor is improving Defendants' decision-making, which Defendants assert makes them money. (*See supra* Resp. to Proposed FOF Nos. 37, 39.) Second, the increased speed is itself a benefit that Blaze Advisor provides over manual decision-making processes. (*See supra* Resp. to Proposed FOF No. 24.)

41.   In sum, as McCarter explained, Blaze merely implements the "human judgment" of Chubb's underwriters, actuaries, compliance managers, and claims managers. Trial Tr. 2079, Dkt. 1186.

FICO Response: *See supra* Resp. to Proposed FOF Nos. 35, 37, 39-40. In addition, Defendants' proposed finding is incomplete in that it ignores the value provided in

45

implementing the human judgment of Chubb's underwriters, actuaries, compliance

managers, and claims managers. Blaze Advisor automates and organizes Defendants'

business logic, which results in more consistent decisions made at the highest level of

expertise, results in faster processing allowing an organization to scale beyond the

limitations of humans to address a larger volume of potential customers, and frees up

employees' time to focus on other, more high value tasks. (*See, e.g.*, Trial Tr. at 92:21-

94:20, 276:22-277:7, 285:19-287:22, 290:20-291:13, 1036:4-1037:6, 1428:16-1430:24,

1468:6-1469:3, 1480:9-1482:6, 2158:13-22, 2293:2-2294:9, 2320:24-2321:6; *see also*

*supra* Resp. to Proposed FOF No. 40.)

## B. Blaze was integrated into a tiny fraction of Defendants' technical infrastructure.

42.    Defendants have a massive infrastructure of software programs and
technology solutions to profitably operate their business—the evidence showed that
Defendants run around 1500 applications, *see* Trial Tr. 687-88, Dkt. 1180; Trial Tr. 1597,
Dkt. 1184; Trial Tr. 2082–83, Dkt. 1196, and even FICO admits there were at least 800,
*see id.* at 2161-63.

FICO Response: FICO objects to this proposed finding as inaccurate, unsupported

by documentary evidence, and irrelevant. None of the cited testimony supports that

Defendants' alleged 1500 programs are solutions that allow Defendants to operate

profitably or affect profitability.[6] FICO did not admit that Defendants' infrastructure

consisted of at least 800 software programs. Rather, the testimony showed that

Defendants' own documents identified approximately 800 applications but that, once

---

[6] However, to the extent each does impact profitability, then this is an admission by
Defendants that Blaze Advisor, one of those alleged 1500 applications, also affects
profitability.

duplicates were removed, there were only 385 unique values. (Trial Tr. at 2161:20-2162:21; P-0576.) Defendants' proposed finding ignores that not all applications have the same level of importance to a company's operations. FICO presented evidence proving Blaze Advisor was central to Defendants' operations and could not be removed without being replaced by another business management system, which took Defendants four years to decide to do and over nine months to implement after having made the decision. (Trial Tr. at 162:24-163:7, 1050:18-1051:17, 1167:24-1168:19.) As Mr. Baseman explained, in a large ecosystem with multiple components, "Blaze Advisor is the central point upon which the next action is decided off of all those components. So Blaze Advisor would be the system that tells all the other systems what to do based off of its decision." (Trial Tr. at 137:3-139:4.)

Moreover, the alleged size of Defendants' infrastructure is irrelevant to whether its use by Defendants in their business has some connection or relationship to Defendants' revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

43.     Even though all of Chubb's software applications use business rules, Trial Tr. 704, Dkt. 1180 (testimony of Pandey), the rate of adoption of Blaze was extremely low—less than one percent, Trial Tr. 1161, Dkt. 1182 (testimony of Chubb Chief Enterprise Architect Claudio Ghislanzoni).

FICO Response: FICO objects to this proposed finding as inaccurate, unsupported by documentary evidence, and irrelevant. FICO's objections are outlined in response to proposed FOF No. 42. Further, Mr. Pandey testified regarding Chubb's software applications prior to the acquisition. Mr. Ghislanzoni testified regarding the combined

ACE/Chubb entity. Mr. Ghislanzoni testified about "rate of adoption" after the merger—

Blaze Advisor was already fully integrated into Chubb's system before March of 2016.

Mr. Ghislanzoni offered no exhibits to support his testimony; his credibility is

questionable.

The proposed finding of fact is also irrelevant because it does not address the

relative significance of Blaze Advisor to Defendants' business operations, revenues, or

profits, or the significance of the benefits Blaze Advisor offers. It remains unrebutted that

Defendants utilized Blaze Advisor for approximately ten years prior to termination and

for over four years following termination, and it took nine months for Defendants to

transition away from use of Blaze Advisor once they decided how to do so. (J-001; J-002;

Trial Tr. at 84:5-15, 87:23-89:6,1050:18-1051:17, 1155:19-1156:16, 1167:24-1168:19)

44.     As McCarter explained, Blaze's adoption into Chubb's vast technology
infrastructure was so "low" that the program was "not a significant tool in terms of the
number of components being used."  Trial Tr. 2084-87, Dkt. 1186. This testimony was
not rebutted.

FICO Response:  FICO objects to this proposed finding as inaccurate, unsupported

by documentary evidence and irrelevant. The significance of Blaze Advisor in terms of

the overall technology structure of Chubb is rebutted. (*See supra* Resp. to Proposed FOF

Nos. 42-43.) This proposed finding of fact is irrelevant because it only addresses the

significance "in terms of the number of components being used." It does not address

whether Blaze Advisor was integral to Defendants' systems (despite, perhaps being one

of many components used by Defendants). Nor does the proposed finding address the

significance of the benefits Blaze Advisor offers or the significance of Blaze Advisor to

Defendants' ability to sell insurance. The evidence showed that Blaze Advisor was

central to Defendants' systems (*see supra* Resp. to Proposed FOF Nos. 2, 4-6) and played

an important and necessary role in Defendants' insurance sales process (*see supra* Resp.

to Proposed FOF Nos. 24, 28).

### C. Blaze was interchangeable with other business rules management programs or with hard-coded rules.

45.     Blaze could have been—and was—replaced with any number of other, interchangeable business rules management software programs. Defendants could—and frequently did—run manually programed business rules without dedicated business rules management software at all.

FICO Response: FICO objects to this proposed finding of fact because it is

unsupported, incomplete, and irrelevant. Defendants were unable or unwilling to replace

Blaze Advisor for over four years. (P-0090; Trial Tr. at 84:5-15, 87:23-89:6.)

Defendants' own documents, prepared prior to the litigation, described Blaze Advisor as

"functionally rich," as the "technology of choice for business rules," and as the "preferred

choice for rules engine." (P-0510; P-0511 at P-0511-007, P-0511-008.) Defendants' own

documents also compared vendor-based software options, including Blaze Advisor, to

open-source options, such as Drools. (P-0527.) That comparison showed the advantages

provided by vendor-based options over open-source options, including that vendor-based

options allow for more frequent rule changes and have superior rule reversal, rule

execution, and speed of execution with less IT involvement. (*Id.*) These unrebutted facts

confirm that other software applications were not equivalent replacements to Blaze

Advisor.

Defendants' proposed finding is irrelevant to whether Blaze Advisor had a connection or relationship to Defendants' revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors. Defendants replaced Blaze Advisor with another software system; Defendants did not go back to manual underwriting. (Trial Tr. at 1050:18-1051:17.) Mr. Ghislanzoni testified he never even considered relying upon manual look-up processes instead of rules engines. (Trial Tr. at 1123:20-1124:21.) The fact that Defendants replaced Blaze Advisor with another rules engine confirms the necessity of rules engines software for the efficient and effective operation of Defendants' business.

46.     McCarter testified that Blaze was interchangeable with "upward of 15" other business rules management software programs—or simply hard-coded rules. *Id.* at 2092-94.

FICO Response: FICO objects to this proposed finding of fact as lacking corroboration, contradicted by the testimony of Defendants' other witness and irrelevant. Mr. McCarter identified no documents to support this statement, and Mr. Ghislanzoni contradicted it. Mr. Ghislanzoni testified that tens of thousands of rules were running through Blaze Advisor, making hard coding impossible. (Trial Tr. at 1146:1-10.) This proposed finding is also irrelevant to whether Blaze Advisor had a connection or relationship to Defendants' revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

47.     To that end, Pandey explained that there is no "functional difference" between Blaze and Drools, a competitor program, and that in "99 percent of the cases" Defendants' software developers "code the rule by themselves"—*i.e.*, do not use any third-party rules management software at all. Trial Tr. 688-89, Dkt. 1180. Ellen Garnes

similarly confirmed that, in her experience, "99 percent of the rules that Chubb uses are in professionally developed code, not in rules engines."  Trial Tr. 2093, Dkt. 1186.

FICO Response: FICO objects to this proposed finding of fact as incomplete and irrelevant. The stated proposition and testimony do not address the relative importance of, value derived from, or role played by those rules hardcoded by Defendants as compared to the rules that are processed through Blaze Advisor. Without such information, Defendants' cited testimony and proposed finding cannot meet Defendants' apportionment burden.

Defendants' proposed finding of fact also ignores testimony that Blaze Advisor acted as the brain of applications in which it was used and that it was central and pivotal to Defendants' systems and integral to Defendants' decisioning process. (Trial Tr. at 136:22-139:3, 162:24-163:7, 172:4-13, 181:19-182:7, 191:18-192:2.) And any suggestion by Defendants that Blaze Advisor was unimportant or unnecessary to their systems is also undermined by their own actions and documents. Defendants were unable or unwilling to replace Blaze Advisor for over four years. (P-0090; Trial Tr. at 84:5-15, 87:23-89:6.) Defendants' own documents, prepared prior to the litigation, described Blaze Advisor as "functionally rich," as the "technology of choice for business rules," and as the "preferred choice for rules engine." (P-0510; P-0511 at P-0511-007, P-0511-008.) Defendants' own documents also compared vendor-based software options, including Blaze Advisor, to open-source options, such as Drools. (P-0527.) That comparison showed the advantages provided by vendor-based options over open-source options, including that vendor-based options allow for more frequent rule changes and

have superior rule reversal, rule execution, and speed of execution with less IT involvement. (*Id.*)

Further, Defendants' proposed finding is misleading. The cited testimony is directed to all of Defendants' systems, not just the applications that use Blaze Advisor. As a result, the cited testimony does not support that 99% of the rules in applications using Blaze Advisor are hard coded. Evidence directed to the entirety of Defendants' system does not speak to the relative value that Blaze Advisor provided to the applications that use it and to the differentiated revenue stream that FICO identified.

Finally, Defendants chose to use Blaze Advisor for years for rules management rather than hard code those rules themselves. (Trial Tr. at 84:5-15, 87:23-89:6; *see also* Trial Tr. at 1066:16-23.)

48.    Ghislanzoni likewise made clear that replacing Blaze with Drools caused no problems and occasioned no complaints. Trial Tr. 1156-57, Dkt. 1182.

<u>FICO Response:</u> FICO objects to this proposed finding of fact as unsupported and irrelevant. Defendants' proposed finding ignores the fact that it took Defendants nearly five years to replace Blaze Advisor. Further, the technical work allegedly took over nine months to ensure a smooth transition without any disruption to business. (Trial Tr. at 1050:18-1051:17, 1167:24-1168:19.) If Blaze Advisor did not contribute to profit, as Defendants contend, it would have been easy to shut off and replace, and such replacement could have been done immediately without any problems. Instead, Blaze Advisor was so integral to Defendants' business that it took Defendants more than four years to determine how to migrate away from it and nine months to complete the

migration. That Defendants were allegedly able to transition away from Blaze Advisor without problems or complaints would, of course, not be surprising considering they purposefully took nine months to ensure a smooth and orderly transition without any disruption to business. This proposed finding is also irrelevant to whether Blaze Advisor had a connection or relationship to Defendants' revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

49.   Likewise, Mirolyuz testified that "Blaze Advisor can be replaced[.]" *Id.* at 1011.

FICO Response: FICO objects to this proposed finding of fact as incomplete, mischaracterizing Mr. Mirolyuz's testimony and irrelevant. The statement is incomplete for the reasons set forth in response to proposed FOF Nos. 45-48. (*See supra* Resp. to Proposed FOF Nos. 45-48.) Further, Mr. Mirolyuz acknowledged that Blaze Advisor would need to be replaced with another piece of software that performs the same functions as Blaze Advisor and that each technology in an application is needed in order for that application to perform its intended function. (Trial Tr. at 1010:24-1011:15.) This proposed finding is also irrelevant to whether Blaze Advisor had a connection or relationship to Defendants' revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

50.   Indeed, FICO's own witnesses made clear that Blaze was interchangeable with other options. Former FICO sales executive Lawrence Wachs testified that other business rules management software was "comparable in its functionality[.]" Trial Tr. 741-42, Dkt. 1181.

FICO Response:  FICO objects to this proposed finding of fact because it is inaccurate, incomplete, misleading and irrelevant. Mr. Wachs' full testimony makes clear

that he is discussing software that FICO actually acquired from his prior employer, Rules

Power. (Trial Tr. at 740:10-21, 741:21-742:3.) Mr. Waid later confirmed that FICO

purchased Rules Power. (*Id.* at 1617:2-1618:14.) This proposed finding is also irrelevant

to whether Blaze Advisor had a connection or relationship to Defendants' revenues, and

whether Defendants met their burden to prove the elements of profit attributable to other

factors.

51.     Even Whitener testified that a number of alternative business rules
management software programs to Blaze exist, although he did not analyze how they
compare to Blaze. Trial Tr. 1595-96, Dkt. 1184.

FICO Response: FICO incorporates its response to Proposed FOF 45. (*See supra*

Resp. to Proposed FOF No. 45.) FICO also objects to this proposed finding of fact as

irrelevant to whether Blaze Advisor had a connection or relationship to Defendants'

revenues, and whether Defendants met their burden to prove the elements of profit

attributable to other factors.

**D.     Blaze attracted no customers and drove no sales.**

52.     As McCarter explained, customers simply did not know or care that
Defendants used Blaze, meaning Blaze did not drive business. Trial Tr. 2095-96, Dkt.
1186. There is no reason to believe customers would know or care about which of several
interchangeable back-office software components their insurer uses.

FICO Response: FICO objects to this proposed finding of fact as irrelevant to

whether Blaze Advisor had a connection or relationship to Defendants' revenues, and

whether Defendants met their burden to prove the elements of profit attributable to other

factors. The relevant question is not whether customers know that Blaze Advisor was

utilized in Defendants' operations, but, rather, whether Defendants' infringing use of

Blaze Advisor had some connection or relationship with their revenues, and whether

Defendants met their burden to prove the elements of profit attributable to other factors.

### E.    Abandoning Blaze had no impact on Defendants' revenue.

53.    Moving away from Blaze had no impact on Defendants' revenue. Kevin Harkin, Chubb's North American CFO testified that he did not "have to incorporate the removal of Blaze from Chubb's systems into the company's revenue projections . . . or deal with it in any other way[.]"  Trial Tr. 1861, Dkt. 1185.

<u>FICO Response:</u> FICO objects to this proposed finding of fact as incomplete and

misleading. Defendants' proposition fails to recognize that it took Defendants nearly five

years to replace Blaze Advisor. Further, the technical work allegedly took over nine

months to ensure a smooth transition without any disruption to business. (Trial Tr. at

1050:18-1051:17, 1167:24-1168:19.) That Defendants were allegedly able to transition

away from Blaze Advisor without an impact on revenue is of no moment when they

purposefully took nine months in order to ensure a smooth transition without any

disruption to business. (*Id.*) There is no evidence to support that Defendants' revenue

would have been unimpacted if Defendants had immediately removed Blaze Advisor as

they were obligated to do, rather than waiting four years to decide to do so and another

nine months to do the technical work to transition away from Blaze Advisor.

Furthermore, any revenue comparisons before and after the use of Blaze Advisor are

misleading because when Defendants ceased the use of Blaze Advisor, they did not go

back to the way they were doing things before implementation of Blaze Advisor, i.e.,

manually. Instead, Defendants merely switched to a different rules engine technology.

(*Id.* at 1050:18-1051:17, 1164:14-21.)

This proposed finding of fact is also irrelevant because Mr. Harkin provided no explanation of how revenue projections are performed or what kind of information is considered in making such projections.

Separately, Mr. Harkin identified "aspects that drive revenue and profit for an insurance company" (Trial Tr. at 1863:14-19), yet when asked what percent each aspect plays in driving revenue for the company, Mr. Harkin stated, "I don't know of an exact percentage." (Trial Tr. at 1872:9-1873:6.) And notably, Mr. Harkin had nominal knowledge of the technology used by Defendants, admitting that he had not heard of Blaze prior to the litigation (Trial Tr. at 1851:20-22) and did not know when Blaze Advisor was installed in the at-issue applications (Trial Tr. at 1878:7-15).

Finally, the proposed finding—"Moving away from Blaze had no impact on Defendants' revenue"—is not supported by the cited testimony of Mr. Harkin which speaks to revenue projections, not actual revenue.

54.     And Chris Bakewell, Defendants' expert, explained that "the revenues didn't change" when Defendants removed Blaze from their systems. Trial Tr. 2181, Dkt. 1186.

FICO Response: FICO objects to this proposed finding of fact as incomplete and irrelevant. (*See supra* Resp. to Proposed FOF No. 53.) In addition, FICO is not required to establish "but-for" causation, and Mr. Bakewell testified that many factors allegedly affected Defendants' revenue. (Trial Tr. at 2182:8-19 (explaining the factors that contribute to Defendants' revenue include "their brand and their business strategy, their ability to, and reputation for paying claims, their work force."); 2207:7-18 ("Well, there's a lot of things that can cause revenue to change in any one year.").) Given these many factors, there is no

56

basis to conclude that removal of Blaze Advisor did not impact revenue when Mr. Bakewell could not pinpoint exactly what impacted Defendants' overall revenue year after year. (*Id.* at 2207:19-2210:19.)

   **F.    Abandoning Blaze had no impact on Defendants' technical operations.**

   55.    Moving away from Blaze likewise had no effect on the efficiency or effectiveness of Defendants' operations.

   FICO Response: FICO objects to this proposed finding of fact because it is unsubstantiated with evidence and inconsistent with the record. It took Defendants over four years to decide to replace Blaze Advisor, and over nine months to complete the migration without disruption to business. (Trial Tr. at 1050:18-1051:17, 1167:24-1168:19.) If Blaze Advisor had no effect on the efficiency or effectiveness of Defendants' operations, as Defendants contend, they ought to have been able to immediately shut off and replace Blaze Advisor.

   56.    Defendants' replacement of Blaze caused, according to Pandey, no "problems with the efficient functioning of [Defendants'] IT systems."  Trial Tr. 706, Dkt. 1180.

   FICO Response: FICO objects to this proposed finding of fact because it is incomplete and irrelevant. It took Defendants over four years to decide to replace Blaze Advisor, and over nine months to complete the migration without disruption to business. (Trial Tr. at 1050:18-1051:17, 1167:24-1168:19.) That Defendants allegedly encountered no problems with their systems would, of course, not be surprising considering they purposefully took nine months to replace Blaze Advisor to ensure a smooth and orderly transition without any business disruptions.

Additionally, Mr. Pandey's knowledge of the applications in Defendants' systems and their use in selling insurance was limited. Despite testifying that there were "1500 plus" software applications which included "1000 plus" software products, Mr. Pandey admitted he could not state the business function of the 1500 applications and that not all of them are connected to revenue generation. (Trial Tr. at 687:20-688:1, 708:23-709:10.) Mr. Pandey also admitted that his perspective on the process of selling insurance was limited to the technology side, not the underwriting side. (*Id.* at 708:9-22.)

Furthermore, Mr. Pandey was an unreliable witness with no corroboration. For example, Mr. Pandey contradicted his sworn deposition testimony on multiple occasions (*see, e.g.*, *id.* at 629:7-631:13, 634:10-635:5, 670:20-673:17) and testified that he had never heard of Chubb & Son before the litigation (*id.* at 686:1-6) despite being an Officer of Chubb & Son (P-0956 at P-0956-013).

57.     Ghislanzoni made clear that since the removal of Blaze from Defendants' systems, he has received no "complaints or concerns about speed or efficiency" or "complaints or concerns about technology problems generally in those computer applications" that had previously used Blaze. Trial Tr. 1156-57, Dkt. 1182.

FICO Response: FICO objects to this proposed finding of fact as incomplete and irrelevant. This proposed finding ignores Mr. Ghislanzoni's testimony that "the easiest path, the most logical, was to replace one rule engine with another." (Trial Tr. at 1123:20-1124:7.) This replacement took Defendants more than nine months. (*Id.* at 1050:10-1051:17, 1167:24-1168:19.) Mr. Ghislanzoni testified that Defendants did not consider relying on a manual look-up process because their "target in the options and evaluation was to standardize technology, not eliminate technology." (*Id.* at 1124:8-19.)

Moreover, whether there were complaints or concerns about the technology with which Defendants replaced Blaze is irrelevant to whether there is a connection or relationship between Defendants' use of Blaze Advisor and their revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors. As Mr. Ghislanzoni noted, the "most logical" solution was to replace Blaze Advisor with other rules management technology, not eliminate it altogether. (*Id.* at 1123:20-1124:19.)

Furthermore, Mr. Ghislanzoni's testimony was contradictory. Mr. Ghislanzoni maintained that he did not become aware that FICO had terminated the Blaze Advisor license agreement until he was preparing for trial (*Id.* at 1048:4-10) and stated that he had no conversations with anyone at Chubb Limited about their experience using Blaze Advisor in connection with selling specialty insurance from 2006 to 2016 (*Id.* at 1162:1-15). Yet, Mr. Ghislanzoni testified that "[t]he initial thinking, beginning 2016, was that we would have adopted FICO Blaze Advisor" but the dispute with FICO "played a very important" role in Chubb's decision to ultimately select IBM ODM. (*Id.* at 1146:18-1149:14.)

58.     Garnes likewise testified that she noticed no change in "the process of developing rules" after the removal of Blaze. Trial Tr. 2043, Dkt. 1186.

FICO Response: FICO objects to this proposed finding of fact as irrelevant and incomplete. Ms. Garnes' testimony speaks only to rules development, which would not necessarily change with the replacement of Blaze Advisor; it does not speak to the execution of those rules or other Blaze Advisor functionality. (Trial Tr. at 2043:12-17; 2036:2-18 (testifying that the process of developing rules has been consistent across her

59

20 years with Chubb).) Ms. Garnes' testimony is also only relevant to TAPS as she had

no experience with rules in any application other than TAPS. (*Id.* at 2048:16-2054:7.)

Moreover, whether the process of developing rules changed after Defendants

replaced Blaze is irrelevant to whether there is a connection or relationship between

Defendants' use of Blaze Advisor and their revenues, and whether Defendants met their

burden to prove the elements of profit attributable to other factors.

59.    Indeed, as Alissa Theberge, a Chubb underwriter, explained, the removal of
Blaze had no impact on the underwriting process. Trial Tr. 2308, Dkt. 1187.

FICO Response: FICO objects to this proposed finding of fact as irrelevant and

incomplete. Ms. Theberge only testified in relation to the specialty lines of business and

the Automated Renewal Processing, Decision Point, CSI Express, Profitability Indicator,

and CUW-IM applications. (Trial Tr. at 2305:15-2313:10.)  She had not held any position

in the commercial lines or personal lines of the business and did not testify about

Premium Booking, TAPS, Cornerstone, or IRMA. (*Id.* at 2317:14-21.) Ms. Theberge

testified that she was not knowledgeable regarding the technologies used within the

applications she had discussed. (*Id.* at 2317:22-25.)

Moreover, whether the replacement of Blaze affected the underwriting process is

irrelevant to whether there is a connection or relationship between Defendants' use of

Blaze Advisor and their revenues, and whether Defendants met their burden to prove the

elements of profit attributable to other factors.

**G.    Many of Blaze's asserted business benefits did not materialize.**

60.    Defendants were unable to realize several of Blaze's touted business
benefits.

FICO Response: FICO objects to this proposed finding of fact as unsubstantiated with any evidence or testimony. This proposed finding is directly contradicted by the testimony of Federal's corporate representative and senior architect Mr. Mirolyuz and Defendants' own documents. Mr. Mirolyuz and Defendants' own documents identify numerous benefits of Blaze Advisor and establish that those benefits were realized. (*See supra* Resp. to Proposed FOF No. 6.) Further, Mr. McCarter testified that Blaze Advisor improved IT efficiency and resulted in IT savings. (Trial Tr. at 2130:22-2134:21.)

Moreover, the key result that Defendants wanted to initially achieve from use of Blaze Advisor was to enter into the mid- and small-markets, which Defendants had previously been unable to penetrate. Defendants' 2006 RFI explained: "Chubb Specialty Insurance gets the majority of its revenue, typically achieved via premiums, from a relatively small number of very large accounts. They have approximately 1000 employees in this line of business driving $3.5B in revenue. ***The key strategic initiative in this area is expanding and growing the business into middle-market and smaller accounts***." (J-002 at J-002-005 (emphasis added).) Federal's underwriters, reputation, marketing and advertising, sales force, relationships with agents and brokers, business rules, and each of the pillars Defendants identified as allegedly contributing to revenue all existed in 2006. The DuckCreek rating engine was also already in use by Federal at that time. (*Id.* at J-002-006-J-002-007 ("The rating application uses the DuckCreek rating engine . . . .").) Yet, Defendants had not been able to enter into the mid- and small-markets and needed Blaze Advisor to do so: "There is an initiative to move work to service centers so

61

CSR's/Underwriters can focus more time on marketing and selling to these agents and agencies. Movement to mid-market and smaller accounts has proven to be difficult, as this requires the team and systems to handle an increased volume of work (more transactions, policies, claims, etc.) in an environment where Chubb's current 'Expense Management Strategy' does not allow for increased staffing." (*Id.* at J-005.) Defendants understood that by automating human decisioning with Blaze Advisor, they could process the higher volume of transactions required to succeed in the mid- and small-markets, without increasing staff, and could also free up underwriters to focus on higher value selling opportunities. (J-002 at J-002-007; *see also* Trial Tr. at 318:4-320:10 (explaining that Federal wanted to be able to move to a bigger market with more prospective customers).)

Defendants' expert Mr. McCarter agreed that Blaze Advisor was a tool to support this "key strategic initiative" to expand and grow into the mid- and small-market for specialty insurance. (Trial Tr. at 2149:16-2151:7.) The benefits provided and realized by Blaze Advisor (as testified to by, e.g., Mr. Mirolyuz) allowed Defendants to achieve this strategic initiative and expand their business into the mid- and small-markets. (P-0958 at P0958-005, P-958-016 (2016 Chubb Corporation Annual Report touting that its middle market and small commercial operation was an $8.6 billion business and represented 26% of their overall net premiums written).) No evidence disputed that Defendants entered into the mid- and small markets, and Defendants presented no evidence that other factors allowed them to enter into this previously unavailable market.

Separately, Federal purchased FICO professional services from the beginning in 2006 until near the time that FICO terminated the license. In the process, FICO helped

62

Federal build its own Center of Excellence so it could best use Blaze Advisor. (Trial Tr. at

574:12-576:12.) In total, Federal purchased more than $3.7 million of FICO professional

services. (*Id.* at 387:6-10.) It belies common sense to believe that Blaze Advisor was not

important to and was not providing significant business benefits and value to Federal when

Federal itself invested in building a Center of Excellence dedicated to Blaze Advisor.

61.     For instance, business users were generally not able to input rules without
help from developers, Trial Tr. 700-01, Dkt. 1180 (testimony of Pandey); Trial Tr. 1144,
Dkt. 1182 (testimony of Ghislanzoni), as FICO had claimed they would be, *see, e.g.*,
Trial Tr. 95-96, Dkt. 1178 (testimony of Baseman that "[t]he business rules management
system provides a framework of which nontechnical users can write and express their
logic in a standard format").

FICO Response: This proposed finding of fact is incomplete and misleading.

Defendants' documents and testimony from their witnesses prove that many benefits

from using Blaze Advisor were realized.  These benefits included: automating the

underwriting process, which reduces the overall underwriting costs and frees up

experienced underwriters from low-value tasks; bringing products to market faster;

moving more of the right business into automated renewal; increasing retention of best

accounts and more readily identifying potentially less profitable accounts; creating

greater efficiency for underwriters; IT efficiency and IT savings; etc. (*See, e.g.*, P-0191 at

P-0191-004, P-0191-012 (authored by Mr. Mirolyuz); P-0192 at P-0192-005 ("The

[more] policies that are automatically renewed the more time the underwriter has to

develop and produce additional business or handle additional business."); Trial Tr. at

1023:4-1024:15, 1028:12-1029:9 (testifying that business benefits identified on slide P-

0192-005 were realized), 2130:22-2134:21.)

Moreover, whether business users needed help from developers is irrelevant to whether there is a connection or relationship between Defendants' use of Blaze Advisor and their revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

62.     Blaze also suffered from latency problems, which limited its usefulness. Trial Tr. 1143, Dkt. 1182 (testimony of Ghislanzoni).

FICO Response:  FICO objects to this proposed finding of fact because it mischaracterizes Mr. Ghislanzoni's testimony. Mr. Ghislanzoni testified that adding rules-based software instead of having engineers write their own code can introduce latency. (Trial Tr. at 1143:3-14.) This does not mean that Blaze Advisor suffered from latency problems. Rather, as Mr. Waid explained, the latency does not stem from Blaze Advisor but, rather, from the architecture being utilized. (*Id.* at 1626:5-1627:1.) Mr. Ghislanzoni did not testify that any alleged latency limited the usefulness of Blaze Advisor. (*Id.* at 1143:1-25.)

Moreover, whether Blaze had latency problems is irrelevant to whether there is a connection or relationship between Defendants' use of Blaze Advisor and their revenues, and whether Defendants met their burden to prove the elements of profit attributable to other factors.

## III.   DEFENDANTS IDENTIFIED THE DRIVERS OF THEIR PROFIT, NONE OF WHICH WERE BLAZE.

63.     Not only did Defendants demonstrate that their profits were not attributable to Blaze, they also explained the many factors that enable a large insurance company to be profitable.

64

FICO Response: FICO objects to this proposed finding of fact as unsupported by evidence or testimony. Defendants' witnesses identified other factors they alleged contributed to Defendants' profits, but only through general and unsubstantiated testimony. Defendants did not put forth evidence to quantify the extent to which Defendants' revenues were allegedly attributable to factors other than Blaze Advisor. For example, Ms. Theberge testified about the importance of reputation, but admitted that she did not have any documents to say what percent of Chubb's revenue and profits are driven by reputation. (Trial Tr. at 2319:19-25.) Similarly, Mr. Harkin testified to several factors that he alleged contributed to profits. However, he too could not quantify the percentage that those factors had in driving revenue. (*Id.* at 1872:9-1873:6.) He could only testify that such factors were important. (*Id.*) Likewise, Defendants' damages expert Mr. Bakewell did not quantify the percentage by which factors, other than infringement, contributed to revenue. (*Id.* at 2216:16-2217:1.) A review of the entire trial transcript shows that none of Defendants' witnesses testified to the extent to which Defendants' revenues were allegedly attributable to factors other than Blaze Advisor.

Separately, while Defendants presented testimony about seven pillars that allegedly contribute to their revenue, Defendants' own expert Mr. McCarter admitted that technology covers each of the pillars. (*Id.* at 2126:13-23.) And Defendants' expert Mr. Bakewell testified that Defendants use technology to compete. (*Id.* at 2217:2-12; *see also id.* at 2290:5-25.)

64.    Defendants' profit is attributable to their reputation in the market, their prompt payment of claims, prudent financial management, strong sales, operations, and careful compliance with regulatory obligations. *See, e.g.*, Trial Tr. 2269-73, Dkt. 1187.

FICO Response: FICO objects to this proposed finding of fact as incomplete and unsubstantiated. Mr. Schraer was unable to quantify the extent to which Defendants' revenue was attributable to reputation in the market, their prompt payment of claims, prudent financial management, strong sales, operations, and careful compliance with regulatory obligations. (Trial Tr. at 2269:10-2273:4.) Mr. Schraer also testified that technology has changed the underwriting process at Chubb. (*Id.* at 2290:23-25.)

65.     For instance, Harkin explained the strength of the Chubb brand and its reputation for "how well they paid claims."  Trial Tr. 1864, Dkt. 1185.

FICO Response: FICO objects to this proposed finding of fact because it is incomplete and unsubstantiated. Mr. Harkin was unable to quantify the extent to which Defendants' revenue is attributable to strength of brand or reputation for paying claims. (Trial Tr. at 1872:9-1873:9.) He was only able to testify that each factor is important, but could not assign a percentage or amount on their contribution to revenue. (*Id.*)

66.     Likewise, Mike Schraer, Chubb's Chief Underwriting Officer for its North American Financial Lines division, emphasized the strength of Chubb's relationships with insurance agents and brokers, Trial Tr. 2260-63, Dkt. 1187, its creation of policies, *id.* at 2267, and its reputation for payment of claims, *id.* at 2270-71, among other things, as the drivers of the company's business.

FICO Response: FICO objects to this proposed finding of fact as incomplete and unsubstantiated. Mr. Schraer did not quantify the extent to which Defendants' revenue is allegedly attributable to the strength of Chubb's relationships with insurance agents and brokers, its creation of policies, and its reputation for payment of claims. (Trial Tr. at 2270:5-2273:4.) Second, Mr. Schraer's testimony at 2267 did not state that creation of policies drives the company's business or revenue. Rather, his testimony merely

66

explained that Defendants' policies are allegedly constantly evolving, and that

Defendants allegedly spend a lot of time adapting their products. (*Id.* at 2266:25-2268:4.)

This does not support the statement in this proposed finding that the creation of policies

drives business or revenue.

* * *

67.     The advisory jury found that FICO did not carry its burden of showing a nexus between Defendants' use of Blaze and their revenue.

FICO Response: FICO objects to this proposed finding of fact as misleading and

irrelevant. The advisory jury found that FICO did not "prove that [Defendants'] infringing

use contributed to the **revenues** of the infringer[.]" (Dkt. 1173 at 3 (emphasis in the

original).) Further, the Court must make its determination based on the evidence presented

at trial and the law, not the jury's advisory opinion.

## CONCLUSIONS OF LAW

## I.      FICO'S BURDEN WAS TO IDENTIFY REVENUE "ATTRIBUTABLE" TO THE USE OF BLAZE.

68.     Under the Copyright Act, "[a] copyright owner is entitled to recover . . . any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages." 17 U.S.C. § 504(b).

FICO Response: None.

69.     Under Section 504(b), the copyright owner's initial burden is to prove "the infringer's gross revenue" resulting from the infringement. *Id.* In meeting this burden, the copyright owner must "demonstrate a nexus" between the alleged infringement and the alleged infringer's revenue. *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796 (8th Cir. 2003). To do so, it must prove that infringement "contributed to" (*i.e.*, was "attributable to") that revenue. *Id.* at 797; *Furnituredealer.net, Inc. v. Amazon.com, Inc.*, 2022 WL 891462, at *3 (D. Minn. Mar. 25, 2022).

67

<u>FICO Response:</u> FICO objects to this conclusion of law because Defendants'

recitation of Section 504(b) is incomplete and inaccurate. Section 504(b) states "[i]n

establishing the infringer's profits, the copyright owner is required to present proof only

of the infringer's gross revenue, and the infringer is required to prove his or her

deductible expenses and the elements of profit attributable to factors other than the

copyrighted work." 17 U.S.C. § 504(b).

The copyright owner's burden of proof does not amount to proof of "but for"

causation. "[T]he standard for nexus requires a showing of causation that is less stringent

than 'but-for' causation." *Furnituredealer.net, Inc*, 2022 WL 891462, at *4. Rather, the

copyright owner's burden is only to "establish some connection or relationship between

the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*, 971

F.3d at 635 ("reasonable relationship"). This is not an "onerous evidentiary burden."

*Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. MJG-06-2662, 2011 WL 4596043, at *4

(D. Md. Sep. 30, 2011) (quoting *Phoenix Renovation Corp. v. Rodriguez*, 258 F. Appx.

526, 534-35 (4th Cir. 2007)); *see also Andreas*, 336 F.3d at 797 (8th Cir. 2003)

(recognizing that the infringing commercial likely did not contribute to all of defendant's

profits, but explaining that defendant bore the burden of establishing profit derived from

factors other than the infringement); *Garcia v. Coleman*, No. C-07-2279, 2009 WL

799393, at *4 (N.D. Cal. Mar. 24, 2009) (infringement need not be the "only" or even the

"main reason" for the revenue). (Dkt. 731 at 21, 24, 56.) As the Sixth Circuit in *ECIMOS,*

*LLC v. Carrier Corp.* explained, the "reasonable relationship" is defined as relevance to

the infringing activity. 971 F.3d at 635.

Where the copyright holder has established "some connection or relationship"
between the infringement and the alleged infringer's revenue, the burden of proof then
shifts to the alleged infringer to prove "the elements of profit attributable to factors other
than the copyrighted work." *Andreas* 336 F.3d at 795, 799; *see also* 17 U.S.C. § 504(b);
*Honeywell Int'l Inc. v. ICM Controls Corp.*, No. 11-cv-569 (JNE/TNL), 2017 WL
374907, at *5 (D. Minn. Jan. 26, 2017) (describing the alleged infringer's burden as
being to show sales of product derived from causes other than infringement).

70.     When a copyright owner attempts to disgorge "direct profits"—"those that
are generated by selling an infringing product"—proving that infringement contributed to
revenue can be a simple matter. *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002). But
where, as here, the copyright owner seeks a defendant's "indirect profits," "the profits
'attributable' to the infringement are more difficult to quantify."  *Andreas*, 336 F.3d at
796. Nevertheless, "that difficulty does not change the burden of proof established by the
statute"—a copyright owner must attribute revenue to infringement to the same degree in
an indirect profits case as it would in a direct profits case. *Id.*

FICO Response: FICO objects to this conclusion of law as incomplete and
misleading. FICO agrees there is no heightened burden of proof for proving entitlement
to disgorgement of indirect profits. *Andreas*, 336 F.3d at 796. However, Defendants'
recitation of the law misconstrues the copyright owner's burden by suggesting a higher
burden than showing "some connection or relationship" and by suggesting the copyright
owner must quantify the exact amount of revenue attributable to infringement. This is
wrong. A copyright owner need only show some connection or relationship between the
use of Blaze Advisor and the alleged infringer's revenues. *Andreas*, 336 F.3d at 799;
*ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc. v. Collezione Europa,
USA*, 599 F. Supp. 2d 648, 653 (M.D.N.C. 2009) ("Gross revenue is calculated only as to

the gross revenue for the infringer's line of business or project related to the
infringement, and not the infringer's gross revenue from all of its commercial
endeavors.") (quotation omitted); *Balsley v. LFP, Inc*., 691 F.3d 747, 769-70 (6th Cir.
2012); *Dayva Int'l Inc. v. Award Prods. Corp.*, No. 97-1397, 1998 WL 105945, at *2
(Fed. Cir. Mar. 11, 1998). If any of the revenues connected or related to the infringement
(*i.e.*, differentiated revenues) are "attributable to factors other than the copyrighted
work," the alleged infringer bears the burden of proving the same. 17 U.S.C. § 504(b).
"Any doubts as to the computation of costs or profits is to be resolved in favor of the
plaintiff." *Andreas*, 336 F.3d at 795.

71.     A plaintiff cannot establish the requisite nexus by identifying revenue that
is "only remotely and speculatively attributable to the infringement." *Polar Bear Prods.,
Inc. v. Timex Corp.*, 384 F.3d 700, 711 (9th Cir. 2004).

FICO Response: FICO objects to this conclusion of law as the support cited is
factually inapplicable. To meet its burden, a copyright owner must introduce "more than
mere speculation" that the alleged infringement was connected or related to gross
revenue. *Andreas*, 336 F.3d at 796. However, the Ninth's Circuit's decision in *Polar Bear
Prods., Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) does not support Defendants
position.  The plaintiff in *Polar Bear* produced an extreme-kayaking film for Timex.  *Id*.
at 704. Timex received a one year license to use the film.  *Id*. After expiration of the
license, Timex used the film at a few trade shows and in a promotion affiliated with
Mountain Dew. *Id*. at 712.  The 9th Circuit affirmed a jury award of disgorgement of
profits from sales from the trade show and from sales who ordered Timex watches
through the Mountain Dew promotion.  *Id*. at 712.  But Polar Bear also sought sales of

70

Timex watches to the general public, unconnected with the trade show.  The 9th Circuit reversed an award of profits from sales to the general public after the trade show infringements because proof of excitement from trade show attendees who saw the film did not establish a connection or relationship between the film and Timex purchasers from the general public (who did not see the film).  *Id*. at 713-17.

72.    Consequently, the fact that an infringing product may be important or valuable to the infringer does not mean that the infringing use contributed to its revenue. "[S]imply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role" is insufficient" to satisfy the plaintiff's nexus burden, "particularly where, as part of [the defendant's] information technology infrastructure, it comprises only a portion of what enabled [the defendant] to conduct its business profitably." *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, 2013 WL 1775437, at *4 (S.D.N.Y. Apr. 25, 2013) (internal quotation marks and citation omitted).

FICO Response: FICO objects to this conclusion of law as legally incorrect. In the Eighth Circuit, evidence of some connection or relationship between the infringement and the revenues identified is all that is required for a plaintiff to meet its burden. *Andreas*, 336 F.3d at 799; *Furnituredealer.net, Inc,* 2022 WL 891462 at *4*; see also, ECIMOS, LLC*, 971 F.3d at 635; *Garcia*, 2009 WL 799393, at *4. Such evidence may include the importance and role played by the infringing material. *Andreas*, 336 F.3d at 797; *see also*, *e.g.*, *ECIMOS, LLC*, 971 F.3d at 634-38 (finding a reasonable relationship established where plaintiff put forth evidence of the integral role software played in defendant's quality control operations). Defendants' proposed conclusion takes the specific factual scenario at issue in the out of circuit *Int'l Bus. Machines Corp. ("IBM") v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *4 (S.D.N.Y. Apr. 25, 2013), decision, and seeks to apply, as a general rule, that evidence of the importance,

significance, role, and the like of the infringing work cannot establish a connection or

relationship between the infringement and revenue. Defendants' proposed conclusion is

inconsistent with *Andreas*. 336 F.3d at 797; *see also, e.g.*, *ECIMOS, LLC*, 971 F.3d at

634-38.

73.     Just as in a direct profits case, a party seeking to disgorge indirect profits
can satisfy its burden on nexus only by identifying revenue "causal[ly] connect[ed]" to
infringement. *Andreas*, 336 F.3d at 795.

FICO Response: FICO objects to this conclusion of law as incorrect. As described

above, the copyright owner's burden is only to "establish some connection or relationship

between the infringement and the profits he seeks." *Andreas* 336 F.3d at 797, 799;

*ECIMOS, LLC*, 971 F.3d at 634-38; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at

653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2.

## II.   FICO FAILED TO SATISFY ITS BURDEN OF PROVING THAT ANY OF DEFENDANTS' REVENUE WAS ATTRIBUTABLE TO THE USE OF BLAZE.

### A.   FICO's witnesses did not connect the use of Blaze to Defendants' revenue.

74.     As found above, *supra* ¶¶ 1-6, none of FICO's witnesses were able to
testify that Defendants' use of Blaze, in fact, contributed to Defendants' revenue. The
Court concludes that FICO failed to carry FICO's burden of proving a causal nexus
between Defendants' use of Blaze and their revenue.

FICO Response: FICO objects to this conclusion of law as incorrect, irrelevant,

and misleading. Defendants' conclusion is implicitly premised on an erroneous legal

standard. FICO's burden was only to establish some connection or relationship between

the infringement and the revenues identified. *Andreas*, 336 F.3d at 799; *ECIMOS, LLC*,

971 F.3d at 635. FICO met its burden. *Andreas*, 336 F.3d at 797 (copyright holder not

required to "put a . . . buyer on the stand to testify that she bought the car because of the [infringing] commercial"). It put forth unrebutted evidence of a differentiated revenue stream of approximately $21.2 billion, which was Defendants' revenue connected or related to their infringement. (*See supra* Resp. to Proposed FOF Nos. 1, 7.) By itself, this revenue has "some connection or relationship" to the infringement.

FICO went even further, providing additional evidence of a connection or relationship between Defendants' use of Blaze Advisor and their revenues. For example, the evidence showed that Blaze Advisor provided Defendants with the means to enter a new and previously impenetrable market by automating Defendants' decision-making processes, resulting in faster and more consistent, expert-level decision-making that allowed Defendants to scale. (*See supra*, Resp. to Proposed FOF Nos. 7, 28, 33.) Defendants' witnesses, including Mr. Mirolyuz, testified that Blaze Advisor led to increased speed, agility, and precision and testified that the benefits of Blaze Advisor had been realized by Defendants. (Trial Tr. at 1031:6-1032:7; 1033:1-17; *see also supra* Resp. to Proposed FOF Nos. 1-6.) Mr. Whitener addressed each of Blaze Advisor's seven benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business—and provided specific examples of how these benefits contributed to revenue,. (*Id.* at 1480:9-1482:6, 1484:22-1485:19, 1519:19-1520:10; 1508:14-1509:3; *see supra* Resp. to Proposed FOF Nos. 24, 28.)

**B.      Whitener did not connect the use of Blaze to Defendants' revenue.**

**1.      Whitener was not qualified to testify on whether the use of Blaze contributed to Defendants' revenue.**

75.      FICO offered Whitener as an expert to testify to a causal connection between Defendants' use of Blaze and their revenue. *See, e.g.*, Trial Tr. 2720-21, Dkt. 1189.

FICO Response: FICO objects to this conclusion of law as mischaracterizing Mr. Whitener's testimony. FICO offered Mr. Whitener to provide expert testimony about the insurance industry, the process of selling insurance, the use of technology in selling insurance, and the application of his expertise to the case-specific facts from Defendants regarding Blaze Advisor and the use of it in their applications. (Trial Tr. at 1373:4-12; *see also id.* at 1378:19-24, 1379:12-23.) Mr. Whitener's testimony was relevant to and supportive of establishing a connection or relationship between the infringement and the Defendants' revenues. (*See supra* Resp. to FOF Nos. 12, 24, 28.) Mr. Whitener was not FICO's sole source of testimony or evidence on this topic. (*See, e.g.*, *supra* Resp. to Proposed FOF Nos. 1-6.)

76.      To testify as an expert, a witness must be "qualified . . . by knowledge, skill, experience, training, or education[.]"  Fed. R. Evid. 702; *see also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) ("[T]he proposed witness must be qualified to assist the finder of fact.").

FICO Response: FICO objects to this conclusion of law as an untimely and improper challenge to Mr. Whitener's testimony. FICO agrees with this recitation of Federal Rule of Evidence 702 but, for the reasons described in response to Conclusions of Law Nos. 77-79 below, (1) challenging Mr. Whitener's qualifications at this stage is

improper; and (2) Mr. Whitener was qualified to offer his opinions. (*See infra* Resp. to Proposed COL Nos. 77-79.)

77.    Defendants objected to Whitener's qualifications to offer an opinion that the use of Blaze contributed to Defendants' revenue. Trial Tr. 1373-79, Dkt. 1183. The Court sustains that objection.

FICO Response: FICO objects to this conclusion of law as an untimely and improper challenge to Mr. Whitener's testimony. Defendants' proposed findings of fact and conclusions of law are provided because the Court granted FICO's motion brought under Federal Rule of Civil Procedure 52(b) requesting the Court make additional findings of fact and conclusions of law.[7] Rule 52(b) allows a Court to make such additional findings and conclusions primarily to ensure the appellate court understands the factual issues determined at trial. Rule 52(b) is not a means by which a party may relitigate issues that the Court has already decided. *See Piekarski v. Home Owners Sav. Bank, F.S.B.*, 759 F. Supp. 542, 545 (D. Minn. 1991) ("Rule 52(b) does not provide an avenue for 'relitigating issues upon which the moving party did not prevail at trial.'") (quoting *DeGidio v. Pung*, 125 F.R.D. 503, 505 (D. Minn. 1989)); *Iowa Assur. Corp. v. City of Indianola*, No. 4:07-cv-000581-RAW, 2010 WL 11534586, at *1 (S.D. Iowa Dec.

---

[7] Following trial, the Court orally stated its decision to accept the advisory jury's verdict on disgorgement (Trial Tr. at 2749:22-2750:18) but provided no additional findings or conclusions in connection with its determination. FICO filed an unopposed motion under Federal Rule of Civil Procedure 52(b) requesting the Court make additional findings and conclusions relating to its determination that FICO was not entitled to disgorge the profits of Defendants. (Dkt. 1206.) Defendants responded to that motion asking the Court to make additional findings and conclusions. (Dkt. 1247.) The Court granted FICO's motion and ordered that Defendants prepare proposed findings of fact and conclusions of law to which FICO could respond. (Dkt. 1264.)

8, 2010) (same); *AMS Sensors USA Inc. v. Renesas Electronics America Inc.*, No. 4:08-c00451, 2022 WL 2918892 (E.D. Tex. Jul. 25, 2022) (denying Rule 52(b) motion where movant argued court improperly excluded expert testimony because movant had previously raised the same arguments which were rejected).

Here, Defendants' proposed conclusion attempts to relitigate an issue already decided by this Court. Defendants did not file a *Daubert* motion seeking to exclude the opinions of Mr. Whitener on the basis of his qualifications to serve as an expert. However, Defendants did file a *Daubert* challenging the methodology utilized by Mr. Whitener and arguing it was improper for him to offer opinions "based solely on his experience." (Dkt. 731 at 24.) The Court explained that:

> [b]ased on his experience in the insurance industry, Whitener identifies three primary factors that contribute to the generation of revenue for insurance companies such as Defendants: speed in response to demand, ease of doing business, and product pricing. He explains how each factor contributes to revenue generation, and he analyzes how technology is used to achieve and improve each factor. Throughout his analysis, Whitener indicates that he relies on industry publications and his extensive industry experience relevant to each factor.

(*Id.* at 25.) The Court then denied Defendants' motion holding that "Whitener's opinions are based on his observations, specialized experience, and analysis. Defendants have not identified any analytical gap between Whitener's opinions and the facts and data on which he relies that warrants excluding his opinions." (*Id.*) Mr. Whitener offered these same opinions at trial that the Court already found were permissible.

During trial, Defendants objected to Mr. Whitener's testimony arguing he lacked the requisite qualifications; the Court overruled that objection and permitted Mr.

Whitener to testify. (Trial Tr. at 1378:19-24, 1379:12-23.) It is improper for Defendants

to reassert this same argument relating to Mr. Whitener's qualifications already rejected

by the Court. And the Court rightly rejected Defendants' unfounded challenge.

78.     Whitener lacks "knowledge, skill, experience, training, or education[,]"
Fed. R. Evid. 702, regarding Blaze or business rules management software. As found
above, *supra* ¶¶ 11-22, he has no experience with business rules management software;
has never worked in the technology department of an insurance company; had not, at the
time he rendered his written report, reviewed or produced peer-reviewed literature
regarding rules software or coding rules; and had not spoken with anyone in the software
industry (apart from FICO) or the insurance industry about Blaze or business rules
management software. He was first introduced to Blaze the day before his deposition
through a 90-minute demonstration that had nothing to do with the Blaze's uses in the
insurance industry. *Supra* ¶ 21-22. The Court concludes that Whitener was not qualified
under Rule 702 to offer an opinion regarding the causal connection between Defendants'
use of Blaze and their revenue. Consequently, the Court discounts his testimony in its
entirety.

FICO Response: FICO objects to this conclusion of law as untimely, incomplete,

improper, mischaracterizing Mr. Whitener's testimony, and incorrect. As described above

(*see supra* Resp. to Proposed COL No. 76), Defendants' proposed conclusion of law is

improper because Defendants are attempting to reassert arguments already rejected by the

Court. Moreover, Mr. Whitener's expertise is in the process of selling insurance and the

value of the tools and benefits offered by Blaze Advisor to that process. Mr. Whitener has

been in the insurance industry for over 45 years with experience with underwriting,

financial management and reporting, product development, product management, field

operations management, business management of technology/technology used in selling

insurance, and technology for implementing and billing and claims. Such experience

qualified Mr. Whitener to testify about the business benefits Blaze Advisor brought to the

process of selling insurance and their impact on Defendants' revenue. (Trial Tr. at 1359:2-9, 1362:21-1372:21; P-0857 (Whitener CV).)

Furthermore, this conclusion of law is incomplete and incorrect. Mr. Whitener *did* have experience with business rules management software (*see supra* Resp. to Proposed FOF No. 13). Mr. Whitener *did* have experience with technology utilized by insurance businesses and Mr. Whitener managed the selection of vendors for policy administration systems. Mr. Whitener has "been heavily involved in the primary setting for technologists and making sure that technologists receive from the business units for which I worked the requirements and documentation that they needed to increase their probability of success, I have seen the value of automating underwriting and compliance and statutory rules through use of technology." (Trial Tr. at 1370:17-1372:21, 1604:24-1605:18; *see also supra* Resp. to Proposed FOF No. 14.) In forming his opinions Mr. Whitener *did* talk with Mr. Waid, FICO's Chief Product and Technology Officer, review over 10,000 pages of documents from Defendants, review six deposition transcripts, review Defendants' rules repository, and speak with an individual knowledgeable about rule repositories to ensure an accurate understanding. (Trial Tr. at 1356:6-1358:20; *see also supra* Resp. to Proposed FOF No. 17.)

Whether Mr. Whitener has personal experience with business rules management software, worked in a technology department, reviewed peer-reviewed literature regarding rules or software coding prior to rendering his opinion, spoke with anyone in the software industry, and when Mr. Whitener received a demonstration of Blaze Advisor

78

are irrelevant to the probative value of his opinions. (*See supra* Resp. to Proposed FOF

Nos. 11-22.)

79. Even assuming Whitener has expertise regarding the insurance industry at a high level of generality, that does not qualify him to opine about a causal connection between the use of Blaze and Defendants' revenue. Rule 702 requires "that the area of [a] witness's competence matches the subject matter of the witness's testimony." *Robinson v. GEICO Gen. Ins. Co.*, 447 F.3d 1096, 1101 (8th Cir. 2006) (internal quotation marks omitted); *see also Schmidt v. City of Bella Villa*, 557 F.3d 564, 571 (8th Cir. 2009) ("[F]or an expert witness to be qualified based on experience, that experience must bear a close relationship to the expert's opinion."). Here, Whitener's general knowledge about the insurance industry does not "bear a close relationship to [his] opinion" that a specific software program as to which he has no experience, skill, or knowledge, in fact, contributed to Defendants' revenue. *Id.*; *see also, e.g., Bollom v. Brunswick Corp.*, 453 F. Supp. 3d 1206, 1219 (D. Minn. 2020) ("[A] fire investigator's experience opining on 'fire cause and origin' does not qualify him as an electrical expert able to testify regarding whether a particular electrical system malfunctioned and caused the fire."); *Khoday v. Symantec Corp.*, 93 F. Supp. 3d 1067, 1078-79 (D. Minn. 2015) (marketing professor not qualified to testify about "conjoint analysis[,]" which "is a marketing research method that measures customer preferences for particular product features[,]" because, while "conjoint analysis is based in marketing, the Defendants . . . offered no evidence that [the witness] ha[d] . . . been trained in or performed conjoint analysis").

FICO Response: As described above, Defendants' proposed conclusion of law is

improper because Defendants are attempting to reassert arguments already rejected by the

Court. Furthermore, Defendants' conclusion is premised on an erroneous legal standard.

FICO was not required to have Mr. Whitener or any other witness testify that Blaze

Advisor, in fact, contributed to Defendants' revenue. FICO was required to establish that

it was more probable than not that Blaze Advisor had some connection to or relationship

with Defendants' revenues.

The first case cited by Defendants confirms that Mr. Whitener is qualified to

testify because his competency matches the subject matter of his testimony. In *Robinson*

*v. GEICO General Insurance Company*, the Eighth Circuit affirmed the district court's

79

decision to admit the testimony of Defendants' expert witness, despite the expert being from a different field of medicine than the plaintiff's expert. 447 F.3d 1096, 1101 (8th Cir. 2006). The Court held that both the defendant's expert, a neurologist, and the plaintiff's expert, an orthopedic specialist, were qualified to testify about the defendant's injuries, which included a rotator cuff contusion and a lumbar sprain. *Id.* at 1098-99, 1101. The Eighth Circuit explained that Rule 702 "requires that the area of the witness's competence matches the subject matter of the witness's testimony" but clarified that "Rule 702 does not require [the parties'] medical expert[s] to be of the identical medical specialty." *Id.* at 1100-01 (quotations omitted).

The other three cases cited by Defendants are distinguishable. In *Schmidt v. City of Bella Villa*, the Eighth Circuit considered whether testimony from a Police Lieutenant on "decisions to arrest, decisions to search for arrest warrants, evidence of collection procedures, strip-search procedures, and general policies" was admissible. 557 F.3d 564, 569 (8th Cir. 2009). The Eighth Circuit affirmed the exclusion of the Lieutenant's testimony finding that his opinions "were improper legal conclusions regarding the reasonableness of conduct in light of Fourth Amendment standards" and found that because "there was no evidence that [the Lieutenant] had experience with civil rights violations or with strip searches" the Lieutenant was not qualified based on experience. *Id.* at 570-71.

Similarly, in *Bollom v. Brunswick Corporation*, the Court found that an expert qualified in "fire origins, material research, accident reconstruction, and mechanics" was not qualified to provide opinions on "a boat's electrical system because he has no

80

expertise in that area." 453 F. Supp. 3d 1206, 1218 (D. Minn. 2020). Finally, in *Khoday v. Symantec Corporation*, the Court explained that even though the expert had never used download insurance or any of the alternatives, the expert was permitted to "testify whether the pricing strategies for [the at issue download insurance] were reflective of the standard marketing practices, even though such a conclusion pertain[ed] to specific information about the [at issue download insurance]." 93 F. Supp. 3d 1067, 1078-79 (D. Minn. 2015). The Court further explained that while the expert was not permitted to testify about the conjoin analysis method used by Plaintiff's expert because he did not have experience with that method, the expert was permitted "to affirmatively testify within his expertise as to what he believes the value of the [at-issue products] to be." *Id.* at 1079.

In each of the cited cases where an expert's testimony was excluded, the expert testified outside their field of knowledge. Here, Mr. Whitener testified squarely within the field of his knowledge and expertise. There is evidence that Mr. Whitener had worked in the field of property and casualty insurance for over 45 years. Mr. Whitener had experience with underwriting, financial management and reporting, product development, product management, field operations management, business management of technology/technology used in selling insurance, and technology for implementing billing and claims. (Trial Tr. at 1359:2-9, 1362:21-1372:21; P-0857 (Whitener CV); *see also supra* Resp. to Proposed FOF No. 12.) Mr. Whitener is qualified to testify on those topics for which he had expertise—the selling process in property casualty insurance (e.g., the

process of how a policy moves from a request to an issued policy) and the role

technology plays in that process. (Trial Tr. at 1355:15-1356:5.)

### 2. Whitener's testimony did not connect the use of Blaze to Defendants' revenue.

80.     Even if Whitener were qualified to testify as an expert regarding a causal connection between Defendants' use of Blaze and their revenue, the Court would conclude that Whitener's testimony did not connect the use of Blaze to Defendants' revenue.

FICO Response: FICO objects to this conclusion of law as incorrect and

unsupported by Mr. Whitener's testimony, for the reasons set forth below.

81.     As found above, *supra* ¶¶ 23-26, 32, Whitener conceded that he did not know "whether Blaze actually contributed to any increase in revenue or profit at Chubb[.]" Trial Tr. at 1599. He repeatedly conceded that he did not "measure" or quantify *any* connection between the use of Blaze and Defendants' revenue. *Id.*; *see also id.* at 1558, 1565. Beyond that, as found above, *see supra* ¶ 29, Whitener evinced a comprehensive lack of knowledge about Defendants' actual use of technology or the role that Blaze played in Defendants' large technology infrastructure. He also testified that he could not say whether Defendants actually realized Blaze's touted business benefits. *See supra* ¶¶ 28.

FICO Response: FICO objects to this conclusion of law as legally incorrect and

unsupported by Mr. Whitener's testimony, taken as a whole. Under 17 U.S.C. § 504(b),

FICO's burden was to present evidence establishing "some connection or relationship

between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 799; *ECIMOS,*

*LLC*, 971 F.3d at 635. Mr. Whitener testified about how Blaze Advisor contributed to

revenues by increasing speed of response (Trial Tr. at 1393:16-1394:5, 1480:9-1482:6),

increasing precision and consistency in pricing (*Id.* at 1482:7-1484:3), decreasing

response times (*Id.* at 1504:11-1506:9), improving data capture making it easier for

agents and brokers to work with Defendants (*id.* at 1449:1-1450:12, 1522:17-1523:14),

and freeing up time of underwriting staff to pursue marketing efforts (*id.* at 1487:20-1488:16). Mr. Whitener addressed each of Blaze Advisor's seven benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business.  Mr. Whitener provided specific examples of how these benefits contributed to Defendants' revenue, including the acquisition of a $25 million book of business, processing of more business with fewer humans, and providing customers with real-time quotes. (*Id.* at 1484:22-1485:19, 1519:19-1520:10; 1508:14-1509:3; 1480:9-1482:6; *see supra* Resp. to Proposed FOF Nos. 24, 28.)

Mr. Whitener was not legally required to *quantify* or *measure* the extent to which Blaze Advisor contributed to Defendants' revenue. Mr. Whitener testified that he didn't "need a tape measure or a stopwatch to know that computers executing transactions is faster than humans because I was a human underwriter and I've worked with many companies to [] deploy technology into those processes" and "I don't need to measure variation in compliance because I know a computer system with a set of facts is going to make the same decision with those fact ever time . . . and I know . . . that humans cannot do that." (Trial Tr. at 1530:15-1532:2; *see supra* Resp. to Proposed FOF Nos. 26, 28.)

Furthermore, FICO's burden was to establish some connection or relationship between Defendants' infringement and their revenue. FICO did this. It put forth evidence of a differentiated revenue stream, which it did via Defendants' own interrogatory responses. This alone was sufficient to meet FICO's burden. FICO, however, provided a substantial amount of additional evidence showing a connection or relationship between Defendants' use of Blaze Advisor and their revenue. This included at least the following:

(1) Defendants' stated reason for using Blaze Advisor was to enter into the mid- and small-markets which, without Blaze Advisor, Defendants had not been able to penetrate and following the licensing of Blaze Advisor, Defendants did, in fact, enter into the mid- and small-markets; (2) Defendants expanded use of Blaze Advisor throughout many applications; and (3) Defendants' own documents admitted that the benefits of Blaze Advisor had been realized and Mr. Whitener explained that those benefits contributed to Defendants' revenue. (*See supra* Resp. to Proposed FOF Nos. 1-8, 24, 28, 33; P-0191 at P-0191-004; P-0192.) Any quantification and apportionment beyond putting forth a differentiated revenue stream is the burden of Defendants, not FICO.

82.     The Court concludes that Whitener's testimony did not carry FICO's burden of proving a causal nexus between Defendants' use of Blaze and their revenue.

FICO Response: FICO objects to this conclusion of law as incorrect and misleading. FICO did carry its burden, including through Mr. Whitener's testimony. Specifically, Mr. Whitener's testimony was relevant and admissible to show the connection or relationship between the infringement and the identified, differentiated revenue stream from Interrogatory No. 17. *See Andreas*, 336 F.3d at 799. FICO was not required to meet its burden relating to disgorgement under 17 U.S.C. § 504(b) with testimony solely from Mr. Whitener, and Mr. Whitener was not FICO's sole source of evidence and testimony regarding disgorgement.

## C.     Identifying revenue that "touched" Blaze was insufficient to show that any of Defendants' revenue was attributable to the use of Blaze.

83.     FICO falls back on its presentation of "differentiated revenues[,]" *see, e.g.*, Dkt. 1206 at 8—that is, Defendants' interrogatory responses, offered through the testimony of Neil Zoltowski, regarding revenue generated by all policies that, at any

point in their lifecycle, "touched" Blaze. The Court concludes that this evidence does not establish a causal nexus between Defendants' use of Blaze and their revenue.

FICO Response: FICO objects to this proposed conclusion of law as misstating the law and the record. Defendants' proposed conclusion of law is implicitly premised on the application of a "but-for" causation standard, which is not the standard applicable here. A copyright owner's burden is only to "establish some connection or relationship between the infringement and the profits he seeks." *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635. FICO met this burden by putting forth Defendants' differentiated revenues (i.e., a revenue stream tied to Defendants' use of Blaze Advisor, rather than Defendants' entire gross revenue). This alone meets FICO's burden. FICO also put forth additional evidence establishing a connection or relationship between Defendants' use of Blaze Advisor and their revenues. This included witness testimony and evidence about the functions and benefits of Blaze Advisor, Defendants' achievement of those functions and benefits, the impact of Blaze Advisor on Defendants' process of selling insurance, and other evidence leading to the conclusion that Blaze Advisor was connected to or had a relationship to Defendants' revenues. (*See supra* at Resp. to Proposed FOF Nos. 1-8, 24, 26, 28.)

84.     That is because these numbers alone do not prove *attribution* of infringement to revenue. *See* 17 U.S.C. § 504(b). They show at most correlation, not causation.

FICO Response:  FICO objects to this proposed conclusion of law as misstating the law and the record. Defendants' proposed conclusion of law is implicitly premised on the application of a "but-for" causation standard, which is not the standard applicable

here. FICO's burden is to "establish some connection or relationship between the infringement and he profits he seeks." *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. FICO met this burden by putting forth Defendants' differentiated revenues (i.e., a revenue stream tied to Defendants' use of Blaze Advisor, rather than Defendants' entire gross revenue). FICO also put forth substantial, additional evidence establishing a connection or relationship between Defendants' use of Blaze Advisor and their revenues. For example, such evidence included Defendants' entry into a previously impenetrable market, witness testimony and evidence about the functions and benefits of Blaze Advisor, Defendants' achievement of those functions and benefits, the impact of Blaze Advisor on Defendants' process of selling insurance, and other evidence leading to the conclusion that Blaze Advisor was connected to or had a relationship to Defendants' revenues. (*See supra* at Resp. to Proposed FOF Nos. 1-8, 24, 26, 28.)

85.     It would be "mere speculation" *Andreas*, 336 F.3d at 796, to conclude, based only on evidence that Defendants' business involves both Blaze and earning revenue, that the revenue is therefore attributable to the use of Blaze.

FICO Response: FICO objects to this proposed conclusion of law as misstating the law and the record. Defendants' proposed conclusion of law is implicitly premised on the application of a "but-for" causation standard, which is not the standard applicable here. FICO need only show a connection or relationship between the use of Blaze Advisor and Defendants' revenue. *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70;

86

*Dayva Int'l*, 1998 WL 105945, at *2. Here, FICO has put forth much more than just

"evidence that Defendants' business involves both Blaze and earning revenue." The

revenue figures in Exhibit P-1004 and P-1007A are connected to and have a relationship

with the infringement. Further, as outlined in response to FOF No. 84, FICO put forth a

substantial and wide variety of additional evidence showing a connection or relationship

between Defendants' use of Blaze Advisor and their revenues, including through

Defendants' own documents and testimony. (*See supra* Resp. to Proposed FOF Nos. 1-8,

24, 26, 28; *supra* Resp. to Proposed COL No. 84.)

86.    Zoltowski, who read Defendants' interrogatory responses to the jury, made
this clear, acknowledging that his presentation of Defendants' revenue alone did not
establish a causal nexus between Defendants' use of Blaze and that revenue. Trial Tr.
1349, Dkt. 1183 (Q:  "And so that means you are not here to offer opinions on how
much, if any, of this $21 billion in revenue is actually connected to Blaze as opposed to
all the other things that make Chubb right?  That's someone else."  A: "That would have
been part of my analysis *if there was information to do so*. I did not endeavor to do so,
though." (emphasis added)). In Zoltowski's own view, the revenue figure alone was
insufficient to reach a conclusion about causation.

    FICO Response: FICO objects to this proposed conclusion of law as misstating the

law and Mr. Zoltowski's testimony. FICO need only show some connection or

relationship between the use of Blaze Advisor and Defendants' revenue. *Andreas* 336

F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F.

Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. As

described above, FICO met this burden.

    Defendants mischaracterize the testimony of Mr. Zoltowski. As the quotation

included by Defendants makes clear, Mr. Zoltowski was asked whether he was offering

an opinion relating to Defendants' burden. It is Defendants' burden, not FICO's, to

apportion and put forth evidence sufficient "to prove . . . the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Mr. Zoltowski's testimony is affirmation that he did not apportion. Further, Mr. Zoltowski did not have the information necessary to apportion because Defendants did not provide such information. The cited testimony from Mr. Zoltowski is irrelevant to whether FICO met its burden of establishing a connection or relationship between Defendants' use of Blaze Advisor and their revenue.

87. To the extent FICO has suggested that the Court found the revenue numbers sufficient to demonstrate nexus in its summary judgment order, *see, e.g.*, Dkt. 1206 at 8, that is incorrect. The Court found that FICO put forward at summary judgment *both* Defendants' interrogatory answers and "*also*" exactly what it failed to adduce at trial: "evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance." Dkt. 731 at 57 (emphasis added). The Court was referring to Whitener's written opinion on causation, which, on summary judgment, it was bound to credit.

FICO Response: FICO objects to this proposed conclusion of law as based on an incorrect legal premise and as mischaracterizing the record. FICO need only show some connection or relationship between the use of Blaze Advisor and Defendants' revenue. *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2.

Moreover, Defendants' statement that the Court "was bound to credit" Mr. Whitener's written opinion at summary judgment is wrong. At summary judgment, a court can only consider admissible evidence. *Brunsting v. Lutsen Mts. Corp.*, 601 F.3d 813, 817 (8th Cir. 2010) ("[I]nadmissible . . . evidence cannot be used to defeat summary

judgment."). The Court found Mr. Whitener's opinions to be admissible. The Court denied Defendants' *Daubert* motion seeking to exclude Mr. Whitener. The Court found that Mr. Whitener's testimony admissible regarding the factors that contribute to the generation of revenue for insurance companies, how those factors contribute to revenue generation, and how technology is used to achieve and improve each factor. (Dkt. 731 at 24.) This is the very same testimony that Mr. Whitener offered at trial. That evidence was sufficient to meet FICO's burden at summary judgment, and it was sufficient to do so at trial as well.

Indeed, FICO presented significant proof at trial meeting its burden under 17 U.S.C. §504(b). (*See, e.g.*, Resp. to Proposed FOF Nos. 1-8, 24, 28.) FICO put forth evidence of a differentiated revenue stream. (*See supra* Resp. to Proposed FOF Nos. 1, 7.) This evidence alone was sufficient to meet FICO's burden. FICO also provided substantial, additional evidence showing a connection or relationship between Defendants' use of Blaze Advisor and their revenues. For example, the evidence showed that Blaze Advisor provided Defendants with the means to enter into a new and previously impenetrable market. (*See supra* Resp. to Proposed FOF Nos. 7, 28, 33.) Defendants' documents and witnesses, including Mr. Mirolyuz, admitted that the benefits of Blaze Advisor had been realized by Defendants. (Trial Tr. at 1031:6-1032:7; 1033:1-17; *see also supra* Resp. to Proposed FOF No. 6.) And Mr. Whitener addressed each of Blaze Advisor's seven benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business—and provided specific examples of how these benefits contributed to revenue, including the acquisition of a $25 million book of business,

processing of more business with fewer humans, and providing customers with real-time quotes. (*Id.* at 1480:9-1482:6, 1484:22-1485:19, 1519:19-1520:10; 1508:14-1509:3; *see supra* Resp. to Proposed FOF Nos. 24, 28.)

88.    At trial, by contrast, FICO completely failed to prove—through the testimony of Whitener or any other witness—that "Blaze Advisor contributed to Defendants' gross revenue." *Id.*

FICO Response: FICO objects to this proposed conclusion of law as misstating the legal standard, unsupported and contrary to the evidence. FICO need only show some connection or relationship between the use of Blaze Advisor and Defendants' revenue. *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. As outlined above in response to COL No. 87, FICO presented significant proof at trial to meet its burden under 17 U.S.C. § 504(b). (*See, e.g.*, *supra* Resp. to Proposed FOF Nos. 1-8, 24, 28.)

89.    Without such proof, FICO's evidence of revenue touching Blaze is not sufficient to prove nexus. *See Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065, at *11 (S.D.N.Y. Nov. 8, 2013) (rejecting a claim for disgorgement, even though plaintiff identified revenue that "flowed through" infringing software). The Court's summary-judgment order is not to the contrary.

FICO Response:  FICO objects to this proposed conclusion of law as based on inapplicable law.  The holding described in the parenthetical was criticizing the scope of revenue being sought. The plaintiff's disgorgement theory sought revenue from other types of financial transactions that did not touch the software at issue. *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497 (KBF), 2013 WL 5970065, at *13 (S.D.N.Y. Nov. 8, 2013). For example, the Court criticized inclusion of revenue for customers

whose relationship predated use of the copyrighted software. *Id*. Here, FICO does not seek revenue from some other type of transaction conducted by Defendants.  Here (unlike in *Complex Systems*), Blaze Advisor is directly utilized in the process of selling insurance.

Under Section 504(b), FICO's burden was to show some connection or relationship between the use of Blaze Advisor and Defendants' revenue. *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. As outlined above in response to COL No. 87, FICO presented significant proof at trial meeting its burden under 17 U.S.C. § 504(b). (*See, e.g.*, *supra* Resp. to Proposed FOF Nos. 1-8, 24, 28.)

90.     Allowing a copyright owner to prove nexus merely by showing an *association* between the use of a copyrighted work and revenue would undermine the Copyright Act's burden-shifting framework. A plaintiff would no longer bear any initial burden of proving the existence of a causal connection between infringement and revenue. Instead, a plaintiff would be able to—as FICO seeks to do—merely show that (i) a defendant used a copyrighted work in a line of business and (ii) that line of business generated revenue. In other words, the burden would shift to the defendant to *disprove* causation without plaintiff having to show *any* evidence of causation in the first instance. That is not how the Copyright Act works. *See Andreas*, 336 F.3d at 797 (copyright owner bears the "burden of [showing] a causal connection").

FICO Response: FICO objects to this proposed conclusion of law as based on an incorrect legal premise. Defendants place an implied "but-for" causation standard on FICO and eliminates Defendants' burden to apportion entirely. That is not the correct legal standard. Rather, FICO's burden is to "establish some connection or relationship between the infringement and the profits he seeks."  *Andreas* 336 F.3d at 797, 799;

91

*ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653;

*Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2.

The statutory language of Section 504(b) states "[t]he copyright owner is entitled

to recover . . . any profits of the infringer that are attributable to the infringement and are

not taken into account in computing the actual damages." 17 U.S.C. § 504(b). Section

504(b) then goes on to state how a plaintiff meets its burden: "In establishing the

infringer's profits, the copyright owner is required to present proof only of the infringer's

gross revenue, and the infringer is required to prove his or her deductible expenses and

the elements of profit attributable to factors other than the copyrighted work." *Id.*

As the Sixth Circuit has explained:

The phrase "attributable to" appears twice in the statute: First, the statute provides that a copyright owner is "entitled" to recover only those profits that are "attributable to" the infringement of its copyrighted material. The final sentence of the statute explains that the burden of proving which portions of that gross revenue are "attributable to" or not attributable to the infringement is on the infringer—not the copyright owner. "Where there is a commingling of gains, [the defendant] must abide the consequences, unless he can make a separation of the profits so as to assure to the injured party all that justly belongs to him."
. . .
To the extent the phrase 'attributable to' is applicable to the copyright owner's burden (though we believe that phrase should not be used in reference to the copyright owner's burden in order to prevent confusion), it simply means that the gross revenue number that the copyright owner presents must have a reasonable relationship to the infringing activity.

*ECIMOS, LLC*, 971 F.3d at 635 (quoting *Balsley*, 691 F.3d at 768-69). Requiring FICO

to establish anything more than that required under the statute is improper.

91.     The bluntness of Zoltowski's analysis, paired with the many admissions by
FICO's witnesses that there is no way of determining whether the use of Blaze
contributed to Defendants' revenue, show that the only way a causal connection can be

drawn between Blaze and *all revenue* associated with *all policies* that merely *touched* Blaze as a component is rank "speculati[on.]" *Polar Bear Prods., Inc.*, 384 F.3d at 711; *see also Bayoh v. Afropunk LLC*, 2020 WL 6269300, at *6 (S.D.N.Y. Oct. 26, 2020) (finding no nexus where an expert "acknowledged that he is not providing any opinion on causality[,]" and "[w]ithout expert testimony explaining the basis for a finding that all of Afropunk's revenue over a four-year period is reasonably related to the infringement, [the expert's] calculation of Afropunk's gross revenues is irrelevant and must be excluded as highly prejudicial" (internal quotation marks and citation omitted)).

<u>FICO Response:</u> FICO objects to this proposed conclusion of law as based on an incorrect legal premise and because it mischaracterizes the record. Defendants proposed conclusion of law places an implied "but-for" causation standard on FICO and eliminates Defendants' burden to apportion entirely. That is not the correct legal standard. Rather, FICO's burden was to show some connection or relationship between the use of Blaze Advisor and Defendants' revenue. *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. Defendants' burden is to apportion by putting forth evidence sufficient "to prove . . . the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

Defendants mischaracterize the record by stating that FICO's witnesses admitted "there is no way of determining whether the use of Blaze contributed to Defendants' revenue." FICO's objections to Proposed Findings of Fact Nos. 2, 24, 26, 29, and 32 responds to Defendants' unsupported assertion. (*See supra* Resp. to Proposed FOF Nos. 2, 24, 26, 29, 32.) No FICO witness testified that "there is no way of determining whether the use of Blaze contributed to Defendants' revenues." Rather, FICO's witnesses testified that they could not quantify or measure the exact extent to which Blaze Advisor

93

contributed to Defendants' revenue, which was not FICO's burden to do and which Defendants failed to do even though it was their burden to carry.

Defendants' case law is inapposite. In *Polar Bear*, the Ninth Circuit affirmed that the plaintiff had met its burden of establishing a causal connection for two of its three disgorgement theories. *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 712-13 (9th Cir. 2004). The Court, however, rejected the plaintiff's third theory, which was premised on the notion of "enhanced prestige." *Id.* at 713. The plaintiff argued that a significant portion of the price increase for certain watches was the result of "enthusiasm" of general public purchasers of Timex watches resulting from "enthusiasm" from attendees at a trade show seeing the infringing film. *Id.* at 713-14.  Without more, the Court found that the plaintiff has not met its burden of establishing a causal connection under its brand enhancement theory. *Id.*  This fact pattern is significantly different from the facts of this case, where the revenue FICO seeks to disgorge is the revenue connected to or relating to the infringement.

Similarly, *Bayoh v. Afropunk LLC* is not comparable to the facts at hand because, there, plaintiff argued that it met its burden merely by establishing use of the infringing work and identifying the entirety of the defendant's revenue. No. 18cv5820 (DLC), 2020 WL 6269300, at *6 (S.D.N.Y. Oct. 26, 2020). As explained, FICO has put forth evidence of a differentiated revenue stream and additional evidence further establishing a connection or relationship between Defendants' use of Blaze Advisor and their revenues (i.e., evidence of more than just use).

**D.     FICO's generalizations about Blaze's quality or value were legally insufficient to demonstrate that any of Defendants' revenue was attributable to the use of Blaze.**

92.     At trial, FICO offered, at most, evidence that Blaze is a useful product. *See, e.g.*, Trial Tr. 2720-21, Dkt. 1189 (counsel for FICO arguing in closing that "Mr. Whitener said [that] Blaze Advisor added significant value to the defendants' process"); Trial Tr. 1530, Dkt. 1184 (Whitener:  "[M]y conclusion is that Blaze Advisor deployed by agents in some places, not all, added significant value to the defendants' business of selling insurance."); *id.* at 1531 ("I don't need a tape measurer or stopwatch to know that computers executing transactions is faster than humans[.]"). The Court concludes that such generalities are insufficient to carry FICO's burden of proving a causal nexus between Defendants' use of Blaze and their revenue.

<u>FICO Response:</u> FICO objects to this proposed conclusion of law as legally

inaccurate and mischaracterizing the testimony.[8]  *Andreas* expressly found that a

connection or relationship can be established by evidence of the importance and role

played by the infringing material. *Andreas*, 336 F.3d at 797; *see also*, *e.g.*, *ECIMOS,*

*LLC*, 971 F.3d at 634-38. Defendants mischaracterize the testimony and evidence,

ignoring documents and testimony beyond Mr. Whitener's statements identified in this

proposed conclusion of law. Further, the quotes identified in Defendants' proposed

conclusion law disprove Defendants' conclusion.

93.     "[S]imply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role is insufficient, particularly where, as part of [defendant's] information technology infrastructure, it comprises only a portion of what enabled [defendant] to conduct its business properly."  *IBM*, 2013 WL 1775437, at *4

---

[8] Defendants' position that "generalities" are not sufficient to meet FICO's burden of proof is belied by Defendants' position with respect to the factors they say drove their profit. Defendants claim they have met their burden of establishing that other factors contributed to Defendants' profits. All of Defendants' evidence is generalized evidence that certain factors, e.g., reputation, paying of claims, operations, compliance, etc. are important. (*See supra* Resp. to Proposed FOF Nos. 63-67.)

(internal quotation marks and citation omitted); *see also DaimlerChrysler Servs. v. Summit Nat'l, Inc.*, 2006 WL 208787, at *4 (E.D. Mich. Jan. 26, 2006).[9]

   FICO Response: FICO objects to this proposed conclusion of law as legally inaccurate and mischaracterizing the testimony. *Andreas* expressly found that evidence of the importance and role played by the infringing material is relevant to and may establish the requisite nexus. *Andreas*, 336 F.3d at 797; *see also*, *e.g.*, *ECIMOS, LLC*, 971 F.3d at 634-38 (finding reasonable relationship established where plaintiff put forth evidence of the integral role software played in defendant's quality control operations); *Berry v. Hawaii Express Serv., Inc.*, No. 03-00385 SOM/LEK, 2006 WL 1519996, at *5 (D. Haw. May 24, 2006) (evidence that software program that improved efficiencies was "one of the cornerstones" of the defendant's operations supported finding of causal link).

   Defendants' proposed conclusion takes the specific factual scenario at issue in *IBM.*, 2013 WL 1775437, at *4, and seeks to apply, as a general rule, that evidence of the importance, significance, role, and the like of the infringing work cannot establish a connection or relationship between the infringement and revenue. Defendants' proposed conclusion should be rejected as inconsistent with *Andreas*. 336 F.3d at 797; *see also*, *e.g.*, *ECIMOS, LLC*, 971 F.3d at 634-38; *Berry*, 2006 WL 1519996, at *5. Moreover, to

---

[9] FICO has argued that *IBM* and *DaimlerChrysler* are not relevant because there, the plaintiffs "sought all of defendant[s'] pre-tax income, independent of any relationship to the infringement." (Dkt. 499 at 38.) That distinction does not diminish the applicability of *IBM*'s reasoning. Just because FICO does not seek portions of Defendants' revenue *plainly* unconnected to the use of Blaze does not establish that the revenue it *does* seek is tied to Blaze—as explained above. And, as *IBM* instructs, "simply saying that copyrighted material may have played an 'important,' 'significant,' or 'meaningful' role is insufficient" to establish that connection. 2013 WL 1775437, at *4 (internal quotation marks omitted).

the extent Blaze Advisor only comprised a portion of what enabled Defendants to

conduct their business properly, any such evidence is pertinent to Defendants' burden of

apportionment, not FICO's burden of establishing a connection or relationship between

Defendants' use of Blaze Advisor and Defendants' revenue.

94.     That rule makes good sense in the context of the nexus analysis, which
focuses on concrete proof of a "causal connection" between infringement and revenue,
not "mere speculation[.]" *Andreas*, 336 F.3d at 796.

FICO Response: FICO objects to this proposed conclusion of law as legally

inaccurate. *Andreas* makes no reference to "concrete proof", and, instead, permits use of

evidence of the importance and role of the infringing material to establish the requisite

connection or relationship so long as the evidence amounts to more than "mere

speculation." *Andreas*, 336 F.3d at 796-97.

95.     Here too, FICO's approach would subvert the Copyright Act's burden-
shifting framework. As FICO would have it, a copyright owner would be able to
demonstrate *prima facie* entitlement to disgorgement by merely (i) introducing general
testimony about its work's quality and (ii) showing that a defendant used the work. With
only that kind of evidence, the required inference of causation could be only the result of
speculation. *Andreas*, 336 F.3d at 796.

FICO Response: FICO objects to this proposed conclusion of law as based on an

incorrect legal premise and as mischaracterizing the evidence presented and relied upon

by FICO. FICO's burden is to "establish some connection or relationship between the

infringement and the profits he seeks." *Andreas*, 336 F.3d at 797, 799; *ECIMOS, LLC*,

971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d

at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. Defendants' burden is to apportion and

97

put forth evidence sufficient "to prove . . . the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

At trial, FICO put forth substantial evidence to meet its burden—evidence that went well beyond "merely (i) introducing general testimony about its work's quality and (ii) showing that a defendant used the work." FICO put forth evidence of a differentiated revenue stream, as well as testimony and documents showing that Blaze Advisor contributed to Defendants' revenues. (*See supra* Resp. Proposed FOF Nos. 1-8, 24, 28.) For example, the evidence showed that Blaze Advisor provided Defendants with the means to enter into a new and previously impenetrable market. (*See supra* Resp. to Proposed FOF Nos. 7, 28, 33.) Defendants' own documents and witnesses admitted that the benefits of Blaze Advisor had been realized by Defendants. (Trial Tr. at 1031:6-1032:7; 1033:1-17; *see also*, *supra*, at Resp. to FOF No. 6.) Mr. Mirolyuz testified that Blaze Advisor led to increased speed, agility, and precision. (Trial Tr. at 1031:6-1032:7; 1033:1-17.) And Mr. Whitener addressed each of Blaze Advisor's seven benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business—and provided specific examples of how these benefits contributed to revenue, including the acquisition of a $25 million book of business, processing of more business with fewer humans, and providing customers with real-time quotes. (*Id.* at 1480:9-1482:6, 1484:22-1485:19, 1519:19-1520:10, 1508:14-1509:3; *see supra* Resp. to Proposed FOF Nos. 24, 28.)

96.    FICO's approach would also hold plaintiffs in indirect-profits cases to a far less stringent attribution standard than direct-profits plaintiffs face—a clearly perverse result. They would need to show only a rough association, not a concrete causal

connection. But the law is clear that the attribution standard is the same in both types of case. *Id.* ("We agree that in an indirect profits case the profits 'attributable' to the infringement are more difficult to quantify. But that difficulty does not change the burden of proof established by the statute.").

    <u>FICO Response:</u> FICO objects to this proposed conclusion of law as based on an incorrect legal premise and as mischaracterizing the evidence presented and relied upon by FICO. FICO's burden is to "establish some connection or relationship between the infringement and the profits he seeks." *Andreas*, 336 F.3d at 797, 799; *ECIMOS, LLC*, 971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. Defendants' burden is to apportion and put forth evidence sufficient "to prove . . . the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

    FICO agrees that the burden of proof established by 17 U.S.C. § 504(b) does not change, regardless of whether a copyright owner is seeking direct or indirect profits— there is no heightened burden of proof for providing disgorgement of indirect profits. *Andreas*, 336 F.3d at 796. Defendants' view of the legal standard, however, saddles FICO with a burden that is greater than that stated under *Andreas* which makes no reference to "concrete proof", and, instead, merely requires some connection or relationship be shown through evidence that amounts to more than "mere speculation." *Andreas*, 336 F.3d at 796, 797, 799; *ECIMOS, LLC*, 971 F.3d at 635.

    97.    This conclusion—that proof that a product is valuable and that a defendant used it, without more, is insufficient to prove nexus—is wholly consistent with *Andreas*, the Eighth Circuit's leading disgorgement case.

FICO Response: FICO objects to this proposed conclusion of law as based on an

incorrect legal standard and because it mischaracterizes the evidence and testimony

admitted during trial. *Andreas* expressly found circumstantial evidence of the infringing

materials' importance and role to be relevant to and supportive of a nexus. *Andreas*, 336

F.3d at 797; *see also*, *e.g.*, *ECIMOS, LLC*, 971 F.3d at 634-38. Defendants further

mischaracterize the totality of the evidence put forth by FICO.

98.     There, the defendant used copyrighted words in an advertisement. *Id.* at
791-92. On its face, the causal connection between a component of a commercial and
revenue from the product advertised is far stronger than the supposed connection between
one of hundreds of back-office software programs and an insurance company's revenues.
*See id.*; *see also Timex Corp.*, 384 F.3d at 712 (finding nexus between the infringing use
of footage in an advertisement and sales of the advertised product); *cf. Mackie*, 296 F.3d
at 916 (finding *no* nexus even though defendant used infringed artwork in a promotional
campaign).

FICO Response: FICO objects to this proposed conclusion of law because it

misstates the holdings in *Andreas* and is irrelevant under the correct legal standard. The

question in both *Andreas* and this case is whether the copyright owner established "some

connection or relationship" between the infringement and the profits. *Andreas* 336 F.3d at

797, 799. Contrary to Defendants' suggestion, courts have held that the efficiencies and

benefits offered by such software programs support a finding of a connection or

relationship between a party's infringement and their revenue and an award of

disgorgement. *ECIMOS, LLC*, 971 F.3d at 634-38; *Berry*, 2006 WL 1519996, at *5.

The Sixth Circuit's *ECIMOS* case is instructive. There, the Court affirmed the

award of profits in a case involving use of infringing code used by a manufacturing plant,

finding that Plaintiff had met its burden under Section 504(b). The Court held that

evidence such as the following supported the jury's conclusion:

- The infringing work was integral to Defendant's control system which was in turn integral to Defendant's quality control operations;

- That operations of the plant would shut down if Defendant could not use its control system until Defendant could find an alternative means to test it products and that the notion that manual testing could be used instead of software "strained credulity"; and

- That Defendant could not easily and quickly replace the infringing work.

971 F.3d at 634-38.

99.    But, as noted above, in *Andreas*

[t]he infringement was the centerpiece of a commercial that essentially showed nothing but the TT Coupe. The evidence established that Audi enthusiastically presented the commercial to its dealers as an important and integral part of its launch of the TT coupe into the U.S. market; sales of the TT coupe during the period that the commercial aired were above Audi's projections; the three commercials received high ratings on the Allison–Fischer surveys that rated consumer recall of the commercials; and Audi paid [the advertising agency] a substantial bonus based on the success of the commercials.

336 F.3d at 796-97.

FICO Response: FICO agrees that *Andreas* includes this quotation, which supports

that the import and role of the infringing material is relevant to and supportive of

showing "some connection or relationship" between the infringement and the defendant's

revenue.

100.    This evidence, taken in the light most favorable to the copyright owner, showed that "the commercial did more than merely 'contribute somehow' to sales of the TT coupe"—the "causal connection" between infringement and revenue was based on "more than mere speculation[.]" *Id.* (citation omitted).

101

FICO Response: FICO agrees that *Andreas* includes the above quotation but states

that the above is not a conclusion of law tailored to or tethered to the facts of this case.

101.    By contrast, here there is no dispute that Defendants "did not market or sell
the [Blaze] software to [their] customers and there is no evidence that its customers cared
what software system [they] used." *IBM*, 2013 WL 177437, at *4. Blaze was not
consumer facing, and was a small part of Defendants' large technological infrastructure.

FICO Response: FICO objects to this proposed conclusion of law as legally

irrelevant. FICO need only show some connection or relationship between the use of

Blaze Advisor and Defendants' revenue. *Andreas* 336 F.3d at 797, 799; *ECIMOS, LLC*,

971 F.3d at 635; *Universal Furniture Int'l, Inc*, 599 F. Supp. 2d at 653; *Balsley*, 691 F.3d

at 769-70; *Dayva Int'l*, 1998 WL 105945, at *2. The test is not whether Blaze Advisor is

"customer facing", but whether there was a connection or a relationship between

Defendants' use of Blaze Advisor and their revenues.

102.    Instead, all FICO could offer was testimony that "copyrighted material may
have played an 'important,' 'significant,' or 'meaningful' role[.]" *Id. Andreas* neither
holds nor suggests that such evidence, without more, is sufficient to prove nexus. 336
F.3d at 796-97.

FICO Response:  FICO objects to this proposed conclusion of law as misleading

and legally incorrect. First, the quoted language "copyrighted material may have played

an 'important,' 'significant,' or 'meaningful' role" comes from the *IBM* case, not

testimony offered by FICO. And FICO offered evidence that went well beyond

establishing that Blaze Advisor "may have played an 'important,' 'significant,' or

'meaningful' role." The evidence showed that Blaze Advisor was necessary for Chubb to

enter into the mid- and small-markets. (J-002.) In fact, in 2006, Chubb had not been able

to penetrate these markets, despite the fact that Chubb's underwriters and other personnel, reputation, marketing and advertising, sales force, relationships with agents and brokers, business rules, technologies such as Duck Creek, and other business infrastructure all existed in 2006. Instead, Chubb needed something more. Through the RFI process, Chubb determined it needed Blaze Advisor. Further, the evidence established that the benefits of Blaze Advisor were realized by Defendants and that those benefits impacted Defendants' sale of insurance and revenue generation. (*See supra* at Resp. to Proposed FOF Nos. 1-7, 24, 28.)

Second, *Andreas* expressly found evidence of the infringing materials' importance and role to be relevant to and supportive of showing "some connection or relationship" between the infringement and the infringer's revenues. *Andreas*, 336 F.3d at 797; *see also*, *e.g.*, *ECIMOS, LLC*, 971 F.3d at 634-38; *Berry*, 2006 WL 1519996, at *5.

103.   It is true that it is inherently more difficult for plaintiffs like FICO—whose products are not consumer-facing—to offer the type of evidence *Andreas* highlighted showing a causal connection between the infringing use and the defendant's revenue. But that is a function of the fact that the Copyright Act places the initial burden on the plaintiff to show a connection between the infringing use and revenue. *Id.* at 796.   That burden may be more difficult to satisfy in a case (like this case) where the infringed product is not consumer facing or even known to consumers, than in a case (like *Andreas*) where the infringing use is directed at revenue-generating consumers themselves. But courts have no authority to lessen the burden on a copyright plaintiff to show that the defendant's revenue was attributable to the infringing use. The Court adopts the advisory jury's finding that FICO failed to satisfy that burden here.

FICO Response: FICO objects to this proposed conclusion of law as misstating the legal standard. There is no heightened burden of proof for providing disgorgement of indirect profits. *Andreas*, 336 F.3d at 796. The legal standard does not require that consumers understand that the infringing work is connected or related to Defendants'

generation of revenue. The question is only whether the infringing work is connected or related to the generation of revenue. Here, the evidence established that Defendants' use of Blaze Advisor is connected or related to Defendants' revenue. In particular, FICO put forth evidence of a differentiated revenue stream. This alone was enough to meet FICO's burden. (*See supra* Resp. to Proposed FOF Nos. 1, 7.) However, FICO put forth substantial, additional evidence showing that Defendants' use of Blaze Advisor was connected or related to their revenues. For example, the evidence showed that Blaze Advisor provided Defendants with the means to enter into a new and previously impenetrable market. (*See supra* Resp. to Proposed FOF Nos. 7, 28, 33.) Defendants' documents and witnesses, including Mr. Mirolyuz, admitted that the benefits of Blaze Advisor had been realized by Defendants. (Trial Tr. at 1031:6-1032:7; 1033:1-17; *see also supra* Resp. to Proposed FOF No. 6.) And Mr. Whitener addressed each of Blaze Advisor's seven benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business—and provided specific examples of how these benefits contributed to revenue, including the acquisition of a $25 million book of business, processing of more business with fewer humans, and providing customers with real-time quotes. (*Id.* at 1480:9-1482:6, 1484:22-1485:19, 1519:19-1520:10, 1508:14-1509:3; *see supra* Resp. to Proposed FOF Nos. 24, 28.)

## III.  DEFENDANTS IDENTIFIED THE ELEMENTS OF PROFIT ATTRIBUTABLE TO FACTORS OTHER THAN THE USE OF BLAZE.

104.  The Court concludes that FICO has failed to carry its initial burden under Section 504(b) of establishing a causal nexus between Defendants' use of Blaze and their revenue. But the Court also concludes that Defendants have carried their burden of identifying "the elements of profit attributable to factors other than the copyrighted

work." 17 U.S.C. § 504(b). Consequently, even if FICO had carried its burden of demonstrating a causal nexus, the Court would conclude that FICO was not entitled to disgorge any of Defendants' profits.

> FICO Response: FICO objects to this proposed conclusion of law as legally incomplete and factually unsupported. FICO met its burden under Section 504(b). After FICO meets its burden under 17 U.S.C. § 504(b), the burden shifts to Defendants "to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Defendants proposed no finding of fact or conclusion of law regarding their deductible expenses. The Court should rule that Defendants failed to prove their deductible expenses.

Defendants' proposed conclusion of law fails to identify how Defendants proved the elements of profit attributable to factors other than the copyrighted work. Defendants' burden of apportionment cannot be met with generalities. Defendants were required to provide the "correct percentage of total revenues or profits that would be attributable to" other factors. *Design Ideas, Ltd. v. Things Remembered, Inc.*, No. 07-cv-3077, 2009 WL 1259035, at 5 (C.D. Ill. May 6, 2009) (explaining that an expert witness's apportionment opinion must provide mathematical apportionment); *Hewlett Custom Home Design, Inc. v. Frontier Custom Builders, Inc.*, No. H-10-04837, 2013 WL 12097801, at *2-3 (S.D. Tex. Jul. 19, 2013) (finding Defendants had not met their burden where "Defendants' proof was limited to broad, generic claims of factors that typically contribute to a builder's profit, but without particularization to these specific infringing homes, and without any effort to provide an evidentiary basis to quantify a percentage of profit on each home to factors other than Plaintiff's copyrighted work"), *aff'd*, 588 F. Appx. 359

(5th Cir. 2014); *see also*, *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743154, at *3-4 (N.D. Cal. May 2, 2016) ("Although apportionment only requires a reasonable approximation, any reasonable approximation must be based on a methodology that is tied to the goal of estimating the profits that Google actually earned due to its use of the allegedly infringing elements of Android."). Defendants' testimony and evidence at trial failed to meet this standard.

105.   This conclusion is based on the Court's findings that Defendants showed that (i) Blaze did not contribute to their revenue, *supra* ¶¶ 1-62, and (ii) that many other factors drove their revenue, *supra* ¶¶ 63-66. In particular, the Court emphasizes its findings that (i) Blaze is interchangeable with many other technological solutions for running business rules, including a variety of other business rules management programs, (ii) customers were not aware of and did not care about Defendants' use of Blaze, (iii) Blaze constituted a tiny portion of Defendants' technology infrastructure, and (iv) Defendants' revenue derives from numerous factors, especially their reputation in the market and their employees' insurance expertise.

FICO Response: FICO objects to this proposed conclusion of law as legally incomplete and factually unsupported. Defendants were required to, but failed to, quantify the extent to which other factors contributed to the infringing gross written premium. (*See supra* Resp. to Proposed COL No. 104.) Rather, Defendants made the strategic decision to exclusively focus their efforts on attempting to defeat FICO's proof of "some connection or relationship" between Defendants' infringement and their revenue and to <u>not</u> present any competent evidence to meet their burden of apportionment. Absent quantification, the factors discussed in subparts (i) through (iv) are irrelevant and insufficient to meet Defendants' burden of apportionment.

106.   With this showing, Defendants have negated any causal connection between the use of Blaze and their revenue. A defendant may "demonstrate the absence of a causal link between the infringement and all or part of the profits claimed by the

plaintiff" by showing "that customers would have purchased its product even without the infringing element." *Data Gen. Corp v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1175 (1st Cir. 1994), *abrogated on other grounds*, *Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010); *see also IBM*, 2013 WL 1775437, at *4 (finding no causal nexus where "BGC did not market or sell the Informix software to its customers and there is no evidence that its customers cared what software system it used"); *Mackie*, 296 F.3d at 916 (finding no causal nexus where "we can surmise virtually endless permutations to account for an individual's desire to subscribe to the Pops series, reasons that have nothing to do with the [infringed] artwork in question").

      <u>FICO Response</u>: Defendants' proposed conclusion addresses causation, rather than Defendants' burden of apportionment, and relies on inapplicable case law. *Mackie* is inapplicable because it involved a copyrighted visual work utilized in a promotional campaign. *Mackie v. Rieser*, 296 F.3d 909, 911 (9th Cir. 2002). In instances in which the copyrighted work is a visual work utilized in a promotional campaign that is consumer facing, the consumer's awareness and the work's impact on a consumer's purchasing decision may well be relevant to the plaintiff's initial burden. This is because the consumer is directly seeing the copyrighted work so if the consumer does not care about the work, this suggests the consumer's purchase was not impacted by the work. However, the consumer's awareness and its impact on a consumer's purchasing decision (or lack thereof) does not have relevance in cases involving non-consumer facing software like Blaze Advisor.

      Although both *Data Gen.* and *IBM* involved software, neither warrant finding otherwise. In *Data Gen.*, the Court made the cited statement when discussing Defendants' burden of apportionment, not when discussing Plaintiff's initial burden. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1175 (1st Cir. 1994). Moreover, the Court in *Data Gen.* made its statement relying on *Walker v. Forbes, Inc.*,

28 F.3d 409, 413-14 (4th Cir. 1994). The *Walker* case involved a visual work used in advertising, and, once again, the Court's discussion of the impact on the consumer's purchasing decisions was in the context of discussing apportionment. *Id*. at 412-14. Finally, Data Gen.'s copyrighted software was a computer program used to diagnose problems with their computers. 36 F.3d at 1152. Nothing suggested that the software in *Data Gen.* impacted revenue generating events in the manner that Blaze Advisor does.

In *IBM*, the copyrighted software was a database management and transaction processing software that was utilized to process trades *after* their execution and to generate various reports and invoices. 2013 WL 1775437, at *3. Again, nothing suggested that the software in *IBM* impacted revenue generating events in the manner that Blaze Advisor does. In other words, Blaze Advisor is used in the quote, bind, book, and issue process for the sale of insurance—the process that generates revenue. It is not an after-the-fact analysis tool.

107.    Likewise, showings that "migration to another software system . . . would have little or no effect" on a defendant's business operations, *IBM*, 2013 WL 1775437, at *3, and that "services provided by [a defendant] are the result of a number of other factors" apart from a single software component, like "a number of [other] software applications and other technologies, in addition to skilled . . . personnel[,]" *Complex Sys., Inc*., 2013 WL 5970065, at *12, defeat causation.

FICO Response: FICO objects to this proposed conclusion of law as relying on inapplicable law for the reasons described in response to proposed COL Nos. 89 and 106.

In addition, the language from *Complex Sys., Inc.* is taken out of context. The point being made by the court in *Complex Sys., Inc.* was merely that the plaintiff must show a benefit derived specifically from the infringement, separate and apart from other

possible contributing factors. 2013 WL 5970065, at *12. To the extent Defendants seek

to interpret *Complex Sys., Inc.* as holding that the existence of multiple factors

contributing to revenue somehow "defeat[s] causation," such an interpretation is

inconsistent with Section 504(b) and *Andreas*[10] and must be rejected. As Section 504(b)

makes clear, once FICO has met its initial burden of establishing some connection or

relationship between Defendants' infringing use of Blaze Advisor and their revenues, the

burden shifts to Defendants "to prove . . . the elements of profit attributable to factors

other than the copyrighted work." 17 U.S.C. § 504(b).

Further, the Court in *IBM* simply got it wrong. The ability to migrate to another

software system does not mean that the infringing software system did not contribute to

revenue. 2013 WL 1775437, at *3. The broad generalization being made by Defendants

would mean that any copyrighted work that can be replaced with a functionally similar

alternative does not contribute to revenue. This premise is flawed.

---

[10] *Andreas* recognized that other factors, besides the infringing commercial, likely
contributed to Volkwagen's revenue and still found the plaintiff had met its burden. 336
F.3d at 797 ("We recognize that the offending commercial probably did not contribute to
every purchase of a TT coupe during the relevant time period. Undoubtedly, some buyer
somewhere bought a TT coupe without having seen the commercial despite Audi's
extensive use of it. But we reject the notion that Andreas was required to put a TT buyer
on the stand to testify that she bought the car because of the commercial in order to meet
his burden of a causal connection. Once a nexus was shown as established above,
Andreas was required under the statute only to establish Audi's gross revenue from the
TT coupe. Audi then bore the burden of establishing that its profit was attributable to
factors other than the infringing words: the other two commercials that did not contain
the infringed words, other parts of the Wake Up commercial, customer loyalty, brand
recognition, etc.").

Separately, as described above, the suggestion that replacement of Blaze Advisor would have little or no effect on Defendants' business is misplaced. Blaze Advisor was so integral to Defendants' business that it took over four years for Defendants to decide to migrate and over nine months for Defendants to complete the migration. (*See supra* Resp. to Proposed FOF Nos. 45-48.)

108.    Applying this authority, the Court concludes that Defendants, by identifying "the elements of profit attributable to factors other than the copyrighted work[,]" 17 U.S.C. § 504(b), have negated any causal connection between their use of Blaze and their revenue and that FICO is not entitled to disgorge any of Defendants' profits.

FICO Response: FICO objects to this proposed conclusion of law as legally incomplete and factually unsupported. Defendants must do more than merely "identify" the elements of profit attributable to factors other than the copyrighted work. Defendants must "prove . . . the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Defendants did not put forth any evidence quantifying the extent to which other alleged factors contributed to Defendants' revenue. Accordingly, the Court should conclude Defendants failed to meet their burden of proving the elements of profit attributable to factors other than the copyrighted work. *Design Ideas, Ltd.*, 2009 WL 1259035, at *5; *Hewlett Custom Home Design, Inc.*, 2013 WL 12097801, at *2-3; *see also*, *Oracle Am., Inc.*, 2016 WL 1743154, at *3-4.

<u>PLAINTIFF'S ALTERNATIVE PROPOSED FINDINGS OF FACT</u>

I.      **FICO met its burden of proof under 17 U.S.C. § 504(b)**

      A.      **FICO identified a differentiated revenue stream with a connection or relationship to the infringement.**

      1.      FICO presented evidence showing a connection or relationship between the Defendants' differentiated revenues of $21.2 billion and their use of Blaze Advisor.

      2.      The Defendants' gross written premium for all insurance policies in connection with which the Blaze Advisor software was used was $21,202,380,943.  (P-1004A and P-1007A; Trial Tr. at 1260:25-1261:15, 1325:18-1334:14.)  Chubb North America's CFO, Mr. Harkin, confirmed at trial that these gross written premiums were accurate and were from policies issued in connection with the use of Blaze Advisor. (Trial Tr. at 1849:10-19, 1898:4-16.) This unrebutted evidence, based on Defendants' own admission satisfies FICO's burden of showing the differentiated revenue stream that is limited to Defendants' gross written premiums "in connection with which the Blaze Advisor software was used."

      B.      **Other facts also show a connection or relationship between that differentiated revenue stream and use of Blaze Advisor.**

      3.      FICO's witnesses and documents identified several functions of Blaze Advisor that contribute to revenue generation.

      4.      Blaze Advisor has numerous decision processing business benefits for companies that use the software, including increased control, speed, accuracy, consistency, transparency, and agility of decision making. (Trial Tr. at 93:12-94:11, 181:19-182:7, 154:19-24. 155:16-156:1, 156:2-7, 158:4-16, 158:21-159:13, 160:1-17,

111

284:4-7, 290:20-291:13; *see also* P-1171A; P-1172A.)  These features were created by

Blaze Advisor software developers and are enabled by its copyrighted code. (Trial Tr. at

198:16-201:20.)

5.    FICO's customers who use Blaze Advisor, including insurance companies,

realize these benefits when using Blaze Advisor in their decision making processes.  For

example, Mr. Baer testified that the features of Blaze Advisor led to the following

benefits for insurance companies: "Increase the processing time on new insurance

policies, transition from a manual underwriting process, reduced decisioning times, an

increase in application volume capacity, reduced processing times, double volume,

reduced costs, increased revenue, and lowered or combined ratio, which is increased

profitability." (Trial Tr. at 290:20-291:13.)

6.    These benefits from the features of Blaze Advisor are revenue-generating

benefits.  (*See supra* Resp. to Proposed FOF Nos. 2-7, 24, 28.)  For example, as Mr.

Baseman explained, Blaze Advisor makes faster, more consistent decisions because it is

automating decisions that used to be done through a manual review by humans and

because it removes subjectivity in interpretation of data. (Trial Tr. at 155:16-156:14; *see

also id.* at 131:8-132:8.)

7.    Federal licensed Blaze Advisor in 2006 to enable it to expand into new

markets to increase revenue.  Specifically, Federal licensed Blaze Advisor to enter into

the small to mid-market insurance market.  (J-002.)  Federal could not enter this market,

and increase revenue, without Blaze Advisor.  (*Id.*)

112

8.      It is unrebutted that Defendants did, in fact, enter and begin selling insurance policies in the mid- and small markets after implementation of Blaze Advisor. (P-0958 at P0958-005, P-958-016.)

9.      The implementation and use of Blaze Advisor led to a new revenue stream in 2006 and that revenue stream in those markets continued through trial.

10.      After 2006, Defendants expanded their use of Blaze Advisor into other revenue-generating technology applications.

11.      Defendants ultimately executed 52 Statements of Work with FICO directed to implementing and configuring Blaze Advisor into Defendants' technology systems, and training Defendants on how to use the technology[1].  Defendants paid FICO over $3.7 million for this implementation and configuration work.  (Trial Tr. at 587:6-10.)

12.      Defendants' witnesses and documents admitted these implementations were a success and Blaze Advisor's copyrighted code led to revenue generation benefits. (*See* *supra* Resp. to Proposed FOF No. 7; *supra* Resp. to Proposed COL Nos. 74, 87, 94, 102.)

---

[1] The Statements of Work and related Change Orders and Amendments to Statements of Work were admitted as Exhibits P-0299, P-0337, P-0341, P-0342, P-0343, P-0344, P-0344, P-0345, P-0346, P-0347, P-0348, P-0349, P-0350, P-0351, P-0353, P-0354, P-0355, P-0356, P-0357, P-0358, P-0359, P-0360, P-0362, P-0363, P-0364, P-0365, P-0366, P-0367, P-0368, P-0369, P-0370, P-0371, P-0372, P-0373, P-0374, P-0375, P-0376, P-0377, P-0870, P-0871, P-0873, P-0874, P-0875, P-0876, P-0877, P-0878, P-0879, P-0880, P-0881, P-0882, P-0883, P-0884, P-0885, P-0886, P-0887, P-0888, P-0889, P-0890, P-0891, P-0892, P-0893, P-0894, P-0895, P-0896, P-0897.

13.     Defendants admitted that in Defendants' applications, Blaze Advisor improved the consistency of decisions by reducing inherent inconsistencies and subjectivities associated with human decision-making. (*See, e.g.*, Trial Tr. at 1031:6-22 (Mirolyuz testifying that Blaze Advisor increased the precision of decision making in applications such as Probability Indicator and CSI Express).)  This function is connected to or has a relationship with the differentiated revenue identified by FICO.

14.     Defendants admitted that in Defendants' applications, Blaze Advisor "[e]levates all decision making to the level of the organization['s] top expert" and each decision is consistently made at that high level of expertise (P-0195 at P-0195-005; Trial Tr. at 1405:3-18.) This function is connected to or has a relationship with the differentiated revenue identified by FICO.

15.     Defendants admitted that Blaze Advisor "reduces the time to market for new products and services." (Trial Tr. at 1023:4-1024:15; P-0191.)  This function is connected to or has a relationship with the differentiated revenue identified by FICO.

16.     In the Automated Renewal I application ("ARP"), Blaze Advisor led to renewing "the right" business, increasing retention, creating greater efficiency, allowing underwriters to do more business development, and easily updating underwriting rules. (Trial Tr. at 1028:15-25; P-0192 at P-0192-002, P-0192-005.)  This function is connected to or has a relationship with the differentiated revenue identified by FICO.

17.     In the Profitability Indicator and CSI Express applications, Blaze Advisor increased decision making precision, added speed and provided real-time quotes.  (Trial

114

Tr. at 1031:6-22, 1031:23-1032:7, 1033:1-17.)  This function is connected to or has a relationship with the differentiated revenue identified by FICO.

18.     In the Profitability Indicator application, Blaze Advisor moved the right business into automated renewals, increased retention of the best accounts, and created greater efficiency for underwriters.  (P-0195 at P-0195-013.)  A case study described the purpose of Profitability Indicator as, among other things, "allow[ing] underwriters to make an objective decision about the potential profitability of a risk based on internal and external factors."  (*Id.*) This "defined business benefit was realized" through use of Blaze Advisor in the Profitability Indicator application. (*Id.*; *see* Trial Tr. at 992:10-993:10, 1031:6-17, 1032:8-25, 1036:4-10.) These functions are connected to or have a relationship with the differentiated revenue identified by FICO.

19.     In the Decision Point application, Blaze Advisor led to the generation of real-time quotes, determined pricing, endorsed policies, bound quote letters, enhanced productivity, improved underwriter response and wrote new business.  (Trial Tr. at 1043:15-1045:10; P-0168 at P-0167-009; P-0195 at P-0195-014.) The case study confirmed that these defined business benefits for the Decision Point application were in fact achieved, including through use of Blaze Advisor.  These functions are connected to or have a relationship with the differentiated revenue identified by FICO.

20.     Blaze Advisor increased the analytical ability in the underwriting process in the Profitability Indicator and Decision Point applications. (Trial Tr. at 1025:7-16; P-0191.)

21.     Defendants put a premium on Blaze Advisor during merger discussions due to its contribution to revenue generation.  An independent evaluator, Duff & Phelps, reviewed Defendants' technology applications.  (Trial Tr. at 655:12-25, 656:3-10, 657:6-7; P-0175.)  Duff & Phelps determined Blaze Advisor allowed Defendants to run a significant amount of new business through the Decision Point application.  The report stated the benefits included: "[a]dditional business intake, support of competitors applications, speed of generating new quotes, support of an AMS integration, use of Blaze decision services to determine eligibility, pricing, predictive analytics, and endorsements, supports forms app load and email upload." (P-0175 at P-0175-006; Trial Tr. at 661:12-663:5.)

22.     All of the above listed facts are business benefits achieved by Defendants that impacted revenue. That revenue comprises the differentiated revenue stream identified by FICO.

23.     Defendants' expert Mr. McCarter testified that Blaze Advisor was connected to or had a relationship with the differentiated revenue stream identified by FICO.

24.     Mr. McCarter confirmed that the use of technology "contributes to" the business of insurance companies. (Trial Tr. at 2125:9-18.) He agreed that technology is a tool that determines the degree to which insurance companies are successful and contributes to the goals of the business, which include making money. (*Id.* at 2125:19-2126:7.)

25.     With regard to Blaze Advisor specifically, Mr. McCarter agreed that Blaze Advisor can achieve the benefits of precision, consistency, agility, speed, time, and costs. (Trial Tr. at 2146:20-2147:24; *see also id.* at 2149:12-15.)

26.     Mr. McCarter testified that Chubb & Son licensed Blaze Advisor to automate decisioning. (Trial Tr. at 2117:23-2118:14, 2119:6-15, 2120:20-2121:6.)

27.     With respect to automatic renewals (a function provided by Blaze Advisor), Mr. McCarter agreed that there is a business benefit to automate renewals and that if a company can automatically issue renewal policies to a thousand existing customers, rather than doing it individually, their rate of renewals will increase. (Trial Tr. at 2144:6-10, 2145:4-10.)  Increasing renewals equals more revenue.

28.     FICO's industry expert, Mr. Bick Whitener, also confirmed that Blaze Advisor was connected to or had a relationship with revenue generation at Defendants.

29.     Mr. Whitener, with 45 years of experience in the field of insurance (including underwriting, financial management and reporting, product development, product management, field operations management, business management of technology and the use of technology in insurance processes) was qualified to offer expert testimony in this case.  (Trial Tr. at 1359:2-9, 1362:21-1372:21; P-0857.)

30.     Mr. Whitener's testimony was relevant to and probative of the issue of the connection or relationship between Defendants' revenue and their use of Blaze Advisor. Mr. Whitener conducted significant research in connection with the preparation of his opinions and testified about Defendants use of Blaze Advisor in the process of selling of insurance.  (Trial Tr. at 1357:5-13.)

31.    Mr. Whitener's testimony separately addressed each of Blaze Advisor's seven benefits—speed, precision, consistency, agility, scale, compliance, and ease of doing business—and how those features affect and improve the sales process and contribute to revenue. (*See, e.g.*, Trial Tr. at 1393:16-1395:5, 1480:9-1491:3, 1498:2-1500:12, 1504:19-1506:22, 1507:10-1509:3, 1511:8-12, 1512:12-22, 1514:22-1515:5, 1516:20-1520:15, 1522:17-1523:14, 1524:4-22, 1527:9-24, 1528:11-1529:12.)

32.    Mr. Whitener explained how Blaze Advisor's functional benefits impacted Defendants' process of selling insurance. (Trial Tr. at 1415:20-1420:13, 1428:16-1432:25, 1480:9-1491:3; P-0192 at P-0192-005; P-0191 at P-0191-004; *see also* Trial Tr. at 1023:19-1024:15, 1028:15-25.)

33.    Mr. Whitener explained how Blaze Advisor's functional benefits contributed to revenue through the CSI Express application:

- Increased speed of response to a request for a quote and speed of making renewal offers, which increases the conversion rate and decreases the time to consider a competitor's quote (Trial Tr. at 1393:16-1394:5, 1481:10-15);

- Helped the underwriting process achieve a precise, adequate price, which increased the probability that the quote or renewal is competitive and will be accepted (*Id.* at 1482:7-1484:3);

- If human involvement in underwriting was necessary, the problems are flagged, which made the response time faster (*Id.* at 1504:19-1505:8);

- The features of the software implemented by Defendants make it easier for agents and brokers to work with Chubb through better data capture and use of third-party data sources, which reduced the need to ask the applicant for more data, increased the accuracy of the data for underwriting, and made the price more competitive through better data (*Id.* at 1449:1-15, 1499:16-21, 1523:5-14); and

- Increased the time of underwriting staff to market to agents and brokers and to market new business (*Id.* at 1488:1-16).

Mr. Whitener concluded the above functions experienced by Defendants facilitated the generation of a greater volume of business, therefore increasing revenue. (*Id.* at 1486:14-22, 1529:14-1530:20, 1531:21-1532:2.)

34. Mr. Whitener also provided specific examples of Blaze Advisor's contribution to Defendants' revenues:

- Acquired a $25 million book of business from another insurance company. This acquisition required quick modification to their booking process, which was facilitated by Blaze Advisor. (Trial Tr. at 1485:9-19, 1519:19-1520:15.)

- Processed more business with the same number of humans (Trial Tr. 1486:17-22), which contributed to revenue because "the faster you respond to quotes, the higher the probability that you convert that quote into a policy." (*Id.* at 1508:14-1509:3.)

- Responded to customers' inquiries for new business by providing real-time quotes which "increase[d] [Defendants' probability of converting the quote into a policy." (*Id.* at 1480:9-1481:25.)

(*See also id.* at 1530:15-1532:2.)

35. Mr. Whitener testified that Blaze Advisor contributed to key aspects of Defendants' business:

- Speed, precision and accuracy of renewal officers (Trial Tr. at 1480:9-1481:25 and 1506:13-22);

- Speed to market with new products;  (*Id.* at 1489:5-9; 1519:21-1520:10);

- Increased the ease of use for agents and brokers. (*Id.* at 1468:6-1470:14, 1490:20-1491:3);

- Accurate and adequate pricing in CIS Claims and Profitability Indicator; (*Id.* at 1526:24-1527:18 *see also id.* at 1506:13-22); and

- Faster, more precise and accurate quotes through Decision Point (*Id.* at 1498:20-1499:9; 1508:14-1509:3).

These functions and results from Blaze Advisor are connected to or have a relationship with Defendants' generation of the $21.2 billion of differentiated revenue identified by FICO.

## II. None of Defendants' witnesses were able to measure the impact of any other factor to Defendants' revenue.

36. Defendants did not put forth evidence to quantify the extent to which Defendants' revenues were allegedly attributable to factors other than Blaze Advisor.

37. Ms. Theberge testified about the importance of reputation, but admitted that she did not have any documents to say what percent of Chubb's revenue and profits are driven by reputation. (Trial Tr. at 2319:19-25.)

38. Mr. Harkin testified to several factors that he alleged contributed to profits. However, he too could not quantify the percentage that those factors had in driving revenue. (Trial Tr. at 1872:9-1873:6.) He could only testify that such factors were important. (*Id.*)

39. Mr. Bakewell did not provide what percentage factors, other than infringement, contributed to revenue. (Trial Tr. at 2216:16-2217:1.)

40. Mr. Schraer was unable to quantify the extent to which Defendants' revenue was attributable to reputation in the market, prompt payment of claims, prudent financial management, strong sales, operations, and careful compliance with regulatory obligations. (Trial Tr. at 2269:10-2273:4.)

120

41.     A review of the entire trial transcript shows that none of Defendants'
witnesses testified to the extent to which Defendants' revenues were allegedly
attributable to factors other than Blaze Advisor.

42.     Defendants presented testimony as to seven pillars that allegedly contribute
to their revenue, but Defendants' own expert Mr. McCarter admitted that technology
covers each of the pillars. (Trial Tr. at 2126:19-23.)

III.    **Defendants failed to prove their expenses for 2016 to 2018 with sufficient
detail.**

43.     Defendants did not put forth evidence sufficient to establish their deductible
expenses for 2016-2018.

44.     Defendants admitted they could not specifically tie their bulk expenses to
an individual policy or premium. (Trial Tr. at 1903:24-1904:1.)

45.     Defendants' Chief Financial Officer, Mr. Harkin, testified that Defendants
"don't track or identify expenses at a policy level" and confirmed that under Defendants'
record keeping, it would be impossible to identify expenses on a policy level. (Trial Tr. at
1899:12-24.)

46.     Mr. Harkin admitted that Defendants' "best estimate" of expenses
potentially included expenses related to policies that did not touch Blaze Advisor. (Trial
Tr. at 1902:8-16.)

47.     Defendants' inability to calculate direct expenses, i.e., expenses on a policy
level, was confirmed by Defendants' expert, Mr. Bakewell. (Trial Tr. at 2196:8-14.)

**IV.    Defendants failed to put forth any evidence of Defendants' expenses for 2019 and 2020.**

48.    Mr. Bakewell admitted that he failed to update his report to include any expense data from 2019 and 2020. (Trial Tr. at 2225:21-2226:13, 2238:14-2240:8.) No other evidence was presented to establish Defendants' actual expenses for 2019 and 2020.

## PLAINTIFF'S ALTERNATIVE PROPOSED CONCLUSIONS OF LAW

**V.    FICO's burden was to show a connection or relationship between Blaze Advisor and the identified revenues.**

49.    Under the Copyright Act, a copyright owner is entitled to recover any profits of the infringer that are attributable to the infringement and are not taken into account in computing actual damages.  17 U.S.C. § 504(b).

50.    The copyright owner's burden of proof does not amount to proof of "but for" causation.  Instead, "the standard for nexus requires a showing of causation that is less stringent than 'but-for' causation." *Furnituredealer.net, Inc. v. Amazon.com, Inc.*, No. 18-232 (JRT/HB), 2022 WL 891462, at *4 (D. Minn. Mar. 25, 2022).

51.    The copyright owner's burden is to "establish some connection or relationship between the infringement and the profits he seeks." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 799 (8th Cir. 2003).

52.    The use of the infringing content need not be the only or even the main reason for the revenue.  *Garcia v. Coleman*, No. C-07-2279, 2009 WL 799393, at *4 (N.D. Cal. Mar. 24, 2009).

53.    The copyright owner's burden under 17 U.S.C. § 504(b) is not an "onerous

evidentiary burden." *Victor Stanley, Inc. v. Creative Pipe, Inc.*, No. MJG-06-2662, 2011

WL 4596043, at *4 (D. Md. Sep. 30, 2011) (quoting *Phoenix Renovation Corp. v.

Rodriguez*, 258 F. Appx. 526, 534-35 (4th Cir. 2007)).

54.    Pursuant to this legal standard, Defendants Proposed Finding of Fact Nos.

35-59 and 63-67, at a minimum, are irrelevant. (*See supra* Proposed FOF Nos. 35-59, 63-

67; *see also* Resp. to Proposed FOF Nos. 35-59, 63-67.)

**VI.    Defendants have not met their burden regarding apportionment.**

55.    After a plaintiff meets its burden under 17 U.S.C. § 504(b), the burden of

proof shifts to the alleged infringer to prove "the elements of profit attributable to factors

other than the copyrighted work." *Andreas* 336 F.3d at 795 (quoting 17 U.S.C. § 504(b));

*Honeywell Int'l Inc. v. ICM Controls Corp.*, No. 11-cv-569 (JNE/TNL), 2017 WL

374907, at *5 (D. Minn. Jan. 26, 2017) (describing copyright owner's burden as

establishing infringement "contributed to" the profits and alleged infringer's burden as

being to show sales of product derived from causes other than infringement).

56.    Defendants were required provide the "correct percentage of total revenues

or profits that would be attributable to" other factors. *Design Ideas, Ltd. v. Things

Remembered, Inc.*, No. 07-cv-3077, 2009 WL 1259035, at *5 (C.D. Ill. May 6, 2009)

(explaining that an expert witness's apportionment opinion must provide mathematical

apportionment); *Hewlett Custom Home Design, Inc. v. Frontier Custom Builders, Inc.*,

No. H-10-04837, 2013 WL 12097801, at *2-3 (S.D. Tex. July 19, 2013), *aff'd*, 588 F.

App'x. 359 (5th Cir. 2014); *see also*, *Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743154, at *3-4 (N.D. Cal. May 2, 2016)

57.     Defendants' testimony and evidence at trial failed to meet this standard. Defendants' generalized conclusions set forth in Defendants' Proposed Findings of Fact 35-59 and 63-67 are irrelevant under this legal standard. (*See supra* Proposed FOF Nos. 35-59 and 63-67; *see also* Resp. to Proposed FOF Nos. 35-59 and 63-67.)

**VII.   Defendants have not met their burden of establishing deductible expenses.**

58.     Under Section 504(b), Defendants bear the burden of "prov[ing] [their] deductible expenses . . . ." 17 U.S.C. § 504(b). "Any doubt as to the computation of costs or profits is to be resolved in favor of the plaintiff." *Andreas*, 336 F.3d at 795.

59.     Defendants failed to introduce any evidence establishing deductible expenses for the years 2019 and 2020.

60.     Defendants were unable to come forward with proof tying their costs and expenses to the gross written premiums generated in connection with Blaze Advisor for the years 2016 to 2018. Defendants' CFO admitted that Defendants' best estimate of expenses would potentially include expenses unrelated to Blaze Advisor. Had Defendants introduced evidence of expenses for 2019 and 2020, this failure would apply equally to those expenses.

61.     Defendants' evidence of deductible expenses is speculative and insufficient to meet Defendants' burden of establishing deductible expenses.

62.     Defendants are not entitled to deduct any expenses from the gross revenue that FICO established is connected to Defendants' use of Blaze Advisor.

124

Dated:  July 24, 2023                        /s/ Heather Kliebenstein

Heather Kliebenstein, MN Bar # 337419
Rachel Zimmerman Scobie, MN Bar # 314171
Paige S. Stradley, MN Bar # 393432
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
Gabrielle L. Kiefer, MN Bar # 0402364
MERCHANT & GOULD P.C.
150 South Fifth Street
Suite 2200
Minneapolis, MN 55402
Tel: (612) 332-5300
Fax: (612) 332-9081
hkliebenstein@merchantgould.com
rscobie@merchantgould.com
pstradley@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com
gkiefer@merchantgould.com

*Attorneys for Plaintiff Fair Isaac
Corporation*