## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Fair Isaac Corporation,

      Plaintiff,

v.

Federal Insurance Company, et al.,

      Defendant.

Case No. 16-cv-1054 (DTS)

**FINDINGS OF FACT
& CONCLUSIONS OF LAW**

---

Fair Isaac Corporation (FICO) sued Federal Insurance Company (Federal) and ACE American Insurance Company (ACE) (collectively, Defendants) alleging breach of contract and copyright infringement. The parties tried their case in early 2023 and the jury found for FICO on its copyright infringement claims against Defendants. Though the jury found Defendants liable for infringement, it advised the Court of its belief that FICO was not entitled to disgorge any profits attributable to the infringement. The Court agrees with the jury's conclusion and now enters its Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1).

### MEMORANDUM

The extensive background of this case has been recounted several times. The Court adopts and incorporates those recitations by reference and limits its current recital to only those facts most relevant to the instant issue.

### I.    Pre-Trial Litigation

In June 2006, Chubb & Son, an unincorporated division of Federal Insurance Company (hereafter referred to as Federal) entered into a License Agreement with FICO

to use Blaze Advisor, a rules management software on which FICO owns several copyrights. FICO and Federal amended the initial License Agreement twice and the resulting agreement, at issue in this lawsuit, granted Federal an enterprise-wide, perpetual license to use Blaze. Federal paid $1,300,000 for that license.

On January 15, 2016, Federal's parent company, Chubb Corporation, merged with ACE INA Holdings, Inc., making Federal a subsidiary of ACE.[1] Two weeks later, FICO notified Federal of its belief that by virtue of the merger Federal was in breach of Section 10.8 of the License Agreement. Federal denied it had breached the License Agreement. The parties were unable to resolve this dispute and FICO purported to terminate the License Agreement, effective March 31, 2016. Three weeks later, FICO sued Federal in this Court, alleging breach of contract and copyright infringement. FICO demanded a jury trial on all claims and remedies. Of particular importance here, FICO claimed Federal infringed its copyright in two ways: (1) through unauthorized disclosure of the software to third parties, including Federal divisions and outside consultants, and (2) continued use of the software post termination of the License Agreement. FICO further alleged ACE infringed its copyright through its unlicensed use of the software for which FICO claimed Federal was vicariously liable. FICO sought actual damages for this infringement, as well as disgorgement of profits, as provided under 17 U.S.C. § 504(b).

### A.    Summary Judgment

At summary judgment, Defendants argued they were entitled to judgment on all copyright infringement claims because FICO's alleged actual and disgorgement damages

---

[1] Because of Chubb's name recognition and the structure of the organization, witnesses used the names "Federal" and "Chubb" essentially interchangeably. Except where detailing witness testimony, the Court will use "Federal" when referring to that Defendant.

were merely speculative. As to disgorgement, Federal argued FICO's evidence attributing Defendant's profits to its infringing use of Blaze was too speculative to meet FICO's burden under Section 504(b) of the Copyright Act. District Judge Wilhelmina Wright found a fact dispute precluding summary judgment, explaining that "FICO present[ed] evidence of gross revenue from the sale of insurance in connection with which Blaze Advisor was used. . . . FICO also present[ed] evidence about how Blaze Advisor contributed to Defendants' gross revenue from the sale of insurance." *Id.* at 57. Thus, she declined to find as a matter of law that FICO could not meet its burden under 17 U.S.C. § 504(b). *Id.*

### B.    Additional Motions Practice

As already noted, when FICO sued Federal it demanded a jury trial on all claims and remedies, including its copyright infringement claims brought under 17 U.S.C. § 504. Second Amended Compl. Dkt. No. 132. Federal moved to strike the jury demand as to disgorgement of profits, contending disgorgement is an equitable remedy for the Court, rather than the jury, to decide. Mot. to Strike Pl.'s Jury Demand on Disgorgement Remedy, Dkt. No. 329; Mem. in Support of Mot. to Strike Pl.'s Jury Demand; Dkt. No. 331. This Court analyzed the text of the Copyright Act, determining it did not reserve disgorgement of profit for a jury. Furthermore, because disgorgement in this case was not a proxy for damages and therefore legal in nature, it was instead equitable and therefore the Seventh Amendment did not guarantee FICO a jury trial on that issue either. Order Granting Mot. to Strike Pl's. Jury Demand; Dkt. No. 588, *passim*. The Court thus granted

Federal's motion—the effect being that the jury would decide liability and actual damages, and the Court would determine disgorgement of profits if needed.

This determination ultimately bore another dispute. Prior to trial, Federal moved to bifurcate the trial with a line drawn between the jury issues—liability and actual damages—and the equitable issue of disgorgement, to be decided by the Court. Mot. to Bifurcate, Dkt. No. 899. Federal contended, among other things, that the jury would be unable to impartially determine liability after hearing the enormous revenue figures relating to the disgorgement issue. Furthermore, those huge figures would anchor the jury, leading them to award an improperly inflated actual damages figure. FICO claimed there would be substantial overlap in evidence between the two phases Federal proposed, leading to a waste of time and resources. The Court denied Federal's motion, finding bifurcation would not appreciably promote judicial economy or prejudice the Defendants, and that evidentiary overlap between the two parts was likely. Order on Mot. to Bifurcate; Dkt. No. 935. The Court notified the parties that it intended to employ the jury in an advisory capacity on the disgorgement claim. Order on Mot. to Strike Jury Demand at 16-17, Dkt. No. 935.[2]

## II.    Trial and Post-Trial Proceedings

The case proceeded to trial, which lasted several weeks. At the close of Plaintiff's case-in-chief, Defendants moved for judgment under Rule 52(c) of the Federal Rules of Civil Procedure (FRCP), arguing FICO had failed to meet its burden under the Copyright Act to prove a causal nexus between Defendants' use of Blaze and their revenues, and

---

[2] Just before trial, FICO moved *in limine* to exclude certain disgorgement evidence. [Dkt. No. 956]. FICO withdrew that motion during the parties' hearing on their motions *in limine,* Dkt. No. 1063 at 42:3-18, and the Court thus omits further discussion of it here.

thus FICO's claim for disgorgement failed. Dkt. No. 1135. The Court denied the motion. Dkt. No. 1196.

After deliberation, the jury returned its advisory opinion to the Court that FICO had not proved the Defendants' infringing use contributed to their revenues and therefore FICO was owed $0 in disgorged profits. Redacted Jury Verdict, Dkt. No. 1173.[3] The following day, the Court convened the parties to inform them of its intention to accept the jury's disgorgement verdict. The Court explained:

> I am going to accept the verdict on disgorgement. . . . I told you that I would exercise my own independent judgment on the issue of disgorgement, and I have. I have been considering the issue, well, simply stated, since the motion to strike the jury, but then more intensively since the motion to bifurcate and certainly with the [motion for judgment as a matter of law] and hearing evidence.
>
> I, nonetheless, wanted the jury's input so that I could certainly reexamine my own decision, should that be necessary but I'm persuaded and I was persuaded based on the law and the evidence at trial that this is not only a proper result, I am persuaded it is *the* proper result.

Dkt. No. 1174.

In post-trial proceedings, FICO moved under Rule 52(b) for "additional findings and conclusions" on the disgorgement question, apparently misperceiving the Court's statements immediately after trial to be the Court's findings and conclusions, required under Rule 52(a)(1). ("In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately. The

---

[3] The jury instructions about FICO's attribution burden explained that FICO must "prove a causal nexus between the revenues Defendants received and the unauthorized use of Blaze Advisor. . . . A party cannot meet its burden to establish the causal nexus by identifying revenue that is only remotely or speculatively attributable to the infringement. That is, FICO must show that the use of Blaze Advisor contributed to the generation of revenue." Final Jury Instructions at 25, Dkt. No. 1167.

findings and conclusion may be stated on the record after the close of evidence or may appear in an opinion or memorandum of decision filed by the Court.") Because the Court has not, until this Order, entered its findings of fact and conclusions of law as required under Rule 52(a), the Court treats FICO's motion merely as a request for those findings and conclusions. The Court ordered Defendants to file proposed findings of fact and conclusions of law; then ordered FICO to file objections. *See* Dkt. Nos. 1264, 1275, 1277.

### a. Applicable Law

Section 504(b) of the Copyright Act provides that a copyright holder may recover actual damages, as well as "any profits of the infringer that are attributable to the infringement." These awards serve different purposes. While damages "are awarded to compensate the copyright owner for losses from the infringement," disgorged profits "prevent the infringer from unfairly benefitting from the wrongful act." H.R. 94-1476, 1976 U.S.C.C.A.N. 5659, 5777, 1976 WL 14045, at *161. To establish the amount of profits subject to disgorgement, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). Over time, Courts have refined these broad guideposts, explaining each party's burden with more specificity. Courts employ useful shorthand for each party's burden: the copyright holder must establish attribution—"*the fact* that an infringement contributed to a defendant's profits"; the infringer must establish apportionment—"*the extent* to which the infringement contributed to profits." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 796, 799 (8th Cir. 2003). This is true whether the case involves direct profits—where the infringer has sold the copyrighted work itself—or

indirect profits—where the infringer used the copyrighted work to sell a different product. *Andreas*, 336 F.3d at 796; *Mackie v. Rieser*, 296 F.3d 909, 914 (9th Cir. 2002); *Complex Sys. Inc. v. ABN Ambro Bank N.V.*, No. 08 Civ. 7497, 2013 WL 5970065 (S.D.N.Y., Nov. 8, 2013). Because in this case Defendants used Blaze Advisor in selling insurance policies, that is, they did not sell Blaze Advisor itself, this is an indirect profits case. *See Andreas,* 336 F.3d at 796.

### b. Defendants' Arguments

Defendants contend FICO failed to meet its attribution burden under the Copyright Act. First, Defendants note that no witness was able to say how much Blaze contributed to revenues. Instead, witnesses stated they could not identify any "specific impact" or "quantify[] the value of Blaze." Defs.'s Proposed Findings of Fact and Conclusions of Law (Def. FOF COL) at 2, Dkt. No. 1275 (citing Tr. Vol. II at 179-80, 185, Dkt. No. 1178 (testimony of Sean Baseman, technical and solution architect at FICO). Further, though Defendants acknowledge that FICO identified revenue that "touched" Blaze, they argue FICO failed to establish the requisite causal nexus between Blaze and those revenues. *Id.* at 3. Defendants then attack FICO's insurance industry expert, Bick Whitener, who testified broadly about the impact of Blaze on Defendants' business. *Id.* at 4. Aside from their contentions that Whitener simply was not qualified to testify as an expert, they explain that he was unable to say whether Blaze contributed to an increase in revenue and that he did not measure any purported impact of Blaze. *Id.*

Defendants next argue that they met their apportionment burden under the Copyright Act. *Id.* at 9. They point to testimony that "Blaze's usefulness derives only from 'the insurance company's rules and logic.'" *Id.* at 10 (quoting testimony of Defendants'

insurance industry expert William McCarter at Tr. Vol. X at 2077-78, Dkt. No. 1186). According to Defendants, "Blaze did nothing more than run rules developed by Defendants' own insurance professionals." *Id.* (citing testimony of Ellen Garnes, Chubb's Assistant Vice President of Operations). Defendants also rely on the fact that Blaze was one small component of their technology systems; they point to evidence that the rate of adoption of the software was low, and that it was "not a significant tool" for their operations. *Id.* at 11. They next point out that there are other rules management products on the market, that customers did not know they were using Blaze (and thus Blaze was not a "draw" for customers to purchase insurance through Defendants); and that eliminating Blaze from their systems did not affect Defendants' revenues or operations. *Id.* at 12-14.

### C.    FICO's Arguments

FICO understands the trial record—and the governing law—differently than Defendants. First, FICO characterizes its burden under the Copyright Act as merely to "establish some connection or relationship between the infringement and the profits [it] seeks." Pl. Proposed Findings of Fact and Conclusions of Law (Pl. FOF COL) at 68, Dkt. No. 1277 (quoting *Andreas*, 336 F.3d at 799). FICO alleges that Defendants' characterization of the law seeks to establish a heightened attribution burden because FICO seeks indirect, rather than direct profits. *Id.* at 69. FICO again stresses that it need only show "some connection or relationship" and nothing more to meet its burden. *Id.* Identifying "differentiated" revenues is sufficient to meet its burden, FICO claims. *Id.* at 73.

FICO has met its burden, it argues, simply because it has identified differentiated revenue streams—*i.e.* revenue from the sale of insurance policies that ran through

computer applications that used, among other software, Blaze Advisor. *Id.* at 113 ("The Defendants' gross written premium for all insurance policies in connection with which the Blaze Advisor software was used was $21,202,380,943. . . .This unrebutted evidence, based on Defendants own admission satisfies FICO's burden of showing the differentiated revenue stream that is limited to Defendants' gross written premiums in connection with which the Blaze Advisor software was used."). While FICO claims those differentiated revenue streams are sufficient to meet its burden, FICO also enumerates other evidence at trial purportedly establishing a "connection or relationship" between Blaze and those revenues. FICO points to evidence that Defendants' expanded their use of Blaze and entered 52 statements of work with FICO over the years, apparently demonstrating Blaze's connection to Defendant's revenue. *Id.* at 113. In preparation for the ACE/Federal merger, Federal employed an independent evaluator to assess its technology applications; according to FICO that evaluator "put a premium on Blaze Advisor." *Id.* at 116 (describing the Duff & Phelps report and its discussion of DecisionPoint, which used Blaze). Several witnesses also testified about the benefits of business rules and rules management software programs, all demonstrating the connection between Blaze and Defendants' revenues, according to FICO. *Id.* at 114-16 (citing testimony from Henry Mirolyuz and William McCarter).

In arguing that it met its burden under the Copyright Act, FICO places great emphasis on Whitener's testimony. FICO details his testimony, explaining that he "addressed each of Blaze Advisor's [] benefits . . . and how those features affect and improve the sales process and contribute to revenue." *Id.* at 118. He explained how Blaze "impacted Defendants' process of selling insurance," including that it "facilitated the

generation of a greater volume of business, therefore increasing revenue." *Id.* at 118-19. Whitener testified that Blaze contributed to "speed, precision, and accuracy of renewal offers, speed to market of new products, increased ease of use for agents and brokers, accura[cy] and adequa[cy] of pricing, [and] faster, more precise quotes." *Id.* (internal citations omitted). According to FICO "[t]hese functions and results from Blaze Advisor are connected to or have a relationship with Defendants' generation of the $21.2 billion of differentiated revenue identified by FICO." *Id.* at 120.

FICO also contends Defendants failed to meet their apportionment burden. FICO argues Defendants "did not put forth evidence to quantify the extent to which [their] revenues were allegedly attributable to factors other than Blaze Advisor." *Id.* While witnesses offered testimony about other factors, those witnesses could "not quantify the percentage that those factors had in driving revenue." *Id.* at ¶¶ 37, 38, 39, 40 (citing testimony of Alissa Theberge (Chubb underwriter), Kevin Harkin (Chubb North America CFO), Christopher Bakewell (Defendants' damages expert), and Michael Schraer (Chubb's Chief Underwriting Officer for North American Financial Lines Division)).

## ANALYSIS

The Court agrees with the jury's finding that FICO is not entitled to disgorge any profits from Defendants. At bottom, FICO has failed to meet its attribution burden, having presented insufficient evidence to establish a causal nexus between Defendants' infringement and their revenues beyond a speculative level. Differentiated revenues—*i.e.* revenues earned through policies that "touched" Blaze—are not enough to meet FICO's burden. Having failed to meet its burden, FICO is not entitled to disgorge any profits from Defendants, and the Court adopts the jury's advisory verdict as its own.

## I.      Disgorgement of Profits Standard

As already explained, Section 504(b) of the Copyright Act provides that in addition to recovering actual damages, a copyright owner is entitled to "any profits of the infringer that are attributable to the infringement." To establish the amount of profits subject to disgorgement, "the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). This framework denotes a shifting burden framework: before the infringer is tasked with apportioning its profits to sources aside from the infringement, the copyright holder must establish those revenues that are attributable to the infringement. The parties interpret these burdens—in particular FICO's burden—differently, and the Court therefore details the law explaining those burdens below.

### A.      FICO's Burden

The copyright holder is responsible for establishing "attribution," *i.e.* identifying "that profits are attributable to the infringed work." *See Andreas*, 336 F.3d at 796; 17 U.S.C. § 504(b). Attribution requires the copyright holder to "demonstrate a nexus between the infringement" and the profits sought. *Id.* Put differently, "[t]here must be a demonstration that the infringing acts had an effect on profits." *Mackie*, 296 F.3d at 915. This requires a "causal link between the infringement and the subsequent indirect profits." *Id.*; *Andreas*, 336 F.3d at 798 (describing plaintiff's burden to establish a "casual connection"); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 159 (2d Cir. 2001). This requirement to establish a causal nexus "dovetails with common sense—there must first be a demonstration that the infringing act had an effect on profits before the parties can

11

wrangle about apportionment." *Mackie*, 296 F.3d at 915; *see also*, *Complex Sys., Inc. v. ABN Ambro Bank N.V.*, 2013 WL 5970065 at *3 (S.D.N.Y. Nov. 8, 2013) ("The requirement of a 'causal nexus'—versus some non-causal 'connection'—is rooted in the text of the statute itself.").

Though the Copyright Act's reference to the "infringer's gross revenues" is broad, "it should not be construed so broadly as to include revenue from lines of business that were unrelated to the act of infringement." *On Davis*, 246 F.3d at 160. A copyright holder may not necessarily introduce evidence of an infringer's total gross revenue; instead, the copyright holder may only introduce revenue from the part of the business directly connected to the infringement. *Andreas*, 336 F.3d at 792 ("[T]he district court granted Audi's motion in limine, precluding Andreas from introducing evidence of Audi's gross revenue from sales of any automobile other than the TT coupe depicted in the [infringing] commercial."). Where the link between the infringement and the profits is only remote or speculative, the copyright holder has failed to meet its burden. *Mackie*, 296 F.3d at 914; *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 523 (4th Cir. 2003) (describing a two-step inquiry which asks (1) whether there is a conceivable connection between the revenues and the infringement and if so, (2) whether the evidence of a causal link between revenues and infringement is more than merely speculative); *see also* 4-M. Nimmer*, Nimmer on Copyright*, § 14.03[A], at 14-29 (2001). Indirect profits claims tend to be "at-best highly speculative." 6 William F. Patry, *Patry on Copyright*, § 22:131 (2010).[4]

---

[4] Patry suggests that the copyright holder's burden is all but impossible to meet in indirect profits cases because the nexus between the infringement and the infringer's revenues is "fatally attenuated." 6 William F. Patry, *Patry on Copyright*, § 22:131 (2010). This forces courts to "vigorously police such claims" by requiring plaintiffs to provide nonspeculative evidence of the nexus. This is challenging for plaintiffs because "most claims for indirect

Cases dealing with software copyright infringement provide useful comparison to the facts presented here. In *Int'l Bus. Machs. Corp. v. BGC Partners, Inc.*, No. 10 CIV 128, 2013 WL 1775437 (S.D.N.Y. April 25, 2013) [*IBM*], the software company IBM sued BGC, alleging BGC had infringed IBM's copyright for its Informix software. BGC, an inter-dealer broker, used Informix to complete "back-office functions" including processing trades and generating reports and invoices. BGC also used other software to perform these same functions and BGC's customers did not know which software BGC used to complete any given trade or process any report or invoice. *Id.* at *3. IBM sought to disgorge all of BGC's profits, pointing to BGC's statements that Informix was "integrally important to the operations of BGC and its ability to service its customers." *Id.* at *4.

This evidence was insufficient to meet IBM's burden. IBM's evidence neither established that the revenues sought were "reasonably related to the infringement" nor did they establish a *causal link* between the infringement and the revenues sought. *Id.* at *4 (citing *On Davis*, 246 F.3d at 160). Though the court acknowledged that "BGC may have profited from using Informix indirectly in that it enabled BGC to operate more efficiently," this evidence of a causal link was "only remote[] or speculative[]." *Id.* Statements that the software is an important, meaningful, or significant part of the infringer's technology infrastructure are insufficient to prove attribution. *Id.* "In the absence of *concrete evidence* regarding the myriad factors that could influence BGC's customers' decisions to engage BGC's services, IBM's indirect profits argument is overly

---

profits"—this case included—"involve infringing works that contain substantial noninfringing material and the indirect profits claimed are both substantial and far removed from the infringement." *Id.; see also Complex Sys.*, 2013 WL 5970064 at *14.

speculative." *Id.* (citing *Mackie*, 296 F.3d at 916 (internal quotation marks and alterations omitted).

*DaimlerChrysler Servs. v. Summit Nat.* 2006 WL 208787 (E.D. Mich., Jan. 26, 2006) presented similar facts as described in *IBM*. In explaining the copyright holder's burden, the court provided a useful analogy: Although the infringer

> could not likely have carried on business without [the software], it does not follow that every cent of profit [the infringer] generated was attributable to [the software]. . . . [The infringer] could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes.

*Id.* at *3. The court there advised that the copyright holder must do more than "point to [the infringer's] balance sheet." *Id.* at *4. "[I]n cases where profits cannot be traced only to an infringing work but rather to a complex income stream, courts have required that plaintiff produce *detailed evidence* linking revenues to the infringement." *Id.* (citing *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 963, 971-72 (E.D.Mich. 1998) (emphasis added)).

The facts in *Complex Sys., Inc. v. ABN Ambro Bank*, 2013 WL 5970065 [CSI], are similar to those presented here. After ABN continued using CSI's Banktrade software after an assignment event, CSI sued alleging copyright infringement. ABN used Banktrade to complete certain transactions in its letter of credit and guarantee business and identified certain revenue "stemming only from transactions processed through Banktrade." *Id.* at 1, 11. To meet its attribution burden, CSI relied in part on experts. *Id.* at *6. As to one expert, the court explained that though he had "proffered reasonable estimates of revenues *somehow connected to or touching BankTrade*," he also merely "*assume[d] a causal* nexus." *Id.* at *7. Another expert provided what the court referred to as "the only evidence in the record regarding whether there is a reasonable basis—or any basis—to infer a causal connection between use of BankTrade and the generation of

revenue." *Id.* at *9. That expert had used BankTrade at a different banking institution and testified that there was no change in the number of foreign exchange transactions after implementing the software. He also stated he was not aware of any impact BankTrade had on the amount of trade finance loans issued, amount of collateral taken in, amount of overdrafts, or the number of lines of credit issued. *Id.* at *9-10. That same expert explained that there were at least five other software programs that performed similar functions. *Id.* at *10. This evidence, coupled with other testimony including that "ABN customers do not care what specific software or technology ABN uses to deliver a trade finance service or product to them" led the court to grant ABN's motion.[5] The court explained:

> [T]here is a tension between holding the leash on causation so tightly that an infringer whose business utilizes a product indirectly can profit and not face disgorgement of such profits, and the Copyright Act's concern with protecting copyright holders from infringement. In this ruling, the Court does not suggest that there is no scenario in which a copyright holder—and even CSI on a different record—could demonstrate a sufficient causal nexus, even when multiple factors are contributing to a company's profits. Here, CSI has failed to meet its burden.

*Id.* at *14.

Cases that deal with copyrighted works other than software demonstrate these same principles. For example, Jack Mackie sued the Seattle Symphony Orchestra Public Benefit Corporation (Symphony) for copyright infringement after the Symphony used his artwork in one of its advertising campaigns for its Pops series without his permission. *Mackie*, 296 F.3d at 911. The Pops advertisement—a collage made up of images of

---

[5] In *CSI*, the court had granted summary judgment to plaintiff on the issue of liability. Before trial, the defendant moved *in limine* to preclude plaintiff's evidence of "indirect profits," arguing it was too speculative to support plaintiff's causation burden.

Mackie's work, the Seattle Symphony's then-future home (Benaroya Hall), the Statue of Liberty, the Seattle skyline, "pastel-like swirls," and several words—was one page in a Symphony brochure. *Id.* at 912. Mackie sought the profits the Symphony generated through its use of his artwork. *Id.* at 913.

The Ninth Circuit concluded that Mackie had failed to meet his burden under the Copyright Act. Though the image of his artwork in the brochure could have had an impact on some symphony-goers' decision to attend the Pops series, "it would be nearly impossible to establish a causal link." *Id.* at 916. The court explained that it could "intuitively . . . surmise virtually endless permutations to account for an individual's decision" to see the Symphony, including the conductor, the dates of the concert, the program, the composers featured, a love of music, or other unspecified reasons. *Id.* Further, the Court explained that though Mackie's expert had opined that the "Symphony's goal of generating 1.5% response rate to the direct mail brochure was [] directly correlated with revenue generated" by ticket sales, that opinion was a "virtual non-sequitur" because even if there were a 1.5% response rate, there is no way to determine how many people responded *because* of the infringing work. Even more, the infringing work was only one page in a multi-page brochure aimed at several concert series, not just the Pops series. *Id.* Thus, Mackie's evidence was too speculative to meet his attribution burden. *Id.*

Similarly in *Estate of Vane v. The Fair, Inc.*, 849 F.2d 186 (9th Cir. 1988), Vane failed to meet his burden. There, a retail store chain, The Fair, hired Dean Vane to photograph some of its merchandise for use in its print advertising. The Fair later hired an advertising agency which used Vane's images in television commercials. Vane sued

16

The Fair, claiming any use of his images beyond its print ads was infringing use. The trial court found for Vane and awarded him $60,000 in actual damages but did not award any disgorgement of The Fair's profits, finding the evidence "too speculative to support such an award." *Id.* at 187.

On appeal, the Ninth Circuit affirmed the lower court's ruling. Though Vane's expert had testified about multiple regression analyses he performed showing how much money each dollar The Fair spent on advertising had yielded it in sales, there were "a number of shortcomings in this analysis." *Id.* at 188. For example, the expert analysis provided a lump sum figure attributable to the TV ads, "without accounting for the fact that the infringed material constituted only a fraction of any given commercial." *Id.* The Court commented that though "some portion of the profits may have been attributable to the infringement, [] much of the profits must be attributed to noninfringing aspects of the commercials." *Id.* The expert's opinion accounted for neither the relative length of time Vane's images were used in the ad, nor the "relative importance" of the various aspects of the commercials in generating profit. *Id.* at 189. When asked whether he had any opinion about what percentage of the profits were attributable to Vane's images relative to the rest of the commercial, the expert responded he had no such opinion. *Id.*

Conversely, Brian Andreas sued Volkswagen and an advertising firm after Audi (owned by Volkswagen) used Andreas's copyrighted words in a television commercial for Audi TT coupes. *Andreas*, 336 F.3d at 791. The jury returned a verdict for Andreas and awarded him $570,000 of Audi's profits. *Id.* at 792. In granting Audi's motion for judgment as a matter of law, the district court vacated that award, holding that Andreas had not proved a causal nexus between the infringement and Audi's profits. But the Eighth Circuit

reversed finding that although it may be "more difficult to quantify" attribution in an indirect profits case, Andreas had presented "more than mere speculation that the [] commercial contributed to the sales of the TT coupe." *Id.* at 796. For example, there was evidence that Audi pushed the ad with its dealers, using it as an "integral part" of its TT sales campaign. Further, sales of the TT were higher than projected during the period the commercial aired. Audi even paid the advertising firm a bonus because of the success of the ad. *Id.* at 797. This was "enough circumstantial evidence" that a jury could have reasonably determined the ad contributed to Audi's profits without merely speculating. *Id.*

### B. Defendants' Burden

If FICO establishes a causal nexus between Defendants' infringement and revenues, the Defendants are burdened with apportionment, *i.e.*, identifying "the contribution to profits of elements other than the infringed property." *Andreas*, 336 F.3d at 796. In other words, the Defendants must prove that "either part or all of those revenues" are deductible expenses and therefore not profits, or that they are "attributable to factors other than the copyrighted work." *Bouchat*, 346 F.3d at 520. Defendants' burden does not require "mathematical precision." *Id.*; *see also*, *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 772 F.2d 505, 516 (9th Cir. 1985) ("[W]e require only a reasonably acceptable formula." (internal quotation marks and citations omitted)); *Sheldon v. Metro-Goldwyn Pictures Corp.* 309 U.S. 390, 408 (1940) ("[W]hat is required is not mathematical exactness but only a reasonable approximation. . . . Equity is concerned with making a fair apportionment so that neither party will have what justly belongs to the other.").

A defendant may meet its burden by, for example, demonstrating that buyers would have purchased "its product even without the infringing element" or that its profits

are not attributable to the infringement *alone*, but rather are "the result of other factors" that add intrinsic or promotional value. *Data Gen. Corp. v. Grumman Sys. Support Corp.*, 36 F.3d 1147, 1175 (1st Cir. 1994) (citing *Sheldon v. Metro-Goldwyn Pictures, Corp.*, 309 U.S.390, 407-408 (1940) (abrogated on other grounds). For example, in entertainment business cases where a film's story has been pirated, a defendant may point to the actors' or performers' "drawing power" to bring in an audience and account for the film's earnings. *Id.* (citing *Abend v. MCA, Inc.*, 863 F.2d 1465 (9th Cir. 1988) (about a film made by Alfred Hitchcock and starring Jimmy Stewart and Grace Kelly). To the extent the identified revenues are apportioned to something other than the infringement, they are excluded from profits subject to disgorgement. *Andreas*, 336 F.3d at 796.

## II.   FICO Has Failed to Meet its Attribution Burden

The Court accepts the jury's verdict on disgorgement finding FICO failed to prove that Defendants' infringing use "contributed to the ***revenues*** of the infringer" and awarding $0 in disgorged profits. Redacted Jury Verdict at 3, Dkt. No. 1173.[6]  Though FICO has clearly established revenues generated from the sale of insurance policies that were run through certain computer applications that used (among other software) Blaze,[7] that is insufficient to meet its burden under the Copyright Act. Though these revenues were differentiated from revenues that had *no* connection to Blaze, FICO's evidence to establish "*the fact*" that the use of Blaze contributed to Defendant's revenues, as required

---

[6] *See supra*, n.3.

[7] Witnesses testified that at the time of the ACE/Federal merger, the entity was using between 800 and 1500 computer applications. Tr. Vol. IV at 687, Dkt. No. 1180, Tr. Vol. X at 2082, 2161-63, Dkt. No. 1186. Only 13 of those applications employed Blaze, among other software. Tr. Vol. IV at 702, Dkt. No. 1180. Vol. But there was no evidence as to the relative size or specific function of Blaze within those 13 applications.

under the governing law, is too remote or speculative to meet its burden. *See Andreas*, 336 F.3d at 796. The evidence FICO relies on only speculatively or remotely links the Defendants' infringing use of Blaze to this revenue, contrary to the standard governing FICO's burden. *See Mackie*, 296 F.3d at 914.

### A.      Differentiated revenues are insufficient to Meet FICO's Burden

As should be plain from the lengthy recitation of the copyright holder's burden above, FICO must do more to prove attribution than merely identify "some connection or relationship," Pl. FOF COL at 68, 73, 111 (quoting *Andreas*, 336 F.3d at 799), between Defendants' infringement and revenues. Though FICO repeatedly cites *Andreas*, it misstates that case's guidance and the law governing the attribution burden generally. FICO points to Defendants' interrogatory responses indicating that they earned $21.2 billion in revenues from policies that passed through computer applications that employed Blaze Advisor.[8] Though this evidence does identify revenue that is differentiated—meaning it is revenue from policies related to the infringing use—differentiation alone does not meet FICO's burden. *On Davis*, 246 F.3d at 160; *Andreas*, 336 F.3d at 792; *Complex Sys.*, 2013 WL 5970065 at *11. Instead, a copyright holder is required to establish a "causal connection" or "causal link" between the revenues and the infringement. *Andreas*, 336 F.3d at 792, 798. There must be evidence "that the infringing acts had an effect on profits." *Mackie*, 296 F.3d at 915. Though the interrogatory responses certainly create *some* connection between use of Blaze and revenue, they do

---

[8] The revenue by application is as follows:  CSI eXPRESS, Automated Renewal Process, Profitability Indicator: $5,011,322,794. Tr. Vol. VII at 1326, Dkt. No. 1183; CUW-IM: $12,747,393,210. *Id*; TAPS: $844,306,538. *Id.*; IRMA: $300,316,999. *Id.*; Decision Point: $19,253,516.  *Id.* at 1327; Cornerstone:  $528,910,484.  *Id.*;  Premium  Booking: $1,750,877,402. *Id.* at 1332.

not on their own establish a *causal* connection. Moreover, this comports with the definition of "attribute,"[9] and with the text of the Copyright Act which allows for disgorgement of "any profits of the infringer that are *attributable to* the infringement," not any profits of the infringer that are *somehow connected to* the infringement.

FICO appears to either downplay or ignore this part of its burden by invoking again and again a single sentence from *Andreas*: "[T]he copyright holder must first establish *some connection or relationship* between the infringement and the profit he seeks." 336 F.3d at 799 (emphasis added).[10] To start, as is often the case, the meaning of this statement is clearer when read in context. Before trial, Volkswagen argued Andreas should be prevented from introducing evidence of profits Audi earned from *all* its car models during the time the TT commercial aired. Andreas argued that the TT commercials were intended to get buyers to go to an Audi dealership where they could buy any number of Audi car models, not just the TT coupe. In seeking to connect the infringing commercial with the sale of all Audi car models, Andreas pointed to the "disproportionately high cost of the commercial as a percentage of Audi's total advertising budget and as related to projected sales of the TT coupe, [and] Audi's purported intent to use the TT coupe as the 'image building spearhead' of its fleet." 336 F.3d at 799. Though Andreas had established a causal connection between the commercial and sales of TTs, *see supra*, he had not established that connection as to all other Audi models. The court put is simply: "It is not enough to show an infringement and then seek all of the defendant's profits, from

---

[9] Attribute, Oxford English Dictionary ("To ascribe, impute, or refer, *as an effect to the cause*; to reckon as a consequence" (emphasis added); Attribute, Merriam-Webster ("To explain (something) *by indicating a cause*." (emphasis added)).

[10] FICO mobilizes some form of these words no fewer than 110 times in its briefing on this issue.

whatever source." *Andreas*, 336 F.3d at 799. Indeed, this portion of *Andreas* speaks mainly to the copyright holder's ability to differentiate revenues (in *Andreas* for TT coupes rather than all Audi cars, and in the instant case for policies passing through computer applications using Blaze rather than all of Defendants' policies), but it does not provide further gloss on the copyright holder's burden.

The rest of *Andreas*, much of which reviews the copyright holder's attribution burden by reviewing the lower court proceedings, makes clear that the attribution burden requires proof of not just *any* connection, but a *causal* one. The Eighth Circuit refers to (1) Andreas's "burden of establishing a causal connection," *id.* at 792, 797,[11] (2) the district court's finding Andreas had not "prove[d] a casual connection," *id.* at 795, (3) the district court's discussion of "proof of causation," *id.* at 796, and finally (4) Audi's argument that Andreas had "failed to establish a causal connection," *id.* at 795-96. In holding that Andreas had met his burden, the court explained that he had proven the infringing commercial "did more than merely contribute *somehow*;" it had instead "contributed to the profitable introduction of the TT coupe" into the marketplace. *Id.* at 797. FICO's differentiated revenues may very well establish that Blaze advisor contributed to Defendants' revenue "somehow"—that the use of Blaze is *connected to* revenue—but they do not provide evidence that the revenue is *attributable to* the infringing use. *See* 17 U.S.C. § 504(b). Andreas had met his burden not merely because he identified revenue earned through the sale of TT coupes; he met his burden because he presented evidence that (1) Audi pushed the ad with its dealers and used the ad as an "integral part"

---

[11] The court summarized the *Rainey v. Wayne State Univ.*, 26 F. Supp. 2d 963 (E.D. Mich. 1998) holding as finding "no causal connection established between the artist's work in the brochure . . . and the defendant's increased goodwill." *Andreas* 336 F.3d at 798.

of its TT sales strategy; (2) TT sales were higher than projected during the period the ad aired; and (3) Audi paid the advertising firm a bonus *because of the success of the ad*. *Id.* at 797; *see also Bouchat*, 346 F.3d 523 (describing a two-step inquiry which asks (1) whether there is a conceivable connection between the revenues and the infringement and if so, (2) whether the evidence of a causal link between revenues and infringement is more than merely speculative). FICO cannot meet its burden by merely presenting evidence of differentiated revenue. It must do more. It must present evidence demonstrating that Blaze, at least in part*, caused* those revenues.

**B.      FICO's evidence of attribution is too speculative to meet its burden**

Though FICO claims its burden is met simply by identifying differentiated revenues, it also identifies other evidence purporting to meet its attribution burden. That evidence is too speculative to sustain FICO's burden, however. In particular, FICO points to testimony that "FICO's customers who use Blaze Advisor, including insurance companies, realize" the benefits of speed, control, accuracy, consistency, transparency, and agility through use of Blaze. Pl.'s FOF COL at 111-12, Dkt. No. 1277 (citing testimony from, among others, FICO employees Sean Baseman and Benjamin Baer). For example, Baer testified that "underwriters can expect to attain" the benefits of "reduced customer churn, improve[d] business insight" faster processing and greater control. Tr. Vol. II at 285-86, Dkt. No. 1178. Jean-Luc Marce, one of the original developers of Blaze, testified about "the purpose of Blaze Advisor"—"to automate decisions and processes so that their decisioning process is more efficient and consistent." Pl.'s FOF COL at 6 (citing Tr. Vol. II at 194). FICO points to testimony that Blaze "reduc[ed] inherent inconsistencies and subjectivities associated with human decision-making." *Id.* at 114. William McCarter,

Defendants' insurance industry expert, "agreed that technology is a tool that determines the degree to which insurance companies are successful and contributes to the goals of the business, which include making money." Pl. FOF COL at 116, Dkt. No. 1277. Blaze was part of Defendants' "core" systems. *See id.* at 114. FICO further highlights that "McCarter agreed that Blaze Advisor can achieve the benefits" listed above. *Id.* at 117.

Aside from conflating testimony about rules management software products and technology generally with Blaze Advisor specifically, FICO's evidence fails to meet its burden because it does not demonstrate a causal link between the infringement and the differentiated revenues above a speculative level. To put it bluntly, the fact that FICO markets Blaze as providing certain benefits to customers does not mean Defendants achieved or realized those benefits, much less that those benefits resulted in revenue. FICO relies on the testimony from Baer, Baseman, Marce, McCarter and others in establishing Blaze's benefits. But none of those witnesses could or would say how Blaze's benefits contributed to Defendants' revenue. Though Baseman proclaimed broadly that Blaze was "pivotal to what [Defendants] were doing" as evidenced by their desire to expand use of the software, that does not necessarily demonstrate any effect on revenue. Instead, Defendants expanded use could reflect a positive user experience,[12] availability of favorable pricing, or a desire to limit the number of software programs used across an enterprise, etc.

Just as the *Mackie* court explained that it could "surmise virtually endless permutations to account for an individual's decision" to see the Symphony aside from the infringing work, so too here. 296 F.3d at 916. Blaze was one small part of several

---

[12] Defendants' witnesses insist this was not the case.

24

applications and there are "endless" ways those components could contribute to revenue generation. That the infringing work in *Mackie* was one part of a marketing brochure that brought in business for the Symphony says nothing of the specific contribution made by the infringing portion of the brochure. That Blaze, which purportedly helps increase speed leading to revenue generation, was one part of computer applications helping Defendants sell insurance policies says nothing of the specific contribution to sales made by Blaze. Put differently, the connection between Blaze and the differentiated revenues is too remote to meet FICO's burden. Even accepting that some Blaze customers have realized the benefits listed, at least two assumptions are required to bridge the gap between those benefits and Defendants' revenues: (1) that these Defendants *realized* those benefits; and (2) that realizing those benefits caused Defendants to sell more insurance or draw in more customers. *Cf. Complex Sys.*, 2013 WL 5970065 at *12 ("ABN customers do not care what specific software or technology ABN uses."); *IBM*, 2013 WL 1775437, at *4 ("BGC did not market or sell the Informix software to its customers and there is no evidence that its customers cared what software system it used."). FICO essentially argues that because Defendants used Blaze, they must have realized its purported benefits, and that realizing those benefits resulted in revenue. But the record does not support those inferences. Even assuming Defendants realized Blaze's purported benefits, there was no evidence that those benefits actually contributed—that is, *caused*—any portion of Defendants' revenue. It seems safe to assume that Blaze offers its users *some* benefit—presumably FICO would not bother developing, marketing, and selling a product that was worthless. But the presence of some benefit alone is not

evidence of the effect of such a benefit on revenue generation. Absent such evidence, FICO has not met its burden.

FICO makes much of testimony from Henry Mirolyuz, a Federal employee involved with claims IT architecture. Mirolyuz testified that he was "boots on the ground" in developing Blaze Advisor in Federal's systems in 2006. Tr. Vol. VII at 1020-21, Dkt. No. 1182. He marketed business rules technology to other groups at Federal to make "life simpler." *Id.* He explained that in particular, the IT team "can deploy the business requests significantly quicker" using rules software. *Id.* When asked whether that meant "that new policies can be put to market faster" he replied, "Not necessarily, but could be more precise guidance or more precise scoring. . . . It doesn't necessarily impact the speed or increase [] the business." *Id.* at 1021-22.  He made clear that his testimony was offered "from the IT perspective" and that he "would not be able to speak to any business benefits achieved through the use of Blaze Advisor or business rules technology." *Id.* at 1022, 1024. Though Mirolyuz was involved with Blaze IT projects, his testimony often referred to the benefits of "business rules technology," rather than Blaze specifically. *E.g. id.* at 1023. Mirolyuz also stated that he believed Chubb was able to "produce additional business" through automated policy renewals. *Id.* at 1028. He offered similar testimony about benefits of Blaze throughout his testimony. *Id.*

Presumably FICO highlights Mirolyuz's testimony because he was an employee of Federal, rather than FICO, demonstrating that even Federal felt it benefited from the use of Blaze. That may be so, but Mirolyuz's testimony does no more to support FICO's burden than any other witness's testimony does. It is does not attribute any revenue to use of Blaze. Though Mirolyuz's testimony helps establish that Federal may have realized

some of Blaze's benefits, it still does not tie those benefits to revenue. Even crediting Mirolyuz's testimony as establishing that Federal would have been unable to do its business without Blaze, that alone does not establish attribution. *See DaimlerChrysler*, 2006 WL 208787 ("[Federal] could not operate without its toilets either, but that does not mean that all of its profits are attributable to commodes.") Mirolyuz's testimony again supports the "conceivable connection" between use of Blaze and Defendants' revenues, but it does not support the inference that the benefits apparently realized necessarily lead to revenue. *Bouchat*, 346 F.3d at 523.

Because the evidence FICO points to merely suggests Blaze "contributed somehow" to Defendants' revenue but only remotely suggests Blaze *caused* Defendants revenue FICO has failed to meet its burden. *See Andreas*, 336 F.3d at 797.

### C. Whitener's opinion was not credible or sufficient

FICO relies heavily on testimony from its insurance industry expert Bick Whitener in arguing it met its attribution burden. According to FICO, Whitener's testimony established that Blaze contributed to the differentiated revenues described above. Because of FICO's heavy reliance on his testimony, the Court summarizes it here.

In testifying about Blaze's benefits—increased control, speed, accuracy, consistency, transparency, and agility[13]—Whitener explained:

- Speed affects the sales process; "The faster you get information about the offer . . . the more likely it is you will convert that quote into a policy. And part of that is . . . the insurance agent doesn't have an incentive to shop" the potential policy to other insurers. Tr. Vol. VII at 1393, Dkt. No. 1183; Tr. Vol. VIII at 1480, Dkt. No. 1184; "Was

---

[13] *See supra*, Part II.B.

Blaze Advisor deployed to make things—to make things faster? Yes. That goal was achieved." *Id.* at 1480. Defendants' applications, like ARP and DecisionPoint, executed decisions faster because of Blaze. *Id.* at 1481; 1508.[14]

- In quoting a price for an insurance policy, precision is important. There are two impacts of precision: (1) "acceptability" of the price to the applicant (which implicates speed, above); (2) compliance with governing insurance industry regulations. *Id.* at 1393-95, 1482; 1489-90.

- Consistency is important for two reasons: (1) agents and brokers appreciate working with companies that are consistent and (2) a rules management software is "going to analyze it and come to the same conclusion every time. . . . We humans, we're not particularly good at that." *Id.* at 1483-84.

- Chubb Custom Market is a $25 million book of business that Chubb was looking to acquire from another insurance company. To achieve that "they had to modify their booking process, and they used Blaze Advisor to accelerate the modifications that were needed to the booking process so that they could get the business." *Id.* at 1485; 1520 (explaining Blaze allowed for that opportunity because "you've got to be able to book and report to the statutory authorities about that premium" and Blaze allowed Defendants to do so).

- Blaze allowed Defendants to process more business with the same number of employees. *Id.* at 1486. "If you can take a staff of 100 and they're doing 200 policies, and now all of a sudden through the deployment of technology you have a staff of 100,

---

[14] Whitener also testified about Blaze's purported impact on EZER, Tr. Vol. VIII at 1512, although FICO has not claimed it is owed profits earned from Defendants' use of EZER.

and now they can do 400 policies, they want to do that. That—that's scale, and that is a point that Blaze Advisor was used at because. . . . If a policy is coming up for renewal and the automated renewal processing project allowed that to go straight through and a human didn't have to touch it, that is underwriting time that can be allocated to something else." *Id.* at 1487.

- Blaze improved "the ease of doing business" with agents and brokers who "got more consistent answers," "faster responses," "consistency." *Id.* at 1490-91, 1522-23.

- Using Blaze, Defendants "built two renewal processing projects" seeking to achieve straight-through (no touch) processing on 90% of renewals. *Id.* at 1505-1506. "Defendant[s'] documents have several statements that say that the use of Blaze Advisor in this rule modification process [related to automated renewals] modified the time frame to change rules from three to four months—to and I'm going to use less than a week. It was three or four days." *Id.* at 1506. In Canada, Chubb wrote 82% of renewals with "no touch." *Id.* at 1511.

- Blaze allowed Defendants to "optimize and manage workflow" by "routing [] work to the appropriate party." *Id.* at 1515.

- Without the systems that employed Blaze, in particular without CUW-IM, "the work doesn't get done." *Id.* at 1524.

- Defendants deployed Blaze in ARP which was, "according to the documents," a success, leading them to expand use of Blaze and "improve the knowledge of concepts of business rules management and decision management in other parts of the organization." *Id.* at 1528-29.

FICO's argument that this testimony establishes Blaze's contribution to the differentiated revenues identified above fails. Aside from failing to establish causation beyond a speculative level as described above, Whitener's opinion also lacked credibility. Though he was qualified to testify as an expert,[15] the factfinder is always allowed to assess a witness's credibility, expert or not. *Cf.* Fed. R. Evid. 607 ("Any party, including the party that called the witness, may attack the witness's credibility."). In the end, Whitener's opinion was worth very little.

Though Whitener testified about Blaze's benefits to Defendants, summarized above, the totality of his testimony undermined the validity of his opinions as to those benefits. In addition to the testimony FICO relies on, Whitener also stated:

- He had never worked as a software developer. Tr. Vol. VIII at 1533, Dkt. No. 1184.

- He had never worked with a decision management software before. *Id.* at 1533-38.

---

[15] Earlier in the litigation, Defendants moved to exclude Whitener's opinions and testimony, claiming his opinion is irrelevant and unreliable. They argued his opinion did not accurately address FICO's burden and that it was based entirely on experience, rather than a reliable methodology. Judge Wright denied the motion, finding Whitener's opinions comported with the legal standard and were reliable because he "relies on industry publications and his extensive industry experience. . . . In short, Whitener's opinions are based on his observations, specialized experience, and analysis." Summary Judgment Order at 23-25, Dkt. No. 731. During Whitener's testimony, Defendants again objected, arguing his opinions exceeded the scope of his expertise. The Court overruled the objection, explaining that his expertise and experience qualified him to opine about the use of technology in the insurance industry and his review of Defendants' documents allow his Blaze-specific opinions. The Court further reminded Defendants of their opportunity to object throughout Whitener's testimony. Tr. Vol. VII at 1376-1379, Dkt. No. 1183.

- He had not used Blaze or seen a demonstration of Blaze prior to issuing his first expert report. *Id.* at 1538-1540.

- He had never conducted any scientific studies on the business impact of rules software. *Id.* at 1542.

- He did not consider the relative efficiency of using a rules software versus having software engineers code rules themselves. *Id.* at 1543.

- That personal judgment is crucial in performing underwriting duties. *Id.* at 1549.

- He did nothing to "investigate how many other technologies" Defendants used aside from Blaze, nor was he aware that Defendants use over 100 other technologies. *Id.* at 1550-51.

- Q [Defendants' Counsel, Leah Godesky]: [Y]ou also have not done anything to measure the relative contribution that Blaze made to all these things like speed, ease of doing business, agility, as compared to the benefits that Chubb got from other technologies, right? You didn't look into that.

A: Correct.

Q: And certainly technologies other than Blaze are contributing to Chubb's ability to acquire revenue, right?

A: Yes.

Q: But you haven't made any effort to determine how much of a direct contribution those other technologies are making to revenue, right? You haven't looked into that.

A: Correct.

*Id.* at 1551:15-1552:2. *See also id.* at 1552 (stating the same for specific computer applications)

- He did nothing to determine how many rules outside of Blaze Advisor Defendants employed to run its business. *Id.* at 1553.

- He did not know whether use of Blaze cut down on Defendants' need for other IT sources, like software engineers and coders. *Id.* at 1555.

- He "performed no quantitative analysis" about whether Defendants use of Blaze actually increased speed of its processes. *Id.* at 1557-58.

- He "measured none of these things"—referring to the business benefits Blaze purports to offer. *Id.* at 1558-60.

- He did not measure Blaze's relative effect on any of the applications in which it was employed. *Id.* at 1563 (CSI Express), 1564-65 (Profitability Indicator), 1565 (DecisionPoint); 1566 (Evolution, Adapt); 1567 (Cornerstone, Premium Booking), 1568 (TAPS), 1569 (IRMA, CUW-IM), 1594-95 (CIS Claims).

- He gave "zero thought" to whether he could have measured Blaze's effect on speed. *Id.* at 1564.

- He could not say whether Blaze improved Defendants' ability to cross-sell or upsell products. *Id.* at 1472, 1483.

On redirect examination, Whitener tried to clarify that "there's a difference between what something does and how much something does something. So when you ask me does it make things faster? Yes. I've been at this for a couple of decades. Okay. Maybe more than a couple decades." *Id.* at 1600. He cited as an example another insurance company who licensed a software package in pursuit of speed. *Id.*

In the end, however, Whitener's opinion that Blaze causally contributed to revenue was simply not credible. Though he opined widely about Blaze's benefits, his opinions appeared to be based merely on large inferential leaps rather that underlying analysis. For example, he testified Blaze increased speed in business processes, but he could not quantify that impact. Nor could he quantify the effect of any of the benefits Blaze purports to offer users. Neither did he consider the relative import of other technologies on Defendants' business. This testimony essentially undermined the foundation of Whitener's opinion. Put simply, because he has never used a business rules software, much less Blaze itself, his opinion about Blaze's contribution to revenue is not meaningful.

Whitener's testimony is no different from the expert in *Estate of Vane. See supra*, Part I.A. Though the expert in that case opined that some of the defendant's profits were attributable to the infringing commercial, the expert had not accounted for the relative importance of the infringing work compared to other aspects of the ad. 849 F.3d at 189. The expert there, like Whitener here, could not say what particular effect the infringing work had on the infringer's profits. *Id.* Just as the expert's testimony did not establish attribution in *Vane*, neither did Whitener's here.

Whitener's pronouncements that Blaze was important or meaningful to Defendants' business is no help to FICO either. Such generalisms cannot alone meet the copyright holder's burden under Section 504(b). "[Defendants] may have profited from using [Blaze] indirectly in that it enabled [them] to operate more efficiently" but that is insufficient where, as here, Blaze was but one small part of Defendants' technology infrastructure. *IBM*, 2013 WL 1775437 at *4; *DaimlerChrysler*, 2006 WL 208787 at *3; *Complex Sys.*, 2013 WL 5970065, at *11. Though Whitener's testimony helped establish

"a conceivable connection between the infringement and a given revenue stream" it did not provide evidence of a causal link between the two. *Bouchat*, 346 F.3d at 520.

In sum, FICO adequately differentiated profits—it identified profits with a "conceivable connection" to the infringement. *Id.* But FICO's evidence was too attenuated to prove causation. Though FICO's evidence established that Defendants may have benefited from Blaze in some way, it did not show that the Defendants' use of Blaze had "an effect on profits." *Mackie*, 296 F.3d at 915. Because FICO failed to meet its burden under the Copyright Act, the Court need not analyze whether Defendants' apportionment burden was met.

## FINDINGS OF FACT

1.      Federal Insurance Company initially licensed Blaze for use only in a single business application. Tr. Ex. J-001. The parties amended their agreement to allow Federal to use Blaze in its entire specialty lines division. Later, the parties again amended their agreement, allowing Federal enterprise-wide use of Blaze.

2.      During the relevant time period (March 31, 2016 – April, 2020), Defendants earned $21.2 billion in revenue from policies that passed through computer applications that employed Blaze Advisor.

Revenue by application:

CSI eXPRESS, Automated Renewal Process, Profitability Indicator: $5,011,322,794. Tr. Vol. VII at 1326, Dkt. No. 1183.

CUW-IM: $12,747,393,210. *Id.*

TAPS: $844,306,538. *Id.*

IRMA: $300,316,999. *Id.*

Decision Point: $19,253,516. *Id.* at 1327.

Cornerstone: $528,910,484. *Id.*

Premium Booking: $1,750,877,402. *Id.* at 1332.

3.     FICO's witnesses could not quantify Blaze's contribution beyond the revenues differentiated above.

4.     FICO did not present evidence of how much Blaze contributed to revenue as compared to the other software components that comprised these applications.

5.     Some applications that employed Blaze are "core" to Defendants' business of selling insurance. *E.g.* Tr. Vol. X at 2137, Dkt. No. 1186.

6.     Blaze seeks to provide customers benefits including speed, control, accuracy, consistency, transparency, and agility. Tr. Vol. X at 2147, Dkt. No. 1186.

7.     Blaze Advisor "can achieve those" goals. *Id.*

8.     Some Blaze customers have realized those benefits. Tr. Vol. II at 290, Dkt. No. 1178.

9.     In the insurance context, Blaze can reduce customer churn, improve business insight, decrease processing times and increase control. Tr. Vol. II at 285-86, Dkt. No. 1178.

10.    When using Blaze, Defendant Federal's information technology team was able to implement changes faster than they had without Blaze. Tr. Vol. VI at 1031-32, Dkt. No. 1183. Blaze made decisioning in Defendants' CSI Express application "more precise." *Id.*

11.    Blaze Advisor made "life simpler" for users in Federal's IT department. *Id.* at 1020-21.

12.     Speed affects the sales process. Tr. Vol. VII at 1393, Dkt. No. 1183.

13.     Precision is important in selling insurance. Tr. Vol. VIII at 1393-95, Dkt. No. 1184.

14.     Consistency is important in selling insurance. *Id.* at 1483-84.

## CONCLUSIONS OF LAW

1.     FICO failed to meet its attribution burden under the Copyright Act, which requires proof of a causal nexus between the infringement and the infringers' revenue. 17 U.S.C. § 504(b); *Andreas*, 336 F.3d at 792-797.

2.     The differentiated revenues FICO identified—the $21.2 billion earned through policies that "touched" Blaze—establish that Blaze has *some* connection to revenue, but they do not on their own establish a *causal* connection. *Andreas*, 336 F.3d at 792.

3.     The fact that FICO markets Blaze as providing certain benefits to customers does not mean Defendants achieved or realized those benefits. *See IBM*, 2013 WL 1775437, at *4; *Complex Sys.*, 2013 WL 5970065 at *11 ("Use is, of course, not necessarily evidence of *causation*.").

4.     The connection between Blaze and the differentiated revenues is too remote to meet FICO's burden. *Mackie*, 296 F.3d at 916; *Vane*, 849 F.3d at 187.

5.     Even assuming Defendants realized Blaze's purported benefits, FICO offered no evidence of a causal nexus between those benefits and Defendants' revenue.

6.     Testimony that Blaze was part of Defendants' "core" systems does not establish attribution. *See DaimlerChrysler*, 2006 WL 208787; *IBM*, 2013 WL 1775437 at *4.

7.     Though qualified to testify as an expert, Whitener's opinion about Blaze's contribution to revenue was not credible and did not establish attribution. *See Vane*, 849 F.3d at 189.

8.     Having failed to meet its attribution burden, FICO is not entitled to any profits of the infringer.

### ORDER

Having concluded as such, the Court adopts the jury's advisory verdict awarding $0 to FICO in disgorged profits. IT IS HEREBY ORDERED that:

The Clerk of Court shall enter judgment consistent with the jury's verdict [Dkt. No. 1173] and these Findings of Fact and Conclusions of Law.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: September 12, 2023                          s/David T. Schultz
                                                   DAVID T. SCHULTZ
                                                   U.S. Magistrate Judge