**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Fair Isaac Corp.,

      Plaintiff,

v.

Federal Insurance Co., et al.,

      Defendant.

Case No. 16-cv-1054 (DTS)

**ORDER**

---

In 2016, Fair Isaac Corporation (FICO) sued Federal Insurance Company (Federal) and ACE American Insurance Company (ACE) (collectively, Defendants) alleging breach of contract and copyright infringement. The parties tried their case in early 2023 and the jury returned a $40 million actual damages verdict for FICO. Defendants now move for a new trial on damages, arguing there is no legally sufficient basis for the jury's damages award and that the Court improperly admitted certain evidence warranting a new trial. Because the evidence in the trial record does not support the jury's damages award and because certain evidence was inadmissible, Defendant's motion [Dkt. No. 1226] is granted, pending FICO's rejection of remittitur.

**FACTS**

## I.    Pre-Trial Litigation

In June 2006, Chubb & Son, an unincorporated division of Federal Insurance Company (hereafter referred to only as Federal[1]) entered into a license agreement with

---

[1] FICO alleged that Chubb & Son, the division, was the "Client" under the License Agreement, and therefore any use of Blaze Advisor by other divisions of Federal Insurance Company exceeded the license grant amounting to breach of the License Agreement and copyright infringement. The dispute over who was the "Client" under the

FICO for use of Blaze Advisor, a rules management software on which FICO owns several copyright registrations. Joint Statement of the Case at ¶ 41, Dkt. No. 1072. The initial license granted Federal the right to use Blaze in perpetuity in a single business application, for which Federal paid $173,750 plus annual support and maintenance fees. Trial Ex. J-001 at 1-11. The parties amended their agreement in August 2006 to grant Federal a license to use Blaze in its entire specialty lines division, for which Federal paid $350,000, plus annual support and maintenance fees. *Id.* at 17. Finally, in December 2006, FICO and Federal amended the agreement again, granting Federal a perpetual enterprise-wide license to use Blaze. Federal paid $1,300,000.[2] *Id.* at 19.

On January 15, 2016, Federal's parent company, Chubb Corporation, merged with ACE INA Holdings, Inc., making Federal a subsidiary of ACE.[3] Two weeks later, FICO notified Federal of its belief that by virtue of the merger, Federal was in breach of Section 10.8 of the License Agreement. Federal denied it had breached the license agreement. The parties were unable to resolve this dispute and FICO terminated the License Agreement, effective March 31, 2016. In its termination letter dated March 30, 2006, FICO's Associate General Counsel Thomas Carretta detailed FICO's position, explaining that "the merger of Chubb Corporation and ACE Limited . . . and subsequent attempt to assign the agreement to [the combined entity], is a breach of Section 10.8" of

---

agreement persisted until the close of Plaintiff's case in chief at trial, when the Court granted judgment as a matter of law to Federal on that question. *See* Dkt. Nos. 1196, 1188; *see also infra* Facts, Part II.H.

[2] This license fee included monies previously paid for the earlier license agreements between FICO and Federal.

[3] Because of Chubb's name recognition and the structure of the organization, witnesses used the names "Federal" and "Chubb" essentially interchangeably. Except where detailing witness testimony, the Court will use "Federal" when referring to that Defendant.

the parties' agreement and that "the attempted transfer and assignment is void and of no force or effect." Tr. Ex. P-0069; *see also* Tr. Exs. P-0090-96; Tr. Vol. V at 843-934 (testimony of Thomas Carretta). He further explained that "FICO had notified its Chubb client contact prior to the merger that consent was required." *Id.* Lastly, Carretta detailed additional "material breach[es]" based on use of the software outside the United States, and through  use by third party consultants. *Id.* Three weeks later, FICO sued Federal in this Court, alleging breach of contract and copyright infringement.[4] FICO demanded a jury trial on all claims and remedies. Dkt. No. 1. At the time of the alleged breach, Defendants were using Blaze Advisor in 15 internal computer applications to support Federal's business operations, including the sale of insurance. *See* Tr. Ex. P-0094; Joint Statement of the Case, Dkt. No. 1072.

FICO's Second Amended Complaint alleged the following claims:

(1)    Breach of Contract Against Federal (Count I): FICO claimed Federal breached sections 3.1, 9.3, and 10.8 of the License Agreement.

Section 3.1 provides in part:

> License Restrictions: Client represents and warrants that it and its employees shall not: . . . (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or any individuals other than the employees of client.

---

[4] FICO's original complaint named Chubb & Son, Inc. as the defendant, which was amended in February 2017 to substitute Federal Insurance Company as the proper corporate entity defendant. FICO's complaint was amended a second time, in September 2018, to add ACE American Insurance Company as a defendant.

FICO alleged Federal breached this provision by (1) using Blaze outside the United States and (2) providing third parties access to Blaze, including subsidiaries of Federal other than Chubb & Son, as well as outside consultants.

Section 9.3 provides in part:

> Effect of Termination: Upon expiration or termination of this Agreement for any reason, all licenses granted hereunder shall terminate immediately, all support and maintenance obligations shall cease. Client shall immediately cease using all Fair Isaac Product(s) and related documentation (including all intellectual property arising from or related to the foregoing), shall remove all copies of the Fair Isaac Product(s) and related documentation from Client's computers and systems, and shall either (i) destroy all copies of Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession; or (ii) return to Fair Isaac all copies of Fair Isaac Product(s), related documentation, and other Fair Isaac Confidential Information and intellectual property in Client's possession. Client shall provide to Fair Isaac a written certification signed by an authorized office of Client certifying that Client has complied with the foregoing. Upon termination of this Agreement, all fees and other charges provided for hereunder will become immediately due and payable to Fair Isaac, and Client shall immediately remit all unpaid fees to Fair Isaac.

FICO claimed Federal breached this provision by continuing to use Blaze after FICO terminated the parties' agreement.

Section 10.8 provides:

> No Assignment: Neither party shall, without the prior written consent of the other party, assign or transfer this Agreement, or any part thereof. In the event of a change of control of Client, or if Client is merged with, acquired by or acquires another entity, or undergoes a reorganization or otherwise acquires the right to process the business of another entity, each such event shall be deemed to be an assignment subject to this section, and Client shall make no expanded use of the Fair Isaac Products as a result of any such event unless and until Fair Isaac provides such written consent, which will not be unreasonably withheld. Any attempt to assign or transfer all or any part of this Agreement without first obtaining such written consent will be void and of no force or effect.

FICO alleged Federal's failure to obtain FICO's consent for its continued and allegedly expanded use of Blaze after the the ACE/Chubb merger violated this provision.

(2)     Copyright Infringement Against Federal (Count II): FICO claimed Federal infringed its Blaze copyright through unauthorized disclosure of the software to third parties, including Federal divisions and outside consultants;

(3)     Copyright Infringement Against Federal (Count III): FICO claimed Federal infringed its Blaze copyright through continued use of the software post termination of the License Agreement; and

(4)     Copyright Infringement Against ACE (Count IV): FICO claimed copyright infringement against ACE for its unlicensed use of the software for which FICO also argued Federal was vicariously liable.

FICO sought actual damages for breach of contract and infringement and disgorgement of profits under 17 U.S.C. § 504(b)—the Copyright Act of 1976. Second Amended Complaint; Dkt. No. 132.

Federal counterclaimed against FICO on two grounds:

(1)     Breach of Contract (Count I): Federal claimed that FICO's termination of the License Agreement was itself a breach of the agreement. In making this claim, Federal contended that none of the circumstances allowing for termination enumerated in Section 9.2 of the License Agreement—uncured breach, insolvency, or violation of license or confidentiality obligations—had occurred, and that FICO's terminating the contract was therefore unjustified.

(2)     Breach of the Implied Covenant of Good Faith and Fair Dealing (Count II): Federal also claimed FICO had breached the implied covenant of good faith and fair dealing by

withholding consent for Federal's continued use of Blaze post-merger. According to Federal, FICO's denial of consent was arbitrary and irrational in light of the circumstances at issue. Answer to Amended Complaint, Counterclaim against Fair Isaac Corporation, Dkt. No. 137.

### A.    Summary Judgment

The parties each moved for summary judgment. Dkt. Nos. 396, 428. FICO and Federal cross-moved for summary judgment on FICO's breach of contract claim (Count I in the Second Amended Complaint). FICO claimed it was entitled to summary judgment for breach of Section 3.1 because Federal installed and used Blaze outside of the United States and because Federal allowed third parties to use Blaze. Federal argued the License Agreement included no geographical restriction, that Federal's subsidiaries' use of the software was permissible, and that any use by consultants was *de minimus*.

District Judge Wilhelmina Wright denied FICO's motion and granted Federal's motion as to the geographical restriction, holding the License Agreement was unambiguous as to geographical restriction: it contained none. Order (hereafter, SJ Order) at 38-41; Dkt. No. 731. Breach of Section 3.1 based on third-party use was a thornier issue that ultimately asked who should be considered the client under the License Agreement. FICO argued Chubb & Son, the unincorporated division, was the client and that any use of Blaze by other Federal subsidiaries was therefore use by a third party, violating the agreement. Federal argued that it, not merely the unincorporated Chubb & Son division, was the client. Because Chubb & Son has no affiliates or employees, Federal argued, portions of the License Agreement would be rendered meaningless (if not nonsensical) if the "Client" were construed to be the division Chubb & Son. Judge

Wright denied both motions on this question, determining that "[a]t best" FICO established ambiguity in the contract, belying summary judgment. *Id.* at 41-45. The question whether it was Chubb & Son or Federal who was the party to the contract persisted until trial. *See infra*, Facts, Part II.H. Judge Wright also denied the motion as to use by consultants because questions persisted about whether any use by consultants amounted to material breach. SJ Order at 44-45, Dkt. No. 731.

FICO and Federal also cross-moved for summary judgment on Federal's alleged breach of Section 10.8. FICO argued Federal both continued and expanded its use of Blaze after the Federal/ACE merger without FICO's consent. Federal argued that because it did not expand its use of Blaze with the merger, FICO's consent was not required under Section 10.8. Judge Wright determined that both interpretations of Section 10.8 were reasonable given the section's ambiguity. Moreover, even if Federal's interpretation was correct, fact questions persisted about what constitutes "expanded use" under the agreement. The cross-motions were both denied. *Id.* at 45-49.

FICO moved for summary judgment on its claim of breach of Section 9.3 based on Federal's continued use of Blaze after FICO terminated the agreement. Because that argument was contingent upon finding Federal breached another section of the agreement, Judge Wright denied the motion. *Id.* at 49-50.

Federal moved for summary judgment on FICO's copyright claims—Counts II and III of the Second Amended Complaint. Count II alleged infringement based on reproduction and distribution of Blaze to third parties. As with the breach claims under Section 3.1, summary judgment was denied because the question of who was the "client" (Chubb & Sons or Federal) persisted. *Id.* at 51. Federal also argued the claim failed as a

matter of law because the third parties and consultants FICO alleged used Blaze were all outside of the United States which generally does not support a copyright claim. This argument raised questions about whether the predicate act of infringement occurred within the claim's three-year statute of limitations. The Court allowed additional litigation on the question, which does not bear on the instant issues. *See* Order on Supplemental Motions for Summary Judgment, Dkt. No. 840. Judge Wright denied Federal's motion as to Count III because, as explained above, fact issues remained as to whether Federal had breached the agreement. SJ Order at 53, Dkt. No. 731. Both Federal and ACE moved for summary judgment on Count IV, which the Court denied consistent with its denial on Counts II and III. *Id.* at 53-54.

Defendants also argued they were entitled to summary judgment on all copyright infringement claims because FICO's alleged actual and disgorgement damages were merely speculative. As to actual damages, Judge Wright determined that, even excluding FICO's expert's opinion on actual damages, *see infra* Part I.B., genuine issues of material fact existed. A reasonable jury could consider FICO's standard pricing methodology and the Defendants' use of Blaze to reach a damages figure that was not speculative. SJ Order at 55, Dkt. No. 731.

As to disgorgement, Federal argued FICO's evidence attributing Defendant's profits to its alleged infringing use of Blaze was too speculative to meet FICO's burden under the Section 504(b) of the Copyright Act. Judge Wright again found a fact dispute precluding summary judgment, explaining that "FICO present[ed] evidence of gross revenue from sale of insurance in connection with which Blaze Advisor was used. . . . FICO also present[ed] evidence about how Blaze Advisor contributed to

Defendants' gross revenue from the sale of insurance." *Id.* at 57. In sum, Judge Wright declined to find that as a matter of law FICO had failed to meet its initial attribution burden under the Copyright Act. *Id.*

Lastly, FICO moved for summary judgment on Federal's counterclaims, arguing they "must be dismissed for all the reasons FICO is entitled to summary judgment." Because Judge Wright found FICO was *not* entitled to summary judgment on its own claims, she denied FICO's motion as to Federal's claims. *Id.*

### B.   Expert Opinions

The parties also filed cross-motions seeking to exclude expert testimony. Of particular importance here, Defendants moved to exclude the testimony and report of FICO's damages expert, Neil Zoltowski.[5] Motion to Exclude Expert Testimony & Expert Report of Neil J. Zoltowski, Dkt. No. 404. Zoltowski's report included opinions about FICO's actual damages and Defendants' profits subject to disgorgement. Defendants argued that Zoltowski's measure of actual damages was unreliable because it "ignore[d] how FICO actually sold licenses to Federal and others, and thus bears no resemblance to actual market value," which is the correct measure of actual damages. Mem. in Support of Mot. to Exclude Expert Testimony & Expert Report at 3, Dkt. No. 406. Ultimately, Federal argued, Zoltowski's actual damages figure ($37.4 million) did not "represent the

---

[5] Federal also sought to exclude opinions and testimony from R. Bickley Whitener, FICO's insurance industry expert, and Brooks Hilliard, FICO's software licensing expert. FICO sought to exclude opinions and testimony from W. Christopher Bakewell, Defendants' damages expert, William McCarter, Defendants' insurance industry expert, and Dr. Steven Kursh, Defendants' licensing expert.

fair market value of a Blaze license, but rather merely represent[ed] what FICO wishes [to] charge." *Id.* at 24.

Judge Wright agreed. She explained, "Zoltowski's opinions as to FICO's actual damages do not consider what a willing buyer and a willing seller would have contemplated. Instead, his opinions focus primarily on what FICO would have charged Defendants . . . ." SJ Order at 31, Dkt. No. 731. Zoltowski applied FICO's application-based pricing structure, which prices a license based on the number of applications the licensee intends to enable with Blaze. He detailed the Application Sizing Matrix and the Category Pricing Matrix FICO uses in determining the annual fee for an application-based license. He then applied those matrices to the applications Federal used with Blaze, added in lost maintenance fees in the United States and abroad, and opined that FICO's actual damages were $37.4 million. But this analysis failed to reflect what a willing buyer and a willing seller would have negotiated for Defendants' allegedly infringing use, reflecting instead what FICO subjectively would have charged.

Put another way, Zoltowski's opinion did not connect the application-based pricing methodology with how FICO and its licensees had negotiated licenses in the past, or how a willing buyer would have agreed to negotiate a license in 2016. Absent that connection, the application-based pricing methodology reflected only what FICO would like to charge. Zoltowski never attempted to explain why a *wiling* buyer of a Blaze license in 2016 would agree to that pricing methodology. Judge Wright therefore excluded Zoltowski's opinion on actual damages, but noted that "some of the facts underlying Zoltowski's opinion may be relevant to the calculation of [actual damages]," which Judge Wright noted "includes evidence of FICO's standard pricing methodology." SJ Order at 32, 55, Dkt. No. 731.

Judge Wright denied Defendants' motion to exclude Zoltowski's disgorgement opinion and analysis. *Id.* at 34.

### C.    Disgorgement; Bifurcation

As already noted, when FICO sued Federal, it demanded a jury trial on all claims and remedies, including its copyright infringement claims brought under 17 U.S.C. § 504. Second Amended Compl. Dkt. No. 132. Federal moved to strike the jury demand as to disgorgement of profits, contending disgorgement is an equitable remedy for the Court, rather than the jury, to decide. Mot. to Strike Pl.'s Jury Demand on Disgorgement Remedy, Dkt. No. 329; Mem. in Support of Mot. to Strike Pl.'s Jury Demand; Dkt. No. 331. This Court analyzed the text of the Copyright Act, determining it did not reserve disgorgement of profit to the jury. Furthermore, because disgorgement in this case was not a proxy for damages and thus legal in nature, it was instead equitable and therefore the Seventh Amendment did not guarantee FICO a jury trial on that issue either. Order Granting Mot. to Strike Pl's. Jury Demand; Dkt. No. 588, *passim*. Accordingly, the Court granted Federal's motion—the jury would decide liability and actual damages, and the Court would determine disgorgement of profits, if any.

This determination ultimately bore another dispute. Prior to trial, Federal moved to bifurcate the trial with a line drawn between the jury issues—liability and actual damages—and the equitable issue of disgorgement, to be decided by the Court. Mot. to Bifurcate, Dkt. No. 899. Federal contended, among other things, that the jury would be unable to impartially determine liability after hearing the enormous revenue figures at issue on the disgorgement question. Furthermore, those huge figures would anchor the jury, leading them to award an improperly inflated actual damages figure. FICO claimed

there would be substantial overlap in evidence between the two phases Federal proposed, leading to a waste of time and resources. The Court denied Federal's motion, finding bifurcation would not appreciably promote judicial economy or prejudice the Defendants, and that evidentiary overlap between the two parts was likely. Order on Mot. to Bifurcate; Dkt. No. 935. The Court notified the parties, however, that it intended to employ the jury in an advisory capacity on the disgorgement claim. Order on Mot. to Strike Jury Demand at 16-17, Dkt. No. 935.

### D.    Motions in Limine

Just before trial, Defendants moved *in limine*[6] to limit FICO's evidence as to its actual damages, arguing the Court "should exclude evidence related to FICO's 'application-based' theory for the same reasons it has already precluded" Neil Zoltowski's testimony about that theory. Defs's Mem. of Law in Support of Mot. *in Limine* Regarding FICO's Presentation of Evidence on its Alleged Actual Damages, Dkt. No. 969. Federal averred that despite Zoltowski's exclusion, this evidence was likely to come in through FICO's witness William Waid. The Court granted the motion in part and denied it in part, holding that Waid could testify consistent with the earlier order on exclusion of experts. The Court specifically held that Waid could testify about "FICO's pricing structure for application-based pricing; which applications are subject to application-based pricing; how many applications Federal has that could be priced using that methodology. He can

---

[6] The parties filed several other motions *in limine* pre-trial, the details of which are not salient here. *See* docket numbers 936, 942, 948, 956, 962, 968, 975, 981, 985, 1017, 1044.

also add up the total price for those applications."[7] Order on Mots. *in Limine* at 5, Dkt. No. 1065. The Court also limited Waid's testimony, stating he "may not make any statement about what FICO's actual damages are, nor can he use the phrase 'hypothetical negotiation' or opine about what FICO would have charged in such a hypothetical negotiation." *Id.* at 5-6.

## II.   The Trial

The case proceeded to trial which lasted several weeks. The Court here recounts only the evidence presented bearing on the question of actual damages, even if only tenuously.

### A. Benjamin Baer

Benjamin Baer is FICO's Vice President of Partner and Industry Marketing. Trial Transcript (Tr.), Vol. III at 269:11-15, Dkt. No. 1179. Baer testified that Blaze provides users the benefits of control, speed, accuracy, consistency, transparency, and agility. *Id.* at 279:2-6. Though other Blaze users have realized these benefits, *id.* at 284:4-7, Baer acknowledged he had "no idea" whether Federal derived these benefits from its use of Blaze. *Id.* at 297:22-299:1. Since he had no knowledge of Federal's use of Blaze, he also agreed that he had "no idea of what value" Federal realized from using the software. *Id.* at 295:16-25.

### B.   Bill Waid

The bulk of the evidence purportedly establishing the market value of Blaze was provided by FICO's Chief Product and Technology Officer, Bill Waid. Waid also served

---

[7] FICO stated that its application-based pricing methodology was one of two standard pricing methodologies. Consistent with the Court's Order, evidence of standard pricing methodologies was admitted.

as FICO's corporate representative and was present throughout trial. His relevant testimony is described below.

### 1. FICO's Global Price List and General Pricing Practices

Waid has extensive experience with Blaze licensing and has participated in "hundreds and hundreds" of Blaze license negotiations. Tr. Vol. VIII at 1684:4-9, Dkt. No. 1184. He had final authority on pricing in 2006, when the FICO/Federal License Agreement originated, through 2016 when it was terminated. *Id.* at 1684:14-17. Waid has experience negotiating agreements with new clients as well as existing clients whose licenses have ended and are seeking new rights. *Id.* at 1684:18-1685:1. Tr. at 1631:20-1632:7. In 2006 FICO's practice was to aggressively discount Blaze, in order to "secure enough business to get references in the industry." *Id.* at 1632:10-20. By heavily discounting, FICO hoped to secure initial business and the prospect of future business as well. *Id.* at 1633:1-5. In 2006, it was common to incentivize Blaze customers to upgrade their existing licenses by crediting them with the monies already paid for those existing licenses when purchasing additional use rights. *Id.* at 1633:13-22. FICO's pricing practices were "very different" by 2016. *Id.* at 1633:23-24. While the pricing model remained and remains the same, around 2010-11 FICO changed its discounting practices and began moving away from perpetual licenses toward term or "annual" licenses, which provide recurring revenue streams. *Id.* at 1634:1-10 ("Our pricing model . . . has always been our pricing model, but our pricing practices [changed] around [] 2010-2011."); *id.* at 1634: 13-15 ("The pricing and how we priced did not change, no. It's the same pricing

model that we had all the way back in 2003."). By 2016 or 2017, FICO's business was strong without aggressive discounting. *Id.* at 1634:18-1635:3.

FICO's Business Science Enterprise Decision Management Design and Deployment, Tools and Infrastructure Software Global Price List (hereafter, Global Price List) has been in place since 2003. [8] *Id.* at 1685:11-1686:4. It includes various pricing and discount schedules for licenses to use Blaze. In addition to the fee for use of Blaze, FICO charges customers for maintenance and support for the software. This is an annual fee, which by 2016, was mandatory and set at 22% of the license fee. *Id.* at 1688:9-25; 1722:1-7.

FICO's Global Price List includes a standard discount schedule, which outlines allowable discounts based on the price of the license at issue. Those discounts give "salespeople the latitude to request and think in the scope of how much they actually discount the software." *Id.* at 1689:22-1690:4. The schedule caps discounts at 40% but FICO has discounted as high as 65%. *Id.* at 1690:5-13; Tr. Vol. IX at 1788:9-15, Dkt. No. 1185. FICO no longer uses the discount schedule in the Global Price List and hasn't used it "in a long period of time," Tr. Vol. VIII at 1690:14-19, Dkt. No. 1184, though a 40% discount on an upfront enterprise license was standard as of 2006 and possibly as late as 2019. Tr. Vol. IX at 1786:5-1788:1, Dkt. No. 1185. FICO's Global Price List also includes marketing discounts that provide price reductions to clients who speak with other

---

[8] Trial Exhibit P-418.The Court understands Waid's reference to FICO's "pricing model" to specifically refer to its Global Price List. *See* Tr. at 1684-84 (Q [counsel for FICO, Allen Hinderaker]:…The guidelines for pricing really have not [changed] since 2003? A [Waid]: Yeah, the core—the core pricing model has not changed, no. . . . Q: [The Global Price List] has been in place since 2003. . . . A: Yeah."); *see also* Tr. at 1634 ("Our pricing model has always been our pricing model. . . . It's the same pricing model that we had all the way back in 2003.").

clients or prospects about Blaze. Tr. Vol. VIII at 1691:3-17, Dkt. No. 1184. That practice is no longer in use. *Id.* at 1691:18-21. The Global Price List also details deployment pricing, which prices use of Blaze based on the size of the server machine on which it was to be installed. The market has largely rejected this pricing method. *Id.* at 1693:24-1694:13.

FICO also prices licenses by development seats, *i.e.* that is, the number of users who are integrating Blaze, writing rules, or deploying Blaze. *Id.* at 1697:17-23. Waid again explained that "ostensibly" the development seats are linked to applications or one division of a company. *Id.* at 1697:24-1698:3. The Global Price List advises that Blaze Advisor is "most commonly sold on a perpetual basis because of the practices in the IT world." Tr. Vol. IX at 1777:22-1778:6, Dkt. No. 1185; Ex. P-418 at 3.

## 2. FICO's primary pricing models

FICO's Global Price List includes an application-based pricing model and an enterprise pricing model. Waid's testimony on each of these models follows.

### a. Enterprise Licenses

Enterprise licenses, which place no restrictions on number of users or applications employing Blaze, were popular in the early days of Blaze but are no longer sold because "clients aren't interested" in them anymore. Tr. Vol. VIII at 1685:2-6, Dkt. No. 1184. Instead, application-based licensing is now the "most popular form." *Id.* at 1685:25-1686:1. Under the right circumstances, however, FICO would "probably" sell an enterprise-wide license; they remain an option. Tr. Vol. IX at 1777:5-12, 1778:10-19, Dkt. No. 1185. In fact, when a buyer is planning to use Blaze in 3 or 4+ applications, FICO's "general" practice is still to offer an enterprise license. *Id.* at 1776:18-23. The more

applications the buyer intends to use with Blaze, the "easier [it is] for them to license an enterprise-wide license." Tr. Vol. VIII at 1696:9-13, Dkt. No. 1184.

FICO prices Blaze based on the value it offers the buyer. *Id.* at 1649:25-1650:1. FICO uses several metrics to estimate that value; when dealing with an enterprise-wide license the primary metric or proxy for value is the buyer's revenues. *Id.* at 1650:2-5; Tr. Vol. IX at 1780:9-14, Dkt. No. 1185. The higher the buyer's revenue, the more value FICO anticipates that company will get from Blaze. Tr. Vol. VIII at 1651:19-1652:4, Dkt. No. 1184 ("Q [counsel for Defendants, Leah Godesky]: Let's say it is a different client that's much smaller. Let's say it's a client with 5 million in revenue, and that licensee licenses Blaze Advisor. It is the same software that goes to the $5 million client as goes to a huge client? A. We have one software. Q. And the fee for the $5 million client will be same or less or more? A. It will be less. Q. Because of value? A. Yes."). The Global Price List enumerates six things that FICO considers in enterprise pricing: (1) probable number of applications that will benefit from Blaze; (2) size of applications that will use Blaze; (3) rate of adoption of the technology; (4) value of reduction in IT costs; (5) value of business agility and precision gain, and (6) Number of product options being purchased as part of the license (current and future).[9] Tr. Vol. IX at 1781:1-1782:10, Dkt. No. 1185.

Though the Global Price List contemplates these factors, it also contains a fee schedule for enterprise licenses, based on the revenues of the buying company, consistent with treating revenue as a proxy for value. Revenue is the "core . . . pricing mechanism." *Id.* at 1697. That schedule suggests a license fee of $4.8 million for a $20

---

[9] Waid did not testify about the sixth factor, though it is listed on the page of the Global Price List about which these questions were asked.

billion entity. The schedule then suggests an additional $1 million in license fee for each $10 billion of revenue the buying company produces. Thus, for a giant $100 billion company, the enterprise-wide license fee would be $12.8 million.[10] *Id.* at 1782:18-1784:9. The revenue figures FICO uses to price these licenses are generally publicly available, as listed on the company's 10-K. *Id.* at 1784:17-23.

Waid has never seen an enterprise-wide license with a fixed term, rather than perpetual duration. *Id.* at 1737:11-18. When asked why that is, Waid explained that early on in Blaze's history, FICO sold a lot of perpetual licenses but that now most of the licensing is annual. *Id.* at 1737:18-1738:9. He explained that FICO still has perpetual licensing and that in 2016 it was a "mixed bag," and most of "it was still perpetual moving to term, but it was moving and it was moving aggressively." *Id.* at 1738:2-6. He reiterated that FICO has never to his knowledge sold an enterprise-wide license on a term basis. *Id.* at 1738:6-9.

Nonetheless, Waid calculated what an annual enterprise-wide license would cost for a $35 billion company based on the Global Price List. Waid started by looking to the enterprise fee schedule for perpetual licenses. Such a license would cost $6.3 million, plus $2,520,000 for use with multiple platforms (*e.g.* coding languages). Because Defendants used Blaze in four countries, some of those on multiple platforms, FICO would charge an extra $1.92 million to cover that use. The standard fee would thus be

---

[10] $4.8 million + ($1 million x 8) = $12.8 million. Though Waid did not testify to this hypothetical, the Global Price List enterprise-wide scheduled fee for a $32 billion company like the combined ACE/Federal enterprise would be $6 million. $4.8 million + ($1 million x 1.2) = $6 million.

$10,740,000 for a perpetual enterprise-wide license. *Id.* at 1738:22-174:04.[11] To determine an annual fee for that enterprise, Waid multiplied the perpetual license fee by 45% as described earlier and added 22% for maintenance. That results in an annual fee of $5,896,260.[12] The $35 billion enterprise would thus pay $29,481,300 for a 5-year license.[13] *Id.* at 1740:5-10. Waid then repeated this exercise for a $3.5 billion enterprise. The perpetual license fee for that company would be $3,040,000. The annual fee with maintenance would be $1,668,960.[14] *Id.* at 1740:13-19. The $3.5 billion enterprise would pay $10,013,760[15] for a 6-year license. *Id.* at 1740:20-1741:5. Waid explained this was

---

[11] Waid's testimony as to this calculation is repeated in full here:

Q [Hinderaker]: So let's start, and just showing the exercise this slide is assuming a 35 billion-dollar enterprise. With that assumption in place, would you explain this process for us?

A [Waid]: Okay, so assuming it's a 35-billion-dollar organization and it's for the entire organization, all 35 billion, not for a piece of it, but the whole thing, the license fees are broken down into the deployment perpetual fee, the multi platform that we discussed earlier, if you have multiple platforms, perpetual fee and then the development license perpetual fee.

So for 35 billion—I'm not going to pull up my price sheet, I can, but I'm not going to pull it up—we would go to the price grid that you saw and look for 35 billion and extrapolate off of that. It comes out to about $6.3 million dollars for that perpetual license. We would take 40 percent of that to get to the multi platform. That would be 2,520,000.

The deployment license fees are actually a little more complicated because we have four separate countries here. That means that you would need to get unlimited development seats for each of the four countries. So that's, starting at a minimum of 400,000 per country, times the four countries, is 1.6 million dollars for that fee.

But you also have two of them that are multi platform. Typically we would uplift that if it's unlimited. If it's not unlimited, we require you to buy both. If we have three .NET and three Java, you got to buy three and three, six total. On the unlimited case, we would actually just take 40 percent of that fee and uplift for that use, in this case two. That would come out to 1.92 million. So your perpetual fees would be $10,740,000. That's the standard price.

[12] ($10,740,000x.45)x1.22=$5,869,260.

[13] $5,869,260x5=$29,346,450

[14] ($3,040,000x.45)x1.22=$1,668,960

[15] $1,668,960x6=$10,013,760

"just our standard pricing" and agreed these figures were starting places for negotiation. *Id.* at 1741:8-11.

### b. Application-Based Pricing

FICO also offers a named application license for use of Blaze, where the license is tied to the specific computer application in which the client intends to employ Blaze. Waid explained that "ostensibly, the way that the sizing worked was this concept of you size the application into small, medium, large or very large. And if it is a small, you go across, your sale price was $200,000. If it was a medium, your sale price was $350,000." Tr. Vol. VIII at 1695:14-18, Dkt. No. 1184 (explaining Part 2 of the Global Price List).

In pricing application-based licenses, FICO uses an application sizing matrix, which classifies a buyer's applications by size. Tr. Vol, IX at 1715:1-20, Dkt. No. 1185.[16] The matrix considers nine criteria in determining application size. *Id.* In selling and negotiating licenses, FICO's salespeople use the sizing matrix and the pricing sheet to inform their offers. *Id.* at 1719:24-1720:9. This pricing methodology—using the sizing and pricing matrices—was standard throughout the relevant period, including when the License Agreement was terminated in 2016. *Id.* at 1721: 1-7. Waid applied these matrices to the Defendants' applications that employed Blaze. *Id.* at 1727:20-1731:13; *see below*.

In determining annual fees for an application-based license, FICO multiplies the perpetual fee for an application by 45%. *Id.* at 1731:22-1732:3. For example, a perpetual license for a small application costs $200,000 according to the Global Price List. The

---

[16] Trial Exhibit P-1090.

annual fee for that application would be $90,000.[17] Maintenance fees are added on top

of the annual fee at a rate of 22% as already described. *Id.* at 1732:1-14. After the annual

fee is calculated, FICO multiplies that by the term of the license, which cannot be less

than a year. *Id.* at 1736:10-21. The application-based pricing guidelines provided a

standard annual fee of $49,714,705 for use of Blaze in 15 applications.[18] When a buyer

wants to license Blaze for use in 3 or 4+ applications, it was FICO's practice, at least

through 2019, to offer an enterprise-wide license. *Id.* at 1776:18-23, 1777:13-15.[19]

Waid then described factors which bear on the price of a license.[20] He explained

that "[i]n a fixed term negotiation where the relationship is not going to go any further, the

biggest factor is . . . I don't have a long-term value proposition with this client where I'm

getting my services, more maintenance, more product sales. I am just negotiating for a

period of time, and then they're going to stop using it." *Id.* at 1742:5-11. When there is no

prospect of future business from the customer, "that has upward pressure on my

negotiation. I'm going to remain firm. This is my one opportunity to negotiate value out of

---

[17] $200,000 x .45 = $90,000. Extrapolating further, if the contemplated period of use was three years or more, the total annual license fee would exceed the price of a perpetual license.

[18] After the Court granted in part Federal's motion for judgment as a matter of law, *see infra*, Facts, Part II.H, FICO revised this figure to $36,542,831, having eliminated alleged losses from use by Chubb's divisions in Australia, Canada, and Europe. *See* Tr. at 2712:19-22.

[19] "Q [Godesky]: "And when your customers start to use Blaze in more than three or four applications, it's FICO's general practice to offer them an enterprise-wide license?
A [Waid]: It was, yes.
Q: And it was at least as of 2019, correct?
A: Oh, absolutely."
Tr. at 1776:18-23.

[20] This testimony directly followed Waid's calculation of an annual fee for an enterprise-wide license. Much of the testimony related to term licenses, which the record reflects were always application based, though the context of this testimony suggests Waid may consider these same factors in an enterprise license negotiation.

the use of my software. I don't have an opportunity after this." *Id.* at 1742:15-16. On the other hand, the buyer has leverage to reduce the price when they are able to quickly turn off the product and cease use. *Id.* at 1742:23-1743:6. Furthermore, when a buyer wants a longer term, their bargaining power increases. When buyers "want to extend that [the term] to three, four, five years, we would sort of back off of that list price. We would start discounting." *Id.* at 1743:23-25. On a four-year term, Waid would reduce the list price by 10%; on a five-year term he might "bump that up to 15." *Id.* at 1744:1-10. The "primary driver" for price negotiation is whether FICO has future business from the buyer. *Id.* at 1744:11-15. Clients who buy a lot of products and have long term relationships with FICO have more bargaining power. *Id.* at 1745:7-21.[21] Moreover, Waid said the size of the transaction affects the negotiation. Where a buyer buys more, FICO discounts more as well. "The more you buy, the more pricing leverage you have." *Id.* at 1746:1-3.

---

[21] Q. [Mr. Hinderaker] Okay. Then let's take another assumption, that there is a future with the client. How does that different assumption affect the negotiating tactics and pressures that you can apply or that the licensee applies against you?

A. [Mr. Waid] In the new business, well, probably the biggest contributor from our perspective to where we bring the price point into, and actually also in this case from the licensee is, what is the long term value to FICO, how much business are we going to do with this client? We saw that previously on the transition side. It plays into the new business side equally and actually maybe even more so than in the previous scenario of a fixed period of time.

We have a number of clients that buy a lot of products from us, and they carry a lot of weight with us. When they speak, we listen. And so the number of products in the revenue stream we have from a particular client has a big factor; and if they come in and demand more discount, we pay attention. We negotiate, but we pay attention.

If, equally, you know, there is a large number of opportunities on that table of sales that we can see coming from this client, we're going to pay attention, and we're going to be a little more flexible in our price. In particular, this has to do with not just what it is today, but what it is five years form now. It matters. We have a lot of our clients today who are negotiating much bigger contracts with us on our new stuff, which is, we want to retain those customers.

Tr. at 1744:19-1745:21.

Waid summarized: "If I'm negotiating a fixed term and that's the extent of my relationship, then I'm less inclined to go to higher discounts because I'm extracting the full value of that negotiation from that one transaction and that one period of time." *Id.* at 1746:20-25. Ten to fifteen percent discounts are typical for the scenarios discussed, but Waid said higher discounts are possible, depending on the circumstances. *Id.* at 1747:1-8.

### 3.    FICO's past license grants

In pricing the initial license between FICO and Federal, FICO considered the fact that Chubb Group of Insurance Companies had $12.3 billion in gross written premiums the prior year (2005). John Haines, a FICO salesperson, told Bill Waid the proposed enterprise license price was $2,952,000, which Haines described as 24% of 1% of Chubb's revenues.[22] This pricing comports exactly with FICO's Global Price List, which suggests $2.4 million on an enterprise license for a $10 billion entity.[23] *Id.* at 1791:14-1793:14. Haines then suggested a 30% discount, reducing the base license price by $923,100. *Id.* at 1793:22-1794:8. Waid signed off on that price though the parties never entered an agreement for that figure. *Id.* at 1794:9-12 (discussing Trial Exhibit P-330). Later, Waid suggested a base price for an enterprise license for $1.6 million with a 20% discount. *Id.* at 1795:22-1799:14. At the end of 2006, FICO hoped to sell Federal a global enterprise license for $1.5 million. *Id.* at 1807:3-18 (discussing Trial Exhibit P-111). As described earlier, the parties ultimately entered a global enterprise-wide license

---

[22] The Court notes for clarity that $2,952,000 is actually 2.4% of 1% of $12.3 billion, not 24% of 1%, which is $29,520,000.

[23] (12.3 billion x 2.4%) x 1% = $2,952,000.

23

agreement for $1.3 million. Trial Ex. J-001; *see also supra*, Facts: I.A (describing Judge Wright's holding that the License Agreement clearly lacked a geographic restriction).

In 2005, FICO sold National City Corporation a perpetual enterprise-wide Blaze license for $1 million.[24] Earlier negotiations with National City were in the $8 million range, but FICO needed money at the end of its fiscal year and offered National City a deep discount. *Id.* at 1811:24-1812:25; 1835:21-1836:17. In 2006, FICO proposed Capital One would get $9.5 million in value from Blaze but offered that company a perpetual enterprise-wide license for $3.8 million, with credits from past purchases. *Id.* at 1821:4-20.[25] In 2007, FICO sent Merrill Lynch a proposal for a perpetual enterprise-wide license, priced at $2.4 million. The proposal reflected a 60% discount, which would have required special approval. *Id.* at 1819:9-1820:10.[26] That same year, FICO negotiated an expanded license with Avnet for $522,000,[27] moving from a limited license to a perpetual enterprise license for Avnet's US operation. Avnet's entire worldwide revenue at that time was roughly $14 billion. There was no testimony as to Avent's US-only revenues. *Id.* at 1815:1-1816:20. Also in 2007, FICO sold to Target a perpetual Blaze license for use in Target's pharmacy division for $450,000. *Id.* at 1813:17-1814:8. Waid stated it "[w]ouldn't surprise [him] at all" to know Target's *total* revenue that year was around $50 billion. *Id.* at 1814:24-1814:1. In 2008, FICO negotiated a perpetual license agreement with CVS for limited use

---

[24] Trial Exhibit D-0004.
[25] Trial Exhibit D-0012.
[26] Trial Exhibit D-0343; The Court notes that if you reverse engineer the math, this proposal reflects FICO's enterprise license table in its Global Price List. $2.4 million is 40% of $6 million. On FICO's enterprise price table, a $6 million starting place would apply for a company with north of $30 billion in revenue. Merrill Lynch's 10K from 2006 (the last year for which there would have been data at the time of this proposal) reports roughly $33 billion in revenue.
[27] Trial Exhibit D-0283.

of Blaze only in its corporate group for $1.4 million.[28] *Id.* at 1816:21-1817:10; 1831:14-1832:9. In 2010, FICO sold to Expedia a perpetual enterprise-wide license for deployment of Blaze.[29] FICO offered only a 10% discount; the total fee was roughly $800,000. *Id.* at 1817:24-1818:15; 1830:8-1831:9. In 2019, FICO entered a license agreement with RGA Technology Partners, Inc., which granted RGA use rights for one application, lasting five years for $2.88 million, including one year of maintenance.[30] Four additional years of maintenance added $1.5 million, for a total spend of $4.3 million for a one-application, five-year license. *Id.* at 1828:21-1829:21.[31]

FICO has never negotiated a Blaze license for which the license fee was $40 million, or even $30 million. *Id.* at 1824:5-18. Waid could not say whether FICO had ever sold a Blaze license for $20 million or even $10 million, but there is no evidence of

---

[28] Trial Exhibit D-0293.

[29] Trial Exhibit D-0276.

[30] Trial Exhibit D-0172.

[31] Other license agreements were in evidence for other purposes, *e.g.* to show similarities or differences in license language. Nevertheless, because the jury could have relied on the entire content of the license agreement in reaching their verdict, the Court includes them briefly here and notes their probative value to the actual damages question is relatively low as these licenses' scope was narrower than what is contemplated by the hypothetical negotiation:

- Exhibit D-0017 is a perpetual license agreement with Humana, Inc. for use in a single application, issued in May 2006, for $295,000. *See* Tr. Vol. V at 946-47.
- Exhibit D-0039 is a perpetual license agreement with ACE for use in a single application on only 2 CPUs, issued in June 2006, for $75,992 including first year support and maintenance fees. *See* Tr. Vol. VI at 1172-73.
- Exhibit D-0077 is a perpetual enterprise license agreement with Seabright Holdings, Inc., issued in November 2010, for $262,500. *See* Tr. Vol. XII at 1756.
- Exhibit D-0280 is a perpetual enterprise license agreement with Healthways, Inc., issued in June 2007, for $802,500. *See* Tr. Vol. IV at 532.
- Exhibit D-0282 is a perpetual enterprise license agreement with Alpha Bank A.E., issued in June 2006, for €800,000. *See* Tr. Vol. V at 945.
- Exhibit D-0304 is a perpetual license agreement with Grange Insurance Group for use in specific business divisions, issued in December 2004, for $280,000. *See* Tr. Vol. V at 917.

licenses sold for those amounts in the trial record. *Id.* at 1824:19-24. Similarly, at least as of Waid's 2019 deposition, FICO had never sold an application-based license to a client that used Blaze in 15 applications, nor had FICO ever sold an enterprise license on a term basis. *Id.* at 1737:11-18, 1825:6-1826:5.

###### C.    Ramesh Pandey

Ramesh Pandey is Chief Architect for Chubb's North America operations. In his experience, there is no functional difference between Blaze and IBM ODM or Drools, both alternative business rules management software programs. Tr. Vol. IV at 688:19-689:4, Dkt. No. 1180. It was Pandey's experience that Blaze did not work as promised; in particular it was slower than expected. *Id.* at 698:18-23; 701:15-702:1.

###### D.    Claudio Ghislanzoni

Claudio Ghislanzoni is Federal's Chief Enterprise Architect and was present throughout trial as Federal's corporate representative. At the time of the ACE/Federal merger, Ghislanzoni was involved in integrating the technologies held by the two companies including eliminating duplicates. Tr. Vol. VI at 1046:6-1047:23, Dkt. No. 1182. As part of that work, Ghislanzoni analyzed available software products to determine what to use for rules management instead of Blaze Advisor. *Id.* at 1048:20-1049:6. Ghislanzoni and his team compared Blaze with IBM ODM, and gave them both "good scores," though Blaze scored higher than ODM. *Id.* at 1150:5-9 (discussing Exhibit P-511). Ghislanzoni disagreed with this ranking. *Id.* at 1151:2-1152:7. In 2018, Federal created a "new IT strategy for the enterprise," with "increase[d] adoption of open source software." *Id.* at 1049:16-1050:17; 1157:20-1158:2. With that strategy in mind, Federal began replacing Blaze Advisor with Drools, an open source rules management software. *Id.* at 1050:23-

1051:3. Because it is open source, Drools can be used for free. *Id.* at 1137:13-20. Ghislanzoni considered Blaze Advisor, Drools, IBM ODM, and Red Hat—all rules management software programs—to be equally as efficient in running rules.[32] *Id.* at 1138:1-12. The combined ACE/Chubb entity ultimately purchased a license to use Red Hat, which is distributed by Drools but provides additional security over Drools' open source offering. *Id.* at 1157:4-1158:6. Ghislanzoni believed $1 million was a reasonable budget for that replacement, given Chubb's use of rules. *Id.* at 1158:16-22. For its first year of use of Red Hat, Federal paid $400,000, then entered a 3-year contract for just over $1 million. Over four years Federal licensed Red Hat for around $1.5 million. *Id.* at 1159:2-5.

### E.  Russell Schrieber

Defendants designated portions of Russell Schreiber's deposition as evidence at trial. Schrieber was Vice President of Health Care and Insurance at FICO and was involved with the Chubb account at the time of the ACE/Chubb merger. Tr. Vol. III at 310:6-312:11, Dkt. No. 1179. In a February 5, 2016  email[33] to another FICO salesperson, Mike Sawyer, Schreiber opined that Federal was not acting with much urgency in addressing the merger and its effect on the parties' license. Sawyer responded that "They [Federal] probably don't have a sense that we are going to be asking for 3+ million." *Id.* at 424:12-425:13. Schreiber explained further that "they don't know that we're going to be asking for 3 plus million since they breached the contract, right." *Id.* at 425:16-

---

[32] Other rules management software products on the market include Duck Creek and Pegasystems. Tr. Vol. III at 299:14-21, Dkt. No. 1179; Tr. Vol. IV at 691:8-13, Dkt. No. 1180.

[33] Trial Exhibit P-133.

17. Going further, "Q. [counsel for Defendants, Leah Janus] At this point, February 5th, 2016, obviously FICO had decided that it was going to be asking for more than $3 million in additional license fees from Chubb, correct? A. Well, yeah, it looks like it. Yeah, correct." *Id.* at 425:25-426:3. Schreiber then hedged, "We don't know that we were going to be charging 3 million in license fees. We didn't know what we were selling." *Id.* at 426:11-12. Later on, in discussing the parties' attempts to reach an agreement post-merger, Schrieber exclaimed, "And was there a license opportunity? Yes, there was. But more important to us was that long-term client relationship. The $3 million would have come and went. I had Chubb as a customer for a decade, and now a lawsuit? Come on." *Id.* at 437:13-17.

### F.    Phillip Folz

Chubb's former Chief Information Officer for the commercial lines division, Phillip Folz, testified at trial. During the two years he worked in that role, his primary responsibility was to integrate ACE and Chubb as a result of the merger. Tr. Vol. XII at 2398:11-2399:6, Dkt. No. 1188. This included managing a $100 million budget. *Id.* at 2399:7-11. During his 30 years at Chubb, he was involved in "a couple hundred" software license agreements and renewals, *id.* at 2402:6-9, including Chubb's negotiation with FICO to expand its divisional license to allow use by the entire enterprise. *Id.* at 2402:15-2403:10. Folz's budget for that expansion was $2 million at most. *Id.* at 2404:25-2505:7. That number reflected considerations of what Chubb had already paid for use of Blaze, as well as the available funds in the budget. *Id.* at 2405:8-13. At this time in 2006, Folz had negotiated software licenses for $4-5 million at most; Chubb paid that figure for "a complete suite of IBM products that did much more than the rules engine." *Id.* at 2406:7-

28

14. When asked how we would react to a proposal that Chubb pay $50 million to use Blaze for a period of ten years in 17 applications he responded, "I think that's ridiculous." *Id.* at 2460:19-24.

### G.   Other testimony: Blaze's Value

Because FICO purports to price Blaze based on its value to customers, some witnesses testified about the value Blaze provided Defendants. Sean Baseman, a FICO employee involved with technical and solution architecture,[34] testified that after Federal purchased its initial license, "it was apparent that Blaze Advisor was central to all of their decision-making process within the group that we were talking about . . . it was pivotal to what they were doing." Tr. Vol. II at 162:24-163:7, Dkt. No. 1178. He further "deduced" that Blaze was "integral" because Federal wanted to implement Blaze in additional systems." *Id.* at 192:21-193:5. Larry Wachs, a FICO sales executive, explained that according to Chubb employees, they had been able to do "in one afternoon" what "would have taken months and hundreds of thousands of budget for that same process done by IT" and had "succeed[ed] in accepting considerably more business than they had in the previous year for no increase in staff." Tr. Vol. V at 815:20-816:14, Dkt. No. 1181. Henry Mirolyuz, a member of Chubb's IT architecture team, explained that the goal in implementing business rules was to simplify processes and "deploy the business requests significantly quicker." Tr. Vol. VI at 1020:23-1021:13, Dkt. No. 1182. The benefits Mirolyuz

---

[34] "Q [Hinderaker]: What does [technical architecture] mean?
A [Baseman]: Technical architecture is I work with a team of individuals that design the future state of our products, or software products.
Q: And what does a solution architect mean?
A: A solution architect is I work with our customers to identify their problems and look for solutions using zero or more FICO technologies." Tr. Vol. II at 91:1-9, Dkt. No. 1178.

testified about were IT benefits and he "would not be able to speak for any business benefits achieved through the use of the Blaze Advisor technology or business rules technology." *Id.* at 1022:18-23; 1024:7-11.

Defendants' insurance expert William McCarter testified that Blaze had not contributed to their profit or revenue. Tr. Vol. X at 2077:13-14, Dkt. No. 1186. Because Blaze does not work immediately "out of the box," and instead requires the user to program its own business logic into the software, its functionality really depends on the user's programming, he opined. *Id.* at 2077:18-2078:6. He further acknowledged that thirteen applications employed Blaze, but explained that Blaze was one small component of those applications. *E.g. id.* at 2085:8-20; 2092:4-6. McCarter agreed that Blaze was part of some of Federal's "core" systems, responsible for policy administration. *Id.* at 2140:13-18.

In response to Wachs's testimony about what use of Blaze could achieve in a "single afternoon," McCarter explained "it's not been my experience that you can bring in a tool to eliminate that level of expense and work in that short a period of time" and that Blaze could not have achieved that result. *Id.* at 2100:1-11. When FICO's counsel asked "And it's fair to say that technology is a part of the eco-system that business users do – or use to drive their business?" McCarter responded "It supports their business, yes. It's not the driver of their business, but it's the support for the business." He agreed that technology "supports the business." *Id.* at 2125:9-18.

FICO's insurance expert, R. Bickley Whitener offered lengthy testimony about Blaze's purported value to Federal. In summary, he testified that while it is possible to sell insurance without technology, the cost to do so would drive the price of the insurance

above what a buyer would pay. Tr. Vol. VII at 1389:3-9, Dkt. No. 1183. Whitener opined that Federal's use of Blaze allowed it to reduce time to market (*id.* at 1419:7-10), enhance its relationships with producers (*id.* at 1419:17-22), quickly adapt to changes in regulations and respond to business opportunities (*id.* at 1420:2-7), increase agility (*id.* at 1424:17-1425:4), gain greater control over its decisions (*id.* at 1428:1-4), increase precision and consistency (*id.* at 1428:5-7), reduce the time and cost involved in developing decision applications (*id.* at 1429:3-5), enable decision logic to be reused by multiple applications (*id.* at 6-8), enable advanced decisioning to be added to legacy systems (*id.* at 9-11), cut operational costs (*id.* at 12-15), reduce error processes (Tr. Vol. VIII, at 1448:13-20, Dkt. No. 1184), and improve percentage of renewals that did not require human touch (*id.* at 1450:3-10). "Using Blaze Advisor," he testified, Federal achieved its objectives. *Id.* at 1477:1-4.

He also confirmed that he had never used any decision management software, including Blaze.[35] *Id.* at 1537:16-25. He only ever saw Blaze used during a demonstration FICO provided him in preparation for his deposition in this case. *Id.* at 1540:5-13. He agreed that "the demo had nothing to do with Chubb's use of Blaze." Rather, the demonstration modeled the use of Blaze in executing college admissions rules. *Id.* at 1541:18-22. In forming his opinion, Whitener did not speak to anyone from Chubb/Federal, *Id.* at 1543:14-17, nor did he "speak to any other people in the insurance industry." *Id.* at 1545:11-14. Whitener did not measure the relative contribution Blaze made compared to all the other technology Federal was using to sell insurance. *Id.*

---

[35] Whitener had a role in selecting Duck Creek for use at an insurance company but left that company before its implementation. *Id.* at 1536:2-16.

at 1551:15-23. He further acknowledged that in rendering his opinion he had given "zero thought" to whether it was possible to measure Blaze's contribution to Federal's speed in issuing policies. *Id.* at 1563:22-1964:16.

### H.   Motions for Judgment as a Matter of Law

At the close of Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law on two issues. First, Defendants moved for judgment under Rule 52(c) of the Federal Rules of Civil Procedure (FRCP), arguing FICO had failed to meet its burden under the Copyright Act to prove a causal nexus between Defendants' use of Blaze and their revenues, and thus that FICO's claim for disgorgement failed. Dkt. No. 1135. The Court denied the motion. Dkt. No. 1196. Second, Defendants argued the evidence at trial made clear who should be considered the "client" under the agreement—Federal, not Chubb & Sons the unincorporated division—and moved for judgment as a matter of law on that basis. Federal also argued it was entitled to judgment as to third-party consultants' use of Blaze. Dkt. No. 1128. The Court granted Federal's motion in part, finding Federal Insurance Company, not the division Chubb & Son, was party to the agreement. The motion was denied in all other respects. *See* Tr. Vol. XII 2518:14-2523:6, Dkt. No. 1188; *see also* Dkt. No. 1196.

At the close of Defendants' case-in-chief, FICO cross-moved for judgment as a matter of law as to breach based on third-party use of Blaze [Dkt. No. 1144]. FICO also moved for judgment as a matter of law on Federal's counterclaims arguing Federal lacked standing, having failed to adequately plead damages [Dkt. No. 1153]. In addition, FICO moved for judgment on its claim of infringement against ACE [Dkt. No. 1148]. The Court denied the motions. Tr. Vol. XII at 2518:14-2523:6, Dkt. No. 1188; *see also* Dkt. No. 1196.

## I.       The Verdict

After nearly three weeks of trial testimony, the jury deliberated and returned the following verdict:

As to claims between FICO and Federal Insurance Company, the jury determined that Federal did not breach Section 3.1 of the License Agreement; that it did breach Section 10.8 of the License Agreement; that FICO properly terminated the License Agreement; and that Federal had infringed FICO's copyright through its use of Blaze after termination. The jury awarded FICO $4.3 million in actual damages for Federal's breach and infringement.[36]

As to FICO's copyright infringement claim against ACE American Insurance Company, the jury determined ACE had infringed FICO's copyright of Blaze and awarded FICO $35.7 million in actual damages.[37]

As to disgorgement of profits under Section 504(b) of the Copyright Act, the jury determined FICO had not proved the Defendants' infringing use contributed to their revenues and therefore advised the Court of its opinion that FICO was owed $0 in disgorged profits. Redacted Jury Verdict, Dkt. No. 1173.

## III.    Post-Trial Proceedings

The day after the conclusion of the trial, the Court convened the parties to inform them of its intention to accept the jury's disgorgement verdict, agreeing that FICO had not met its burden and was therefore entitled to no disgorged profits. Dkt. No. 1174. The

---

[36] Federal's period of infringing use lasted nine months.
[37] ACE's period of infringing use lasted three years and four months.

Court's Findings of Fact and Conclusions of Law as to Disgorgement provides further discussion of that issue.

In post-trial motions practice, FICO moved for attorneys' fees [Dkt. No. 1220] and for pre- and post-judgment interest [Dkt. No. 1231]. FICO also renewed its motion for judgment as a matter of law as to breach of section 3.1 of the License Agreement based on third-party use of Blaze [Dkt. No. 1240]. Federal and ACE opposed those motions. Defendants also moved for a new trial on damages [Dkt. No. 1226], the subject of this Order, which FICO opposed.

**ANALYSIS**

**I.    Legal Standard**

Whether Defendants are entitled to a new trial on damages turns in part on the governing standard for damages in the case. The parties agree now and have agreed repeatedly throughout the litigation that the proper measure of actual damages for FICO's breach of contract and copyright infringement claims is the fair market value (FMV) of Defendants' unlawful use of Blaze. Ultimately this question must be answered with two figures: (1) covering Federal's infringing use, from March 31, 2016, the date of termination of the License Agreement to December 31, 2016, the day before ACE took over Federal's operations and (2) ACE's unlicensed use from January 1, 2017 through April, 2020 (40 months) when Blaze was completely removed from ACE's systems. At trial, the jury assigned $4.3 million to the period covering Federal's use and $35.7 million for the period covering ACE's use.[38]

---

[38] Because the Court's holding and underlying analysis relates to both awards individually and taken together, the Court will refer to the award as $40 million. As is apparent from the face of the verdict, the jury did not assign a FMV to ACE's use of Blaze that was

To determine the FMV of the improper use that was made, courts employ the device of a hypothetical negotiation for a license covering that use. The "hypothetical negotiation," asks what a *willing* buyer and a *willing* seller would have agreed to as a reasonable license fee covering the use that was made.  *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001). This hypothetical negotiation is deemed to take place just before the infringing use begins. *Gaylord v. United States*, 777 F.3d 1363, 1367 (Fed. Cir. 2015) ("It may hypothesize a negotiation between the parties before the infringement occurred."). "The touchstone for hypothetical license damages is 'the range of the license's reasonable market value.'" *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (quoting *Polar Bear Prods. Inc. v. Timex Corp.*, 384 F.3d 700, 709 (9th Cir. 2004)). Evidence that may be admitted to establish FMV includes "expert testimony, prior sales history, and evidence of sales of comparable assets," *Safka Holdings, LLC v. iPlay Inc.*, 42 F. Supp. 3d 488, 493 (S.D.N.Y. 2013), as well as the parties' past settlement offers and dealings with each other, *Oracle*, 765 F.3d at 1092-93, and the seller's pricing practices. *E.g. Polar Bear Prods.*, 384 F.3d at 710 (9th Cir. 2004) (upholding an award based on what plaintiff quoted defendant for its services). In using past licensing practices, "benchmark" licenses may be useful, but use of such licenses "must always take account of economically relevant differences between the circumstances of those licenses and the circumstances of the latter in the litigation." *Gaylord*, 777 F.3d at 1368. The objective inquiry thus asks not what the copyright owner would like to charge but

---

proportional to the FMV of Federal's use of Blaze, instead assigning a per-month FMV to ACE's use that was approximately twice that assigned to Federal's use. There is no evidence in the trial record that ACE's scope of use of Blaze was any different than that of Federal's or that the value of that use was somehow greater.

rather what was the fair market value of the infringing use. *On Davis*, 246 F.3d at 166; *Oracle*, 765 F.3d at 1088 ("[W]e do not ask what the owner would like to have charged if unconstrained by reality."); *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (9th Cir. 2007) ("The court's inquiry was objective, avoiding references to what Jarvis thought he should have earned or wished he had charged."). This helps protect against a damages award that effectively punishes the infringer for their illegal use while ensuring they pay for what they took. *See Gaylord*, 777 F.3d at 1368.

Though engaging in the fiction of a hypothetical negotiation necessarily engenders a degree of uncertainty, "the amount of damages sought cannot be based on undue speculation." *Dash v. Mayweather*, 731 F.3d 303, 313 (4th Cir. 2013) (citing *On Davis*, 246 F.3d at 166); *Gaylord*, 777 F.3d at 1368 ("Other circuits have recognized the often-unavoidable uncertainties in establishing the fair market value of a reasonable license fee as well as the importance of avoiding undue speculation."); *Jarvis*, 486 F.3d at 534. The hypothetical negotiation in this case asks for the FMV of roughly four years of use of Blaze beginning in March 2016 by a company with $35 billion in annual revenue.

Defendants contend they are entitled to a new trial on damages for two independent, though related, reasons. First, they contend the Court erred in admitting certain evidence. Next, they argue even if that evidence was properly admitted, the damages award was excessive in light of the governing law. The Court takes each argument in turn.

## II.    Evidentiary Rulings at Trial

Defendants argue that the Court erred in admitting certain evidence and testimony at trial. In particular, they contend Bill Waid's testimony exceeded what was permissible

under the governing law and it was contrary to Judge Wright's order excluding certain testimony of FICO's expert Neil Zoltowski. In addition, they argue certain charts should not have been admitted, both because they were prepared for mediation purposes (citing Federal Rule of Evidence (FRE) 403) and because they are hearsay (citing FRE 802). Defs. Mem. at 27-35, Dkt. No. 1228. FICO sees these issues differently, arguing Waid's testimony was probative of FICO's actual damages and properly admitted. Further, the charts at issue were properly admitted under FRE 803, FICO contends. Pl. Mem. at 42-51, Dkt. No. 1258.

The erroneous admission or exclusion of evidence is not grounds for a new trial unless that error affected "any party's substantial rights." Fed. R. Civ. P. 61. An error affects a party's substantial rights when that "error affected the judgment." *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 959 (8th Cir. 2021) (quoting *Shinseki v. Sanders*, 556 U.S. 396, 407-08 (2009)).  An evidentiary holding which misled the jury or affected the verdict is reversible error. *E. I. du Pont de Nemours & Co. v. Berkley and Co., Inc.*, 620 F.2d 1247, 1257 (8th Cir. 1980). "The parties have a right to untainted jury deliberations and a verdict which is based upon admissible evidence." *Qualley v. Clo-Tex Intern. Inc.*, 212 F.3d 1123, 1131 (8th Cir. 2000). In making this determination, the Court looks to the jury's verdict. *Id.*

## A.    Bill Waid's testimony on FICO's application-based pricing

Defendants contend the Court erred in allowing Waid to testify about FICO's application-based pricing methodology. They argue Waid's testimony as to FICO's application-based pricing flies in the face of the actual damages standard—FMV for the unlicensed use of Blaze—and was therefore irrelevant. Defendants aver that Waid's

testimony merely reflected "subjective" evidence of Blaze's purported value, *i.e.* what FICO believes it was worth or would like to have charge for it. "Consequently, it has no place in an analysis that turns only on 'objective considerations of market value,'" Defendants argue. Defs. Mem. at 28, Dkt. No. 1228 (quoting *Jarvis*, 486 F.3d at 534). Moreover, Defendants argue this testimony's prejudice substantially outweighed its probative value. *Id.* at 29 (citing Fed. R. Evid. 403). The size of the verdict demonstrates that the jury was "distracted" from the objective evidence of market value, according to Defendants. While the Court attempted to limit Waid's testimony to keep it within the bounds of what is relevant to the hypothetical negotiation, they argue, that limitation failed. In the end Waid's testimony all but duplicated Zoltowski's expert opinion, which was previously excluded from the case, according to Defendants. *Id.* at 29-32.

FICO counters that Waid's testimony merely reflected FICO's standard pricing methodology, which has "been in place and **accepted by the marketplace** for over a decade." Pl. Mem. at 42, Dkt. No. 1258 (emphasis added). His testimony was therefore both relevant to and probative of Blaze's FMV, FICO argues. *Id.* Contrary to Defendants' characterization of Waid's testimony as violating the Court's earlier order on experts, FICO contends it merely reflected the "relevant evidence underlying" Zoltowski's opinion, which was permissible. *Id.* at 37 (citing SJ Order at 31, Dkt. No. 731).

Waid's calculation applying FICO's application-based pricing model to Defendants' unlicensed use of the software was admitted in error and affected the verdict, which therefore cannot stand. The Court premises this finding on two interrelated issues: (1) the testimony's relationship to Zoltowski's excluded expert opinion and (2) the balance

between the testimony's probative value and risk of prejudice under Federal Rule of Evidence 403.

Pre-trial, Defendants challenged the admission of Neil Zoltowski's expert opinion on FICO's actual damages. *See supra*, Facts, Part I.B. In excluding that opinion, Judge Wright explained that "Zoltowski's opinions as to FICO's actual damages do not consider what a willing buyer and a willing seller would have contemplated." SJ Order at 31, Dkt. No. 731. As was clear from the face of Zoltowski's report,[39] Zoltowski did not attempt to employ a hypothetical negotiation nor ask what a willing buyer would pay and a willing seller would accept for use of the software. Rather, he unequivocally stated that the FMV was what FICO *would charge* under its application-based pricing methodology. Thus, his opinion on actual damages was excluded by Judge Wright because it did not attempt to apply the proper legal measure of such damages. *Id.* However, as Judge Wright observed, "some of the facts underlying [his] opinion may be relevant to the calculation of the hypothetical lost license fee." *Id.* at 31-32. Under the governing law, such admissible evidence includes a party's standard pricing practices. *E.g. Polar Bear Prods.*, 384 F.3d at 710 (9th Cir. 2004) (upholding an award based on what plaintiff quoted defendant for its services). But Zoltowski, an expert, lacked foundation to testify to such facts.

In contrast to Zoltowski, Waid had the requisite personal knowledge to testify to such facts. For example, Waid has experience pricing Blaze licenses, negotiating with buyers, and utilizing FICO's internal practices in doing so. He could therefore properly lay

---

[39] And emphasized in his rebuttal report. *See* Dkt. No. 1238-1.

foundation for evidence such as FICO's Global Price List. Waid can explain the different parts of the Global Price List in general and testify as to FICO's use of it over time.

In presenting FICO's application-based pricing methodology, however, it was incumbent upon Waid to connect that pricing practice to the market for Blaze. FICO implicitly acknowledges this burden in its brief when it argues that the application-based pricing model was "accepted by the marketplace." Pl. Mem. at 42, Dkt. No. 1258. Waid attempted to do this by testifying that FICO had moved away from enterprise-wide licenses to application-based license for a term of years. Though he acknowledged that perpetual licenses remained an option through the present day, Waid testified that by 2019 FICO was no longer selling perpetual enterprise-wide licenses. He pointed to the 2019 RGA license to illustrate this point.

But ultimately this evidence fell short of the mark. In 2016 when the hypothetical negotiation was to take place, FICO continued to offer enterprise-wide perpetual licenses. Tr. Vol. IX at 1777:5-12, 1778:10-19. When a licensee intended to use Blaze in more than three or four applications, it was FICO's standard practice, even in 2016, to offer an enterprise-wide license, rather than an application-based license. *Id.* at 1824:14-17, 1825:2-25. Waid admitted that FICO had never sold an application-based license for 15 applications, nor sold a Blaze license to anyone for $40 million. Thus, this aspect of FICO's pricing practices was not relevant to the market for a Blaze license that covered the infringing use that was made. Stated otherwise, FICO never established that the market had accepted the application-based pricing methodology for a license that would cover the use that was made.

Thus Waid's testimony ultimately exceeded the admissible scope of those underlying facts when he purported to calculate an application-based fee to use as a "starting place" in a negotiation for Defendants' unlicensed use. While he claimed to be applying FICO's "standard pricing," FICO offered no evidentiary link between that pricing method and an actual license for Blaze that was remotely similar to the license that was the subject of the hypothetical negotiation. There was simply no evidence that Waid or anyone else at FICO has priced a comparable license using this method, much less that any buyer had accepted one. Absent such evidence, Waid's calculation merely represented what FICO wished to charge. Waid's calculation, which the Court permitted to be performed assuming it would be connected in a relevant way to the hypothetical negotiation, was therefore just as unreliable and inadmissible as Zoltowski's excluded opinion.

Indeed, this same analysis applies to Waid's calculation of a fee for an annual, enterprise-wide license ($5,896,260 per year). Waid purported to extrapolate an annual fee for an enterprise-wide license to use Blaze based on the Global Price List's enterprise-wide schedule, which prices on a perpetual basis. But Waid admitted that he had never sold or even seen an enterprise license for Blaze sold on a term basis, rather than perpetual duration. Tr. Vol. IX at 1737:11-18; 1738:6-9, Dkt. No. 1185. FICO offered no evidence, either through witness testimony or past license agreements, that any license had ever been priced in this manner. FICO's repeated justification for this was that the Global Price List is "standard." *See* Pl. Mem. at 18-22, Dkt. No. 1258. Yet, it defies common sense to consider the $40 million opening offer to be standard—"regularly and widely used"—when Waid had never sold such a license before. *See* Standard, Merriam-

Webster Dictionary, https://www.merriam-webster.com/dictionary/standard.[40]  Instead, that calculation is mere conjecture about what FICO wishes to charge, not what a buyer would actually pay for a Blaze license in the marketplace. Without some tether between Waid's calculation and an actual license to use Blaze, that testimony was simply irrelevant to determining the fair market value of a Blaze license.

Without evidence that Blaze actually fetches tens of millions of dollars in the marketplace, Waid's calculations rested on no firmer ground than had Zoltowski's opinion. It was nothing more than the price FICO wishes it could charge. Had FICO offered evidence that it has actually sold similar licenses using the methodology propounded by Waid (and Zoltowski), this holding would be different. The expectation that FICO would present sufficient evidence linking Waid's calculation and methodology to the market for Blaze permitted admission of his testimony. Had Defendants moved to voir dire Waid or moved to strike his testimony when no such evidence was forthcoming, the Court would have been obliged to reach the same outcome that it reaches now.

FICO contends that Waid's testimony simply reflects its "standard" pricing from its longstanding Global Price List, which supports its reliability. Pl. Mem. at 36; Dkt. No. 1258. There are two flaws with this argument. First and foremost, the proposition that this pricing is standard is belied by Waid's own testimony. Second, even if reliable in some sense, the evidence does not bear on the hypothetical negotiation. There is no evidence that

---

[40] Nor could such a price or calculation be considered "something established by authority, custom, or general consent," given the complete lack of similar licenses in evidence. Standard, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/standard.

FICO uses the application-based price list in a circumstance like the present.[41] Moreover, FICO did not link a single license to the Global Price List itself; nowhere in the trial record did any witness, including Bill Waid, provide testimony that FICO's opening offer originated with the Global Price List. John Haines appears to have used the Global Price List in reaching his suggestion to Waid that FICO offer Federal a license for $2.952 million with a 30% discount. Tr. Ex. P-330.[42] Russell Schreiber, when asked whether the enterprise-wide license with Federal was "sized on [Federal's] $12.3 billion" in revenue, responded "Sounds about right." Tr. Vol. III at 414-15, Dkt. No. 1179. But Waid later suggested a $1.6 million license with a 20% discount. The record does not contain any evidence that FICO's opening offer to Federal reflected Haines's $2 million[43] fee, instead reflecting Waid's offer of approximately $1.3 million.[44] Neither does the record establish

---

[41] Waid also repeatedly averred that sections of the Global Price List were no longer in use, including multiple discount schedules listed in the document. Tr. Vol. VI at 1690:14-1691:20; 1699:2-3; Tr. Vol. VII at 1785:25-1786:4, Dkt. No. 1184. Waid claimed the pages covering enterprise licenses were essentially defunct because "clients aren't interested" in them, though he repeatedly maintained that FICO continued to offer enterprise licenses. Tr. Vol. VI at 1685:2-6, Dkt. No. 1182.

[42] Waid appears to have confirmed the same when testifying about an email from Mr. Haines:

Q: [Godesky]: And then [Haines] pastes some information that looks like it would have been come from Chubb's 10-K, right?

A: Correct.

Q: And the information from Mr. Haines shows in the first line of the financial information that 12.3 billion in next written premiums for 2005, correct?

A: Correct.

Q: And so this is undoubtedly a reference to 12.3 billion in revenue for the entire global Chubb Group of Insurance Companies. That's what this reflects?

A: Correct.

Tr. Vol. IX at 1801:6-19.

[43] $2,952,000 x .7 = $2,066,400

[44] $1,600,000 x .8 = $1,280,000

how Waid reached his $1.6 million less 20% offer.[45] There does not appear to be anything "standard" about FICO's pricing based on the trial record.[46]

Absent evidence tying the application-based pricing calculation to market realities, the calculation had *no* probative value but presented a serious risk of misleading or confusing the jury, and it must also be excluded on that basis. Federal Rule of Evidence 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by" a danger of unfair prejudice, misleading the jury, or confusing the issues. Assuming Waid's $40 million "opening offer" was relevant in some way, it was so untethered from the rest of the evidence bearing on the license's FMV that it must have misled the jury. Though the vast bulk of the evidence on actual damages pointed toward an FMV around $4 million, the jury awarded ten times that figure. *See supra*. There simply was no other evidence supporting a $40 million verdict, leaving no inference but that the jury relied on Waid's testimony alone in reaching its award. Looking to the jury's verdict, as the Court must do, it is patently obvious that Waid's testimony clouded the jury's understanding of the issues, resulting in an unjust verdict. *Qualley*, 212 F.3d at 1131 (explaining that only by "looking beyond" the admissible evidence and considering inadmissible evidence could the jury have reached its verdict). This error affected Defendants' substantial rights and a new trial is warranted.

---

[45] The only insight the jury had was Mark Layden's—Bill Waid's boss—response to Waid's suggesting charging $1.3 million instead of Haines's $2 million offer. Layden agreed with Waid stating, "Let's not get greedy." Tr. Vol. IX at 1799:15-25 (discussing Tr. Ex. P-226).
[46] Though it may be that some of the enterprise licenses in evidence were priced using the Global Price List in some fashion, there was no testimony to establish that point.

### B.     Defendant's Mediation Charts

Defendants also contend admission of P-0517 and P-0518 was improper because they were prepared for purposes of settlement negotiations and in any case are inadmissible hearsay. Defs.'s Mem. at 32-35, Dkt. No. 1228. These documents are charts detailing various characteristics of the Federal applications that employed Blaze. Mr. Waid used them in calculating his application-based license price.[47] Because the Court has determined Waid's testimony calculating that license price was inadmissible, this argument is now essentially moot. The Court can anticipate no reason for their admission absent Waid's inadmissible calculations. Therefore their admission was error. That said, as already explained, an erroneous evidentiary ruling is only grounds for a new trial where it affects the substantial rights of the parties. Fed. R. Civ. P. 61. Given the content of these charts, in a counterfactual world where Waid had not testified about the application-based pricing calculation but these charts had been admitted, their very technical nature leaves serious doubt that the jury would have or could have meaningfully used them in reaching a verdict.

### III.    New Trial for Excessive Damages

### A.  The Legal Standard

Even if Waid's pricing calculations were properly admitted, Defendants are nonetheless entitled to a new trial on damages, because the verdict was excessive given the facts and the law. Under Federal Rule of Civil Procedure 59, "the court may, on motion, grant a new trial on all or some of the issues—and to any party—as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in

---

[47] Mr. Ghislanzoni testified about them briefly as well.

an action at law in federal court." A new trial is only warranted where the "verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice." *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 553 (8th Cir. 2013) (quoting *The Shaw Grp., Inc. v. Marcum*, 516 F.3d 1061, 1067 (8th Cir. 2008); *see also Oracle USA, Inc., et al. v. SAP AG, et al.*, No. C 07-1658, 2011 WL 3862074 at *2 (N.D. Cal. Sept. 1, 2001) ("The court may grant a motion for a new trial . . . if it concludes that the verdict is contrary to the clear weight of the evidence, is based on evidence which is false, or would result in a miscarriage of justice."), *aff'd in relevant part*, *Oracle*, 765 F.3d 1081.

While courts may weigh the evidence and make credibility determinations just as a jury would, *Lincoln Composites, Inc. v. Firetrace USA, Inc.*, 825 F.3d 456, 460 (8th Cir. 2016), a new trial is not warranted merely because the court would have arrived at a different amount in damages than the jury reached. *Bennett*, 721 F.3d at 553. A new trial is warranted only "if, having given full respect to the jury's finding, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed." Section 2806 Grounds for New Trial—Weight of the Evidence, 11 Fed. Prac. & Proc. Civ. § 2806 (3d ed.); *see also Ryan by Ryan v. McDonough Power Equip. Inc.*, 734 F.3d 385, 389 (8th Cir. 1984) (citing Fed. Prac. & Proc. Civ.); *Landes Const. Co., Inc. v. Royal Bank of Canada*, 833 F.3d 1635, 1371-72 (9th Cir. 1987) (same). A damages award which is contrary to the governing law on damages constitutes an injustice. *Cf. Wolk v. Churchill*, 696 F.2d 621, 626 (8th Cir. 1982) ("The jury was allowed to assess liability and damages under an erroneous legal standard . . . [which] could have affected the damages awarded by the jury . . . and that Wolk is entitled to some relief on appeal because of the error.")

### B.    Defendants' Arguments

Defendants argue the $40 million actual damages award was excessive in light of the evidence. Defs.'s Mem. in Support of Their Motion For a New Trial on Actual Damages (Defs. Mem.) at 11-17, Dkt. No. 1228. According to Defendants, the evidence bearing on FMV falls into four broad categories: (1) the parties' past dealings; (2) the prices charged for comparable Blaze licenses; (3) the market value of comparable products; and (4) the current market for Blaze. *Id.* at 12-16. These categories are objective considerations properly contemplated in the hypothetical negotiation, Defendants argue. *Id.* at 11. Considering this evidence, the reasonable market value for a license covering Defendants' unlawful use "is a few million dollars, at most—far short of the $40 million" the jury awarded. *Id.* at 11. The jury's verdict, Defendants argue, reflects improper *subjective* evidence, *i.e.* what FICO would have liked to charge if "unconstrained by reality." *Id*. at 18 (citing *Oracle*, 765 F.3d at 1088. According to Defendants, the testimony about FICO's application-based pricing model merely reflected what FICO wishes it could charge, rather than what it could obtain in the marketplace. *Id.* Lastly, Defendants argue FICO's counsel made improper appeals to punish Defendants for their infringement. *Id.* at 23-27. Among other issues, Defendants note that at closing FICO's counsel explained that a large actual damages award was appropriate because "that's a lot of applications that you're using without permission." *Id*. at 24 (citing Tr. at 2712:4-7, Dkt. No. 1189).

### C.    FICO's Position

FICO argues the damages award is not against the great weight of the evidence. It points to evidence suggesting Blaze was "core" to Defendants' systems and provided them with "significant value." Pl. Fair Isaac Corp.'s Mem. of Law in Opposition to Defs.'s

Motion for a New Trial on Actual Damages (Pl. Mem.) at 9, Dkt. No. 1258. Because Blaze aided in Chubb's sale of insurance, it was intrinsically valuable and the jury's damages award reflected that value, FICO argues. *Id.* at 11. Bill Waid's testimony, rather than being subjective evidence of what FICO wishes it had charged, instead detailed FICO's "standard" pricing which as been "accepted by the marketplace" and is thus a proper basis for deriving the FMV of a Blaze license, FICO claims. *Id.* at 12. FICO points to its license agreement with RGA Technology Partners as evidence of market acceptance of FICO's application-based pricing. *Id.* at 14.

### D.   Analysis

The Court agrees with Defendants that the jury's award was excessive in light of the evidence. At bottom, the award defies the law on actual damages in this case because there was no evidence that a *willing* buyer and seller would agree to a $40 million price tag for Blaze. In making this determination, the Court first turns to the standard for actual damages, which seeks to determine the fair market value of Defendants' unlawful use. This is an objective inquiry. It does not contemplate what the parties subjectively wish they could have charged or paid. The hypothetical negotiation device which is used to help discern FMV is constrained by the "range of the license's *reasonable* market value." *Polar Bear Prods.*, 384 F.3d at 709. In this inquiry, the factfinder properly considers "expert testimony, prior sales history, and evidence of sales of comparable assets," *Safka Holdings, LLC v. iPlay Inc.*, 42 F. Supp. 3d 488, 493 (S.D.N.Y. 2013), as well as parties' past dealings with each other and settlement offers," *Oracle*, 765 F.2d at 1092-93, and the seller's standard pricing practices. *E.g. Polar Bear Prods.*, 384 F.3d at 710 (9th Cir. 2004) (upholding an award based on what plaintiff quoted defendant for its services); *On*

*Davis*, 246 F.3d at 161 (finding plaintiff's past pricing practices sufficient to establish at least some market value); *Oracle USA, Inc.*, 2011 WL 3862074 at *7 (N.D. Cal*.,* Sept. 1, 2011). Though this exercise tolerates some level of speculation, "the amount of damages may not be based on undue speculation." *On Davis*, 246 F.3d at 166 (internal quotations omitted); *see also Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) ("There is no evidence other than Mr. Bell's unsupported assertion that he has sold the rights to [his photo] for years at a price of $200.00 Without any support or evidence, this value is based on undue speculation.").

The objective evidence bearing on the hypothetical negotiation in this case follows: FICO and Federal entered into a perpetual enterprise-wide license agreement in 2006 for $1.3 million. FICO sold Blaze licenses to other entities on a perpetual enterprise-wide basis for the following dollar figures: $1 million,[48] $1.4 million,[49] $800,000,[50] FICO also prepared proposals for perpetual enterprise licenses for $3.8 million[51] and $2.4 million[52] but there was no evidence that those proposals resulted in finalized licenses or, if they did, at what price. FICO disputed the economic similarity of these licenses to the circumstances of the 2016 Blaze license FMV. Though these licenses are distinguishable, they are nonetheless germane to the FMV inquiry. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316 (Fed. Cir. 2011) (reliance on other license agreements is proper so long as they are not "radically different" from the hypothetical license). In 2019, FICO sold an application-based license for use in one application for a five year term for

---

[48] National City License, Tr. Ex. D-0004.
[49] CVS, Ex. Tr. D-0293.
[50] Expedia, Tr. Ex. D-0276.
[51] Capital One, *see supra*.
[52] Merrill Lynch, *see supra*.

$2.5 million.[53] At no time in its history had FICO ever negotiated a Blaze license fee of $40 million or even $30 million. Tr. Vol. IX at 1824:10-24. There is no evidence in the record to establish that FICO had ever licensed Blaze for $20 million or even $10 million. *Id*. At the time of the ACE/Chubb merger, FICO internally discussed demanding an additional "3+ million" for what it deemed expanded use by Federal. FICO's discounting practices changed over the relevant period, with aggressive discounting in the early years and fewer discounts in the later years, though even in 2016  FICO continued to discount under certain circumstances, including when a customer was negotiating for a license term of three or four years. *E.g.*, Tr. Vol. IX at 1744:1-10, Dkt. No. 1185.

The testimony on FICO's discounting practices ultimately boils down to the general conclusion that a Blaze license in 2016 was more costly than it was in 2006. By 2016, all Blaze licensees were required to pay support and maintenance fees, equal to 22% of the license price per year. Tr. Vol. VIII at 1688:9-25, Dkt. No. 1184; Tr. Vol. IX at 1722:1-7, Dkt. No. 1185. Enterprise-wide licenses have only ever been sold on a perpetual basis, and application-based licenses generally sold on a term basis.[54] Earlier during the relevant period enterprise licenses were more popular; later, application-based licenses were more popular and FICO began its negotiations with that pricing model in mind, though enterprise licenses remained available. There were alternatives to Blaze in the marketplace, including Drools, which was free, and Red Hat which distributed Drools with technical support. Around 2018, Federal licensed Red Hat for four years at a cost of $1.5

---

[53] RGA Technologies Partners, Tr. Ex. D-0172.
[54] There is no evidence in the record of an application-based license issued with a perpetual duration, though the Court presumes some may exist, because the Global Price List prices them in that manner.

million. Tr. Vol. VI at 1159:2-5, Dkt. No. 1182. Other evidence established that FICO factored in the expected length of the relationship with the buyer when negotiating Blaze licenses; the longer the expected relationship, the more negotiating leverage the buyer had. *E.g.*, Tr. Vol. IX at 1747:1-8, Dkt. No. 1185. If negotiating for a four-year license, FICO might discount up to 10%-15%. Tr. Vol. IX at 1744:1-10.

It is plain that none of this evidence—the objective evidence of what a license to use Blaze was worth in the marketplace—came anywhere close to the $40 million verdict. While FICO—a willing seller—would undoubtedly accept $40 million to license Blaze, there is nothing to suggest a willing buyer—Defendants or anyone else—would pay that price. Absent any evidence that any willing buyer ever had or would pay anywhere near $40 million, the verdict is unreasonable and does not comport with the legal standard.

### 1.   FICO's Evidence of Value

FICO contends it presented ample evidence to support the $40 million verdict. According to FICO, the evidence established that Blaze brought "significant" value to Defendants, and that Blaze was "core" to Federal's sale of insurance. Pl. Mem. at 15-16; Dkt. No. 1258. They point to testimony that Blaze allowed Federal to "expand and grow" into different areas of the market. *Id.* They note that Blaze was deployed in policy administration systems without which a company cannot sell insurance. *Id.* at 17. This certainly supports the notion that Blaze had market value in 2016 but does little to quantify the amount of that value. As discussed in detail below, this evidence is too vague, imprecise, or speculative to bridge the gap between the objective evidence of value and the verdict.

### a.    General testimony as to Blaze's "value"

FICO points to Sean Baseman's testimony that Blaze was integral to Federal's operations because Federal wanted to deploy Blaze in additional systems. Pl. Mem. at 16-17. This expansion demonstrates Federal received "significant" value from the software, FICO argues. The Court recognizes that Federal's desire to expand its use of Blaze indicates it received *some* benefit from the software. But Baseman's testimony is not specific enough to support a jump from somewhere near "3+ million" dollars that FICO planned to ask for at the time of the merger, to $40 million. *See Oracle*, 765 F.3d at 1090 ("$10 million [paid for the subject license] is a great deal less than the $1.3 billion Oracle says SAP would have paid to Oracle for a license. . . ."). Likewise, Henry Mirolyuz's testimony that use of Blaze allowed Federal to "deploy the business requests significantly quicker," is too general to support the $40 million verdict.  Pl. Mem. at 17. Even setting aside the fact that Mirolyuz repeatedly explained that his testimony was limited to IT benefits and not business benefits, the notion that Blaze software increased speed (making processing "significantly quicker") is also too imprecise to bridge the enormous gap between the bulk of the evidence and the $40 million verdict.

Even considered together, the testimony characterizing Blaze's contribution to Federal's (and others') business as "significant" is not only imprecise, it suffers the additional limitation of being—in part—subjective. Much of the testimony of Blaze's benefits came from FICO's employees as distinct from Federal's. For their part, Federal's employees' testimony downplayed the benefits of Blaze. Such testimony—from both sides—is of limited value in determining the monetary FMV of a license to use Blaze in 2016. Such evidence establishes that Blaze has a market value but cannot overcome the

cold hard fact that no one has ever paid anywhere near $40 million for a license to use Blaze. Nor can that evidence overwhelm the fact that internally, on the eve of the termination of the contract, which coincides with the timeframe of the hypothetical negotiation, FICO intended to ask for a fee of "3+ million" for Federal's post-merger use of Blaze. The context of that internal discussion evinces skepticism whether Federal would willingly pay even that amount for a such a license. *See* Tr. Vol. III at 424-26 (discussion Exhibit P-0133); *Oracle*, 765 F.3d at 1090.

This case is not unlike the *Oracle* case. In *Oracle*, plaintiff explained that the infringed data "would encircle the globe nine times if printed out on double-sided paper laid end to end," as evidence supporting the jury's $1.3 billion verdict. *Id*. at 1089. But the court explained that while that was a "dramatic image" it ultimately said nothing about the value defendants derived from that data. *Id.* Further, plaintiffs there pointed to testimony from the defendants that the data was an "important part" of its operation. *Id.* The court again explained that while that testimony may reflect some benefit to defendants, it left "important gaps." *Id*. The same issues plague FICO here. Their evidence of Blaze's value to Federal, including Baseman's and Mirolyuz's testimony of expanding use and increased speed, leave "important gaps" between the testimony and the $40 million verdict. *See id.*

FICO notes that Defendants' own expert, William McCarter "admitted that Defendants deployed Blaze Advisor in applications that were core to Defendants' business as an insurance company." Pl. Mem. at 17, Dkt. No. 1258. While true that McCarter agreed that Blaze was used in CUW, an application that was "part of" Federal's policy administration system, the testimony FICO cites also suggested Blaze itself was

several steps removed from the sale of insurance, or at least merely one small part of such a sale. Tr. at 2137-2141. A "buyer will not ordinarily pay more for a license than its anticipated benefit," and FICO's evidence of that benefit is too tenuous to sustain the verdict. *Oracle*, 765 F.3d at 1089.

FICO's heavy reliance on its insurance expert's testimony is also unavailing. Bick Whitener's testimony was largely untethered to the facts of the case and its probative value on the FMV issue was low. For example, FICO's counsel asked Whitener: "With or without technology, can insurance companies sell insurance without a policy administration system?" Whitener responded, "In today's current environment, it could be done, but you can't be price-competitive because the expense it would cost to do that would drive your price way above the point where you could sell in the marketplace." Tr. at 1389:3-9. Further, FICO's counsel asked "And in your experience, technology is used inside of a policy administration system to assist in that part of the [book and bind] process as well? A: Yes. The policy administration system is the technology that is driving all of these processes." *Id.* at 1399:14-18. Similarly, FICO's counsel asked Whitener what would happen if one of Federal's applications was out of order. He responded, "[T]here is little to no 'bind'—'book, bind, issue' taking place. . . . If that can't be done, the work doesn't get done." *Id.* at 1505:9-10, 22. He further testified that one application employing Blaze Advisor resulted in eliminating a "minor amount of button-pushing." *Id.* at 1505:3-8. Again, these nebulous assertions of Blaze's role in selling insurance are not enough to support the $40 million verdict. Broad proclamations about the value of technology do not meet FICO's burden to establish a non-speculative FMV. An award *need not* reflect mathematical precision, but it *must not* reflect mere speculation. *Dash*, 731 F.3d at 313.

Whitener's testimony only provided fodder for speculation, rather than a reasonable basis for the jury's verdict.

### b.   The parties' past dealings

FICO also seeks to support the $40 million verdict by arguing that the evidence of the parties past dealings, including the 2006 License Agreement and negotiations at the time of the ACE/Chubb merger, as well as license agreements between FICO and third parties, are distinguishable from the economic circumstances in which the hypothetical negotiation was to take place. Therefore, FICO argues, the jury was free to reject this evidence. Pl. Mem. at 20-28, Dkt. No. 1258. It is true the economic circumstances in 2016 were different. The 2006 License Agreement was negotiated at a time when FICO offered steep discounts and had turned little profit on Blaze. Pl. Mem. at 27, Dkt. No. 1258. Further, Federal's witness Phil Folz described the 2006 license as a "good deal." *Id.* at 28. By contrast, at the time of the hypothetical negotiation, things were different: Federal was now 3x bigger due to its merger with ACE, and FICO was "moving away" from enterprise licenses, FICO explains. *Id.* These same distinguishing features, FICO argues, apply to other the Blaze licenses in evidence, which were all executed between 2005 and 2010.[55] *Id.* Moreover, FICO contends evidence that it planned to ask for "3+ million" after the ACE/Chubb merger is irrelevant because that offer was made with an eye toward an ongoing and future relationship with Federal, a circumstance FICO argues is absent from the hypothetical negotiation. *Id.* at 30.

These arguments are flawed. At bottom it was FICO's burden to prove the fair market value of the hypothetical license without undue speculation. *Oracle*, 765 F.3d at

---

[55] With the exception of the RGA license, detailed later in this subpart.

1093. Yet FICO offered no license agreements into evidence that it views as comparable to the hypothetical negotiation, with the possible exception of the RGA license in which RGA agreed to pay $2.52 million for a license to use Blaze in one application for a term of five years, including one year of maintenance fees. But the RGA license is also distinguishable from the economic circumstances of the 2016 hypothetical negotiation. For one, the RGA license was not negotiated until 2019, three years later. Though FICO was "moving aggressively" away from perpetual enterprise licenses in 2016, "most" licenses were still perpetual at that time. Tr. Vol. IX at 1738:2-9. More importantly, it was an application-based license for a single application. In light of Waid's testimony that (1) FICO had never sold an application-based license for 15 applications; (2) in 2016 when a company decided to use Blaze in 3 or 4 applications FICO would offer an enterprise-wide (and perpetual) license;[56] and (3) it had never sold a Blaze license for $40 million, the RGA license does not support the jury's verdict, either singly or in combination with the other evidence at trial.

The rest of the evidence FICO presented was either inadmissible or, if admissible, too non-specific to support the jury's $40 million award. Without the license agreements Defendants put into evidence, there would be little to *no* objective evidence on which the jury could find the fair market value of the hypothetical license, aside from the parties' 2006 License Agreement itself.[57] Though a plaintiff is not required to present "benchmark" agreements in order to recover damages, "it may be difficult for a plaintiff to establish the

---

[56] Even in 2019, the year the RGA license was issued, it was still "absolutely" FICO's practice to sell an enterprise-wide license under these circumstances. Tr. Vol. IX at 1776:18-23.

[57] Joint Exhibit 001.

amount of such damages without undue speculation in the absence of such evidence." *Oracle*, 765 F.3d at 1093. As in *Oracle*, where the plaintiff provided neither benchmark licenses from the industry nor evidence of a "history granting similar licenses," FICO too failed to provide benchmark licenses similar enough for a jury to approximate FICO's actual damages based on objective evidence. *Id.* Without such evidence FICO, like Oracle, "faced an uphill battle." *Id.*

Moreover, the law is clear that evidence of the parties past agreements and negotiations, as well as third party agreements for the software are relevant to the hypothetical negotiation, despite FICO's claims to the contrary. *See Oracle*, 765 F.3d at 1090 (looking to SAP's acquisition price and noting that "[this $10 million] low acquisition price does not in itself necessarily preclude Oracle's recovery of a $1.3 billion verdict. But it casts substantial doubt on Oracle's argument . . ."); *Polar Bear Prods. Inc.*, 384 F.3d at 709 ("Timex argues that Polar Bear cannot recover the amount of Sepp's estimate because Polar Bear never charged that rate. That argument is curious. The $37,500 price time reflects the amount Polar Bear actually quoted to Timex."); *Jarvis*, 486 F.3d at 534 ("The court also examined the financial perspectives of both the willing buyer (in the form of evidence about *what K2 typically pays for images* and what it specifically *paid Jarvis* in its prior dealings with him) and the willing seller (in the form of Jarvis' earlier deals with K2 and *his revenue from image databanks*." (emphases added)); *Gaylord*, 777 F.3d at 1368 ("Past arms-length licensing practices by the copyright owner or the infringer for similar uses and 'benchmark' licenses by others in the industry may be useful.") Whether or not these license agreements provided the jury objective evidence it found useful in

determining the FMV of a license for the infringing use, there was no objective evidence on which the jury could have properly reached its $40 million figure.

### c. Competitive alternatives to Blaze

FICO also denies there are comparable software products in the marketplace, with particular focus on Drools's dissimilarities to Blaze. *Id.* at 29. According to FICO, the existence of Drools is essentially irrelevant to the FMV of a Blaze license. Pl. Mem. at 34, Dkt. No. 1258 ("Defendants attempt to use the price of an open-source software program called Drools to suggest the jury's award of actual damages does not reflect the fair market value of Blaze Advisor. That argument fails. The circumstance of the hypothetical negotiation is one in which the parties [are negotiating] for Blaze Advisor."). *Id.* at 35. FICO ignores that even if Drools is not comparable to Blaze in *some* ways, its existence as a free rules management software would still affect the market price for a Blaze license, driving the price down to keep Blaze competitive. *See* Wolfgang Kasper*, Competition*, *The Concise Encyclopedia of Economics* at 73-76 (David Henderson, Ed., 2008) ("Buyers need to ask themselves what their requirements are, *what products are available*, what they can afford, and *how various products compare*, *taking prices into account.*" (emphases added)); *see also Gaylord*, 777 F.3d at 1370 ("We do not question the government's suggestion that alternatives available to a potential licensee provide an important constraint on the hypothetical negotiation.").

FICO contends Defendants presented no evidence that an open-source software like Drools "could possibly be comparable to a proprietary commercial product like Blaze Advisor." This argument is contrary to the trial record. The evidence at trial was that various rules management software programs on the market—including Blaze, Drools,

Red Hat, and IBM ODM—provided essentially the same functionality in terms of Federal's intended use. *See* Tr. at 688:19-689:4; 713:21-715:21; 1149:25-1152:21; 1155:6-13; *cf.* 1138:1-3 ("Red Hat, FICO, IBM, and Drools, are pure rules engine. They do one thing only. The rules, they are, you create rules and generates code."). In fact, FICO's own witnesses routinely referred to Drools and other software programs as Blaze's competitors. *See id.* at 299:17-21; 606:20-24 (agreeing that Drools is "similar to Blaze"); FICO's counsel even acknowledged that Federal "find[s] Drools acceptable" for its business rules needs since ceasing use of Blaze. *Id.* at 2685:22-2686:3.

*Gaylord* offers a useful contrast to this case. 777 F.3d 1363. There the sculptor of *The Column*, the central focus of the Korean War Memorial sued the United States Postal Service (USPS) after it created a postage stamp using a photograph of *The Column* without the sculptor's consent. In contesting the per-unit royalty awarded to plaintiff for the infringement, USPS explained that in the past it "had found alternatives rather than agree[ing] to" per-unit royalties. *Id.* at 1369. But looking to the "particular circumstances" of the case, the court determined that the uniqueness of the "distinctively recognized" work at issue—Gaylord's sculpture—was sufficient to "discount the significance of potential alternatives." *Id.* at 1370. Furthermore, there was evidence in the record that "all of the images considered by" the stamp selection committee were of Gaylord's sculpture. *Id.* The court explained: "There is only one nationally recognized Korean War memorial, and the evidence readily allows the finding that, by 2003, that memorial—and particularly *The Column* within it—was a distinctively valuable subject for a commemoration of the veterans who sacrificed through service in that war." *Id.* There is no similar evidence of Blaze's uniqueness in the market, such that a jury should have discounted all alternatives.

Instead, the trial testimony consistently placed Blaze in a class of other similar products, including Drools, Red Hat, Duck Creek, and IBM ODM. Whereas *The Column* was essentially the only option for the stamp in *Gaylord*, *id.* ("There is only one nationally recognized Korean War memorial"), there were several other competitive rules management software programs available to Federal.

The parties certainly dispute how the other rules management software products available on the market compare to Blaze. But what they do not dispute is that they compete with Blaze. If Blaze is the superior product then it can presumably command a higher price in the market. But the existence of market alternatives to Blaze does influence the price of a Blaze license and courts routinely recognize the admissibility of such evidence. It was incumbent upon Federal to establish the comparability to Blaze of such competitive products; it was incumbent upon FICO to establish that the products were not comparable. One thing is clear from the record. Nothing in the evidence related to these products supports an award of $40 million.

Thus, even assuming Blaze is superior to Drools and that Blaze would command a substantially higher price on that basis, an assumption for which evidence in the record is lacking, absent some tether to real-world license agreements or negotiations reflecting that a willing buyer would pay somewhere near $40 million for Blaze, the assertion of Blaze's superiority over Drools is insufficient to support the verdict.

### 2.    Application-based pricing was subjective

In opposition to Defendants' argument that the verdict reflects FICO's subjective desire as to what it wishes to charge them for the use of Blaze, FICO contends its application-based pricing structure has been "accepted by the marketplace." Pl. Mem.

at 18, Dkt. No. 1258. They rely heavily on Waid's testimony about the application-based calculation and his testimony that such a calculation reflects FICO's standard pricing and is merely a starting point for negotiation. But Waid's testimony, even if admissible, suffers from essentially the same problem as FICO's other evidence, detailed above, but for a different reason. That earlier-described evidence, as well as Waid's testimony lack any link to a real-world license or license negotiation where the parties contemplated a fee anywhere near $40 million. Without that link, the earlier-described evidence required undue speculation for a jury to arrive at a $40 million verdict. Without some link to an actual license reflecting the methodology Waid employed here, his testimony of FICO's $40 million "starting place" merely reflects FICO's subjective desire as to what it wishes it could charge for Defendants' use, rather than reflecting an objective indicia of Blaze's FMV. Assuming Waid's calculation itself is admissible, it is still *subjective*, absent some evidence buyers pay for licenses based on those calculations. Given the subjective nature of that $40 million "starting place," a reasonable jury faithfully applying the governing law on actual damages as plainly described in the jury instructions, could not have reached this verdict.[58] Put another way, Waid's testimony did not establish that the marketplace had accepted this pricing methodology for anything like the license at issue in the hypothetical negotiation.

   Aside from Waid's testimony, the only alleged support for FICO's argument that the pricing is "accepted by the marketplace" is FICO's license agreement with RGA Technology Partners. That license was limited to use of Blaze in one application for a five

---

[58] The Court deliberately excluded further discussion of Claudio Ghislanzoni and Philip Folz's testimony about what Federal would pay; though their testimony was corroborated by other evidence in the record, it could be read as similarly subjective.

year period. Ex. D-172. Though FICO does not put it in so many words, the implication is that this license represents the market's general acceptance of the application-based pricing model. Because the RGA license was sold on an application-basis, other licenses, including the hypothetical license here, would also be sold on that basis, FICO contends. Pl. Mem. at 20, Dkt. No. 1258. Several deficiencies plague this argument. First, there is no direct evidence in the record that the RGA license was negotiated with the application-based Global Price List as a starting point. The lack of a link between the license and the Global Price List reduces the probative value of the license as to the pricing structure's "accept[ance] by the marketplace." Pl. Mem. at 18, Dkt. No. 1258. The RGA license was executed in 2019, not 2016, the relevant time period. Even if the RGA license reflects some level of acceptance of the application-based pricing in the marketplace, it does not establish that acceptance as of 2016. Moreover, because the RGA license was limited to a single application, its usefulness in assessing the FMV of a license for 15 applications is low. This is especially so given Waid's own testimony that in 2016 if a buyer were interested in deploying Blaze in 3 or 4+ applications, it would be FICO's "general practice" to offer enterprise-wide pricing. Tr. at 1776:18-23. Because the RGA license's scope is markedly different from the hypothetical license and because other testimony at trial further called into question its use as a benchmark for that hypothetical license, it does not support the $40 million verdict.

To put in its starkest terms, there is nothing in the record to establish that any willing buyer would ever pay $40 million for a Blaze license to cover the use that was made. Forty million dollars is not the fair market value of such a license.

IV.    **Remittitur**

When granting a new trial based on excessive damages, including when that award was the result of trial error, the Court may condition grant of a new trial on the plaintiff's agreeing to remit the amount of the award determined to be excessive under the law, *i.e.* remittitur. *Tedder v. Am. Railcar Indus., Inc.*, 739 F.3d 1109, 1110 (8th Cir. 2014); *Gasperini v. Ctr. For Humanities, Inc.*, 518 U.S. 415, 433 (1996); *Dimick v. Scheidt*, 293 U.S. 474, 482 (1935). In cases such as this, which has been both lengthy and complex, remittitur helps limit costs and conserve judicial resources. *United States v. 47.14 Acres of Land, More or Less, Situate in Polk Cnty., State of Iowa*, 674 F.2d 722, 728 (8th Cir. 1982). Remittitur does not require precise calculation. *Kropp v. Ziebarth*, 601 F.2d 1348, 1354 (8th Cir. 1979) ("Although we believe Buyers' damage computation was highly excessive and may well have confused the jury, the nature of the verdict prevents us from precisely determining to what extent the jury may have discounted the inflated figures. . . . In light of the unreasonable cost of care figures appearing on Buyers' exhibits and presented to the jury, it would be a denial of justice to permit the verdict to stand.").

The maximum verdict supported by this record is $6 million. The hypothetical negotiation asks what a willing buyer and a willing seller would have negotiated (here in 2016). In 2016 it was FICO's standard practice to offer an enterprise-wide license if the scope of use was similar to Federal's. Tr. Vol. IX at 1776:18-23; 1777:13-15.  Further, FICO testified that all enterprise-wide licenses were negotiated as perpetual licenses rather than for a term of years. *Id.* at 1737:11-18; Trial Ex. P-0418. Certainly once the total license fee for a fixed-term license exceeds that for a perpetual license, which the

evidence at trial established occurs somewhere between two and three years,[59] any rational economic actor would simply purchase a perpetual license. FICO acknowledged that its licensing practice in 2016 for a scope of use like Federal's was to offer an enterprise-wide license, which were always offered as a perpetual license. A willing buyer would seek and a willing seller would offer an enterprise-wide license for a perpetual term[60] and therefore the Court finds that a willing buyer and seller would have *negotiated* an enterprise-wide perpetual license in 2016 for the infringing use.[61] FICO's own employees acknowledged a price around $3 million or more to continue use under the original license purchased for $1.3 million. The hypothetical license price would likely reflect both the $1.3 million originally paid, plus the "3+ million" for which FICO planned to ask. In 2016, a willing buyer might well have agreed to a modest premium on that amount. FICO's Global Price List suggests a license fee of $6 million for a buyer with $32 billion in revenues.[62]

Given the objective evidence detailed above, the highest reasonable license fee for the hypothetical license is $6 million. Because this case dealt with two licenses (one covering Federal's use and one covering ACE's use), the remittitur as to each is as

---

[59] For example, according to FICO's Global Price List and Waid's testimony, the perpetual fee for a license to use Blaze in one Very Large Application is $1,000,000. The annual fee for that application would be $450,000 ($1,000,000 x .45 = $450,000). A 3-year license would thus cost $1,350,000 – a price no rational economic actor would pay if they could instead pay $1,000,000 for the same use. *See* Tr. Ex. P-418 at 20.

[60] Even if the willing seller insisted on negotiating for a license for a term of years, the perpetual option would still curb the price of that license. Furthermore, because this inquiry asks for the FMV of the license, support and maintenance fees are not a factor.

[61] The objective evidence reflected that no enterprise-wide licenses were ever sold for a term of years and that no application-based license was ever sold covering use in 15 applications. This leads to only one objective conclusion: the license in the hypothetical negotiation would have been both enterprise-wide and perpetual.

[62] $4.8 million + ($1 million x 1.2) = $6 million

follows: Federal's 9 months of use accounts for approximately 18.36% of the 49-month period[63] at issue and thus that license is limited to $1,101,600.[64] ACE's use accounts for the remaining 40 months and thus that license is limited to $4,898,400.[65]

Should FICO reject the remittitur, the Court orders a new trial on damages.


## ORDER

For these reasons, IT IS HEREBY ORDERED:  Defendants' Motion for a New Trial on Actual Damages [Dkt. No. 1226] is conditionally **GRANTED** pending Plaintiff's rejection of the remittitur.


Dated: September 13, 2023                          __s/David T. Schultz_____
                                                   DAVID T. SCHULTZ
                                                   United States Magistrate Judge


---

[63] March 31, 2016-April 30, 2020
[64] $6,000,000 x 18.36% = $1,101,600.
[65] $6,000,000 x 81.64% = $4,898,400.