# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Fair Isaac Corp.,

      Plaintiff,

v.

Federal Insurance Co., et al.,

      Defendant.

Case No. 16-cv-1054 (DTS)

**ORDER**

---

In 2016, Fair Isaac Corporation (FICO) sued Federal Insurance Company (Federal) and ACE American Insurance Company (ACE) (collectively, Defendants) alleging breach of contract and copyright infringement. The parties tried their case in early 2023, with the jury finding in FICO's favor on one of its two grounds for breach of contract against Federal. Pursuant to Federal Rule of Civil Procedure 50(b), FICO now renews its motion for judgment as a matter of law arguing it proved its second ground for breach and termination of parties' license agreement. Pl. Mem. of Law in Support of its Renewed Motion for Judgment as a Matter of Law (Pl. Mem.) at 7, Dkt. No. 1242. Federal argues that the jury reasonably found in its favor on the alleged breach, and FICO's termination for that breach. Because a reasonable jury could have found in favor of Federal on FICO's claim, the Court denies FICO's renewed motion for judgment as a matter of law [Dkt. No. 1240].

## FACTS

### I.    The Lawsuit, Generally

The extensive background of this case has been recounted several times, including in this Court's Order on Defendant's Motion for a New Trial on Actual Damages

[Dkt. No. 1284]. The Court adopts and incorporates those recitations by reference and limits its current recital to only those facts most relevant to the instant motion.

In June 2006, Chubb & Son, an unincorporated division of Federal Insurance Company (hereafter referred to as Federal) entered into a license agreement for use of FICO's Blaze Advisor (Blaze), a business rules management software. FICO and Federal amended their initial license agreement twice and the resulting agreement, at issue in this lawsuit, granted Federal an enterprise-wide, perpetual license to use Blaze.

On January 15, 2016, Federal's parent company, Chubb Corporation, merged with ACE INA Holdings, Inc., making Federal a subsidiary of ACE.[1] Two weeks later, FICO notified Federal that its merger had breached the parties' License Agreement. The parties were unable to resolve this dispute and FICO purported to terminate the License Agreement, effective March 31, 2016. Three weeks later, FICO sued Federal in this Court, alleging breach of contract and copyright infringement. FICO demanded a jury trial on all claims and remedies.

In September 2018, FICO filed the now-operative complaint. FICO claimed Federal breached Section 3.1[2] of the License Agreement. Section 3.1 provides in relevant part:

> License Restrictions: Client . . . shall not: (iv) disclose the Fair Isaac Products to, or permit the use or access of the Fair Isaac Products by, any third party or any individuals other than the employees of client.

---

[1] Because of Chubb's name recognition and the structure of the organization, witnesses used the names "Federal" and "Chubb" essentially interchangeably. Except where detailing witness testimony, the Court will use "Federal" when referring to that Defendant.
[2] FICO also claimed breach of Sections 9.3 and 10.8 of the License Agreement. The jury's finding on those claims is not at issue in this motion.

FICO alleged Federal breached this provision by providing Blaze to Federal subsidiaries other than the Chubb & Son division, as well as to third-party consultants, DWS Group and AppCentrica. FICO alleged that Chubb & Son the division, not Federal, was the "Client" under the License Agreement, and therefore any use of Blaze Advisor by other divisions of Federal Insurance Company breached the License Agreement. The dispute over who was the "Client" under the agreement persisted until the close of Plaintiff's case-in-chief at trial, when the Court granted judgment as a matter of law to Federal on that question.[3] In effect, the Court found that any Federal divisions' use of Blaze was not a breach under Section 3.1. The jury was thus left to decide only whether the third-party consultants' purported use and access to Blaze constituted a breach. Because the focus of the evidence at trial concerned Federal's divisions' use of Blaze, there was minimal evidence the jury heard about third-party consultants' use, which evidence is enumerated below.

## II.   Trial Evidence

### A.   Federal's Interrogatory Responses

Federal Insurance Company's Second Supplemental Answers to Interrogatory Nos. 2, 3, and 4, provided in relevant part:[4]

> Interrogatory No. 2: Identify every person, division, or entity, other than employees of the division Chubb & Son, to whom Federal has disclosed the FICO Blaze Advisor software after June 30, 2006.

> * * *

---

[3] That ruling is not implicated here.

[4] This exhibit (P-0147A) was admitted into evidence via Henry Mirolyuz's deposition designations. Mirolyuz was one of Federal's 30(b)(6) deponents and signed the interrogatory response. Bill Waid, FICO's Chief Product and Technology Officer also testified about this exhibit.

Second Supplemental Answer: . . . disclosure of the Blaze Advisor software was made to at least the following: . . . (2) Chubb Insurance Company of Canada, including through its relationship with AppCentrica, and (3) Chubb Insurance Company of Australia Limited, including through its relationship with the DWS Group. Disclosure of the Blaze Advisor software to the Chubb & Son division of Federal occurred on or around June 30, 2006 with FICO's knowledge and participation. Information regarding Blaze Advisor software and accessibility to it were provided on internal Chubb organization shared space.

\* \* \*

Interrogatory No. 3: Identify every person, division, or entity, other than employees of the division Chubb & Son of which Federal is aware, that has used the FICO Blaze Advisor software after June 30, 2006.

\* \* \*

Second Supplemental Answer: . . . use of the Blaze Advisor software was made by at least the following:. . . . 2) Chubb Insurance Company of Canada, including through its relationship with AppCentrica, and (3) Chubb Insurance Company of Australia Limited, including through its relationship with the DWS Group. Federal began using the Blaze Advisor software in its Chubb & Son division on or around June 30, 2006 and did so with FICO's knowledge and participation. Information regarding the Blaze Advisor software and accessibility to it were provided on internal Chubb organization shared space.

No Federal employee testified as to what was meant by the statement that the foreign Federal affiliates used Blaze "through its relationship with [AppCentrica and DWS]."

**B.    DWS Group**

Exhibit P-1112[5] was "a listing of all the product support cases" from Federal, reflecting times Federal e-mailed or called FICO for Blaze software support. Tr. Vol. IV at 588-89, Dkt. No. 1180. One such instance from March 21, 2016, was logged with a contact email address imran.aziz@dws.com.au. FICO's description of the problem read, "Hi, product support team. Below is an issue faced by a consultant whose client is Chubb.

---

[5] Admitted into evidence via FICO's Vice President of Product Support, Chris Ivey.

Chubb seems to be an existing BA user. He has been struggling to upgrade the Blaze project on his own and he needs assistance with it." The relevant portion of the support request itself reads, "The problem is, I am experiencing all the project files in read only mode after importing them in Blaze Advisor 7.3. Below are the steps: I have checked out an old Blaze Advisor 7.1 project from svn repo and saved it somewhere on my C drive." FICO's support team does not "check ID's at the door" to ensure those reaching out for help are valid Blaze licensees. Tr. Vol. IV at 596-97, Dkt. No. 1180.

Waid also testified that at some time in March 2016 he personally learned DWS was using Blaze. Tr. Vol. VIII at 1670, Dkt. No. 1184.[6] Waid was included in an email exchange between several FICO employees that detailed questions about Blaze posted to FICO's community site by Imran Aziz, the same DWS employee who appeared in the Blaze support log. *Id.* at 1671-74, 1770-1772 (discussing Pl. Ex. P-1114). In addition to that email exchange, FICO employee Jeremy Chen called Waid to talk about the posts. *Id.* at 1676-77.

That email chain began on March 17, 2016 and continued through March 24, 2016 and is detailed below. All senders and recipients were FICO employees.

| | |
|---|---|
| 3/17/16 | Jeremy Chen forwarded a message from Imran Aziz requesting assistance. Comments on the forwarded email included that the sender had learned about Aziz through his community site posts. Aziz is described as "a potential buyer, but he seems to have an existing project that he's trying to upgrade." |
| 3/19/16 | Inquiry about whether others at FICO know of any existing customer trying to use Blaze's Cloud offering. |

---

[6] Sometime later in the course of the litigation, he also learned AppCentrica was using Blaze. *Id. See infra*, Part II.C.

3/21/16     Paul Swyny reporting that he spoke with Aziz and that "it appears he has an evaluation license for Blaze 7.3 (a 90 day trial) and is trying to upgrade an earlier Blaze project to 7.3 but has run into some problems I was unable to help with." He went on to say he was "not sure how [Aziz] came across the trial license," then asked whether the trial could "be downloaded without getting their contact details." Swyny requested the email recipients, Erwan Layman and Pradeep Ballal, reach out to Aziz to "try and find out what exactly he's up to and what they are using Blaze for."

3/21/16     Swyny followed up a short while later, asking for an update.

3/21/16     Ballal provided an update that he did not think perpetual Blaze licenses are tied to specific versions.

3/21/16     Swyny again asked that Ballal or Layman reach out to Aziz. He explained he was "not sure where Chubb got their Blaze license."

3/21/16     Layman responded that Chubb is an existing Blaze user. He also wrote that "a trial licence can be had from the FICO web site as part of the evaluation programme."

3/21/16     After speaking with Aziz, Ballal reported back to Swyny and Layman saying that Aziz had a Blaze repository that was created in version 7.1 which he was trying to open in version 7.3. He was experiencing an error when doing so. He also informed Aziz that "he should be using the software version that Chubb also has running in production to prevent side effects and unknown issues."

3/21/16     Layman described additional contact with Aziz and attempts to upgrade the Blaze repository.

3/22/16     Chen wrote that "I think it is now clear that [Aziz is] working on a project that is in some fashion related to Chubb. This means that he's entitled to maintenance support."

3/22/16     Additional correspondence about referring Aziz to FICO's support because "Chubb is an existing Blaze Advisor customer."

3/23/16     Paul Swyny described his understanding of this ongoing situation stating "Chubb in Australia want to evaluate a solution built by Chubb Canada, which has been developed on Blaze 7.1 and they have chosen a 3rd party based in Melbourne—DWS—to help get the evaluation up and running. As Chubb Australia have no Blaze license, *Imran has downloaded a trial license—version 7.3—from our website,* with the intent of upgrading the original Chubb Canada solution to 7.3." (emphasis added)

Swyny continued on, asking several questions of the email recipients. In particular, he asked what was appropriate "with a formal agreement in place. I think we (ie me) maybe should be talking to Chubb Australia to get some kind of formal agreement in place *but seeing as we offer 90 day trial licenses directly from the website* this may not be appropriate." (emphasis added)

3/24/16   Mike Sawyer, a FICO salesperson, intimated that FICO and Chubb were in "high level" negotiations. He advised that FICO should "continue to be responsive to DWS but do not make any statements regarding Chubb's rights to use the software."

3/24/16   Several emails seeking general information about Aziz, including his contact information.

Waid also testified about an email exchange between a FICO salesperson, Paul Swyny, and Aziz, where Swyny told Aziz FICO could no longer provide him Blaze support *Id.* at 1674-76 (discussing Tr. Ex. P-1113). Swyny wrote:

Regarding Blaze Advisor support, I have been informed by our legal department that it has notified Chubb and Son that it has breached our license agreement which includes the [Maintenance & Support] schedule. This was followed up with a termination notice last week. I suggest you check with your management team if you are not aware of this development. Given the current situation we are unable to provide any further support to you until the issues have been resolved and we have been given the all clear to continue.

Waid testified that FICO never gave DWS authority to use Blaze. *Id.* at 1674. He was never contacted by anybody at Federal or DWS seeking permission to use Blaze, nor was he aware of anyone at FICO who had been contacted for such permission. *Id.* at 1677.

Thomas Carretta, FICO's Associate General Counsel, relied on the help desk log listing a imran.aziz@dws.com.com when warning Federal that it had breached the License Agreement through "disclosure of confidential information to an unauthorized third-party consultant." Tr. Ex. P-0103, Tr. Vol. V at 886-88, Dkt. No. 1181. When asked

whether Blaze customers may share the software with consultants under certain circumstances, Carretta replied, "Every deal is different, so it sort of depends." Tr. at 910. When asked whether there is a categorical rule against allowing Blaze customers to share the software, he explained "I wouldn't phrase it that way. It's dependent on the whole deal, and therefore it may or may not be." *Id.* Carretta also acknowledged that he learned of potential third-party use of Blaze by Federal's consultants because "after [he] heard about the ACE acquisition, [he] asked folks to start reviewing FICO's maintenance logs to see if they could see any problems related to Chubb." *Id.* (Carretta's reply to a question to this effect on cross-examination: "Yes."). In the regular course of his work, Carretta does not usually review maintenance logs for problems, or direct others to do so. *Id.* at 911.[7]

Carretta "did not personally" investigate the nature or extent of DWS and AppCentrica's purported use. *Id.* at 912. He went on to explain that "It's an absolute, you are not allowed to do this." Further:

> Q [counsel for Defendants, Leah Godesky]: And did you ever identify any evidence that AppCentrica or DWS accessed Blaze for any purpose other than assisting Chubb in its work on one of its internal computer applications?
> A: I don't know what they did. I don't remember.
> Q.: So you have not identified any evidence that AppCentrica or DWS accessed Blaze for any purpose other than assisting Chubb, correct?
> A.: The only thing I know is that they showed up in the maintenance logs. I was told that. But I don't remember any of the details that you are asking about.

---

[7] Q [counsel for Defendants, Leah Godesky]: And in the regular course of business, Mr. Carretta, you don't usually scan maintenance logs for potential problems with your customers, right?
A. I don't.
Q. And you don't direct people to do that either, right?
A. I don't direct people to do that.

* * *

Q.: So that's a no. You don't have any evidence?
A.: I don't personally have any evidence, no.
Q.: And are you aware of any evidence that anyone at AppCentrica or DWS shared Blaze with any third party outside Chubb?
A.: I don't know. I just know that third parties accessed the software.

* * *

Q. Mr. Carretta, I'm entitled to an answer to the question I'm asking. Are you aware of any evidence that anyone at AppCentrica or DWS shared Blaze with any third party outside Chubb?
A. Not that I'm aware of, other than they appear in the logs.

Tr. at 913-914.

Claudio Ghislanzoni, Chubb's Chief Enterprise Architect, stated that he worked with an IT lead for Chubb Canada, Zorica Todorovic, who was the "owner" of Chubb Canada's Evolution computer application, which employed Blaze. Ghislanzoni learned from Todorovic that Chubb Canada was engaged with a consultant called AppCentrica. Tr. Vol. VI at 1094-95, Dkt. No. 1182. He was also aware that Chubb Australia was working with DWS on creating a version of the Evolution application for use in Australia. *Id.* Ghislanzoni and others at Chubb communicated via email, deciding how to go about coding rules into Chubb Australia's version of Evolution. *Id.* at 1095-98 (detailing Tr. Ex. P-526). Martin Sill, a DWS employee, was included on these emails and he apparently was testing various rules specifications. He advised that "the conditions tested are quite straightforward" and that he would "pull together some brief notes on how rules were implemented in Blaze currently." Tr. Ex. P-526.  In this same email exchange, Russell Hodey, a Chubb Australia employee, wrote that DWS would continue to explore Drools[8]

---

[8] Drools is an open-source business rules management software.

for rules management and keep Federal in the loop about that option. *Id*. Ghislanzoni

explained that while DWS was exploring Drools for rules management, Federal ultimately

chose to use a different rules management software made by IBM. Tr. Vol. VI at 1095-

98, Dkt. No. 1182.

    **C.**    **AppCentrica**

Aside from the interrogatory responses and the brief mentions above, the only

evidence at trial purporting to establish AppCentrica's allegedly improper use of Blaze

was Ghislanzoni's testimony. That testimony was summarized above, the relevant part is

detailed here:

> Q [FICO's Counsel, Allen Hinderaker]: All right. Are you familiar with Zorica Todorovic?
> A [Ghislanzoni]: I met Zorica at the time we started integration [of Federal and ACE].
> Q: Okay. And she's, she's out of Chubb Canada?
> A: Yeah. She was IT lead CIO for Canada at the time.
> Q: And she was part of the process of taking the Evolution application with Blaze Advisor as it was in Canada and transferring that to Australia for ultimately development of the Australian application called Evolution?
> A: Yeah. I cannot tell you if that is an accurate statement. I was not directly involved in that activity.
> Q: Did you know she was involved in that activity?
> A: I know she owned the Evolution application in Canada.
> Q: Okay. And you know that she was a senior vice president operations of IT and chief information officer for Chubb Insurance of Canada?
> A: Yes.
> Q: Okay. And did you know that she was working with a consultant in Canada called AppCentrica in connection with this project?
> A: When I met with Zorica, I remember her mentioning AppCentrica being one of the consultants they were using in Canada.
> Q: And in terms of the work being done by Chubb Australia, you were aware that Chubb Australia was using a consultant in connection with this project called DWS Group?
> A: Yes, I was aware of that.
> Q: And by 'this project,' I'm talking about the project of creating the Australia Evolution application from the Canadian Evolution application. We're on the same page?
> A: Yes.

Q: Okay. Would you go to the exhibit in your notebook called 526.
A.  526, yes.
Q: … And exhibit 526 is one where you happen to be on the email chain. It's from Hamish Tonkin and Russell Hodey and yourself, among others. Agreed?
A: Yes.
Q: As it bears the dates of May 12, 2016.
A: Yes.
Q: Russell Hodey is a Chubb representative out of Chubb Australia?

Tr. Vol. VI at 1094-95. This was followed by somewhat lengthy back-and-forth between FICO's counsel and Ghislanzoni about the email and other documents, but the email's contents were never discussed, nor admitted into evidence.

**D.    Harm to FICO**

According to Waid, the purpose of Section 3.1 of the License Agreement is to "make sure the software is used in accordance with very specific constraints or limitations that we place on that license grant. There's various reasons for them from a business perspective, but all of it is to protect a very valuable piece of IP." Tr. Vol. VIII at 1637-1638, Dkt. No. 1184. FICO prohibits disclosure or use by third parties so it can "know who is using our software at all times. That third party could be a competitor or . . .  could be leaking confidential information about the use of our software to a competitor." *Id.* at 1638. FICO also wants to ensure third parties are not holding themselves out as Blaze experts "unless [FICO has] at least had a conversation with the client about that third party and any representations that they've made." *Id.*

In negotiating the License Agreement's final language, the parties shared several rounds of revisions of the language, including language in Section 3.1. The language that was ultimately included in the contract reflected, almost exactly, FICO's standard language. *See* Tr. Exs. P-307, 309, 310, 311. The License Agreement itself included a

carve out the parties had negotiated for use by a particular third-party consultant, ACS Commercial Solutions. *Id.*[9]

## III.   FICO's Motion and Renewed Motion for Judgment as a Matter of Law

At the close of Defendants' case-in-chief, FICO moved for judgment as a matter law on several issues. Pertinent to this motion, FICO contended it was entitled to judgment on the question whether Federal had breached Section 3.1 and, accordingly, that FICO's termination of the License Agreement was proper. The Court denied the motion, explaining there was "evidence from which a jury could reasonably decide that the use was known, consented to, harmless and not a breach." Tr. at 2520, Dkt. No. 1188. Because a reasonable jury could find for either party, judgment as a matter of law was inappropriate. *Id.* ("So I am not finding as a matter of law that the use by third-party consultants was a breach, and I am not finding that it was not a breach. That is for the jury to decide.").

The jury returned a verdict for Federal on FICO's claim that Federal breached Section 3.1. FICO now renews its motion for judgment as a matter of law. The Court's view of the evidence has not changed: a reasonable jury could have found for Federal based on the evidence at trial. FICO's motion is therefore denied.

## ANALYSIS

## I.   Legal Standard

Judgment as a matter of law is appropriate only where no reasonable jury could find for the nonmoving party. *Monohon v. BNSF Railway Co.*, 17 F.4th 773, 781 (8th Cir. 2021). In assessing a renewed motion for judgment as a matter of law, the Court must

---

[9] The carve out for ACS was not implicated in the lawsuit.

consider the evidence in the light most favorable to the prevailing party, assume that the jury resolved all conflicts of evidence in favor of that party, assume as true all facts which the prevailing party's evidence tended to prove, give the prevailing party the benefit of all favorable inferences which may reasonably be drawn from the facts, and deny the motion, if in light of the foregoing, reasonable jurors could differ as to the conclusion that would be drawn from the evidence.

*Minneapolis Cmty. Dev. Agency v. Lake Calhoun Assocs.*, 928 F.2d 299, 301 (8th Cir. 1991); *see also Parada v. Anoka Cnty.*, 555 F. Supp. 3d 663, 675 (D. Minn. 2021); *Bayes v. Biomet Inc.*, 55 F.4th 643 (8th Cir. 2022). This standard is necessarily high to protect "the jury's rightful province." *Andreas v. Volkswagen of Am., Inc.*, 336 F.3d 789, 795 (8th Cir. 2003) (quoting *First Nat'l of Omaha v. Three Dimension Sys. Prods., Inc.*, 289 F.3d 542, 544 (8th Cir. 2002). Only where no reasonable interpretation of the evidence supports the jury's verdict should judgment as a matter of law be granted. *Id.*

## II.    The Parties' Arguments

FICO argues that all evidence on the question of third-party use points in its favor. Pl. Mem. at 7, Dkt. No. 1242 (citing *Bombardier Rec. Prods. v. Arctic Cat Inc.*, 331 F. Supp. 3d 902, 906-907 (D. Minn. 2018)). According to FICO, Federal plainly breached the License Agreement "by disclosing and permitting use of and access to Blaze Advisor by DWS Group and AppCentrica." *Id.* at 7-8. FICO avers that Federal admitted as much in its Second Supplemental Answers to Interrogatories (Tr. Ex. P-0147A). Federal's counsel also admitted as much, according to FICO, when she stated that "an employee of AppCentrica . . . gave DWS a demonstration of how Blaze worked." *Id.* at 10 (citing Tr. At 72:6-14). Moreover, Ghislanzoni's testimony about DWS and AppCentrica's transfer of Evolution establishes breach—DWS and AppCentrica must have had access to Blaze in the course of that transfer according to FICO which violated the License

Agreement. *Id.* at 10 ("[Ghislanzoni] further explained that AppCentrica was working with Chubb Canada on transferring that copy of Evolution to DWS Group while DWS Group was working with Chubb Australia on that transfer.") (citing Tr. at 1117:23-1119:13)). Lastly, FICO argues exhibits P-1114 and P-1113 definitively "show DWS was working in Blaze Advisor to support Chubb Australia." *Id.* at 10.

As to harm, FICO points to testimony about the business purpose of Section 3.1, namely that it protects FICO's intellectual property and allows it to control its software. FICO also notes that the parties negotiated about the language in this section, ultimately including FICO's standard language, which demonstrates the importance of those protections to FICO. *Id.* at 12. Furthermore, the parties negotiated a specific carve out for one particular third-party consultant, further emphasizing the importance of Section 3.1's restrictions. According to FICO, "[t]he very protections that Paragraph 3.1 were meant to afford FICO were violated by Federal's breach. . . [which] deprived FICO of its ability to control the access and use of Blaze Advisor and to ensure its intellectual property was protected." *Id.* Ghislanzoni's testimony that consultants were helping Chubb Australia copy Chubb Canada's Evolution application "implicates the[se] exact concerns."[10] *Id.* at 14. FICO's argument boils down to the following: "The loss of control of the access and use of Blaze Advisor and the ability to ensure that such access and

---

[10] Much of the testimony on this question was elicited in support of the idea that Federal subsidiaries—including Chubb Canada and Chubb Australia—had used Blaze in violation of the License Agreement. This argument turned on who the "Client" was under the agreement. Once the Court determined as a matter of law that the "Client" was Federal, not merely its division Chubb & Son, Chubb Australia and Chubb Canada's use of Blaze was no longer a potential basis for breach under Section 3.1. This left only third-party consultants DWS's and AppCentrica's use for the jury to assess.

use was in accordance with the license grant and restrictions contained therein is [per se] harm to FICO." *Id.*

Federal views the evidence differently. Federal notes that its Second Supplemental Answers to Interrogatories make clear that "any use or disclosure occurred on internal Chubb organization shared space," which is not plainly a breach of the license agreement. Def. Mem. at 3, Dkt. No. 1253. Furthermore, they note that Aziz's use of Blaze discussed in Exhibit P-1114 was made via a "trial license" which can be downloaded from FICO's website, casting doubt on whether Federal itself gave Aziz access to the Blaze software. *Id.* at 4. This minimal evidence suggests that breach, if any, was harmless, according to Federal. *Id.*[11]

Moreover, Federal argues that even if the evidence is sufficient to establish breach, FICO has not proved harm flowing from that breach, because any unauthorized use was *de minimus* and FICO has not provided any evidence that the interests purportedly protected by Section 3.1 were in fact harmed. Def. Mem. at 3-4, Dkt. No. 1253. Without the required evidence of harm, Federal argues, FICO has failed to prove an essential element of its breach of contract claim.

## III.    Analysis

A reasonable jury could have found for Federal on FICO's claim of breach of Section 3.1. In the Court's view, the trial evidence on breach does not all "point one way" such that judgment as a matter of law is appropriate. *See Bombardier Rec. Prods. v. Arctic Cat Inc.*, 331 F. Supp. 3d 902, 906-907 (D. Minn. 2018). At bottom, while the

---

[11] Federal seems to acknowledge consultants' *de minimus* use of Blaze through its briefing and focuses its arguments on FICO's failure to prove harm. As explained below, the trial record supports a finding that Federal did not breach the License Agreement.

evidence reflects that some third-party consultants worked with Federal on projects involving Blaze, it is not clear such involvement constitutes breach of Section 3.1. A reasonable jury could have concluded based on the record before it that FICO had not established breach, and judgment as a matter of law is accordingly unwarranted.

### A.    Federal's Interrogatory Responses

FICO's argument that the interrogatory responses are definitive proof of breach fails, especially when viewing the responses in context of all the evidence at trial. Far from establishing breach outright, the interrogatory responses merely suggest that AppCentrica and DWS were consulting on projects involving Blaze, but the scope of that involvement is vague. For example, Federal's response—directed to the issue of use by foreign Federal entities—stated that Chubb Canada and Chubb Australia used Blaze, "including through [their] relationship[s]" with AppCentrica and DWS. This answer does not unequivocally establish that those consultants themselves used or had access to Blaze, let alone that they did so because of Federal's conduct. The answer to the interrogatory is simply not that clear or definitive. A reasonable juror could read the interrogatory response and question its meaning, concluding it evinced breach or concluding the opposite. That same interrogatory response explained that the identified divisions (Chubb Canada and Chubb Australia, including through their relationships with AppCentrica and DWS respectively) received "[i]nformation regarding Blaze" and "accessibility to it" through Chubb's "internal [] organization shared space." Tr. Ex. P-147A. A jury could read the entire interrogatory response and reach several reasonable, competing conclusions, including that it is unclear who used or accessed Blaze. If left with reasonable questions about who used or accessed Blaze, the jury could rightfully

conclude FICO had not proved its claim. Because this interpretation is reasonable, judgment as a matter of law is inappropriate. Moreover, the evidence analyzed below undermines FICO's interpretation of Federal's interrogatory responses.

**B.    Evidence of DWS's use of Blaze**

FICO relies on the Blaze support log and the related email exchanges in arguing Federal breached the license agreement through its relationship with DWS. But the strength of that argument is also dubious. The relevant language from the support log entry reads: "The problem is, I [imran.aziz@dws.com.au] am experiencing all the project files in read only mode after importing them in Blaze Advisor 7.3. Below are the steps: I have checked out an old Blaze Advisor 7.1 project from svn repo and saved it somewhere on my C drive." FICO claims "the specifics of that inquiry illustrate that DWS Group had access to and was using Blaze Advisor." Pl. Mem. at 10. But looking at this single support log entry in context with the other evidence about DWS's involvement with Chubb Australia, including the lengthy email exchange between several FICO employees, a reasonable juror could have concluded Federal had not breached Section 3.1. Most notably, the FICO email chain (Tr. Ex. P-1114) strongly suggests that Aziz had a trial license for Blaze that he obtained through FICO's website. Use of such a license does not support the idea that Federal breached the License Agreement. If Aziz's access to Blaze came entirely from FICO's own website, his access to it would not implicate Federal at all.

Similarly, though the support log entry makes clear that Aziz had "an old Blaze Advisor 7.1 project," a reasonable jury considering all these facts together could have determined that FICO had not proved breach. The evidence does not establish what a

Blaze project is or how it differs from the Blaze software itself, if at all. A reasonable juror could have questioned whether access to Blaze project files even fell within Section 3.1's enumerated limits. It is reasonable based on the evidence to question whether access to a "Blaze project file" is access to the software itself. A reasonable jury could conclude such access had not violated the License Agreement.

Moreover, the email chain about Aziz's support requests could lead a reasonable jury to further confusion about the meaning of Section 3.1. For example, FICO employees provided Aziz with product support even knowing he was emailing from a non-Federal/Chubb email address, advising him to use the Blaze software version Federal had. Jeremy Chen stated that because Aziz was working on something for Federal, Aziz was "entitled to maintenance and support." Even when that email chain turned to the growing dispute between the parties that ultimately lead to this lawsuit, FICO's directive was to "continue to be responsive to DWS . . . ." In light of this evidence, a reasonable jury could simply conclude that FICO itself did not believe Federal's and DWS's conduct was prohibited by Section 3.1. That reasonable conclusion would be sufficient to find for Federal on this claim.

Similarly, Martin Sill's rules testing and his statement that he would "pull together some brief notes on how rules are implemented in Blaze currently" is not definitive. Especially in light of evidence at trial that Blaze is not usable "out of the box" and that Federal software engineers needed to code their own rules into the software, a reasonable jury could conclude Sill's references to Blaze merely reflect more general information about writing rules, rather than use or access to Blaze in violation of the license agreement. *See e.g.* Tr. at 2077 ("Blaze is an industry agnostic tool that has no

18

specific insurance capability. When you get Blaze out of the box, it doesn't work for you as an insurance company. There is a significant amount of effort to get data into the engine to make it work.").

At bottom, the totality of the evidence about DWS is open to several reasonable interpretations, including that FICO had not met is evidentiary burden. The inferences in favor of Federal are reasonable and judgment as a matter of law is thus inappropriate.

C.     Evidence of AppCentrica's use of Blaze

FICO makes much of Federal's statement at the opening of trial that "an employee of AppCentrica . . . gave DWS a demonstration of how Blaze worked," claiming it amounts to admission of breach. Again, that statement is not so absolute that a juror could not reasonably question whether it demonstrates breach. Put another way, a reasonable jury could determine that a demonstration does not amount to disclosure, use or access to Blaze by third parties. *See* Section 3.1(iv) of Tr. Ex. J-01. But more importantly, the statement on its face implicates *only* third parties, not Federal itself. It does not admit that Federal provided either consulting firm with access to Blaze, instead it merely suggests AppCentrica had access to some Blaze software. A reasonable juror could assume AppCentrica had access through some means other than Federal, including by downloading a trial version of Blaze from FICO's own website as appeared to be the case for Aziz at DWS. Indeed, under the governing legal standard, the Court must assume the jury resolved these questions in favor of the prevailing party—Federal. *Minneapolis Cmty. Dev. Agency*, 928 F.2d at 301.

FICO's argument about Federal's opening statement fails for another more fundamental reason. Federal's opening statement is neither evidence nor a judicial

admission. *Best v. Dist. of Columbia*, 291 U.S. 411, 489 (1934) ("The power of the court to act upon facts conceded by counsel is as plain as its power to act upon evidence produced. But the power is not properly exercised if the opening statement leaves doubt as to the facts or permits conflicting inferences. Where uncertainty arises either from a conflict of testimony or because the facts being undisputed, fair-minded men may honestly draw different conclusions from them, the question is not one of law, but of fact to be settled by the jury. The opening statement of counsel is ordinarily intended to do no more than to inform the jury in a general way of the nature of the action and defense so that they may better be prepared to understand the evidence." (internal citations omitted)). FICO has not identified, and the Court has not found, any evidence admitted at trial establishing this demonstration as a fact. Without such a fact at trial, FICO's argument is unpersuasive.

FICO's reliance on Ghislanzoni's testimony about transfer of Evolution from Canada to Australia is similarly ill-fated. According to FICO, Ghislanzoni's testimony that AppCentrica employees were working on a project "aimed at creating the Australia Evolution application from the Canadian Evolution application" is proof that AppCentrica had access to or used Blaze. But again, the testimony was not nearly so cut and dry. Though Ghislanzoni's testimony established that AppCentrica was working on a project about Evolution, an application which employed Blaze, there was no direct testimony that AppCentrica's role on the project had anything to do with Blaze itself or that AppCentrica was using or accessing the software. Ghislanzoni's testimony confirming that Todorovic was working to transfer Evolution from Canada to Australia, and that Chubb Canada was working with AppCentrica to do so, does not definitively establish AppCentrica's access

to Blaze. AppCentrica's role in that project is largely undefined based on the trial testimony. Though a jury could infer AppCentrica had access to Blaze throughout this project, they could have reasonably concluded based on the limited evidence presented that AppCentrica was acting merely as an advisor to the project, without accessing or using Blaze. Because these inferences in favor of Federal are reasonable, the Court assumes the jury made such inferences, precluding judgment as a matter of law. *Minneapolis Cmty. Dev. Agency*, 928 F.2d at 301.

FICO attempted to admit additional evidence at trial relating to AppCentrica's purported use of Blaze. FICO's counsel asked Ghislanzoni somewhat extensive questions about the authenticity of documents created by Todororvic and others, including a sworn declaration Todorovic signed in support of Federal's summary judgment positions. Tr. Vol. VI at 1098-1101, 1111-21, Dkt. No. 1182.[12] Those documents were never admitted into evidence, Ghislanzoni never having laid foundation required for their admission. Though District Judge Wilhelmina Wright had additional documents at her disposal when reviewing this claim at the summary judgment phase,[13] and the state of

---

[12] In late February 2019, before the close of fact discovery, Defendants raised the issue of "trial preservation depositions," informing the Court that there were several persons with relevant knowledge, such as former employees, who were beyond the control of either party and outside the Court's subpoena power to compel appearance at trial. Federal sought a designated time period during which those depositions would be taken. Ultimately, the Court reserved the issue of trial testimony or preservation depositions for a future date. Dkt. No. 221. In October 2022, Federal moved to take trial depositions of two employees, including Zorica Todorovic, who had cooperated with Federal in earlier discovery efforts but had not responded to Federal's attempts to contact her and who was not subject to the Court's subpoena power because she lives in Canada. The Court granted Defendants' motion, making clear that the trial commencement date would not change. No such deposition occurred and Todorovic did not testify at trial.

[13] The parties' consented to the undersigned's jurisdiction after the summary judgment phase.

the record at that time suggested that AppCentrica's alleged use was not hotly disputed, the jury never saw those documents; they simply were not part of the trial record and no jury could have relied on them. The Court accordingly need not review them at this phase of litigation. As to AppCentrica's purported use of Blaze in particular, the trial record is incredibly thin. Aside from Federal's vague interrogatory responses and Ghislanzoni's testimony about AppCentrica's involvement with Chubb Canada, the record is devoid of other evidence about AppCentrica.

The Court assumes the jury addressed all of this evidence and resolved each question in Federal's favor. *Minneapolis Cmty. Dev. Agency*, 928 F.2d at 301. Because a reasonable jury could view the evidence and find for Federal, the Court will not upset the verdict.

### D.      Harm

Even if FICO had proven breach and no reasonable jury could have concluded otherwise, FICO has failed to prove its damages. FICO contends that it has proved harm through evidence purporting to establish that the exact events FICO tries to protect against through Section 3.1 came to pass because of Federal's conduct. For example, FICO points to Bill Waid's testimony that FICO wants to know and control who is using its software. According to FICO, Ghislanzoni's acknowledgement that consultants were helping copy Chubb Canada's application for use by Chubb Australia demonstrates FICO was deprived of its ability to do as Waid stated—know and control who was using Blaze. Pl. Mem. at 14, Dkt. No. 1242. This argument fails for the same reasons as described above in analyzing the breach element. In short, even assuming use by third parties, the trial record is muddy as to the scope and bounds of that use. A reasonable jury could

hear all the evidence and question whether the consultants' use caused FICO harm, given that the consultants were only working on behalf of Federal in that "organization's shared space." This calls into question how the consultants' use would have deprived FICO of the interests Waid testified Section 3.1 is designed to protect. To put it bluntly, if consultants were only able to access Blaze through Federal's "shared space" a jury could reasonably conclude that FICO still had control over Blaze because it remained on Federal's—a Blaze licensee's—IT platform.

FICO also points to the parties' negotiations over the language of Section 3.1(iv) and FICO's rejection of nearly all Federal's proposed changes which "would have offered FICO significantly less protection." Pl. Mem. at 12, Dkt. No. 1242. Moreover, FICO revised Federal's proposed language allowing for use by one consultant (ACS), ensuring the terms and conditions were satisfactory to FICO. *Id.* at 12-13. Again, this evidence merely demonstrates how FICO seeks to *avoid* harm through the drafting of its license agreements, but it does nothing to quantify the harm FICO purportedly suffered here.

And again, the email chain discussing Aziz's support request belies the idea FICO was harmed by DWS's use. Put plainly, why would FICO state DWS was entitled to support and direct its employees to continue to be responsive to DWS if DWS's conduct were causing FICO harm?

Though FICO has not proved its damages, it would be entitled to nominal damages had it proven breach. As explained above, the jury's verdict that FICO did not prove breach was reasonable, and FICO is accordingly entitled to no damages, nominal or otherwise.

**IV.     Proper Termination**

FICO's motion also seeks judgment as a matter of law that it properly terminated the parties' license agreement in light of Federal's breach of Section 3.1. Because the Court cannot find as a matter of law that FICO is entitled to judgment on that claim, it need not address whether FICO's termination was proper.[14]

**ORDER**

For the reasons set forth above, IT IS HEREBY ORDRED: FICO's Renewed Motion for Judgment as a Matter of Law [Dkt. No. 1240] is **DENIED**.

Dated: September 13, 2023                         s/David T. Schultz
                                                  DAVID T. SCHULTZ
                                                  U.S. Magistrate Judge

---

[14] The jury found already FICO's termination of the license agreement proper based on its finding of breach of Section 10.8.