## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION, a            )    Case No. 16-cv-1054 (DTS)
Delaware corporation,                )
                                     )
            Plaintiff,               )
                                     )
v.                                   )
                                     )    **REDACTED VERSION**
FEDERAL INSURANCE COMPANY,           )
an Indiana corporation and ACE       )
AMERICAN INSURANCE                   )
COMPANY, a Pennsylvania              )
corporation,                         )
                                     )
            Defendants.              )

## PLAINTIFF FAIR ISAAC CORPORATION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO AMEND OR MODIFY JUDGMENT UNDER FED. R. CIV. P. 59(E)

Plaintiff Fair Isaac Corporation ("FICO") respectfully submits this Memorandum of Law in support of its Motion under Fed. R. Civ. Proc. 59(e) to amend or modify the remittitur in the Court's September 13, 2023 Order granting Defendant Federal Insurance Company's ("Federal") and Defendant ACE American Insurance Company's ("ACE") (together, "Defendants") motion for a new trial pending FICO's rejection of the remittitur ("Order"). (Dkt. 1284.)[1]

---

[1] FICO has not accepted or declined the Court's remittitur. FICO understands that by filing this Rule 59(e) motion, the Court's 30 day time limit to accept or reject remittitur will restart upon the Court's ruling on this motion. To the extent the Court disagrees, FICO respectfully requests that the Court treat this Motion as a request for an extension of time to respond to the remittitur until 30 days after disposition of this Motion and enter an order to that effect. FICO files this motion so that it can be fully informed before making its decision whether to accept or decline the remittitur. Nothing in this Motion shall be

In issuing its remittitur to reduce the jury's award, the Court used a hypothetical negotiation of a perpetual, enterprise-wide license agreement for Blaze Advisor negotiated in 2016 and determined that the maximum verdict supported by the record for such an agreement was a $6 million "license fee." (*Id.* at 63, 64.) Of that $6 million, the Court determined $1,101,600 was owed by Federal and $4,898,400 was owed by ACE. (*Id.* at 65.)

The Court made this determination independently, without any argument or suggestion from the parties. Assuming solely for purposes of this motion that issuing a remittitur was proper here, the Court's determination of the amount of remittitur constitutes manifest error because it failed to award FICO actual damages in the maximum amount that a reasonable jury could have awarded based on the evidence at trial. For the reasons explained below, FICO respectfully requests that the remittitur be amended or modified to $17,262,000, to reflect the maximum amount of FICO's actual damages as supported by the evidence at trial.

A remittitur must reflect the *maximum amount* that could be sustained by the evidence. And as the Court acknowledged, copyright and contract law entitle FICO to its *actual damages* stemming from the breach and infringement. (*See id.* at 34.) The legal standard allowing recovery of actual damages is not restricted to an amount labeled as a "license fee" in an agreement. Instead, actual damages must restore FICO to the position it

---

construed as an acceptance or rejection of the Court's remittitur or as a waiver of any of FICO's rights, including any rights of appeal, with respect to any aspect of the Court's Order or any other final judgments or orders in this case. All of FICO's rights are expressly reserved.

would have occupied had the wrong not occurred. Accordingly, a fair market value determination of Blaze Advisor must include all amounts that a willing buyer would pay a willing seller when licensing the copyrighted material for the infringing use. Thus, the remittitur by the Court must award the full amount that the record indicates Defendants would have paid when licensing Blaze Advisor.

The Court's remittitur failed to award FICO the maximum amount of actual damages supported by evidence at trial for three reasons. First, the Court erred in the amount of Defendants' gross revenue it used to calculate the enterprise-wide license fee. Defendants' combined revenue at the time of the hypothetical negotiation in 2016 was $35 billion, not $32 billion. (*See id.* at 64.) The Court's remittitur should be amended to award FICO a license fee consistent with the correct size of the Defendants' combined enterprise at the time of the hypothetical negotiation.

Second, when calculating the enterprise-wide license fee, the Court erred by relying on evidence that addressed only the *deployment* components of Blaze Advisor. Blaze Advisor is comprised of both development components and deployment components, and Defendants also needed the rights necessary to use the *development* components. The Court's calculation of damages failed to include the additional fees a willing buyer would pay for the access it needed to the development components of Blaze Advisor. The Court's remittitur should be amended to award FICO those additional fees.

Third, the Court failed to include the 22% annual maintenance and support fee *all* Blaze Advisor licensees pay, noting in a footnote that "because this inquiry asks for the FMV of the license, support and maintenance fees are not a factor." (*Id.* at 64, n.60.)

3

However, as the Order noted, by 2016, annual maintenance and support fees for Blaze Advisor sales was *mandatory* and set at 22% of the license fee. (*Id.* at 15, 50.) Defendant Federal paid an annual maintenance and support fee from 2006 to 2016 as part of the license agreement that predated its infringement. In fact, Federal offered, shortly before this lawsuit commenced, to continue payment of maintenance and support fees. To deprive FICO of an additional five years of maintenance and support fees that would have been paid by a willing buyer to cover the 49-month period of unauthorized use would reward Defendants for their wrong. When correcting for the three errors above, FICO respectfully requests that the remittitur be amended to be a total of ███████.

## I.     Remittitur Awards May Be Amended to Correct Errors of Law or Fact and Must Follow the Maximum Recovery Rule.

Rule 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period following entry of judgment. *Innovative Home Health Care v. P.T.-O.T. Assocs.*, 141 F.3d 1284, 1286 (8th Cir. 1998) (citation omitted). Rule 59(e) motions serve to correct manifest errors of law or fact or to present newly discovered evidence. *Id.* (quotation omitted); *see also Matthew v. Unum Life Ins. Co. of Am.*, 639 F.3d 857, 863 (8th Cir. 2011) (upholding correction of a mistake that appeared on the face of a verdict). A "manifest" error of law or fact generally means that the Court overlooked some dispositive factual or legal matter that was presented to it. *Stults v. Bush Boake Allen, Inc.*, No. C11-4077-MWB, 2014 WL 775525, at *2 (N.D. Iowa Feb. 25, 2014) (explaining that a Rule 59(e) motion to reconsider may also be granted where the court overlooked a factual or legal *argument* presented by a party, which is manifest oversight).

4

Rule 59(e) can be used to request correction of a remittitur when the court has overlooked a factual or legal issue. *Matthew*, 639 F.3d at 836; *Wright v. Preferred Research, Inc.*, 891 F.2d 886, 890 (11th Cir. 1990) (allowing movant to use 59(e) to modify the trial court's remittitur order); *Shimek v. Michael Weinig Ag*, No. 99-2015 (JRT/FLN), 2002 WL 31520370, at *2 (D. Minn. Nov. 12, 2002) (granting Rule 59(e) motion, explaining "Rule 59(e) may be granted where the movant can demonstrate that the motion is necessary to correct manifest errors of law or fact upon which the judgment is based").

Courts must follow the "maximum recovery rule" when issuing a remittitur, meaning that the remittitur must reflect the maximum amount sustainable by the proof. *Wright v. Byron Fin., Ltd. Liab. Co.*, 877 F.3d 369, 374 (8th Cir. 2017) (explaining that under the "maximum recovery rule . . . damages may be remitted only to the maximum amount the jury could have reasonably awarded."); *see also Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1094 (9th Cir. 2014). Importantly, the Court's task when reducing a jury's damages calculation is not to choose the damages amount the court thinks would be most appropriate in the matter. *Capitol Records Inc. v. Thomas-Rasset*, 680 F. Supp. 2d 1045, 1054 (D. Minn. 2010). That is, when a court remits a jury award, the remitted amount cannot be less than the maximum amount the jury could reasonably have found, even if the court's independent view of the evidence suggests a lesser amount. *McCabe v. Parker*, 608 F.3d 1068, 1081 (8th Cir. 2010) (quotation omitted).

**II.    The Law Defines Actual Damages as All Losses of the Plaintiff Because of the Infringement.**

Under the Copyright Act, a "copyright owner is entitled to recover the actual damages suffered . . . as a result of the infringement." 17 U.S.C. § 504(b). The statute does not define the term "actual damages," or prescribe a method for calculating actual damages. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 167 (2d Cir. 2001). The term has no special meaning in the copyright context beyond the basic definition of all plaintiff's losses due to the infringement, based upon the revenue that would have accrued to the plaintiff but for the infringement. 5 Nimmer on Copyrights § 14.02[A][1]. The term "actual damages" is broadly construed in favor of the victim of infringement. *On Davis*, 246 F.3d at 164; *Leonard v. Stemtech Int'l, Inc.*, 834 F.3d 376, 394 (3rd Cir. 2016) (denying motion for new trial as actual damages award was not excessive). The purpose of actual damages is both to ensure that the victim of infringement is restored to the position it would have occupied had the defendant committed no wrong, and to ensure that a defendant does not benefit from its wrong. *On Davis*, 246 F.3d at 166; *Flying J, Inc. v. Cent. Ca. Kentworth*, 45 Fed. Appx. 763, 766 (9th Cir. 2002).

Although courts have recognized different methods for calculating actual damages awarded to a plaintiff for copyright infringement, this Court focused on the fair market value the owner was entitled to charge for the copyrighted work. (Dkt. 1284 at 34-35.) *See also Oracle*, 765 F.3d at 1087; *On Davis*, 246 F.3d at 166. To determine the fair market value, courts analyze the amount a willing buyer would have paid a willing seller for the plaintiff's work. (Dkt. 1284 at 35.) *See also Oracle*, 765 F.3d at 1087. To arrive at the proper amount, the court constructs a hypothetical negotiation between the parties, assuming they were both willing to enter into an agreement for the protected material. *Id.*

Notably, the "hypothetical negotiation" is merely a construct designed to provide full compensation to the copyright holder. *On Davis*, 246 F.3d at 164.

Nothing in the Copyright Act suggests that the copyright holder's recovery is limited to only an amount the parties would have denominated as a "license fee" in a hypothetical negotiation. For example, in *Oracle*, the Ninth Circuit revised a remittitur award upward to include not just a specific software license fee for the named defendant (SAP), but also revenues associated with 10 years of future earnings from customers that switched from Oracle to defendant SAP permanently as a result of the infringement. *Oracle*, 765 F.3d at 1094-95.

Likewise, other courts have ensured that actual damages include all revenues a plaintiff would have realized in a contract for the protected material. *See Thoroughbred Software Int'l, Inc. v. Dice Corp.*, 488 F.3d 352, 359-60 (6th Cir. 2007) (awarding actual damages for used software and unused software even though defendant's access to unused software was restricted); *Flying J*, 45 Fed. Appx. at 766 (finding that actual damages for copying architectural plans properly based on lost franchise fees from businesses built with plans); *Laspata DeCaro Studio Corp. v. Rimowa GmbH*, No. 16 Civ. 934 (LGS), 2018 WL 3059650, at *6 (S.D.N.Y. June 20, 2018) (holding that actual damages for copying a photograph could include all photoshoot revenues such as a retainer fee, photography fee, styling fee and production fee; those amounts were part of the market value for the copyrighted work); *Live Face on Web, LLC v. Borges*, No. CV 15-9928-GHK (RAOx), 2016 U.S. Dist. LEXIS 73443, at *7 (C.D. Cal. June 3, 2016) (finding that actual damages to "properly licens[e] software" included monthly charge and video production

fee) (Declaration of Heather Kliebenstein ("Kliebenstein Decl."), Ex. 10); *Design Ideas, Ltd. v. Meijer, Inc.*, No. 15-cv-03093, 2018 WL 3545157, at *8 (C.D. Ill. July 23, 2018) (finding that lost revenues on future sales between plaintiff and defendant were appropriate, non-speculative actual damages); *Sunset Lamp Corp. v. Alsy Corp.*, 749 F. Supp. 520, 521 (S.D.N.Y. 1990) (permitting a party to present at trial a theory of actual damages based on lost sales on non-infringed works where the non-infringing products were marketed as part of a line of merchandise that included the product that infringed).

Because the Copyright Act aims to provide full compensation for the wrong through the award of actual damages, the hypothetical negotiation construct must not artificially exclude fees that are routinely charged as part of the license agreement simply because those fees were not denominated as "license fees". When the market allows a copyright holder to package services along with a license fee, and willing buyers routinely pay additional amounts for those services when licensing the protected material, restoring the copyright holder to its rightful position absent the wrong requires awarding those additional revenues. To that end, several cases have recognized that maintenance and support fees are properly recoverable as actual damages in copyright cases involving computer software. *See CNC Software, LLC v. Nvo MacHining, LLC*, No. 8:22-cv-00089-JLS-ADS, 2023 WL 4680923, at *5 (C.D. Cal. May 31, 2023) (concluding plaintiff was "entitled to recover the actual damages suffered . . . as a result of the infringement" which included "the cost of a license for a full suite of Mastercam® software . . . and the mandatory per seat annual maintenance fee"); *Int'l Bus. Machines Corp. v. BGC Partners, Inc.*, No. 10 Civ. 128 (PAC), 2013 WL 1775437, at *6-7 (S.D.N.Y. Apr. 25, 2013) (denying motion to exclude

8

expert's testimony where expert found copyright damages to be the sum of the license fee and maintenance fee for the copyrighted software). The Copyright Act's remedy of actual damages does not confine itself to the labels given to fees in license agreements. It aims at full recovery for the consequences flowing from the plaintiff's wrongdoing.[2]

## III.    The Record Compels the Correction of the License Fee and the Addition of Maintenance and Support Fees.

Here, under the Court's own view of the evidence, the full amount that a willing buyer would have paid a willing seller in a typical license agreement for Blaze Advisor is the proper amount of actual damages. Yet that is not what the Court ordered. The Order set a $6 million fee for a perpetual, enterprise-wide license, but the Order based this amount on the wrong enterprise-wide revenue and failed to consider the necessity of a development license[3] and maintenance and support fees. (Dkt. 1284 at 63, 64.) As a result, the Court

---

[2] Similarly, under contract law, the non-breaching party is entitled to recover "damages which are the natural and probable consequence" of the breach. *Bi-Economy Mkt., Inc. v. Harleysville Ins. Co. of N.Y.*, 886 N.E.2d 127, 130 (2008); *Gusmao v. GMT Grp., Inc.*, No. 06 CIV. 5113 (GEL), 2008 WL 2980039, at *11 (S.D.N.Y. Aug. 1, 2008). Courts applying New York contract law have also awarded maintenance and support fees along with a license fee. *See, e.g.*, *BMC Software, Inc. v. Int'l Bus. Machines Corp.*, No. H-17-2254, 2022 1733106, at *39-40 (S.D. Tex. May 30, 2022) (applying New York law and finding the direct damages for breach of contract included both the license and support fees); *see also Int'l. Decisions Sys. v. Genpact Int'l., Inc.*, No. 27-CV-17-11626, 2018 Minn. Dist. LEXIS 478 at *33-34 (July 25, 2018) (applying New York law and finding plaintiff was entitled to recover the ongoing maintenance fees it anticipated receiving during the term of the agreement) (Kliebenstein Decl., Ex. 11); *Clinical Insight, Inc. v. Louisville Cardiology Med. Grp., PSC*, No. 11-CV-6019T, 2013 WL 3713414, at *7 (W.D.N.Y. July 12, 2013) (finding that damages for copyright infringement included the annual maintenance and support fees).

[3] Notably, despite failing to include development fees in its calculation of actual damages, the Court acknowledge that "FICO also prices licenses by development seats." (Dkt. 1284 at 16.)

9

remitted damages to *less* than the amount a willing buyer would have paid to a willing seller in a hypothetical negotiation that took place in 2016, at the start of the infringement. Exclusion of the additional amounts requested below, if allowed to stand, would reward Defendants' wrongdoing and would result in a manifest error of law.

**A)**    ***Correcting the Revenue Base Results in a Deployment License Fee of ███ ███.***

The evidence, and the Court's Order, recognized that Defendants' combined revenues in 2016 were $35 billion. (Dkt. 1284 at 36; Kliebenstein Decl., Ex. 1 at D-208-003.) However, the remittitur amount, which the Court calculated by applying the deployment license fee pricing from the FICO Global Price List, is based on an enterprise revenue amount of $32 billion. (Dkt. 1284 at 64.) That revenue amount resulted in a deployment license fee that is priced too low. When using the proper amount of annual revenues for the combined enterprise of Defendants—$35 billion—the deployment license fee is ███ ███ rather than $6 million. (Kliebenstein Decl., Ex. 2 at P-0418-021.)

**B)**    ***The Record Supports a Hypothetical Negotiation That Includes Payment of Development License Fees, Adding ███████ to the Remitted Award.***

To award FICO the maximum amount supported by the record (as a remittitur must), this Court must include *development* license fees in addition to *deployment* license fees. Both are necessary components of the consideration required for use of Blaze Advisor. The development components of Blaze Advisor are the technical tools used to develop, author, connect, and integrate projects into the deployment environment. (Trial Tr. at 1641:2-17.)[5]

---

[4] ████████████████████████████
[5] The complete trial transcript can be found at Dkt. 1177 through Dkt. 1191.

Customers use the development components of Blaze Advisor to build new projects and maintain previously deployed projects, including writing rules. (Trial Tr. 1640:18-1641:17, 1698:18-1699:19.) In sum, the development components allow software developers to build and maintain Blaze Advisor projects and write rules; the deployment components allow customers to launch those projects and rules into production. (*Id.* at 1640:18-1643:11.)

The development components of Blaze Advisor are installed on individual programmers' computers. (Trial Tr. 1641:6-1642:4.) A customer must buy separate licenses on a per-seat basis to acquire access to the development components. (Trial Tr. 209:15-210:2, 1699:7-19.) ████████████████████████████████████

████████████████████████████████████████:

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Customers routinely buy development licenses alongside deployment licenses for Blaze Advisor. (Trial Tr. at 1641:2-5, 1699:7-19.) For example, development licenses were

purchased in each of the third-party agreements cited in the Order.[6] Federal itself purchased unlimited development licenses through Amendment Two of the parties' 2006 Software License and Maintenance Agreement ("2006 Agreement"). (Kliebenstein Decl., Ex. 3 at J-001-019.) The development licenses were important to Federal. Mr. Phil Folz testified that Federal wanted an unlimited number of development seats because Federal's development and deployment of Blaze Advisor was international and this arrangement offered Federal "ultimate flexibility to deploy the software in situations where we think it can best fit." (Trial Tr. at 2415:11-2417:1.)

From 2006-2016, Federal used its development seat licenses to integrate Blaze Advisor into its technology systems, to write rules and to maintain previously deployed Blaze Advisor applications. Trial Exhibits P-0337, P-0341 through P-0351, P-0353 through P-0377, P-0870 through P-0871, and P-0873 through P-0897, introduced through Chris Ivey, document all the deployments of Blaze Advisor throughout Federal from 2006-2016. (*See* Kliebenstein Decl., Ex. 4 (summarizing the 63 Statements of Work and Change Orders entered into between FICO and Federal from 2006 to 2016).) Mr. Ramesh Pandey, a chief architect at Federal pre-merger, testified he communicated with Henry Mirolyuz, Senior Architect in Chubb's Claims IT group at Federal, almost daily about the process of writing rules into Blaze Advisor. (Trial Tr. 700:5-8.) Federal's use of the development components is further confirmed by several of Federal's documents illustrating how Federal software engineers continued to maintain and modify Blaze Advisor

---

[6] The Court's Order cited to the following Exhibits: D-0004, D-0283, D-0284, D-0293, D-0276, D-0172, D-0017, D-0039, D-0077, D-0280, D-0282.

implementations for peak performance. (*See, e.g.*, Kliebenstein Decl., Ex. 5; Trial Tr. 1043:7-14.) Use of the development components was so important to Federal that it built a Center of Excellence for its developers to centralize their knowledge regarding Blaze Advisor development. (Trial Tr. 574:9-576:12.)

Defendants expected to continue this level of development with Blaze Advisor after 2016, after the ACE merger. Claudio Ghislanzoni testified that in 2016, there were tens of thousands of rules running through Blaze Advisor software in Chubb applications. (Trial Tr. 1146:1-10.)  He testified Defendants intended to use internal software engineers for work on Defendants' applications. (Trial Tr. 1146:1-14.) In April 2016, Defendants chose Blaze Advisor as the "going-forward," "preferred rules" technology for developers to use in the new organization. (Trial Tr. 1146:18-22, 1038:12-1039:9; Kliebenstein Decl., Ex. 6 at P-0151-001, P-0151-010.) Clearly, a hypothetical negotiation in 2016 would have included development seats (and a development license) for Defendants' software engineers to implement and maintain Blaze Advisor as the preferred rules technology for Defendants' combined systems and to continue to modify, maintain and update applications that had already been deployed.  Tellingly, while trying to negotiate resolution of this lawsuit in 2016, Defendants asked for (and needed) 100 development seats going forward. (Trial Tr. 930-931:19.) Under Section 7.6 of the Global Price List, ███████████ ████████████████████████ (Kliebenstein Decl., Ex. 2 at P-0418-021.)  In light of this evidence, a reasonable jury readily could have concluded that a hypothetical negotiation would include a development license for Blaze Advisor.

Yet the Court's remitted amount failed to consider the necessary development license fee. The Order stated that the hypothetical negotiation construct to be used was an enterprise-wide perpetual license in 2016, but that the "highest reasonable license fee for the hypothetical license is $6 million." (Dkt. 1284 at 64.) However, the Order obtained the $6 million figure from Section 7.5 of the Global Price List identifying the various tiers of pricing for *deployment* licenses. (*Id.*; Kliebenstein Decl., Ex. 2 at P-0418-021.) The Order failed to utilize Section 7.6 "Development Seat Pricing" in the Global Price List, which clearly states development seat pricing ███████████████████████████ (Kliebenstein Decl., Ex. 2 at P-0418-021.)

The price that a reasonable jury would conclude Defendants must pay for an unlimited development license in the United States, Canada, Australia and Europe amounts to ███████. (Kliebenstein Decl., Ex. 2 at P-0418-021; Trial Tr. at 1641:2-5.) As noted above, the development components for Blaze Advisor are priced and licensed separately from the deployment components in the Global Price List (Section 7.5 versus Section 7.5). (*Id.*) Development licenses are priced ██████████████████████████ ██████████████████████████████. (*Id.*; *see also* Trial Tr. 1641:23-1643:9, 1732:20-1734:16, 1738:22-1740:4.) Under Section 7.6 of the Global Price List, the price for an enterprise-wide, unlimited development license for one country for one platform is ████████. (Kliebenstein Decl., Ex. 2 at P-0418-0021; Trial Tr. at 1732:20-1734:16, 1738:22-1740:4.) Defendants deployed Blaze Advisor in the United States, Canada, Australia and Europe. (*Id.* at 1724:14-1725:10.) The development license fee for these countries would be ████████████████████

Next, Defendants used Blaze Advisor on two platforms—Java and .NET—in the United States and Canada. (Trial Tr. at 1511:13-16 (agreeing that Evolution in Canada uses both Java and .NET architectures); Kliebenstein Decl., Ex. 7 at P-0175-005 (noting that CSI Express uses a .NET desktop application and an online Java WebSphere); Kliebenstein Decl., Ex. 3 at J-001-011 (noting the platform was "JAVA and .Net" for the named application of CSI Express).) As Mr. Waid testified, customers would pay ██████████ ████████████████████ for a license to use the development component on a second, additional platform for each country. (Trial Tr. 1739:15-1740:4.) Here, use of the Blaze Advisor development component on a second platform in two countries—United States and Canada—would result in an additional ████████ license fee ██████████████ The total is ████████████ in development license fees. (*See* Trial Tr. 1738:22-1740:4.)

C)   ***The Record is Clear that a Hypothetical Negotiation Would Result in Payment of Maintenance and Support Fees, Adding*** ████████████ ***to the Remitted Award.***

Finally, the record, and the Court's own ruling, make clear that a reasonable jury would have concluded that Federal would have agreed to an annual 22% maintenance and support fee in addition to the license fee that the Court awarded. The Court cited no legal authority for excluding that amount. (Dkt. 1284 at 64, n.60.) As a matter of fact, the Order repeatedly and correctly recognized that, by 2016, maintenance and support fees were a *mandatory* part of any license agreement. As the Order noted, "maintenance and support for the software . . . [was] an annual fee, which by 2016, was mandatory and set at 22% of the license fee." (Dkt. 1284 at 15; *see also id.* at 21 ("Maintenance fees are added on top of the annual fee at a rate of 22% as already described."); 50 ("By 2016, all Blaze licensees

were required to pay support and maintenance fees, equal to 22% of the license per year."); *see also* Trial Tr. 540:10-14, 588:8-589:24, 588:25-589:21, 1688:9-25, 1722:5-12.)

Further, the third-party agreements identified in the Order as factual support for an enterprise-wide perpetual license each included a charge for maintenance and support fees. (Dkt. 1284 at 24, 25, 49, 50.) A review of these agreements[7] shows that each included two separate components: (1) the license fee and (2) annual maintenance and support fees. (*See* Dkt. 1284 at 24-25.) The total amount paid by the customer for Blaze Advisor included both the license fee and the maintenance and support fees, summed. The Order and evidence cited therein shows that *both* fee elements are an essential part of the consideration for granting the client access to and use of Blaze Advisor. The record makes clear that paying for maintenance and support was, in 2016, *part of the price of every Blaze Advisor license*. (Dkt. 1284 at 15, 21, 50; *see also* Trial Tr. 1688:9-25, 1722:5-12.) Licensees—and particularly licensees making enterprise-wide use of Blaze Advisor— would not purchase one without the other.

Federal's own history shows it consistently paid maintenance and support fees every year when licensing Blaze Advisor. The parties' 2006 Agreement[8] included maintenance and support fees. (Kliebenstein Decl., Ex. 3 at J-001-003.) The "License Fee" and the "Support and Maintenance Fee" were both amounts paid pursuant to the license agreement

---

[7] Only one license cited by the Court, D-0172, was not a perpetual license. The Court cited to the following Exhibits: D-0004; D-0283, D-0284, D-0293, D-0276, D-0172, D-0017, D-0039, D-0077, D-0280, D-0282, D-0304

[8] Notably, the title of the agreement between the parties is "Software License and Maintenance Agreement," and it was referred to as the "License and Maintenance Agreement" by both parties throughout trial. (*See* Kliebenstein Decl., Ex. 3.)

granting Federal the right to use Blaze Advisor. (*See id.* at J-001-011, J-001-017, J-019.) And Federal in fact used FICO's maintenance and support services. For example, a log of Federal's support requests was admitted during trial, showing that Federal used the maintenance and support services for which it had paid. (Kliebenstein Decl. Ex. 8; Trial Tr. at 588:25-589:21.) The evidence is also clear that Defendants intended to continue using, and paying for, maintenance and support after the merger that gave rise to this lawsuit. For example, during the parties' pre-termination negotiations, Defendants offered to ███████████████████████████████████████████████████ ████████████████████████████ (Trial Tr. at 935:14-19; *see also* Kliebenstein Decl., Ex. 9 at P-0094-002 (emphasis added).)

Here, the evidence leads to the conclusion that adding maintenance and support fees to FICO's award of actual damages is required, and is far from speculative. Under the law, FICO is owed as actual damages all amounts it would have been paid if Defendants had lawfully licensed Blaze Advisor. *See* 17 U.S.C. § 504(b); 5 Nimmer on Copyrights § 14.02[A][1]. The fair market value of Blaze Advisor includes all revenues FICO would have received stemming from a contract to license the software. *See, e.g., Oracle*, 765 F.3d at 1094-95; *Thoroughbred Software*, 488 F.3d at 359-60; *Flying J*, 45 Fed. Appx. at 766, *Laspata*, 2018 WL 3059650 at *6, *Live Face*, 2016 U.S. Dist. LEXIS 73443. Relatedly, the fact that maintenance and support fees are not *called* "license" fees does not determine whether FICO may recover them. Instead, the Copyright Act's "actual damages" standard focuses on causation—by what amount was the copyright holder made worse off—and is not strictly tied to an amount denominated as a "license" fee.

17

Based on the record discussed above, there is no reason to doubt that Defendants would have agreed to pay such fees had they contracted for the right to continue to use Blaze Advisor rather than simply taken it.[9] And based on the trial record and the Court's own Order, there is no reason to doubt that the amount of those fees in 2016 would have been 22% of the license fee, annually. (Dkt. 1284 at 15, 50.) To award less would, most assuredly, violate the maximum recovery rule and award FICO far less than the amount supported by the evidence. *See, e.g., Oracle*, 765 F.3d at 1094.

In sum, there is no reason to conclude that maintenance and support fees would have been *excluded* from the hypothetical license agreement that Defendants and FICO would have negotiated in 2016. To the contrary, excluding maintenance and support fees from the remitted award would *reward* the Defendants' infringement by reducing the amount they have to pay FICO for use of Blaze Advisor compared with the amount they would have paid had they *not* infringed. This result is completely at odds with the purpose of actual damages under the Copyright Act: to restore the victim to its original position and to ensure the defendant does not benefit from its wrong. *On Davis*, 246 F.3d at 166; *Flying J*, 45 Fed.

---

[9] It does not matter that Defendants, having taken FICO's copyrighted material rather than contracted for it, were not allowed to use maintenance and support after Federal breached the 2006 Agreement in 2016. The relevant question is not whether Defendants actually received maintenance and support services during the period of infringement, but whether they would have paid for it under a hypothetically negotiated agreement absent the infringement. The record leaves no doubt about that, and the record surely supports as reasonable the conclusion that, Defendants would have paid for maintenance and support. It may be true that Defendants did not receive those services after termination in 2016, but that is a consequence of their wrongdoing, and they should not benefit from it. *See, e.g.*, *Laspata DeCaro Studio Corp.*, 2018 WL 3059650, at*6 (finding photography business's actual damages may include the various fees plaintiff charged clients for photoshoots).

Appx. at 766. The mandatory annual maintenance and support fees based on a license fee that has been corrected to address the two errors described above ██████████ is ██████████[10] and would total ██████████ over the 5-year period Defendants would have had to purchase to cover the 49-month period of infringing use. That amount should be included in the Court's remitted award.  There would have been no basis for a reasonable jury to have reached any other conclusion.

## IV.     Requested Amendments to the Remittitur.

FICO's requested amendments to the remittitur are set forth below. In sum, properly accounting for Defendants' $35 billion in revenue in 2016 increases the Court's remitted license fee from $6 million to ██████████. Proper calculation of the development license fee would further increase the Court's remitted license fee by ██████████. (Kliebenstein Decl., Ex. 2 at P-0418-021.) The total license fee would be approximately ██████████ ██████████. Mandatory maintenance and support fees on the total license fees ██████████ would be calculated at 22% of that license fee, annually, or ██████████ ██████████ (*See* Dkt. 1284 at 15, 21, 50.) Because FICO sells maintenance and support on an annual (not monthly) basis, a willing buyer using Blaze Advisor for 49 months would purchase 5 years of maintenance and support. (Trial Tr. 1734:21-25.) Therefore, the total maintenance and support fees owed on an ██████████ Blaze Advisor license for a 49-month period would be ██████████.[11] Using the same method used by the Court in its Order to allocate amounts between the Defendants, an itemization of the

_____

[10] ██████████
[11] ██████████

total remitted award requested by FICO is set forth below:[12]

| Federal | |
|---|---|
| ███████████████ | ███████ |
| ███████████████ | ███████ |
| ███████████████ | ███████ |
| ████ | ███████ |
| **Ace** | |
| ███████████████ | ███████ |
| ███████████████ | ███████ |
| ███████████████ | ███████ |
| ████ | ███████ |
| **TOTAL DAMAGES** | ███████ |

## V.     Conclusion.

Consistent with the Copyright Act and New York contract law, FICO is entitled to

recover the full scope of its actual damages. This includes all consideration it would have

received in a license agreement for the use of Blaze Advisor had there been no breach and

no infringement. The trial record is clear that a willing buyer would have paid a willing

---

[12] Nothing in this Motion shall be construed as setting forth the maximum amount of damages FICO is entitled to seek under a hypothetical negotiation framework in a second trial. FICO expressly reserves the right to present evidence and testimony on factors relevant to the hypothetical negotiation framework.



seller substantially more than the Court's remitted award, for the reasons described above. FICO respectfully requests that the Court properly consider the full scope of FICO's actual damages and amend its remittitur to award FICO the maximum amount of actual damages supported by evidence at trial.

MERCHANT & GOULD P.C.

DATE: October 9, 2023 　　　　/s/ Heather Kliebenstein
Heather Kliebenstein, MN Bar # 337419
Rachel Scobie, MN Bar # 314171
Paige S. Stradley, MN Bar # 393432
Michael A. Erbele, MN Bar # 393635
Joseph W. Dubis, MN Bar # 398344
Gabrielle L. Kiefer, MN Bar # 402364
MERCHANT & GOULD P.C.
150 South Fifth Street, Suite 2200
Minneapolis, MN  55402
Tel:  (612) 332-5300
Fax:  (612) 332-9081
hkliebenstein@merchantgould.com
rscobie@merchantgould.com
pstradley@merchantgould.com
merbele@merchantgould.com
jdubis@merchantgould.com
gkiefer@merchantgould.com