# EXHIBIT 11

No *Shepard's* Signal™
As of: October 8, 2023 1:25 AM Z

# *Int'l. Decisions Sys. v. Genpact Int'l., Inc.*

Minnesota District Court, County of Hennepin, Fourth Judicial District

July 25, 2018, Decided

Court File No.: 27-CV-17-11626

**Reporter**
2018 Minn. Dist. LEXIS 478 *

International Decisions Systems, Inc., Plaintiff, v. Genpact International, Inc., Defendant.

**Notice:** [EDITOR'S NOTE: THIS ORDER HAS BEEN SIGNED BY THE JUDGE, BUT SIGNATURE TEXT WAS ILLEGIBLE IN THE ORIGINAL DOCUMENT AND THEREFORE THE JUDGE'S NAME IS NOT DISPLAYED.]

**Judges:** **[*1]** Amy Dawson, Judge of District Court.

**Opinion by:** Amy Dawson

## Opinion

### ORDER AND MEMORANDUM

The above-entitled matter came before the Honorable Amy Dawson, Judge of District Court, on May 5, 2018, upon the parties' Cross-Motions for Summary Judgment. Nathaniel Zylstra, Esq., appeared on behalf of Plaintiff. Nicholas Loyal, Esq., appeared on behalf of Defendant.

Based upon all of the files, records, and proceedings herein, the Court being duly advised,

### IT IS HEREBY ORDERED THAT:

1. Plaintiff's Motion for Summary Judgment is hereby **GRANTED**.

2. Defendant's Motion for Summary Judgment is hereby **DENIED**.

3. The attached Memorandum is incorporated into this Order.

4. Plaintiff is entitled to $544,859.86 in damages.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: July 25, 2018

/s/ Amy Dawson

Amy Dawson

Judge of District Court

### MEMORANDUM

### I. Introduction

This case centers on whether Defendant can terminate its contracts with Plaintiff and be relieved of its obligation to provide maintenance and support payments because its third-party client entered into bankruptcy. Plaintiff International Decision Systems, Inc. (International) and Defendant Genpact International, Inc. (Genpact), entered into two relevant contracts. In the initial contract **[*2]** (the "Base Agreement"), International agreed to license its software and provide annual maintenance and support to Genpact and Genpact's third-party clients. In return, Genpact agreed to pay for annual maintenance and support with the option to

renew the Base Agreement annually.

Section 10.2 of the Base Agreement provided that the parties could terminate the Base Agreement upon written notice if they had become insolvent, or if a party or any of its assets were entered into bankruptcy. (See Pl. Ex. 1, Base Agreement, § 10.2.) Section 10.4 of the Base Agreement allowed termination for annual maintenance and support upon 90 days written notice. (*See* Pl. Ex. 1, Base Agreement, § 10.4.)

The second contract (the "Product Schedule") specified the software products Genpact could license to its third-party client SunEdison. The Product Schedule provided that Genpact agreed to a minimum term for annual maintenance and support for at least five (5) years, or its term of commitment with SunEdison, whichever was longer. (Pl. Ex. 2, Product Schedule.)

Midway through the five-year term, SunEdison filed for bankruptcy which prompted Genpact to terminate the Product Schedule and cease making maintenance **[*3]** and support payments to International for the remainder of the five-year term. Genpact believes it was entitled to terminate the Product Schedule under the termination terms of the Base Agreement. International believes the five-year minimum term in the Product Schedule controls the termination language in both contracts.

International now brings the current suit before the Court. Both parties have submitted cross-motions for summary judgement to determine whether Genpact had a contractual right to terminate the Product Schedule based on SunEdison's bankruptcy and whether Genpact breached its contract with International when it failed to make payments for the full five-year term.

International argues that Genpact did not have a right to terminate the Product Schedule because the contract expressly states that Genpact was obligated to provide maintenance and support payments for at least five years. International also asserts that the bankruptcy of Genpact's client, SunEdison, did not affect the Product Schedule's five-year term or the trigger termination pursuant to the Base Agreement because Genpact did not file for bankruptcy itself or cancel the Base Agreement with all of its third-party **[*4]** customers. International also argues that if Genpact had the right to terminate the Product Schedule, it failed to do so properly. Additionally, International argues that Genpact materially breached the Product Schedule contract because it has refused to pay for annual maintenance and support for the full five-year term.

In response, Genpact argues that it had a right to terminate its annual maintenance and support obligations under the Product Schedule because the Base Agreement provides for termination in the event of bankruptcy, and this language controls because there is no conflict between the termination clauses in the Base Agreement and any provision in the Product Schedule. Genpact also asserts that it was entitled to terminate the Product Schedule because some its assets were included in SunEdison's bankruptcy proceedings. Genpact further argues that it properly terminated the Product Schedule because it provided International with adequate notice. Additionally, Genpact argues that it did not breach its contract with International regarding annual maintenance and support payments because it had no obligation to make payments after termination. Genpact further asserts that International **[*5]** did not suffer actual damages or failed to mitigate its damages.

The Court finds that Genpact did not have a right terminate the Product Schedule because

the language in the contact expressly states that Genpact was obligated to provide maintenance and support payments for at least the duration of the five-year term. The Court also finds that SunEdison's bankruptcy did not entitle Genpact to terminate the Product Schedule prior to the expiration of the five-year term because the Product Schedule requires a minimum term of five years and because it did not trigger any termination exceptions in the Base Agreement. The Court finds it unnecessary to address the parties' arguments regarding whether Genpact properly terminated the Product Schedule and Base Agreement. The Court also finds that Genpact materially breached the terms of the Product Schedule because it had an obligation to pay for maintenance and support, and its refusal to do so injured International. The Court further finds that International was not required to mitigate its damages because Genpact agreed to provide maintenance and support payments for at least the five years under the Product Schedule.

Accordingly, the Court **[*6]** grants International's motion for summary judgment in its entirety and denies Genpact's cross-motion for summary judgment.

**III. Statement of Issues**

1. Did Genpact have the right to terminate the Product Schedule prior to the expiration of the Product Schedule's five-year term and did SunEdison's bankruptcy constitute a reason for termination prior to the expiration of the five-year term?
   a. Did Genpact have the right to terminate its support and maintenance payment obligations under the Product Schedule when it expressly stated that Genpact must satisfy the obligations for at least a five-year term?
   b. Did SunEdison's bankruptcy entitle Genpact to terminate the Product Schedule when the bankruptcy failed to trigger any termination exceptions in the Base Agreement?
2. Did Genpact materially breach the terms of the Product Schedule when it failed to satisfy its obligations to pay for maintenance and support, and its refusal to do so injured International?

**IV. Statement of Facts**[1]

**A. The Base Agreement and Product Schedule**.

On November 27, 2013, International and Genpact entered into a Base Agreement in which International would provide licensing, software updates and maintenance support to Genpact. **[*7]** (Loyal Aff., Ex. 3, at 10.) The Base Agreement established the general framework under which Genpact would license the software to its third-party clients through product schedules. (Pl. Ex. 6, Somers Dep. 24:6-25.) The parties later agreed to two sets of product schedules under the Base Agreement: one for a company called Alliance Laundry Services ("Alliance Laundry"), and one for SunEdison ("SunEdison"). (Loyal Aff. Ex. 6, International Transcript Dep. 25:15-25:22.) While the Alliance Laundry Services product schedules remain in effect, this litigation concerns the termination of the SunEdison Product Schedule ("Product Schedule"). (*Id.* at Ex. 1, ¶ 9.) The Product Schedule was executed on December 31, 2014, and along with the Base Agreement, imposed annual maintenance and support

---

[1] Consistent with this Court's standard of review on a motion for summary judgment, the facts are viewed in the light most favorable to the non-moving party. *Citizens State Bank Norwood Young Am. v. Brown, 849 N.W.2d 55, 61 (Minn. 2014)*.

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 5 of 15

Page 4 of 14
2018 Minn. Dist. LEXIS 478, *7

obligations on both International and Genpact. (Pl. Ex. 1; Ex. 2.) It is important to note that, while Genpact seeks to terminate its payment obligations under the Product Schedule, it is not seeking to terminate the Base Agreement.

**B. Annual Maintenance and Support Obligations under the Base Agreement and Product Schedule**.

Both the Base Agreement and Product Schedule between International and Genpact addressed **[*8]** the parties' annual maintenance and support obligations. Specifically, the Base Agreement imposed the following obligation on International:

> **3.1 Annual Maintenance and Support**. So long as Annual Maintenance and Support have not been terminated, supplier shall provide the annual maintenance and support to Customer as described below. (Pl. Ex. 1, § 3.1.)

The annual maintenance and support International agreed to provide included responding to specific customer inquiries by phone or online, addressing problems with the software, and providing updates to the software. (*Id.* at Ex. 6. Somers Dep. 45:16-46:4.)

Genpact also agreed to pay an annual maintenance and support fee under the following conditions in the Base Agreement:

> **4.2.1 Annual Maintenance and Support** Fee. Customer agrees to pay an Annual Maintenance and Support Fee for the Software upon which it receives Annual Maintenance and Support for the Initial Maintenance Term and for any Renewal Maintenance Term. (Pl. Ex. 1, § 4.2.1.)

While the Base Agreement set forth the general obligations dealing with annual maintenance and support, the actual cost of annual maintenance and support are laid out in the SunEdison Product Schedule as followed: **[*9]**

> 4. **Annual Maintenance and Support Percentage**. The annual percentage excused in calculating Annual Maintenance and Support Fees for the Software shall be twenty-two percent (22%) of the then current license value of the software . . . .
>
> . . .
>
> 5. **Annual Maintenance and Support obligations**. So long as this section has not been terminated in accordance with the Base Agreement and Customer is not otherwise in breach of the Base Agreement or this Product Schedule, Supplier shall provide Annual Maintenance and Support to Customer during the initial maintenance term and any Renewal Maintenance Term(s) for the Software . . . .

(Pl. Ex. 2, §§4-5.)

The Product Schedule also contained a special term regarding the annual maintenance and support obligations in an attachment marked Exhibit C:

> **1. Minimum Annual Maintenance and Support Commitment**. Customer agrees to a minimum term for Annual Maintenance and Support of the longer of five (5) years or the term commitment that Customer has with SunEdison, Inc. or its affiliates to provide business process outsourcing services using the Software, from the Effective Date of this Product Schedule No. 1-SunEdison.

(*Id.*) This language represented that Genpact was **[*10]** obligated to provide annual maintenance and support payments from December, 2014 through December, 2019. International alleges that Genpact agreed to the five-year minimum term in order to assume

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 6 of 15

Page 5 of 14
2018 Minn. Dist. LEXIS 478, *10

all contractual risks with International and "to allow SunEdison access to [International's] products with a low upfront investment in order to lower SunEdison's commercial burden and to enable SunEdison to focus on business growth while continuing to deal with [International] after the contract term had expired." (*Id.* at Ex. 9, Interrogatories, No. 6.) International also alleges that in order to be comfortable with Genpact assuming the contractual risk on behalf of the SunEdison, International insisted that the five-year term be included in the Product Schedule. (*Id.* at Ex. 6, Somers Dep. 40:8-8.)

## C. Termination terms of Annual Maintenance and Support under the Base Agreement.

The language in the Base Agreement allowed for termination of both the Base Agreement and the parties' annual maintenance and support obligations under certain circumstances. (*Id.* at Ex. 1.) Specifically, the Base Agreement provided the following termination clauses:

> **10.2 Base Agreement Termination**.
> 
> . . .
> 
> Notwithstanding **[*11]** the foregoing, this Base Agreement may be terminated upon written notice if a receiver, trustee or other liquidating officer is appointed for any of the assets of a party to this Base Agreement, if a party to this Base Agreement makes an assignment for the benefit of creditors, if a party to this Base Agreement has become insolvent (however defined), or a voluntary or involuntary petition or other filing (however defined or described) is made regarding a party to this Base Agreement or any of its assets under the bankruptcy or insolvency laws under any jurisdiction. (*Id.* at Ex. 1, §10.2.)

> . . .
> 
> **10.4 Annual Maintenance and Support termination**. Either party may terminate Annual Maintenance and Support for any part, or all, of the Software described in a product schedule to this Base Agreement upon ninety (90) days written notice prior to the end of the Initial Maintenance term or any Renewal Maintenance Term. (*Id.* at Ex. 1, § 10.4.)

The Product Schedule does not specifically address termination; that is only addressed in the Base Agreement. (*See Id.* at Ex. 2.) Furthermore, neither does the Base Agreement nor the Product Schedule define the term "Termination."(*See Id..* at Ex. 1; Ex. 2.)

 **[*12]** Additionally, the Product Schedule provided the following language in regards to conflicting terms between the Base Agreement and Product Schedule:

> **9. General**. Except as provided herein, all other terms and conditions of the Base Agreement are unchanged and unmodified and continue in full force and effect. In the event of a conflict between the terms and conditions of the Base Agreement and this Product Schedule, this Product Schedule shall govern, but only in relation to the Software described herein. (Id. at Ex. 2, § 9.)

## D. Genpact's payment and termination of annual maintenance and support.

In 2014, after the parties executed the Product Schedule, International issued an invoice to Genpact for the initial license fee and for the first year's annual maintenance and support payment. (Pl. Ex. 13. Invoices, at 1.) Genpact paid the invoiced amount in full. (*Id.* at Ex. 7, Negi Dep. 158:14-159:11.) In October 2015,

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 7 of 15

Page 6 of 14
2018 Minn. Dist. LEXIS 478, *12

International issued an invoice to Genpact for the following year's annual maintenance and support payment. (*Id.* at Ex. 13, Invoices, at 1.) Genpact also paid this invoice amount in full. (*Id.* at Ex. 7, Negi Dep. 162:24-164:11.)

On April 21, 2016, SunEdison sent Genpact notice of **[\*13]** its bankruptcy. (Loyal Aff. Ex. 18, SunEdison's Notice of Bankruptcy.) Genpact had outstanding contracts and accounts receivables with SunEdison at time of the bankruptcy. (Pl. Ex. 7, Negi Dep. 100:22-24.) These Genpact assets were included in SunEdison's bankruptcy. (*Id.*) The annual term for the SunEdison Product Schedules ran from January 1 to December 31 of each year, however, the Product Schedule's five-year term ran through December, 2019. (Loyal Aff. at Ex. 11; Pl. Ex. 2)

On July 15, 2016, due to SunEdison's bankruptcy, Sachin Paliwal of Genpact sent an email notification terminating Genpact's annual maintenance and support obligations under the Base Agreement and Product Schedule more than 90 days before the end of the 2016 term. (*Id.* at Ex. 8.)

### E. Post-termination action.

Following the termination notice, Genpact was no longer operating International's software which was referenced in the Product Schedule (*Id.* at Ex. 7, Genpact Deposition, at 213.08-213.14.) Genpact alleges that it had not received any service for that software since notifying International of its termination. (*Id.* at 197:08-197:21.)

Despite Genpact's termination email, International sent invoices to Genpact for **[\*14]** annual maintenance and support payments on October 29, 2016 and October 17, 2017. (Pl. Ex. 7, at 173-176.) Genpact failed to pay the 2016 or the 2017 invoice, basing its non-payment on its termination email. (*Id.* at Ex. 7; Ex. 8.) Genpact also requested a final termination fee. (*Id.* at Ex. 11.) A representative of International responded by indicating that the remaining fee would be the annual maintenance and support payments for the remaining three-year period in the amount of $544,859.86. (*Id.*; Somers Dep. 109:19-120:6.)

### V. Legal Standard for Summary Judgment and Choice of Law

### A. Summary Judgement Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." *Minn. R. Civ. P. 56.03*. When a motion for summary judgment is made and supported, the nonmoving party must "present specific facts showing that there is a genuine issue for trial." *DLH, Inc. v. Russ, 566 N.W.2d 60, 69 (Minn. 1997)*. The evidence must be "viewed in the light most favorable to the nonmoving party." *Citizens State Bank Norwood Young Am. v. Brown, 849 N.W.2d 55, 61 (Minn. 2014)*. "Where the record taken as a whole could not lead a rational trier **[\*15]** of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *DLH, Inc., 566 N.W.2d. at 69*. Summary Judgment is "inappropriate when reasonable persons might draw different conclusions from the evidence presented." *Montemayor v. Sebright Prod, Inc., 898 N.W.2d 623, 628 (Minn. 2017)*.

"A material fact is one of such a nature as will affect the result or outcome of the case depending upon its resolution." *Rathbun v. W. T. Grant Co., 300 Minn. 223, 219 N.W.2d 641, 646 (Minn. 1974)*. The court's role "is not to

decide issues of fact, but solely to determine whether genuine factual issues exist." *DLH, Inc., 566 N.W.2d. at 70*.

"The moving party has the burden of showing an absence of factual issues" *Montemayor, 898 N.W.2d. at 628 (Minn. 2017)*. *Continental Sales and Equip. Co. v. Town of Stuntz, 257 N.W.2d 437, 441 (Minn. 1983))*. "[T]here is no genuine issue of material fact for trial when the nonmoving party presents evidence which merely creates a metaphysical doubt as to a factual issue and which is not sufficiently probative with respect to an essential element of the nonmoving party's case to permit reasonable persons to draw different conclusions." *Leeco, Inc. v. Cornerstone Bank, 898 N.W.2d 653, 657 (Minn. Ct. App. 2017)*.

### B. Choice of Law

According to the terms of the Base Agreement between International and Genpact, all of the claims at issue before the Court will be construed under the laws of New York. (*See* Pl. Ex. 1, § 12.15.) This choice of law provision under the Base Agreement was agreed to by both International and Genpact, and controls over the parties' **[*16]** issues in the current matter. (*Id.*)

### VI. Analysis

**1. Genpact may not terminate the SunEdison Product Schedules prior to the expiration of the Products Schedule's five-year term and SunEdison's bankruptcy does not affect the five-year term**.

### Rule

According to New York Law, contracts will be construed in a manner that gives effect to every provision therein. *Software AG, Inc. v. Consist Software Sols., Inc., No. 08 CIV. 389CMFM, 2008 U.S. Dist. LEXIS 19347, 2008 WL 563449, at *11 (S.D.N.Y. Feb. 21, 2008)*, *aff'd*, *323 F. App'x 11 (2d Cir. 2009)* citing 22 N.Y. Jur.2d Contracts § 249 (2008). "[T]he role of the court in interpreting a contact is to ascertain the intentions of the parties at the time they entered into the contract." *Evans v. Famous Music Group, 1 N.Y.3d 452, 807 N.E.2d 869, 872, 775 N.Y.S.2d 757 (N.Y. 2004)*. "The objective intent of the parties' controls contract interpretation." *Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997)*. The subjective intent of the parties is irrelevant. *Id.* If the subjective intent of the parties is discernable from the plain language of the contract, then there is no need for a court to look further. *Rosenthal v. Quadriga Art, Inc., 69 A.D.3d 504, 894 N.Y.S.2d 32 (N.Y.S. 2010)*.

### Analysis

**A. Genpact was not entitled to terminate its support and maintenance payment obligations under the Product Schedule prior to the expiration of its five-year term**.

In support of its motion for summary judgment, International argues that Genpact had no right to terminate the Product Schedule contract prior to the contract's five-year term agreement. (Pl. Mot. Summ. **[*17]** J. at 14.) International asserts that the unambiguous language of the Product Schedule obligated Genpact to provide at least five years of support and maintenance payments. (*Id.*) International argues that the specific five-year term prevails over any generic language elsewhere in the Product Schedule or Base Agreement. (*Id. at 15*.) Additionally, International argues that to allow Genpact to terminate the Product Schedule would be

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 9 of 15

Page 8 of 14
2018 Minn. Dist. LEXIS 478, *17

contrary to the plain language of the contract and render the minimum five-year term meaningless. (Pl. Reply Mot. Summ. J. at 5.) International asserts that the fundamental rule of contract construction is to give all terms within the contract meaning. (*Id.*)

In response, Genpact argues that its support and maintenance payment obligations contained in the Base Agreement, as opposed to the Product Schedule, control in the dispute before the Court. (Def. Mot. Summ J. at 11.) Therefore, Genpact asserts that it had a right to terminate the parties Product Schedules. (*Id.*) Genpact also asserts that under the Base Agreement, it could terminate its agreement with International due to the fact that its own assets were drawn into SunEdison's bankruptcy, or by providing **[*18]** at least 90-days' notice prior to the end of the annual renewal period. (Def. Resp to Pl. Mot. Summ. J. at 7.) Genpact alleges that it provided an adequate termination notice on July, 15, 2016, more than 90 days before the end of the 2016 term. (*See* Loyal Aff. Ex. 8.) Genpact argues that Section 10.2 and 10.4 of the Base Agreement explicitly provide termination clauses, and the Product Schedule fails to provide termination clauses. (*Id.*) Genpact asserts that since the Base Agreement and the Product Schedule form one contract, the Base Agreement's termination rights extend to the Product Schedule. (*Id.*) Genpact argues that the five-year minimum term provided in the Product Schedule is merely used to establish the duration of the contact, while the termination provisions are meant to bring an early end to that duration. (*Id.* at 9.)

The Court finds the New York federal district court case *Software AG, Inc. v. Consist Software Sols., Inc.*, instructive. *Software AG, Inc. v. Consist Software Sols., Inc., No. 08 CIV. 389 CMFM, 2008 U.S. Dist. LEXIS 19347, 2008 WL 563449 (S.D.N.Y. 2008)*. In *Software AG*, plaintiff Software AG ("plaintiff") entered into a distributorship agreement with defendant Consist Software Solutions, Inc., and its affiliate Consist-Brazil (collectively "defendant"). The agreement ("the Agreement") stated **[*19]** that plaintiff would provide a series of software distribution, licensing and maintenance support to defendant. *2008 U.S. Dist. LEXIS 19347, [WL] at *2*. The Agreement term commenced in 1998 and ran through December 31, 2007. *Id.* Additionally, the Agreement was renewable for successive five-year terms, as long as either party did not provide a notice of cancellation in accordance with the Agreement's terms. *Id.*

Paragraph 2 of the Agreement authorized defendant to enter into customer agreements for the purposes of licensing, installing, assisting, and providing maintenance to its customers for plaintiffs software products. *2008 U.S. Dist. LEXIS 19347, [WL] at *3*. Paragraph 5(4) of the Agreement provided that defendant would be responsible for all technical assistance and support activities in its territories, including maintenance services for both present and future users. *2008 U.S. Dist. LEXIS 19347, [WL] at *4*. Defendant's obligations were intended to continue until termination of the agreement, including any extensions. *Id.* The Agreement further stated that plaintiff would provide defendant, at no additional cost, software updates and servicing materials. *Id.*

On April 6, 2006, plaintiff sent defendant a notice that it did not intend to renew the 1998 Agreement for an additional **[*20]** five-year term. *2008 U.S. Dist. LEXIS 19347, [WL] at *3*. Defendant believed that the notice was ineffective to terminate the parties' relationship and asserted that the Agreement had been automatically renewed for a five-year term commencing January 1, 2008, because plaintiff failed to comply with the Agreement's non-renewal provision. *Id.* The district court ruled that plaintiffs notice complied with the

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 10 of 15

Page 9 of 14
2018 Minn. Dist. LEXIS 478, *20

terms of the Agreement and was effective to terminate the parties' relationship on January 1, 2008. *Id.*

Between December 21, 2007 and December 31, 2007, defendant's affiliate Consist-Brazil, promised Companhia de Processamento de Dados do Estado de Sao Paulo ("Companhia") that defendant would continue to provide maintenance services for plaintiffs software products after January 1, 2008. *2008 U.S. Dist. LEXIS 19347, [WL] at *5*. On December 28, 2007 defendant and Companhia entered into an official agreement wherein defendant was obligated to provide services for 24 months, commencing on the date the agreement was signed. *Id.* Defendant also agreed to provide Companhia with new versions of plaintiff's software and computer programs, in light of the fact that they were not authorized to do so beyond January 1, 2008. *Id.* Defendant also entered into **[*21]** 179 similar maintenance agreements with other customers purporting that it was obligated to provide maintenance to its customers after the termination of the Agreement on January 1, 2008. *2008 U.S. Dist. LEXIS 19347, [WL] at *6*.

Additionally, even though paragraph 5(4) of the Agreement obligated defendant to provide maintenance to its customers, as a practical matter, defendant's employees were only able to provide basic maintenance (known as "Level 1 Support") for plaintiffs software products. *Id.* Most Level 2 Support (more complicated) and all Level 3 Support (most complicated) were provided by plaintiffs employees, however, that assistance ended on the termination date as well. *Id.*

Plaintiff later filed suit in New York federal district court for a preliminary injunction due to defendant's post-termination agreements, which would have obligated both parties to provide maintenance to plaintiffs software. *2008 U.S. Dist. LEXIS 19347, [WL] at *1*.

The New York federal district court found that "maintenance agreements ordinarily run for a term of years and end when a distributorship concludes." *2008 U.S. Dist. LEXIS 19347, [WL] at *8*. Additionally, the district court found that Paragraph 3 of the Agreement did not give defendant the right to enter into maintenance agreements **[*22]** that extended beyond the expiration of the Agreement. *2008 U.S. Dist. LEXIS 19347, [WL] at *7*. The district court stated that "paragraph 5(4) of the Agreement specifically states that [defendant's] obligation to provide customer maintenance ends when the Agreement terminates." *Id.*

Pursuant to industry custom, the district court held that Paragraph 3 of the Agreement only granted defendant the right to issue maintenance agreements during the term of the distributorship agreement. *2008 U.S. Dist. LEXIS 19347, [WL] at *11*. This conclusion was further supported by the fact that the Agreement neither "(i) ma[de] provision for post-termination access to products and services needed to provide maintenance to customers, nor (ii) set[] a schedule of payment for that access; nor (iii) obligate[d] the parties to negotiate in good faith to arrive at a schedule of payments to cover the cost of those goods and services following the expiration of the Agreement." *Id.* The district court also stated that "[t]o the extent that [defendant] has entered into agreements with customers that obligate it to provide maintenance to those customers on or after January 1, 2008, it was not contractually authorized to enter into those agreements and it did so at its peril." **[*23]** *2008 U.S. Dist. LEXIS 19347, [WL] at *12*. Accordingly, the district court granted plaintiffs preliminary injunction and found that defendant breached its contract with plaintiff. *2008 U.S. Dist. LEXIS 19347, [WL] at *1, and *12*.

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 11 of 15

Page 10 of 14
2018 Minn. Dist. LEXIS 478, *23

Similar to the facts in *Software*, in the case at bar, the term of years for Genpact to provide maintenance and support payments are clearly stated in the Product Schedule. (*See* Pl. Ex. 2, Product Schedule.) The Product Schedule specifically provides that Genpact agrees to at least a minimum five-year term for maintenance and support payments, which run from December 31, 2014 through December 31, 2019. (*Id.* at 8.) While Genpact states that it has a right to terminate the Product Schedule annually, the Court finds that where language in the Product Schedule and Base Agreement conflict, the language in the Product Schedule shall prevail. (*See* Id. at § 9.) Therefore, the language obligating Genpact to a five-year minimum term prevails over the annual termination language in the Base Agreement. This Court concludes that to do otherwise would render the five-year minimum term meaningless, and under New York law, all contracts must give effect to every provision therein. Accordingly, the Court finds that Genpact is not entitled **[*24]** to terminate the Product Schedule prior to the expiration of the five-year term, and therefore is obligated to provide maintenance and support payments to International for the remaining three years under the Product Schedule.

## B. SunEdison's bankruptcy did not alter the Product Schedule's terms and did not allow Genpact to terminate the Base Agreement or Product Schedule.

International argues that SunEdison's bankruptcy did not alter the Product Schedule's five-year term, and therefore Genpact should be obligated to fulfill the terms' payment requirements. (Pl. Mot. Summ. J. at 15.) Again, International asserts that Genpact's claim that it was entitled to terminate the Product Schedule early because of SunEdison's bankruptcy "flies in the face in the face of the direct contract language." (*Id. at 15* - 16.) International argues that the Product Schedule specifically states that "the contract would last the longer of the Genpact-SunEdison relationship or five years." (*Id. at 16*.) International also argues that SunEdison's bankruptcy did not trigger any other termination provision in the Base Agreement. (*Id.*) International asserts that nothing in the Base Agreement provides for termination **[*25]** in the event of a third-party bankruptcy, and that termination can only occur if the parties to the agreement file for bankruptcy. (Exhibit 1, Base Agreement § 10.2.) International further argues that Genpact did not terminate the Base Agreement under Section 10.2 because that sections only permits termination for the entire Base Agreement, which would include the agreement with Alliance Laundry. (Pl. Reply for Mot. Summ. J. at 7.)

In response, Genpact argues that it was entitled to terminate the Product Schedule under Section 10.2 of the Base Agreement due to SunEdison's bankruptcy. (Def. Resp. to Pl. Mot. Summ. J. at 11.) Genpact asserts that Section 10.2 "allows for termination if'a voluntary or involuntary petition or other filing (however defined or described) is made regarding a party to this Base Agreement *or any of its assets* under the bankruptcy or insolvency laws under any jurisdiction.'" (*Id.* (emphasis added).) Genpact argues that at the time of SunEdison's bankruptcy filing, "Genpact had contracts and accounts receivable with SunEdison, totaling more than $4 million." (*Id.*) Genpact asserts that its contracts and accounts with SunEdison are considered assets under New York **[*26]** law, and were subject to SunEdison's Chapter 11 bankruptcy filing. (*Id.*) Therefore, Genpact argues that its assets in regard to SunEdison's bankruptcy filing entitled Genpact to terminate the Product Schedule based on the language in the Base Agreement for Sun Edison under Section 10.2 (*Id. at 11* - 12.) To be clear,

CASE 0:16-cv-01054-DTS   Doc. 1300-2   Filed 10/09/23   Page 12 of 15

Page 11 of 14
2018 Minn. Dist. LEXIS 478, *26

however, Genpact does not seek to terminate the Base Agreement entirely, because it wants to have the benefit of the Base Agreement and its Product Schedule with Alliance Laundry.

In the case at bar, the Court finds that Genpact was not entitled to terminate the Product Schedule due to SunEdison's bankruptcy. The record shows that Section 10.2 of the Base Agreement only permits a party to terminate the entire Base Agreement. (Exhibit 1, Base Agreement § 10.2.) Terminating the entire Base Agreement would include terminating the product schedule Genpact has with Alliance Laundry. Genpact never made a request to terminate the entire Base Agreement and admittedly still utilizes International's software for Alliance Laundry. (Loyal Aff. Ex. 6, International Transcript Dep. 25:15-25:22.) Furthermore, terminating the Product Schedule under Section 10.2 of the Base Agreement would **[*27]** conflict with the minimum five-year term for maintenance and support payments in the Product Schedule and render the language meaningless. As stated in the previous section, the language in the Product Schedule prevails over the language in the Base Agreement, and therefore the minimum five-year term for Genpact to provide maintenance and support payments was not altered by SunEdison's bankruptcy. Accordingly, the Court finds that there is no genuine issue of material fact and summary judgement should be granted in favor of International.

**2. Genpact materially breached the terms of the Product Schedule contract when it ceased to pay its support and maintenance payment obligations**.

**Rule**

Under New York law, "[t]he elements of a cause of action to recover damages for breach of contract are (1) the existence of a contract, (2) the plaintiffs performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages [to the plaintiff]." *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC, 83 A.D.3d 804, 921 N.Y.S.2d 260, 264 (N.Y. App. Div. 2011)*; See also *Arthur Cab Leasing Corp. v. Sice Mois Hacking Corp., 137 A.D.3d 828, 27 N.Y.S.3d 592 (N.Y. App. Div. 2016)*.

"Typically, a contract is not breached until the time set for performance has expired. . . [h]owever ,. . . where one party repudiates its contractual obligations prior to the time designated for performance, the nonrepudiating **[*28]** party may immediately claim damages for total breach and be absolved from its obligations of future performance." *Palmetto Partners, L.P. 921 N.Y.S.2d at 264*.

**Analysis**

International argues that Genpact's refusal to pay for support and maintenance under the Product Schedule constitutes a material breach of the Product Schedule contract. (Pl. Mot. Summ. J. at 20.) International asserts that the parties formed a valid and enforceable contract. (*Id. at 21*.) International states that it satisfied its duties to perform under the contract by making its software support and maintenance available for Genpact's use. (*Id.*) Additionally, International asserts that Genpact materially breached its duties when it ceased payments for maintenance and support for the minimum five-year term. (*Id. at 22*.) International asserts that the Product Schedule unambiguously established that Genpact would pay for maintenance and support for a minimum of five years. (*See* Ex. 1, Base Agreement § 4.2.1.) International further argues that Genpact's failure to pay for

maintenance and support has caused International substantial injuries, including loss of past payments, loss of future payments under the five-year term, attorneys' fees, costs, and other damages. **[\*29]** (*Id.*) International asserts that under the contract, it reasonably expected to receive payment for the full term of the Product Schedule. (*Id. at 23*.) International also asserts that it did not have a duty to mitigate it damages because it is a "lost volume seller." (*Id. at 24*.)

Genpact argues that it did not breach its contract with International by failing to pay for continued annual maintenance and support. (Def. Resp. to Pl. Mot. Summ. J. at 17.) Genpact asserts that it had no obligation to pay the 2016 and 2017 invoices sent by International because both invoices covered terms after Genpact properly terminated the Base Agreement. (*Id.*) Genpact argues that it properly terminated the Base Agreement on July 16, 2016 and provided 120 days' notice, which would have terminated its support obligations on November 13, 2016. (*Id. at 18*.) Additionally, Genpact argues that International suffered no actual damages or failed to mitigate its damages by refusing to take on a replacement customers. (*Id.*) Genpact also asserts that International is not a "lost volume seller," because "it is not providing product or licens, but support services with a limited team and limited resources...." (*Id.* **[\*30]** at 19.)

The Court finds the New York Supreme Court Appellate Division case of *Arthur Cab Leasing Corp. v. Sice Mois Hacking Corp.*, instructive. *Arthur Cab Leasing Corp. v. Sice Mois Hacking Corp., 137 A.D.3d 828, 27 N.Y.S.3d 592 (N.Y. App. Div. 2016)*.

In *Arthur Cab Leasing*, The defendant Sice Mois Hacking Corp. ("Sice Mois") owned two New York City taxi medallions.[2] *Id. at 594*.

Pursuant to the terms and conditions of the taxi medallion lease agreement ("the agreement"), Sice Mois leased the medallions to the plaintiff Arthur Cab Leasing Corp. ("Arthur Cab") in exchange for Arthur Cab's payment of $2,600 per medallion. *Id.* The agreement was made on May 1, 2010 and the duration of the agreement was for a period of 4 years and 10 months. *Id.* "The agreement provided that: '[i]f at any time during the term hereof [Sice Mois] shall no longer lease the Medallion(s) to [Arthur] ... for any other reason other than breach of contract by [Arthur], then [Sice Mois] shall make [Arthur] whole for potential income that could have been earned by [Arthur] for the remainder of the term of the Agreement." *Id.* Both parties agreed that in the case of a breach or early termination by Sice Mois, Arthur would receive $10,000.00 per medallion per year if the termination took place during the first two years. *Id.* Additionally, **[\*31]** the agreement provided that the $10,000.00 signing bonus paid by Arthur to Sice Mois would be refunded if Sice Mois failed to satisfy its obligations under the agreement. *Id.*

On May 11, 2011, Sice Mois informed Arthur that it wanted the medallions returned immediately and that Arthur was no longer the managing agent of the medallions. *Id.* Arthur returned the medallions and subsequently filed suit against Sice Mois alleging breach of contract and seeking damages. *Id.* Upon the parties' cross-motions for summary judgement, the Supreme Court entered judgement in favor of Arthur and against Sice Mois in the amount of $123,114.05. *Id.* Sice Mois appealed. *Id.*

On appeal, the New York Supreme Court Appellate Division stated that "[c]ontracts are to be construed as the parties intended." *Id.* "When the contract is in writing, the best evidence of what the parties intended is what

---

[2] A taxi medallion is a transferable permit which allows a taxi driver to operate.

they said in that writing." *Id.*

The appellate court found that the parties' contract clearly stated that its duration would last for 4 years and 10 months. *Id.* The appellate court also found that Arthur performed its obligations under the contract and that Sice Mois breached the contract by prematurely terminating it. **[*32]** *Id.* Additionally, the appellate court determined that Sice Mois failed to raise a triable issue of fact because there was no evidence presented in the record that would make the contract terminable at will. *Id. at 595*. Accordingly, the appellate court upheld the New York Supreme Court's decision and dismissed Sice Mois's appeal. *Id. at 593*.

In the case at bar, the Court must find each element of a breach of contract claim under New York law. First, the Court finds that the Product Schedule and Base Agreement are direct evidence of validly formed contracts, which neither party disputes. (*See* Pl. Ex. 1, and 2.)

Second, the Court finds that International performed its duties under the Product Schedule by providing software maintenance and support to Genpact's customers. (Pl. Ex. 6 - 21 Somers Dep. 64:23-65:7; 74:11-76.5.) More specifically, International provided telephone support, extended hours' support, responded to technical questions, provided maintenance to the self-service site, updated the software, provided user ID support, assisted in product documentation, and provided assistance with upgrade planning (Pl. Ex. 12 - Interrogatories No. 14.) International stood ready to provide further maintenance **[*33]** and support but it was refused by Genpact.

Third, the Court finds that Genpact failed to satisfy its obligations under the Product Schedule. The Product Schedule explicitly provided that Genpact was required to pay for maintenance and support payments for at least five years, however, Genpact terminated the Product Schedule and ceased making payments before the five-year term's expiration. (*See* Pl. Ex. 2.) Therefore, the Court concludes that Genpact breached its obligations under the Product Schedule.

Fourth, the Court must find that Genpact's breach resulted in damages to International. The record shows that International reasonably relied on Genpact's maintenance and support payments for the full five-year term and claims that it would not have agreed to the Product Schedule without the inclusion of this provision. (Pl. Ex. 9, Interrogatories, No. 6.) Due to Genpact's breach, International will lose $544,859.86 in maintenance and support payments. Accordingly, the Court finds that Genpact's breach resulted in damages to International, and therefore, International is entitled to collect the remaining three years of maintenance and support payments in the amount of $544,859.86.

The Court **[*34]** also concludes that International's business structure allowed it to license and support as many customers as would have been interested in its products, and therefore International did not have a duty to mitigate its damages because it is a "lost volume seller." Accordingly, the Court finds that there is no genuine issue of material fact and summary judgment shall be granted in favor of International.

## VI. Conclusion

The Court finds that Genpact did not have a right terminate the Product Schedule because the terms in that contract expressly stated that Genpact was required to provide at least five years of maintenance and support payments. The Court also finds that SunEdison's bankruptcy did not entitle Genpact to terminate the Product Schedule because its five-year

minimum term prevailed over any termination language in the Base Agreement. The Court also finds that Genpact materially breached the terms of the Product Schedule which lead to damages for International. The Court further finds that International was not required to mitigate its damages and is entitled to collect the remaining $544,859.86 that would have been due under the Product Schedule.

Accordingly, the Court grants International's **[*35]** motion for summary judgment in its entirety and denies Genpact's cross-motion for summary judgment.

AD

**End of Document**