## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

FAIR ISAAC CORPORATION,

        Plaintiff,

   v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation, and ACE
AMERICAN INSURANCE COMPANY,
a Pennsylvania corporation,

        Defendants.

No. 16-cv-1054 (DTS)

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO FICO'S MOTION TO AMEND OR MODIFY THE JUDGMENT UNDER FED. R. CIV. P. 59(E)**

Defendants Federal Insurance Company and ACE American Insurance Company submit this memorandum of law in opposition to FICO's motion to amend or modify the judgment (ECF No. 1298).

## INTRODUCTION

This Court held in its order granting Federal's motion for a new trial that the highest possible damages award FICO could be entitled to consistent with the trial record is $6 million, and set a remittitur at that amount. FICO now asks for nearly ███████████, requesting that the remittitur be raised to ███████. This request is unsupported by the record and defies precedent concerning the proper calculation of an actual-damages award.[1]

---

[1] As explained below, Chubb concedes that the remittitur may be adjusted slightly, to ███████, but that is the absolute upper limit of any reasonable actual-damages award in this case that can be supported by the evidentiary record.

Consistent with FICO's previous defense of the jury's $40 million verdict, FICO's arguments in its present motion are based on its subjective hopes about the price it would have liked to extract from Federal for a Blaze license in 2016, rather than on what a willing buyer would be willing to pay for such a license. FICO's arguments are also improper under Rule 59(e). In a Rule 59(e) motion for reconsideration, parties may only present issues that were previously raised and that the Court overlooked. Here, not only did FICO not previously raise its arguments, but the Court actually anticipated and rejected them. And FICO's arguments are in all events wrong both legally and factually.

FICO's first argument for substantially increasing the remittitur is that the Court erred by including in its actual-damages calculation only the fair market value of a deployment license (*i.e.*, a license to *use* Blaze), but excluded the value of a development license (*i.e.*, a license to *install* Blaze). FICO argues that this supposed error should raise the remittitur by ███████. But even though FICO did not raise this argument in opposition to Federal's motion for a new damages trial, the Court recognized the two kinds of Blaze licenses offered by FICO and distinguished between the two in making its calculations. *See* ECF No. 1284 at 16 ("FICO also prices licenses by development seats…"). So it did not overlook anything. And FICO's argument is legally wrong in any event, because the actual-damages analysis concerns the fair market value of a license *for the infringing use*, and a development license would not have been necessary for Chubb's infringing use. That is because a development license is not necessary to *use* Blaze; it is only necessary when Blaze is being *added* to a new application. And it is undisputed that after FICO terminated Chubb's license in 2016, Chubb did not add Blaze to any new

applications; Chubb instead decided to switch to different rules-management software to develop new applications. As the Court correctly concluded, there is no basis for including the value of a development license in the actual-damages calculation.

FICO also argues that the remittitur should be increased by an additional ▆▆▆▆ because the Court's order did not include maintenance and service fees in its actual-damages calculation. There are several problems with this argument. The first is that while FICO never raised this argument before this motion, the Court expressly anticipated and rejected it, so it is not properly adjudicated on a Rule 59(e) motion. The argument is also wrong both legally and factually. For one thing, FICO's argument—that actual damages are not limited to the fair market value of a license for the infringing use, but also include other fees the copyright owner says it would charge—is contradicted by the case law as well as by the jury instructions in this case, to which FICO did not object. FICO's argument would also result in an unwarranted windfall because it is undisputed that after 2016, FICO did not actually provide any maintenance and support services to Chubb. Such a windfall is contrary to basic principles under which actual damages in copyright cases are determined.

Finally, all of FICO's arguments suffer from the same flaw as its earlier defense of the original jury verdict: The evidentiary record simply does not support the fanciful proposition that a *willing* buyer would pay ▆▆▆▆ ▆▆▆▆ for a Blaze license. FICO's suggestion that it lost out on more than ▆▆▆▆ through Chubb's infringing use finds no support in any objective evidence. It simply reflects what FICO wishes it could

3

extract from Federal under pain of litigation.  FICO's contention that it is entitled to

███████ in actual damages is wrong many times over and should be rejected.

## ARGUMENT

"Rule 59(e) motions serve a limited function of correcting 'manifest errors of law or fact or to present newly discovered evidence.'" *Innovative Home Health Care, Inc. v. P.T.-O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998). "Such motions cannot be used to introduce new evidence, tender new legal theories, or raise arguments which could have been offered or raised prior to entry of judgment." *Id.*  As FICO acknowledges, Rule 59(e) may only be used where "the court overlooked a factual or legal argument presented by a party." *Driesen v. Smith*, No. C13-4037-MWB, 2014 WL 12613398, at *2 (N.D. Iowa Mar. 11, 2014) (emphasis omitted); *see also* Mot. at 4.

With one minor exception, FICO's motion must be denied under that standard. Chubb does not dispute that the jury would have been entitled to find that Chubb's 2016 revenue was $35 billion rather than $32 billion. *See* Mot. at 10.[2]  But by FICO's own admission, the effect of that argument on the remittitur amount is *de minimis*—$█████ rather than $6 million.  Meanwhile, FICO's remaining arguments—that the Court erred in failing to consider the value of development licenses that FICO offered in some cases, and that in 2016, FICO purportedly charged an additional mandatory maintenance fee beyond

---

[2] There is evidence in the record that Chubb's annual revenue in 2016 was $32 billion. *See, e.g.*, P-0036 at 55.  But because there was also evidence of a $35 billion revenue figure, and the Court also acknowledged as much, *see, e.g.*, ECF No. 1284 at 36, there would have been a basis for a reasonable juror to calculate the market value off of the latter revenue figure, and thus arrive at a market value of a license for Blaze of █████.

the value of the license itself—were never raised in FICO's opposition to Federal's motion for a new trial, and were in any event anticipated and rejected by the Court in its new trial order. *See* ECF No. 1284 at 16, 19, 64 n.60. Relief under Rule 59(e) is thus improper under the applicable legal standard. FICO's motion—which is in essence a request for reconsideration—is additionally improper because prior to bringing its motion FICO never requested the Court's permission for reconsideration of its decision, as the Local Rules require. *See* D. Minn. LR 7.1(j) ("Except with the court's prior permission, a party must not file a motion to reconsider. A party must show compelling circumstances to obtain such permission…"). And FICO's arguments are wrong in any event. FICO's request to raise the remittitur amount to more than ███████ should be roundly rejected.

### A. The Court Correctly Concluded That The Value Of A Development License Is Not Part Of FICO's Actual Damages.

FICO contends that the Court's remittitur was nearly ███████ too low because it should have included not only the value of a deployment license but of a development license as well. Mot. at 10. That argument fails for several reasons. *First*, it is not the proper subject of a motion for reconsideration. FICO did not argue in its opposition to Defendants' motion for a new damages trial that the value of a development license should have been included in the actual-damages calculation. *See* ECF No. 1258; *see also Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 374 (6th Cir. 1998) ("A motion under Rule 59(e) is not an opportunity to re-argue a case."); *F.D.I.C. v. World Univ. Inc.*, 978 F.2d 10, 16 (1st Cir. 1992) ("Rule 59(e) motions are aimed at *re*consideration, not initial consideration." (emphasis in original)). The Court, moreover, did not overlook

the existence of development licenses—it explicitly acknowledged that "FICO also prices licenses by development seats."  ECF No. 1284 at 16.  Had the Court determined that, based on the record, the price of a development license should have been included in its calculation of the fair market value of a Blaze license, it would have included it.  The Court thus did not overlook any legal or factual argument that FICO had previously raised, which is sufficient to reject FICO's argument.

*Second*, FICO's argument is wrong on the merits.  As this Court's jury charge (to which FICO did not object) explained, the actual-damages calculation requires determining the fair market value "for a license covering the allegedly infringing use that was made." Trial Tr. 2615:17–18; *see also Gaylord v. U.S.*, 777 F.3d 1363, 1367 (Fed. Cir. 2015) (court "may hypothesize a negotiation between the parties before the infringement occurred and determine the reasonable license fee on which a willing buyer and a willing seller would have agreed *for the use taken by the infringer*." (emphasis added) (internal citations omitted)); *On Davis v. The Gap, Inc.*, 246 F.3d 152, 172 (2d Cir. 2001) (actual-damages analysis requires determining "the fair market value of a license covering the defendant's infringing use" of the copyrighted work).  And a development license was unnecessary for (*i.e.*, did not cover) Chubb's infringing use.

As Bill Waid, FICO's Chief Product and Technology Officer explained at trial, a development license serves a very specific purpose: it is "limited to the purposes of writing rules, connecting your Blaze Advisor application to your systems and data and actually generating the deployment that gets eventually put into the servers of the client."  Trial Tr. 1641:7–11 (Waid).  In other words, a development license is necessary only when a client

first adopts Blaze, or when it incorporates Blaze into a new application.  But once Blaze is incorporated into the relevant application, the client requires only a *deployment* license to actually use Blaze: "when you have authored your rules and tested them that they are what you want them to be, you have to take those[] [r]ules and push them out into a server or some processing unit somewhere" and the deployment license is what allows the application "to eventually go to production and execute or operate, run those rules."  Trial Tr. 1642:9–17 (Waid).

The problem for FICO is that it is undisputed that after 2016—*i.e.*, during the period of the infringing use—Chubb did not incorporate Blaze into any new applications.  Trial Tr. 692:14–19 (testifying that, after the ACE acquisition, Blaze "was limited to the existing software.  We never expanded to any new applications of software.") (Pandey).  It is true that "[f]rom 2006-2016, Federal used its development seat licenses to integrate Blaze Advisor into its technology systems."  Mot. at 12.  But even before 2016, Chubb's use of Blaze was limited.  Despite having a license to use Blaze across the entire enterprise for more than a decade, Chubb integrated Blaze into only 13 out of more than 1,500 applications.   Trial  Tr.  687:20–690:5;  702:14–18  (Pandey).   Most important,  it is undisputed that Chubb did not add Blaze to any more applications after the ACE merger in 2016.  Instead, all the evidence at trial indicated that in 2016, Chubb decided to phase Blaze out of its applications and replace it with different software.  Claudio Ghislanzoni testified that, "[i]nitially after the ACE acquisition," IBM ODM was "formally identified as the preferred vendor," meaning that "if there was a need to develop an application using a rules

7

engine, IBM ODM would have been the technology of choice." Trial Tr. 1149:2–9 (Ghislanzoni).

And Chubb stuck to this. Immediately following the acquisition, Chubb was developing a new application called Evolution Australia, and Mr. Ghislanzoni was very clear in his testimony that the company had decided *not* to use Blaze in any new development and "agreed that ODM was the technology to be adopted, and that happened." Trial Tr. 1097:16–1098:4 (Ghislanzoni). Chubb later decided to use Red Hat Decision Manager rather than IBM ODM, Trial Tr. 1157:4–1158:2 (Ghislanzoni), but in all events, it is undisputed that Chubb did not use Blaze in any new applications after FICO terminated Chubb's license, and that Chubb ultimately fully removed Blaze from Chubb's systems. *See* Trial Tr. 706:10–17 (Pandey) (confirming that Blaze has been removed from all of the applications at Chubb).

FICO may certainly have *wanted* to charge Chubb for a development license in 2016. But the question "is not what the owner would have charged, but rather what is the fair market value," *Oracle Corp. v. SAP AG*, 765 F.3d 1081, 1088 (9th Cir. 2014) (quoting *Jarvis v. K2 Inc.*, 486 F.3d 526, 534 (7th Cir. 2003)), and in particular, the fair market value of a license *for the infringing use*, as the Court instructed the jury without objection. *See infra* p.11. And here, it is undisputed that the infringing use did not involve adding Blaze to new applications, and thus did not require a development license. The Court was correct in not including any license fees for development licenses in its remittitur analysis.

**B.      The Court Correctly Concluded That Maintenance And Support Fees
Are Not Part Of Actual Damages.**

FICO also argues that the remittitur amount should include a 22% annual

maintenance fee, totaling more than ██████. Incredibly, this figure would be ██

██████ *of the Court's remittitur calculation for the market value of the license itself.*  Mot.

at 15, 20.  FICO's argument should be denied for several independent legal and factual

reasons.

*First*, FICO's claim again improperly asks the Court to revisit previously unraised

issues on a motion for reconsideration.  FICO did not argue in opposition to Chubb's

motion for a new damages trial that a separate maintenance fee should have been included

as part of the fair market value calculation.  *See* ECF No. 1258; *see also supra* p.5.  And,

in any event, the Court actually anticipated FICO's argument here and rejected it, holding

that because the actual-damages inquiry "asks for the [fair market value] of the *license*,

support and maintenance fees are not a factor." ECF No. 1284 at 64 n.60 (emphasis added).

FICO spills a great deal of ink recounting how actual damages are calculated.  *See* Mot. at

5–9.  But none of this is new, nor was it overlooked by the Court in its remittitur analysis.

That suffices to reject FICO's argument.

*Second*, FICO's argument is legally incorrect and contrary to the jury charge that

the Court crafted and to which FICO did not object.  FICO argues in its motion that the

Court improperly limited actual damages to the fair market value of a development license

by not including a separate fee for maintenance and support that was not included in the

license fee itself.  But the Court's approach is the law.  Time and again, courts have held

that the proper measure for actual damages is the license fee. *See, e.g.*, *Bell v. Taylor*, 827 F.3d 699, 709 (7th Cir. 2016) (to determine actual damages, "[i]t is not improper for a jury to consider . . . a hypothetical *lost license fee*") (emphasis added); *Gaylord*, 777 F.3d at 1367 (to calculate fair market value, a court "may hypothesize a negotiation between the parties before the infringement occurred and determine the reasonable *license fee* on which a willing buyer and a willing seller would have agreed for the use taken by the infringer") (emphasis added); *On Davis*, 246 F.3d at 167 (same); *Jarvis*, 486 F.3d at 535 (court must identify the price a "reasonable business person . . . would pay *to license*" the work) (emphasis added).[3]

This makes sense, because the purpose of the Copyright Act is to "permit[] a copyright owner to recover actual damages, in appropriate circumstances, for the fair market value of a license covering the defendant's *infringing use*." *Semerdjian v. McDougal Littell*, 641 F. Supp. 2d 233, 239 (S.D.N.Y. 2009) (quoting *On Davis*, 246 F.3d at 172) (emphasis added).  It is not to allow a copyright owner to recover all possible additional support charges that it could have, but did not, provide.  *See also Do It Best Corp. v. Passport Software, Inc.*, 2005 WL 743083, at *15 (N.D. Ill. Mar. 31, 2005)

---

[3] None of the cases that FICO cites compel a different conclusion. *Thoroughbred Software International, Inc. v. Dice Corp.* also held that "[t]he lost *license fee* that the district court used to measure actual damages for the used software copies is also the proper measure of actual damages for the unused copies." 488 F.3d 352, 360 (6th Cir. 2007) (emphasis added). *Laspata DeCaro Studio Corp. v. Rimowa GmbH* involved infringement of photographs and the court there again tried to find a way to determine the equivalent of "a reasonable *license fee*." 2018 WL3059650, at *6 (S.D.N.Y June 20, 2018). Federal is unaware of a single case holding that a lost license fee must include support and maintenance fees, and FICO has not identified one in its briefing either.

(rejecting argument that maintenance and support fees should be included in the actual damages where "the maintenance fees were not a product of allegedly infringing activities").

That is also what the Court instructed the jury: "The fair market value is *the license fee* that a willing buyer and a willing seller would have negotiated for the allegedly improper or infringing use that was made.  The license fee is the amount that the licensor and the licensee would have agreed to in a hypothetical negotiation for a license covering the allegedly infringing use that was made."  Trial Tr. 2615:11–14 (emphasis added).  FICO now argues that "[t]he legal standard allowing recovery of actual damages is not restricted to an amount labeled as a 'license fee' in an agreement."  Mot. at 2.  But apart from being legally wrong under the precedent just discussed, that argument is long forfeited.  FICO did not object to the jury charge or ever argue that maintenance and support fees should be included in the instruction.  It is, of course, well established that "[f]ailure to object to a jury instruction . . . prior to the jury retiring results in a waiver of that objection."  *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 57 (2d Cir. 2002).  And FICO's argument is even more improper here because a Rule 59(e) motion may not be used "where a party failed to present a relevant factual or legal argument to the court in the first instance."  *Driesen*,  2014 WL 12613398, at *2.

*Third*, even if FICO's argument were not legally precluded, the argument finds no support in the record because (as FICO itself admits, Mot. at 18 n.9) it is undisputed that FICO did not provide any maintenance and support to Chubb after FICO terminated the license.  Therefore, including fees for maintenance and service would not correspond to

the market value of a license covering Chubb's "infringing use" because Chubb did not use any maintenance or support services. And granting FICO damages based on the value of services it did not provide would only serve to punish Chubb and represent a windfall to FICO, which is exactly what the actual-damages framework forbids. "Making [a] plaintiff whole"—the purpose of an actual damages award—"is plainly different from punishing the infringer by charging the highest possible rate for the infringement." *Jarvis*, 486 F.3d at 535. And an actual damages award should not "over-compensate an injured party" or "create[e] a windfall judgment." *Alexander Binzel Corp. v. Nu-Tecsys Corp.*, 2000 WL 310304, at \*14 (N.D. Ill. Mar. 24, 2000) (quoting *BASF Corp. v. Old World Trading Co.*, 41 F.3d 1081, 1096 (7th Cir. 1994)).

There is no question that including maintenance and support fees in the remittitur would over-compensate FICO with a windfall judgment. When Federal paid maintenance and service fees *before* 2016, it was to compensate FICO for services it provided. For example, Christopher Ivey, FICO's Vice President of Product Support, described how, in 2009, FICO spent "up to 6,000 hours" in order to "actually implement the designs, configure Blaze Advisor for this rules project and write the rules into the system, configure it and then deploy it." Trial Tr. 568:17–569:13 (Ivey). He also explained that the type of maintenance and support that FICO provided "varied across all of the statements of work, but again, it ranged from high level consulting to rules harvesting to definition to development to design – design, development, to mentoring them, training, and so on, review and helping them to set up a Center of Excellence and so on." *Id.* 615:12–18 (Ivey). After 2016, FICO did not do any of this type of work and, therefore, is not owed any actual

12

damages for it.

*Finally*, FICO's contention that it is entitled to receive an additional ███████ in actual damages suffers from the same problem as the original jury verdict: It reflects what FICO would subjectively like to extract from the litigation, not what it would have received in a hypothetical negotiation with a willing buyer. It was FICO's burden to prove the fair market value of the hypothetical license without undue speculation, *Oracle Corp.*, 765 F.3d at 1093; *see also* ECF No. 1284 at 55, but FICO offered no objective evidence that it had ever received anything approaching ███████ (the amount FICO now says it was entitled to) for an enterprise license covering 5 years of use. To the contrary, as the Court explained, "Waid could not say whether FICO had ever sold a Blaze license for $20 million or even $10 million, but there is no evidence of licenses sold for those amounts in the trial record." ECF No. 1284 at 25–26, 50. Waid—who had access to all of FICO's historical pricing through trial, *see* Trial Tr. at 1822:5–12 (Waid)—would have certainly provided evidence that FICO had ever received that much for a comparable license if it were true. He did not because he could not. FICO has never charged so much for a Blaze license, and no willing buyer would ever pay such a price when they could purchase a comparable product for at least an order of magnitude less. Trial Tr. 1158:25–1159:5 (Ghislanzoni) (testifying that Chubb paid around $1.5 million for Red Hat Decision Manager); *see also* ECF No. 1284 at 50, 58-59 (analyzing competitive alternatives to Blaze "including Drools, which was free, and Red Hat which distributed Drools with technical support").

"Absent such evidence," FICO's request to add maintenance and support fees to increase the remittitur amount to ███████ "merely represent[s] what FICO wished to

charge."  ECF No. 1284 at 41; *see also Oracle Corp.*, 765 F.3d at 1092.  Such "subjective"

idiosyncrasies are not part of the hypothetical negotiation, ECF No. 731 at 32, especially

when they are transparently used to justify an "unrealistically exaggerated claim" for actual

damages, *On Davis*, 246 F.3d at 166.

## CONCLUSION

The Court should alter the remittitur amount to ▮▮▮▮▮▮▮ to reflect Chubb's

revenue for 2016, but otherwise deny FICO's motion to amend or modify the judgment.

Dated:  October 31, 2023

*/s/ Leah Godesky*
Terrence J. Fleming (#0128983)
tfleming@fredlaw.com
Leah C. Janus (#0337365)
ljanus@fredlaw.com
Christopher D. Pham (#0390165)
cpham@fredlaw.com
Ryan C. Young (#0397751)
ryoung@fredlaw.com
Panhia Vang (#399444)
pvang@fredlaw.com

**Fredrikson & Byron, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
(612) 492-7000 (tel.)
(612) 492-7077 (fax)

Leah Godesky (Admitted Pro Hac Vice)
lgodesky@omm.com
Anton Metlitsky (Admitted Pro Hac Vice)
ametlitsky@omm.com
Daryn Rush (Admitted Pro Hac Vice)
drush@omm.com
Roxana Guidero (Admitted Pro Hac Vice)
rguidero@omm.com

**O'Melveny & Myers LLP**
Times Square Tower

7 Times Square
New York, NY 10036
(212) 326-2000

***Attorneys for Federal Insurance Company
and ACE American Insurance Company***